IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CHAE BROS., LLC, et al.,       :

    Plaintiffs,            :

v.                      :         Civil Action No. GLR-17-1657

MAYOR & CITY COUNCIL    :
OF BALTIMORE, et al.,
                        :

    Defendants.

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendants Mayor & City Council of Baltimore (the "Mayor & City Council"), the City of Baltimore, and former Baltimore City Mayor Stephanie Rawlings-Blake's ("Mayor Rawlings-Blake") (collectively, the "City" or "City Defendants") Motion to Dismiss (ECF No. 27).[1]  Also pending is the State of Maryland's Motion to Dismiss (ECF No. 33), and the Baltimore Police Department and former Baltimore Police Commissioner Anthony Batts' ("Commissioner Batts") (collectively, "BPD" or "BPD Defendants") Motion to Dismiss (ECF No. 34). This action arises out of the civil unrest that occurred after the arrest and subsequent death of Freddie Gray while in police custody in April 2015.  The Motions are ripe for disposition, and no hearing is necessary.  See Local Rule 105.6 (D.Md. 2016).  For the

---

[1] City Defendants initially filed a Motion to Dismiss or, in the Alternative, for Summary Judgement seeking a ruling for City Defendants as to the claims of Plaintiff Grace Lyo.  (Defs.' Mot. to Dismiss at 34, ECF No. 27).  City Defendants subsequently filed a Motion to Withdraw their Motion against Grace Lyo.  (ECF No. 39).  The Court granted City Defendants' Motion on July 25, 2017.  (ECF No. 42).

reasons outlined below, the Court will grant in part and deny in part the City Defendants'
Motion, grant the State's Motion, and grant the BPD Defendants' Motion.

## I.    BACKGROUND[2]

On April 12, 2015, BPD officers arrested Freddie Gray.  (Compl. ¶ 36, ECF No.
2).  Gray sustained various injuries and subsequently fell into a coma.  (Id.).  Protests in
response to BPD officers' treatment of Gray began around April 18 at the BPD's Western
District police station.  (Id. ¶ 37).  After Gray died from his injuries on April 19, protests
"began growing in frequency and size."  (Id. ¶ 38).  The BPD "regularly communicated"
with the City about the ongoing protests, warning them on April 22 that certain
individuals may use "very aggressive/potentially violent tactics."  (Id. ¶ 40).
Commissioner Batts also warned the public on April 22 "about the dangers of escalating
protests."  (Id. ¶ 41).

At BPD's request, thirty-two Maryland State Troopers with expertise in crowd
control arrived in Baltimore on April 23.  (Id. ¶ 43).  The same day, "[v]arious businesses
and city agencies warned their employees and the public about expected protests," many
even encouraging people to leave early.  (Id. ¶ 44).  News outlets reported that several
hundred protesters gathered in front of the BPD's Western District station and tossed
bottles at officers, and hundreds more protestors marched in the streets of downtown
Baltimore.  (Id. ¶ 42, 45).  The protests impeded rush-hour traffic, and at least two
protestors were arrested for disorderly conduct and destruction of property.  (Id. ¶ 45).

---

[2] Unless otherwise noted, the Court takes the following facts from the Plaintiffs'
Complaint and accepts them as true.  See Erickson v. Pardus, 551 U.S. 89, 94 (2007)
(citations omitted).

On April 24, news outlets began reporting about a protest planned for April 25. (Id. ¶ 50). BPD sent an email to the City about the ongoing demonstrations, explaining that it had received information that certain individuals "are encouraging others to use aggressive tactics and even violence against our officers or others" and that it expected protests to "grow in size." (Id. ¶ 48). Commissioner Batts also contacted various community leaders, warning, "we must avoid any attempts to create a riot." (Id. ¶ 49). BPD cancelled all leave for April 25 to ensure adequate coverage for the impending protests. (Id. ¶ 46). In spite of these precautions, the April 25 protest ultimately "turned violent, as demonstrators reportedly looted a [convenience store], damaged other storefronts, fought with and threw bricks and bottles at police officers . . . and damaged police vehicles." (Id. ¶ 55).

The next day, local business leaders received an email from the City and participated in a conference call with Mayor Rawlings-Blake. (Id. ¶ 59). The business leaders learned that the City was taking steps to ensure "the least amount of disruption to downtown businesses." (Id.). As a result of these communications with the City, at least one business leader decided that he would "be open for business as normal [on April 27]." (Id.). The next day, April 27, the City sent an email to a local business organization expressing concerns that "it will look like a ghost town" if businesses "tak[e] in or lock outdoor furniture[,] despite concerns that the furniture could be used to destroy business storefronts." (Id. ¶ 65).

