**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Northern Division)**

| | | |
|---|---|---|
| CHAE BROTHERS, LIMITED LIABILITY COMPANY d/b/a FIRESIDE NORTH LIQUORS, et al., | * | |
| | * | |
| Plaintiffs, | * | Case No. 1:17-CV-01657 (SAG) |
| v. | * | |
| MAYOR AND CITY COUNCIL OF BALTIMORE, et al., | * | |
| | * | |
| Defendants. | | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**MEMORANDUM OF LAW**

Defendant Mayor and City Council of Baltimore ("the City"), through undersigned

counsel, submits this Memorandum of Law in support of its Motion for Summary Judgment.

**TABLE OF CONTENTS**

Introduction………………………………………………………………………………………2
Facts……………………………………………………………………………………………….3
Legal Standard………………………………………………………………………………......18
Argument…………………………………………………………………………………….......18
    I. Even in the light most favorable to Plaintiffs, they cannot establish the elements of
    liability under Maryland's Riot Act……………………………………………………......18
        A. The City did not have notice that civil unrest would occur on April 27,
        2015…………………………………………………………………………………19
            1. The City had no notice of any forthcoming civil unrest on April 27,
            2015……………………………………………………………………19
            2. The City had no notice of potential for any unrest outside of
            the immediate area of the Mondawmin Mall and downtown……………21
        B. The City did everything reasonable within its power to prevent unrest in the
        City and to aid the Baltimore Police Department in its efforts…………………..23
            1. Plaintiffs cannot establish that the National Guard could have
            prevented the unrest……………………………………………………...23
            2. The City correctly deferred to BPD to handle the unrest and
            provided any requested support……………………………………………26
            3. In addition to providing support to BPD, the City took
            independent actions to attempt to prevent civil unrest…………………..28

    4.  Plaintiffs cannot establish that calling for a posse *comitatus*
        would have been reasonable or prevented the unrest…………………….30

II.  If Plaintiffs can establish a case of liability under the Riot Act,  the state cap
on damages under the Local Government Tort Claims Act should apply to
their claims…………………………………………………………………………31

Conclusion………………………………………………………………………………33

---

## Introduction

This case arises out of the sudden and widespread unrest that occurred over a period of approximately twelve hours in Baltimore City after the April 27, 2015 funeral of Freddie Gray, a young man who died after injuries sustained in police custody.  Following Gray's injuries and subsequent death, Baltimore experienced approximately two weeks of largely peaceful protests against police brutality.  On April 25, 2015, a small group of individuals, spurred on by agitators from outside Baltimore City, splintered off from the large demonstration at City Hall and headed toward Camden Yards, damaging some storefronts, attacking police cars, and throwing projectiles at officers.  Baltimore Police Department (BPD) officers were able to suppress this flare-up within a few hours.  This incident was a solitary and short-lived instance of violence in a series of protests that were characterized as largely peaceful and respectful in spite of the passion and anger prompted by suspected police brutality.

Thus, the widespread violence that occurred after Freddie Gray's funeral service was unprecedented and unheralded.  Having received a single piece of vague intelligence the day before the funeral--a flyer directed at City schoolchildren that said that they were going to "purge" at Mondawmin Mall--the Baltimore police nonetheless prepared for a possible large incident by staging platoons at and near the shopping center.  Despite their preparations, however, after schools in the area released their students, many of those present in the immediate

area of the mall started attacking police officers.  The resulting melee apparently inspired individuals throughout the City to engage in opportunistic looting, violence, and damage.

Despite being under-equipped and understaffed as a result of the State and other jurisdictions refusing its requests for assistance in the days leading up to the funeral, BPD managed to suppress the unrest in approximately twelve hours, with no loss of civilian or officer life.  Compared to the violence that has erupted nationwide both before (Ferguson) and after (following the 2020 death of George Floyd), and even the last time Baltimore experienced rioting in 1968, BPD's handling of the unrest should be considered a success.

Plaintiffs, however, with the benefit of hindsight, second guess the actions of BPD in handling the ever-evolving situation.  They attempt to attribute these purported failures to the City, despite the fact that BPD is not a City agency, because legally, they have no cognizable claims against BPD.  Relying on a heavy dose of speculation and transference, they claim that the City should have foreseen the unexpected violence and prevented the unrest.  The actual facts, absent conjecture, do not bear out these contentions.

## Facts

Freddie Gray sustained injuries that ultimately proved fatal on Sunday, April 12, 2015, while in the custody of officers of the Baltimore Police Department.[1]  On Saturday, April 18, peaceful protests began in Baltimore City when hundreds gathered in front of the Western District police station.[2]  Freddie Gray passed away the following day, on April 19.[3]  On Tuesday,

---

[1] Erik Ortiz, *Freddie Gray: From Baltimore Arrest to Protests, a Timeline of the Case*, NBC News (May 1, 2015) at http://www.nbcnews.com/storyline/baltimore-unrest/timeline-Freddie-gray-case-arrest-protests-n351156.

[2] *Id.*

[3] *Id.*

April 21, peaceful protests continued, with BPD Commissioner Batts commenting, "I think that they're sharing their thoughts, they're sharing their concerns, and I hear them and understand them."[4]  The protests continued, and grew in size, through Thursday, April 23.[5]

It is important to note that these protests, and the City and BPD's handling of them, occurred in the recent wake of the August 2014 riots in Ferguson, Missouri.  After a White police officer shot and killed an unarmed Black teenager on August 9, 2014, Ferguson descended into unrest and violence that lasted for over a week.  During this time, Ferguson businesses experienced looting nearly every night and some were victims of arson; there also were numerous violent clashes between police and protesters.[6]  Police responded to the unrest with a heavy hand, utilizing riot gear, armored vehicles, tear gas, and smoke bombs.[7]  The governor declared a state of emergency in Ferguson on August 16, and ordered a curfew, the latter of which was unsuccessful.[8] On August 18, after a night in which individuals shot at officers and threw Molotov cocktails at them, Missouri's governor ordered the National Guard into Ferguson.[9]  After twelve days, the violence mostly concluded by August 21, 2014.[10]

---

[4] *Id*.

[5] *Id*.

[6] Emily Brown, *Timeline: Michael Brown Shooting in Ferguson, Mo.*, USA Today (Aug. 14, 2014, updated Aug. 10, 2015), at https://www.usatoday.com/story/news/nation/2014/08/14/michael-brown-ferguson-missouri-timeline/14051827/.

[7] Kathleen Caulderwood, *Ferguson: During Friday Police Standoff, Protesters Try To Stop Looters Entering Stores*, International Business Times (Aug. 16, 2014) at https://www.ibtimes.com/ferguson-during-friday-police-standoff-protesters-try-stop-looters-entering-stores-1660418.

[8] *See* Brown, *supra* note 6.

[9] *Id*.

[10] *Id*.

Following the Ferguson unrest, the Department of Justice (DOJ) issued an after-action

report on the handling of the August 2014 protests and subsequent violence.  At the time the

report was issued, the DOJ noted, "The report, especially the lessons learned, is intended to be

used as a guidebook for agencies across the country on how to prepare for and respond to mass

demonstrations."[11]  Indeed, Baltimore Mayor Stephanie Rawlings-Blake's Chief of Staff,[12]

Kaliope Parthemos, indicated that City management had studied the report in advance of the

unrest in Baltimore.  *See* Deposition of Kaliope Parthemos attached hereto as Exhibit 1, at pp.

