**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

|  |  |  |
|---|---|---|
| CHAE BROTHERS LIMITED LIABILITY COMPANY, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No.  1:17-cv-01657-SAG |
| MAYOR & CITY COUNCIL OF BALTIMORE, *et al.*, | ) ) ) | |
| Defendants. | ) ) | |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Peter K. Hwang, Esq.
    District Court Bar No. 19052
Sung Hwang & Kim LLP
9256 Bendix Road, Suite 109
Columbia, MD 21045
(410) 772 2324
(410) 772 2328 (fax)
phwang@shkfirm.com

Ray M. Shepard, Esq.
    District Court Bar No. 09473
The Shepard Law Firm, LLC
122 Riviera Drive
Pasadena, MD 21122
(410) 255 0700
(443) 773 1922 (fax)
Ray@Shepard.Law

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

INTRODUCTION ...........................................................................................................1

STATEMENT OF MATERIAL FACTS IN DISPUTE.................................................1

    A.    Freddie Gray's Arrest, The Initial Protests, And The City's Coordination With BPD.........................................................................................................1

    B.    Freddie Gray Passes Away, And It Becomes Abundantly Clear To The BPD And The City That The BPD Does Not Have Sufficient Resources.....2

    C.    Protests Escalate Upon Freddie Gray's Passing, But Decisions Are Made To Limit Arrests, And BPD Officers Are Restricted From Wearing Protective Gear, While The City Continues Coordinating With The BPD ...3

    D.    While The Protests Are Escalating, It Becomes Abundantly Clear That The BPD Was Not Going To Receive The Number Of Officers From Mutual Aid That It Needed ..........................................................................5

    E.    Protests Turn Into Rioting On April 25, 2015 Amidst Stand-Down Orders Issued To BPD Officers ...............................................................................7

    F.    The City Acknowledges A New Reality And Refers To The City's Emergency Operations Plan, But Fails To Implement It Or Take Any Further Action In Light of Rioting That Occurred On April 25, 2015 .........11

    G.    The City Has Good Reason To Believe That Further Rioting Would Occur On April 27, 2015, And, Again, Is Notified By The BPD About Insufficient Resources ...................................................................................16

    H.    Rioting Results In Violence, Theft, And Property Destruction Throughout The City On April 27, 2015, While Restrictions On BPD Officers Continue ...................................................................................................18

    I.    After It Is Far Too Late, The Governor Convinces The Mayor to Request The Declaration Of A State Of Emergency, And Additional Resources Enter The City And Quell Rioting ...............................................................19

LEGAL STANDARD...................................................................................................21

ARGUMENT ................................................................................................................22

    I.    There Are Genuine Issues Of Material Fact That Preclude Summary Judgment.........................................................................................................22

A.      The City "Had Good Reason To Believe That Riots Were About To Take Place Or, Having Taken Place, Had Notice Of The Riot In Time To Prevent The Theft, Damage, Or Destruction" That Occurred On April 27, 2015 ..............................................................23

B.      The City Did Not Use Reasonable Diligence And All The Powers Entrusted To It To Prevent Or Suppress The Riot ...........................25

1.      The City Did Not Use Reasonable Diligence When "Stand-Down" Orders Were Issued Precluding BPD Officers From Making Arrests And/Or Appropriately Engaging Rioters .....26

2.      The City Failed To Use Reasonable Diligence And All The Powers Entrusted To It When It Failed To Timely Request A State Of Emergency Declaration, Request The National Guard, And/Or Take Steps To Address The BPD's Insufficient Resources Until It Was Far Too Late .....29

3.      The City Should Have Enacted The Curfew Earlier And/Or Had The Curfew Take Effect On April 27, 2015 Before Rioting Spread Across The City .............................................34

II.     The City's Third Request To Apply The State Cap On Damages Is In Contravention Of The Local Rules And Plainly Ignores The Well-Reasoned Rulings Of This Court ..........................................................34

CONCLUSION .....................................................................................................35

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242, 248 (1986)……………………………………………………………21, 22

*Black & Decker Corp. v. United States,*
436 F.3d 431 (4th Cir. 2006)………………………...………………………...…..22

*City of Baltimore v. Silver,*
263 Md. 439 (1971)………………………………………………...29, 32, 34

*Dennis v. Columbia Colleton Med. Ctr., Inc.,*
290 F.3d 639 (4th Cir. 2002)…………………………………………………22

*Guessous v. Fairview Prop. Invs., LLC,*
828 F.3d 208 (4th Cir. 2016)……………………………………………...…22

*In Re Microsoft Corp. Antitrust Litig.,*
355 F.3d 322 (4th Cir. 2004)…………………………………………………35

*Int'l Bhd. of Teamsters v. Willis Corroon Corp.,*
369 Md. 724, 802 A.2d 1050 (2001)………………………………………32

*Jacobs v. N.C. Administrative Office of the Courts,*
780 F.3d 562 (4th Cir. 2015)…………………………………………………22

*Legrier v. Tuma,*
No. 1:20-CV-02216-SAG, 2021 WL 1946515, (D. Md. May 14, 2021)………………..26

*Libertarian Party of Va. v. Judd,*
718 F.3d 308, 313 (4th Cir. 2013)…………………………………………………22

*Mayor and City Council of Hagerstown v. Dechert,*
32 Md. 369 (1870)…………………………………………………………26

*McLhinney v. Lansdell Corp. of Md.,*
254 A.2d 177, 181 (Md. 1969)……………………………………………..…26

*Mercantile Peninsula Bank v. French,*
499 F.3d 345 (4th Cir. 2007)…………………………………………………22

*Raynor v. Pugh,*
817 F.3d 123, 130 (4th Cir. 2016)…………………………………………………21

*Sharif v. United Airlines, Inc.,*
    841 F.3d 199, 204 (4th Cir. 2016)……………………………………………………21

**Statues, Rules and Regulations**

28 U.S.C. § 2201………………………………………………………………………35

Md. Code Ann., Pub. Safety § 14-1001(b)…………………………………………..23, 25

Md. Code Ann., Pub. Safety § 14-1002………………………………………….........22

Md. Code Ann., Pub. Safety § 14-1002(a)………………………………............23, 25, 26

Md. Code Ann., Pub. Safety § 14-1002(b)…………………………………………... 23

Md. Code, Pub. Safety § 14-702(1)…………………………………………………...15

Md. Code, Pub. Safety § 14-702(4)…………………………………………………...15

Md. Code, Pub. Safety § 14-702(9)…………………………………………………...15

Fed. R. Civ. P. 57 ……………………………………………………………………..35

## INTRODUCTION

In its Motion, Defendant Mayor and City Council of Baltimore (the "City") contends that the "handling of the unrest should be considered a success." Plaintiffs – who sustained serious injuries after being viciously assaulted, had property burned to the ground or otherwise damaged, and/or had their business looted and/or destroyed – disagree. While the "not-as-bad-as-Ferguson" standard submitted by the City has no bearing on its Motion, the City also attempts to fashion non-existent immunity from whole cloth, submitting that it is not liable because it deferred to the Baltimore Police Department ("BPD") to handle the protests and/or in light of what the State communicated to it. Liability under the Maryland Riot Act, however, is not concerned with what others did or did not do, but rather with whether the City could have done more. While the answer is a resounding yes, there are, at the very least for the purposes of this Motion, genuine issues of material fact that preclude summary judgment.

## STATEMENT OF MATERIAL FACTS IN DISPUTE[1]

A.   Freddie Gray's Arrest, The Initial Protests, And The City's Coordination With BPD

On April 12, 2015, BPD officers arrested Freddie Gray, who sustained serious injuries during the course of his arrest, and the Mayor was informed that day or the very next day.[2] The Police Commissioner had concerns "from day one" that protests may escalate into full-blown riots, and the City shared the same concerns in light of the BPD's prior policing issues.[3]

Protests began shortly thereafter, accompanied by threats against BPD officers as a result

---

[1] For this Court's reference, a summary of the persons deposed in this matter and referenced throughout this Opposition is attached as Exhibit A.

[2] *See* Exhibit 9 ("McMillan Tr.") to the Declaration of Peter K. Hwang ("Hwang Decl."), attached hereto as Exhibit B, at 36:1–9; *see also* Exhibit 1 ("Rawlings-Blake Tr.") to the Hwang Decl. at 22:7–22, 23:23–25.

[3] *See* Exhibit 10 ("Batts Tr.") to the Hwang Decl. at 142:7–25; *see also* Exhibit 7 ("Maloney Tr.") to the Hwang Decl. at 25:3–17; McMillan Tr. at 36:1–9.

of the circumstances of Freddie Gray's arrest.[4] Even as the protests began, the City had meetings with the BPD regarding how the BPD would handle the protests and was "very engaged" with respect to the protests.[5] Indeed, even before the arrest of Freddie Gray, the City had previously been very engaged with the BPD's well-known use-of-force issues.[6] Additionally, the rioting in Ferguson, Missouri due to another in-custody death had only recently occurred, and the Police Commissioner had been tasked with addressing such issues when Freddie Gray was arrested.[7]

    B.    <u>Freddie Gray Passes Away, And It Becomes Abundantly Clear To The BPD And The City That The BPD Does Not Have Sufficient Resources</u>

Freddie Gray subsequently passed away on April 19, 2021, and the City was informed that same day.[8] Between April 19 and 21, 2015, senior leadership at the BPD discussed how the BPD did not have enough officers to appropriately deal with the protests, particularly in light of the geography of the city and concerns of protestors taking over streets and damaging property.[9] Indeed, the BPD's Operations Commander during the protests noted that the BPD was "very, very short on having enough officers" even for basic protest needs.[10]

Upon Freddie Gray's passing, the City also had discussions with the BPD regarding the BPD's need for additional officers, and the need to seek additional officers by way of mutual aid from jurisdictions outside of Baltimore.[11] In light of the clear need for more officers, coupled with concerns that the rioting in Ferguson could also happen in the City with the escalation in protesting