Also on April 26, the City and BPD began receiving reports about a "purge"—a term from a movie with the same title in which citizens "were given a twelve-hour period

of lawlessness to rob, kill, and commit other crimes with impunity"—scheduled to take place at Mondawmin Mall on April 27. (Id. ¶ 61). On April 27, "violence erupted at the Mondawmin Mall." (Id. ¶ 66). Violence subsequently began in other Baltimore neighborhoods. (Id. ¶ 67). Buildings and vehicles were set on fire, stores were looted and damaged, and individuals were assaulted. (Id.). BPD officers were unable to respond to all incidents of violence that day because, according to Commissioner Batts, "[w]e had opposite ends of the city pulling us at the same time." (Id. ¶¶ 67, 68). Moreover, even where BPD officers were present, they "simply watched and/or turned away, and let the destruction of property continue." (Id. ¶ 69). It was only after this civil unrest on April 27 that Mayor Rawlings-Blake ultimately issued an executive order requesting resources from the State and imposing a curfew. (Id. ¶ 74).

According to a report issued by the Baltimore City Fraternal Order of Police, officers were specifically told "to allow the protestors room to destroy and allow the destruction of property" and that BPD "would not respond until [the protestors] burned, looted, and destroyed the city." (Id. ¶ 56). News outlets reported that the City and BPD had issued a "stand-down order" to BPD officers, preventing them from intervening as the destruction of property continued. (Id. ¶ 72). Mayor Rawlings-Blake and Commissioner Batts also publicly spoke about the response to the civil unrest. (Id. ¶ 58). Mayor Rawlings-Blake stated that "we [ ] gave those who wished to destroy space to do that as well." (Id.). Commissioner Batts explained that BPD "couldn't be seen as the aggressors or instigators." (Id.). These public statements "were consistent with the 'stand-down' orders" given on April 25 and April 27. (Id.).

On June 19, 2017, Plaintiffs filed the instant 264-count Complaint (ECF No. 2), which individually alleges each Plaintiff's claims against each Defendant. Sixty-two of the sixty-five named Plaintiffs[3] allege 250 counts: (1) violations of the Maryland Riot Act (the "Riot Act"), Md. Code Ann., Pub. Safety ["PS"] § 14-1001 et seq. (West 2018), against the Mayor & City Council and City of Baltimore (Counts 1–50); (2) violations of the Due Process Clause of the Fourteenth Amendment to the United States Constitution for deprivation of property without due process against all Defendants (Counts 51–100); (3) violations of Article 24 of the Maryland Declaration of Rights for deprivation of property without due process against all Defendants (Counts 101–150); (4) violations of the Fifth Amendment to the United States Constitution for takings without just compensation against all Defendants (Counts 151–200); and (5) violations of Article III, § 40 of the Maryland Constitution for takings without just compensation against all Defendants (Counts 201–250). (Compl. at 53 ¶¶ 1–1750). Plaintiffs seek compensatory and punitive damages. (Id. at 680).

---

[3] The Plaintiffs include Chae Brothers, LLC, John Han Chae, Han Bok Chae, 3DED Mobile, Inc., Seong Ok Baik, Jun Bin Baik, Kyong Joo Baik, Kyong Yol Baik, Beauty Fair, Inc., Cathedral Rock, Inc., Chong Il Choe, Choon & Hae, Inc., Jung Chung, Sung Chung, Dasarang Wholesale, Inc., DSK Enterprise, Inc., Geun, Inc., Grace Lyo, Grace C. Lyo, Gruners LLC, Hoon Suk Cho Inc., Hoon's Beer & Wine, Inc., Gina Hwang, Se Hoon Jang, Mi Ja Jang, Jennifer Youn, Jin Suk Kim, Kil Ja Kim, Jin Suk Kim, Inc., JJYC, Inc., J & K Food, Inc., Jung Hyun Kim, Jung Ran Kim, K and Mike Corporation, KCJJ, Inc., KHY Company, Inc., Chong Ran Kim, Tony Kim, Hyo H. Kim, Koam Pillars II, Inc., Koam Pillars, Inc., Sung Hee Koo, Seung Yong Lee, Song Ja Lee, Luckychoi Inc., MGC Market, Inc., Mica II, Inc., Hyun Young Oh, Kyung Hae Oh, Stephen Park, Pat Liquors, Inc., Royal K&K, Inc., Shon's Market, Inc., Soon Jung Hong, Soonsue Kim, SRN Communications 101, Inc., Sung Park, The One Liquor, Inc., Wonderland Cheers, Inc., Sook Yeo, Young Koo Lee, and Min Ja Lee. Unless otherwise indicated, the Court refers to these sixty-two individuals and businesses collectively as "Plaintiffs."