77-82.  Some of the DOJ's findings include:

> The use of military weapons and sniper deployment atop military vehicles was
> inappropriate, inflamed tensions, and created fear among demonstrators. Agencies
> possessing military-type equipment or weaponry should restrict its deployment to
> limited situations in which the use of the equipment or weapons is clearly justified
> by the events. The equipment and weapons should be kept out of sight and not be
> used routinely or in the absence of special circumstances.  Policies and procedures
> should clearly state the limited situations for deployment.[13]

> While a tactical response was warranted at times during the Ferguson
> demonstrations because of threats to public safety, the highly elevated initial
> response, including tactical elements, limited options for a measured, strategic
> approach. The elevated daytime response was not justified and served to escalate
> rather than de-escalate the overall situation.[14]

> Because relationships with some community segments were lacking, community
> leadership was underused in the overall response. Elected and appointed officials,

---

[11] Nazmia E.A. Comrie, *Lessons from the Police Response to the Demonstrations in Ferguson, Missouri*, Department of Justice (Nov. 2015), at https://cops.usdoj.gov/html/dispatch/11-2015/lessons_from_ferguson.asp.

[12] In this Memorandum, individuals will be referred to by the titles that they held during August 2015.

[13] U.S. Department of Justice, *After Action Assessment of the Police Response to the August 2014 Demonstrations in Ferguson, Missouri*, p. XVII, at https://www.policefoundation.org/wp-content/uploads/2018/08/After-Action-Assessment-of-the-Police-Response-to-the-August-2014-Demonstrations-in-Ferguson-Missouri.pdf

[14] *Id.*

local clergy, and community leaders can be very effective in sending the message that violence damages the community in ways that will take years to mend.[15]

Rather than solely implementing a series of reactions to developing events, there must be a proactive approach that anticipates the impact of the community's anger and frustration and of operational decisions. Influencers must be identified and brought to the table. Not only public safety but also faith-based and political leaders and community stakeholders are important in the planning and preparation stages.[16]

The militarization of the police in Ferguson was not only a concern for the DOJ, but others as well.  United States Senator Claire McCaskill of Missouri stated that the "militarization of the police escalated the protestor's response"[17] and St. Louis Chief of Police Sam Dotson stated he would not have employed military-style policing, noting that "my gut told me what I was seeing were not tactics that I would use in the city."[18]

The Mayor and other city officials were cognizant of these issues when the Gray protests began in Baltimore.  She acknowledged that she and her staff were "mindful of the ways in which we believed the protests there [in Ferguson] escalated."  Deposition of Stephanie Rawlings-Blake, attached hereto as Exhibit 2, at p. 30; Deposition of David McMillan (Director of Planning and Preparedness, Mayor's Office of Emergency Management), attached hereto as Exhibit 3, at pp. 62-63.  She stated, "I believe that the immediate introduction of military equipment as evidenced by what...happened in Ferguson would be a--the immediate introduction of that type of force would lead to the ongoing escalation….I didn't want to have weeks and

---

[15] *Id*. at XIV.

[16] *Id*. at XVII.

[17] Staff, *McCaskill: Police 'Militarization' Escalated Unrest In Ferguson*, NBC News, (Aug. 14, 2014) at http://www.nbcnews.com/video/nbc-news/55867114#55866941.

[18] Marina Fang, *St. Louis Police Chief Condemns Military Tactics Being Used In Ferguson*, The Huffington Post (Aug. 14, 2014) at http://www.huffingtonpost.com/2014/08/14/ ferguson-military-tactics_n_5679532.html.

weeks of violent interaction and property destruction so we were very--I was very concerned about the immediate introduction of that escalated military response." Ex. 2 at pp. 32-33. She added, "the police response [in Ferguson] was very aggressive and confrontational and caused an escalation that they could not...deescalate." *Id*. at 41.

        In contrast to Ferguson, where violence began almost immediately after the shooting, Baltimore experienced largely peaceful protests for nearly two weeks, even after Freddie Gray passed away from his injuries. Nevertheless, BPD preemptively prepared for the possibility of larger protest crowds by, *inter alia*, seeking mutual aid, that being assistance from other jurisdictions in the form of personnel or equipment. Mutual aid agreements are primarily arranged between law enforcement agencies, rather than City departments. *See* Deposition of Connor Scott (Deputy Director, Mayor's Office of Emergency Management), attached hereto as Exhibit 4, at p. 92. On April 19, 2015, Police Commissioner Anothony Batts directed Deputy Police Commissioner Dean Palmere to reach out to "every law enforcement agency in the state" for mutual aid. *See* Deposition of Anthony Batts, attached hereto as Exhibit 5, at pp. 70-73, 118-19; Deposition of Dean Palmere (BPD Deputy Commissioner), attached hereto as Exhibit 6, at p. 34. In addition to the requests put out by Deputy Commissioner Palmere, Commissioner Batts reached out to the Colonel in charge of the Maryland State Police to ask him to furnish 5,000 officers to aid the City; the Commissioner noted that in order to get these bodies, the colonel had the ability to ask Governor Hogan to activate the National Guard. Ex. 5 at pp. 249-50. Unfortunately, Commissioner Batts noted that "[S]tate police did not respond. They did not give us the resources we were asking for. Nor did they [try] to give us the numbers we asked for. They were also informed that they could have...brought the National Guard online. They were aware from...the Colonel. They did not bring the National Guard online." *Id*. at pp.

276-77.  Prior to April 25, Commissioner Batts and his Chief of Staff, Melissa Hyatt, invited the police chiefs of local jurisdictions to a meeting in order to convince them to send resources to BPD.  *See* Deposition of Melissa Hyatt (Dec. 12, 2020), attached hereto as Exhibit 7, at pp. 43-44. In spite of BPD's many efforts to obtain mutual aid, it did not "get a whole lot of resources from those jurisdictions at first" and only started to see a response to their requests once the situation in the City started to deteriorate on April 25, 2015.  *See* Ex. 6 at pp 48-49.  For example, by Monday, April 20, 2015, BPD had only received mutual aid in the form of "200 officers from agencies within the state."  *See* Ex. 5 at p. 119, *see also* Documents 19 and 21 from the Deposition of Anthony Batts, attached to that Exhibit.

While mutual aid requests for personnel were typically handled by the law enforcement agency itself, the City stepped in when requested.  When Commissioner Batts communicated to the Mayor's Office that the State had been reluctant to provide requested resources, Kaliope Parthemos, the Mayor's Chief of Staff, contacted her counterpart in the Governor's office to speak to him about these concerns.  Ex. 1 at pp. 56.  When Commissioner Batts requested that the City ask for 600 police officers, City Emergency Manager Robert Maloney submitted the request to the State emergency management department and attempted to secure other mutual aid.  *See* Deposition of Robert Maloney, attached hereto as Exhibit 8, at pp. 162-64; Ex. 4 at pp. 121-27.

BPD received intelligence about a large protest scheduled for April 25, 2015, including the possibility that the protest would be attended by "outside agitators," meaning individuals who do not reside in Baltimore but travel to protests with the intent to cause problems.  *See* Deposition of Melissa Hyatt (Jan. 5, 2021), attached hereto as Exhibit 9, at pp. 44-45, 64-68.  In order to "ensure adequate coverage" for the protests, BPD canceled all leave for Saturday, April

25, which put approximately 3,000 police officers on Baltimore streets on Saturday.[19] As information about the larger protest began to spread, some events were also cancelled throughout the City, including the annual Shock Trauma Gala, due to concerns over the inability of BPD to offer support or traffic control for the event. *See* Ex. 7 at p. 141.

On Saturday, April 25, over 1,000 individuals gathered for a protest march towards City Hall.[20] Despite being led by Malik Shabazz, who is on the Southern Poverty Law Center's "40 to Watch" list (which identifies radical extremists in the United States),[21] the protest and march were largely peaceful, with only 12 protestors arrested after "small pockets of individuals caus[ed] disturbances."[22] Shabazz had called on the protestors to "[s]hut it down if you want to! Shut it down!"[23] Despite his urgings toward violence, near the end of the evening, only a few unruly individuals splintered off from the main protest and became destructive in the downtown area and near Camden Yards.[24] The splinter group was only "briefly violent" with most members of the main protest rejecting Shabazz's tactics.[25] BPD officers, facing angry accusations about

---

[19] Maggie Ybarra, *Baltimore Police Brace for Riots This Weekend in Freddie Gray Protests*, The Washington Times (Apr. 23, 2015), http://www.washingtontimes.com/news/2015/apr/23/freddie-gray-protests-prompt-baltimore-police-riot/.