---

[4] *See* Exhibit 20 to the Hwang Decl. (CITY00010337); *see also* Exhibit 21 to the Hwang Decl. (CITY00004537).
[5] Batts Tr. at 62:6–64:13; McMillan Tr. at 39:1–18, 77:3–9, 80:6–9.
[6] *See* Batts Tr. at 28:8–31:9, 34:23–35:14.
[7] *See* Exhibit 22 to the Hwang Decl. (CITY00015586–626); *see also* Batts Tr. at 85:10–88:18.
[8] Exhibit 23 to the Hwang Decl. (CITY00010183–84); Exhibit 4 ("Robinson Tr.") to the Hwang Decl. at 37:6–38:2.
[9] Exhibit 12 ("Hyatt First Tr.") to the Hwang Decl. at 84:12–85:15; Batts, Tr. at 139:17–142:6.
[10] Hyatt First Tr. at 95:13–96:10.
[11] Rawlings-Blake Tr. at 47:20–48:4.

upon Freddie Gray's passing, the BPD began asking for additional officers by way of mutual aid from jurisdictions outside of Baltimore.[12] According to the Police Commissioner, the BPD needed 4,000 – 5,000 additional officers in the City by April 24, 2015 in order to adequately address the escalating protests that were expected to occur.[13]

> C.   Protests Escalate Upon Freddie Gray's Passing, But Decisions Are Made To Limit Arrests, And BPD Officers Are Restricted From Wearing Protective Gear, While The City Continues Coordinating With The BPD

On the day of Freddie Gray's passing, rumors of riots began, and the BPD was concerned about increasing tensions.[14] The Mayor also believed that the protests would escalate as a result of Freddie Gray's passing, and the City continued coordinating with the BPD.[15]

The Mayor, however, instructed the BPD to address her concern that "the city and I . . . not [be] seen as trying to being overly aggressive[.]"[16] Indeed, within the Mayor's Office of Emergency Management ("MOEM"), the City's Emergency Manager believed that his job was to protect protestors rather than maintain control over protests, and that MOEM was tasked to that end to coordinate with the BPD.[17] As the Mayor would later tell the City's Emergency Manager, "use of force is what got us here in the first place."[18] The Police Commissioner was concerned that when officers "have bricks being thrown at [their] head, people spitting upon you, urine, feces, ball bearings, rocks, acid, or any things along those lines, . . .  they can be short on patience[, . . .

---

[12] *See* Exhibit 24 to the Hwang Decl. (CITY00005798); *see also* Hyatt First Tr. at 81:12–84:11, 103:4–19; Exhibit 11 ("Palmere Tr.") to the Hwang Decl. at 49:4–50:12, 52:18–53:8.

[13] Batts Tr. at 65:11–23, 71:17–72:3, 74:10–15.

[14] *See* Exhibit 25 to the Hwang Decl. (CITY00010094); *see also* Exhibit 26 to the Hwang Decl. (CITY00044190; Palmere Tr. at 47:3–17.

[15] Rawlings-Blake Tr. at 27:7–28:25; Exhibit 23 to the Hwang Decl. (CITY00010183–84); Robinson Tr. at 37:6–38:2.

[16] Rawlings-Blake Tr. at 176:24–177:11.

[17] Maloney Tr. at 68:2–11, 70:2–18, 70:19–71:8.

[18] *Id*. at 223:12–13.

and they need to instead] follow[] orders of their command officers."[19]

Consistent with the Mayor's concerns, decisions were made to order officers to seek permission before making certain types of arrests, try to "mediate" an incident prior to making an arrest, and to refrain from wearing protective gear because it looked too intimidating.[20] Such arrest procedures were contrary to standard operating procedures, and ignored the BPD's recognition that making arrests could help calm tensions by removing "agitators" who aimed to incite protestors to commit violence and property destruction.[21]

Indeed, the BPD's Operational Plan for April 22, 2015 expressly stated that "Arrest is not a preferred function during this operation[,]" which the Police Commissioner does not recall ever being a directive prior to the protests beginning.[22] This directive was shared during roll calls conducted by the BPD.[23] According to the BPD, it was "very specific with what our folks could and couldn't do" and had supervisors who were tasked with keeping officers in their squads in line.[24] Operational Plans were meant to be orders or directives that went to the entire police department, the Mayor's Office, and anyone who may be impacted.[25] As such, in addition to the Mayor's Office, Operational Plans were also given to officers from other jurisdictions provided by way of mutual aid, and such officers were told and expected to follow the BPD's directives

---

[19] Exhibit 27 to the Hwang Decl. (CITY00044185); Batts Tr. at 66:7–10, 67:1–68:20.

[20] Hyatt First Tr. at 52:24–54:11, 77:2–78:23; Palmere Tr. at 57:11–58:13; Exhibit 15 ("Butler Tr.") to the Hwang Decl. at 24:6–26:5, 72:25–73:16; Exhibit 14 ("Ryan Tr.") to the Hwang Decl. at 27:19–29:4, 38:7–39:21, 52:10–53:7, 53:20–56:6; Palmere Tr. at 68:4–69:24, 77:7–13.

[21] Butler Tr. at 109:22–110:16; Palmere Tr. at 97:7–19.

[22] Exhibit 28 to the Hwang Decl. (CITY00009552–55), at CITY00009554; Batts Tr. at 107:12–18.

[23] Exhibit 13 ("Hyatt Second Tr.") to the Hwang Decl. at 153:4–11.

[24] *Id*. at 192:15–193:20.

[25] Batts Tr. at 100:5–8, 101:15–102:2.

regarding arrest procedures and riot gear.[26] Such directives resulted in some outside jurisdictions leaving the City for fear of their officers' safety.[27]

With these directives in place, protests got worse following the passing of Freddie Gray.[28] Indeed, during protests that occurred between April 22 and 24, 2015, protestors began blocking traffic and throwing objects at BPD officers, and, during this time, the City was monitoring the escalating protests and continued to coordinate with the BPD regarding the escalation.[29] Despite the growing violence, the Mayor maintained her focus on placating protestors rather than addressing criminal behavior.[30] Indeed, the Mayor stated, prior to April 25, that "she would rather have them destroy property . . . th[a]n have a physical confrontation" that resulted in an arrest.[31]

> D.   While the Protests Are Escalating, It Becomes Abundantly Clear That The BPD Was Not Going To Receive The Number Of Officers From Mutual Aid That It Needed

On April 22, 2015, as the protests were escalating, the BPD cancelled BPD officers' leave for April 25, which was relayed to the Mayor.[32] Additionally, the BPD continued seeking

---

[26] *See* Exhibit 29 to the Hwang Decl. (CITY00008422); Hyatt Second Tr. at 71:1–21, 78:4–79:15, 107:12–108:14.

[27] Ryan Tr. at 27:19–29:4, 38:7–39:21.

[28] McMillan Tr. at 55:6–56:8; Exhibit 2 ("Parthemos Tr.") to the Hwang Decl. at 32:25–33:7, 40:21–41:1; Maloney Tr. at 36:5–9; Exhibit 8 ("Scott Tr.") to the Hwang Decl. at 54:9–14; Palmere Tr. at 116:16–19.

[29] Exhibit 30 to the Hwang Decl. (CITY00007430); Scott Tr. at 32:5–11; Exhibit 31 to the Hwang Decl. (CITY00007004); Hyatt Second Tr. at 15:19–17:5; Exhibit 32 to the Hwang Decl. (CITY00008781); Scott Tr. at 40:12–41:10; Exhibit 33 to the Hwang Decl. (CITY00053351); Maloney Tr. at 43:7, 44:21–45:1; Batts Tr. at 116:6–20; Rawlings-Blake Tr. at 64:2–5, 65:4; McMillan Tr. at 55:6–56:8.

[30] Rawlings-Blake Tr. at 178:3–17 (stating that when protestors were walking down Interstate 83 and disrupting traffic, making arrests would not have been "received well."); *see also* Exhibit 34 to the Hwang Decl.  (CITY00041067–68) (referring to the BPD's "efforts to accommodate and facilitate these peaceful demonstrations."); Rawlings-Blake Tr. at 87:7–14, 88:9–17.

[31] Ryan Tr. at 59:24–61:15; *accord id.* at 98:23–99:9.

[32] Exhibit 35 to the Hwang Decl. (CITY00009496); Hyatt Second Tr. at 18:10–22; Palmere Tr. at 77:20–78:22; Batts Tr. at 116:21–117:4; Rawlings-Blake Tr. at 76:6–77:25.

additional officers from outside jurisdictions, because, even with leave being cancelled, the BPD still would not have enough officers to adequately deal with the protesting.[33] On April 23, the BPD scheduled an April 24 meeting with police departments across the State to reiterate the City's need for more officers.[34] As April 25 approached, however, it became clear that, even with cancelled leave and with the mutual aid coming in, the BPD still would not have enough officers for crowd control, to protect City infrastructure, and/or to address escalating protests.[35] Indeed, while the BPD needed at least 4,000 more officers to adequately address the escalating protests, the BPD would only receive commitments to provide 200 officers as a result of the April 24 meeting.[36]

During this time, the City was keeping track of the resources that were requested by the BPD and the resources that were being provided.[37] Indeed, the City was well aware of the difficulty the BPD was having in securing sufficient mutual aid.[38] Importantly, both the BPD and City were aware that it was completely up to the discretion of the surrounding jurisdictions whether to provide any mutual aid at all as requests were being made at this time from police department to police department (rather than from the City to other counties/cities in Maryland).[39]

---

[33] *See* Exhibit 36 to the Hwang Decl. (CITY00006825); *see also* Exhibit 37 to the Hwang Decl. (CITY00007492); Exhibit 38 to the Hwang Decl. (CITY00007498); Exhibit 39 to the Hwang Decl. (CITY00008884); Hyatt Second Tr. at 20:22–23:12, 31:11–32:19, 33:17–36:9; Palmere Tr. at 80:25–83:23.

[34] *See* Exhibit 40 to the Hwang Decl. (CITY00005695); *see also* Hyatt Second Tr. at 100:13–101:5, 102:22–103:16.

[35] Hyatt Second Tr. at 37:18–38:5, 61:21–62:17; Palmere Tr. at 86:6–14.

[36] Batts Tr. at 80:19–81:16, 153:16–22; Hyatt Second Tr. at 104:11–19, 110:16–22, Palmere Tr. at 104:13–22.

[37] *See* Exhibit 41 to the Hwang Decl. (CITY00045742); Rawlings-Blake Tr. at 98:2–11, 125:17–127:15; Robinson Tr. at 83:3–85:19; Parthemos Tr. at 41:6–42:17; Batts Tr. at 171:20–172:9.