A smaller subset of the Plaintiffs—John Han Chae, Han Bok Chae, Young Park, Jong Youn, Julie Youn, Jin Suk Kim, and Kil Ja Kim—allege: (1) violations of the Fourteenth Amendment for unjustified intrusions on personal security against all Defendants (Counts 251–257); and (2) violations of Article 24 of the Maryland Declaration of Rights for unjustified intrusions on personal security against all Defendants (Counts 258–264). (Compl. at 645 ¶¶ 1751–1862). Plaintiffs seek compensatory and punitive damages. (Id. at 680).

Plaintiffs bring all federal constitutional claims under 42 U.S.C. § 1983 (2018).

All Defendants now move to dismiss all Counts against them for failure to state a claim upon which relief can be granted. (ECF Nos. 27, 33, 34). Plaintiffs oppose the Motions.

## II. DISCUSSION

### A. <u>Standard of Review</u>

"The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." <u>King v. Rubenstein</u>, 825 F.3d 206, 214 (4th Cir. 2016) (quoting <u>Edwards v. City of Goldsboro</u>, 178 F.3d 231, 243–44 (4th Cir. 1999)). A complaint fails to state a claim if it does not contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), or does not "state a claim to relief that is plausible on its face," <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that

the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555). Though the plaintiff is not required to forecast evidence to prove the elements of the claim, the complaint must allege sufficient facts to establish each element. Goss v. Bank of Am., N.A., 917 F.Supp.2d 445, 449 (D.Md. 2013) (quoting Walters v. McMahen, 684 F.3d 435, 439 (4th Cir. 2012)), aff'd sub nom., Goss v. Bank of Am., NA, 546 F.App'x 165 (4th Cir. 2013).

In considering a Rule 12(b)(6) motion, a court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. Albright v. Oliver, 510 U.S. 266, 268 (1994); Lambeth v. Bd. of Comm'rs of Davidson Cty., 407 F.3d 266, 268 (4th Cir. 2005) (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). But, the court need not accept unsupported or conclusory factual allegations devoid of any reference to actual events, United Black Firefighters v. Hirst, 604 F.2d 844, 847 (4th Cir. 1979), or legal conclusions couched as factual allegations, Iqbal, 556 U.S. at 678.

**B.** **Analysis**

**1.** **Maryland Riot Act**

At bottom, the Court concludes that it will not dismiss Plaintiffs' Maryland Riot Act claims against the Mayor & City Council of Baltimore.[4]

---

[4] Plaintiffs also bring Riot Act claims against the "City of Baltimore." Under the City's Charter, however, the "City of Baltimore" is not the City's corporate identity.

To state a claim against a municipal corporation under the Riot Act, a plaintiff must first allege that his or her "structure or personal property [was] stolen, damaged, or destroyed" during an event of civil unrest. PS § 14-1001(b). Next, a plaintiff must assert that the authorities of the municipal corporation "had good reason to believe that the [event] was about to take place or, having taken place, had notice of the [event] in time to prevent the theft, damage, or destruction. Id. § 14-1002(a). Finally, the plaintiff must show the municipal corporation "had the ability, either by use of the . . . municipal corporation's police or with the aid of the residents of the . . . municipal corporation, to prevent the theft, damage, or destruction." Id.[5]

The Mayor & City Council submit that Plaintiffs fail to state each of these elements. The Court considers them in turn.

### i.        Damages

The Mayor & City Council argue that Plaintiffs fail to adequately plead damages under the Riot Act because Plaintiffs do not specifically state that their property was damaged by rioters. Plaintiffs contend that it is sufficient to plead that their property was

---

Rather, only the entity known as the "Mayor and City Council of Baltimore" may sue and be sued. Baltimore City Charter, art. I § 1. Accordingly, the Court will dismiss all claims against the City of Baltimore with prejudice.

[5] The Riot Act also provides that a municipality is not liable under the statute unless it failed to use "reasonable diligence and all the powers entrusted to [it] to prevent or suppress" the civil unrest. PS § 14-1002(b). The Mayor & City Council argue that this element is irrelevant to Plaintiffs' initial pleading burden because it serves as an affirmative defense to a claim under the Riot Act. The Court accepts this argument at face value, and therefore does not analyze whether Plaintiffs sufficiently state this element.

stolen, damaged, or destroyed during civil unrest without attributing the damage to rioters. The Court agrees with Plaintiffs.