[20] Ortiz, *supra* note 1.

[21] Sheryl Gay Stolberg, *After Thousands Rally in Baltimore, Police Make Some Arrests as Curfew Takes Hold*, The New York Times (May 2, 2015) at https://www.nytimes.com/2015/05/03/us/baltimore-braces-for-more-protests.html.

[22] Ortiz, *supra* note 1.

[23] Stolberg, *supra* note 21.

[24] Christine M. Boynton*, Batts: Baltimore Residents Put Themselves Between Officers, Agitated Crowd*, Fox Baltimore Fox45 News (Apr. 25, 2015) at http://foxbaltimore.com/batts-baltimore-Residents-put-themselves-between-officers-agitated-crowd

[25] Stolberg, *supra* note 21.
.

police brutality and occasionally violent individuals, did not aggressively confront these persons, but followed orders to "deescalate any situation with no response rather than to escalate with action."[26]  Individuals attending the Orioles game that evening at Camden Yards were required to remain in the stadium due to the crowds congregating outside of the stadium. *See* Ex 3 at p. 28; *see also* Ex. 9 at p. 74.  Ultimately, BPD sought to avoid inflaming tensions on April 25th and escalating the incident into a larger and more dangerous event.  *See* Ex. 9 at pp. 59, 157.  BPD was able to successfully suppress the violence after a few hours, and after 11:00 pm there were no more incidents of note.[27]  The destruction caused by these agitators occurred primarily at or near the Inner Harbor and was largely limited to outdoor restaurant furniture being disturbed, a few broken windows at some downtown businesses, and damaged police vehicles.  *See* Ex. 3 at p. 28; Ex. 4 at p. 66; Ex. 9 at p. 195. Notably, and likely because BPD brought the incident under control that evening, the State explicitly stated to the City that the National Guard would not be deployed at this time. *See* E-mail from Brendan McCluskey (Deputy Chief of the State Office of Emergency Management) to Suzanne Sangree (Baltimore City attorney), dated April 25, 2015, attached hereto as Exhibit 10.  Following the events of Saturday night, State Delegate Curt Anderson, co-chair of the state's working group on public safety, said the tactics and strategy employed during the skirmishes were "probably the best considering no police force had been in

---

[26] Phillip Jackson*, Union Blasts Baltimore Police Commanders as Conflict Over #BaltimoreUprisings Continues*, The Root (Jul. 9, 2015) at http://www.theroot.com/ Union-blasts-baltimore-police-commanders-as-conflict-ov-1790860461.

[27] *12 Arrested After Freddie Gray Protests Turned Violent*, WJZ (Apr. 25, 2015) at https://baltimore.cbslocal.com/2015/04/25/protesters-plan-to-shut-down-baltimore-as-questions-r emain/.

that type of situation before," and also noted that a more aggressive stance could have increased the tension.[28]

Sunday, April 26, the day of Freddie Gray's wake, was "largely quiet" with no incidents of violence.[29]  Ex. 3 at p. 144.  Officials believed the "agitators" who had caused disruption on Saturday had left the city.  *See id.* at pp. 153-54.  On Sunday afternoon, BPD was notified about a flyer from a local high school stating that students were going to "purge" on Monday.[30] However, news of the impending "purge" did not indicate what the "purge" would constitute, nor did it suggest that more widespread unrest would result. *See* Ex. 2 at pp. 199-200.  The flyer itself stated "All High Schools Monday @3 We Going To Purge From Mondawmin, To The Ave, Back To Downtown #Fdl."  *See* April 26, 2015 E-mail with Attachment from Kevin A. Jones to BPD staff (including Melissa Hyatt), attached hereto as Exhibit 11.  The scant details listed on the flyer only provided City officials with a date, time, and location for an alleged "purge" but no indication as to what type of activity might take place.  *Id.*  Officials thus were not clear as to what, if anything, might occur as a result of the flyer, nor were they aware of whether the threat was even credible.  *See, e.g.*, Ex. 2 at pp. 116-18, 200, 239 ("there had been nothing in our city prior to that, nor I think anywhere else in the country that would give...very clear intel on what it means"); Ex. 3 at pp. 81, 152.  Not only was there no further intelligence about the "purge," neither the City nor BPD received any information about other possible adverse events scheduled

---

[28] Justin Fenton*, Police Union Blasts Commanders in 'After Action Review' of Riot*, The Baltimore Sun (Jul. 8, 2015) at http://www.baltimoresun.com/news/maryland/freddie-gray/ bs-md-ci-fop-report-20150708-story.html#page=1.

[29] Josh Sanburn, *Calm Restored in Baltimore as the City Awaits the Funeral of Freddie Gray*, Time, (Apr. 6, 2015) at http://time.com/3836108/freddie-gray-protests-funeral-baltimore/.

[30] Justin Fenton & Erica L. Green, *Baltimore Rioting Kicked Off with Rumors of 'Purge,'* The Baltimore Sun, (Apr. 27, 2015) at http://www.baltimoresun.com/news/maryland/ freddie-gray/bs-md-ci-freddie-gray-violence-chronology-20150427-story.html.

for Monday, April 27.  *See* Ex. 2 at p. 239 ("I was not aware at the time of anything else, nor have I been made aware that there was any other intelligence of anything other than a protest--the purge that nobody knew exactly what that meant in the context of high school kids.").

Despite not having explicit information about what the threatened "purge" entailed, BPD nevertheless treated the threat seriously and staged platoons at Mondawmin Mall.  *See* Ex. 5 at pp. 274-75, 300; *see also* Ex. 6 at pp. 181, 188-89.  Specifically, prior to any activity occurring at Mondawmin Mall, BPD deployed officers there in "preparedness for the potential purge."  *See* Ex. 5 at pp. 274-75, 300; *see also* Ex. 6 at pp. 181, 188-89.  Commissioner Batts informed the City that they were aware of the intelligence, and that they were "prepared" and "ready for the purge." Ex. 1 at pp.133-34, 144.

Freddie Gray's funeral began at 11:00 am on April 27.  By early to mid-afternoon, with news of the purge spreading, several businesses, including T. Rowe Price, Lexington Market, Cross Street Market, and the University of Maryland had announced they would be closing for the remainder of the day.[31]  *See* April 27, 2015 E-mail from Brian Rogers with subject line "T. Rowe Price's Plans," attached hereto as Exhibit 12; April 27, 2015 E-mail from Robert Thomas with subject line "Ealry [sic] Markets Closing," attached hereto as Exhibit 13.  In preparation for the "purge," police officers had been deployed to Mondawmin Mall.  *See* Ex. 5 at pp. 274-75, 300; *see also* Ex. 6 at pp. 181, 188-89.  At some point prior to 3:00 pm, the Maryland Transit Authority "closed the MTA, all the buses and subways from that location," resulting in "a lot of kids becoming stranded at that station." Ex. 2 at 209.  The confrontation between police and the

---

[31] John Bacon and William M. Welch, *Baltimore Police, Protesters Clash; 15 Officers Hurt*, USA Today (Apr. 28, 2015) at http://usatoday.com/story/news/nation/2015/04/27/ baltimore-credible-threat/26454875/.

predominantly juvenile protesters escalated at approximately 3:34 pm.[32]  The crowd began

throwing rocks, bricks, and bottles at the assembled police officers.[33]  *See* MOEM Timeline of

Events, attached hereto as Exhibit 14.  By 4.44 pm, the unrest had spread to the Penn North

neighborhood, where the local CVS was looted.  *Id*.  Eventually, the criminal activity became

widespread throughout the City.[34]

 At or around 6 pm, Commissioner Batts contacted the Mayor and asked her to declare a

state of emergency so that he could get the additional resources he needed.  Ex. 5 at pp. 285-86.