[38] Parthemos Tr. at 230:1–12, Robinson Tr. at 41:3–18, 45:18–46:20, 56:13–57:4, 67:13–20, 71:21–72:5, 109:20–112:12, 188:14–190:4; Batts Tr. at 84:8–85:9; Hyatt Second Tr. at 197:10–22; Scott Tr. at 55:4–20.

[39] Rawlings-Blake Tr. at 105:12–19, Batts Tr. at 120:3–12, Parthemos Tr. at 100:14–101:25, Hyatt Second Tr. at 140:11–16, Palmere Tr. at 100:14–101:25.

As indicated in the BPD's Incident Action Plan (which incorporated its Operational Plan) for April 25, 2015, the BPD would end up having, including mutual aid provided by jurisdictions outside of the City, 707 officers available and assigned to protest duty for April 25, 2015.[40] Out of the 707 officers available and assigned to protest duty, 147 officers came by way of mutual aid from surrounding jurisdictions.[41] According to the BPD's Operations Commander at the time of the protests, the number of officers was not enough to address crowd control and protect infrastructure, and constituted only "a fraction of what [the BPD] needed and had asked for."[42]

E.     Protests Turn Into Rioting On April 25, 2015 Amidst Stand-Down Orders Issued to BPD Officers

As the protests were escalating, the City was notified, as early as April 22, 2015, about protests that were scheduled to occur on April 25.[43] Intelligence shared with the City indicated that the April 25 protests would be large, and that "agitators" were expected to participate with the "goal . . . to get it towards civil unrest."[44] Indeed, agitators were expected to use aggressive tactics and employ violence against BPD officers, and the BPD worried that it did not have sufficient resources to address such concerns.[45] In an April 24 email sent by the Police Commissioner, the Police Commissioner stressed that "we must avoid any attempts to create a riot."[46] The City was

---

[40] *See* Exhibit 42 to the Hwang Decl. (CITY00007595–7689), at CITY00007637; *see also* Hyatt Second Tr. at 119:1–121:6, 134:7–18.

[41] *See id.* at CITY00007637; Hyatt Second Tr. at 134:22–136:20.

[42] Hyatt Second Tr. at 136:21–138:18.

[43] Exhibit 43 to the Hwang Decl. (CITY00054571); Scott Tr. at 52:9–19; McMillan Tr. at 100:15–23, 101:20–24.

[44] McMillan Tr. at 41:12–47:24; *see also* Rawlings-Blake Tr. at 68:15–69:17; Batts Tr. at 158:3–9.

[45] Exhibit 46 to the Hwang Decl. (CITY00001315–17); Exhibit 44 to the Hwang Decl. (CITY00009618–19); Batts Tr. at 121:6–123:8, 139:17–142:6; Exhibit 45 to the Hwang Decl. (CITY00040254–58); Hyatt Second Tr. at 42:3–10, 43:7–17, 47:2–15, 48:17–19, 49:19–50:2, 62:18–67:7.

[46] Exhibit 46 to the Hwang Decl. (CITY00001315–17).

particularly aware of the increased risk of unrest with the escalating protests due to prior riots in Ferguson, and, as a result, the City increased its coordination with the BPD to discuss how protestors would be dealt with and approached.[47]

The City's focus, however, was on "doing everything that we could to give the impression. . . [that] nobody that worked for the city was interested in silencing the protestors[.]"[48] Consistent with the City's focus, the BPD's Operational Plan for April 25, 2015 – like the BPD's Operational Plan for April 22 – expressly maintained that "Arrest is not a preferred function during this operation[,]" which was also shared during the BPD's roll call on that day with the expectation that BPD officers would follow such directives.[49] As was the case for the BPD's Operational Plan for April 22, the Mayor was also aware of the BPD's April 25 Operational Plan.[50]

Indicative of its awareness that protests were expected to erupt on April 25, 2015, the City's Emergency Manager demanded updates every thirty minutes throughout the day to keep the City informed.[51] Unlike prior protests, the Mayor herself observed from the Watch Center and BPD Headquarters as events unfolded.[52] When commenting on the command structure as events unfolded that day, the Police Commissioner stated that the Mayor was "on top of everything."[53]

The planned protest on April 25, 2015 at City Hall escalated, and "kids" began "kicking

---

[47] Maloney Tr. at 64:3–13, 66:12–68:1, 76:2–78:18, 80:11–81:18; *see also* Exhibit 47 to the Hwang Decl. (CITY00054378); McMillan Tr. at 72:7–16, 73:21–74:1.
[48] Rawlings-Blake Tr. at 181:22–182:12; *see also* Exhibit 48 to the Hwang Decl. (CITY00046791–92).
[49] Exhibit 49 to the Hwang Decl. (CITY00005656–5661); Batts Tr. 174:17–175:20, 176:17–21.
[50] Rawlings-Blake Tr. at 76:21–77:25.
[51] Exhibit 50 to the Hwang Decl. (CITY00054190); Scott Tr. at 59:8–19, McMillan Tr. at 102:2–10.
[52] Exhibit 51 to the Hwang Decl. (CITY00008247–49); Rawlings-Blake Tr. at 129:20–130:11, 132:9–14; Parthemos Tr. at 102:19–105:8; Scott Tr. at 85:15–86:8; McMillan Tr. at 114:1–9; Batts Tr. at 198:21–199:25.
[53] Batts Tr. at 59:12–13.

and punching cars" before proceeding towards the Inner Harbor and "tipping tables of diners," among other violence and property destruction.[54] Purported "gang members identifying themselves by colors (Bloods and Crypts) were together engaging police and trying to instigate[, and . . . [p]rotestors [began] disrupt[ing] traffic."[55]

While this was not a part of the "planned" protest, a group of protestors then continued towards Camden Yards to disrupt a baseball game that was being played at that time, and proceeded to destroy police vehicles, throw objects at police officers (e.g. bike racks), physically assault bystanders, loot stores, break windows of business establishments, set trash cans on fire, and overturn tables, among other incidents of violence and property destruction.[56] Notably, as a result of the rioting, the Mayor and Police Commissioner commanded attendees of the baseball game to remain at the stadium, and the BPD advised downtown businesses and large events (e.g. the Shock Trauma Gala) to close and/or cancel for the evening.[57]

Throughout the course of the protests and rioting on April 25, 2015, and as the Mayor observed from the Watch Center, "stand-down" orders were issued to BPD officers, ordering BPD officers not to engage with protestors.[58] While BPD officers were ordered not to engage or to stay

---

[54] Maloney Tr. at 106:10–107:15.

[55] Exhibit 52 to the Hwang Decl. (CITY00008818–21); Scott Tr. at 65:6–15.

[56] Maloney Tr. at 107:16–109:10; Exhibit 53 to the Hwang Decl. (CITY00043672); Exhibit 54 to the Hwang Decl. (CITY00041513); Hyatt Second Tr. at 158:11–159:7; Rawlings-Blake Tr. at 19:21–20:22, 140:4–142:16; Parthemos Tr. at 26:5–13, 27:7–12; Batts Tr. at 39:24–41:5; McMillan Tr. at 27:4–28:3, 28:13–16.

[57] Exhibit 55 to the Hwang Decl. (CITY00053393–96); McMillan Tr. at 28:4–5, 149:3–150:20; Palmere Tr. at 123:8–18; Exhibit 56 to the Hwang Decl. (CITY00055110); Rawlings-Blake Tr. at 118:6–14.

[58] *See, e.g.*, Exhibit 57 to the Hwang Decl. at CITY00085975 (at 3:12pm, BPD officers are ordered, "per Unified Command, at this time, our demonstrators are moving southbound on North Avenue, do not engage, do not follow, do not show any police presence in the area at all[.]"); *Id.* at CITY00086023 (at 4:04pm, BPD officers are ordered, "per Unified Command, our demonstrators are now approaching Camden Yards, once again any units that are in the area, please do not approach, please do not engage, do not make your presence known."); *Id.* at CITY00086150 (at

away from areas where protestors were present, BPD officers who were already on the scene –
consistent with the directives and procedures put in place – needed permission from BPD
headquarters before making any arrests, which handcuffed BPD officers since they did not have
time to wait for permission before making arrests, and could otherwise not make arrests despite
being assaulted.[59] According to the shift commander in the Southern District for the BPD at the
time, the rioting on April 27 would not have happened if BPD officers were allowed to make
arrests on April 25, because restrictions on making arrests emboldened protestors, who, as a result,
got away with assaulting BPD officers without consequences.[60]

Updates within the City's MOEM provided throughout April 25, 2015 make clear that the
City was coordinating and monitoring adherence to the directives of not engaging with
protestors.[61] Indeed, at 2:17pm that day, the City's MOEM reported:

> By Pennsylvania Ave we had some activity where gang members
> identifying themselves by colors (Bloods and Crypts) were together
> engaging police and trying to instigate.  Police were not provoked,
> but might have engaged more than necessary (particular Coppin
> State Police).  We are trying to reach out to their commander to
> make sure they understand the mission is not to engage like that.[62]

---

approximately 5:46pm, BPD officers were advised "we got the crowd coming down to the Harbor
. . . do not engage them, do not engage them."); *Id*. at CITY00086316 (at approximately 7:42pm,
"all the patrol units that are in the downtown area" were ordered to "leave the area immediately,
the crowds are moving to your direction, leave the downtown area."); *Id*. at CITY00086366 (at
approximately 8:21pm, it is reported that "B and E in progress at Lexington Market East, trying to
break into the market," and units are asked to respond, but a response is provided that "patrol has
been advised not to respond down to the protest."); *Compare* Exhibit 42 to the Hwang Decl.
(CITY00007595–7689) at CITY00007602 *with* Exhibit 58 to the Hwang Decl. (CITY00021802–
06) and Exhibit 59 to the Hwang Decl. (CITY00021807–12).
[59] Butler Tr. at 29:6–30:24, 32:11–33:19, 114:4–7; *accord* Exhibit 16 ("Mancuso Tr.") to the
Hwang Decl. at 17:2–18:8, 34:9–35:11 (BPD officer stating that he was relieved of duty after
making an arrest for assault and refusing to obey orders to uncuff the person because he did not
have permission from BPD headquarters).
[60] Butler Tr. at 32:4–10, 36:1–37:15, 66:7–67:2; *accord* Ryan Tr. at 36:3–5.
[61] *See* Exhibit 52 to the Hwang Decl. (CITY00008818–21); Scott, Tr. at 65:6–15.
[62] *Id.* at CITY00008819–20 (emphasis added).