Under the plain language of the Riot Act, Plaintiffs need not allege that individual rioters caused their property damage. Rather, the Act provides that Plaintiffs "may recover actual damages" in a civil action "if a structure or personal property is stolen, damaged, or destroyed <u>in a riot</u>." PS § 14-1001(b) (emphasis added). At this stage of the litigation, Plaintiffs have met this burden.

While Plaintiffs' injuries vary, each individual Plaintiff sets forth allegations that he, she, or, in the case of a business, it, suffered at least some minimal level of property damage during the civil unrest. (Compl. ¶¶ 78(a)–(uu)). Moreover, Plaintiffs allege these damages with sufficient particularity, citing the approximate time the alleged injury occurred, what contributed to or caused the injury, and which structure or property was affected. (<u>Id.</u>). For example, Plaintiffs Jung Chung and Sung Chung allege that on the evening of April 27, 2015 or the early morning of April 28, 2015, "rioters broke the steel pull-down security gate covering the front of [Plaintiffs'] business" and broke "the front display windows and front entryway of the business."[6] (<u>Id.</u> ¶ 78(h)). And Plaintiffs Seong Ok Baik, Jun Bin Baik, Kyong Joo Baik, and Kyong Yol Baik claim that "[o]n or about 7:00PM on April 27, 2015, rioters set fire to" a building they own "located at 2054 East Federal Street, Baltimore, Maryland 21213," and that "[t]he fire destroyed the entire building, including, but not limited to, all of the improvements, furnishings, fixtures, and

---

[6] Due to the number of Plaintiffs and the length of the Complaint, the Court provides only examples of the allegations and does not address each of Plaintiffs' allegations individually.

the retail business that had operated within the building." (Id. ¶ 78(c)). Such allegations contain sufficient factual matter to allege damages. Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570).

Plaintiffs, therefore, adequately plead the first element of their claims under the Riot Act.

### ii. Foreseeability

The Mayor & City Council assert that Plaintiffs fail to establish that civil unrest of this magnitude was foreseeable. Plaintiffs counter that they adequately allege a series of events that should have reasonably led the Mayor & City Council to believe that civil unrest in some form was about to take place. The Court finds Plaintiffs' argument persuasive at this stage of the litigation.

Plaintiffs allege that protests in response to Freddie Gray's arrest began as early April 18, 2015. (Compl. ¶ 37). They state that after Gray's death on April 19, protests "began growing" and "grew in frequency and size in various areas of Baltimore." (Id. ¶¶ 38, 40, 42). And while the protests grew, Commissioner Batts stated that he "underst[ood] the sense of urgency from the community" but that "he just want[ed] the process to play itself out fully." (Id. ¶ 39) (alteration in original). On April 24, news outlets began reporting about a protest planned for the following day, and Commissioner Batts sent correspondence to various community leaders stating, "While peaceful demonstration is to be encouraged, we must avoid any attempts to create a riot." (Id. ¶¶ 49, 50) (emphasis in original). Plaintiffs claim the Mayor & City Council "should have taken additional steps to prevent" the violence and destruction. (Id. ¶ 57). The

10

April 25 protests ultimately turned violent, however.  (Id. ¶ 57).  Likewise, although the Mayor & City Council "began receiving reports on April 26 about a 'purge' that was scheduled to occur the following day," Plaintiffs allege that the City "failed to take reasonable steps to address the risk" of the civil unrest that ultimately ensued on April 27. (Id. ¶¶ 61, 64).

Taken together, these allegations are more than sufficient to state a claim that the Mayor & City Council had reason to believe that civil unrest was about to take place.

### iii.    Use of Police or Aid of Residents

The Mayor & City Council argue that the City does not have legal control over the BPD and, as a result, Plaintiffs cannot plausibly allege that the City had the ability to prevent the alleged damages through use of the police force.  Plaintiffs contend that there is a sufficient connection between the City and BPD to establish liability under the Riot Act.  For the limited purpose of evaluating the City Defendants' Motions to Dismiss, the Court agrees with Plaintiffs.

The Mayor & City Council attempt to rely on "the mountain of law" from this Court and others to insist that the City does not have sufficient control over the BPD to be liable under § 1983 for constitutional violations by BPD officers.  E.g., Estate of Anderson v. Strohman, 6 F.Supp.3d 639, 646 (D.Md. 2014) ("[A] § 1983 claim cannot be brought against the City for Baltimore police officer conduct because it does not sufficiently control the BPD and cannot be considered to employ Baltimore police officers.").  This is because "the [BPD] is an entity of the State, and not of the City of Baltimore." Mayor of Balt. v. Clark, 944 A.2d 1122, 1130 (Md. 2008).