Per the Commissioner, the Mayor "jumped on it."  *Id*. at 287.

 By 6:30pm, Mayor Rawlings-Blake had been in contact with Governor Hogan and

requested that he declare a state of emergency and deploy the National Guard to Baltimore.  *See*

Ex. 2 at p. 232.  Governor Hogan did so at 7:01 pm, activating the National Guard for

deployment to Baltimore.[35]  The Mayor likewise declared a state of emergency in the City, and

enacted a curfew.[36]  *See also* Ex. 14.

 The unrest largely ended in the early hours of Tuesday morning, however, before the bulk

of the National Guard support arrived in Baltimore.  *See* Ex. 6 at pp. 193-94; Ex. 3 at pp. 34,

192-93. By that time, the police had arrested a total of 235 individuals.[37]  There were no

---

[32] Joshua Berlinger, *Baltimore Riots: A Timeline*, CNN, (Tue. April 28, 2015, 3:08 PM ET), http://www.cnn.com/2015/04/27/us/baltimore-riots-timeline/index.html.

[33] *Id.*

[34] *See infra*, n.51

[35] *Id*.

[36] *Id*.

[37] Jessica Anderson, *Baltimore Riots Lead to 235 Arrests, 20 Injured Officers*, The Baltimore Sun, (Apr. 28, 2015), http://www.baltimoresun.com/news/maryland/baltimore-riots/bs-md-ci-baltimore-Riots-what-we-know-20150428-story.html.

fatalities.  Despite the fact that the "purge" flyer only mentioned Mondawmin Mall and the downtown area, damage was spread across the City and not confined to any specific neighborhood.[38]  *See* Map of the Locations of Plaintiffs' Claims, attached hereto as Exhibit 15.

Throughout the protests and subsequent unrest, the City provided integral support to BPD, which was designated as the lead agency for handling the evolving situation.  *See* Ex. 4 at p. 89.  Incident Commander Melissa Hyatt noted that during that time, members of the Baltimore City Office of Emergency Management were "right in there with us in the [BPD] Command Center.  They were usually within an arm's distance away.  If there were things that we needed...they helped us a lot with logistics."  Ex. 9 at p. 122.  She added, "They helped organize some of the personnel requests, where people were going, people were coming in.  They had a significant role when the National Guard was deployed.  They created an added jurisdiction staging area, which was a significant undertaking."  *Id*. at 123.  She further acknowledged that they brought in out-of-state emergency management teams and concluded, "So they were really a strong [support] function and helped really pull our emergency resources together."  *Id*. Commissioner Batts concurred, stating, "[T]he City was doing everything it could with its resources in the city to help the police department."  Ex. 5 at pp. 277-78.  Clay Stamp, Executive Director of the Maryland Emergency Management Agency, noted that Baltimore City was operating "in full gear" and his agency was working to fulfill the numerous resource requests submitted by the City.  *See* Clay Stamp E-mail, attached hereto as Exhibit 16.

Some of the requests for assistance made by BPD, which were promptly addressed by City employees and officials, included:  street sweeping, cleaning, and removing items that could

---

[38] The damage to businesses was "widespread" throughout the city.  Natalie Sherman, *Shop Owners' Stories Show Riot Damage was Widespread*, Balt. Sun (May 29, 2015), http://www.baltimoresun.com/business/Bs-bz-damaged-business-vignettes-20150529-story.html.

be used as projectiles against police, procuring towing services to remove cars that were obstructions, supplying plywood for police station windows, providing traffic and crowd control devices like barrels and water barriers, obtaining buses and vans for BPD, arranging parking for police, setting up and fueling light towers, submitting various requests to Maryland Emergency Management for equipment and personnel, shutting down traffic and managing traffic flow, setting up paths for the protesters, obtaining enough food to feed the officers on duty, and setting up a sleeping area for officers.  *See* Deposition of Khalil Zaied (Deputy Mayor), attached hereto as Exhibit 17, at p. 44; Ex. 4 at p. 108; Ex. 3 at pp. 26, 38, 40-41, 48-49, 57; *see also* E-mails Regarding City Protest Actions, attached hereto collectively as Exhibit 18.

The City also monitored all channels of which they were aware where people were discussing protests and events as a means of gathering intelligence about any possible activities. Ex. 2 at p. 191.  City officials and employees reviewed permit applications for information and had communications with event organizers to learn about expected events and potential issues. Ex. 3 at pp. 48-49.

Initially, City officials fully staffed the BPD Watch Center to provide support to the police department during the protests.  *See id.* pp. 66-67, 143-44. After the situation on Monday escalated, however, the City activated its Emergency Operations Center (EOC) at approximately 5.30 pm to continue its role supporting BPD.  Ex. 8 at pp. 157, 164; *see also* Deposition of Stephanie Robinson (Deputy Mayor), attached hereto as Exhibit 19, at p. 166 ("we were in the EOC emergency management center to assist in any way we could, to answer any questions we could, to facilitate anything we could, to address any issues we could.").   In the EOC, officials began working on a curfew order and a local declaration of emergency. Ex. 3 at p. 34.  They worked to pair City firefighters with BPD officers so that they could successfully fight fires in

the face of crowd dangers and individuals cutting their fire hoses. *Id*. Essentially, they provided any assistance requested of them by BPD to support police efforts in quelling the unrest.

It is apparent when contrasted with other incidents of civil unrest in other American cities that the approach of BPD and the City in response to police brutality protests was significantly more effective when compared to the responses of similarly situated police forces before and since. The 2015 Baltimore unrest lasted only one night,[39] in stark contrast to the last time the city experienced a civil disturbance. In 1968, following the assassination of Dr. Martin Luther King, Jr., seven days of rioting resulted in six casualties and over 700 injuries.[40] The actions of BPD show that it learned from the Ferguson response, discussed *supra*, where protests were met with a heavy-handed police response that escalated them into violent riots that lasted for days and flared up again in subsequent months.[41] Further, the unrest across the country during the summer of 2020 in response to the death of George Floyd lasted for weeks to months in some cities, including New York City[42] and Minneapolis. During its 2020 riots, Minneapolis saw at

---

[39] Stolberg, *supra* note 21.

[40] Margery Harriss, *Recalling Baltimore's 1968 Riots*, The Baltimore Sun (Apr. 3, 1998) at http://articles.baltimoresun.com/1998-04-03/news/1998093147_1_baltimore-riot-gay-street-east-baltimore.

[41] Breeanna Hare, *How Did We Get Here from Ferguson?*, CNN, (Aug. 9, 2016) at http://www.cnn.com/2016/08/09/us/ferguson-michael-brown-timeline/index.html.

[42] Brian Mahoney, *N.Y.C. Left Reeling after Days of Unrest, Violence Amid George Floyd Protests*, Global News (May 31, 2020) at https://globalnews.ca/news/7008592/george-floyd-protests-new-york/.

least 2 deaths,[43] hundreds of arrests,[44] and more than $500 million dollars in property damage[45] that resulted directly from the rioting that erupted after George Floyd's death.  Further, despite having a population of approximately 200,000 fewer people than Baltimore, the Minneapolis unrest saw damage to 1,500 businesses,[46] compared to 300 in the Gray unrest.[47]  As with Ferguson, the continued unrest and escalation in destruction and violence in many of these localities has been directly attributed to the police response to those specific events.[48]  Specifically, the issues cited in "city after city," included militarization of law enforcement during protests and overly aggressive police responses, which "seemed to make things worse" and little effort to de-escalate tensions and work with people in the community.[49]

---

[43] Libor Jany, *Authorities: Body Found in Wreckage of S. Minneapolis Pawn Shop Burned During George Floyd Unrest*, Star Tribune (Jul. 20, 2020) at https://www.startribune.com/ body-found-in-wreckage-of-mpls-pawn-shop-burned-during-george-floyd-unrest/571838681/.