As the day went on and even as the protests escalated into property destruction, the City's MOEM reported that the "out of towners, led by Shabazz, are at Camden Yards attempting to disrupt gameday operations. Along their way down there, some windows have been broken on cars/store fronts. BPD is monitoring but not engaging substantially in any way that would agitate."[63]

According to the Director of Planning and Preparedness at the MOEM for the City, the events of April 25, 2015 were "highly notable, because unlike the other protests prior to that, the extent of the damage, or the extent to which it became unpeaceful, and got out of control, was far greater than any prior protest or riot" and, "at the Orioles game, those group of protestors really stopped being protestors, and <u>turned into rioters</u>."[64] Despite the rioting, and consistent with her and the City's focus, however, the Mayor stated that, on April 25, "we anticipated aggressive protestors, we anticipated people wanting to make a show, to make a stand, in all of those cases, they were not met with force."[65] As the Governor stated: "I was getting a sense of the [M]ayor's approach to the gathering threat: Back off. Stand down. And try to wait it out."[66]

      F.     <u>The City Acknowledges A New Reality And Refers To The City's Emergency Operations Plan, But Fails To Implement It Or Take Any Further Action In Light Of The Rioting That Occurred On April 25, 2015</u>

In an e-mail sent on April 26, 2015, the Police Commissioner acknowledged that, "because this was a protest against the Baltimore Police Department. We couldn't be seen as the aggressors or instigators, as such we needed to give them space."[67] Indeed, the BPD's Operations Commander during the rioting agreed with the assertion that "officers were ordered to allow protestors room to

---

[63] *Id*. at CITY00008818.

[64] McMillan Tr. at 24:16–20, 25:20–24, 27:4–28:3 (emphasis added); *accord* Maloney Tr. at 24:6–10 (stating that protests devolved into unrest); McMillan Tr. at 110:10–16.

[65] Rawlings-Blake Tr. at 187:2–7.

[66] Declaration of Lawrence J. Hogan, attached hereto as Exhibit C (the "Hogan Decl."), at ¶ 5; Exhibit 17 to the Hwang Decl. (PLS0000046–61) ("Governor's Book Excerpts"), at PLS0000047.

[67] Exhibit 60 to the Hwang Decl. (CITY00046343).

destroy and allow the destruction of property so that rioters would appear to be the aggressors."[68]

Reflecting the City's coordination with the BPD, the Mayor would also state:

> I made it very clear that I work with the police and instructed them to do everything that they could to make sure that the protesters were able to exercise their right to free speech. It's a very delicate balancing act, because, while we tried to make sure that they were protected from the cars and the other things that were going on, we also gave those who wished to destroy space to do that as well. And we worked very hard to keep that balance and to put ourselves in the best position to deescalate, and that's what you saw.[69]

As the Governor noted, "[t]he [M]ayor was truly making some very poor decisions: ordering the police to stand down and missing in action when her city was desperate and needed her the most."[70]

By April 26, 2015, the City was dealing with a "new reality," recognizing that it should shift its focus towards "lives and property" in light of the "emotionally charged large protest . . . [that] devolved" into rioting, and the City purportedly "assess[ed] what [it] needed to do moving forward throughout the city."[71] According to the Mayor, the City "had just gone through something extremely traumatic, which we experienced . . . Saturday was so fresh in everyone's mind that . . . people were . . . on edge because of the – again, like it says, the unpredictable nature. People – everyone was feeling like, you know, something could happen anywhere at any time and that this very emotional event of the funeral was coming up."[72] Indeed, while the City had hoped that no rioting would occur on April 25, 2015, it was at that point on notice that agitators would be effective, and that property destruction, looting, and violence would occur.[73]

---

[68] Hyatt Second Tr. at 198:20–199:11.
[69] Exhibit 48 to the Hwang Decl. (CITY00046791–92) (City's emphasis and additions removed, emphasis added).
[70] Hogan Decl. at ¶ 5; Governor's Book Excerpts at PLS0000048.
[71] McMillan Tr. at 35:15–20; Rawlings-Blake Tr. at 168:20–169:7.
[72] Rawlings-Blake Tr. at 205:9–206:21.
[73] Rawlings-Blake Tr. at 146:5–19.

The City and BPD agreed that April 25, 2015 resulted in an emergency that went beyond normal operating procedures.[74] Consistent with that understanding, the City referred to the City's Emergency Operations Plan (the "EOP"), Continuity of Government Plan (the "COG Plan"), and Civil Disorder Annex as protests escalated that day.[75] The City's EOP "is to be implemented when an emergency . . . exceeds normal operating procedures[,]" and the Civil Disorder Annex "is a document to specifically focus on potential civil unrest, essentially, and to kind of carve out the specificities and key actions that would need to take place during that sort of event."[76]

When defining the Assignment of Responsibilities within the City, the City's EOP expressly provides, among other things, that the "Mayor <u>will</u>: . . . [e]xercise overall responsibility for plans and operations for major emergencies and disasters within the City; . . . [d]eclare a local state of disaster . . . request the Governor declare a state of emergency, or invoke the emergency powers of government when necessary."[77] Notably, the Civil Disorder Annex also expressly provides that the Mayor's Office is to "[p]rovide strategic direction to BPD during civil disorder events; [d]eclare local emergency as needed . . . [and] [r]equest state declaration of emergency[,]" among other things.[78] The EOP further provides that the mayor should request the Governor to declare a state of emergency "[w]hen an event overwhelms local resources[.]"[79]

Additionally, the City's EOP provides that the Emergency Operations Center "will be activated" for "major emergencies" and is responsible for, among other things, "[c]itywide

---

[74] Maloney Tr. at 122:4–9; McMillan Tr. at 141:15–19; Scott Tr. 82:22–83:12; Palmere Tr. at 160:20–161:4.
[75] Exhibit 61 to the Hwang Decl. (CITY00003820–4060); Scott Tr. at 79:6–81:5, 82:11–16; McMillan Tr. at 131:7–17, 131:18–132:4, 132:5–19.
[76] Exhibit 61 to the Hwang Decl. at CITY00003833; Scott Tr. at 82:4–16.
[77] Exhibit 61 to the Hwang Decl. at CITY00003839–41 (emphasis added).
[78] *Id.* at CITY00004057–58.
[79] *Id.* at CITY00003837.

direction and control; . . . coordination; . . . [and] [r]esource management."[80] According to the City's EOP, it is the City's Emergency Operations Center's responsibility to request mutual aid from the Baltimore Region, the State, and the Federal Government through established and specified procedures.[81] The COG Plan expressly provides that the Mayor serves as the "Conservator of the peace" during times of emergency.[82]

At this point, the City and BPD were aware that additional resources "would've made a dramatic difference" on April 25, and would have enabled the BPD to "better control the entire scenario."[83] According to the Police Commissioner, the BPD could have had such additional officers "staffed prior to that to anticipate that they were going to go to convention centers, the inner harbor, the places where you have our soft underbelly. If you have the proper resources, it's not to wait 'til people do it, it's they anticipate that they're going to be there, and you put those resources there to keep the people away from them."[84] Indeed, the Police Commissioner identified malls, liquor stores, 7-11s, and pharmacies, among others, as places where the BPD would have put resources in advance "to prevent any damage being done before it happens."[85] As the Mayor would subsequently acknowledge, "it was clear as things escalated we needed more resources."[86]

Mutual aid, however, was still being requested by the BPD and provided by other police departments (rather than between the City and other cites/counties).[87] The City could have made requests for additional officers from surrounding intrastate jurisdictions through the Baltimore

---

[80] *Id.* at CITY00003846.
[81] *Id.* at CITY00003913.
[82] *Id.* at CITY00004031.
[83] Batts Tr. at 191:3–11.
[84] *Id.* at 206:8–207:7.
[85] *Id.* at 216:1–10.
[86] Rawlings-Blake Tr. at 216:3 – 10.
[87] Parthemos Tr. at 204:12–25; Scott Tr. at 93:22–94:4.

Region Emergency Assistance Compact and from jurisdictions out of the State through the Emergency Management Assistance Compact.[88] Unlike mutual aid requests made between police departments (which are discretionary), such compacts require agencies state and nationwide to respond, and provide a process by which responding jurisdictions are reimbursed for expenses.[89] Importantly, however, such compacts required a state of emergency declaration.[90]

Additionally, a state of emergency declaration would have given the State authority to activate the National Guard, coordinate additional assistance, and allow state police to patrol streets throughout the City.[91] Indeed, on April 25, 2015, the Governor instructed one of his senior advisors to "attach [him]self to the [M]ayor," and get a sense of the City's needs.[92] Additionally, the Governor put the National Guard on standby, and cancelled leave for all state troopers.[93] That same evening, however, the Governor's senior advisor was told by the City that it had everything under control and made no mention about the need for more officers.[94] While the Governor was concerned, he also "didn't want to step on [the Mayor's] toes."[95] As the Governor's senior advisor explained, the "Governor and I'm sure other governors are – or other electeds defer to the locals

---

[88] *See* Exhibit 62 to the Hwang Decl. (CITY00025839–45); *see also* Scott Tr. at 92:21–93:17, 126:10–18, 128:5–16; Exhibit 63 to the Hwang Decl. (CITY00004997–5012).

[89] McMillan Tr. at 90:16–20; Md. Code, Pub. Safety § 14-702(4) ("[a]ny party state requested to render mutual aid or conduct exercises and training for mutual aid <u>shall</u> take such action as is necessary to provide and make available the resources covered by this compact[.]") (emphasis added); Exhibit 62 to the Hwang Decl. at CITY00025840 ("[a]ny jurisdiction which is a party to this compact and that receives a request for assistance <u>shall</u> take such actions as are necessary to provide requested resources.") (emphasis added); *see also* Md. Code, Pub. Safety § 14-702(9); Exhibit 62 to the Hwang Decl. at CITY00025842.

[90] *See id*. at CITY00025839; *see also* Md. Code, Pub. Safety § 14-702(1).

[91] *See* Governor's Book Excerpts at PLS0000050; Exhibit 18 ("Mitchell Tr.") to the Hwang Decl. at 69:7–13, 69:18–22, 70:5–9, 84:11–85:4.