The Court does not dispute that, as a general principle, the City may not be held liable for the actions of BPD officers under § 1983. The inquiry before the Court, however, is not whether the City exercises sufficient control over the BPD to subject itself to liability for the actions of individual officers. Rather, the question here is whether Plaintiffs have adequately alleged under the Riot Act that the Mayor & City Council could have prevented the damage, theft, and destruction through the use of the police force.

The Court of Appeals of Maryland considered a similar question in <u>City of Baltimore v. Silver</u>, 283 A.2d 788 (Md. 1971). In <u>Silver</u>, the court noted that because "the City is the agency responsible for appropriating money for the operation of the police department," the relationship between the City and the BPD often gives rise to "the flow and exchange of communications, accommodations and co-operative action between the City and the police commissioner." <u>Id.</u> at 794. Thus, in the context of claims under the Riot Act, it is at least plausible that the Mayor & City Council could have "conferred with the police commissioner and made requests for specific kinds of police action." <u>Id.</u> at 795. In fact, the connection between the Mayor & City Council and the BPD is even stronger than it was at the time <u>Silver</u> was decided. A 1976 amendment to the Baltimore City Local Laws transferred the powers to appoint and remove the Police Commissioner from the Governor to the Mayor & City Council. <u>Vanguard Justice Soc. Inc. v. Hughes</u>, 471 F.Supp 670, 689 (D.Md. 1979).

Given this background, Plaintiffs adequately plead that the Mayor & City Council had the ability to prevent the theft, damage, or destruction resulting from the civil unrest

through the use of the police force. Plaintiffs allege that BPD "regularly communicated" with the Mayor & City Council during the period leading up to the civil unrest. (Compl. ¶¶ 40, 48). Plaintiffs further allege that the City and BPD issued a stand-down order to BPD officers, and that "the stand-down order was a direct order from Mayor Rawlings-Blake to [Commissioner] Batts." (Id. ¶ 72). Consistent with this order, rather than taking reasonable steps to prevent violence and destruction, Commissioner Batts directed officers not to engage protestors until they "burned, looted, and destroyed the city." (Id. ¶¶ 56, 58). Mayor Rawlings-Blake also indicated during a press conference that "we also gave those who wished to destroy space to do that as well." (Id. ¶ 58). In the words of Plaintiffs, the Mayor & City Council "made a decision from the outset that there would be no mass arrests and/or aggressive crowd control tactics, and they were sticking with that decision." (Id.).

Plaintiffs also sufficiently plead that the Mayor & City Council had the ability to prevent theft, damage, and destruction with the aid of residents. Mayor Rawlings-Blake told local business leaders that the City was doing all it could to ensure "the least amount of disruption to downtown businesses," causing at least one business to stay "open for business as normal" instead of closing. (Id. ¶ 59). The City also sent an email to a local business organization expressing concerns that "it will look like a ghost town" if businesses take in or lock outdoor furniture, despite the possibility that such furniture could be used to destroy business storefronts. (Id. ¶ 65). Considering these allegations in the light most favorable to Plaintiffs, the Court finds it plausible that the Mayor & City

Council had the ability to prevent at least some of the theft, damage, and destruction resulting from the civil unrest by enlisting the aid of the BPD and local business owners.

The Court, therefore, will not dismiss Plaintiffs' Riot Act claims against the Mayor & City Council. The Court next considers whether Plaintiffs have adequately stated their federal constitutional claims.

### 2.       Federal Constitutional Claims

Plaintiffs bring three types of claims under § 1983 for alleged violations of their constitutional rights. First, Plaintiffs assert that City Defendants, BPD Defendants, and the State deprived Plaintiffs of their property (Counts 51–100). Second, Plaintiffs claim that all Defendants committed unjustified intrusions on Plaintiffs' personal security (Counts 251–257) in violation of the Due Process Clause of the Fourteenth Amendment. Finally, Plaintiffs allege that all Defendants committed unlawful takings of Plaintiffs' property in violation of the Fifth Amendment (Counts 151–200).

Under Monell v. Department of Social Services, municipalities and units of local government may be held liable for deprivation of a plaintiff's constitutional rights under § 1983. 436 U.S. 658, 690 (1978). However, "there can be no municipal liability in the absence of an underlying constitutional violation." E.g., Jones v. Mullins Police Dep't, 355 F.App'x 742, 747 (4th Cir. 2009). Accordingly, to state a Monell claim for municipal liability, a plaintiff must first adequately plead the elements of the alleged constitutional injury.