[44] Julia Lurie, *Weeks Later, 500 People Still Face Charges for Peacefully Protesting in Minneapolis*, Mother Jones (Jul 15, 2020) at https://www.motherjones.com/crime-justice/ 2020/07/weeks-later-500-people-still-face-charges-for-peacefully-protesting-in-minneapolis/.

[45] Walker Orenstein, *Minnesota Lawmakers Split Over Using State Money to Help Minneapolis Recover from Floyd Riots*, MinnPost (Jan. 28, 2021) at https://www.minnpost.com/ state-government/2021/01/minnesota-lawmakers-split-over-using-state-money-to-help-minneapo lis-recover-from-floyd-riots/

[46] Rilyn Eischens, *From Building Damage to Police Payouts, the Costs of Floyd's Killing are Piling Up*, Minnesota Reformer (Nov. 30, 2020) https://minnesotareformer.com/2020/11/30 /from-building-damage-to-police-payouts-the-costs-of-floyds-killing-are-piling-up/.  In addition, there was damage to an additional 300 buildings in neighboring St. Paul.

[47] Associated Press, *Maryland: Rioting Damaged 300 Businesses*, The New York Times (May 7, 2015) at https://www.nytimes.com/2015/05/08/us/freddie-gray-rioting-Damaged-300-businesses.html.

[48] Kim Barker, Mike Baker, & Ali Watkins, *In City After City, Police Mishandled Black Lives Matter Protests*, The New York Times (Mar. 20, 2021) at https://www.nytimes.com/ 2021/03/20/us/protests-policing-george-floyd.html.

[49] *Id*.  Incidentally, "[o]f the outside reviews, only the police department in Baltimore was credited with handling protests relatively well. The department deployed officers in ordinary uniforms and encouraged them 'to calmly engage in discussion' with protesters."  *Id*.

## Legal Standard

Rule 56(a) of the Federal Rules of Civil Procedure provides, "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  To qualify as a "genuine" dispute, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Although the court must draw all justifiable inferences in favor of the nonmoving party, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence."  *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013) (citing *Anderson*, 477 U.S. at 252).

## Argument

**I.      Even in the light most favorable to Plaintiffs, they cannot establish the elements of liability under Maryland's Riot Act.**

The Maryland Riot Act provides that "[s]ubject to § 14-1002 of [the Act], if a structure or personal property is stolen, damaged, or destroyed in a riot, the injured party may recover actual damages sustained in a civil action against the county or municipal corporation of the State in which the riot occurred."  Md. Code Ann., Pub. Safety § 14-1001(b).  A municipality is **not** liable, however, **unless** a plaintiff can prove that the municipality

> (1) had good reason to believe that the riot was about to take place or, having taken place, had notice of the riot in time to prevent the theft, damage, or destruction; and
>
> (2) had the ability, either by use of the county's or municipal corporation's police or with the aid of the residents of the county or municipal corporation, to prevent the theft, damage, or destruction.

*Id*. § 14-1002(a).  Further, "[a] person may not recover damages from a county or municipal corporation under § 14-1001 of this subtitle if it is satisfactorily proved that the authorities of the

county or municipal corporation, and the residents of the county or municipal corporation when called on by the authorities, used reasonable diligence and all the powers entrusted to them to prevent or suppress the riot."  *Id*. § 14-1002(b).

### A.     The City did not have notice that civil unrest would occur on April 27, 2015.

In order to recover under the Riot Act, a plaintiff must first prove that the municipality "had good reason to believe that the riot was about to take place or, having taken place, had notice of the riot in time to prevent the theft, damage, or destruction."  Md. Code Ann., Pub. Safety § 14-1002(a).  Plaintiffs have not provided any information to support this crucial element of establishing a viable claim under the Riot Act.  Even viewing the facts in light most favorable to Plaintiffs, there is simply no evidence that the City knew or should have known in advance about the civil unrest that occurred on April 27, 2015, either at Mondawmin or throughout the City.

### 1.     The City had no notice of <u>any</u> forthcoming civil unrest on April 27, 2015.

Plaintiffs have utterly failed to provide any information that the City "had good reason to believe that the riot was about to take place or, having taken place, had notice of the riot in time to prevent the theft, damage, or destruction." Md. Code Ann., Pub. Safety § 14-1002(a).  In the absence of any such notice, Plaintiffs are barred from recovery as a matter of law.  Specifically, Plaintiffs have failed to establish sufficient, specific facts indicating that the property damage they have alleged was caused by a riot or riots.  In fact, there have been no facts introduced that the damage caused to the Plaintiffs' property was caused by anything other than individuals opportunistically taking advantage of unrest in order to commit crimes and property destruction. *See* Ex. 2 at pp. 220-24.  Ergo, the Plaintiffs have also failed to provide facts that the City had

any notice about the "riot or riots" that caused their specific damages.  Accordingly, they have failed to meet this threshold requirement for recovery under the Act.

Further, Plaintiffs have failed to provide any facts that the City knew, or should have known, that unrest of any magnitude was forthcoming.  As noted above, in the days preceding the unrest, protests had been largely peaceful with some small pockets of individuals causing damage on Saturday night.  On Sunday, the City was quiet once again.[50]  The first indication BPD and the City received regarding any possible protests activity was the flyer advertising a "purge."  As noted above, due to the vagueness of the flyer, no one knew or could have known what it actually meant.  Plaintiffs' contention that the City should have predicted that widespread rioting would be forthcoming based on this flyer and a few hours of destruction on one evening in a completely different area of the City is ludicrous and unsupported by facts.[51]  Additionally, Plaintiffs' suggestion that police should activate its panoply of riot-squelching resources every time it becomes aware of a note, flyer, scrawl, scrap, or document evincing nebulous language is similarly absurd and altogether untenable.

Moreover, Plaintiffs have cast the incidents leading to their alleged property damage as not one large riot, but as dozens and dozens of "separate" and "individual" riots (Complaint ¶ 78).  The mere idea that the City should have been aware that each and every one of these "separate" riots would occur is preposterous, particularly in light of the scant intelligence regarding a single student demonstration at Mondawmin Mall and possibly downtown.  As

[50] Josh Sanburn, *Calm Restored in Baltimore as the City Awaits the Funeral of Freddie Gray*, Time, (April 6, 2015), http://time.com/3836108/freddie-gray-protests-funeral-baltimore/.

[51] It is also of note that a number of individuals died while in BPD custody in the three years prior to Freddie Gray, and while protests occurred, they did not devolve into widespread rioting. *See* Jessica Anderson, *A Look into the Recent History of Baltimore Police In-Custody Deaths*, Balt. Sun (Apr. 22, 2015), http://www.baltimoresun.com/news/maryland/baltimore-city/Bs-md-police-in-custody-deaths-20150422-story.html.

noted, the property addresses provided by Plaintiffs show that the "individual" riots that are the subject of this action were spread across the City, and not confined to any specific neighborhood.[52]  To attempt to draw a parallel between the destruction that occurred due to a small group of individuals on the evening of Saturday, April 25, 2015, to more widespread unrest on Monday, April 27, 2015, is frankly absurd and the assertion that the City knew or should have known such unrest would occur following the events of Saturday is baseless.  While it is convenient for Plaintiffs to assert that the City knew or should have known that future unrest would occur due to some destruction on Saturday night, it is not supported by any of the facts in this matter.  Therefore, Plaintiffs' claims of notice are insufficient under the Riot Act.