[92] Governor's Book Excerpts at PLS0000047; Mitchell Tr. at 30:2–31:2.

[93] Governor's Book Excerpts at PLS0000047.

[94] Mitchell Tr. at 31:3 – 32:8.

[95] Governor's Book Excerpts at PLS0000047.

because they best know what's happening on the ground[,]" and the State would therefore wait for the City to request resources before sending them in.[96]

Importantly, the Police Commissioner understood that, "when you declare a state of emergency, you get all the state police officers that we had asked for eight days prior, all the national guard that we had asked for prior, and all the resources that we had asked eight days prior[.]"[97] The Mayor's Chief of Staff also acknowledged that the goal in declaring a state of emergency was "to have the assistance of the National Guard . . . [and to] trigger[] through the mutual aid agreements for other jurisdictions to send in more resources."[98] When asked about the effect a state of emergency would have on requests for additional resources, the Mayor replied: "I do not know if increased aid was dependent on a state of emergency declaration."[99]

Indeed, the City would not declare a local state of emergency, request that the Governor declare a state of emergency, or activate the City's Emergency Operations Center on April 25 or 26, 2021, despite the provisions of the City's EOP, the need for resources, and the rioting that occurred on April 25.[100] Notably, it had also been suggested to the Mayor prior to April 25 that she request assistance from the National Guard, which "fell on deaf ears[,]" and, by April 25, triggers identified by the National Guard for support to the City had already been met.[101]

G.    The City Has Good Reason To Believe That Further Rioting Would Occur On April 27, 2015, And, Again, Is Notified By The BPD About Insufficient Resources

The funeral for Freddie Gray scheduled for April 27, 2015 had been on the City's radar,

---

[96] Mitchell Tr. at 28:17–29:4, 50:10–13, 51:6–13, 91:11–14.
[97] Batts Tr. at 288:14–289:7.
[98] Parthemos Tr. at 207:8–18; *accord id.* at 237:10–11 (the Mayor's Chief of Staff stating that "[t]he purpose of declaring a state of emergency was to get more resources.").
[99] Rawlings-Blake Tr. at 196:14–23.
[100] *See* Parthemos Tr. at 123:13–124:21.
[101] Ryan Tr. at 70:7–71:9; Exhibit 92 to the Hwang Decl. (CITY00011634–35); Hyatt Second Tr. at 215:8–218:7.

particularly because such events become "flash points" for increased activity, resulting in concerns by the City for April 27 that the City had on April 25.[102] With just the funeral alone, the BPD considered April 27 to be an "all-hands on deck" day.[103] Indeed, leave for BPD officers was cancelled for April 27 three days earlier on April 24 "[d]ue to the [f]uneral arrangements for Freddie Gray[,]" and the Mayor was made aware.[104]

In addition to the funeral, however, the City also received reports of a "purge" that was to occur on April 27, 2015, which the BPD was taking seriously because it "deal[t] with high school kids on the day that Freddie Gray was being buried . . . two miles north of his high school."[105] The term "purge" referred to "a movie where anybody after dark was killed by anybody else until sun up[,]" among other things.[106] There was also a credible threat that "members of various gangs . . . have entered into a partnership to 'take-out' officers."[107] According to the Police Commissioner, the scheduled funeral coupled with reports of a purge "had a possibility to be an atom bomb."[108]

With Freddie Gray's funeral, reports of a purge, and now credible threats to BPD officers, April 27, 2015 was "shaping up to be a pretty big problem" that would be "certainly beyond normal operating procedures[,]" and protests were expected to escalate on April 27, 2015 from April 25,

---

[102] McMillan Tr. at 151:17–25, 153:9–21; Exhibit 64 to the Hwang Decl. (CITY00045625); Exhibit 65 to the Hwang Decl. (CITY00052045); Rawlings-Blake Tr. at 197:9–198:24, 211:6–9; Parthemos Tr. at 138:21–24; Robinson Tr. at 98:8–11; *see also* Batts Tr. at 192:2–23 (Police Commissioner expressing his concerns that protests were going to continue and become worse after April 25, 2015).

[103] Exhibit 66 to the Hwang Decl. (CITY00046285); Palmere Tr. at 180:3, 181:23–182:2.

[104] Exhibit 67 to the Hwang Decl. (CITY00041194); Rawlings-Blake Tr. at 217:4–9.

[105] Exhibit 68 to the Hwang Decl. (CITY00052170); Robinson Tr. at 112:19–113:5; Exhibit 69 to the Hwang Decl. (CITY00013514–15); Exhibit 70 to the Hwang Decl. (CITY00011631); Palmere Tr. at 181:11–22; Batts Tr. at 275:2–8; Rawlings-Blake Tr. at 20:24–21:12.

[106] Batts Tr. at 38:20–39:3; McMillan Tr. at 29:24–30:21.

[107] Exhibit 71 to the Hwang Decl. (CITY00045302); Palmere Tr. at 182:3–11; Batts Tr. at 275:9–18.

[108] Batts Tr. at 273:17–274:13.

2015.[109] The BPD had "begged" for more resources but had not gotten them.[110]  According to the Police Commissioner, the City was well aware of the resource issues leading up to April 27, stating: "I did approach the City . . . we've been having that conversation during the entire time. The city hall was aware that we didn't have enough resources and - - and knew what was happening."[111] As a result of the funeral scheduled for April 27 and reports of a "purge," the MOEM at the City held a meeting at approximately 10:00am that morning "to say, you need to tell your family, you know, your wife, husband, partner, whoever, your kids, your parents, that, you know, we anticipate there could be a major incident, and you need to [be] self-sufficient while we go into twenty-four operations again."[112]

H.    Rioting Results In Violence, Theft, and Property Destruction Throughout The City On April 27, 2015, While Restrictions On BPD Officers Continue

Notably, despite the rioting that had occurred on April 25, 2015 and indications that the rioting would escalate further, the number of officers available on April 27 would be similar to April 25.[113] Additionally, despite the foregoing and the clear threat of escalated rioting that would exceed the rioting that had already occurred on April 25, similar arrest procedures and directives to stand down circulated at BPD's roll call on April 27.[114]

In the early afternoon of April 27, 2015, rioters converged in and around Mondawmin Mall and began looting businesses in Mondawmin Mall and throwing rocks, bricks and cinder blocks

---

[109] Batts Tr. at 275:19–276:16; Exhibit 72 to the Hwang Decl. (CITY00040413); Exhibit 67 to the Hwang Decl. (CITY00041194); Exhibit 73 to the Hwang Decl. (CITY00012113); Exhibit 66 to the Hwang Decl. (CITY00046285); Palmere Tr. at 179:24–180:17, 182:12–23.
[110] *Id*. at 275:24–276:8.
[111] *Id*. at 276:9–16.
[112] McMillan Tr. at 29:24–30:21.
[113] Palmere Tr. at 180:18–181:1; *see also* Exhibit 73 to the Hwang Decl. (CITY00012113); Palmere Tr. at 180:2, 181:4–8.
[114] Butler Tr. at 38:5–39:3; Ryan Tr. at 109:9–24.

at police officers.[115] Soon thereafter, rioters moved to another area and, among other things, began throwing bricks at patrol cars and set fire to the CVS located at the intersection.[116] Splinter groups then moved to the downtown areas and eventually throughout the city setting buildings and cars on fire and destroying property throughout the evening and into April 28, 2015.[117]

Even as riots were initially erupting near Mondawmin, and in response to requests for National Guard, the City responded that the "[n]ational guard is only when there is a state of emergency."[118] The City also declined at that time to activate the City's Emergency Operations Center.[119] As the Governor saw rioting at Mondawmin Mall, he contacted the Mayor and told her, "I just want you to know we are prepared to provide whatever assistance and support the city could possibly need[.] . . . Everyone is at the ready. The Maryland State Police.  The National Guard. The Emergency Management Agency. We have the full resources of the state ready to back you up."[120] Despite the ongoing rioting that had erupted near Mondawmin and the now well-known and well-established need for more officers, the Mayor replied, "We don't need your assistance[.] We have everything under control."[121] In the meantime, as the rioting spread across the City, and consistent with the directives given earlier that day in coordination with the City, officers were repeatedly ordered to stand down, seek permission to make arrests, and/or not allowed to make arrests while rioters committed violence and property destruction in the BPD's presence.[122]

I.      After It Is Far Too Late, The Governor Convinces The Mayor To Request The

---

[115] McMillan Tr. at 32:1–33:6.
[116] Id. at 33:7-11; see also Butler Tr. at 46:4–47:10.
[117] McMillan Tr. at 33:12–20; see also Exhibit 82 to the Hwang Decl. (CITY00021675–715); Exhibit 83 to the Hwang Decl. (CITY00025873–913).
[118] Exhibit 84 to the Hwang Decl. (CITY00012781); Parthemos Tr. at 186:7–24.
[119] Exhibit 6 ("Sparaco Tr.") to the Hwang Decl. at 41:1–21, 45:5–20.
[120] Hogan Decl. at ¶ 5; Governor's Book Excerpts at PLS0000049.
[121] Id.
[122] Butler Tr. at 54:25–56:12; Ryan Tr. at 23:8–18, 102:18–103:18, Exhibit 19 ("Lewis Tr.") to the Hwang Decl. at 26:16–27:13; 29:3–30:8; 37:8–21.

<u>Declaration Of A State Of Emergency, And Additional Resources Enter The City</u>
<u>And Quell the Rioting</u>

With now wide-spread rioting and the "city on fire[,]" the Governor again got in contact
with the Mayor, this time stressing, "I have two executive orders sitting in front of me. One of
them says that, at the request of the mayor of Baltimore, I'm declaring a state of emergency and
sending in the National Guard. The other one says that, as governor of the state of Maryland, I'm
declaring an emergency and sending in the National Guard. We would prefer to execute the first
one.  But either way, we're coming in to help handle this crisis in the city."[123] The Mayor finally
responded, "since you have a gun at my head and are going to do it anyway, I guess I'll ask you to
come in."[124] After it was far too late, the Mayor finally declared a local state of emergency, asked
the Governor to declare a state of emergency, enacted a curfew, and activated the City's
Emergency Operations Center.[125]

After a state of emergency was declared, the additional resources that the BPD needed
began coming into the City, and the State also helped coordinate resources from inside and outside
the State through state of emergency procedures.[126] According to the Police Commissioner:

> On that Monday . . . we had large numbers of police and national guard in
> the city, roughly about 2300 hours, mid, we were – with those numbers –
> we were able to gain control of the city.  I think those numbers got pretty
> close to 3 – to 4,000 police officers and national guards people at the time,
> which is the number that we asked for eight days prior.  If we had them on
> the front end, we probably wouldn't' have had those issues.  But they
> numbered there, we were able to control the city for the next, I guess, eight

---

[123] Hogan Decl. at ¶ 5; Governor's Book Excerpts at PLS0000050.