Here, City Defendants, BPD Defendants, and the State argue that Plaintiffs fail to sufficiently allege Monell claims under § 1983. First, the State maintains that it is

immune from liability under § 1983 because it is not a "person" for the purposes of the statute. Next, City Defendants and BPD Defendants assert that Plaintiffs fail to state the elements of the underlying due process and Fifth Amendment takings claims. The Court addresses Defendants' arguments in turn.

### i. State Liability under § 1983

The State maintains that it cannot be held liable under § 1983 pursuant to <u>Will v. Michigan Department of State Police</u>, 491 U.S. 58 (1989), in which the Supreme Court held that a State is not a "person" within the meaning of the statute. <u>Id.</u> at 65. Plaintiffs concede that <u>Will</u> is controlling. Nonetheless, Plaintiffs argue that their claims against the State should not be dismissed because they believe <u>Will</u> was incorrectly decided. The Court disagrees—and, in any event, <u>Will</u> is binding on this Court.

Therefore, the Court will dismiss Plaintiffs' federal constitutional claims against the State (Counts 51–100, 151–200, 251–257) for failure to state a claim.

### ii. City Defendants' and BPD Defendants' Liability under § 1983

At bottom, the Court concludes that it will dismiss all § 1983 claims against City Defendants and BPD Defendants. Because the Court concludes that Plaintiffs do not adequately allege the underlying constitutional claims, the Court will not address whether Plaintiffs adequately stated a custom or policy under <u>Monell</u>.

### a.    Substantive Due Process Claims[7]

To establish a substantive due process violation, Plaintiffs must plead: "(1) that they had property or a property interest; (2) that the state deprived them of this property or property interest; and (3) that the state's action falls so far beyond the outer limits of legitimate governmental authority that no process could cure the deficiency." Sunrise Corp. of Myrtle Beach v. City of Myrtle Beach, 420 F.3d 322, 328 (4th Cir. 2005) (quoting Sylvia Dev. Corp. v. Calvert Cty., 48 F.3d 810, 827 (4th Cir. 1995)).  Although the Due Process Clause prevents the government itself from depriving individuals of life, liberty, or property without due process, "its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 195 (1989).  In other words, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." Id. at 197.

Notwithstanding this general principle, the government has an affirmative obligation to protect individuals from private harms where: (1) there is a "special relationship" between the government and the plaintiff; or (2) the government itself has acted to create the danger, known as a state-created danger theory.  See Pinder v. Johnson, 54 F.3d 1169, 1174–75, 1176–77 (4th Cir. 1995).  A "special relationship" arises for the purposes of the Due Process Clause only where the government has

---

[7] It is unclear from the Complaint whether Plaintiffs intended to raise procedural or substantive due process claims.  Although Plaintiffs contend that their property was taken "without notice and opportunity to be heard," (Compl. ¶¶ 252, 652), they do not explain what procedures they believe they should have been afforded.  Accordingly, the Court treats Plaintiffs' claims as substantive due process claims.

physical "custody" over the plaintiff and "restrains" the plaintiff from "acting on [his] own behalf." Id. at 1174–75. Alternatively, to establish § 1983 liability on a state-created danger theory, "a plaintiff must show that the state actor created or increased the risk of private danger, and did so directly through affirmative acts, not merely through inaction or omission." Doe v. Rosa, 795 F.3d 429, 439 (4th Cir. 2015).

Plaintiffs here do not allege they had a "special relationship" with City Defendants or BPD Defendants. Instead, Plaintiffs assert that City Defendants and BPD Defendants created the danger that ultimately deprived Plaintiffs of their property. City Defendants and BPD Defendants contend that the state-created danger exception is inapplicable here because the government did not act affirmatively to create or increase the risk of private danger. The Court agrees with City Defendants and BPD Defendants for two reasons.

First, Plaintiffs fail to allege any affirmative actions by City Defendants or BPD Defendants that created or increased the risk of danger. Plaintiffs merely allege that, pursuant to a "policy of restraint," the City and BPD issued a "stand-down order" to BPD officers to discourage intervention with protestors, and officers gave "space" to protestors who "wished to destroy." (Compl. ¶¶ 58, 72). These allegations demonstrate the City's and BPD's inaction, but do not show that the City and BPD took affirmative acts that created a danger to Plaintiffs. Likewise, the allegation that the City delayed its request for additional support from the State represents an omission by the government, not an affirmative act. Moreover, even if the Court construed the "policy of restraint" as an affirmative act by the City and BPD, it is at most a failure of the government to provide

adequate protection from private harm, not evidence that City Defendants and BPD Defendants created the danger to Plaintiffs.