> 2.    **The City had no notice of potential for any unrest outside of the immediate area of the Mondawmin Mall and downtown.**

Plaintiffs suggest the notice of a "purge" by students that was to occur at Mondawmin Mall on April 27, 2015 that the City knew or should have known that widespread unrest would occur throughout the City.  As discussed above, this assertion is simply not supported by the facts.  Should the Court find that the City knew or should have known of any potential unrest, however, there are no facts indicating that the City had any notice of any events outside of the immediate area of Mondawmin Mall and downtown.  After nearly two weeks of mainly peaceful protests, on Sunday, April 26, BPD received a copy of the flyer regarding a student demonstration identified as a "purge."  *See* Ex. 11.  This information was conveyed to City officials on Monday, April 27, and subsequently, local businesses became aware of the impending "purge" and began to close early. *See* Ex. 5 at pp. 274-75, 300; *see also* Ex. 6 at pp. 181, 188-89; *see also* Ex. 11; *see also* Ex. 12; *see also* Ex. 13.   However, as discussed *supra*,

---

[52] The damage to businesses was "widespread" throughout the city.  Natalie Sherman, *Shop Owners' Stories Show Riot Damage was Widespread*, Balt. Sun (May 29, 2015), http://www.baltimoresun.com/business/bs-bz-damaged-business-vignettes-20150529-story.html.

the "purge" flyer included no details, nor did it indicate that more widespread unrest would result. *See* Ex. 11; *see also* Ex. 2 at pp. 199-200; *see also* Ex. 5 at pp. 274-275, 300; *see also* Ex. 6 at pp. 181, 188-189.   As is now known, at or around 3 pm on April 27, conflict broke out between BPD and a crowd of high school students.  The City was not involved in the BPD response at Mondawmin Mall, other than providing requested support to police, and received no indication that the unrest would spread beyond that immediate area.  *See* Ex. 2 at pp. 199-200, 209-210.

At a minimum, the City expected something to happen at Mondawmin Mall but had no specific information about what that would entail.  *See id.*  at 199-200.  But certainly, the flyer did not indicate City-wide violence.  Rather than one large event that "spread" from Mondawmin, pockets of individuals began to engage in property destruction and violence in different areas throughout the City. *See id.* at pp. 209-10, 220-24.  The various, widespread locations of Plaintiffs' alleged property damage prove this to be true, as it spread throughout the City and not concentrated in a single area.  *See* Ex. 15.  Further, and with specific regards to the "purge" flyer that was dispersed, the flyer *only* noted that Mondawmin would be the meeting place for the commencement of the "purge" and that it would continue downtown.  *See* Ex. 11. None of Plaintiffs' property damage occurred downtown and, in fact, very little violence occurred in that area.[53]

The City's limited knowledge of one possible event does not and cannot lead to the conclusion that the City knew or should have known that greater unrest would occur or spread beyond the location of Mondawmin Mall.  The City had no notice whatsoever that the events occurring at Mondawmin would result in opportunistic crimes throughout the City.  Further, it is

---

[53] New York Times, *Mapping the Clashes Between Baltimore Police and Protesters* (Apr. 28. 2015), at https://www.nytimes.com/interactive/2015/04/24/us/freddie-gray-and-the-baltimore-police-department-timeline.html.

also unclear what prompted further unrest throughout the City, beyond individuals taking advantage of the situation at Mondawmin and the decreased police presence in other areas of the City as a result.  *See* Ex. 2 at pp. 220-24.

It is clear from the available facts the City did not have any information that a riot would break out at Mondawmin Mall, or that it would spread to other areas of the City that was not mentioned in the flyer and had not seen any incidents of protests or unrest during the previous two weeks.  Therefore, even if this Court determines that the City had notice of some of the unrest, Plaintiffs' claims of notice beyond the events that occurred at or around Mondawmin Mall are insufficient under the Riot Act.

 **B.** **The City did everything reasonable within its power to prevent unrest in the City and to aid the Baltimore Police Department in its efforts.**

As explained by the Maryland Court of Appeals in *City of Baltimore v. Silver*, "a reading of the [Riot Act] makes it abundantly clear that the core of the statutory liability for riot damages is negligence on the part of those in authority who are charged with the responsibility and are vested with the power to maintain public peace. 263 Md. 439, 446-47 (1971).  Due to the lack of unrest in Maryland in the modern era, there is very little guidance from the Maryland appellate courts on what constitutes negligence on the part of public officials or police officers during civil unrest.  The *Silver* court did, however, indicate that officials are only required to use "reasonable means" in addressing unrest. 263 Md. at 453.

 **1.** **Plaintiffs cannot establish that the National Guard could have prevented the unrest.**

Plaintiffs suggest that the City should have requested National Guard assistance sooner, and that doing so would have prevented their respective property damage.  This assumption, however, is flawed for a number of reasons.

Throughout this litigation, Plaintiffs have insinuated that the City should have called for Guard assistance during the violent flare-up on Saturday, April 25.  This premise, however, ignores the fact that, as discussed above, Commissioner Batts had already contacted the State Police to get additional resources from them, which could have included utilization of the National Guard to put more boots on the ground, a request that was largely ignored.  Further, as also noted *supra*, Governor Hogan's deputy emergency management director had already indicated to the City that the governor did <u>not</u> intend to activate the National Guard at that time, although a City attorney had prepared a possible declaration to that effect.  While a governor may consult with city or county leaders before sending in the National Guard, the governor has the sole power to order the Guard into active duty.  *See* Md. Code Ann., Pub. Safety § 13-702.  Thus, given the position of the governor and the further lack of any troubling activity in Baltimore on the following day (Sunday, April 26), the earliest time at which the mayor could have requested National Guard aid from the governor would have been when the violence actually started on April 27 at approximately 3.30 pm.  Mayor Rawlings-Blake made the request of Governor Hogan around 6.30 pm that evening.  Ex. 2 at p. 232.  The bulk of the National Guard, however, did not deploy until approximately 6.44 am on April 28, 2015, about twelve hours after it was activated and well after most of the violence was over.[54]  Plaintiff cannot establish that the approximately 180 minute delay between the start of the unrest and the mayor's request for assistance would have resulted in the Guard arriving significantly earlier in the City, let alone soon enough to have prevented the property damage of which they complain. Additionally, the City has scoured the annals of caselaw and has been unable to find any

---

[54] Associated Press, *Timeline Of Freddie Gray Story And State Of Emergency In Baltimore*, WBAL (Apr. 29, 2015), at https://www.wbal.com/article/114799?title= timeline-of-looting-and-riots-in-baltimore.

authority which even suggests that three hours between the first signs of unrest and a phone call to a governor requesting the National Guard is negligent.

Further, Plaintiffs cannot provide facts that the National Guard's presence in the City would have prevented or ended the unrest and thus, their damages.  It is a logical fallacy to suggest that the fact that there was no rioting after the Guard arrived is proof that it caused the end of violence; as noted, the unrest had already been mostly quelled by BPD by that time.  And it is not only speculative to say that the National Guard would have prevented the violence, but is contradicted by recent anecdotal evidence.  For example, from May 26 to May 29, 2020, following the in-custody death of George Floyd, Minneapolis experienced the "most destructive riots" in America since Los Angeles in 1992.[55]  There, the National Guard, along with state troopers, reported for duty on the evening of May 27, yet the rioting, which included arson, other property damage, and violence to individuals, was not controlled until approximately two days later.[56]  Likewise, in Ferguson, "[c]onfrontations between protesters and law enforcement officers continued even after [the governor] deployed the Missouri National Guard to help quell the unrest."[57]  Therefore, for Plaintiffs to suggest that the National Guard would have prevented their damages is to engage in the type of speculation of which the Supreme Court prohibited consideration in *Anderson*.