[124] *Id.*

[125] *See id.*; *see also* Exhibit 85 to the Hwang Decl. (CITY00052381); Sparaco Tr. at 50:9–15, 52:1–
53:9; Parthemos Tr. at 198:9–199:12; Exhibit 86 to the Hwang Decl. (CITY00052727–32); Exhibit
87 to the Hwang Decl. (CITY00052541)

[126] Batts Tr. at 112:12–113:6; Mitchell Tr. at 81:13–83:18; *see also* Maloney Tr. at 209:6–12;
Palmere Tr. at 198:4–199:6; Exhibit 88 to the Hwang Decl. (CITY00018202); Batts Tr. at 285:11–
286:2; Exhibit 89 to the Hwang Decl. (CITY00024073); Scott Tr. at 120:20–123:3.

or seven days that the protests were still going on.[127]

Senior leadership of the City agreed that the state of emergency declaration, the National Guard, and the curfew all eventually helped quell the rioting and helped prevent further rioting.[128] Indeed, the Mayor herself, confirming that the "civil unrest [had] started [on] <u>April 25, 2015</u>," acknowledged that the National Guard activated by the state and mutual aid officers (from inside and outside the state) were "critical in stopping the event from further escalating and in preventing the loss of life and property[,]" that the curfew "helped the Baltimore Police Department, the National Guard, and other public safety personnel prevent further physical damage and keep the peace[,]" and that declaring a local state of emergency and activating the City's EOP "were critical in containing the event and helping return calm to the City of Baltimore[.]"[129]

During the course of the rioting, however, Plaintiffs were assaulted, sustained property damages, and had their business looted, and, in some cases, burned to the ground.[130]

## LEGAL STANDARD

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*; *see also Sharif v. United Airlines, Inc.,* 841 F.3d 199, 204 (4th Cir. 2016); *Raynor v. Pugh,* 817 F.3d 123, 130 (4th Cir.

---

[127] Batts Tr. at 290:22–291:9.
[128] Parthemos Tr. at 236:4–12; McMillan Tr. at 193:8–11.
[129] Exhibit 91 to the Hwang Decl. (CITY00024060–63); *accord* McMillan Tr. at 193:8–11.
[130] *See* Exhibit 90 to the Hwang Decl.

2016); *Libertarian Party of Va. v. Judd,* 718 F.3d 308, 313 (4th Cir. 2013).  When considering a motion for summary judgment, the court must "view the evidence in the light most favorable to . . . the nonmovant[s], and draw all reasonable inferences in [their] favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.,* 290 F.3d 639, 645 (4th Cir. 2002). The Supreme Court has made clear that the district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249; *accord Guessous v. Fairview Prop. Invs., LLC,* 828 F.3d 208, 216 (4th Cir. 2016). Thus, the trial court may not make credibility determinations on summary judgment. *Jacobs v. N.C. Administrative Office of the Courts,* 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French,* 499 F.3d 345, 352 (4th Cir. 2007); *Black & Decker Corp. v. United States,* 436 F.3d 431, 442 (4th Cir. 2006); *Dennis,* 290 F.3d at 644-45. Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility.

## ARGUMENT

Contrary to the City's assertions, material facts in dispute abound in this case, and the City's motion for summary judgment should therefore be denied.  Additionally, the City's now third request to apply the state cap on damages is in contravention of the Local Rules, is precluded by the doctrine of issue preclusion, and ignores the well-reasoned prior rulings of this Court.

## I.    There Are Genuine Issues Of Material Fact That Preclude Summary Judgment

The Maryland Riot Act provides that, "[s]ubject to § 14-1002 of [the Act], if a structure or personal property is stolen, damaged, or destroyed in a riot, the injured party may recover actual damages sustained in a civil action against the county or municipal corporation of the State in

which the riot occurred." Md. Code Ann., Pub. Safety § 14-1001(b). The City, however, is not liable unless it:

> (1) had good reason to believe that the riot was about to take place or, having taken place, had notice of the riot in time to prevent the theft, damage, or destruction; and

> (2) had the ability, either by use of the county's or municipal corporation's police or with the aid of the residents of the county or municipal corporation, to prevent the theft, damage, or destruction.

*Id.* at § 14-1002(a). Plaintiffs may not recover damages if the City "used reasonable diligence and all the powers entrusted to them to prevent or suppress the riot." *Id.* at § 14-1002(b). While evidence clearly establishes the City's liability, there are, at a minimum, genuine issues of material fact that preclude summary judgment.

> A.   The City "Had Good Reason To Believe That Riots Were About To Take Place Or, Having Taken Place, Had Notice Of The Riot In Time To Prevent The Theft, Damage, Or Destruction" That Occurred On April 27, 2015

The City submits in conclusory fashion that "Plaintiffs have utterly failed to provide any information" that the City had reason to believe that rioting would occur on April 27, 2015.  In making this disingenuous claim, the City states that it had no notice that rioting would occur, and, in the same breath, then proceeds to describe at length the steps it allegedly took in light of this purportedly nonexistent concern.

Contrary to the City's contradictory assertion, it had good reason to believe that rioting would occur on April 25, 2015, two days prior to the rioting that is the subject of Plaintiffs' claims. Indeed, the Statement of Material Facts in Dispute above is replete with facts establishing the City's knowledge and involvement as protests began escalating prior to April 25, in light of concerns "from day one" upon the arrest of Freddie Gray that protests may escalate into full-blown rioting. *See* Statement of Material Facts, *supra*, at 1–3, 5, 7–9. As noted above, the Mayor was concerned about escalating protests as violence increased prior to April 25. *Id*. at 2–3, 5.

As the protests were escalating in size, the City was notified, as early as April 22, 2015, about protests scheduled to occur on April 25. *Id*. at 7. Intelligence shared with the City indicated that the April 25 protests would be large, and that "agitators" would participate with the "goal . . . to get it towards civil unrest." *Id*. The City was particularly aware of the increased risk of unrest due to prior riots in Ferguson and increased its coordination with the BPD. *Id*. at 7–8. Indicative of the City's awareness that protests were expected to erupt on April 25, the City's Emergency Manager demanded updates every thirty minutes to keep the City informed. *Id*. at 8. Unlike prior protests, the Mayor herself observed from BPD Headquarters as events unfolded. *Id*.

The City had good reason to believe that rioting would occur on April 25, 2015, and the actual violence and property destruction on April 25 put the City on notice with sufficient time to prevent the damage that would occur on April 27. Indeed, the Mayor herself, confirmed that the "civil unrest [had] started [on] <u>April 25, 2015</u>," *Id*. at 21. The City recognized that April 25 was "highly notable, because unlike the other protests prior to that, the extent of the damage, or the extent to which it became unpeaceful, and got out of control, was far greater than any prior protest or riot" and, "at the Orioles game, those group of protestors really stopped being protestors, and <u>turned into rioters</u>." *Id*. at 11. According to the City, it was dealing at that point with a "new reality," recognizing the "unpredictable nature" and that "something could happen anywhere at any time and that this very emotional event of the funeral was coming up." *Id*. at 12.

Indeed, while this "new reality" gave the City good reason to believe that violence and property destruction would escalate, the City also had other good reasons to independently believe that riots were about to take place on April 27, 2015 as a result of the scheduled funeral and reports of a "purge." *Id*. at 16–18. As a result, the City's MOEM held a meeting at approximately 10:00am that morning "to say, you need to tell your family, you know, your wife, husband, partner,

whoever, your kids, your parents, that, you know, we anticipate there could be a major incident, and you need to [be] self-sufficient while we go into twenty-four operations again." *Id*. at 18.

Despite clear indications that the City was on notice of rioting that occurred on April 25, 2015 and had good reason to believe that rioting would occur on April 27, the City submits that "there have been no facts introduced that the damage caused to the Plaintiffs' property was caused by anything other than individuals opportunistically taking advantage of unrest in order to commit crimes and property destruction." The Riot Act, however, is devoid of any such requirement, and a common-sense reading of the Act clearly indicates that no such requirement exists. Indeed, the Act does not require that property damage be caused by "rioters." Rather, the Act holds the City liable for property "stolen, damaged, or destroyed <u>in a riot</u>. . ."  Md. Code Ann., Pub. Safety § 14-1001(b) (emphasis added). Additionally, the Act further expressly includes "theft" with "property destruction." *Id*. at § 14-1002(a).  As such, whether it was people committing property damage or opportunistic theft, the Act merely requires that the damage happen in a riot. Plaintiffs' accounts further establish they sustained damages due to, and/or during, the rioting that occurred on April 27 and continued throughout the night.[131]  As such, the foregoing, at a minimum, establishes genuine issues of material fact so as to preclude judgment as a matter of law.

    B.    <u>The City Did Not Use Reasonable Diligence And All The Powers Entrusted To It To Prevent Or Suppress The Riot</u>

---

[131] *See* Exhibit 90 to the Hwang Decl.  The City also submits that this Court should grant summary judgment because it "had no notice of potential for any unrest outside of the immediate area of the Mondawmin Mall and downtown." Any contention that the Riot Act has such a requirement, however, is rooted in neither the express language of the Act nor common sense. As an initial matter, the Act does not require that a defendant have notice of a potential riot in any particular neighborhood; rather, the Act provides that Plaintiffs have an action *against the county or municipal corporation* of the State *in which the riot occurred*." Md. Code Ann., Pub. Safety § 14-1001(b) (emphasis added). Additionally, the City was on notice that "planned protests" could splinter and scatter to other parts of the City. Indeed, as noted above, the "planned protests" at City Hall on April 25, 2015 resulted in rioters committing violence and property destruction while proceeding unexpectedly to Camden Yards.