Second, Plaintiffs do not sufficiently allege that the actions of City Defendants and BPD Defendants "fall[ ] so far beyond the outer limits of legitimate governmental authority that no process could cure the deficiency." Sunrise Corp, 420 F.3d at 328 (quoting Sylvia Dev. Corp., 48 F.3d at 826). To establish this element, Plaintiffs must plead that the government took an action "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." Cty. of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (1998). Although this standard bears no precise definition, "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." Id. at 849.

As alleged, the City and BPD's conduct was not "unjustifiable by any government interest." See id. In fact, Plaintiffs assert that Mayor Rawlings-Blake publicly stated BPD's justification for its response to the civil unrest, explaining, "[w]e used a very serious but measured approach. And once we had the appropriate resources in place to respond appropriately, we went in." (Compl. ¶ 73). Plaintiffs' own allegations, therefore, undercut any argument that the City's and BPD's conduct was "intended to injure in some way unjustifiable by any government interest." Lewis, 523 U.S. at 849. Simply put, Plaintiffs do not plead facts tending to show that the conduct of the City and BPD rises to the level of unjustifiable, conscience-shocking behavior.

The Court, therefore, concludes that Plaintiffs fail to sufficiently allege substantive due process claims. Accordingly, the Court will dismiss Plaintiffs' claims against the

City and BPD (Counts 51–100, 251–257) for failure to state an underlying constitutional violation.

### b. Takings Claims

The Takings Clause of the Fifth Amendment to the United States Constitution provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. The Takings Clause requires just compensation for government acts that "rise[ ] to the magnitude of an appropriation of some interest in . . . property for the use of the government." Ridge Line, Inc. v. United States, 346 F.3d 1346, 1356 (Fed. Cir. 2003). To establish a taking under federal law, a plaintiff must allege "an affirmative action on the part of the Government." Nicholson v. United States, 77 Fed.Cl. 605, 620 (2007). A taking has "clearly" not occurred "when whatever acts complained of are those of private parties, not the government." Alves v. United States, 133 F.3d 1454, 1457–58 (Fed. Cir. 1998). And even where the government engages in an affirmative act that is "causally related" in some way to a third-party's destruction of property, the government action constitutes a taking only when "government involvement in the deprivation . . . is sufficiently direct and substantial to require compensation under the Fifth Amendment." Nat'l Bd. of Young Men's Christians Ass'ns v. United States, 395 U.S. 85, 93 (1969) (YMCA). Thus, "merely . . . incidental or consequential" damage to private property—even when resulting from government action—is, at most, "compensable as a tort." Ridge Line, 346 F.3d at 1355–56.

Here, Plaintiffs contend that the City's and BPD's involvement in the destruction of their property was sufficiently direct and substantial to require compensation. City Defendants and BPD Defendants argue that Plaintiffs have failed to state a colorable takings claim because Plaintiffs' Complaint is devoid of any facts suggesting that the City Defendants and BPD Defendants physically invaded or otherwise took Plaintiffs' property. The Court agrees with Defendants.

At the outset, Plaintiffs clearly fail to allege that the City or BPD physically took their property for the purpose of government use. Nor do Plaintiffs adequately plead that the governments' involvement in the damage or theft of their property was sufficiently "direct and substantial." YMCA, 395 U.S. at 93. At most, Plaintiffs allege that BPD officers "avoided becoming involved and took no action to stop the rioting, violence[,] and destruction, resulting in even worse rioting, violence[,] and destruction." (Compl. ¶ 69). Therefore, any damage Plaintiffs suffered was "merely . . . incidental or consequential" to the inaction by BPD officers. Ridge Line, 346 F.3d 1356. Incidental or consequential damage to Plaintiffs' property does not rise to the level of a government taking under the Fifth Amendment. Thus, Plaintiffs fail to sufficiently state takings claims against the City and BPD.

In sum, the Court will dismiss Plaintiffs' federal substantive due process and takings claims against the City and BPD for failure to state an underlying constitutional violation. The Court next considers whether Plaintiffs adequately plead their state constitutional claims.

### 3. State Constitutional Claims

Plaintiffs allege that City Defendants, BPD Defendants, and the State deprived them of property (Counts 101–150) and committed unjustified intrusions on Plaintiffs' personal security (Counts 258–264) in violation of Article 24 of the Maryland Declaration of Rights. Plaintiffs also allege that City Defendants, BPD Defendants, and the State committed unlawful takings of Plaintiffs' property in violation of Article III, § 40 of the Maryland Constitution (Counts 201–250).

City Defendants, BPD Defendants, and the State argue that Plaintiffs fail to adequately plead their Maryland substantive due process and takings claims for the same reasons as the corresponding federal claims. The Court agrees with Defendants and will dismiss Plaintiffs' state constitutional actions for failure to state a claim.