---

[55] Farah Stockman, *'They Have Lost Control':  Why Minneapolis Burned*, The New York Times (Jul. 3, 2020), at https://www.nytimes.com/2020/07/03/us/minneapolis-government-george-floyd.html

[56] *Id*.

[57] Larry Buchanan, et al., *What Happened in Ferguson?*, New York Times (Aug. 13, 2014, updated Aug. 10, 2015), at https://www.nytimes.com/interactive/2014/08/13/us/ferguson-missouri-town-under-siege-after-police-shooting.html.

## 2.   The City correctly deferred to BPD to handle the unrest and provided any requested support.

Properly, the Baltimore Police Department was the lead agency in handling the unrest that occurred on April 27, 2015.  *See* Ex. 6 at p. 35; Ex. 8 at p. 57.   Not only do BPD commanders and officers have law enforcement and crowd control training that political officials lack, BPD Commissioner Anthony Batts, had significant personal experience dealing with large, violent demonstrations, having served as an officer in Long Beach, California during the Los Angeles riots following the verdict in the Rodney King trial, and as Chief of Police in Oakland during multiple demonstrations.  Ex. 5 at pp. 238-39.  The role of the City was to support the lead agency and to "be responsive to whatever BPD would need."  *See* Ex. 4 at p. 89; Ex. 8 at pp. 36, 76 ("But going back to the concept of Baltimore Police being the lead agency, they set direction, set tone for the incident.  So it wouldn't really be our role to come in and say we have to get people [disrupting traffic] out of here….It would more so be our role to take direction from BPD and potentially do things to help facilitate safety….We...try to do the ancillary things to keep people safe [and] make the overall situation less dangerous.").

And, as has been the case in Baltimore City since the 19th century, the Baltimore Police Department is not a City agency.  The law that created the Baltimore Police Department unequivocally states, "The Police Department of Baltimore City is hereby constituted and established as an agency and instrumentality of the State of Maryland."  Maryland Code of Public Local Laws, art. 4 § 16-2(a).  *See also, e.g., Clea v. Baltimore*, 312 Md. 662, 668 (1988) ("this Court has consistently held that Baltimore City should not be regarded as the employer of members of the Baltimore City Police Department for purposes of tort liability. Unlike other municipal or county police departments which are agencies of the municipality or county…the Baltimore City Police Department is a state agency.") (internal citations omitted); *Mayor & City*

*Council v. Clark*, 404 Md. 13, 26 (2008) ("The decisions of this Court concerning the liability of the City of Baltimore for the acts, activity and inaction of the Police Department, over which it has no power, have been consistent and unequivocal, premised on, and holding uniformly, that the Baltimore Police Department is an entity of the State, and not of the City of Baltimore."). Following the 1968 Baltimore riots, the Court of Appeals agreed that "the City of Baltimore had no authority over the police department" and could instead "confer[] with the police commissioner and [make] requests for specific kinds of police action." *Silver*, 263 Md. at 452. As noted by numerous officials, however, they deferred to the individuals actually trained in law enforcement and demonstrations. *See, e.g.*, Ex. 3 at p. 180; Ex. 4 at p. 36. It is not "reasonable" within the ambit of *Silver* to expect untrained officials individuals to usurp the decisions of persons who are qualified and experienced in handling such situations.

Accordingly, as discussed thoroughly in the Facts section above, the City made every effort to support BPD and provide the resources it needed to handle the protests and unrest. Commissioner Batts stated, "[The City was not] just activating the EOC. They were bringing up the resources of [the] school district, they were bringing up Public Works, They were bringing up every department in the city and they were informing, coordinating, working with us and they were taking a very active role in leadership on that date." Ex. 5 at p. 277. Commissioner Batts has stated unequivocally that there was not a single request that BPD made of the City to which it did not respond. *Id*. at p. 306. Accordingly, the City did everything in its power, absent micromanaging the lead agency with unnecessary and uninformed input, to support BPD in its efforts to quash the unrest. Again, the City has scoured the annals of jurisprudence and identified no cases nor any authority to even suggest that a municipality is required to micromanage a police department during civil unrest to avoid claims of negligence.

### 3. In addition to providing support to BPD, the City took independent actions to attempt to prevent civil unrest.

Because it would have been frankly foolish for the City to second-guess the law enforcement decisions of trained police officers and offer unsolicited and uneducated input into police practices, the City took its own independent steps to prevent escalation of the protests. Guided by the Ferguson report discussed *supra*, City officials engaged community leaders and stakeholders to calm the situation to avoid the kind of unrest that broke out in Ferguson. Mayor Rawlings-Blake noted, "I remember us trying to do a lot of work--to do outreach with faith leaders, community leaders, activists, trying to ensure that people understood what we were doing with respect to the investigation, to make sure people knew that...we weren't sweeping this under the rug; that we were concerned about the circumstances, that we were taking it seriously, reminding people about the ongoing work that we've done around police reform." Ex. 2 at p. 30. She added, "I think one of the things that we knew would...contribute to unrest was a lack of information and a lack of transparency.  So we worked hard to make sure [that we had] open lines of communication and to be transparent about what we knew, what we didn't know, and to be clear about what our plans were." *Id*. at pp. 36-37.

Further, the Mayor's office reached out to businesses "to share the intelligence that we knew or as much as we had so that potentially...impacted businesses and business owners could be prepared, as well as I believe part of that conversation was suggestions or advice about what preparedness looks like." Ex. 2 at pp. 66-67.

Following the spate of violence on April 25, 2015, the Mayor's office contacted Freddie Gray's twin sister, Fredericka, and enlisted her to speak at a press conference in an attempt to cool the situation.[58]  Alongside the Mayor and Police Commissioner, who condemned the

---

[58] *Freddie Gray's Twin Sister Fredricka Gray Speaks After Violent Protests*, CBS News (Apr. 26, 2015) at https://www.cbsnews.com/news/freddie-grays-twin-sister-fredricka-gray-

violence, Ms. Gray pleaded with the public, "My family wants to say, 'Can y'all please, please stop the violence? Freddie Gray would not want this.' Freddie's father and mother do not want any violence. Violence does not get justice."[59]

The following day, Mayor Rawlings-Blake gathered a coalition of two dozen interdenominational faith leaders to call for peace in the community; in a statement released by the Mayor's office, the group stated, "From the days of our nation's earliest civil rights sit-ins, Baltimore has a long tradition of peaceful and respectful demonstrations. Together, as leaders of different faiths in our city, we join Mayor Stephanie Rawlings-Blake and call for our citizens to honor and continue that history as we pray for the family of Freddie Gray."[60]  The Mayor also reached out to community leaders and business leaders in an effort to discuss how to move forward with regard to the protests.  *See* Community Leader Call Confirmation, attached hereto as Exhibit 20; *see* Business Leader Call Confirmation, attached hereto as Exhibit 21; Ex. 6 at pp. 148-49.

Further, the Baltimore City Fire Department, which is a City agency, prepared an action plan for the funeral so that it could best support BPD in the field in the event of an emergency, and provided BPD with two large vans and drivers.  *See* Freddie Gray Funeral Incident Action Plan, attached hereto as Exhibit 22; Fire Chief Ford E-mail, attached hereto as Exhibit 23; Fire Department Resources E-mail, attached hereto as Exhibit 24.  The City also cancelled additional

---

speaks-after-violent-protests/

[59] Miguel Marquez & Steve Almasy, *Freddie Gray Death: Protesters Damage Cars; 12 Arrested*, CNN (Apr. 25, 2015) at https://www.cnn.com/2015/04/25/us/baltimore-freddie-gray-protest/index.html.