As noted above, the City is required to have "used reasonable diligence and all the powers entrusted to them to prevent or suppress the riot." Md. Code Ann., Pub. Safety § 14-1002(a) (emphasis added). On the existing record, however, this Court cannot hold that the City used "reasonable diligence"[132] and "all the powers entrusted" to warrant judgment as a matter of law.

> 1.   *The City Did Not Use Reasonable Diligence When "Stand-Down" Orders Were Issued Precluding BPD Officers From Making Arrest And/or Appropriately Engaging Rioters*

For purposes of the Riot Act, Plaintiffs may establish a lack of reasonable diligence by showing, among other things, an "indifference to the discharge of [the City's] official duty, and [the City's] sympathy with the spirit and temper of the mob." *Mayor and City Council of Hagerstown v. Dechert*, 32 Md. 369, 385 (1870). The City's actions in directing, coordinating, and/or permitting stand-down orders and restrictions on arrests and/or other police conduct – and/or failing to direct the change in such directives after April 25, 2015 – establishes just that.

Despite her belief that protests would escalate as a result of Freddie Gray's passing, the Mayor instructed the BPD to address her concern that "the city and I . . . not [be] seen as trying to being overly aggressive[.]" Statement of Material Facts in Dispute, *supra*, at 3. Consistent with the Mayor's concerns, decisions were made, contrary to standard operating procedures, to order officers to seek permission before making certain types of arrests, try to "mediate" an incident prior to making an arrest, and to refrain from wearing protective gear because it looked too intimidating. *Id*. at 4. Indeed, the BPD's Operational Plans for April 22 and 25, 2015 expressly

---

[132] Notably, reasonableness may only be decided as a matter of law when the facts and circumstances of the case are so clear that reasonable minds could not differ. *McLhinney v. Lansdell Corp. of Md.*, 254 A.2d 177, 181 (Md. 1969). Any, even meager evidence, requires the case be submitted to a jury to weigh and evaluate. *Legrier v. Tuma*, No. 1:20-CV-02216-SAG, 2021 WL 1946515, at *3 (D. Md. May 14, 2021).

stated that "Arrest is not a preferred function during this operation[,]" which the Police Commissioner does not recall ever being a directive prior to the protests beginning, and the Mayor was aware of the BPD's Operational Plans. *Id*. at 4, 8. While protests got worse between April 22 and 24, the Mayor maintained her focus on placating protestors rather than addressing criminal behavior, stating that "she would rather have them destroy property . . . th[a]n have a physical confrontation" that resulted in an arrest. *Id*. at 5.

Despite receiving intelligence suggesting the possibility of rioting on April 25, 2015, the City's focus in preparing for that day was on "doing everything that we could to give the impression – or to ensure that . . . nobody that worked for the city was interested in silencing the protestors[.]" *Id*. at 8. Throughout the course of the protests and rioting on April 25, and as the Mayor observed from the Watch Center, recorded police radio transmissions identified above clearly establish that "stand-down" orders were issued to BPD officers, ordering BPD officers not to engage with the protestors. *Id*. at 9. BPD officers who were already on the scene were required to have permission to make arrests, and those who made arrests without permission were relieved of duty. *Id*. at 10. According to the shift commander in the Southern District for the BPD at the time, the rioting on April 27 would not have happened if BPD officers were allowed to make arrests on April 25, because restrictions on making arrests emboldened protestors, who, as a result, got away with assaulting BPD officers without consequences. *Id*.

Updates within the City's MOEM provided throughout April 25, 2015 make clear that the City was coordinating and monitoring adherence to the directives of not engaging with protestors. Indeed, at 2:17pm that day, the City's MOEM reported:

> By Pennsylvania Ave we had some activity where gang members identifying themselves by colors (Bloods and Crypts) were together engaging police and trying to instigate. Police were not provoked, but might have engaged more than necessary (particular Coppin State Police). <u>We are trying to reach out to their commander to make sure they understand the</u>

<u>mission is not to engage like that</u>.

*Id*. at 10. Even as protests escalated into property destruction as the day went on, the City's MOEM reported that protestors were "at Camden Yards attempting to disrupt gameday operations. Along their way down there, some windows have been broken on cars/store fronts. BPD is monitoring but not engaging substantially in any way that would agitate." *Id*. at 11. Despite the rioting and consistent with the City's focus, the Mayor stated, on April 25, "we anticipated aggressive protestors, we anticipated people wanting to make a show, to make a stand, in all of those cases, they were not met with force." *Id*. at 11. As the Governor stated: "I was getting a sense of the [M]ayor's approach to the gathering threat: Back off. Stand down. And try to wait it out." *Id*.

The Police Commissioner acknowledged on April 26, 2015, that, "because this was a protest against the Baltimore Police Department. We couldn't be seen as the aggressors or instigators, as such we needed to give them space." *Id*. at 11. Indeed, the BPD's Operations Commander at the time agreed that "officers were ordered to allow protestors room to destroy and allow the destruction of property so that rioters would appear to be the aggressors." *Id*. at 11–12. Reflecting the City's coordination with the BPD, the Mayor stated after the rioting on April 25:

> <u>I made it very clear that I work with the police and instructed them</u> to do everything that they could to make sure that the protesters were able to exercise their right to free speech.  It's a very delicate balancing act, because, while we tried to make sure that they were protected from the cars and the other things that were going on, <u>we also gave those who wished to destroy space to do that as well</u>. And we worked very hard to keep that balance and to put ourselves in the best position to deescalate, and that's what you saw.

*Id*. at 12. As the Governor noted, "[t]he [M]ayor was truly making some very poor decisions: ordering the police to stand down and missing in action when her city was desperate and needed her the most." *Id*.

In light of what occurred on April 25, 2015, it was made clear to the City that standing

down, not engaging, and/or giving protestors space was not effective, and resulted in giving, as

the Mayor acknowledged, "those who wished to destroy space to do that as well." While the City

should not have directed, coordinated, and/or permitted such directives to dictate the BPD's

approach prior to April 25, the City should have at least directed a change in how the BPD engaged

with protestors and rioters once the rioting on April 25 occurred.  Indeed, when commenting on

the command structure as events unfolded that day, the Police Commissioner stated that the Mayor

was "on top of everything," and the City's EOP required the Mayor to provide direction. *Id*. at 8,

13.[133] The City, however, failed to do so. Statement of Material Facts in Dispute, *supra*, at 14.

As a result, and despite the clear threat of escalated rioting that would exceed the rioting

that had already occurred on April 25, 2015, similar arrest procedures and directives to stand down

circulated at BPD's roll call on April 27. *Id*. at 18. As the rioting spread across the City, and

consistent with the directives given earlier that day in coordination with the City, officers were

repeatedly ordered to stand down, seek permission to make arrests, and/or not allowed to make

arrests while rioters committed violence and property destruction in the BPD's presence. *Id*. at 19.

As a result, Plaintiffs, among others, suffered the consequences.

   2.   *The City Failed To Use Reasonable Diligence And <u>All</u> The Powers
        Entrusted To It When It Failed To Timely Request A State Of Emergency
        Declaration, Request The National Guard, And/Or Take Other Steps To
        Address The BPD's Insufficient Resources Until It Was Far Too Late*

The Statement of Material Facts in Dispute above is replete with facts establishing the

---

[133] Despite the reality that the Mayor was "on top of everything" and the foregoing provisions of
the City's EOP and the Civil Disorder Annex thereto, the City appears to deflect blame by
contending that it appropriately "deferred" to the BPD, because, among other reasons, the BPD is
not a City agency.  The Court of Appeals of Maryland, however, has expressly dismissed the notion
that the status of the BPD as a state agency absolved the City from any obligation to act under the
Riot Act, and has held that the practical effects of any actions by the City should be determined by
the trier of facts.  *See City of Baltimore v. Silver*, 263 Md. 439, 450 – 53 (1971).

City's knowledge that the BPD lacked sufficient resources from the outset and the City's failure to appropriately act. *See id.* at 2–3, 5–6, 13–19. As April 25, 2015 approached, it became clear that, even with leave being cancelled and despite repeated requests for mutual aid, the BPD would not have enough officers for crowd control, to protect City infrastructure, and/or to address the protests if they escalated into rioting. *Id*. at 6. Indeed, while the Police Commissioner believed the BPD needed at least 4,000 more officers to adequately address the escalating protests, the BPD would only receive commitments to provide 200 officers leading up to April 25, and the BPD ended up actually receiving less on April 25. *Id*. at 6–7. Importantly, the City was keeping track of the resources that were requested by the BPD and the resources that were being provided, and was well aware of the difficulty the BPD was having in securing sufficient officers. *Id*. at 6.

As noted above, protestors turned into rioters on April 25, 2015.  At this point, the City was aware that additional resources "would've made a dramatic difference" on April 25, and would have enabled the BPD to "better control the entire scenario." *Id*. at 14. According to the Police Commissioner, if the BPD had additional officers on April 25, it could have such officers "staffed prior to that to anticipate that they were going to go to convention centers, the inner harbor, the places where you have our soft underbelly. If you have the proper resources, it's not to wait 'til people do it, it's they anticipate that they're going to be there, and you put those resources there to keep the people away from them." *Id*. As the Mayor would subsequently acknowledge, "it was clear as things escalated we needed more resources." *Id*.

Mutual aid, however, had been requested by the BPD and provided by other police departments (rather than between the City and other cites/counties). *Id*. at 6, 14. The City could have made requests for additional officers from surrounding intrastate jurisdictions through available compacts. *Id*. at 14–15. Unlike requests made between police departments, responses to

which are entirely discretionary, such compacts require agencies state and nationwide to respond, and provide a process by which responding jurisdictions are reimbursed for expenses. *Id*. at 6, 14–15. Additionally, requests under the Emergency Management Assistance Compact would have cast a much wider net by seeking resources outside the State. Importantly, however, such compacts also required a declaration of a state of emergency. *Id*. at 15.