### i. Substantive Due Process Claims

Courts generally interpret Article 24 of the Maryland Declaration of Rights in <u>pari materia</u> with federal law. <u>Allmond v. Dep't of Health and Mental Hygiene</u>, 141 A.3d 57, 67 (Md. 2016). In fact, when construing Article 24 of the Declaration of Rights, "the decisions of the Supreme Court on the Fourteenth Amendment are practically direct authorities." <u>Goldsmith v. Mead Johnson & Co.</u>, 7 A.2d 176, 178 (Md. 1939) (internal citation and quotations omitted); <u>see also</u> <u>Palotai v. Univ. of Md. at College Park</u>, 38 F.App'x 946, 954 n.3 (4th Cir. 2002).

Because Plaintiffs fail to state cognizable substantive due process claims under the Fourteenth Amendment, their claims under Article 24 are similarly insufficient. Thus,

the Court will dismiss Plaintiffs' state substantive due process claims against the City, BPD, and the State (Counts 101–150, 258–264).

### ii.    Takings Claims

Maryland courts generally interpret Article III, § 40 of the Maryland Constitution in pari materia with the Takings Clause of the Fifth Amendment.  See, e.g., Bureau of Mines of Md. v. George's Creek Coal & Land Co., 321 A.2d 748, 755 (Md. 1974). Indeed, because the Fifth Amendment has "the same meaning and effect" as Article III, § 40, "the decisions of the Supreme Court are practically direct authorities for both provisions." Weigel v. Maryland, 950 F.Supp.2d 811, 840 (D.Md. 2013) (quoting Neifert v. Dep't of Env't, 910 A.2d 1100, 1118 n.33 (Md. 2006)) (internal citations and quotations omitted)).

Like their federal takings claims, Plaintiffs' state takings claims are devoid of any allegations that City Defendants, BPD Defendants, or the State physically invaded or otherwise took Plaintiffs' property.  Plaintiffs argue, however, that Maryland law provides a remedy for takings resulting from government inaction if the government had an affirmative duty to act.  In response, City Defendants, BPD Defendants, and the State contend they had no affirmative duty to prevent private actors from causing Plaintiffs' alleged damages.  The Court finds Defendants' reasoning persuasive.

The Court of Appeals of Maryland recently suggested that a plaintiff may raise a takings claim premised on government inaction "where the governmental agency had an affirmative duty to act under the particular circumstances." Litz v. Md. Dep't of Env't, 131 A.3d 923, 932 (Md. 2016).  In Litz, the plaintiff brought a takings claim for inverse

condemnation against her local government, alleging that the government's failure to address pollution and sewage problems near her property led directly to the substantial devaluation and ultimate foreclosure on her home.  Id. at 929–30.  Litz alleged that the government failed to remediate the property even after entering into a Consent Decree with the Maryland Department of the Environment.  Id. at 932–33.  The Consent Decree required the government to take certain actions, including to "complete a study to identify and characterize the construction of a public sewer system," submit a schedule and "Compliance Plan" for construction of a public sewer system, and "begin implementation of the Compliance Plan" by a certain date.  Id. at 926–27.  Relying on cases from other jurisdictions, the Court of Appeals held that Litz adequately stated a claim for inverse condemnation because her allegations could be read to assert that the Consent Order imposed upon the government an affirmative duty to act.  Id. at 934.

Here, Plaintiffs contend that Mayor Rawlings-Blake's "power and authority as conservator of the peace" and BPD's "broad duties to act as a police department" give rise to a general duty to protect individuals from private harm.  (Compl. ¶ 74; Pls.' Mem. Opp'n Mot. Dismiss at 28, ECF No. 44).  But, unlike the Consent Decree in Litz, these broad ministerial duties do not give rise to an affirmative duty on the part of the City or BPD.  Moreover, Plaintiffs do not allege that the City, BPD, or State have a statutory or otherwise legal duty to prevent damage resulting from the acts of private individuals during times of civil unrest.  In short, Plaintiffs fail to sufficiently plead the elements of a state takings claim.

The Court, therefore, must dismiss Plaintiffs' state takings claims against the City, BPD, and the State for failure to state a claim.

### III.    CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part City Defendants' Motion to Dismiss (ECF No. 27), grant State of Maryland's Motion to Dismiss (ECF No. 33), and grant BPD Defendants' Motion to Dismiss (ECF No. 34).  A separate order follows.

Entered this 30th day of March, 2018

_____/s/_____
George L. Russell, III
United States District Judge