[60] Yvonne Wenger & Colin Campbell, *Baltimore Police Arrest 35, 6 Officers Injured in Protest*, The Baltimore Sun (Apr. 27, 2015) at https://www.baltimoresun.com/maryland/baltimore-city/bs-md-ci-protest-arrests-20150426-story.html.

leave and scheduled overtime shifts for its emergency dispatchers to handle extra call volume.
*See* EDS Scheduling E-mails, attached hereto collectively as Exhibit 25.

    **4.**      **Plaintiffs cannot establish that calling for a *posse comitatus* would have been reasonable or prevented the unrest.**

The Riot Act also suggests that one way a municipality may prevent property damage during civil unrest is "with the aid of the residents of the county or municipal corporation," or, in other words, form a *posse comitatus* to suppress the agitators.  Md. Code Ann., Pub. Safety § 14-1002(a)(2).  In 1971, the *Silver* court concluded that a *posse comitatus* of citizen volunteers was still a viable option.  263 Md. at 458.  This notion today, however, is positively ludicrous and would not using "reasonable means" of dealing with the unrest.  Not only can Plaintiffs not establish that the City could have gathered such a group and prepared them for battle (which would include background checks, evaluation of training, legal waivers, credentials, and orders among others), during the scant twelve hours the unrest lasted, such an action surely would have led to increased violence and damage as well as deaths that BPD otherwise successfully prevented.  This is particularly true in light of the racial justice issues at the heart of the protests and subsequent unrest; such tragedy certainly happened elsewhere.  Notably, in 2020, an Illinois teenager traveled to Kenosha, Wisconsin with a semi-automatic rifle, "ostensibly to protect businesses from protesters," and fatally shot two demonstrators while wounding another.[61] Involving volunteer civilians in unrest suppression in today's climate is not just unreasonable, but deadly.

The City took every *reasonable* action, as required by the Riot Act and the *Silver* court, to assist BPD in addressing the unrest.  Plaintiffs can speculate and second guess as to other

---

[61] *Teen Told Police 'I Shot Two White Kids" After Allegedly Killing Two Kenosha Protesters*, CBS News (Oct. 31, 2020), https://www.cbsnews.com/news/kenosha-protesters-killed-teen-kyle-rittenhouse-police-report/.

actions the City could have taken, but legally, these arguments fail because they cannot prove

that such actions would have affected the outcome and prevented their property damage.

Accordingly, Plaintiffs' claims fail as a matter of law.

II.   **If Plaintiffs can establish a case of liability under the Riot Act,  the state cap on damages under the Local Government Tort Claims Act should apply to their claims.**

The Local Government Tort Claims Act (LGTCA) establishes a cap for claims against a

municipality; at the time of the incidents giving rise to this lawsuit, the statute provided that "the

liability of a local government may not exceed $200,000 per an individual claim, and $500,000

per total claims that arise from the same occurrence for damages resulting from tortious acts or

omission…."  Md. Code Ann., Cts & Jud. Proc. § 5-303(a)(1) (2015).  Accordingly, the City

filed a motion for a declaratory judgment to enforce the cap.  ECF Nos. 58, 78.  The Court

denied the City's motion.  ECF Nos. 87-88.

With all due respect to the prior Court, the City requests that this Court exercise its power

to reconsider the interlocutory ruling rendered on this issue, should it not grant summary

judgment on the substantive issues.  *See Fayetteville Invs. v. Com. Builders, Inc.*, 936 F.2d 1462,

1469 (4th Cir. 1991) ("An interlocutory order is subject to reconsideration at any time prior to

the entry of a final judgment.").  To the City's knowledge, that determination represents the first

time a court has ever declined to apply the statutory cap to a claim arising under Maryland law,

which is an extraordinary departure from the state's appellate court rulings.

To that end, the City incorporates ECF Nos. 58 and 78 as if fully set forth herein.  In

short, Maryland case law makes it clear that the statutory cap does apply to claims under the Riot

Act.   The Court of Special Appeals has noted that the cap applies "for damage resulting from

tortious acts or omissions," which is precisely the basis for a plaintiff's recovery under the Riot

Act.  *Espina v. Prince George's Cnty*., 215 Md. App. 611, 631 (2013).  And Maryland's high court ruled that a limitation on damages applies with equal force to statutory claims, even those that were created before the cap was enacted.  *See Green v. N.B.S., Inc.*, 409 Md. 528, 544 (2009).  Applying a previous LGTCA decision to the cap question, the Court of Appeals noted, "Nothing in the LGTCA's language or its legislative history indicates that the General Assembly intended to exclude any category of tortious conduct committed by a local government or its employees."  *Espina v. Jackson*, 442 Md. 311, 326 (2015) (quoting *Rounds v. Md.–Nat. Capital Park & Planning Comm'n*, 441 Md. 621 (2015)).  The Court of Special Appeals correctly recognized that the LGTCA "provides no exceptions for intentional torts or constitutional violations" and that it would not "recognize an exception in a statute when there is no express basis for the exception in the statutory language."  *Espina v. PG Cnty*., 215 Md. App. at 632.  *See also Espina v. Jackson* 442 Md. at 326 ("This Court has been most reluctant to recognize exceptions in a statute when there is no basis for the exception in the statutory language.  Indeed, to recognize an exception not apparent in the statutory language would be contrary to our effort to neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute.") (citations omitted).  Despite the fact that no such express exception exists for Riot Act claims, the previous Court determined that the LGTCA did not apply to them because the Act allows a plaintiff to recover their "actual damages."  The Maryland legislature, however, would have been well aware of the Riot Act at the time that it passed the LGTCA and its cap on damages; had it wanted to exempt the Riot Act from the cap, it would have expressly stated so.  Thus, the LGTCA cap must be applied to claims under the Riot Act.

Accordingly, because the cap is applicable to Plaintiffs' claims, this Court should pass an order that the $500,000 cap applies to their claims in total, as they all arise out of the same occurrence.  To determine if claims arise out of the same occurrence, Maryland has adopted the "cause test," meaning that if a local government is negligent and that negligence is the proximate cause of multiple claims, the claims "would arise out of the same occurrence, even if the local government was (1) negligent in several different ways, and (2) for an extended period of time." *See, e.g., Board of County Comm'rs v. Marcas*, 415 Md. 676, 689-90 (2010). at 689-90.  *See also J.G. v. Prince George's County Bd. of Education*, PWG-16-1008 (D. Md. Mar. 8, 2017).  Despite Plaintiffs' attempts to characterize the events of April 27, 2015 as dozens of "separate" and "individual" riots (Complaint ¶ 78) to defeat the cap, their efforts are futile.  Regardless of whether there was one riot or one hundred on that day, the unrest all arose out of the same alleged cause--that being the City's negligence in preparing for and responding to the unrest. Because all of Plaintiffs' claims arise out of one singular cause, they constitute one occurrence under Maryland law, and therefore the $500,000 cap under the LGTCA applies to their claims in the aggregate.

<u>**Conclusion**</u>

For the reasons stated herein, Defendant Mayor and City Council of Baltimore respectfully requests that this Honorable Court grant its Motion for Summary Judgment, as well as any and all other relief it deems appropriate.  In the alternative, the City respectfully asks that this Court apply the statutory cap established in the Local Government Tort Claims Act.

Date:  April 9, 2021                    Respectfully,

JAMES L. SHEA, City Solicitor (00142)


_____/s/_____
Sara E. Gross, Chief Solicitor (27704)
Hanna M. Sheehan, Assistant Solicitor (19531)
Baltimore City Department of Law
100 N. Holliday Street
Baltimore, Maryland 21202
(410) 396.3947
sara.gross@baltimorecity.gov
Attorneys for Defendant Mayor and City Council
  of Baltimore