A state of emergency declaration would have also given the State authority to activate the National Guard, coordinate additional assistance, and allow state police to patrol streets throughout the City. *Id*. at 15. Indeed, on April 25, 2015, after the rioting at Camden Yards had begun, the Governor put the National Guard on standby, and cancelled leave for all state troopers. *Id*. That same evening, however, the Governor's senior advisor was told by the City that it had everything under control and made no mention about the need for more officers, despite the City's (and BPD's) clear acknowledgment that it needed more resources. *Id*.[134]

Even as rioting erupted at Mondawmin on April 27, 2015, the City resisted requesting a state declaration of emergency, requesting assistance of the National Guard, and activating the City's Emergency Operations Center. Statement of Material Facts in Dispute, *supra*, at 19. By that point, the BPD had "begged" for more resources but had not gotten them. *Id*. at 18. According to the Police Commissioner, the City was well aware of the resource issues leading up to April 27, 2015, stating: "I did approach the City . . . we've been having that conversation during the entire time.  The city hall was aware that we didn't have enough resources and - - and knew what was

---

[134] Importantly, the City was aware that a state declaration of emergency would result in resources, but it nonetheless failed to request it. *Id*. at 16. Simply stated, the City did not want to declare a state of emergency and request the National Guard because of the resulting perception that the City lost control. As the Deputy Director of the MOEM stated, it was a policy consideration and "known to [him] that, generally speaking, one of the considerations when requesting a resource beyond those of the city is are we – are we sending the message that we are unprepared or underresourced." Scott Tr. at 143:8–19.

happening." *Id*. It was only when the Governor forced the Mayor's hand, that the Mayor finally declared a local state of emergency, asked the Governor to declare a state of emergency, and activated the City's Emergency Operations Center, after it was far too late. *Id*. at 20.

Senior leadership of the City agreed that the state of emergency declaration, the National Guard, and the curfew all eventually helped quell the rioting and helped prevent further rioting. Indeed, the Mayor herself, confirming that the "civil unrest [had] started [on] April 25, 2015," acknowledged that the National Guard activated by the state and mutual aid officers (from inside and outside the state) were "critical in stopping the event from further escalating and in preventing the loss of life and property[,]" that the curfew "helped the Baltimore Police Department, the National Guard, and other public safety personnel prevent further physical damage and keep the peace[,]" and that declaring a local state of emergency and activating the City's EOP "were critical in containing the event and helping return calm to the City of Baltimore[.]" *Id*. at 21.

As the City did in *Silver,* the City here again argues that that any "suggest[ion] that the City should have requested National Guard assistance sooner" cannot negate the City's "reasonable diligence." As an initial matter, however, the practical effect of having the National Guard present in the City sooner is a question for the trier of fact. *See Silver,* 263 Md. at 452–453 ("[T]he question as to whether [the Mayor timely requested a certain] action . . ., or whether other action was taken by the Mayor in [her] capacity as conservator of the peace, *as well as the practical effect of such action*, . . . should be determined by the trier of facts at a hearing on the merits of the case.") (emphasis added).[135] Additionally, it is disingenuous for the City to contend that the Mayor could not have requested the presence of the National Guard sooner because "Governor Hogan's deputy

---

[135] *see also Int'l Bhd. of Teamsters v. Willis Corroon Corp.,* 369 Md. 724, 740, 802 A.2d 1050, 1059 (2001) ("Because the issue in a negligence action is the reasonableness of the [defendant's] conduct, it normally will be fact-specific" and "for the trier of fact to determine.")

emergency management director had already indicated that the governor did <u>not</u> intend to activate the National Guard[.]" Indeed, the City relies on an email dated April 25, 2015 and sent at 4:17pm. According to the Governor, however, after protestors headed to Camden Yards "around 6 PM" on April 25 (*i.e.,* more than an hour after the email relied upon by the City was sent), he met with the Maryland State Police and the Maryland National Guard, and told them: "'Cancel leave for all state troopers,' [and] 'Put the National Guard on standby,' meaning the state's part-time soldiers should alert their employers, have their bags packed, and be ready to report to the armory immediately." Governor's Book Excerpts at PLS0000047.

Moreover, as noted above, the Governor's senior advisor was told by the City on the evening of April 25, 2015 that it had everything under control and made no mention about the need for more officers, despite the City's (and BPD's) clear acknowledgment that it needed more resources. Statement of Material Facts in Dispute, *supra*, at 15. As the Governor's senior advisor explained, the "Governor and I'm sure other governors are – or other electeds defer to the locals because they best know what's happening on the ground[,]" and the State would therefore wait for the City to request resources before sending them in. *Id*. at 15–16. Simply stated, despite any concerns, there was no reason for the Governor to unilaterally send in the National Guard, or make an unsolicited state declaration of emergency, when his senior advisor was told by the City that it had everything under control. Importantly, the City's attempt to deflect blame has no bearing on the fact that the City simply could have admitted that it needed help notwithstanding any resulting image that the City had lost control. Indeed, as noted above, the City and BPD agreed that the rioting on April 25 constituted an emergency that went beyond normal operating standards, triggering the implementation of the EOP and its Civil Disorder Annex, and the EOP makes clear that it is the Mayor who is to request a state declaration of emergency "[w]hen an event

overwhelms local resources." *Id*. at 13. The Mayor, however, failed to do so.

3. *The City Should Have Enacted The Curfew Earlier And/Or Had The Curfew Take Effect On April 27, 2015 Before The Rioting Spread Across The City*

The Mayor has expressly stated that, while the curfew "helped the Baltimore Police Department, the National Guard, and other public safety personnel prevent further physical damage and keep the peace, many leisure and hospitality businesses across the City lost income during the curfew." *Id*. at 21.[136] Despite these concerns, the Mayor should have enacted a curfew after the rioting that occurred on April 25, 2015 for the same reasons the Mayor should have requested a state declaration of emergency and requested the National Guard that same day. Alternatively, the Mayor should have had the curfew enacted on April 27, 2015 take effect earlier. Indeed, the curfew enacted by the Mayor on April 27, 2015 provided that the General Curfew did not take effect until 10:00pm the following day, on April 28, 2015. Exhibit 86 to the Hwang Decl. at CITY00052728. Simply stated, there was no reason for the curfew to take effect 24 hours after it was enacted,[137] particularly in light of the widespread rioting that was underway.[138]

## II. The City's Third Request To Apply The State Cap On Damages Is In Contravention Of The Local Rules And Plainly Ignores The Well-Reasoned Rulings Of This Court

That the City now attempts to take a third bite at the apple "[w]ith all due respect to the

---

[136] *See also* Exhibit 81 to the Hwang Decl. (CITY00012914–15) (City advising against BPD's recommendations because of business interruption); Exhibit 3 ("Tarbert Tr.") to the Hwang Decl. at 116:5–119:7.

[137] Indeed, on January 6, 2021, upon the U.S. Capitol building being breached, the Mayor of Washington, DC enacted a curfew that would take effect that same day within hours. NBC Washington Staff, DC, Alexandria, Arlington Under Curfew Amid Capitol Hill Chaos, NBC Washington (January 6, 2021) at https://www.nbcwashington.com/news/local/dc-orders-curfew-wednesday-night/2531582/.

[138] Additionally, the City again renews arguments that it submitted with its Motion to Dismiss that calling for a posse comitatus would have been unreasonable.  As noted in Plaintiffs' Opposition thereto, however, the City, in so submitting, ignores the express holding in Silver. *Silver*, 263 Md. at 452, 455 - 56

prior Court" does not make it so. Over three years ago, on April 13, 2018, the City moved for a declaratory judgment under Fed. R. Civ. P. 57 and 28 U.S.C. § 2201 seeking the application of the state cap to Plaintiffs' claims, which Plaintiffs opposed. ECF Nos. 58, 73. On December 18, 2018, this Court denied the City's request, declaring that the state caps do not apply to Plaintiffs' claims. ECF Nos. 87, 88. The City then filed a Motion for Reconsideration, contending this Court's order was an interlocutory order, which Plaintiffs opposed and this Court denied on March 5, 2019. ECF Nos. 91, 92, 96, 97.

As an initial matter, Local Rule 105(10) makes clear that "any motion to reconsider any order issued by the Court shall be filed with the Clerk not later than fourteen (14) days after entry of the order. As reflected above, more than two years have passed since this Court entered the Order that the City is now asking this Court to reconsider for the second time. Moreover, while the City characterizes the Order as an "interlocutory ruling," this Court expressly found that the Order "is a final judgment under the Declaratory Judgment Act." ECF No. 96 at 3. As such, this issue is also precluded under the doctrine of issue preclusion. *See, e.g., In Re Microsoft Corp. Antitrust Litig.*, 355 F.3d 322, 326 (4th Cir. 2004); *Herrera v. Wyoming,* 139 S.Ct. 1686, 1697 (2019) (citing *New Hampshire v. Maine,* 532 U. S. 742, 748-749 (2001)).[139]

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court deny Defendant's Motion for Summary Judgment.

---

[139] Additionally, the other arguments submitted by the City in its Motion are the very same arguments that were before this Court in the City's original motion seeking application of the state cap and the motion for reconsideration. Accordingly, Plaintiffs hereby incorporate by reference herein in their entirety Plaintiffs' previously filed oppositions to the City's original motion and motion for reconsideration (ECF Nos. 73, 92) and this Court's rulings on the same (ECF Nos. 87, 96), and submit, for the same reasons contained therein, that this Court should deny the City's third request to have the state caps applied to Plaintiffs' claims.

Date:  June 21, 2021                    Respectfully submitted,

                                        /s/ Peter K. Hwang
                                        _____
                                        Peter K. Hwang, Esq.
                                              District Court Bar No. 19052
                                        Sung Hwang & Kim LLP
                                        9256 Bendix Road, Suite 109
                                        Columbia, MD 21045
                                        (410) 772 2324
                                        (410) 772 2328 (fax)
                                        phwang@shkfirm.com

                                        Ray M. Shepard, Esquire
                                              District Court Bar No. 09473
                                        The Shepard Law Firm, LLC
                                        122 Riviera Drive
                                        Pasadena, MD 21122
                                        (410) 255 0700
                                        (443) 773 1922 (fax)
                                        Ray@Shepard.Law

                                        *Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

        I hereby certify that a copy of the foregoing was served via the Court's ECF system this 21st day of June 2021 on:

                Sara E. Gross
                Doris N. Weil
                Matthew Bradford
                Hanna Marie C. Sheehan
                Baltimore City Department of Law
                100 N. Holliday Street
                Baltimore, Maryland 21202

                *Counsel for Defendant Mayor and City Council of Baltimore*

                                        /s/ Peter K. Hwang
                                        _____
                                        Peter K. Hwang, Esq.

36