# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## NORTHERN DIVISION

|  |  |
|---|---|
| CHAE BROTHERS LIMITED<br>LIABILITY COMPANY, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>MAYOR & CITY COUNCIL OF<br>BALTIMORE, *et al.*,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 1:17-cv-01657-SAG

## DECLARATION OF PETER K. HWANG

I, Peter K. Hwang, being duly sworn, do hereby certify and state that I am over 18 years of age. I am competent to testify, and I have personal knowledge of the matters asserted herein and state as follows:

1.     Attached hereto as Exhibit 1 is at true and accurate copy of excerpts from the transcript for the deposition of Stephanie Rawlings-Blake conducted on January 29, 2021.

2.     Attached hereto as Exhibit 2 is at true and accurate copy of excerpts from the transcript for the deposition of Kaliope Parthemos conducted on January 12, 2021.

3.     Attached hereto as Exhibit 3 is at true and accurate copy of excerpts from the transcript for the deposition of Colin Tarbert conducted on December 14, 2020.

4.     Attached hereto as Exhibit 4 is at true and accurate copy of excerpts from the transcript for the deposition of Stephanie Robinson conducted on January 11, 2021.

5.     Attached hereto as Exhibit 5 is at true and accurate copy of excerpts from the transcript for the deposition of Kahlil Zaied conducted on January 14, 2021.

6.      Attached hereto as Exhibit 6 is at true and accurate copy of excerpts from the transcript for the deposition of Daniel J. Sparaco conducted on January 14, 2021.

7.      Attached hereto as Exhibit 7 is at true and accurate copy of excerpts from the transcript for the deposition of Robert Maloney conducted on December 18, 2020.

8.      Attached hereto as Exhibit 8 is at true and accurate copy of excerpts from the transcript for the deposition of Connor Scott conducted on December 18, 2020.

9.      Attached hereto as Exhibit 9 is at true and accurate copy of excerpts from the transcript for the deposition of David McMillan conducted on January 15, 2021.

10.     Attached hereto as Exhibit 10 is at true and accurate copy of excerpts from the transcript for the deposition of Anthony Batts conducted on March 12, 2021.

11.     Attached hereto as Exhibit 11 is at true and accurate copy of excerpts from the transcript for the deposition of Dean Palmere conducted on December 17, 2020.

12.     Attached hereto as Exhibit 12 is at true and accurate copy of excerpts from the transcript for the deposition of Melissa Hyatt conducted on December 2, 2020.

13.     Attached hereto as Exhibit 13 is at true and accurate copy of excerpts from the transcript for the deposition of Melissa Hyatt conducted on January 5, 2021.

14.     Attached hereto as Exhibit 14 is at true and accurate copy of excerpts from the transcript for the deposition of Gene Ryan conducted on October 18, 2019.

15.     Attached hereto as Exhibit 15 is at true and accurate copy of excerpts from the transcript for the deposition of Kenneth Butler conducted on September 18, 2019.

16.     Attached hereto as Exhibit 16 is at true and accurate copy of excerpts from the transcript for the deposition of Michael Mancuso conducted on September 17, 2019.

17.     Attached hereto as Exhibit 17 is a true and accurate copy of excerpts from a book

2

entitled *Still Standing: Surviving Cancer, Riots, a Global Pandemic, and the Toxic Politics that Divide America*, which was published in July, 2020 and co-authored by Lawrence J. Hogan, Jr., bates stamped PLS0000046-61 and produced by Plaintiff to Defendant.

18.     Attached hereto as Exhibit 18 is at true and accurate copy of excerpts from the transcript for the deposition of Keiffer Mitchell, Jr. conducted on January 27, 2021.

19.     Attached hereto as Exhibit 19 is at true and accurate copy of excerpts from the transcript for the deposition of Michael A. Lewis conducted on April 23, 2019.

20.     Attached hereto as Exhibit 20 is a true and accurate copy of a document bates stamped CITY00010337 produced by Defendant to Plaintiff.

21.     Attached hereto as Exhibit 21 is a true and accurate copy of a document bates stamped CITY00004537 produced by Defendant to Plaintiff.

22.     Attached hereto as Exhibit 22 is a true and accurate copy of a document bates stamped CITY00015586-626 produced by Defendant to Plaintiff.

23.     Attached hereto as Exhibit 23 is a true and accurate copy of a document bates stamped CITY00010183-84 produced by Defendant to Plaintiff.

24.     Attached hereto as Exhibit 24 is a true and accurate copy of a document bates stamped CITY00005798 produced by Defendant to Plaintiff.

25.     Attached hereto as Exhibit 25 is a true and accurate copy of a document bates stamped CITY00010094 produced by Defendant to Plaintiff.

26.     Attached hereto as Exhibit 26 is a true and accurate copy of a document bates stamped CITY00044190 produced by Defendant to Plaintiff.

27.     Attached hereto as Exhibit 27 is a true and accurate copy of a document bates stamped CITY00044185 produced by Defendant to Plaintiff.

28.     Attached hereto as Exhibit 28 is a true and accurate copy of a document bates stamped CITY00009552-55 produced by Defendant to Plaintiff.

29.     Attached hereto as Exhibit 29 is a true and accurate copy of a document bates stamped CITY00008422 produced by Defendant to Plaintiff.

30.     Attached hereto as Exhibit 30 is a true and accurate copy of a document bates stamped CITY00007430 produced by Defendant to Plaintiff.

31.     Attached hereto as Exhibit 31 is a true and accurate copy of a document bates stamped CITY00007004 produced by Defendant to Plaintiff.

32.     Attached hereto as Exhibit 32 is a true and accurate copy of a document bates stamped CITY00008781 produced by Defendant to Plaintiff.

33.     Attached hereto as Exhibit 33 is a true and accurate copy of a document bates stamped CITY00053351 produced by Defendant to Plaintiff.

34.     Attached hereto as Exhibit 34 is a true and accurate copy of a document bates stamped CITY00041067-68 produced by Defendant to Plaintiff.

35.     Attached hereto as Exhibit 35 is a true and accurate copy of a document bates stamped CITY00009496 produced by Defendant to Plaintiff.

36.     Attached hereto as Exhibit 36 is a true and accurate copy of a document bates stamped CITY00006825 produced by Defendant to Plaintiff.

37.     Attached hereto as Exhibit 37 is a true and accurate copy of a document bates stamped CITY00007492 produced by Defendant to Plaintiff.

38.     Attached hereto as Exhibit 38 is a true and accurate copy of a document bates stamped CITY00007498 produced by Defendant to Plaintiff.

39.     Attached hereto as Exhibit 39 is a true and accurate copy of a document bates

4

stamped CITY00008884 produced by Defendant to Plaintiff.

40.     Attached hereto as Exhibit 40 is a true and accurate copy of a document bates stamped CITY00005695 produced by Defendant to Plaintiff.

41.     Attached hereto as Exhibit 41 is a true and accurate copy of a document bates stamped CITY00045742 produced by Defendant to Plaintiff.

42.     Attached hereto as Exhibit 42 is a true and accurate copy of a document bates stamped CITY00007595-7689 produced by Defendant to Plaintiff.

43.     Attached hereto as Exhibit 43 is a true and accurate copy of a document bates stamped CITY00054571 produced by Defendant to Plaintiff.

44.     Attached hereto as Exhibit 44 is a true and accurate copy of a document bates stamped CITY00009618-19 produced by Defendant to Plaintiff.

45.     Attached hereto as Exhibit 45 is a true and accurate copy of a document bates stamped CITY00040254-58 produced by Defendant to Plaintiff.

46.     Attached hereto as Exhibit 46 is a true and accurate copy of a document bates stamped CITY00001315-17 produced by Defendant to Plaintiff.

47.     Attached hereto as Exhibit 47 is a true and accurate copy of a document bates stamped CITY00054378 produced by Defendant to Plaintiff.

48.     Attached hereto as Exhibit 48 is a true and accurate copy of a document bates stamped CITY00046791-92 produced by Defendant to Plaintiff.

49.     Attached hereto as Exhibit 49 is a true and accurate copy of a document bates stamped CITY00005656-5661 produced by Defendant to Plaintiff.

50.     Attached hereto as Exhibit 50 is a true and accurate copy of a document bates stamped CITY00054190 produced by Defendant to Plaintiff.

51.     Attached hereto as Exhibit 51 is a true and accurate copy of a document bates stamped CITY00008247-49 produced by Defendant to Plaintiff.

52.     Attached hereto as Exhibit 52 is a true and accurate copy of a document bates stamped CITY00008818-21 produced by Defendant to Plaintiff.

53.     Attached hereto as Exhibit 53 is a true and accurate copy of a document bates stamped CITY00043672 produced by Defendant to Plaintiff.

54.     Attached hereto as Exhibit 54 is a true and accurate copy of a document bates stamped CITY00041513 produced by Defendant to Plaintiff.

55.     Attached hereto as Exhibit 55 is a true and accurate copy of a document bates stamped CITY00053396 produced by Defendant to Plaintiff.

56.     Attached hereto as Exhibit 56 is a true and accurate copy of a document bates stamped CITY00055110 produced by Defendant to Plaintiff.

57.     Attached hereto as Exhibit 57 are true and accurate copies of audio files bate stamped CITY00085057, CITY00085105, CITY00085971, CITY00085975, CITY00086023, CITY00086031,      CITY00086044,      CITY00086046,      CITY00086150,      CITY00086202, CITY00086290, CITY00086316, CITY00086366, CITY00086440, and CITY00090844, produced by Defendant to Plaintiff

58.     Attached hereto as Exhibit 58 is a true and accurate copy of a document bates stamped CITY00021802-06 produced by Defendant to Plaintiff.

59.     Attached hereto as Exhibit 59 is a true and accurate copy of a document bates stamped CITY00021807-12 produced by Defendant to Plaintiff.

60.     Attached hereto as Exhibit 60 is a true and accurate copy of a document bates stamped CITY00046343 produced by Defendant to Plaintiff.

61.     Attached hereto as Exhibit 61 is a true and accurate copy of a document bates stamped CITY00003820-4060 produced by Defendant to Plaintiff.

62.     Attached hereto as Exhibit 62 is a true and accurate copy of a document bates stamped CITY00025839-45 produced by Defendant to Plaintiff.

63.     Attached hereto as Exhibit 63 is a true and accurate copy of a document bates stamped CITY00004997-5012 produced by Defendant to Plaintiff.

64.     Attached hereto as Exhibit 64 is a true and accurate copy of a document bates stamped CITY00045625 produced by Defendant to Plaintiff.

65.     Attached hereto as Exhibit 65 is a true and accurate copy of a document bates stamped CITY00052045 produced by Defendant to Plaintiff.

66.     Attached hereto as Exhibit 66 is a true and accurate copy of a document bates stamped CITY00046285 produced by Defendant to Plaintiff.

67.     Attached hereto as Exhibit 67 is a true and accurate copy of a document bates stamped CITY00041194 produced by Defendant to Plaintiff.

68.     Attached hereto as Exhibit 68 is a true and accurate copy of a document bates stamped CITY00052170 produced by Defendant to Plaintiff.

69.     Attached hereto as Exhibit 69 is a true and accurate copy of a document bates stamped CITY00013514-15 produced by Defendant to Plaintiff.

70.     Attached hereto as Exhibit 70 is a true and accurate copy of a document bates stamped CITY00011631 produced by Defendant to Plaintiff.

71.     Attached hereto as Exhibit 71 is a true and accurate copy of a document bates stamped CITY00045302 produced by Defendant to Plaintiff.

72.     Attached hereto as Exhibit 72 is a true and accurate copy of a document bates

stamped CITY00040413 produced by Defendant to Plaintiff.

73.     Attached hereto as Exhibit 73 is a true and accurate copy of a document bates stamped CITY00012113 produced by Defendant to Plaintiff.

74.     Attached hereto as Exhibit 74 is a true and accurate copy of a document bates stamped CITY00039305-07 produced by Defendant to Plaintiff.

75.     Attached hereto as Exhibit 75 is a true and accurate copy of a document bates stamped CITY00038330 produced by Defendant to Plaintiff.

76.     Attached hereto as Exhibit 76 is a true and accurate copy of a document bates stamped CITY00039641-42 produced by Defendant to Plaintiff.

77.     Attached hereto as Exhibit 77 is a true and accurate copy of a document bates stamped CITY00037614 produced by Defendant to Plaintiff.

78.     Attached hereto as Exhibit 78 is a true and accurate copy of a document bates stamped CITY00037600 produced by Defendant to Plaintiff.

79.     Attached hereto as Exhibit 79 is a true and accurate copy of a document bates stamped CITY00052047 produced by Defendant to Plaintiff.

80.     Attached hereto as Exhibit 80 is a true and accurate copy of a document bates stamped CITY00052552 produced by Defendant to Plaintiff.

81.     Attached hereto as Exhibit 81 is a true and accurate copy of a document bates stamped CITY00012914-15 produced by Defendant to Plaintiff.

82.     Attached hereto as Exhibit 82 is a true and accurate copy of a document bates stamped CITY00021675-715 produced by Defendant to Plaintiff.

83.     Attached hereto as Exhibit 83 is a true and accurate copy of a document bates stamped CITY00025873-913 produced by Defendant to Plaintiff.

8

84.     Attached hereto as Exhibit 84 is a true and accurate copy of a document bates stamped CITY00012781 produced by Defendant to Plaintiff.

85.     Attached hereto as Exhibit 85 is a true and accurate copy of a document bates stamped CITY00052381 produced by Defendant to Plaintiff.

86.     Attached hereto as Exhibit 86 is a true and accurate copy of a document bates stamped CITY00052727-32 produced by Defendant to Plaintiff.

87.     Attached hereto as Exhibit 87 is a true and accurate copy of a document bates stamped CITY00052541 produced by Defendant to Plaintiff.

88.     Attached hereto as Exhibit 88 is a true and accurate copy of a document bates stamped CITY00018202 produced by Defendant to Plaintiff.

89.     Attached hereto as Exhibit 89 is a true and accurate copy of a document bates stamped CITY00024073 produced by Defendant to Plaintiff.

90.     Attached hereto as Exhibit 90 are true and accurate copies of Declarations by Plaintiffs.

91.     Attached hereto as Exhibit 91 is a true and accurate copy of a document bates stamped CITY00024060-63 produced by Defendant to Plaintiff.

92.     Attached hereto as Exhibit 92 is a true and accurate copy of a document bates stamped CITY00024060-63 produced by Defendant to Plaintiff.

I DECLARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Date: June 21, 2021                              Respectfully submitted,

                                                  Peter K. Hwang, Esq.
                                                  District Court Bar No. 19052

Sung Hwang & Kim LLP
9256 Bendix Road, Suite 109
Columbia, MD 21045
(410) 772 2324
(410) 772 2328 (fax)
phwang@shkfirm.com

*Counsel for Plaintiffs*

# EXHIBIT 1

# In The Matter Of:

*CHAE BROTHERS, LIMITED LIABILITY COMPANY, ET AL. v.*
*MAYOR AND CITY COUNCIL OF BALTIMORE, ET AL.*

---

*STEPHANIE RAWLINGS-BLAKE*
*January 29, 2021*
*ORIGINAL TRANSCRIPT*

---

*CourtScribes, Inc.*
*"Delivering More For Less"*
*(833) 727-4237*
*info@courtscribes.com*
*www.courtscribes.com*

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                FOR THE DISTRICT OF MARYLAND

 3                     NORTHERN DIVISION

 4

 5    _____

 6    CHAE BROTHERS LIMITED LIABILITY   )
      COMPANY, et al.,                  )
 7                                      )
               Plaintiffs              )Civil Action No.:
 8                                      )
      VS.                              )1:17-CV-01657-SAG
 9                                      )
      MAYOR & CITY COUNCIL OF BALTIMORE)
10    et al.,                          )
                                        )
11             Defendants             )Pages 1-244
      _____

12

13

14

15       REMOTE DEPOSITION OF STEPHANIE RAWLINGS-BLAKE

16

17

18

      DATE:            JANUARY 29, 2021 (FRIDAY)
19
      TIME:            10:04 A.M.
20
      LOCATION:        Baltimore, MD
21

22    REPORTER:        SHERRY L. BROOKS, CLR
                       Certified LiveNote Reporter
23                     State of Maryland Notary Public

24

25
```

2

1                      I N D E X

2

3   EXAMINATION BY:                           PAGE

4   Mr. Hwang, Esq. ...............................   7

5   Ms. Gross, Esq. ............................... 237

6

7

8

9

10

11  Appearance Page ...................................3

12  Exhibit Page ......................................4

13  Certified Questions .............................162

14  Reporter's Certificate Page......................242

15  Errata Sheet ....................................243

16

17

18

19

20

21

22

23

24

25

**ORIGINAL TRANSCRIPT**

3

1                     A P P E A R A N C E S

2

3   FOR THE PLAINTIFFS:      SUNG & HWANG, LLP
                             Attorneys at Law
4                            9256 Bendix Road
                             Suite 109
5                            Columbia, MD  21045

6                            PHONE:  (410) 772-2324
                             PHWang@SungandHwang.com
7                            Ray@Shepard.Law

8                            BY:  PETER K. HWANG, ESQ.
                                  RAY M. SHEPARD, ESQ.
9

10

11  FOR DEFENDANTS:          BALTIMORE CITY LAW DEPARTMENT
                             Attorneys at Law
12                           100 North Holliday Street
                             Baltimore, MD  21202
13
                             PHONE:  (410) 396-3947
14                           Sara.Gross@BaltimoreCity.gov

15                           BY:  SARA E. GROSS, ESQ.
                                  HANNA C. SHEEHAN, ESQ.
16

17

18

19

20

21

22

23

24

25

**ORIGINAL TRANSCRIPT**

4

1                               E X H I B I T S

2

3     EXHIBIT NO.                                            PAGE

4     Exhibit 1    Subpoena to Testify at a Deposition      13

5     Exhibit 2    Agreement - Protective Order              14

6     Exhibit 3    Amended Complaint                         18

7     Exhibit 4    Memorandum Dated 4/19/15 to K. Harris     27

8     Exhibit 5    Memorandum Dated 4/19/15 to S. Rawlings   27

9     Exhibit 6    Memorandum Dated 4/22/15 to R. Maloney    58

10    Exhibit 7    Memorandum Dated 4/23/15 to R. Maloney    62

11    Exhibit 8    Memo-Business Outreach Conference Call    65

12    Exhibit 9    Memorandum Dated 4/23/15 to S. Rawlings   84

13    Exhibit 10   Memorandum Dated 4/24/15 to L. McNeely    87

14    Exhibit 11   Memo - Mayor to Call Governor Hogan       107

15    Exhibit 12   Memorandum Dated 4/24/15 - S. Rawlings    109

16    Exhibit 13   Memo - Freddie Gray Update Call           113

17    Exhibit 14   Memorandum Dated 4/25/15-K. Parthemos     117

18    Exhibit 15   Memorandum Dated 4/26/15 to G. Martin     125

19    Exhibit 16   Memorandum Dated 4/25/15 to R. Maloney    129

20    Exhibit 17   Memorandum Dated 4/25/15 to Group         160

21    Exhibit 18   Memorandum Dated 4/25/15 - S. Robinson    164

22    Exhibit 19   Memorandum Dated 4/26/15-J. Kowalczyk     167

23    Exhibit 29   Memorandum Dated 4/27/15 - A. Curley      169

24    Exhibit 20   Memorandum Dated 4/26/15 - S. Robinson    197

25    Exhibit 30   Attend Family Hour - Freddie Gray         197

5

1   EXHIBITS CONTINUED:

2

3                       E X H I B I T S

4

5   EXHIBIT NO.                                      PAGE

6   Exhibit 22 Memorandum Dated 4/26/15 to K. Harris  199

7   Exhibit 32 Memorandum Dated 4/27/15 to B. Rogers  202

8   Exhibit 33 Memorandum Dated 4/27/15 - A. Williams 204

9   Exhibit 34 Meeting to Discuss Curfew, etc.        225

10   Exhibit 35 Memorandum Dated 4/27/15 to D. Sparaco 229

11   Exhibit 37 Mayor to Interview with Time Magazine  230

12   Exhibit 40 Memorandum Dated 4/27/15 to K. Zaied   231

13   Exhibit 43 Memorandum Dated 4/28/15 to C. Scott   233

14   Exhibit 44 Memorandum Dated 4/28/15-K. Parthemos  233

15   Exhibit 45 Letter Dated 5/22/15 to Governor Hogan 235

16   Exhibit 46 Memorandum Dated 4/28/15 S. Sangree    236

17   Exhibit 47 Memorandum Dated 4/28/15 S. Sangree    237

18

19

20

21

22

23           (Exhibits attached to transcript.)

24

25

6

1              P R O C E E D I N G S

2                      -   -   -

3           THE VIDEOGRAPHER:  We are now on the

4  record in the matter of Chae Brothers Limited

5  Liability Company, et al. versus Mayor and City

6  Council of Baltimore, et al.

7           Today's date is January 29th, 2021.  The

8  time is 10:04 a.m.  This is the video recorded

9  deposition of Stephanie Rawlings-Blake being taken

10  via remote video conference.

11           My name is Nicholas Pollard.  I'm the

12  camera operator representing CourtScribes, Inc.  The

13  court reporter is Sherry Brooks, also with

14  CourtScribes, Inc.

15           Will counsel please introduce themselves?

16           MR. HWANG:  Good morning, Peter Hwang and

17  Ray Shepard on behalf of all plaintiffs.

18           MS. GROSS:  Good morning.  Sara Gross and

19  Hanna Sheehan on behalf of the Mayor and City Council

20  of Baltimore.

21           THE VIDEOGRAPHER:  Will the court reporter

22  please swear in the witness?

23                      -   -   -

24           This videotaped deposition is being held

25  via videoconferencing equipment.  The witness and

1  reporter are not in the same room.  The witness has

2  been sworn in remotely pursuant to agreement of all

3  parties.  The parties stipulate that the testimony is

4  being given as if the witness was sworn in person.

5                  *     *     *     *     *

6  WHEREUPON,

7                  STEPHANIE RAWLINGS-BLAKE

8  having been sworn remotely by the Certified LiveNote

9  Reporter, Sherry L. Brooks, to tell the truth, the

10  whole truth, and nothing but the truth, testified as

11  follows:

12                          -   -   -

13          EXAMINATION BY COUNSEL FOR PLAINTIFFS

14          BY MR. HWANG:

15      Q.    Good morning, Ms. Rawlings-Blake, as you

16  know, my name is Peter Hwang and I represent the

17  plaintiffs in this action who have filed suit against

18  the Mayor and City Council of Baltimore for, among

19  other things, damages to plaintiff's property and

20  businesses.

21              As you may know, we're here for a

22  deposition, which will consist of me asking you

23  questions and you providing answers to those

24  questions.

25              As you can see on the Zoom, there's a

**ORIGINAL TRANSCRIPT**

17

1          Q.     Okay.  And you were once on the city
2     council; is that correct?
3          A.     Correct.
4          Q.     During what time period were you on the
5     city council?
6          A.     December 1995 to February 2010.
7          Q.     And you were also the former mayor of
8     Baltimore City; is that correct?
9          A.     Correct.
10         Q.     During what time period were you the mayor
11     of Baltimore City?
12         A.     February 2010 to December 2016.
13         Q.     Okay.  Now, during your time as mayor, do
14     you understand what I mean when I refer to the senior
15     leadership team?
16         A.     Yes.
17         Q.     I don't need the specific names of the
18     actual people.  But during your time as mayor, can
19     you describe what positions were considered a part of
20     your senior leadership team?
21         A.     The senior leadership team included the
22     chief of staff, deputy chief of staff, deputy mayors,
23     and head of communications and city solicitor.
24         Q.     Okay.  Now, are you familiar with what has
25     been commonly referred to as the Baltimore riots or

1        Q.    I'll take you through it in a minute.  But
2   again, to put things into context, I'll be referring
3   to two dates in particular throughout the course of
4   today's deposition.  The first date is Saturday,
5   April 25th, 2015.
6        A.    One second.
7        Q.    Sure.
8        A.    If you don't mind, I'm just going to grab
9   my water.  One second.
10        Q.    Sure.
11        A.    Okay.  January -- I'm sorry.  April --
12        Q.    So the first date is Saturday, April 25th,
13   2015, and the other date I'll often refer to is
14   Monday, April 27th, 2015.
15            And again, I'll be referring to those two
16   dates often just to help you place things into
17   context.
18            Do you generally recall what happened on
19   those two days?
20        A.    Generally.
21        Q.    What do you generally recall as happening
22   on Saturday, April 25th, and Monday, April 27th,
23   2015?
24        A.    Saturday, April the 25th, if my memory
25   serves me correctly, is the date of the largest

20

1   organized protest demonstration.

2        Q.    Do you recall where that happened on April

3   25th?

4        A.    I don't remember where it started.  It

5   culminated at City Hall -- well, it -- it was -- the

6   plan was for it to culminate at -- from what I

7   understand, the plan was for it to culminate at City

8   Hall.

9        Q.    Did it end up culminating at City Hall or

10  did it end up moving to another location?  I'm still

11  talking April 25th.

12       A.    It ended up scattering, I believe.

13       Q.    Do you recall something happening on that

14  day, after City Hall, at Camden Yards?

15       A.    Yes.

16       Q.    What do you recall happening at Camden

17  Yards on Saturday, April 25th, 2015?

18       A.    I recall there being a confrontation

19  between the -- some individuals that came to the

20  protest and Baltimore police officers.

21       Q.    Okay.  And you recall that happening at or

22  near Camden Yards, correct, on April 25th?

23       A.    Correct.

24       Q.    What do you recall generally happening on

25  April 27th, 2015, the Monday?

**ORIGINAL TRANSCRIPT**

21

1      A.    On the Monday in the morning?

2      Q.    Generally, what do you recall about that

3  day?

4      A.    I remember that there was a -- the funeral

5  for Freddie Gray in the morning.  I recall there

6  being a pretty calm afternoon, and I also remember

7  there being a concern that there may be some students

8  who planned to be disruptive at the conclusion of --

9  at the end of the school day in the Mondawmin area.

10          And I remember that eventually turning

11  into -- from a demonstration to a violent interaction

12  to a few hours of unrest.

13      Q.    Okay.  Now, if I could direct your

14  attention back to Exhibit 3, and if I could

15  specifically direct your attention to paragraphs 54

16  and 55 of the First Amended Complaint.

17      A.    Say the exhibit again.

18      Q.    Paragraphs 54 and 55.

19      A.    Yes.

20      Q.    Do you understand that what is described

21  in paragraphs 54 and 55 happened on April 25th, 2015?

22      A.    Would you repeat the question?

23      Q.    Sure.  Do you understand that what is

24  described in paragraphs 54 and 55 happened on April

25  25th, 2015?

1     A.    Yes.

2     Q.    And if I could direct your attention to

3  paragraphs 66 and 67, do you understand that what is

4  described in paragraphs 66 and 67 happened on Monday,

5  April 27th, 2015?

6     A.    Yes.

7     Q.    Now, I'd like to go back to the arrest of

8  Freddie Gray.  When do you first recall hearing about

9  the circumstances of Freddie Gray's April 12th, 2015

10  arrest?

11     A.    What day of the week was April 12th?

12     Q.    If you can bear with me, I can try to look

13  that up.  I believe it was a Sunday.

14     A.    I don't -- I was trying to use that as a

15  reference so I could remember.  I don't know if it

16  was that Sunday that I was informed or the next day.

17  I can't recall.

18     Q.    Okay.  Whether it was on April 12th, 2015,

19  or April 13th, 2015, how were you informed of the

20  circumstances of Freddie Gray's arrest?

21     A.    I'm pretty sure I was informed by one of

22  the members of my senior team.

23     Q.    Okay.  Now, this was happening after the

24  events in Ferguson, correct?

25     A.    Correct.

1      Q.    And when I refer to Ferguson, do you

2   understand what I'm referring to?

3      A.    Yes.

4      Q.    What is your understanding as far as what

5   happened in Ferguson?

6      A.    That there were -- there was an incident

7   involving the police and a young black man who died

8   at the hands of the police, followed by significant

9   protests and unrest in Ferguson.

10      Q.    When you heard about the circumstances of

11   Freddie Gray's arrest, did that raise any concerns?

12      A.    What do you mean?

13      Q.    What do you recall about --

14            THE REPORTER:  I'm sorry.  Please repeat

15   your question.

16            MR. HWANG:  Sure.

17            BY MR. HWANG:

18      Q.    What do you recall hearing about the

19   circumstances of Freddie Gray's arrest?

20      A.    Initially, I recall hearing that -- I

21   don't know if I knew his name at that point, but a

22   suspect -- an individual was arrested and suffered

23   injuries during either the arrest -- at that point I

24   didn't know if it was the arrest or transportation

25   and was -- the first -- the first time I heard of it

1  those marked as Exhibits 4 and 5.

2           (Exhibit Numbers 4 and 5 were marked for

3  identification and were attached to the deposition.)

4           BY MR. HWANG:

5      Q.    And while you're looking through them,

6  I'll identify them for the record.

7           Exhibit 4 is an email chain produced by

8  the city as City 00010183 through 84, and Exhibit 5

9  is also an email chain produced by the city as City

10 00044442 through 43.

11          Now, you're on the email chain in Exhibit

12 5; is that correct?

13     A.    Yes.

14     Q.    And, in fact, you sent the email in that

15 chain that was sent on April 19th, 2015 at 7:34 p.m.,

16 correct?

17     A.    All right.  I was reading it.  Now, tell

18 me, what was your question again?

19     Q.    Sure.  I'm still on Exhibit 5.  You sent

20 the email in that chain that was sent on April 19th,

21 2015 at 7:34 p.m., correct?

22     A.    Correct.

23     Q.    Okay.  Now, Freddie Gray passes away on --

24 a week later on Sunday, April 19th, 2015, right?

25     A.    He passes away at what time?

1      Q.    I didn't say a time.  I just said a date,
2  on April 19th, 2015, correct?
3      A.    I believe so, based on this.
4      Q.    Okay.  Now, did you believe that protests
5  would occur or escalate now that Freddie Gray passed
6  away?
7      A.    Yes.
8      Q.    Okay.  And do you recall that, indeed,
9  being the case after his passing, the protests
10  escalating leading up to April 25th?
11     A.    Yes.
12     Q.    Now, as these protests are escalating, do
13  you recall attending or participating in discussions
14  or meetings to discuss protests as a result of
15  Freddie Gray's death?
16     A.    Yes.
17     Q.    Who do you recall having discussions with
18  or meetings with?
19     A.    Definitely conversations with the police
20  commissioner, conversations with my senior team.  And
21  I forgot.  There's also -- when I mention my senior
22  team, I also had the director of the Mayor's Office
23  of Neighborhoods, who was a part of my senior team.
24  He was a part of these conversations -- these
25  conversations around the protests as well.

1    Department upon Freddie Gray's passing on April 19th

2    with respect to the protests that would occur?

3         A.    I'm sure at the time there were a lot more

4    conversations.  I just don't remember specifically

5    what they were.

6              I can say generally there were

7    conversations about, you know, the intelligence that

8    we were gathering, you know, making sure that

9    everybody was talking to each other, meaning that the

10   police were finding out information, the community

11   teams were finding out information, that we were

12   working to make sure, like I said, that everybody

13   was, as much as possible, in the loop in real time.

14             I don't remember the specific decisions

15   around additional -- the readiness of additional

16   resources, but I know that we had conversations about

17   -- readiness or preparedness would potentially mean

18   other resources than just the Baltimore City Police

19   Department.

20        Q.    Okay.  In other words, that the Baltimore

21   City Police Department may not have sufficient

22   numbers of law enforcement officers to address

23   protesting?

24        A.    Yes.

25        Q.    And as a result, that's -- you may need to

48

1    seek mutual aid or additional law enforcement

2    officers from jurisdictions outside of Baltimore

3    City; is that correct?

4         A.    Correct.

5         Q.    Now, in these discussions with the

6    Baltimore City Police Department -- again, we're

7    still on Freddie Gray's passing on April 19th, 2015

8    -- one concern that you mentioned was the use of

9    military equipment in Ferguson that you did not want

10   to be the case here in Baltimore City.

11             Did you discuss that concern specifically

12   with Commissioner Batts or others at the Baltimore

13   City Police Department?

14        A.    I know we -- again, I think I said before,

15   like -- it was -- it was -- that was a conversation

16   that we had, I think, in real time as, you know, the

17   world was watching what was going on in Ferguson.

18             So it wasn't -- I don't remember ever

19   having to say to Commissioner Batts you shouldn't do

20   that.  It was more, I think, universally understood,

21   you know, that that type of use of force isn't

22   helpful --

23        Q.    Okay.

24        A.    -- or isn't effective.  If the goal is to

25   de-escalate, that type of use of force and the way

**ORIGINAL TRANSCRIPT**

64

1      A.     I do not recall.

2      Q.     Do you recall Robert Maloney or the Office

3  of Emergency Management keeping you posted or keeping

4  you updated as the protests were continuing?

5      A.     Yes.

6      Q.     And what kind of updates were they

7  providing?

8      A.     Pretty general, I would say, ongoing

9  updates around where protests were happening.  It was

10  the basics:  The who, the what, the where.

11      Q.     And did that include observations as to

12  whether the protests were escalating in size, things

13  along those lines?

14      A.     Sometimes.

15      Q.     Okay.  And do you recall that actually

16  being the case, that Robert Maloney or the Office of

17  Emergency Management would update you on protests

18  escalating in size?

19      A.     I don't recall specifically Robert Maloney

20  or the Office of Emergency Management.  I do recall

21  -- being the ones that communicated it to me.

22            I do recall along that week generally

23  getting updates, and sometimes they would include,

24  you know, things are escalating; things are calming

25  down, stuff like that.

1    Q.    Now, this specific email refers to two

2  arrests being made.  Were you updated as far as

3  arrests being made during these protests?

4    A.    I'm sure I was.  I don't recall.

5    Q.    Okay.  Now, arrests specifically was one

6  of the things in the group of things that gave you

7  cause for concern as far as the police response to

8  protesting in Ferguson.

9          Now, as arrests are being made during

10 protests here in Baltimore City, was there any

11 discussion about that?

12   A.    I do not recall.

13   Q.    You don't recall either way?  It could

14 have happened or it may not have happened.  Is that

15 what you're saying?

16   A.    Correct.

17   Q.    If I could direct your attention to 08.

18         MR. HWANG:  And if we could have that

19 marked as Exhibit 8, please.

20         (Exhibit Number 8 was marked for

21 identification and was attached to the deposition.)

22         BY MR. HWANG:

23   Q.    It is a -- it looks like a calendar entry

24 produced by the city as City 00038330.  Now, what is

25 Exhibit 8, Ms. Rawlings-Blake?

1          I don't -- the downtown businesses,

2    stores, and things like that at some point before the

3    protests on that Saturday were advised to consider

4    closing.

5          Q.    Okay.  Now, this call happened on April

6    24th, and you're referring to the events that

7    eventually happened on Saturday, April 25th.

8          The protest that happened on Saturday,

9    April 25th, did that come out of nowhere or was there

10   intel that there would be a large protest on April

11   25th prior to that day?

12         A.    There was -- there -- we were aware that

13   there was going to be a large protest.  It was

14   advertised.

15         Q.    Okay.  Does the name -- strike that.

16         Does the term agitators sound familiar to

17   you?

18         A.    Yes.

19         Q.    And was that term used in the context of

20   these protests?

21         A.    On -- yes, after -- for sure after --

22   after Saturday -- or on Saturday and then afterwards,

23   yes.  Prior to that, I cannot recall.

24         Q.    Okay.  What was your understanding as to

25   what that term "agitators" referred to?

1      A.     What that term -- when I used it or when I

2   heard it, what I understood it to mean is individuals

3   outside of the -- separate from the -- or I shouldn't

4   say separate -- different from the individuals who

5   came or participated in the protest as an expression

6   of their First Amendment -- you know, as a peaceful,

7   while vocal -- very vocal, but a peaceful

8   demonstration or exercise of their First Amendment

9   right.

10          Apart from those individuals, there were

11   also individuals as a part of the event who either

12   came with the intent to be violent and disruptive or

13   during the course of the -- during the course of the

14   demonstration decided that -- decided to be -- to do

15   more than just protest, that they were going to be

16   violent, destructive, and encourage others to do the

17   same.

18      Q.     Does the name Malik Shabazz ring a bell?

19      A.     Yes.

20      Q.     Was he considered an agitator?

21      A.     I do not recall.

22      Q.     Did the city receive intelligence that

23   agitators may be present for the protests scheduled

24   to occur on April 25th, 2015 prior to that day?

25      A.     I do not recall.

1  believe that -- from these advertisements that a

2  protest of a large size would actually occur on

3  Saturday, April 25th?

4       A.   We were -- we were certain that a large

5  demonstration would happen.

6       Q.   Okay.  Was there any concern -- based upon

7  the advertisements, the language used, or the intel

8  that the city was receiving that the protests that

9  were expected to occur on April 25th, 2015 could go

10  awry?

11       A.   Again, there is a general understanding

12  and it's -- again, it's -- it's -- it is a general

13  understanding, not just in Baltimore, but

14  universally, that if you -- if there is a large crowd

15  of people, whether they're happy, sad, or otherwise,

16  that you need to -- that that -- if you are

17  responsible for ensuring the safety of those

18  individuals, you should be prepared for things to go

19  awry or to -- things to happen that you would not

20  expect.

21       Q.   Okay.  Knowing that the protests on April

22  25th, 2015 were expected to be large, what was the

23  city doing to prepare for the possibility that things

24  could go awry?

25       A.   I do not know the specifics of the

1   preparation.  I do know that there was a police

2   engagement and deployment -- well, at least

3   deployment plan.

4            And I don't know at that point if the

5   police commissioner had started restricting officer's

6   leave time to make sure that we had more officers on

7   the street.

8            I don't know -- I can't remember when that

9   started, but things like that would happen, that we

10  -- that the police commissioner would examine how

11  many officers that he had available in any given

12  district, if there were a way to deploy those

13  officers differently to be in position to ensure the

14  safety of everyone, protestors, citizens that weren't

15  participating in the protests, everybody.

16      Q.    Sure.  Now, leave for the Baltimore City

17  Police Department was canceled on April 25th, 2015.

18  The leave had been canceled for the Baltimore City

19  Police Department on April 25th, 2015.  You would

20  have been aware of that, correct?

21      A.    Yes.

22      Q.    Now, you referred to a deployment plan.

23  Are you referring to operational plans? incident

24  action plans?  Is that what you're referring to?

25      A.    Generally, yeah.

1   department aware of the concern.

2       Q.    And that was sent to the police department

3   with the expectation that they would do something

4   about the concern that you or others in your office

5   were forwarding, correct?

6       A.    Yes.

7       Q.    If I could direct your attention to 10.

8           MR. HWANG:  And if we could have this

9   marked as Exhibit 10, please.

10          (Exhibit Number 10 was marked for

11  identification and was attached to the deposition.)

12          BY MR. HWANG:

13      Q.    It is an email chain produced by the city

14  as City 00041067 through 68.

15          Do you recall Dawn -- and I apologize if

16  I'm completely butchering the name.  Do you recall

17  Dawn Kirstaetter?

18      A.    Yes.

19      Q.    Who was -- what was her role at that time?

20      A.    I don't remember her specific title.  She

21  was a part of my leadership team.  She was -- I'm

22  pretty sure she dealt with the Baltimore City School

23  Department, homelessness, the health department.

24          Those -- I mean, I know -- I have a

25  recollection that those are some of the things that

1   were in her portfolio.

2       Q.    Okay.  Now, the email that she sends at

3   4:39 p.m. on April 24th, 2015 --

4       A.    Um-hum.

5       Q.    -- that was a message from you sent by Ms.

6   Kirstaetter on your behalf, is that correct, a

7   statement from Mayor SRB?

8       A.    Okay.  Can you ask the question again?

9       Q.    Sure.  I believe I asked the email sent at

10  4:39 p.m., was that a message from you sent by Ms.

11  Kirstaetter on your behalf?

12      A.    This is a communication that was crafted

13  by my communications team and sent on my behalf.

14      Q.    Okay.  And when it says, "statement from

15  SRB," is it safe to assume that people are to receive

16  it as a statement from you?

17      A.    Correct.

18      Q.    Now, in the first paragraph in the email

19  sent at 4:39 p.m., it refers to a call to be

20  scheduled for no later than Monday morning.

21          Do you see that?

22      A.    Yes.

23      Q.    And then in the email in that same chain,

24  the email sent at 5:28 p.m. --

25      A.    Um-hum.

1    A.    Yes.

2    Q.    Now, as these protests are continuing --

3  and we're still leading up to Saturday, April 25th --

4  would the Baltimore Police Department keep you

5  updated on the resources that they had or the

6  resources that they lacked?

7    A.    I would say generally yes.  That would

8  have been the -- would have been customary.  And with

9  respect to what they lacked, I would say that that

10  would -- that would reach my attention if it were a

11  -- a lack that they were not able to address.

12    Q.    Did that happen, or was it a lack that

13  they were not able to address that was brought to

14  your attention?

15    A.    I do not recall.

16    Q.    During this time, were you communicating

17  with Governor Hogan or anyone at the state -- or

18  leading up to -- still leading up to April 25th,

19  2015?

20    A.    Yes.

21    Q.    Who at the state were you communicating

22  with at that time?

23    A.    I don't -- I wasn't directly communicating

24  with Governor Hogan.  I know that his representative,

25  Keiffer Mitchell, was -- I don't -- I can't remember

1   being a shortage, do you recall hearing those

2   concerns from the Baltimore Police Department?

3       A.   Not specifically.

4       Q.   But that certainly could have happened,

5   correct?

6       A.   I'm not sure of your question.  Like, are

7   you asking if I disagree with what they're saying?

8       Q.   No.  I'm asking whether you heard his

9   concerns.  And if you say you don't recall, I'm

10  asking you:  You don't recall either way or --

11      A.   I don't recall either way.

12      Q.   Now, prior to -- or leading up to April

13  25th, 2015, Chief Hyatt testified that requests for

14  mutual aid -- that it was completely up to the

15  discretion of the outside jurisdictions, the outside

16  police departments, whether or not to send any mutual

17  aid, even if a request was made.

18           Is that accurate?

19      A.   Yes.

20      Q.   Now, Chief Hyatt also testified that

21  leading up to April 25th, 2015, as mutual aid was

22  coming in and she was seeing the numbers, that she

23  knew that mutual aid from other jurisdictions would

24  still not result in enough officers to address crowd

25  control issues and to protect infrastructure.  And

118

1      Q.    It's an email produced by the city as City

2  00055110.  And you're on this email chain, correct?

3      A.    Yes.

4      Q.    All right.  Do you recall Senator Kelly?

5      A.    Yes.

6      Q.    And do you recall the Shock Trauma Gala

7  that's referenced in this email chain?

8      A.    I'm familiar with the Shock Trauma Gala.

9  I was on their board.

10     Q.    Okay.  It's an annual -- is it an annual

11  event?

12     A.    Yes.

13     Q.    And would you say it's a pretty big event?

14     A.    Yes.  It's huge.

15     Q.    Okay.  Now, if you see here, Senator Kelly

16  reaches out to you and asks for your advice regarding

17  the Shock Trauma Gala scheduled -- he says tonight.

18  So that would have been on April 25th?

19     A.    Correct.

20     Q.    And you then asked -- you say that you

21  asked Kali.  And I presume that means Kaliope, your

22  chief of staff?

23     A.    Correct.

24     Q.    So you asked her to reach out and --

25  specifically to reach out to Senator Kelly.  Why did

**ORIGINAL TRANSCRIPT**

125

1  out.

2         BY MR. HWANG:

3     Q.   Ms. Rawlings-Blake, I notice that you're

4  wearing an earbud --

5     A.   Yes.

6     Q.   -- in your left ear.  Is that being used

7  as a mic?

8     A.   No.  They're connected to my phone.

9     Q.   Okay.  You're not speaking -- no one is on

10 the other line, is there?

11    A.   No.

12    Q.   I just thought I'd double-check.

13    A.   So if I get a -- you know, a text message

14 or something, it doesn't pop -- you know, you don't

15 -- it will not disrupt the recording.  It just --

16    Q.   If I could direct your attention to 15.

17        MR. HWANG:  And if we could mark it as

18 Exhibit 15, please.

19           (Exhibit Number 15 was marked for

20 identification and was attached to the deposition.)

21        BY MR. HWANG:

22    Q.   It is an email chain produced by the city

23 as City 00045742.  And I believe you testified

24 earlier that Stephanie Robinson was the deputy mayor

25 for public safety at that time; is that correct?

1      A.     I think so.

2      Q.     So she would have been a member of your

3   senior leadership team at that time, correct?

4      A.     Yes.

5      Q.     Now, in this email chain, Stephanie

6   Robinson requests information regarding what the city

7   was requesting from Baltimore County by way of law

8   enforcement and mutual aid and Baltimore County's

9   response to that request.

10          Do you see that?

11     A.     Yes.

12     Q.     Okay.  And she was -- do you recall

13   Ganesha Martin?

14     A.     Say that again.

15     Q.     Do you recall Ganesha Martin?

16     A.     Yes.

17     Q.     Was she -- what was her role at that time?

18     A.     She was a part of the commissioner's team.

19   I don't remember her exact title.

20     Q.     So she was a member of the Baltimore

21   Police Department; is that correct?

22     A.     At that point, correct.

23     Q.     So in this email Stephanie Robinson is

24   asking the Baltimore Police Department to provide

25   information regarding what was requested from

1  Baltimore County and what that response was --

2         THE REPORTER:  I'm sorry.  Counsel, you're

3  fading out.  I need you to keep your voice up.  "And

4  what that response was" --

5         BY MR. HWANG:

6     Q.    So in this email Stephanie Robinson is

7  asking the Baltimore Police Department to provide

8  information regarding what was requested from

9  Baltimore County, among other jurisdictions, and what

10  the response was; is that correct?

11    A.    That's what it looks like, yes.

12    Q.    So was the city keeping track at this

13  point of what mutual aid requests were going out and

14  what was coming in?

15    A.    I believe so.

16    Q.    And what do you recall about that

17  tracking?  Were sufficient resources coming in?

18    A.    I do not recall.

19    Q.    You don't recall either way, whether it

20  was sufficient or insufficient?

21    A.    Correct.

22    Q.    Now, Robert Maloney testified that April

23  25th, 2015 was specifically on MOEM's radar,

24  particularly because of the expected size of the

25  protests and because outside agitators were expected

1   That would include the Mayor's Office of Emergency

2   Management.  That would include even some other

3   departments like DPW or transportation that could or

4   would -- whose resources could or would be necessary.

5        Q.    Okay.  And so what additional resources

6   would have been used or deployed on April 25th in

7   light of the expected increase in the size of the

8   protest?

9        A.    I do not remember specifically what

10  resources were requested or deployed.

11       Q.    Okay.  You do recall that leave was

12  canceled, correct, for the Baltimore City Police

13  Department that Saturday, April 25th?

14       A.    As I mentioned to you before, I recall at

15  some point during the response to the protest leave

16  was -- among other thing, leave was canceled.  And as

17  I mentioned before, I do not recall the exact date

18  that that was done.

19       Q.    If I can direct your attention to 16.

20            MR. HWANG:  And if I can mark that as

21  Exhibit 16, please.

22            (Exhibit Number 16 was marked for

23  identification and was attached to the deposition.)

24            BY MR. HWANG:

25       Q.    It's an email chain produced by the city

1    as City 00008247 through 49.  And you can start from

2    the bottom -- it may help -- but I'll give you a

3    minute to look through it.

4         A.    Okay.

5         Q.    Now, this email chain depicts events as

6    they were unfolding on Saturday, April 25th, 2015,

7    correct?

8         A.    Um-hum -- yep.

9         Q.    And at 5:09 p.m. on April 25th, 2015, it

10   says the mayor just walked in, right?  Correct?

11        A.    Yes.

12        Q.    Now, it seems to indicate that you had

13   just walked into the watch center; is that correct?

14        A.    I think that that's what it's saying, yes.

15        Q.    I just want to make sure we have the same

16   understanding as to terminology.

17              Is your understanding that the watch

18   center and the emergency operations center or EOC

19   refers to two different things?

20        A.    So I -- potentially.  So the Mayor's

21   Office of Emergency Management has a watch center and

22   I know that there was a sort of coordinated command

23   center that was created, I believe, in police

24   headquarters as well.

25        Q.    Okay.  So on April 25th, 2015, do you

1          I feel like for sure I was there on

2    Monday.  I do not know if I was there on Saturday as

3    well.

4          Q.    Okay.  You testified earlier that if it's

5    like a blizzard or some sort of emergency that's when

6    you would go to the watch center.

7                Is that accurate?

8          A.    Yes.

9          Q.    So, you know, if you had gone to the watch

10   center at police headquarters on April 25th, 2015, it

11   would be because at that point it's an emergency,

12   right?

13         A.    If I went to the watch center at the

14   police headquarters, yes.  If I went to the watch

15   center at -- the one that the emergency management

16   operates, you know, I would go there like if -- when

17   we had the -- what do you call it? -- like the Grand

18   Prix or big events like that.

19                You know, that's -- when you say I would

20   go because it's an emergency, it's not just an

21   emergency.  It's more -- it's also where you would --

22   you know, to coordinate the needs or the -- you know,

23   the potential city needs if there is a huge event.

24         Q.    Sure.  Prior to the events unfolding at

25   Camden Yards on April 25th, 2015, that Saturday, do

1    speaking program at City Hall ended, a crowd

2    progressed towards Camden Yards; is that correct?

3         A.    Yes.

4         Q.    Okay.  Now, I understand your

5    characterization of events leading to the conclusion

6    of the loosely organized speaking program at City

7    Hall.  But what (sic) would you characterize what

8    happened after that as a crowd began to go towards

9    Camden Yards?

10        A.    As a crowd began to go towards Camden

11   Yards, the demonstration and the protest turned into

12   something altogether different.

13              There were not -- you know, the -- I do

14   not recall there being, you know, people with signs,

15   you know, trying to be seen and be heard about the

16   circumstances surrounding Freddie Gray's death.

17              What I seem to remember is there was a

18   group -- and I don't want to -- I can't say how big

19   or what a percentage of the total number of people

20   was, but there was a group of individuals that had

21   been a part of the demonstration who, you know, like

22   many that were out there were very -- very upset,

23   very frustrated, very -- still very full of emotion.

24              As the event was winding down, when

25   whoever it was that was speaking suggested that it's

1  not -- you know, I don't suggest and I don't know the

2  exact words, but basically, you know, that -- you

3  know, it's not over and sort of encouraged people to

4  use that energy and to -- you know, again, I can't

5  remember the words.

6          But basically, there was -- it seemed to

7  be some interest in -- or encouragement to do more

8  than what had been done with the peaceful protest.

9  You know, it seemed like people were whipping them up

10  or riling them up.

11          And again, I don't know what he meant --

12  what the person -- I think it was a guy -- meant by

13  sort of shut it down or whatever, but it was just

14  kind of the language of incitement.

15      Q.    Sure.  And so was more done following that

16  than just peaceful protesting?

17      A.    Yes.

18      Q.    Okay.  What was done that was beyond

19  peaceful protesting following that?

20      A.    There was a -- again, this was a loosely

21  organized group of individuals stirred up in emotion

22  and incited to -- to do something, sort of spread out

23  from City Hall and work their way downtown towards

24  Camden Yards breaking windows.  I think there was

25  looting in some stores.

1          I don't know -- I can't remember offhand

2     if there were any individuals that were downtown in

3     the area that weren't a part of anything that, you

4     know, were injured in that -- you know, got kind of

5     caught up in it.

6          But I do know there were a lot of

7     confrontations between public -- sort of the public

8     officials, meaning police, fire -- anybody that was

9     seen as -- anybody or, you know, anything that was

10    seen as a symbol of authority or the government was

11    vulnerable.

12         So, you know, police cars got damaged,

13    fire trucks got damaged.  Firefighters were -- were

14    targeted, injured --

15    Q.    Sure.

16    A.    -- and businesses.

17    Q.    So I understand that speech by agitators

18    -- an agitator or agitators may have precipitated

19    this, the property destruction and the violence and

20    the looting as a crowd progressed to Camden Yards.

21         But was it your sense that it was only the

22    agitator or agitators from out of town that were

23    committing the property destruction, violence, and

24    looting, or did that include people from Baltimore

25    City?

1  people weren't really -- that -- that our community

2  members did not -- from -- generally were not

3  participating in this as a way -- as a pretense to

4  loot.

5      Q.    Okay.  So I understand that you didn't

6  have any prenotice as far as the violence and

7  property destruction you believe that happened on

8  April 25th, 2015.

9          But certainly, you know, once it happened,

10  once you saw that there was looting, property

11  destruction, and violence on that day, April 25th,

12  2015, at that point you knew that the agitators could

13  be effective, that this could result; isn't that

14  correct?

15      A.    When you say, "this could result," what do

16  you mean?

17      Q.    Property destruction, looting, and

18  violence.

19      A.    Yes.

20      Q.    Now, Chief Hyatt testified that the

21  Baltimore Police Department did not have enough

22  resources on April 25th, 2015 to, at times, safely

23  make arrests by sending in arrest teams.

24          Specifically, she recalled an instance

25  where there was property damage occurring near Camden

**ORIGINAL TRANSCRIPT**

1  whether it was coordinating with the police or

2  otherwise to have --

3      A.    I didn't hear you.  You kept going in and

4  out.  I couldn't hear your question.

5      Q.    Okay.  So in addition to more aggressively

6  engaging with the community, in addition to engaging

7  with Freddie Gray's family, and the discussions that

8  you recall having about mutual aid, is there anything

9  else that the city did or you did, whether it's

10 coordinating with the police department or not, to

11 make sure that there were increased safety measures

12 planned in place for downtown as referenced in this

13 exhibit, Exhibit 19?

14     A.    I cannot say specifically downtown.  I

15 just don't remember.

16     Q.    Okay.  Anything generally?

17     A.    Generally, I know that we were working on

18 a -- working on increased safety measures throughout

19 the city, downtown included.

20     Q.    But you don't recall what those safety

21 measures were?

22     A.    No.  But on Sunday, April 26th, we were

23 dealing with a fresh -- a new circumstance, a new

24 reality.  We had a city that had gone from what we

25 had anticipated, which was, you know -- again, even

1   -- you know, an emotionally charged large protest to

2   what happened when -- at the end of it devolved into

3   looting.

4          So on the 26th, we were dealing with that

5   new reality.  So I'm sure -- I know that, you know,

6   we were assessing what we needed to do moving forward

7   throughout the city.

8      Q.   You don't recall any specifics, though?

9      A.   No.

10      Q.   If you could actually jump ahead to

11   Exhibit 29 for now.

12          (Exhibit Number 29 was marked for

13   identification and was attached to the deposition.)

14          MR. HWANG:  And I'm going to play a video

15   for you.  And if whoever has control over the panel

16   here on the Zoom could put the focus on Mr. Shepard,

17   the video will show on his screen.

18          THE VIDEOGRAPHER:  Let me know when you're

19   ready.

20          MR. HWANG:  Yep.  Ready to go.

21          (Whereupon, there was a video played.)

22          BY MR. HWANG:

23      Q.   Now, Ms. Rawlings-Blake, do you recall

24   that press conference and there being commotion with

25   the room to destroy comment?

1          It was more of, you know, you have the

2    right to say what you want to say.  We're trying to

3    make sure that there's nothing -- there's nothing in

4    our control that would escalate.

5          So, you know, we had seen in other places

6    where members of the public, you know, frustrated by

7    protestors, you know, would -- like I said, you know,

8    people have been hit by cars and stuff like that.

9          Like that seemed to be, as I remember, you

10   know, the focus to make sure that as long as this was

11   going on that we were trying to make sure that, you

12   know, people were seen if they wanted to be seen,

13   heard if they wanted to be heard and there was -- you

14   know, it was safe for the police, the protestors, and

15   the general public.

16   Q.    Other than the police not responding

17   verbally to what's called combative verbal attacks by

18   protestors or running into them with their cars, was

19   there anything --

20   A.    I'm not talking about police running into

21   people with their cars.  I'm saying that that had

22   happened in the past where members of the public had

23   gone into --

24   Q.    Okay.  Well, then in that case, aside from

25   the police not responding verbally to verbal

1  confrontations initiated by protestors, how else did

2  the police -- how else was (sic) the police

3  instructed to engage with respect to the protestors

4  so that they could be ensured that protestors were

5  able to protest as stated here?

6        A.    I don't -- I don't remember specifics --

7  you know, I don't -- so what -- what I was talking

8  about was my -- my concern that -- you know, that we

9  were not seen -- the city and I was (sic) not seen as

10  trying to being overly aggressive, so we silenced the

11  peaceful protest.

12            That was really my focus of what I was

13  saying, that I saw what happened in other cities

14  where, you know, in response to protests that in some

15  places the government response was very

16  confrontational, it was, you know, to force

17  dispersement (sic) from the onset.  And I just -- I

18  did not have a sense that that would be productive.

19        Q.    Okay.  So you're -- I guess is what you're

20  saying then that you were cognizant or you were

21  focused on the city not appearing to be the aggressor

22  or to be aggressive in response to these protests?

23        A.    I can agree with that word, yes, but more

24  than just aggressive, it would be overly aggressive

25  that I was concerned about.

**ORIGINAL TRANSCRIPT**

1      Q.    Okay.  I mean, what would you deem to be

2   overly aggressive?

3      A.    I think as -- for example, if -- as people

4   were walking down 83, even though everybody knows

5   that they were disrupting traffic, if the police had,

6   you know, gone in in their cars and jumped out and

7   started yanking people to the ground and handcuffing

8   them, I can't imagine that being received well.

9           I can imagine that that would have caused

10  an escalation, something like that.

11     Q.    So was, in your opinion, an appropriate

12  response to, for example, 83, the blockage of 83,

13  that it was important to allow some of that to

14  happen?

15     A.    I think it was important to balance what

16  was happening with what could happen if we responded

17  incorrectly.

18     Q.    Okay.  And in order to balance that, would

19  that include, for example, if I-83 was blocked, which

20  it was, to not arrest people for that, to allow a

21  certain --

22     A.    I'm using that as an example of force.  I

23  do not have any independent recollection of specific

24  arrests or not arrest, conversations being had around

25  83.

1           While not specific to 83, though, do you

2  recall there being discussions or a general decision

3  if you overreact and if there's a police response;

4  for example, arrests made to instances like that,

5  that that may do more harm than good?

6      A.   I do not recall specific conversations

7  like that.

8      Q.   Okay.  What about generally?

9      A.   I've just spoken at length about

10 generally.

11     Q.   Okay.  But you do recall having general

12 discussions then about that, about what you had just

13 discussed?

14     A.   I don't understand what you're saying.  I

15 just told you what we -- the general concerns, right?

16     Q.   General concerns were discussed, though;

17 is that correct?

18     A.   I don't remember specifically if they were

19 -- if these things were discussed.  What I was trying

20 to tell you was, to the best of my memory, the types

21 of things that were top of mind.

22     Q.   Now, in your quote, you say that, "We

23 worked very hard to keep that balance and to put

24 ourselves in the best position to de-escalate."

25           Do you see that?

1      A.    Yes.

2      Q.    Okay.  So how did the city put itself in

3    the best position to de-escalate?

4      A.    So throughout the day when the protest

5    started at the Western District and as it grew and

6    meandered through the city and ended up at City Hall,

7    by making sure that there was not -- that we were

8    doing everything that we could to give the impression

9    -- or to ensure that the city -- and nobody that

10   worked for the city was interested in silencing the

11   protestors or interfering with their First Amendment

12   rights.

13          We were working very hard to create that

14   balance so there would not be an escalation into what

15   we had seen in other cities and unfortunately what

16   ultimately happened at the end of the demonstration.

17     Q.    Okay.  But I mean at that point you knew

18   that the Baltimore City Police Department didn't have

19   enough resources, for example, to send out arrest

20   teams to help de-escalate.

21          So at that point what was the city doing

22   to address that?

23     A.    You're talking about two different -- two

24   different things.  So the arrest teams -- the need to

25   arrest came as a result of unforeseen circumstances

1   your words.

2        A.    Right.  This is exactly what I described.

3   The work that we did throughout 90 percent of the

4   25th where we anticipated aggressive protestors, we

5   anticipated people wanting to make a show, to make a

6   stand, in all of those cases, they were not met with

7   force.

8             And the -- just like I've said multiple

9   times, as heated as it was, it started -- you know,

10  people were able to, you know, make their stand, make

11  their statements, express themselves.

12            And, you know, people had already started

13  leaving.  A large majority of the people that had

14  come were going back to wherever they came from.  And

15  our efforts to make sure that, you know, whatever it

16  was that people -- you know, they came, they saw, and

17  they were heard.

18            And so that -- again, that is what I'm

19  talking about.  That is what we prepared for.  That

20  is what the information that we had available to us

21  up until that point informed us to prepare for.

22        Q.    Okay.  So I believe these were your words,

23  but please correct me if I'm wrong.  In terms of your

24  clarification of the room to destroy comment, you

25  stated that what you meant to say was that the city

1  from -- you know, from destroying property, I don't

2  have -- I don't know of many -- or any examples where

3  that has -- where what you're talking about is an

4  actual thing.

5      Q.    Okay.  Now, Kaliope Parthemos, as you

6  know, was deposed in this case.  In her deposition

7  she acknowledged that declaring a state of emergency

8  would have triggered an escalated request for mutual

9  aid from other jurisdictions and other jurisdictions

10  would have then brought additional resources.  We're

11  talking about outside the National Guard.

12          Do you agree with that?

13      A.    Say that again.

14      Q.    Sure.  During her deposition, Kaliope

15  Parthemos stated that she -- or acknowledged, rather,

16  that declaring a state of emergency would have

17  triggered an escalated request for mutual aid from

18  other jurisdictions and that other jurisdictions

19  would have then brought additional resources.  And

20  we're talking about outside the National Guard.

21          Do you agree with that?

22      A.    I do not -- I do not know if increased aid

23  was dependent on a state of emergency declaration.

24      Q.    Okay.

25          MR. HWANG:  Can we take one final break

1  before we finish up?  If we could take a ten-minute

2  break, please.

3          THE VIDEOGRAPHER:  Okay.  Going off

4  record.  It is 4:44 p.m.

5          (A break was taken.)

6          THE VIDEOGRAPHER:  Okay.  We are back on

7  record.  It is 4:55 p.m.

8          BY MR. HWANG:

9      Q.    Okay.  Now, Ms. Rawlings-Blake, if I can

10  refer you to three different exhibits.  The first is

11  20 -- and if we can mark that as Exhibit 20 -- which

12  is an email produced by the city as City 00045625;

13  Exhibit 30, which was produced -- and if we could

14  mark that as 30.  It was produced by the city as City

15  00052045 -- I'm sorry.  Just those two exhibits.

16          (Exhibit Numbers 20 and 30 were marked for

17  identification and were attached to the deposition.)

18          BY MR. HWANG:

19      Q.    Okay.  Now, if you look at Exhibit 20,

20  that refers to a funeral.

21          Do you see that?

22      A.    Yes.

23      Q.    Okay.  And it says a funeral is going to

24  be on -- at 11:00 a.m. on Monday.  Do you know which

25  funeral this refers to?

1      A.      I believe that's the funeral of Freddie

2   Gray.

3      Q.      And Exhibit 30 appears to be a calendar

4   entry for 10:40 a.m. on Monday, April 27th for you to

5   attend family hour and possibly the funeral service

6   for Freddie Gray; is that correct?

7      A.      That's 30?

8      Q.      Yes.

9      A.      Yes.

10     Q.      Okay.  And did you attend the family hour

11  and/or funeral of Freddie Gray?

12     A.      Yes.

13     Q.      Did you attend both?

14     A.      I do not know if I stayed for the entire

15  funeral, but I definitely stayed for part of it.

16     Q.      Okay.  But the city knew that a funeral

17  for Freddie Gray was going to be on Monday, April

18  27th, 2015 a good time prior to that, correct?

19     A.      Oh, absolutely.  That's why it was so

20  important for me -- for us to work with his family to

21  try to set the tone and the temperature in the city

22  and to make sure that people knew from his family

23  that what they wanted in his memory was a peaceful

24  day to mourn his death.

25     Q.      Okay.  And if I could direct your

1    shutting down, do you vaguely -- at least vaguely

2    recall hearing that Lexington Market and Cross Street

3    Markets were also shutting down early on Monday,

4    April 27th?

5        A.    That I don't -- I -- like I said, I have a

6    vague recollection of T. Rowe Price, but I don't have

7    -- I don't have an independent recollection of Cross

8    Street or Lexington Market.

9        Q.    Okay.  Do you have a recollection of other

10    businesses or institutions or entities on Monday,

11    April 27th deciding to close down early?

12        A.    I can -- what I recall is the city was

13    very shaken by -- by what happened on Saturday, not

14    just what happened, but, you know, it -- the events

15    of Saturday were running on a -- on a repeat loop on

16    the 24-hour news stations, which, I think, had the

17    effect of increasing the level -- the level of

18    concern.

19            You know, every time the story was

20    reported about Saturday, you know, people would call

21    -- you know, I know me and other people as if it was

22    going on currently in the city.  You know, so it was

23    like a repetitive traumatic experience that, as I

24    mentioned -- as I said before, that the city calmed

25    down on Saturday night, but it was a very uneasy

1    calm.

2        Q.    Okay.  So did you believe that these

3    continuing concerns were unwarranted?

4        A.    No.  They certainly weren't unwarranted.

5    The city had just gone through something extremely

6    traumatic, which we experienced and which was

7    broadcast around the world repeatedly for at this

8    point more than 24 hours.

9             And as I said, there was a -- it was --

10   things had calmed down, but -- and again, I'll

11   repeat, on Sunday, while -- I don't recall any

12   protests, looting.

13            I think Saturday was so fresh in

14   everyone's mind that it was still -- there was still

15   -- you know, people were -- people were on -- were on

16   edge because of the -- again, like it says, the

17   unpredictable nature.

18            People -- everyone was feeling like, you

19   know, something could happen anywhere at any time and

20   that this very emotional event of the funeral was

21   coming up.

22       Q.    I'm sorry.  Did you say their concerns

23   were warranted or unwarranted?

24       A.    The first thing I said was that it was

25   understandable that they would be concerned.  I'll

1   about it -- at some point in that time I was at City

2   Hall.

3         And as far as I can remember -- for some

4   reason, I have a recollection of Keiffer being there.

5   I knew that -- you know, everybody knew that it was a

6   funeral and -- the day of the funeral.  And we know

7   from not just what happened in Baltimore on Saturday

8   but what's happened in other cities, events like a

9   funeral can be flash points.

10        So I think Keiffer may have attended the

11   funeral on behalf of the governor.  I'm not -- I'm

12   not -- I'm not 100 percent sure, but he was in

13   Baltimore on that day in City Hall and in

14   communication -- I -- I'm assuming -- not planted

15   there but stationed there to be at the ready if we

16   needed to communicate with the governor.

17     Q.  Okay.  So I believe you just stated at

18   some point in time, whether it's when Mondawmin

19   started or thereabouts, you recall being at City Hall

20   and you recall Keiffer Mitchell being there.

21        Am I fairly stating what you stated?

22     A.  Yes.  I just don't remember exactly, you

23   know, the timing.

24     Q.  Okay.  Do you recall eventually leaving

25   City Hall and going somewhere else?

1   voice as -- or at least that's how I interpreted it

2   as the violence was erupting.

3       Q.    Did he say we need more help?  Do you

4   recall that?

5       A.    I don't recall.  I can't -- I'm sure at

6   some point -- I think -- I think he would be -- I

7   can't imagine why he wouldn't have said that.  I just

8   don't recall him specifically saying that, but it was

9   clear that as things escalated we needed more

10  resources.

11      Q.    Okay.  And you know, prior to going to the

12  command center as you're speaking with Commissioner

13  Batts you said you recall more of the tone than the

14  substance.

15      A.    Prior to getting there, yeah.

16      Q.    Did you get a sense that he was

17  overwhelmed?

18      A.    No.  I don't -- I -- I can't -- I don't

19  know if I characterized it as overwhelmed.

20      Q.    Okay.  How would you characterize it?

21      A.    It -- at the time I had the sense that he,

22  his team, my team, you know, that everyone that was

23  involved was in the middle and responding to a

24  horrific event that was evolving and -- rapidly

25  evolving and that people were working very hard to

1    try to respond in a way that was -- you know, trying

2    to -- trying to create the best outcome in a horrible

3    event that was devolving.

4          Q.    Now, leave had been canceled -- leave for

5    the Baltimore Police Department had been canceled for

6    Saturday, April 25th, 2015.  You were also aware that

7    leave had been canceled for Monday, April 27th, 2015,

8    correct?

9          A.    I'm sure.  I don't remember specifically,

10   but that makes sense.

11         Q.    And with respect to mutual aid, you were

12   aware that there was mutual aid present there in

13   Baltimore City on Saturday, April 15th, 2015,

14   correct?

15         A.    Yes.

16         Q.    Okay.  And were you also aware that the

17   amount of mutual aid present here -- that was to be

18   present here at the beginning of April 27th, 2015

19   there wasn't a large fluctuation between the numbers

20   being provided on the morning of April 27th, 2015

21   when compared to April 25th, 2015?

22         A.    I do not know that information.

23         Q.    Okay.  But was it your impression that the

24   number -- the total number of law enforcement

25   officers available to be deployed on Monday, April

1       CERTIFICATE OF NOTARY PUBLIC

2

3

4       I, SHERRY L. BROOKS, the officer before whom the

5  foregoing deposition was taken, do hereby certify

6  that the witness whose testimony appears in the

7  foregoing deposition was remotely duly sworn by me;

8  that the testimony of said witness was taken by me in

9  stenotype and thereafter reduced to typewriting under

10  my direction; that said deposition is a true record

11  of the testimony given by said witness; that I am

12  neither counsel for, related to, nor employed by and

13  of the parties to the action in which this deposition

14  was taken; and, further, that I am not a relative or

15  employee of any counsel or attorney employed by the

16  parties hereto, nor financially or otherwise

17  interested in the outcome of this action.

18

19  _____

20           SHERRY L. BROOKS

21       Notary Public in and for the

22           State of Maryland

23

24  My Commission Expires:

25  July 9, 2023

# EXHIBIT 2

# In The Matter Of:

*CHAE BROTHERS, LIMITED LIABILITY COMPANY, ET AL. v.*
*MAYOR AND CITY COUNCIL OF BALTIMORE, ET AL.*

---

*KALIOPE PARTHEMOS*
*January 12, 2021*
*ORIGINAL TRANSCRIPT*

---

*CourtScribes, Inc.*
*"Delivering More For Less"*
*(833) 727-4237*
*info@courtscribes.com*
*www.courtscribes.com*

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

```
-----------------------------
                              :
CHAE BROTHERS LIMITED         :
LIABILITY COMPANY, Et Al.,    :
                              :
             Plaintiff,       :
                              :
        v.                    : CASE NO.:
                              : 1:17-CV-01657-GLR
MAYOR & CITY COUNCIL OF       :
BALTIMORE, Et Al.,            :
                              :
             Defendant.       :
-----------------------------:
```

Tuesday, January 12, 2021

Deposition of
                KALIOPE PARTHEMOS,
a witness called for examination by counsel for the
Plaintiffs, pursuant to Notice, hosted via virtual
videoconference by CourtScribes, Inc., commencing
at approximately 9:00 a.m., there being present on
behalf of the respective parties:

**ORIGINAL TRANSCRIPT**

2

1   ON BEHALF OF THE PLAINTIFFS:

2

3                PETER K. HWANG, ESQUIRE

4                SUNG & HWANG, LLP

5                9256 Bendix Road, Suite 109

6                Columbia, Maryland 21045

7                (410) 772-2324

8                phwang@sungandhwang.com

9

10                RAY M. SHEPARD, ESQUIRE

11                THE SHEPARD LAW FIRM, LLC

12                122 Riviera Drive

13                Pasadena, Maryland 21122

14                (410) 255-0700

15                ray@shepard.law

16

17

18

19

20

21

22

23

24

25

**ORIGINAL TRANSCRIPT**

3

1   ON BEHALF OF THE DEFENDANTS:

2

3                  HANNA MARIE C. SHEEHAN, ESQUIRE

4                  SARA GROSS, ESQUIRE

5                  CITY OF BALTIMORE DEPARTMENT OF LAW

6                  LITIGATION DIVISION

7                  100 N. Holliday Street, Suite 101

8                  Baltimore, Maryland 21202

9                  (410) 396-4431

10                 hanna.sheehan@baltimorecity.gov

11                 sara.gross@baltimorecity.gov

12

13  VIDEOGRAPHER: IAN WALLACH, Courtscribes, Inc.

14  REPORTED BY:  EMILY G. COLKITT, Notary Public

15

16                      - - -

17

18

19

20

21

22

23

24

25

**ORIGINAL TRANSCRIPT**

```
                                                      4
```

1                      C O N T E N T S

2

3   WITNESS          EXAMINATION BY          PAGE(S)

4   K. Parthemos   Mr. Hwang                    8

5                       - - -

6                    E X H I B I T S

7   PARTHEMOS DEPOSITION                      MARKED

8   Exhibit No. 1 - Subpoena Package           14

9   Exhibit No. 2 - Protective Order and Agreement  16

10  Exhibit No. 3 - Amended Complaint          23

11  Exhibit No. 4 - Bates No. CITY00010183-4   30

12  Exhibit No. 5 - Bates No. CITY00044442-43  30

13  Exhibit No. 6 - Bates No. CITY00042157-58  42

14  Exhibit No. 7 - Bates No. CITY00039305-07  52

15  Exhibit No. 8 - Bates No. CITY00038330     53

16  Exhibit No. 9 - Bates No. CITY00052431     65

17  Exhibit No. 10 - Bates No. CITY00041669-70  65

18  Exhibit No. 11 - Bates No. CITY00054101-02  68

19  Exhibit No. 12 - Bates No. CITY00054708    91

20  Exhibit No. 13 - Bates No. CITY00052380    93

21  Exhibit No. 14 - Bates No. CITY00052923    95

22  Exhibit No. 15 - Bates No. CITY00055110    96

23  Exhibit No. 16 - Bates No. CITY00045742    97

24  Exhibit No. 17 - Bates No. CITY00008247-49  102

25  Exhibit No. 18 - Bates No. CITY00053393-96  121

**ORIGINAL TRANSCRIPT**

5

```
 1                  E X H I B I T S

 2                     (continued)

 3    PARTHEMOS DEPOSITION                    MARKED

 4    Exhibit No. 19 - Bates No. CITY00039193      134

 5    Exhibit No. 20 - Bates No. CITY00040085      135

 6    Exhibit No. 21 - Bates No. CITY00045625      136

 7    Exhibit No. 22 - Bates No. CITY00052441-42   139

 8    Exhibit No. 23 - Bates No. CITY00052170      161

 9    Exhibit No. 24 - Bates No. CITY00011473      1641

10    Exhibit No. 25 - Bates No. CITY00037614      145

11    Exhibit No. 26 - Bates No. CITY00037600      148

12    Exhibit No. 27 - Bates No. CITY00052047      148

13    Exhibit No. 28 - Bates No. CITY00055136      157

14    Exhibit No. 29 - Bates No. CITY00052179      159

15    Exhibit No. 30 - Bates No. CITY00046791-92   162

16    Exhibit No. 31 - Bates No. CITY00052424      170

17    Exhibit No. 32 - Bates No. CITY00054186      171

18    Exhibit No. 33 - Bates No. CITY00037932      173

19    Exhibit No. 34 - Bates No. CITY00052552      174

20    Exhibit No. 35 - Bates No. CITY00046457      176

21    Exhibit No. 36 - Bates No. CITY00011859-60   178

22    Exhibit No. 37 - Bates No. CITY00046497      179

23    Exhibit No. 38 - Bates No. CITY00052500-01   181

24    Exhibit No. 39 - Bates No. CITY00037933      183

25    Exhibit No. 40 - Bates No. CITY00012781      186
```

6

1          E X H I B I T S

2             (continued)

3  PARTHEMOS DEPOSITION                    MARKED

4  Exhibit No. 41 - Bates No. CITY00053858        191

5  Exhibit No. 42 - Bates No. CITY00052381        198

6  Exhibit No. 43 - Bates No. CITY00012126        203

7  Exhibit No. 44 - Bates No. CITY00013069        208

8  Exhibit No. 45 - Bates No. CITY00054223        211

9  Exhibit No. 46 - Bates No. CITY00046346        219

10  Exhibit No. 47 - Bates No. CITY00052460       219

11  Exhibit No. 48 - Bates No. CITY00046610       219

12  Exhibit No. 49 - Bates No. CITY00052350       223

13  Exhibit No. 50 - Bates No. CITY00052848-51    224

14  Exhibit No. 51 - Bates No. CITY00052209       224

15  Exhibit No. 52 - Bates No. CITY00054110       232

16  Exhibit No. 53 - Bates No. CITY00052097       235

17  Exhibit No. 54 - Bates No. CITY00052727-32    238

18  Exhibit No. 55 - Bates No. CITY00052541       238

19  Exhibit No. 56 - Bates No. CITY00052347       240

20  Exhibit No. 57 - Bates No. CITY00049959       242

21  Exhibit No. 58 - Bates No. CITY00032029       245

22  Exhibit No. 59 - Bates No. CITY0003820-4060   246

23                    - - -

24

25

1             P R O C E E D I N G S

2             THE VIDEOGRAPHER:  We are now on the

3    record in the matter of Chae Brothers, LLC, Et Al.

4    v. The Mayor and City Council of Baltimore, Et Al.

5    Today's date is January 12th, 2021.  The time is

6    9:08 a.m.

7             This is the video-recorded deposition of

8    Kaliope Parthemos being taken via Zoom.  My name is

9    Ian Wallach.  I am the camera operator with

10   CourtScribes.  The court reporter is Emily Colkitt

11   with CourtScribes.  Will Counsel please introduce

12   themselves for the record?

13            MR. HWANG:  Good morning.  Peter Hwang on

14   behalf of all the Plaintiffs.

15            MR. GROSS:  Good morning.  Sara Gross and

16   Hanna Sheehan on behalf of the Mayor and City

17   Council of Baltimore.

18            THE VIDEOGRAPHER:  Thank you.  Will the

19   court reporter please swear in the witness?

20            THE REPORTER:  Ms. Parthemos, would you

21   raise your right hand, please?

22   Whereupon,

23                KALIOPE PARTHEMOS,

24   a witness, called for examination by counsel for

25   the Plaintiffs, was duly sworn, and was examined

**ORIGINAL TRANSCRIPT**

1   and testified as follows:

2            THE REPORTER:  Thank you.  The time is

3   now 10:08 a.m.  Counsel, you may proceed.

4            MR. HWANG:  All right.  Thank you.

5       EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

6            BY MR. HWANG:

7       Q    And Ms. Parthemos, I want to make sure I

8   pronounce your name correctly.  Would you mind

9   pronouncing your name for the record, please?

10      A    Kaliope Parthemos.

11      Q    Now, Ms. Parthemos, as you know, my name

12  is Peter Hwang, and I represent the Plaintiffs in

13  this action who have filed suit against the Mayor

14  and City Council of Baltimore for, among other

15  things, damages to Plaintiffs' property and

16  business.

17           As you know, we're here for a deposition,

18  which will consist of me asking you questions, and

19  you providing answers to those questions.  As you

20  can see, there's a court reporter here.  She's

21  transcribing my questions as well as your

22  responses.

23           As such, it's important that you answer

24  my questions verbally.  Please refrain from

25  answering with gestures like a head nod or with

**ORIGINAL TRANSCRIPT**

1      A      I was the Chief of Staff for Mayor

2    Stephanie Rawlings-Blake from 2014 through December

3    of 2016.

4      Q      And from 2014 through December of 2016,

5    was the Chief of Staff to former Mayor Stephanie

6    Rawlings-Blake your only source of employment?

7      A      Yes.

8      Q      Now, prior to becoming the Chief of Staff

9    in or around 2014, were you employed by the City?

10     A      Yes.

11     Q      When did you first become employed by the

12   City?

13     A      December 2006.

14     Q      Okay.  Now, if you could kind of walk me

15   through your C.V., so to speak?  From 2006 through

16   2014, at least, the different titles that you held

17   while employed by the City and, for each title,

18   what your duties were?

19     A      December -- actually, it might have been

20   January of 2007 or the end of December.  I think it

21   might have been January 2007 through February of

22   2010, I was the Deputy Chief of Staff to then City

23   Council President Stephanie Rawlings-Blake.

24             From February 2010 until about May or

25   June of 2010, I was the Assistant Deputy Mayor of

**ORIGINAL TRANSCRIPT**

26

1           (The witness reviewed the document.)

2           THE WITNESS:  I'm sorry, could you repeat

3    your question?

4           BY MR. HWANG:

5      Q    Sure.  Do you understand -- in addition

6    to what happened at Camden Yards, as you described

7    it, do you understand that what is described in

8    paragraphs 54 and 55 happened on Saturday, April

9    25th, 2015?

10     A    I don't know what Mr. Shabazz reportedly

11   told the crowd.  But I do know that there was the

12   damage with the police vehicles and the breaks in

13   7-11.

14     Q    Okay.  Do you recall the name Malik

15   Shabazz?

16     A    I'm sorry, do I recall the name --

17     Q    Malik Shabazz, the name written in

18   paragraph 54.

19     A    I do not.

20     Q    I'm sorry, it seemed like I cut you off.

21   You were about to say something?

22     A    No, I'm good.

23     Q    But you do recall what's described in

24   paragraph 55 as happening on that Saturday,

25   correct?  April 25th?

1      A      What I was going to say is I don't

2    remember the last statement -- I'm sorry, it was so

3    long ago -- when "Defendant Batts later publicly

4    stated that the protestors had 'wreaked

5    havoc' and 'became very violent.'"  I don't

6    remember if he said that on that Saturday.

7      Q      Okay.  But just to make sure I'm

8    understanding you correctly -- you do recall on

9    April 25th, 2015, damage to police vehicles, bricks

10   and bottles being thrown at police officers, a 7-11

11   being looted, and some other property damage?

12     A      Yes, sir.

13     Q      Now, if I could direct your attention to

14   paragraphs 66 through 69?  And I'll give you a

15   minute to read it, but let me pose a question

16   first.

17            Do you understand that what is described

18   in paragraphs 66 through 69 happened on Monday,

19   April 27th, 2015?

20     A      Okay.  Did you want me to read it before

21   I answer that question, or are you telling me?

22     Q      If you could read it, please, and just

23   confirm.

24     A      Okay.

25     Q      And again, it's 66 through 69.

1      Q     Now, both of these email chains happened

2    throughout Sunday, April 19th, 2015, correct?

3      A     Yes.

4      Q     And I believe you testified earlier that

5    you recall being at church when you recalled

6    receiving the call about Freddie Gray's passing.

7    Was that what you said?

8      A     I don't think it was a call.  It was the

9    day of the Greek Independence Day Parade at church.

10   So I remember being on the podium, which is why I

11   don't think I got any of these messages.  I wasn't

12   looking at my phone.

13     Q     Okay.

14     A     I remember being on the podium, and

15   someone saying, "Did you hear that Freddie Gray

16   died today?"  And me saying, "Who?  What?"  And

17   then that's how I heard.

18     Q     Okay.  And then following you hearing

19   about Freddie Gray's passing, is it safe to say

20   that you found out more about who Freddie Gray was

21   and then what happened?

22     A     Yes.  And I may have already known who

23   Freddie Gray was.  I just don't remember.  I'm

24   sorry, it was so long ago.

25     Q     Okay.  Do you recall there being protests

1   that got worse after Freddie Gray's passing?

2       A   Yes.

3       Q   Okay.  And I would assume that the City

4   was aware of the reason for these protests and that

5   they were directly related to the arrest and

6   eventual passing of Freddie Gray, right?

7       A   Yes.

8       Q   Do you recall participating in any

9   meetings at that time, upon Freddie Gray's passing,

10   regarding these protests?

11       A   There were a number of meetings.

12       Q   Okay.

13       A   I don't remember specific dates and

14   times, but we had a number of meetings.

15       Q   Sure.  What do you recall about the first

16   meetings, the early meetings, with respect to the

17   protests and how the City would deal with them?

18       A   Well, at that point, it was a public

19   safety issue.  It wasn't a City Hall issue.  I just

20   remember us having conversations with the Police

21   Commissioner --

22       Q   Sure.  And what kind of --

23       A   -- and the Mayor's Office of Emergency

24   Management to make sure everybody was ready and

25   that they had the resources that they needed.

1  A Yes.

2  Q What's the difference between the Watch

3 Center and the EOC?

4  A The Watch Center was in the Police

5 Headquarters, and it was under the control of the

6 Police Department.  And they managed the Watch

7 Center and controlled who came into the room and

8 who didn't and who was a part of whatever was going

9 on there.

10   The Emergency Operation Center was

11 activated through the Mayor's Office of Emergency

12 Management on Calvert Street.

13  Q Okay.

14  A It was a different location than the

15 Watch Center at the Police Department.

16  Q Was your center, the Watch Center,

17 something that had to be activated?  Or was it

18 always in place?

19  A I'm pretty sure it's always in place, but

20 I don't know.

21  Q Okay.  Now, again, Freddie Gray passes

22 away on April 19th, which was a Sunday.

23  A Yes.

24  Q After his passing, do you recall protests

25 generally escalating in terms of size?

## ORIGINAL TRANSCRIPT

41

1       A     Yes, sir.  Yes.

2       Q     And I assume as these protests were

3   escalating, that the frequency of the meetings

4   regarding these protest also rose, correct?

5       A     Yes.

6       Q     As these protests started escalating

7   after Freddie Gray's passing on April 19th, what

8   kind of discussions do you recall having within the

9   City?

10      A     I just remember asking Commissioner Batts

11  was he ready, explaining, setting up times to call

12  clergy and community groups and business groups

13  with regards to what we were doing to prepare.  And

14  I guess those were the kind of basic discussions

15  that we had during those meetings --

16      Q     Okay.

17      A     -- generally.

18      Q     And would you personally --

19      A     I don't remember specifically.  I'm

20  sorry.

21      Q     Would you personally meet with

22  Commissioner Batts?  When you say you met with

23  Commissioner Batts and talked with him, was it you

24  that did that?

25      A     It wasn't just me.  It was -- yeah, it

1  would be me or Stephanie, sometimes Kevin,

2  sometimes the Mayor.

3      Q     Okay.  And I just want to make sure we're

4  referring to the same people.  So you said it

5  wasn't just you.  It also may have included

6  Stephanie --

7      A     Robinson.

8      Q     Stephanie Robinson?

9      A     Kevin Harris, and Mayor Rawlings-Blake.

10     Q     And as the protests were escalating after

11  Freddie Gray's passing on April 19th, and you were

12  communicating with Commissioner Batts, did those

13  communications continue to include, you know, the

14  Baltimore City Police Department's resources and

15  whether they had enough and the mutual aid that

16  they were requesting?

17     A     Yes.

18     Q     So if I could direct your attention to

19  the document marked as 06?

20     A     One second.  Okay.

21         MR. HWANG:  And if we could mark that as

22  Exhibit 6?  It's an email chain produced by the

23  City as CITY00042157 through 158.

24             (Whereupon, a document was marked for

25  identification Parthemos Deposition Exhibit No. 6.)

1  Exhibit 7?

2           (Whereupon, a document was marked for

3  identification Parthemos Deposition Exhibit No. 7.)

4           BY MR. HWANG:

5      Q    This is an email chain produced by the

6  City as CITY00039305 through 07.

7      A    Yes.

8      Q    Now, Exhibit 7 is an April 23rd email

9  chain between Colin Tarbert and Donald Fry.  Do you

10  recognize Donald Fry?

11      A    Yes.

12      Q    Do you recall who he was or what his role

13  was at that time?

14      A    I think he has the same role -- the head

15  of the Greater Baltimore Committee.

16      Q    And what is Greater Baltimore Committee,

17  for those who don't know?

18      A    It's an organization with business

19  leaders in the City.

20      Q    Okay.  Now, in the early --

21      A    It's not a City organization.  It's a

22  private business organization.

23      Q    Okay.  In the earliest email in Exhibit

24  7, which Colin Tarbert sent on April 23rd at 11:18

25  a.m.?

1      A      Yes.

2      Q      He states that you wanted to schedule a

3  business outreach call --

4      A      Yes.

5      Q      -- with the Mayor and business leaders at

6  3:00 p.m. on April 24th.  Do you see that?

7      A      Yes.

8      Q      Okay.  What updates were to be provided

9  on that call?

10     A      With regards to what we were doing to

11  prepare for the protest.

12     Q      Okay.

13     A      And, you know, people were getting a

14  little anxious and nervous with regards to

15  everything that they were hearing and, of course,

16  what happened to Mr. Gray.  And everyone, you know,

17  was upset and wanted to make sure that we were

18  prepared for what was going on.

19     Q      Okay.  And now if I could direct your

20  attention to 08?

21            MR. HWANG:  If we could mark it as

22  Exhibit 8?  It's produced by the City as

23  CITY00038330.

24            (Whereupon, a document was marked for

25  identification Parthemos Deposition Exhibit No. 8.)

## ORIGINAL TRANSCRIPT

54

1          THE WITNESS:  Yes.

2          BY MR. HWANG:

3      Q    Now, this refers to the same business

4  outreach call, correct?

5      A    Yes.

6      Q    And at the bottom it says "requestor,"

7  and it has your first name on there, correct?

8      A    Yes.

9      Q    So you're the one that organized this

10  call?

11      A    I'm the one that requested the Economic

12  Development Team organize the call.

13      Q    Okay.  Now, you said -- and did this call

14  actually happen?

15      A    I'm pretty sure it did -- that call as

16  well as a community call.

17      Q    Okay.  These calls -- who typically led

18  these calls?  Who spoke?

19      A    On this call, it was probably the Deputy

20  Mayor -- or, excuse me, the specific business

21  outreach call, when I referenced this call, was

22  probably the Deputy Mayor initially spoke and then

23  the Mayor spoke and then answered questions.

24      Q    And when you say -- which deputy mayor

25  would have spoken?

100

1    So I don't know who was more helpful or not.  I
2    don't remember.
3        Q    Sure.  Would you say politics plays a
4    part into whether and to what extent certain
5    counties may provide mutual aid to Baltimore City?
6        A    I would hope not, but I guess that could
7    be a factor, as well as relationships.  I'm not
8    exactly sure.  I don't know the police -- I don't
9    -- I'm not a police officer that has to call in
10   mutual aid, so I don't know the nature of the
11   discussions and the relationships.  So I don't
12   know.  I'm sure there's a lot of factors.  I just
13   don't know what they are.
14       Q    Sure.  So at this time -- we're talking,
15   you know, Saturday, April 25th, 2015 -- when we
16   talk about mutual aid, we're talking about the
17   requests coming from the Baltimore City Police
18   Department and directly going to police departments
19   in other jurisdictions, correct?
20       A    Yes.
21       Q    It's police department to police
22   department?
23       A    Yes.
24       Q    It's not city to county, or city to city?
25       A    No.  The Mayor doesn't make the request.

1    The Police Commissioner does.

2       Q    So it's from police department to police

3    department --

4       A    Yes.

5       Q    -- as requests are being made and the

6    request to provide mutual aid.  It's police

7    department to police department, right?

8       A    And I'm sure that if a -- I'm sure it's

9    common practice that if a jurisdiction were to

10   request aid, I'm pretty sure that it's common

11   practice that it's granted.

12           Just like if any other jurisdiction were

13   to call us, they wouldn't hesitate -- we wouldn't

14   hesitate to provide them the resources that they

15   needed if we had them.

16      Q    Sure.  And again, I just want to make

17   sure we have this clear.  Because we say "us" and

18   "them" when we're referring to jurisdictions in

19   general.  But again, this would be a request made

20   by the police department and a request granted by

21   another police department, right?

22      A    Yes.  Commissioner to commissioner.

23      Q    Police commissioner to police

24   commissioner, right?

25      A    Yes, sir.  Uh-huh.

102

1      Q    Now, if I could direct your attention to

2  -- I'm sorry?

3      A    I was asking her if we're going to go

4  through all of these exhibits.

5      Q    It'll go quicker.

6      A    Okay.

7      Q    If I could direct your attention to

8  Exhibit 17, please?

9      A    Sure.

10      Q    And Ms. Parthemos, again, if you need to

11  take a break, just let me know.  I'm not going to -

12  -

13      A    No, I'm fine.  If I have to use the

14  restroom, that's the only thing.  I'll let you

15  know.  And my meter runs out at 12:40, so I just

16  need to get there and put in some more money before

17  then.

18      Q    Sure.

19           MR. HWANG:  And if we could have this

20  marked as 17?  It's an email chain produced as

21  CITY00008247 through 49.

22           (Whereupon, a document was marked for

23  identification Parthemos Deposition Exhibit No.

24  17.)

25           THE WITNESS:  I'm sorry, I'm asking if

1   she can enlarge it for me.  I'm having a hard time

2   seeing, it's so small.  Yes, that's better.  Okay.

3   Yes.

4           BY MR. HWANG:

5       Q    Okay.  Now, I believe you testified

6   earlier that you do recall protests and

7   specifically things happening at Camden Yards and

8   at City Hall on Saturday, April 25th, 2015,

9   correct?

10      A    I'm sorry, say that again?  I apologize.

11      Q    I believe you testified earlier that you

12  do recall things happening at Camden Yards and also

13  at City Hall during protests that occurred on

14  Saturday, April 25th, 2015.  Is that correct?

15      A    Yes.

16      Q    Now, I'll give you a chance to read

17  through this email, again, to help you refresh your

18  recollection to the extent needed.  And if I may

19  offer a suggestion -- if you start from the bottom

20  and go up to the top, or go from the back to the

21  front --

22      A    Right.

23      Q    -- so you can read it in chronological

24  order, that is.

25      A    Yes.

1          (The witness reviewed the document.)

2          THE WITNESS:  Okay.

3          BY MR. HWANG:

4     Q    Now, as these events were unfolding on

5   April 25th, 2015, do you recall where you were?

6     A    I was at City Hall.

7     Q    You were at City Hall for the entirety of

8   the protests and the violence and destruction that

9   occurred on April 25th?

10    A    I was there a lot.  I got a few hours of

11  sleep that week.

12    Q    Okay.  Now, prior to the EOC being

13  activated, do you recall where OEM operated out of?

14    A    We were at the Watch Center.  Because

15  when it said "the Mayor walked in," we both went

16  over to the Watch Center on Saturday.

17    Q    Got it.  So --

18    A    I was at City Hall, and she called me and

19  told me she was headed to the Watch Center.  And

20  Howard Libit and I were headed to the Watch Center.

21  And I was calling her to tell her that we were

22  walking over.

23          Because we were letting the police handle

24  their operations.  But at that point, we couldn't

25  see what was going on, and it was getting more

1    people.  And we knew that they couldn't provide us

2    with updates.  So we wanted to go over, and the

3    Mayor told me that she was in the car on the way

4    over as well.

5          Q    Okay.  And so you met the Mayor at the

6    Watch Center on April 25th, 2015.  And I guess it

7    would be around 5:00 p.m., right?

8          A    Yeah.

9          Q    Okay.  And you said prior to that, you

10   were at City Hall?

11         A    Yes.

12         Q    Prior to, I guess, walking over to the

13   Watch Center at Police Headquarters -- and let me

14   confirm that.  The Watch Center at that time was at

15   Police Headquarters, correct?

16         A    Yes.

17         Q    So prior to walking over to Police

18   Headquarters around 5:00 p.m. on Saturday, April

19   25th, while you were at City Hall, can you walk me

20   through your day kind of as the protests started,

21   they began escalating, and eventually when other

22   things started happening, like the violence and the

23   property destruction?

24         A    I know that people were calling.  I think

25   there may have been something at the Hippodrome.

1          At this point in time, you know, there is

2     escalating violence.  You do recall there being

3     some looting and property destruction.  At that

4     time, you know, downtown businesses are told to

5     actually close for the evening.

6          I mean, would you say at that point in

7     time the City has gone beyond normal operating

8     procedures?

9          A    Well, I don't know what "normal operating

10    procedures" are.  But at the time was the City

11    concerned and wanted to make sure that people were

12    protected and not in the middle of this?  Yes.

13         Q    Would you say that what had happened on

14    April 25th that Saturday was a departure from what

15    had happened during the protests leading up to that

16    day?

17         A    Yes.

18         Q    Did what happened on April 25th that

19    Saturday give the City cause for concern as to what

20    might happen moving forward?

21         A    Sure, yes.

22         Q    Okay.  Now, April 25th happens.  There's

23    violence.  There's looting.  There's property

24    destruction.

25         Was there any discussion within the City

1    about whether additional measures needed to be

2    taken to ensure that people and businesses were

3    protected?

4         A    I'm sure there were.  I don't remember.

5         Q    All right.  Well, let's see if we can

6    help you jog your memory.  So again, April 25th

7    happens.  That evening -- the property destruction,

8    the violence, the looting.

9              At that point in time, whether it's April

10   25th or April 26th, was there any discussion as to

11   whether the National Guard should be called in?

12        A    No.

13        Q    Do you recall --

14        A    I don't think so.

15        Q    Do you recall there being any discussion

16   as to whether or not a state of emergency should be

17   declared?

18        A    I don't believe so, but I don't remember.

19        Q    Do you recall there being any discussion

20   as to whether a curfew should be imposed?

21        A    No, I don't think so.

22        Q    Now, again, we're talking April 25th,

23   April 26th, after the events at Camden Yards and

24   City Hall happened.

25        A    Oh, I'm sorry, wait -- we're not on

138

1    attention has been requested for the funeral.  Do

2    you know to what special attention this email is

3    referring?

4        A    I'm assuming it means increased police

5    presence.

6        Q    Okay.  Was the City helping to coordinate

7    that?

8        A    I don't know if -- were City Hall helping

9    to coordinate that?  No, I think it's just like any

10   other thing.  We would say, "Hey, is this on your

11   radar?  Have you planned for this?"  And they would

12   say "yes" or "no."

13       Q    Okay.

14       A    But we don't coordinate police

15   operations.  That's the job of the Police

16   Commissioner.

17       Q    Okay.  Sorry, you kind of froze up a

18   little bit.  Let's wait just a second.

19       A    We don't coordinate police operations.

20   That's the job of the Police Commissioner.

21       Q    Okay.  Now, safe to say that Freddie

22   Gray's funeral on April 27th, 2015 had been on the

23   City's radar for some time as an important event?

24       A    Yes.

25       Q    If I could direct your attention to 22?

139

1      A     Okay.

2            MR. HWANG:  And if we could mark that as

3   22?  Email chain produced by the City as

4   CITY00052441.

5            (Whereupon, a document was marked for

6   identification Parthemos Deposition Exhibit No.

7   22.)

8            THE WITNESS:  Yes.

9            BY MR. HWANG:

10     Q     Do you recall Kirby Fowler?

11     A     Yes.

12     Q     Who was he?  At that time, what was his

13  role?

14     A     He was the President of the Downtown

15  Partnership.

16     Q     In the email he sent at 11:24 a.m. on

17  April 26th, 2015, Mr. Fowler states that, "We are

18  encouraging everyone to patronize the businesses

19  and restaurants affected by last night's

20  activities."  Do you see that?

21     A     Yes.

22     Q     And you received this -- you were on this

23  email chain, correct?

24     A     Yes.  I was on the Board representing the

25  Mayor for the Downtown Partnership.

1      Q    Got it.  Now, during these discussions,

2  was business interruption a concern?

3      A    I mean, I'm sure it was.  We had things

4  happen in Baltimore City that hadn't happen in 40

5  years with regards to property damage and people

6  jumping on police cars.  So I think everyone was

7  concerned, yes.

8      Q    Sure.  And certainly after April 25th

9  that was the case, correct?

10      A    Yes.

11      Q    Now, there must have been some discussion

12  as far as the line between, you know, ensuring

13  safety and at the same time minimizing business

14  interruption, right?  Do you recall there being

15  discussions about that kind of dynamic?

16      A    I mean, you said that they probably

17  occurred.  I'm sure they occurred, but I don't

18  remember, no.

19      Q    Okay.  You don't recall any such -- you

20  recall there being discussions, but you don't

21  remember what was discussed?  Or you don't remember

22  there being discussions?

23      A    Both?  I'm sorry, it was so, so long ago,

24  I don't remember.

25      Q    Okay.  But you do recall business

1    Do you see that?

2          A     Yeah, I do.

3          Q     Do you recall there being discussions

4    about -- strike that.  I believe you testified

5    earlier that Commissioner Batts had told the City,

6    "Hey, we're not going to have officers don riot

7    gear until it becomes necessary, so let's not

8    escalate the situation," correct?

9          A     From what I recall, yes.

10         Q     Now, as time went on, we're now at April

11   26, and you see this email where Laurie is saying

12   Baltimore City Police Department are in riot gear.

13         Were there continuing discussions as to

14   whether or not that strategy or that theory of

15   officers not wearing riot gear was being followed?

16   Were there any complaints that they were wearing

17   riot gear when they shouldn't be?

18         A     I don't remember.

19         Q     Now, if I could direct your attention to

20   25, 26, and 27?

21         MR. HWANG:  And if we could mark them as

22   25, 26, and 27?  25 is produced by the City as

23   CITY00037614.  And 26 is CITY00037600.  And 27 is

24   CITY00052047.

25         (Whereupon, documents were marked for

**ORIGINAL TRANSCRIPT**

1   identification Parthemos Deposition Exhibit Nos.

2   25-27.)

3            BY MR. HWANG:

4      Q    Now, Ms. Parthemos, all three of these

5   exhibits refer to a 5:30 p.m. call on April 26 by

6   the Mayor to various business leaders.  Do you see

7   that?

8      A    Yes.

9      Q    Okay.

10     A    That was a discussion that we had on

11  Sunday in my office where we made a list of our

12  business leaders for the Mayor to reach out to talk

13  to.

14            And as well as -- I think there was a

15  community leaders list and a faith-based liaison

16  list.  But I can't remember.  I think the Mayor

17  made three or four calls that day.

18     Q    Okay.  That day being Sunday, correct?

19  April 26th?

20     A    Yes, sir.  Yes, sorry.

21     Q    Now, Exhibit 25 is an email sent to the

22  business leaders inviting them to this call.  Is

23  that correct?

24     A    Yes.

25     Q    And you received that email, correct?

1       A      Yes.

2       Q      Now, you testified earlier about a call

3   with business leaders on April 24th, which would

4   have been Friday.  Why have another call two days

5   later?

6       A      Because of everything that happened on

7   Saturday.

8       Q      Okay.  Everything that happened on

9   Saturday, April 25th?

10      A      Yes.

11      Q      Now --

12      A      Again, we were getting a lot of messages

13  from business leaders making sure that we were

14  prepared for the purge and that we were prepared

15  for the funeral.

16      Q      Okay.  Now, for this call scheduled for

17  April 26 at 5:30 p.m., Exhibit 25 talks about the

18  Mayor wanting to "update business leaders on what

19  steps are being taken to ensure public safety and

20  the least amount of disruption to downtown

21  businesses."  Do you see that?

22      A      On the 25th -- I'm sorry, Exhibit 25?

23      Q      Yes.

24      A      Okay.

25      Q      If you look at Exhibit 25, I think it's

150

1  the first sentence.

2      A    Yes.

3      Q    It says that "the Mayor wants to update

4  business leaders on what steps are being taken to

5  ensure public safety and the least amount of

6  disruption to downtown businesses."  Do you see

7  that?

8      A    Yes.

9      Q    To what steps is this email referring?

10     A    I don't know.

11     Q    I mean, April 25th had happened.  Do you

12 recall what additional steps the City was taking to

13 ensure public safety and the least amount of

14 disruption to downtown businesses, as Exhibit 25

15 refers?

16     A    I don't remember.

17     Q    Okay.  I'm sorry, did you say "I don't

18 remember"?

19     A    Yeah, I don't.  I'm sorry.

20     Q    Do you recall attending this call,

21 though?

22     A    I'm pretty sure I was on the call, but I

23 don't remember.

24     Q    Okay.  Do you know if the Mayor would

25 have led this call or if she would have at least

**ORIGINAL TRANSCRIPT**

1   participated?

2        A    Yes, she would have spoken to everyone

3   and answered questions.

4        Q    Okay.  Do you recall anything that was

5   discussed during this call?

6        A    I do not.

7        Q    Okay.  Well, if I could go on to 26,

8   which is the second document we were looking at.

9        A    Uh-huh.

10       Q    Now, you received the email marked as 26,

11  correct?

12       A    I did.

13       Q    And 26 lists various business leaders who

14  were to participate in the call scheduled for April

15  26, 2015.  Is that correct?

16       A    Yes.

17       Q    Okay.  And then the same business leaders

18  are reflected on Exhibit 27?

19       A    I'm not doing a side-by-side comparison,

20  but I assume they're all the same.

21       Q    Okay.  So who decided which business

22  leaders would be invited to participate in calls

23  like this?

24       A    The Deputy Mayor of Economic and

25  Neighborhood Development and the Mayor's Office of

1  she had called him.

2      Q    Okay.  When she --

3      A    I was not in the same room with her.

4      Q    Okay.  But you were both at City Hall,

5  though, at that point?

6      A    In different rooms.

7      Q    Okay.  If I could direct your attention,

8  actually, to Exhibit 40.

9          MR. HWANG:  And if we could mark it as

10  Exhibit 40?  This is an email chain Bates stamped

11  as CITY00012781.

12          (Whereupon, a document was marked for

13  identification Parthemos Deposition Exhibit No.

14  40.)

15          THE WITNESS:  Yes.

16          BY MR. HWANG:

17      Q    Do you recall Daphney Williams?

18      A    Yes.

19      Q    And what was her role at that point in

20  time?

21      A    I think she was the Director of the

22  Mayor's Office of Constituent Services.

23      Q    And you're on this email chain, correct?

24      A    Yes.

25      Q    Now, on April 27th, 2015, at 3:52 p.m.,

198

1    Ms. Parthemos, to 42?

2            MR. HWANG:  And if we could mark it as

3    42, please?

4            (Whereupon, a document was marked for

5    identification Parthemos Deposition Exhibit No.

6    42.)

7            THE WITNESS:  Sure.

8            BY MR. HWANG:

9        Q    It is an email chain produced by the City

10   as CITY00052381.

11       A    Yes.

12       Q    You're on this email chain, correct?

13       A    Yes.

14       Q    Okay.  Now, this is April 27th at 4:38

15   p.m. and 4:40 p.m., which are the times that the

16   two emails were sent.

17       A    Yes.

18       Q    The first email, Daniel Sparaco emails

19   you, refers to Bob -- and I assume that's Bob

20   Maloney -- saying that, "Bob wants approval to open

21   EOC now."  Do you see that?

22       A    Yes.

23       Q    And you respond 2 minutes later and you

24   say "yes," correct?

25       A    Yes.  And I believe by that time -- was

199

1  trying to figure out why Dan was emailing that.
2  Because he didn't have any -- I don't know why Bob
3  would talk to Dan, but I guess I can figure it out.
4       But we had already had discussions that
5  the EOC needed to open.  And that message was
6  supposed to have been relayed to Bob.  So that's
7  why I said "yes."
8       Q    Okay.  Do you recall at what point it was
9  decided that the EOC needed to be opened?
10      A    At some point when we started getting the
11  calls to call in the national troops and/or stop
12  harming children.
13      Q    Okay.  Prior to Monday, April 27th, 2015,
14  were there any discussions as to whether the EOC
15  should be activated or opened?
16      A    I think we did have some discussions as
17  to whether or not it should, but I can't remember.
18      Q    So for example, if --
19      A    I think everything was being -- it was a
20  police operation, and all of the appropriate people
21  were in the Watch Center.  And at that point, it
22  wasn't something that was city-wide.
23      It was something that was a specific area
24  where the protests were.  So at that point, it
25  wasn't city-wide where it was determined and there

1    Other than Dan just wanting, I don't know, to see

2    what was going on -- I'm not exactly sure.

3         Because everyone was clear that it was a

4    police operation, and we shouldn't be interfering

5    with that.  So I was surprised to find out that Dan

6    was over there at all.

7         I don't know why Dan would be the person

8    sending this email, other than the fact that

9    Suzanne Sangree or George Nilson asked him to do so

10   because he was over at the Watch Center. I don't

11   know.

12        Q    Okay.  Well, here in his email he's

13   saying, "Police trying to reach mutual aid

14   agreement," presumably with the police department

15   over in Philadelphia, right?

16        A    I don't know what he means by that.  I'm

17   assuming -- that's what it looks like, but I don't

18   know.

19        Q    Okay.  So at this point, the mutual aid

20   agreement, the resources coming from outside of

21   Baltimore City, is still police to police, right?

22   The request is being made by the police department

23   and would have to be granted by another police

24   department, right?

25        A    Yes.

207

1    Guard?

2         A    Because we know what happens when you

3    declare a state of emergency from our weather

4    events.  We've had to declare them before for

5    blizzards and other things.  So we know that it

6    also requires -- you know, it comes with other

7    resources.

8         Q    Okay.  So would declaring a state of

9    emergency have provided additional law enforcement

10   officer resources?

11        A    Yes.  You mean through the National

12   Guard?

13        Q    Aside from the National Guard.

14        A    I think the goal was to declare the state

15   of emergency to have the assistance of the National

16   Guard.  I don't -- I think it might have triggered

17   through the mutual aid agreements for other

18   jurisdictions to send in more resources.  But I'm

19   not exactly sure.

20        Q    I'm sorry, you kind of froze up the last

21   few seconds.

22        A    So we knew that that would provide

23   National Guard resources.  I believe that it would

24   have triggered and escalated the seriousness of our

25   requests of mutual aid with neighboring

1        Q    Okay.  And by "she," you're referring to

2   Stephanie Rawlings-Blake, correct?

3        A    Yes, the Mayor.

4        Q    You said that she was aware that you were

5   contacting outside jurisdictions to see why they

6   ere not sending in resources by way of law

7   enforcement officers -- additional officers that

8   Commissioner Batts had requested.

9        A    The State Police and Baltimore County.

10       Q    Okay.  So you were keeping the Mayor

11  informed of that, right?  She was aware?

12       A    Yeah.  Yes.

13       Q    So the next bullet point says that the

14  Mayor instituted a city-wide curfew in effect each

15  night from 10:00 p.m. to 5:00 a.m.

16            Now, the curfew was declared on April

17  27th, but it didn't start or didn't take effect,

18  until April 28th, the following day.  Is that

19  correct?

20       A    I think the curfew -- didn't it go into

21  effect that night?  She told everyone to be in --

22  she implemented it that night at 10:00 p.m.

23       Q    Tell me if I'm wrong.  My understanding

24  may very well be wrong.  My understanding is that

25  the actual -- the curfew may have been implemented.

236

1          BY MR. HWANG:

2      Q    Okay.

3      A    53, yes.

4      Q    What is your understanding as to why

5  things eventually quieted down?  Like, what -- it

6  seems like things were out of control earlier on

7  April 27th.  What is your understanding as to what

8  led things to eventually calm down?

9      A    The Mayor went on TV and declared at

10 state of emergency and said the National Guard

11 would be coming, and the National Guardsmen started

12 coming, and there was a curfew implemented.

13     Q    Okay.  So would you say the curfew also

14 helped quell the rioting and prevent any future

15 rioting?

16     A    I'm not exactly sure what.  I'm sure it

17 was -- that may have been one of the aspects that

18 helped.  But I don't know.

19     Q    If I could direct your attention to 53?

20     A    Uh-huh.

21     Q    So 52 was kind of an update during the

22 very early morning hours of April 28th as far as

23 resources coming in by noon.

24     A    Uh-huh.

25     Q    53 is an email from Keiffer Mitchell to

237

1   you thereafter, after noon on April 28th.  This was

2   sent to you at 3:42 p.m.

3        A     Yes.

4        Q     You received this email, correct?

5        A     Yes.

6        Q     Okay.  And was this also in part because

7   you and the City wanted to be updated on what kind

8   of resources were coming in from outside

9   jurisdictions?

10       A     Yes.  The purpose of declaring the state

11  of emergency was to get more resources, yes.

12       Q     Okay.  And these resources that Mr.

13  Mitchell is listing here -- I presume that these

14  are resources that are to be coming in, correct?

15       A     I don't remember.

16       Q     Do you recall if these resources came in?

17       A     I don't remember.

18       Q     Okay.  If I could direct your attention

19  to 54 and 55?

20       A     Uh-huh.  Yes.

21            MR. HWANG:  And if we could mark those as

22  well?  Exhibit 54 is an email chain produced by the

23  City as -- it's an email and attachments --

24  CITY00052727 through 732.  And 55 is an email chain

25  produced by the City as CITY00052541.

1                      CERTIFICATE OF NOTARY

2              I, Emily G. Colkitt, Notary Public,

3   before whom the foregoing testimony was taken, do

4   hereby certify that the witness was duly sworn by

5   me; that said testimony is a true record of the

6   testimony given by said witness; that I am neither

7   counsel for, related to, nor employed by any of the

8   parties to this action, nor financially or

9   otherwise interested in the outcome of the action;

10  and that the testimony was reduced to typewriting

11  by me or under my direction.

12              This certification is expressly withdrawn

13  upon the disassembly or photocopying of the

14  foregoing transcript, including exhibits, unless

15  disassembly or photocopying is done under the

16  auspices of Huseby, and the signature and original

17  seal is attached thereto.

18

19

20

21

22                      EMILY G. COLKITT,

23                   Notary Public in and for

24                      The State of Maryland

25  My Commission Expires:  February 20, 2024

# EXHIBIT 3

# In The Matter Of:

*CHAE BROTHERS, LIMITED LIABILITY COMPANY, ET AL. v.*
*MAYOR AND CITY COUNCIL OF BALTIMORE, ET AL.*

---

*COLIN TARBERT*
*December 14, 2020*
*ORIGINAL TRANSCRIPT*

---

*CourtScribes, Inc.*
*"Delivering More For Less"*
*(833) 727-4237*
*info@courtscribes.com*
*www.courtscribes.com*

1

1        IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF MARYLAND

3            NORTHERN DIVISION

4    - - - - - - - - - - - - - - - - - X

5    CHAE BROTHERS LIMITED              |

6    LIABILITY COMPANY, et al.,        | CIVIL ACTION NO.:

7            Plaintiffs,               | 1:197-CV-01657

8    v.                                |

9    MAYOR & CITY OF BALTIMORE, et al., |

10           Defendants.               |

11   - - - - - - - - - - - - - - - - - X

12

13        Videotaped Deposition of COLIN TARBERT

14              Conducted remotely

15            Monday, December 14, 2020

16                 9:00 a.m.

17

18

19

20

21   Pages:  1 - 160

22   Reported by:  Sharon Gregory, Court Reporter

1       Videotaped Deposition of COLIN TARBERT,

2  conducted remotely:

3

4

5

6

7

8

9

10    Pursuant to agreement, before Sharon Gregory,

11  Professional Court Reporter and Notary Public of the

12  state of Maryland.

13

14

15

16

17

18

19

20

21

22

**ORIGINAL TRANSCRIPT**

3

1                    A P P E A R A N C E S

2         ON BEHALF OF THE PLAINTIFFS:  (Via Zoom)

3           PETER K. HWANG, ESQUIRE

4           SUNG & HWANG, LLP

5           9256 Bendix Road

6           Suite 109

7           Columbia, MD 21045

8           (410) 722-2324

9         ON BEHALF OF THE DEFENDANTS: (Via Zoom)

10          SARA E. GROSS, ESQUIRE

11          HANNA MARIE C. SHEEHAN, ESQUIRE

12          BALTIMORE CITY DEPARTMENT OF LAW

13          100 North Holliday Street

14          Baltimore, MD 21202

15          (310) 396-3835

16

17   ALSO PRESENT:  IAN WALLACH, VIDEOGRAPHER

18

19

20

21

22

4

1                    C O N T E N T S

2    EXAMINATION OF COLIN TARBERT              PAGE

3          By Mr. Hwang                          7

4

5                  E X H I B I T S

6          (Attached to transcript)

7    TARBERT DEPOSITION EXHIBIT               PAGE

8    Ex. 1    Photo                             6
     Ex. 2    Protective order and agreement    6
9    Ex. 3    Amended complaint                 6
     Ex. 4    CITY00054742                      6
10   Ex. 5    CITY00039305-07                   6
     Ex. 6    CITY00039641-42                   6
11   Ex. 7    CITY00054576-79                   6
     Ex. 8    CITY00039193                      6
12   Ex. 9    CITY00041602                      6
     Ex. 10   CITY00011473                      6
13   Ex. 11   CITY00037614                      6
     Ex. 12   CITY00037600                      6
14   Ex. 13   CITY00052047                      6
     Ex. 14   CITY00038648-49                   6
15   Ex. 15   CITY00039609-10                   6
     Ex. 16   CITY00046320-22                   6
16   Ex. 17   CITY00037932                      6
     Ex. 18   CITY00052522                      6
17   Ex. 19   CITY00012914-15                   6
     Ex. 20   CITY00012997                      6
18   Ex. 21   CITY00012918-19                   6
     Ex. 22   CITY00012985                      6
19   Ex. 23   CITY00013541                      6
     Ex. 24   CITY00046533                      6
20   Ex. 25   CITY00052350                      6
     Ex. 26   CITY00015657-58                   6
21   Ex. 27   CITY00039188                      6
     Ex. 28   CITY00037935                      6
22   Ex. 29   CITY00050701                      6

5

          E X H I B I T S (CONTD.)
TARBERT DEPOSITION EXHIBIT                    PAGE
Ex. 30  CITY00015640-41                        6
Ex. 31  CITY00015642-43                        6
Ex. 32  CITY00039757                           6
Ex. 33  CITY00031765                           6
Ex. 34  CITY00032029                           6
Ex. 35  CITY00038578                           6
Ex. 36  CITY00038646                           6
Ex. 37  Page 55 of FAC                         6

6

1                    P R O C E E D I N G S

2               (Tarbert Exhibit Numbers 1 through 37 were

3    marked for identification.)

4               THE VIDEOGRAPHER:  Good morning.  We are now

5    on the record.  The time is 9:10 a.m., December 14,

6    2020.  My name is Ian Wallach, and I am the

7    videographer.  The court reporter is Sharon Gregory.

8    We are here today for the video-recorded deposition of

9    Colin Tarbert, in the matter of Chae Brothers Limited

10   Liability Company, et al., versus the Mayor & City

11   Council of Baltimore, et al., Case Number

12   1:17-CV-01657-SAG, in the United States District Court

13   for the District of Maryland.

14               Will counsel state their appearance for the

15   record.

16               MR. HWANG:  Peter Hwang on behalf of all the

17   plaintiffs.

18               MS. GROSS:  Good morning.  Sara Gross and

19   Hanna Sheehan on behalf of the Mayor & City Council of

20   Baltimore.

21               THE VIDEOGRAPHER:  Thank you.  Will the

22   witness please state and spell their name for the

7

1  record.

2          THE DEPONENT:  Colin Tarbert, C-O-L-I-N

3  T-A-R-B-E-R-T.

4          THE VIDEOGRAPHER:  The court reporter will

5  now swear in the witness after which counsel will

6  start.

7          COLIN TARBERT, having first been duly

8  sworn, was examined and testified as follows:

9  BY MR. HWANG:

10     Q   Mr. Tarbert, as you know, my name is Peter

11  Hwang and I represent the plaintiffs in this action who

12  are suing the Mayor and City Council of Baltimore for,

13  among other things, damages to plaintiffs' property and

14  businesses.

15          As you know, we're here for a deposition

16  which will consist of me asking you questions and you

17  providing answers to those questions.  There is a court

18  reporter on the line right now.  She is transcribing my

19  questions and your responses.  As such it's important

20  that you answer my questions verbally.  Please do not

21  answer with a gesture like a head nod or sounds like

22  "uh-huh."  As you can imagine, it's hard for the court

1  can refer to that as BDC.  Do you understand that?

2         A    Yes.

3         Q    How long have you been employed by the BDC?

4         A    Since you know 2019.

5         Q    Okay.  What is your title at the BDC?

6         A    President and CEO.

7         Q    Has that been the only title you have held

8  at the BDC since June 2019?

9         A    Yes.

10        Q    What are your duties as the president/CEO of

11 the BDC?

12        A    I lead the organization.

13        Q    Okay.  And what does the BDC do?

14        A    We're the city's economic development

15 agency.

16        Q    Where were you employed prior to June of

17 2018?

18        A    I was employed by the City of Baltimore.

19        Q    Okay.  For how long -- during what time

20 period, rather, were you employed by the City of

21 Baltimore?

22        A    Approximately May of 2010 through May of

1  2019.

2       Q   Okay.  So during that approximate nine-year

3  period, could you walk us through the different titles

4  you've held, and for each title the duties that you had

5  and the time period you held those?

6       A   Yeah.  My first position was deputy director

7  for the mayor's office of economic and neighborhood

8  development and I served in the capacity to oversee

9  various agencies and special initiatives related to

10 economic neighborhood development, served on various

11 civic boards and then was promoted to deputy mayor.

12      Q   What time period did you serve in that role?

13 Let's take it one step at a time.

14      A   May 2010 through -- it was about a four-year

15 period, so roughly May of 2014.

16      Q   Okay.

17      A   I think.  I don't know.

18      Q   Are you looking at your resume.  Is that

19 what you are looking up?

20      A   Yeah, it would be easier.

21      Q   Just while you are doing that, Mr. Tarbert,

22 just so I can -- we can go over this.  As we are going

1    through your testimony today, if you can kindly not

2    refer to any outside documents.  And if you need to,

3    let us know what you are referring to or else we're

4    going to be asking for you to produce that.  For now,

5    it's okay.  I understand you are looking at your

6    resume, but just for future reference.

7            A    I'm looking at my LinkedIn page.  So June

8    2010 through May 14, 2014, deputy director of Mayor's

9    Office of economic and neighborhood development,

10   assisted in implementing city's economic development

11   practices, co-chair downtown task force, provided a

12   website for small business owners to find information

13   on permits and licenses.  Subsequent to that, deputy

14   mayor for economic and neighborhood development,

15   May 2014 through December 2016, and responsible for

16   implementing all the major policies and initiatives

17   related to economic and community development for the

18   City of Baltimore.  And then subsequent to that,

19   January 2017 through I guess June 2019 period, I served

20   as the deputy chief for strategic alliances.  In

21   similar types of work.

22            Q    How was that role different than your role

1  remember the protests increasing, I believe, yes.

2        Q   Okay.  As the protests increase after his

3  death, prior to April 25th, though, did you attend any

4  discussions or meetings to discuss the protests?

5        A   I don't believe so.

6        Q   Okay.  If I could direct your attention to

7  Exhibits 04 and 05.  04 is a document produced by the

8  city, Bates stamped City00054722 and 05 is a document

9  produced by the City, Bates stamped City00039305

10  through 07.

11        A   You broke up a little bit.  You are looking

12  at 04, the mayor to meet with Colin Tarbert, is that

13  what you are asking about?

14        Q   And also 05.  And if you could read through

15  05 as well.

16        A   Okay.

17        Q   Now, if I could specifically direct your

18  attention to 04.  What is Exhibit 4?

19        A   It looks like it's an appointment calendar

20  for me to meet with Mayor Rawlings-Blake.

21        Q   Okay.  Now, Exhibit 4 reflects that you

22  requested that meeting; is that correct?

29

1        Q   Got it.  And your assistant's name is or

2    was?

3        A   Beverly Lanier.

4        Q   Got it.  So you said that they wouldn't

5    typically attend.  Who would typically attend these

6    meetings?

7        A   Myself and the mayor.

8        Q   Okay.  Was it one on one?

9        A   Yes.

10       Q   Now, moving from just generally standing

11   meetings to this meeting in particular, and if I could

12   direct your attention to 05.

13       A   Yes.

14       Q   05 is an e-mail chain; is that correct?

15       A   Yes.

16       Q   And you were a party to this e-mail chain?

17       A   Yes.

18       Q   Now, in the earliest e-mail in that chain,

19   which is on what?  Is it the third page?

20       A   Yes.

21       Q   It's an e-mail that you sent on April 23,

22   2015, at 11:18 a.m.  You say that Kaliope would like to

41

1    point person to communicate back to the business

2    community on what was happening and what the city, you

3    know, may be doing in response to that.  But it was

4    more of a facilitator role in that respect.

5         Q   It's your testimony you don't recall any

6    specifics about those conversations at this time with

7    Ms. Parthemos?

8         A   I don't specifically remember at this point.

9    It was five and a half years ago.

10        Q   Okay.  Now, if I could direct your attention

11   to the exhibit marked as 06 which is an e-mail chain

12   produced by the city, Bates stamped City 00039641

13   through 42?

14        A   Yes.

15        Q   It's an e-mail chain, correct?

16        A   Yes.

17        Q   And were you a party to this e-mail chain?

18        A   Yes.

19        Q   Okay.  Who else was on this e-mail chain?

20        A   Don Fry of the Greater Baltimore Committee.

21   Looks like just Don Fry.

22        Q   When you say Greater Baltimore Committee,

1   what is that group?

2        A   It's a group of business leaders similar to

3   a Chamber of Commerce, but not exactly.

4        Q   Okay.  How many members would the Greater

5   Baltimore Committee approximately have at that time?

6        A   I don't know.

7        Q   I mean, is it 2, 5, 10, 100 if you had to

8   approximate?

9        A   Members or board members?

10       Q   Member businesses.

11       A   I would imagine it's hundreds.  I don't

12   know.

13       Q   Okay.  Now, when did these communications

14   take place in 06?

15       A   The date is April 23rd.

16       Q   Okay.  Now, in the earliest e-mail in this

17   chain was an e-mail that you sent on April 23, 2015, at

18   12:58 p.m., asking Donald Fry whether he would like to

19   participate in a business outreach call with the mayor

20   on April 24; is that correct?

21       A   Yes.

22       Q   Okay.  Now, in Donald Fry's response to you

1      A   I don't think so.  I think it would have

2  been the same call, but -- it's more of the same

3  people, so I think it was the same call and we would

4  have been reaching out to Don Fry in his position as

5  the CEO of the Greater Baltimore Committee to

6  coordinate with him and his constituencies as well to

7  have probably one -- I would imagine it was one call,

8  update call, with as many business leaders as we could

9  get.

10      Q   Okay.  Now, these concerns that Donald Fry

11  mentioned in 06, in this e-mail about business

12  interruption and the image perception of the city, do

13  you recall those concerns being relayed to you by other

14  business leaders in addition to Donald Fry?

15      A   Generally.  I mean, the business community

16  has, and still has, concerns about the image of the

17  city.

18      Q   Okay.  I'm saying at that time do you recall

19  people other than Donald Fry expressing those same

20  concerns to you?

21      A   There were a handful of business leaders

22  that had reached out, so I would imagine they had

1  I'll give you some time to flip through these

2  exhibits -- Exhibits 11, 12, 13 and 14.  Exhibit 11 is

3  an e-mail produced by the city, Bates stamped City

4  00037614, Exhibit 12 is an e-mail produced -- sorry.

5  It's an e-mail produced by the city, Bates stamped City

6  00037600.  Exhibit 13 is what appears to be a calendar

7  entry produced by the City, Bates stamped 00052047.

8  And Exhibit 14 is an e-mail chain produced by the city,

9  Bates stamped City 00038648 through 49.  And again,

10  Mr. Tarbert, if you need time I'll let you flip through

11  these exhibits real quick.

12       A   I'm good.  You can proceed.

13       Q   Now, Exhibits 11 through 14 all refer to a

14  5:30 p.m. call on April 26, 2015 by the mayor to

15  various business leaders.  Do you see that?

16       A   Yes.

17       Q   And Exhibit 11 is an e-mail that you sent to

18  business leaders inviting them to this call; is that

19  correct?

20       A   Yes.

21       Q   Now, again, this is April 26th.  This is

22  after Camden yards.  You testified earlier about a call

112

1    don't know.  You can Google it if you want to read it.

2         Q   And you see in this e-mail ZeroFOX refers to

3    intelligence.  Do see that?

4         A   Yes.

5         Q   What intelligence -- to what intelligence

6    are they referring?

7         A   I don't know.  I didn't respond back to the

8    e-mail.  I mean I responded back, but I didn't ask them

9    specifically.  I basically copied the higher-ups and

10   passed it along.

11        Q   Okay.  The story didn't reflect what

12   intelligence it ended up being?

13        A   I don't remember.  I don't think so.

14        Q   If I could refer your attention to Exhibit

15   18 which is an e-mail produced by the city, bates

16   stamped City 00052552.

17        A   Yes.

18        Q   You are a party to this e-mail chain,

19   correct?

20        A   Yes.

21        Q   Who is Brian Rogers?

22        A   He was, again, an executive level member at

113

1    T. Rowe Price.  I think he may have been chairman

2    something of that nature.

3          Q   Now, despite telling you on April 14, after

4    the April 26 call that T. Rowe Price was going to

5    remain open on April 27th, T. Rowe Price seemingly

6    changes course here and informs you at 1:19 p.m. on

7    April 27th that it decided to shut down; isn't is that

8    correct?

9          A   Yes.

10         Q   So you notice that T. Rowe Price changed his

11   mind.  Did you call T. Rowe Price and say, hey, what's

12   going on?  Why are you changing you mind?

13         A   No.  I think I simply responded to the

14   e-mail.

15         Q   Okay.  Did you know what the source of

16   information was that made T. Rowe Price change its

17   mind?

18         A   I assume it was the social media stuff that

19   was being circulated.

20         Q   Okay.  And was this the only communication

21   you received from a business that was saying, hey,

22   we're going to close down early today on April 27th?

1        A    I don't remember if anybody else

2    communicated to me, but I think that other businesses

3    probably took similar steps during that time given that

4    it was unknown if they were going to be -- there was

5    going to be more unrest.

6        Q    Okay.  And your understanding was that the

7    concerns centered primarily around the social media

8    postings about the purge?

9        A    That's my understanding.

10       Q    So these companies are taking it seriously.

11   They don't see it as unconfirmed.  They were like, Hey,

12   we need to close down?

13       A    Correct.

14       Q    But in your view, it's unconfirmed because

15   it's on social media that's widely distributed?

16       A    What I said was is that I wasn't going to

17   forward social media posts to the business community.

18   First of all, they already saw all the social media

19   posts, but I wasn't forwarding things that I didn't

20   have specific knowledge as to whether they were

21   confirmed or unconfirmed.

22       Q    Okay.  So you didn't think it was that

1  purge rose to that level; is that what I'm

2  understanding?

3       A   I wouldn't have pushed out information about

4  a rumor on social media.

5       Q   Now, if I could direct your attention to

6  Exhibit 19.  This is an e-mail chain produced by the

7  city, Bates stamped City 00012914?

8       A   Yes.

9       Q   Through 15.  Sorry.  You are a party to this

10  e-mail chain, correct?

11       A   Yes.

12       Q   Now, Exhibit 19 includes e-mails between you

13  and Laurie Schwartz; is that correct?

14       A   Yes.

15       Q   And this is the same Laurie Schwartz that we

16  referred to in Exhibit 16?

17       A   Yes.

18       Q   Now, in the earliest e-mail in this chain,

19  Ms. Schwartz receives an e-mail at 3:45 p.m. on April

20  26 stating that Lieutenant Olson of the Baltimore

21  Police Department is encouraging restaurants to close

22  their outdoor seating for at least the next week.  Do

117

1    you see that?

2           A    Yes.

3           Q    Now, after receiving this message, you

4    respond to Ms. Schwartz at 4:16 p.m., on April 26th,

5    and you appear to state that maybe the restaurant

6    should take in and lock furniture only if there is

7    protest.  Do you see that?

8           A    Yes.

9           Q    You then express concerns that it would look

10   like ghost town; is that correct?

11          A    Yes.

12          Q    Now, why would the concern that it would

13   look like a ghost town override a recommendation from

14   the Baltimore Police Department to lock up furniture?

15          A    I recommended that they just take in the

16   furniture if there was a protest.

17          Q    Right.  But the Baltimore Police Department

18   is recommending, Hey, lock up your furniture.

19               And you're saying, Hey, it's going to look

20   like a ghost town.  Why not wait until there is an

21   actual protest?  That's what you seem to be saying;

22   isn't that correct?

1        A    Looks that way, yes.

2        Q    Okay.  So why would you try to work -- not

3   try to.  Why would you say, Hey, don't listen to the

4   Baltimore Police Department, just wait until there is

5   a --

6        A    I didn't say don't listen to the Baltimore

7   Police Department.

8        Q    Right.  But obviously you see a

9   recommendation from the Baltimore Police Department

10  there to lock up patio furniture.  And in response --

11           MS. GROSS:  I'm sorry.  You've asked him and

12  the question's been answered.  You're getting

13  argumentative.  Please move on.  Thank you.

14       Q    And you say in response it would look like a

15  ghost town.

16       A    That's what it says, yes.

17       Q    All right.  Why were you concerned that it

18  would look like a ghost town?

19       A    I'm not going to answer that question.

20       Q    That one you have to answer.

21       A    Because it would look empty.

22       Q    Okay.  And why were you concerned about it

119

1   looking empty?

2        A    Because we didn't want it to look like

3   downtown was closed up.

4        Q    Okay.  Why did you not want it to look like

5   downtown was closed up?

6        A    Because it's not a very good image to have a

7   downtown that's shut down.

8        Q    Okay.  Now, despite your expressing your

9   concerns that it would look like a ghost town if

10  restaurants locked up their patio furniture,

11  Ms. Schwartz e-mails you back at 1:31 p.m. on April 27,

12  2015, saying now that Lieutenant Colonel Marcus

13  recommended also that patio furniture be taken in as a

14  result of info they have about kids meeting at and

15  tearing up Mondawmin and then heading downtown to reek

16  havoc.  Do you see that?

17       A    Yes.

18       Q    And you responded again at 1:53 p.m., on

19  April 27th, saying this is the rumor, nothing

20  confirmed, I'm worried about the image.  Do you see

21  that?

22       A    Yes.

160

1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2        I, Sharon B. Gregory, Court Reporter and Notary

3    Public, the officer before whom the foregoing

4    proceedings were taken, do hereby certify that the

5    foregoing transcript is a true and correct record of

6    the proceedings; that said proceedings were taken by me

7    stenographically and thereafter reduced to typewriting

8    under my supervision; and that I am neither counsel

9    for, related to, nor employed by any of the parties to

10   this case and have no interest, financial or otherwise,

11   in its outcome.

12       IN WITNESS WHEREOF, I have hereunto set my hand and

13   affixed my notarial seal this 5th day of January, 2021.

14   My commission expires:

15   February 13, 2021

16

17

     *Sharon B Gregory*
18   _____

19   NOTARY PUBLIC IN AND FOR

20   THE STATE OF MARYLAND

21

22

# EXHIBIT 4

# In The Matter Of:

*CHAE BROTHERS, LIMITED LIABILITY COMPANY, ET AL. v.*
*MAYOR AND CITY COUNCIL OF BALTIMORE, ET AL.*

---

*STEPHANIE ROBINSON*
*January 11, 2021*
*ORIGINAL TRANSCRIPT*

---

*CourtScribes, Inc.*
*"Delivering More For Less"*
*(833) 727-4237*
*info@courtscribes.com*
*www.courtscribes.com*

**ORIGINAL TRANSCRIPT**

1

1      IN THE UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF MARYLAND

3            NORTHERN DIVISION

4    ----------------------------X

5    CHAE BROTHERS LIMITED,          :

6    LIABILITY COMPANY, ET AL.,      :

7              Plaintiffs,     :

8    v.                              :   Civil Action No.

9    MAYOR & CITY COUNCIL OF         :   1:17-CV-01657-SAG

10   BALTIMORE, ET AL.,              :

11             Defendants.     :

12   ----------------------------X

13

14       Video Deposition of STEPHANIE ROBINSON

15            Conducted Virtually

16           Monday, January 11, 2021

17                9:15 a.m.

18

19

20

21   Pages 1 - 201

22   Reported by:  Lisa Barbera, Stenographer

2

1    Deposition of STEPHANIE ROBINSON, conducted

2    virtually.

3

4    Witness Location:  Owings Mills, Maryland

5

6

7    Pursuant to agreement, before Lisa Barbera,

8    stenographer.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

3

1                    A P P E A R A N C E S

2

3       ON BEHALF OF PLAINTIFFS, CHAE BROTHERS

4       LIMITED LIABILITY COMPANY, ET AL.:

5             PETER K. HWANG, ESQUIRE

6             SUNG & HWANG, LLP

7             9256 Bendix Road, Suite 109

8             Columbia, Maryland 21045

9             (410)772-2324

10

11      ON BEHALF OF DEFENDANTS, MAYOR & CITY COUNCIL

12      OF BALTIMORE, ET AL.:

13            SARA E. GROSS, ESQUIRE

14            HANNA MARIE C. SHEEHAN, ESQUIRE

15            BALTIMORE CITY DEPARTMENT OF LAW

16            100 N. Holliday Street

17            Baltimore, Maryland 21202

18

19

20      ALSO PRESENT:

21            Ian Wallach, Zoom Technician

22            Nicholas Pollard, Videographer

4

C O N T E N T S

                                                    PAGE

EXAMINATION OF STEPHANIE ROBINSON

      by Mr. Hwang                              9

      by Ms. Gross                            194

5

1                       E X H I B I T S

2                          (Attached)

3

4    ROBINSON DEPOSITION                              PAGE

5

6    Exhibit 1    Stephanie Robinson (Subpoena and   14
                  Schedule)
7
     Exhibit 2    Protective Order and Agreement     17
8
     Exhibit 3    Amended Complaint                   28
9
     Exhibit 4    CITY00010183-4                      37
10
     Exhibit 5    CITY00042157-58                     50
11
     Exhibit 6    CITY00009496                        51
12
     Exhibit 7    CITY00055627                        73
13
     Exhibit 8    CITY00052923                        76
14
     Exhibit 9    CITY00055051                        81
15
     Exhibit 10   CITY00045742                        83
16
     Exhibit 11   CITY00039193                        93
17
     Exhibit 12   CITY00045625                        96
18
     Exhibit 13   CITY00038973                       109
19
     Exhibit 14   CITY00052170                       112
20
     Exhibit 15   CITY00038166                       123
21
     Exhibit 16   CITY00037932                       129
22
     Exhibit 17   CITY00037933                       131

1

2    Exhibit 18     CITY00053858                    135

3    Exhibit 19     CITY00054600                    140

4    Exhibit 20     CITY00052381                    154

5    Exhibit 21     CITY00046346                    155

6    Exhibit 22     CITY00052460                    159

7    Exhibit 23     CITY00046610                    161

8    Exhibit 24     CITY00047753                    164

9    Exhibit 25     CITY00052350                    169

10   Exhibit 26     CITY00045383                    171

11   Exhibit 27     CITY00011548                    172

12   Exhibit 28     CITY00049862                    177

13   Exhibit 29     CITY00052347                    179

14   Exhibit 30     CITY00049959                    181

15   Exhibit 31     CITY00025839-45                 185

16   Exhibit 32     CITY00045303                    190

17

18

19

20

21

22

7

1              P R O C E E D I N G S

2                      - - -

3           THE VIDEOGRAPHER:  We are here today for

4      the purposes of recording the deposition

5      of -- sorry -- we're here today for the

6      purposes of recording the deposition of

7      Stephanie Robinson taken by -- what's the

8      defense?

9           Ian?  Ian?

10          MR. HWANG:  Do we want to go off the

11      record for, like, five minutes, and you guys

12      want to figure this out, please?

13          THE VIDEOGRAPHER:  Yes.  Will do.  Will

14      do.

15          (Off the record at 9:16 a.m.)

16          (Back on the record at 9:21 a.m.)

17          THE VIDEOGRAPHER:  We are on the record

18      in the matter of Chae Brothers LTD versus

19      Mayor and City [sic] of Baltimore.  Today's

20      date is January 11th, 2021.  The time is

21      9:21 a.m.

22          This is the video recording deposition

8

1      of Stephanie Robinson taken via Zoom.  My

2      name is Nicholas Pollard; I'm the camera

3      operator representing Court Scribes,

4      Incorporated.  The court reporter is Lisa

5      Barbera with Court Scribes.

6           Will counsel please introduce

7      themselves?

8           MR. HWANG:  Good morning.  Peter Hwang

9      on behalf of all the plaintiffs.

10          MS. GROSS:  Good morning.  Sara Gross

11     and Hanna Sheehan on behalf of the Mayor and

12     City Council of Baltimore.

13          THE VIDEOGRAPHER:  Can the court

14     reporter please swear in the witness?

15          THE COURT REPORTER:  Due to it being

16     Maryland, we have to do a stipulation that I

17     can swear the witness in remotely.

18          Pursuant to 2-401(g) of the Maryland

19     Rules of Civil Procedure, all parties

20     stipulate and agree that the witness was

21     identified as Stephanie Robinson, that she

22     will be sworn in remotely, and that this

1    deposition shall be used for all purposes

2    like other depositions.

3         Counsel, can you please identify

4    yourselves for the record, state whom you

5    represent, and state whether or not you agree

6    with the stipulation?

7         You can skip all of that and state

8    whether or not you agree with the

9    stipulation, starting with Mr. Hwang.

10        MR. HWANG:  Yes, we agree.

11        THE COURT REPORTER:  And Ms. Gross?

12        MS. GROSS:  We also agree.

13  Whereupon,

14             STEPHANIE ROBINSON

15  was examined and testified as follows:

16        THE WITNESS:  I do.

17     EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

18  BY MR. HWANG:

19     Q.   Ms. Robinson, good morning.  As you may

20  know, my name is Peter Hwang, and I represent the

21  plaintiffs in this action who have filed suit

22  against the Mayor and City Council of Baltimore

24

1      Q.   It would have been sometime in 2016?

2      A.   I did.

3      Q.   Okay.  Prior to being employed by the

4  Baltimore Police Department in an HR capacity,

5  where were you employed?

6      A.   I worked for the former Mayor in her

7  cabinet as the director of public safety.

8      Q.   And the former Mayor being former-Mayor

9  Stephanie Rawlings-Blake?

10     A.   Yes.

11     Q.   And for how long were you the director

12 of public safety in the Mayor's cabinet?

13     A.   Less than a year.

14     Q.   Okay.  Do you recall, did you begin that

15 position in 2014?

16     A.   '15.  I believe it was March of 2015, if

17 I'm not mistaken.

18     Q.   Okay.  And so you were there until, you

19 know, the end of 2015, thereabouts?

20     A.   Correct.  To the best of my

21 recollection.

22     Q.   Sure.  Prior to -- and, I'm sorry, what

1    were your duties as the director of public safety?

2         A.    To provide support to the Mayor in terms

3    of acting as a liaison with specifically the

4    Baltimore Police Department and any other duties

5    as assigned by either the Mayor or her chief of

6    staff.

7         Q.    When you say liaison to the Baltimore

8    Police Department, what would that have included

9    as far as your duties are concerned?

10        A.    I regularly met with the police

11   commissioner.  I kept primarily the Mayor's chief

12   of staff abreast of issues with the police

13   department.  I worked in terms of constituent

14   issues with the police department.  And, of

15   course, any other thing that the Mayor or her

16   chief of staff needed with respect to primarily

17   the police department, but I also worked with the

18   fire department.

19        Q.    When you say the Mayor's chief of staff,

20   are you referring to Kaliope Parthemos?

21        A.    Yes.

22        Q.    Was she the chief of staff during the

1          I'm just asking generally do you recall

2    there being protests before Freddie Gray passed

3    away?

4        A.   I can't recall when the protests

5    started.

6          MR. HWANG:  Okay.  If I could direct

7       your attention to the exhibit that starts

8       with 04.

9          And if we could have that marked as

10      Exhibit 4, please.

11          (Whereupon, CITY00010183-4 was marked as

12   Plaintiffs' Exhibit 4 for Identification by the

13   Reporter.)

14          MR. HWANG:  This was an e-mail chain

15      produced by the City, Bates stamped

16      CITY00010183 through 184.

17          And I'll give you some time to look

18      through it if you need.

19          THE WITNESS:  Okay.  I've read it.

20      Thank you.

21   BY MR. HWANG:

22       Q.   Now, you're on this e-mail chain;

1   correct?

2        A.   I am.

3        Q.   Now, at 9:43 a.m., you're e-mailed by

4   Kevin Harris forwarding you an e-mail sent at

5   9:35 a.m. which states that Freddie Gray has died

6   and that there's talk of a riot in East Baltimore

7   taking place by noon.

8             Do you see that?

9        A.   I do see that.

10       Q.   You then e-mail Kevin Harris at 12:29

11   p.m. asking Kevin Harris to call you.  And then

12   you state that you're with the police at 1:26 p.m.

13             Do you see that?

14       A.   I do.

15       Q.   Now, again, I understand you don't

16   remember dates.  I understand that it was a long

17   time ago.  That's part of the reason why I'm

18   presenting you with these e-mails to help you

19   perhaps jog your memory and bring things back into

20   light.  Okay?

21             So as you're looking through this

22   e-mail, does that day come back to you when

1    recall nothing.  But I'm just asking you generally

2    what do you recall --

3         A.   I recall having discussions with the

4    Baltimore Police Department about both Mr. Gray

5    and the situation that arose following his death.

6    I recall having many discussions.

7         Q.   Now, during these many discussions

8    regarding the situation that arose after his

9    death, what topics do you recall discussing?

10        A.   The topics I've just enumerated.

11        Q.   Okay.  As far as the issues -- you refer

12   to issues that arose after Freddie Gray's passing.

13   To what issues are you referring?

14        A.   Getting them equipment.  Getting them

15   additional support from other law enforcement

16   agencies.  Injuries of various police officers.

17             There were so many discussions over such

18   wide-ranging topics.

19        Q.   Okay.  Let's take those issues one by

20   one.

21             So equipment, when you refer to

22   equipment, what equipment are you referring to?

**ORIGINAL TRANSCRIPT**

45

1      A.   What do you mean?

2      Q.   Who made that request?  Was it you?  Was

3  it the Mayor?  Someone else in the Mayor's office?

4  Was it the police?

5           What was your role in that?

6      A.   I think that it depended on the entity.

7  I don't think I personally reached out.  I think I

8  facilitated some conversations.

9           But, to my knowledge, I don't recall

10  personally reaching out to any specific law

11  enforcement agency.  I think that was done through

12  other means.

13      Q.   Okay.  When you say other means, was it

14  done by the police department itself, or was it

15  done more from the Mayor's office?

16      A.   I can't say with certainty.  I'm sorry,

17  sir.  It's six years later.

18      Q.   So when you say you facilitated it or

19  you at least helped out, in what way did you

20  facilitate or help out?

21      A.   Well, I recall at least in one

22  discussion relaying the police commissioner's

1  request and needs to our chief of staff.  But

2  there was so much going on, sir, I -- again you're

3  asking me to say specifically what happened.  And

4  I just know there were a number of calls, a number

5  of meetings, and a number of people were reaching

6  out trying to facilitate things as quickly and as

7  expediently as possible.

8      Q.   So what do you recall the police

9  commissioner saying he needed?

10      A.   He needed additional resources.

11      Q.   Law enforcement officers?

12      A.   Law enforcement officers and resources,

13  other resources.

14      Q.   Just to make sure I understand you

15  correctly, you're saying that the police

16  commissioner relayed to you the need for

17  additional law enforcement officers, and you

18  relayed that to the chief of staff, who was then

19  Kaliope Parthemos; correct?

20      A.   Yes.

21      Q.   Do you recall whether you relaying this

22  was prior to the Camden Yards incident?

56

1  you, did you relay those concerns to anyone else?

2      A.   As I stated earlier, to the chief of

3  staff.

4      Q.   Other than -- and the chief of staff,

5  just to make sure we're on the same page, at that

6  time was Kaliope Parthemos; correct?

7      A.   Yes.  At all times relevant to this

8  discussion, she was chief of staff.

9      Q.   Other than Ms. Parthemos, do you recall

10  relaying those concerns to anyone else?

11      A.   That would have been the person to whom

12  I discussed them.

13      Q.   Okay.  Also during their depositions,

14  Melissa Hyatt and Dean Palmere also testified that

15  before April 25th, 2015, they knew that the mutual

16  aid or law enforcement officers that other

17  jurisdictions would be providing still would not

18  result in enough officers to address crowd control

19  issues and protect infrastructure.

20          Specific to the mutual aid, do you also

21  recall hearing those concerns?

22      A.   I just recall Commissioner Batts

1    expressing that he needed additional resources,

2    the discussions about securing those resources,

3    and the discussions with the chief of staff and

4    Commissioner Batts.

5            I cannot recall specifically every last

6    detail of those discussions.  I'm sorry.

7        Q.   Do you recall then-Commissioner Batts

8    ever stating, "Hey, we're not getting enough

9    mutual aid; this isn't going to be enough,"

10   concerns along those lines?

11       A.   I recall having multiple discussions

12   with him about resources.  Specifically what he

13   said at this time I'm not comfortable saying

14   specifically what he said because I can't recall

15   specifically what he said.

16       Q.   Is that -- I didn't understand.  Is that

17   a yes or no or can't remember?

18            I guess the question --

19       A.   I believe that I have -- as I stated

20   earlier, there were a number of conversations over

21   the course of this event in terms of getting

22   additional resources for the Baltimore Police

1    were all before that.  I can't say where in the

2    time line they were.  This was six years ago.  I'm

3    sorry.  You're asking me to go by memory.  I have

4    no notes.  I have nothing to jog my memory.  I

5    cannot recall specifically in the time frame when

6    these conversations occurred.

7         Q.   Sure.  But you can't recall whether any

8    of those conversations occurred before Mondawmin

9    Mall erupted on April 27th?

10        A.   I cannot say with certainty.  I can't.

11   I'm sorry.  And I don't want to give -- I do not

12   want to say anything that is not correct.

13        Q.   Okay.  Was then-Commissioner Batts

14   relaying equipment and manpower concerns to you

15   for you to relay it to the chief of staff?  Or

16   what was the purpose of those calls?

17        A.   He wanted to make sure the Mayor and

18   chief of staff knew what his needs were so that we

19   could all work collectively to address them.

20        Q.   Got it.  Okay.

21             And you definitely relayed those

22   concerns regarding manpower and equipment to the

1    those meetings?

2         A.   I honestly don't recall.  There were so

3    many.

4         Q.   Right.

5         A.   I don't recall.

6         Q.   I'm asking, at least one of those

7    meetings, do you ever recall seeing Melissa

8    Hyatt's face?

9         A.   I don't recall seeing her at the

10   emergency management center.  I don't -- she was

11   not a part of my communications with Commissioner

12   Batts.

13             Can I say with certainty that she wasn't

14   at any meetings?  No.  But I don't recall her

15   being a part of those.

16        Q.   How about Dean Palmere?

17        A.   I don't -- he may have been at one.  He

18   may have been at one that I can say in which we

19   were discussing something about the Freddie Gray

20   circumstance.

21             But, again, during that time frame I

22   would have to say that most of my communications

1   were directly with Commissioner Batts.

2        Q.   Okay.  And, again, most of those

3   communications revolved around manpower and riot

4   gear; correct?  Or gear; correct?

5        A.   Correct.

6        Q.   Okay.

7        A.   To my recollection.  I mean, there may

8   have been other topics discussed or things that I

9   was getting information for or trying to ascertain

10  or relay.  But I can't recall specifically each

11  and every thing.

12            But I do recall having conversations

13  about resources.

14       Q.   Do you recall any of those other issues

15  that you just enumerated?

16       A.   There were so many.  There were so many

17  issues about, you know, confirming reports, trying

18  to relay information.  One of the e-mails that you

19  had in your packet involved permitting.

20            I mean, there was just so much -- so

21  much.  And unfortunately, sir, I'm sorry, I have

22  no notes from that period, and it's -- it's really

83

1    Trauma Gala?

2         A.   I do not.

3              MR. HWANG:  Okay.  If I could direct

4         your attention to the exhibit marked 10.

5              If we could mark that as Exhibit 10,

6         please, produced by the City as CITY00045742.

7              (Whereupon, CITY00045742 was marked as

8    Plaintiffs' Exhibit 10 for Identification by the

9    Reporter.)

10             THE WITNESS:  I'm reviewing.

11             Okay.  I've reviewed it.

12   BY MR. HWANG:

13        Q.   Do you recall Ganesha Martin?

14        A.   I do.

15        Q.   Okay.  What was her role at that time?

16        A.   She worked very closely with

17   Commissioner Batts.  She had a number of roles

18   with the Baltimore Police Department.  At this

19   time I can't remember her specific role, but it

20   may have been his chief of staff.

21        Q.   Okay.  But she was with the Baltimore

22   Police Department, not with the City; correct?

84

1        A.   Correct.

2        Q.   Now, you sent the e-mail in this chain

3    on April 25th, 2015, at 12:47 p.m. to Ganesha

4    Martin; correct?

5        A.   Yes.

6        Q.   Now, in the e-mail, what did you

7    request?

8        A.   I requested information on what was

9    requested from Baltimore County most recently and

10   specifically and what the county's response was.

11        I also noted that AA County was present.

12   And I asked her to please send me the information

13   as soon as possible.

14        Q.   Why would you have requested this

15   information?

16        A.   I'm sure I wanted to know what they had

17   in place and what -- to compare with what they had

18   asked for and what we could additionally provide.

19        Q.   Okay.  So were you tracking the

20   resources that were coming in from jurisdictions

21   outside of the city of Baltimore by way of mutual

22   aid for law enforcement officers?

1       A.   I don't know if I was personally

2   tracking it.  I think I was just trying to see

3   what was outstanding and what was needed.

4       Q.   Okay.  And as Chief Hyatt testified and

5   as Dean Palmere testified, when you were receiving

6   this information as far as what resources were

7   coming in, was it also your understanding that

8   Baltimore City still was not receiving enough

9   resources to be able to address its crowd control

10  and infrastructure concerns?

11      A.   As I said earlier, I was aware and had

12  more than one conversation with respect to

13  Commissioner Batts about resources.  What

14  specifically was involved in those conversations

15  and when each conversation was and what was said

16  in each I can't recall.

17           But as I noted, it was ongoing

18  throughout the entire protest, just trying to make

19  sure that BPD had what it needed.

20      Q.   Okay.  I was asking about your

21  understanding, though.

22           So was it your understanding -- as

1  respect to Mr. -- I don't know.  Perhaps Mr. Gray,

2  but I don't know.

3      Q.   Do you recall the funeral for Mr. Gray

4  being on the City's radar?

5      A.   There was so much on the radar at that

6  time.  I'm sure that we were aware of it given the

7  community significance.

8      Q.   Okay.  And Freddie Gray's funeral would

9  have been seen as a matter that was significant to

10 the community; correct?

11     A.   Absolutely.

12     Q.   Now, this e-mail notes that special

13 attention has been requested for the funeral.

14          To what special attention is this e-mail

15 referring?

16     A.   I would have no idea.  You would have to

17 ask Mr. Gussener.

18     Q.   Okay.  This e-mail was directed to you,

19 though, correct, not to the police department?

20          I mean, you're the sole person noted on

21 the "to" line, and Ms. Parthemos, Mr. Libit, and

22 Ms. Hyatt are CC'd?

109

1       A.   I don't recall.

2            MR. HWANG:  If I could direct your

3       attention to number 13.

4            If we could mark that as 13, an e-mail

5       chain produced by the City as CITY00038973.

6            THE WITNESS:  Okay.  I've read it.

7            (Whereupon, CITY00038973 was marked as

8   Plaintiffs' Exhibit 13 for Identification by the

9   Reporter.)

10  BY MR. HWANG:

11      Q.   Do you recall this -- I'm sorry.

12           You're on this e-mail chain; correct?

13      A.   I am.

14      Q.   Now, do you recall this SPCA event being

15  an issue?

16      A.   I don't recall it.  But in reading the

17  e-mail, there clearly was a question about it.

18  But, no, I would have not have recalled it but for

19  this e-mail.

20      Q.   Okay.  Now, in the e-mail you sent on

21  April 26, 2015, at 12:47 p.m., you said that you

22  were texting with the commissioner.

**ORIGINAL TRANSCRIPT**

110

1                Do you see that?

2        A.    Yes.

3        Q.    And I'm assuming you're referring to

4    Commissioner Batts?

5        A.    Yes.

6        Q.    In that same e-mail, you stated that the

7    PC is exhausted and asleep.

8                Do you see that?

9        A.    Yes.

10       Q.    And I assume PC also refers to Police

11   Commissioner Batts at that time?

12       A.    I would assume so.

13       Q.    Other than the police commissioner, who

14   else at the police department were you in contact

15   with at that time?

16                In other words, how would you know that

17   he was asleep?

18       A.    I don't know.  Based on this e-mail, I

19   can only deduce that at some time he relayed the

20   information that I shared with Ms. Kirstaetter.

21   And I don't know how -- I can't recall how I found

22   out six years ago that he was exhausted and

**ORIGINAL TRANSCRIPT**

1    asleep.  I'm sure I found out some way because

2    that's what I relayed.

3         Q.   By this time were you in regular --

4    would you say you were in regular communication

5    with the commissioner, by phone at least?

6         A.   We were in communications, yes.

7         Q.   Would you say that you were

8    communicating at least multiple times a day?

9         A.   I would say that we were in significant

10   communication over the course of -- over the

11   course of a 24-hour period.

12        Q.   Okay.  And generally what were you

13   communication [sic] about?

14        A.   Whatever was transpiring at the time.

15   Anything related to the unrest and the protest,

16   the Freddie Gray situation.  I mean, we were in

17   communication quite a bit over that time frame

18   about those issues.

19        Q.   I'm sorry.  About which issues?

20        A.   About those issues.

21        Q.   I'm asking about which issues?

22        A.   About the situation surrounding Freddie

112

1    Gray.

2         Q.   Okay.  Would that have included the need

3    for manpower, among other things?

4         A.   That included he had conversations with

5    me about resources, yes.  But clearly it would

6    have also involved other things as evidenced by

7    this e-mail.

8         Q.   Right.  And whether it was resources or

9    other things, you would have relayed that to

10   Kaliope Parthemos?

11        A.   If it was about resources, it would have

12   been relayed to Kali.

13             MR. HWANG:  If I could direct your

14        attention to 14, please.

15             THE WITNESS:  Sure.

16             (Whereupon, CITY00052170 was marked as

17   Plaintiffs' Exhibit 14 for Identification by the

18   Reporter.)

19             MR. HWANG:  And if we could mark this as

20        14.  It's an e-mail produced by the City as

21        CITY00052170.

22             And I'll give you a minute to read

1          through it.

2                    THE WITNESS:  Okay.

3     BY MR. HWANG:

4          Q.   You received this e-mail; correct?

5          A.   Yes.

6          Q.   And this e-mail refers to a mass high

7     school purge expected tomorrow at 3 p.m.

8                    Do you see that?

9          A.   Well, actually, to clarify, this e-mail

10    is sent to a number of people including the chief

11    of staff and myself and to others.  And it

12    involves the schools opening.

13                   And at some point there's a reference

14    that -- as to, and I quote, "a mass high school

15    purge expected tomorrow."  But that is not the --

16    necessarily the point of the e-mail.

17         Q.   My question was:  This e-mail refers to

18    a mass high school purge expected tomorrow at

19    3 p.m.?

20                   Do you see that?

21         A.   I see one line out of the e-mail about

22    that.

188

1      Q.   Do you recall the acronym MEMA?

2      A.   Maryland Emergency Management?

3      Q.   Correct.

4           So do you recall resources having to go

5   through MEMA -- requests for resources having to

6   go through MEMA?

7      A.   I do recall.

8      Q.   Okay.  Do you recall how that process

9   would have worked?  Who would have initiated it on

10  the City's end?

11     A.   I believe that would have fallen under

12  Bob.

13     Q.   Okay.  I'm only -- sure.

14          So, before, you testified that, you

15  know, you had a part in relaying or otherwise

16  requesting mutual aid resources or manpower, so to

17  speak.  And so I'm trying to figure out exactly

18  what your role is.

19          Did you have any role in terms of

20  requests made through MEMA for additional law

21  enforcement officer support?

22     A.   Our role -- well, my role, let me just

189

1   speak to that, was to ensure that the Mayor knew

2   what the needs were of the Baltimore Police

3   Department.  The coordination of who did what,

4   when, where and how would probably fall under the

5   chief of staff.

6           But I know we reached out and we

7   received a -- and those resources under MEMA might

8   have included those list of supplies that I sent

9   to Khalil.  So it might not just have been

10  manpower.

11      Q.   Would you classify your role during

12  these protests more as a conduit of information;

13  that you would be the person relaying information

14  from the Baltimore Police Department to the

15  Mayor's office?

16      A.   More so that liaison role back and forth

17  between the parties, yes.

18      Q.   Is that correct?

19      A.   Yes.

20      Q.   And certainly any concerns that the

21  police commissioner or anyone else at the

22  Baltimore City Police Department had that was

190

1  relayed, you would have relayed that to the

2  Mayor's office; correct?

3       A.   Absolutely would have relayed it to the

4  chief of staff.

5            MR. HWANG:  Okay.  If I could direct

6       your attention to 32.

7            (Whereupon, CITY00045303 was marked as

8  Plaintiffs' Exhibit 32 for Identification by the

9  Reporter.)

10           MR. HWANG:  Produced by the City -- and

11      if we could mark it as 32, produced by the

12      City as CITY00045303.

13           THE WITNESS:  Yes.

14  BY MR. HWANG:

15      Q.   Do you recall the statements reflected

16  here?

17      A.   Can I read this, please?

18      Q.   Sure.

19      A.   Thank you.

20           Yeah.  I've read it.  Thank you.

21      Q.   Do you recall there being some commotion

22  about these comments that the Mayor had made?

198

1          CERTIFICATE OF SHORTHAND REPORTER

2

3          I, Lisa Barbera, Shorthand Reporter, the

4     officer before whom the foregoing deposition

5     was taken, do hereby certify that the

6     foregoing transcript is a true and correct

7     record of the testimony given; that said

8     testimony was taken by me stenographically

9     and thereafter reduced to typewriting under

10    my supervision; and that I am neither counsel

11    for or related to, nor employed by any of the

12    parties to this case and have no interest,

13    financial or otherwise, in its outcome.

14

15          IN WITNESS WHEREOF, I have hereunto set

16    my hand this 21st day of January, 2021.

17

18    _Lisa Barbera_

19    _____

20    LISA BARBERA

21    STENOGRAPHER

22

# EXHIBIT 5

# In The Matter Of:

*CHAE BROTHERS, LIMITED LIABILITY COMPANY, ET AL. v.*
*MAYOR AND CITY COUNCIL OF BALTIMORE, ET AL.*

---

*KHALIL ZAIED*
*January 14, 2021*
*ORIGINAL TRANSCRIPT*

---

*CourtScribes, Inc.*
*"Delivering More For Less"*
*(833) 727-4237*
*info@courtscribes.com*
*www.courtscribes.com*

**ORIGINAL TRANSCRIPT**

1

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF MARYLAND

3                  NORTHERN DIVISION

4

5   CHAE BROTHERS LIMITED        : Civil Action No.

6   LIABILITY COMPANY, et al.,  : 1:17-cv-01657-SAG

7                Plaintiffs,    :

8                v.             :

9   MAYOR & CITY COUNCIL OF      :

10  BALTIMORE, et al.,           :

11               Defendants.    :

12                Thursday,January 14, 2021

13                  Taken Virtually

14

15  Video Conference deposition of KHALIL ZAIED,

16  pursuant to notice, the witness being sworn by

17  BARBARA MOORE, a Notary Public in and for the State

18  of Maryland, commencing at 1:00 p.m., and the

19  proceedings being taken down by Stenotype by

20  BARBARA MOORE, CRR, RMR and transcribed under her

21  direction.

22

2

1    APPEARANCES:

2            On Behalf of the Plaintiffs:

3                    PETER K. HWANG, ESQ.

4                    SUNG & HWANG, LLP

5                    9256 Bendix Road, Suite 109

6                    Columbia, MD   21045

7                    phwang@sungandhwang.com

8

9            On Behalf of the Defendants:

10                   HANNA MARIE C. SHEEHAN, ESQ.

11                   SARA E. GROSS, ESQ.

12                   BALTIMORE CITY DEPARTMENT OF LAW

13                   100 N. Holiday Street

14                   Baltimore, MD   21202

15

16   Ian Wallach, Videographer

17

18

19

20

21

22

3

1                      TABLE OF CONTENTS

2                         WITNESSES

3    WITNESS                                    PAGE

4    KHALIL ZAIED

5    BY MR. HWANG                                 4

6

7

8
     _____EXHIBITS_____
9
     EXHIBIT        DESCRIPTION                   PAGE
10
     Exhibit 1      Subpoena package              10
11
     Exhibit 2      Protective order              13
12
     Exhibit 3      Amended Complaint             21
13
     Exhibit 4      Email chain                   25
14
     Exhibit 5      Email chain                   47
15
     Exhibit 6      Email                         53
16
     Exhibit 7      Email                         58
17
     Exhibit 8      Email                         61
18
     Exhibit 9      Email chain                   63
19
     Exhibit 10     Email                         66
20
     Exhibit 11     Email chain                   69
21

22

**ORIGINAL TRANSCRIPT**

4

1                P R O C E E D I N G S

2                THE VIDEOGRAPHER:  We're now on

3        the record in the matter of Chae

4        Liability Company, et al, versus Mayor

5        and City Council of Baltimore, et al.

6        Today's date is January 14, 2021.  The

7        time is 1:03 p.m.  This is the

8        video-recorded deposition of Khalil Zaied

9        being taken via Zoom.  My name is Ian

10       Wallach, I'm the videographer

11       representing CourtScribes.  The court

12       reporter is Barbara Moore, also

13       representing CourtScribes.

14                Will counsel please introduce

15       themselves for the record.

16                     (Attorneys stated their

17            appearances for the record.)

18                THE VIDEOGRAPHER:  Will the court

19       reporter please swear in the witness.

20

21

22

1                 **********************

2                      KHALIL ZAIED,

3       having been called as a witness on behalf of the

4       Defense and having been first duly sworn, was

5       examined and testified as follows:

6       EXAMINATION BY

7       MR. HWANG:

8            Q.      Good afternoon, Mr. Zaied.  As you

9       know, my name is Peter Hwang, and I represent the

10      plaintiffs in this action, who have filed suit

11      against the Mayor and City Council of Baltimore

12      for, amongst other things, damages to Plaintiffs'

13      property and businesses.

14            As you know, we're here for a deposition

15      here today, which will consist of me asking you

16      questions and you providing responses to those

17      questions.  As you can tell, there's a court

18      reporter here.  She is transcribing my questions

19      and your responses.  As such, it's important that

20      you respond to my questions verbally.  Please

21      refrain from answering with gestures like a head

22      nod or with sounds like "uh-uh."  As you can

1          A.     July 1 of 2016.

2          Q.     Okay.  Now, during that year and a

3   half was that your only source of employment?

4          A.     Yes, sir.

5          Q.     Now, prior to July 1, 2016, where

6   were you employed?

7          A.     City of Baltimore.

8          Q.     For how long -- from what date to

9   what date were you employed by the City of

10  Baltimore?

11         A.     I would say roughly December 19 --

12  I'm sorry.  May 1998 till June 30 of 2016.

13         Q.     Okay.

14         A.     Roughly, roughly 18 years.

15         Q.     Quite a long time.

16         A.     Yes.

17         Q.     Can you walk me through the

18  different titles you've held while employed by the

19  City of Baltimore, what your duties were for each

20  title and kind of specify the time period that you

21  held each title?

22         A.     Okay.  That's a long stretch, but I

1  could do that for you if that's what you want to

2  hear.  So I started with the city in 1998 as an

3  Engineer 1 for year.  Then Engineer 2.  Another

4  year, I think.

5       In 2001 I was, bypassed Engineer 3 to be

6  the engineer supervisor for the Department of

7  Transportation as the chief of the highway section.

8  Held that position for four years.

9       Then I was promoted to division chief for

10  the conduit division for six months.  Then after

11  that I was promoted to be the director of planning,

12  design and school construction for the school

13  system outside the City of Baltimore.  I left the

14  city for a year, year and a half, for two years.

15  For the school system, Baltimore City Public

16  Schools, and I was the director of planning, design

17  and school construction.

18       In 2006 -- I'm sorry, 2008 I became the

19  director -- the first director of the Department of

20  General Services for the City of Baltimore, and I

21  served for two years.  After that I became the

22  director of transportation for the City of

1    Baltimore, and I served for two years, and finally

2    I was promoted in July -- I'm sorry, December 2011,

3    I think, to the deputy mayor of operations for the

4    City of Baltimore working in the mayor's office

5    from that period of time until the time I left in

6    2016.

7            Q.     Okay.  Now, as the deputy mayor of

8    operations, could you describe what your duties

9    were?

10           A.     I oversaw the Department of

11   Transportation, the Department of Public Works, the

12   Department of General Services, parking authority

13   of Baltimore City.  Later on they added the mayor's

14   Office of Information Technology under my

15   portfolio.  I had smaller departments and a smaller

16   group of people that I oversaw as well.

17           Q.     Okay.  As a deputy mayor of

18   operations, who did you report to?

19           A.     Multiple people throughout my

20   career.  But the last two to three years was

21   Kaliope.

22           Q.     And Kaliope Parthemos, the chief of

**ORIGINAL TRANSCRIPT**

77

1  STATE OF MARYLAND:                              SS

2       I, Barbara Moore, a Registered Court Reporter

3  of the State of Maryland, do hereby certify that

4  these proceedings took place before me at the time

5  and place herein set out, and the proceedings were

6  recorded stenographically by me and this transcript

7  is a true record of the proceedings.

8

9       I further certify that I am not of counsel to

10 any of the parties, nor an employee of counsel nor

11 related to any of the parties, nor in any way

12 interested in the outcome of this action.

13

14

15

16 _____

17           BARBARA MOORE, CRR, RMR

18

19 _____

20 My Commission Expires:

21 February 8, 2022

22

# EXHIBIT 6

# In The Matter Of:

*CHAE BROTHERS, LIMITED LIABILITY COMPANY, ET AL. v.*
*MAYOR AND CITY COUNCIL OF BALTIMORE, ET AL.*

*DANIEL J. SPARACO*
*January 14, 2021*
*ORIGINAL TRANSCRIPT*

*CourtScribes, Inc.*
*"Delivering More For Less"*
*(833) 727-4237*
*info@courtscribes.com*
*www.courtscribes.com*

1

1      IN THE UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF MARYLAND

3           NORTHERN DIVISION

4   - - - - - - - - - - - - - - - - - X

5   CHAE BROTHERS LIMITED              |

6   LIABILITY COMPANY, et al.,        | CIVIL ACTION NO.:

7           Plaintiffs,               | 1:197-CV-01657

8   v.                                |

9   MAYOR & CITY OF BALTIMORE, et al.,  |

10          Defendants.               |

11  - - - - - - - - - - - - - - - - - X

12

13       Videotaped Deposition of DANIEL J. SPARACO

14           Conducted remotely

15         Thursday, January 14, 2021

16              9:00 a.m.

17

18

19

20  Job No.:   326399

21  Pages:  1 - 78

22  Reported by:  Sharon Gregory, Court Reporter

**ORIGINAL TRANSCRIPT**

2

1          Videotaped Deposition of DANIEL J. SPARACO,

2    conducted remotely:

3

4

5

6

7

8

9

10        Pursuant to agreement, before Sharon Gregory,

11    Professional Court Reporter and Notary Public of the

12    state of Maryland.

13

14

15

16

17

18

19

20

21

22

3

1                    A P P E A R A N C E S

2          ON BEHALF OF THE PLAINTIFFS:  (Via Zoom)

3            PETER K. HWANG, ESQUIRE

4            SUNG & HWANG, LLP

5            9256 Bendix Road

6            Suite 109

7            Columbia, MD 21045

8            (410) 722-2324

9          ON BEHALF OF THE DEFENDANTS: (Via Zoom)

10           SARA E. GROSS, ESQUIRE

11           HANNA MARIE C. SHEEHAN, ESQUIRE

12           BALTIMORE CITY DEPARTMENT OF LAW

13           100 North Holliday Street

14           Baltimore, MD 21202

15           (310) 396-3835

16

17   ALSO PRESENT:  IAN WALBACH, VIDEOGRAPHER

18

19

20

21

22

4

1                       C O N T E N T S

2      EXAMINATION OF DANIEL J. SPARACO              PAGE

3            By Mr. Hwang                              6

4

5                       E X H I B I T S

6            (Attached to transcript)

7      SPARACO DEPOSITION EXHIBIT                     PAGE

8      Ex. 1    Subpoena package                       77

9      Ex. 2    Protective order and agreement         77

10     Ex. 3    Amended complaint                      77

11     Ex. 4    CITY000011616-17                       77

12     Ex. 5    CITY000352381                          77

13     Ex. 6    CITY00012126                           77

14     Ex. 7    CITY00013069                           77

15     Ex. 8    CITY00012096                           77

16     Ex. 9    CITY00052818                           77

17     Ex. 10   CITY00020212                           77

18

19

20

21

22

5

1                   P R O C E E D I N G S

01:16:31  2                   THE VIDEOGRAPHER:  We are now on the record

01:16:32  3       in the matter of Chae Brothers Limited Liability

01:16:39  4       Company, et al., versus the Mayor and City Council of

01:16:48  5       Baltimore, et al.  Today's date is January 14, 2021.

01:16:52  6                   The time is 9:05 a.m.  This is the

01:16:55  7       video-recorded deposition of Daniel Sparaco, being

01:16:58  8       taken via Zoom.  My name is Ian Wallach.  I am the

01:17:01  9       videographer with Court Scribes.  The court reporter is

01:17:03  10      Sharon Gregory, also with Court Scribes.

01:17:06  11                  Will counsel please introduce themselves for

01:17:08  12      the record.

01:17:08  13                  MR. HWANG:  Good morning.  Peter Hwang on

01:17:10  14      behalf of all plaintiffs.

01:17:11  15                  MS. GROSS:  Good morning.  Sara Gross and

01:17:13  16      Hanna Sheehan on behalf of the Mayor and City Council

01:17:15  17      of Baltimore.

01:17:17  18                  THE VIDEOGRAPHER:  Will the reporter please

01:17:19  19      square in the witness.

01:17:19  20                  DANIEL J. SPARACO, having first been duly

01:17:19  21      sworn, testified as follows:

01:18:18  22                  EXAMINATION

6

01:18:18  1   BY MR. HWANG:

01:18:19  2        Q   Good morning, Mr. Sparaco.  As you know, my

01:18:23  3   name is Peter Hwang and I represent the plaintiffs in

01:18:30  4   this action who have filed suit against the mayor and

01:18:34  5   City Council of Baltimore for, among other things,

01:18:37  6   damages to plaintiffs' property and businesses.

01:20:07  7             As you may know, we're here for a deposition

01:20:10  8   which will consist of me asking you questions and you

01:20:13  9   providing answers to those questions.  As you can see,

01:20:16  10  there is a court reporter here.  She is transcribing my

01:20:20  11  questions and your responses.  As such, it's important

01:20:23  12  that you answer any questions verbally.  Please refrain

01:20:27  13  from answering with gestures like a head nod or sounds

01:20:31  14  like "uh-huh."  As you can imagine, it's hard for the

01:20:35  15  court reporter to transcribe such responses.

01:20:37  16            Extremely important that you understand the

01:20:39  17  questions that I'm asking.  If for some reason you do

01:20:42  18  not understand a particular question, please let me

01:20:45  19  know and I will try to rephrase.  If you, however, go

01:20:48  20  ahead and answer a question, I will assume that you

01:20:51  21  understood it.

01:20:53  22            You may also notice that there is counsel

16

01:30:02  1        Q    And for how long were you employed by

01:30:04  2   Baltimore City?

01:30:05  3        A    I started work in March of 2010 with

01:30:08  4   Baltimore City.

01:30:10  5        Q    Until -- until when?

01:30:14  6        A    The end of 2015.

01:30:19  7        Q    And how did your employ at Baltimore City

01:30:22  8   end?

01:30:23  9        A    I resigned.

01:30:26 10        Q    Okay.  Can I ask the reason for the

01:30:30 11   resignation?

01:30:31 12        A    Well, I mean I was really -- I was asked to

01:30:35 13   resign by the head of the Department of Public Works at

01:30:39 14   the request of the mayor's chief of staff at the time.

01:30:44 15        Q    Okay.  Who was the mayor's chief of staff at

01:30:47 16   that time?

01:30:47 17        A    Kaliope Parthemos.

01:30:53 18        Q    Okay.  Now, during the course of the, I

01:30:57 19   guess, five and a half years that you were employed by

01:30:59 20   Baltimore City, can you kind of walk me through what

01:31:02 21   your different titles were, the time periods in which

01:31:05 22   you held those titles, and the duties that you had.

**ORIGINAL TRANSCRIPT**

17

01:31:09 1        A    From 2010 to April 2013 I was assistant

01:31:13 2   solicitor, so my duties were the same as Ms. Gross's,

01:31:20 3   more or less.  And then in April of 2013 I became

01:31:24 4   assistant deputy mayor for operations, so I was working

01:31:28 5   in the mayor's office.

01:31:33 6        Q    And you were in that position as assistant

01:31:36 7   deputy mayor for operations from April 2013 to the end

01:31:40 8   of 2015?

01:31:42 9        A    To September of 2015.  And then from

01:31:48 10  September until -- it was probably only six or eight

01:31:54 11  weeks, so I think it was the end of October I was at

01:31:57 12  the Department of Public Works as a special assistant.

01:32:01 13       Q    Okay.  And you were a special assistant for

01:32:04 14  the Department of Public Works until you resigned?

01:32:09 15       A    Correct, yeah.

01:32:10 16       Q    Could you walk me through what your duties

01:32:13 17  were as the assistant deputy mayor for operations from

01:32:18 18  you said approximately April of 2013 until September of

01:32:22 19  2015 I believe.

01:32:26 20       A    Yeah.  I reported to Mr. Zaied, and he and I

01:32:33 21  -- the mayor's office had been arranged under a series

01:32:39 22  of deputy mayors.  We each had a portfolio of city

03:01:44  1         Q   Okay.  And so you're working at your desk

03:01:47  2    and that's what you recall during the morning of April

03:01:51  3    27th.  And as the day progresses what do you recall?

03:01:55  4         A   Well, at some point we get reports of --

03:01:58  5    well, we get reports of rumors of something is about to

03:02:02  6    happen at Mondawmin Mall and nobody really knew what

03:02:08  7    that was.  And then at some point the encounter between

03:02:18  8    kids at the Mondawmin bus stop and the police began.

03:02:23  9    But, you know, for all that I was pretty much a

03:02:26 10    spectator.  I wasn't aware that that deployment was

03:02:31 11    happening.

03:02:33 12             And then eventually my boss and I went down

03:02:36 13    to the chief of staff's office, Ms. Parthemos, tried to

03:02:42 14    get a sense from her what was going on, what needed to

03:02:51 15    be done.  Khalil, my boss, wanted to open the emergency

03:02:55 16    operations center which essentially would be a civilian

03:03:00 17    command center, used for things like snow emergencies

03:03:07 18    and stuff like that.  And then we went over to the --

03:03:11 19    we went over to police headquarters and then finally

03:03:15 20    the emergency operations center opened so we went

03:03:20 21    there.

03:03:20 22             Q   Okay.  Now, if I use the acronym BOC, I

**ORIGINAL TRANSCRIPT**

45

03:07:35  1   Mondawmin Mall?

03:07:37  2        A   I don't think I did.  You know, again

03:07:41  3   keeping in mind, that's not my -- that just wasn't my

03:07:47  4   -- it wasn't my -- wasn't my role.

03:07:48  5        Q   Okay.  So as the day progresses and things

03:07:52  6   start to happen at Mondawmin Mall, you said at that

03:07:56  7   point in time you and Mr. Zaied, still at City Hall

03:07:59  8   walked over to Ms. Parthemos's office, correct?

03:08:02  9        A   Yes, we walked down.  She was on the second

03:08:05 10   floor.  We were on the third floor.

03:08:06 11        Q   Now, in addition to Mr. Zaied advocating for

03:08:09 12   the activation of the EOC, what else did you two

03:08:13 13   discuss with Ms. Parthemos at that time?

03:08:18 14        A   I mean I don't -- I mean I remember that

03:08:22 15   being the substance of it.  Like it was not a -- it was

03:08:28 16   not a BS session.  You know, we weren't -- and we

03:08:33 17   weren't in her office very long.

03:08:35 18        Q   Okay.  And when Mr. Zaied was advocating for

03:08:41 19   the activation of BOC, how did Ms. Parthemos respond?

03:08:45 20        A   She did not want to.

03:08:47 21        Q   Okay.  I assume she explained why she didn't

03:08:51 22   want to?

03:12:57 1   headquarters eventually went over to the EOC.  My

03:13:01 2   question is regarding your time at the watch center, at

03:13:03 3   Baltimore City Police Headquarters; why you and

03:13:06 4   Mr. Zaied went there and eventually what you did while

03:13:09 5   you were there?

03:13:09 6          A   Well, we want there because there was

03:13:11 7   nothing else to do for us, and that's where the

03:13:16 8   response to what was happening was headquartered.

03:20:40 9          Q   If I could direct your attention to Exhibit

03:20:43 10  5, please.  05, we can mark that as Exhibit 5.  It is

03:20:51 11  an e-mail chain Bates stamped -- produced by the City,

03:20:53 12  Bates stamped City 00052381?

03:20:59 13         A   Yeah.

03:21:01 14         Q   You are on this e-mail chain, correct?

03:21:04 15         A   That's correct, yeah.

03:21:09 16         Q   Now, did Robert Maloney ask you to send the

03:21:14 17  e-mail that's included in this chain that was sent at

03:21:17 18  4:38 p.m.?

03:21:19 19         A   I think it was -- I think that was -- I

03:21:25 20  think that was Khalil relaying that message from

03:21:31 21  Mr. Maloney.  I don't recall but -- I don't recall -- I

03:21:35 22  don't remember Bob telling me that directly.  He would

03:23:30  1         Q    Just to make sure we're on the same page, do

03:23:33  2    you recall what Robert Maloney's role was at that time?

03:23:36  3         A    He was the head of -- I believe by that

03:23:39  4    point he was head of emergency management.  Yeah, he

03:23:42  5    was.

03:23:42  6         Q    And by "emergency management," do you mean

03:23:45  7    the Mayor's Office of Emergency Management?

03:23:48  8         A    Correct.

03:23:51  9         Q    So in Exhibit 5, you sent an e-mail 4:38

03:23:57 10    p.m. on April 27th to Ms. Parthemos saying, "Bob wants

03:24:01 11    approval to open EOC now."  Let's make this clear.

03:24:07 12    When you say "Bob," you are referring to Robert

03:24:10 13    Maloney, correct?

03:24:10 14         A    That's correct.

03:24:11 15         Q    Now, this e-mail that you sent saying "Bob

03:24:13 16    wants approval to open EOC now," would this now have

03:24:17 17    been the second time you said to Ms. Parthemos that the

03:24:21 18    EOC should be opened?

03:24:23 19         A    Yes.

03:24:24 20         Q    The first time being back at City Hall when

03:24:26 21    you and Mr. Zaied went to her office, correct?

03:24:29 22         A    Yeah, like I guess an hour, hour and a half

03:24:32  1    before this e-mail.

03:24:33  2            Q    Okay.  At this time, I mean you're asking

03:24:38  3    Ms. Parthemos again.  Did you guys need Ms. Parthemos's

03:24:41  4    permission to open the EOC?

03:24:44  5            A    We needed somebody's permission.

03:24:46  6            Q    And I guess Ms. Parthemos was one person who

03:24:50  7    could grant that permission?

03:24:51  8            A    Well, she's -- on behalf of the mayor, yeah.

03:24:54  9    It's either the mayor or her.

03:24:59  10           Q    Now, do you recall any discussions leading

03:25:03  11   up to this e-mail?  Like was Robert Maloney sitting

03:25:06  12   next to you --

03:25:07  13           A    No.

03:25:07  14           Q    He was not?  Okay.  But he was at the watch

03:25:11  15   center?

03:25:12  16           A    Yep.

03:25:12  17           Q    Okay.  Was he in a different room?  Do you

03:25:15  18   recall where he was?

03:25:16  19           A    Well, it's a big room.  He was at the front

03:25:21  20   I believe with or near Commissioner Batts and we were

03:25:24  21   off to the side.

03:25:25  22           Q    Okay.  In addition to Robert Maloney, Khalil

1   CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2        I, Sharon B. Gregory, Court Reporter and Notary

3   Public, the officer before whom the foregoing

4   proceedings were taken, do hereby certify that the

5   foregoing transcript is a true and correct record of

6   the proceedings; that said proceedings were taken by me

7   stenographically and thereafter reduced to typewriting

8   under my supervision; and that I am neither counsel

9   for, related to, nor employed by any of the parties to

10  this case and have no interest, financial or otherwise,

11  in its outcome.

12       IN WITNESS WHEREOF, I have hereunto set my hand and

13  affixed my notarial seal this 18th day of February,

14  2021.

15  My commission expires:

16  April 13, 2021

17

18

19  *Sharon B. Gregory*

20  NOTARY PUBLIC IN AND FOR

21  THE STATE OF MARYLAND

22

# EXHIBIT 7

# In The Matter Of:

*CHAE BROTHERS, LIMITED LIABILITY COMPANY, ET AL. v.*
*MAYOR AND CITY COUNCIL OF BALTIMORE, ET AL.*

---

*ROBERT MALONEY*
*December 18, 2020*
*ORIGINAL TRANSCRIPT*

---

*CourtScribes, Inc.*
*"Delivering More For Less"*
*(833) 727-4237*
*info@courtscribes.com*
*www.courtscribes.com*

1

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF MARYLAND

3                 NORTHERN DIVISION

4    -------------------------
     CHAE BROTHERS LIMITED
5    LIABILITY COMPANY, et al.,

6          Plaintiffs

7    v.                            Civil Action No.
                                   1:17-cv-01657-SAG
8
     MAYOR & CITY COUNCIL OF
9    BALTIMORE, et al.,

10         Defendants.

11   -------------------------

12

13

14

15      VIDEOCONFERENCE DEPOSITION OF ROBERT MALONEY

16              Baltimore, Maryland

17           Friday, December 18, 2020

18                 1:00 p.m.

19

20

21   Reported by:  Goldy Gold

22   Job No.  324989

2

1                          Date:  December 18, 2020

2                          Time:  1:00 p.m.

3

4

5              VIDEOTAPED DEPOSITION OF ROBERT MALONEY,

6         taken by Counsel for Plaintiffs, in the

7         above-titled matter, on December 18, 2020,

8         commencing at 1:00 p.m. and reported by Goldy

9         Gold, a Registered Professional Reporter and a

10        Notary Public within and for the State of

11        Maryland.

12

13

14

15

16

17

18

19

20

21

22

**ORIGINAL TRANSCRIPT**

3

1    A P P E A R A N C E S (Via Video Conference):

2

3    On Behalf of the Plaintiffs:

4        PETER K. HWANG, ESQUIRE
         Sung & Hwang, LLP
5        9256 Bendix Road - Suite 109
         Columbia, Maryland 21045
6        Telephone:  410.772.2324
         E-mail:  phwang@sungandhwang.com
7

8

     On Behalf of the Defendants:
9
         SARA E. GROSS, ESQUIRE
10       HANNA MARIE C. SHEEHAN, ESQUIRE
         Baltimore City Department of Law
11       100 North Holliday Street
         Baltimore, Maryland 21202
12

13
     Also Present:
14
         Ian Wallach, Videographer
15

16

17

18

19

20

21

22

**ORIGINAL TRANSCRIPT**

1

1              I N D E X

2        Deposition of Robert Maloney

3              December 18, 2019

4

5   EXAMINATION BY                          PAGE

6   Mr. Hwang                                5

7

8              E X H I B I T S

9   EXHIBITS              DESCRIPTION         PAGE

10  Exhibit 1      A subpoena dated 11/23/2020    12

11  Exhibit 2      Protective Order and Agreement,  13
                   12/14/2018

12  Exhibit 3      First Amended Complaint and   21
                   Demand for Jury Trial,
13                 4/27/2018

14  Exhibit 4      An e-mail, 4/22/2015         33

15  Exhibit 5      An e-mail, 4/23/2015         33

16  Exhibit 6      An e-mail chain, 4/23/2015   41

17  Exhibit 7      An e-mail chain, 4/23/2015   41

18  Exhibit 8      An e-mail chain, 4/23/2015   42

19  Exhibit 9      An e-mail chain, 4/23/2015   42

20  Exhibit 10     An e-mail chain, 4/23/2015   42

21  Exhibit 11     An e-mail chain, 4/24/2015   64

22

1                    E X H I B I T S (continued)

2    EXHIBITS              DESCRIPTION              PAGE

3    Exhibit 12    An e-mail chain, 4/24/2015         71

4    Exhibit 13    An e-mail chain, 4/22/2015         76

5    Exhibit 14    An e-mail, 4/25/2015               92

6    Exhibit 15    An e-mail chain, 4/25/2015        101

7    Exhibit 16    (not marked)

8    Exhibit 17    (not marked)

9    Exhibit 18    (not marked)

10   Exhibit 19    An e-mail chain, 4/27/2015        129

11   Exhibit 20    An e-mail chain, 4/27/2015        136

12   Exhibit 21    An e-mail chain, 4/27/2015        146

13   Exhibit 22    An e-mail chain, 5/2/2015         146

14   Exhibit 23    An e-mail chain, 4/28/2015        182

15   Exhibit 24    An e-mail chain, 4/27/2015        185

16   Exhibit 25    (not marked)

17   Exhibit 26    An e-mail, 4/27/2015              187

18   Exhibit 27    An e-mail chain, 4/27/2015        191

19   Exhibit 28    An e-mail, 4/27/2015              191

20   Exhibit 29    An e-mail, 4/27/2015              191

21   Exhibit 30    An e-mail chain, 4/27/2015        194

22

3

1                    E X H I B I T S (continued)

2     EXHIBITS                 DESCRIPTION                PAGE

3     Exhibit 31      (not marked)

4     Exhibit 32      An e-mail chain, 4/27/2015         198

5     Exhibit 33      An e-mail, 4/28/2015               200

6     Exhibit 34      (not marked)

7     Exhibit 35      An e-mail chain, 4/28/2015         204

8     Exhibit 36      (not marked)

9     Exhibit 37      (not marked)

10    Exhibit 38      (not marked)

11    Exhibit 39      (not marked)

12    Exhibit 40      (not marked)

13    Exhibit 41      Baltimore Region Emergency
                      Assistance Compact                 211
14    Exhibit 42      (not marked)

15    Exhibit 43      Lessons Learned from the 2015      213
                      Civil Unrest in Baltimore,"
16                    9/2015

17    Exhibit 44      "After Action Report Notes,"       215
                      6/23/2015
18
      Exhibit 45      Timeline of Events, Baltimore      226
19                    City Protest & Riots

20    Exhibit 46      "Office of Emergency Management     229
                      After-Action Review, Civil
21                    Unrest, April 27, 2015,"

22

4

1                E X H I B I T S (continued)

2    EXHIBITS              DESCRIPTION              PAGE

3    Exhibit 47    A1 CD (4/25 1200-1159)          230

4    Exhibit 48    Photographs                     235

5    Exhibit 49    An e-mail chain, 4/29/2015
                                                   238
6    Exhibit 50     (not marked)

7    Exhibit 51    An e-mail chain, 5/2/2015       240

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

5

1                    P R O C E E D I N G S

2              VIDEOGRAPHER:  Good afternoon.  We are

3       on the record.  Today's date is December 18th,

4       2020.  The time is 1:04 p.m.  I am Ian Wallach,

5       the videographer.  The court reporter is Goldy

6       Gold.

7              We are here for the video recorded

8       deposition of Robert Maloney, taken by the

9       plaintiffs in the matter of Chae Brothers

10      Limited Liability Company, et al., versus

11      Baltimore Mayor and City Council, et al., case

12      number 1:17-CV-01657-GRL.

13             Will counsel please announce their

14      appearances for the record.

15             MR. HWANG:  Good afternoon.  Peter Hwang

16      on behalf of all the plaintiffs.

17             MS. GROSS:  Good afternoon.  Sara Gross

18      and Hanna Sheehan on behalf of the Mayor and

19      City Council of Baltimore.

20             VIDEOGRAPHER:  Will the court reporter

21      swear in the witness.

22   WHEREUPON,

6

1               ROBERT MALONEY,

2  was called as a witness, having been duly sworn by a

3  Notary Public, was examined and testified as follows:

4                   EXAMINATION

5  BY MR. HWANG:

6       Q.     Good afternoon, Mr. Maloney.

7       A.     Good afternoon.

8       Q.     My name is Peter Hwang, and I represent

9  the plaintiffs in this action, who are suing the

10 Mayor and City Council of Baltimore for, among other

11 things, damages to plaintiffs' property and

12 businesses.

13            As you may know, we're here for a

14 deposition, which will consist of me asking you

15 questions and you providing the answers to those

16 questions.

17            As you may see on Zoom, there is a court

18 reporter sitting here.  She's transcribing my

19 questions and your responses.  As such, it's

20 important that you answer questions verbally.

21            Please do not answer with a gesture,

22 like a head nod or with sounds like "uh-huh."  As you

**ORIGINAL TRANSCRIPT**

18

1      Q.      So you had started working at Johns

2  Hopkins Medicine was -- around 2017 or so?

3      A.      Let's see.  I think so, yes.

4      Q.      Okay.  What was your title there?

5      A.      Senior director of emergency management.

6      Q.      And did you hold that title for the

7  entirety of the time that you were employed at Johns

8  Hopkins Medicine?

9      A.      Yes.

10      Q.      And what were your duties?

11      A.      So I was responsible for all of the

12  preparedness response, crisis management, grant

13  funding, and joint commission compliance as it

14  related to the function of emergency management for

15  Johns Hopkins Medicine.

16      Q.      And prior to being employed at Johns

17  Hopkins Medicine, where were you employed?

18      A.      Baltimore City.

19      Q.      Okay.  And during what time period were

20  you employed by the city of Baltimore?

21      A.      So I was employed -- I started my

22  employment for the city March 31st, 1997, and I

1  retired 20 years later from that, so whatever that

2  date, the date.

3        Q.    Quite a long time.

4        A.    Yes.

5        Q.    Could you walk me through what time

6  periods the different titles that you held at the

7  City of Baltimore, and what your duties were for each

8  title?

9        A.    Yes, I can do that to the best of my

10  recollection, so -- as far as the dates go.

11        Q.    Okay.

12        A.    So I came in to the Fire Department at

13  the rank of an apprentice, firefighter, paramedic

14  apprentice, and at some point within my career, I

15  think within five years, I was appointed to

16  lieutenant based on taking a civil service exam.

17              At some point in my career, I left civil

18  service protection and entered into management.  I

19  was given the title of Fire Department chief of

20  staff.  Previous to that I did some instruction at

21  the Fire Academy, teaching paramedics.

22              When I was the chief of staff of the

20

1  Fire Department, I had assumed the day-to-day

2  responsibilities of emergency management for the

3  chief of the Fire Department.  When he -- his name

4  was William J. Goodwin.  When he retired, I took the

5  acting role of the city's emergency manager.  That

6  was officially confirmed by Mayor Dixon during her

7  tenure, and I remained in that position until two

8  thousand -- I -- I still was the city's emergency

9  manager.  I took on additional duties at City Hall

10  under the title of deputy mayor of public safety.  I

11  remained in the Fire Department.  I was detailed to

12  City Hall.  That lasted until January of 2015, to

13  which time I returned to functioning solely as the

14  city's emergency manager within the Fire Department.

15      Q.    Okay.  And after -- in January of 2015,

16  after you returned back to become the city's

17  emergency manager?

18      A.    Yeah.

19      Q.    You remained in that role until you went

20  to Johns Hopkins Medicine?

21      A.    That's right.

22      Q.    And can you explain your duties as a

24

1   minute-by-minute at this point.  We'll get to that

2   later.

3              But just to make sure we're referencing

4   the same days, could you just summarize what happened

5   on April 25th and what happened on April 27th?

6       A.    Yeah.  So Saturday the 25th was a day of

7   major protests in the city.  It followed a period of

8   multiple protests that had led up to that particular

9   Saturday.  And there was unrest that evening, that

10  afternoon and evening.  I would describe it as civil

11  disobedience.

12             And then Monday was the day of

13  Mr. Gray's funeral.  And during that day, later on in

14  the afternoon was the civil disobedience that took

15  place on the day of his funeral.

16      Q.    Now, if we could start, Mr. Maloney,

17  with the arrest of Freddie Gray.  When do you first

18  recall hearing about the circumstances of Freddie

19  Gray's April 12th, 2015, arrest?

20      A.    I don't remember.

21      Q.    Okay.  Do you recall hearing about the

22  circumstances of his arrest before his death on

1   April 19th, 2015?

2       A.      I think so.

3       Q.      What do you recall hearing about the

4   circumstances of his arrest prior to his -- his

5   passing?

6       A.      I recall that during -- you know, during

7   my career there were times where events and

8   circumstances would come onto my radar where I would

9   think, you know, this is something that's exceptional

10  or extenuating or will require a response.

11              And at the time, you know, there were

12  other events in the country that had -- had got my

13  attention, specifically Ferguson, and so I remember

14  at some point learning about the case, and then

15  thinking, you know, these -- this is something that

16  could possibly, you know, lead into civil unrest

17  here.  But I can't tell you the dates or...

18      Q.      Sure.

19      A.      I mean.

20      Q.      But you're already thinking that prior

21  to his passing, correct, given the circumstances of

22  his arrest and him being in the hospital?

1    BY MR. HWANG:

2         Q.     Sure.  [audio distortion] And that

3    moniker, "Mayor's Emergency Management Office," or

4    office of --

5         A.     Mayor's Office of Emergency Management,

6    and the acronym is MOEM, M-O-E-M.

7         Q.     Right.  So when did it start -- when did

8    the city start using that moniker and that acronym?

9         A.     Somewhere around -- I'm thinking it was

10   somewhere around 2001.

11        Q.     Okay.  And so it was still referred to

12   as MOEM or the Mayor's Office of Emergency Management

13   in -- in 2015, correct?

14        A.     Yes.

15        Q.     Now, do you recognize the acronym EOC?

16        A.     Yes.

17        Q.     Okay.  And -- and what do you understand

18   the EOC to be?

19        A.     So the EOC is the physical emergency

20   operations center where representatives go to control

21   and coordinate in a time of crisis.  And Baltimore

22   has two, two locations.

36

1   MSP to assist."  Okay.

2             Not in particular.  Not in particular do

3   -- do I recall the events, but I have no reason to

4   believe they didn't transpire.

5        Q.    Sure.  Generally speaking, the protests

6   leading up to April 25th, do you recall them

7   generally increasing in size?

8        A.    I think that would be accurate.

9        Q.    Okay.

10       A.    I mean, there were so -- there were so

11  many different types of -- or so many different

12  protests, you know, in different locations of the

13  city.  But gradually, yes, the size of the protests

14  increased.

15       Q.    Okay.  Now, as -- and I want you to stay

16  before April 25th.  We'll talk about April 25th

17  onward later.

18       A.    Okay.

19       Q.    But before April 25th or leading up to

20  that, as the protests are increasing in size, do you

21  recall having meetings within OEM as to how to deal

22  with these protests?

43

1          MR. HWANG:  So 06 is an e-mail chain

2      produced by the City, Bates stamped CITY00008781

3      through 82.

4               07 is CITY00008860.

5               08 is CITY00008777.

6               Exhibit 09 is CITY00054332.

7               Exhibit 10 is CITY00053351.

8               THE WITNESS:  Okay.  6, I've read.

9               Do you want me to move on to 7?

10  BY MR. HWANG:

11      Q.    Sure.  And, again, this is just to give

12  you context.

13      A.    Sure.  Sure.  You know, this time I'm

14  questioning whether or not Connor was at City Hall as

15  well.  It seems like there's a level of detail that

16  I'm asking from him or to exchange that would be

17  more -- is -- if he was working directly with me as

18  opposed to City Hall.

19      Q.    Okay.

20      A.    But at one point in time he went down

21  and took over as the deputy mayor of operations.  But

22  I'm -- I'm not sure when that was.  So -- okay.  Now,

1  all right.

2          "Is David in the loop?"

3          "Yes."

4          "Briefed David about the arrest."

5          Okay.  I got that one.  This is

6  Thursday.  Okay.  And this is the -- okay.  7 and 8

7  look the same to me.

8      Q.    They're very similar.  I think the only

9  difference is what's at the top.

10      A.    Okay.  9, I just finished.  Okay.  Jeff

11  Segal was the chief of administration in the Fire

12  Department at that time.  And Mark Wagner was the

13  chief of operations in the Fire Department.  Chief

14  Ford was the fire chief.

15          Okay.  So that -- and then 11?

16      Q.    Oh, no, no.  Just that.  You can stop.

17      A.    Okay.

18      Q.    So you're a party to all the e-mails

19  that are included in Exhibits 6 through 9, correct?

20      A.    Yes.

21      Q.    And Exhibit 10, you sent the original

22  e-mail, that's the oldest e-mail, at 7:18 p.m. in

1    Exhibit 10, correct?

2         A.    Okay.

3         Q.    Now, if you could direct your attention

4    first to Exhibit 6.  Now, as -- as you're reading

5    through this, is it your recollection that the

6    protests on April 23rd were worse than those that

7    occurred on prior days?

8         A.    You know, unless there's other e-mails

9    that show that other days were worse, you know, I

10   would just say it seems to me by reading these

11   e-mails that things were escalating on Thursday.

12        Q.    Okay.  Now, if you look at Exhibit 6, do

13   you see a reference to two arrests that were made

14   during the protests?

15             That -- in that e-mail chain it was the

16   e-mail sent at 6:16 p.m.?

17        A.    Yes.

18        Q.    Okay.  So there's reference to two

19   arrests there.

20             And then if you look at 07, shortly

21   thereafter, on the same day at 7:24 p.m., Connor

22   says, "Yes.  Briefed David about the arrests."

64

1          MR. HWANG:  Okay.  We can move on to

2     Exhibit 11.

3               [Exhibit 11, an e-mail chain, 4/24/2015,

4     was marked for identification.]

5               THE WITNESS:  Okay.

6  BY MR. HWANG:

7     Q.     Which is an e-mail chain produced by the

8  City at CITY00054378.

9     A.     Okay.  Got it.

10    Q.     And I'll give you a minute.

11               But you -- you're a party to this e-mail

12  chain, correct?

13    A.     Yes.

14    Q.     Okay.

15    A.     It looks like I sent it.

16    Q.     And this --

17    A.     It's number 11?

18    Q.     Yes.  Number 11.

19    A.     Yeah.

20    Q.     Now, in the earliest e-mail, which is

21  the e-mail at the bottom -- that you sent to David

22  McMillan at 8:29 a.m. on April 24th, 2015 --

66

1   to working on the weekends.

2          Does that make sense?

3      Q.     Okay.

4      A.     So the assumption could -- it could very

5   well be that I realized that the protests were

6   gaining in momentum and size.  I don't necessarily --

7   I mean, I guess I recall that, but I -- without

8   reading too much into it, I -- you know, I don't know

9   if I'm saying to him, you know, I just need you to --

10  I just need you to be at work, or I need you to not

11  take off, or something like that.

12     Q.     Okay.  In the e-mail above it that

13  Mr. McMillan sent to you at 9:20 a.m. that same day?

14     A.     Yes.

15     Q.     He stated that he was going to meetings

16  with the Baltimore Police Department at 10:00 a.m.

17  and 1:00 p.m.

18          Do you see that?

19     A.     I do.

20     Q.     Why would Mr. McMillan be attending

21  meetings with the Baltimore City Police Department at

22  that time?

67

1          A.     So I'm assuming that the planning

2     meetings for the protests at that point were taking

3     place at the Watch Center, and so either David was

4     saying he's attending.  Either David was -- helped to

5     coordinate in that meeting, or he was attending an

6     operational meeting for the BPD.

7          Q.     Okay.  And what would be discussed at

8     these meetings?

9          A.     You know, a whole host of things:  What

10    happened during the week, what -- what is scheduled

11    coming up.  I would imagine, you know, at this point

12    -- and this is Friday the 24th -- there is no doubt

13    that the intel was telling the City that there were

14    going to be major numbers at the Saturday protest.

15    And at that time I believe there were reports that --

16    that they were going to be -- you know, there was

17    going to be a walk from West Baltimore down to City

18    Hall.

19          Q.     Okay.  And at these meetings, would

20    police strategy be discussed as far as, you know, how

21    they intended to approach protesters or deal with

22    protesters?

**ORIGINAL TRANSCRIPT**

68

1      A.      Probably.  Probably, yes.

2      Q.      Okay.  What do you recall hearing about

3  what the Baltimore City Police Department's strategy

4  was or tactics they would use in dealing with

5  protesters?  Specifically we're talking April 24th

6  leading up to April 25th, right?

7      A.      Yeah.  So I remember there was a --

8  there was -- one of the things that I conveyed to my

9  interior people, and if I was at any of those

10  meetings, is that our job is to protect the

11  protesters.

12          We -- we have to -- there are certain

13  people that want to cause harm to the protesters.

14  And at the time, I don't know if that had actually

15  manifested itself anywhere in the country, but either

16  right before that or shortly after that period, there

17  was an event in Minnesota where a group of

18  individuals harmed people who were protesting.  And

19  our -- you know, it would have been discussions about

20  proper equipment.  It would have been discussions

21  about making certain that if trucks were needed to

22  block certain streets, or if bike racks were needed

**ORIGINAL TRANSCRIPT**

70

1    protesters?

2         A.    Yes.  Well, I just think that -- you

3    know, there were -- I remember there were passions

4    running high during this period where, you know,

5    there is a whole host of other day-to-day activities

6    that you have in this job.  And I'm a veteran, and so

7    one of the things that's really important to me is

8    people's First Amendment rights.  So I felt in my

9    role in leadership, it -- you know, I wanted to kind

10   of convey to people that what makes this country

11   great is that people can protest without getting

12   their heads chopped off.  And I know I was always

13   trying to remind people that, given the level of

14   fatigue that, you -- you know, was -- was -- was

15   happening.

16              And so now I guess, you know, there must

17   have been a lot of activity that week, because I was

18   thinking in those -- in those terms.

19        Q.    Sure.  And if -- if you're thinking

20   along those terms and you're relaying that message to

21   others at OEM, what are you doing or what is OEM

22   doing to try to, quote-unquote, protect protesters as

71

1   much as possible?

2        A.    Well, I think that's more of a -- of a

3   -- you know, OEM's function is to coordinate so that

4   the proper agency can function.  And I would view

5   that as a function of the Police Department, where,

6   you know, you have a scenario where there's, you

7   know, a bunch of people coming together and, you

8   know, you have to be thinking of all things.

9             I recall one night -- and I'm thinking

10  this -- I don't know if this was before or after, but

11  I remember there was a pick-up truck at one of the

12  lights downtown, and I was watching it.  We were all

13  watching it.  And -- and a tactical maneuver was made

14  to get to the intersection because we felt that the

15  driver of the truck, for some reason, was getting

16  ready to run people over.

17            MR. HWANG:  Okay.  So if we can mark

18       Exhibit 12, please.

19            [Exhibit 12, an e-mail chain, 4/24/2015,

20       was marked for identification.]

21  BY MR. HWANG:

22       Q.    12 is an e-mail produced by the City as

1      13, please.

2           [Exhibit 13, an e-mail chain, 4/22/2015,

3      was marked for identification.]

4  BY MR. HWANG:

5      Q.    And Mr. Maloney, if you can kindly open

6  13 as well.

7      A.    Sure.

8      Q.    While you're looking at it, I'll

9  identify it:  It's an e-mail chain produced by the

10 City as city -- Bates-stamped CITY00054571.

11     A.    Okay.

12     Q.    Now, you're a party to this e-mail

13 chain, correct?

14     A.    Yes.

15     Q.    Now, this e-mail chain occurred on

16 April 22nd and discusses something happening on

17 Saturday at 3:00 p.m.

18           Do you see that?

19     A.    Yes.

20     Q.    Now, by my calculations, Saturday after

21 April 22nd would have been April 25th, 2015?

22     A.    Yes.

1    Q.    To what does this e-mail chain refer to

2  as happening at 3:00 p.m. on April 25th, 2015?

3    A.    Probably the -- I guess -- you know,

4  whether or not we were calling it at that point, or

5  it -- we referred to it later on, but that was the

6  Shabazz protest -- protests.

7    Q.    Okay.  So I'll refer to it also as the

8  Shabazz protest.

9    A.    Okay.

10    Q.    The Shabazz protests on April 25th,

11  2015, was already on your radar on April 22nd, 2015,

12  then; is that correct?

13    A.    It appears so.  Yeah.

14    Q.    Okay.  I mean, what about that expected

15  protest made it appear on your radar that early and

16  made you pay attention to it?

17    A.    I'm thinking -- I'm thinking it was the

18  numbers, and -- and now I believe that there was

19  conversations at some point that there -- you know,

20  outsiders were going to come in.

21    Q.    Okay.  And what conversations do you

22  recall about outsiders coming in?

78

1      A.      You know, I don't remember specific

2   conversations with people.  But it seems like I had

3   the sense that this protest was going to be different

4   than all the protests, which up at that point I think

5   we had a sense that most of the participants were --

6   were local.  Although, you know, that appeared --

7   that -- after, you know, researching it later on,

8   that wasn't the case.  There were -- there was

9   outsiders here all week.

10      Q.      Okay.  Well, the thought that outsiders

11   are coming in, would that be a cause for increased

12   concern?

13      A.      I'm thinking that there were -- there

14   was -- you know, the Ferguson riots or the Ferguson

15   events, there were individuals saying that the -- the

16   unrest was not caused by the people who live there,

17   but it was individuals that came in and exacerbated

18   it.

19      Q.      Okay.

20      A.      But I got to tell you, like, back then,

21   I didn't have a concept of what that meant as I do

22   now.

1    information based on that from various websites and

2    information, the crowd estimates that, you know, the

3    police would put together, you know, based on the

4    different protests.

5        Q.    Okay.  And the numbers that you were

6    hearing to be expected for Saturday, April 25th, did

7    those numbers far exceed the size of the protests

8    that preceded that day?

9        A.    I -- I would assume so.  I would assume

10   so.

11       Q.    Okay.  And was OEM taking any additional

12   steps in light of this expected increase in the

13   number of expected protesters?

14       A.    So based on the e-mails that I just

15   read, the fact that we were -- you know, David was in

16   some meetings, most likely I was probably in some

17   meetings.  You know, the answer is yes.

18       Q.    Okay.  So what additional steps?

19       A.    Probably, you -- you know, just an

20   increased awareness, an increased coordination.  You

21   know, just trying to figure out -- I mean, any day in

22   the city, you're trying to figure out, you know, the

81

1    lay of the land.  So I guess that -- that series of

2    -- you know, the e-mails before we looked at had to

3    do with another public gathering that would require,

4    you know, resources.  So -- but, you know, there was

5    no doubt we -- we were thinking about that Saturday.

6         Q.    Okay.

7         A.    That's -- that protest was on our radar.

8         Q.    Now --

9         A.    In particular why, I -- I don't

10   necessarily recall.

11        Q.    Okay.

12        A.    I remember the Shabazz.  I'd never heard

13   of -- of that person, and I -- you know, I just was

14   told that this person was coming in.  And there was

15   some meeting I attended, this person was coming in

16   and that maybe there had been places where that

17   individual had been before where things had broken

18   out.

19        Q.    Okay.  I mean, what -- what kind of

20   intel like that were you receiving about Shabazz?

21        A.    So it was interesting.  You know, I can

22   honestly say that I normally didn't receive intel

1       to keep everybody safe.

2                MR. HWANG:  Sure.  Madam court reporter,

3       if you could, if you don't know how to spell

4       something, if you could just phonetically spell

5       it and then ask us later on, instead of

6       interrupting our line of questioning, I would

7       appreciate it.

8                COURT REPORTER:  Okay.  Sure.

9  BY MR. HWANG:

10      Q.    Now, Mr. Maloney, you referred to the

11  first unrest on April 25th, 2015, as happening -- did

12  you say by City Hall?

13      A.    Yes.

14      Q.    Okay.  So you're talking -- you're not

15  talking about Camden Yards, then?  You're talking --

16      A.    No.

17      Q.    Okay.  And when you say unrest at City

18  Hall, I mean, what happened there?

19      A.    There were kids jumping on top of the

20  bus stop.  There were kids -- there were kids, you

21  know, kicking and punching cars.  There was a group

22  of individuals that, at some point when the protest

1   was over, ran in a group down South Street, up along

2   the Harbor Promenade and going through the Harbor

3   Place, I believe, tipping tables of diners.  And

4   there was also vehicles that went -- went up into

5   that area as well.  So it was kind of like a mass

6   exodus towards the stadium.

7       Q.    Okay.  And the -- the violence and

8   property destruction you saw with respect to the

9   first unrest that you're referring to, on April 25th,

10  that Saturday, 2015, you referred to "kids."

11          Was it mainly kids?

12      A.    You know, that's what -- that's the

13  sense I had when I -- still to this day of what --

14  you know, the film that I saw.

15      Q.    Okay.

16      A.    Now, that was initially, you know --

17  once -- you know, if you review footage from the

18  Camden Yards, you know, it's adults and children.

19      Q.    Okay.  And so would you call Camden

20  Yards on April 25th, 2015, the second unrest on that

21  day?

22      A.    Yes.

1      Q.     And -- and what happened at Camden

2   Yards?

3      A.     So there were -- the first -- you know,

4   just to kind of compartmentalize it, the first major

5   event that happened was -- there was police cars that

6   were parked on Howard Street and they were destroyed.

7   And there was, you know, police there in riot gear.

8   There was, you know, a ton of protesters, but they

9   were, you know, destroying those cars.

10              And then there was an incident in front

11   of the bars and restaurants, Pickles and Sliders.

12   There was, you know, a plethora of activity around

13   the Harbor and Camden Yards, you know, throughout the

14   course of that evening.

15      Q.     Okay.  What kind of activity.  But you

16   mentioned Pickles and another --

17      A.     Yeah, so tables overturned, fights

18   amongst people, windows smashed, trash cans set on

19   fire.  I don't think we had any vehicle fires that

20   night; I don't recall.  But it was definitely a

21   turning point.

22              So, you know, for me as the emergency

1  manager, there was a before and after.  There was --

2  you know, from Ferguson, there was all these

3  protests, and there just -- you know, things did not

4  exacerbate to where there was civil disorder, civil

5  disobedience, an increased level of danger to

6  civilians and protesters and officers and firemen.

7  But that all changed on Saturday.

8      Q.    Okay.  Saturday was a pretty significant

9  event, then?

10     A.    Oh, yeah.

11         MR. HWANG:  Now, if we can mark

12     Exhibit 15, please.  Did we mark it already?

13     Oh, we did mark it.  I'm sorry.

14 BY MR. HWANG:

15     Q.    So you're at the Watch -- you report to

16 the Watch Center on April 25th?

17     A.    Yes.

18     Q.    Where was Connor Scott at that time?

19     A.    Hold on.  I inadvertently clicked 16.

20 So I just closed that.

21         Where was Connor Scott at the time -- so

22 I don't -- I don't know the answer to that.  I know

122

1    second-guessing about responding to both medical

2    emergencies and fires.  And I figured that's where I

3    could help the most.

4        Q.    Okay.  I mean, on April 25th, 2015, if

5    the Fire Department is not respond -- or is hesitant

6    to respond to emergencies, I mean, at this point it's

7    an emergency beyond normal operating procedures,

8    right?

9        A.    Correct.

10       Q.    When Kaliope Parthemos was there, do you

11   recall whether that was, you know, before, during, or

12   after the events at City Hall and Camden Yards, the

13   violence and destruction?

14       A.    Well, I'm thinking it would have had to

15   be after, because, you know, I didn't arrive till --

16   till after, you know, that had started.  It seemed to

17   me -- you know, I don't remember watching any of that

18   live.  I -- I remember getting updates about it, but

19   I don't remember watching any of that, you know,

20   live, whether it was on TV or any of the cameras.

21              But at some point I got there, and then

22   the activity starts -- you know, I was involved in

1          Now, there were -- there were instances

2   of National Guard showing up at supermarkets, and

3   there was questions on why they were there.  But, you

4   know, I don't have that.  Those were conversations

5   about self-deployment and stuff.

6          Q.     You say that far more resources from

7   outside jurisdictions, by way of law enforcement

8   officers, came after the state of emergency was

9   declared than had come before?

10         A.     Yes.

11         Q.     Significantly more?

12         A.     Yes.

13         Q.     Do you by chance remember the numbers,

14  how much more?

15         A.     No.  I mean, it's -- there were some

16  days where there was, you know, a lot of mutual aid

17  to help us to get through, you know, the different

18  protests.  I do know that there was -- one of the

19  things that -- there was a -- there was -- there was

20  a chatter that, you know, the City police -- there --

21  there was all these different accusations about

22  Mondawmin.

223

1    says, "Bob, mayor said use of force is what got us

2    here in the first place, and so we don't know if

3    arresting those who stopped traffic would have

4    stopped it at all or inflamed it or no difference at

5    all"?

6            A.      Yes.

7            Q.      You don't recall having a discussion

8    about this within OEM or with the mayor's office?

9            A.      That particular statement?

10           Q.      No.   That particular topic.

11           A.      No.   I remember, you know, during the --

12   after the riots, I think the mayor said, you know,

13   use of force is what got us here in the first place.

14   But I -- you know, I don't know if we had -- I don't

15   know if we had in-depth conversations on philosophy.

16           Q.      Or -- I mean, or strategy for that

17   matter?

18           A.      Yes.

19           Q.      You don't recall that during the --

20   during the protesting or riots?

21           A.      I don't.

22           Q.      If you go towards the bottom of the

**ORIGINAL TRANSCRIPT**

246

1            CERTIFICATE OF REPORTER/NOTARY PUBLIC

2

3            I, Goldy Gold, a Notary Public within and

4   for the State of Maryland, do hereby certify that the

5   within-named witness personally appeared before me at

6   the time and place herein set out, and after having

7   been duly sworn by me, according to the law, was

8   examined by counsel.

9            I further certify that the examination was

10   recorded stenographically by me and this transcript

11   is a true record of the proceedings.

12            I further certify that I am not of counsel

13   to any of the parties, nor in any way interested in

14   the outcome of this action.

15            As witness my hand and notarial seal this

16   6th day of January, 2021.

17

18                    _____

19                      GOLDY GOLD, RPR
                       Notary Public

20

21

22   My Commission Expires:  April 21, 2024

# EXHIBIT 8

## In The Matter Of:

*CHAE BROTHERS, LIMITED LIABILITY COMPANY, ET AL. v.*
*MAYOR AND CITY COUNCIL OF BALTIMORE, ET AL.*

---

*CONNOR SCOTT*
*December 18, 2020*
*ORIGINAL TRANSCRIPT*

---

*CourtScribes, Inc.*
*"Delivering More For Less"*
*(833) 727-4237*
*info@courtscribes.com*
*www.courtscribes.com*

1

1        IN THE UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF MARYLAND

3               NORTHERN DIVISION

4    --------------------------
CHAE BROTHERS LIMITED
5    LIABILITY COMPANY, et al.,

6          Plaintiffs

7    v.                              Civil Action No.
                                     1:17-cv-01657-SAG
8
MAYOR & CITY COUNCIL OF
9    BALTIMORE, et al.,

10          Defendants.

11   --------------------------

12

13

14

15        VIDEOCONFERENCE DEPOSITION OF CONNOR SCOTT

16              Baltimore, Maryland

17           Friday, December 18, 2020

18                 9:00 a.m.

19

20

21   Reported by:  Goldy Gold

22

**ORIGINAL TRANSCRIPT**

2

1                       Date: December 18, 2020

2                       Time:  9:00 a.m.

3

4

5           VIDEOTAPED DEPOSITION OF CONNOR SCOTT,

6       taken by Counsel for Plaintiffs, in the

7       above-titled matter, on December 18, 2020,

8       commencing at 9:00 a.m. and reported by Goldy

9       Gold, a Registered Professional Reporter and a

10      Notary Public within and for the State of

11      Maryland.

12

13

14

15

16

17

18

19

20

21

22

3

1   A P P E A R A N C E S (remote parties):

2

3   On Behalf of the Plaintiffs:

4       PETER K. HWANG, ESQUIRE
        Sung & Hwang, LLP
5       9256 Bendix Road - Suite 109
        Columbia, Maryland 21045
6       Telephone:  410.772.2324
        E-mail:  phwang@sungandhwang.com

7

8
    On Behalf of the Defendants:
9
        SARA E. GROSS, ESQUIRE
10      HANNA MARIE C. SHEEHAN, ESQUIRE
        Baltimore City Department of Law
11      100 North Holliday Street
        Baltimore, Maryland 21202
12      E-mail:  saragross@baltimorecity.gov

13
    Also Present:
14
        Ian Wallach, Videographer
15

16

17

18

19

20

21

22

**ORIGINAL TRANSCRIPT**

1

1                           I N D E X

2                   Deposition of Connor Scott

3                       December 18, 2020

4    EXAMINATION BY                              PAGE

5    Mr. Hwang                                     5

6    Ms. Gross                                   153

7                        E X H I B I T S

8    EXHIBITS              DESCRIPTION            PAGE

9
     Exhibit 1     A subpoena, 11/12/2020          9
10
     Exhibit 2     Protective Order and Agreement, 12
11                 5/22/2018

12   Exhibit 3     Amended Complaint, 4/27/18      23

13   Exhibit 4     An e-mail and an attachment,    29
                   4/17/2015
14
     Exhibit 5     An e-mail, 4/22/2015            31
15
     Exhibit 6     An e-mail chain, 4/22/2015      31
16
     Exhibit 7     An e-mail chain, 4/23/2015      40
17
     Exhibit 8     An e-mail chain, 4/23/2015      40
18
     Exhibit 9     An e-mail chain, 4/23/2015      40
19
     Exhibit 10    An e-mail chain, 4/22/2015      52
20
     Exhibit 11    An e-mail, 4/25/2015            59
21
     Exhibit 12    An e-mail chain, 4/25/2015      62
22

                  E X H I B I T S (continued)

2

1

EXHIBITS            DESCRIPTION            PAGE

2

3   Exhibit 13    An e-mail chain, 4/25/2015        78

    Exhibit 14    An e-mail and attachment,         83
4                 4/25/2015

5   Exhibit 15    An e-mail chain, 4/25/2015        85

6   Exhibit 16    An e-mail chain, 4/25/2015        87

7   Exhibit 17    An e-mail chain, 4/25/2015        95

8   Exhibit 18    An e-mail chain, 4/27/2015        98

9   Exhibit 19    An e-mail chain, 4/27/2015       103

10  Exhibit 20    An e-mail chain, 4/27/2015       111

11  Exhibit 21    (not marked)

12  Exhibit 22    An e-mail chain, 4/28/2015       114

13  Exhibit 23    An e-mail chain, 4/28/2015       115

14  Exhibit 24    An e-mail chain, 4/28/2015       117

15  Exhibit 25    An e-mail chain, 4/29/2015       118

16  Exhibit 26    "Baltimore Civil Unrest, April   120
                  2015
17
    Exhibit 27    "Baltimore Region Emergency      123
18                Assistance Compact,"

19  Exhibit 28    (not marked)

20  Exhibit 29    An e-mail, 4/28/2015             129

21  Exhibit 30    An e-mail chain, 4/30/2015       131

22

3

1                    E X H I B I T S (continued)

2       EXHIBITS                 DESCRIPTION                    PAGE

3       Exhibit 31
                         "Timeline of Events, Baltimore       133
4                        City Protest & Riots,"

5       Exhibit 32       "After-Action Review, Civil           136
                         Unrest, April 27th, 2015,"
6
        Exhibit 33       "A1 CD (4/25 1200-1159),"            137
7
        Exhibit 34       "After-Action Report Notes            139
8                        Hosted by JHU Center for Public
                         Health Preparedness and MOEM,"
9                        6/23/2015

10

11

12

13

14

15

16

17

18

19

20

21

22

**ORIGINAL TRANSCRIPT**

4

1                    P R O C E E D I N G S

2              VIDEOGRAPHER:  Good morning.  We are on

3        the record.  Today's date is December 18th,

4        2020.  The time is 9:05 a.m.  I am Ian Wallach,

5        the videographer.  The court reporter is Goldy

6        Gold.

7              We are here for the video-recorded

8        deposition of Connor Scott, taken by the

9        plaintiffs, in the matter of Chae Brothers

10       Limited Liability Company, et al., versus

11       Baltimore Mayor and City Council, et al., case

12       number 1:17-CV-01657-GRL.

13             Will counsel please announce their

14       appearances for the record.

15             MR. HWANG:  Good morning.  Peter Hwang,

16       on behalf of all the plaintiffs.

17             MS. GROSS:  Good morning.  Sara Gross

18       and Hanna Sheehan on behalf of the defendant

19       Mayor and City Council of Baltimore.

20             VIDEOGRAPHER:  Thank you.

21             Will the witness please state and spell

22       their name for the record.

**ORIGINAL TRANSCRIPT**

5

1            THE WITNESS:  Connor Scott, C-o-n-n-o-r,

2        S-c-o-t-t.

3            VIDEOGRAPHER:  Thank you.

4            The court reporter will now swear in the

5        witness, after which counsel may proceed.

6    WHEREUPON,

7                        CONNOR SCOTT,

8    was called as a witness, having been duly sworn by a

9    Notary Public, was examined and testified as follows:

10                        EXAMINATION

11    BY MR. HWANG:

12        Q.    Good morning, Mr. Scott.  As you know,

13    my name is Peter Hwang, and I represent the

14    plaintiffs in this action, who are suing the mayor

15    and city council of Baltimore for, among other

16    things, damages to plaintiffs' property and

17    businesses.

18            As you may know, we're here for a

19    deposition, which will consist of me asking you

20    questions and you providing answers to those

21    questions.

22            As you can see, there's a court reporter

**ORIGINAL TRANSCRIPT**

17

1        Hospital in St. Petersburg, Florida.

2    BY MR. HWANG:

3        Q.    Okay.  And as chief of staff -- you're

4    chief of staff to -- to whom?

5        A.    So I was chief of staff to the

6    vice-president for security.  And when that position

7    was vacated, I became the acting.  And the chief of

8    staff position is essentially a second-in-command

9    position, so it's, you know, also overseeing the

10   organization, but more on a -- operational, sort of

11   carrying out tasks, sort of level, rather than

12   overseeing, which is what I do now.

13       Q.    Sure.

14       A.    In the [audio distortion.]

15       Q.    And prior to being employed at Johns

16   Hopkins, where were you employed?

17       A.    I worked for the City of Baltimore.

18       Q.    Okay.  And for how long did you work for

19   the City of Baltimore?

20       A.    I started with the City of Baltimore, I

21   believe, in April of 2011.

22       Q.    Okay.  And then you -- you worked there

1  until 2018 or so?

2      A.    Correct.  I believe it was April of '18.

3      Q.    Okay.  For that approximately seven-year

4  period, could you walk me through the different

5  titles that you've held, and for each title, the

6  duties that you had?

7      A.    Sure.  So I began as -- in April of

8  2011, I believe that was the start time, time frame

9  -- I started as an emergency planner for the Office

10  of Emergency Management, which is part of the Fire

11  Department.

12      And my responsibilities were to

13  coordinate emergency preparedness activities relating

14  to different planning initiatives that the

15  organization had, such as emergency preparedness for

16  the city schools, extreme weather preparedness.

17  Things along those lines.

18      It was after I was in that position for

19  a while, I was promoted to the deputy director of

20  emergency management, where I was the second in

21  command of the Office of Emergency Management, which

22  at the time was an agency of -- probably about ten

**ORIGINAL TRANSCRIPT**

19

1   full-time people, still part of the Fire Department.

2   And I left that role for a position with the mayor's

3   office as the assistant deputy mayor for operations.

4            In that role, I helped to coordinate the

5   activities of the city operational agencies, which

6   are the agencies such as Department of

7   Transportation, Department of Public Works,

8   Department of General Services, Mayor's Office of

9   Information Technology and a couple other smaller

10  agencies.

11           I left that position to become the

12  deputy director of operations for the City Department

13  of Transportation.  In that role I was responsible

14  for the operational entities of transportation, which

15  were everything ranging from maintenance to capital

16  improvement, planning, snow removal, and traffic

17  management.  Things along those lines.

18      Q.    Okay.  I just want to establish a

19  timeline here.

20           So you started out as an emergency

21  planner in April of 2011.  When did you become the

22  deputy director of OEM?

**ORIGINAL TRANSCRIPT**

20

1       A.    I could -- you know, if I -- if you

2   wanted me to go back and look at, you know, résumé or

3   whatnot, I can get you the exact dates.  But I can

4   ballpark it for you.  I believe it was 2013, at some

5   point in 2013 where I became the deputy director.

6   And then it would have been, I believe, October of

7   2015, I left emergency management to go to the

8   mayor's office.  So October of '15 to October '16.

9   So October of '16, [audio distortion] left to go work

10  for the Department of Transportation.  And then I

11  believe it was from October '16 to April of '18 that

12  I worked for Transportation.

13          But that's off the top of my head.

14      Q.    If I say "OEM," do you understand I'm

15  referring to the Office of Emergency Management?

16      A.    Yes.

17          COURT REPORTER:  Can you hold on a

18      minute?

19          [Technical interruption.]

20          COURT REPORTER:  Okay.

21  BY MR. HWANG:

22      Q.    Can you describe what OEM does?

1        was marked for identification.]

2   BY MR. HWANG:

3        Q.      And, Mr. Scott, if you can kindly open

4   those documents as well.

5                Exhibit 05 is an e-mail produced by the

6   City as CITY00007430, and 06 is an e-mail chain

7   produced by the City, marked CITY00008255.

8        A.      Okay.

9        Q.      So we'll start with 05, Mr. Scott.

10               You sent that e-mail, correct?

11       A.      I did.

12       Q.      Okay.  And you sent it to Robert Maloney

13   and David McMillan.

14               Do you recall what their roles where at

15   that time?  And this is on April 22nd, 2015.

16       A.      I believe -- so Robert Maloney was the

17   emergency manager for the city.  He had recently -- I

18   believe at this point he had recently transitioned

19   from being the deputy mayor to being the director of

20   emergency management.  And then David McMillan, I

21   believe, at the time was the assistant deputy mayor

22   for operations, I believe.  I believe that was --

40

1    know, revisit planning documents or that sort of

2    thing.

3          Q.      Okay.

4          A.      And that's how it's supposed to work.

5    You know, you're not supposed to -- you develop a

6    plan not so that [audio distortion] you all sit down

7    at the table and read it when an emergency is

8    happening.  The idea is to, you know -- the planning

9    document is really just documentation of the

10   preparedness efforts and training activities that

11   have gone into what you're getting ready for.

12              MR. HWANG:  Madam court reporter, if you

13        can mark 07, 08, and 09, please.

14              [Exhibit 7, an e-mail chain, 4/23/2015,

15        was marked for identification.]

16              [Exhibit 8, an e-mail chain, 4/23/2015,

17        was marked for identification.]

18              [Exhibit 9, an e-mail chain, 4/23/2015,

19        was marked for identification.]

20   BY MR. HWANG:

21        Q.    So 07 is an e-mail chain produced by the

22   City as CITY00008781 through 82.  08 is an e-mail

1  chain produced by the City as CITY00008860.  09 is

2  also an e-mail chain produced by the City as

3  CITY00008777.

4            Now, Mr. Scott, are you on all these

5  e-mail chains in Exhibits 07, 08, and 09?

6       A.    I am, yes.

7       Q.    And these are all e-mail chains that

8  were -- were sent and received on April 23rd, 2015;

9  is that correct?

10      A.    Yes.

11      Q.    Okay.  [Audio distortion] look at them

12  real quick?

13      A.    I'm sorry?

14      Q.    Look through them real quick?

15      A.    Yep.  I've been doing that, 7, 8, 9.

16      Q.    So -- sure.  And 05 and 06, again, that

17  was from April 22nd.

18            Now looking at 07, 08, and 09, protests

19  continued on April 23rd; is that correct?

20      A.    Yes.

21      Q.    Okay.  Now, if I could direct your

22  attention to 07 first.

52

1    typical for her to stop by our office.

2              So that would be something I would

3    remember, and I don't remember that.  Yeah.

4              MR. HWANG:  Okay.  Madam court reporter,

5        if we can mark 10.

6              [Exhibit 10, an e-mail chain, 4/22/2015,

7        was marked for identification.]

8    BY MR. HWANG:

9        Q.    Exhibit 10 is an e-mail chain produced

10   by the City as CITY00054571.

11       A.    Okay.

12       Q.    And you're a party to this e-mail chain,

13   correct, Mr. Scott?

14       A.    I am, yeah.

15       Q.    Now, this e-mail chain happened on

16   April 22nd, 2015, and discusses something happening

17   on Saturday at 3:00 p.m.

18              Do you see that?

19       A.    Yes, I do.

20       Q.    So by my calculations, the Saturday

21   after April 22nd would have been April 25th, 2015.

22              What does this e-mail chain refer to as

54

1       A.     I believe so.  I don't recall

2   specifically.  Yeah.  But that does ring a bell at

3   least.

4       Q.     Okay.  You don't recall any discussions,

5   hey, this guy Malik Shabazz is coming and there's

6   going to be a protest on April 25th, you know, at

7   3:00 p.m., we should be prepared?

8       A.     I don't recall, no.

9       Q.     Well, as things are progressing from

10  April 19th, 20th, 23rd -- 22nd, 23rd, the protests

11  are generally increasing in size.

12          Do you recall that?  Is that your

13  recollection?

14      A.     Yeah.

15      Q.     Now, do you recall the name Melissa

16  Hyatt?

17      A.     I do.

18      Q.     Okay.  Do you recall what her role was

19  at that time?

20      A.     I don't.  I don't remember what her rank

21  was at that point.  But she was a -- a high-ranking

22  individual with BPD, and she was sort of the major

1  event -- major incident lead for BPD.  Any type of

2  bigger emergency or preplanned event, she would be

3  responsible for.

4      Q.    Okay.  Now, during her deposition -- and

5  she's now the chief of police in Baltimore County.

6  So during her deposition, Chief Hyatt testified that

7  before April 25th, 2015, she knew that the Baltimore

8  City Police Department did not have enough officers

9  to address crowd control issues and also to protect

10  infrastructures.

11          Do you recall hearing those concerns,

12  about the limited resources of the Baltimore City

13  Police Department?

14      A.    I -- I mean, it's something that was

15  generally a concern.  I mean, it would be with any

16  emergencies; do we have enough people.  And I

17  remember the concern in general, but I -- I can't

18  remember in what context.  You know, did it come up

19  in a meeting or just offhand in a conversation.  So I

20  can't recall specifically.

21      Q.    Okay.  Well, so that's -- we're talking

22  about internal resources at the Baltimore City Police

1           Do you recall hearing about that?

2       A.      No.

3               MR. HWANG:  Okay.  Madam court reporter,

4       if you can mark 11, please.

5               [Exhibit 11, an e-mail, 4/25/2015, was

6       marked for identification.]

7   BY MR. HWANG:

8       Q.      Exhibit 11 is an e-mail produced by the

9   City as CITY00054190.

10              And you're on this e-mail, correct,

11  Mr. Scott?

12      A.      I am.

13      Q.      And you received this e-mail at 11:22

14  a.m. on April 25th, Saturday, 2015?

15      A.      Yes.

16      Q.      In this e-mail, Robert Maloney tell you

17  that he wants updates every 30 minutes, even if it's

18  uneventful, correct?

19      A.      Correct.

20      Q.      Now, prior to April 25th, 2015, during

21  the Freddie Gray protests, do you recall ever being

22  asked for such frequent updates?

1    it's written.

2         A.    Got it.

3         Q.    And while you're reading that,

4    Mr. Scott, just so I'll identify this for the record,

5    because I can't remember if I did.

6                Exhibit 12 is an e-mail chain produced

7    by the City as CITY00008818 through 8821.

8         A.    Okay.

9         Q.    Now, aside from the most recent e-mail,

10   or the e-mail at the very top, you're a party to the

11   e-mail chain, correct?

12        A.    Right.

13        Q.    And this e-mail chain is a continuation

14   of the e-mail that was marked as Exhibit 11?

15        A.    It looks to be.  Yes.

16        Q.    Now, can you walk me through what

17   happened with the protests on April 25th, 2015, as

18   you recall it?

19        A.    Honestly, this is -- just about

20   everything I recall is from this e-mail.  I mean, I

21   -- I recall seeing a video from outside of Camden

22   Yards and in the area of the bars that are sort of

1        was marked for identification.]

2  BY MR. HWANG:

3        Q.     And, Mr. Scott, if you can kindly open

4  13 as well.

5        A.     Okay.  Got it.

6        Q.     So 13 is an e-mail and three attachments

7  produced by the City as CITY00003820 through 4060.

8  And it's quite long, Mr. Scott.

9               And I think -- this is all one

10  attachment, right?

11        A.     It appears so.

12        Q.     [Audio distortion] exhibit that is.

13        A.     Oh.  Yeah.

14        Q.     Let me give you some reference points

15  because it's going to take you forever to flip

16  through it and find these.  And you might want to

17  write these numbers down so you can easily refer to

18  it without looking through all these pages.

19        A.     Okay.

20        Q.     So the e-mail is one page.  And then the

21  next document is the "City of Baltimore Emergency

22  Operations Plan."  It says December of 2013.  That

1  goes from Bates stamp CITY00003821.

2          You might want to write this down so you

3  can refer to it.

4      A.    Okay.

5      Q.    So the EOP is 3821 through 4021.

6  Following the EOP is the "City of Baltimore

7  Continuity of Government Plan," dated May of 2013,

8  begins at CITY00004022, and that goes until 4053.

9          The next document is "City of Baltimore

10  Emergency Operations Plan, Hazard Annex," Section

11  H-04, subject is "Civil Disorder," begins at

12  CITY00004054 through the end, which is 4060.

13      A.    Okay.

14      Q.    And I don't know if you're familiar with

15  the documents just by my mentioning or describing

16  what it -- what it is.  But using those Bates stamps,

17  you know, if you need a minute, I could let you kind

18  of peruse through this.

19      A.    I'm familiar.

20      Q.    Okay.  Now, Exhibit 13, the e-mail and

21  the attachments, you sent this, correct?  If you look

22  at the first page?

1      A.      Yes, I did.

2      Q.      And you sent this e-mail with the

3  attachments reflected in Exhibit 13 to David McMillan

4  on April 25th, 2015, at 5:18 p.m., correct?

5      A.      Yes.

6      Q.      Okay.  If you could walk me through the

7  three attachments and just describe for me or give me

8  a summary of what they are?

9      A.      Sure.  So the emergency operations plan

10  I referenced earlier, and that's the document that

11  establishes how the city will prepare for or respond

12  to recover from emergencies.  And it's an all-hazards

13  document that covers any type of incident the city

14  would be impacted from, be it naturally occurring,

15  accidental, or some sort of intentional event, and

16  contains essentially everything that all of the city

17  agencies would do to mitigate this event.

18           The second document, or -- yeah, the

19  continuity of government plan, that plan essentially

20  lays out how the city will maintain constitutional

21  government should there be some sort of impact to

22  either the people, the elected officials of the city,

1    or their ability to do normal everyday work due to

2    loss of a facility, loss of technology, that sort of

3    thing.

4              And then the Hazard Annex for Civil

5    Disorders, I think it's called, is an attachment to

6    the first document, the Emergency Operations Plan.

7    And what it is, is a document to specifically focus

8    on potential civil unrest, essentially, and to kind

9    of carve out the specificities and key actions that

10   would need to take place during that sort of event.

11        Q.    Okay.  Now, these three attachments that

12   you had e-mailed for April 25, 2015, at 5:18 p.m.,

13   and these are true and accurate copies of the EOP,

14   the continuity plan, and the civil disorder annex

15   that were in placed at that time, correct?

16        A.    It appears to be, yep.  Without reading

17   every word, obviously, it seems to be, yes.

18        Q.    Now, why did you e-mail these documents

19   at this particular time, April 25th, 2015, at

20   5:18 p.m.?

21        A.    I do not remember.

22        Q.    I mean, was on the same day that the

85

1        A.      I don't think so, but I don't completely

2   recall.

3        Q.      So you don't recall one way or another,

4   is what you're saying?

5        A.      Right.

6        Q.      While it was generally known that the

7   Baltimore City Police Department would not make

8   arrests for traffic disruption, was there any

9   discussion within OEM with respect to whether or not

10  arrests should be made or shouldn't be made?

11       A.      I don't -- I don't think so.  It

12  wouldn't really be our role to second-guess or try to

13  influence what BPD was doing, so I -- I wouldn't

14  think so.  But I -- I don't recall specifically.

15              MR. HWANG:  If we can mark 15, please.

16              [Exhibit 15, an e-mail chain, 4/25/2015,

17       was marked for identification.]

18  BY MR. HWANG:

19       Q.      And, Mr. Scott, you can open 15 as well.

20  It's an e-mail marked by the City as CITY00008247

21  through 49.  And I'll give you a second to review

22  this, although I think it's -- a lot of it is similar

86

1    to the prior exhibit.

2         A.    It seems to be the same thread with

3    maybe one or two added, right?

4         Q.    I believe so.

5         A.    Okay.  Then yeah, I see it.

6         Q.    Now, you -- you're a party to this

7    e-mail chain as well, correct?

8         A.    Correct.

9         Q.    Now, at 5:09 p.m. on April 25th, 2015,

10   you're told that the mayor just walked in; is that

11   correct?

12        A.    Yes.

13        Q.    Were you there when the mayor walked in?

14        A.    I don't think so, but I honestly

15   don't -- you know, don't recall whether I was here or

16   home or somewhere else during this chain of events.

17   I don't think I was there.

18        Q.    And I don't know if you testified to

19   this earlier, but, I mean, were you privy to any

20   discussions between the mayor and OEM, or were you

21   ever present when the mayor was there?  During that

22   time, that is.

92

1    office.

2        Q.    I mean, did OEM at this point start

3    preparing for a possible curfew?

4        A.    Beyond what we already had in place, in

5    terms of plans to support some sort of curfew or

6    restriction-of-travel event, I don't believe that we

7    did.

8        Q.    Does OEM's responsibility include

9    helping to coordinate mutual aid?

10       A.    Yes.  Although typically, like I said,

11   law enforcement to law enforcement is done through

12   sort of interagency agreements.  OEM's role in mutual

13   aid is more so resources beyond the purview of the

14   lead agency or out-of-state mutual aid.

15           So, like, I believe we were involved in

16   -- well, I mean, it's -- it's hazy.  But I think we

17   may -- may have been involved in out-of-state police

18   coming to support, but now I can't -- I want to say

19   Philadelphia police came, but now I'm thinking maybe

20   not.  But yeah, that's kind of our role.

21       Q.    How would OEM coordinate out-of-state

22   mutual aid?

1    A.    There's a -- an existing mutual aid

2  network, called the emergency management assistance

3  compact, that is designed for -- it's a framework for

4  mutual aid resources from state to state.  And we, as

5  emergency management, we would be responsible for

6  submitting that request to the State of Maryland

7  through the Maryland Emergency Management Agency.

8              Kind of like -- to put it, you know --

9  to really sum it up, to oversimplify it, I guess, BPD

10  could come to us and say, we need 100 more officers

11  and we've tapped out our agreements with other

12  Maryland [audio distortion] departments, find us

13  another 100 from out of state.  So we essentially

14  fill out a form that says:  We need 100 officers.

15  Send that to Maryland Emergency Management Agency.

16  And then they take that and go out to other states to

17  see who can fill that request.

18    Q.    So at this point, we're talking still

19  April 25th, and this is prior to Mondawmin and other

20  events erupting on April 27th?

21    A.    Right.

22    Q.    [Audio distortion] April 25th, had OEM

1   made such MEMA requests for out-of-state mutual aid?

2       A.    I don't believe so.  I think at this

3   point everything was between BPD and other agencies.

4   So I don't think so.  But that would be something

5   that would be easy to determine through paperwork.

6       Q.    Okay.  And when I say MEMA, you

7   understand that I'm referring to the Maryland

8   Emergency Management Agency.

9           (Reporter clarification.)

10  BY MR. HWANG:

11      Q.    I'm sorry, what does MEMA stand for, Mr.

12  Scott?  I forget myself.

13      A.    Maryland Emergency Management Agency.

14      Q.    Would out-of-state mutual aid include

15  the National Guard?

16      A.    No.  The National Guard is a Maryland

17  resource, or at least the Maryland National Guard is.

18      Q.    Would OEM coordinate with the National

19  Guard in terms of, you know, deployment of resources?

20      A.    In terms of mission assignments once

21  they were here, or to obtain their support?

22      Q.    Would OEM coordinate with the National

120

1    or -- sorry.  What's the specific question?

2        Q.    Do you recall outside resources -- by

3    "outside" I mean mutual aid from jurisdictions in

4    Maryland outside of Baltimore City, and also

5    jurisdictions outside of the State of Maryland --

6    continuing to come in after April 28th?

7        A.    I -- I don't remember.  By which I mean

8    I don't -- I guess I'm -- so in this e-mail, I'm

9    reporting how many are in the city at that point in

10   time, right?  So, yeah, I guess I don't know if these

11   are resources that came on the 28th or -- yeah.  I

12   don't know when these resources came to the city.

13   So, yeah, I don't -- I don't remember specifically.

14              MR. HWANG:  Okay.  If I can direct your

15        attention to 26 -- I'm sorry, if we could mark

16        26, please.

17              [Exhibit 26, "Baltimore Civil Unrest,

18        April 2015," was marked for identification.]

19   BY MR. HWANG:

20        Q.    And Exhibit 26 is produced by the City

21   as CITY00024073.

22              I'll give you a minute to read it, but

121

1   I'm going to ask you just if you recognize this

2   document?

3          A.    Yeah, I -- I think we were asked by the

4   Fire Department to document our roles, maybe.   I

5   only -- I only vague remember this.

6          Q.    Okay.  Well, but you drafted this,

7   correct?

8          A.    Yeah.

9          Q.    Okay.  It says for "date worked," it

10  says, "April 25th and April 27th through May 3rd."

11              Do you see that, Mr. Scott?

12         A.    Yes.

13         Q.    Among things that you listed as far as

14  what you did during that time period, you said that

15  you enacted mutual aid requests.

16         A.    Yep.

17         Q.    Was that on April 25th and April 27th,

18  or just on April 27th onward?

19         A.    I believe April 27th onward were the

20  only ones I was involved in.

21         Q.    Okay.  And those requests that you were

22  making, were all they done through MEMA?

1     A.     Most likely, yes.

2     Q.     Was there a protocol to request

3  resources through MEMA?

4     A.     Yes.

5     Q.     Aid resources?

6     A.     Yes.

7     Q.     What was the protocol?

8     A.     There's a -- there's a form to be filled

9  out that documents what you're asking for, and you

10 have to sign off on that, and then it gets submitted

11 up the state for them to try to fill.

12    Q.     Is that form submitted electronically

13 or --

14    A.     Yes.  Although you do have to hand-sign

15 it.  So it either has to be scanned in or we did have

16 a representative from MEMA in the EOC, so it's also

17 possible I could have handed paper copies to that

18 person.

19    Q.     Okay.  And this would have been after

20 you came back from Boston, right?  You [audio

21 distortion] while you were in Boston or at Logan?

22    A.     Right.

123

1        Q.     This would have been after the -- the --

2   after the state of emergency had been declared?

3        A.     Yes.

4               MR. HWANG:  If I could [audio

5        distortion] 27.

6               [Exhibit 27, "Baltimore Region Emergency

7        Assistance Compact," was marked for

8        identification.]

9   BY MR. HWANG:

10       Q.     This is a document produced by the City

11  as CITY00025839 through 845.  It was produced by the

12  City.  It is the Baltimore Region Emergency

13  Assistance Compact.

14              Do you recognize that?  It's sometimes

15  reference to by an acronym, BREAC, "BREAC"?

16       A.     Yes.

17       Q.     What is the Baltimore region Emergency

18  Assistance Compact?

19       A.     It's an agreement by which the Baltimore

20  regional jurisdictions can share resources during an

21  emergency.  It's the mutual aid agreement.

22       Q.     Okay.  And this was in place during the

126

1   Pennsylvania.  I think the Ohio team was a local

2   county-level team, and I think the Pennsylvania team

3   was a state-level team.

4            And I believe the Ohio -- yeah, the Ohio

5   team helped manage resources and logistics, and were

6   staged out of the staging center at M&T Bank Stadium,

7   and the Pennsylvania team, if I'm getting this

8   correct, worked out of Baltimore Police headquarters

9   to help support whatever they needed.

10       Q.    And for these resources outside the

11  State of Maryland, MEMA would reach out to them,

12  right, not OEM and Baltimore?

13       A.    Correct.

14       Q.    Okay.  So Baltimore would -- the OEM and

15  Baltimore would initiate the request to MEMA, and

16  then MEMA would then reach out to various states

17  [audio distortion.]

18       A.    Right.

19            COURT REPORTER:  Sorry, would you speak

20       up?

21  BY MR. HWANG:

22       Q.    Would OEM select which states to contact

128

1          (Brief recess.)

2          VIDEOGRAPHER:  It is 12:01 p.m. and

3     we're back on the record.

BY MR. HWANG:

5     Q.     Now, Mr. Scott, does EMAC, or the

6  Emergency Management Assistance Compact, ring a bell?

7     A.     It does.

8     Q.     What do you understand that to be?

9     A.     As the state-to-state mutual aid

10  agreement between emergency management agencies and

11  the U.S.

12     Q.     Okay.  So for resources coming from

13  outside of the State of Maryland, that is originating

14  from OEM and going to MEMA, is that being processed

15  by MEMA under EMAC?

16     A.     Yes.

17     Q.     Now, if I could direct your attention

18  back to Exhibit 23.

19     A.     23?

20     Q.     Yes.

21     A.     Okay.

22     Q.     Now, 23 noted resources coming in from

1      Q.      Do you ever recall being resistant or

2  hearing about the mayor's office or others in the

3  city being opposed to having outside jurisdictions

4  come in?

5      A.      Specifically, no.  I -- I mean, there --

6  yeah, specific -- not specifically.

7      Q.      What about generally?

8      A.      Generally, you know, and I don't know

9  that I was even involved in conversations, but I

10 guess it -- it was known to me that, generally

11 speaking, one of the considerations when requesting a

12 resource beyond those of the city is are we -- are we

13 sending the message that we are unprepared or

14 underresourced.

15     Q.      Okay.  How -- how -- what do you mean,

16 aware of that consideration?

17     A.      I don't really know.  I just recall

18 being aware of it as sort of a policy consideration

19 that was -- that existed somewhere.

20     Q.      Okay.  Was that -- would that have been

21 something you were told?

22     A.      Probably, or maybe inferred based on

156

1        CERTIFICATE OF REPORTER/NOTARY PUBLIC

2

3        I, Goldy Gold, a Notary Public within and

4  for the State of Maryland, do hereby certify that the

5  within-named witness personally appeared before me at

6  the time and place herein set out, and after having

7  been duly sworn by me, according to the law, was

8  examined by counsel.

9        I further certify that the examination was

10  recorded stenographically by me and this transcript

11  is a true record of the proceedings.

12        I further certify that I am not of counsel

13  to any of the parties, nor in any way interested in

14  the outcome of this action.

15        As witness my hand and notarial seal this

16  6th day of January, 2021.

17

18           *Goldy Gold*
           _____

19           GOLDY GOLD, RPR
           Notary Public

20

21

22  My Commission Expires:  April 21, 2024

# EXHIBIT 9

# In The Matter Of:

*CHAE BROTHERS, LIMITED LIABILITY COMPANY, ET AL. v.*
*MAYOR AND CITY COUNCIL OF BALTIMORE, ET AL.*

---

*DAVID MCMILLAN*
*January 15, 2021*
*ORIGINAL TRANSCRIPT*

---

*CourtScribes, Inc.*
*"Delivering More For Less"*
*(833) 727-4237*
*info@courtscribes.com*
*www.courtscribes.com*

ORIGINAL TRANSCRIPT

1

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MARYLAND
 2                 NORTHERN DIVISION

 3          Civil Action No. 1:17-cv-01657-SAG

 4    CHAE BROTHERS LIMITED
      LIABILITY COMPANY, et al.,
 5
           Plaintiffs,
 6
      vs.
 7
      MAYOR & CITY COUNCIL, OF
 8    BALTIMORE, et al.,

 9         Defendants.

10    _____/

11                  VIDEOTAPED DEPOSITION
                          OF
12                   DAVID McMILLAN

13

14       Taken on Behalf of the Plaintiffs

15

16            DATE:    January 15, 2021

17            TIME:    1:09 p.m. to 5:15 p.m.

18            PLACE:   Zoom Remote Conference

19       Transcribed by:

20            Lori W. Pyron,
              Florida Professional Reporter
21            Notary Public

22

23

24       Huseby Global Litigation - King Melbourne Office
                 14 Suntree Place, Suite 101
25                Melbourne, Florida 32940
                      (321) 242-8080
```

2

1                  A P P E A R A N C E S

2

3        For the Plaintiffs:  (Via Zoom)

4           PETER K. HWANG, ESQUIRE
            Sung & Hwang, LLP
5           9256 Bendix Road
            Suite 109
6           Columbia, Maryland 21045
            phwang@sungandhwang.com

7

8        For the Defendants:  (Via Zoom)

9           SARA E. GROSS, ESQUIRE
            Chief Solicitor
10          Baltimore City Department of Law
            100 Holliday Street
11          Baltimore, Maryland 21202

12   ALSO PRESENT:

13          HANNA MARIE C. SHEEHAN, ESQUIRE
            Assistant Chief Solicitor
14          Baltimore City Department of Law
            100 Holliday Street
15          Baltimore, Maryland 21202

16

17

18

19

20

21

22

23

24

25

3

```
1                     I N D E X

2

3      DIRECT EXAMINATION
            BY MR. HWANG .............    4
4      CROSS-EXAMINATION
            BY MS. GROSS .............   201
5      CERTIFICATE OF TRANSCRIPTION
            By REPORTER .............   205
6                  E X H I B I T S

7      PLAINTIFF'S EXHIBITS:

8      1 --  Notice of Deposition .....   10

9      2 --  Protective Order ........   14

10     3 --  Complaint ...............   23

11     4 --  BATE Stamped
            City's 00007430 .........   54
12
       5 -- Email chain Bate Stamped
13        City's 0008255 ..........   54

14     6 -- Email chain Bate Stamped
          City's 00008781-82 .......   65
15
       7 -- Email chain Bate Stamped
16        City's 00008860 ........   65

17     8 -- Email chain Bate Stamped
          City's 000054332 ......   65
18
       9 -- Email chain Bate Stamped
19        City's 000054378 .......   72

20     10 -- Email chain Bate Stamped
          City's 000054101-02 ....   94
21
       11 -- Email Chain Bate Stamped
22        City's 00054571 ........  100

23     12 -- Email Chain Bate Stamped

24           City's 00054190 .......  102

25     13 -- Email Chain Bate Stamped
          City's 00008818-8821 ...  110
26
```

14 -- Email Chain with Attachments
        City's 0000-3820-4060 ...    130

15 -- Email Chain Bate Stamped
        City's 00040223-24 ......    136

16 -- Email Chain Bate Stamped
        City's 00008247-8249 ....    138

17 -- Email City's Bate Stamped
        00053393-53396 ..........    149

18 -- Email Chain City's Bate Stamped
        00013514-15  ............    151

19 -- Email Chain City's Bate Stamped
        00054186 ...............    156

20 -- Email Chain with Attachments
        Bate Stamped
        00010775-10777 .........    158

21 -- Email Chain Bate Stamped
        City's 00003588-3596 ...    171

22 -- Email Chain Bate Stamped
        City's 00014934-14941 ...    175

23 -- REC-A Form ............    178

24 -- Email Attachment Bate Stamped
        City's 00052848-851 ....    185

25 -- Email Chain Bate Stamped
        City's 00021802-2182 ....    194

26 -- Email Chain Bate Stamped
        City's 00036212 ........    197

27 -- BREAC Bate Stamped City's 00025839-45 ......

197

28 -- Link to MOEM Video .....    199

                    * * * * * * * *

**ORIGINAL TRANSCRIPT**

5

1                    P R O C E E D I N G S

2                       * * * * * *

3        THE VIDEOGRAPHER:  We are now on the record

4     of the matter of Chae Brothers LTD, et al.,

5     versus et al Mayor and City Council.

6        Today's date is January 15, 2021.  The time

7     is 1:10 p.m.  This is the video recorded

8     deposition of David McMillan.  This is being

9     taken via Zoom.

10        My name is Nicolas Paulard.  I am the camera

11     operator, representing Courtscribes Incorporated.

12     The Court Reporter is Monque Beckles, and works

13     for Huseby.

14        Will counsel please introduce themselves?

15        MR. HWANG:  Good afternoon.  Peter Hwang, ob

16     behalf of all the Plaintiffs.

17        MS. GROSS:  Good afternoon, Sara Gross and

18     Hanna Sheehan on behalf of Mayor & City Council

19     of Baltimore.

20        THE VIDEOGRAPHER:  Can the Court Reporter

21     please swear in the witness?

22        COURT REPORTER:  Would you raise your right

23     hand. (Witness complies)

24        Do you swear or affirm that the testimony

25     that you're about to give will be the truth, the

ORIGINAL TRANSCRIPT

6

1          whole truth, and nothing but the truth?

2                THE WITNESS:  I do.

3     WHEREUPON:

4                     DAVID McMILLAN,

5          having first been sworn remotely, was examined

6          and testified as follows:

7                     DIRECT EXAMINATION

8     BY MR. HWANG:

9          Q,      Good afternoon, Mr. McMillan.  My name

10    is Peter Hwang, and I represent plaintiffs in this

11    action, who filed suit against the Mayor and City

12    Council of Baltimore, for among other things, damages

13    to Plaintiff's property and business, or businesses.

14          As you know we're here for a deposition, which will

15    consist of me asking you questions, and you responding

16    to those questions.

17          As you can see, there's a Court Reporter here.

18    She is transcribing my questions and your responses.

19    As such, it's important to answer my questions verbally.

20    Please refrain from answering with just gestures like a

21    head nod, or sounds like a uh-huh.

22          As you can imagine, it's hard for the Court

23    Reporter to transcribe those kind of responses.

24          It's extremely important that you understand the

25    questions that I'm asking.  If for some reason you do

ORIGINAL TRANSCRIPT

17

1        A.      Correct.

2        Q.      Now are you currently employed?

3        A.      No.

4        Q.      Where were you last employed?

5        A.      For the City of Baltimore.  I believe I

6    mentioned that I resigned in March of 2020.

7        Q.      And when were you first employed by the

8    City of Baltimore?

9        A.      I started as unpaid intern in December

10   of 2010, and I was hired as a planner in April of 2011.

11       Q.      Okay.  So you were there for approximately

12   ten years.  Mr. McMillan, can you walk me through your

13   ten years being employed by the City of Baltimore, and

14   go through each title you've held?

15       The time period during which you held each title,

16   and for each title the duties that you had.

17       A.      Sure.  So I again, I started as an unpaid

18   intern December 2010.  Really at that point, I was

19   taking just ICS courses, Instant Command Systems

20   courses, and IS courses online to learn about Emergency

21   Management was, and what the meant for the City of

22   Baltimore.

23       And then I was hired as a planner, an Emergency

24   Planner for the Mayor's office in Emergency Management

25   April of 2011.

ORIGINAL TRANSCRIPT

18

1          My responsibilities, I was primarily working on

2     continuity of operations, and continuity of government

3     plans, and updating those.  I was involved in a limited

4     level, more just like observing and absorbing

5     everything, and I lot of middle level operations, the

6     funeral for Mayor slash Governor, Donald Schaefer.

7          I believe one of the Grand Prix events, but

8     basically I was in the office, kind of at an entry

9     level capacity doing plans, involved in staffing the

10    Emergency Operations Center, or Incident Commands in the

11    field, and those kinds of things.

12         Towards the end of that first year, with the agency

13    being employed, I title changed, my compensation didn't,

14    to Director of Planning and Finance, and I started to

15    get my feet wet a little bit with the physical component

16    of the agency.

17         Really probably -- taking to most leading the City,

18    or helping to guide the City through a public assistance

19    applications.  Public Assistance is basically Federal

20    Grant program through FEMA.  So local governments can

21    get reimbursed for costs related to major emergencies.

22         So I kind of cut my teeth with that, and some other

23    basic grant management and reporting.

24         And then somewhere around August or September of

25    2012, the prior Emergency Manager, Bob Maloney, got the

1   offer to go to City Hall, the one on North Holliday

2   Street, to be the Deputy Mayor for Public Safety

3   Emergency Management, and I went with him as his deputy.

4   So my title was Assistant Deputy Mayor for Public Safety

5   Emergency Management.

6       And this was a big, I guess, change in terms of my

7   roles and responsibilities.  It was just more broad in

8   terms of looking at public safety.

9       In the beginning largely I was attending City Stat

10  meetings, which is one of the primary ways the City then

11  tried to manage the City, in terms of effectiveness and

12  efficiency, using a very data based approach.

13      I also attended a number of high level, either --

14  pre -- basically, cabinet meetings and pre senior staff

15  and senior staff meetings, these are meetings where the

16  Deputy Mayors, City Solicitor, and other kind of

17  important City officials, would debate, you know, policy

18  directives before presenting those to the Mayor, for a

19  final decision.

20      So I would attend those meetings.  I would

21  represent the Deputy Mayor, Robert Maloney, or

22  sometimes the Mayor herself, at certain, you know,

23  policy meetings throughout the City.  And would, you

24  know, liaise with, communicate with, or give directives

25  to the City agencies in the Public Safety Emergency

1    Management Portfolio, which changed over time, but

2    generally included fire department, police, EMS.

3         At points, it included the Health Department.

4    Transportation left the portfolio at one point, public

5    works.

6         So it's basically a lot of coordination and

7    liaising between agencies, and appointed and elected

8    leadership, and also some liaising with State and some

9    Federal Officials.

10        So I did that from September 2012, until I departed

11   the agency early in, I believe, 2015.  Right before I

12   left I was the acting Deputy Mayor for Public Safety

13   Emergency Management.

14        So Robert Maloney departed that Deputy Mayor role

15   to return to just being the Emergency Manager.  I was

16   acting for him for about a month and a half, maybe six

17   to seven weeks, but chose not to take an offer that was

18   made to me to be deputized as Chief of Staff, and then

19   return back to the agency, the Mayor's Office Emergency

20   Management, I want to say March of '15.

21        My title was Director of Planning and Preparedness.

22   So similar to what I was doing previously.  A little

23   less physical involvement.  A little more thinking about

24   preparedness for the City.

25        I served on the Mayor's Commission on Disabilities,

 1   and a number of other kind of roles that were about

 2   preparedness and community outreach.

 3        So I did that role for a little less than a year.

 4   At that point, I believe Connor Scott, who was then the

 5   Deputy Director, departed to go be go be the Assistant

 6   Deputy Mayor for Operations under Kaliope Parthemos.

 7        So he left the agency, and the I took his position.

 8   I was promoted to being Deputy Director of the Agency.

 9   I believe towards the end of 2015, and I held that role

10   for a little more than a year, at which point Robert

11   Maloney who was the Emergency Manager and the Director

12   for the agency retired from his duties with the City,

13   and went to go work at John Hopkins in a new role.

14        At that point, I was the acting Emergency Manager

15   and the acting Director of the agency, from I believe

16   March of 2016 until October 2016.

17        And then at that point I was offered to be

18   Director, and basically my roles increased there, you

19   know, total responsibility for the strategic direction

20   and vision of the agency.

21        Basically, that was a lot of liaising,

22   communication with my peers, the other Emergency

23   Managers, in the State, part of the State wide Emergency

24   Management System.

25        And to clarify, there was kind of two things there.

ORIGINAL TRANSCRIPT

22

1    There's the title of Emergency Manager, which a

2    Governor's appointment from Governor Hogan, that

3    doesn't directly attach to any salary, but basically a

4    State title that ties into me into that system that

5    makes me -- or made me accountable, to the Maryland

6    Emergency Management Agency, as well as Governor Hogan.

7         And then the Directorship, being the Director of

8    the Director of the Mayor's Office Emergency Management,

9    that was my City title and position, and that's what

10   came with compensation, and the responsibility for

11   directing the agency.

12        So I -- you know, attended cabinet meetings.  At

13   that point, under Mayor Pugh, they weren't doing, that

14   I'm aware of, the same kind of pre senior-senior staff

15   meetings, but that kind of upper management, kind of

16   senior executive level management, I was, you know, a

17   part of, in terms of communicating with other agency

18   heads, and communicating with the State, communicating

19   with FEMA Region 3 for the Mid Atlantic.

20        I managed my employee, which we started with maybe

21   five or six employees, and we had a bunch of turnover.

22   Right before my resignation, I built the staff to about

23   fourteen or fifteen people, not including interns, and

24   auxiliary members from the Fire Department, but again,

25   that was all kind of strategic management, directing my

ORIGINAL TRANSCRIPT

23

1  employees, my deputies, on what grants to apply for, how

2  we would conduct operations, helping to activate and run

3  the Emergency Operations Center, Incident Commands for

4  notable special events, or emergencies, et cetera.

5      I performed those duties for about three years

6  until my resignation in March of 2020.

7      Q.    Okay.  Thank you.  So Mr. McMillan, are you

8  familiar with what has been commonly referred to as the

9  Baltimore Riots, or Baltimore Unrest?

10     A.    Yes.

11     Q.    If I could direct your attention to 03, and

12  if we have that marked as Exhibit 3, please.

13     (Whereupon, Plaintiff's Exhibit No. 3 was marked

14  for identification, and published to the Witness.)

15  BY MR. HWANG:

16     Q.    Mr. McMillan, this is a copy of the first

17  thirty pages of the first amended complaint that's been

18  filed in this case, and I'll give you some time to

19  peruse through it.

20     A.    Okay.

21     Q.    But as you're doing so, just to confirm that

22  we're on the same page, when I refer to the Baltimore

23  Riots, or just protesting in general, I'm referring to

24  the rioting and protests described in this lawsuit.

25  Do you understand that?

ORIGINAL TRANSCRIPT

24

1      A.    Yes.

2      Q.    Now I know some time has passed, and it's

3  hard to remember dates in general, but it's certainly

4  harder to remember dates when so much time has passed.

5      So I want to give you points of context that will

6  hopefully help you refresh your recollection to the

7  extent you need that.

8      and throughout the course of today's deposition

9  I'll often refer to two different dates to provide

10 points of context.

11     One date is Saturday, April 25, 2015, and the other

12 date is Monday, April 27, 2015.

13     Do generally recall what happened on those two

14 dates?

15     A.    Yes, certainly.

16     Q.    What is your recollection as to what happened

17 on Saturday April 25, 2015, and Monday, April 27, 2015?

18     A.    So on Saturday, there was a planned protest

19 at City Hall related to the in custody death of

20 Freddie Gray.

21     We knew that -- and I can't remember the time of

22 the formal event at City Hall, the speakers and the

23 actual protest, but I believe it was afternoon, maybe

24 around 4:00, but I was in the Incident Command that was

25 located out of the BPD Watch Center, I believe on the --

1  I want to say the 13th floor of the Baltimore Police

2  Central District slash Headquarters.  So I was there

3  that day from probably 6:00 or 8:00 a.m., until the end

4  of the events that evening.

5       It was notable because obviously the Freddie Gray

6  case was very notable, but it was also a protest in a

7  long line of protests, that both occurred in response to

8  Freddie Gray's death, but the City had had a number of

9  various protests over the few years that I basically was

10  in that City Hall capacity.

11      We were dealing with the Occupy Movement.  We also

12  had, I believe, the Tyron West case, and other notable

13  kind of police -- either in custody death cases, or

14  other kind of abuse of force, or -- all those kind of

15  cases.

16      So we had done a number of basically planning

17  sessions, and we had been apart of a number of Incident

18  Commands related to protests like what occurred

19  Saturday.

20      Obviously Saturday was highly notable, because

21  unlike the other protests prior to that, the extent of

22  the damage, or the extent to which it became unpeaceful,

23  and got out of control, was far greater than any prior

24  protest or riot, or incident, if you will.

25      So I was in that Watch Center that day from again

1    of the estimate, the crowd estimate, about a hundred or

2    two splintered off, and took off from City Hall, towards

3    downtown and the Orioles game.

4        And so at the Orioles game, those group of

5    protestors really stopped being protestors, and turned

6    into rioters, and started doing property damage, and

7    really -- the notable event in my memory that kicked off

8    the seriousness of the violence was some protesters

9    grabbed one of the metal bike racks, and launched it

10   over one the barriers at Camden Yards at some officers.

11       And I don't believe it hit anybody, but again this

12   is almost five years ago, but that's -- when I saw that

13   on camera in the Watch Center, as one of the triggers

14   for okay, this is obviously getting very serious, and

15   then from there begin to unwind with there's violence

16   against property, and the cars were getting attacked.

17       There was some violence by the strip of bars, like

18   Pickles and maybe Frank & Nicks.  It was a series of

19   bars that are right next to the statutes by, I guess,

20   the northwest corner of Camden Yards.

21       And there started to be fights that were breaking

22   out there between the protestors who are now becoming

23   rioters, and patrons of those bars who have now been

24   tailgating and/or buying alcohol and other things for,

25   you know, time.

ORIGINAL TRANSCRIPT

28

1        So there were skirmishes there.  I believe someone

2   broke out the windows to some of those bars.  So really

3   the damage started to escalate that evening.

4        Notably, the Mayor and Commissioner Batts, made the

5   decision to command people at the game to not leave.

6   They basically sheltered in place for an additional

7   maybe thirty minutes to an hour after the game, that's

8   my recollection of it, until it was safe.

9        BPD, there was, you know, a big -- they kind of set

10  up their line to move the protester out, I believe, on

11  Pratt Street, and there some skirmishes or interactions

12  there, and then throughout that evening the people who

13  were -- the rioters who were downtown by the game,

14  scattered into a number of different kind of splintered

15  selves, and did some damage of breaking windows and

16  property damage on the way out, but my recollection is

17  that kind of ended the events of that evening in terms

18  of property damage and violence.

19       A very stressful situation, obviously.  I remember

20  the Mayor went on TV to try to reassure people, you

21  know, about what happened and about the City's response.

22  And we had ministers and other officials around her for

23  that, and then operations formally might have wrapped up

24  around midnight or 1:00 in the Watch Center.

25       Where the Watch Center is always going for BPD, and

ORIGINAL TRANSCRIPT

29

1   there was an increased presence overnight.  So we
2   continued to be violent, but in terms of the level of
3   activity, we kind of believed that we had gotten past
4   the worst of it.
5        And then Sunday was very quiet.  There was really
6   no chatter, there was protests planned, there was no
7   action taken.
8        Q.   And I want to pause you before you move onto
9   to Sunday.  So everything you've described to thus far,
10  you're describing Saturday April 25, 2015, correct?
11       A.   Correct.
12       Q.   Okay, sorry.  And then you were continuing on
13  to Monday April 27th?
14       A.   Yeah.  So not that you wanted to know about
15  that, but Sunday was very quiet.  We maintained our
16  positions and the EOC -- or not the EOC, sorry.  Out of
17  the Incident Command out of the Watch Center, and then I
18  believe Sunday evening going into Monday there was
19  chatter.  BPD Intelligence picked up on, I believe, the
20  flier at some point, that the kids were spreading on
21  social media about the purge, which is then -- at that
22  point, Sunday going into Monday, we didn't know what
23  that meant, or what that would be.
24       We knew from the movie, you know, The Purge, that
25  meant some violence, or some protest, or some something,

 1   but we didn't know what it would be become, obviously.

 2       Going into Monday, I reported to work at 1201 East

 3   Cold Spring Lane.  I did not go to the Watch Center, for

 4   kind of our -- not normal, but daily operation that was

 5   our normal day to day office, but we really got the

 6   directive earlier on from Bob Maloney that we knew about

 7   this chatter.

 8       We need to be prepared for, you know, some kind of

 9   action.  And also that morning of Monday was the funeral

10   for Freddie Gray.  We knew there was increased media

11   presence.

12       There a lot of people in attendance, a lot of

13   VIP's, elected officials, otherwise I believe -- so we

14   knew the tensions -- there could be this like flash

15   point here again, going into Monday.

16       And so we had a meeting early that morning, maybe

17   at 10:00 a.m. to say, you need to tell your family, you

18   know, your wife, husband, partner, whoever, your kids,

19   your parents, that, you know, we anticipate there could

20   be a major incident, and you need to self-sufficient

21   while we go into twenty-four operations again.

22       So I did that.  And we were reviewing our plans and

23   liaising with, I believe, MEMA, Maryland Emergency

24   Management Agency with police, with the city agencies,

25   and getting ready to respond if something happened.

ORIGINAL TRANSCRIPT

32

1      Then when the kids started to self-dismiss around

2  1:00 or 2:00, and then they started to get rowdy, and

3  that's when the action started to take place.  I think

4  where it took a turn for the worse was some of the

5  officers around Mondawmin were getting rocks thrown at

6  them by kids.

7      I don't know which street it was, but probably off

8  of I guess it might be Ritches Town Road, by the plaza,

9  there's like a tire shop.

10      Anyway, there's a street there that was like a back

11  alley to some of these row homes, and they were throwing

12  some rocks there, and the kids started to retreat -- and

13  there was some adults, but the kids largely retreated

14  into the side road, and BPD would shield and were not

15  pursued, and then back there I believe there were like

16  some row homes that were under construction.

17      So there was just a ton of cinder blocks and bricks

18  that was around for them to throw.  And they started

19  throwing them at police, and the quality of the shields

20  they were, if you look at the pictures it's kind of

21  plastic riot shields, but they weren't heavy-duty.

22      Some of them were shattering.  It was kind of older

23  equipment.  There was some serious injuries to officers,

24  and I think the news started to report on it, and then

25  adults started to kind of join into this.  So it started

1   to fuel and get obviously ever more out of control than

2   Saturday was.

3       And then going into that evening it started at

4   Mondawmin with people trying to intermittently lute

5   Mondawmin, at points being pushed back by the police

6   presence.

7       And then actually kind of started to move south,

8   again not well organized, but ad hoc.  Just different

9   people trying to flow into the area to do bad things,

10  moved really towards North Ave, I think that's when the

11  CVS got looted and set on fire.

12      And then there was splinter groups, that either

13  moved south and people that were joining them at areas

14  in the downtown area, and then really all across the

15  city.

16      And then that evening was just a very challenging

17  period, with intermittent property damage occurring, and

18  a number of arsons, lot of small setting -- small

19  structure fires and cars, but also some major structure

20  fires the BCFD was dealing with, and we left our office

21  around -- my recollection is 4:00, to go over to the

22  Incident Command to support Commissioner Batts' efforts,

23  and then one of the things that we found out with the

24  after action reports that we did with, I believe, PERF,

25  in our internal after action report was just the amount

1  that morning, both DPW professionally was trying to

2  clean up debris, and burned out cars from the streets,

3  but you had a number of citizens doing their best to

4  kind of clean up the wreckage from that -- twelve to

5  eighteen period of unrest.

6      And so a very challenging time, and really across

7  these three days, it kind of started with a focus of

8  protecting the -- you know, free speech and right to

9  assemble, kind of the rights of these protestors and

10 keeping them safe, because in the run up to these

11 protests, or the protest and then they became riots,

12 we had seen people starting to run cars into crowds of

13 protestors, and starting to get angry, and starting to

14 threaten their lives.

15     So we were more focused on that then the focus had

16 to shift from Saturday going into Sunday and Monday

17 towards lives and property, and trying to get these bad

18 actors, and these now rioters off the street, and either

19 arrested, or back away, and then investigate them after

20 the fact.

21     So that's my kind of recollection of those two days

22 and the day in between.

23     Q.   Sure.  Thank you.  Now for the time being,

24 Mr. McMillan, I'd like to go back to the actual arrest

25 of Freddie Gray.

1        When do first recall hearing about the

2   circumstances of Freddie Gray's April 12, 2015 arrest?

3        A.    This is such a long time ago.  I think right

4   afterwards, I can't remember where I was when I heard,

5   but I knew that he was seriously injured, and you know,

6   we were worried that he would pass away, and that this

7   was going to be a major, major issue for the city,

8   because we had already had enough kind of policing

9   issues.

10       And under Commissioner Batts, he worked very hard

11  to repair the relationship with the community, but the

12  community policing and achieving that all takes time,

13  but I remember hearing about it shortly after it

14  happening, and then knowing that it was a serious

15  injury.,

16       And I can't remember how many days it might have

17  been a week, I can't remember the amount of time that it

18  was between the initial injury in that ride in the

19  police wagon and his passing, but the minute that he

20  passed, you know, there was obviously a lot of grief in

21  the community.  I live in the community, on the west

22  side of the city.

23       and you can see I'm a person of color, so there's a

24  lot of emotion around that, and then from the public

25  safety side, we were very aware acutely that this was

39

1      Q.    Sure.  So prior to Freddie Gray's passing,

2   when you're attending these meetings about how to either

3   deal with the protests, or plan for protests, who do you

4   recall being in those meetings?

5      A.    Sometimes it could be anywhere from

6   Commissioner Batts, down to Deputy Commissioners, maybe

7   Paul Mere, or a -- who was it then?  Paul Mere, Davis.

8   I forget if Rodriguez was there yet, or maybe he came

9   afterwards.

10      It was some of the Deputy Commissioners sometimes,

11   and at times BPD's Lieutenant or Colonials, those types,

12   along Battalion Chiefs for BCFD.

13      The Emergency Manager sometimes, if not with me,

14   but also -- then the Deputy Director at that point was

15   Connor Scott, myself as Director of Planning, sometimes

16   City Hall officials.

17      And the obviously, more middle management usually

18   from Transportation.

19      Q.    Okay.  So again prior to Freddie Gray's

20   passing on April 19th, as you're having these meetings

21   with the Baltimore City Police Department, what kind of

22   things are being discussed?

23      A.    So a lot of it was -- again, trying to keep

24   the protesters safe, because it started to turn

25   sometimes violent against them.

ORIGINAL TRANSCRIPT

41

1    with them.

2         So when was it working before that Saturday, it was

3    just kind of s symbiosis.  We were keeping them safe.

4    They were giving us the heads up of where it would go.

5         And obviously again, with the traffic management

6    components too.  If roads needed to be shut down ahead

7    of time, or managing traffic, and then also trying to

8    keep those people safe, that was a big focus of

9    protecting people's kind of rights to protest, and to

10   assemble peacefully.

11        Q.    Sure.

12        A.    Obviously not when turns into a riot.  I

13   think the big difference between that success in the

14   Saturday, was the introduction of some of the outside

15   actors, who weren't those local organizers of protests,

16   who really their goal for the protest was to get it

17   towards civil unrest.

18        Whereas the local organizers, who are known to

19   BPD, generally were trying to keep it safe, and there

20   was a good partnership there.

21        I think BPD sometimes had either -- they had a

22   combination of uniformed officers, so there was a visual

23   presence.  Sometimes plainclothes officers, and I think

24   sometimes occasionally undercover officers that could

25   walk with the protesters.

1        so there was a lot of tracking that was happening

2   of protests, and kind of where the protestors were and

3   what they were doing, and most of that was like a

4   partnership almost, if you will, between most of the

5   good kind of community organizers who wanted to push for

6   social justice, or were certainly not pushing for civil

7   unrest, or violence, or property damaged.

8        Q.    Sure.  Now these people that are coming in,

9   that expected to come in from out of town, who don't

10  have good intentions, whose purpose is to try to cause

11  a riot.  You've referred to these people several times

12  throughout the course of today's deposition.

13       When I use the term agitators, do you understand

14  that term to refer to these people?

15       A.    Yes.

16       Q.    How early on was the City was made away of

17  the potential of these agitators coming in?

18       A.    I mean, this is five years ago, but I believe

19  probably the Thursday, somewhere the Thursday or the

20  Friday before Saturday.

21       Q.    Okay.

22       A.    Of the events in question.  We started to

23  hear from -- and I wasn't in those Intel meetings, and

24  at this point I think BPD was good at sharing Intel,

25  but they still operated sometimes in their own kind of

1   silo, for good reasons.  There's a lot of risk that

2   they're talking, but they were starting to relate to the

3   city officials, somewhere I would say -- Thursday or

4   Friday, that we were starting to get the chatter of some

5   of these bad actors coming into the area.

6        I'm not sure if I should mention any names of these

7   people, but I can remember this one name that sticks

8   out, and we were looking at his videos online, I want to

9   say the Friday when we were preparing for what might

10  happen.

11       And this particular individual, do you want the

12  name, or I should or shouldn't say it, you tell me, but

13  this particular individual had a habit of video

14  recording and then interviewing officers, and trying

15  agitate officers, and then at the same time, within

16  thirty minutes, interviewing protestors, and trying to

17  agitate the protestors.

18       So an interview might be like, oh, yeah, you cops

19  are the good guys, and the protestors, they're not

20  American, and you just need to beat them down, and

21  whatever.

22       And then he'd go play the other side, oh, the cops

23  are terrible and this violence, and I'm with you in

24  solidarity.  And I think this individual got arrested by

25  the Feds shortly after he made his way to Baltimore.  I

ORIGINAL TRANSCRIPT

44

1   think he was from Ohio.

2       So we were aware of some of these people, some of

3   the names.  It varied in race, creed, gender, but we had

4   some knowledge that they were coming in.

5       Some names of the certain people, some of the more

6   prominent kind of youtube channels, some of them had

7   probably prominent like dark web -- you know, seedy

8   presence.  They had that kind of presence, and we knew

9   they were coming.

10      And that's where the -- kind of the incident

11  command was established that Saturday for that City Hall

12  protest in response to that.

13      I think the Watch Center is always manned, and we

14  are always ready for these events, but there was

15  definitely a higher awareness that Saturday could be

16  notable.

17      Q.    Sure.  Can I ask you this person's name that

18  you're referring to about watching?

19      A.    Yeah.  I think his name was Pete Santilli.

20  He was a Caucasian gentleman who I think had like a

21  youtube channel, or -- he would basically, he was a pot

22  stirrer, he was an agitator.

23      And I think he was from Ohio, or somewhere in the

24  mid west, but he would travel -- again, these outside

25  agitators, to different events and try to stir it up,

ORIGINAL TRANSCRIPT

45

1    and try to make it happen.  Try to light that march, if

2    you will.

3         Q.    Now there wasn't just on agitator that was

4    made known to the city, and the Baltimore City Police

5    Department.  There were multiple agitators, is that

6    correct?

7         A.    Correct.

8         Q.    For example, does the name Alec Shabazz ring

9    a bell?

10        A.    Yes.

11        Q.    Was he considered an agitator?

12        A.    Yes.

13        Q.    Does the name Carlos Mohammad ring a bell?

14        A.    It does not, but I'm sure I did hear it, but

15   it's been five years, that one does not.

16        Q.    Okay.  How many agitators would you say

17   were in the police department's and/or City's radar?

18        A.    I mean, the high profile ones, probably at

19   least five, maybe ten, but there was also we were aware

20   -- I don't want to call them agitators, because I don't

21   know what they or didn't do, but we were aware of people

22   wanting to travel to the city Saturday for that protest,

23   and that was also -- not a threat, but there was a risk

24   there, because all the prior protests were generally

25   organic and local, if you will.

ORIGINAL TRANSCRIPT

46

1      Q.    Sure.  Now these agitators to which you

2  referred, did they actually end up showing up on

3  Saturday, April 25th?

4      A.    I want to say Shabazz did, Pete Santilli did,

5  and did his whole stick of agitating both sides, and

6  recording it, and trying to broadcast it.

7      And then it was five years ago, and those are just

8  the ones that stick out, but at least a few of them did,

9  and I believe there was like -- the morning of Saturday,

10  there were some fliers that were getting distributed out

11  of cars, I want to say on the west side Baltimore, that

12  I believe might have been related to Shabazz, but again

13  this like five years ago for me, but there was some

14  major concerns there that we could see they were trying

15  to stir it up and organize it.

16      And I think some of those fliers was when we

17  started to see that chatter about BGF, Black Gorilla

18  Family, and some of the entities joining forces, or

19  what not.

20      So it was definitely -- agitators did make their

21  way to the city as early as -- early Saturday morning

22  until somewhere before noon.

23      Q.    Now you said on Saturday you recall there

24  being fliers distributed about BGF, or the Black Gorilla

25  Family.  What about the Black Gorilla Family did those

1   fliers refer?

2       A.    I believe -- again, five years ago, but there

3   was fliers getting pushed out of these cars.  And I've

4   only seen one that was recovered, so I can't even see if

5   there was more than one version of it, but it was

6   talking about protests, and it was talking, I believe

7   about, you know, some solidarity between BGF, or the

8   Bloods or Crips, or what not.

9       And then there was one, we were in the Watch

10  Center, and there was this video we saw live of --

11  now I don't know if they were really a member of these

12  gangs, you just see colors, but there was some video of

13  like a BGF member, and a Bloods and Crips with red,

14  blue, and brown bandanas, and have taken them off, and

15  doing some dance or something.

16      There was some idea of solidarity between those

17  kind of criminal elements.

18      Q.    Sure.  Now you mentioned that the City was

19  made aware of these agitators either Thursday or Friday.

20  So I'm assuming you're referring to either Thursday

21  April 13th or Friday April -- I'm sorry.

22      Either Thursday April 23rd, or Friday April 24th,

23  is that correct?

24      A.    Correct.  And it could have been earlier than

25  that.  That's when I -- my recollection became aware of

1          A.     Yes.   I'm looking at that right now.

2          Q.     Okay.   And then just so we get this out of

3    the way, you're also on the email chain marked as

4    Exhibit 5, correct?

5          A.     I'm opening that right now.   Correct.

6          Q.     Now, after Freddie Gray's passing on

7    April 19th, and leading up to Saturday April 25th, do

8    you recall the protest getting worse?   In other words,

9    escalating in size?

10         A.     Yes.

11         Q.     Now leading up to the protest reflected --

12   strike that.   Leading up to the protest on

13   April 22, which are reflected in Exhibits 4 and 5, as

14   these protests are starting to get worse, did you attend

15   any meetings regarding how to deal with these escalating

16   protests?

17         A.     Yes.

18         Q.     What meeting do you recall, who was there?

19         A.     I can't -- I mean this is five years ago.

20   If there's a meeting that -- I know I attended a series

21   of meetings related to the acceleration of the protests,

22   but the only meeting that sticks out, because the memory

23   is so strong of what happened Saturday, is a Friday

24   afternoon meeting that was at BPD.

25         Where I was present, and Connor Scott was present,

ORIGINAL TRANSCRIPT

56

1    and I don't believe Bob Maloney was present, but he

2    might have been, is my memory.  There was police from

3    the command staff present.  Commissioner Batts, I

4    believe, at least was present for a part of the meeting.

5         There was definitely fire battalion chiefs, and

6    there was transportation officials.  I don't believe

7    there was any public works, and there might have been

8    City Hall kind of appointed officials.

9         That's the only particular meeting I can pluck out

10   of memory, like the details of the memory, because it's

11   vivid, because it's kind of adjacent to the Saturday,.

12   and the run up to the event in question, but there were

13   definitely meetings before that meeting about planning.

14        I can't recall the dates, or who else was there,

15   because again since the Occupy Movement started

16   somewhere in -- I forget what year that was, but we had

17   been doing so many of these things.

18        Q.    Sure.  Well at the risk of going out of

19   chronological order, let's stick with this Friday

20   meeting that you do recall.

21        And I assume this would have been on Friday,

22   April 24th?

23        A.    Yes.

24        Q.    And you just identified various people who

25   you remember attending that meeting.  What do you recall

ORIGINAL TRANSCRIPT

72

1      So that's the reason for asking to make sure I'm

2  aware of what's happening, and just maintaining that

3  awareness through the situation.

4      Q.   Okay.  If I could direct your attention to

5  09, please.

6      A.   Okay.

7      Q.   And we'll mark that as Exhibit 9, please.

8      (Whereupon, Plaintiff's Exhibit No. 9 was marked

9  for identification, and published to the Witness.)

10  BY MR. HWANG:

11     Q.   And email produced by the City as City's

12  000054378.

13     A.   Okay.

14     Q.   Now this is an email chain between you and

15  Robert Maloney, is that correct?

16     A.   Yes.

17     Q.   Now in the earliest email Robert Maloney sent

18  to you in this chain at 8:29 a.m. on Friday, April 24th.

19     He states that he really needed you to engage today

20  and tomorrow with the protests.  Do you see that?

21     A.   Yes.

22     Q.   While was there a need to -- a particular

23  need to engage on April 24th and 25th of 2015?

24     A.   Again, in the context there is -- Connor was

25  the number 2 at that point, and I was Bob's number two

ORIGINAL TRANSCRIPT

73

1   at City Hall.  Now in a position of really being number
2   three or four.
3        So you know I'm getting back to the agency, and I'm
4   involved in these meetings, but I'm not the number two
5   or three decision maker in the agency, at this point.
6        Really, if Bob is number one, Connor was number
7   two.  Tony at that point, very good operationally, and
8   was my deputy later in my career.  He was really
9   probably number three on operations, and I was maybe
10  number four.
11       So I think this was knowing that we had to staff
12  multiple locations, and him trusting me, because we had
13  a good relationship up to this point, that was just not
14  -- I think this email is not so much about the
15  escalation, although I've already testified to that it
16  was escalating.
17       This email is really about, you know, letting me
18  know that I would be working that Saturday in like a
19  prominent role, as opposed to be being on site and
20  Connor was there, or Tony was there.
21       Q.   Okay.  By this point though, Saturday
22  April 25th is on your radar, right?
23       A.   Of course.  The meeting that this mentions,
24  or the prior exhibit that he mentioned Friday, I mean,
25  we were very aware of what -- you know, what the risks

ORIGINAL TRANSCRIPT

74

1   was, or this was notable.

2       Q.    Okay.  Now if you look at the next email on

3   the chain, the one that you sent on April 24th at 9:20

4   a.m., we're still on Exhibit 9 here.

5       A.    Exhibit 9, okay.  I'm sorry.  Yes.

6       Q.    And again, this is on Friday, April 24th at

7   9:20 a.m.  You say you're heading to the BPD shortly

8   to attend a 10:00 a.m. meeting, and then a meeting at

9   1:00 p.m. at the BPD and then to the Watch Center.

10      So these meetings at the BPD, were these the

11  meetings that you were referring to earlier on

12  Friday, April 24th, that you recalled?

13      A.    Correct.

14      Q.    When did you start going to the Watch Center?

15      A.    So the meetings, the 10:00 a.m., and this

16  actually great that I'm glad my memory is this good five

17  years later.

18      So it sounds like there was two meetings, and then

19  we'd have a meeting like -- I'm assuming the 10:00 a.m.,

20  might have been an hour long meeting, and then the 2:00,

21  and there's a gap between.

22      So the email, I'm saying that I'm going to be at

23  the Watch Center in between, that I wouldn't drive back

24  and forth, because our office was north at 1201 East

25  Cold Spring Lane.

ORIGINAL TRANSCRIPT

77

1    Monday in question, whether she was present or not, just

2    because it's too long ago to recall.

3        Q.    Well would you say that she was very, and by

4    she I'm still on Chief Kaliope Parthemos.  Was she also

5    very hands on with respect to the Freddie Gray protests?

6        A.    I would say, yes.  I would guess, yes.  I

7    mean, I can't recall what meetings she was at, but

8    definitely senior leadership of the City was very

9    interested, and very engaged.

10        Q.    Okay.  How would senior city leadership,

11   whether it's the Mayor herself, or Chief of Staff, or

12   any of the Deputy Mayors, how did they engage when it

13   came to these Freddie Gray protests?

14        A.    So this was interesting because Maloney had

15   just departed his Deputy Mayor for Public Safety role in

16   the January.

17        And then I was acting after that, like I said, for

18   six to seven weeks, and then departed, and I recall that

19   they had hired my or Bob's replacement, who I think was

20   Stephanie Robinson Yett.

21        But her background was somewhat police, but she was

22   really HR from police, which they made it an interesting

23   hire, an odd hire to me personally.  So I think at that

24   point there was a bit more hands on -- I mean, there's

25   always hands on, but probably even more than usually

ORIGINAL TRANSCRIPT

1    where it was Kaliope or the Mayor, who wants these

2    agency heads or these officials to come here for this

3    weekend or this day to work -- you know, a day on a

4    policy document, or a plan, for a press briefing event.

5    So they definitely could be hands on.

6         Q.    Sure.  And this hands on approach by Kaliope

7    Parthemos and/or the Mayor, this continued with the

8    Freddie Gray protest, correct?

9         A.    Yes.

10        Q.    I mean, you briefly touched upon resources.

11   So we can get into that.  Do you recall Melissa Hyatt?

12        A.    Yes.

13        Q.    And I believe you referred early to Dean Paul

14   Mere?

15        A.    Yes.

16        Q.    Now they've both been deposed in this case.

17        A.    Okay.

18        Q.    And during their respective depositions,

19   Chief Hyde for example testified that before April 25th,

20   before that Saturday, April 25, 2015?

21        A.    Yes.

22        Q.    She knew that the Baltimore City Police

23   Department did not have enough resources, and did not

24   have enough officers specifically, to address crowd

25   control issues, and to protect infrastructure.  Was

ORIGINAL TRANSCRIPT

90

1    have to see it, but there's flexibility in these

2    documents.

3         The point of these documents are an emergency -- in

4    our system of Federalism, how our local emergencies that

5    escalate to regional, state, or national emergencies,

6    how are they going to be properly resourced, and there's

7    a minimum way to do that.

8         And for something like the protest in this email

9    Wednesday, we probably hadn't looked at that, and it

10   wasn't at that point, anything of like a state of

11   emergency, or a -- you know, or even a state of

12   heightened -- you know, like it wasn't at that level

13   where Commissioner Batts would be asking Bob yet for

14   assistance through the MEMAC or the EMAC, and we'd be

15   doing REC-A paperwork.

16        Q.    Sure.  Now MEMAC and EMAC, I think you said

17   this, but just want to be sure.  I mean, mutual aid

18   under EMAC and MEMAC, it's mandatory, right?

19        A.    So it's -- that's a great question.  So the

20   way that I understand it is, you're required to respond.

21        What I mean by that is, if there's a -- the beauty

22   of both things, or two things.  One is you are

23   memorializing your costs in writing, and you're going to

24   get reimbursed, and by doing that, then you're also

25   going to be eligible for reimbursement through pubic

 1        A.     Yeah, sure.

 2        (Whereupon, a recess was had at 3:10 p.m.,

 3   continuing at 3:22 p.m.)

 4              THE VIDEOGRAPHER:  It is 3:22 p.m., and we

 5        are back on the record.

 6   BY MR. HWANG:

 7        Q.    Now Mr. McMillan, during the break, did you

 8   speak with anyone about the --

 9        A.     No.

10        Q.    Did you review any documents?  Did you review

11   any documents during the break?

12        A.     No, I didn't.  Should I have been?  If so, I

13   apologize.

14        Q.     No, no, no.  You actually shouldn't be.

15        Now if I could direct your attention to 11, and if

16   we could have that marked as Exhibit 11?

17        (Whereupon, Plaintiff's Exhibit No. 11 was marked

18   for identification, and published to the Witness.)

19   BY MR. HWANG:

20        Q.    It was produced by the City as City's

21   00054571.  Now you're a party to this email chain,

22   correct?

23        A.     Correct.

24        Q.    Now this email chain, which happened on

25   April 22, 2015, this discusses something happening on

1    Saturday at 3:00 p.m.  Do you see that?

2          A.    Yes.

3          Q.    Now by my calculations, the Saturday after

4    April 22nd, would have been April 25, 2015?

5          A.    Yes.

6          Q.    What does this email chain refer to as

7    happening at 3:00 p.m., on April 25, 2015?

8          A.    I would assume that it's the City Hall

9    protest for that Saturday, my guess is -- but again,

10   I don't see it reflected in the email, and this was

11   five years ago.

12         There was the planned protest for City Hall, and

13   eight permits of some sort were filed.  And so Connor

14   was the Deputy Director at that time, probably tied into

15   those -- the permitting stuff that we aware of that way,

16   or BPD was aware through their relationships with the

17   local organizers, or their monitoring of social media

18   chatter, in the way in which they subscribed to certain

19   social media accounts.

20         Q.    Okay.  So would you say that the protests

21   that occurred on April 25, 2015 were already on the

22   City's radar by the time April 22, came around?

23         A.    Yeah.  I think this email is letting us know

24   that there's a time, and it's being set.  So, yes.

25         Q.    Sure.  Now if I could direct your attention

1  to 12.  And if we could have that marked as 12.

2      (Whereupon, Plaintiff's Exhibit No. 12 was marked

3  for identification, and published to the Witness.)

4  BY MR. HWANG:

5      Q.   It's produced by the City as City's

6  00054190.

7      A.   Yes.

8      Q.   Now you received this email on April 25th at

9  11:22 a.m., correct?

10      A.   Correct.

11      Q.   Now in this email Robert Maloney tells you

12  that he wants updates every thirty minutes, even if it's

13  uneventful, correct?

14      A.   Correct.

15      Q.   Did the -- was there something in particular

16  about this day, or did he often ask for updates that

17  frequently?

18      A.   I think during -- I mean, Bob is -- you know,

19  is a very talented individual in terms of having a nose

20  for these things.

21      So I think going into that morning with some of the

22  chatter, he thought it could turn eventful clearly.  It

23  was standard to do this for every day certainly,

24  although I spent three years working for him as a deputy

25  where we shared -- we didn't share an office.  We had

1      Q.    Okay.  Prior to April 25, 2015, do you recall

2  there being any discussion about whether if and when a

3  state of emergency would be declared?

4      A.    Prior what date, I'm sorry?

5      Q.    April 25, 2015.

6      A.    I do not recall any conversations about that.

7      Q.    What about curfews, do you ever recall

8  curfews being discussed prior to April 25, 2015?

9      A.    No.

10     Q.    Now eventually April 25, 2015, it turns into

11  rioting, correct?

12     A.    Correct.

13     Q.    And is it safe to say that there was greater

14  violence and property destruction on April 25, 2015,

15  then on days prior?

16     A.    Yes, correct.

17     Q.    Now if I could direct your attention to 13,

18  and if we could have this marked, please?

19     (Whereupon, Plaintiff's Exhibit No. 13 was marked

20  for identification, and published to the Witness.)

21  BY MR. HWANG:

22     Q.    This is produced by the City, as an email

23  chain as City's 00008818 through 8821.  Now you're on

24  this email chain, correct?

25     A.    Correct.  Can I have one minute to review, if

1    In the command center, Commissioner Batts was in
2    and out.  Later in the evening, Kaliope was there.
3    Kaliope Parthemos, Chief of Staff.
4    Mayor Rawlings-Blake was there in the early
5    evening, as soon as things started to take that turn.
6    Commissioner Batts was there.  I can recall watching
7    some of the Camden Yards action right next to
8    Commissioner Batts and the Mayor, and the Chief of
9    Staff.
10    Assistant Chief, Jeff Segal, made his way down
11    midway through.  So I think he was there some time in
12    the afternoon or evening, at 4:00 or 5:00.
13    A lot of different officers from BPD command were
14    running their various points, and the radio chatter once
15    this escalated was very loud and there was a lot of
16    action.
17    So a lot of -- most of the agencies that I would
18    think should be represented, were represented there.
19    I can't remember all the names.
20    I want to say that Erica Walcheck was there, but
21    there was all basic BPD command that I can thing of
22    notably, that wasn't in the field, was in that room
23    along side, you know, representatives from a number of
24    agencies.
25    Q.   Do recall Melissa Hyatt being there?

ORIGINAL TRANSCRIPT

131

1       A.    Yes.

2       Q.    Now just to help me, because this is very

3   long.  The attachments are very long.  I'm going to

4   refer to things by the base number, which is the number

5   on the right hand.

6       A.    Okay.

7       Q.    Now beginning on City's 00003821, going to

8   4021 --

9       A.    Yes.

10      Q.    That is the City of Baltimore's Emergency

11  Operations Plan, is that correct?

12      A.    Correct.

13      Q.    And is this a true and accurate copy?

14      A.    Yes.

15      Q.    And this was in place during the period of

16  the Freddie Gray protests, correct?

17      A.    Right.

18      Q.    And next, beginning on 4022.

19      A.    One second.

20      Q.    To 4053.  4022, is where is starts.

21      A.    Okay, 4022.

22      Q.    Going to 4053.

23      A.    Yes.

24      Q.    That is the City of Baltimore's Continuity of

25  Government plan, correct?

1         A.    Right.

2         Q.    And was that also in place during the

3    entirety of the Freddie Gray protests?

4         A.    Correct.

5         Q.    Now next, the third attachment begins on

6    City's 00004054, and goes until 4060, which is the end.

7         A.    Okay.

8         Q.    Now this is the Civil Disorder Section, for

9    the Hazard Annex to the City of Baltimore's Emergency

10   Operations plan, correct?

11        A.    Correct.

12        Q.    And was this also in place in the entirety of

13   the Freddie Gray protests?

14        A.     So that's an interesting question on that

15   one.  It was in draft form.  I do not believe it was

16   ever formally promulgated.  Meaning, I don't believe the

17   Mayor signed off on that.

18        So basically, the City's EOP is ESF, Emergency

19   Support Function based, which is basically we look at

20   the different functions the City has, and then really

21   run through who's responsible for each function as the

22   lead agency.

23        Who they core support agency in providing that

24   service or that function, and with other kind of

25   ancillary stakeholders.  And then generally speaking to

ORIGINAL TRANSCRIPT

1    damage to cars.

2         They were now violent to people, not just property,

3    and property is important, but there were the fights

4    that were happening at that strip of bars.  Some of the

5    protestors were fighting with each other.

6         I think as some of ones who realized this is wrong,

7    were trying to correct the others, they were fighting

8    each other now.

9         So there was a lot of sadness about that, and then

10   policy discussions I think about their arrests, and how

11   to get this under control, but I can't recall any detail

12   of that, both five years later, but also the amount of

13   radio traffic and chatter happening in that room was

14   just immense.

15        Q.    Okay.  I mean, with all the violence, and the

16   fighting, and the property destruction, I mean at that

17   point it had become an emergency beyond normal operating

18   procedures, correct?

19        A.    Yes.  I would say it was.

20        Q.    And I know you may not recall specifics, but

21   generally you referred to recalling there being policy

22   discussions about arrests, and how to get this under

23   control.

24        At that point, the Mayor is there, Stephanie

25   Rawlings-Blake, as well as Kaliope Parthemos.  I mean,

ORIGINAL TRANSCRIPT

1   quiet.

2        A.   Yes.

3        Q.   If I could direct your attention to --

4   actually, before we get into Sunday.  If I could point

5   to Exhibit 17, please, if we could mark it as such.

6        (Whereupon, Plaintiff's Exhibit No. 17 was marked

7   for identification, and purblished to the Witness.)

8   BY MR. HWANG:

9        Q.   It's an email chain produced -- or email

10  produced by the City as City's 00053393 through 53396.

11       A.   Yes.

12       Q.   Do you recall what the Safety Coalition was?

13       A.   Yeah.  So the Downtown Business Partnership

14  is like a quasi governmental, I think non profit that

15  does a lot of things in the downtown area to make it

16  more vibrant.

17       Part of that is the Safety Coalition.  They helped

18  discriminate information amongst the public safety folks

19  in the private community.  You know, the hotels and

20  things have their own security forces and all that.

21       We would go to those meetings, whenever it was, a

22  monthly or quarterly basis.  And so they kind of did a

23  lot of discriminating information.

24       Q.   Okay.  Do you recall Tom Yeager?

25       A.   Yes, I do.

1      Q.    Who was he at that time, or what was his

2  role?

3      A.    I believe he was basically the director of

4  the public safety arm of the Downtown Business

5  Partnership.

6      Q.    Okay.  Now you received this email, correct,

7  Exhibit 17?

8      A.    I'm guessing I did, but let me look at -- if

9  I'm in this list.  Oh, it's a long list.  I'm going to

10  say yes.  I assume that I was on this distribution list.

11      Q.    Okay.  Now if you look towards the message,

12  and in case you're curious, your name is half way -- I

13  know it's hard to see with hundreds of names.

14      A.    It's in there.

15      Q.    But I direct your attention to the actual

16  message which is shown on the last page.  In this email

17  Mr. Yeager states that the Baltimore Police Department

18  is asking downtown businesses to close for the evening

19  out of concern for public safety.  Do you see that?

20      A.    Yes.

21      Q.    And this is again, this is still on Saturday

22  April 25, 2015, and this email was sent at 8:00 p.m.

23      A.    Right.

24      Q.    You're still at the Watch Center at this

25  point, correct?

**ORIGINAL TRANSCRIPT**

151

1    A.    Yes.

2    Q.    Do you recall there being a discussion about

3 hey, we need to advise the businesses to close out of

4 public safety?

5    A.    I do not, and I don't know -- you know, who

6 he might have liaised with at BPD.  It could be a direct

7 call to anybody that he was in contact with, but I don't

8 recall a direct conversation about that, or debate.

9    Q.    Okay.  Now if we could go to Exhibit 18,

10 please.

11    (Whereupon, Plaintiff's Exhibit No. 18 was marked

12 for identification, and published to the Witness.)

13 BY MR. HWANG:

14    Q.    Now Saturday was quiet -- or sorry, Sunday

15 was quiet?

16    A.    Yes.

17    Q.    But Monday was on the City's, and Baltimore

18 City Police Department's radar, correct?

19    A.    Correct.

20    Q.    Why was it on the City's radar, and why was

21 it on the Baltimore City Police Department's radar?

22    A.    So initially it was because the funeral for

23 Freddie Gray was scheduled, if I recall correctly, that

24 Monday morning.  So that can be, you know, a flash point

25 for more protests.

1      A.    I mean, at least I would say -- I wouldn't

2  say messy, but I'd say large.  We knew -- however we

3  knew, I can't recall back then.  Whether it was a

4  permit, whether it was through BPD's other sources, that

5  there was going to be the City Hall protests, and that

6  it would at least be in the hundreds, if not more.

7      And so that made, you know, a larger crowd control

8  concern, plus things had be escalating, yes.

9      Q.    Now Monday the City knew -- you know, for

10  some time that Freddie Gray's funeral was scheduled for

11  that day, correct?

12      A.    Correct.

13      Q.    And did the City view the fact that Freddie

14  Grays' funeral was scheduled for a Monday as a potential

15  trigger point, or a cause for there to be a big protest

16  on Monday as well?

17      A.    Yes.  I would say yes.

18      Q.    Right.  And just like the big protests

19  scheduled for Saturday brought concerns, there were

20  also concerns for Monday, April 27th, correct?

21      A.    Correct.

22      Q.    Now the fact that Sunday was largely quiet,

23  did that minimize the concerns that the City had for

24  Monday, April 27, 2015?

25      A.    I wouldn't say minimize.  I mean, I do think

ORIGINAL TRANSCRIPT

1   wide was continuing to be a problem.  So I would guess

2   that there was continued protest.

3        I don't recall anything like on the day of Tuesday,

4   but ongoing, I'm sure there were.

5        Q.    Sure.  Now whether there was ongoing protest,

6   was there anymore rioting?

7        A.    No.  Or not to my recollection at least, no.

8        Q.    Would you say that the National Guard coming

9   in, the curfew, the state of emergency that all helped

10  quell, and prevent further rioting?

11       A.    Yes.  I think the presence of the National

12  Guard -- I know a citizen who lives on the west side

13  and who saw National Guardsmen posted outside of

14  Mondawmin Mall, which is only five minutes from my house

15  that I'm sitting in right now.

16        There's -- it's scary on one end, and also

17  comforting on another, which is a bizarre position.

18  So there was that from a citizen's standpoint.

19       I think from my professional experience as a Public

20  Safety Official, I think the event was already over, had

21  finished by the time that National Guard arrived, but at

22  the same time the presence ongoing, with the mutual aid,

23  would deter anybody from restarting it.

24       Then at that point you get days out, it's like it

25  is out of everybody's system, and now you're thinking

1      (Whereupon, the deposition proceedings were

2  concluded at 5:15 p.m., where the reading and signing

3  was waived.)

4          CERTIFICATE OF REPORTER-TRANSCRIPTIONIST

5

6      STATE OF FLORIDA )

7      COUNTY OF BREVARD )

8

9          I, LORI W. PYRON, Florida Professional
   Reporter, do hereby certify that I was authorized
10  to and did transcribe the digitally recorded
   deposition of
11              DAVID McMILLAN,
   that a review of the transcript was not requested,
12  and that the foregoing transcript, Pages 4 through
   204, is a true and correct record to the best of my
13  hearing abilities.
          I further certify that I am not a relative,
14  employee, or attorney, or counsel of
   employee of any other parties' attorney or
15  counsel connected with this action, nor
   am I financially interested in the action.
16
          DATED this 31st day of March, 2021.
17

18

19

20  _____

21          Lori W. Pyron
          Florida Professional Reporter
22          Notary Public at Large
          HH029407 Expires 8/31/2024
23

24

25

# EXHIBIT 10

# In The Matter Of:

*CHAE BROTHERS, LIMITED LIABILITY COMPANY, ET AL. v.*
*MAYOR AND CITY COUNCIL OF BALTIMORE, ET AL.*

---

*ANTHONY BATTS*
*March 12, 2021*
*ORIGINAL TRANSCRIPT*

---

*CourtScribes, Inc.*
*"Delivering More For Less"*
*(833) 727-4237*
*info@courtscribes.com*
*www.courtscribes.com*

1

1   IN THE UNITED STATES DISTRICT COURT FOR THE

2   DISTRICT OF MARYLAND

3   NORTHERN DIVISION

4   CIVIL ACTION NO.: 1:17-CV-01657-SAG

5

6   CHAE BROTHERS, LIMITED LIABILITY COMPANY

7   D/B/A FIRESIDE NORTH LIQUORS, ET AL. ,

8   PLAINTIFF,

9

10  VS.

11

12  MAYOR AND CITY COUNCIL OF BALTIMORE, ET AL.,

13  DEFENDANTS,

14  _____/

15  VIDEOTAPED DEPOSITION OF ANTHONY BATTS

16  DATE:            MARCH 12, 2021

17  REPORTER:        TREY SIDENBENDER

18  PLACE:           REMOTE VIDEO CONFERENCE

19

20

21

22

23

24

25

2

1                          APPEARANCES

2      ON BEHALF OF THE PLAINTIFF, CHAE BROTHERS,
       LIMITED LIABILITY COMPANY D/B/A FIRESIDE
3      NORTH LIQUORS, ET AL.:
       PETER HWANG, ESQUIRE
4      SUNG & HWANG LLP
       9256 BENDIX ROAD, #109
5      COLUMBIA, MARYLAND 21045
       TELEPHONE NO.: (410) 772-2324
6      E-MAIL: PHWANG@SUNGANDHWANG.COM

7      RAY SHEPARD, ESQUIRE
       THE SHEPARD LAW FIRM LLC
8      122 RIVIERA DRIVE
       PASADENA, MARYLAND 21122
9      TELEPHONE NO.: (410) 225-0700

10     ON BEHALF OF THE DEFENDANT, MAYOR AND CITY COUNCIL
       OF BALTIMORE, ET AL.:
11     HANNA MARIE C. SHEEHAN, ESQUIRE
       SARA E. GROSS, ESQUIRE
12     BALTIMORE CITY DEPARTMENT OF LAW
       100 NORTH HOLLIDAY STREET
13     BALTIMORE, MARYLAND  21202
       TELEPHONE NO.: (410) 396.3947
14     E-MAIL: SARA.GROSS@BALTIMORECITY.GOV

15     ON BEHALF OF THE WITNESS, ANTHONY BATTS
       JAMES CORLEY, ESQUIRE
16     BALTIMORE CITY DEPARTMENT OF LAW
       100 NORTH HOLLIDAY STREET
17     BALTIMORE, MARYLAND  21202
       TELEPHONE NO.: (410) 396.3947
18

19

20

21

22

23

24

25

3

1                              INDEX
                                                  Page
2
   PROCEEDINGS                                       9
3  DIRECT EXAMINATION BY PETER HWANG                10
   CROSS EXAMINATION BY SARA GROSS                  306
4
                             EXHIBITS
5  Exhibit                                         Page

6      1      SUBPOENA AND SCHEDULE                  16

7      2      PROTECTIVE ORDER AND AGREEMENT         18

8      3      PRESS RELEASE                          28

9      4      AMENDED COMPLAINT                      37

10     5      CITY00005465-5541                      42

11     6      GENERAL ORDER T-7                      44

12     7      CITY00010337                           54

13     8      CITY00010224-32                        54

14     9      CITY00004537                           54

15     10     CITY00010392-96                        54

16     11     CITY00010094                           66

17     12     CITY00044190                           66

18     13     CITY00044185                           66

19     14     CITY00005798                           69

20     15     CITY00015586-626                       85

21     16     CITY00040945                           99

22     17     CITY00009552-55                       100

23     18     CITY00009496                          114

24     19     CITY00007498                          117

25     20     CITY00008884                          117

25

5

```
 1                    EXHIBITS CONTINUED
        Exhibit                                 Page
 2        21      CITY00007492                   117
 3        22      CITY00009618-19                121
 4        23      CITY00008781-82                126
 5        24      CITY00008860                   126
 6        25      CITY00053351                   126
 7        26      CITY00008777                   126
 8        27      CITY00040301                   134
 9        28      CITY00040304                   134
10        29      CITY00001315-17                139
11        30      CITY00040254-58                148
12        31      CITY00005695                   152
13        32      CITY00041208                   154
14        33      CITY00005656-61                155
15        34      CITY00007595-7689              163
16        35      CITY00040259                   170
17        36      CITY00045742                   171
18        37      CITY00043672                   203
19        38      CITY00041513                   203
20        39      CITY00021802-06                212
21        40      CITY00021807-12                212
22        41      CITY00008818-21                226
23        42      CITY00021529-60                232
24        43      CITY00053393-96                252
25        44      CITY00009993                   254
```

6

|  | Exhibit | EXHIBITS CONTINUED | Page |
|---|---|---|---|
| 2 | 45 | CITY00005547-52 | 257 |
| 3 | 46 | CITY00006498-6596 | 257 |
| 4 | 47 | CITY00005465-5541 | 257 |
| 5 | 48 | CITY00040223-24 | 262 |
| 6 | 49 | CITY00045303 | 264 |
| 7 | 50 | CITY00045272 | 268 |
| 8 | 51 | CITY00013301-06 | ** |
| 9 | 52 | CITY00045933 | ** |
| 10 | 53 | CITY00045272 | 270 |
| 11 | 54 | CITY00040413 | 272 |
| 12 | 55 | CITY00041194 | 272 |
| 13 | 56 | CITY00012113 | 272 |
| 14 | 57 | CITY00046285 | 272 |
| 15 | 58 | CITY00011631 | 274 |
| 16 | 59 | CITY00045302 | 275 |
| 17 | 60 | CITY00046343 | 279 |
| 18 | 61 | CITY00000736 | 281 |
| 19 | 62 | CITY00010660 | 283 |
| 20 | 63 | CITY00053858 | 283 |
| 21 | 64 | CITY00010998 | ** |
| 22 | 65 | CITY00016847-63 | ** |
| 23 | 66 | CITY00021675-715 | ** |
| 24 | 67 | CITY00025873-913 | ** |
| 25 | 68 | CITY00054010-11 | ** |

```
 1                    EXHIBITS CONTINUED
          Exhibit                               Page
 2          69     CITY00046346                  **

 3          70     CITY00010586                  285

 4          71     CITY00012096                  288

 5          72     CITY00045327                  **

 6          73     CITY00011548                  289

 7          74     CITY00012139                  **

 8          75     CITY00021354                  **

 9          76     CITY00018202                  **

10          77     ARTICLE, 5.27.15              291

11          78     ARTICLE, 10.13.20             296

12               **EXHIBIT MARKED OFF RECORD

13                    CERTIFIED QUESTIONS

14        PAGE 35, LINES 22-24
          PAGE 243, LINES 17-20
15        PAGE 299, LINES 4-6

16

17

18

19

20

21

22

23

24

25
```

1                         STIPULATION

2

3    THE VIDEO DEPOSITION OF ANTHONY BATTS TAKEN VIA REMOTE

4    VIDEO CONFERENCE ON FRIDAY THE 12TH DAY OF MARCH, 2021

5    AT APPROXIMATELY 10:01 A.M.; SAID DEPOSITION WAS TAKEN

6    PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE.

7

8

9

10   IT IS AGREED THAT TREY SIDENBENDER, BEING A NOTARY PUBLIC

11   AND COURT REPORTER FOR THE STATE OF FLORIDA, MAY SWEAR

12   THE WITNESS AND THAT THE READING AND SIGNING OF THE

13   COMPLETED TRANSCRIPT BY THE WITNESS IS NOT WAIVED.

14

15

16

17

18

19

20

21

22

23

24

25

1        COURT REPORTER:  All right.  I currently have the

2    time as 10:01 a.m.  We are on the record.  My name is

3    Trey Sidenbender, I'm the digital court reporter.  We

4    are here today for the purpose of recording the

5    deposition of Anthony Batts taken by Plaintiff in the

6    matter of the Chae Brothers Limited Liability versus

7    City Council.  If everyone is ready to commence the

8    proceedings, Counsel will now state their appearances.

9        MR. HWANG:  Good morning.  Peter Hwang and Ray

10   Shepard, on behalf of all the plaintiffs.

11       MR. CORLEY:  Jim Corley, on behalf -- go ahead,

12   Sarah.

13       MS. SHEEHAN:  Good morning, Sara Gross and Hanna

14   Sheehan on behalf of the mayor and City Council,

15   Baltimore.

16       MR. CORLEY:  Good morning.  Jim Corley, on behalf

17   of Anthony Batts.

18       COURT REPORTER:  Thank you.  I will now swear in

19   the witness.  Please raise your right hand.  Do you,

20   Anthony Batts, swear or affirm to tell the truth, the

21   whole truth, and nothing but the truth so help you God?

22       THE WITNESS:  I do.

23       COURT REPORTER:  Counsel, you may begin.

24        DIRECT EXAMINATION

25        BY MR. HWANG:

1      Q     Good morning, Mr. Batts.  As you may know, my name

2    is Peter Hwang and I represent the plaintiffs in this action

3    who are suing the mayor and City Council of Baltimore for,

4    among other things, damages to plaintiff's property and

5    businesses.  As you know, we're here for a deposition which

6    will consist of me asking you questions and you providing

7    answers to those questions.  As you can see there's a court

8    reporter here.  He is transcribing my questions and your

9    responses.  As such, it's important that you answer any

10   questions verbally.  Please refrain from answering questions

11   with gestures like a head nod or a sound like, "Uh-huh." As

12   you can imagine, it's hard for the court reporter to

13   transcribe those kinds of responses.  It's extremely

14   important that you understand the questions that I'm asking.

15   If for some reason you do not understand a particular

16   question, please let me know and I'll try to rephrase.  If

17   you, however, go ahead and answer a question, I will assume

18   that you understood it.  I noticed that you do have counsel

19   present.  You may hear your counsel object to certain

20   questions from time to time.  However, unless he

21   specifically advises you not to answer a particular

22   question, I will ask that you answer questions despite any

23   objections.  Also, if you, at any point, need to take a

24   bathroom break or need to stretch your legs, please let me

25   know, and I'll try to at least finish my line of

1      Q    Okay.  Now, prior to doing that kind of consulting

2 work for the past six years operating that company, were you

3 employed?

4      A    Yes.

5      Q    Where?

6      A    One I had -- still had the company but it wasn't

7 official.  I was doing things as I was requested to.  I was

8 the Commissioner of the Baltimore Police Department.

9      Q    Okay.  And during what period of time were you the

10 Commissioner for the Baltimore City Police Department?

11      A    Approximately Oct -- Septem -- last week of

12 September, roughly October 2012 to July, 8th,1500 hours,

13 2015.

14      Q    Okay.  And prior to late September of 2012, where

15 were you employed?

16      A    Prior to 2012, I did some consultant work, did

17 some work as a fellow for Harvard University.  And prior to

18 that, I was with the Oakland Police Department.

19      Q    Okay.  And during what period of time were you

20 employed by the Oakland Police Department?

21      A    Would be approximately October of 2009, to roughly

22 October of 2011.

23      Q    Okay.  And during your time period during which

24 you were employed by the Oakland Police Department, what

25 rank or title did you hold?

1    you were with Long Beach Police Department in 1982?

2         A    In 1982, I -- I went in as a recruit police

3    officer into the police academy.

4         Q    Okay.  Now, if I could take you back to late

5    September of 2012, through July 8, 2015.  That period of

6    time during which you were the police chief of the Baltimore

7    City Police Department -- or the commissioner, rather.  When

8    you became commissioner, was that position an appointed

9    position?

10        A    Say that one more time?  I'm sorry.

11        Q    Your position as the Baltimore City Police

12   Commissioner, was that an appointed position?

13        A    Yes.

14        Q    Who appointed you?

15        A    As far as I know, it was the mayor of the city by

16   approval of probably the City Council.

17        Q    Okay.  By the mayor, do you mean then Mayor

18   Stephanie Rawlings-Blake?

19        A    Correct.

20        Q    Okay.  And that appointment was subject to the

21   approval of the City Council, is that what you testified to?

22        A    I believe that is correct.  Yes.

23        Q    And I assume that the City Council approved then

24   Mayor Stephanie Rawlings-Blake's appointment of you as

25   police commissioner?

24

1       A     Yes.  Based on a hearing that took place.

2       Q     Okay.  Now, during your time as commissioner of

3   the Baltimore City Police Department, did you have any role

4   in submitting and/or supporting the police department's

5   budget?

6       A     Yes.

7       Q     What role?

8       A     My job, as a commissioner to the police

9   department, was overseeing the budget, you know, supplying a

10  budget to be approved by City Council each year, as well as

11  defending the budget, regulating the budget, and addressing

12  any questions that the council or citizens may have of the

13  budget.

14      Q     Okay.  During your time as police commissioner,

15  can you walk me through the process of the police

16  department's submission and the subsequent approval and

17  defending of the budget?

18      A     I could give you a overview.

19      Q     Sure.

20      A     The budget was constructed within my agency,

21  usually by a budget director.  It was approved by me, then

22  submitted to the deputy mayor who oversaw my organization.

23  Questions were asked or corrections were made, if direction

24  was given, it was given to the budget office.  I believe

25  that budget office would then submit it to the mayor, or

25

1    send it back to me to be corrected, or changed, or whatever

2    they wanted done to it.

3         Q    Okay.  And this process with the mayor's office,

4    was it an annual process?

5         A    Yes.

6         Q    Okay.  And did you also have to appear before the

7    City Council or the board of estimates to have that budget

8    approved?

9         A    I -- I either had to appear or a representative

10   under my command had to appear.

11        Q    Okay.  And that's before the City Council and

12   board of estimates?

13        A    Yes.

14        Q    Okay.  And was that also done annually?

15        A    Yes.

16        Q    Now, during your time as a commissioner, who did

17   you report to?

18        A    There was a deputy mayor that was over top of me,

19   and then there was a chief of staff over him, and then the

20   mayor of the City of Baltimore.

21        Q    Okay.

22        A    In addition, I also reported to City Council

23   members and the president of the council, tangentially.

24        Q    Okay.  During your time as police commissioner,

25   who was the deputy mayor that you reported to?

1        A     Bob Maloney.

2        Q     Okay.  And you mentioned, I believe, that Bob

3   Maloney reported to a chief of staff?

4        A     Yes.

5        Q     During your time as police commissioner, who was

6   that chief of staff?

7        A     I think there were several.  The ones that --

8   there was Mr. Sanchez, cannot remember his first name.  And

9   then there was Kaliope, I think her name is, who was the

10  chief of staff when I left.

11       Q     Would that be Kaliope Parthemos?

12       A     I think that's correct.

13       Q     Okay.  Now, during your time as commissioner, did

14  you have regularly scheduled standing meetings with Mayor

15  Stephanie Rawlings-Blake?

16       A     Initially, yes.

17       Q     Okay.  How often were those regularly scheduled

18  standing meetings?

19       A     Don't recall exactly.

20       Q     Were they more like weekly, more like monthly,

21  more like yearly?

22       A     More like monthly.

23       Q     Okay.  And what was the purpose of those standing

24  monthly meetings with then Mayor Stephanie Rawlings-Blake?

25       A     They were subsequent to a request that I had made

1    as when I became -- or took -- took the job, that I had

2    regular access with her to make sure I knew exactly what she

3    wanted that was not filtered.

4         Q    Okay.  And what kind of things would you discuss

5    with then Mayor Stephanie Rawlings-Blake as far as what she

6    wanted during these monthly meetings?

7         A    The running of the police department, any current

8    events, any things that may blindside the mayor, budgetary

9    issues, crime issues, overall running of the police --

10   police organization within probably the 30 minutes that I

11   had with her and answering any questions she may have of

12   those issues.

13        Q    Okay.  Now, did you also meet with then Mayor

14   Stephanie Rawlings-Blake outside of those regularly

15   scheduled standing monthly meetings as police commissioner?

16        A    If you will define the meeting with her, she and I

17   one-on-one, no.  But I would have meetings that we met with

18   the public and I was in attendance with her.

19        Q    Okay.  Would you meet with the mayor's office even

20   if it's not the mayor on and off, outside of these standing

21   regularly scheduled monthly meetings?

22        A    Yes.

23        Q    Okay.  How often would you say you would be in

24   touch with someone from the mayor's office?

25        A    It could be daily, it could be hourly, would

1    depend on the day.

2        Q    Okay.  So would you -- is it safe to assume that

3    it'd be as situations arise that would dictate how often

4    you're speaking with the mayor's office?

5        A    It could be scheduled meet -- regular meetings and

6    it can be if some issue that took place or they wanted

7    answers to questions.

8        Q    Okay.  Now, if I could direct your attention to

9    03.  And if we could have this marked as Exhibit 3?

10            (EXHIBIT 3 MARKED FOR IDENTIFICATION)

11        Q    Now, Mr. Batts, this is -- Exhibit 3 is a press

12    release issued by the City on November 21, 2013.  This press

13    release refers to then Mayor Stephanie Rawlings-Blake

14    joining you to release a strategic plan for the Baltimore

15    Police Department through a report entitled, "Public safety

16    and the City of Baltimore, a strategic plan for

17    improvement." Do you see that?

18        A    Yes.

19        Q    Do you recall the strategic plan?

20        A    Yes.  It was at my request.

21        Q    Okay.  What kind of coordination was there between

22    the mayor's office and the Baltimore City Police Department

23    for that strategic plan?

24        A    Well, when I made the -- first of all, to even

25    think about doing a strategic plan, I ran it by the mayor in

1  a concept and explained to her why.  I wanted a strategic

2  plan which was to let the public, community politicians know

3  exactly what I was focused on, what I was trying to achieve,

4  in addition to having to be a report card for me and the

5  police organization, and to make sure the organization was

6  responsive to its community and what the community said that

7  we should be doing as a whole.  Then -- then we had to hire

8  outside consultants to come in to construct the strategic

9  plan and the mayor had to approve it.

10     Q     Okay.  And what was the crux of the strategic

11  plan?

12     A     I think it fell into five pillars that focused on

13  what the public wanted from the organization.  We looked at,

14  not only input and output but outcome.  Were we serving the

15  community in a way that they said?  We'll allow the

16  community to rate us and tell us where we were at that time

17  and the areas that we needed to improve in to allow

18  employees to respond back to give their perception of where

19  the organization was, what it need -- needed to improve in

20  -- improve on as an organization.

21     Q     Okay.  Were there any specific concerns that the

22  mayor wanted to be addressed in this strategic plan or

23  concerns or issues?

24     A     One of the -- what comes out in the strategic plan

25  is the mayor is very much concerned with community policing.

1    She had two things, she wanted the homicide rate to stay

2    down and she wanted better connectivity with the community.

3        Q    Okay.  When you say that the mayor wanted better

4    connectivity with the community.  What does she mean by

5    that, or what do you mean by that?

6        A    What I was led to believe by people sharing with

7    me as they recruited me to come to the police organization,

8    is although the homicide rate was going to -- in the correct

9    way, that they didn't feel comfortable with the community

10   policing within the city.

11       Q    Okay.  What issues were there with community

12   policing in the city that you wanted to -- that you and/or

13   the mayor wanted to address?

14       A    There was a number of things.  I wanted to make

15   sure that the police department was a customer-driven

16   organization.  That the community-directed us in what we

17   wanted to do.  As you can see, the strategic plan is built

18   around that.  I wanted to make sure that officers felt com

19   -- comfortable in the community making connections.  To

20   build a community policing framework within the

21   organization.  My concern, coming in, is that the police

22   department had what I believed to be officer-involved -- a

23   number of off -- high officer-involved shooting rate that --

24   that was uncomfortable -- uncomfortable with.  Issues of

25   excessive force cases were too high from my perspective.

1    Too many lawsuits, too many EEOC complaints, and too many

2    citizen complaints overall.

3        Q    Okay.  Was use of force a concern of the mayor --

4        A    Yes.

5        Q    -- when coordinating with the police department

6    with respect to the strategic plan?

7        A    Sir, I interrupted you.  I apologize.  If the

8    question was, was excessive force a concern with the mayor?

9    Yes.

10       Q    Okay.  Now, aside from this strategic plan, what

11   other general issues do you recall coordinating with the

12   mayor's office to address with respect to the Baltimore City

13   Police Department?

14       A    I'm not sure I understand your question.

15       Q    Sure.  I mean, strategic plans, they're very high

16   level, right?  Were there any other high-level issues that

17   you recall discussing with the mayor's office or

18   coordinating with the mayor's office, to determine how, from

19   a high level, you would instruct the Baltimore City Police

20   Department to operate?

21       A    Still not sure.  Could you hone down on exactly

22   because that's -- I'm not getting the crux of what you --

23   you're asking me?

24       Q    Sure.  So we mentioned excessive force or use of

25   force as being one issue in particular that the mayor was

1    is to come back and do a presentation before the City

2    Council to answer any of their questions and provide the

3    data that they requested.  If we were not on the agenda, the

4    responsibility of the staff member for my department was to

5    be there to answer any off-agenda items or know what's going

6    on to report back to me.

7         Q    Okay.  Would the City Council provide input during

8    these meetings as to how they wished the Baltimore City

9    Police Department to operate?

10        A    There -- there are sub-committee meetings that

11   dealt specifically with public safety within those -- within

12   those meetings.  They would ask us questions or concerns or

13   direct me to address things that they had focused on.  But

14   we also had -- I had my -- my district majors calling every

15   council member, their office, on a weekly basis, every

16   Monday, to ask them if they had any major issues that we

17   could address.

18        Q    Okay.  Do you recall any issues that either the

19   City Council as a whole or the public safety sub-committee

20   raised and asked the Baltimore City Police Department to

21   address?

22        A    No.

23        Q    Okay.  You don't recall any discussions regarding

24   use of force issues or excessive force issues?

25        A    All I recall is when I came into the organization,

1  a consistent theme was a unit that was response -- was said

2  to be responsible for the crime drop or was seen by parts of

3  the community as being heavy-handed and those who drove the

4  excessive force complaints, the citizen complaints, the

5  lawsuits, et cetera.

6      Q    Okay.  And were those concerns also expressed by

7  the City Council as a whole or the public safety

8  sub-committee?

9      A    I wouldn't say it was addressed by the City

10 Council as a whole but I do recall City Council members,

11 including the president of the council, addressing those --

12 those issues.  It was more of the counsel people who were

13 connected to the African-American communities within the

14 city.

15     Q    Okay.  And the president at that time, was it Jack

16 Downey?

17     A    Yes.

18     Q    Okay.  And who were the other council members that

19 you recall raising those concerns?

20     A    That's all I recall.

21          (CERTIFIED QUESTION)

22     Q    Now, how was your employment as police

23 commissioner of the Baltimore City Police Department

24 terminated?

25     A    July, I was in a meeting that was critiquing our

1    response to the riots, which I had called and asked to come

2    in --

3            MS. SHEEHAN:  I -- I'm going to object.

4        Commissioner, I am going to ask your attorney to

5        instruct you not to answer the question.  We're

6        asserting executive privilege on behalf of the mayor,

7        personnel issues are confidential and within the purview

8        of executive privilege.  So --

9            BY MR. HWANG:

10   Q    Let me ask you this way: Mr. Batts --

11           MR. HWANG:  Well, first of all, Mr. Corley, do you

12       instruct your client not to answer that question?

13           MR. CORLEY:  I do.

14   Q    Okay.  Mr. Batts, let me ask it to you another

15   way: Were you fired as the police commissioner?

16   A    Yes.

17   Q    Okay.  Who fired you?

18   A    The mayor.

19   Q    Okay.  And the mayor, you mean then Mayor

20   Stephanie Rawlings-Blake?

21   A    Correct.

22   Q    Okay.  Now, Mr. Batts, are you familiar with what

23   has commonly been referred to as the Baltimore riots or

24   Baltimore unrest?

25   A    Yes.

1    2015, which was a Monday.  And again, I will refer to those

2    two dates in particular just to place things into context.

3    Do you generally recall what happened on those two dates?

4        A    I have some independent recollection but crystal

5    clear, no.

6        Q    Okay.  What recollection do you have, for example,

7    as to what happened on Saturday, April 25, 2015?

8        A    We had a follow-up of activity taking place within

9    the city.  We had a march that took place from where Freddie

10   Gray was arrested to city hall and then which led to

11   activity within the city.

12       Q    Okay.  And do you recall that extending to an area

13   near Camden Yards?

14       A    Camden Yards being Oriole Sta -- Stadium where the

15   baseball gaming is, yes, I do.

16       Q    Okay.  And do you recall there being some level of

17   violence and property destruction at that time?

18       A    I remember that the crowd became agitated throwing

19   different objects at officers, yes.

20       Q    And what is your general recollection as to what

21   happened on Monday, April 27, 2015?

22       A    We had young people the day before who had sent

23   out a message to do what they considered or called a purge,

24   referring to a movie where anybody after dark was killed by

25   anybody else until sun up.  We responded to it, which led to

1    major activity throughout the city for the rest of that day

2    and the rest of that afternoon from about 14:30 into the

3    night.

4         Q    Okay.  Now, referring your attention to Exhibit 4,

5    if I could direct your attention to paragraphs 54 and 55 of

6    the first amended complaint, which is on page 22.

7         A    It's at Exhibit 4, correct?

8         Q    It's Exhibit 4, yes.

9         A    Page 22.  I'm on page 22.

10        Q    Okay.  And do you see paragraphs 54 and 55?

11        A    I do.

12        Q    Okay.  Is it your understanding that what is

13   described in paragraphs 54 and 55 happened on Saturday,

14   April 25, 2015?

15        A    Ask your question again, please.

16        Q    Sure.  If you read paragraphs 54 and 55, is it

17   your understanding that what is described in those two

18   paragraphs, happened on Saturday, April 25, 2015?

19        A    I cannot affirm that what you see in that 54 and

20   55 is correct, no, I cannot affirm that.

21        Q    Okay.  Do you recall the name Malik Shabazz?

22        A    I recall getting a briefing about Malik Shabazz.

23   Yes.

24        Q    Okay.  Do you recall Malik Shabazz participating

25   in a protest near city hall?

1      A     I was -- it was reported to me that someone who

2  was identified as Malik Shabazz at -- was at the protest

3  trying to incite the crowd.

4      Q     Okay.  And that was on Saturday, April 25, 2015,

5  correct?

6      A     Correct.

7      Q     Okay.  Do you recall hearing reports of a 7-Eleven

8  being looted and other store fronts being damaged on April

9  25, 2015?

10      A     I recall that a subgroup tangentially broke away

11  from the majority of the crowd.  What my memory says,

12  there's larger kids who started a breaking into liquor

13  stores or that was concerned with liquor storage if it was

14  7-Eleven, I don't recall that.

15      Q     Okay.  And that was on Saturday, April 25, 2015,

16  correct?

17      A     Correct.  As the large group began to move its way

18  back to where it started.

19      Q     Okay.  And do you also recall incidents on

20  Saturday, April 25, 2015 where people threw bricks and

21  bottles at police officers and damaged police vehicles?

22      A     I recall that when sub tangential pieces of a

23  larger group made its way to, I believe it was the northeast

24  corner of Camden Yards, where officers were deployed and

25  began to throw objects and/or our stanchions at officers

1    that reported to me in the emergency operate -- or the

2    tactical operations center of the police department.

3        Q    Okay.  And you recall that happening on Saturday,

4    April 25, 2015?

5        A    Correct.

6        Q    You recall also there being police vehicles that

7    were damaged on Saturday, April 25, 2015 as a result of the

8    protests?

9        A    I recall police vehicles been damaged during the

10   riotous conduct over several days.  I can't say my memory

11   says specifically on the 25th.

12       Q    Okay.  Now, if I could direct your attention to

13   paragraph 66 through 69, which begins on page 26.

14       A    I'm there.

15       Q    Okay.  Actually, if I can direct your attention to

16   paragraphs 66 and 67.

17       A    I'm there.

18       Q    Do you remember events depicted in paragraphs 66

19   and 67 happened on Monday, April 27, 2015?

20       A    My memory says the time is off for -- in -- in

21   paragraph 66, that's where my memory says doesn't mean that

22   is correct, but overall, I remember incidents much like

23   this.

24       Q    Okay.  When you say you recall the time being

25   different, what time do you recall?

1    captain at the EOC?

2         A    Yes.  There was a captain there.  She's from

3    personnel.  African-American female.  I think she oversaw

4    person -- the personnel office.  I do not recall her name.

5         Q    Okay.  Do you recall when the EOC was activated?

6         A    No. I do not.

7         Q    Okay.  Is it your recollection that the EOC was

8    activated during much of the time period during which the

9    protests were occurring in April of 2015?

10        A    My -- my memory serves that I know it was -- it

11   was online or I was told it was online Monday the 27th.

12        Q    Okay.  Do you recall whether the EOC was activated

13   on Saturday, April 25th?

14        A    I -- I don't know, but I do know the mayor and the

15   chief of staff were in a TOC with me.

16        Q    Okay.  Then on April 25, 2015, while you were at

17   TOC, or was it the operations center?  Is that what you said

18   it was?

19        A    The tactical operations center.

20        Q    Okay.  On Saturday, April 25, 2015, while you were

21   at the tactical operations center or TOC, you just testified

22   that you recall the mayor being there as well.  What was the

23   command structure at that point in time?  How were

24   directives issued?  Who were -- who was making decisions as

25   far as how the Baltimore City Police Department was

1    operating during the protest on April 25th?

2         A    Melissa Hyatt is the incident commander, which

3    means she is the ultimate authority of all operations for

4    that police organization.  She had an assistant who wa --

5    who was the captain of the SWAT team, Special Weapons and

6    Tactics, I forget his name.  Melissa Hyatt, although she was

7    junior in rank, I believe she was a lieutenant colonel or a

8    colonel.  As the incident commander gives a directive, could

9    be the people who are higher in rank than she was.  I had

10   Dean Palmere as the field operations commander.  He had

11   responsibility for all police personnel in the field on that

12   particular day, Melissa Hyatt would give him directions from

13   the com -- the TOC or the command post.  I just lock -- lost

14   the deputy commissioner's name who just -- who came after

15   me, but he was a deputy commissioner for me at -- at that

16   time.  He eagerly wanted to get out in the field.  He had

17   prior experience with riots taking place down where he came

18   from, the other agency.  He asked if it was okay for him to

19   go out in the field to observe things.  He was also out in

20   the field as a senior commander.  Both -- both the deputy

21   commissioners were senior commanders.  I wanted them in the

22   field, both of them had prior experience with special --

23   special weapons and tactics and tactical situations so

24   that's how I kind of set it up.

25        Q    Okay.  On Saturday, April 25, 2015, was there a

1  unified commander?

2       A    I don't know.  I don't recall, I should say.

3       Q    On Saturday, April 25, 2015, was there some

4  semblance of a policy group that was --

5       A    Can I go back -- can I go back to your last

6  question?

7       Q    Sure.

8       A    If you -- if you're identifying a unified

9  commander that sits on top of the TOC and gives direction,

10  theoretically, that could be the mayor.  The mayor was in

11  the TOC at the same time.

12      Q    Okay.  So was it the mayor that was serving as

13  unified commander on Saturday, April 25, 2015?

14      A    I think the mayor was serving as the mayor, which

15  means she's on top of everything.

16      Q    Okay.  Now, if I could direct your attention back

17  to Exhibit 7, 8, 9, and 10, and I don't know if you had an

18  opportunity to flip through those.

19      A    I did not.  I have 7 now.  I'm looking at -- it

20  looks like a e-mail from a William Marcus sent to Darryl De

21  Sousa, who is I believe at that time, a colonel in charge of

22  patrol operations, dated April 15th, zero -- 05:42 p.m.

23  which may -- or 5:42 p.m. in -- in the evening.

24      Q    Okay.  And if we're looking at Exhibit 7, which is

25  -- which was produced by the City as City 00010337.  You

1    internally within the Baltimore City Police Department to

2    address the possibility of protests or protests escalating?

3         A    I don't have an independent recollection of

4    meetings.  I'm sure that they were -- they were spoke --

5    talked about or met on or given direction on.

6         Q    Okay.  Were there any discussions with the City,

7    and again, the City, I mean, the mayor's office, the mayor

8    herself, the office of emergency management, were there any

9    discussions with the City, with respect to the possibility

10   of protesting or protests escalating during the time period

11   in between Freddie Gray's arrest and his passing, as far as

12   how the Baltimore City Police Department would address

13   protests?

14        A    No. I can't independently recall that but I would

15   -- I will surmise there was conversations because I believe

16   at that time, I was supposed to be on vacation and

17   reconnected with the mayor and she canceled me, because she

18   had a level of concern, being on a vacation, which tells me

19   there was a lev -- there was a level of concern.

20        Q    Okay.  I'm sorry.  I don't think I understood the

21   last statement.  You said there was a level of concern, but

22   your meeting was canceled?

23        A    No. I -- you were asked me if there was meetings.

24   I said I don't have an independent recollection of meetings

25   or how many meetings.  But I do know there was a level of

1    concern because that week I was supposed to be in Europe on

2    vacation.  When I -- before going on vacation, I called the

3    mayor and -- and made sure that she remembered that I was

4    supposed to be on vacation.  She canceled my vacation

5    because she had a level of concern and she wanted me there,

6    which told me that there was a level of concern that had

7    been raised.

8         Q    Okay.  And the level of concern that's with

9    respect to protests as a result of Freddie Gray's arrest,

10   correct?

11        A    It may not -- it may be at the -- at the result of

12   Freddie Gray's arrest but it may have been just because

13   overall activities and the level of tension within the city.

14   It may not have been that they were going to be protests but

15   it wouldn't have been unusual in America, at that time, that

16   you'd have small protests that would take place.

17        Q    Okay.  Now, prior to Freddie Gray's passing on

18   April 19, 2015, then Mayor Stephanie Rawlings-Blake canceled

19   your vacation to Europe, was there -- you don't recall

20   meeting with her during that time period?

21        A    I don't have any independent.  I apologize.  It

22   has been six years and a number of things I don't recall --

23   I don't recall that, it doesn't mean it didn't happen.

24        Q    Okay.  Do you recall any discussions with the City

25   -- anyone at the City?  I mean, your vacation had just been

1    canceled.  Obviously, there's something important to address

2    or discuss.  You don't recall whether there were any

3    discussions with the City regarding whatever it was that

4    made the mayor cancel your vacation?

5        A    Well, I know there was a discussion with the mayor

6    because she and I talked on the phone and we both knew that

7    we had the issue with Freddie Gray and I was clarifying with

8    her that I was supposed to be on vacation, with Freddie

9    Gray's issue, did she want me to stay.  And in fact, she

10   said yes, she did, which clarified that we both had levels

11   of concerns.  I didn't want the City caught with its pants

12   down and the mayor, I believe, felt more comfortable with me

13   in that chair and being there.

14       Q    Okay.  In addition to canceling your vacations,

15   were there any other discussions regarding the protests or

16   how the Baltimore City Police Department should address the

17   protests?

18       A    I don't have independent recollections of meet --

19   any meetings taking place.  I'm sorry.

20       Q    Now, the mayor had just canceled your vacation, so

21   you're -- you're here during the time period between Freddie

22   Gray's arrest and his passing.  What discussions do you

23   recall, internally within the Baltimore City Police

24   Department, as to how it would operate and address the

25   protests during that time?

1      A    I don't have an independent recollection but

2  knowing me and that we were on the hills of Ferguson and

3  that we had had a number of peaceful protests, although in

4  large numbers throughout Baltimore up until that time in

5  January, February, my mind normally would go, let's start

6  preparing for this and start thinking about it.

7      Q    Okay.  And when you say, "You being you, it would

8  go through your mind and you would say, let's start thinking

9  about how-- what to do." I mean, what steps did you take in

10  line with that?

11      A    The steps that -- I don't -- I don't recall that

12  week that you are speaking of, but when I was informed of

13  Freddie Gray's passing, I immediately, which was on a

14  Sunday, called my Deputy Police Commissioner Palmere, gave

15  him a direction to put a hue and cry out to the entire

16  state.  It was rumored that we have anywhere between --

17  anywhere around 5,000 people showing up in our city in the

18  next five or six days.  I put out a hue and cry that I

19  wanted to -- to look to have additional officers along with

20  Baltimore officers, an additional, my mind says 4,000 to

21  5,000 extra police officers in that city by Friday, which

22  would have been five -- six days after Freddie Gray's

23  passing.

24           MR. HWANG:  Okay.  If I can direct your attention

25    to the exhibits marked as 11, 12, and 13 and if you

1    could have them marked as Exhibits 11, 12, and 13.

2              (EXHIBIT 11 MARKED FOR IDENTIFICATION)

3              (EXHIBIT 12 MARKED FOR IDENTIFICATION)

4              (EXHIBIT 13 MARKED FOR IDENTIFICATION)

5    A    I'm on 11.

6         BY MR. HWANG:

7    Q    So 11 is an e-mail produced by the City as City

8    00010094.  Exhibit 12 is an e-mail chain produced by the

9    City as City 00044190 and Exhibit 13 is an e-mail produced

10   by the City as City 00044185.

11   A    I'm looking at the one from a Augustus -- Aguzna

12   Augustus (phonetic).  Is that what you want me to look at?

13   Q    Yes.  11, 12, and 13.

14   A    Okay.

15   Q    And now, if you look at Exhibit 11, you received

16   that e-mail, correct?

17   A    It was sent to my mailbox.  It doesn't mean that I

18   received it.

19   Q    Do you mean it you don't -- it doesn't matter or

20   it doesn't mean that you read it?

21   A    No.  It means that I didn't -- I didn't -- it

22   didn't get to me.  A lot of my e-mails are pulled off by my

23   staff within my office and replied to if replies needed to

24   be done.

25   Q    Okay.  So if I can direct your attention to

1     Exhibit 13.  Do you see where it says, "Police

2     commissioner's message that was sent to Broadcast BPD?"

3         A    Yes.  It looks -- appears that it was sent now by

4     a Robert Snead.

5         Q    And if you look at the e-mail beneath that?

6         A    Yes.

7         Q    It was sent to Broadcast BPD and it says police

8     commissioner's message?

9         A    Yes.

10        Q    And did you direct that message to be sent out?

11        A    I don't re -- I don't have any independent

12    recollection of directing that to be sent out but it -- if

13    it went out, it went out -- it went out under my

14    authorization.

15        Q    Okay.

16        A    I would not have typed it or put it together.

17        Q    Well, do you see the second sentence, it says,

18    "Now more so than ever, it is imperative that we maintain

19    our professionalism, dignity of demeanor and continue to

20    have compassion for those that we serve." Do you see that?

21        A    I see that.

22        Q    Did you recall having concerns about that and

23    thinking that there was a need to send that message?

24        A    Anytime -- I didn't send the message, the -- that

25    message would have been drafted by someone on my staff for

1    below me with concerns of what I wanted them to -- to kind

2    of put into it.  Anytime you have any riotous conduct and

3    you have high tensions, it's always a concern that you keep

4    officers in a professional state and you remind them not to

5    take things from a personal standpoint.

6        Q    Okay.  And when you say your concern about

7    officers taking things from a personal standpoint, what do

8    you mean by that?

9        A    Anytime that you have riotous conduct and you have

10   bricks being thrown at your head, people spitting upon you,

11   urine, feces, ball bearings, rocks, acid, or any things

12   along those lines, if officers are standing too long, not

13   been fed, not going to the bathroom, they can be short on

14   patience and allow things to escalate upon them, so you have

15   to remind them what our mission is.

16       Q    Okay.  And so officers, if they're having feces,

17   bricks, other things thrown at them, how should they be

18   patient, what should they be doing from your your

19   perspective?

20       A    Following orders of their command officers.

21       Q    Okay.  And you said they should still be patient

22   despite having feces and bricks and other things thrown at

23   them.  Does that mean that they should -- does that mean

24   that they should not make arrests or they should not act

25   independently?

1      Q     -- and seek resources from the state; is that
2   accurate?
3      A     Well, theoretically where I come from and what I'm
4   used to, is when you're going into mobile field force and
5   you need additional officers and what I had done prior was
6   to go to the colonel of state police, at least in the state
7   of California, the state police representative would get you
8   the resources.  I also believe in -- in Maryland when I
9   needed resources prior to Freddie Gray, I went to the state
10  colonel who supplied me the resources.  I did tell Dean
11  Palmere to put out a hue and cry to the entire state because
12  we need resources.
13     Q     Okay.  By the entire state, do you mean also other
14  counties or other police departments?
15     A     I mean, every law enforcement agency within the
16  state of Maryland.
17     Q     Okay.  Now, if you look at Exhibit 14, it says
18  that the Baltimore Police Department will prepare to conduct
19  a coordinated effort in response to possible protest
20  activity.  Do you see that?
21     A     Yes.  I see that.
22     Q     Okay.  At this time, what kind of coordinated
23  response was being developed by the police department?
24     A     As I stated prior or testified prior is on that
25  Sunday, I had called Palmere and told him as of Monday to

1  put out a hue and cry because I was looking for anywhere

2  from around the area of 4,000 additional police officers to

3  -- to -- to assess us or help -- help us.  Usually in my

4  mind, what I usually want is whatever the number of

5  anticipated respondents to have anywhere from two to one or

6  three to one ratio and how I have dealt with prior riotous

7  conduct and that's what I addressed with Dean Palmere.  And

8  at that point, when you're able to get your numbers in, you

9  would ask for the representatives from those organizations

10  that have responded, you'd have meetings, you would stet --

11  you would set up SOPs.  You would check to see what type of

12  resources they were bringing, meaning what type of weapon

13  systems that they had.  You'd have to make sure that your

14  people have skills in using those weapons systems. If they

15  did not, they had to pull those weapons systems out.  You'd

16  have to look at logistical concerns, feeding, radios, cars,

17  directions, guides.  You'd also have to make sure that

18  everybody was on the same page with planning where people

19  would go.  You'd have to uniform things in terms of numbers

20  of officers in -- in uniform squads, which we call platoons

21  and make sure -- because different police departments have

22  different numbers there.  We'd have to look at squads to

23  uniform those.  So it's an array of things that if you got

24  those bodies in on Monday or Tuesday, you should be bringing

25  in representatives and -- and ferreting out all those issues

1    you're trying to acquire a mutual aid by way of, you know,

2    4,000 or so law enforcement officers, were these requests

3    being made solely from law enforcement agency to law

4    enforcement agency?

5         A    Theoretically.  I don't know what Dean actually

6    did, but theoretically he would contact the colonel in

7    charge of state police and make the request.  State police

8    would put the hear of cry out between -- throughout the

9    entire state and call the resources as I identified.

10        Q    Okay.  And you're asking for 4,000 police officers

11   because you believe internally the Baltimore City Police

12   Department does not have enough police officers to address

13   protesting; is that accurate?

14             MR. CORLEY:  Objection.

15        A    Not even close.  Sorry.

16        Q    So since it's not even close, did you also speak

17   to anyone at the City or the mayor's office to let them

18   know, hey, we're -- we're drastically understaffed.  We're

19   going to need more resources at this time?

20        A    I -- I don't have any independent recollection of

21   any meeting or call but the -- my normal thing was -- would

22   be to advise my bosses.

23        Q    Okay.  And that would include then Mayor Stephanie

24   Rawlings-Blake?

25        A    At that time, my contact with the mayor was

1        A    When I first came, my first six months in
2   Baltimore, I brought with me what we had in -- in
3   California, the mu -- mutual aid agreements there.  I gave
4   it to at -- at that time to colonel, his name was Brown in
5   charge of state police and I told him in California our very
6   sophisticated system, this is our mutual aid agreements that
7   if we put out a human cry people are mandated or -- or
8   contractually mandated to come and -- and support us.  I
9   explained it to him.  Gave him a copy.  And -- and said, you
10  know, maybe this is something that we could use here and
11  start to grow because I knew they did not have a mutual aid
12  agreement.  I don't know what he did with that but I do know
13  -- whether he did it or not.  I know I didn't sign one and
14  there -- it didn't come back to me.  There was no discussion
15  I knew of by the state to do that.  When I did make request
16  or when did -- the police department did make requests of
17  Colonel Brown, he made sure that we got the resources that
18  we requested.  But he left office in December of 2014.
19       Q    Okay.  You instructed Dean Palmere on April 19th,
20  Sunday to request more resources by way of law enforcement
21  officers.  Did the Baltimore City Police Department end up
22  receiving those -- those requested law enforcement officers?
23       A    My memory serves at the end of Monday, Deputy
24  Commissioner Palmere reported to me that after the human
25  cry, we had received 200.

1     Q   Okay.  So you wanted 4,000 but you were receiving

2  200; is that accurate?

3     A   It's correct.

4     Q   Okay.  Do you recall where those 200 officers were

5  coming from?

6     A   I think Prince George in Montgomery County if I

7  remember correctly.

8     Q   Okay.  And just to put a time frame on this.  The

9  Baltimore City Police Department received 200 law

10  enforcement officers from outside jurisdictions when?

11     A   Sometimes for -- sometime towards the end of the

12  week.  I believe it may have been on Friday or Saturday.

13  I'm not sure.

14     Q   Okay.  So that'd be Friday, April 24th or

15  Saturday, April 25th?

16     A   Yes.  It's what my memory says.

17     Q   Okay.  Now, you testified earlier that from your

18  time on whether it's Oakland or Long Beach, your time at --

19  with other police departments, that there were mutual aid

20  agreements that made the provision of law enforcement

21  officers mandated -- mandatory?

22     A   It's -- it -- it was a -- it's contractual

23  agreements between cities that if an emergency happens on a

24  shift you would slim down 50 percent of your on-duty shift,

25  send them to the state police who -- who would deploy you.

84

1    have -- even with the meeting on Wednesday, even if I had
2    gotten bodies on Wednesday, that would give me Thursday to
3    do things that I needed to have done way back on Monday.  So
4    that was cutting it short and I had a -- I had a sense of
5    great frustration and irritation over it.  So we in fact
6    called the state police and a number of chiefs to the
7    Baltimore Police Department on Wednesday.
8        Q    Okay.  And out of this great frustration, did you
9    ever reach out to anyone at the City saying, hey, we're not
10   getting the numbers we need.  We need some help.  Can you
11   make a call?
12       A    I don't recall.  I -- my -- I don't recall
13   independent meetings along those lines, but I -- I know if I
14   had an issue like that, I would have raised it with someone
15   within city hall to let them know what the issue was.
16   That's not something I would just kind of walk away with and
17   -- and not address.  So not have an independent recollection
18   but knowing myself, I'm pretty sure I let my bosses know.  I
19   -- I tend to keep them up-to-date on everything much like
20   when I was going on vacation, I let the mayor know.  So I'm
21   pretty sure the mayor probably forgot I was going on
22   vacation.  Those are things I would tell my bosses to be
23   aware of.
24       Q    Okay.  And when you say your bosses that includes
25   Mayor Stephanie Rawlings-Blake?

1       A     At -- I was sharing with you at that time, I was

2    restricted from having direct contact with Mayor

3    Rawlings-Blake and I had to deal with the deputy mayor over

4    me and/or Kaliope.

5       Q     Okay.  So you would have let either Kaliope

6    Parthemos or a Stephanie Rawlings know, hey look, wanted

7    4,000.  We're only getting 200.  We're not getting the

8    resources that we need, correct?

9       A     That would be my norm.

10          MR. HWANG:  Now, if we could back up a second.  If

11       I could direct your attention to 15 -- if we could have

12       this marked as Exhibit 15, please.  Now, you referred

13       earlier to Ferguson.  Do you recall events or there

14       being social unrest or rioting in Ferguson in or around

15       August of 2014?

16          (EXHIBIT 15 MARKED FOR IDENTIFICATION)

17       A     Yes.  I do recall that Ferguson, the City itself,

18    had issues.  Yes.

19          BY MR. HWANG:

20       Q     Okay.  And you recall that happening in or around

21    August of 2014?

22       A     I do.

23       Q     Okay.  Now, if I can -- if you can have this

24    marked as Exhibit 15.  It's produced by the City as City

25    00015586 through 626.  Do you recognize this document?

1     A    I do not but I am reading it.

2     Q    Okay.

3     A    Okay.  I've scanned it.

4     Q    Okay.  As you're scanning this, do you have a
5 recollection of this document?

6     A    No, sir.

7     Q    Well, this document is dated October 6, 2014 and
8 this would have been after the events in Ferguson in August
9 of 2014.

10     A    Okay.

11     Q    Do you recall having any discussions with anyone
12 at the City regarding what had happened in Ferguson and
13 concerns that the same thing would happen here in Baltimore
14 City?

15     A    I don't know if I had.  I don't recall independent
16 conversations with the City as you define that, but I sure
17 -- clearly, this document was put out to make sure that the
18 police department was paying attention.

19     Q    Okay.  And what about Ferguson did you want the
20 police department to pay attention to?

21     A    Part of what I did when I first came into the
22 Baltimore police department, because of the many issues I
23 saw and -- and what I fought -- what I thought was a
24 stressed relationship with the community, and if you look at
25 the surveys taken in my strategic plan, they show from an

1   outcome standpoint that we had a very stressful relationship

2   with the community in the fact that we were not seen as a

3   legitimate police department to the community, and not

4   serving it the way that it should have.  So I started, from

5   that point of view, to -- to instruct my organization and

6   tried to build my organization into having better contact,

7   to remind them that we're here to do constitutional

8   policing, and I think this document is -- was sent -- excuse

9   -- sent out by the fact that I wanted them -- to remind them

10  I wanted them to have constitutional policing.  I also, when

11  I first got there, looked out, and which is referenced in

12  this document, I looked at all the consent decrees -- the

13  contemporary consent decrees within the United States at

14  that time, and I took a -- a number of those pieces and put

15  it in a strategic plan, which was a guiding light for that

16  police department, and it looks like I am -- our staff is

17  re-emphasizing the consent decrees that have happened

18  throughout the United States and why those would have --

19  have happened, and where I want to police organization to

20  go, to build trust within the community.

21      Q    Do you recall having any discussions regarding,

22  you know, clinical lessons learned regarding how law

23  enforcement officers responded to rioting and protests in

24  Ferguson?

25      A    I have no independent recollection.  There again,

1    it's been six or seven years.

2         Q    Okay.  So you don't recall any discussions, even

3    internally, within Baltimore's police department, hey, lets

4    make sure we don't do this?

5         A    I -- I'm sorry, I don't have anything of

6    recollection.  This document says, and my mindset at that

7    time was kind of saying exactly what you're saying, pay

8    attention.

9         Q    Okay.  Pay attention to what?

10        A    To all the things I just said.  That -- the things

11   that cause consent decrees, the lack of legitimacy within

12   the community, the disconnect within the community, how do

13   you use force when communities don't believe that you're

14   just or that you truly care about the community as a whole.

15   Overall it's overly simplified, I think this is what this is

16   sharing.  It's going back over case laws dealing with

17   Garrity and when you can stop people and probable cause and

18   reasonable suspici -- suspicion, things like that.

19        Q    Do you recall having any concerns regarding how

20   police officers conducted themselves during the time of the

21   Ferguson unrest that you wanted to make sure did not happen

22   here in Baltimore City?

23        A    I would -- I don't have any independent

24   recollection, but this document kind of leans that way.

25        Q    Okay.  Do you ever recall having any concerns that

1    see that?

2         A    Yes.  Correct.

3         Q    -- you recall what that protest order was?

4         A    No, sir.

5              MR. HWANG:  Okay.  If I could direct your attention

6         to 17, if we could have it marked as Exhibit 17.  It's a

7         document produced by the City, as City 00009552 through

8         9555.

9              (EXHIBIT 17 MARKED FOR IDENTIFICATION)

10             BY MR. HWANG:

11        Q    Now, Mr. Batts, do you recognize this document?

12        A    No. I do not.

13        Q    Okay.  Do you generally recall there being what's

14   called operational plans during the period of these

15   protests?

16        A    I do.

17        Q    Okay.  Is there any difference between an

18   operational plan and an incident action plan or at least

19   during that time period?

20        A    I -- I've -- I am not familiar with an incident

21   action plan.  I am familiar with a operations order or

22   operation plan.  I don't know that -- the one that you

23   mentioned.

24        Q    Okay.  Were the terms operation plan and operation

25   order, were they used interchangeably --

 1       A    Yes.

 2       Q    -- at the time?

 3       A    Yes.

 4       Q    And what was the purpose of these operational

 5   plans?

 6       A    To -- usually, you have operations orders to set

 7   priorities of what you do.  When we were just talking about

 8   do you make an arrest or not in what circumstance, you make

 9   an arrest.  So it can identify and kind of answer those

10   questions for you.  It also identifies who's in -- who's in

11   command, who was in position, and kind of go from there.

12       Q    Okay.  Are these operational plans or operational

13   orders meant to be orders and directives?

14       A    They can be.  They are meant to -- to clarify.

15       Q    Okay.  What about during the course of these

16   protests?  For example, the operational plan that's marked

17   as exhibit 17.  Would this be considered an order or

18   directive?

19       A    Yes.  You can consider it that.  Yes.

20       Q    Now, to whom were operational plans like this

21   distributed?

22       A    Normally, depending -- you could have subsets of a

23   plan, but ul -- ultimately it goes to the entire

24   organization.

25       Q    Okay.  Including line officers?

1      A      Line officers, mayor's office, fire department,

2  anyone who may be impacted to -- to have a understanding.

3      Q      Okay.  Would you review these operational plans?

4      A      I'm sorry?

5      Q      Did you review these operational plans?

6      A      I don't recall.  This is coming from Melissa Hyatt

7  who is -- who was my chief of staff at the time, who either

8  may have presented it or what her responsibility normally is

9  to give me a briefing on what is occurring.

10      Q      So as far as the contents of the operational plan

11  for -- including exhibit 17, you would have either reviewed

12  this or at some point, you would've been made aware of the

13  contents of this operational plan; is that accurate?

14      A      There are circumstances that I may not have been

15  aware of.  But --

16      Q      Okay.  What about during the period of these

17  protests?  Would you have been made aware?

18      A      I would like to have been made aware, but there

19  are opportunities that directions could have been, depending

20  on time and ability, they could have went out.  This is not

21  coming from me, it's coming from Lieutenant Hyatt.

22      Q      Okay.  Well, on the third page, this is the page

23  Bates stamped City 00009554.

24      A      I have City 0009552-55-pdf.  Is that the same

25  thing?  Am I in the wrong place?

1    order.

2         Q    Even if it's not a document, do you recall arrests

3    not being a preferred function, being a directive?  Whether

4    it's orally in a document, whether it's a policy, whatever

5    have you?  Do you ever recall arrests not being a preferred

6    function, being a directive before the Baltimore riots

7    and/or protests in April of 2015 during your time as Police

8    Commissioner?

9         A    I -- I remember making sure that my -- my command

10   staff and officers used discretion, much like they have

11   every day.

12        Q    Okay.  I appreciate that.  But again, I'm going to

13   repeat the question again.  If you don't recall, you can say

14   you don't recall.  My question is: Do you ever recall

15   arrests not being a preferred function, being a directive

16   prior to the Baltimore protests in April of 2015 during your

17   time as Police Commissioner of Baltimore City?

18        A    I don't recall a directive.

19        Q    Okay.  In the next sentence after it says, "Arrest

20   is not a preferred function during this operation", it says,

21   "However, in the events that arrest become necessary, the

22   following procedures will be followed." Do you see that?

23        A    Yes.

24        Q    Now, this operational plan is for April 22, 2015.

25   What types of infractions would arrests be considered

1  found out what happened to the platoon.

2      Q    Okay.  When requesting resources from outside

3  police departments, was some of the resources you were

4  trying to acquire additional platoons to help make arrests?

5      A    That was -- that was part of it, yes.  If the

6  crowd got out of control, we needed to gain -- gain control

7  of the crowd.

8      Q    Okay.  And the Baltimore Police Department never

9  received sufficient resources to do that, correct?

10     A    They -- we didn't receive the numbers that I

11  wanted.

12     Q    Okay.  Did -- was the Baltimore Police Department

13  short-staffed to sufficiently have enough platoon to make

14  arrests at that time?

15     A    Correct.  And let me go back to your last

16  question.  Your question was, did I -- did we ever receive

17  the correct number?  And my answer was no, that's not

18  correct.  We did receive the correct number as we went into

19  the night in 20 -- in Monday the 27th, late in the night in

20  Monday the 27th.  So let me correct that one.  And so what

21  was your question?

22     Q    Well, let me stick with that first, you said you

23  finally did receive the amount of law enforcement officers

24  that you needed to address the protests or rioting during

25  the evening of April 27, 2015; is that accurate?

1      A     About 2100 hours, if I remember correctly, we

2   started receiving the numbers that we needed that we should

3   have had long before that.

4      Q     Okay.  And that was after the mayor's declaration

5   of a local state of emergency; is that accurate?

6      A     Yes.

7      Q     Okay.  Now, if I could direct your attention back

8   to the exhibit, which was what?  Exhibit 17.  If I could

9   direct your attention to the last page.  On the last page,

10   it says, "Businesses will be advised of protests in the area

11   in order to prepare to secure their establishments if

12   desired." Do you see that?

13      A     Under subsection 5 or 6?  Where are you seeing

14   that?

15      Q     Oh, the last page.

16      A     The last page for me talks about the mayor's

17   office of emergency.

18      Q     Right.  The last bolded topic, it says,

19   "Businesses."

20      A     Oh, okay.  I see it.  Yes.

21      Q     So who at the police department was tasked with

22   advising businesses regarding their preparations to secure

23   their establishments if desired?

24      A     That -- that -- that depends.  It could've been

25   the police department, or it could've been the EOC.

1    that we had enough resources to respond.

2        Q    And at this time, were protests escalating inside

3    in severity?

4        A    To 20 -- the 24th, things started happening in the

5    City of Baltimore.

6        Q    Okay.  When you say, "Things started happening.",

7    what things started happening?

8        A    Hotspots in different places in the city.

9    Youthful, young people throwing rocks at police officers,

10   hopping on cars, marching in the streets and different

11   places.

12       Q    Okay.  And you said this was -- this started on

13   Friday, April 24, 2015?

14       A    Yes.  In the late afternoon.  Evening.

15       Q    Okay.  And as this was happening, did the

16   Baltimore City Police Department report that to the City?

17   Anyone at the mayor's office?

18       A    I don't have independent recollection of that, but

19   I'm sure they did.  It was on the news too, so I'm sure they

20   were aware of it.

21       Q    Okay.  Dean Palmere said that you made a decision

22   to cancel leave for April 25, 2015, and that's why this

23   e-mail was sent on April 22nd; is that accurate?

24       A    Could be.  Would make sense.  I don't ha -- I

25   don't have an independent recollection of it.

1     Q    Okay.  Would you ha -- would you have consulted

2   with the City regarding that?

3     A    It makes sense to -- to notify my bosses on that

4   and keep them updated.

5     Q    Okay.  If I can direct your attention to 19, 20,

6   and 21.

7          MR. HWANG:  And if we could mark them as 19, 20,

8      and 21.  19 is an e-mail produced by the City as City

9      00007498.  20 is City 0008884, and 21 is 00007492.

10          (EXHIBIT 19 MARKED FOR IDENTIFICATION)

11          (EXHIBIT 20 MARKED FOR IDENTIFICATION)

12          (EXHIBIT 21 MARKED FOR IDENTIFICATION)

13     A    I see it.

14          BY MR. HWANG:

15     Q    Now, you were cc'd on the e-mail marked as Exhibit

16   19, correct?

17     A    Yes.

18     Q    Okay.  And Exhibit 20 is a letter from you,

19   presumably signed by Melissa Hyatt, your chief of staff at

20   that time; is that accurate?

21     A    20 you said?

22     Q    Yes.

23     A    Pulling it up.  It's -- yeah, it's signed by

24   Melissa, that's correct.

25     Q    Okay.  And 21 is an e-mail that you were cc'd on

**ORIGINAL TRANSCRIPT**

1      Q    Day after Freddie Gray's death, correct?

2      A    Yes.  Correct.

3      Q    Okay.  Now, when you heard that you received -- or

4  you were only going to receive 200 officers, was it your

5  understanding that it was not mandatory for these counties

6  in Maryland to provide you with mutual assistance?

7      A    We discussed that before, and it's -- it's not

8  contractual.

9      Q    Okay.  And to your knowledge, at this point in

10  time, it was just police department to police department,

11  right, these requests?

12      A    Correct.

13      Q    To your knowledge, at this point, was the City

14  reaching out to try to help the Baltimore City Police

15  Department secure additional mutual aid, seeing that the

16  numbers coming in would be so low?

17      A    Not that I'm aware of.  And that's not the norm.

18      Q    Okay.  When you say, "That's not the norm.", what

19  do you -- what do you mean?

20      A    In my -- my 30-some odd years in policing is when

21  we need assistance, we call other police departments, and we

22  get them.

23      Q    Okay.  But the City was aware, presumably, of the

24  numbers of officers that you were receiving being short of

25  the numbers you felt were needed; is that accurate?

1    A    I don't have any in -- independent recollection of
2   what the City was aware of.  I knew it was an issue for me,
3   and most -- most likely I passed -- I passed that up in my
4   chain.
5    Q    Okay.  If I could direct your attention to 22.
6         MR. HWANG:  And if we could have them marked as 22.
7    It's the e-mail chain produced by the City as City
8    00009618 through 19.
9         (EXHIBIT 22 MARKED FOR IDENTIFICATION)
10   A    I have it up.
11        BY MR. HWANG:
12   Q    And I'll give you a second to read through this.
13   A    Okay.  I've scanned it.
14   Q    Okay.  Do you recall Drew Vetter?
15   A    Yes.
16   Q    What was his role at that time?
17   A    I believe he was part of my governmental staff, if
18  I remember correctly.
19   Q    Okay.  As part of your governmental staff, what
20  was his duties?
21   A    To keep -- much like this e-mail says, to keep our
22  elected politicians aware of what was going on in the city
23  --
24   Q    And now, --
25   A    -- and the police department.

1      Q     Exhibit 22 then was an update that -- as the

2   subject heading indicates, was an update that Drew Vetter

3   was sending on your behalf; is that accurate?

4      A     Correct.  And it looks like it came out on

5   Thursday, 23rd.

6      Q     Right.  Now, Exhibit 22 refers to protests that

7   were expected to happen on April 23rd and 25th; is that

8   accurate?

9      A     You said April 23rd?

10      Q     Yeah.

11      A     I think they were -- okay.  I see where it's

12   written in there.  Yeah, I see it in the first paragraph.

13      Q     Right.  Now in Exhibit 22, the end of the first

14   paragraph talks about intelligence that the department has

15   that individuals from outside the city were coming in to

16   encourage others to use aggressive tactics and even violence

17   against officers or others?

18      A     I see it.

19      Q     Okay.  Do you recall --

20      A     Yes.

21      Q     -- there being such intelligence that people from

22   outside of the city were coming in to create trouble?

23      A     Yes.

24      Q     Okay.  And what do you recall about that

25   intelligence?

1      A    I recall I was called to the FBI office of

2  Maryland.  They talked about that gentleman that you

3  mentioned earlier, Malik something, who was the head of the

4  new black panther party out of Texas -- Beaumont, Texas

5  area.  That he shows up at different locations and gets the

6  crowd to -- to be violent, and that he may be in attendance

7  at -- in Baltimore.  And I was shown pictures of him, shown

8  some of his background, some of the things that he has done.

9      Q    Okay.  Did they say that he would be in Baltimore

10  on a specific date?  For example, Saturday, April 25th?  Or

11  that he was expected to?

12      A    I don't -- I don't know if they said that he --

13  that he'll be there on a specific date.  My memory says that

14  they were notifying that possibly he may be there.

15      Q    Okay.  Do you recall the term agitators being used

16  during the course of the protests?

17      A    By whom?

18      Q    Do you recall Malik Shabazz being referred to as

19  an agitator?

20      A    I -- I don't -- I don't remember that specific

21  term, no.

22      Q    Okay.  Do you recall there being discussions about

23  people from outside the city (Audio interference) to incite

24  crowds to commit violence and property destruction?

25      A    I do recall, as I just said, that the FBI gave me

1       Q    Okay.

2       A    That's not my role.

3       Q    Would that be normal though, that someone would

4    have to radio either Dean Palmere or Melissa Hyatt for

5    permission to make an arrest?

6       A    It depends on if Melissa Hyatt and Dean Palmere

7    gave them direction to do that, or if they saw the necessity

8    for making that happen.  My expectation is when a officer in

9    a command or sergeant in charge sees a necessity, they

10   should -- they should have the discretion to make those

11   arrests.

12      Q    Okay.  And so you weren't aware of that kind of

13   back-and-forth between Melissa Hyatt and Dean Palmere and

14   command staff on the ground?

15      A    No.

16      Q    If I could direct your attention to 29.

17           MR. HWANG:  If we could have it marked as 29,

18      please.  It's an e-mail with an attachment produced by

19      the City as 1315 through 1317.

20           (EXHIBIT 29 MARKED FOR IDENTIFICATION)

21      A    Okay.

22           BY MR. HWANG:

23      Q    And if you look at the last page, did you sign

24   that?

25      A    I -- I -- I believe that's my signature, yes.

1          Q     Okay.  Now, this is a letter sent by you on April

2    24, 2015 to, purportedly, community leaders; is that

3    accurate?

4          A     Yes.

5          Q     Okay.  Do you recall sending this letter?

6          A     No.

7          Q     Well --

8          A     But I like what it says.

9          Q     What do you -- what do you like about what it

10   says?

11         A     It's informing the City, letting them know what's

12   going on and employing our citizens to get involved, to

13   protect our city as a family.

14         Q     Okay.  Now, in this letter, it does state that,

15   "BPD can confirm that groups from outside the state of

16   Maryland are descending on Baltimore to participate in

17   Saturday's protests." Do you see that?

18         A     Yes.

19         Q     Now, this being April 24, 2015, Saturday will be

20   referring to Saturday, April 25, 2015, is that accurate?

21         A     Yes.

22         Q     Okay.  Does that refresh your recollection as to

23   whether or not there were specific concerns of people from

24   outside the state coming on Saturday, April 25, 2015 to

25   participate in protests?

1     A    It doesn't have to.  I knew that on April 19th.

2     Q    Okay.  And you knew that on April 19th that they

3  would specifically come on Saturday, April 25th?

4     A    Yeah.  That's what social media was saying, yes.

5     Q    Okay.  Now, in light of that knowledge that people

6  from outside the state may be descending on Baltimore City

7  on Saturday, April 25th, that would the protests on April

8  25th, different than the protest that I heard -- that had

9  occurred on prior days, correct?

10    A    One more time?

11    Q    The threat of people from outside the state coming

12 into agitate the crowd during protests that were expected to

13 occur on Saturday, April 25, 2015, that would be different

14 than the protests that had occurred up to that date; is that

15 correct?

16    A    Yes and no.

17    Q    How yes?  How no?

18    A    Yes.  The difference is that you have outside

19 people coming in who may have more of a propensity to do --

20 to destroy and harm your city because they have no --

21 they're not vested in the city.  However, the days before

22 were most likely people from the City who was still angry,

23 who could also still do damage to your city.

24    Q    The fact that there were outside people expected

25 to come on April 25, 2015, did that increase the concern

1    that there would be violence and property destruction on

2    Saturday, April 25th?

3        A    It increased the concern that we would not be able

4    to control or respond adeq -- adequately if things went

5    wrong, which is why I -- I asked for the heavy numbers of

6    officers to be there.

7        Q    Okay.  Now, Exhibit 29 then expressly states that,

8    "We must avoid any attempts to create a riot." Do you see

9    that?

10       A    From Drew Vetter?  Is that the same one?

11       Q    No.  That's the letter that you've been looking

12   at, the attachment to that e-mail.

13       A    Which -- which paragraph are you looking at?  I'm

14   sorry.

15       Q    It's in the second paragraph, fourth to last

16   sentence.

17       A    Okay.  I see it.

18       Q    It says, "We must avoid any attempts to create a

19   riot." Do you see that?

20       A    Yes.

21       Q    You recall there being specific concerns that the

22   protests would escalate into full-scale rioting at that

23   time?

24       A    It was in my mind from day one that it may

25   escalate into a full riot.  I don't -- I don't lead based on

1    Monday, didn't get the numbers, called another meeting on

2    Wednesday.  And I don't know if I told Dean to do this or

3    Dean did it on himself -- himself.  He is an executive so he

4    can call those meetings himself, but to still try to get

5    those-- get those numbers up.

6         Q    Okay.  Melissa Hyatt recalled you being at this

7    April 24th 1:00 PM meeting--

8         A    Okay.

9         Q    -- and characterized it as a pretty desperate plea

10   for us needing help.

11        A    Okay.

12        Q    That doesn't help you refresh your recollection as

13   to whether or not there was a meeting with other agencies?

14        A    No.  But I can understand -- we needed those

15   numbers.  I can understand it.

16        Q    Okay.  Well, Melissa Hyatt also testified that

17   after this meeting it didn't result in a substantial amount

18   of additional mutual aid coming in and that you were

19   "extremely alarmed about the lack of commitments that we

20   were" getting -- "going to get for mutual aid".  Would you

21   would -- you say that's accurate?

22        A    Very much so.

23        Q    Okay.  What is your understanding as to why these

24   other counties were not providing more law enforcement

25   officers for mutual aid than they were providing?

1   into this operations order, but they were already set up to
2   make that happen.
3        Q    Okay.  Is it fair to say that the Baltimore City
4   Police Department expected the protests on April 25th to be
5   greater in size and severity than the previous protests that
6   occurred prior to Saturday, April 25th?
7        A    Yes.  Because you have -- you had potential of
8   outside people coming in from different places in the United
9   States.
10       Q    Okay.  Now if I could direct your attention --
11  we're on 33.  And if I could direct your attention to -- do
12  you see the Bates stamps on the bottom right-hand corner of
13  each page
14       A    Of each page --
15       Q    It says "City" 000 and then numbers?
16       A    Yes.  I do.
17       Q    If I can direct your attention to the page that's
18  Bates stamped City 00005660?
19       A    Got it.
20       Q    And if you go down to -- do you see VIII, External
21  Resources?
22       A    Yes.
23       Q    And if you go down to the bolded heading beneath
24  that where it says law enforcement support from other
25  jurisdictions.

1   Partnership?

2        A     Yes.

3        Q     What are the organizations that are listed here?

4        A     Say it again.  I didn't hear the last question.

5        Q     What are the organizations listed here?

6        A     I think, and I could be wrong, is they're part of

7   a consortium in the downtown area that may be impacted.  I

8   see the MTA down there which may have transportation that

9   may be impacted in the downtown area.  And the Lexington

10  market, those are downtown businesses in the business

11  corridor.

12       Q     Okay.  Do you recall there being any coordination

13  between the Baltimore City Police Department and the City,

14  whether it's OEM or the mayor's office, to talk with these

15  groups or coordinate with these groups in terms of what

16  should be done in light of the protests?

17       A     I don't know.  Bill Mark (phonetic) is assigned --

18  was assigned to the Central District down there, so I don't

19  know.  I have no idea.

20            MR. HWANG:  Okay.  If I could direct your attention

21       to 36 and if we can mark that as 36.  It's a e-mail

22       chain produced by the City at City 00045742.

23            (EXHIBIT 36 MARKED FOR IDENTIFICATION)

24       A     I see it.

25            BY MR. HWANG:

172

1          Q     Now, you received the e-mail sent on April 25,
2     2015 at 12:47 p.m. and you sent the e-mail on April 26, 2015
3     at 12:20 p.m.; is that accurate?
4          A     Yes.
5          Q     Now, I believe you testified earlier that
6     Stephanie Robinson was the deputy mayor, which was one of
7     the persons that you reported to; is that accurate?
8          A     She was the -- my direct report.  I was her direct
9     report, I should say.
10          Q     Okay.  Now, in this e-mail, Stephanie Robinson
11     requested that the -- or stated that the City was requesting
12     from Baltimore County -- or strike that.  In this e-mail,
13     Stephanie Robinson was asking the Baltimore City Police
14     Department to specify what was requested from Baltimore
15     County and their response.  Do you see that?
16          A     I'm kind of confused what they're asking for
17     there, but I see it.
18          Q     Okay.  Well, it seems to me that Stephanie
19     Robinson is asking how many officers -- what resources were
20     requested from Baltimore County and, you know, what did they
21     say in response to that?
22          A     Okay.
23          Q     And you then forward it to Denisha (phonetic)
24     Martin and you say, did we do this?  Do you see that?
25          A     Yes.  I see that.

1    recollection as to what extent the Baltimore City Police

2    Department was keeping the City up-to-date as far as the

3    resources it was requesting and the resources that was

4    receiving?

5         A    No.

6         Q    No?

7         A    No, it doesn't refresh my memory.  It just says

8    that -- that I can see Robinson asking for information.

9         Q    Okay.  So you don't recall whether that

10   information was ever provided?

11        A    I'm -- I'm pretty sure.  I don't know for a fact,

12   but I'm pretty sure it was.

13        Q    Okay.  And the information that would have been

14   provided would be the numbers that were requested and the

15   numbers that were actually being received?

16        A    Yes.

17        Q    Now, do you recall how roll call was conducted on

18   April 25, 2015?

19        A    I recall a roll -- at least one -- there are a

20   couple of roll calls I was at but in specificity, no.

21        Q    Do you recall roll calls on April 25th being

22   conducted differently than roll calls are typically

23   conducted?

24        A    Yes.

25        Q    Okay.  How was it different?

1      A     We had a mass number of officers in our auditorium

2   area, where they were getting briefed by Lieutenant Hyatt --

3   Lieutenant Colonel Hyatt.

4      Q     Okay.  And what were they getting briefed on?

5      A     Everything that was in operations order.  She, I

6   believe, if my memory serve -- serves me correctly, she was

7   setting the tone of what she expected from officers in how

8   they were going to be conducted.  We had a couple command

9   officers sharing moments of pride in organization to get

10  their guys heads up and to get them focused.

11     Q     Okay.  When you say, "Operational orders," would

12  that have included the operations order that were marked as

13  Exhibit 17, Exhibit 33.  Those kind of operation orders?

14     A     Yes.  Or subsets thereof.

15     Q     Okay.  So the arrest procedure outlined in the

16  operational plan for April 25, 2015.  That would have been

17  shared during the roll call that occurred on April 25, 2015

18  by Melissa Hyatt at the auditorium; is that accurate?

19     A     If not an outline thereof.  It may not have been

20  word by word but the outline, the gist would've been, yes.

21     Q     Were you present for that roll call?

22     A     I was -- I was present for several roll calls.  If

23  that -- that specific one, I don't know.

24     Q     Okay.  Do you recall arrests not being a preferred

25  function being specifically discussed during the roll calls

1   that you attended?

2        A    That verbiage and wordage does not pop-up in my

3   mind along those lines, but that would not have been

4   unusual.  It's basically saying, use your discretion whether

5   you need to arrest people.  They're doing their

6   constitutional rights and not violating the law.  That's why

7   we're there for.

8        Q    Do you recall whether the mayor was present for

9   any of these roll calls?

10       A    My mind says no. I don't think so.

11       Q    Okay.  Would the law enforcement officers provided

12   by way of mutual aid from outside jurisdictions, for April

13   25, 2015, would they have attended this roll call at the

14   auditorium?

15       A    I don't recall.  Good question, but I don't know

16   the answer to it.

17       Q    Okay.  Were the law enforcement officers who

18   actually did come on April 25, 2015, would they have been

19   expected to follow the guidelines in the operational plan

20   for that day?

21       A    Yes.

22       Q    Okay.  How would that be communicated to them?

23       A    Theoretically, they would have -- you --

24   theoretically, they should have had a briefing.  And as to

25   the question that you asked earlier, it would have been --

1    think we -- if we had moved a lot faster, we could have

2    gained control quicker.

3        Q    Got it.  And if you had -- if the Baltimore City

4    Police Department had more law enforcement officers, would

5    it have allowed it to move quicker and to deescalate things?

6            MR. CORLEY:  Objection.  You can answer.

7        Q    You can answer.

8        A    If we had more resources, we would've been able to

9    better control that entire scenario and we could anticipate

10   it better that those things were going to happen.  Yeah,

11   those resources would've made a dramatic difference.

12       Q    Okay.  And to the extent that wasn't understood or

13   realized before or after April 25, by that point, you

14   understood we need more resources.  Is that an accurate

15   thing to say?

16       A    I knew we needed more resources before that.

17       Q    Okay.  And did April 25, 2015, the events that

18   happened, did that confirm in your mind that, hey, unless we

19   get more resources, if things escalate, we're going to be in

20   trouble here.

21       A    Again, I already knew that before that.

22       Q    Okay.  So April 25, that just confirmed what you

23   knew before; is that accurate?

24       A    April 25 showed flaws that I already knew were

25   going to show.  Almost seven to eight days prior, I knew

1    that was going to happen.

2         Q    Okay.  Now, were there concerns that things would

3    escalate even beyond what happened on April 25, 2015.

4         A    On?

5         Q    Were there concerns that things would escalate

6    even worse than what had happened on April 25, 2015.

7         A    On what day?

8         Q    After April 25, 2015.

9         A    26th --

10             MR. CORLEY:  Objection to form.

11        Q    Strike that.  So April 25, 2015, things happened

12   by Camden Yards.  Okay.  After that happened, were there

13   concerns, hey things may get even worse.

14             MR. CORLEY:  Objection to form.

15             MS. GROSS:  Counsel, please specify who's concerned

16        your inquiring about.

17        Q    Sure.  Mr. Batts, so April 25, 2015 happens at

18   Camden Yards, were you concerned that things would escalate

19   even further to the extent protests would continue after

20   that day?

21        A    I -- I was concerned that protests were going to

22   continue after that day.  I also knew that -- or also knew

23   that the potential was there to become worse.  Yes.  And

24   there again, I share with you I tend to think worst-case

25   scenario, not best-case scenario.  So my mind automatically

**ORIGINAL TRANSCRIPT**

1      A     I don't think that would be a word I would use.

2      Q     Okay.  So after going around the city with your

3  protective unit, did you eventually make your way to TOC?

4      A     Back to the TOC?  Yeah.  Before -- before

5  everything took place.  Yes.

6      Q     Around what time would that have been?

7      A     I don't recall -- I don't recall.

8      Q     Would it have been like early afternoon, late

9  afternoon?

10      A     It would -- it would've been probably before 4:00

11  I'm sure.

12      Q     Okay.  So after observing the city, go to the TOC

13  at around -- before 4:00.  And you were there continuously

14  until you tried to make your way to the eastern side of

15  Camden Yards?

16      A     Correct.

17      Q     Okay.  During the entire time when you were at the

18  TOC, before you go to the eastern side of Camden Yards, was

19  Melissa Hyatt there the entire time?

20      A     As far as I know, yes.

21      Q     Okay.  When did the mayor and Kaliope Parthemos

22  show up?

23      A     I don't recall.  I think it's after activity

24  started because news coverage -- because news coverage was

25  on and the sun was still up.  So sometime early evening.

1      Q    Okay.  Would that have been before the incidence

2  at Pickles and --

3      A    Yes.

4      Q    Okay.  So they show -- did they show up before the

5  property destruction and the violence that day?

6      A    When you're saying and property destruct --

7  destruction, we're talking about the start of Camden Yards

8  issue?

9      Q    Correct.

10     A    Yes.  They showed up before that.

11     Q    Okay.  And when you left to go to the eastern side

12 of Camden Yards, was the mayor and her chief of staff still

13 there at the TOC?

14     A    Yes.

15     Q    Okay.  Now, you said that you didn't eventually

16 get there because of something that happened on the western

17 side of Camden Yards eventually that you returned to the

18 TOC; is that accurate?

19     A    Correct.

20     Q    When you returned to the TOC, was the mayor and

21 chief -- her chief of staff still there?

22     A    I don't recall.  I think so but I don't recall.

23     Q    Okay.

24     A    I think the mayor and her chief of staff stayed

25 there until most of the things started to calm down in the

 1     Q    Do you know why the SWAT team was not deployed at

 2   Camden Yards?

 3     A    If I had to guess, not remembering well, but it's

 4   probably with the larger crowd.  You -- the Camden Yards was

 5   a sma -- small subset of the larger crowd.  You still had to

 6   get the large crowd back to its cars on the -- in the

 7   western area, and get them out of that area.

 8     Q    Okay.  So your testimony is that SWAT was not

 9   present at Camden Yards (Audio interference) district?

10     A    As far as I can recall, that -- that is correct.

11   That's my memory at this time.

12     Q    Okay.  So if you would have had an additional SWAT

13   team from an outside jurisdiction, they would presumably

14   have been sent to Camden Yards; is that accurate?

15            MR. CORLEY:  Objection.

16     A    If we had --

17     Q    You can answer.

18            MR. CORLEY:  You can answer.

19     A    If we had had extra resources, hopefully we would

20   have them staffed prior to that to anticipate that they were

21   going to go to convention centers, the inner harbor, the

22   places where you have your soft underbelly.  If you have the

23   proper resources, it's not to wait 'til people do it, it's

24   they anticipate that they're going to be there, and you put

25   those resources there to keep the people away from them.

1       Q    And at that time, the Baltimore City Police

2   Department did not have those resources, correct?

3       A    We had some resources around the baseball state --

4   or around the baseball stadium, which limited us to be able

5   to do any other things.  So we put them where we could,

6   anticipating what -- where they would go, and that's the

7   best that we could.  We needed extra resources, yes.

8       Q    Okay.  Now, if I could direct your attention to

9   39, please.  Actually 39 and 40.  And actually before we get

10  there, if I could -- actually if I can take you back to 34.

11      A    34?

12      Q    Yeah.  And specifically to the page Bates stamped

13  7602.

14      A    7602.  Okay.

15      Q    What is 7602?

16      A    If it's the same one I'm looking at, it's an

17  Incident Radio Communication Plan.

18      Q    Okay.  And again, this is part of the operational

19  plan for April 25, 2015; is that accurate?

20      A    It appears so -- It's dated as such.

21      Q    Okay.  Now, does this list the radio channels that

22  were being used on April 25t, 2015 during the protest?

23      A    It -- it lists what channels that you will build a

24  tactical response, which basically means you shut that

25  channel off to regular communication and it's only for that

1    underbelly is.  They will go where your tourist locations

2    are, your malls, they will go where liquor stores, like a

3    7-Elevens.  You can anticipate that.  Some crowds will go

4    where you have guns, they'll break into guns stores or pawn

5    shops.  Some crowds will go to places where you have drugs,

6    pharmacies, break into pharmacies.  If you know that those

7    places are long -- along the route that you're at.  Mon --

8    Mondawmin Mall, places like that.  You can put those -- you

9    can put those resources there to prevent any damage being

10   done before it happens.

11        Q    Okay.  So how exactly would officers prevent

12   damage from happening if they were there?

13        A    Just set up a skirmish line, stand in formation.

14   The crowd knows that they're there.  Normally crowds are not

15   going to storm through those officers to get to those

16   locations.  They will divert and go to another direction.

17        Q    Right.  So -- I'm sorry.  Go ahead.

18        A    No.  Go ahead.  I was finished.

19        Q    So forming a skirmish line to hopefully deter

20   people from coming into the area, that's different than

21   ordering officers to not engage and to stay away; isn't that

22   accurate?

23        A    Say that one more time.

24        Q    Sure.  Forming in advance a skirmish line to deter

25   people from hitting a soft spot or coming to a soft spot

1     A     Okay.

2     Q     To your recollection, does that accurately reflect

3     the number of officers from outside jurisdictions by way of

4     mutual aid that were available for April 27, 2015?

5     A     I do not know.

6     Q     Okay.  Now, at -- up to this point, the mutual aid

7     that was coming in, by way of law enforcement officers, was

8     still being arranged from police department to police

9     department; is that accurate?

10    A     I -- I don't know.  To be acc -- to be correct.  I

11    don't know.

12    Q     Okay.  Now, in light -- the funeral for -- the

13    scheduled funeral for Freddie Gray on April 27, 2015, was

14    that on your radar?  Did you know in advance that was

15    scheduled?

16    A     Yes.

17    Q     All right.  And I believe you testified earlier

18    that you saw the funeral as being a possibility for a flash

19    point; is that accurate?

20    A     Yes.

21    Q     What did you mean by that?  How could it be a

22    flash point?

23    A     It's -- well then -- the entire weekend was an

24    emotional issue for the community, not only just community,

25    but the nation as a whole and all eyes from CNN to Fox to

1     MSNBC was on Baltimore and this issue.  Now, the gentleman

2     whose -- who the focus is, is having a funeral which his

3     family is going to be at and his mom is going to be at and

4     the world's going to see all the pain that that family is

5     going through and they're going to want to react.  To which

6     you also had the high school that Freddie Gray graduated

7     from put out this notice, this -- for lack of a better word,

8     e-blast to all the high schools in the City of Baltimore,

9     telling the kids to descend on this area, to do a purge.

10    And all of that was taking place within hours a funeral at

11    11:00, not knowing how long those services were going to go

12    in, and then these kids getting out of school at 14:30 on

13    the same day.  They had a possibility to be an atom bomb.

14        Q    Okay.  So if you look at Exhibit 58, which is

15    produced by the City as 11631.

16        (EXHIBIT 58 MARKED FOR IDENTIFICATION)

17        A    Okay.

18        Q    It seems to come from the school police chief, and

19    that was e-mailed to you, among many others, but it refers

20    to an image that's been floating all through social media,

21    or that's what the e-mail states.  Is this the purge flyer

22    that you're referring to?

23        A    I never saw the purge flyer.  I was informed by my

24    staff that the purge issue had come up.

25        Q    Okay.  Were you taking rumors of a purge

1    seriously?

2         A    I was taking the rumors of everything seriously.

3         Q    Okay.  Was these -- this possibility of a

4    so-called purge, would that -- was that a particular concern

5    of yours on that day?

6         A    Yes.  Especially dealing with high school kids on

7    the day that Freddie Gray was being buried, I think like two

8    miles north of his high school.

9         Q    If I could direct your attention to 59, produced

10   by the City as City 45302.

11              (EXHIBIT 59 MARKED FOR IDENTIFICATION)

12        A    Okay.

13        Q    This reflects a threat to police officers.  Do you

14   recall this threat?

15        A    I do.  Yes.

16        Q    Okay And you do recall this threat being on April

17   27, 2015?

18        A    I do.

19        Q    Okay.  So you have Freddie Gray's funeral, you

20   have this rumors of a purge, you have this threat.  April 27

21   was shaping up to be a pretty big day; would you agree?

22        A    The potential was shaping up to be a pretty big

23   problem.

24        Q    Okay.  Was the Baltimore City Police Department

25   taking any additional steps in light of what may happen to

1    address these rumors or concerns?

2        A    I don't know when you say anymore steps.  We asked

3    -- tried to start steps eight days prior to any of this

4    taken place, we reached out, we asked for resources, we

5    asked for help.  We begged, we had multiple meetings, begged

6    people to come and assist, they did not.  So we had to go

7    into battle with the -- what we had to do the best that we

8    can with what we had and that's what we did.

9        Q    Right.  So things are escalating.  I mean, at this

10   point, April 27, you don't recall any discussions or

11   approaching the City saying, hey, we have an issue here.  We

12   don't have enough manpower.

13       A    I did approach the City at -- or, we had -- we've

14   been having that conversation during the entire time.  The

15   city hall was aware that we didn't have enough resources and

16   -- and knew what was happening.  They also knew that the --

17   the state police had been notified.  They also knew that's

18   our norm to notify the state police and that the state

19   police responds along those lines.  There's -- state police

20   did not respond.  They did not give us the numbers that we

21   were asking for.  Nor did they tried to give us the numbers

22   that we asked for.  They also were informed they could have

23   -- they could have brought the National Guard online.  They

24   were aware from the -- the Colonel.  They did not bring the

25   National Guard online.  I don't know what else you think we

1        (EXHIBIT 70 MARKED FOR IDENTIFICATION)

2        A        Got it.

3        Q        This was an e-mail produced by the City as 10586.

4   And this is on April 27, 2015, at approximately 6:05 p.m. It

5   says, "BPD is reporting the following assets on hand: 1,340

6   sworn BPD, 80 outside jurisdiction, 700 vehicles." Does that

7   appear accurate to you?

8        A        I don't know if it's accurate or not, but I know

9   we started when things started going awry, and I started

10  making phone calls.  We started getting heavy numbers in.

11       Q        Okay.  When you were making phone calls to whom?

12       A        When we had Pennsylvania -- we had the school

13  issue take place.  Kids came out of school, the platoons up

14  there engaged kids, kids were pushed south at Pennsylvania

15  and ended up at Pennsylvania, Northwood.  Large groups of

16  people out, they ended up burning the CVS.  We started

17  responding every unit possible in the City of Baltimore out

18  of the 85-90 square miles.  Every police officer was headed

19  for Pennsylvania North, crowds were started to break off in

20  many directions, store owners were being pulled out of their

21  -- their stores and being beaten.  I was pushed in Palmere

22  to move faster and I just felt that the organization was

23  overwhelmed and that we can come up -- come up to speed.  I

24  called Cathy Lanier at Washington DC and said I'm not

25  getting the support that I need from the State of Maryland.

1    I need help.  Would you -- would you help?  She said that

2    she would slim down her resources and come as -- assist us.

3    I had staff call Penn -- Philadelphia PD, see if they can

4    send resources and help.  I called Bill Bratton in New York

5    PD, see if he can send resources and help since I wasn't

6    getting a response from the State of Maryland that I thought

7    I should.  All -- all -- all of them said if they were to

8    come, they can't come in without the governor's deputizing

9    them since it's a different state.  I then called the mayor

10   and said we need to declare a state of emergency to get

11   officers in.  I think she made that call to the governor,

12   and that's where we were.

13       Q    Okay.  Do you recall at what point you called the

14   mayor to ask her to declare a state of emergency?

15       A    I actually said, I think we need to declare a

16   state of emergency.  I need to get these resources in if

17   they can.  I think that was about 1800, I could be wrong.  I

18   lost track of time.  I don't -- I don't really remember.

19       Q    Okay.  When you say -- was this when events were

20   erupting in Mondawmin?

21       A    We had -- they had -- they had moved beyond

22   Mondawmin and went southbound to Pennsylvania North and CVS

23   was broken into, looted, and set fire to and crowds started

24   to subdivide.  Some said they were going down to the city

25   hall to ransack city hall.  Some were pulling store owners

288

1          Q    Okay.  Do you ever recall calling anyone in -- at

2     the Office of Emergency Management asking for their help to

3     get more resources?

4          A    I would think most likely someone like Ganesha

5     Martin.  I was given her -- I think I -- I delegated her to

6     call Philadelphia PD and anywhere else, so they -- they may

7     have been following up with the phone calls along those

8     lines.  She used to work for Bob Maloney in that area so it

9     would make sense that she probably would make that phone

10    call.

11         Q    Okay.  If I could direct you to 71.

12              (EXHIBIT 71 MARKED FOR IDENTIFICATION)

13         A    Got it.

14         Q    This is produced by the City as 12096 and this is

15    an e-mail sent at 6:20 p.m. on April 27, 2015.

16         A    Yep.

17         Q    Do you recall where you were around that time?

18         A    This is at 6:20.  Most like -- I was bouncing

19    around the police station, talk, I was in and out, I was in

20    the field, I was all over the place.

21         Q    Okay.  In addition to calling the mayor and asking

22    her to declare a state of emergency, do you also recall

23    asking her around that time to call the national guard or do

24    something to help facilitate calling the national guard?

25         A    I -- I -- no. I surmised that when you declare a

1    state of emergency, you get all the state police officers

2    that we had asked for eight days prior, all the national

3    guard that we had asked for prior, and all the resources

4    that we had asked eight days prior would be coming.

5         Q    As a result of the declaration of a state of

6    emergency.

7         A    Yes.

8         Q    Okay.  I am almost done here.  Can we take a short

9    break before we finish up?

10        A    Nope.  I'm sorry.  I'm just getting pissed off

11   reliving it.  But keep on going, I'm good.

12             MR. HWANG:  Mind if we take a five minute break

13      before we finish up?

14             THE WITNESS:  Okay.

15             (OFF THE RECORD)

16             COURT REPORTER:  4:55 p.m. back on the record.

17             BY MR. HWANG:

18        Q    Okay.  So if I could direct your attention to 73.

19             (EXHIBIT 73 MARKED FOR IDENTIFICATION)

20        A    73.  Yes, sir.

21        Q    This was produced by the City as 11548.  Do you

22   see below where it says materials needed by BPD and it

23   proceeds to list various equipment and quantities?

24        A    Yes.

25        Q    Chest, leg, arm protection: 1,000 each; protective

1    riot clothes: 1,000 each; riot shields: 1,000 each; so on

2    and so forth?

3        A    Yes.

4        Q    Do you recall requesting this equipment?

5        A    Yes.

6        Q    Okay.  I thought you testified earlier that it was

7    your understanding that the BPD was sufficiently equipped,

8    at -- at least as far as protective gear was concerned?

9        A    Yes.  I had brought in a consultant to check our

10   viability to respond and they found a trailer full of

11   helmets that were sufficient, night st -- sticks, and

12   shields.  But what we found was that these things were

13   collapsing and were not up to snuff around the middle.  What

14   you see there is actually what they call "turtle gear" and

15   that's your chest, leg, arm protection.  Those things I'm

16   not familiar with and were not familiar with.  It's not as

17   -- used on the west coast as much.  My training team never

18   said that they wanted or needed it prior to this, but as

19   this got going because the guys were taking rocks and

20   bottles and hit -- and began hit on their shins and knees

21   and -- and elbows and things, we ordered this stuff.

22       Q    Okay.  Now, on April 27, 2015, when did the

23   rioting stop?  Do you recall?

24       A    On that Monday, I think, don't quote me on this,

25   we had large numbers of police and national guard in the

1     city, roughly about 2300 hours, mid, we were -- with those

2     numbers -- we were able to gain control of the city.  I

3     think those numbers got pretty close to 3 -- to 4,000 police

4     officers and national guards people at the time, which is

5     the number that we asked for eight days prior.  If we had

6     them on the front end, we probably wouldn't have had those

7     issues.  But they numbered there, we were able to control

8     the city for the next, I guess, eight or seven days that the

9     protests were still going on.

10         Q     Okay, So things deescalated, rioting stopped and

11    -- that night, correct?

12         A     Yup.

13         Q     Okay.  If I could direct your attention to 77.

14               (EXHIBIT 77 MARKED FOR IDENTIFICATION)

15         A     Sevent -- got it.

16         Q     This was a Baltimore Sun article published on May

17    27, 2015.

18         A     Okay.

19         Q     Title is "Batts Apologizes to Baltimore Officers

20    at Union Meeting."

21         A     Uh-huh.

22         Q     Now if you go to page 5 of this document.

23         A     Got it.

24         Q     Second to the last paragraph says: "In my

25    intuition, I didn't stay with it.  People said, 'We haven't

1                        CERTIFICATE OF OATH

2

3    STATE OF FLORIDA

4    COUNTY OF BROWARD

5

6       I, the undersigned, certify that the witness in

7    the foregoing transcript personally appeared before

8    me and was duly sworn.

9

10   Identification:  Produced Identification

11

12

13

14

15

16

17

18

19        _____

20             TREY SIDENBENDER

21             Court Reporter, Notary Public

22             State of Florida

23             Commission Expires: 08/15/2021

24             Commission Number:  GG134817

25

1                         REPORTER'S CERTIFICATE

2

3    STATE OF FLORIDA

4    COUNTY OF BROWARD

5

6        I, TREY SIDENBENDER, Notary Public in and for the

7    State of Florida at Large, do hereby certify that I

8    made an accurate and complete digital recording of

9    the deposition in the above-styled case.

10

11        I further certify that I am not a relative,

12   employee, attorney or counsel of any of the parties,

13   nor am I a relative or employee of any of the parties

14   attorney or counsel connected with the action, nor

15   financially interested in the action.

16

17        Dated this 28th day of March, 2021.

18

19

20

21

22   _____

23              TREY SIDENBENDER

24

25

```
 1              CERTIFICATE OF TRANSCRIPTIONIST

 2

 3    STATE OF FLORIDA

 4    COUNTY OF BROWARD

 5

 6    I, the undersigned, a Notary Public within the State of

 7    Florida do hereby certify:

 8

 9    That the said proceedings were taken and recorded by

10    electronic means at the time and place therein set forth

11    and transcribed under my direction and supervision and that

12    the testimony as typed is a true, accurate, and complete

13    transcript of the official recording.

14

15         I further certify that I am not a relative,

16    employee, attorney or counsel of any of the parties nor

17    am I a relative or counsel connected with the parties'

18    attorneys or counsel associated with the action, nor am

19    I financially interested in the outcome of the action.

20

21    Submitted on: March 28th, 2021

22

23    _____

24         IAN WALLACH

25
```

# EXHIBIT 11

# In The Matter Of:

*CHAE BROTHERS, LIMITED LIABILITY COMPANY, ET AL. v. MAYOR AND CITY COUNCIL OF BALTIMORE, ET AL.*

*DEAN PALMERE*
*December 17, 2020*
*ORIGINAL TRANSCRIPT*

*CourtScribes, Inc.*
*"Delivering More For Less"*
*(833) 727-4237*
*info@courtscribes.com*
*www.courtscribes.com*

**ORIGINAL TRANSCRIPT**

1

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF MARYLAND

3                  NORTHERN DIVISION

4

5   CHAE BROTHERS LIMITED        )
    LIABILITY COMPANY, et al.,   )
6                                )
                                 )
7           Plaintiffs,          )
                                 )Civil Action
8   v.                           )No.
                                 )1:17-cv-01657-
9   MAYOR & CITY COUNCIL OF      )    SAG
    BALTIMORE, et al.,           )
10                               )
                                 )
11          Defendants.          )

12

13

14          Deposition of DEAN PALMERE taken via

15   remote videoconferencing of all participants,

16   beginning at 1:04 p.m. on December 17, 2020,

17   before Eleanor J. Schwandt, Registered Merit

18   Reporter and Notary Public.

19

20

21

22

23

24

25

2

1    APPEARANCES:

2

        PETER K. HWANG, ESQ.
3       SUNG & HWANG LLP
          9256 Bendix Road - Suite 19052
4         Columbia, Maryland  21045
          410.772.2324
5         phwang@sungandhwang.com
          for the Plaintiffs
6
        SARA E. GROSS, ESQ.
7       HANNA MARIE C. SHEEHAN, ESQ.
        BALTIMORE CITY DEPARTMENT OF LAW
8         100 North Holliday Street
          Baltimore, Maryland  21202
9         410.396.3947
          sara.gross@baltimorecity.gov
10        for the Defendants Mayor and
          City Council of Baltimore
11

12   ALSO PRESENT:   MARYANDREINA ROJAS,
                     Videographer
13
                - - - - - - - -
14

15

16

17

18

19

20

21

22

23

24

25

**ORIGINAL TRANSCRIPT**

3

1

2                         I N D E X

3    DEPONENT:    DEAN PALMERE                    PAGE

4          Examination by Mr. Hwang              8

5          Examination by Ms. Gross             199

6          Re-Examination by Mr. Hwang          207

7                    E X H I B I T S

8    DEAN PALMERE EXHIBITS          1st MENTIONED

9    Exhibit 01 - Subpoena Package              15

10   Exhibit 02 - Protective Order and

11   Agreement                                  16

12   Exhibit 03 - Amended Complaint             25

13   Exhibit 04 - Response Guide for Critical

14   Incident, CITY 00005465                    27

15   Exhibit 05 - General Order T-7             29

16   Exhibit 06 - MD Code Criminal Law,

17   10-201                                     38

18   Exhibit 07 - MD Code Criminal Law,

19   3-904                                      38

20   Exhibit 08 - CITY00010336                  40

21   Exhibit 09 - CITY00010224-32               40

22   Exhibit 10 - CITY00004537                  40

23   Exhibit 11 - CITY00010392-96               40

24   Exhibit 12 - CITY00044190                  47

25   Exhibit 13 - CITY00005798                  49

4

```
1   DEAN PALMERE EXHIBITS        1st MENTIONED
2   Exhibit 14 - CITY00044216         51
3   Exhibit 15 - CITY00015586         54
4   Exhibit 16 - CITY00040945         58
5   Exhibit 17 - CITY00009552-55      59
6   Exhibit 18 - CITY00009496         77
7   Exhibit 19 - CITY00007498         81
8   Exhibit 20 - CITY00007492         81
9   Exhibit 21 - CITY00009618-19      90
10  Exhibit 22 - CITY00008781         94
11  Exhibit 23 - CITY00008860         94
12  Exhibit 24 - CITY00053351         94
13  Exhibit 25 - CITY00008777         94
14  Exhibit 26 - CITY00001315-17      102
15  Exhibit 27 - CITY00040254-58      104
16  Exhibit 28 - CITY00007422         106
17  Exhibit 29 - CITY00008422         108
18  Exhibit 30 - CITY00041447         113
19  Exhibit 31 - CITY00005656-61      114
20  Exhibit 32 - CITY00005695         123
21  Exhibit 33 - CITY00041208         128
22  Exhibit 34 - CITY00007595-7689    129
23  Exhibit 35 - CITY00040259         136
24  Exhibit 36 - CITY00043672
25  Exhibit 37 - CITY00041513
```

**ORIGINAL TRANSCRIPT**

5

```
 1   DEAN PALMERE EXHIBITS          1st MENTIONED
 2   Exhibit 38 - CITY00021802-06       147
 3   Exhibit 39 - CITY00021807-12       147
 4   Exhibit 40 - CITY00008818-21       161
 5   Exhibit 41 - CITY00021529-60       164
 6   Exhibit 42 - CITY00053393-96
 7   Exhibit 43 - CITY00009993
 8   Exhibit 44 - CITY00005547-52
 9   Exhibit 45 - CITY00006498-6596
10   Exhibit 46 - CITY00005465-5541
11   Exhibit 47 - CITY00040223-24       168
12   Exhibit 48 - CITY00045303          176
13   Exhibit 49 - CITY00045272
14   Exhibit 50 - CITY00013301-06       171
15   Exhibit 51 - CITY00040413          179
16   Exhibit 52 - CITY00041194          179
17   Exhibit 53 - CITY00012113          179
18   Exhibit 54 - CITY00046285          179
19   Exhibit 55 - CITY00011631          181
20   Exhibit 56 - CITY00045302          182
21   Exhibit 57 - CITY00046343
22   Exhibit 58 - CITY00000736          184
23   Exhibit 59 - CITY00010660          184
24   Exhibit 60 - CITY00053858          184
25   Exhibit 61 - CITY00010998          186
```

**ORIGINAL TRANSCRIPT**

6

1  DEAN PALMERE EXHIBITS          1st MENTIONED

2  Exhibit 62 - CITY00016847-63          186

3  Exhibit 63 - CITY00021675-715         186

4  Exhibit 64 - CITY00025873-913         186

5  Exhibit 65 - CITY00046159

6  Exhibit 66 - CITY00010586             192

7  Exhibit 67 - CITY00012051

8  Exhibit 68 - CITY00013006

9  Exhibit 69 - CITY00012139

10 Exhibit 70 - CITY00021354             194

11 Exhibit 71 - CITY00018202             195

12

13

14

15 DIRECTIONS NOT TO ANSWER      NONE

16 REQUESTS MADE FOR DOCUMENTS   NONE

17

18 ERRATA SHEET/DEPONENT'S SIGNATURE   PAGE 212

19 CERTIFICATE OF REPORTER             PAGE 213

20

21

22

23

24

25

**ORIGINAL TRANSCRIPT**

7

1          THE VIDEOGRAPHER:  We are now

2   on the record in the matter of Chae Brothers

3   Limited Liability Company versus Mayor and

4   City Council of Baltimore.  Today's date is

5   December 17th, 2020.  The time is 1:05 p.m.

6   This is the video recorded deposition of Dean

7   Palmere taken via Zoom.

8              My name is Maryandreina Rojas.

9   I am the camera operator representing

10  CourtScribes.  The court reporter is Eleanor

11  Schwandt with CourtScribes.

12             Will counsel please introduce

13  themselves.

14             MR. HWANG:  Good afternoon.

15  Peter Hwang, representing all the plaintiffs.

16             MS. GROSS:  Good afternoon.

17  Sara Gross and Hanna Sheehan representing the

18  Mayor and City Council, Baltimore.

19             THE WITNESS:  I'm Dean Palmere.

20             THE VIDEOGRAPHER:  Can the

21  court reporter please swear in the witness.

22

23

24

25

**ORIGINAL TRANSCRIPT**

1              DEAN PALMERE,

2       the witness herein, having first been

3       duly sworn on oath, was examined and

4       testified as follows:

5                   EXAMINATION

6    BY MR. HWANG:

7       Q.    Good afternoon, Mr. Palmere.  As

8    you know, my name is Peter Hwang, and I

9    represent the plaintiffs in this action who

10   are suing the Mayor and City Council of

11   Baltimore for, among other things, damages

12   to plaintiff's property and businesses.

13              As you may know, we are here

14   for a deposition which will consist of me

15   asking you questions and you providing

16   responses to those questions.

17              As you can see on the Zoom,

18   there is a court reporter here.  She is

19   transcribing my questions and your

20   responses.  As such, it is important that

21   you answer my questions verbally.  Please

22   do not answer with a gesture, like a head

23   nod or sounds like mm-hmm.  As you can

24   imagine, it is hard for the court reporter

25   to transcribe such responses.

**ORIGINAL TRANSCRIPT**

1    handled a security portfolio to assign

2    security officers to different locations.

3        Q.    Why did you leave Wolf Professional

4    Security?

5        A.    To join Guntry of Maryland.

6        Q.    You left voluntarily?

7        A.    Yes, sir.  It is owned by the same

8    owners.

9        Q.    Okay.  Prior to being employed at

10   Wolf Professional Security where were you

11   employed?

12       A.    Baltimore Police Department.

13       Q.    And during what time period were

14   you employed by the Baltimore Police

15   Department?

16       A.    June of 1990 to June of 2018.

17       Q.    Did you retire from the force?

18       A.    Yes, sir.

19       Q.    If you can kindly walk me through

20   your work history with the Baltimore City

21   Police Department, perhaps going by title

22   or rank, and if you could provide the time

23   periods in which you held that and what

24   your duties were, please.

25       A.    Yes, sir.  In June of '90 I was

1     So there was quite a bit of discussion

2     regarding assets and resources.

3        Q.    Okay.  Let's move on to Exhibit 12.

4     Exhibit 12 is an e-mail chain produced by

5     the City, Bates stamped CITY 00044190.

6        A.    Okay.

7        Q.    The first e-mail that was sent on

8     April 19th at 1:41 p.m., you received this

9     e-mail, correct?

10       A.    Yes, sir.

11       Q.    Okay.  So Freddie Gray passes away

12    on April 19th, 2015.  When he passes away

13    does anything change with respect to the

14    department's approach towards protests

15    after Freddie Gray's death?

16       A.    I believe that there was concern

17    that it would become very disruptive.

18       Q.    How did plans change, if they did,

19    as a result of that concern?

20       A.    I'm not sure what you mean, how did

21    plans change.

22       Q.    Sure.  So Freddie Gray passes away

23    on April 19th.  You said that there was a

24    concern that things would become more

25    disruptive.

1      A.     25th.

2      Q.     25th, the Saturday?

3      A.     Yes, sir.

4      Q.     While we are talking about

5   resources, if I could direct your attention

6   to Exhibit 13, a document produced by the

7   City, Bates stamped CITY 00005798.

8      A.     Yes, sir.

9      Q.     Do you know what Exhibit 13 is?

10  I'll let you look through it.

11     A.     State Law Enforcement Coordinating

12  Council Request.

13     Q.     Are you familiar with these

14  requests?

15     A.     I believe this is, it is called a

16  SLECC request, where the commissioner gives

17  authority for other agencies to operate

18  within the City limits.

19     Q.     Okay.  Now, this is dated April

20  20th, one day after Freddie Gray's death,

21  correct?

22     A.     Yes, sir.

23     Q.     Now, if you look at the first

24  sentence in the body of Exhibit 13, it says

25  that the Department will prepare to conduct

**ORIGINAL TRANSCRIPT**

1    a coordinated effort in response to

2    possible protest activity.  Do you see

3    that?

4       A.    Yes, sir.

5       Q.    Did Freddie Gray's death prompt

6    this coordinated response?

7       A.    To my knowledge, yes, sir.

8       Q.    And how was the Department going to

9    make a coordinated response?

10      A.    With other agencies, either being

11   on call or available to stage at locations

12   throughout the City.

13      Q.    Okay.  Were all decisions then to

14   be made at a certain level and by certain

15   people?

16      A.    When -- well, that's what the ICS

17   would be for, yes, sir.

18      Q.    And was that established like at

19   this time?

20      A.    Again, I don't recall specifically.

21   But I would -- I don't recall specifically,

22   but I would think so.

23      Q.    Okay.  At this time do you recall

24   whether there was any structure put into

25   place as to who would be making decisions

1    seems to think that switching out incident

2    commanders during an event is a bad idea.

3    Do you see that?

4        A.    Yes, sir.

5        Q.    Do you agree with that?

6        A.    Again, I don't recall this

7    specifically.  And again, I don't

8    necessarily agree with it or disagree with

9    it.

10       Q.    You don't have an opinion one way

11   or another?

12       A.    Well, again, I don't know what the

13   relief factor would have been.  Obviously,

14   incident commander can't work 24/7, so,

15   again, I don't recall this specifically,

16   what the timeline was.  But they would have

17   had to have alternated eventually.

18       Q.    Well, if I could direct your

19   attention back to Exhibit 13.  So as you

20   mentioned, Exhibit 13 is a SLECC request,

21   and it is by the Baltimore City Police

22   Department to the State Law Enforcement

23   Coordinating Council for additional

24   resources.  At this time did the Baltimore

25   City Police Department have enough

1      resources on its own to handle things,

2      handle the protests?

3         A.    Not, my opinion is no.

4         Q.    And because it didn't have enough

5      resources, that's why it was requesting

6      resources from outside jurisdictions,

7      correct?

8         A.    Yes, sir.

9         Q.    Now, the end of Exhibit 13 states

10     that personnel shall have riot equipment on

11     hand.  Do you see that?

12        A.    Yes, sir.

13        Q.    At that time were there any

14     discussions within the Department about

15     instructing patrol or officers to have riot

16     equipment on hand?

17        A.    I don't know if it was specifically

18     at this time.  But there was a time where

19     the officers were requested to have their

20     riot equipment on hand.

21               In fact, it was supposedly to

22     always be available.  But we had to acquire

23     some additional equipment, and it was

24     coming in at different times.

25        Q.    Okay.  Were there any discussions

1   conversations to it.

2      Q.   Okay.  I don't need dates, but, I

3   mean, what do you recall about the

4   discussions?

5      A.   That, obviously, we were to act

6   professional, and not to look militarized.

7   I know that that term was used at some

8   point.  To be professional.  And then, so,

9   again, I don't recall specific

10   conversations to this at the time.

11      Q.   Sure.  When you say you do recall

12   concerns that police officers should not

13   look or act militarized --

14      A.   Yes, sir.

15      Q.   -- you don't recall any discussions

16   about whether officers should wear riot

17   gear and whether that would make them look

18   militarized?

19      A.   That was part of it.  It wasn't

20   that they weren't to wear riot gear.  It is

21   to wear it, you know, specifically when

22   there was a need, need to have it on.  If

23   there was parts of the protest that were

24   very peaceful, that weren't threatening,

25   where officers would be in what we call

1    Class B uniform, and if things started to

2    get out of control, then officers would

3    wear their, what they called a turtle gear

4    at the time.

5       Q.    So there were no discussions

6    whether to instruct officers specifically

7    not to wear riot gear until it became

8    necessary?

9       A.    Again, I don't recall specifically

10   what conversations regarding that.  But I

11   do recall that it was discussed, that

12   officers would not be in their turtle gear

13   at all times.

14      Q.    And was this discussed before April

15   25th?

16      A.    I don't recall, sir.

17      Q.    I'm sorry?

18      A.    I don't recall specific dates, no,

19   sir.

20      Q.    If I could direct your attention to

21   16.  It is an e-mail produced by the City,

22   Bates stamped CITY 00040945.

23      A.    Yes, sir.

24      Q.    You are a party to this e-mail,

25   correct?

1    procedure would be put into place?  For

2    example, hey, before you make an arrest,

3    ask first?

4        A.    I don't recall specifically.  I

5    just recall that there were certain

6    incidents where they would try to mediate

7    arrests or confer, get a legal opinion

8    regarding an arrest.

9        Q.    Sorry, did you say mediate arrests?

10       A.    I'm sorry?

11       Q.    I didn't hear what you said.  Did

12   you say mediate arrests?

13       A.    Try to, try to mediate an incident

14   before an arrest.

15       Q.    Got it.  Would you say that's

16   different from how things were done before

17   the protests or under normal circumstances?

18       A.    Yes.

19       Q.    And why the change for the

20   protests?

21       A.    I think it was for the safety of

22   everyone and not to cause basically more of

23   a riot, or if there was a peaceful protest

24   where you had an agitator or two, regarding

25   an incident, the course of action that

**ORIGINAL TRANSCRIPT**

69

1    would be taken, basically for everyone's

2    safety.

3        Q.   Okay.  Do you recall any incidents

4    when an officer wanted to make an arrest

5    but he was told not to, hey, let's try to

6    mediate this first?

7        A.   Not specifically, no.

8        Q.   If you don't recall a specific

9    officer or specific incident, do you recall

10   there being incidents where that happened?

11       A.   Yes.  But, again, I don't recall

12   the details.  I just remember clergy and

13   other interrupters that were led by the

14   commanders in the Police Department that

15   would deescalate certain things.  And this

16   was even prior to, sometimes prior to an

17   assembly or a protest in the evening as

18   well.

19       Q.   Okay.  So who made this, who made

20   the decision to employ this different

21   procedure?  In other words, before an

22   arrest is made, let's try to mitigate it

23   first or mediate it first?

24       A.   The Commissioner, Batts at the

25   time, was discussing it with, and I think

77

1    was communicated that was to be employed?

2       A.    I don't recall specifically.  I

3    would have to refer to a document.

4       Q.    Okay.  Was there a procedure

5    employed or communicated down the line?

6       A.    Not that I recall specifically.

7       Q.    But there was a general

8    instruction, hey, before you make an

9    arrest, try to mediate; is that correct?

10      A.    Yes.

11      Q.    And that originated from former

12   Police Commissioner Anthony Batts?

13      A.    Yes, sir.

14      Q.    Do you know whether that was

15   discussed with the City?

16      A.    I do not.

17      Q.    Okay.  I would like to direct your

18   attention to Exhibit 18.

19      A.    Yes, sir.

20      Q.    It is e-mail produced by the City,

21   Bates stamped CITY 00009496.  Now, it was

22   sent to all BPD and Broadcast, so you would

23   have received this, correct?

24      A.    Yes, sir.

25      Q.    Now, this e-mail cancels leave for

**ORIGINAL TRANSCRIPT**

1      April 25th, 2015, correct?

2         A.    Yes, sir.

3         Q.    So when was a decision made to

4      cancel leave for April 25th, 2015?

5         A.    I don't recall.  It looks like by

6      e-mail, April 22nd.

7         Q.    Why was leave canceled for April

8      25th, 2015?

9         A.    In preparation for protests.

10        Q.    Okay.  And was the decision to

11     cancel leave for April 25th made because

12     otherwise the Baltimore Police Department

13     would not have sufficient resources or

14     officers to handle the protests?

15        A.    Correct.

16        Q.    Who made the decision to cancel

17     leave?

18        A.    The commissioner.

19        Q.    And just moving forward when you

20     refer to "the commissioner" can I assume

21     you mean Anthony Batts?

22        A.    Yes, sir.

23        Q.    Now, what discussions were there

24     about canceling leave for April 25th?

25        A.    I don't recall specific

1     exhibits.  So whoever, basically the

2     executive staff and command staff at the

3     time.

4        Q.    Got it.  So all those persons would

5     have been involved in discussions as to

6     whether to cancel leave?

7        A.    Normally, if leave was to be

8     canceled, there were certain special events

9     that we always cancel leave for, so 4th of

10    July, New Year's Eve, so this, because it

11    was a significant incident, would have

12    required leave cancellation.

13       Q.    Okay.  I'm sorry.  My question was,

14    so all the persons that you named --

15       A.    Mm-hmm.

16       Q.    -- they should have been involved

17    in the discussion to cancel leave for April

18    25th?

19       A.    They may, they may have.  Again, I

20    don't know if all of them were there during

21    this particular time or not.  But that

22    would be the main group, would be

23    lieutenant colonels and above, that that

24    would have been discussed with.

25       Q.    If I could direct your attention to

1      Exhibits 19 and 20.  19 is an e-mail

2      produced by the City, Bates stamped CITY

3      00007498, and 20 is an e-mail Bates

4      stamped, produced by the City, Bates

5      stamped CITY 00007492.

6        A.    Yes, sir.

7        Q.    Now, you sent the e-mails reflected

8      as Exhibits 19 and 20, correct?

9        A.    Yes, sir.

10       Q.    Now, if I could direct your

11     attention to Exhibit 19.  Do you remember

12     who Pete Evans is?

13       A.    I don't remember him specifically.

14     A commander in Baltimore County police.

15       Q.    And Exhibit 19 is a request for

16     mutual aid; isn't that correct?

17       A.    Yes, sir.

18       Q.    Exhibit 20, you also sent this

19     e-mail, correct?

20       A.    Let me pull it up.

21             Yes, sir.

22       Q.    And Exhibit 20 is a request to

23     request mutual aid from, is it Howard

24     County and also Anne Arundel County?

25       A.    Yes, sir.

**ORIGINAL TRANSCRIPT**

1      Q.    And both of these you had sent on

2    April 22nd, 2015, correct?

3      A.    Yes, sir.

4      Q.    Now, the decision to cancel leave

5    had already been made, and additional

6    resources were previously also requested

7    from the state, as reflected in a prior

8    exhibit.  So at this point why was there

9    still a need to request these additional

10   resources from these other specific

11   jurisdictions?

12     A.    I believe, based on the way I

13   recall this is I had reached out to several

14   jurisdictions asking for assistance.  And

15   again, I don't remember the timelines.

16   Several of their -- a representative from

17   each agency, I think it was state police,

18   Baltimore County, Howard County, PG County,

19   maybe Montgomery County, Anne Arundel

20   County, sent the representative, and we

21   discussed the upcoming protests and the

22   need for mutual aid and specifically what

23   they could send us.  So that's what

24   precipitated from these e-mails.

25     Q.    Okay.  So when was the decision

1    made to request these resources?

2        A.    It looks like around April 22nd.

3        Q.    Who made the decision to request

4    these resources?

5        A.    Commissioner Batts asked that I

6    reach out to other agencies, seeking

7    assistance.

8        Q.    And you had a discussion with him

9    about requesting these additional

10   resources, correct?

11       A.    Yes, sir.

12       Q.    What did you guys discuss about the

13   need to, why the need to request these

14   additional resources?

15       A.    Based on our staffing levels at the

16   time, and to be able to keep up with

17   regular operations, and, again, I believe

18   we anticipated several protests around the

19   city, and simply didn't have the resources,

20   even with leave canceled, to cover them for

21   significant periods of time and keep up

22   with daily operations, calls for service

23   and things of that nature.

24       Q.    Okay.  So what discussions were

25   there about the lack of resources or about

1      Exhibits 19 and 20, the Baltimore City

2      Police Department is requesting mutual aid.

3      Are surrounding jurisdictions required to

4      provide that mutual aid at this point?

5          A.    They are not required to, no, sir.

6          Q.    Now, during her testimony Melissa

7      Hyatt testified that it was clear, prior to

8      April 25th, with the numbers that were

9      coming in, that the surrounding

10     jurisdictions would not provide enough

11     mutual aid for the needs of the Baltimore

12     City Police Department.  Do you agree with

13     that?

14         A.    Yes, sir.

15         Q.    Are you familiar with the Baltimore

16     Regional Emergency Assistance Compact?  It

17     is also referred to as the acronym BRAC.

18         A.    No, sir.  I believe we were using

19     the SLECC form for mutual aid requests.

20         Q.    But I guess you understood at that

21     time that surrounding jurisdictions were

22     not required to provide you with mutual

23     aid, correct?

24         A.    Correct.

25         Q.    At this point, any talk about

1    6:16 p.m. on April 23rd.

2       A.    Yes, sir.

3       Q.    It says:  "Crowd got rowdy.  2

4    arrested.  Seems to have calmed down

5    somewhat."

6       A.    Okay.

7       Q.    Now, when you were in command, and

8    at these protests, when arrests were made,

9    did you find that making arrests helped

10   disperse the crowd and calm things down?

11      A.    It didn't help disperse the crowd

12   that I recall.  But it took whatever

13   agitator -- I don't recall this specific

14   arrest in the e-mail.  But it would diffuse

15   or take the agitator away from things.

16      Q.    By taking the agitator away from

17   things, would it help diffuse the

18   situation?

19      A.    At times, yes.

20      Q.    Do you recall these arrests

21   agitating the crowd or making things worse?

22      A.    I don't recall.

23      Q.    Now, Exhibit 25 -- strike that.

24            MR. HWANG:  Actually, Sara, do

25   you want to take a quick break right now

**ORIGINAL TRANSCRIPT**

1    whether arrests should be made?

2       A.    Not specifically, no.

3       Q.    Okay.  Generally?

4       A.    Not generally, no.

5       Q.    When I say emergency management, do

6    you know what I'm referring to?

7       A.    Yes, sir.

8       Q.    Or the Office of Emergency, is it

9    the OPDOM, the Office of Emergency

10   Management?

11      A.    Yes, sir.

12      Q.    Would you have discussions with

13   others at that office aside from Robert

14   Maloney?

15      A.    Not that I recall.  I mean I knew

16   individuals that worked there.  I don't

17   recall any specific conversations.  Connor

18   Scott was, he is in the e-mail, he was at

19   OEM.

20      Q.    Do you recall having discussions

21   with him, though?

22      A.    No, sir.

23      Q.    Sorry, that was a no?

24      A.    No, sir.  I'm sorry.

25      Q.    Do you know the name David

1    McMillan?

2        A.    Yes, sir.

3        Q.    Do you recall having discussions

4    with David McMillan during the Baltimore

5    riots?

6        A.    No, sir, not directly.

7        Q.    Now, Exhibit 25, the e-mail sent at

8    6:46 p.m., Robert Maloney says:  "Keep me

9    posted with intel.  Mayor is asking."

10       A.    Exhibit 25.  I hit the wrong

11   button.  Yes, sir.

12       Q.    Did you have any discussions with

13   the mayor to provide her some intel or give

14   her some idea of what is going on or what

15   may go on?

16       A.    I'm sorry, could you repeat the

17   first part.

18       Q.    Did you have any discussions with

19   the mayor to give her intelligence or to

20   provide her with an explanation as to what

21   is going on or what may happen?

22       A.    Not that I recall.

23       Q.    Do you ever recall having

24   discussions with the mayor directly?

25       A.    Not during this time.  I talked to

1   that point we had some mutual aid from

2   surrounding jurisdictions.  And it was

3   being handled like the other protests would

4   have been as far as resources.

5       Q.    But there weren't any specific

6   plans as to how to deal with this very

7   specific agitator?

8       A.    Again, I think we were involving

9   grassroots people, grassroots organizations

10  into the mix.  But I don't recall a set

11  plan to say this is how we are going to

12  deal with this group.

13      Q.    Okay.  And nothing had changed?

14  Right?  So even at this point, with the

15  mutual aid that you were receiving, there

16  still was not enough resources to, as far

17  as what you thought was needed to handle

18  the protest, correct?

19      A.    No, sir.

20      Q.    No, meaning --

21      A.    We did not have enough resources,

22  no, sir.

23      Q.    If I could direct your attention to

24  Exhibit 27.

25      A.    Okay.

1    correct?

2       A.    No, sir.

3       Q.    Now, were these plans in place, by

4    these plans I mean the special operations

5    section reflected in 31, for the protests

6    on April 25th, were they also in place,

7    although not listed, during the protest for

8    April 22nd?

9       A.    I don't recall.  I know special

10   operations was available.  But I don't know

11   what equipment we had for them at the time

12   because we had to acquire them equipment as

13   well, and I don't know the timeframe of

14   when we were able to get them equipment as

15   well.

16      Q.    Between April 22nd and April 25th

17   would you agree that the protests were

18   escalating?

19      A.    Yes, sir.

20      Q.    And as protests escalated, did the

21   Baltimore City Police Department, you know,

22   increase plans or change plans to address

23   that?

24      A.    Yes, sir.

25      Q.    The use of arrest team, arrest

123

1    decisions on the ground or through the

2    intelligence of incident command.

3       Q.    Sure.  Were mutual aid resources,

4    were they told not to make arrests, to pass

5    them through the Baltimore City Police

6    Department first?

7       A.    I don't recall that.

8       Q.    All right.  The last page of

9    Exhibit 31 refers to the Shock Trauma Gala.

10      A.    One second.

11            I'm sorry.  The Shock Trauma

12   Gala?

13      Q.    Yes.

14      A.    Yes, sir.

15      Q.    Do you recall that being scheduled

16   and then canceled?

17      A.    I believe it was canceled, yes,

18   sir.

19      Q.    Okay.  Do you know if the Baltimore

20   City Police Department provided any input

21   as to whether it should be canceled?

22      A.    That I don't recall.

23      Q.    If I could direct your attention to

24   32, which is an e-mail produced by the

25   City, CITY 00005695.

132

1    correct?

2        A.    Yes, sir.

3        Q.    Did you, in fact, serve in that

4    role during the protests on April 25th,

5    2015, as indicated here?

6        A.    I don't, I don't recall

7    specifically, because I know Chief Hyatt at

8    the time was assuming a lot of the incident

9    command role.  Even though it was

10   documented this way, there was other things

11   that were I guess a bit more fluid with

12   other agencies and meetings and things of

13   that nature.

14       Q.    What does that mean exactly?  Why

15   were you listed as the incident commander

16   and unified commander, but why did Melissa

17   Hyatt take more of that role on?

18       A.    I think just based on different

19   directions that we may have been pulled at

20   the time.

21       Q.    What different directions?

22       A.    With other meetings or planning or

23   just how things unfolded.  Again, you know,

24   I don't recall specifically all the events

25   as they unfolded at the time.

1    what the specifics were.  This is mainly

2    pertaining to patrol.

3        Q.    Okay.  During that time do you

4    recall mobile field forces being deployed

5    to attend to incidents like this?

6        A.    I don't recall if they were

7    deployed this specific night.  Ultimately,

8    I know that they were deployed at some

9    point.

10       Q.    Would you have made the decision to

11   deploy them or would someone else have made

12   it?

13       A.    Generally, the chief of patrol

14   would coordinate that.

15       Q.    Okay.  Well, I mean, this helps you

16   remember what happened on April 25th,

17   right, I would assume, at Camden Yards and

18   elsewhere?

19       A.    Sure.

20       Q.    Would you agree by this point on

21   April 25th that it was an emergency that

22   went beyond normal operating procedures?

23       A.    I'm sorry, could you repeat that.

24       Q.    Sure.  As far as what happened on

25   April 25th, would you agree that it was an

161

1    emergency that went beyond normal operating

2    procedures?

3        A.    Yes, sir.  It was obviously getting

4    out of hand.

5        Q.    If I could direct your attention to

6    Exhibit 40 --

7        A.    Yes, sir.

8        Q.    -- which is an e-mail chain marked

9    as CITY 00008818 through 8821.  If I could

10   direct your attention to the e-mail in that

11   chain that was sent at 2:17 p.m., which

12   begins at the bottom of page 8819 and

13   continues on to 8820.

14       A.    Give me one second.  Okay.  I'm at

15   8819.

16       Q.    And the meat of it is actually on

17   8820.

18       A.    I'm sorry?

19       Q.    The meat of it is actually on 8820.

20       A.    There were 2 middle-eastern looking

21   persons is where it starts?

22       Q.    Yeah.  The second paragraph:  By

23   Pennsylvania Avenue we had some activity

24   where gang members identifying themselves

25   by colors were together engaging police and

1       time didn't have enough resources for two

2       things.  One was crowd control and the

3       other was to protect infrastructure.

4          A.     What was the second?

5          Q.     To protect infrastructure,

6       infrastructure.

7          A.     Correct.

8          Q.     Do you agree with that?

9          A.     Yes, I think we were low on

10      resources, absolutely.

11                 MR. HWANG:  I'm sorry, can we

12      take a five-minute break, please.

13                 THE VIDEOGRAPHER:  Yes.  We are

14      off the record at 4:40 p.m.

15                 (Recess taken.)

16                 THE VIDEOGRAPHER:  We are back

17      on the record at 4:45 p.m.

18      BY MR. HWANG:

19         Q.     Now, Mr. Palmere, during the break

20      did you speak to anyone?

21         A.     No, sir.

22         Q.     Did you review any documents?

23         A.     No, sir.

24         Q.     If I could direct your attention to

25      Exhibits 51 through 54.  51 is an e-mail

180

1    produced by the City, CITY 00040413.  52 is

2    CITY 00041194.  53 is CITY 00012113.  And

3    54 is CITY 00046285.  I'll allow you to

4    take a minute or two to look through these

5    e-mails.

6        A.    Yes, sir.

7        Q.    Okay.  Now, you are a party to all

8    these e-mails, correct?

9        A.    Yes, sir.

10       Q.    Okay.  Now, as you read through

11   these e-mails, April 27th, 2015 had been on

12   the Baltimore Police Department's radar as

13   a big day, right?

14       A.    Yes, sir.

15       Q.    And certainly beyond normal

16   operating procedures, correct?

17       A.    Yes, sir.

18       Q.    Is the number, with leave canceled,

19   approximately how many Baltimore City

20   police officers were available on April

21   27th would have been the same?

22       A.    Yes, sir.

23       Q.    Would there have been a big

24   fluctuation between April 25th and 27th

25   since leave was canceled on both days?

1      A.    No, sir.

2      Q.    If you look at Exhibit 53.

3      A.    Yes, sir.

4      Q.    Does that accurately reflect the

5  number of officers from outside

6  jurisdictions by way of mutual aid that

7  were available for April 27th, 2015?

8      A.    Yes, sir.

9      Q.    Now, in addition to what is in

10  Exhibits 51 through 54, if you go look at

11  Exhibit 55, which is an e-mail produced by

12  the City, CITY 00011631, and you also

13  received that e-mail as well, right?

14      A.    Yes, sir.

15      Q.    Okay.  There were also rumors of a

16  purge, do you see that?

17      A.    Yes, sir.

18      Q.    How seriously was the Baltimore

19  City Police Department taking the rumor of

20  a purge?

21      A.    If I recall correctly, we were

22  taking it serious.

23      Q.    Okay.  And even prior to this rumor

24  of a purge, I mean, Exhibit 54 describes it

25  as an all-hands-on-deck day; would you

182

1    agree with that characterization?

2      A.    Yes, sir.

3      Q.    And if you look at Exhibit 56,

4    which was produced by the City as CITY

5    00045302, do you recall this threat, being

6    made aware of this threat on April 27th?

7      A.    Yes, sir.  I recall that.

8      Q.    And the Baltimore City Police

9    Department was taking this threat seriously

10   as well, correct?

11     A.    Yes, sir.

12     Q.    Okay.  Were there fears that April

13   27th would be worse than April 25th?

14     A.    If I recall correctly, we

15   anticipated things to escalate, yes, sir.

16     Q.    Do you recall engaging in any

17   discussions to that effect?

18     A.    Not specific, I don't recall

19   specific conversations.  But I think what

20   happened leading up to the 27th, and some

21   of the intelligence that was coming in, we

22   were discussing the possibilities of worse

23   than what we had on the 25th.

24     Q.    Okay.  Now, in anticipation of

25   things getting worse, were there talks

198

1      A.    Let me see.  I believe it pertained

2    to the D.C. employees at the time, for

3    Metro Police Department.

4      Q.    After the state of emergency was

5    declared, approximately how many more

6    officers did you receive by way of mutual

7    aid from outside jurisdictions?

8      A.    I think after the 27th we saw a lot

9    -- the agency were sending more than what

10   they initially agreed to in our meetings.

11   So I don't have an estimated number.  Each

12   jurisdiction sent what they could.  State

13   police sent quite a few.  Baltimore County

14   sent quite a few.  The surrounding

15   jurisdictions, as far as Wicomico County.

16   I know state police were bringing in

17   troopers from across the state.

18     Q.    Okay.  I mean, prior to the

19   declaration of the state of emergency, in a

20   prior exhibit the assets on hand said 80

21   from outside jurisdictions?

22     A.    Mm-hmm.

23     Q.    After the declaration of the state

24   of emergency, would you say that number

25   double or even more than doubled?

1      A.     Yes.

2      Q.     More than doubled?

3      A.     Yes.  Because we had a relief

4   factor.  So they were using their

5   resources, just as we were, to get through

6   like 24-hour periods at a time.

7                MR. HWANG:  Okay.  That's all

8   the questions I have for now.  Sara, do you

9   have any questions?  Sara?

10               MS. GROSS:  All right.  Always

11   takes me a minute to like unmute.  I do

12   have a few questions.  Briefly, though.

13                     EXAMINATION

14  BY MS. GROSS:

15      Q.     Commissioner, I just want to talk

16   briefly about when you had talked about

17   mediating arrests earlier in your

18   deposition.  When you were talking about

19   mediating arrests, you had also said that

20   the orders were generally to arrest people

21   who were a danger to property or a danger

22   to other people's lives.  So when you were

23   talking about mediating arrests, were you

24   talking about with violent people or with

25   like people that were engaged in disorderly

213

1  Commonwealth of Pennsylvania )
                               )
2  Chester County              )

3              CERTIFICATE OF REPORTER

4

5       I, Eleanor J. Schwandt, Registered
   Merit Reporter and Notary Public, do hereby
6  certify that there came before me on the 17th
   day of December, 2020, the deponent herein,
7  DEAN PALMERE, who was duly sworn by me and
   thereafter examined by counsel for the
8  respective parties; that the questions asked
   of said deponent and the answers given were
9  taken down by me in Stenotype notes and
   thereafter transcribed by use of
10 computer-aided transcription and computer
   printer under my direction.

11

12      I further certify that the foregoing is
   a true and correct transcript of the
13 testimony given at said examination of said
   witness.

14      I further certify that reading and
   signing of the deposition were waived by the
15 deponent and counsel.

16      I further certify that I am not
   counsel, attorney, or relative of either
17 party, or otherwise interested in the event
   of this suit.

18

19

20

                    *Eleanor J. Schwandt, RMR*
21

22            Eleanor J. Schwandt, RMR

23

24

25

# EXHIBIT 12

# In The Matter Of:

*CHAE BROTHERS, LIMITED LIABILITY COMPANY, ET AL. v.*
*MAYOR AND CITY COUNCIL OF BALTIMORE, ET AL.*

---

*CHIEF MELISSA HYATT*
*December 2, 2020*
*ORIGINAL TRANSCRIPT*

---

*CourtScribes, Inc.*
*"Delivering More For Less"*
*(833) 727-4237*
*info@courtscribes.com*
*www.courtscribes.com*

1

1   IN THE UNITED STATES DISTRICT COURT FOR THE

2   DISTRICT OF MARYLAND

3   NORTHERN DIVISION

4   CIVIL ACTION NO.: 1:17-CV-01657-SAG

5

6   CHAE BROTHERS, LIMITED LIABILITY COMPANY

7   D/B/A FIRESIDE NORTH LIQUORS, ET AL.,

8   PLAINTIFF,

9

10  VS.

11

12  MAYOR AND CITY COUNCIL OF BALTIMORE, ET AL.,

13  DEFENDANTS.

14  _____/

15  VIDEOTAPED DEPOSITION OF CHIEF MELISSA HYATT

16  DATE:            DECEMBER 2, 2020

17  REPORTER:        GERVEL WATTS

18  PLACE:           700 EAST JOPPA AVENUE

19                   BALTIMORE, MARYLAND

20

21

22

23

24

25

2

1                      APPEARANCES

2

3   ON BEHALF OF THE PLAINTIFF, CHAE BROTHERS, LIMITED

4   LIABILITY COMPANY

5   D/B/A FIRESIDE NORTH LIQUORS, ET AL.:

6   PETER HWANG, ESQUIRE

7   PETER K. HWANG, SUNG & HWANG LLP

8   9256 BENDIX ROAD, #109

9   COLUMBIA, MARYLAND 21045

10  TELEPHONE NO.:  (410) 772-2324

11  E-MAIL: PHWANG@SUNGANDHWANG.COM

12

13  ON BEHALF OF THE DEFENDANT, MAYOR AND CITY COUNCIL

14  OF BALTIMORE, ET AL.:

15  HANNA MARIE C. SHEEHAN, ESQUIRE

16  SARA E. GROSS, ESQUIRE

17  BALTIMORE CITY DEPARTMENT OF LAW

18  100 NORTH HOLLIDAY STREET

19  BALTIMORE, MARYLAND  21202

20  TELEPHONE NO.: (410) 396.3947

21  E-MAIL: SARA.GROSS@BALTIMORECITY.GOV

22

23  ALSO PRESENT:

24  RODNEY HILL, ESQUIRE, COUNSEL FOR MELISSA HAYATT

25  EUNICE STRICKLAND, VIDEOGRAPHER

**ORIGINAL TRANSCRIPT**

3

1                              INDEX

2                                                      Page

3    PROCEEDINGS                                        5

4    DIRECT EXAMINATION BY MR. HWANG                    6

5

6                             EXHIBITS

7    Exhibit                                            Page

8       1        SUBPOENA                               13

9       2        PROTECTIVE ORDER                       47

10      3        PLEADING                               27

11      4        GUIDE FOR CRITICAL INCIDENTS           30

12      5        NIMS DOCUMENT' GENERAL ORDER T-7       33

13      6        MD CODE COMM 10-201                    49

14      7        MD CODE COMM 3-904                     49

15      8        E-MAIL                                 49

16      9        BPD PLAN                               50

17     10        SITUATIONAL AWARENESS ORDER            50

18     11        BPD PLAN                               50

19     12        SLECC REQUEST                          81

20     13        E-MAIL                                 91

21     14        PROTECTION ORDER                       101

22     15        HYATT E-MAIL                           109

23     16        ORDER: 9554                            110

24

25

4

1                            STIPULATION

2

3    THE VIDEOCONFERENCE DEPOSITION OF MELISSA HYATT TAKEN AT

4    700 EAST JOPPA AVENUE, BALTIMORE, MARYLAND ON WEDNESDAY

5    THE 2ND DAY OF DECEMBER, 2020 AT APPROXIMATELY 12:00

6    P.M.; SAID DEPOSITION WAS TAKEN PURSUANT TO THE FEDERAL

7    RULES OF CIVIL PROCEDURE.

8

9    IT IS AGREED THAT GERVEL WATTS, BEING A NOTARY PUBLIC

10   AND COURT REPORTER FOR THE STATE OF FLORIDA, MAY SWEAR

11   THE WITNESS AND THAT THE READING AND SIGNING OF THE

12   COMPLETED TRANSCRIPT BY THE WITNESS IS NOT WAIVED.

13

14

15

16

17

18

19

20

21

22

23

24

25

**ORIGINAL TRANSCRIPT**

5

1              PROCEEDINGS

2         COURT REPORTER:  Can you raise your right hand

3    for me, please?  Do you swear or affirm the

4    testimony given in this deposition today will be the

5    truth, the whole truth, and nothing but the truth?

6         THE WITNESS:  I do.

7         MR. HWANG:  Good afternoon, Chief.  My name is

8    Peter Hwang and I represent the plaintiffs in this

9    action who are suing the Mayor and City Counsel of

10   Baltimore for, among other things, damages to the

11   plaintiff's property and business.  I'll take a

12   moment to allow everyone else to introduce

13   themselves to you so you know who is in the room.

14   Sitting to your right is Rodney --

15        MR. HILL:  Rodney Hill.  I'm an attorney, for

16   the record, Chief Legal Counsel Baltimore County

17   Police Department and attorney for Chief Hyatt.

18        MS. SHEEHAN:  And I am Hanna Marie Sheehan.  I

19   am an Assistant City Solicitor representing the

20   Mayor and City Counsel of Baltimore.

21        THE WITNESS:  Thank you.

22        MS. SHEEHAN:  Sara, do you want me to introduce

23   you?

24        MS. GROSS:  I got it.

25        MS. SHEEHAN:  Okay.

**ORIGINAL TRANSCRIPT**

1          MS. GROSS:  Sara Gross, Chief Solicitor with

2     the Baltimore City Department of Law appearing

3     remotely.

4          THE WITNESS:  Thank you.

5          VIDEOGRAPHER:  You're going to have to turn up

6     the volume.

7          COURT REPORTER:  That's as loud as it gets.

8          THE WITNESS:  Oh, that's as loud as it gets?

9          COURT REPORTER:  It says max volume.  I can

10    point it towards you.  Would that help?

11         THE WITNESS:  No, no, no, it's the -- it's this

12    way that you have to move.  Yeah, there we go.

13                    DIRECT EXAMINATION

14         BY MR. HWANG:

15    Q     Okay.  And may I call you Chief Hyatt?

16    A     Sure.

17    Q     So, Chief Hyatt, as you know, we're here for a

18    deposition which will consist of me asking you questions

19    and you responding to those questions.  As you can see,

20    there is a court reporter sitting at the far end of the

21    table.  She is transcribing my questions and your

22    responses.  As such, it's important that you answer my

23    questions verbally.  Please do not answer with a gesture

24    like a head nod or sounds like "uh-huh."  As you can

25    imagine, it's hard for the court reporter to transcribe

1      MR. HWANG:  Okay.  Thank you.

2      BY MR. HWANG:

3  Q    Now, Chief Hyatt, are you currently employed?

4  A    I am.

5  Q    Where are you employed?

6  A    Baltimore County Police Department.

7  Q    And for how long have you been employed by the

8  Baltimore County Police Department?

9  A    Since June of 2019, coming up on a year-and-a-

10 half.

11 Q    Okay.  And what is your title?

12 A    Chief of Police.

13 Q    And have you been the Chief of Police during

14 that entire time?

15 A    Yes, I have.

16 Q    And as the Chief of Police, what are your

17 duties?

18 A    My duties are to oversee the daily operations

19 and strategic plans of the police department in a large

20 jurisdiction.

21 Q    And how many sworn officers are there in the

22 Baltimore County Police Department?

23 A    We're just shy of 2,000.

24 Q    Okay.  Now, prior to becoming the Chief of

25 Police of Baltimore County, where were you employed?

20

1      A      Johns Hopkins University and Johns Hopkins
2   Medicine.
3      Q      Okay.  And during what time period were you
4   employed there?
5      A      April of 2018 until May or June of 2019.
6      Q      Okay.  And what was your title?
7      A      Vice President for Security for Johns Hopkins
8   University and Johns Hopkins Medicine.
9      Q      And was that your title during the entirety of
10  the time period during which you were employed there?
11     A      Yes, it was.
12     Q      And what were your duties?
13     A      I was responsible for -- for global security
14  for Johns Hopkins Medicine and University Enterprise
15  which consisted of locations across the United States
16  and elsewhere.
17     Q      Okay.  And prior to being employed by, I'll
18  call it the Johns Hopkins System, where were you
19  employed?
20     A      The Baltimore Police Department.
21     Q      Okay.  And did you actively seek out the Johns
22  Hopkins position or was there a reason why you left the
23  Baltimore City Police Department?
24     A      I was recruited for the position.
25     Q      Okay.  And for how long were you employed by

1  the Baltimore City Police Department?

2       A    A little bit over 20 years.

3       Q    Okay.  Now, if you could walk me through a

4  chronology of the different ranks that you held, your

5  job duties, during the 20-year period that you were at

6  the Baltimore City Police Department, please?

7       A    Sure.  I was hired in 1997.  I was in the

8  first class of the Maryland Police Corp which was a

9  heavily funded intensive residential trainee academy.  I

10  was in the Police Corp for residential about four months

11  and then returned to Baltimore City where I had been

12  hired for a six-week bumper academy.  After that I was

13  assigned to the Northwest District in foot patrol.  I

14  was a foot officer for approximately nine months.  Then

15  while in Northwest District, I was in motorized patrol,

16  bicycle patrol operations.  In maybe around 2000, my

17  dates -- my dates are not great.  Somewhere around 2000,

18  I went to a citywide operations unit called the Mobile

19  Enforcement Team.  I was there for a period of time

20  until 2001 when I went to the SWAT team at the time.  It

21  was called the Quick Response Team.  I was there for

22  approximately three-and-a-half years as an officer.  I

23  ultimately got promoted to sergeant and was assigned to

24  the Southwest District and patrol.  I remained in

25  Southwest District for a period of time.  Again, I don't

1    Q    Okay.

2    A    So I unfortunately, and I'm looking through

3    this, I see my name is not in any of the plans.  I don't

4    recall what my involvement or my lack of involvement

5    was, but I -- I do know that towards the very beginning

6    of this I was still in -- in a lot of the administrative

7    meetings with Commissioner Batts, not operational, but I

8    don't recall.

9    Q    Now prior to Freddie Gray's passing, do you

10   recall being in any -- whether it's in an administrative

11   capacity or not, participating in any meetings where the

12   approach to protests was discussed?

13   A    Where the what protests?

14   Q    How to approach the protests.

15   A    That's some of what I'm trying to put

16   together.  I know that I was in meetings, but I don't

17   know when and I don't recall the -- the context of them.

18   If you can be really specific, I --

19   Q    Sure.

20   A    -- that might help me.

21   Q    I'll give -- I'll go into more specific

22   topics.  Maybe that'll jog your memory.

23   A    Okay.

24   Q    For example, early on, again, this is prior to

25   Freddie Gray's passing, do you recall being in any

1  meetings where arrest protocols were discussed or, you

2  know, whether certain arrests should be made or not,

3  whether issues like that were discussed?

4       A     So, I -- I do know for certain that I was in

5  meetings with conversations about, you know, conduct

6  protocols, but I can't tell you at what point during

7  this that those meetings were, but I definitely was

8  included in meetings.

9       Q     Okay.  And what do you recall about those

10  meetings regarding conduct and protocol?

11       A     So in terms of -- of conduct, there were --

12  were conversations about, you know, officers and -- and

13  when they would don gear, protective gear.  There was

14  conversation about -- about arrests and some of -- and

15  I'm trying to see, I know that our legal section at the

16  time had done a lot of work on determining what the --

17  the proper charges were for arrests.  I know that there

18  was an individual from the State Attorney's office that

19  was working closely to make sure that those charges were

20  the appropriate charges.  You know, there were

21  conversations about, you know, when people were -- were

22  blocking, let's say, an intersection about providing

23  warnings and making sure that it was legally sound to --

24  to make an arrest.  So I was absolutely present, I just

25  don't remember when they were.

54

1      Q     Okay.  I understand you may not remember the

2   exact date.  Do you recall being in any of those

3   meetings prior to the passing of Freddie Gray?

4      A     I don't remember.  I know that they were prior

5   to some demonstrations, but I -- I can't tell you in

6   terms of chronology when they were.

7      Q     Again, making various trigger points we

8   discussed before, do you recall it being before April

9   25th, the Camden Yards incident?

10     A     Yeah, I'm certain it would have been before

11  then, absolutely certain it would have been before then.

12     Q     So you're in these discussions prior to April

13  25th, prior to the Camden Yards incident.  You mentioned

14  several topics that were discussed.  You mentioned

15  discussing when protective gear should be worn.  What

16  discussions about that occurred?

17     A     So I remember there were some discussions in

18  reference to, you know, if we were going to have allied

19  police departments coming to help us and, you know, I

20  think it, you know, that we couldn't have one

21  jurisdiction who is standing there in -- in full gear

22  and another jurisdiction who, because of where -- where

23  they believe, they perceive the threat level is, that

24  isn't wearing any gear, and -- and so some of this, you

25  know, a lot of the -- the internal conversations that I

1    be different.

2         Q    Okay.  So what about the things that came out

3    of these meetings prior to April 25th?  And again, I'm

4    going to rephrase -- or I'm going to repeat.  For

5    example, you know, not to don protective gear unless the

6    situation warranted it, or you know, to consult

7    regarding certain types of arrests prior to or before

8    making those decisions.  I believe your testimony that

9    those are communicated to the rest of the department

10   through briefings; is that correct?

11        A    The direction that the -- the vision of

12   leadership and how it would be executed during the

13   deployment would have been delivered during the

14   briefing.

15        Q    Okay.  And that direction would include those

16   two topics, right, like the protective gear?

17        A    Correct.

18        Q    And the arrests?

19        A    Correct.

20        Q    Okay.  And as far as those two topics, again,

21   we're still talking about pre-April 25th.  How were

22   briefings conducted?  Was it district by district?  Or

23   if you could kind of explain that.

24        A    So it would depend on the scale of the

25   incident.  When we did, for example, our 4th of July or

1   Baltimore Marathon with hundreds and hundreds of

2   officers, we would have a large location, a large

3   auditorium-type location where we would be able to pull

4   large numbers of officers together and brief them in

5   that way.  Something smaller, it would be done on a much

6   smaller scale.

7       Q   Okay.  I'm talking specifically about these

8   two issues, the not to don protective gear unless the

9   situation warranted and to consult for certain types of

10   arrests, that direction.  Again, we're talking before

11   April 25, 2015.  How were the briefings to relay those

12   directions conducted?

13       A   Prior to that time, I don't -- I don't

14   remember some of the specifics with the briefings, but

15   it would've been communicated in much the same way.  You

16   know, maybe not a large auditorium full of hundreds of

17   people, but the meetings that were held by senior

18   leadership with the direction of the police commissioner

19   being, you know, put forward, that would've been

20   delivered at the point before the officers were

21   deploying for the demonstration, and whether it was at

22   this briefing or in some other appropriate way for them

23   to understand the direction.

24       Q   Okay.  Good.  So now we're -- I want to kind

25   of close the gap here.  So on the one hand, we have

1      Q    Okay.

2            MR. HWANG:  I'm sorry.  Do you mind sharing

3      this?

4            COURT REPORTER:  Thank you.  I think you gave

5      this, this morning.

6            MR. HWANG:  Oh, I gave it to you already.

7      That's why I don't have these.

8            MR. HILL:  Oh, okay.

9            COURT REPORTER:  Yeah, yeah, yeah.

10           MR. HWANG:  Why don't I have any copies?

11            BY MR. HWANG:

12     Q    Now, Chief Hyatt, I placed in front of you a

13     document that's been marked as Exhibit 12.  Do you know,

14     what Exhibit 12 is?

15           (EXHIBIT 12 MARKED FOR IDENTIFICATION)

16     A    I know it's a SLECC request.

17     Q    Okay.  And what is SLECC?

18     A    A SLECC request is when a police department --

19     at least in the state of Maryland -- is making a request

20     for resources, but it's not -- it's not in an emergent

21     situation, so it would be in advance.  Sometimes they're

22     used for large-scale events.

23     Q    Okay.  And when is this dated?

24     A    This is April 20, 2015.

25     Q    Okay.  So this would've been one day after

1   Freddie Gray's passing; is that correct?

2       A   I believe that you indicated that was on the

3   19th.  Yes.

4       Q   Okay.  Now, if you look at the first sentence

5   in the body, it states the department -- and I quote --

6   will prepare to conduct a coordinated effort in response

7   to possible protest activity.  Now given this timeline,

8   could you give some insight as to what that coordinated

9   effort was to be?

10      A   I am -- I am not intimately familiar with this

11  particular SLECC request, but at the point of April

12  21st, we realized that we were going to be having

13  ongoing demonstrations and that we were going to need to

14  have sufficient support.

15      Q   Okay.  And what made the BPD realize that?

16      A   Our numbers.  We did not have enough police

17  officers to be able to cover all of the geography and

18  critical needs that we had.

19      Q   Okay.  But the numbers are the numbers.  How

20  would you come to know that only on April 20 -- or by

21  April 21st?  In other words, the number of police

22  officers, though, is generally constant.  What about

23  that time period, April 21st, made the BP realize that

24  it didn't have enough officers?

25      A   So I can't say -- again, going back in time --

1   why at this exact moment.  I can tell you my

2   recollection of this period of time was that after the

3   passing of Mr. Gray, and the emotions that were very

4   evident in the individuals, the crowds that were

5   demonstrating, you could feel a clear escalation that

6   was starting to occur.  And while we had managed, you

7   know, many demonstrations -- again, starting from the

8   Ferguson era -- we had successfully managed many

9   demonstrations, but this felt a very strong shift.  And

10  there was no question that we needed more police

11  officers to be able to have sufficient resources around

12  the city where we needed them and able to perform the

13  functions that we needed them to perform.

14        Q    Okay.  And this was upon Freddie Gray's

15  passing, April 20th, April 21st; is that correct?

16        A    Yes.

17        Q    Okay.

18        A    Wait.  What did we say that the date of his

19  passing was?

20        Q    April 19th.

21        A    Okay.

22        Q    So is that correct?

23        A    I'm asking you.  I don't have the --

24        Q    Yeah.

25        A    It's somewhere in here, but --

**ORIGINAL TRANSCRIPT**

1      Q    Well, assuming the date is --

2      A    Okay.

3      Q    The date of death is April 19th.

4      A    Okay.

5      Q    Is that correct?

6      A    If that's what you're telling me without me

7  referring --

8      Q    Yeah.

9      A    -- I'm going to trust you on it.

10     Q    Okay.

11     A    So yes.

12     Q    Okay.  Do you recall any specific discussions

13 about -- again, I'm talking right at Freddie Gray's

14 passing or thereabouts, April 19th, 20th, 21st -- do you

15 recall any specific discussions that -- where concerns

16 were raised?  Hey, we don't have enough officers.  We

17 need to ask for more resources?

18     A    Yes.

19     Q    Okay.  And what do you recall about the

20 discussions?  Who was present?  What was discussed?

21     A    So I know for certain I was present.  I know

22 for certain that Commissioner Batts was present.  I was

23 unquestionably one of the people that was saying we

24 needed more police officers.  You know, I was one of the

25 people that at this point was involved in overseeing

85

1   some of the plans that were being built.  And

2   considering the geography of the city, the vast

3   geography of the city, the concerns that we had --

4   everything from violence to, you know, some of the

5   things that we had seen around the country with people

6   taking over streets, damaging property, intimidating

7   people -- we had some specific deployment numbers in

8   mind that we felt that we needed to achieve in order to

9   be able to provide the level of safety and security to

10  Baltimore City that we needed.  And we simply didn't

11  internally have the numbers.  And I would say, you know,

12  looking at where this has happened elsewhere in other

13  police departments, in a situation like this, police

14  departments rarely in-house have the numbers that they

15  need for these things.

16       Q    Got it.  You said you recall Commissioner

17  Batts being there.  Do you recall anyone else in there

18  at those discussions?

19       A    There were other people.  I just don't recall

20  who.

21       Q    Okay.  Do you recall if Dean Palmere was

22  there?

23       A    I can't say definitively.  I would presume

24  that he probably was, given that he was at that point

25  either the deputy commissioner of operations or the

**ORIGINAL TRANSCRIPT**

1  for a specific protest at that time, or would a -- an

2  incident commander be assigned to -- for example, you're

3  incident commander for April 22nd, 2015.

4        A    I understand what you mean.

5        Q    Yeah.

6        A    So generally it was by the event, but if

7  something arose that -- let's say on April 22nd there

8  was nothing that we knew of that was planned, and then

9  something arose.  We had contingencies in place in case

10 something arose that we didn't know about.  But if it

11 was something that was planned, everything was ironed

12 out.

13       Q    So if we go back to Exhibit 12 -- and you had

14 testified earlier that at that point in time it was

15 clear that the Baltimore City Police Department didn't

16 have enough officers, or enough resources to cover the

17 geographical area, and that it needed more resources.

18 What did it need more resources to do, exactly?

19       A    A couple of things.  So -- and -- and I

20 certainly don't remember the exact numbers at the time,

21 but I -- I do recall we asked for several hundred police

22 officers, and maybe it was even closer to 1,000.  When

23 we look at deployment for these types of incidents, it's

24 -- it's generally two different types of deployment.

25 It's the crowd control, so actually the -- the

1    demonstrators, you know, managing the issues that come

2    out of that.  And then it's the fixed infrastructure

3    support.  So that might be posting officers around City

4    Hall, or in a business district, those types of things.

5    We were very, very short on having enough officers for

6    both, and it made it very challenging because when we

7    did not have nearly enough -- you know, mutual aid to

8    help us.  The -- the plans that we built to be able to

9    you know, appropriately respond, we -- we didn't have

10   the ability to do it.  And one of the things that was

11   really tricky -- well, I'll wait until we get into April

12   25th and 27th, unless you just want me to say it.

13        Q    Sure.  I mean, why not?

14        A    Okay.  So one of the things that was also

15   particularly tricky for us, and something that's not,

16   you know, widely known, but during the course of this,

17   when our fire department had to go in to put out a fire,

18   or they had to send a medic in somewhere, we provided a

19   significant number of police officers to escort them in,

20   and there was a lot going on that they were involved in,

21   and that took a lot of resources as well.  So we just --

22   we knew before the 25th.  We knew we didn't have enough

23   police, and it just made it very challenging.

24        Q    Okay.  You testified earlier that early

25   meetings that you recall -- and again, this is prior to

**ORIGINAL TRANSCRIPT**

1   during your discussions, let's say after Freddie Gray's

2   passing, before April 25th, thereabouts?

3        A    I don't understand.

4        Q    Honestly, Ferguson brought nationwide

5   attention, rioting, and what protests can turn into.

6   Were there discussions regarding concerns that the same

7   type of rioting would occur in Baltimore City prior to

8   April 25th, but after Freddie Gray was arrested, and/or

9   after his passing?

10       A    I understand your question.  So I can't say

11  per se that we were saying, "just like Ferguson," but

12  you know, we were -- we -- we absolutely -- the whole

13  country saw what happened, and we were absolutely

14  cognizant of the fact that something like that could

15  happen in Baltimore, which is part of the reason why we

16  were requesting so many resources, because we couldn't

17  afford to be caught short staffed in the event that, you

18  know, it -- the situation started to deteriorate, much

19  like it did there.

20       Q    Sure.  Aside from being cognizant of being

21  short staffed, and the need to have adequate staffing to

22  address protests, what else about Ferguson was

23  discussed, for example, "Okay.  We need to do this.  We

24  need to make sure this doesn't happen," was anything

25  like that discussed?

1      CERTIFICATE OF ELECTRONIC REPORTER

2          NOTARY PUBLIC

3   I, GERVEL A. WATTS, the officer before whom

4   the foregoing deposition for the record was

5   taken, do hereby certify that the foregoing

6   transcript is a true and correct record of

7   the testimony given; that said testimony was

8   taken by me, electronically, and thereafter

9   reduced to typewriting; that reading and

10  signing was requested; and that I am neither

11  counsel for, related to, nor employed by any

12  of the parties to this case and have no interest,

13  financial or otherwise, in its outcome.

14  IN WITNESS WHEREOF, I have hereunto set my hand

15  and affixed my notarial seal this 31st day of

16  December 2020.

17

18  My commission expires:  June 7, 2024

19

20  _Gervell Watts_

21  GERVELL WATTS

22  NOTARY PUBLIC IN AND FOR

23  THE STATE OF MARYLAND

24

25

# EXHIBIT 13

# In The Matter Of:

*CHAE BROTHERS, LIMITED LIABILITY COMPANY, ET AL. v.*
*MAYOR AND CITY COUNCIL OF BALTIMORE, ET AL.*

---

*MELISSA HYATT*
*January 5, 2021*
*ORIGINAL TRANSCRIPT*

---

*CourtScribes, Inc.*
*"Delivering More For Less"*
*(833) 727-4237*
*info@courtscribes.com*
*www.courtscribes.com*

**ORIGINAL TRANSCRIPT**

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

```
----------------------------
                            :
CHAE BROTHERS LIMITED       :
LIABILITY COMPANY, Et Al.,  :
                            :
            Plaintiff,      :
                            :
        v.                  : CASE NO.:
                            : 1:17-CV-01657-GLR
MAYOR & CITY COUNCIL OF     :
BALTIMORE, Et Al.,          :
                            :
            Defendant.      :
_____:
```

                        Tuesday, January 5, 2021


Deposition of
                MELISSA HYATT,
a witness called for examination by counsel for the
Plaintiffs, pursuant to Notice, at the offices of
the Baltimore County Police Department Headquarters
located at 700 East Joppa Road, Towson, Maryland
21286, commencing at approximately 10:00 a.m.,
there being present on behalf of the respective
parties:

2

1  ON BEHALF OF THE PLAINTIFFS:

2

3              PETER K. HWANG, ESQUIRE

4              SUNG & HWANG, LLP

5              9256 Bendix Road, Suite 109

6              Columbia, Maryland 21045

7              (410) 772-2324

8              phwang@sungandhwang.com

9

10             RAY M. SHEPARD, ESQUIRE

11             THE SHEPARD LAW FIRM, LLC

12             122 Riviera Drive

13             Pasadena, Maryland 21122

14             (410) 255-0700

15             ray@shepard.law

16

17

18

19

20

21

22

3

1   ON BEHALF OF THE DEFENDANTS:

2

3                  HANNA MARIE C. SHEEHAN, ESQUIRE

4                  SARA GROSS, ESQUIRE

5                  CITY OF BALTIMORE DEPARTMENT OF LAW

6                  LITIGATION DIVISION

7                  100 N. Holliday Street, Suite 101

8                  Baltimore, Maryland 21202

9                  (410) 396-4431

10                 hanna.sheehan@baltimorecity.gov

11                 sara.gross@baltimorecity.gov

12

13  ON BEHALF OF THE WITNESS, MELISSA HYATT:

14

15                 RODNEY HILL, ESQUIRE

16                 BALTIMORE COUNTY POLICE DEPARTMENT

17                 700 East Joppa Road

18                 Towson, Maryland 21286

19                 (710) 887-2211

20

21  VIDEOGRAPHER: NICHOLAS POLLARD, Courtscribes, Inc.

22  REPORTED BY:  EMILY G. COLKITT, Notary Public

4

1                    C O N T E N T S

2

3  WITNESS           EXAMINATION BY              PAGE(S)

4  M. Hyatt        Mr. Hwang                        7

5                  Ms. Gross                       207

6                  Mr. Hwang                       213

7                      - - -

8                  E X H I B I T S

9  HYATT DEPOSITION                              MARKED

10  Exhibit No. 17 - Bates Nos. CITY00040014-15   10

11  Exhibit No. 18 - Bates Nos. CITY00007004      15

12  Exhibit No. 19 - Bates No. CITY00009496       18

13  Exhibit No. 20 - Bates No. CITY00008884       20

14  Exhibit No. 21 - Bates No. CITY00007498       21

15  Exhibit No. 22 - Bates No. CITY00006825       21

16  Exhibit No. 23 - Bates No. CITY00041725       38

17  Exhibit No. 24 - Bates No. CITY00009618       42

18  Exhibit No. 25 - Bates No. CITY00054504       50

19  Exhibit No. 26 - Bates No. CITY00054241       50

20  Exhibit No. 27 - Bates No. CITY00040301       50

21  Exhibit No. 28 - Bates Nos. CITY00001315-17   56

22  Exhibit No. 29 - Bates Nos. CITY00040254-58   63

5

1                         (Continued)

2   HYATT DEPOSITION                             MARKED

3   Exhibit No. 31 - Bates No. CITY00007422        67

4   Exhibit No. 32 - Bates No. CITY00008422        67

5   Exhibit No. 33 - Bates No. CITY00041447        71

6   Exhibit No. 34 - Bates Nos. CITY00005656-61    75

7   Exhibit No. 35 - Bates No. CITY00005695        78

8   Exhibit No. 36 - Bates No. CITY00041208       100

9   Exhibit No. 37 - Bates Nos. CITY00054101-02   109

10  Exhibit No. 38 - Bates Nos. CITY00007595-689  116

11  Exhibit No. 39 - Bates No. CITY00041663       119

12  Exhibit No. 40 - Bates No. CITY00010007       144

13  Exhibit No. 41 - Bates No. CITY00043672       147

14  Exhibit No. 42 - Bates No. CITY00041513       158

15  Exhibit No. 43 - Bates Nos. CITY00021802-06   158

16  Exhibit No. 44 - Bates Nos. CITY00021807-12   180

17  Exhibit No. 45 - Bates Nos. CITY00008818-28   180

18  Exhibit No. 46 - Bates Nos. CITY00021529-60   189

19  Exhibit No. 47 - Bates No. CITY00045303       198

20  Exhibit No. 48 - Bates No. CITY00025839       202

21  Exhibit No. 49 - Bates Nos. CITY00011634-35   206

22  Exhibit No. 30 - Bates No. CITY00007701       215

**ORIGINAL TRANSCRIPT**

6

1                P R O C E E D I N G S

2             THE REPORTER:  Chief Hyatt, would you

3    raise your right hand, please?

4    Whereupon,

5                  MELISSA HYATT,

6    a witness, called for examination by counsel for

7    the Plaintiffs, was duly sworn, and was examined

8    and testified as follows:

9             THE REPORTER:  Thank you.  We're on the

10   record at 10:08 a.m.  Counsel, you may proceed.

11            THE VIDEOGRAPHER:  We are now on the

12   record in the matter of Chae Brothers Limited

13   Liability Company v. Mayor and City Council.

14      Today's date is January 5th, 2021.  The time

15   is 10:08 a.m.  This is the video-recorded

16   deposition of Melissa Hyatt being taken at 700 East

17   Joppa Road, Towson, Maryland 21234.

18            My name is Nicholas Pollard.  I am the

19   camera operator representing CourtScribes,

20   Incorporated.  The court reporter's name is Emily

21   Colkitt with Huseby Global Litigation.  Will

22   Counsel please introduce themselves?

**ORIGINAL TRANSCRIPT**

1          MR. HWANG:  Good morning.  Peter Hwang on

2    behalf of all Plaintiffs, and linked in through

3    Zoom is Ray Sheppard also on behalf of all

4    Plaintiffs.

5          MS. SHEEHAN:  Good morning.  Hanna

6    Sheehan on behalf of the Mayor and City Council of

7    Baltimore, and here appearing virtually via Skype

8    is Sara Gross, also with the Mayor and City Council

9    of Baltimore.

10          MR. HILL:  Good morning.  Rodney Hill on

11    behalf of Melissa Hyatt.

12          THE VIDEOGRAPHER:  Can the court reporter

13    please swear in the witness?  That already

14    happened.

15          MR. HWANG:  Yeah, we already --

16          THE VIDEOGRAPHER:  Okay.  The time is

17    10:09 a.m., and we are now on the record.

18       EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

19          BY MR. HWANG:

20       Q    Now, Chief Hyatt, we're here continuing a

21    deposition that began on December 2nd, 2020.  Do

22    you understand that?

1   sufficient resources to be able to safely remove

2   agitators.  And I couldn't tell you now who those

3   conversations were held in the company of, but we

4   certainly had those conversations.

5       Q    Okay.  Do you recall anyone from the City

6   who that conversation was had with?  Whether it's

7   OEM -- and do you understand what I mean by "OEM"?

8       A    I do.

9       Q    Okay.

10      A    Office of Emergency Management.  I don't

11  know if those -- I can't tell you now,

12  unfortunately, if those conversations were internal

13  or external conversations.  You know, internal

14  between police department personnel, or external.

15  I simply don't remember.

16      Q    Okay.  Now, Chief Hyatt, I'll be handing

17  you -- by the way, Exhibit 17 was an email chain

18  Bates stamped CITY00040014 through 40015.

19          (Whereupon, a document was marked for

20  identification Hyatt Deposition Exhibit No. 18.)

21          BY MR. HWANG:

22      Q    And I am placing before you a document

1    marked as Exhibit 18, which is also an email Bates

2    stamped CITY00007004.

3         A    Thank you.

4         Q    Now, it's an email sent on April 22nd,

5    2015 at 4:29 p.m., stating that you are "requesting

6    access to plywood in case reinforcement of the

7    Western District windows/doors would be needed."

     Do you see that?

9         A    I do.

10        Q    Okay.  And do you recall requesting

11   access to plywood --

12        A    Yes.

13        Q    -- for such purposes?  Okay.  What at

14   that time made you believe such reinforcement would

15   be necessary?

16        A    So I don't remember specific examples or

17   specific things.  But when I read this, it triggers

18   the memory that some of the demonstrations had

19   escalated.  There were demonstrators that were

20   throwing things at officers, at our buildings.

21             I don't recall what, if any, damage was

22   done.  My concern at that time, looking nationally

**ORIGINAL TRANSCRIPT**

1    at some other trends in, you know, demonstrators

2    and protests, was that someone may either start

3    throwing rocks and bricks into the District or, you

4    know, worst case scenario, a Motolov cocktail or

5    something.

6              And I wanted to make sure that if we had

7    to do some work to -- if that Western District was

8    going to continue to be a focal point, and if we

9    needed to take action to secure it, that we would

10   have the resources to be able to do it.

11             I recall specifically that there wasn't

12   immediate access to plywood, to resources that

13   would be needed.  And we had some internal

14   conversation about that, which then triggered this

15   email.

16        Q    Okay.  And is it accurate to say that the

17   escalating protests kind of brought that concern to

18   a head?  That the escalating protests made you

19   realize "hey, we've got to be prepared for things

20   to get worse"?

21        A    I would just say that seeing some of the

22   demonstrations and seeing the tone of them, and

1   then thinking, you know, big picture, worst case

2   scenario, that's what came to my mind when I

3   requested this.

4        Q    Okay.  Now, I will be placing before you

5   a -- I'm sorry, can I see that last exhibit you've

6   got?  Okay.  Thank you.

7             (Whereupon, a document was marked for

8   identification Hyatt Deposition Exhibit No. 19.)

9             BY MR. HWANG:

10       Q    I'm placing before you an email Bates

11  stamped CITY00009496 marked as Exhibit 19.  Now,

12  this email was sent to Broadcast BPD and a blind

13  carbon copy to all BPD on April 22nd, 2015 at 8:18

14  p.m.

15            Since it was sent to Broadcast BPD and

16  all BPD, you would have received this email,

17  correct?

18       A    I'm certain that I would have.

19       Q    Okay.  Now, this email essentially

20  cancels all leave for Saturday, April 25th, 2015,

21  correct?

22       A    Yes.

1    to cancel leave?  Would that have come from

2    Commissioner Batts or someone lower down the line?

3        A    So ultimately the Chief of Patrol has the

4    authority to cancel leave.  So, you know, it

5    certainly could have been Commissioner Batts.  It

6    could have been one of the several deputy

7    commissioners.  It could have been the Chief of

8    Patrol.

9        Q    Okay.

10        A    But usually that's a decision that --

11    that decision is rarely made in a silo.

12        Q    Sure.

13        A    You know, there would have been multiple

14    people involved in that conversation.

15        Q    Sure.  I'm going to be handing you

16    several -- three exhibits, again, to give you

17    context.

18        A    Sure.

19             (Whereupon, a document was marked for

20    identification Hyatt Deposition Exhibit No. 20.)

21             BY MR. HWANG:

22        Q    This first is Exhibit 20, which is a

1    document produced by the City as CITY00008884.

2              (Whereupon, the witness reviewed the

3    document as requested.)

4              (Whereupon, a document was marked for

5    identification Hyatt Deposition Exhibit No. 21.)

6              BY MR. HWANG:

7       Q    And that one is Exhibit 20.  This one is

8    Exhibit 21, which is an email produced by the city

9    as CITY00007498.

10             (Whereupon, a document was marked for

11   identification Hyatt Deposition Exhibit No. 22.)

12             BY MR. HWANG:

13      Q    And the third one is Exhibit 22, which is

14   an email chain produced by the City as

15   CITY00006825.

16      A    Thank you.

17      Q    Now, if you take a look at Exhibit 20,

18   Chief Hyatt -- is that your signature at the

19   bottom?

20      A    It is.

21      Q    Signing for Commissioner Batts?

22      A    Yes, that's correct.

22

1     Q    Okay.  And did you, in fact, sign this?

2     A    I did.

3     Q    Okay.  And you were the Chief of Staff at

4  that time, correct?

5     A    Correct.

6     Q    Now, what is Exhibit 20?

7     A    So Exhibit 20 -- and I can't promise you

8  that that's exactly what this is -- I don't know if

9  this was an official request, which a lot of state

10  agencies require, or if this was just a request for

11  resources.

12          But regardless, it's essentially the same

13  thing -- requesting for mobile field force

14  resources for several different dates.

15     Q    Okay.  And mobile field force resources

16  -- could you describe what that is?

17     A    Sure.

18     Q    Or at least, what it was at that time.

19     A    Okay.  Essentially, that would be

20  officers that are prepared to respond if a protest

21  or demonstration starts to get violent or

22  aggressive, to be able to be a group of officers

1    that responds to mitigate the issue.

2         Q    Okay.  And by "mitigating the issue,"

3    what would they do to mitigate the issue?

4         A    It could be a variety of things.

5    Sometimes it's just presence and nothing else.

6    Sometimes they give other officers the ability to

7    don gear or get other resources that are needed.

8              If there are issues with officers that

9    need to be evacuated because they're injured, if

10   there are munitions that need to be deployed,

11   they're part of that.  If there are arrests that

12   need to be made, they're part of that.

13        Q    Okay.  And this request was sent on April

14   22nd, 2015, correct?

15        A    Yes.

16        Q    And it requests personnel for April 23rd

17   and April 25th of 2015, correct?

18        A    Yes.

19        Q    Okay.  Now, in the second paragraph, it

20   says that the "the purpose of this request is to

21   ensure that adequate personnel are on location to

22   provide cover during any protest which may

31

1           THE VIDEOGRAPHER:  My apologies.  Can I

2    just switch this disc?

3           MR. HWANG:  Sure.  We'll go off the

4    record.

5           THE REPORTER:  Going off the record at

6    10:34 a.m.

7           (Whereupon, there was a brief recess.)

8           THE REPORTER:  Going back on the record

9    at 10:34 a.m.

10          BY MR. HWANG:

11     Q    Now, Chief Hyatt, if I could direct you

12   to Exhibit 21?  You received this email, correct?

13   And I'm sorry, if you need a minute to read it,

14   please do so.

15          (Whereupon, the witness reviewed the

16   document as requested.)

17          THE WITNESS:  It appears that I did

18   receive it.

19          BY MR. HWANG:

20     Q    Okay.  And it was sent on April 22nd,

21   2015 at 5:09 p.m.  And it was sent to, it looks

22   like, Pete Evans.  Do you see that?

32

1        A    I do.

2        Q    Do you recall who Pete Evans was?

3        A    I did not know him personally.  Certainly

4   since I've been in my current role, I've heard his

5   name.  But I did not know him personally.  But I

6   did know that he was employed -- he was in a

7   leadership position in the Baltimore County Police

8   Department.

9        Q    Okay.  And this email also requests a

10   mobile field force team from Baltimore County,

11   correct?

12        A    Yes, it is.

13        Q    Okay.  Now, this is not the same mobile

14   force team that is requested in Exhibit 20.

15        A    Correct.

16        Q    20 is requesting it from the State, and

17   21 is requesting it from Baltimore County.  Is my

18   understanding correct?

19        A    Correct.  And I would further clarify 20,

20   which is through MDTA, that is separate from the

21   Maryland State Police.

22        Q    Okay.  And so what does MDTA stand for?

1      A    So that's through Transportation

2  Authority.

3      Q    Got it.  Okay.  But despite 20 and 21

4  requesting mobile field force teams from different

5  jurisdictions or sources, does "mobile field force

6  team" mean the same thing for both requests?

7      A    Essentially, it does.

8      Q    Okay.  And they serve the same purpose?

9      A    Correct.

10     Q    Whether they come from Baltimore County

11 or from the State Department of Transportation?

12     A    Exactly.

13     Q    Okay.  And these two requests -- they

14 were requesting mobile field force teams for the

15 same dates, for April 23rd and April 25th?

16     A    I believe that's what I saw.  Yes.

17     Q    Okay.  And if I could direct your

18 attention now to 22 -- you received this email,

19 correct?

20     A    I am on the CC, yes.

21     Q    Okay.  And this was sent on April 22nd,

22 2015 at 11:00 p.m.  And what does this email

34

1  reflect?

2      A    This email is not a specific request for

3  a mobile field force.  This email is a request for

4  mutual aid, which might be the same email.  I think

5  they're all independent emails.  So this one

6  appears to be a request for mutual aid.  It doesn't

7  specify.

8      Q    Okay.  So we've now gone through

9  different requests for mobile field forces and just

10 general mutual aid.  We've also seen that leave has

11 been canceled.

12          I mean, at that point, how great of a

13 risk did you think there was?  Again, we're talking

14 April 22nd.  How great of a risk there was that

15 there would be rioting or that protests would get

16 out of control?

17     A    Well, you know, we were highly concerned

18 that we were going to have issues, and we did not

19 have sufficient resources.  Which is why -- and

20 while I don't request -- I don't recall all of the

21 requests that we made, I know that we made a lot

22 more than these few requests for resources.

35

1       Q    I'm sorry, what was that last --

2       A    While I don't recall every one that at

3   that time Deputy Palmere or Commissioner Batts

4   reached out to, I know it was certainly much more

5   than these few organizations that were reached out

6   to.

7       Q    Okay.  And your concern that the

8   Baltimore City Police Department didn't have enough

9   resources -- you expressed those concerns, I

10  assume, correct?

11      A    That's correct.

12      Q    And who did you express those concerns

13  to?

14      A    All the way up through my chain.

15      Q    And by that you mean all the way up to

16  Commissioner Batts?

17      A    That's correct.

18      Q    Okay.  Now, the decision to cancel leave

19  had already been made, like we stated.  And

20  additional resources were also requested from the

21  State as reflected in Exhibit 12 and these recent

22  exhibits.

1           I believe you testified to this on

2    December 2nd, but the Baltimore City Police

3    Department was requesting additional law

4    enforcement officers by way of mutual aid from

5    surrounding jurisdictions because, even with the

6    cancellation of leave, the police department still

7    did not have enough officers for crowd control and

8    to protect infrastructure.  Is that correct?

9           A    Correct.

10          Q    Do you recall any discussions internally

11   at the Baltimore City Police Department about how

12   many resourcs would be required or how much -- to

13   what extent these requests should be made?

14          A    I know for certain that we had them.  I

15   know for certain that there were some numbers.  I

16   couldn't tell you what they were now.  I remember

17   that even with our own resources, there were a lot

18   of police officers that we were requesting.

19          Q    Okay.

20          A    You know, we had a lot of places that we

21   were concerned about.  We had a lot of possible

22   events.  I just simply don't remember any of the

1  numbers.

2      Q    Okay.  So at this point -- we're talking

3  April 22nd -- was it more of "we need to get what

4  we can get, because we need so much"?  Was it that

5  kind of mentality?

6      A    I can't tell you that it was April 22nd.

7  I remember that we had some very specific requests

8  that we needed in terms of numbers.  And at some

9  point -- and again, I can't tell you where in there

10  -- it became abundantly clear that we weren't going

11  to even get a portion of those out of mutual aid.

12          And then at that point, we couldn't

13  cancel the protests, so we had to use the resources

14  that we had -- the limited resources that we had --

15  to try to manage an unfolding and, frankly, unknown

16  situation.  But, you know, we certainly made

17  multiple requests for resources.

18      Q    Okay.  And I believe you testified to

19  this on December 2nd, but -- and I know you can't

20  pinpoint an exact date -- but I believe you

21  testified that prior to April 25th, that Saturday,

22  2015, it became abundantly clear by looking at the

1   numbers of mutual aid coming in that even with

2   mutual aid, you still would not have enough law

3   enforcement officers that was needed for crowd

4   control and to protect infrastructure.  Is that

5   correct?

6       A    That's correct.

7            (Whereupon, a document was marked for

8   identification Hyatt Deposition Exhibit No. 23.)

9            BY MR. HWANG:

10      Q    Now, Chief Hyatt, I'm placing before you

11  an exhibit that's been marked as 23, which is an

12  email chain produced by the City as CITY00041725.

13      A    Thank you.

14      Q    Now, you're on this email chain, correct,

15  Chief Hyatt?

16      A    Yes.

17      Q    Do you recall Tom Yeager?

18      A    I do.

19      Q    Who is he or who was he at that time?

20      A    He was the vice president or an executive

21  vice president for Downtown Partnership of

22  Baltimore and was a very -- had a very close

42

1   identification Hyatt Deposition Exhibit No. 24.)

2          BY MR. HWANG:

3      Q    Chief Hyatt, I'm placing an email in

4   front of you that's marked as 24 that was produced

5   by the City as CITY00009618.  And I'll give you a

6   minute to look through it.

7          (The witness reviewed the document.)

8          BY MR. HWANG:

9      Q    Do you recall Drew Vetter?

10     A    Yes.

11     Q    Okay.  What was his role at that time?

12  And at that time, we're talking April 23rd, 2015

13  when this email was sent.

14     A    I don't recall.  He was the Director of

15  Government Affairs, on page 2.  So he had several

16  roles in the department, but that was his role at

17  this time.

18     Q    Okay.  And I know his title, but can you

19  describe what his role would have been at the

20  police department at that time?

21     A    Sure.  He liaised with government

22  officials locally as well as in Annapolis.

1     Q    Okay.  Now, Exhibit 24 is an update that

2 Drew Vetter is sending on behalf of then-

3 Commissioner Batts.  Is that correct?  In the

4 subject heading, it says "On Behalf of Commissioner

5 Batts"?

6     A    Yes.

7     Q    Okay.  And Exhibit 24 refers to protests

8 that were expected to happen on April 23rd and

9 25th.  Is that correct?

10    A    I see the 23rd -- I see the -- yes, the

11 23rd and 25th.

12    Q    Okay.  Now, in Exhibit 24, the end of the

13 first paragraph talks about intelligence that the

14 department had at that time, that "individuals from

15 outside the city were coming in to encourage others

16 to use aggressive tactics and even violence against

17 officers or others."  Do you see that?

18    A    I do.

19    Q    Okay.  Do you recall that?

20    A    I recall conversations surrounding that.

21    Q    Okay.  Well, what do you recall about the

22 conversations surrounding that?

47

1       A     You know, we had platoons or we had plans

2   to have certainly more platoons than we ended up

3   with, to be able to strategically post in

4   locations.  And, you know, we just had some

5   challenges with our shortages.

6       Q     Okay.  I know you don't -- you may not

7   remember the specifics of all these plans.  But

8   you're talking about the deployment of resources,

9   putting people in strategic locations --

10      A     Correct.

11      Q     Can you describe what you do recall?

12      A     Sure.

13      Q     Just to give us a better understanding of

14   --

15      A     Yeah, absolutely.  I'm sorry, I didn't

16   understand that's what you meant.  So, you know,

17   one of the things that we routinely did -- we knew

18   that there were certain areas that were focal

19   points for certain demonstrations.  Obviously the

20   Western District was one.  The Police Headquarters

21   building was one.  The Inner Harbor promenade area

22   was one.

1        There were places where, when we had

2   demonstrations, that we routinely saw groups that

3   were demonstrating would spend a lot of time and

4   attention focusing on these locations.  And, you

5   know, those were fairly frequently places where

6   things were getting thrown at police officers, that

7   people were being intimidated.

8            You know, I remember that we had some

9   issues in, for example, the Inner Harbor promenade

10  of people being intimidated by large groups.  So

11  those were just some areas that we were able to

12  identify over time as places that tended to be

13  focal points.

14            And so we certainly, in our plans, always

15  kept those locations in mind, as well as attempting

16  to have flexibility to respond to other places as

17  needed.  But unfortunately, we did not have

18  sufficient resources to always be able to respond

19  in a way that we would have liked.

20       Q    Sure.  And so you've described how the

21  police department identified focal points.  So once

22  those focal points were identified, what was the

1    police department's plan with respect to those

2    focal points?

3        A    So, I mean, it's a little bit difficult.

4    Because some of it's a little bit of a moving

5    target.  So it's not like, you know, if A, then B.

6    You know, we had seen looting at Mondawmin Mall and

7    places like that.

8            So we -- when there was activity in that

9    direction, we would rapidly get resources there to

10   be able to prevent people from doing things like

11   that.  So, you know, some of it is proper

12   deployment of resources, sufficient deployment of

13   sources.

14           And, you know, there were certainly times

15   that there were arrests that were made.  Again, you

16   know, arrest was not the preferable means for

17   managing a peaceful demonstration.  But there were

18   certainly times that that was part of it as well.

19       Q    Okay.  Now, we're talking April 23rd

20   here.  I mean, these were the plans.  Was the

21   Baltimore City Police Department able to execute

22   all these plans as it desired in light of the

1    shortage of resources?

2        A    Absolutely not.

3        Q    Okay.  Now, Chief, I'm going to be

4    handing you three exhibits, again, to place things

5    into context.

6            (Whereupon, a document was marked for

7    identification Hyatt Deposition Exhibit No. 25.)

8            BY MR. HWANG:

9        Q    The first is Exhibit 25, which is an

10   email chain produced by the City as CITY00054504.

11           (Whereupon, a document was marked for

12   identification Hyatt Deposition Exhibit No. 26.)

13           BY MR. HWANG:

14       Q    The second is an email produced by the

15   City marked as 26, Bates stamped CITY00054241.

16           (Whereupon, a document was marked for

17   identification Hyatt Deposition Exhibit No. 27.)

18           BY MR. HWANG:

19       Q    And the third one is an email chain

20   produced by the City marked 27 and produced as

21   CITY00040301.  And Chief Hyatt, if you could take a

22   moment to look at those emails?

1  protest, people breaking things, hurting people,

2  breaking the law.  So that's when -- you know, when

3  you move into that realm, that's when you would

4  utilize mobile field force.

5          So that's why we requested all of those

6  resources, in case something like this -- again, I

7  probably would have used different language -- but

8  in case something that were unrest or if you want

9  to call it a riot -- people no longer having a

10  peaceful protest, hurting people, damaging

11  property.  Then mobile field force would have been

12  activated.

13      Q    Got it.  Did the Baltimore City Police

14  Department receive all the mobile field force teams

15  that it had requested from surrounding

16  jurisdictions?

17      A    No.  We neither received all of the

18  mobile field force as well as other resources,

19  which are referred to as CDU platoons.  But we did

20  not receive enough of either of them.

21      Q    Understood.  Now, you testified earlier

22  today and also on December 2nd that, prior to April

62

1   25th, at least, it became clear that the mutual aid

2   coming in would still not provide the Baltimore

3   City Police Department with sufficient law

4   enforcement officers for crowd control purposes and

5   to protect infrastructure.

6          Is it safe to say, then, that even with

7   the mutual aid that was coming in, it was clear

8   before April 25th that the Baltimore City Police

9   Department would not have enough officers to quell

10  or address rioting if it escalated to that?

11     A   Do you want my opinion?  I mean, I can't

12  speak -- I can tell you my opinion.

13     Q   Sure.

14     A   You know, my opinion, being very involved

15  in a lot of what was going on, was that we had

16  insufficient numbers.  By far, we had insufficient

17  numbers.

18     Q   Okay.  Chief Hyatt, I'm going to be

19  giving you an exhibit marked as 29, which is an

20  email and attachment produced by the City as

21  CITY00040254 through 58.

22          (Whereupon, a document was marked for

63

1   identification Hyatt Deposition Exhibit No. 29.)

2           BY MR. HWANG:

3       Q    And not so much the email, but I'll be

4   more directing your attention to the attachment to

5   the email.  I'll give you a minute to look over it.

6           (The witness reviewed the document.)

7           THE WITNESS:  I've reviewed it.

8           BY MR. HWANG:

9       Q    Okay.  Now, Exhibit 29 provides specific

10  intelligence on Malik Shabazz and his expected

11  participation in protests on April 25th, 2015.  Is

12  that correct?

13      A    Yes.

14      Q    Now, I know you had some concerns on

15  December 2nd about disclosing some information

16  about Malik Shabazz.  But I received an email from

17  your Counsel, Rodney Hill, yesterday that you had a

18  discussion and that you're now comfortable with

19  disclosing the information you were a little

20  concerned about with respect to Malik Shabazz.  Is

21  that correct?

22      A    Correct.

64

1     Q    Okay.  Now, why was Malik Shabazz a

2   specific concern for the department?

3     A    I can't tell you -- and I know you

4   mentioned another name before that I didn't

5   recognize.  There were -- I believe it was D.C. or

6   somewhere else, there had been some significant

7   issues with him.

8          He was not an individual that was a

9   resident or anything else in Baltimore City.  He

10   was quickly identified as, what we talked about

11   before, as potentially being an outside agitator.

12   And some of his background in things like that were

13   certainly outside of what we were used to with out

14   demonstrations.

15     Q    Okay.  You referred to the source of

16   concern being information about something that

17   happened in D.C. and also his background.  Could

18   you go more into depth about what you recall about

19   those two things?

20     A    Yeah.  And I actually -- I flipped past

21   some of this, because I know it triggered some

22   things in my mind.  I want to say that he had given

65

1   deliberate and inflammatory speech in Washington

2   D.C.  But I believe that there was something

3   somewhere else.  I don't think that that was the

4   only location.

5           And his role with the New Black Panthers

6   and knowing that organization to have a reputation

7   as being a violent organization, you know, these

8   were all things that -- we have a lot of

9   demonstrations in Baltimore City.

10          We didn't have demonstrations that

11  brought people like this with the true potential

12  not just for violence, but to be able to draw

13  people and have an influence on people.  So that

14  was very concerning.

15      Q   Okay.  When you say the possibility of

16  drawing people -- drawing people to do what,

17  exactly?

18      A   Well, you know, I think that our concern,

19  knowing that a lot of our demonstrators were young

20  -- many of them weren't even adults.  And

21  oftentimes younger people are very influential --

22  easily influenced.

1       And we had a lot of concerns that he

2  would be somebody who would have the ability to

3  draw a lot of young people around him and be smart

4  enough not to probably do things himself to get

5  arrested.

6       But because we already knew that we had a

7  lot of young people that, at that point, after the

8  death of Freddie Gray, were not happy with police

9  in general, were certainly not happy with Baltimore

10 City Police Department, that this would be kind of

11 a recipe for a lot of concern for us.

12     Q    Sure.  Now, drawing young people to

13 peacefully protest and exercise their First

14 Amendment rights -- I mean, that wouldn't be a

15 concern, right?

16     A    Not at all.

17     Q    So I mean, when you say that there were

18 concerns that he would draw in young people, I

19 mean, what were those concerns?  Drawing young

20 people to do what?

21     A    To injure people, to destroy property.  I

22 know that with some of the rhetoric that he's been

1 associated with, a lot of it had to do with

2 violence against police officers.  So there was a

3 lot of general concern.

4     Q    Understood.  And to your knowledge, did

5 Malik Shabazz end up coming on Saturday, April

6 25th?

7     A    He did.  Chief Hyatt, I'll be giving you

8 an exhibit marked as 30, which is an email produced

9 by the City as CITY00007701.

10          (Whereupon, a document was marked for

11 identification Hyatt Deposition Exhibit No. 30.)

12          BY MR. HWANG:

13     Q    So it's an email sent on Friday, April

14 24th, at 2:41 p.m.  And actually, I'm going to be

15 giving you a second exhibit as well.  This one

16 marked as Exhibit 31, also an email produced by the

17 City as CITY00007422.

18          (Whereupon, a document was marked for

19 identification Hyatt Deposition Exhibit No. 31.)

20          BY MR. HWANG:

21     Q    Now, you received both of these emails,

22 right?  Exhibits 30 and 31?

1          Q    Chief Hyatt, I'll be giving you a

2   document marked as Exhibit 32, which is an email

3   chain produced by the City as CITY00008422.

4              (Whereupon, a document was marked for

5   identification Hyatt Deposition Exhibit No. 32.)

6              THE WITNESS:  Thank you.

7              BY MR. HWANG:

8          Q    So this is an email chain that occurred

9   on April 24th, 2015.  And you're on this email

10  chain, correct?

11         A    I am.

12         Q    Okay.  Now, in the initial email that

13  Dean Palmere sent to you that day at 9:33 a.m., he

14  states that the department would be providing the

15  ops plan to mutual aid partners.  Did you

16  understand that to mean the operations plan that

17  you would be drafting?

18         A    Correct.

19         Q    Okay.  And then Dean Palmere continues to

20  state that you should make sure the operations plan

21  can be presented as a professional order.  How was

22  the operations plan distributed to mutual aid

78

1          (Whereupon, a document was marked for

2   identification Hyatt Deposition Exhibit No. 34.)

3          BY MR. HWANG:

4      Q   Chief Hyatt, I'm going to be giving you a

5   document marked as Exhibit 34.  This was produced

6   by the City as CITY00005656 through 5661.  And I'll

7   give you a minute to peruse through that.

8          THE VIDEOGRAPHER:  Excuse me.  Do you

9   mind if I switch the battery while --

10         MR. HWANG:  Sure.  We can go off the

11  record.

12         THE VIDEOGRAPHER:  Sorry about that.

13         THE REPORTER:  Going off the record at

14  11:28 a.m.

15         (Whereupon, there was a brief recess.)

16         THE REPORTER:  Going back on the record

17  at 11:29 a.m.

18         BY MR. HWANG:

19     Q   Okay.  Do you recognize this document,

20  Chief Hyatt?

21     A   I do.

22     Q   What is this document?

1        A    This was a document that I drafted, an

2   operational plan for April 25th, 2015.

3        Q    Okay.  And would this have been the

4   operational plan that was to be distributed to

5   mutual aid partners, as Dean Palmere has requested

6   in Exhibit 32?

7        A    I don't know.  There may have been

8   another version that got distributed.  This one was

9   in a, what we call, 495 administrative report.  And

10  I don't know if that's the exact same thing that

11  got distributed or not.  It may have.

12       Q    But if something different was

13  distributed, it would have included the same

14  contents, correct?

15       A    Yes, yes.

16       Q    Okay.  Now, this operational plan

17  generally follows the same formatting as the

18  operational plan for April 22nd, 2015, which was

19  Exhibit 16, correct?

20       A    I'll trust you on the exhibit, but yes,

21  this was prior to us actually using the new ICS

22  forms.

**ORIGINAL TRANSCRIPT**

96

1       Q    And I know on December 2nd you had

2  testified that at a certain point your role as

3  Chief of Staff to then-Commissioner Batts was more

4  administrative, and that at a certain point during

5  the Freddie Gray protests it shifted to a more

6  operational capacity.

7            So at this point as the Operations

8  Commander, what would your duties have been on

9  April 25th as set forth in this operations plan?

10      A    So at this point, obviously Deputy

11  Palmere was the Incident Commander.  So ultimately,

12  he was providing oversight for the operation.  But

13  my role would have been the actual operations

14  component -- you know, the proper deployment of the

15  resources, strategy on the proper way to deploy

16  them.

17            And although our planning section would

18  have actually produced the plans to be able to, you

19  know, have the staffing to put those components in

20  place, the decisions that were made as the incident

21  was unfolding -- how to move resources from here to

22  there, some of the things that we needed to do --

100

1        A     Correct.

2        Q     Okay.  So it was essentially the message

3     to Shock Trauma Gala organizers, "We're not going

4     to be able to provide you with the resources for

5     adequate protection for the event"?

6        A     I don't remember.

7        Q     Okay.

8        A     But I just know that the officers that

9     were working it were now recalled to work for us.

10    And I absolutely know that we had some

11    conversations about it.

12       Q     Okay.

13             (Whereupon, a document was marked for

14    identification Hyatt Deposition Exhibit No. 35.)

15             BY MR. HWANG:

16       Q     Chief Hyatt, I'm placing in front of you

17    a document marked as Exhibit 35, which is an email

18    produced by the City as CITY00005695.  This was an

19    email sent on April 23rd at 2:12 p.m.  And you

20    received this email, correct?

21       A     Yes.

22       Q     Okay.  Now, this email schedules a 1:00

1    p.m. meeting on April 24th, 2015 with various

2    mutual aid partners, correct?

3        A    Yes.

4        Q    Did you attend this meeting?

5        A    I did.

6        Q    Okay.  Now, was the operational plan for

7    April 25th distributed to mutual aid partners?

8        A    During the meeting?

9        Q    Yes.

10        A    I don't recall what was distributed, but

11    I presented at that meeting, so I remember that

12    meeting.

13        Q    Do you recall what you presented?

14        A    I remember presenting about -- and, you

15    know, I wish I could tell you what all that was --

16    but what we knew about the upcoming several days,

17    the resources.  Well, I believe it was Commissioner

18    Batts that spoke about the specifics with the

19    resources.

20            But I remember talking about what we

21    needed their assistance for doing.  And we

22    discussed that earlier -- between the fixed

1    infstracture support, you know, mobile field force

2    type of resources.

3            So I just -- I think I had a PowerPoint

4    that I think I remember presenting.  And I seem to

5    remember that there were some maps on it.  So maybe

6    we already knew the protest routes.  But I remember

7    that we put some time into this presentation.

8        Q    Okay.  You said that at this meeting at

9    1:00 p.m. on April 24th, then-Commissioner Batts

10   presented about resources.  What do you mean by

11   that?  What did he present, exactly?

12       A    So I remember that he -- it was his

13   meeting, obviously.  I know that Deputy Palmere had

14   requested it, but it was Commissioner Batt's

15   meeting.

16           And I don't remember the specifics.  But

17   I know that it was, you know, bringing everybody in

18   and basically telling them the circumstances that

19   we were in, the seriousness of the -- the

20   significance and seriousness of the events that

21   were upcoming for us.

22           And to be perfectly honest, it was a

103

1    pretty desperate plea for us needing help.  We were

2    very short on resources, even with our own

3    staffing.  You know, it was not that much staffing.

4    We really needed help.  And I just -- I remember

5    that initial tone at the meeting.

6         Q    Got it.  So was this meeting more

7    designed as a plea or a request more so than "hey,

8    this is what we're going to do tomorrow"?

9         A    It was designed to bring our partners

10   together, to have the Commissioner of our

11   organization be there to show it's important enough

12   that he was there in person to make the request, to

13   say, "This is what we know we have coming up.  We

14   are in a really difficult spot.  We don't have

15   resources.  This is very serious.  Can you please

16   help us?"

17        Q    Okay.

18        A    That was really the tone of it.

19        Q    Okay.  And then you said then-

20   Commissioner Batts talks about resources, and then

21   you spoke more about what specifically was needed?

22        A    So I spoke not so much what was needed.

1    He was dealing with the actual resource requests.

2    I was talking about -- and I'm, like, sort of

3    picturing a slide where I was talking about, I want

4    to say, some of the times and the places that we

5    were concerned about, and some of what we needed to

6    deploy to.

7         Q    Okay.

8         A    And just loosely what some of our plans

9    were.  Because by the point of this meeting, we had

10   enough of our planning that we knew what we needed.

11        Q    Okay.  Now, you testified earlier today

12   and also on December 2nd that it was clear before

13   April 25th that Baltimore City would not receive

14   enough law enforcement officers by way of mutual

15   aid to sufficiently address crowd control issues

16   and protect infrastructure, right?

17        A    Correct.

18        Q    Did that change after this meeting?

19        A    No.

20        Q    Okay.  So even after this meeting,

21   Baltimore City still did not receive enough mutual

22   aid.  Is that correct?

1             I don't remember the exact details.  But,

2    you know, when a police department comes from

3    another jurisdiction, they can't just throw out all

4    of their own rules when they come in.  So there are

5    some things that have to be agreed upon.

6             Some of those pieces were outside of my

7    level.  But, you know, there were conversations

8    between attorneys and things like that.  And I

9    don't remember specifics, but I know that there

10   were a lot of conversations about those types of

11   things.

12        Q    Sure.  I mean, at this time -- we're

13   talking April 23rd to April 25th -- the mutual aid

14   that Baltimore City had received.

15             If an officer from a surrounding

16   jurisdiction witnessed a crime that he wanted to

17   make an arrest for, would he also have to seek

18   permission for certain types of arrests up the

19   chain of command in Baltimore City as Baltimore

20   City police officers had to do?

21        A    So that was the philosophy that we pushed

22   out that was -- you know, there was a lot of moving

1  parts.  That was certainly from our commander's

2  intent, command in control, that was certainly what

3  our intention was.  We didn't want outside

4  jurisdictions coming in and just going rogue,

5  because that wouldn't have been any help for us.

6       Q    Sure.  And in addition to asking

7  permission for arrests, the donning of riot gear --

8  would that also have been pushed out to mutual aid

9  jurisdictions that came in?

10      A    So when we had mutual aid come in, they

11  were always invited to have a representative in our

12  Command Center, they did.  Those were conversations

13  that we had amongst leadership to make every effort

14  to be as aligned as possible.

15           I can tell you it didn't always work.

16  You know, there were times that you would have one

17  jurisdiction wearing full gear, and another

18  jurisdiction not.

19           Some of that is, you know, managing

20  moving parts.  But, you know, we tried to work very

21  closely with the jurisdictions that came in to get

22  us all aligned.

110

1    meeting that you were talking about before, or --

2          A    No, I didn't -- this one was -- this

3    email, Exhibit 35, was sent out at 2:12 p.m.

4          Q    Okay.

5          A    That's what I was referring to.

6          Q    Okay.  Understood.  So this email, 36,

7    was sent out on April 24th at 2:13 p.m.  Now, the

8    meeting with mutual aid partners was at 1:00 p.m.

9    on April 24th.

10         A    Yes.

11         Q    Do you recall attending this briefing

12   with Commissioner Batts after the 1:00 p.m. meeting

13   with mutual partners on April 24th, as reflected in

14   Exhibit 36?

15         A    So I don't remember this specific

16   meeting.  But what I do remember is after this

17   meeting --

18         Q    "This"  being --

19         A    -- the 1:00 meeting with the partners --

20   that he was extremely alarmed about the lack of

21   commitments that we were going to get from mutual

22   aid.

1    document marked as Exhibit 38, which is a document

2    produced by the City as CITY00007595 through 7689.

3              MR. HWANG:  Sorry, I only have one copy.

4              MS. SHEEHAN:  That's okay.  Can I just

5    see it?

6              MR. HWANG:  Sure.

7              (Whereupon, a document was marked for

8    identification Hyatt Deposition Exhibit No. 38.)

9              BY MR. HWANG:

10         Q    Do you recall this document, Chief Hyatt?

11         A    It's certainly been a long time since

12   I've seen it, but I do recall that we had a

13   document for that day.

14         Q    And what is this document, specifically?

15         A    This is an IAP, an incident action plan.

16   It is more in the traditional ICS format.  It has

17   different components in place to deal with

18   everything from organizational structure, command

19   structure, assignments.

20              If I had to guess, there's probably

21   something in here for dealing with if streets get

22   shut down, mass arrest -- all of the things that

120

1   we've discussed.

2       Q    Okay.  And this is the incident action

3   plan for April 25th, 2015, correct?

4       A    Correct.

5       Q    Now, how is this different from the

6   operational plans that we've previously looked at

7   and discussed?

8       A    It doesn't.  This was -- we eventually,

9   at some point during this -- the difficult thing at

10  the very beginning of all this, a couple of us

11  didn't leave, didn't go home for about nine or ten

12  days and were managing demonstrations all day and

13  into the night.

14            And then in our, you know, last hours

15  before we started all over again, we were writing

16  those operational plans, like you saw before.  This

17  was -- we finally had developed a strong planning

18  section.  And so they were able to just put more

19  detail into what we were doing.

20            It didn't change any of it.  For example,

21  if you look, I want to say, my document -- you

22  know, pieces of my document still remain in it.

1    Like, page 7603.

2              Rather than having some of our other

3    plans just completely separated, they were just

4    essentially merged into one document.  So there's

5    really no difference.  It's just that there's more

6    detail.

7         Q    Sure.  Would this have been provided to

8    mutual aid partners?

9         A    I would certainly think so.  I don't

10   recall for sure.  But, you know, as a practice, you

11   know, personally I like to provide them our

12   operational plans and they will provide us theirs.

13   So I would assume so.

14        Q    Okay.  So while you drafted the

15   operations plan or operational plan for April 25th,

16   this incident action plan -- you said it would have

17   been prepared by the planning committee?

18        A    So if you look at this -- let's see.  If

19   you look at page 7603, this was the day before I

20   essentially wrote a skeleton, a couple of pages.

21   Wrote a skeleton.  It was maybe, you know, five

22   pages or so -- however many pages.

1  City.

2         Mass arrest -- and we talked about not

3  knowing if that was included -- that would have

4  been Baltimore City.  So, you know, the numbers for

5  Baltimore City, we would certainly be taking a, you

6  know, at least, what, 150 maybe out of that.

7         Q    Sure.  Again, so just to clear this up

8  and make sure we're on the same page -- if you're

9  looking at the page Bates stamped CITY00007631?

10        A    Uh-huh.

11        Q    That total number of 707 -- that means

12 that there were 707 total law enforcement officers,

13 whether it's Baltimore City police officers with

14 leave canceled and the mutual aid that was being

15 provided by surrounding jurisdictions.  If you

16 total that all up, that's how you get 707 total

17 officers?

18        A    Correct.

19        Q    Okay.

20        A    I'm glad we did that exercise, because I

21 had it all wrong.

22        Q    And since that's correct -- and I'm

135

1    looking through this.  I just want to make sure I

2    have a correct understanding as to which of these

3    resources are mutual aid from outside

4    jurisdictions.  If you could kind of go down the

5    list of what's listed?

6         A    Sure.

7         Q    Again, we're referring to 7637.

8         A    Okay.

9         Q    And let me know which of those listed are

10   mutual aid from outside jurisdictions.

11        A    So other Western District, the AACO

12   platoon would have been Anne Arundel County.  So

13   that would be external.  If you go under where it

14   says MOCO, that would have been Montgomery County.

15   If you keep going down where it says HOCO, that

16   would have been Howard County.

17             Keep going down to the next section where

18   it says reserves, where it says PGCO, that would

19   have been Prince George's County.  Underneath that

20   would be Maryland State Police/Transportation

21   Authority.

22             Underneath that would have been Anne

1  Arundel County Motors.  And those that I just

2  mentioned would have been external.  Everything

3  else should have been internal.

4      Q    Got it.  And this is with leave canceled,

5  correct?

6      A    Correct.

7      Q    For Baltimore City.

8      A    Leave canceled, and still staffing patrol

9  and other critical assignments.

10     Q    Okay.  And if you would bear with me

11  while I use my calculator?

12     A    Sure.

13     Q    So if I add those numbers up, it comes

14  out to 147.

15     A    Sounds about right.

16     Q    So 147 out of the 707 total law

17  enforcement officers available to be deployed on

18  April 25th would have been from outside

19  jurisdictions?

20     A    Sounds right.

21     Q    Okay.  And again, that still was not

22  sufficient to address crowd control concerns and

1    infrastructure, correct?

2        A    Correct.

3        Q    Okay.  Approximately how many more

4    officers would you say the Baltimore City Police

5    Department needed to sufficiently address crowd

6    control concerns and to protect infrastructure as

7    of April 25th, 2015?

8        A    So I don't remember.  But what I do

9    remember is that that was literally a fraction of

10   what we needed and had asked for.  And I truly -- I

11   remember it was significant number that we needed,

12   and that at the time, we were -- I don't want to

13   use the word "disappointed," but, you know,

14   disappointed.

15            It certainly created a lot of anxiety,

16   that we had asked for -- and again -- and

17   somewhere, you have to be able to find that number.

18   I don't know if it was ever, you know, transmitted

19   electronically.

20            But there were some very specific

21   staffing numbers that Commissioner Batts had asked

22   for.  And I just remember that this was literally a

**ORIGINAL TRANSCRIPT**

138

1    drop in the bucket for what had been requested.

2       Q    Okay.  I'm trying to get a better idea of

3    what "drop in the bucket" or what "fraction" means.

4    I mean, was this -- was 707, like, half of what you

5    needed?

6       A    It's been so long, I don't -- I hesitate

7    to say something specific when I don't really

8    remember.

9       Q    Sure.

10      A    But I can tell you my feeling.  And at

11   the time, remembering some of the aura around the

12   conversations, was -- and I don't want to keep

13   saying "a fraction."

14           But, you know, I don't even think we had

15   half of what we needed.  And it could have even

16   been less than that.  I just don't know.  But we

17   just did not have the resources that we had hoped

18   to have.

19      Q    Okay.  And at this time, we're talking

20   preparing for April 25th.  You referred to

21   discussions.  I mean, what discussions were had and

22   with whom?

140

1    sure he was very involved in the actual plans --

2        Q    Okay.

3        A    -- and the planning component.  So while

4    I don't remember the actual conversations and

5    meetings, I would find it hard to believe that he

6    wouldn't have been a part of it, too.

7        Q    Okay.  During those conversations, is it

8    safe to say that everyone was in agreement, "we're

9    desperately understaffed here"?

10       A    Yes.

11       Q    Okay.  Now, up to this point, it was

12   completely up to the discretion of the surrounding

13   jurisdictions whether and to what extent to provide

14   mutual aid by way of law enforcement officers to

15   Baltimore City.  Is that correct?

16       A    Yes.

17       Q    Okay.  And I assume there were

18   conversations with mutual aid partners, "Hey, can

19   you send more?  Why or why not?"  I assume there

20   were those kind of discussions, then?

21       A    I don't know.  You know, at the time,

22   being a lieutenant colonel, there may have been

1    what role in terms of executive leadership.  Pretty

2    similar to the things that we would do for a

3    special event.

4        Q    Sure.  Would arrest not being a preferred

5    function and the need to ask for permission to

6    maeke certain types of arrests -- would that have

7    been discussed at roll call?

8        A    It would have been discussed in -- so

9    when you say "permission needed for arrests,"

10   certainly arrests not being a preferred function

11   would have been discussed.  But in terms of asking

12   permission, probably not articulated quite like

13   that.

14           There was always -- you know, we were

15   always trying to impose, if something is an

16   immediate, like, safety issue, if somebody stabbed

17   somebody, pulls out a gun, is assaulting somebody,

18   you're a police officer.  Do your police officer

19   work.

20           But always be cognizant that depending on

21   what action you take, because of the volatility,

22   that your action, if not properly formulated, you

1  some of the protestors and be received less in a --

2  less in an aggressive role and more to facilitate

3  conversation.  And at different times, that was a

4  successful strategy for us, for kind of de-

5  escalating some of the emotion.

6      Q    Okay.  At times was it unsuccessful?

7      A    It was never unsuccessful.  You know,

8  there were times that it just didn't net us

9  anything.  But there were times that they were

10  really able to de-escalate some angry crowds.

11      Q    Okay.  Chief Hyatt, I'm going to be

12  giving you a document marked as Exhibit 41, which

13  is an email produced by the City as CITY00046372.

14          (Whereupon, a document was marked for

15  identification Hyatt Deposition Exhibit No. 41.)

16      Q    And I'm also going to be giving you a

17  document marked as Exhibit 42, which is also an

18  email produced by the City as CITY00041513.

19          (Whereupon, a document was marked for

20  identification Hyatt Deposition Exhibit No. 42.)

21          THE WITNESS:  Thank you.

22          BY MR. HWANG:

159

1      Q    Now, these two emails describe some of

2 the violence and property destruction that occurred

3 on April 25th, 2015.  Do you see that?

4      A    Yes.

5      Q    Would you agree with the descriptions and

6 characterizations?

7      A    Yes, I would.

8      Q    Okay.  Now, as this was happening, these

9 events described in Exhibits 41 and 42 -- as this

10 was happening on April 25th, 2015, where were you?

11      A    I was in the Command Center.

12      Q    Who else was in the Command Center with

13 you?

14      A    I know that Captain Schluderberg was

15 there.  I know that there were other people that

16 were in and out, but I don't remember when.

17 Between Commissioner Batts -- and the best of my

18 recollection is Deputy Palmere, but I don't

19 remember for certain.  So I don't want to for-

20 certain place him there.

21      Q    Okay.  When you were at the Command

22 Center or Watch Center -- strike that.  Can I use

192

1   don't remember the details.  And I remember

2   somebody was trying to reach out to their

3   leadership, and I don't know what became of it.

4       Q    Okay.  You may not remember specific

5   detail, but give me some idea of what kind of

6   behavior we're talking about?.

7       A    I don't have anything else.  I don't know

8   if it was how they were speaking to protesters.  I

9   don't know if it was, you know, anything they were

10  saying or doing.

11          I have zero recollection, outside of the

12  fact that there was something with another

13  jurisdiction that we felt was -- or our folks that

14  were on the ground felt was concerning behavior.

15  And, you know, we were very specific with what our

16  folks could and couldn't do.  And I just don't

17  remember beyond that.

18      Q    Okay.  When you say you were very

19  specific on what your folks could and could not do,

20  what do you mean by that?

21      A    Well, you know, we had -- the way that we

22  were structured with our platoons, our squads, were

1   line-of-sight squads.  So their supervisor could

2   have contact with each person in the squad.

3          It's not an accident.  It's done to make

4   sure if you have one of your police officers who's

5   been out there for hours and is exhausted and is

6   getting annoyed and, you know, they need to be

7   controlled, they're about to do something that

8   could escalate --

9          You know, all it takes is yelling

10  something and somebody, throwing something back,

11  you know, escalating with force.  We made sure that

12  we had a lot of those first-line supervisor

13  controls out there.

14         And we couldn't make the assumption that

15  -- and I wouldn't have even remembered until you

16  said that it was Coppin State that everybody had

17  that.

18     Q    So first-line people out there to make

19  sure that that doesn't happen?

20     A    Absolutely.

21     Q    Okay.  Now, in that same email chain sent

22  -- with the email sent at 6:16 p.m. on the page

1    time.

2           And they were literally within arm-shot.

3    So it was very infrequent that they didn't know

4    exactly what was going on and why.

5       Q    Okay.  And would that have included

6    Robert Maloney as well?

7       A    He was not there -- he was there, but he

8    wasn't there quite as frequently.  He had other

9    duties outside the City in that room.

10      Q    So you're talking more about Brian

11   Bovaird and Connor Scott, then.  They would have

12   known that, because of lack of resources, this is

13   what we're going to do.

14      A    And I mean, they're not police officers.

15   They weren't police officers.  So I don't expect

16   that they would have understood every drop of it.

17   But they were close by.

18           They knew a lot of what was going on.

19   They knew that we were grossly understaffed and

20   having unfolding things occurring in multiple

21   locations at one time.  So they would have

22   understood enough of that gist.

1      Q    Okay.  I'm going to be handing you a

2   document marked as Hyatt 46, which is a document

3   produced by the City as CITY00021528 through 21560.

4           (Whereupon, a document was marked for

5   identification Hyatt Deposition Exhibit No. 46.)

6           THE WITNESS:  Thank you.

7           BY MR. HWANG:

8      Q    Do you recognize this document?

9      A    I do.

10     Q    Okay.  If I could direct your attention

11  to pages 7 and 8?  Actually, we'll start with

12  seven.

13     A    Seven as in --

14     Q    Oh, sorry.

15     A    -- the actual number on the page?

16     Q    Yeah, their page 7.

17     A    Okay.

18     Q    Which is on 21535.

19     A    Okay.

20     Q    On page 7, which is 21535, do you agree

21  with the characterization that "officers were

22  ordered to allow protesters room to destroy and

1    allow the destruction of property so that rioters

2    would appear to be the aggressors"?

3         A    I remember during a briefing a statement

4    that was made by Commissioner Batts -- not quite

5    like this -- but that if there was going to be --

6    if things were going to get to a boiling point,

7    essentially that it couldn't be the police first.

8              That it would have to be people taking

9    criminal action before the police got aggressive.

10   I don't know that I would characterize it just like

11   that, but that was essentially the essence of it.

12        Q    Sure.  The way you characterize it,

13   though, do you know if Commissioner Batts had

14   discussions with the Mayor or anyone in the City --

15        A    I don't know.

16        Q    -- regarding that thought?

17        A    I don't know.

18        Q    Flip to the next page, 21536, their page

19   8.  Do you see there's bullet points there?  The

20   second bullet point, where it refers to channel 11A

21   and someone stating, "Looting is expected.  Let it

22   happen."

215

1      Q     And this is just on this specific topic.

2            MR. HWANG:  And I'm sorry, what are we on

3      right now?  We're on --

4            THE REPORTER:  Forty-nine.

5            (Whereupon, a document was marked for

6      identification Hyatt Deposition Exhibit No. 49.)

7            BY MR. HWANG:

8      Q     I'm handing to you an exhibit marked as

9      49, which is the email chain produced by the City

10     as CITY00011634 through 635.

11     A     Yes, I remember this.

12     Q     Okay.  Do you recall this email?

13     A     I don't remember the email, but I

14     remember having conversations with whatever -- I

15     don't remember what rank Lawrence Barber was at the

16     time.  But he was in the National Guard.  And I

17     remember that we were able to have some

18     conversations.

19     Q     Okay.  And this was dated April 26th,

20     2015, that you received this email, correct?

21     A     Yes.

22     Q     Okay.  If you look at the earliest email

216

1   on April 26th, 2015, at 10:24 a.m., the subject

2   hading of the email is "Potential Triggers for

3   National Guard Support to BPD."  And then it lists

4   several triggers.

5       A    Uh-huh.

6       Q    Would you say -- I mean, this is April

7   26th.  So April 25th had already happened.

8       A    Correct.

9       Q    Would you say most if not all of these

10  triggers had already happened?

11      A    Not necessarily, no.

12      Q    Okay.  Well, Baltimore Police Department

13  logistics shortfall -- that had happened, right?

14      A    Absolutely.

15      Q    Presence of/participating in City events

16  by known activists and/or antagonist groups, i.e.

17  Malik Shabazz" -- that had already happened,

18  correct?

19      A    Yes.

20      Q    "Baltimore Police Department exhausting

21  their own capability to sustain extended

22  operations"?

217

1      A     Uh-huh.

2      Q     That had already happened, correct?

3      A     Yes.

4      Q     "Baltimore Police Department having a

5   finite amount of civil disturbance riot gear."

6      A     Yes.

7      Q     That had happened as well, correct?

8      A     Uh-huh.

9      Q     Okay.  "Known events or information

10  release dates," for example, the findings of the

11  Freddie Gray investigation?

12     A     Yes.

13     Q     That was already a concern, correct?

14     A     Correct.

15     Q     Okay.  "Significant and/or multiple

16  simultaneous events in the City that would draw

17  large crowds, i.e. O's game."  I assume that refers

18  to an Orioles game?

19     A     Yes.  And that was the one that I didn't

20  fully read.  I thought that they were referring to

21  significant simultaneous unfolding events at one

22  time.

218

1      Q    Sure.

2      A    And when I was looking at the logistics

3   shortfall, I was looking at the jersey barriers and

4   the transportation components.

5      Q    Sure.  But the O's game -- that had

6   happened on April 25th, hadn't it?

7      A    That's correct.

8      Q    Okay.  Now, despite these triggers

9   already having been met, there weren't any

10  discussions "hey, we need to call in the National

11  Guard" by the time this email was sent on April

12  26th?

13     A    We had certainly -- like I said, we had

14  certainly had conversations.  That is well far

15  outside of the paygrade of where I was.  But it is

16  not abnormal for us to talk to peers in the Guard

17  before they are deployed.

18          They may not even be deployed.  That's

19  done so that way if they get deployed, we're not

20  starting from nothing, and they have the ability --

21  it takes them a considerable period of time to spin

22  up fully.

1                    CERTIFICATE OF NOTARY

2            I, Emily G. Colkitt, Notary Public,

3    before whom the foregoing testimony was taken, do

4    hereby certify that the witness was duly sworn by

5    me; that said testimony is a true record of the

6    testimony given by said witness; that I am neither

7    counsel for, related to, nor employed by any of the

8    parties to this action, nor financially or

9    otherwise interested in the outcome of the action;

10   and that the testimony was reduced to typewriting

11   by me or under my direction.  This certification is

12   expressly withdrawn upon the disassembly or

13   photocopying of the foregoing transcript, including

14   exhibits, unless disassembly or photocopying is

15   done under the auspices of Huseby, and the

16   signature and original seal is attached thereto.

17

18

19                    EMILY G. COLKITT,

20                    Notary Public in and for

21                    The State of Maryland

22   My Commission Expires:  February 20, 2024

# EXHIBIT 14

# In The Matter Of:

*CHAE BROTHERS, LIMITED LIABILITY COMPANY, ET AL. v.*
*MAYOR AND CITY COUNCIL OF BALTIMORE, ET AL.*

---

*GENE S. RYAN*
*October 18, 2019*
*ORIGINAL TRANSCRIPT*

---

*CourtScribes, Inc.*
*"Delivering More For Less"*
*(833) 727-4237*
*info@courtscribes.com*
*www.courtscribes.com*

Original File 10.18.19 Gene S. RyanTAES.txt
**Min-U-Script® with Word Index**

**ORIGINAL TRANSCRIPT**

1

1    UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF MARYLAND
2    CIVIL ACTION NO. 1:17-CV-01657-GLR

3    CHAE BROTHERS, LIMITED LIABILITY COMPANY
     D/B/A FIRESIDE NORTH LIQUORS, ET AL.,
5    PLAINTIFF,

6    vs.

7    MAYOR AND CITY COUNCIL OF BALTIMORE, ET AL.,
     DEFENDANTS.
8    _____/
     VIDEOTAPED DEPOSITION OF GENE S. RYAN
9    DATE:      OCTOBER 18,2019
     REPORTER:  JAMES BARTLETT
10   PLACE:     SUNG & HWANG
                9256 BENDIX ROAD, SUITE 109
11               COLUMBIA, MARYLAND 21045

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**ORIGINAL TRANSCRIPT**

2

```
 1                    APPEARANCES

 2    ON BEHALF OF THE PLAINTIFF, CHAE BROTHERS, ET AL.:
      PETER K. HWANG, ESQUIRE
 3    SUNG AND HWANG
      9256 BENDIX ROAD, SUITE 109
 4    COLUMBIA, MARYLAND 21045
      TELEPHONE NO.: (888) 772-3001
 5    FACSIMILE NO.: (410) 772-2328
      E-MAIL: PHWANG@SUNGANDHWANG.COM
 6
      ON BEHALF OF THE DEFENDANTS, THE MAYOR AND CITY COUNCIL
 7    OF BALTIMORE:
      SARA GROSS, ESQUIRE
 8    CITY OF BALTIMORE DEPARTMENT OF LAW
      100 HOLLIDAY STREET, ROOM 101
 9    BALTIMORE, MARYLAND 21202
      TELEPHONE NO.: (410) 396-3826
10    FACSIMILE NO.: (410) 547-1025
      E-MAIL: SARA.GROSS@BALTIMORECITY.GOV
11
      AND
12
      MATTHEW BRADFORD, ESQUIRE
13    CITY OF BALTIMORE DEPARTMENT OF LAW
      100 HOLLIDAY STREET, ROOM 101
14    BALTIMORE, MARYLAND 21202
      TELEPHONE NO.: (410) 396-3826
15    FACSIMILE NO.: (410) 547-1025
      E-MAIL:  MATTHEW.BRADFORD@BALTIMORECITY.GOV
16
      AND
17
      DORIS N. WEIL, ESQUIRE
18    CITY OF BALTIMORE DEPARTMENT OF LAW
      100 HOLLIDAY STREET, ROOM 101
19    BALTIMORE, MARYLAND 21202
      TELEPHONE NO.: (410) 396-3826
20    FACSIMILE NO.: (410) 547-1025
      E-MAIL:  DORIS.WEIL2@BALTIMORECITY.GOV
21
      ON BEHALF OF THE WITNESS, GENE S. RYAN
22    CHAZ R. BALL, ESQUIRE
      SCHLACHMAN, BELSKY, & WEINER, P.A.
23    300 EAST LOMBARD STREET, SUITE 100
      BALTIMORE, MARYLAND. 21012
24    TELEPHONE NO.: (410) 685-2022
      FACSIMILE NO.: (410) 783-4771
25    E-MAIL:  CBALL@SBWLAW.COM
```

3

1                              INDEX

2                                              Page

3    PROCEEDINGS                                 5

4    DIRECT EXAMINATION BY PETER K. HWANG        5

5    CROSS-EXAMINATION BY SARA GROSS            153

6    REDIRECT EXAMINATION BY PETER K. HWANG     176

7                           EXHIBITS

8    Exhibit                                    Page

9    1    LETTER WITH PAYMENT FOR DEPOSITION    12

10   2    AGREEMENT TO BE BOUND BY PROTECTIVE   13
           ORDER
11
     3    JURY TRIAL DEMANDED                    30
12   4    BALTIMORE CITY F.O.P. REVIEW OF       112
          THE MANAGEMENT OF THE 2015
13        BALTIMORE RIOTS DOCUMENTS

14   5    4.30.15 EMAIL RE:FOP ALERT-PAYROLL    150

15   6    SUBPOENA TO PRODUCE DOCUMENTS         179

12

13

14

15

16

17

18

19

20

21

22

23

24

1                            STIPULATION

2

3       THE VIDEO DEPOSITION OF GENE S. RYAN, TAKEN AT THE
        OFFICES OF SUNG & HWANG, 9256 BENDIX ROAD, SUITE 109,
4       COLUMBIA, MARYLAND 21045, ON FRIDAY THE 18TH DAY OF
        OCTOBER, 2019 AT APPROXIMATELY 10:00 A.M.; SAID DEPOSITION WAS
5       TAKEN PURSUANT TO THE MARYLAND RULES OF CIVIL PROCEDURE.

6       IT IS AGREED THAT JAMES BARTLETT, BEING A NOTARY PUBLIC AND
        COURT REPORTER FOR THE STATE OF MARYLAND, MAY SWEAR THE
7       WITNESS AND THAT THE READING AND SIGNING OF THE
        COMPLETED TRANSCRIPT BY THE WITNESS IS NOT WAIVED.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          VIDEOGRAPHER:  Today is Friday, October 18, 2019.

2     We are here today for the purposes of recording the

3     deposition of Gene S.  Ryan, taken by Peter K.  Hwang

4     in the in the matter of Chae Brothers Limited Liability

5     Company, et al. versus Mayor and City Council of

6     Baltimore, et al., Civil Action Number

7     1:17-CV-01657-GLR, in United States District Court for

8     the District of Maryland, Northern Division.  Counsel

9     will now state their appearance.

10          MR. HWANG:  Peter Hwang on behalf of the

11     plaintiffs.

12          MS. GROSS:  Sarah Gross, Doris Weil, and Matthew

13     Bradford on behalf of the Mayor and City Council of

14     Baltimore.

15          MR. BALL:  And Chaz Ball on behalf of Gene Ryan.

16          COURT REPORTER:  I will now swear in the witness.

17     All right.  Do you, Gene S.  Ryan, swear or affirm to

18     tell the truth, the whole truth, and nothing but the

19     truth so help you God?

20          THE WITNESS:  I do.

21          COURT REPORTER:  All right.  Counsel, you may

22     begin, and the time is now 10:17 a.m. and we are now on

23     the record.

24           DIRECT EXAMINATION

25           BY MR. HWANG:

1      Q    Lieutenant, could you state your name for the

2 record, please.

3      A    Gene Steven Ryan.  I'm a lieutenant with the

4 Baltimore City Police Department.

5      Q    Great.  Thank you.  And as you may know, my name

6 is Peter Hwang, and I represent the plaintiffs in this

7 action, who are suing the mayor and City Council of

8 Baltimore for, among other things, damage to plaintiff's

9 property and businesses.  As you may know, we're here for a

10 deposition, which will consist primarily me asking you

11 questions and you responding to those questions.  As you

12 can see, there's a court reporter here.  He's transcribing

13 my questions and your responses.  As such, it's important

14 that you answer my questions verbally.  Please don't answer

15 with a gesture like a head nod or sounds like "uh-huh." As

16 you can imagine, it is hard for the court reporter to

17 transcribe that kind of responses.

18      A    Yes.

19      Q    It is extremely important that you understand the

20 questions that I'm asking.  If for some reason you do not

21 understand a particular question, please let me know and

22 I'll try to rephrase.  If you, however go ahead and answer

23 a question, I will assume that you understood it.

24 Additionally, I see that you have counsel here -- Mr. Ball.

25 You may hear your attorney object to my question from time

1      don't think there's an issue where you need to put on

2      the record again.

3           BY MR. HWANG:

4      Q    All right.  That's fine.  Are you currently

5   employed?

6      A    Yes, sir.

7      Q    And where are you employed?

8      A    Baltimore City Police Department.

9      Q    And for how long have you been employed by the

10  Baltimore City Police Department?

11     A    I completed 36 years last March.  I'm at

12  36-and-a-half approximately.

13     Q    Okay.  And what is your current title?

14     A    I am a lieutenant.

15     Q    And Lieutenant for how long have you been a

16  lieutenant with the Baltimore Police Department?

17     A    Since 2005.  April 29th.

18     Q    I'm sorry, since 2005?

19     A    Yes, sir.  I was promoted exactly April 20th --

20  28th.  I'm sorry, 28th.

21     Q    April 28th.  Okay.  And as a lieutenant, what are

22  your duties?

23     A    Well, for the most part, I'm a what we call shift

24  commander.  I run a shift.  I use -- it depends on -- like

25  a patrol shift I would have three sergeants under me and it

1   say that again and again, when I say FOP, I mean Fraternal

2   Order of Police.

3        A    Yes.

4        Q    So for how long were you the president of the

5   Fraternal Order -- the FOP?

6        A    For four years.

7        Q    Okay.  So during those four years period were

8   your duties with the Baltimore City Police Department

9   limited to your role as president of the Fraternal -- of

10  FOP?

11       A    Well, that's -- well, that's what I was assigned

12  to the last four years.  But I still had full police

13  powers.  I can take, you know, the same action I can take

14  when I was working the street but -- for the most part, my

15  duties were taking care of the union.

16       Q    Okay.  A side from taking care of the union, do

17  you have any other assignments during your time as

18  president of the FOP?

19       A    Any other assignments?

20       Q    A side from serving as the union president?

21       A    Well, I was put on some committees as far as, you

22  know, like on a state level and a national level.

23       Q    Okay.

24       A    But it was all -- it was all union -- union work.

25       Q    Sure.  Would you mind identifying those

1    everybody an open checkbook to do what whatever they wanted

2    to do.

3         Q    Okay.  Let's get back to the stand down order.

4         A    Uh-huh.

5         Q    The committee members that you spoke with, did

6    they state why they objected to such orders being given,

7    why they thought that wasn't the right thing to do?

8         A    Oh, absolutely.  I mean, anybody that's in law

9    enforcement for -- especially for anything like that time

10   it's, you know, you're told not to do your job and we are

11   there to protect and serve.  I don't know any officer that

12   would agree with that.  So we basically had to stand by

13   while they were looting store, setting things on fire.  So

14   it's -- that's a hard pill to swallow when, you know --

15   that's -- what we're supposed to do is prevent the

16   criminals from destroying property.  And there was

17   certainly a lot of injuries not only to the police officers

18   but also to civilians.

19        Q    Right.  Okay.  Prior to convening in Oklahoma

20   City in June of 2017, do you recall the last time prior to

21   that the Urban Committee convened?

22        A    It was before the riots.

23        Q    Okay.

24        A    It was probably 2014.

25        Q    Okay.  Do you recall what other FOPs are

27

1        Q     Okay.  And do all counties participate?

2        A     No, not all counties.  I mean, it is -- it all

3   depends on who it effects to be honest with you as far as

4   -- I mean, there are several other jurisdictions that are

5   on state committee.  And if they need help even if they're

6   not going to legislative committee, they can certainly --

7   anybody can attend the meetings we have so they can see

8   what's going on.  But if it's something that affects their

9   specific jurisdiction they will come and asked for help.

10       Q     Okay.

11       A     And then we-all get together and get behind

12  whatever localize that is and we support that localize.  I

13  mean, that's the whole idea the committees to support each

14  other.

15       Q     Okay.  Now, it's my understanding that police

16  officers from other jurisdictions came to Baltimore City to

17  help with the Baltimore riots?

18       A     Yes, absolutely.

19       Q     Okay.  Now, did you have any discussions during

20  the times you convened for the legislative committee with

21  police officers from other jurisdictions about how the

22  Baltimore riots were handled?

23       A     Oh, yes.  Actually before the riots.

24       Q     Okay.

25       A     Because there was an incident, I call it a mini

1   riot, that Saturday before the riots.

2       Q    Okay.  When you say Saturday before the riots,

3   you mean the incident at Camden Yards?

4       A    Well, not only that, the -- the -- the district

5   where all this started, Western District.

6       Q    Okay.  And what discussions did you have with

7   other members of the -- with committees at the Grand Lodge

8   with respect to that?

9       A    Well, I spoke with Baltimore County president and

10  because their guys were being criticized for leaving but

11  what they didn't know -- our people didn't know is, they

12  were ordered to put their, what they call turtle suit.

13  It's a protective suit that they wore.  And our commander

14  decided that that was too intimidating.  And the -- I don't

15  know who the commander was on scene because I get most of

16  my information from their union.  The commander on scene

17  said, I'm not putting my officers out there without

18  protection.  So he packed everybody and left.

19      Q    Okay.

20      A    PG County had the same complaint.  Because --

21  that day, especially that day.  And they were -- we weren't

22  -- they weren't allowed to use certain equipment that

23  really would help calm or prevented the unrest and

24  eventually what led up to the riots on that Monday.

25          MS. GROSS:  Objection.

1      Q    Okay.  So you mentioned two counties, Baltimore

2  County and PG County who left because they were given

3  orders not to wear protective gear.

4      A    Yes.

5      Q    Do you recall who from Baltimore County you heard

6  that from?

7      A    Yeah, from the president of their Lodge.

8      Q    Do you recall his name?

9      A    Yeah, it's John Telledac (phonetic)

10     Q    Okay.  And you -- did he tell you who that word

11 came from the Baltimore City Police side?

12     A    No, he didn't.  Our officers told me where it

13 came from.

14     Q    Okay.  Who did it come from?

15     A    It came from the Colonel -- it was Colonel Hyatt.

16     Q    Okay.  And you say that the Baltimore County

17 contingency eventually left?

18     A    Yeah, they left.

19     Q    Do you know when they left?

20     A    I -- I don't -- not exactly.  I mean, it wasn't

21 too long after they were told to take the turtle suits off.

22     Q    Okay.  Do you recall if they left prior to

23 Monday, April 27th?

24     A    Oh, no, no, no.  This was that Saturday.

25     Q    Okay.  So the left prior to April 27th?

1    from happening.  And -- well, just to go back there's

2    something in there about the '67, '68 riots, about how to

3    prevent it.  If we would've squashed the mini riot on

4    Saturday, myself and many other union leaders believe

5    Monday never happens.

6            MS. GROSS:  Objection.

7        A    So we dropped that ball from many levels.

8            BY MR. HWANG:

9        Q    Okay.

10       A    And anyway, when I was -- like I said, when I was

11   go -- getting back to the mayor, I thought the conversation

12   was going in the right direction, and then it was just her

13   and I, and she wanted to know what Batts did wrong.  While

14   I was explaining it to her, then I saw her attitude change

15   a shift.  Her command staff -- or her staff comes in and

16   they start criticizing me because I wanted National Guard

17   in.  And one of her chief of -- chief of staff actually

18   said, "Why do the National Guard have to have bullets in

19   their rifles?" It's like, what good is a gun without

20   bullets?  So anyway --

21       Q    Okay.

22       A    -- these just say I agreed on many levels with

23   the mayor, too.

24       Q    Okay.  Well, let's talk about this discussion you

25   just -- you're talking about right now --

1      Q    Okay.

2      A    Which was very little.

3      Q    Okay.

4           MS. GROSS:  Objection.

5      Q    Now I'm going to come back to all this --

6      A    Uh-huh.

7      Q    -- and we're going to do it, you know, with a

8  timeline.  But prior to doing that, I want to kind of take

9  you back to your discussions with the president of the

10  Baltimore County's FOP, and also whoever you spoke to from

11  PG County's FOP.  You testified earlier that the President

12  of the Baltimore County's FOP was told that members cannot

13  wear protective gear, and eventually Baltimore County's

14  contingency left?

15     A    Yes.

16     Q    Do you recall when Baltimore County's contingency

17  was told not to wear protective gear?

18     A    It was that Saturday.

19     Q    Okay.  And when you say "Saturday," you mean

20  Saturday, April 25th?

21     A    Yes.

22     Q    Okay.  And I believe you testified that that

23  command from the Baltimore City side came from Lieutenant

24  Colonel Melissa Hyatt; is that correct?

25     A    Yes.

1       Q     Okay.  Do you know who specifically from the

2    Baltimore County Melissa Hyatt ordered to not wear

3    protective gear?

4       A     That, I'm not sure about.

5       Q     Okay.  And so they were given that command from

6    Melissa Hyatt on Saturday, April 25th, and you said

7    eventually -- the Baltimore County contingency eventually

8    left as a result?

9       A     Yes, they did.

10      Q     Do you know when they left?

11      A     It was shortly after they were told to take their

12   turtle suits off.

13      Q     Okay.  So did they leave -- they were told on

14   April 25th, Saturday?

15      A     Yes.

16      Q     Did they leave prior to Monday, April 27th?

17      A     Yes.  Absolutely.

18      Q     Okay.

19      A     They left that day, the 25th.

20      Q     They left on the 25th?

21      A     Yes, they did.

22      Q     Okay.  Do you know kind of when on April 25th

23   they eventually packed up and left?  Was it as the Camden

24   Yards incident was happening?  Before, after, during?

25      A     It was before Camden Yards because Western

1  had screwed up the prior riots he was involved with in

2  other jurisdictions?

3        MS. GROSS:  Objection.

4    A    Because I talked to the President out there

5  during, you know, when they were having their issues

6  because just like when I was telling my -- you know, what

7  was going on in Baltimore, he was sort of in the limelight

8  at the time when they were having their issues.

9    Q    Okay.  What's -- is there anything specific that

10 you can point to, that you believe he did wrong in riots in

11 other jurisdictions preceding the Baltimore record?

12       MS. GROSS:  Objection.

13   A    He was so worried about the perception of being

14 intimidating.  When riot -- riot -- when yours -- if you

15 study what's supposed to be done during a riot, you want to

16 intimidate the crowd so they won't do anything violent to

17 where if they do get violent we have to make an arrest

18 then, we're going to wind up hurting somebody because no

19 matter how you look at it, arrest is ugly.  Especially if

20 you -- they are going to fight you putting handcuffs on

21 them.  Putting handcuffs on a violent person is extremely

22 difficult.  To say the least.

23       MS. GROSS:  Objection.

24   Q    Prior to April 25th again April, you know, 18th,

25 19th thereabouts up to April 24th.

1        A     Uh-huh.

2        Q     Were there any orders given to not engage the

3    protesters or to otherwise stand down?

4              MS. GROSS:  Objection.

5        A     Yes -- yes, there was.  They wanted -- I'm

6    thinking back.  They -- they didn't want any confrontation

7    between us and the protesters, so I mean, prior to what the

8    mayor said, I mean, they were basically allowed to do

9    pretty much anything they want unless they were attacking

10   another person of course, you know.  That took priority,

11   personal safety but property came last.  I mean the mayor

12   even said to me, you know, she's not, you know, they set a

13   building on fire.  She just really didn't care.

14             MS. GROSS:  Objection.

15       A     As far as her -- her opinion and she said it to

16   me, was that she would rather have them destroy property

17   and that eventually came back to bite her when she made

18   that comment on camera because -- but anyway, you know, she

19   rather have them do that and then have a physical

20   confrontation where an arrest like I said, it does -- it's

21   not pretty.  And that would incite more -- it would

22   escalate the crowd because they would be angry and you

23   know, one thing will lead to another and that would

24   snowball out of hand.

25       Q     Okay.  You just testified that former Mayor

1  Stephanie Rawlings-Blake told you directly --

2       A    Yes, she did.  I had several conversations with

3  her too besides Batts.

4       Q    Okay.  This specific statement she didn't care if

5  the building was on fire.  When did --

6       A    She wasn't concerned with property at all.

7       Q    When did she say this to you, directly?

8       A    It was -- that was actually before the riots.

9  When I was arguing with Batts, I wasn't getting what I

10  wanted out of him so I went directly to her.

11       Q    Okay.  Do you recall when this was?  Was it

12  before April 25th, on April 25th, after?  On the 25th or

13  6th?

14       A    Well, no. It was before 25th.  It was before the

15  first -- the mini riot, as I call it.

16       Q    Okay.

17       A    Or we can say just April 25th.

18       Q    Okay.  Now, as far as the principle of not

19  engaging protesters, and again I'm talking before April

20  25th.

21       A    Uh-huh.

22       Q    Were these relayed by formal orders?  In other

23  words, the Commissioner Batts actually tell his commanders

24  to tell others to not engage?

25       A    Yes.  Yes, he did.

1   procedure being in place.  That --

2       A    Right.

3       Q    -- officers had to get permission.  What did

4   Commissioner Batts say in response to you?

5       A    He didn't care.  He said, "This is the way I want

6   it done."

7       Q    Okay.  Prior to April 25, did you have any

8   discussions to Commissioner Batts about bringing in the

9   National Guard, or --

10      A    Yes.

11      Q    Okay.  Prior to April 25th, what discussions did

12  you have Commissioner Batts about bringing in the National

13  Guard?

14      A    I thought we should start getting ready for the

15  ultimate escalation of a riot because if you paid

16  attention, which he apparently wasn't --

17          MS. GROSS:  Objection.

18          THE WITNESS:  -- it was progressively getting more

19      hostile day after day.  You could see that it was a

20      pattern.  It was only a matter of time before it blew

21      up --

22          MS. GROSS:  Objection.

23          THE WITNESS:  -- but he fought me and disagreed

24      with me.

25          MR. HWANG:  Okay.

1          THE WITNESS:  And that's when I had started having

2      conversations with the mayor trying -- because she's

3      the ultimate boss, so she's ultimately responsible.

4      He's in charge of the police department, so he's to

5      blame for everything that happened that day, or that

6      week or -- moving forward, but --

7          MS. GROSS:  Objection.

8          THE WITNESS:  -- it fell on deaf ears when talking

9      to both of them.

10          MR. HWANG:  Okay.  Now, moving on to Stephanie

11      Rawlings-Blake.

12      A    Uh-huh.

13          BY MR. HWANG:

14      Q    Did you have discussions with her regarding these

15  issues we've been discussing prior to April 25th?

16      A    Yes, yes.  It only -- I didn't -- the only thing

17  I didn't I talked -- I talked to her about everything

18  except for the riot helmets because she's doesn't know

19  anything about our job, so it wouldn't have been any good

20  to talk to her.

21      Q    Okay.  So prior to April 25th, you did have

22  discussions with Stephanie Rawlings-Blake regarding the

23  stand down orders or the orders not to engage protesters?

24      A    Yes.

25      Q    Okay.  Do you recall when prior to April 25th,

1    trash can, you know, but --

2              MS. GROSS:  Objection.

3         Q    Did Commissioner Batts --

4         A    With that conversation on the 25th, he was like,

5    "I don't know why they're not locking people up." It's

6    like, you're the commissioner.

7              MS. GROSS:  Objection.

8         Q    Did Commissioner Batts express any lack of

9    concern about property destruction?  In other words, did he

10   say, "If it's property, just let it happen?"

11        A    Yeah, right.  I mean, that was -- he -- obviously

12   had the same attitude that the mayor had.

13             MS. GROSS:  Objection.

14        A    They would -- didn't worry or didn't care about

15   any property damage.  And part of the argument I had is,

16   you know, if you allow them to destroy property, one thing

17   is going to lead to another.  It's going to escalate.  They

18   disagreed with me, both of them.

19             MS. GROSS:  Objection.

20        Q    And this is again, these discussions with the

21   commissioner and mayor were prior to April 27th?

22        A    Oh, yes.

23        Q    Okay.  Now, sorry, I'm being a little scattered

24   here.  But this discussion with the mayor where she said

25   she didn't care about property destruction, prior to April

1    27th, was this discussion over the phone?

2        A    Yes.

3        Q    Okay.  And who was on this phone call?  Just you,

4    or you and the mayor, or were there other people on the

5    phone call as well?

6        A    As far as I know, it was just the mayor and I.  I

7    know on my side, it was just me.  I mean, I called her

8    directly.

9        Q    Okay.

10       A    So if she had anybody else in the room -- as far

11   as I know, there wasn't.

12       Q    Okay.  And again, prior to April 27th, she told

13   you directly over the phone, she didn't care about property

14   destruction?

15       A    No, she didn't care.

16            MS. GROSS:  Objection.

17       A    She did make the comment, yes.

18       Q    She did say that?

19       A    No, she didn't care.  I'm sorry.

20       Q    Okay.

21       A    I want to explain that.

22       Q    Okay.  Now, let's move on to April 27th.  Can you

23   briefly describe your schedule on April 27th?

24       A    The 27th, I was working day work to start.  But

25   needless to say, I was there pretty much well into the

1   anyway that's -- our civilian secretary called me down.

2   And it was, like I said, prior to everything happening,

3   prior to that first trash can, and we just watched it

4   escalate.  And then we just watched it on television as

5   things just steadily got worse and worse.  And then, you

6   know, it was open season.  It was, you know, like they

7   opened the doors at Mondawmin Mall and everything was free.

8           MS. GROSS:  Objection.

9       Q    As you were observing these things happen at --

10  happening at Mondawmin Mall, did you have any

11  communications with Commissioner Batts?

12      A    That time, no, I didn't.  I don't recall talking

13  to him at that particular time.  Because we had some,

14  definitely, had some conversations in the evening.  I mean,

15  if my wife was still with me, she would tell you she used

16  to get angry with me because I would, him and I would like

17  battle.  We would yell, scream, and holler at each other.

18      Q    What discussions do you recall having with

19  Commissioner Batts on that day, on April 27th?

20      A    About the -- the lack of police officers allowed

21  to do what they're supposed to do.

22      Q    Okay.  What do you mean by that?

23          MS. GROSS:  Objection.

24      A    They were told not to do their job, and

25  thereafter, getting physically beat up by these bricks and

1   weapons.  And as a matter of fact, I have some of the

2   younger police officers, you know, for the next -- after

3   the fact, asking me if it's an aggravated assault or deadly

4   weapon when they throw a cinder block at you.  And I said

5   absolutely.  You can kill somebody with a cinder block.

6   And we -- like I had said before, we had several officers

7   that were hit in the head with the worst of riot damage we

8   had.  And to this day, they're never going to be the same.

9        MS. GROSS:  Objection.

10   Q    When you say they weren't allowed to do their

11   jobs, you mean they weren't allowed to make arrests or what

12   do you mean, specifically?

13   A    Yes.  They weren't allowed to make arrests.

14        MS. GROSS:  Objection.

15   Q    Okay.  And how were they not allowed to make

16   arrests on April 27th?

17        MS. GROSS:  Objection.

18   A    They were told not to.  There were commanders on

19   the scene.  I mean, some commanders would take it upon

20   themselves to -- to -- to make arrest like the captain that

21   -- on the 25th.

22   Q    How?

23   A    That on the radio they were -- he would say,

24   "Lock the," -- he said, "Lock them up."

25   Q    Okay.  Do you know which commanders were not

**ORIGINAL TRANSCRIPT**

1      Q    -- was a standing order from the union on these

2  riots.

3      A    Yes, it was.

4      Q    Now that was a standing order issued by whom?

5      A    Well it all started from the commissioner.

6  Police commissioner started the whole thing, yes.

7      Q    Okay.

8          MS. GROSS:  Objection.

9      Q    And that stand-down order was ordered by the

10  commissioner?

11     A    Yes.

12     Q    How long did you given to the troops on the

13  ground?

14         COURT REPORTER:  Mr. Hwang, the micro --

15         MR. HWANG:  Oh.

16         COURT REPORTER:  I'm still picking you up.  It's

17     just -- feel a little better.  Sorry about that.

18         BY MR. HWANG:

19     Q    Thank you.  So that stand-down -- the stan -- the

20  standing order to stand down and not to engage that was

21  given by Commissioner Batts, how was it transmitted to the

22  people on the ground?

23         MS. GROSS:  Objection.

24     A    He did it through roll calls and his command --

25  commanders sends it down through the rest of the -- the --

1                          CERTIFICATE OF OATH

2

3    STATE OF MARYLAND

4

5

6        I, the undersigned, certify that the witness

7    in the foregoing transcript personally appeared

8    before me and was duly sworn.

9

10   Identification:  Produced Identification

11

12

13

14

15

16

17

18

19                    _____

20                    JAMES BARTLETT

21                    Court Reporter, Notary Public

22                    State of Maryland

23                    Commission Expires: 5/31/2023

24

25

```
 1                    REPORTER'S CERTIFICATE

 2

 3   STATE OF MARYLAND

 4

 5

 6      I, JAMES BARTLETT, Notary Public in and for the

 7   State of Maryland at Large, do hereby certify that I

 8   made an accurate and complete digital recording of

 9   the deposition in the above-styled case.

10

11         I further certify that I am not a relative,

12   employee, attorney or counsel of any of the parties,

13   nor am I a relative or employee of any of the parties

14   attorney or counsel connected with the action, nor

15   financially interested in the action.

16

17         Dated this 29th day of October, 2019.

18

19

20

21

22   _____

23          JAMES BARTLETT

24

25
```

1              CERTIFICATE OF TRANSCRIPTIONIST

2

3    STATE OF FLORIDA

4    COUNTY OF HILLSBOROGH

5

6    I, the undersigned, a Notary Public within the State of

7    Florida do hereby certify:

8

9    That the said proceedings were taken and recorded by

10   electronic means at the time and place therein set forth

11   and transcribed under my direction and supervision and that

12   the testimony as typed is a true, accurate, and complete

13   transcript of the official recording.

14

15        I further certify that I am not a relative,

16   employee, attorney or counsel of any of the parties nor

17   am I a relative or counsel connected with the parties'

18   attorneys or counsel associated with the action, nor am

19   I financially interested in the outcome of the action.

20

21   Submitted on: October 29th, 2019

22

23   _____

24        Adam Fleisher

25

# EXHIBIT 15

# In The Matter Of:

*CHAE BROTHERS, LIMITED LIABILITY COMPANY, ET AL. v.*
*MAYOR AND CITY COUNCIL OF BALTIMORE, ET AL.*

---

*KENNETH B. BUTLER*
*September 18, 2019*
*ORIGINAL TRANSCRIPT*

---

*CourtScribes, Inc.*
*"Delivering More For Less"*
*(833) 727-4237*
*info@courtscribes.com*
*www.courtscribes.com*

Original File 138703 Kenneth Butlet 9-18-19 ASCII.txt
Min-U-Script® with Word Index

**ORIGINAL TRANSCRIPT**

1

1   UNITED STATES DISTRICT COURT

2   FOR THE DISTRICT OF MARYLAND

3   CIVIL ACTION NO. 1:17-CV-01657-GLR

4

5   CHAE BROTHERS, LIMITED LIABILITY COMPANY

6   D/B/A FIRESIDE NORTH LIQUORS, ET AL.,

7

8   PLAINTIFF,

9

10  VS.

11

12  MAYOR AND CITY COUNCIL OF BALTIMORE, ET AL.,

13

14  DEFENDANTS.

15  _____/

16  VIDEOTAPED DEPOSITION OF KENNETH B. BUTLER

17  DATE:        SEPTEMBER 18, 2019

18  REPORTER:    JAMES BARTLETT

19  PLACE:       SUNG & HWANG

20               9256 BENDIX ROAD, SUITE 109

21               COLUMBIA, MARYLAND 21045

22

23

24

25

```
 1                         APPEARANCES

 2    ON BEHALF OF THE PLAINTIFFS, CHAE BROTHERS, ET AL.:
      PETER K. HWANG, ESQUIRE
 3    SUNG AND HWANG
      9256 BENDIX ROAD, SUITE 109
 4    COLUMBIA, MARYLAND 21045
      TELEPHONE NO.: (888) 772-3001
 5    FACSIMILE NO.: (410) 772-2328
      E-MAIL: PHWANG@SUNGANDHWANG.COM
 6
      AND
 7
      RAY M. SHEPARD, ESQUIRE
 8    THE SHEPARD LAW FIRM, LLC
      122 RIVIERA DRIVE
 9    PASADENA, MARYLAND 21122
      TELEPHONE NO.: (410) 255-0700
10    FACSIMILE NO.: (443) 773-1922
      E-MAIL:  RAY@SHEPARD.LAW
11
      ON BEHALF OF THE DEFENDANTS, THE MAYOR AND CITY COUNCIL
12    OF BALTIMORE:
      MATTHEW BRADFORD, ESQUIRE
13    SARA GROSS, ESQUIRE
      DORIS N. WEIL, ESQUIRE
14    CITY OF BALTIMORE DEPARTMENT OF LAW
      100 HOLLIDAY STREET, ROOM 101
15    BALTIMORE, MARYLAND 21202
      TELEPHONE NO.: (410) 396-3926
16    FACSIMILE NO.: (410) 547-1025
      E-MAIL:  MATTHEW.BRADFORD@BALTIMORECITY.GOV
17    E-MAIL:  SARA.GROSS@BALTIMORECITY.GOV
      E-MAIL:  DORIS.WEIL2@BALTIMORECITY.GOV
18

19

20

21

22

23

24

25
```

1                            INDEX

2                                                Page

3    PROCEEDINGS                                 5

4    DIRECT EXAMINATION BY MR. HWANG             6

5    CROSS EXAMINATION BY MR. BRADFORD           93

6    REDIRECT EXAMINATION BY MR. HWANG           109

7    RECROSS EXAMINATION BY MR. BRADFORD         120

8    FURTHER DIRECT EXAMINATION BY MR. HWANG     121

9


10                            EXHIBITS

11   Exhibit                                     Page

12      1    DEPOSITION NOTICE AND PAYMENT

13           INFORMATION                         10

14      2    CIVIL ACTION JURY TRIAL DEMANDED    21

15      3    BALTIMORE F.O.P. REVIEW OF THE

16           MANAGEMENT OF THE 2015 RIOTS        82

17

18

19

20

21

22

23

24

25

4

1                        STIPULATION

2

3    THE VIDEOTAPED DEPOSITION OF KENNETH B. BUTLER TAKEN AT

4    THE OFFICES OF SUNG & HWANG, 9256 BENDIX ROAD, SUITE

5    109, COLUMBIA, MARYLAND 21045 ON WEDNESDAY, THE

6    18TH DAY OF SEPTEMBER, 2019 AT APPROXIMATELY 10:00 A.M.;

7    SAID DEPOSITION WAS TAKEN PURSUANT TO THE FEDERAL RULES

8    OF CIVIL PROCEDURE.

9

10   IT IS AGREED THAT JAMES BARTLETT, BEING A NOTARY PUBLIC

11   AND COURT REPORTER FOR THE STATE OF MARYLAND, MAY SWEAR

12   THE WITNESS AND THAT THE READING AND SIGNING OF THE

13   COMPLETED TRANSCRIPT BY THE WITNESS IS NOT WAIVED.

14

15

16

17

18

19

20

21

22

23

24

25

**ORIGINAL TRANSCRIPT**

                         PROCEEDINGS

1            COURT REPORTER:  The time is 10:11 a.m.  We are

2      here today for the purposes of recording the

3      deposition of Lieutenant Kenneth B. Butler, taken by

4      Peter K. Hwang in the matter of Chae Brothers

5      Limited Liability Company, et al., v. Mayor & City

6      Council of Baltimore, et al., civil action number

7      117-cv-01657-GLR, in United States District Court

8      for the District of Maryland, Northern Division.

9      Counsel will now state their appearance.

10           MR. HWANG:  Peter Hwang and Ray Shepard

11     representing the plaintiffs.

12           MR. BRADFORD:  Matthew Bradford, Doris Weil,

13     and Sara Gross on behalf of the mayor and City

14     Council of Baltimore.

15           COURT REPORTER:  And before we begin, if you

16     guys could just put your microphones on.  Sorry

17     about that.  All right.  Thank you so much.  And I

18     will now swear in the witness.  Do you, Lieutenant

19     Kenneth B. Butler, swear or affirm to tell the

20     truth, the whole truth, and nothing but the truth,

21     so help you God?

22           THE WITNESS:  I do.

23           COURT REPORTER:  Counsel, you may begin.  And

24     it's 10:12 a.m. and we are now on the record.

**ORIGINAL TRANSCRIPT**

1              DIRECT EXAMINATION

2         BY MR. HWANG:

3    Q    Good morning, Lieutenant.

4    A    Good morning.

5    Q    Could you say your full name for the record,

6    please?

7    A    Kenneth Butler.

8    Q    And is your middle initial B, as in boy?

9    A    B, as in boy.  I'm sorry.

10   Q    As I stated before, my name is Peter Hwang,

11   and I represent the plaintiffs in this action who are

12   suing the mayor and the City Council of Baltimore for,

13   among other things, damage to Plaintiffs' property and

14   businesses.  As you may know, we're here for a

15   deposition, which will consist primarily of me asking

16   you questions and you answering those questions.  As you

17   can see, there's a court reporter sitting at the table.

18   He is transcribing my questions and your responses.  As

19   such, it is important that you answer any questions

20   verbally.  Please, do not answer with a gesture like a

21   head nod or with sounds like, "uh-huh."

22   A    Got you.

23   Q    As you can imagine, it's hard for the court

24   reporter to transcribe such responses.  It's extremely

25   important that you understand the questions that I'm

**ORIGINAL TRANSCRIPT**

12

1       Q     And for how long have you been employed by the
2    Baltimore City Police Department?
3       A     34 years.
4       Q     What is your -- and I'm calling you
5    Lieutenant, but if you can say for the record.  What is
6    your current rank?
7       A     Lieutenant.
8       Q     And how long have you been a Lieutenant with
9    the Baltimore Police Department?
10      A     Since October of 2000.
11      Q     Okay.  And as a lieutenant, what are your
12   duties?
13      A     Now, I've been with the traffic division in
14   the special operations section.  So I'm in charge of our
15   motorcycle unit, our crash team accident investigation
16   unit, the mounted unit, as well as the towing unit, and
17   fleet safety.
18      Q     Okay.  And for how long have you been detailed
19   or assigned to the traffic division?
20      A     October of 2015.
21      Q     And prior to being assigned to the traffic
22   division, where were you assigned prior to that?
23      A     Southern District.
24      Q     And immediately prior to being assigned to the
25   traffic division when you were assigned to the Southern

1       A      No.

2       Q      Okay.  All right.  Do you recall having any

3   discussions with Mayor Rawlings-Blake during that time

4   period?

5       A      During that time period, no.

6       Q      Okay.  Now, as the protests were occurring,

7   between April 18th to the 24th, during that time period,

8   do you recall anything about what you were doing as a

9   police officer?

10      A      I was still a shift commander in the Southern

11  District.

12      Q      Okay.  Can you tell us what you recall about

13  that time period as a shift commander in the Southern

14  District?

15      A      I know we were -- I believe at that time

16  because of the -- the protests -- I can't remember the

17  date, but I think we had gone on 12-hour shifts.  I just

18  can't remember the -- I can't remember when, but I

19  believe we had all gone on 12-hour shifts.

20      Q      Okay.  And do you remember any general orders

21  being given during that time with respect --

22             MR. BRADFORD:  Objection to form.

23      Q      -- with respect to demeanor or what equipment

24  you were allowed to wear or how you can or cannot engage

25  with protesters?

1      A      I don't remember any specific policy, but I
2  remember they didn't want us to wear, like, the black
3  cutoff gloves.  What was it?  The -- the Punisher -- the
4  thing -- I think it was the Punisher emblem if I -- if I
5  can remember.  Because I just -- I just distinctively
6  remember they didn't want us to look intimidating.  But
7  as far as a specific policy, I -- I don't remember it.
8      Q      Okay.  And when you say they didn't want you
9  to look intimidating, how was that relayed to you?  Who
10 said that to you?
11     A      Well, I don't -- no one specifically.  And I
12 can't remember anyone specifically coming up to me.  But
13 that's what was relayed down through the -- through the
14 ranks.
15     Q      Okay.  When you say it was relayed down
16 through the ranks, from what rank did it start --
17     A      The only way --
18     Q      -- and how was it eventually communicated to
19 the troops on the ground?
20     A      Well, given that type of order, that comes --
21 that comes from high.
22     Q      Okay.
23     A      So when we get that order, then we're assuming
24 that type of order comes from the top.
25     Q      Okay.  And when you say the top, you mean?

1    A    The PC.  The Commissioner.

2    Q    The Police Commissioner.

3    A    Yes.

4    Q    Who at that time was Anthony Batts, correct?

5    A    Yes.

6    Q    Okay.  When it came to orders like that, did

7  you know how those orders were communicated down the

8  chain?  For example --

9         MR. BRADFORD:  Objection.

10   Q    -- did it go from Police Commissioner Batts to

11  Melissa Hyatt to someone down the line?

12   A    What -- whatever the chain of command is.  I

13  mean, it's like -- it's a military structure -- general,

14  three-star, two-star.  So in -- in our police

15  department, commissioner, deputy colonel, lieutenant

16  colonel, major -- did we have captains then?  Captain,

17  lieutenant.

18   Q    Okay.  So who would have Commissioner Batts

19  have relayed that order down to?

20   A    Whoever his deputy commissioner was.

21   Q    Okay.  Do you recall who that was at that

22  time?

23   A    I think that was Davis, or -- I think he -- he

24  had two of them.  It should have been Davis -- Kevin

25  Davis and Rodriguez.

1  through.  But as far as when they left, myself and

2  Lieutenant Jackson were the highest ranking members on

3  that scene.

4      Q    Okay.  Are you familiar with "The C4 Show"?

5      A    Yes.

6      Q    Okay.  At the Camden Yards incident, do you

7  recall hearing orders not to engage protesters?

8      MR. BRADFORD:  Continuing objection as to

9      hearsay.  You can answer.

10     A    Oh, okay.  Now, when I was at Camden Yards and

11 former Commissioner Batts showed up and let me get this

12 -- let me get this right.  The first -- first wave of

13 protesters came through.  They were peaceful, and may

14 have -- I may have my timings off, but I think that's

15 when former Commissioner Batts came up.  And, you know,

16 he asked, "Hey, you know how are things going?"  And I

17 told him about the first -- the first wave and he did

18 something that -- he said, "Listen, if you can, reach

19 out and shake hands because it looks good to the pub --

20 it looks good in the media."  So I didn't say anything,

21 because he was my boss.  I just say, "Yes, sir."  But I

22 found that odd because you're asking us to shake hands,

23 not to say that everyone was -- all the protesters were

24 violent, because they weren't, you know, in that first

25 wave.  So I just said, "Yes, sir."  But I just found

1   that very odd -- and given the heated situation that we

2   were in.  Then once he left and I don't know -- I can't

3   recall the time, but that's when the second wave came

4   through.  And that's when the bottles, and the trash

5   cans, and things, and stuff started getting thrown at

6   us.

7        Q    And when that started happening, were you or

8   other people on the ground given orders not to engage?

9        A    Yeah.  We were given that way before.

10       Q    When you say you were given that way before,

11  when do you mean?

12       A    Before we even got out to Camden Yards, we

13  knew don't engage, just let them protest.  So we knew --

14  we knew we weren't going to engage.  There were -- and I

15  remember to my -- my right flank, Lieutenant Jackson,

16  because there was an opening and he said, "Kenny, I'll

17  take this side.  You just take the front."  So we

18  covered -- covered each other's flank.  So I turned

19  around and I saw trash cans being thrown at the

20  officers.  And -- but we knew we couldn't lock anybody

21  up.  So we just had to sit there and take it.  And --

22       Q    How did you know that you were not allowed to

23  lock anyone up?

24       A    Oh, we were -- we were -- we were told.  Was

25  that -- was it at headquarters?  I know before we got

**ORIGINAL TRANSCRIPT**

1        A     Sure.

2        Q     -- if it helps you draw a timeline.

3        A     Sure.

4        Q     So when you just testified that you felt as

5   though if you took care of business on Saturday, Monday

6   would not have happened.

7        A     Oh, absolutely.

8        Q     What do you mean by that?

9        A     If we had started locking some people up on

10  Saturday, Monday would not have occurred.

11       Q     And on Saturday, do you recall whether in

12  order to make an arrest you needed approval from -- from

13  headquarters?

14       A     Oh, absolutely.  Absolutely.  Yeah.  And I

15  remember late during the evening as things calmed down,

16  at my end, I was listening to the radio and I can't

17  remember if he was -- he was a lieutenant or a major at

18  the time, Mark Howell.  I can't remember what the

19  incident was, but I know it was some type of protest,

20  but I think it was -- I think it may have been some

21  looting, but I remember him coming over the air and

22  saying, "Look, we need to start locking some people up.

23  That's the only way that stuff is going to stop."  So

24  whether they did, I don't know.  But I -- I remember

25  that like it was yesterday, because we all felt the same

1   way.

2        Q    Sure.  So I'm still staying on Saturday --

3        A    Sure.

4        Q    -- April 25th, the Camden Yards incident.  If

5   someone wanted to make an arrest and they needed to get

6   permission as you stated, how would they seek that

7   permission?  Who would they ask permission from?

8        A    Well, if I -- we would have to radio and say

9   where we were to command.  I'm at Utah and wherever, and

10  I want to make an arrest on ABC.  Then we would have to

11  get permission to say, "Okay.  Yeah, you can make that

12  arrest."  So but with a situation like that and it's

13  fluid, you don't have time for that.  So I know none of

14  us made any arrests.

15       Q    Did you, as the on-scene lieutenant, feel like

16  you were handcuffed from taking action --

17       A    Yes.

18       Q    -- because of that?

19       A    Absolutely, absolutely.

20       Q    Now, in order to make an arrest, if you had to

21  get permission from command, and you would radio in the

22  command.  During that Camden Yards incident, do you

23  recall who at command would respond, with either

24  permission to arrest or an instruction not to arrest?

25       A    I can't remember who was in that command

1          Q    Now, moving on to April 27th.  So Camden Yards

2     was Saturday.  April 27th is Monday.

3          A    Monday.  Okay.

4          Q    In between those two incidents, do you recall

5     communicating with the higher ups of your concerns about

6     the approach of not engaging the protesters with

7     concerns regarding the arrest procedures?  Do you recall

8     communicating your concerns with anyone?

9          A    I can't recall anyone specifically.  I mean, I

10    know we talks among -- talked amongst ourselves. Because

11    all of us, you know, the rank and file, we were just

12    pissed off, because we were handcuffed.  I mean, we were

13    punked.  That was the bottom line.  We were just punked.

14    And you know, we were just very angry, because all of us

15    knew, start locking some people up.  And a lot of other

16    protesters are like, "Okay.  I don't want to get locked

17    up.  You know, I want to protest, but I don't want to

18    get locked up."  And we just knew -- well, I'll -- I'll

19    say -- I'll say me.  I just knew because we did not do

20    anything Saturday.  And we had heard maybe something's

21    going to happen Monday.  We didn't know -- I just had an

22    eerie feeling and I can't even remember what we did

23    Sunday if we went back to our regular shift.  I can't

24    even remember.  But I just knew because we didn't do

25    anything Saturday.  It just -- it just empowered certain

1    people.
2         Q     When you say it empowered certain people, do
3    you mean --
4         A     Protesters, yeah.
5         Q     Now, you testified a few seconds ago that you
6    had a feeling something was going to happen on Monday,
7    or that you had heard that something might happen on
8    Monday.
9         A     Yeah, we heard protests.  There were going to
10   be protests.  We knew that.
11        Q     Yeah.
12        A     Yeah.  So that -- that was -- that was
13   something that we already knew --
14        Q     Yeah.
15        A     -- was going to happen.
16        Q     Now, earlier today you testified -- and this
17   is -- you were kind of pinned down the timeline.  You
18   said that you were given instructions at headquarters to
19   give them room, give the protesters room.
20        A     Yeah.  That was on Monday.
21        Q     That was on Monday.
22        A     That was on Monday.
23        Q     Was that on Monday morning?
24        A     Yeah.  That was Monday morning, because I knew
25   we all -- we all went down to headquarters.  And I

38

1    remember I had all my Southern District guys with me.

2    And, you know, we were all -- it was just so many of us.

3    And then we were just getting called to go out to

4    certain locations -- certain locations.

5         Q    Okay.  And by Monday morning, I mean Monday

6    April 27th.

7         A    Uh-huh.

8         Q    Okay.

9         A    Yes.

10        Q    Now, this meeting at headquarters, was this a

11   roll call?

12        A    Yes.  Yes.

13        Q    And aside from the Southern District, were

14   there any other officers attending that roll call?

15        A    Oh, yeah, there were -- there were officers

16   from -- from all over.

17        Q    Okay.  All the districts?

18        A    All the districts, CID, whomever it was -- it

19   was all hands on deck.

20        Q    Okay.  Now, the order to give the protesters

21   room.  Who gave that order?

22        A    If I'm remembering -- if I remember

23   distinctively -- I'm looking at Lieutenant Colonel

24   Hyatt.  And I believe she was on this side of the

25   auditorium when she was at the front.  So, and it was,

1    you know, "Hey give them room to protest," things like
2    that.  "Do not engage."  So yeah, because I -- I
3    distinctively remember her being on this side.
4         Q    And when you say the auditorium, it -- I'm not
5    familiar with police headquarters.
6         A    Headquarters' auditorium.
7         Q    Okay.
8         A    Yes.
9         Q    In addition to, I think she was Lieutenant
10   Colonel Hyatt at that point, right?
11        A    Yes.  She was a lieutenant colonel.
12        Q    In addition to her, do you recall Commissioner
13   Batts being there or attending the roll call?
14        A    Oh, yes.  Yes.
15        Q    Okay.
16        A    Yes.
17        Q    And was Commissioner Batts there when
18   Lieutenant Colonel Hyatt gave these orders to not
19   engage?  Give them room?
20        A    I can't -- I don't.  I can't remember seeing -
21   - I can't remember seeing him at the front.  But I know
22   when we were standing in the hall, he came outside and
23   addressed us in the hall.  And he was basically saying,
24   "This is game time."  So I can't -- I can't say that he
25   was -- that he was at the front with Lieutenant Colonel

54

1    the state troopers stayed up there with them, and then

2    we were relieved.

3        Q    Do you recall when the Maryland or what time

4    it was approximately, when the --

5        A    No.

6        Q    -- Maryland National Guard relieved you and

7    your troops?

8        A    It was late.

9        Q    Had the sun come up yet?

10       A    No.

11       Q    Okay.

12       A    No.  But it was late.

13       Q    Past midnight?

14       A    Yes.  Yes.  It was past midnight.

15       Q    Do you recall if was past 3:00 a.m.?

16       A    I don't think it was past 3:00 a.m.  I don't -

17   - I -- I don't know, but I just know we were out there

18   for a long time, but I know it was past midnight.

19       Q    Okay.  Now, we've gone through a timeline,

20   beginning on April 18th and heading up to April 27th.

21       A    Yes.

22       Q    Now, you testified earlier that prior to April

23   25th and continuing during April 25th --

24       A    Yes.

25       Q    There were procedures in place if you -- if

1      anyone want to make an arrest.

2           A     Yes.

3           Q     You had to get permission to make that arrest.

4           A     Sure.

5           Q     Did that procedure remain in place through

6      April 27th?

7           A     Oh, yes.

8           Q     Okay.

9           A     Yes.

10          Q     So that procedure was in place when you were

11     at Mondawmin on April 27th?

12          A     Yes.

13          Q     That procedure was in place when you and your

14     troops were at Penn-North on April 27th?

15          A     Yes.

16          Q     That procedure was in place as you headed west

17     from Penn-North to North and Fulton on April 27th?

18          A     Yes.

19          Q     You also testified that you were previously

20     given orders to not engage --

21          A     Yes.

22          Q     -- and even during the roll call to give them

23     room --

24          A     Yes.

25          Q     -- give the protesters room.

1       A    Yes.

2       Q    Was that order in place also at Mondawmin?

3       A    Yes.

4       Q    Was that order also in place while you and

5   your troops were at Penn-North?

6       A    Yes.

7       Q    Was that order also in place while you headed

8   west towards North and Fulton?

9       A    Yes.

10      Q    And was that order also in place until you and

11  your troops got relieved by the Maryland National Guard?

12      A    Yes.

13      Q    On April 27th, whether it's at Mondawmin,

14  Penn-North, North and Fulton, or anywhere in between at

15  city hall while you guys were on standby --

16      A    Sure.

17      Q    -- do you recall, during that time, whether

18  you saw Commissioner Batts?

19      A    No.  I didn't see -- I didn't see him on

20  Monday.

21      Q    Okay.

22      A    Yeah.

23      Q    And forgive me if you told me this already, I

24  might have forgotten, so you testified that Dean Palmere

25  was the commanding officer at Penn-North and as you

1      Q    Yeah.

2      A    But it was just our lack of just being police,

3  you know, where the protesters were like, "Okay, I got

4  away with that.  What else can I get away with?"

5      Q    Right.

6      A    So --

7      Q    And what do you feel like the protesters got

8  away with on April 25th at Camden?

9      A    Oh, throwing bottles at us, throwing trash

10  cans at us.  I mean, we -- we're used to the insults,

11  the verbal insults.  We can deal with that.  But when

12  you get trash cans thrown at you, bottles thrown at you,

13  and you do nothing.  And -- and I'm just going to speak

14  for -- for Camden Yard.  You know, and just -- in my

15  opinion, from seeing what I saw because I was on the

16  ground, it just empowered them.  "Oh, well, I threw a

17  bottle at a cop.  Oh, okay.  I got away with it."  Or,

18  "I threw trash cans at the cops.  Oh, I got away with

19  that."  So I just had a feeling, Monday, it's not going

20  to be good.

21      Q    And they got away with it because of the

22  orders not to engage --

23      A    Absolutely.

24      Q    -- because of the arrest procedures.

25          MR. BRADFORD:  Objection.

1     Q     Is that a "yes"?

2     A     Yes.

3     Q     Okay.  Now, you testified earlier that you

4  heard windows breaking on Monday.

5     A     Yes, down at Penn-North.

6     Q     Yes.

7     A     Yes.

8     Q     What did you think was happening when the

9  windows were being broken?

10         MR. BRADFORD:  Objection.

11    Q     When you heard the windows being broken?

12    A     I -- I just assumed because the stores -- I

13  just assumed either car windows were being broken, maybe

14  police car windows were being broken, or store windows

15  were being broken.

16    Q     Okay.

17    A     Because from where we -- where I saw -- where

18  I was -- and I could look -- I didn't see anything being

19  broken.  But I remember it coming from over my right

20  side.

21    Q     Okay.  On Monday, April 27th, did you know

22  that looting was occurring?

23    A     I wasn't sure.  I didn't know.

24    Q     Okay.

25    A     Yeah, I didn't know.  And then once we got

1      A     I knew I went on the news.  But I don't know

2   if I specifically told the command member.  Because I

3   remember I was interviewed on CNN, and the Megyn Kelly

4   show.  But specifically saying any -- anything to any

5   commander, like, going, "Hey, I need to meet with you."

6   But if I saw a commander --

7      Q     Yeah.

8      A     -- and if the subject came up, you know.  But

9   I can't -- I don't -- I don't think I specifically

10  sought out a commander.  I can't remember doing that.

11     Q     Okay.  Do you recall what you said on the air

12  when you were interviewed on CNN and/or Megyn Kelly?

13     A     Yeah.  I remember when the second time I went

14  on Megyn Kelly, I remember her asking, because Batts had

15  just gotten fired.  And I remember saying to her, my

16  specific words were, you know, me -- me -- me being in

17  sports and using a sports analogy, the coach lost the

18  locker room, and these guys just wouldn't play for him

19  anymore.

20     Q     Do you recall discussing the stand-down order

21  or the arrest procedures when you spoke on CNN and/or

22  Meg Kelly?

23     A     No.

24         MR. BRADFORD:  Objection.

25     Q     Now, we've discussed the arrest procedures and

1    the stand-down orders, so to speak.  Want to talk to you
2    about equipment.  You testified earlier that you and
3    your troops were told not to wear the -- I can't
4    remember how you described it.  It was a --
5        A    It was called the Punisher.
6        Q    The Punisher.
7        A    The emblem.
8        Q    The emblem.
9        A    No black gloves with the fingers cut out.  We
10   just didn't want to look intimidating.
11       Q    And you were told that on April 25th at Camden
12   Yards?
13       A    No, we were told before that.
14       Q    Okay.
15       A    Yeah, we were told before that.  Yeah.  April
16   25th, we already had our marching orders.
17       Q    Okay.  Do you recall Commissioner Batts ever
18   telling you and/or your troops not to wear the black
19   gloves?
20       A    I can't remember him specifically saying it.
21       Q    Okay.
22       A    But I know it was relayed down to us, the rank
23   and file.
24       Q    Okay.  On April 25th at Camden Yards, were you
25   and your troops permitted to where riot helmets?

1    line and check it out?

2         A    That I don't know.

3         Q    Lieutenant, what's the purpose of moving the

4    lines slowly or keeping the line contained?

5              MR. HWANG:  Objection as to form.

6         A    Because you -- you always want to keep that

7    uniform, you don't want to break it.  Because if you

8    break it, that's a -- that's a show of weakness.  That's

9    a weak point in your line.  So you move at a steady slow

10   pace and it looks uniformity.  And when people see

11   uniformity and they don't see that -- that weakness,

12   they tend to -- "Okay, well, these people are serious.

13   They know what they're doing."

14        Q    Does it also keep the protesters within a

15   specific area, or at least assist in keeping the

16   protesters in a specific area?

17        A    Keep them front of you.  You keep them in

18   front of you.

19             MR. BRADFORD:  No further questions.

20                  REDIRECT EXAMINATION

21             BY MR. HWANG:

22        Q    Lieutenant Butler, while you're on duty today,

23   someone comes up to you and throws a brick at you. Would

24   you arrest that person?

25        A    Absolutely.

110

1           MR. BRADFORD:  Objection.

2      Q    Prior to April 12, 2015, if you are on duty,

3  and you're on the street and someone threw a brick at

4  you, would you arrest him?

5      A    Absolutely.

6           MR. BRADFORD:  Objection.

7      Q    Whether it's before April of 2015 or if it's

8  today, if someone throws was a brick at you, do you have

9  to call and ask for permission to make an arrest?

10     A    No.

11          MR. BRADFORD:  Objection.

12     Q    So the procedure that was put in place during

13  the riots and protests where you had to ask for

14  permission to arrest, that was contrary to standard

15  operating procedure; is that correct?

16     A    Correct.

17     Q    So if Batts gave that order --

18          MR. BRADFORD:  Objection.

19     Q    -- or set forth that procedure, he would be

20  acting contrary to standard operating procedure; is that

21  correct?

22     A    Correct.

23          MR. BRADFORD:  Objection.

24     Q    Now you testified that on Monday, April 27th,

25  roll call was held at the auditorium at headquarters?

1        A    Yes --

2             MR. BRADFORD:  Objection.

3        A    -- it was the same thing.

4        Q    Okay.  So even on April 25th, during that roll

5   call, did Lieutenant Hyatt also give the same "do not

6   engage" --

7        A    Yes.

8        Q    -- "give them space"?

9        A    Yeah, we knew --

10            MR. BRADFORD:  Objection.

11       Q    Is that a "yes"?

12       A    Yes.  I'm sorry, yes.  Yes.

13       Q    After April 27th, was roll call continuing to

14  be conducted in that same manner, with all the districts

15  appearing in one place?

16       A    Yes.

17       Q    Okay.

18       A    Well, after the 25th or the 27th?

19       Q    After the 27th.

20       A    No, I think after the 27th, after everything

21  was over, we went -- we went back to -- because I

22  remember after the 27th there was a curfew, and we were

23  still on 12-hour shifts, but we were back.  I know I was

24  back in the Southern with my troops.

25       Q    Okay.  Was there a roll call on Sunday, April

125

1                        CERTIFICATE OF OATH

2

3   STATE OF MARYLAND

4

5

6       I, the undersigned, certify that the witness

7   in the foregoing transcript personally appeared

8   before me and was duly sworn.

9

10  Identification:  Produced Identification

11

12

13

14

15

16

17

18

19  _____

20          JAMES BARTLETT

21          Court Reporter, Notary Public

22          State of Maryland

23          Commission Expires: 5/31/2023

24

25

126

1                    REPORTER'S CERTIFICATE

2

3    STATE OF MARYLAND

4

5

6        I, JAMES BARTLETT, Notary Public in and for the

7    State of Maryland at Large, do hereby certify that I

8    made an accurate and complete digital recording of

9    the deposition in the above-styled case.

10

11           I further certify that I am not a relative,

12    employee, attorney or counsel of any of the parties,

13    nor am I a relative or employee of any of the parties

14    attorney or counsel connected with the action, nor

15    financially interested in the action.

16

17           Dated this 1st day of October, 2019.

18

19

20

21

22    _____

23           JAMES BARTLETT

24

25

```
 1                  CERTIFICATE OF TRANSCRIPTIONIST

 2

 3    STATE OF FLORIDA

 4    COUNTY OF ORANGE

 5

 6         I, the undersigned, certify that I was authorized

 7    to and did transcribe to the best of my ability the

 8    foregoing audio provided to me by the Offices of

 9    Milestone Reporting Company, Inc., and that the

10    transcript is a true and accurate representation of the

11    recording as heard by me.

12

13         I further certify that I am not a relative,

14    employee, attorney or counsel of any of the parties nor

15    am I a relative or counsel connected with the parties'

16    attorneys or counsel associated with the action, nor am

17    I financially interested in the outcome of the action.

18

19    Submitted on: October 1, 2019.

20

21

22

23    _____

24              KATIE O'MALLEY

25
```

# EXHIBIT 16

# In The Matter Of:

*CHAE BROTHERS, LIMITED LIABILITY COMPANY, ET AL. v.*
*MAYOR AND CITY COUNCIL OF BALTIMORE, ET AL.*

---

*MICHAEL MANCUSO*
*September 17, 2019*
*ORIGINAL TRANSCRIPT*

---

*CourtScribes, Inc.*
*"Delivering More For Less"*
*(833) 727-4237*
*info@courtscribes.com*
*www.courtscribes.com*

Original File 138586 Mike Mancuso 9-17-19 ASCII.txt
Min-U-Script® with Word Index

1

1   UNITED STATES DISTRICT COURT

2   FOR THE DISTRICT OF MARYLAND

3   CIVIL ACTION NO. 1:17-CV-01657-GLR

4

5   CHAE BROTHERS, LIMITED LIABILITY COMPANY

6   D/B/A FIRESIDE NORTH LIQUORS, ET AL.,

7   PLAINTIFF,

8

9   VS.

10

11   MAYOR AND CITY COUNCIL OF BALTIMORE, ET AL.,

12   DEFENDANT,

13   _____/

14   VIDEOTAPED DEPOSITION OF MICHAEL MANCUSO

15   DATE:          SEPTEMBER 17, 2019

16   REPORTER:      JAMES BARTLETT

17   PLACE:         SUNG & HWANG

18                  9256 BENDIX ROAD, SUITE 109

19                  COLUMBIA, MARYLAND 21045

20

21

22

23

24

25

2

```
 1                     APPEARANCES

 2   ON BEHALF OF THE PLAINTIFFS, CHAE BROTHERS, ET AL.:
     RAY M. SHEPARD, ESQUIRE
 3   THE SHEPARD LAW FIRM, LLC
     122 RIVIERA DRIVE
 4   PASADENA, MARYLAND 21122
     TELEPHONE NO.: (410) 255-0700
 5   FACSIMILE NO.: (443) 773-1922
     E-MAIL:  RAYWSHEPARD.LAW
 6
     AND
 7
     PETER K. HWANG, ESQUIRE
 8   SUNG AND HWANG
     9256 BENDIX ROAD, SUITE 109
 9   COLUMBIA, MARYLAND 21045
     TELEPHONE NO.: (888) 772-3001
10   FACSIMILE NO.: (410) 772-2328
     E-MAIL: PHWANG@SUNGANDHWANG.COM
11
     ON BEHALF OF THE DEFENDANTS, THE MAYOR AND CITY COUNCIL
12   OF BALTIMORE:
     SARA GROSS, ESQUIRE
13   CITY OF BALTIMORE DEPARTMENT OF LAW
     100 HOLLIDAY STREET, ROOM 101
14   BALTIMORE, MARYLAND 21202
     TELEPHONE NO.: (410) 396-3826
15   FACSIMILE NO.: (410) 547-1025
     E-MAIL: SARA.GROSS@BALTIMORECITY.GOV
16
     AND
17
     MATTHEW BRADFORD, ESQUIRE
18   CITY OF BALTIMORE DEPARTMENT OF LAW
     100 HOLLIDAY STREET, ROOM 101
19   BALTIMORE, MARYLAND 21202
     TELEPHONE NO.: (410) 396-3826
20   FACSIMILE NO.: (410) 547-1025
     E-MAIL:  MATTHEW.BRADFORD@BALTIMORECITY.GOV
21
     AND
22
     DORIS N. WEIL, ESQUIRE
23   CITY OF BALTIMORE DEPARTMENT OF LAW
     100 HOLLIDAY STREET, ROOM 101
24   BALTIMORE, MARYLAND 21202
     TELEPHONE NO.: (410) 396-3826
25   FACSIMILE NO.: (410) 547-1025
     E-MAIL:  DORIS.WEIL2@BALTIMORECITY.GOV
```

```
 1                    APPEARANCES CONTINUED

 2      ON BEHALF OF THE WITNESS, F.O.P. PRESIDENT MICHAEL
        MANCUSO
 3      CHAZ R. BALL, ESQUIRE
        SCHLACHMAN, BELSKY, & WEINER, P.A.
 4      300 EAST LOMBARD STREET, SUITE 100
        BALTIMORE, MARYLAND. 21012
 5      TELEPHONE NO.: (410) 685-2022
        FACSIMILE NO.: (410) 783-4771
 6      E-MAIL:  CBALL@SBWLAW.COM

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1                           INDEX

2                                         Page

3    PROCEEDINGS                            6

4    DIRECT EXAMINATION BY MR. SHEPARD      7

5    CROSS EXAMINATION BY MS. GROSS         49

6    REDIRECT EXAMINATION BY MR. SHEPARD    70

7    RECROSS EXAMINATION BY MS. GROSS       73

8

9                         EXHIBITS

10   Exhibit                                Page

11       1    BALTIMORE CITY F.O.P. REVIEW OF THE

12            MANAGEMENT OF THE 2015 BALTIMORE

13            RIOTS                          22

14       2    DOCUMENTS RE: WITNESS FOR THE

15            DEPOSITION                     32

16

17

18

19

20

21

22

23

24

25

5

1                            STIPULATION

2

3     THE VIDEO DEPOSITION OF MICHAEL MANCUSO TAKEN AT THE

4     OFFICES OF SUNG & HWANG, 9256 BENDIX ROAD, SUITE 109,

5     COLUMBIA, MARYLAND 21045 ON TUESDAY THE 17TH DAY OF

6     SEPTEMBER, 2019 AT APPROXIMATELY 10:00 A.M.; SAID

7     DEPOSITION WAS TAKEN PURSUANT TO THE MARYLAND RULES OF

8     CIVIL PROCEDURE.

9

10    IT IS AGREED THAT JAMES BARTLETT, BEING A NOTARY PUBLIC

11    AND COURT REPORTER FOR THE STATE OF MARYLAND, MAY SWEAR

12    THE WITNESS AND THAT THE READING AND SIGNING OF THE

13    COMPLETED TRANSCRIPT BY THE WITNESS IS NOT WAIVED.

14

15

16

17

18

19

20

21

22

23

24

25

**ORIGINAL TRANSCRIPT**

6

1                    PROCEEDINGS

2           COURT REPORTER:  Time is now 10:12 a.m.  We are

3     here today for the purposes of recording the

4     deposition of Michael, Mike, Thomas Mancuso taken by

5     Ray M. Shepard in the matter of Chae Brothers --

6     Chae? -- Chae Brothers Limited Liability Company, et

7     al., versus Mayor and City Council of Baltimore, et

8     al., civil action number 1:17-CV-016 -- or sorry, --

9     CV-01657-GLR, a United States District Court for the

10    District of Maryland Northern Division.  Counsel

11    will now state their appearance.

12          MR. SHEPARD:  Good morning.  My name is Ray

13    Shepard.  I'm here on behalf of all of the

14    plaintiffs.

15          MR. HWANG:  Good morning.  Peter Hwang also

16    here on behalf of all the plaintiffs.

17          MS. GROSS:  Sara Gross, Matthew Bradford and

18    Doris Weil on behalf of the mayor and City Council

19    of Baltimore.

20          MR. BALL:  I'm Chaz Ball, here on behalf of FOP

21    president Michael Mancuso.

22          COURT REPORTER:  I will now swear in the

23    witness.  Do you, Michael Thomas Mancuso, swear or

24    affirm to tell the truth, the whole truth, and

25    nothing but the truth, so help you God?

**ORIGINAL TRANSCRIPT**

1          THE WITNESS:  I do.

2          COURT REPORTER:  Counsel, you may begin, and

3     also the time is 10:13 a.m.  We are now on the

4     record.

5                    DIRECT EXAMINATION

6          BY MR. SHEPARD:

7     Q    Thank you.  Good morning, Detective.

8     A    Morning.

9     Q    Would you please state your full name for the

10    record?

11    A    Michael Thomas Mancuso.

12    Q    And how do you spell Mancuso?

13    A    M-A-N-C-U-S-O.

14    Q    Okay.  And you are employed?

15    A    Yes, I am.

16    Q    Where are you employed?

17    A    Baltimore Police Department.

18    Q    Okay.  And you're an officer?

19    A    I'm a detective sergeant.

20    Q    Detective sergeant?  Okay.  Have you had your

21    deposition taken before?

22    A    No.

23    Q    First time?

24    A    I believe so.  I've testified a lot in court,

25    but I th -- I think this is my first deposition.

**ORIGINAL TRANSCRIPT**

1          COURT REPORTER:  The time is now 10:20 a.m. --

2     or 10:21 a.m.  I apologize.  And we are now back on

3     the record.

4          BY MR. SHEPARD:

5     Q    Okay.  So a objection was noted, but I believe

6     you still answer the question.  It's up to the Court to

7     decide whether or not the objection is sustained or

8     overruled.

9     A    That's fine.

10    Q    So let me ask you, Detective Mancuso, what

11    were your responsibilities during the riots?

12    A    You know, I had a squad at the time.  They

13    were deployed with me to the riots.  I think initially

14    we were deployed to Mondawmin Mall where we held a

15    position there along with some national guard members

16    that showed up.  I think that first day -- was about 20

17    hours that, I think, we were at Mondawmin.  I don't --

18    the sequence of events after that, I know we were

19    deployed to -- I think, Tuesday, we were deployed to

20    Penn North as an arrest team.  And subsequently

21    throughout the week we were different spots where things

22    were breaking out, but specifically, locations that are

23    -- so many, I just -- you know.

24    Q    Okay.  And you said a squad. How many members

25    were in your squad?

1      A     Think at that time there was probably six.

2      Q     Okay.  So including yourself, it was seven?

3      A     Yes.

4      Q     All right.  And you said when you went to Penn

5  North, you were -- I think you said an arrest team. What

6  is an arrest team?

7      A     Well, there's -- you have a -- you have a --

8  the lines, like, you see at the riots, you see the

9  officers standing up in the front usually with their

10  shields, and then behind them is a -- a group that, if

11  needed -- if there's somebody identified in -- in the

12  group on the other side, the rioters, so to speak -- if

13  somebody is breaking the law to a point where command

14  would issue an order of arrest, then we would do that.

15      Q     Uh-huh.  With respect to arrests, were you

16  given any instructions?  Was your -- were you or your

17  team given any instructions regarding arrests?

18      A     Yeah.  One of the nights --

19          MS. GROSS:  Objection.  I'm going to note a

20      continuing objection to hearsay if that's --

21          MR. SHEPARD:  So noted.

22          MS. GROSS:   -- all right.

23      A     Okay.  One night I know that we were a part of

24  the line at Gay Street and Fayette.

25          BY MR. SHEPARD:

1        Q     Uh-huh.

2        A     Kind of, protecting headquarters.  And it was

3    nighttime -- I want to say it was after an Oriole game,

4    too, so there was a lot of people in the street -- that

5    things were breaking out all over.  Fights and stuff

6    like that.  And directly in front of us over the barrier

7    was two or three guys beating up one guy.  And I went

8    over the rail after the aggressor and dragged him back

9    over the -- the rail, placed him under arrest.  And --

10   so, yeah, I mean, we did make an arrest.

11       Q     Okay.  And after that, what happened to that

12   person that you arrested?  Was he prosecuted?

13       A     Yes.  I can -- you know, there are -- you

14   know, I'll -- I'll tell the story about that arrest.

15   Once I was -- placed him under arrest, I was approached

16   by the acting commander of that area, Major Russell, who

17   ordered me to unhandcuff him.  And he told me at the

18   time that I did not have permission from the 9th floor,

19   which is our command post, to arrest anybody.  I refused

20   to uncuff him.  Told him I was a Baltimore City police

21   officer with the powers of arrest and I made an arrest.

22   He suspended me at that time, sent me to headquarters. I

23   told my squad not to release him and I went inside

24   headquarters for about 20 minutes and I received a call

25   from Command to go back out to my post, that I was not

1    suspended.

2         Q     Uh-huh.

3         A     And I took the individual over to the central

4    district and processed him.

5         Q     Okay.  Now, when -- you mentioned when Major

6    Russell said you didn't have permission from the 9th

7    floor.  What's the 9th floor?  I'm not --

8         A     It's where our command post was.

9         Q     Okay.

10        A     He actually turned and pointed up to it.

11        Q     And who's in the command -- who -- if you

12   know, who was in the command post?

13        A     I don't know who was running the command post

14   at that time.

15        Q     Okay.  Prior to that period in time, had you

16   heard any statements from leadership regarding not

17   having permission to arrest or to not respond to rioters

18   or to limit your response in any way?

19        A     I think the general response from command that

20   we heard throughout was to -- you know, don't do

21   anything unnecessarily, you know.  There was command,

22   usually, at every -- every point of contact with the

23   rioters.  You know, they would give commands on what to

24   do.

25        Q     All right.  And when you -- did you personally

**ORIGINAL TRANSCRIPT**

34

1          THE WITNESS:  Sure.

2          MR. SHEPARD:  Okay.

3          COURT REPORTER:  The time is 10:45 a.m. and we

4      are now off the record.

5           (OFF THE RECORD)

6          COURT REPORTER:  All right.  The time is 10:55

7      a.m.  We are now back on the record.

8          BY MR. SHEPARD:

9      Q    Okay.  Detective Mancuso, I want to go back to

10     the incident you described with Major Russell.  Who was

11     it that told you that you were suspended?

12     A    Major Russell said I was relieved of duty

13     which to me is -- was suspension.

14     Q    Okay.  All right.  Now, you still have Exhibit

15     1.  If you turn to page 29.

16     A    Thank God we numbered them.

17     Q    Yeah.  The second bullet point on page 29

18     reads, "A sergeant reported working riot detail at East

19     Fayette and Gay Street on April 25, 2015."  Were you the

20     reporting sergeant?

21     A    Whe -- where are we at now?

22     Q    I'm sorry.  The second bullet on page --

23     A    Oh, the second.  Okay.  Got you.

24     Q    -- on page 29.

25     A    Yeah.

1        Q    Talks about taking "the arrestee behind metal

2    barricades, sat him on a bus stop bench and then was

3    approached by a command staff member who told me this is

4    what we're going to do.  We're going to unhandcuff him

5    and let him go."  Do you see that?

6        A    Yep.

7        Q    Is that you?

8        A    Yes.

9        Q    All right.  And the command staff member would

10   be Major Russell?

11       A    Yes.

12       Q    Okay.  All right.  And if I could ask you a

13   few more questions just about a couple of these bullets.

14   On the previous page, on page 28, the first one states,

15   "A command member appointed by Commissioner Batts

16   reported being given orders from executive command

17   members not to engage rioters, even while officers on

18   the line were being assaulted with rocks and bottles."

19   Do you know who the command member was?

20       A    No.  I don't recall.

21       Q    Okay.  Is there -- how many command members

22   are appointed by Commissioner Batts -- or at that time?

23       A    I don't know.  I -- I think that right now

24   there's 60, so I would imagine it's somewhere in that.

25       Q    Okay.  So it's a pretty large group?

1                        CERTIFICATE OF OATH

2

3   STATE OF MARYLAND

4

5

6       I, the undersigned, certify that the witness

7   in the foregoing transcript personally appeared

8   before me and was duly sworn.

9

10  Identification:  Produced Identification

11

12

13

14

15

16

17

18

19  _____

20                  JAMES BARTLETT

21                  Court Reporter, Notary Public

22                  State of Maryland

23                  Commission Expires: 5/31/2023

24

25

1                          REPORTER'S CERTIFICATE

2

3   STATE OF MARYLAND

4

5

6       I, JAMES BARTLETT, Notary Public in and for the

7   State of Maryland at Large, do hereby certify that I

8   made an accurate and complete digital recording of

9   the deposition in the above-styled case.

10

11          I further certify that I am not a relative,

12   employee, attorney or counsel of any of the parties,

13   nor am I a relative or employee of any of the parties

14   attorney or counsel connected with the action, nor

15   financially interested in the action.

16

17          Dated this 1st day of October, 2019.

18

19

20

21

22   _____

23          JAMES BARTLETT

24

25

```
1                   CERTIFICATE OF TRANSCRIPTIONIST
2
3      STATE OF FLORIDA
4      COUNTY OF ORANGE
5
6          I, the undersigned, certify that I was authorized
7      to and did transcribe to the best of my ability the
8      foregoing audio provided to me by the Offices of
9      Milestone Reporting Company, Inc., and that the
10     transcript is a true and accurate representation of the
11     recording as heard by me.
12
13         I further certify that I am not a relative,
14     employee, attorney or counsel of any of the parties nor
15     am I a relative or counsel connected with the parties'
16     attorneys or counsel associated with the action, nor am
17     I financially interested in the outcome of the action.
18
19     Submitted on: October 1, 2019.
20
21
22
23     _____
24          KATIE O'MALLEY
25
```

# EXHIBIT 17

# CHAPTER 15

# BALTIMORE'S BURNING

t was the van ride that nearly destroyed Baltimore.

When Freddie Gray arrived at the hospital on April 12, 2015, some facts were known already, with one key fact remaining a topic of hot dispute. The known facts included these: Gray, a twenty-five-year-old black man from the Sandtown-Winchester section of West Baltimore, was arrested after a police chase near the Gilmor Homes housing project and charged with possessing an illegal weapon. He was handcuffed and placed in the back of a police wagon. There, he fell into a coma from which he would never return. An autopsy would conclude that Gray died from injuries that included a severed spinal cord.

The key fact in dispute was how exactly Freddie Gray came to be harmed. Were his injuries the result of a tragic, unforeseeable accident as the police drove him to the Central Booking and Intake Center on East Eager Street?

Or was it a victim of police misconduct, banged around during a purposely rough ride in the van? What responsibility, if any, did six city officers bear for the severe injuries suffered by their handcuffed suspect?

There is no point in confusing Freddie Gray with a singer in the church choir, the way some in the media did. He was a Crips gang–connected, street-level drug dealer with a long criminal rap sheet, well known to the Baltimore City police. Officers would say later that they kept the handcuffs on because Gray had been so unruly while they were attempting to place him in the van, the cuffs couldn't be safely removed. None of that, to be clear, would justify any mistreatment on the way to jail.

The case hit the news at a time of rising uproar across America over police behavior in urban neighborhoods, coming eight months after Ferguson, Missouri, erupted in riots in response to a police officer shooting a young black man. This was just as the Black Lives Matter movement was really taking off. But nowhere would this loaded national debate play out with any more drama than in the streets of Maryland's largest city. The city and the state would be severely tested, and so would I.

The anger bubbled up gradually, but I could feel it early on. By then, I'd been governor for not quite three months.

On Saturday, April 18, six days after Gray's arrest, a couple of hundred protesters gathered outside the Western District police station on North Mount Street. The demonstration was spirited but peaceful. Gray died the next morning around seven o'clock. On Tuesday, the Baltimore Police Department released the names of the six officers involved in Gray's arrest. That evening, protesters were back at the Western District police station, having marched eight blocks from the site of Gray's arrest on Presbury Street. Tensions flared. The mood was a bit angrier this time but still resulted in only two arrests.

Saturday, April 25, was the day the violence really began to escalate.

Hundreds of people marched from Baltimore City Hall to the Inner Harbor, where the city's downtown revival had begun in the early 1980s. Some were simply concerned citizens demanding answers and seeking justice. But mixed in the crowd were gang members and radical out-of-town agitators. Some of the marchers stopped to stage a "die-in," halting traffic briefly

PLS 0000046

along the route. Near the end of the march, small groups of violent protesters smashed a few car windows and storefronts.

Around 6 PM, one group of protesters broke off and headed to Camden Yards, where 36,757 baseball fans, including many of my young staffers, were watching a game between the Baltimore Orioles and the Boston Red Sox. Some of those demonstrators tussled with fans outside the stadium. Scattered but ugly, as the assaults were described in news reports. Then, some violent protesters flipped over a police car.

A couple of dozen arrests followed, but mostly the police stood back. When the game ended after the tenth inning with a 5-4 Orioles win, an unsettling announcement flashed onto the giant electronic scoreboard in right center field: "Due to an ongoing public safety issue, the Mayor of Baltimore City and the BCPD have asked all fans to remain inside the ballpark until further notice. Thank you."

The gates were closed. No one was allowed to leave.

Instead of confronting the law-breakers on the streets, Mayor Stephanie Rawlings-Blake and police commissioner Anthony Batts chose to lock the law-abiding fans inside the stadium—though not for long. Less than half an hour later, the gates were reopened and the people were sent on their way with a warning: Avoid Howard Street going north, one of the city's main commercial thoroughfares, and Harborplace.

I was getting a sense of the mayor's approach to the gathering threat: Back off. Stand down. And try to wait it out.

To most people, this appeared to be a small uprising of angry kids who were letting some of their frustrations out. But I could see how volatile the situation really was, and my gut was telling me it could get a whole lot worse. The death of Freddie Gray was not sitting well with a lot of people.

All that pent-up anger was growing. It was sure to boil over. I had an urgent message for my senior leadership team: my cabinet, and homeland-security folks: "We need to get prepared. Now!"

I didn't run the Baltimore Police Department; I wasn't the Baltimore City prosecution; I wasn't the mayor's "boss," despite what some people thought. And I didn't want to step on her toes. But as the governor of Maryland, I had

a lot to be concerned about. I was concerned about the safety of Maryland citizens. Concerned about fraying race relations. Concerned about the community's distrust of the city police department. Concerned about the cops' ability to do their job. Concerned about a lot of things. The potential here was too explosive for me to simply sit back and see what might happen—which proved to be the correct assessment, as events would quickly demonstrate. Baltimore would soon be overwhelmed.

I immediately called in Keiffer Mitchell. "I want you to attach yourself to the mayor," I said. "I need an open line of communication with her, twenty-four-seven. I'm going to need up-to-date information—what the city's needs are, how City Hall is responding, what we're hearing on the street, everything we can possibly find out."

Keiffer was one of my senior advisors, a Democrat who had served on the Baltimore City Council and in the Maryland House of Delegates. His family, going back generations, were leaders in the civil rights movement in Baltimore. He lived in the city's historic Bolton Hill neighborhood. He knew all the players. He'd known the mayor since middle school.

With Keiffer on his way, I summoned more than a dozen other key people into the governor's conference room, the ones I would count on most in a major state emergency. The group included my chief of staff, Craig Williams; my counsel, Bob Scholz; my communications director, Matt Clark; and other members of my senior staff as well as the members of our security cabinet: Colonel Bill Pallozzi, the superintendent of the Maryland State Police; and Major General Linda Singh, the adjutant general of the Maryland Army National Guard. If all hell was about to break loose, these were the people I would need at my side.

I had an urgent message for everyone at the table: "No one can say for certain how bad this is going to get. We need to be prepared for the worst."

I think everyone grasped the intensity in my voice.

"Cancel leave for all state troopers," I said. "Put the National Guard on standby," meaning the state's part-time soldiers should alert their employers, have their bags packed, and be ready to report to the armory immediately. Then I turned to Bob Scholz, my counsel. "I want you to draft up

PLS 0000047

whatever paperwork we need to declare a state of emergency," I said. "What I have to do, how we go about that, and what all the ramifications are." Bob was on it.

While we were preparing for the worst, Mayor Rawlings-Blake and her staff continued to downplay everything. "We don't think anything else is going to happen," the mayor told me on the phone.

The city police were saying the same thing to the state police: "We don't have any issues." The unmistakable message, delivered to me directly and through the media, was that the city had everything under control.

In a press conference, the mayor called for peace. But when a reporter asked her to comment on how Baltimore police had responded to Saturday's violence, she said she had instructed officers to allow protestors to express themselves, adding, "We also gave those who wished to destroy space to do that as well."

*What did she just say?* "Space" for "those who wished to destroy"? I could hardly believe my ears.

"It's a very delicate balancing act," was how the mayor put it. "Because while we try to make sure that they were protected from the cars and other things that were going on, we also gave those who wished to destroy space to do that as well. And we worked very hard to keep that balance and to put ourselves in the best position to de-escalate."

In other words, unless the gang members and the out-of-town agitators injured or killed someone, the mayor was going to let them destroy property and cause other kinds of mayhem. It was as close to a hands-off response to urban violence as I had ever heard from a political leader. It was dangerous and reckless, and it threatened innocent lives and property. Paralyzed with fear and indecision, the mayor was truly making some very poor decisions: ordering the police to stand down and missing in action when her city was desperate and needed her most.

I'm sorry, but giving rioters "space" to destroy their city wasn't what most Baltimore residents were craving at that dicey moment. They wanted a mayor who believed in justice but was equally committed to public safety and to keeping the city from burning down.

The mayor's staff struggled on Sunday to clean up the furor her words

had caused, insisting that she merely wanted to give "peaceful demonstrators room to conduct their peaceful protests." Unfortunately, she also said, "those seeking to incite violence also had the space to operate." For her part, the mayor tried to blame it all on the media, scolding the reporters: "It is very unfortunate that members of your industry decided to mischaracterize my words and try to use it as a way to say that we were inciting violence."

Actually, no. The TV stations merely played the video—a lot—and let her words fully sink in.

Her priorities were obvious. Her message was loud and clear. The stage was now set for real disaster.

On Monday morning, April 27, nearly a thousand people packed the New Shiloh Baptist Church for Freddie Gray's funeral, a service that was equal parts personal and political. As the mourners arrived, video screens flashed the messages "BLACK LIVES MATTER" and "ALL LIVES MATTER." In a soft voice, the young man's stepfather, Richard Shipley, read a poem he said the family wrote for Freddie: "You're still here in my heart and mind. I feel you, and this gives me strength and courage."

But it was the fiery eulogies that got most of the attention, especially in the wall-to-wall media coverage.

"With everything that we've been through, ain't no way you can sit here and be silent in the face of injustice," Reverend Jamal Bryant thundered from the pulpit to a congregation that included Mayor Rawlings-Blake, former mayor Sheila Dixon, Reverend Jesse Jackson, civil-rights activist and comedian Dick Gregory, and Congressman Elijah Cummings.

"The eyes of the country are all on us," Gray family attorney Billy Murphy warned. "They want to see if we have the stuff to get this right."

So how would people respond?

After the funeral, Freddie's mother, Gloria Darden, tried to send a calming message: "I want you all to get justice for my son," she said. "But don't do it like this here. Don't tear up the whole city just for him. It's wrong."

Unfortunately, the streets grew only hotter. The fuse had already been lit. We were monitoring the situation very closely that afternoon as I headed

PLS 0000048

Case 1:17-cv-01657-SAG   Document 126-2   Filed 06/21/21   Page 654 of 1474

to a long-planned meeting with the Korean ambassador in Washington. Yumi was going to meet me there. But just as we neared the ambassador's residence in the Cathedral Heights neighborhood, my assistant Alex Clark handed his iPad to me. On the live TV feed, a Baltimore police car was on fire. What looked like hundreds of people were breaking windows. The growing mob was throwing rocks, bricks, and garbage cans at police officers and attacking cars at West Baltimore's Mondawmin Mall.

I quickly called Keiffer and had him get the mayor on the line right away. When Mayor Rawlings-Blake said, "Hello, Governor," I got right to the point. "I just want you to know we are prepared to provide whatever assistance and support the city could possibly need." I said. "Everyone is at the ready. The Maryland State Police. The National Guard. The Emergency Management Agency. We have the full resources of the state ready to back you up."

The mayor's answer was just as direct as my offer. "We don't need your assistance," she said. "We have everything under control."

I took a breath, but just a short one. "With all due respect, Madam Mayor," I said, "it doesn't look like anything is under control. It looks like hundreds of people rioting in the streets and police cars on fire."

The mayor didn't budge. "We don't need any help," she repeated. "The police commissioner says it's manageable."

"Well," I said, "our senior security leadership team has been meeting all day at the State House. I'm on my way there now. I want to stay in constant communication with you. We're going to have to work closely together to ensure that the city and its citizens are safe."

I jumped out of the SUV in the driveway, I apologized to the ambassador, Ahn Ho-young, and his wife, Sun-hwa Lee, who were there to greet us. "I've got to return to Annapolis immediately," I said. "There's an emergency."

They completely understood. Like the rest of the world, the ambassador and his wife had been watching the live TV coverage of the mayhem in Baltimore. Yumi agreed to stay behind and smooth over my abrupt departure.

We sped off, lights flashing and sirens wailing for the full thirty miles back to the State House. The whole way to Annapolis, we kept trying to get the mayor back on the phone.

"She took off," a frustrated Keiffer said when I called. "They're trying to find her."

He asked the police commissioner, who said he didn't know where the mayor was. He asked her other aides. They didn't know either.

By now, the city was literally on fire. Stores were being looted and torched. The violence had spread from Mondawmin Mall to other parts of the city, including the historic Lexington Market. People were rioting now in many different neighborhoods.

Roaming bands of young men clashed with police officers. Bricks and bottles flew everywhere. Doors were smashed open at local businesses. People ran off with cash and whatever merchandise they could grab: Groceries. Cell phones. Sneakers. Televisions. Someone loaded a pickup truck with men's and women's clothing. Someone grabbed all the cigars from a neighborhood tobacco shop. A wig store was looted and totally trashed. ATMs were busted open for the cash.

The big CVS pharmacy at the corner of North and Pennsylvania Avenues was set on fire. As firefighters rushed to the scene, people hurled cinder blocks at them. Fire hoses were slashed.

The city's pharmacies were especially ripe targets, sparking some rare cooperation among the city's violent street gangs. A pattern began to repeat itself all over town. A group of young kids would throw bricks through the drugstore's front windows, and a big mob of young looters would rush in, clearing the aisles of candy, makeup, toiletries, and other grab-and-go merchandise. Meanwhile, organized gangs were backing up trucks to a rear door, cleaning out the pharmacy of all manner of drugs. This happened over and over again. Rival gangs had some kind of joint-venture agreement, dividing up the yet-to-be-looted drugstores among themselves.

We got calls from top executives at CVS, Rite Aid, and Walgreens, all pleading for help. It was the worst outburst of violence in Maryland's largest city in forty-seven years. Baltimore had seen nothing like it since the riots that followed the 1968 assassination of the Reverend Martin Luther King Jr.

Homeowners and small-business people stood outside their properties, helpless and scared. Their stories were painful to hear, even in short snatches.

PLS 0000049

on TV news reports. The police were mostly playing defense—ill-directed, under-equipped, and ordered to stand down and not respond.

When I got back to the State House, my homeland security team was waiting for me at the long wooden table in the governor's conference room. What an impressive group they were! Linda Singh, adjutant general of the Maryland National Guard, was the first woman and the first African American ever to hold that job. The state police superintendent, Colonel Bill Pallozzi, was a retired US Army Reserves captain who'd spent twenty-five years as a state trooper working his way up through the ranks. These people were tops in their field, and so were the others who filled the long table, including my chief of staff Craig Williams, homeland security director Tim Hutchins (a Marine Corps veteran and former superintendent of the state police), crime control director Chris Shank (a former state senator), governor's counsel Bob Scholz, public affairs director Steve Crim, communications director Matt Clark, and deputy communications director Doug Mayer. They'd all been in constant communication for days. They were monitoring everything. They were more than ready to take on the mission.

A formal state of emergency would give us the authority to provide important assistance. Normally, the state police did not patrol city streets. Once an emergency was declared, they could. The declaration would enable us to stand up and activate the National Guard. The Emergency Management Agency could cut through the usual bureaucracies and fast-track state aid. Whatever Mayor Rawlings-Blake cared to believe, the violence on the street wasn't subsiding. It was getting worse.

I kept calling Keiffer, insisting he put the mayor on the phone.

"Gov," he said to me. "We're trying everything. We still can't find her. The police commissioner doesn't even know where she is."

"Listen to me," I said. "Tell the police commissioner he needs to get the mayor on the phone immediately before I send in the National Guard. Tell him to find her!"

Ten minutes later, the mayor called.

"Madam Mayor," I said sharply, "I have two executive orders sitting in front of me. One of them says that, at the request of the mayor of Baltimore, I'm declaring a state of emergency and sending in the National Guard. The

other one says that, as governor of the state of Maryland, I'm declaring an emergency and sending in the National Guard. We would prefer to execute the first one. But either way, we're coming in to help handle this crisis in the city."

The mayor didn't say a word. So I continued.

"I believe that it would be better for you and better for us if we do the emergency declaration at your request."

"I need more time," she said.

The city was on fire. As far as I could tell, the mayor had not done much more than wring her hands and make the situation worse. And now she needed more time? Not after we'd spent two hours trying to find her and get her on the phone! "With all due respect . . . ," I started. I found myself using that gritted-teeth expression quite often with Mayor Rawlings-Blake.

"With all due respect, Mayor, there is no more time. The city police are overwhelmed. The violence is escalating. The situation is out of control. There is no more time."

"Can you get me fifteen minutes?" she asked.

"What do you need fifteen minutes for?" I pressed.

"I need to consult with the police commissioner."

"Okay," I answered reluctantly, "we'll give you another fifteen minutes."

I hung up the phone. The people at the conference table, who'd over-heard my end of the conversation, were all staring in disbelief. Many were shaking their heads.

Fourteen minutes later, the mayor called back.

"Governor," she said, "since you have a gun at my head and are going to do it anyway, I guess I'll ask you to come in."

That's all I needed to hear. "Thank you," I said before hanging up and reaching for my pen.

It was 6:46 PM when I signed Maryland Executive Order 01.01.2015.14, declaring a state of emergency in Baltimore, the version with the mayor asking for our help. The state police superintendent, the adjutant general of the National Guard, and the rest of the people in the conference room immediately got on their phones, their iPads, and their laptops and gave the official call to action.

"Go!"

PLS 0000050

# SHOCK TRAUMA

## CHAPTER 17

iffer Mitchell, Steve Crim, and headed straight for Shock Trauma, which, come to think of it, was not a bad way of describing the critical condition that the city of Baltimore currently found itself in. In just the past few hours, 400 businesses had been destroyed. One hundred and twenty-seven police officers and firefighters were injured severely enough to be taken to local hospitals, including the University of Maryland Medical System's R Adams Cowley Shock Trauma Center on South Greene Street.

Shock Trauma is one of the nation's leading institutions for treating severely injured and critically ill people. Its groundbreaking team approach saves lives every day.

Freddie Gray had been taken to Shock Trauma on April 12 with his life-threatening injuries. If anyone could have saved him, it would have been the incredible doctors and nurses there. And now, sixteen days later, Shock Trauma was overflowing with police officers and other first responders who'd been injured by rioters seeking to avenge the young man's death.

You go to Shock Trauma when you're in really bad shape. I saw broken bones and serious burns. I met officers who'd been hit by bottles, bricks, and cinder blocks. Many of the first responders felt abandoned and scared.

"I came to see how you guys are doing," I said.

That simple gesture, the fact that the governor had shown up to check on them, had grown men and women openly emotional. "Thank you for having our backs, Gov," they kept saying to me. "Thanks for being here."

"I was in Iraq," said a gray-haired Baltimore city police officer who looked like he'd stared down some bad guys in his time. Now, he was lying in a hospital bed, his neck broken in the day's mayhem. "I never saw anything like this before. Rival gangs were working together. They were organized. They were communicating by cell phone."

He said he and a team of fellow officers had been forced into a corner at Mondawmin Mall by an advancing mob. "We had nowhere to go," he said. "We didn't have riot gear. Not enough shields or helmets. We couldn't use tear gas because we didn't have gas masks. We didn't have rubber bullets, and we couldn't fire our weapons. There was a gang up on the roof tossing cinder blocks down on our heads."

It sounded like a war zone. I could hardly imagine the panic he must have felt.

"The mayor abandoned us," the veteran cop said to me. "She ordered us to stand down. We were sitting ducks out there. We needed to defend ourselves the way we were trained to." He started to cry.

I hugged him. Then I went to the next officer, and I hugged him too. And the next one and the next one and the next one. There was no media inside Shock Trauma. No cameras. No microphones. This was no publicity stunt. I was there because I cared and because I was genuinely grateful for the dedication and bravery of those who had agreed to protect and serve the citizens of the state I'd been elected to govern.

The men and women of the Baltimore Police Department were put in an impossible position. On the one hand, their fellow officers were the ones being accused of killing Freddie Gray. Now, they were literally under attack and not permitted to respond. A lot of them were city residents. They hated

PLS 0000051

seeing their city destroyed. They hated not being able to save it. They were desperately crying out for strong leadership.

Yes, there are some bad cops. We all know that's true. But by and large, the vast majority of police officers are dedicated, hardworking people who put their lives on the line every day for the rest of us. I have always believed that. Now, angry people were looking at them and only seeing them as racists and murderers.

As I was consoling the distraught officers at Shock Trauma, Keiffer excused himself to take a call. It was from his wife, Nicole, and she sounded panicked. She was at home with their two young children, as looters trashed a nearby hardware store and Rite Aid pharmacy. Nicole said she was hiding upstairs in a bedroom with young Jack and Kenna with all the lights turned off. Looking out a window, she had just seen several rioters running through their backyard.

"I need to check on my family," Keiffer said, promising to catch up with me as soon as he could.

"Absolutely," I told him. "Do whatever you have to. Let us know if they need anything. I hope everyone's okay."

Keiffer kept his wife on the phone the whole way home. By the time he got to their Bolton Hill neighborhood, things seemed to have calmed a bit, he told me later. The looters were mostly out of the stores. His own backyard looked clean. Keiffer's wife and children were still hiding upstairs with the lights off, watching the live riot coverage on TV. Keiffer asked his twelve-year-old son if he was okay. "Everything is gonna be all right, Dad," Jack told his father. "The governor is coming."

Shock Trauma was filled that night with people who felt deserted and overwhelmed. It was a diverse group: black, white, Latino, and Asian. Police officers, firefighters, and paramedics. Men and women, young and old. I personally spoke to as many of them as I could. Then, I made a point of thanking the nurses and the doctors too. After what they'd all been facing and would continue to face, at least they'd know that they had a governor who was looking out for them and who would have their backs.

I couldn't stay at Shock Trauma all night. I needed to get over to Schaefer Tower, where my leadership team and much of my cabinet were waiting. I was already late to the all-hands meeting I had called at our new Baltimore command center. But as soon as I climbed back into the SUV for the short drive to Saint Paul Street, my comms guys were on the phone. Steve put them on speaker. "CNN keeps calling," Matt said. "They really want you to go live."

"I don't have time to do an interview with CNN," I snapped. "Don't you think we have more important things to do right now? I'm not doing it!"

"Just do this quick hit on CNN to let people know what's going on," Doug Mayer said.

"I'm not trying to get on TV," I insisted. "I'm trying to stop a riot. I'm trying to save the city."

As we made our way through the smoky streets, I kept refusing. Steve joined in, and all three kept pushing for it. Finally, I relented. "Okay," I said. "I'll do the interview. But we can't waste a lot of time on it."

I agreed to meet CNN anchor Don Lemon where he was set up on the street outside Baltimore City Hall, which happened to be on our way. This has got to be quick," I warned the guys before I climbed out of the SUV.

As I stood on the sidewalk getting wired up for the interview, who should walk up to join us but the woman I had spent so many hours trying to reach, Mayor Stephanie Rawlings-Blake. I didn't realize until that moment that this was going to be a joint appearance.

Don Lemon spent most of the live interview trying to provoke me into complaining about the mayor's response to the riot. I certainly had my frustrations with the mayor, but I didn't see the point of broadcasting them at that moment live on CNN.

Three or four times, Lemon kept pressing me on why we didn't act any sooner. When I explained I had declared a state of emergency as soon as the mayor requested it, he tried to jam that as a wedge between us. I stayed positive, emphasizing that we had taken firm action and the situation on the ground was about to drastically improve. "I can assure you we have now taken over the situation," I said for what seemed like the tenth time. "This is not

PLS 0000052

128

going to continue . . . We're going to get this under control. The city will be safe. And Marylanders will be proud of the effort once we get this cleaned up."

That's when I noticed Keiffe, gesticulating at me. He had finished making sure his family was safe and had caught back up with us outside City Hall. Listening to Don Lemon go on and on, Keiffe was obviously thinking the same thing that I was, and he was getting calls from Matt and Doug at Schaefer Tower. He was staring at me and slicing his extended right index finger across the middle of his throat, the universal signal for *"Cut if off Now."*

The CNN anchor wasn't done, even if I was. "How are you going to enforce the curfew tomorrow now that—" he demanded.

"We have to go," I said, glancing at the mayor and ranking out my TV earpiece. "Thanks for your time," I told the anchor.

Then, Rawlings-Blake also pulled her earpiece, as we both turned and walked right out of the live interview.

Twitter and Facebook exploded with complaints about Lemon's approach: "They are trying to stop the violence. . . . You keep asking stupid questions . . . How many times are you going to ask the same question over and over again?" But maybe the mayor and I had finally found something we could agree on: Don Lemon had behaved like a jerk during that interview.

It was after midnight by the time I joined my executive team at Schaefer Tower. It had been an exhausting day. It had been only nine hours since our sudden turnaround in the Korean ambassador's driveway. So much had happened since then. We had no idea how long we'd be working out of our temporary digs in Baltimore. For the foreseeable future, this would be our round-the-clock home base.

We'd do whatever we needed to in the coming days. Walk the streets. Visit the churches. Thank the state and city police, the firefighters, the paramedics, and the guardsmen. Take helicopters to the command center at MEMA.

Every night, we agreed, we would sit down at the Baltimore Police Department command center for a joint progress report, assessing what we had achieved that day and making plans for the next one. Not a big meeting,

129

just the principals: the mayor, her police commissioner, her chief of staff, Me, my state police superintendent, the adjutant general, my chief of staff.

Then, my team would typically head back to Schaefer Tower, where we would skip showers, forget to shave, catch five-minute catnaps, and become far too familiar with what quickly became known as our Riot Diet: an endless succession of pizza slices, candy bars, diet sodas, and the occasional stale donut. For better or worse, this was our twenty-four-hour command post for the foreseeable future.

Hundreds of state troopers had already moved into the city. So had the 1st Battalion, 175th Infantry Regiment, of the Maryland Army National Guard, whose uninterrupted history goes all the way back to the Revolutionary War. They built an instant tent city between Camden Yards and M&T Bank Stadium, where the Baltimore Ravens play. The armories weren't large enough to handle the 4,000 troops, the 1,000 additional police officers, and all the others involved in Operation Baltimore Rally. National Guard Humvees were already being seen patrolling streets all over the city, along with hundreds of heavy green military trucks, which in itself was a potent symbol of order being restored. Sometime in the middle of the night, I said my bleary goodnights.

The troopers drove me home to the governor's mansion, where I managed to say a groggy "good night, honey" to Yumi, snatch two hours of sleep, grab a fast shower, and change my clothes before I headed back to the city again.

## CHAPTER 18

# STREET CRED

eiffer met me at the Baltimore Police Department's Western District station before the sun came up. As soon as I stepped out of the SUV, the troopers on my detail, Craig Ciccarelli and Thomas Scott, walked over to me with a bulletproof vest. "Sir," Thomas said, "we need you to put this on."

I recognized this was a volatile morning in Baltimore. People were already gathering in front of the station on West Mount Street. In the hours and days to come. I would be all over the city, interacting with all kinds of people everywhere. I understood that no one, not even a dedicated detail of highly trained state troopers, could 100 percent guarantee my safety. But I didn't want to confront the people of Baltimore like an armored warrior. I wanted no interact person to person. I hated what that vest symbolized.

"I'm not wearing it," I told the troopers.

They didn't like that, but they didn't put up a fight. They just figured they'd have to watch me extra closely. After a briefing from the city police

station commanders and a round of thank-yous with the cops, we hit the streets. Next stop: North and Penn.

The burned and looted CVS was still smoldering. The firefighters were still on the scene, joined now by large contingents of city and state police officers and uniformed guardsmen. This was Ground Zero, a busy West Baltimore intersection that was now an international symbol of the city's darkest hours.

I wanted people to see that their governor was there.

I stood at the corner, breathing in the acrid smell of the smoldering buildings, offering thanks and promises to stop the violence and begin the process of rebuilding. "We're not going to have a repeat of last night." I declared emphatically. "It's not going to happen tonight."

People were salvaging what was left of burned or wrecked homes and businesses, dragging charred furniture and busted display cabinets onto the sidewalk. Everywhere we went, I saw sad scenes of human tragedy, dreams built over decades of hard work destroyed in a single night. I listened to people's stories, assuring them we would do what it took to bring life back to normal. Most of the residents I encountered were black. Quite a few of the merchants were Asian. The store owners were surprised to hear me say *anyong haspyo* to them in Korean. All of them—residents and small shop owners, blacks and Asians—were victims of these destructive riots. Some had insurance. Most didn't. These were hardworking people. This was their city too.

An older woman was standing on a corner, just weeping. I went over to her and hugged her. I remembered what Christie had told me about being the consoler-in-chief and letting people know that things were going to be okay. The people of Baltimore were in pain. They needed to know they had a governor who cared and who was taking charge.

Across North Avenue, the mayor was holding a press conference, standing at a forest of microphones, surrounded by reporters and TV crews. I had no interest in joining her.

Instead, I spent the time walking and talking to regular people, asking how they were doing and what we could do to help. That's what I was there for.

PLS 0000054

For the most part, I would leave the interviews to others, especially General Singh. She was a perfect choice: a strong black woman with the forcefulness and firm posture of a natural-born leader. Standing in front of the cameras in her tan combat fatigues, she delivered a potent message to the people of Baltimore and beyond: "We are here. We mean business. We are going to get this done."

---

"I want to go to Freddie Gray's neighborhood," I said.

When he died, the young man was living with his sisters in Gilmor Homes in Sandtown-Winchester. The response I got from my troopers wasn't overly enthusiastic. "Not a good idea, sir," Craig said to me. "It's too dangerous."

"I think it's important for me to go there," I responded. The people in Sandtown-Winchester needed to know I was going to listen to their concerns.

I met first with Tessa Hill-Aston, president of the Baltimore NAACP at the group's satellite office on Gilmor Street. I promised our initial chat would be just "the beginning of a dialogue."

"This neighborhood," she told me, "has been known for the police to just pick you up and throw you in the car, take you around the corner and beat you."

I listened to her carefully. "We're going to address the underlying causes," I said. "We will do that. But right now, we're going to deal with the immediate crisis."

That meeting was important. But what I'd really come for was a chance to walk these streets with Freddie Gray's neighbors. So that's what I did.

"I'm very sorry for your loss," I told the residents I spoke with. "I promise you, we're going to try to bring some peace to the neighborhood. We'll work on addressing some of these issues that you're concerned about."

It would be an understatement to say that people were surprised to see me. They looked almost shocked.

"Hey, that's the governor," I heard several people say. "What's he doing here?"

I faced no hostility. No one expressed anger or resentment toward me. They just didn't expect to see me in their neighborhood.

There were several young men about Freddie's age playing basketball on a nearby court.

"Hey, guys, what's up?" I said.

"Is that the governor?" one of them asked.

"I came down to see how you all are doing," I said.

I shook hands with each of them. One of the guys, Desmond Edward, passed me the ball. I took a jumper from the top of the key.

Desmond was quoted later in the *Baltimore Sun*. He said he'd never shoot hoops with a governor before. "It was pretty good," he said. "A new experience. He can shoot."

I definitely liked the "he can shoot" part. It's good to know I still got game—and at least a little street cred.

---

Rumors were flying everywhere. Some were true. Some were half true. Some were concocted out of thin air. Security Square Mall was closed over rumors that looters were heading in that direction. That one turned out to be nothing. Word was also that the city's gang leaders and drug dealers didn't appreciate the occupying armies on what they considered *their* streets. That one was definitely true.

At scattered spots, small groups of protesters threw objects at police, now in riot gear. Nowhere near as rough as Monday, but Tuesday was still young.

At the White House, President Obama spoke publicly about the riots in Baltimore. This time, there was nothing equivocal about his language or his tone. He clearly denounced what he called the "senseless violence and destruction . . . They're not protesting. They're not making a statement. They're stealing. They're destroying and undermining businesses and opportunities in their own communities. They need to be treated as criminals." The president had completely changed his tune. Maybe I had gotten through to him. But as the afternoon gave way to evening, no one knew for sure: Would the streets erupt in violence again? Would the Baltimore curfew hold?

Back at Ground Zero, there was a large, public standoff around 10:15 PM. I want on the corner for this one. I was back with my team at our Schaefer Tower command post, assessing our first-day performance, making

PLS 0000055

plans for tomorrow, consulting with the chiefs and the generals, all while monitoring the live coverage on TV. This would be the first major test of the citywide curfew.

A couple of hundred demonstrators, many of them from out of town, remained outside the CVS store at the busy corner of North and Penn. They were face-to-face with police in helmets and riot shields, while announcements blared from a helicopter overhead. "You must go home. You cannot remain here. You will be subject to arrest." Other choppers shined high-intensity floodlights on the crowd. Some of my own people had been opposed when I first called for the use of helicopters. Now, everyone was very happy we had them in the sky, as their floodlights turned the night into day.

Around 10:30, some of the demonstrators began throwing rocks and smoke bombs. In long ranks, standing side by side, the riot-equipped city police held their ground. They didn't advance on the demonstrators, but they also refused to budge. Behind them was a huge presence of Maryland National Guardsmen, along with their trucks and Humvees.

That show of force alone did not disperse the crowd. They were dug in. There was one especially significant demonstrator. He seemed to be the chief violent instigator. The TV cameras were focused on him. He was pacing and yelling and throwing things, acting several degrees wider and more frantic than anyone else on the street.

"You must go home," the announcements continued overhead. "You are subject to arrest."

The rabble-rouser picked up what looked like a bottle with a rag fuse, a makeshift firebomb, and hurled it toward the officers. It landed a few feet short. He then moved forward, standing almost face-to-face with the cops in their riot gear. Still, they did not move.

Then slowly, without any announcement at all, a Maryland National Guard Humvee inched toward the police line, approaching from behind. Watching on live TV, it was hard to tell if the guardsmen and the police officers communicated directly. But at just the right moment, the phalanx of officers methodically parted, creating a small separation just a couple of feet wide.

A uniformed guardsman reached out of the vehicle and snatched the

man who had thrown the firebomb. In a single, swift movement, the man was lifted off his feet and yanked inside the National Guard Humvee.

The Humvee backed out and drove off. Not a punch was thrown. No one seemed to be injured. But the violent instigator on the street was no longer there.

"What just happened to that guy?" Doug Mayer asked at Schaefer Tower.

The answer came back from two or three of our people almost in unison: "He's just gone."

And he was.

That seemed to do it. Within minutes, the crowd began to dissipate. With the leader of the violence now missing in action, the energy of the mob seemed to fade almost immediately. These citizen-soldiers of the Maryland National Guard had delivered a strong message that was clearly received. *We have a job to do. We aren't standing down.*

Tuesday night was the turning point we had all been hoping for, a huge improvement over the night before. Our Schaefer Tower command center erupted in cheers and high-fives as the curfew successfully took hold.

___

Wednesday morning, Keiffer and I were back out walking in the neighborhoods. We stopped at the Avenue Market on Pennsylvania Avenue. Five or six rough-looking dudes were standing together, arms folded, glaring straight ahead.

"Gang members," Keiffer whispered to me.

"Yeah," I deadpanned, "I kinda suspected that as soon as I saw the neck tattoos."

They were eyeing me suspiciously. Not one of them suggested I sit down for a chat or that we go outside for some friendly hoops.

"Fuck the governor," the roughest-looking one said.

"What's he doing here?" I heard another one grumble.

One of the troopers shot me a look. "Let's keep moving, sir," he said. But I wasn't ready to leave.

"I know you guys have a lot of things on your mind," I said, not sure how they'd respond to that. But they began to speak. One of them mentioned the

Case 1:17-cv-01657-SAG   Document 126-2   Filed 06/21/21   Page 662 of 1474

mayor closing community centers. Another brought up the lack of jobs and the poor city schools.

"We ain't too happy 'bout that," he said, shaking his head ominously.

"I understand," I told him. "And you know what? You've got the right to be mad about the schools and the community centers and some of the failures here in the city."

They talked about Freddie Gray. They talked about the police. They had some valid concerns and serious complaints.

"Look, I hear you," I said. "But this violence—this isn't helping anybody. These are your own neighborhoods that are getting burned down."

They nodded at that. But their facial expressions were unyielding, and I couldn't tell if I was really getting through.

"These ladies down the street, they don't deserve to have the windows broken out of their houses," I said. "And these guys who have the corner stores, they didn't deserve to get burned out. All this violence is hurting your own people. You've got to help do something about this. We can talk about all this other stuff. We can try to help fix some of these other things. But right now, we've got to stop the violence. And you need to help us. We're going to keep working on the things you're talking about that aren't right. But first we have to get the city back under control."

As we spoke, I felt like we might be turning a corner.

We'd started with a list of grievances and a whole lot of attitude. Now, they were listening to me, and I was listening to them. One of them said to me, "I feel you, Gov. I feel you." Another said, "We hear what you're saying, man."

Then came the moment I would not have predicted. "Can we get a selfie with you?" one of the guys asked.

I posed for pictures with them. Every one of them.

"Man. I can't believe the Gov talked to us," I heard one of them say as we left the market. "The dude even listened," added one of his friends.

# CHAPTER 13

# CALM AGAIN

Mayor Rawlings-Blake continued to be an issue. I probably should have expected that. Wednesday, we had our nightly meeting at Baltimore police headquarters. General Singh. Commissioner Batts. Colonel Pallozzi. The mayor. Her chief of staff, Kaliope Parthemos. My chief of staff, Craig Williams. And me. After just one night, the mayor was already itching to lift the citywide curfew. I didn't think we were close to ready yet.

"The bar owners say the curfew is killing their business," she said.

"I understand that bar owners are upset about losing business," I answered. "But would they rather have their businesses burned down?"

"And the gang leaders are really angry," the mayor said to me. "They're demanding that if we don't . . ."

"Did you just say, '*The gang leaders are angry?*'" I thundered at the mayor. She nodded.

"*So what?*" I shot back. "I don't care if the gangs or the drug dealers are upset because their drug sales are down. Let me ask you something: Do you want the city to be more like Monday night with all the violence and the fires

PLS 0000057

and the damage and the chaos? Or would you prefer the calm of Tuesday night? I'd rather have it be more like Tuesday."

She tried to raise the ante on me.

"The gangs are threatening that if we don't lift the curfew, they're going to march downtown and burn down the Inner Harbor."

"You tell them to go ahead and make my day," I said. "Tell them to come on down, I'll be waiting for them, and several hundred state troopers and National Guard soldiers will be waiting for them."

As I glanced around the room, people were staring down at the table or leaning back in their chairs, looking distinctly uncomfortable.

The mayor and her police commissioner kept pushing. "It is a city curfew," she said. "We instructed the curfew. I am the mayor. I'm going to have a press conference, and I'm going to say, 'I'm lifting the curfew.'"

I pushed back harder. "Well," I said to the mayor as all the others sat quietly in their seats, "you have every right to do that. But here's what I'm going to do immediately after your press conference. I'm going to say that the mayor has completely lost her mind, and as governor in a state of emergency, I am immediately reinstating a curfew. So if that's what you want—"

Despite the mayor's concerns and the gang leaders' threats, the curfew remained in place.

---

If the Baltimore riots brought out the worst in some people, they brought out the best in many more, even before the smoke had cleared. Church groups. Students from Johns Hopkins, Loyola, and Towson University. Volunteers from companies and industry associations. They all came out to help. The Governor's Office of Community Initiatives, led by my old friend Steve McAdams, organized more than 2,000 volunteers. We set up a Maryland Unites website and funneled donations to pre-vetted community organizations to fund rebuilding projects.

Countless good people from around the corner and around the world wanted to do what they could. They showed up with their tool belts and jumbo-size trash bags. No one had to ask them. They just got to work, beginning the long process of rebuilding Baltimore. Mission BBQ, the Glen

Burnie-based barbecue chain, rolled in trucks, donated food, and set up industrial-sized grills outside the stadium to feed the thousands of soldiers who were camped there. Union tradesmen helped replace the doors on looted stores. Food banks popped up around the city. Under the watchful gaze of cops and guardsmen and first responders, this army of voluntary generosity commissioned itself to help pull the battered city back up on its feet.

That didn't mean our work here was over. Not even close. Things didn't let up a second for us. Over the next four days and nights—slowly but surely—I could really feel peace being restored in Baltimore and law and order taking hold.

It wasn't any one thing. It was everything coming together, a fully integrated response. Firm leadership at the top. A clear sense of where the lines were: Peaceful protesters were welcome but violent rioters would be quickly locked up. To me, it was crucial to make an overwhelming show of police and military strength. I didn't want there to be any doubt that we had all the force we needed. But if we showed enough strength, I figured we might not have to use it.

This was Ronald Reagan's idea, peace through strength, the very same concept I learned about as the chairman of Youth for Reagan. I hadn't forgotten. And all these years later, it came in handy again.

I'm proud to say that with 4,000 part-time citizen-soldiers in a hostile urban environment, along with 1,000 officers from across the state and around the East Coast, we didn't have a single incident of abuse, brutality, or misconduct in the streets of Baltimore. Not one.

Once we declared the state of emergency and took charge, no one else got hurt. No more buildings were destroyed. People were now coming out of their houses and stores and offering cold water to the police and the soldiers who were protecting them. Maybe some trust was even being restored.

---

On Thursday, the Reverend Al Sharpton joined Mayor Rawlings-Blake and the presidents of the Urban League and the NAACP for a rally that was half a call for activism and half a defense of Mayor Rawlings-Blake. Now was the time to "end the scapegoating," the New York-based activist and

PLS 0000058

140

liberal MSNBC host told the packed congregation at the New Shiloh Baptist Church in West Baltimore. "Don't blame the mayor for what the last fifty years of mayors and governors didn't do," Sharpton declared.

The issues that sparked the violence were much larger than the Freddie Gray case, Sharpton argued, touting the importance of noisy protest. "Most folks don't want peace," he said. "They want quiet. They want people to shut up and suffer."

We were back together Thursday night at Baltimore police headquarters, the mayor's top people and mine. Twenty-four hours earlier, Rawlings-Blake had been pleading to end the curfew. Now, she and Commissioner Batts were making a very different request.

"Is there any way you can bring in two thousand more guardsmen?" Batts asked. He said his detectives had been picking up some ominous rumors: Gangs were receiving shipments of ferocious new weaponry; violent West Coast anarchists would soon be descending on Baltimore; roving hit squads were targeting city police; and some instigators were hoping to further inflame the city by staging "suicide-by-cop" encounters, purposely provoking the police into using deadly force.

Our state police investigators couldn't confirm any of that, and I was skeptical about much of it. I told the police commissioner and the mayor that I didn't believe we could deploy any additional Maryland National Guardsmen. Their request—and the panicked tone of it—was certainly a 180-degree reversal from the night before. It was then that Commissioner Batts said, "We have one other item, Governor."

I nodded.

"We have completed our internal police investigation of the Gray case," he said. "Almost an hour from now, we will be forwarding the results of the investigation to the state's attorney's office."

That certainly got my attention. "I'm not a lawyer," I cautioned the commissioner. "I'm not sure how much of that information I should be aware of now. I certainly don't need to know details from the investigation that would be inappropriate for you to divulge. But can you just tell me—the report you're turning over to the prosecutor, in your opinion, will it be likely to inflame the situation further or help to defuse it?"

The commissioner didn't waver this time. "Our internal investigation shows absolutely no wrongdoing whatsoever on the part of any of the officers," he said.

"And you feel confident that this is a thorough and fair investigation?" I asked.

"We had our very best, most senior people doing the investigation," Batts insisted. "We have confidence in the facts. This should ease tensions, I would think."

For the sake of the city, I was very relieved to hear this.

That's why we were all shocked when, twelve hours later, State's Attorney Marilyn Mosby announced that she was charging all six police officers with serious felonies, including second-degree murder, manslaughter, misconduct in office, and false imprisonment. An hour before the announcement, she had called Keiffer with a heads-up. We all gathered in front of the TV in our Schaefer Tower office to watch the state's attorney's press conference. As jarring as the charges were, the prosecutor's incendiary language was even more so. "To the people of Baltimore and the demonstrators across America," she declared, "I heard your call for 'no justice, no peace.'"

Was she announcing a sound prosecutorial judgment or leading a protest rally? Frankly, it was hard to tell.

Friday morning, I declared that Sunday would be "a day of peace and prayer" with special services at churches, synagogues, and mosques across Baltimore. At many houses of worship, this would be the first time the congregations would be together since the major rioting began. If peace was going to return to the city, I knew the faith community had a role to play.

Baltimore archbishop William Lori agreed to lead an interfaith service at Saint Peter Claver Catholic Church on Fremont Avenue, the border between the Sandtown-Winchester and Upton neighborhoods. Saint Peter Claver had long been known as the "mother church" of West Baltimore's African-American Catholic community.

In recent days, we'd been getting calls from other Baltimore neighborhoods—local politicians, clergymen, and community leaders—pleading

141

PLS 0000059

"Don't forget about us just because we aren't in West Baltimore." There'd been some scattered outbreaks of juvenile delinquency in other parts of the city. People were understandably concerned that the unrest could spread. "We are vulnerable too," they said.

Friday afternoon, we dispatched additional state police officers plus Humvees and other heavy equipment from the National Guard to various other Baltimore neighborhoods. I walked the streets and met with local residents in Fells Point, Little Italy, and several other sections. My message to everyone: "Whatever affects some of us affects us all."

At our regular sit-down on Friday night, the mayor pushed again to lift the curfew. She was getting renewed pressure from the bar owners. Now the issue was Saturday night's boxing match between undefeated five-division world champion Floyd Mayweather Jr. and eight-division world champion Manny Pacquiao. The fight was being held in Las Vegas. But bar owners across the country, including in Baltimore, had paid as much as $5,000 to carry the action on live pay-per-view TV.

"The curfew will cost these business owners a fortune," the mayor said to me. I felt for the small-business owners, but I didn't want to fill the streets of Baltimore too quickly and have the violence explode again. Another round of protests was planned for Saturday, including a "massive national rally" led by former New Black Panther Party chairman Malik Shabazz, whose violence-tinged rhetoric often turned anti-Semitic.

"Let's see how the weekend goes." I said, holding the mayor off for another day or two. To me, it was still too early to pull the state police, the Guard troops, and the others out.

Here's another indication of how uncertain things still were as the weekend arrived. Saturday was Kentucky Derby Day. That was no particular issue for us. The derby was being run at Churchill Downs in Louisville, Kentucky, 600 miles away. But the 140th running of the Preakness Stakes, the second jewel in horse racing's Triple Crown, was set for May 16 at the Pimlico Race Course in Baltimore. Would we need to postpone the Preakness? Would the city's unrest still be an issue for the next two weeks? People were beginning to ask, and no one really knew the answer. It was all still one day at a time.

In fact, with the curfew and our strong presence remaining in place Friday

and Saturday nights, things stayed calm. On Sunday, 250 people turned out for our "peace and prayer" service at Saint Peter Claver with Archbishop Lori presiding and at similar services at Southern Baptist Church, Fulton Baptist Church, and elsewhere. After ours, a large gaggle of media, national and local, waited for me outside.

"It's time to get the community back to normal again," I said. "It's been a very hard week, but we've kept everybody safe. Since Monday night, we haven't had any serious problems." It seemed like the right time, I said, for the mayor to lift the curfew. We'd gotten through Marilyn Mosby's announcement that she was charging six officers. We'd gotten through Saturday's protests—Shabazz's "massive" rally was a bust. Mayweather had won the fight by unanimous decision, and the bar owners survived.

"When I came into the city on Monday night, it was in flames," I said. "Stores were being looted, a lot of terrible things were happening. But since then, I've seen incredible acts of kindness. I saw neighbors helping neighbors. I've seen a community that cares about each other."

In her announcement that she was lifting the curfew, six days after the worst of the rioting began, the mayor sounded thoroughly relieved. "A lot of the unrest has been settled," she said after routing the reopened Mondawmin Mall.

The city was returning to normal, and the signs were everywhere. Most of the stores had reopened. People were our shopping again. The houses of worship were full. The children would be returning to school on Monday. Neighbors were out on the sidewalks. The needed repairs were beginning.

As soon as I left the church, I went straight to the tent city that had served as home base for the heroes of Operation Baltimore Rally. I wanted to thank each of them. I wanted to let them know that their mission had been successfully completed and that they were safe to pull out and return home to their families. These soldiers, police officers, firefighters, paramedics, and other first responders from around the state and the region had been there for us when we needed them, I was deeply grateful.

It would take months—years, probably—for Baltimore to fully shake off the pain of those terrible days. The mayor and I would continue to clash on how to secure the peace we had restored. Major divisions in the city still

PLS 0000060

needed to be healed. There was much more to be done. The relationship between the citizens and the police department remained dangerously raw.

The Freddie Gray cases would eventually fall apart in court—a complete defeat for Marilyn Mosby. Despite her taunting rhetoric, the fiery prosecutor failed to win a single conviction. The first case, of Officer William Porter, ended in a mistrial. Then, Officer Edward Nero was found not guilty on all four counts, including two counts of misconduct in office, reckless endangerment, and assault. Two other officers were subsequently acquitted. In July 2016, following those acquitals, charges against Porter and the remaining officers were dropped. Mosby, the "no justice, no peace" prosecutor, was 0 for 6. Sadly, so were those who continued to seek the truth. They also failed to find it.

Unfortunately, the justice system has never fully answered the question that launched the Baltimore riots: What really happened to Freddie Gray? But thanks to the incredible efforts of our team, Baltimore was able to move past the violent self-destruction and pull itself back from the brink.

And what a baptism by fire for the brand-new governor of Maryland!

# PART IV

# HEALING

# EXHIBIT 18

# In The Matter Of:

*CHAE BROTHERS, LIMITED LIABILITY COMPANY, ET AL. v.*
*MAYOR AND CITY COUNCIL OF BALTIMORE, ET AL.*

---

*KEIFFER MITCHELL, JR.*
*January 27, 2021*
*ORIGINAL TRANSCRIPT*

---

*CourtScribes, Inc.*
*"Delivering More For Less"*
*(833) 727-4237*
*info@courtscribes.com*
*www.courtscribes.com*

1

1        IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF MARYLAND

3              NORTHERN DIVISION

4   ----------------------------X

5   CHAE BROTHERS LIMITED,          :

6   LIABILITY COMPANY, ET AL.,      :

7               Plaintiffs,         :

8   v.                              :   Civil Action No.

9   MAYOR & CITY COUNCIL OF         :   1:17-CV-01657-SAG

10  BALTIMORE, ET AL.,              :

11              Defendants.         :

12  ----------------------------X

13

14      Video Deposition of KEIFFER MITCHELL, JR.,

15            Conducted Virtually

16          Wednesday, January 27, 2021

17                11:43 a.m.

18

19

20

21  Pages 1 - 97

22  Reported by:  Lisa Barbera, Stenographer

1  Deposition of KEIFFER MITCHELL, JR., conducted

2  virtually.

3

4  Witness Location:  Annapolis, Maryland

5

6

7  Pursuant to agreement, before Lisa Barbera,

8  stenographer.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

3

1                    A P P E A R A N C E S

2

3        ON BEHALF OF PLAINTIFFS, CHAE BROTHERS

4        LIMITED LIABILITY COMPANY, ET AL.:

5               PETER K. HWANG, ESQUIRE

6               SUNG & HWANG, LLP

7               9256 Bendix Road, Suite 109

8               Columbia, Maryland 21045

9               (410)772-2324

10

11

12               RAY M. SHEPARD, ESQUIRE

13               THE SHEPARD LAW FIRM

14               122 Riviera Drive

15               Pasadena, Maryland 21122

16               (410)255-0700

17

18

19

20

21

22

4

1  APPEARANCES CONTINUED

2

3      ON BEHALF OF DEFENDANTS, MAYOR & CITY COUNCIL

4      OF BALTIMORE, ET AL.:

5          SARA E. GROSS, ESQUIRE

6          HANNA MARIE C. SHEEHAN, ESQUIRE

7          BALTIMORE CITY DEPARTMENT OF LAW

8          100 N. Holliday Street

9          Baltimore, Maryland 21202

10

11

12      ON BEHALF OF KEIFFER MITCHELL:

13          ROBERT SCOTT, ESQUIRE

14          OFFICE OF THE ATTORNEY GENERAL

15          200 St. Paul Place

16          Baltimore, Maryland 21202

17          (410)576-6300

18

19

20      ALSO PRESENT:

21          Ian Wallach, Zoom Technician

22          Nicholas Pollard, Videographer

5

C O N T E N T S

                                              PAGE

EXAMINATION OF KEIFFER MITCHELL, JR.

     by Mr. Hwang                              9

     by Ms. Gross                             88

     by Mr. Hwang                             90

6

1                    E X H I B I T S

2                        (Attached)

3

4    MITCHELL DEPOSITION                          PAGE

5

6    Exhibit 1    Subpoena                          13

7    Exhibit 2    Protective Order and Agreement    14

8    Exhibit 3    Amended Complaint                 17

9    Exhibit 4    Still Standing Excerpt            25

10   Exhibit 5    CITY00052097                      87

11

12

13

14

15

16

17

18

19

20

21

22

1                  P R O C E E D I N G S

2                       - - -

3          THE VIDEOGRAPHER:  We're now on the

4     record in the matter of Chae Brothers Limited

5     Liability Company, et al., versus Mayor and

6     City Council of Baltimore, et al.  Today's

7     date is January 27th, 2021.  The time is

8     11:43 a.m.  This is the video recorded

9     deposition of Keiffer Mitchell being taken

10    via remote video conference.

11         My name is Nicholas Pollard; I am the

12    camera operator representing Court Scribes,

13    Incorporated.  The court reporter is Lisa

14    Barbera, also with Court Scribes,

15    Incorporated.

16         Would counsel please introduce

17    themselves?

18         MR. HWANG:  Good morning.  Peter Hwang

19    and Ray Shepard on behalf of all plaintiffs.

20         MS. GROSS:  Good morning.  Sara Gross

21    and Hanna Sheehan on behalf of the Mayor and

22    City Council of Baltimore.

ORIGINAL TRANSCRIPT

8

1          THE VIDEOGRAPHER:  Will the court

2     reporter --

3          MR. SCOTT:  And I'm -- I'm Robert Scott

4     on behalf of the witness.

5          THE VIDEOGRAPHER:  Will the court

6     reporter please swear in the witness?

7          THE COURT REPORTER:  All right.

8     Pursuant to Rule 2-401(g) of the Maryland

9     Rules of Civil Procedure, all parties

10     stipulate and agree that the witness was

11     identified was Keiffer Mitchell, Jr., that he

12     will be sworn in remotely, and that this

13     deposition shall be used for all purposes

14     like other depositions.

15          Please state whether or not you agree

16     with the stipulation, starting with

17     Mr. Hwang.

18          MR. HWANG:  We agree.

19          THE COURT REPORTER:  And, Ms. Gross?

20          MS. GROSS:  We agree as well.

21          THE COURT REPORTER:  And, Mr. Scott?

22          MR. SCOTT:  Yes, agreed.

**ORIGINAL TRANSCRIPT**

9

1          THE COURT REPORTER:  Thank you.

2    Whereupon,

3               KEIFFER MITCHELL, JR.

4    was examined and testified as follows:

5          THE WITNESS:  I do.

6          THE COURT REPORTER:  Before we begin, if

7       you are not using video function or if you

8       don't need to be on video, please turn your

9       video off so that we can preserve some

10      streaming -- some bandwidth.

11         Thank you.  Go ahead.

12      EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

13   BY MR. HWANG:

14      Q.   Thank you for joining us, Mr. Mitchell.

15           As you know, my name is Peter Hwang.  I

16   represent the plaintiffs in this action who have

17   filed suit against the Mayor and City Council of

18   Baltimore for, among other things, damages to

19   plaintiffs' property and businesses.

20           As you know, we're here for a

21   deposition, which will consist of me asking you

22   questions and you providing responses to those

1          As such, we ask that you agree to be

2     bound by the protective order in this case.  And I

3     believe Mr. Scott transmitted to you an agreement

4     along with the protective order.

5               If you look at Exhibit 2, the first page

6     is the agreement.  Did you sign that?

7          A.   I did.

8          Q.   Did you agree to be bound by the

9     protective order entered in this case?

10         A.   I agree.

11         Q.   Thank you.

12              Now, Mr. Scott [sic], in case we need to

13    get in contact with you in the future, do you

14    agree that we can contact you through --

15              Or, Mr. Mitchell, do you agree that we

16    can contact you through Mr. Scott?

17         A.   Correct.  Yes.

18         Q.   Now, in April of 2015, where were you

19    employed?

20         A.   At the state of Maryland governor's

21    office.

22         Q.   Do you recall what your title was at

16

1   that time?

2       A.   I believe I was a special adviser to the

3   governor.

4       Q.   And were you -- was your title special

5   adviser to the governor for the entirety of April

6   of 2015?

7       A.   Correct.

8       Q.   Do you recall what time -- for what time

9   period or during what time period you held that

10  title?

11      A.   It was for about a year, I believe.

12      Q.   And what were your duties as special

13  adviser to Governor Hogan?

14      A.   I was assigned to his legislative office

15  to assist the Governor on his legislative agenda

16  for the 2015 legislative -- legislative session.

17      Q.   Now, are you familiar with what's been

18  commonly referred to as the Baltimore riots or the

19  Baltimore unrest?

20      A.   Yes.

21          MR. HWANG:  Now, if I could direct your

22          attention to Exhibit 3.

1  well?

2      A.   I guess what I -- I wasn't there

3  monitoring.  We were there earlier in the

4  afternoon monitoring the protests.  But I had gone

5  home, and I hadn't been really following what was

6  unfolding at Camden Yards until someone called and

7  told me I should turn on the TV and watch what's

8  happening.

9      Q.   Okay.  If I could direct your attention

10  to the bottom of page 108, the second sentence in

11  the last paragraph, it says, "I wasn't the mayor's

12  boss, despite what some people thought, and I

13  didn't want to step on her toes."

14      A.   I'm sorry.  What page are you on again?

15      Q.   On the same page, on page 108 --

16      A.   Okay.

17      Q.   -- at the bottom, the second-to-last

18  sentence says, "I wasn't the mayor's boss, despite

19  what some people thought, and I didn't want to

20  step on her toes."

21           Do you see that?

22      A.   Yes.

1       Q.   Do you recollect that being a concern of

2   the Governor, that, hey, this is happening in the

3   city, it's the city's lead, we're here to support?

4       A.   Yes.

5       Q.   And what discussions were there about

6   that dynamic that the City was kind of the lead in

7   how to respond to these protests?

8            MR. SCOTT:  Hold on.  I'm going to

9       object to that question and instruct the

10      witness not to answer on the basis of

11      executive privilege.  Communications between

12      Mr. Mitchell and the Governor about an

13      ongoing crisis are off limits.

14           MR. HWANG:  Okay.  Can we agree that

15      we've had good faith attempts in case I need

16      to file a motion?

17           MR. SCOTT:  Yes.

18   BY MR. HWANG:

19      Q.   Mr. Mitchell, do you recall having any

20   discussions with the Mayor regarding that, about

21   who would be the lead, who would be calling the

22   shots at that point?

1      A.    No.

2      Q.    If I could direct your attention to the

3  next page, page 109, which is on the same page of

4  the exhibit to the right.  The first new

5  paragraph, Governor Hogan says, "I immediately

6  called in Keiffer Mitchell," and stated, "I want

7  you to attach yourself to the mayor.  I need an

8  open line of communication with her 24/7.  I'm

9  going to need up-to-date information -- what the

10  City's needs are, how City Hall's responding, what

11  we're hearing on the street, everything we can

12  possibly find out."

13          Do you see that?

14      A.    Yes.

15      Q.    Is that accurate?  Did Governor Hogan

16  say that to you?

17      A.    Yes.

18      Q.    And this was still on April 25th, 2015;

19  correct?  On that Saturday?

20      A.    Correct.

21      Q.    On the same day but presumably after the

22  violence and property destruction near Camden

**ORIGINAL TRANSCRIPT**

1   Yards had already started?

2        A.   Correct.

3        Q.   Now, Governor Hogan says -- or asks you

4   to get a sense of the City's needs.

5             Up to that point, do you recall the City

6   ever expressing any particular needs to either you

7   or others at the state level?

8        A.   My recollection is my primary source of

9   communication was through the chief of staff,

10  Kaliope.  And that Saturday they had indicated

11  that they had it under control through the police

12  department.

13       Q.   And that was throughout the day on

14  Saturday, even after --

15       A.   No.  This was in the evening.

16       Q.   This was in the evening of April 25th?

17       A.   I didn't have any communication with the

18  City folks during the day.

19       Q.   Got it.

20            So just to make sure we're on the same

21  page, things happen at Camden Yards; there's

22  violence and property destruction.  After that

1    happens, you have a discussion with the chief of

2    staff, Kaliope Parthemos; correct?

3        A.    Yes.  I believe it was a brief phone

4    call.

5        Q.    And at that time she says that the City

6    has everything under control, and she doesn't

7    mention any need for resources; correct?

8        A.    Correct.

9        Q.    Now, Governor Hogan ask you to,

10   quote/unquote, attach yourself to the Mayor.  Did

11   you do so?  Did you --

12       A.    I was -- I believe the Governor is

13   referring to Monday.  That's when I had my first

14   physical presence with the Mayor, Monday.

15       Q.    Okay.  So let's stick with this

16   Saturday, April 25th.  When you're having this

17   conversation with the Governor, the one we just

18   mentioned where he says he wants you to attach

19   yourself to the Mayor, do you recall where you

20   were at that time?

21       A.    I believe I was at home.

22       Q.    Okay.  And you mentioned that you had a

1          And I had asked you regarding

2   discussions that you had with the Governor or

3   others at the state regarding that dynamic.

4   Before disclosing the actual discussions, could

5   you describe the nature of those discussions,

6   please?

7          A.   Is this the way how state government

8   operates or defers to the locals in terms of

9   policing and how it handles situations within

10  their jurisdiction?  The Governor and I'm sure

11  other governors are -- or other electeds defer to

12  the locals because they best know what's happening

13  on the ground.

14         Q.   Okay.  And that was discussed between

15  you and the Governor, correct, and others at the

16  state?

17             MR. SCOTT:  Objection.

18             You can answer.  Just don't disclose any

19        conversations you had with the Governor.

20             THE WITNESS:  I don't remember having

21        any discussions.  Again, I was the new guy

22        that happened to live in Baltimore City, so I

51

1          wasn't in a bunch of meetings that the

2          Governor had with his Homeland Security

3          folks, his law enforcement folks.  I believe

4          I was at home on Sunday.

5     BY MR. HWANG:

6          Q.   Sure.  But is it fair to say that at

7     that time that the state was taking the same

8     approach, that it would defer to Baltimore City

9     and the locals to take the lead --

10         A.   Correct.

11         Q.   -- because they have their boots on the

12    ground; they know what's going on?

13         A.   Correct.  The state was monitoring the

14    situation.

15         Q.   Sure.

16              Okay.  Now, if we could go back -- and,

17    actually, before we go back to where we were, we

18    were previously discussing a meeting that you had

19    had or attended on Friday, April 24th with the

20    Lieutenant Governor and also community leaders.

21              Do you recall that?

22         A.   Yes.

69

1    you."

2         Q.   Okay.  I want to ask you this.  On page

3    114 in the middle, there's a paragraph that begins

4    "a formal state of emergency."

5              Do you see that?

6         A.   Right.

7         Q.   Governor Hogan says, "A formal state of

8    emergency would give us the authority to provide

9    important assistance.  Normally, the state police

10   did not patrol city streets.  Once an emergency

11   was declared, they could."

12             Is that accurate?

13        A.   Correct.

14        Q.   Do you recall that being relayed to the

15   City?

16        A.   I don't.  I wasn't part of that

17   conversation.

18        Q.   Okay.  Governor Hogan then continues to

19   state, "The declaration would enable us to stand

20   up and activate the National Guard."

21             Is that accurate?

22        A.   Yes.

1      Q.   Do you recall anyone conveying that to

2  the city?

3      A.   I wasn't part of any of those

4  conversations.

5      Q.   Okay.  Governor Hogan then says, "The

6  Emergency Management Agency could cut through the

7  usual bureaucracies and fast-track state aid."

8           Is that accurate?

9      A.   That's accurate.

10      Q.   Did you help coordinate state aid to the

11  City during the protesting?

12      A.   I did not.

13      Q.   Do you recall ever conveying what

14  Governor Hogan just stated here to anyone at the

15  city?

16      A.   I don't.

17      Q.   When Mayor Rawlings-Blake -- whether it

18  was at City Hall or at the EOC that day, do you

19  recall there being any discussion about declaring

20  a state of emergency?

21      A.   Just -- at that time, no.  I was just in

22  the EOC, so I don't know what the governor's staff

1    then the Governor -- what was happening at EOC,

2    basically the Governor -- or not the Governor but,

3    like, just a lot of stuff happening on the

4    monitors of the fire and the police monitoring

5    things, getting the emergency personnel to certain

6    spots around the city.  Conference room is off

7    from like a big -- like a war room, so to speak,

8    with a bunch of monitors, so.

9        Q.   Do you recall any additional discussions

10   that you had with the then mayor?

11       A.   No.

12       Q.   Okay.  Let's see here.

13            If I could direct your attention to

14   Exhibit 5, which is an e-mail that was produced by

15   the City as CITY00052097.

16       A.   Uh-huh.

17       Q.   You sent this e-mail; correct?

18       A.   Yes.

19       Q.   And you sent this e-mail to the chief of

20   staff -- then chief of staff for the Mayor,

21   Kaliope Parthemos?

22       A.   Yes.

82

1       Q.   And this was sent on April 28th, 2015,

2   at 3:42 p.m.; correct?

3       A.   Correct.

4       Q.   And on here I see a list.  What does

5   this list represent?

6       A.   This is a list -- from what I recall,

7   there was a request of all the state resources

8   that were being put on behalf of the City.

9       Q.   Okay.  These are -- you say state

10  resources?

11      A.   The state resources.  I believe this is

12  a result of, I guess, a phone call that I received

13  from Kaliope about how many -- what was the state

14  doing to assist the City.

15      Q.   Got it.

16           Well, I see, for example, on this --

17  included on this list are 300 Pennsylvania

18  officers and 150 officers from New Jersey.

19           Do you see that?

20      A.   Yes.

21      Q.   So those resources came from outside the

22  state of Maryland; right?

1      A.   Correct.

2      Q.   But did the state of Maryland -- was

3 that coordinated on the state level or was that

4 coordinated on the city level?

5      A.   That would be coordinated on the state

6 level.

7      Q.   Now, we talked earlier about, in the

8 Governor's book, him saying how declaring a state

9 of emergency would help get aid faster, cut

10 through the bureaucracy, have a different

11 procedure.

12           Do you recall that?

13      A.   From the book, yeah.

14      Q.   Okay.  Now, these resources described in

15 Exhibit 5 coordinated by the state, were these all

16 done kind of through the state of emergency

17 procedures that were put in place?

18      A.   I believe so.

19      Q.   Now, if we could go back to the book on

20 page 114.

21           As we move on to April 28th, do you

22 recall having discussions with different groups in

84

1 Baltimore, whether it be the Waterfront

2 Partnership, Herbie Fowler (phonetic), other

3 organizations within Baltimore?

4     A.   That was -- yeah.  During that week,

5 yes.

6     Q.   Okay.  And do you recall discuss --

7 having discussions regarding what state resources

8 would be coming in?

9     A.   With those entities?  I don't remember

10 specifically what we talked about.

11     Q.   Okay.  Well, if I could go back to page

12 114, again the paragraph that starts "a formal

13 state of emergency."

14     A.   Right.

15     Q.   The second sentence says, "Normally, the

16 state police do not patrol city streets.  Once an

17 emergency was declared, they could."

18          Do you see that?

19     A.   Yeah.

20     Q.   So did that, in fact, happen?

21          Once a state of emergency was declared,

22 did the state police also help patrol the streets?

ORIGINAL TRANSCRIPT

1       A.   I believe so.

2       Q.   And do you recall that being the case

3    throughout the city?

4       A.   Yes.

5       Q.   Bear with me.

6            If I could direct your attention to page

7    137.

8       A.   What page?

9       Q.   137.

10      A.   All right.

11      Q.   And I'll let you read the first -- what

12   is it -- four paragraphs or so.  I want to lead

13   you up to the point where Governor Hogan recounts

14   stating to Mayor Rawlings-Blake, "Did you just say

15   the gang leaders are angry?"

16           But obviously I want to have you have

17   some context, so --

18      A.   All right.

19           Okay.

20      Q.   So Governor Hogan seems to be stating

21   here that Mayor Rawlings-Blake was receiving input

22   from, quote/unquote, gang leaders.

1    deferring to the local jurisdictions.  I don't

2    know if they will call the state in these

3    situations.

4              But in this particular situation, I just

5    don't know.

6         Q.   Okay.  Do you know whether the state was

7    considering whether to send resources regardless

8    of whether or not the City was requesting the

9    resources?

10        A.   I don't.

11        Q.   Okay.  But is it safe to say that the

12   state would have waited for the City to say "we

13   need these resources" before sending them?

14        A.   I think you can make that assumption.

15             MR. HWANG:  Okay.  That's all I have.

16             So, Mr. Scott, did you have any

17        questions?  Actually I forgot to ask you

18        that.

19             MR. SCOTT:  No, I do not.

20             MR. HWANG:  Did you want to advise as

21        to --

22             MR. SCOTT:  We'll read and sign the

1         CERTIFICATE OF SHORTHAND REPORTER

2

3         I, Lisa Barbera, Shorthand Reporter, the

4     officer before whom the foregoing deposition

5     was taken, do hereby certify that the

6     foregoing transcript is a true and correct

7     record of the testimony given; that said

8     testimony was taken by me stenographically

9     and thereafter reduced to typewriting under

10    my supervision; and that I am neither counsel

11    for or related to, nor employed by any of the

12    parties to this case and have no interest,

13    financial or otherwise, in its outcome.

14

15         IN WITNESS WHEREOF, I have hereunto set

16    my hand this 11th day of February, 2021.

17

18

19

20   LISA BARBERA

21   STENOGRAPHER

22

# EXHIBIT 19

CHASE BROTHERS, LLC, ET AL. vs MAYOR & CITY COUNCIL OF BALTIMORE, ET AL.
Michael A. Lewis on 04/23/2019

```
 1    IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF MARYLAND
 2              NORTHERN DIVISION

 3    ----------------------------
                                    :
 4    CHASE BROTHERS LIMITED        :
      LIABILITY COMPANY, ET AL.,    :
 5                                  :
                       Plaintiff,   :
 6                                  :
                  vs.          :CIVIL ACTION NO.:
 7                             :   1:17CV-01657-GLR
      MAYOR & CITY COUNCIL OF       :
 8    BALTIMORE, ET AL.,            :
                                    :
 9                     Defendant.   :
      _____

10
                           April 23, 2019
11
      Deposition of
12
                     MICHAEL A. LEWIS,
13
      a witness, called for examination by counsel for
14
      the Plaintiffs, pursuant to Notice, at Wicomico Public
15
      Library, 2300 N. Salisbury Boulevard, Suite 101,
16
      Salisbury, Maryland 21801, commencing at 1:20 p.m.,
17
      there being present on behalf of the respective
18
      parties:
19

20

21

22

23

24

25
```

```
 1    ON BEHALF OF THE PLAINTIFF:

 2         PETER K. HWANG, ESQUIRE
           Sung & Hwang, LLP
 3         9256 Bendix Road
           Suite 109
 4         Columbia, Maryland 21045

 5    ON BEHALF OF THE DEFENDANT:

 6         SARA E. GROSS, ESQUIRE
           JASON FOLTIN, ESQUIRE
 7         City of Baltimore
           Department of Law
 8         100 N. Holliday Street
           Suite 101
 9         City Hall
           Baltimore, Maryland 21202
10
      VIDEO OPERATOR:  JULIE SOUZA
11
      REPORTED BY:  KATHLEEN A. COYLE, Notary Public
12
                             - - -
13

14

15

16

17

18

19

20

21

22

23

24

25
```

CHASE BROTHERS, LLC, ET AL. vs MAYOR & CITY COUNCIL OF BALTIMORE, ET AL.
Michael A. Lewis on 04/23/2019                              Page 3

```
 1                    C O N T E N T S

 2
     WITNESS               EXAMINATION BY          PAGE
 3
     MICHAEL LEWIS         MR. HWANG                  4
 4                         MS. GROSS                 68
                           MR. HWANG                101
 5
                      E X H I B I T S
 6
     LEWIS       DESCRIPTION                       PAGE
 7
     Exhibit 1       Subpoena                         8
 8
     Exhibit 2     Lawsuit excerpt (first 30 pages)  13
 9
     Exhibit 3     Subpoena for documents            63
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                   P R O C E E D I N G S

2          THE VIDEOGRAPHER:  Today is April 23, year

3    2019.  We're going on the record at 1:19.  This is a

4    deposition of Sheriff Michael Lewis, taken in the

5    matter of Chae Brothers Limited and the Mayor and City

6    Council for Baltimore, Maryland.  The deposition is

7    being held in the Wicomico Public Library, on the 23rd

8    of April, 2019, starting at 1:00.  My name is Julie

9    Souza, videographer, from the firm of Hunt Reporting

10   Company, located at 12 Crain Highway, Northwest, Glen

11   Burnie, Maryland.  This case is in the court of the

12   U.S. District Court for the District of Maryland.  Case

13   number 1:17-CV-01657-GLR.  The court reporter's name is

14   Kathy Coyle in association of Hunt Reporting Company.

15   Would counsel please introduce themselves?

16          MR. HWANG:  Peter Hwang, counsel for the

17   Plaintiffs.

18          MS. GROSS:  Sara Gross and Jason Foltin on

19   behalf of Defendant, Mayor and City Council of

20   Baltimore.

21          THE VIDEOGRAPHER:  Would the court reporter

22   please swear the witness.

23          THE REPORTER:  Mr. Lewis, could you raise

24   your right hand, please. Whereupon,

25     MICHAEL LEWIS, a witness, called for examination by

1                          counsel for the

2              Plaintiffs, was duly sworn, and was examined

3      and testified as follows:

4              THE VIDEOGRAPHER:  Please continue.

5              EXAMINATION BY COUNSEL FOR PLAINTIFFS

6              BY MR. HWANG:

7      Q    Good afternoon, Sheriff.

8      A    Good afternoon.

9      Q    Could you state your full name for the

10     record, please?

11     A    Sheriff Mike Lewis, L-E-W-I-S, Sheriff of

12     Wicomico County.  I've been a sheriff for 12 years, six

13     months.

14     Q    Great.  As you may know, my name is Peter

15     Hwang, and I represent the Plaintiffs in this action,

16     who are suing the Mayor and City Council of Baltimore

17     for, among other things, damage to Claimant's property

18     and business.  As you may know, we are here for a

19     deposition which will consist primarily of me asking

20     you questions and you providing the answers to those

21     questions.

22              As you can see, there's a court reporter

23     sitting at the table.  She is transcribing my questions

24     and your responses.  As such, it is important that you

25     answer my questions verbally.  Please refrain from

1    address?

2        A    My current  -

3        Q    Address?

4        A    401 Naylor Mill Road, Salisbury, Maryland.

5    That's my work address.  That's where I receive all

6    correspondence as Sheriff of Wicomico County.

7        Q    That's the sheriff's office, correct?

8        A    That's correct.

9        Q    And how long have you been working at that

10   address?

11       A    Twelve-and-a-half years.

12       Q    And do you have any present intention to move

13   offices or anything like that?

14       A    No, sir.

15       Q    What is your current phone number?

16       A    (410) 548-4891.

17       Q    Is this a cell phone or a land line?

18       A    That is a land line at the Wicomico County

19   Sheriff's Office.

20       Q    Okay.  You stated before, you testified

21   earlier that you are the sheriff of Wicomico County?

22       A    I am.

23       Q    Is that your only source of current

24   employment?

25       A    It is.

CHASE BROTHERS, LLC, ET AL. vs MAYOR & CITY COUNCIL OF BALTIMORE, ET AL.
Michael A. Lewis on 04/23/2019                                   Page 10

1       Q      And for how long have you been the sheriff of

2    Wicomico County?

3       A      I was elected in November of 2006, after

4    serving 22 years as a Maryland State Trooper.

5       Q      And since November of 2006 have you

6    continuously been the sheriff of Wicomico County?

7       A      I have.  I've been elected three more

8    successive terms, after running unopposed each time.

9       Q      Now, prior to you being elected as sheriff

10   where were you employed?

11      A      As a Maryland State Trooper.

12      Q      And for how long?

13      A      Twenty-two years.

14      Q      And during your 22 years of employment as a

15   Maryland State Trooper what titles did you hold or

16   rank?

17      A      Trooper, trooper first class, corporal,

18   sergeant, and after being promoted to sergeant I chose

19   not to participate in the promotional process for the

20   last 11 years of my career.  I was very happy doing

21   what I was doing.

22      Q      So for how long were you a sergeant with the

23   Maryland State Police, approximately?

24      A      Ten years.

25      Q      Ten years.  And as a sergeant, what were your

CHASE BROTHERS, LLC, ET AL. vs MAYOR & CITY COUNCIL OF BALTIMORE, ET AL.

1   was that assignment?

2        A    She asked us, because of the size of our

3   armored vehicle, would we sit out in front of BPD

4   Headquarters and protect East Lafayette Street and City

5   Hall, specifically the mayor's office, which is, I

6   think Gay Street.

7        Q    And that was the assignment for your vehicle

8   and also for --

9        A    And my deputies.

10       Q    - and all your deputies?

11       A    All my deputies, who were armed with rifles,

12   fully automatic weaponry.  They are SWAT Team,

13   tactically sound guys.  We were asked to protect the

14   BPD Headquarters and City Hall from any further

15   destruction.

16       Q    Do you recall what the  - I'm going to call

17   it the chain of command, but in terms of how orders

18   were issued, or assignments were issued, or who your

19   point of contact was, do you recall how that worked

20   between your agency and the Baltimore City Police

21   Department?

22       A    No, sir.

23       Q    Okay.

24       A    I'm going to be honest with you, sir.  It was

25   very chaotic and disorganized.  It really was.  I was

CHASE BROTHERS, LLC, ET AL. vs MAYOR & CITY COUNCIL OF BALTIMORE, ET AL.
Michael A. Lewis on 04/23/2019                                    Page 27

1    disappointed there wasn't more of a chain of command,

2    someone with authority saying this is what we want you

3    guys to do.  This is what  - all I could hear on the

4    radio that entire night was stand down.  Stand down.

5              MS. GROSS:  Objection.

6              THE WITNESS:  That's what I heard.  But no

7    one told me that.  No one told me to stand down.  But I

8    heard officers being told to stand down by what

9    appeared to be superior officers on the radio.

10             BY MR. HWANG:

11       Q    When you say you heard that over the radio,

12   was that over the radio that was issued to you?

13       A    That's correct.  BPD radio.  Absolutely.

14       Q    So you weren't able to hear that or have

15   access to that while you were driving from Wicomico

16   County to Baltimore City?

17       A    No, sir.  I did not.  I do know there were

18   deputies that were informing me that their significant

19   others were watching the news and that all hell had

20   broken loose in Baltimore City.  They were destroying

21   businesses.

22       Q    Okay.  You said that your office was tasked

23   with protecting headquarters and City Hall.  Were there

24   officers from other jurisdictions that were given the

25   same assignment as your office?

1       A     Yes, sir.

2       Q     With who?

3       A     They were all street cops that were coming in

4   to BPD Headquarters.  They were  - there were anywhere

5   from three to five police officers in each car.  And I

6   had lots of communication with them.

7       Q     Do you recall any communication specifically?

8       A     I do.

9       Q     What communications do you recall?

10      A     They all --

11            MS. GROSS:  Objection.

12            THE WITNESS:  They were all telling me they

13  were told to stand down.  They were cursing.  They were

14  upset that the mayor had left them out to get injured,

15  to get hit, to be beaten.  They said specifically, can

16  you fucking believe this.  They're allowing them to

17  destroy this city.  We can't even do our fucking jobs.

18  They're allowing them to destroy the city.  That was

19  said to me by carloads of BPD cops that came in and out

20  while we were standing there near BPD headquarters for

21  hours.  That's what we've repeatedly heard the whole

22  time we were there.  And quite honestly, I was in

23  disbelief because it went against everything I had ever

24  been taught as a Maryland State Trooper and as a

25  sheriff of Wicomico County when it comes to the

CHASE BROTHERS, LLC, ET AL. vs MAYOR & CITY COUNCIL OF BALTIMORE, ET AL.

Michael A. Lewis on 04/23/2019                                    Page 30

1   preservation of life and property.  That is what we do,

2   we protect people and protect our property.  And I was

3   told repeatedly that the mayor said let them destroy

4   property, let them vent their frustration.  It is only

5   property.  Let them destroy property.  That's what I

6   heard repeatedly from cops that night.  And then of

7   course I later saw it in person as it was played

8   repeatedly on national TV.

9        Q    We'll come back to the stand down order.  But

10  for now, from the location where you were posted did

11  you first-hand-see any rioting?

12       A    Did I hand see what, sir?

13       Q    First-hand-see any rioting?

14       A    Oh, absolutely.

15       Q    Did you first-hand-see any destruction of

16  property happening?

17       A    By the way, I didn't see any rioting at all

18  Monday night into Tuesday morning, before we left to

19  come back home.  It's when I went back that I saw

20  rioting, that I saw gang bangers in various bandannas

21  across their faces, destroying property.

22       Q    Did you see anyone destroying any property

23  when you were there on Monday, from Monday to --

24       A    No, sir.  I did not.  I did not.

25       Q    Are you familiar with 105.7 The Fan?

1   the time, but she's been pointed out to me many times

2   since then as the one who had given the order.

3        Q    And when you say given the order, you mean

4   the stand down order?

5        A    That's correct.

6        Q    Did you ever personally hear it from her

7   mouth?

8        A    No, I did not.  What I did hear is the order

9   being given over BPD radio that was tethered to by body

10  armor, telling them to retreat,  -

11            MS. GROSS:  Objection.

12            THE WITNESS:   - retreat, and retreat. Stand

13  down.  Do not engage them.  Do not engage them. I heard

14  that repeatedly.  And I heard one officer screaming,

15  "they are throwing bricks and bottles at us from the

16  rooftops" and they were still told to retreat and stand

17  down.

18            BY MR. HWANG:

19        Q    You're testifying that you heard it

20  repeatedly?

21        A    Yes, sir.

22        Q    Did you hear that come from the same person,

23  that order?

24            MS. GROSS:  Objection.

25            THE WITNESS:  I'm not sure who it was coming

CHASE BROTHERS, LLC, ET AL. vs MAYOR & CITY COUNCIL OF BALTIMORE, ET AL.
Michael A. Lewis on 04/23/2019                                    Page 90

1                    CERTIFICATE OF NOTARY

2    I, KATHLEEN A. COYLE, Notary Public, before whom the

3    foregoing testimony was taken, do hereby certify that

4    the witness was duly sworn by me; that said testimony

5    is a true record of the testimony given by said

6    witness; that I am neither counsel for, related to, nor

7    employed by any of the parties to this action, nor

8    financially or otherwise interested in the outcome of

9    the action; and that the testimony was reduced to

10   typewriting by me or under my direction.

11   This certification is expressly withdrawn upon the

12   disassembly or photocopying of the foregoing

13   transcript, including exhibits, unless disassembly or

14   photocopying is done under the auspices of Hunt

15   Reporting Company, and the signature and original seal

16   is attached thereto.

17   _____

18   KATHLEEN A. COYLE

19   Notary Public in and for the State of Maryland

20   My Commission Expires: April 30, 2022

21

22

23

24

25

# EXHIBIT 20

**From:** Marcus, William <William.Marcus@baltimorepolice.org> on behalf of Marcus, William
<William.Marcus@BaltimorePolice.org>
**Sent:** Wednesday, April 15, 2015 5:43 PM EDT
**To:** Batts, Anthony <Anthony.Batts@baltimorepolice.org>
**Subject:** FW: Protest at 1743 hours


-----Original Message-----
**From:** Marcus, William
**Sent:** Wednesday, April 15, 2015 05:42 PM Eastern Standard Time
**To:** DeSousa, Darryl
**Subject:** Protest at 1743 hours


Boss,
The size of the protest has reached about 35. They are mostly number 2 males and females about 25 to 45 years old. They are orderly and peaceful.
Respectfully,
William Marcus

**CONFIDENTIAL - Produced Pursuant to Protective Order**

# EXHIBIT 21




# BALTIMORE POLICE DEPARTMENT
## ANALYTICAL INTELLIGENCE SECTION
# SITUATIONAL AWARENESS

| | | |
|---|---|---|
| Author: Gaylord<br>410-396-2640 | Date: 4/16/2015<br>AIS: 2015-115 | Prepared by BPD Analytical<br>Intelligence Section |

# THREAT ON OFFICERS – USE EXTREME CAUTION

**THREAT:**
On 4/16/2015 at approximately 0500hrs, an unknown male called the Central District and stated there were BGF, Bloods and Crips members in the Gilmore Homes area. These gangs were going to kill any police who come in there. Officers need to be careful because it stems from the Gilmore Homes incident that occurred this past Sunday. The caller refused to give his name and hung up the phone. Information was immediately relayed to the Watch Center and Communications.

*The tip received is an unconfirmed threat and could not be verified by the source. However, Officers should exercise extreme caution around the Gilmore Homes and work as a two man unit when patrolling the area. Officers should alert their Commander and Communications when entering Gilmore Homes to patrol. Any incidents should be documented and reported through the chain of command and also forwarded to the Watch Center.*

**SUNDAY INCIDENT:**
The incident the caller was referring to occurred on 4/12/2015 when Freddie Gray, 27yoa, was arrested by Baltimore City Police leaving him in critical condition after the arrest. It is unknown what happened from the time he was arrested to when he was placed in Shock Trauma, but witnesses captured the arrest on cell phone cameras and now the incident is under investigation.

Witnesses described the arrest as brutal. Gray's family says he now has spinal injuries. Gray's family also explained Gray's face is swollen and he is in an induced coma. Gray's family also stated he was tased, however, there is no evidence of that occurring. Police say they saw the video and there was no use of excessive force. But, they do suspect Gray was brought to Maryland Shock Trauma with injuries.

CBS. *Cell Phone Video Captures Police Incident Now Under Investigation*
http://baltimore.cbslocal.com/2015/04/13/cell-phone-video-captures-police-incident-now-under-investigation/

## ANALYTICAL INTELLIGENCE

A search on Facebook and Twitter was conducted by the Open Source Unit to identify any mentions of threats in the Gilmore Homes with negative results. A search using Geofeedia was also conducted around the Gilmore Homes for any mentions of threats with negative results.

*For Official Use Only//Law Enforcement Sensitive//Do Not Disseminate Outside Agency*
*Further Investigation Must be Conducted Prior to Taking Action*
**Page 1 of 1**

CONFIDENTIAL - Produced Pursuant to Protective Order

# EXHIBIT 22

# "Preventing Harm"
# Conduct in the Community



*Anthony W. Batts*

*Police Commissioner*

*Baltimore Police Department*

*October 6, 2014*

**CONFIDENTIAL - Produced Pursuant to Protective Order**

## TABLE OF CONTENTS

Introduction:                                                                              3

**Chapter 1: The Baltimore Police Use of Force**                                           **5**

    **Use of Force Data**                                                6

    **Reportable Use of Force**                                          6

    **External & Internal Complaints to the Internal Affairs Division**  6

    **Command Investigations Units Data**                               6

    **The Zero Tolerance Policy**                                        7

    **Internal Affairs Division (IAD)**                                  7

    **Command Level Investigations**                                     8

    **Recent IAD Reforms**                                               9

    **Results**                                                          10

    **Recommended IAD Reforms**                                          10

**Chapter 2: Reestablishing Community Trust**                                              **12**

    **Consent Decree Comparisons**                                       12

    **Baltimore Police Department Specifics**                            20

**Chapter 3: Independent Review Boards**                                                   **27**

**Chapter 4: Training**                                                                    **31**

**Chapter 5: Stronger Management Rights**                                                  **34**

**Chapter 6: Community Partnerships**                                                      **37**

**Summary**                                                                                **41**

2

## **PREVENTING HARM: AN INTRODUCTION**

The Baltimore Police Department (BPD) is charged to protect the lives and property of everyone who lives, works and visits the City, and to secure the equal protection of laws for all.  The BPD detects and prevents crime, investigates crime and apprehends those charged with crime including homicide, sexual assault, child abuse, drug and human trafficking, and burglary.  The BPD is entrusted with many tools to carry out these missions; the most weighty and potentially harmful is the authority to use force.

State and Federal laws, along with BPD's policies, authorize police to use only the amount of force necessary to effectuate a lawful arrest, or to protect themselves or others from harm or death.  The September 2014 excessive force incident involving a uniformed officer of a man at a bus stop appears to be an egregious example of the unjustified use of force.  Commissioner Batts and Deputy Commissioner Rodriguez were quick to condemn it as unacceptable and launched a full scale criminal and administrative investigation.

The video of the bus stop incident was swiftly followed by a front page Baltimore Sun article detailing 43 cases where police misconduct was alleged and plaintiffs received payments over $30,000 during the last three years.  Most of these cases concerned incidents that occurred before 2009, though one was from July 2012.  All of these cases pertain to police interactions with residents prior to Commissioner Batts' tenure.

Commissioner Batts, since his appointment in September 2012, has been seriously engaged in the work of improving police relationships with Baltimore's communities. From the start Commissioner Batts has strategically prioritized reforms that will have the greatest impact in fostering the ethic to "protect and serve".  It isn't flashy and it doesn't make headlines, but he and his team have been doing the hard work of reforming the internal discipline process so that bad actors are punished and bad cops are fired. Already the conviction rate for trial boards, the only way police can be disciplined under state law, has increased from 57% in 2012 to 89% in 2014 (year to date).  Complaints against officers for misconduct are down significantly as are lawsuits filed.[1]

The reforms instituted by Commissioner Batts, as outlined below, are deep and all encompassing:

- Appointed Independent Review Boards (IRBs) who objectively reviewed the Tyrone West and Anthony Anderson in-custody death cases and worked to implement their recommendations on preventing such deaths in the future.

---

[1] In 2011 there were approximately 93 lawsuits filed; in 2012 there were approximately 101 lawsuits filed; in 2013 there were approximately 84 lawsuits filed, and 2014 year-to-date there have been approximately 51 lawsuits filed.

3

- Commissioned a Strategic Plan[2] and an audit of the BPD internal discipline process and he has steadfastly worked to implement their recommended reforms.
- Created a Categorical Use of Force Review Board and Force Investigation Team to increase the standards of ethics, integrity and accountability.
- Developed a website dedicated to informing the public on the details of categorical uses of force.
- Established relationships with advisory councils that give voice to African-American, Hispanic, lesbian, gay, bisexual and transgender (LGBT), as well as other communities.
- Improved training, mentoring and supervision for police.
- Launched the Department's overall revision and updating of internal policies.
- Disbanded the Violent Crimes Impact Section (VCIS), a unit responsible for a large number of citizen complaints against the Department.

The best way to prevent abuse is to train on its use, circumscribe it with rules, and enforce the rules.  When bad actors have impunity, the good cops become demoralized and the bad ones are emboldened.  Conversely when bad actors are punished the effects ripple out through the force and everyone knows that good, constitutional policing is required and rewarded.  This is how the culture of policing changes:

1) Effective training
2) Effective supervision and investigation
3) Fair and swift discipline

The burden on taxpayers of paying court judgments and settlements to plaintiffs will be greatly reduced in the near future, when the suits filed today are concluded.  The payments now are based on what happened several years ago.  The past cannot be changed but the Department is intent on changing the future.

BPD needs the collaboration of the community to do its job in every way.  It needs help with information to prevent and solve crime.  It needs an honest critique about how it is doing and what needs improvement.

Mayor Stephanie Rawlings-Blake and Police Commissioner Anthony Batts have repeatedly stated the importance of rebuilding the trust of all residents and visitors of Baltimore City.  This starts by ensuring officers are courteous and respectful to everyone they encounter, regardless of the situation.

This document outlines reforms in progress and provides context for those reforms. The BPD recognizes that many of its reforms can be aided by the expertise and assistance of the Department of Justice (DOJ); it is thus requesting that assistance.

---

[2] Baltimore Police Department 2013, Public Safety in the City of Baltimore, A Strategic Plan for Improvement

4

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00015589

# CHAPTER 1

In 2012, the Baltimore Police Department began the process of undergoing institutionalized reform to bring the agency more into alignment with community expectations. The Police Commissioner disbanded the plain-clothes unit known as VCIS (Violent Crime Impact Section), which was responsible for an overwhelming majority of citizen complaints.  At the same time the Police Commissioner brought in outside experts to evaluate the Baltimore Police Department in the most comprehensive review conducted in a decade.  This review would become the Strategic Plan, the basis for a majority of reform in the agency.  That evaluation would be one of four such outside reviews he would request.   The other evaluations included the Anthony Anderson Independent Review Board, The Tyrone West Independent Review Board, and the Karen Kruger Internal Affairs Division Audit Report.  Portions of those reports were utilized in the development of this review.

The most significant step taken by the Police Commissioner was the addition of a third Deputy Police Commissioner and creation of the Professional Standards and Accountability Bureau (PSAB).  This Bureau has taken on the bulk of responsibility in reforming the disciplinary process and accountability of the organization.   Internal Affairs, the Force Investigation Team, the Professional Development and Training Academy, Written Directives, General Accountability Office, Office of Internal Oversight, and the Overtime Unit all fall under the PSAB.

These reforms are already statistically indicating a degree of success.   Trial Board convictions have gone from 57% to 89%.   Use of force and civilian discourtesy complaint numbers are down by 30% margins.   These few highlights are reflective of the reforms that are being enacted agency-wide.

While the amount of money paid to plaintiffs in civil cases against the BPD is large, Baltimore does well compared to other jurisdictions.  According to data in a CBS news report in 2010, Baltimore pays out less than half the amount **per capita** compared to Los Angeles, Philadelphia, New York City or Chicago[3].  During the fiscal years 2007 through 2013 Baltimore paid out an average of $1.64 million per year, or approximately $2.64 per resident.  Los Angeles paid out $5.64 per resident, Philadelphia $6.03 per resident, New York City $11.79 per resident and Chicago $14.51 per resident.

## The Baltimore Police Use of Force

In preparing this document, the BPD collected data from its internal software system IAPRO[4].  The BPD began using IAPRO at the end of 2010 as part of a settlement

---

[3] http://newyork.cbslocal.com/2010/10/14/nypd-paid-nearly-1-billion-to-settle-lawsuits/
[4] IAPRO is a software system owned by CI Technologies, which is used by law enforcement agencies throughout the world for capturing and tracking data.

5

agreement arising from a federal lawsuit against the BPD[5].  As previously stated, the information shows a decline in the number of complaints against BPD officers.

## Use of Force Data

The BPD requires the documentation of uses of force that fall within the category of Reportable Force.  Reportable Force is defined as:

- Any discharge of a firearm
- Any discharge of a less lethal shotgun
- Any use of a Taser
- Any use of the capture net
- Any canine inflicted injury
- Any discharge of Oleoresin Capsicum (OC)
- Any strike with an impact object
- Any striking of a suspect and/or arrestee with hands or feet
- Any physical contact with a suspect and/or arrestee resulting in an injury or complaint of injury

## Reportable Use of Force

**2011:**       563 Separate Reported Uses of Force – Total Arrests 54,798
**2012:**       598 Separate Reported Uses of Force – Total Arrests 53,438
**2013:**       471 Separate Reported Uses of Force – Total Arrests 48,423
**2014 YTD:**  435 Separate Reported Uses of Force – Total Arrests 35,157

## External & Internal Complaints to the Internal Affairs Division

|                      | 2011  | 2012 | 2013 | 2014 YTD |
|----------------------|-------|------|------|----------|
| **Total**            | 964   | 784  | 704  | 519      |
| **Sustained**        | 275   | 141  | 169  | 44       |
| **Percent Sustained**| 28.5% | 18%  | 24%  | 8.5%     |

*Note the majority of 2014 complaints are still open, therefore the numbers in the Sustained and Percent Sustained rows will increase.

## Command Investigations Units Data
*Includes Supervisory Complaints and minor internal complaints of tardiness and failing to appear in court.

**2011:** 6,111
**2012:** 5,833
**2013:** 5,047
**2014:** 4,171

---

[5] Maryland State Conference of NAACP Branches, _et al._ v. Baltimore City Police Department, _et al._, Civil Action No. 06-1863 (CCB), May 3, 2010.

6

**The Zero-Tolerance Policy**

In 2000, the Baltimore Police Department adopted a "zero-tolerance" crime fighting strategy. That strategy, based loosely on the "Broken Windows" theory[6], targeted members of the public who committed minor non-violent offenses such as loitering and trespassing. It was believed that targeting minor offenses would lead to getting serious criminal offenders off the street and deter others from committing even the most minor crime. Although crime decreased, the high number of arrests for minor offenses ignited a rift between the citizens and the police, which still exists today.

In 2005, at the height of the BPD's experiment with zero-tolerance policing, the number of arrests surpassed 100,000. Critics launched protests and called the zero-tolerance policy a misguided policy of mass arrests. The State's Attorney's Office at the time, not only criticized the arrests for minor infractions such as loitering and drinking alcohol in public, it declined to prosecute about a third of the cases[7].

The mistrust that zero-tolerance policies caused continues to contribute to the perception that the BPD has a serious problem with the use of force. Ongoing improvements are needed and will continue to be implemented. Some success is measurable over the last two years, but the work is far from done.


**Internal Affairs Division (IAD)**

IAD handles all serious allegations of misconduct made against all members of the Department. IAD is led by a Chief (civilian equivalent of a Colonel) and falls within the Professional Standards and Accountability Bureau.

The average length of time to complete IAD investigations is approximately 9 to 10 months. The length of time taken to complete the investigations erodes the publics', and the officers' confidence in assuring a complete and thorough investigation. The reason for the lengthy investigations includes a shortage of personnel, combined with the numerous operational details the IAD detectives are routinely assigned to assist the Neighborhood Patrol Bureau. Additionally, many cases are awaiting the State's Attorney's decision as to whether they will be proceeding with criminal prosecution. Presently, IAD is awaiting a decision on approximately 40 cases that date back to 2009.

The BPD's IAD is staffed primarily by detectives who hold the rank of officer. The investigative section of IAD consists of 20 detectives in the General Investigations Section (along with four sergeants and two lieutenants) and six (6) detectives in the

---

[6] A criminological theory introduced in 1982 by social scientists James Q. Wilson and George L. Kelling, which maintained the position that ignoring minor offenses led to the invitation of criminals to commit more serious offenses.

[7] Justin Fenton, *With Fewer Arrests in Baltimore, fewer cases that don't stick,* The Baltimore Sun, July 3, 2011.

7

CONFIDENTIAL - Produced Pursuant to Protective Order                                                  CITY00015592

Ethics Section (one sergeant and one lieutenant).  There is also an Administrative Section with one detective and four civilian administrative staff members that include one sergeant and one lieutenant, and an Early Intervention sergeant.

There is a general belief in the police community that IAD should be staffed with investigators the rank of Detective Sergeant, instead of detective.  Agencies such as Boston Police Department, New York City Police Department, the Montgomery County Police Department and the Los Angeles Police Department, all utilize sergeants to handle investigations.

Pursuant to the BPD's Strategic Plan, to ensure that rank-and-file officers have confidence in the disciplinary process, there must be assurances of impartiality and quality investigations.  Currently, IAD sergeants review all investigations, which are then reviewed by a lieutenant, the Acting Captain and then the Chief of IAD.  The Strategic Plan calls for IAD to be restructured so that sergeants conduct all investigations.


## Command Level Investigations

Whereas IAD handles all serious complaints of misconduct against members of the BPD, the Command Investigation Units (CIU) handles minor complaints of misconduct, (e.g. discourtesy, failure to appear in court, tardiness).  The CIU's fall under the command of the unit commanders, who have the authority to impose summary punishment of a penalty not to exceed 3-days suspended and/or $150 fine.  The CIU's are staffed with both detectives and sergeants, depending on the assignment, and work load averages anywhere between 850 to 1,000 cases per year.

Because of the discretion commanders have in imposing punishment, there is no consistency amongst the different commands.  There is a need for greater oversight of these types of investigations by IAD.

Effective and timely discipline is the backbone of reform in the organization.  Budget implications and resource allocation have factored heavily in the reform of the Baltimore Police Department.  As a result a strategic approach has been taken to enact reform. Since 2012 dramatic and sweeping reforms have been implemented. The following reforms have been implemented over the course of the last 24-months:

8

CONFIDENTIAL - Produced Pursuant to Protective Order                                                                                      CITY00015593

**Recent IAD Reforms**

| Before PSAB Creation | After PSAB Creation |
|---|---|

Before PSAB Creation:

1. Detectives determine if a case should be sustained or not-sustained

2. Training was provided by outside counsel connected to defendant officers cases
3. No previous investigative training
4. No combined training between IAD and CIU investigators
5. Minimal supervisor accountability
6. Cases reviewed as disciplinary issues only
7. No IRB for in-custody death cases
8. IAD detectives recruited with no specific background skills
9. IAD detectives did not previously respond to active scenes
10. IASTAT for IAD detectives was not held twice a week
11. No regular Trial Board training
12. Charging Documents completed by Trial Board Office
13. Stagnant Charging Committee
14. Trial Board had one Command member, one Lieutenant, one peer member
15. Semi-Annual Training Bulletins from the IAD Chief to the detectives

After PSAB Creation:

1. The Lieutenant, the Captain, and the Chief of IAD determine if a case is sustained or not. This ensures multiple levels of review before a decision is made.
2. New internal training in the area of the Law Enforcement Officers' Bill of Rights to prevent violations and procedural errors
3. Training in the area of internal investigations and interview and interrogation skills
4. Combined training between IAD and CIU investigators
5. Holding supervisors accountable when investigations revealed they failed to take corrective action.
6. Reviewing cases from a broader perspective than just misconduct (i.e., training issues or policy failures)
7. Utilizing independent review boards for in-custody death cases
8. Recruiting new IAD detectives with investigative experience
9. Implementing a more positive team approach at investigations, (i.e., detectives immediately respond to the scene as a team when the incident occurs)
10. Twice a week IASTAT for IAD detectives
11. Increased Trial Board training
12. Charging Documents now completed by the detectives and reviewed for legal sufficiency by BPD Legal Affairs attorneys
13. Revamped Charging Committee
14. Revamped the Trial Board Office and members who sit on the trial boards
15. Semi-annual training bulletins issued

9

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00015594

**Results**

BPD has achieved a dramatic improvement in results in its internal discipline of officer misconduct.  In 2012, only 57% of charged officers were convicted.  In 2014 (year to date) 89% have been convicted of misconduct.  Importantly, 39% of those charged are now accepting punishment or resigning rather than face a hearing, whereas in 2012 that number was only 32%.

**Recommended IAD Reforms:**

1. **Increased Staffing** – In order for IAD to handle serious allegations of misconduct, staffing should be increased by a minimum of 12 detectives.  This would increase the number of detectives per squad to six, and two for the Early Intervention Unit, the creation of a four person Domestic Violence Squad and the creation of a two person Complaint Intake Unit. In previous years IAD has had 38 detectives (seven (7) in each of the four squads in General, and 10 in Ethics Section).  The two lieutenants would supervise the CIUs.

- The General Section currently has four squads (five detectives per squad).  The number should be increased to six detectives per squad.
- The Early Intervention Unit is charged with acting as an early warning by monitoring the number of use-of-force incidents reported by officers, the number of deadly force incidents, and the number of complaints received within a set period of time. Currently there is one supervisor, with two detective vacancies.
- The two person Complaint Intake Unit will review all Blue Team entries and decide the case will remain in IAD or be handled by Command.
- The Domestic Violence Squad would be responsible for handling all domestic and intimate partner cases.  The detectives should receive specialized training and coordinate their work with the Department's Family Crimes Unit.
- Discontinue the practice of detailing IAD detectives to patrol, traffic, crowd control and enforcement details.

The increased staffing, coupled with refraining from using the IAD detectives for duties other than internal investigations, will greatly increase the rate of completion of the investigations.  This should lead to more confidence from the public, and officers, on the quality and fairness of the internal investigations.

2. **Update Equipment** – The Ethics Section is charged with conducting serious cases of police corruption and criminal activity.  They work in a covert location, conduct surveillances, and utilize various surveillance equipment.  The current equipment is outdated and needs to be upgraded.  The audio transmitters are worn by the undercover detectives (Merlin Whisperer Radio Transmitter - $2,500 per transmitter, requesting two transmitters); video surveillance cameras to

10

 CITY00015595

record integrity tests (Sony or Canon brands – average costs from $4,700 to $7,000 per – requesting one camera).

3. **Training Seminars** – Money needs to be allocated for IAD detectives to attend more external training programs.  The outside training should assist in improving the detective's skills and abilities.

4. **Vehicles** – Six additional vehicles need to be allocated to IAD for use by the detectives, one for each of the four areas, and one for the Early Intervention Unit and the sixth for the Domestic Violence Squad.  Currently each area has one vehicle to share amongst the five detectives (and the sergeant's car).

5. **Data Analyst II** – A Data Analyst needs to be hired for the IAD Administrative Section to properly collect, enter, monitor and analyze the data collected and entered into IAPRO.  This process has been started by Human Resources.  This item is already budgeted.

6. **Computers** – In the event IAD receives 12 additional detectives, 12 computers need to be purchased for their use. Total estimated cost is

7. **CIU Staffing and Oversight** – There are approximately 15 CIU units.  Each needs to be properly staffed with a minimum of one supervisor and a detective.  The CIU's need to be dedicated to investigating only disciplinary cases, and not assigned details.  The CIUs will come under the supervision of IAD.

8. **Notary Public** – The law requires that complaints of excessive force be notarized.  Funds need to be allocated to provide a notary certification for all IAD detectives.

9. **Increase Police Commissioner's Authority** – To provide the Police Commissioner with more decision making in the discipline of his officers.  Baltimore City Public Local Law provides the Police Commissioner the authority to supervise and discipline the members of the agency.  Currently, once IAD makes a sustained finding, the case is forwarded to the Charging Committee.  The Charging Committee makes a punishment recommendation to the accused officer.  The officer either accepts the punishment, or requests an Administrative Hearing Board.  This process completely bypasses the Police Commissioner, i.e., the Police Commissioner has no say in the punishment.  Currently, the Police Commissioner only has a say once the case has been adjudicated guilty at an Administrative Hearing Board.

The recommendation is that the Chief of IAD submits a recommended punishment to the Charging Committee.  The Charging Committee's recommendation is then forwarded to the Police Commissioner, or his designee, for his final agreement to the recommended punishment.

11

# CHAPTER 2

## Reestablishing Community Trust

Discipline of officers who commit misconduct is the work of the Internal Affairs Division. The efficacy of a police force's internal discipline has significant ramifications in virtually all aspects of police work. It helps maintain the public trust in the agency, ensures adherence to legal guidelines and effective practices, assists departments in exercising command oversight, reinforces training, protects the integrity of the department, and more. Agencies with inadequate internal affairs systems often struggle to maintain effective standards, morale, and discipline. Inasmuch, cities such as Los Angeles, Pittsburgh, Seattle, New Orleans, East New Haven, Steubenville, and Detroit have reached comprehensive settlement agreements with the Civil Rights Division of the DOJ to ensure that police services are delivered in a manner that fully complies with the Constitution and laws of the United States. Those agreements are usually embodied in two documents: (1) a **Settlement Agreement and Stipulated Order of Resolution (Consent Decree)** overseen by the Courts and a Monitor and (2) a **Memorandum of Understanding** (MOU) enforced by the parties (police department and court) with community oversight and the assistance of a Monitor.

This chapter compares the core group of policies and practices that were identified as areas of concern at those police departments that were investigated by the DOJ and judged as needing immediate changes. The areas of concern outlined in this chapter are not inclusive of all the changes ordered by the various agreements between the DOJ, courts and the police departments. Commissioner Batts directed his team to analyze the consent decrees to help guide the BPD's reform effort. BPD's analysis identified 10 areas where adopting an approach from a consent decree could improve BPD operations: The areas addressed in the consent decrees which BPD has decided to proactively implement include: (1) monitoring; (2) training; (3) institutional infrastructure; (4) supervision of officers; (5) collecting data and frequency of reporting; (6) community participation; (7) professional participation; (8) use of force; (9) traffic stops; (10) and, early warning systems.

<u>**Consent Decree Comparisons**</u>

The following chart reflects police agencies that have been ordered to make changes to their policies and procedures in response to consent decrees. The changes ordered in the agreements are organized into categories and those agencies that have taken measures to address those changes are issued an X relative to the category.

12

**CONFIDENTIAL - Produced Pursuant to Protective Order**                    CITY00015597

| Measures to Change | LAPD | Pitt PD | SEA PD | N.O. PD | E.Haven PD | Steubenville PD | Detroit PD |
|---|---|---|---|---|---|---|---|
| Recruiting, training, mentoring new officers | X | X | | X | | X | X |
| Monitoring | X | X | X | X | X | X | X |
| Training | X | X | X | X | X | X | X |
| Institutional Infrastructure | X | X | | X | | | X |
| Managing, Supervision, and Performance evaluations | X | X | X | X | X | X | X |
| Collecting Data, reporting, and report frequency | X | X | X | X | X | X | X |
| Professional or community participation | X | X | | X | X | X | X |
| Use of Force (training, policies, procedures, practices, documenting, etc.) | X | X | X | X | X | X | X |
| Traffic stops, stops, detention and arrests | X | X | X | X | X | X | X |
| Early Warning System (create, revise, enhance) | X | X | X | X | X | X | |
| Bias free policing, discriminatory policing | X | X | X | X | X | X | X |
| Revising and enhancing policy, procedures and practices | X | X | X | X | X | X | X |
| IID cases, training, reporting, monitoring | X | X | X | X | X | X | X |

13

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00015598

**CONSENT DECREE**
**Los Angeles Police Department**
**Mandated Changes**

On June 15, 2001, the courts formally entered the Los Angeles Police Department into a consent decree after the discovery and disclosure of the Rampart Area Corruption Incident by the Los Angeles Police Department. The DOJ notified the City of Los Angeles that it intended to file a civil suit alleging that the Department was engaging in a pattern or practice of excessive force, false arrests and unreasonable searches and seizures. As a result, the following reforms were mandated by the courts:

<u>Monitoring</u>

- Chief of Police shall provide quarterly reports on all disciplinary action, providing description of the circumstances and the disciplinary action, and explanations for the chosen action.
- City shall develop a plan for organizing and executing regular, targeted and random integrity audit checks to identify and investigate officers engaging in at-risk behavior, as well as random audits of warrant applications, arrest and booking reports, and use of confidential informant.
- Audit officer and supervisory training to reduce incidents of excessive force, false arrests, illegal searches, and make greater use of community-oriented-policing training models.
- City and DOJ shall appoint an Independent Monitor who shall monitor, review and report on the City's implementation of the Agreement, and who shall be subject to supervision and orders of the Court and shall file quarterly written, public reports to the Court.

<u>Training</u>

- Train managers and supervisors on early warning system to address at-risk behavior and implement system protocol.
- Develop and implement a protocol that sets requirements for training and managing units that monitor gangs to ensure proper experience with the practices of the units' and ensure training in interpersonal and administrative skills, cultural and community sensitivity, and police integrity.
- Continue to set eligibility criteria and to ensure training for Field Training Officers, and to provide all recruits, officers, supervisors, and managers with regular and periodic training on integrity and position-specific training targeted to supervisors and managers and those conducting investigations.

<u>Institutional Infrastructure</u>

- Create an early warning database, and to provide support to managers and supervisors in using the system.
- Continue its 24-hr toll free complaint hotline, provide access for complaints, and distribute materials to the community.

14

CITY00015599

## Supervision of Officers

- City shall establish a database containing relevant information about its officers and their practices to serve as an early warning system to identify at-risk behavior and promote best practices, which can be used to search and retrieve information and statistics as needed.
- Supervisors and managers shall monitor officers for at-risk behavior.
- Supervisors and managers shall review information about the officers they supervise; managers shall review the actions of subordinate managers and supervisors regarding adherence to policy of identifying and addressing at-risk behavior.
- Department shall have all booking recommendations and requests for warrants and affidavits reviewed and approved by a watch commander who will determine appropriateness, legality, and conformance with policies of such actions.

## Collecting Data and Frequency of Reporting

- City shall collect for its early warning system database information relating to officers' use of force, firearm discharges, injuries to officers, the results of all investigations into disciplinary matters, awards or commendations earned by officers, criminal charges brought against an officer, lawsuits or claims brought against officers, arrest reports, and training history; city shall maintain all personally identifiable information about an officer.
- City shall work to input historical data and information on an as available and cost effective basis.
- In conducting an investigation, LAPD shall keep records of all interviews, collect and preserve all evidence, and identify and report in writing all inconsistencies in statements.
- LAPD officers shall complete a report each time an officer conducts a motor vehicle stop or pedestrian stop. LAPD shall conduct an evaluation of successful programs across the US of programs addressing police interactions with persons who may be mentally ill, and conduct an evaluation of LAPD training, policies, and procedures for such interactions.
- Chief of Police shall report to the Commission on the imposition of discipline imposed each quarter.
- Chief of Police shall report on the findings of all audits on a quarterly basis.

## Community Participation

- LAPD shall make policies to ensure that complaints are easily filed and that materials are distributed to the community with information about individual rights and process for filing a complaint.
- LAPD shall keep complainant informed of resolution of matters including the disposition of the complaint.

15

                                   CITY00015600

- Department shall conduct a Community Outreach and Public Information program for each LAPD geographic area for the term of the Consent Agreement, which shall include open meetings and other communication with the community.
- LAPD shall prepare and publish on its website semiannual public reports including statistics on geographic and racial information of arrests, summary of discipline imposed upon claims of misconduct, and any new policies to address the issues of the Consent Agreement.
- LAPD shall establish a media advisory working group to facilitate information dissemination to various communities in Los Angeles.

## Professional Participation

- Department shall develop and implement a plan that ensures annual personnel performance evaluations for all sworn employees that address officers' civil rights integrity and community interaction, supervisors' performance in addressing at-risk behavior, reviewing uses of force, and other officer information.
- A specific unit within Operations Headquarters Bureau shall conduct all administrative investigations for Categorical Uses of Force, while LAPD shall conduct separate criminal investigations for such uses of force when appropriate. Police Commission shall review all reports of such uses of force to determine whether further investigation is appropriate. All other complaints shall be investigated by Internal Affairs Group.
- LAPD shall notify LA District Attorney's office whenever an officer shoots and injures a person.
- City shall notify LAPD whenever a civil lawsuit or claim of misconduct by an officer is filed.

### CONSENT DECREE
### New Orleans Police Department
### Mandated Changes

In May 2010, the DOJ formally notified the City of New Orleans that it was initiating an investigation of the New Orleans Police Department for an alleged pattern or practice of unlawful misconduct, pursuant to the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141 ("Section 14141"); the anti-discrimination provisions of the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. § 3789d1 Case 2:12-cv-01924-SM-JCW Document 2-1 Filed 07/24/12 Page 7 of 129("Safe Streets Act"); and Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000d ("Title VI").

As part of its investigation, DOJ, in conjunction with its police-practices consultants, conducted a detailed fact-finding review, including numerous tours of NOPD facilities; interviews with New Orleans officials, NOPD command staff, supervisors, and police officers; review of more than 36,000 pages of documents; and meetings with residents, community groups, and other stakeholders within the City. In addition, DOJ participated

16

in detailed exit interviews between its police-practices consultants and NOPD officials following each investigatory tour. DOJ issued a written report of its findings ("Report") on March 16, 2011. The Report documents DOJ's finding of a number of patterns or practices of unconstitutional conduct and details DOJ's concerns about a number of NOPD policies and practices. DOJ's investigation was conducted with the full cooperation of the City and NOPD. As a result, the following reforms were mandated by the courts:

## Use of Force

- Implement use of force policy. Policy should be clear to all members that use force or witness force.
- Provided clear guidance to what types of force can be used and situations to use it.
- Develop this policy with members of the community, NOPD commanders, training division and City Attorney Office.
- Require all officers to report force above un-resisted handcuffed.
- Establish penalties for officers who use or witness force use and fail to report it.
- Require all officers on scene to write a report documenting their observations.
- Use of force will be investigated by uninvolved superior.
- Investigators will collect all pertinent information in reference to force.
- Develop use of force review process.
- Collect and maintain use of force data and analyze same to identify trends.

## Stops, Searches and Arrests

- Annual training for 4th amendment rights (all members).
- Institute policies and procedures to collect data on and review stops.
- Establish system to coordinate with DA Office for input on quality of life arrest.
- Establish policy when it is mandatory or discretionary or prepare and Field Interview Cards (FIC).
- Ensure FIC info complies with all Federal and State privacy standards.

## Discriminatory Policing on the Basis of Race, Ethnicity and LGBT Status

- Implement policies that address and prohibit discriminatory policing.
- Provide training in the academy, field and IST.
- Collect data related to race and ethnicity of law enforcement actions. Report annually of the findings.
- Track complaints alleging profiling.
- Implement policies that indicate a pattern of biased policing by using an Early warning system.

## Recruitment

- Focus on applicants who share department's values.

17

- Dep. Superintendent will manage the background investigation unit.
- Provided recruiters with training on discrimination laws.

**Paid Details**

- Create unit that arranges, coordinates and monitors all officers' outside employment.
- Underscore that the ability to work Details is a privilege.
- Increase officer accountability of Detail system.
- Set Detail pay according to rank.

**Performance Evaluations and Promotions**

- Revise or develop a new performance evaluation with help from the Civil Service Commission.
- Ensure all supervisors are trained how to complete evaluations.
- Promotion process must be more transparent, fair and flexible.
- Advertise promotion opportunities.
- Exams should be given every 18 months.

## CONSENT DECREE
## Seattle Police Department
## Mandated Changes

On March 31, 2011, the DOJ opened an investigation of the Seattle Police Department (SPD) pursuant to the Violent Crime Control and Law Enforcement Act of 1994, the Omnibus Crime Control and Safe Streets Act of 1968 and Title VI of the Civil Rights Act of 1964. Following a comprehensive investigation, on December 16, 2011, DOJ announced their findings. DOJ found that SPD engaged in a pattern or practice of excessive force that violates the Constitution and federal law. Their investigation further raised serious concerns that some SPD policies and practices, particularly those related to pedestrian encounters, could result in discriminatory policing. DOJ negotiated and filed a consent decree to address their concerns on July 27, 2012, and separately entered into a settlement agreement on related issues on that same date. On September 21, 2012 the court modified and entered the consent decree. As a result, the following reforms were mandated by the courts:

**Use of Force**

- These principles will guide SPD on the development of revised use of force policies and training.
- SPD will develop policies for use and deployment of all force weapons, including firearms, TASERs, OC spray, and impact weapons.
- SPD will clarify and enhance use of force reporting requirements, and supervisory investigation and review responsibilities.

18

                    CITY00015603

- SPD will develop an investigatory team charged with rolling out to and investigating serious uses of force.
- SPD will continue development and implementation of a panel that conducts timely, comprehensible, and reliable reviews of uses of force.
- SPD will specify training requirements regarding use of force and the use of SPD data systems that track officer behavior.
- The City will develop a process to examine *Garrity* issues from DOJ's technical assistance letter.

## Stops and Detention

- SPD will provide clear guidance to officers that social contact and non-custodial interviews are voluntary, consensual encounters and will prohibit investigatory stops that lack reasonable suspicion.
- SPD will provide training and roll call training regarding Fourth Amendment and detentions.
- Supervisors will continue to review reports that documents investigatory stops and detentions to determine if there was reasonable suspicion.
- The Community Police Commission may make recommendations to the city regarding SPD policies, training and procedures regarding stops and detention.

## Bias Free Policing

- SPD will clarify its Unbiased Policing Policy.
- SPD will develop and train all its patrol members.
- SPD and the Community Police Commission will clarify supervisor's responsibilities when responding to allegations of discriminatory policing.
- The Community Police Commission may make recommendations to the city regarding SPD policies, training and procedures regarding Unbiased Policing.

## Supervision

- The city and SPD will ensure that an adequate number of qualified first line supervisors are deployed to implement the use of force policy/reporting policies. Each officer shall have a clearly identified sergeant to report to.  Acting sergeants will receive the appropriate training.
- SPD will review and adjust its threshold levels and indicators as needed and continue to collect and maintain to information relating to supervisors, units, squads and precincts.
- SPD will revise policies to clarify when and how officers must report misconduct and what constitutes prohibited retaliation.

## Office of Professional Accountability (OPA)

19

CITY00015604

- OPA will formalize its policies, procedures, classifications, training requirements, etc., in a written manual.
- OPA Liaison Officers will identify officers to facilitate matters handled at the precinct level.
- The parties will jointly select a monitor within 60 days to oversee the implementation of the agreement.

## Monitoring

- The Monitor will provide advice and technical assistance to the Commission. SPD, in conjunction with the Community Police Commission, will address the following topics and tasks:
- Conduct an assessment of SPD's outreach and initiatives and develop strategies on how to increase community engagement and confidence in SPD.

## Data Collecting and Accountability

- Review OPA's structure, including roles and responsibilities of the OPA Director, Auditor, and Review Board. Continue to assess ways to reduce investigative timelines for complaints. Develop a program to broadly educate community about various methods for making complaints.
- Overcome impediments related to the release of information; make publicly available all SPD audits and reports related to implementation of Agreements.
- Assess whether data should be collected for investigatory stops; and procedures for retention, reporting, and analysis of the data.
- Consider whether to implement a pilot volunteer patrol officer mentoring program.

## Crisis Intervention

- SPD will continue to interact with persons who have mental health issues, substance abuse and behavioral crisis, and will document and track each incident.
- SPD will also develop an inter-agency Crisis Intervention Committee that will develop resources available to refer individuals in crisis; develop policies and procedures for disposition of voluntary referral of individuals; evaluate SPD's current curricula; and evaluate the current crisis intervention program.

### Baltimore Police Department's Strategic Plan

Police Commissioner Batts' *A Strategic Plan for Improvement,* provides a blueprint for reforming the Department and restoring its legitimacy within the community. The plan reports that a community survey found only 50% of Baltimore residents find an officer approachable and only 47% of the residents find officers of the Baltimore Police Department to be professional. The Strategic Plan addresses critical components that have a direct impact on communities' broken trust, including use of force and internal investigations.

20

CITY00015605

Tragically, on January 9, 2011, an on-duty officer in plainclothes, was fatally shot by other on-duty uniformed officers, while assisting to break up a fight at a downtown nightclub. On February 12, 2013, tragedy would again strike the Baltimore Police Department when a police instructor critically shot and wounded a police trainee by bringing a loaded firearm into a training exercise.  Panels of outside experts studied these shootings and recommended operational changes, which the Department has since implemented.

However, there are some positive trends regarding use of force.   Specifically, the number of times BPD officers have discharged their firearm is decreasing.   Between 2007 and 2013, Baltimore police officers reported using their firearm 199 times, an average of 28 per year. In analyzing these reportable incidents, 27% of the incidents resulted in a citizen being killed by police gunfire, 40% of the incidents resulted in a citizen being wounded by police gunfire, and 33% of the incidents resulted in an officer discharging at a citizen but missing. In 2014, there have been 13 officer involved shooting incidents year to date, down an average of 21 at this time during the prior seven years.  2014 shootings involved two fatalities, eight wounded by police gunfire, and three incidents where officers fired their weapons at a citizen but missed.

### Baltimore Police Officer Involved Shootings 2007 thru 2014

|  | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | YTD 14 |
|---|---|---|---|---|---|---|---|---|
| Missed | 12 | 11 | 6 | 17 | 7 | 4 | 8 | 3 |
| Non-Fatal | 20 | 11 | 16 | 9 | 8 | 7 | 9 | 8 |
| Fatal | 13 | 12 | 8 | 3 | 4 | 8 | 6 | 2 |
| TOTAL | 45 | 34 | 30 | 29 | 19 | 19 | 23 | 13 |

### Professional Standards and Accountability Bureau

Under the leadership of Police Commissioner Batts, the Professional Standards and Accountability Bureau (PSAB) was created.  Headed by Deputy Police Commissioner Jerry Rodriguez, PSAB's mission is to (1) create a departmental culture characterized by ethics, integrity and accountability; (2) reduce disciplinary case backlogs; (3) reform trial boards; (4) reform police officer involved shootings; and (5) create a use of force investigation team and a Categorical Use of Force Review Board.

21

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00015606

**Force Investigation Team (F.I.T.)**

A competent, well trained, well respected investigative unit is a necessary staple to creating public trust in any internal investigation.   Use of Force incidents have a dramatic impact on public perception and the response to those incidents must be one that instills confidence in the public.[8] As the Force Investigation Team continues to establish its presence, it is vital that they receive training that places them at the forefront of national best practices, which only serves to highlight their credibility.  As an established, credible team, consideration should be given to assigning all use of force investigations to the Force Investigation Team.   FIT will bring a heightened level of integrity to the investigations and findings, whatever they may be.  The public will have the reassurance that force investigations are being handled by a competent, transparent group, and not officers that work together on a daily basis.

**Recommendations**

1. **Expanding Investigative Scope** - The Baltimore Police Department shall require all "Non-Categorical Uses of Force" be reported to a non-involved supervisor who shall conduct a timely supervisory investigation of the incident, as required under BPD's Use of Force policy. The investigation shall include collecting and analyzing reports, conducting witness interviews, and completing a standardized use of force review form. Upon completion of the investigation, the supervisor shall forward the use of force investigative packet through the chain of command for further review and approval. All non-categorical use of force investigations shall be reviewed by the Division Chief within 14 days of the incident, unless a member of the chain of command reviewing the investigation detects a deficiency in the investigation, in which case the review shall be completed within a period of time reasonably necessary to correct such deficiency in the investigation or report.

   After reviewing and approving the use of force packet the Division Chief shall forward a completed investigation to the Bureau's Deputy Police Commissioner within seven days of receiving the use of force packet. The Deputy Police Commissioner shall review and forward the final packet to the Office of Internal Oversight for review, approval and tracking.

2. **Increase Staffing and Training** - To fulfill the aforementioned recommendation, FIT will need to be sufficiently staffed to handle the assigned workload.

3. **Additional Resources** - In addition to a larger staff, the FIT requires equipment and other resources in order to efficiently and effectively investigate incidents. This initial request is based on the Las Vegas model and the BPD's operational needs:

---

[8] COPS 2010, Building Trust Between the Police and the Communities They Serve pg. 37

22

1) Two additional Sergeants (two to supervise investigation and one administrative duties)
2) 10 detectives
3) One Analyst II
4) Six vehicles
5) Six additional computers ( 3 equipped with ORI numbers)
6) Three tablets with NCIC capabilities
7) 10 digital voice recorders
8) Seven department cell phones equipped with command paging
9) One white board
10) Secured storage area for documents
11) Two digital cameras
12) Secure office space
13) Two interview rooms with video recording equipment
14) Funding for training
15) One laptop
16) One portable projector for use of force presentations

## Train Officers and Supervisors on Function and Reporting Criteria

The only way to sustain a cultural change within any organization is through constant and consistent training.[9]  Training must be instituted to ensure that supervisory level officers are making the necessary, and mandated, reporting to the Force Investigation Team.  This training should be constantly reinforced so that time does not elapse between an incident and notification to the FIT.  The longer the delay the less likely the public is to trust the reporting and the results of the investigation.[10]

**Recommendation**

4. **Develop Entry Level and In-Service training** - For the Department's essential personnel to know when and how to notify the FIT of an incident.  This training should be reinforced through roll-call training bi-annually.

## Categorical Use of Force Review Board

The Categorical Use of Force Review Board examines if the tactics used by an officer are within the policies of the Department and if the force deployed was in accordance with Maryland case law and federal constitutional standards, ( i.e., whether the force used was "objectively reasonable"). A categorical use of force incident is defined as any use of force that has the potential to cause serious physical injury or death.

---

[9] COPS 2012, Community Policing Defined pg. 10
[10] COPS 2010, Building Trust Between the Police and the Communities They Serve pg. 25

23

## Recommendation

5. **Implement New System by April 1, 2015 -** Review non-categorical uses of force through the Office of Internal Oversight (OIO), to include a final review by the PSAB Deputy Commissioner, and track and analyze all cases to improve training and identify trends.

6. **Implement Non-Categorical Use of Investigation**

   - Incident investigated by non-involved supervisor
   - Investigation reviewed by member's Commanding Officer
   - Report reviewed by member's Area Commander
   - Report reviewed by member's Division Chief
   - Report reviewed by Office of Internal Oversight
   - Deputy Commissioner, Professional Standards and Accountability has final approval

## Body Cameras

Body cameras, when worn effectively, have the unique ability to memorialize an officers point of view as they go about their tour of duty. The benefits of such recordings have been touted both commercially by companies such as Taser[11] and from civil rights groups such as the American Civil Liberties Union.[12] These wide ranging supporters (it should be noted that the ACLU has specific privacy, storage and retention, and surveillance caveats) make the case that body cameras are the future for law enforcement in the United States. Some studies have shown that the use of body cameras by police result in a 50% reduction in the use of force by police officers.[13] The Baltimore Police Department should form a panel to assess the cost, privacy, storage, and policy concerns for implementation of a body camera program. Additionally, it would put the Baltimore Police Department on-par with Washington D.C. which began its pilot program on October 1, 2014.[14]

## Recommendation

7. **Panel Creation -** Convene a panel to develop a pathway towards body camera implementation.

## Early Warning System

---

[11] http://www.taser.com/products/on-officer-video/axon-flex-on-officer-video
[12] Stanely, J. 2013, Police Body-Mounted Cameras: With Right Policies in Place, a Win For All, ACLU
[13] Farrar, W. 2013, Self-awareness to being watched and socially-desirable behavior….Police Foundation
[14] http://www.washingtonpost.com/local/dc-officers-begin-wearing-body-cameras/2014/10/01/d7e940d6-4952-11e4-a4bf-794ab74e90f0_story.html

24

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00015609

The BPD is developing a more robust database containing relevant information about its officers, supervisors, and managers to promote professionalism and best police practices development, and to identify and modify at-risk behavior (also known as an early warning system). This system shall be a successor to, and not simply a modification of, the existing IAPRO.

The new system will include:

- All reportable non-categorical uses of force
- All instances in which a police canine bites a member of the public
- All officer-involved shootings and firearms discharges, both on-duty and off-duty (excluding training or target range shootings, authorized ballistic testing, legal sport shooting events, or those incidents that occur off-duty in connection with the recreational use of firearms, in each case, where no person is hit by the discharge)
- All other lethal uses of force
- All other injuries and deaths that are reviewed by the BPD Use of Force Review Board (or otherwise are the subject of an administrative investigation)
- All vehicle pursuits and traffic collisions
- All allegations of discourtesy
- All written compliments received by the BPD about officer performance
- All commendations and awards
- All criminal arrests and investigations involving BPD employees
- All civil or administrative claims filed with and all lawsuits served upon the City or its officers, or agents, in each case resulting from BPD operations, and all lawsuits served on an officer of the BPD resulting from BPD operations and known by the City, the Department, or the City Solicitor's Office
- All civil lawsuits against BPD officers
- All arrest reports, crime reports, and citations made by officers, and all motor vehicle stops and pedestrian stops
- Assignment and rank history
- All performance evaluations
- Training history, including any failure of an officer to meet weapons qualification requirements
- All management and supervisory actions taken pursuant to a review of all information including non-disciplinary actions.

The system shall also include, for the incidents included in the database, appropriate additional information about involved officers (e.g., name and sequence number), and appropriate information about the involved members of the public (including demographic information such as race, ethnicity, or national origin). Additional information on officers involved in incidents (e.g., work assignment, officer partner, field supervisor, and shift at the time of the incident) shall be determinable from the system.

**Recommendation**

25

8. **Early Warning System Software**: Transfer monitoring responsibility of IAPRO from IAD to OIO by April 1, 2015.

26

CONFIDENTIAL - Produced Pursuant to Protective Order

# CHAPTER 3

## Independent Review Boards

As discussed previously the Police Commissioner has pledged to increase transparency.  In keeping with that promise he has ordered the creation of outside reviews to include two Independent Review Boards (IRBs) which were tasked with an impartial investigation into two separate In-Custody deaths. These investigations came at the end of both the criminal and administrative investigations conducted by the State's Attorney's Office and Internal Affairs respectively. The intent behind the IRB's was not to reexamine the cases for criminal wrongdoing or agency culpability, rather to take an outside, in-depth review of the incidents to look for tactical and procedural improvements to prevent such incidents from occurring in the future.  The focus and intent is to create a culture where "Do No Harm" is at the forefront of every citizen encounter.  The IRB's members were chosen for their impartiality and expertise in a number of different fields to include law, national best practices, defensive tactics, and medicine.  The two members of both boards were widely respected in their field and they were not connected to the Department.  These two boards would author the *Anthony Anderson Independent Review Board* and *Tyrone West Independent Review Board Reports*.  Both boards made many of the same recommendations to the Baltimore Police Department.

## Officer Judgment/Decision Making

- The BPD should better supervise officers in the Northeast Operations Unit (especially when working in non-uniform assignments) and provide them with specific directions that more carefully focus their activities on high-probability evidence-based stops, searches, and arrests.
- The BPD should conduct a full review of the tactics and decisions made in future incidents that led up to the use of force and retrain the officers involved (and other patrol officers) to be alert for lapses in practice that can threaten officer safety.
- BPD training should include de-escalation methods and tactical disengagement defensive tactics.
- Use of Force Review Boards should include a detailed review into the totality of circumstances, including the reasons for the initial contact with a subject.
- BPD leadership should consider refresher training and the need for a comprehensive training plan regarding the risks and tactical mitigation involved in traffic stops by unmarked police vehicles.

27

CONFIDENTIAL - Produced Pursuant to Protective Order

**Transfer Criteria for Specialized High-Discretion Units (i.e., Northeast Operations Unit)**

- BPD should create a policy that details the requirements for candidates wishing to serve in this specialized unit.

**Use of Force Policies**

- The BPD should provide additional supervisor and command training in best methods for conducting performance audits to ensure supervisor accountability for officer performance and officer compliance with written Use of Force policies.
- The BPD should consider following the practice of leading police agencies in contracting with independent, competent, objective investigators for all Officer-Involved Shootings or Death in Custody Investigations.

**Officer Tactical Procedures and Techniques**

- The BPD should provide training and special bulletins describing health risks in severe heat conditions, including prevention and mitigation procedures.
- The BPD should review tactical procedures during high heat times and include options for arrest tactics and use of force to control for these risk factors.
- Reinforce through review, retraining and better monitoring current BPD OC Spray policies and guidelines.
- Review current BPD Defensive Tactics Training and align with the best practices used by leading agencies.
- Examine BPD restraint procedures to determine if there are tactically, technically, and strategically more efficient methods available when multiple officers are involved in restraint procedures. If more efficient measures are available and not used in incidents like this one, revise policy, training, and accountability mechanisms.
- Use linked pairs of handcuffs when attempting to arrest large, muscular, and/or resistive suspects.
- Provide information annually on defense tactics during in-service reviews and training.
- Provide BPD officers with additional non-lethal restraint tools, such as Electronic Control Devices (e.g., "Tasers").
- The BPD should issue an updated training bulletin to alert officers to this potential danger.

28

**Professional and Objective Investigative Protocols**

- Critical use of force incidents require sophisticated investigations and an understanding of the legal complexities associated with a police officer's authority, tactical decisions and conduct during the totality of circumstances surrounding the incident. The IRB recommends that BPD contract such review tasks to outside experts, consistent with state laws, to conduct an independent and objective investigation.
- Homicide investigators should video and audio record all statements from officers, witnesses, and experts as part of an officer-involved investigation of an incident.
- The BPD should formalize the requirements for training and maintaining high-level investigative competence and objectivity to investigate officer-involved incidents that may result in death.
- The BPD should establish an internal expert panel of specially trained investigators in a Critical Incident Review Team (CIRT).

**Care of Life and Emergency Lifesaving Protocols**

- Where specialized expertise is needed that may cause significant delays, the information should be presented to the family and the public to keep them updated.

**Communications/ Transparency**

- The BPD should adopt communications and transparency guidelines that emulate other leading police agencies.
- The BPD Commissioner should provide public presentations on high-interest incidents.
- Public presentations of critical incident investigative reviews need to be timely and conducted without delay once all the facts are known.
- The BPD should focus on delivering high-quality investigations in the most transparent manner possible.
- The BPD should develop ways to inform the public of investigative findings in both criminal and administrative investigations.
- Building community trust should be a priority within the BPD, through procedural justice training and practice.
- BPD collects data on reported use of force incidents, and this data and the trends and patterns should be tracked, analyzed and released to the public annually.
- The BPD, in consultation with the State's Attorney, should release the full homicide investigation to the public (appropriately protecting the names and identities of persons) as an example of transparency.

29

   CITY00015614

The Baltimore Police Department has placed the IRB's recommendation into a Matrix and has tasked the Office of Oversight to oversee the implantation of the recommendation.

30

CITY00015615

# CHAPTER 4

## Training

The Baltimore Police Professional Development and Training Academy (PDTA) has initiated a comprehensive review of all training programs to determine best practices and implement them. Many of these practices come from changes in legal standards, concerns from community, identification of outdated training and policies, and use of force issues arising from inappropriate or questionable police conduct. The following areas are those that have been identified as most critical and are undergoing immediate reform.

### <u>Use of Force:</u>

The PDTA has been overhauling the way in which use of force training is structured and taught. Some of these changes are based on recommendations from the Tyrone West IRB, while others are the efforts to review and incorporate dynamic training programs that address the safety of officers, ethical conduct, de-escalation methods and respect for all citizens.

<u>Use of Force Training Changes</u>

- Legally based 8-hour training blocks
  - o Focused on legal elements
  - o Decision making processes
  - o Participation in computer based electronic simulation
  - o Creation of Mock use of force report required
  - o New use of force policy
- New Use of Force Report Criteria
  - o Identify all officers present
  - o Document level of force used
  - o Document suspect actions
  - o Document "Early-Warning Criteria"
- Non-Categorical Internal Survey
  - o Survey to evaluate when officers use force and the decisions behind it
  - o Academy will evaluate survey and adapt training to reflect results
- Oleoresin Capsicum (OC) "Pepper Spray" Training
  - o Focus on de-escalation techniques
  - o New Policy
- Revised Defensive Tactics
  - o Emphasis on de-escalation
  - o Training on Constitutional limitations
  - o Testing to ensure understanding
- Emotional Intelligence
  - o Training on how emotions impact decision making
  - o Training on how to overcome emotional decision making
  - o Training on recognizing emotional decision making in citizens

31

CONFIDENTIAL - Produced Pursuant to Protective Order

- Tracking officers involved in Police Involved Shootings
  - Monitor for PTSD
  - Provide additional training to decrease likelihood of additional shootings
  - Recognize officers engaged in courageous activity

## Working with Diversity and Maintaining Safe Communities

Baltimore is a city of neighborhoods with many diverse populations. In order to effectively improve police and community relations, officers must have a deep understanding of the intricacies within each neighborhood. Officers must adapt to the ethnic, socio-economic, religious and additional factors that make each neighborhood in Baltimore unique.

- Continue Procedural Justice and Impartial Policing Training
  - Evaluate situations to determine exact amount of intervention required
  - Reinforce that not every situation requires an arrest
  - Ensure that emotional intelligence is part of decision making
  - Reinforce officer discretion with enforcement of laws
- Recognition of Vulnerable Populations
  - Training to deal with homeless
  - Training to deal with mentally-ill

## Community Partnerships

Building community partnerships is important to the training program. Each academy class is assigned a community project. These projects include working with at-risk juveniles, community rejuvenation projects, playground revival, etc.

### Academy Class

- Youth Explorer Summer Camps
- Attend Community Meetings
- Youth Interaction with High Schools
- "Project PNEUMA"
  - This program involves community leaders identifying at risk youth and providing a bi-weekly training program to 4th through 8th grade students, that includes physical fitness, martial arts, academic and computer skills training.

In 2015 the Baltimore Police Explorer Academy will once again be sponsored at the Training Academy.

32

## Supervisor and Command Training

The academy is in the process of developing a "Command College" for Command Staff members.  A partnership is underway with academic professionals to provide command personnel with the necessary skills that identify accountability for critical incidents, allocation of resources, internal operations, the promotion of civil rights integrity, documentation, investigation and review of disciplinary actions, civil liability, advanced crowd control, community outreach and public information.   These programs are designed around adult learning principles that encourage critical thinking and problem solving skills.

To obtain the goals and objectives of these various programs, the Director of Professional Development and Training Academy will seek resources, personnel and funding to meet the needs of the program.   The training academy will continue its partnership with city government and community groups, while seeking to develop new relationships with other community groups as well as seek financial assistance in the forms of grants.

The training academy will also create specific training regarding the Incident Command structure with specific focus involving mass protests with special attention to the protection of civil rights while maintaining a safe environment for protestors and citizens.

33

   CITY00015618

# CHAPTER 5

## Stronger Management Rights

The efficacy of the Department's disciplinary process is significantly hampered by management rights that have been eroded through collective bargaining. By asserting greater control of the disciplinary process, the Department will be better positioned to transform itself into a highly professional organization characterized by discipline, integrity, and selfless public service.

A close review and comparison of The *Memorandum of Understanding between the Baltimore Police Department and the Baltimore City Lodge No. 3, Fraternal Order of Police, Inc.*, (hereinafter referred to as "MOU"), points to numerous management rights the Department has relinquished and ought to reclaim.

The bargaining process is complex and often contentious.  Management concessions made over decades of labor negotiations have significantly decreased the Department's ability to implement fair and equal discipline.  While the City and Department are eager to strengthen many of these weakened management rights, it will likely require additional contract negotiations in the future.

Despite the challenges outlined above, under Police Commissioner Anthony W. Batts, the Department has made significant strides in strengthening the role of Trial Boards, which have been revamped to include training and the addition of another command staff member.

### Results
These changes have led to an increase in officer discipline.  For example, in 2012 the Board considered 246 cases. Of those, 57% percent of the officers involved were found guilty.  In 2013, while the number of cases dropped to 189, the guilty rate climbed to 77%.  For 2014 year to date, the percent of cases with a guilty finding has risen to 89%. This demonstrates a new commitment to impartiality and higher standards of conduct.

However, to further improve the Trial Board system, the following reforms are suggested:

### Recommendations

1.  **"Discipline for Minor Violations" & "Discipline for Major Violations".** In her audit of the Department's internal disciplinary process, Karen Kruger pointedly addresses the flaws in categorizing violations of the Department's rules and regulations as "minor" or "major" based upon the potential penalty as set forth in the Disciplinary Matrix. Doing so, she writes, "Creates almost an 'outcome determinative' situation. In reality, even a seemingly minor violation of policy may be significant if it violates the public trust, is motivated by greed or malice or is committed repeatedly without regard to the consequences." Accordingly, this language ought to be amended in the MOU.

34

CITY00015619

2. **Peremptory Challenges -** The number of peremptory challenges granted to the defense in striking Administrative Hearing Board members should be reduced in the MOU from four (4) to two (2). Furthermore, only one (1) of the two (2) peremptory challenges should be used to strike the Hearing Board Chairperson (it should be noted that 2014 contract negotiations changed the preemptive strikes from four (4) to three (3)). Defense counsel should be required to make these peremptory challenges at least 30 days before a three-member hearing board is scheduled to convene.

3. **Applications to the Retirement Board -** The MOU states that "No Departmental Hearing shall be conducted provided the member has expeditiously filed an application with the Retirement Board for a special or ordinary disability pension under the Fire and Police Employees' Retirement System". This provision has been used to postpone administrative hearings and is contrary to the Department's best interest.

4. **Loss of Vacation as Preferred Discipline -** In the event a member is disciplined by forfeiting vacation days, the MOU affords him/her the option of suspension without pay for the same period or to pay an equivalent fine. This is contrary to the Department's preferred policy of forfeiting vacation days over mandatory fines or suspensions.

5. **Involuntary Transfer Review Board Hearings -** The right of members to contest an involuntary transfer through an "Involuntary Review Board Hearing" has been rescinded in the MOU.

6. **Drug Screening and/or Alcohol Testing Pursuant to Uses of "Deadly Force" -** Members are currently not required to submit to drug screening and/or alcohol testing pursuant to an on-duty use of deadly force "unless there is reasonable suspicion to believe the member acted under the influence of drugs and/or alcohol". This policy, according to the MOU, is subject to change at the Police Commissioner's discretion. Accordingly, Departmental policy hereafter will require all members to submit to drug and/or alcohol screening pursuant to all categorical uses of force.

7. **Postponement Requests -** The MOU should state that only in extraordinary circumstances will the Administrative Hearing Board have the right to overrule the Department's decision to deny a motion for postponement.

8. **Scheduling Administrative Hearings -** The MOU should be changed to allow an Administrative Hearing Board to be held, if the Department chooses, before the conclusion of any related criminal proceedings. Additionally, the Department is now scheduling hearing boards for those members who decline the Charging Committee's recommendations of discipline. This is a significant departure from recent past practice, when the Department neglected to schedule hearings for several months after a member requested a hearing board.

35

9. **Rules of Procedure -** The Department should develop pre-trial Administrative Hearing Board rules of procedure regarding postponement requests, scheduling of hearings, and filing of motions. These rules of procedure are essential to preventing unnecessary hearing postponements and frivolous defense motions.

36

CONFIDENTIAL - Produced Pursuant to Protective Order

# CHAPTER 6

## Community Partnerships

A DOJ/COPS August 2012 publication states, "Community policing is a philosophy that promotes organizational strategies that support the systematic use of partnerships and problem-solving techniques, to proactively address the immediate conditions that give rise to public safety issues such as crime, social disorder, and fear of crime."

What follows are suggestions for reform taken from the DOJ/COPS and national best practices. These reforms are centered on a philosophy of community engagement and a guiding mission of "Preventing Harm."

### Quarterly Shoot/Don't Shoot Training

In July 2014 the Baltimore Police Department conducted "Shoot/Don't Shoot" training for community leaders and members of the media. The event was intended as a means of training and building trust through understanding. The participants, in anecdotal exchanges of information as well as publicized reports, spoke of the dramatic impact the training had on their understanding of the challenges officers face in performing their duties. This understanding is critical when members of the agency use deadly force. It is well understood that the use of deadly force erodes public trust and confidence in a police department.[15] The need to better explain the decision-making process an officer goes through, and the training they receive, is paramount in creating third-party validators and enhancing public understanding. The Community Partnership Division should select anchor institutions and community leaders to attend quarterly "Shoot/Don't Shoot Training." The selection should include business leaders, faith-based leaders, Community Relations Council presidents, and community leaders.

### Recommendations

1. **Quarterly Meetings -** The Community Partnership Division, in conjunction with the Professional Development and Training Academy, should provide quarterly "Shoot/Don't Shoot Training." The Media Relations Section should invite members of the media to attend.

---

[15] Micucci, A., & Gomme, I. (2005). American Police and Subcultural Support for the Use of Excessive Force. Journal of Criminal Justice, 33(5), 487-500. Retrieved from https://www.ncjrs.gov/App/Publications/abstract.aspx?ID=232927

CONFIDENTIAL - Produced Pursuant to Protective Order                                         CITY00015622

**Preemptive Reporting of Use of Force Incidents**

Because any use of force incident has the ability to negatively impact the public's perception of the Baltimore Police Department, the preemptive explanation of use of force incidents has demonstrated the Baltimore Police Department's desire to be transparent and accountable for any use of force.  Any significant use of force incident should be explained to the public as soon as possible and in as much detail as is possible.  Ideally this would occur before a media inquiry so as to not look reactionary.

**Recommendations:**

2. **Use of Force Presentations -** Continue to standardize preemptive use of force presentations.

3. **Additional Resources -** Install a ceiling mounted projector and screen to accommodate presentations in the Media Relations Room.

**Enhance Use of Force Reporting Information on the Website**

In 2014 the Baltimore Police Department became the first police department in the state to publish any "Categorical Use of Force" on its website.   The information provides a basic overview of the incident.   The content on the website should be consistently reviewed to determine how more information can be provided, so long as that information does not compromise an investigation or violate state law.

**Recommendation:**

4. **Increase Transparency -** Continue to look for ways to publish more information on "Categorical Use of Force Incidents."

**Bike and Foot Patrol**

Every community across Baltimore consistently asks for foot patrols.  They are a critical step to establishing trust and credibility in any community.  Foot patrols also offer an officer the opportunity to develop relationships with residents and business owners in their assigned geographic area which supports previously mentioned objectives.  Foot patrols are a strategic objective for the Baltimore Police Department and have been sporadically implemented.[16]

---

[16] Baltimore Police Department 2013, Public Safety in the City of Baltimore, A Strategic Plan for Improvement, Objective 2.2 pg. 65

38

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00015623

**Recommendation**

    5. **Foot and Bike Patrol** - When scheduling efficiencies are enacted utilize officers for targeted foot patrol.

## Hourly Reporting to the Police Commissioner's Office

As outlined in the Strategic Plan, accurate and timely data sharing is essential to rapidly and correctly addressing emerging situations[17]. These situations are not always or necessarily crime based, but can be any number of serious issues that impact the Baltimore Police Department on a daily basis. Very often these issues have broad-based policy implications for the agency. This information should be reported to his office on an hourly basis so that he can maintain a constant feel for the pulse of the agency and fulfill a core function of his position. To facilitate this Lieutenants and Sergeants should be regularly trained to see the larger perspective of incidents and notify the Watch Center of any critical or noteworthy incident. The Watch Center should then provide hourly reporting to the Office of the Police Commissioner.

**Recommendation**

    6. **Hourly Reporting** - Train supervisors to recognize noteworthy incidents and enact regular reporting to the Police Commissioner.

## Promotional Requirements

The Strategic Plan made clear that promotions are a constant area of concern for officers in the Baltimore Police Department. Less than 25% of police feel that the promotion system is fair or just.[18] Part of the plan calls for restructuring the promotion process to be more fair and holistic. A portion of the promotion process should focus on the principles of community policing.[19] This could include community members at every level of the promotion process, helping to add legitimacy to the process through the use of third-party validators.

**Recommendation:**

    7. **Fair Promotion** - Structure portions of the written and oral testing to reflect core values of community policing. Review Civil Service law to determine the feasibility of adding community members to the Sergeant and Lieutenant oral boards.

---

[17] Baltimore Police Department 2013, Public Safety in the City of Baltimore, A Strategic Plan for Improvement, pg. 49
[18] Baltimore Police Department 2013, Public Safety in the City of Baltimore, A Strategic Plan for Improvement, pg. 25
[19] Baltimore Police Department 2013, Public Safety in the City of Baltimore, A Strategic Plan for Improvement, pg. 83

39

CONFIDENTIAL - Produced Pursuant to Protective Order

**Mandatory Officer Attendance at Community Meetings**

Nearly every community association in Baltimore holds a monthly meeting in their geographic area.[20]   These meetings provide the opportunity to engage directly with residents that they might not otherwise encounter. It gives officers the opportunity to hear issues and concerns and begin to develop a relationship with the community they serve.   More importantly the people who attend community meetings have a vested interest in their community and can be engaged to assist in being problem-solvers.[21] Every officer who patrols a specific neighborhood should regularly attend community meetings.

**Recommendation:**

8. **Officers at Community Meetings** - Draft PCM requiring sector officers at the direction of their District Commander to attend community meetings in their geographic region.   Officers should be familiar with the community associations they serve and this should be part of the quarterly community policing evaluation.

**Create Citizens Police Academy**

According to the 2010 DOJ publication *Building Trust Between the Police and the Citizens They Serve* "Another way for law enforcement to foster community trust is through citizen police academies. Citizen police academies enable residents to learn about their local law enforcement agency's culture and core values and the overall operations of a department. Citizen police academies provide citizens with a first-hand look at the mission, policies, and regulations to which officers must adhere, and allow them to better understand the job of being a police officer, including the stresses of the occupation (see National Citizens Police Academy Association, www.nationalcpaa.org). Graduates of citizen police academies often become advocates and ambassadors of police policy and practices to fellow citizens. This is an effective way to enhance the relationship between the public and law enforcement."[22]

The Community Partnership Division in conjunction with the Professional Development and Training Academy should develop a Citizens Police Academy that works towards the goal of establishing a knowledge base in the community.   This should be an ongoing, well publicized program run by the Baltimore Police Department.

**Recommendation:**

9. **Create a Citizens Police Academy** - The Professional Development and Training Academy should create a Citizens Police Academy based on national best practices.   The Community Partnership Division should actively and continuously recruit community members to attend.

---

[20] http://livebaltimore.com/neighborhoods/
[21] COPS 2012, Community Policing Defined pg. 3
[22] COPS 2010, Building Trust Between the Police and the Citizens They Serve pg. 14

40

**CONFIDENTIAL - Produced Pursuant to Protective Order**

**2015 Town Halls**

The Mayor's Public Safety Forums held over the course of 2014 were well attended and provided a valuable opportunity to be transparent and engaged with the community. The Baltimore Police Department should plan to have a Public Safety Town Hall in each police district throughout 2015.  It is vital to return to report on the progress that was made from the issues raised during the first iteration of forums.  It will also demonstrate a continued desire to remain engaged with the community.

**Recommendation:**

10. **Town Halls** - Plan and execute nine (9) "Town Hall" forums beginning in January, 2015.

## CONCLUSION

In September 2012, Police Commissioner Anthony W. Batts began a series of dramatic and long-sought-after reforms.  The commissioning of the *Strategic Plan for Improvement* made clear the need for institutional reform in more than 100 areas of operational and administrative practices within the police department.  In addition, the *Tyrone West Independent Review Board Report* and the *Karen J. Kruger Internal Investigations Audit Report* made clear that additional reforms were required, particularly with respect to use of force incidents.  These audits and review boards came as a result of the Police Commissioner's efforts to fulfill his confirmation promise to bring the Baltimore Police Department into alignment with the expectations of the citizens it serves.

The community will play a critical role in the reforms of the Baltimore Police Department. The expectations they have, and the conduct they want from their officers will be the guiding principles of reform moving forward.  The citizens of Baltimore pay for their police department and have every right to set standards for how they wish to be protected.  The police department must exist to serve, and be equal partners with the community in the fight against violent crime.  It will only be through cooperative efforts between the Baltimore Police Department and the stakeholders in Baltimore that real progress will be made.

Just as the problems that impact the community's trust in the Baltimore Police Department did not develop overnight, they will not be fixed overnight.  The various reports that have been commissioned are building blocks upon which the department will begin to regain community trust.  Many of the recommendations detailed in this report can be achieved through funding and guidance provided by the DOJ COPS Office, Collaborative Reform Programs.

CONFIDENTIAL - Produced Pursuant to Protective Order

# EXHIBIT 23

**From:** Robinson, StephanieJ <StephanieJ.Robinson@baltimorecity.gov>
**Sent:** Sunday, April 19, 2015 1:26 PM EDT
**To:** Harris, Kevin <Kevin.Harris@baltimorecity.gov>
**CC:** Parthemos, Kaliope <Kaliope.Parthemos@baltimorecity.gov>
**Subject:** RE: Freddie Gray

Here with police

-----Original Message-----
**From:** Harris, Kevin
**Sent:** Sunday, April 19, 2015 12:45 PM Eastern Standard Time
**To:** Robinson, StephanieJ
**Subject:** RE: Freddie Gray

Not sure what happened but have tried calling you back and keep getting your voicemail.

**Kevin R. Harris**
*Chief of Public Affairs*

250 City Hall, 100 N. Holliday Street
Baltimore, MD  21202
kevin.harris@baltimorecity.gov

*Office of
Mayor Stephanie
Rawlings-Blake*

410-818-4269 (Mobile)
410-783-5385 (Fax)

*Connect with Mayor Rawlings-Blake*

@MayorSRB
/Stephanie.Rawlingsblake

MayorSRB

**From:** Robinson, StephanieJ
**Sent:** Sunday, April 19, 2015 12:29 PM
**To:** Harris, Kevin
**Subject:** RE: Freddie Gray

Kevin, please call


443-838-5470

-----Original Message-----
**From:** Harris, Kevin
**Sent:** Sunday, April 19, 2015 09:43 AM Eastern Standard Time
**To:** Parthemos, Kaliope
**Cc:** Robinson, StephanieJ
**Subject:** FW: Freddie Gray


FYI - see below.  Have you guys heard anything on this?  If true we will need to plan for a media event and it will need to involve the Mayor.


Office of
Mayor Stephanie
Rawlings-Blake
Kevin R. Harris
Chief of Public Affairs

250 City Hall, 100 N. Holliday Street
Baltimore, MD  21202
kevin.harris@baltimorecity.gov

410-818-4269 (Mobile)
410-783-5385 (Fax)

Connect with Mayor Rawlings-Blake
@MayorSRB
/Stephanie.Rawlingsblake
MayorSRB



-----Original Message-----
From: Augustus, Gussener

Sent: Sunday, April 19, 2015 9:35 AM
To: Anthony.batts@baltimorecity.gov
Cc: Harris, Kevin
Subject: Freddie Gray

Good morning Commissioner,

I'm getting intel that the suspect Freddie Gray has died. There's talk of a riot in East Baltimore maybe taking place by noon.

Just an FYI

GUS

443-310-3374

**CONFIDENTIAL - Produced Pursuant to Protective Order**

# EXHIBIT 24

 **BALTIMORE POLICE DEPARTMENT** 

STEPHANIE RAWLINGS-BLAKE
Mayor

April 20, 2015

ANTHONY W. BATTS
Police Commissioner

**State Law Enforcement Coordinating Council Request (SLECC)**

**Event:** Protest Activity April 21, 2015

**Date and Time:** April 21, 2015        1530-clear

**Location:** Baltimore Police Headquarters, 601 E Fayette St 21202, Atrium

**Requesting Authority:** Commissioner Anthony Batts, Baltimore Police Department

**Nature of Request:**

The Baltimore Police Department will prepare to conduct a coordinated effort to in response to possible protest activity. Our mission is to provide for the safety and comfort of citizens attending the event through crowd and traffic control, as well as anti-crime patrol.

The purpose of this request is to ensure that adequate personnel are on location to provide coverage during any protest which may spontaneously occur involving disruption to the free flow of pedestrian and vehicle traffic or public safety.

The State Law Enforcement Coordinating Council has the authority and responsibility to coordinate among its member agencies to further the safety and security of the people of Maryland and to improve the administration and enforcement of the laws of Maryland. Utilizing police officers from member agencies at the direction of the Council to augment the Baltimore Police Department during this event does further the safety and security of the people of Maryland and improve the administration and enforcement of the laws.

**Requested Agencies:**
**Maryland Transportation Authority Police Department**
    1 Lieutenant    3 Sergeants    21 Police Officers

Personnel shall have riot equipment on hand.

Sincerely,

Anthony Batts
Commissioner
Baltimore Police Department

c/o 242 W. 29th Street  •  Baltimore, Maryland 21211

# EXHIBIT 25

**From:** Augustus, Gussener <Gussener.Augustus@baltimorecity.gov>
**Sent:** Sunday, April 19, 2015 9:34 AM EDT
**To:** anthony.batts@baltimorecity.gov <anthony.batts@baltimorecity.gov>
**CC:** Harris, Kevin <Kevin.Harris@baltimorecity.gov>
**Subject:** Freddie Gray

Good morning Commissioner,

I'm getting intel that the suspect Freddie Gray has died. There's talk of a riot in East Baltimore maybe taking place by noon.

Just an FYI

GUS

443-310-3374

**CONFIDENTIAL - Produced Pursuant to Protective Order**                                              CITY00010094

# EXHIBIT 26

**From:** DeMotto, Nicole <Nicole.DeMotto@BaltimorePolice.org>
**Sent:** Sunday, April 19, 2015 1:49 PM EDT
**To:** Davis, Kevin <Kevin.Davis@baltimorepolice.org>; Reitz, David <David.Reitz@BaltimorePolice.org>; Hyatt, Melissa R.
<Melissa.Hyatt@BaltimorePolice.org>; Schluderberg, Gordon <Gordon.Schluderberg@BaltimorePolice.org>
**Subject:** Fw: Possible Protest Today 2:00

We may need to implement an ICS plan for any possible protest. We recieved a threat twice last week against officers in reference to the Gilmor Homes.

I think we need to start planning for the worst case scenario on both ends.

------ Original message------
**From:** Orenstein, Joseph
**Date:** Sun, Apr 19, 2015 13:41
**To:** Marcus, William;James, Charles;Howe, Mark;Garrity, Deron;Jones, KevinA;Ward, Steven T.;Carter-bey, Desmond A.;Worley, Jr. Richard;Snead, Milton;Burrus, Kimberly;Gibson, Richard;Partee, Marc;Briscoe, Sheree;Robinson, Osborne;Bauer, Donald;Handley, James;Hohman, Steven;Dombroski, Ian;Hance, Brian J.;Matthews, Keith;Miller, Sean;Hyatt, Melissa R.;Miller, Michael;Smith, Thomas;Fassl, Kevin;Frederick, Aaron;Faison, Robert;DiPaola, Jason;Rueger, Timothy;Lugo, Ramon;Copeland, Timothy;Pecha, Erik J.;DeSousa, Darryl;Palmere, Dean;Hyatt, Melissa R.;
**Cc:** DeMotto, Nicole;Dickey, Sarah E.;McClaskey, George;Bartone, Jocelyn;Batts, Anthony;Djan, Michael;Duty Officer;Feser, Jason;Furman, Leo;Hood, Samuel;Ji, Kai;Johnson, Edward;Leiren, Lisa;Lofton, Osiris;MacDonald, William;Martini, Harvey;Paradise, John;Presser, Lindsey;Schluderberg, Gordon;Smith, Anthony W.;
**Subject:**

Good afternoon,

Please be advised that it is being widely reported that Freddie Gray has passed away. Gray was injured during an arrest by BPD earlier this week.  Commanders should be aware that according to open source reporting tensions are high across the city.

Thank you,

Joe Orenstein, T655
Baltimore City Police Department
Analytical Intelligence Section
Crime Intelligence Analyst
Office : (410) 396-2640
Cell: (443) 401-3329
Email : Joseph.Orenstein@baltimorepolice.org

**CONFIDENTIAL - Produced Pursuant to Protective Order**

# EXHIBIT 27

**From:** Snead, Robert S. <Robert.Snead@BaltimorePolice.org>
**Sent:** Sunday, April 19, 2015 11:34 PM EDT
**To:** Conaway, Byron J. <Byron.Conaway@BaltimorePolice.org>
**Subject:** FW: Police Commissioner's Message

Just an FYI, Protest are planned for Monday and Tuesday

-----Original Message-----
**From:** Broadcast, BPD
**Sent:** Sunday, April 19, 2015 04:49 PM Eastern Standard Time
**To:** Broadcast, BPD
**Subject:** Police Commissioner's Message

**Subject:** Police Commissioner's Message

As many of you know, this morning Freddy Gray passed away after last Sunday's arrest in the Western District.  Now more so than ever, it is imperative that we maintain our professionalism, dignity of demeanor, and continue to have compassion for those that we serve.  A multi-discipline Task Force led by our Force Investigation Team, assisted by the Professional Development and Training Academy, Homicide Section, and Crime Lab will work to determine exactly what events transpired that afternoon. We will follow the facts wherever they take us, and we will ensure that we are as transparent as possible, without compromising the investigation.  We will not jump to conclusions. The investigation will be beyond reproach, and we will continue to keep you and the public updated as appropriate. This is a difficult time for the officers involved and the family of Mr. Gray.  They all deserve a quick, thorough investigation that gets to the truth.  As this process moves forward, continue to have pride in yourselves and each other as you work to keep the city of Baltimore safe.

Anthony W. Batts
Police Commissioner

# EXHIBIT 28

**POLICE DEPARTMENT**

**BALTIMORE, MARYLAND**

**TO:**       Police Commissioner Anthony Batts

**VIA:**      Official Channels

**FROM:**     Lieutenant Colonel Melissa Hyatt

            Chief of Staff

**SUBJECT:**  Protests April 22, 2015


Sir:

I respectfully report the following operational plan.  This plan is in reference to the possible protests in the WD and CD on today's date.


**I. Command and Control:**

Incident Commander: Deputy Commissioner Palmere

Operations Commander: LTC Hyatt

Deputy Operations Commander: Captain Schluderberg

Planning: Colonel DeSousa

Logistics: Lieutenant Colonel Reitz

Finance: Chief Moore


CD Field Operations Commander: Major Marcus

CD Assistant Field Operations Commander: Captain Howe

WD Field Operations Commander: Major Robinson

WD Assistant Field Operations Commander: Captain Bauer

Staging Area:  Central Distract Deployment 601 E. Fayette Street (Atrium)

              Western District Deployment 1034 N. Mount Street (Roll Call Room)

Command Post/Base of Operations: 601 E. Fayette Street, 9th Floor, Watch Center

Dedicated Channels:  10A/1C for CD and 11A/7C for WD


**CONFIDENTIAL - Produced Pursuant to Protective Order**

Individual call numbers will be assigned to officers by their individual commands. However, it will be essential to utilize position locations to relay information via radio.

**II. Overall Objective:** Support a peaceful demonstration of lawfully assembled protesters, while protecting life and property. This operation will utilize the least amount of force possible.

Priorities in Order:

1. Life (Citizen, Safety, Officer Safety)
2. Property and Business
3. Safe Traffic Flow (Ingress and Egress)
4. Restoration of Normal City Services

**III. Supervisory Premise:**

First Tier: Sergeants—Utilize line of sight principles to maintain departmental objectives and ensure officer safety. Squads will be broken down into manageable numbers with supervisors in secondary positions keeping subordinates in front of or at their periphery. Squads will be deployed as a single unit.

Second Tier: Manage personnel based on the objective and actionable intelligence provided by line sergeants, observation point personnel, foxtrot, City Watch operators, and plain clothes officers.

**IV. Individual Assignments (If required):**

**CITY HALL:** Officers assigned to City Hall will be posted on the perimeter of City Hall during full activation with officers posted on the steps/front door of City Hall and inside of the bike racks (on the Lexington side of City Hall, on the Fayette side of City Hall, and parallel to Gay directly to the east of the steps).

**POLICE HEADQUARTERS:** Officers assigned to Police Headquarters will be staged to protect the building. Those on the north side of the building will not permit individuals to get between themselves and the glass or doors of the building. Those officers will maintain the flat concrete area outside of the main entrance to the Annex building. Only a small number of officers will be visible to the group on any side, as they will be spread around the building but within eyesight of each other.

**WESTERN DISTRICT:** Officers assigned to Western District stationhouse will be tasked with protecting the building. Those officers will be posted within the barriers and will not permit individuals to get between themselves and the building. Under no circumstances will persons be able to access the Western District stationhouse.

**TRAVEL ROUTES:** Motorized units and foot platoons will be utilized to manage routes from each location to the other in the event that the demonstration becomes mobile. These officers will be focused on pedestrian and vehicular safety. No routes have been verified at this time. In

the event that a group attempts to linger in an intersection to gather the attention of motorists, officers will divert traffic for a minimum of 1 block in each direction in order to remove the attention that they are seeking.

**CITIWATCH:** Monitors will proactively monitor cameras specific to the event and will relay information to ground units.

## V. Arrest Procedure:

Arrest is not a preferred function during this operation. However, in the event that arrests become necessary, the following procedures will be followed. All arrest related equipment will be maintained by the COP Office for safekeeping and immediate access.

One arrest team will enter the crowd (1/5 SWAT) and extract the arrestees. Multiple arrest teams may be utilized if deemed necessary. The team will extract the arrestees and will be met by a wagon at pre-designated locations.

In the event that any juveniles are arrested, they will be transported directly to Juvenile Booking.

In the event of mass arrests, wagons will transport prisoners to a secondary holding facility at 601 E. Fayette Street (loading dock area). In the event that this occurs, District Detective Units will be activated and 1 uniform detective from each district will respond to the loading dock.

Wagon officers will ensure that arrestees have masking tape on their backs with the arresting officer's last name and sequence number written on same. Also, a photo will be taken when practical of the arresting officer and the prisoner together. In the event that the arresting officer must remain at the demonstration, light duty officers will be utilized to process arrests. 3 wagons will be utilized for the event form various districts across the city.

## VI. Video Recording:

A minimum of 3 video recorders will be deployed during this incident. Court attire detectives will operate the cameras and each will be paired with a uniformed officer. The Operations Commander will have a video camera assigned to a detective who will be with him/her during the duration of the event.

## VII. OIS/SES: Plain clothes SES detectives will be placed within the demonstrators in order to gather intelligence and alert the Incident Commander of any intelligence.

## VIII. External Resources:

**Mayor's Office of Emergency Management:**  OEM will coordinate collecting trashcans and newspaper boxes in the protest area.  They are also coordinating with MTA to divert bus lines that are impacted by the protests.  Street sweepers will be on call and they will prepare plywood in the event that it is required.

**Fire Department:** Fire department medics and suppression will be staged for this event.

**DPW:** DPW will provide bike racks and other barriers at the direction of the police department.

**State's Attorney's Office:**  Pat Motsay is working closely with us, along with our Legal Affairs to manage any arrests and charging during demonstrations.

**Businesses:**  Businesses will be advised of protests in the area in order to prepare to secure their establishments if desired.


The personnel and assignments will be submitted separately to this document.


Respectfully,

Lieutenant Colonel Melissa Hyatt

Chief of Staff

# EXHIBIT 29

**From:** Schluderberg, Gordon <Gordon.Schluderberg@baltimorepolice.org> on behalf of Schluderberg, Gordon <Gordon.Schluderberg@BaltimorePolice.org>
**Sent:** Friday, April 24, 2015 9:52 AM EDT
**To:** Palmere, Dean <Dean.Palmere@BaltimorePolice.org>; Hyatt, Melissa R. <Melissa.Hyatt@BaltimorePolice.org>
**CC:** Higgins, James <James.Higgins@baltimorepolice.org>
**Subject:** RE: Ops plan

10 4 Sir. Do know the Orioles are sold out and we are fully staffed for the event. Plan would be to close the gates and will check with Dennis to see if the stadium has a written plan.


-----Original Message-----
From: Palmere, Dean
Sent: Friday, April 24, 2015 9:33 AM
To: Hyatt, Melissa R.; Schluderberg, Gordon
Cc: Higgins, James
Subject: Ops plan


Melissa/ Gordo,


We will be providin the Ops plan to our mutual aid partners.  I know this goes w/o saying, but make sure it can be presented as a professional order. I also need their role specifically described.  Additionally, I need specifics on other events planned for Sat (ie: Orioles, shock trauma gala- which I need more details).
Higgins can assist if needed.


Dean M. Palmere
Deputy Commissioner
Baltimore Police Department

CONFIDENTIAL - Produced Pursuant to Protective Order

# EXHIBIT 30

**From:** Scott, Connor D. <Connor.Scott@baltimorecity.gov>
**Sent:** Wednesday, April 22, 2015 6:33 PM EDT
**To:** Maloney, Robert <Robert.Maloney@baltimorecity.gov>; McMillan, David <David.McMillan@baltimorecity.gov>
**Subject:** IMG_4535.jpg

Protesters have marched to MLK and Pennsylvania and are blocking traffic. May be marching to City Hall. Approx 100 of them.

**CONFIDENTIAL - Produced Pursuant to Protective Order**

# EXHIBIT 31

**From:** Smith, Anthony R <AnthonyR.Smith@baltimorecity.gov>
**Sent:** Wednesday, April 22, 2015 4:32 PM EDT
**To:** Ching, Kenith <Kenith.Ching@baltimorecity.gov>
**Subject:** Fw: Plywood

---

**From**: John Henderson [mailto:jehenderson1@msn.com]
**Sent**: Wednesday, April 22, 2015 04:29 PM
**To**: Scott, Connor D.; Bovaird, Brian D.; Smith, Anthony R
**Subject**: Plywood

Col Hyatt is requesting possible access to plywood in case reinforcement of the Western District Windows/doors would be needed. Just passed information to Tony...

JEH

CONFIDENTIAL - Produced Pursuant to Protective Order

# EXHIBIT 32

**From:** Maloney, Robert <Robert.Maloney@baltimorecity.gov>
**Sent:** Thursday, April 23, 2015 7:10 PM EDT
**To:** Scott, Connor D. <Connor.Scott@baltimorecity.gov>
**Subject:** Re: Signal 13. Making an arrest.

Find out if Batts is around from Tony and who is in command?

----- Original Message -----
From: Scott, Connor D.
Sent: Thursday, April 23, 2015 07:03 PM
To: Maloney, Robert
Subject: Re: Signal 13. Making an arrest.

Still at western district. Crowd has grown to 125-150.

----- Original Message -----
From: Maloney, Robert
Sent: Thursday, April 23, 2015 06:40 PM
To: Scott, Connor D.
Subject: Re: Signal 13. Making an arrest.

Whose in watch center?

----- Original Message -----
From: Scott, Connor D.
Sent: Thursday, April 23, 2015 06:39 PM
To: Maloney, Robert
Subject: Re: Signal 13. Making an arrest.

They marched to the western district station.

----- Original Message -----
From: Maloney, Robert
Sent: Thursday, April 23, 2015 06:39 PM
To: Scott, Connor D.
Subject: Re: Signal 13. Making an arrest.

Where are they now?

----- Original Message -----
From: Scott, Connor D.
Sent: Thursday, April 23, 2015 06:28 PM
To: Maloney, Robert
Subject: Re: Signal 13. Making an arrest.

2 arrested. Crowd size still around 70.

----- Original Message -----
From: Maloney, Robert
Sent: Thursday, April 23, 2015 06:21 PM
To: Scott, Connor D.
Subject: Re: Signal 13. Making an arrest.

Message received. How many?

----- Original Message -----
From: Scott, Connor D.
Sent: Thursday, April 23, 2015 06:16 PM
To: Maloney, Robert
Subject: Re: Signal 13. Making an arrest.

Yes. Crowd got rowdy. 2 arrested. Seems. To have calmed down somewhat. Back on the move.

----- Original Message -----
From: Maloney, Robert
Sent: Thursday, April 23, 2015 06:15 PM
To: Scott, Connor D.
Subject: Re: Signal 13. Making an arrest.

Dealing with protest?

----- Original Message -----
From: Scott, Connor D.
Sent: Thursday, April 23, 2015 06:13 PM
To: Maloney, Robert
Subject: Signal 13. Making an arrest.

**CONFIDENTIAL - Produced Pursuant to Protective Order**

# EXHIBIT 33

**From:** Ford, Niles
**Sent:** Thursday, April 23, 2015 7:24 PM EDT
**To:** Segal, Jeffrey R. <Jeffrey.Segal@baltimorecity.gov>; Wagner, Mark <Mark.Wagner@baltimorecity.gov>
**Subject:** Fwd: Protesters were throwing stuff at Police earlier. You may want to check out CNN. Tonight was intense.

FYI

Sent from my iPhone

Begin forwarded message:

> **From:** "Maloney, Robert" <Robert.Maloney@baltimorecity.gov>
> **Date:** April 23, 2015 at 7:18:32 PM EDT
> **To:** "Ford, Niles" <Niles.Ford@baltimorecity.gov>
> **Subject: Protesters were throwing stuff at Police earlier. You may want to check out CNN. Tonight was intense.**
>
> *This message has no content.*

# EXHIBIT 34

**From:** Kirstaetter, Dawn <Dawn.Kirstaetter@baltimorecity.gov> on behalf of kirstaetter, Dawn
<Dawn.Kirstaetter@baltimorecity.gov>
**Sent:** Friday, April 24, 2015 5:28 PM EDT
**To:** Whitney-McNeely, Lorraine <lorraine.whitney-mcneely@baltimorecity.gov>
**CC:** Parthemos, Kaliope <Kaliope.Parthemos@baltimorecity.gov>
**Subject:** FW: Statement from Mayor SRB

Hi Lorraine! Would you kindly assist me in getting a call-in number and code for a conference call on Monday with
the following stakeholders:

1. Annie E Casey—Patrick McCarthy
2. Weinberg—Rachel Monroe
3. Abell—Bob Embry
4. ABAG- Celeste D'Amato
5. Associated Black Charities- Diane Bell McKoy
6. United Way—Mark Furst
7. Baltimore Community Foundation—Tom Wilcox
8. Open Society Foundation—Diana Morris
9. BCPS School Board-Shanaysha Sauls
10. Bon Secours – Dr. Sam Ross
11. Coppin – Dr. Mortimer Neufville
12. UMB – Dr. Jay Perman
13. MICA – Sammy Hoi
14. JHU – Ron Daniels
15. University of Baltimore – Kurt Schmoke
16. Loyola – Father Brian Linnane
17. Notre Dame of Maryland – Dr. Mary Lou Yam
18. Morgan State University – Dr. David Wilson
19. ACLU-Bebe Verde
20. BEC

---

**From:** Kirstaetter, Dawn
**Sent:** Friday, April 24, 2015 4:39 PM
**To:** Kirstaetter, Dawn
**Subject:** Statement from Mayor SRB

On behalf of Mayor Rawlings-Blake, thank you very much for your well wishes, suggestions and prayers during this
challenging time for our City. We value your leadership and want to give you an opportunity to ask questions and
hear from the Mayor directly. No later than Monday morning, I will be sending you and other key leaders call in info
for a conference call with Mayor on Monday.

Meanwhile, please feel free to share the following statement with your board:

We want to offer sincere condolences to all of Mr. Gray's friends and his family during this painful time.
We also thank members of our community for their commitment to peaceful and respectful protest
throughout this process. We understand the frustration of our community, because many of us remain
frustrated. We all deserve answers.

Commissioner Batts has assured us that the Baltimore Police Department is moving as quickly as a
responsible investigation calls for, so that we determine exactly how his death occurred, and if necessary,
hold the appropriate parties responsible.

We also recognize that while there is frustration over the investigation, this is a process we must respect.
In order to have justice, rather than seek justice, this investigation has to follow procedures and those
involved need follow up on leads and be as thorough as possible. Commissioner Batts has pledged to
leave no stone unturned during the BPD investigation, with the goal of turning it over to the State's
Attorney's Office on May 1st. We appreciate the outside, independent investigations and reviews that will
be part of this process. The outside review from the Department of Justice is welcomed and should
provide confidence to everyone that this investigation will be comprehensive, independent, thorough and
fair.

But throughout this process, it is absolutely vital that we remain one community.

Over the past week, administration officials have met with community leaders and spoken with families to talk
about exactly this.

So far, we am incredibly encouraged by how peaceful demonstrations have been. And we want to acknowledge the
Baltimore Police Department's efforts to accommodate and facilitate these peaceful demonstrations. As we move
forward, we hope that I residents who wish to voice their frustrations will remain peaceful.

While the City of Baltimore has a long, complicated history on issues such as these, it is important to remember that

---

we have an equally long history of peaceful and legal protest.

We are the home of Thurgood Marshall...We are home to one of the first sit-ins of the civil rights movement...We have a responsibility to preserve that legacy and this administration is confident in our city's ability to rise to the challenge. Stephanie Rawlings-Blake, Mayor

Dawn

**CONFIDENTIAL - Produced Pursuant to Protective Order**

# EXHIBIT 35

**From:** Broadcast, BPD <BPD.Broadcast@baltimorepolice.org> on behalf of broadcast, BPD
<BPD.broadcast@BaltimorePolice.org>
**Sent:** Wednesday, April 22, 2015 8:18 PM EDT
**To:** broadcast, BPD <BPD.broadcast@BaltimorePolice.org>
**BCC:** ALLBPD <allbpd@baltimorepolice.org>
**Subject:** FW: Leave Cancellation - Saturday 4/25/15

Subject: Leave Cancellation - Saturday 4/25/15

To ensure adequate coverage, all leave is cancelled in accordance with the MOU between the Fraternal Order of Police Lodge #3 and the Baltimore
Police Department for 25 April 2015.

All members whose H Day are cancelled will report to their respective commands for roll call.  All members must have all issued riot gear and be
prepared for redeployment on a citywide basis.

Per Order of Chief of Patrol

**CONFIDENTIAL - Produced Pursuant to Protective Order**

# EXHIBIT 36

**From:** Palmere, Dean <Dean.Palmere@baltimorepolice.org> on behalf of Palmere, Dean
<Dean.Palmere@BaltimorePolice.org>
**Sent:** Wednesday, April 22, 2015 11:00 PM EDT
**To:** Batts, Anthony <Anthony.Batts@baltimorepolice.org>
**CC:** Hyatt, Melissa R. <Melissa.Hyatt@BaltimorePolice.org>
**Subject:** FW: Mutual Aid Request

Howard co. Response below


Dean M. Palmere
Deputy Commissioner
Baltimore Police Department



-----Original Message-----
**From:** Gardner, Gary [ggardner@howardcountymd.gov]
**Sent:** Wednesday, April 22, 2015 09:09 PM Eastern Standard Time
**To:** Palmere, Dean
**Subject:** Re: Mutual Aid Request

Dean, I certainly understand and will have someone  reach out to you tomorrow to discuss.

*Gary Gardner*
*Howard County*
*Chief of Police*
*Sent from my Verizon Wireless 4G LTE DROID*


"Palmere, Dean" <Dean.Palmere@baltimorepolice.org> wrote:

Chief,

On behalf of Commissioner Anthony Batts, the Baltimore Police Department is seeking your assistance via mutual aid for upcoming protests.  I am sure that you have been monitoring the recent events unfolding in the City of Baltimore pursuant to the unfortunate death of Freddie Gray.  If at all possible, I would like to confirm what if any assistance you may be able to provide as we are expecting a series of expanded protests in the near future.

Thank you,

Dean

*Dean M. Palmere*
*Deputy Commissioner*
*Baltimore Police Department*

# EXHIBIT 37

**From:** Palmere, Dean <Dean.Palmere@baltimorepolice.org> on behalf of Palmere, Dean
<Dean.Palmere@BaltimorePolice.org>
**Sent:** Wednesday, April 22, 2015 5:50 PM EDT
**To:** ggardner@howardcountymd.gov <ggardner@howardcountymd.gov>; q02095@aacounty.org <q02095@aacounty.org>
**CC:** Batts, Anthony <Anthony.Batts@baltimorepolice.org>
**BCC:** Palmere, Dean <Dean.Palmere@BaltimorePolice.org>; Ebberts, Frank <Frank.Ebberts@BaltimorePolice.org>;
Higgins, James <James.Higgins@baltimorepolice.org>
**Subject:** Mutual Aid Request

Chief,

On behalf of Commissioner Anthony Batts, the Baltimore Police Department is seeking your assistance via mutual
aid for upcoming protests.  I am sure that you have been monitoring the recent events unfolding in the City of
Baltimore pursuant to the unfortunate death of Freddie Gray.  If at all possible, I would like to confirm what if any
assistance you may be able to provide as we are expecting a series of expanded protests in the near future.

Thank you,

Dean

*Dean M. Palmere*
*Deputy Commissioner*
*Baltimore Police Department*

CITY00007492

# EXHIBIT 38

**From**: Palmere, Dean <Dean.Palmere@baltimorepolice.org> on behalf of Palmere, Dean
<Dean.Palmere@BaltimorePolice.org>
**Sent**: Wednesday, April 22, 2015 5:09 PM EDT
**To**: pevans@baltimorecountymd.gov <pevans@baltimorecountymd.gov>
**CC**: Hyatt, Melissa R. <Melissa.Hyatt@BaltimorePolice.org>; Batts, Anthony <Anthony.Batts@baltimorepolice.org>
**Subject**: Mutual Aid

Pete,

I am sure that you have been monitoring the recent events unfolding in the City of Baltimore pursuant to the unfortunate death of Freddie Gray.  If at all possible, the Baltimore Police Department is seeking your assistance via mutual aid from your Mobile Field Force Team Platoons for upcoming protests.  The current needs are driven around the anticipation of a large protest on Thursday, April 23, 2015 w/ a (reporting time, 12:30) and Saturday, April 25, 2015 (reporting time, TBD).  The reporting location for both dates will be Baltimore Police Headquarters, 2nd floor Atrium of the Annex building.

Please confirm what if any assistance you may be able to provide.

Thank you,

Dean

*Dean M. Palmere*
*Deputy Commissioner*
*Baltimore Police Department*

# EXHIBIT 39



# BALTIMORE POLICE DEPARTMENT



Stephanie Rawlings-Blake
Mayor

Anthony W. Batts
Police Commissioner

To:     Colonel Michael Kundrat
        Chief, MDTA Police

From:   Commissioner Anthony Batts
        Baltimore Police Department

Date:   22 April 2015

Re:     Request for Mobile Field Force Team

The Baltimore Police Department is preparing to conduct a coordinated effort in response to possible protest activity. Our mission is to provide for the safety and the comfort of citizens attending the event through crowd and traffic control, as well as preventative patrol.

The purpose of this request is to ensure that adequate personnel are on location to provide coverage during any protest, which may spontaneously occur involving disruption to the free flow of pedestrian and vehicle traffic or public safety.

I am requesting additional personnel from your agency to assist with crowd control on 23 April 2015 at 1230 hours and 25 April 2015. Times for 25 April 2015 will be forthcoming as information develops. Personnel should have riot and protective gear on hand.

Sincerely

LTC _(signature)_ (Chief of Staff)

FOR Anthony W. Batts
Police Commissioner

c/o 242 West 29th Street   •   Baltimore, Maryland 21211-2908

CONFIDENTIAL - Produced Pursuant to Protective Order

# EXHIBIT 40

**From:** Alleyne, Karen <Karen.Alleyne@baltimorepolice.org> on behalf of Alleyne, Karen <karen.alleyne@baltimorepolice.org>
**Sent:** Thursday, April 23, 2015 2:12 PM EDT
**To:** mkundrat@mdta.state.md.us <mkundrat@mdta.state.md.us>; clifford.hughes@maryland.gov <clifford.hughes@maryland.gov>; anthony.satchell@maryland.gov <anthony.satchell@maryland.gov>; woodrow.jones@maryland.gov <woodrow.jones@maryland.gov>; JGavrilis@mta.maryland.gov <jgavrilis@mta.maryland.gov>; Damron, Fred (MTA) <FDamron@mta.maryland.gov>; Goodwin, Marshall T. - (BCPSS) <mtgoodwin@bcps.k12.md.us>; jwjohnson@baltimorecountymd.gov <jwjohnson@baltimorecountymd.gov>; pevans@baltimorecountymd.gov <pevans@baltimorecountymd.gov>; dwaltemeyer@aacounty.org <dwaltemeyer@aacounty.org>; kgoodwin@aacounty.org <kgoodwin@aacounty.org>; q02095@aacounty.org <q02095@aacounty.org>; ggardner@howardcountymd.gov <ggardner@howardcountymd.gov>; sdpatel@co.pg.md.us <sdpatel@co.pg.md.us>; Anderson, John <John.Anderson@baltimorecity.gov>; Martin, Henry <Henry.Martin@baltimorecity.gov>; MCPDChief@montgomerycountymd.gov <MCPDChief@montgomerycountymd.gov>
**CC:** Batts, Anthony <Anthony.Batts@baltimorepolice.org>; Schluderberg, Gordon <Gordon.Schluderberg@BaltimorePolice.org>; Martin, Ganesha <Ganesha.Martin@BaltimorePolice.org>; Hyatt, Melissa R. <Melissa.Hyatt@BaltimorePolice.org>; DeSousa, Darryl <Darryl.DeSousa@BaltimorePolice.org>; Miller, Sean <Sean.Miller@BaltimorePolice.org>; Robinson, Osborne <Osborne.Robinson@baltimorepolice.org>; Marcus, William <William.Marcus@BaltimorePolice.org>
**BCC:** Palmere, Dean <Dean.Palmere@BaltimorePolice.org>; Higgins, James (James.Higgins@baltimorepolice.org) <James.Higgins@baltimorepolice.org>; Ebberts, Frank <Frank.Ebberts@BaltimorePolice.org>; Alleyne, Karen <karen.alleyne@baltimorepolice.org>; Davis, Debbie D. <Debbie.Davis@BaltimorePolice.org>
**Subject:** Deputy Commissioner Palmere - Meeting on Mutual Aid for Upcoming Protests

*Message from Deputy, Police Commissioner Dean Palmere:*

On behalf of Commissioner Anthony Batts, the Baltimore Police Department is seeking your assistance via mutual aid for upcoming protests.  As such, we have scheduled a meeting on 4/24/2015 1300 hrs. at Baltimore Police headquarters so we can provide a face-to-face overview regarding the specifics/parameters of the assistance being requested.  In the event that you are unable to attend, we would respectfully request that an executive level member with decision making authority be designated to attend.

The meeting will be held at the Baltimore Police Headquarters, located at 601 E. Fayette St, Baltimore, Maryland, 3rd floor Annex building, ComStat Room, parking access via Baltimore Street - w/ garage entrance at Frederick Street.

We definitely understand that this is short notice; however, your attendance will be greatly appreciated. Please RSVP

Respectfully,

Dean M. Palmere
Deputy Commissioner
Baltimore Police Department
410-637-8880 (Office)
410-625-1978 (Fax)

# EXHIBIT 41

**From:** Batts, Anthony <Anthony.Batts@baltimorepolice.org>
**Sent:** Sunday, April 26, 2015 12:20 PM EDT
**To:** Martin, Ganesha <Ganesha.Martin@BaltimorePolice.org>
**Subject:** FW: Got message

Did we do this


Sent with Good (www.good.com)


-----Original Message-----
**From:** Robinson, StephanieJ
**Sent:** Saturday, April 25, 2015 12:47 PM Eastern Standard Time
**To:** Martin, Ganesha
**Cc:** Parthemos, Kaliope; Batts, Anthony
**Subject:** Got message


Please send what was requested from Baltimore Co, most recently and specifically, and response.  Understand AA co is present. Need asap. Please pardon brevity nd any typos. On cell.

Stephanie

**CONFIDENTIAL - Produced Pursuant to Protective Order**

# EXHIBIT 42

# BALTIMORE POLICE DEPARTMENT
## PROTEST
## 25 April 2015

## Table of Contents

A.   Maps

B.   Organization Assignment List (ICS)

C.   Arrest and Prisoner Protocol System

D.   Command Structure

E.   Personnel Strength

F.   Personnel Assignments

**CONFIDENTIAL - Produced Pursuant to Protective Order**                                    CITY00007595

# Protest 4-25
## Downtown



CONFIDENTIAL - Produced Pursuant to Protective Order

# Protest 4-25
## Central District Area



CONFIDENTIAL - Produced Pursuant to Protective Order

## Protest 4-25
## Western District



## ORGANIZATION ASSIGNMENT LIST (ICS 203)

| 1. Incident Name:<br>Protest 4-25 | | 2. Operational Period: | Date From:<br>4/25/2015 | Date To: 4/25/2015 |
| | | | Time From: 1000 | Time To: Clear |

| 3. Incident Commander(s) and Command Staff: | | 7. Operations Section: | | |
|---|---|---|---|---|
| IC/UCs | D.C.  D. Palmere | Chief | Ltc. M. Hyatt | |
| | | Deputy | Cpt.G. Schluderberg | |
| Deputy | | Staging Area | | |
| Safety Officer | | Branch | Field Operations | |
| Public Info. Officer | Cpt.E. Kowalczyk | Branch Director | D.C. Davis | |
| Liaison Officer | | Deputy | Lt. C. Thompson | |
| **4. Agency/Organization Representatives:** | | Division/Group | | |
| Agency/Organization | Name | Division/Group | | |
| BCFD | DC K. Zimmerman | Division/Group | | |
| MOEM | Director C. Scott | Division/Group | | |
| DOT | C. Baker | Division/Group | | |
| | | Branch | Central District | |
| | | Branch Director | CPT M. Howe | |
| | | Deputy | Major. Marcus | |
| **5. Planning Section:** | | Division/Group | | |
| Chief | Col. Desousa | Division/Group | | |
| Deputy | | Division/Group | | |
| Resources Unit | | Division/Group | | |
| Situation Unit | | Division/Group | | |
| Documentation Unit | | Branch | Western District | |
| Demobilization Unit | | Branch Director | Major Robinson | |
| Technical Specialists | LT S. Hood | Deputy | Cpt. Pecha | |
| | | Division/Group | | |
| | | Division/Group | | |
| | | Division/Group | | |
| **6. Logistics Section:** | | Division/Group | | |
| Chief | Cpt M. Bartness | Division/Group | | |
| Deputy | Major Smith | **Air Operations Branch** | | |
| **Support Branch** | | Air Ops Branch Dir. | Sgt Seitz | |
| Director | | | | |
| Supply Unit | LT B. Ridely | | | |
| Facilities Unit | | **8. Finance/Administration Section:** | | |
| Ground Support Unit | | Chief | Moore | |
| **Service Branch** | | Deputy | Dir. C. Sturgis | |
| Director | Lt W. Furlong | Time Unit | | |
| Communications Unit | a/CPT D. Effland | Procurement Unit | | |
| Medical Unit | | Comp/Claims Unit | | |
| Food Unit | | Cost Unit | | |

| 9. Prepared by:   Name: | | Position/Title: | Signature: _____ |
|---|---|---|---|
| ICS 203 | IAP Page 1 | Date/Time: Date | |

CONFIDENTIAL - Produced Pursuant to Protective Order

## COMMUNICATIONS LIST (ICS 205A)

| 1. Incident Name:<br>Protest 4-25 | 2. Operational<br>Period: | Date From: 4/25/2015 | Date To: 4/25/2015 |
|---|---|---|---|
| | | Time From: 1000 | Time To: Clear |

**3. Basic Local Communications Information:**

| Incident Assigned Position | Name (Alphabetized) | Method(s) of Contact<br>(phone, pager, cell, etc.) |
|---|---|---|
| BPD | D.C. Palmere, Dean | 410-409-6856 |
| BPD | Col. Desousa, Darryl | 443-610-9420 |
| BPD | Ltc. Hyatt, Melissa | 443-934-6667 |
| BPD | Chief Moore, Tom | 443-743-9342 |
| BPD | Cpt. Schluderberg, Gordon | 443-829-3811 |
| BPD | Lt. Thompson, Charles | 443-286-9342 |
| BPD | Lt. Devita, Kevin | 443-392-2622 |
| Howard Co. PD | Chief Gardner, Gary | 410-802-7015 |
| Howard Co. PD | Cpt. Yetter, Michael | 410-206-8225 |
| Montgomery Co. PD | Cpt. Bolesta, Bob | 240-876-2135 |
| Montgomery Co. PD | Sgt. Davidov, Peter | 240-876-5367 |
| AA Co. PD | A/DC Waltemeyer, David | 443-623-0483 |
| AA Co. PD | Chief Altomaic, Tim | 443-790-0885 |
| AA Co. PD | A/Cpt. Goodwin, Katie | 443-623-0480 |
| AA Co. PD | Sgt. Galligan, Michael | 410-320-1709 |
| School Police | Major Hamm, Akil | 443-904-9364 |
| MDTAP | Major Rodriguez, Antonio | 443-829-6726 |
| Dept. Public Safety | DSO France, Wendell | 443-848-2506 |
| B Co. PD | Chief Johnson, Jim | 443-271-4287 |
| B Co. PD | Col. Evans, Pete | 443-271-4319 |
| MDSP | Col Pallozzi, William | 410-365-6901 |
| MDSP | Cpt. Dofflemyer, Bill | 443-829-0019 |
| MDSP | Lt. Phillips, Greg | 410-992-2641 |
| MD National Guard | Col. Casey, Sean | 410-652-9553 |
| Baltimore Sheriff | Major Cogen, Sam | 410-591-0142 |
| OEM | McMillian, David | 443-690-6814 |
| BCFD | DC Zimmerman, Karl | 443-690-4778 |
| BCFD | PC Wagner, Mark | 443-992-8498 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

| 4. Prepared by:   Name: | Position/Title: | Signature: |
|---|---|---|
| ICS 205A | IAP Page | Date/Time: Date |

**CONFIDENTIAL - Produced Pursuant to Protective Order**

# INCIDENT ORGANIZATION CHART (ICS 207)

**1. Incident Name:**
Protest 4-25

**2. Operational Period:** Date From: 4/25/2015   Date To: 4/25/2015
Time From: 100   Time To: Clear

**3. Organization Chart**



**Incident Commander** — D.C. D. Palmere

**Liaison Officer**

**Safety Officer**

**Public Information Officer** — CPT Kowalczyk

**Finance/Admin Section Chief** — Chief Moore
- Time Unit Ldr.
- Procurement Unit Ldr. — Del H. Lane
- Comp./Claims Unit Ldr.
- Cost Unit Ldr.

**Operations Section Chief** — Lt.c. M. Hyatt
- Staging Area Manager
- Field Operation — D.C. Davis
- Central District — Cpt. M. Rowe
- Western District — Cpt. E. Pocha

**Planning Section Chief** — Col. Desousa
- Resource Unit Ldr.
- Situation Unit Ldr.
- Documentation Unit Ldr.
- Demobilization Unit Ldr

**Logistics Section Chief** — Cpt Bartness
- Support Branch Dir.
  - Supply Unit Ldr. — LT Ridley
  - Facilities Unit Ldr.
  - Ground Spt. Unit Ldr.
- Services Branch Dir. — LT W Furlong
  - Comm. Unit Ldr. — LT. D Effland
  - Medical Unit Ldr.
  - Food Unit Ldr.

**ICS 207** | **IAP Page 4** | **4. Prepared by:** Name: | Position/Title: Coordinator | Signature: | Date/Time: 09102014/1000

CONFIDENTIAL - Produced Pursuant to Protective Order

## INCIDENT RADIO COMMUNICATIONS PLAN (ICS 205)

| 1. Incident Name: FREDDIE GRAY PROTEST | 2. Date/Time Prepared: Date: 4/24/2015 Time: 1000 Hrs | 3. Operational Period: Date From: 4/25/2015  Date To: 4/25/2015 Time From: 1000  Time To: TBD |
|---|---|---|

### 4. Basic Radio Channel Use:

| Zone Grp. | Ch # | Function | Channel Name/Trunked Radio System Talkgroup | Assignment | RX Freq N or W | RX Tone/NAC | TX Freq N or W | TX Tone/NAC | Mode (A, D, or M) | Remarks |
|---|---|---|---|---|---|---|---|---|---|---|
| A | 10 | INCIDENT CHANNEL | TAC1 | CENTRAL | N/A | 800 MHz | | | DIGITAL | INCIDENT CHANNEL CD |
| C | 1 | LATERAL CHANNEL | CDLAT | CENTRAL | N/A | 800 MHz | | | DIGITAL | DESIGNATED FOR LATERALS |
| A | 11 | INCIDENT CHANNEL | TAC2 | WESTERN | N/A | 800 MHz | | | DIGITAL | INCIDENT CHANNEL WD |
| C | 7 | LATERAL CHANNEL | WDLAT | WESTERN | N/A | 800 MHz | | | DIGITAL | DESIGNATED FOR LATERALS |
| B | 12 | INTEROP | 8 TAC 91 | MEMA | N/A | 800 MHz | | | ANALOG | BACKUP FOR OOJ |
| B | 13 | INTEROP | 8 TAC 92 | MEMA | N/A | 800 MHz | | | ANALOG | BACK UP FOR OOJ |
| H | 4 | LOANER | CM-EVENT1 | CMARC | N/A | 800MHZ | | | DIGITAL | BACK UP OOJ |
| H | 2 | LOANER | CM-EVENT2 | CMARC | N/A | 800MHZ | | | DIGITAL | BACK UP OOJ |

### 5. Special Instructions:

B12 & B13 WILL BE UTILIZED IF OUT OF JURISDICTION UNITS ARE CALLED IN NOT HAVING BALTIMORE CITY TALK GROUPS.

1A & 2A ZONE H WILL BE UTILIZED AS BACK UP CHANNELS WITH OR WITHOUT OOJ

| 6. Prepared by (Communications Unit Leader): | Name: LIEUTENANT DEANNA L. EFFLAND | Signature: |
|---|---|---|
| ICS 205 | IAP Page | Date/Time: 4/24/2015 4:00 PM |

CONFIDENTIAL - Produced Pursuant to Protective Order

POLICE DEPARTMENT

BALTIMORE, MARYLAND

April 24, 2015

TO:        Police Commissioner Anthony Batts

VIA:       Official Channels

FROM:      Lieutenant Colonel Melissa Hyatt
           Chief of Staff

SUBJECT:   Protests April 25, 2015

Sir:

I respectfully report the following operational plan. This plan is in reference to the possible protests in the WD and CD on today's date.

**I. Command and Control:**

Incident Commander: Deputy Commissioner Palmere

Operations Commander: LTC Hyatt

Deputy Operations Commander: Captain Schluderberg

Planning: Colonel DeSousa

Logistics: Major Dennis Smith/Captain Martin Bartness

Finance: Chief Moore


CD Field Operations Commander: Major Marcus

CD Assistant Field Operations Commander: Captain Howe

WD Field Operations Commander: Major Robinson

WD Assistant Field Operations Commander: Captain Bauer

Staging Area:  Central Distract Deployment 601 E. Fayette Street (Atrium)

                      Western District Deployment 1034 N. Mount Street (Roll Call Room)

Command Post/Base of Operations: 601 E. Fayette Street, 9th Floor, Watch Center

Dedicated Channels:  Separate Communications Plan to follow

**CONFIDENTIAL - Produced Pursuant to Protective Order**          CITY00007603

Individual call numbers will be assigned to officers by their individual commands. However, it will be essential to utilize position locations to relay information via radio.

**II. Overall Objective:** Support a peaceful demonstration of lawfully assembled protesters, while protecting life and property. This operation will utilize the least amount of force possible.

Priorities in Order:

1. Life (Citizen, Safety, Officer Safety)
2. Property and Business
3. Safe Traffic Flow (Ingress and Egress)
4. Restoration of Normal City Services

**III. Individual Assignments (If required):**

**All teams will travel in a minimum of maintained squads for ease of tracking and accountability.**

CITY HALL: Officers assigned to City Hall will be posted on the perimeter of City Hall during full activation with officers posted on the steps/front door of City Hall and inside of the bike racks (on the Lexington side of City Hall, on the Fayette side of City Hall, and parallel to Gay directly to the east of the steps).

MCKELDIN SQUARE and INNER HARBOR (BRICKS) Officers assigned to McKeldin Square will be posted on the perimeter of the Square, including on the footbridges. Due to the presence of the ice rink, in the event that the location becomes relevant, officers will surround and protect the rink. This will leave a small area for demonstrators which will not impact foot traffic or the operation of the rink. The rink will be bike racked in order to protect the integrity of the area.

A deployment will be assigned to the Inner Harbor bricks area with a concentration on stairwells, high ground, and business protection. Communication has been established with Pavilion management in order to lockdown the Pavilions if necessary.

GALLERY: Inner Harbor Units will be posted outside of the Gallery, specifically at Calvert and Pratt Streets. They will stand on the northeast corner. Communication has been established with management in order to lockdown the Gallery if necessary.

POLICE HEADQUARTERS: Officers assigned to Police Headquarters will be Those on the north side of the building will not permit individuals to get between themselves and the glass or doors of the building. Those officers will maintain the flat concrete area outside of the main entrance to the Annex building. Only a small number of officers will be visible to the group on any side, as they will be spread around the building but within eyesight of each other.

COURTHOUSE: The courthouse will be maintained by the Baltimore City Sherriff's Department, who will be in communication with BPD.

**CONFIDENTIAL - Produced Pursuant to Protective Order**

WESTERN POLICE DISTRICT: Officers assigned to Western District stationhouse will be staged to protect the building and ensure safe ingress and egress.

SPECIAL OPERATIONS SECTION:

The Special Operations Section will provide the following support:

SWAT will be utilized in teams of 1/5 and will function as arrest teams. Individual arrests will be extracted quickly and immediately transported away from the area.

Grenadiers: 2 two-person SWAT grenadier teams will be assigned. Utilizing grenadiers is a last resort option, as this operation prioritizes utilizing the least amount of force needed. Grenadiers will be paired together and each team will have one officer equipped with a 37 mm smooth bore gas launcher, while the other officer will be equipped with a 37 mm Sageco launcher.

Bearcat: A 2 officer team will stage the Bearcat as an evacuation tool in the event that an officer is seriously injured in a hostile environment during the operation. The primary evacuation route from both McKeldin Square and City Hall to University of Maryland Shock Trauma is west on Lombard, south on Penn into the ER. The evacuation route from the Western District will be north on Mount, right on Riggs, right on Gilmor, left on Mulberry, right on Greene into ER.

Mounted: 4 Mounted units will be utilized.

K9: K9 units will provide mobile patrol in the downtown area unless requested to post on a particular location. In the event of a hostile incident, K9 may be utilized to provide security at the command post. Dogs will remain in kennels unless otherwise advised by the Operations Commander with approval from the Incident Commander.

Foxtrot: One helicopter will be committed to the operation. The ship will monitor crowd movement and identify potential threats. The ship will remain in flight until the event concludes or it is relieved.

Equipment Trailer: This will be staged on Light Street near Redwood and manned by SOS.

OIS/SES: Plain clothes SES detectives will be placed within the demonstrators in order to gather intelligence and alert the Incident Commander of any intelligence. OIS observation point officers will be deployed to each of the following locations. They will provide oversight and communicate intelligence to units on the ground.

CITIWATCH: Monitors will proactively monitor cameras specific to the event and will relay information to ground units.

FISCAL: Fiscal will have a representative present in the Watch Center.

**IV. Supervisory Premise:**

First Tier: Sergeants—Utilize line of sight principles to maintain departmental objectives and ensure officer safety. Squads will be broken down into manageable numbers with supervisors in secondary positions keeping subordinates in front of or at their periphery.

Second Tier: Manage personnel based on the objective and actionable intelligence provided by line sergeants, observation point personnel, Foxtrot, City Watch operators, and plain clothes officers.

## V. Arrest Procedures:

Arrest is not a preferred function during this operation. However, in the event that arrests become necessary, the following procedures will be followed.

A line will progress forward of the arrest team and the arrest team (1/5 SWAT) will extract the arrestees. Multiple arrest teams may be utilized if deemed necessary. The team will extract the arrestees and will be met by a wagon at pre-designated locations. Mass arrests will be immediately placed in the Department of Corrections buses. These buses will respond to Central Booking and stage in the sally port until the facility is prepared to accept the prisoners. Detectives will stage at Central Booking to standby and process prisoners.

In the event that any juveniles are arrested, they will be transported directly to Juvenile Booking.

Wagon officers will ensure that arrestees have masking tape on their backs with the arresting officer's last name and sequence number written on same. Also, a photo will be taken when practical of the arresting officer and the prisoner together.

## VI. Video Recording:

A minimum of 4 video recorders will be deployed during this incident. Court attire detectives and undercover officers will maintain video cameras. The Field Operations Commander will have a video camera assigned to a detective who will be with him/her during the duration of the event. All camera operators will film both the crowd and the actions of the officers. Any conversations between the Field Operations Commander and demonstrators will be filmed in entirety. Other contact by officers and demonstrators will be minimized by the positioning of officers. However, in the event that a demonstrator or other citizen approaches an officer, he or she shall remain polite. The incident will be video recorded whenever possible.

## VII. Travel Routes:
Motorized units and foot platoons will be utilized to manage routes from each location to the other in the event that the demonstration becomes mobile. These officers will be focused on pedestrian and vehicular safety. No routes have been verified at this time. In the event that a group attempts to linger in an intersection to gather the attention of motorists, officers will divert traffic for a minimum of 1 block in each direction in order to remove the attention that they are seeking.

CONFIDENTIAL - Produced Pursuant to Protective Order

The Community Partnership Division will attempt to make contact with the organizer to predetermine the route and locations.

**VIII. External Resources:**

**Mayor's Office of Emergency Management:**  OEM will coordinate collecting trashcans and newspaper boxes in the protest area.  They are also coordinating with MTA to divert bus lines that are impacted by the protests.  Street sweepers will be on call and they will prepare plywood in the event that it is required.

**Fire Department:** Fire department medics and suppression will be staged for this event.

**DPW:** DPW will provide bike racks and other barriers at the direction of the police department.

**State's Attorney's Office:** Pat Motsay is working closely with us, along with our Legal Affairs to manage any arrests and charging during demonstrations.

**Businesses:**  Businesses will be advised of protests in the area in order to prepare and to secure their establishments if desired.

**Department of Public Safety & Correctional Services:** Two (2) vans at 2201 W. Cold Spring Lane stage at the location unless needed and are responsible for transportation during the event for mass arrests.

**Law enforcement support from other jurisdictions** will be utilized in a reserve status initially.

*Maryland State Police and Maryland Transportation Authority Police* will be maintained in a reserve status.  They will only be utilized in the event that officers require assistance. They will be staged in the Headquarters Auditorium initially. Upon the Incident/Operations Commander's determination of the need to transfer them to a secondary reserve position, they will be posted within a three minute response to the protest site.

*Prince George's County Police* will be utilized in a mobile reserve capacity.  They will be deployed in assistance to Baltimore Police when deemed necessary

*Baltimore City Sheriff's Office* will be utilized in the vicinity of the courthouse unless the Incident/Operations Commander determines the need to adjust deployment.  They will maintain security on courthouse property.  In the event that resources are needed to assist in another location, the BCS will adjust to a minimum configuration in the vicinity of the courthouse and will await instructions for redeployment.

*Baltimore County Police and Montgomery County Police* will be utilized primarily in stationary positions to protect private and city property.  Examples of such assignments are Police Headquarters, City Hall, Light Street Pavilion, Pratt Street Pavilion, and Gallery. They may also be utilized in a stationary manner to post across expressway entrances.

*Anne Arundel Police, Howard County Police, and Prince Georges County Police and* will be utilized to supplement and provide relief for Baltimore Police in the Western District and during

mobile march routes. Their roles will range from supplementing security inside of the barricades on the property of the Western District stationhouse to shadowing the protest route with Baltimore Police. They will fall under the direction of the Baltimore Police command during these assignments. They may also be utilized in a stationary manner to post across expressway entrances. When not being utilized, these assets will be staged inside of the Western District stationhouse or in alternative locations.

*MD Transit Administration Police* will initially be utilized in transit hub areas in the downtown and Western District. However, upon the Incident/Operations Commander's determination of the need to utilize them in an active role, they may be reassigned.

*Baltimore City School Police* will be deployed to supplement Baltimore City Police in assignments. They will be utilized primarily for stationary posts such as City Hall, the pavilions, etc. However, upon the Incident/Operations Commander's determination of the need to utilize them in an active role, they may be reassigned.

**\*The personnel roster and assignments will be submitted separately to this document.**

### IX. Events:

The below events are the most notable scheduled in Baltimore City on April 25, 2015.

0900 hours Brigance Brigade Foundation 2nd Annual 5.7K Championship Run, Canton Waterfront Park (3001 Boston St, Baltimore, MD 21224)

1905 hours Orioles vs Red Sox at Camden Yards (333 West Camden Street, Baltimore, MD 21201)

1800-2400 hours Shock Trauma Gala, Baltimore Convention Center (1 West Pratt Street, Baltimore, MD 21201)


Respectfully,

Lieutenant Colonel Melissa Hyatt

**CONFIDENTIAL - Produced Pursuant to Protective Order**

**POLICE DEPARTMENT**
Baltimore, Maryland

**REPORT**
Form 96/95

Date: 25 April 2015

TO:     Captain Gordon Schluderberg
        Commander, Special Operations Section

VIA:    Official Channels

FROM:   Sergeant Kenneth J. DeLuca
        Accident Investigation Unit / Crash Team

RE:     I-295 I-395 Roadway Closure

        Sir:

        I respectfully report the below listed locations will need to be addressed should
the need for an I-295 and or I 395 closure become necessary due to pedestrian traffic.
After speaking to Mr. Charles Baker, I was advised that DOT only has two personnel
assigned to the Watch Center and no available cone crews. Without adequate resources,
this closure will need to be dynamic and utilization of fire apparatus will become
necessary.

**I-295 Closure**
**Southbound**

Russell Street @ Lee Street

MLK to Russell Street On-Ramp

Hamburg Street

Worchester Street

Bayard Street

Bush Street

**CONFIDENTIAL - Produced Pursuant to Protective Order**

**N/B Closure**

All of the above roads utilized for S/B closure with the addition of the two roads below.

Annapolis Road On-Ramp

Haines Street

**I-395 Closure S/B**

Pratt @ Howard Street

Camden @ Howard Street

Conway@ Howard

Saratoga Street On-Ramp

**I-395 Closure N/B**

Pratt @ Howard Street

Camden @ Howard Street

Conway@ Howard

All of the above roads utilized for S/B closure with the addition of the S/B I-95 ramp into downtown.

Respectfully,

Sgt. Kenneth DeLuca

Sergeant Kenneth  DeLuca
Baltimore Police Department
Accident Investigation Unit/Crash Team

CONFIDENTIAL - Produced Pursuant to Protective Order

*395 plan on way*

**POLICE DEPARTMENT**
Baltimore, Maryland

**REPORT**
Form 96/95

Date: 24 April 2015

TO:     Captain Gordon Schluderberg
        Commander, Special Operations Section

VIA:    Official Channels

FROM:   Sergeant Kenneth J. DeLuca
        Accident Investigation Unit / Crash Team

RE:     I-83 Roadway Closure

        Sir:

        I respectfully report the below listed locations will need to be addressed should the need for an I-83 closure become necessary due to pedestrian traffic. After speaking to Mr. Charles Baker, I was advised that DOT only has two personnel assigned to the Watch Center and no available cone crews. Without adequate resources, this closure will need to be dynamic and utilization of fire apparatus will become necessary. Per my conversation with Conner Scott we will have bike racks at Fayette and President Street. There will also be two crews in the area of the War Memorial Building with additional racks available to deploy as needed.

**Northbound Closure**

President Street @ Fayette Street

Madison Street On-Ramp

Charles Street On-Ramp

North Avenue On-Ramp

Cold Spring Lane

**CONFIDENTIAL - Produced Pursuant to Protective Order**

**Southbound Closure @ Cold Spring Lane**

Closure prior to the Cold Spring Lane (Traffic should be diverted W/B toward Park Heights Avenue to avoid getting back onto S/B I-83 @ Falls Road.)

28th Street On-Ramp

North Avenue On-Ramp

Saratoga Street On-Ramp

Respectfully,

*Sgt. Kenneth DeLuca*

Sergeant Kenneth DeLuca
Baltimore Police Department
Accident Investigation Unit/Crash Team

**CONFIDENTIAL - Produced Pursuant to Protective Order**

POLICE DEPARTMENT
BALTIMORE, MARYLAND

April 24, 2015

To:      Anthony W. Batts
        Police Commissioner

Via:     Official Channels

From:   Captain, Professional Development & Training Academy

Subject:  **High Volume Arrest and Prisoner Protocol System**
           **For Saturday April 25, 2015**

     Sir,

        The following operations plan will be in effect on April 25, 2015 for high volume arrest and prisoner protocol.

### Summary:

     CBIF can handle 30 adult prisoners directly.
     Juvenile booking can handle 50 juveniles in custody directly.

        When CBIF has reached 30 prisoners, the prisoner transportation vehicles will be routed to the Public Safety Training Facility at 3500 W. Northern Parkway.  The prisoners will arrive at the processing center for processing.

### Staffing Resources:

| | |
|---|---|
| 1 – Captain | 1 – Sergeant (CBIF Liaison) |
| 2 – Lieutenants | 1 – Sergeant (IAD) |
| 3 – Sergeants | |
| 25 – Officers | |

    1 – Platoon for Security when activated

    2 – Fire Department Medics

### Equipment Resources Requested:

  25 – Leg Irons
   5 – Video Cameras
   5 – Advise of Rights forms posted (and handed out)
   2 – Flex Cuff cutting tool

**CONFIDENTIAL - Produced Pursuant to Protective Order**                         CITY00007613

d.   If an arrestee is seated and agrees to walk, the arresting officer or assisting officer shall lead him from the crowd to the transport vehicle.

e.   If an arrestee is seated or lying down and refuses to walk, they shall be carried by two (2) or more officers.

2.   Except for felony offenses, members of the force shall not pursue demonstrators into buildings for the purpose of effecting arrests unless specifically instructed to do so by an official. Officials shall accompany and exercise close control over members under their command who go on private property or enter buildings to effect arrests.

3.   If the arrestee is not going to be questioned about matters relating to a misdemeanor offense, it is not necessary that the Miranda warning of rights be given to the arrestee at that time. However, if a participant is charged with a felony or will be subject to questioning for a misdemeanor offense or violation, the Miranda warning of rights shall be given at the time of arrest.

4.   During mass demonstrations and civil disturbances, members shall document every arrest consistent with the department's responsibility to protect life and property and to prevent unlawful conduct.

5.   Arrestees shall be restrained and brought to a transport vehicle (for transport to the designated Prisoner Control System site/processing center) where they shall be thoroughly searched for weapons and contraband by Prisoner Control System personnel before being placed in the transport vehicle.

6.   Restraints

a.   All arrestees shall be secured in accordance with Policy 503 (Transportation of Passengers in Departmental Vehicles) and Policy 1114 (Persons in Police Custody).

b.   Members shall only use such restraints in the transporting, processing, and detention of persons as the Commissioner or his/her designee determines to be reasonably necessary to maintain the safety of the arrestees and of BPD arresting, transporting, and/or processing personnel, and to prevent escape.

c.   Where flex-cuff restraints are used to secure an arrestee's hands or arms, the member applying the flex-cuffs must always check restraint tightness.

(1) To avoid injuries that may be caused by over-tightening the restraints, when applying the flex-cuff, the member is to draw the strap up only until the strap comes in contact with the arrestee's skin at all points and ensure the flex- cuff is not too tight.

d.   Members shall give prompt attention to complaints that the flex- cuffs are too tight.

(1) Even after using the precautionary measures indicated above to prevent over-tightening of flex-cuffs, if the restrained person complains that the cuffs are too tight the member shall stop (if reasonably possible) and check the tightness of the cuffs.

a.  Prisoners are thoroughly searched for weapons and contraband by the Prisoner Control transportation personnel before being placed in the vehicle.

b.  Adults and juveniles are transported separately.

(1) Juveniles will be transported to the Juvenile Booking Facility or to another facility as approved by the Commissioner or his/her designee; and

(2) Adults will be transported to designated adult processing site(s).

c.  Arrestees are personally advised of the charges, and photos are taken of the arrestees with the arresting officer prior to loading the arrestees onto the transport vehicle, unless the Incident Commander determines that circumstances require that arrestees be transferred prior to being photographed with their arresting officers in order to protect the safety of the arrestees, police officers, and/or others.

NOTE: The requirement that photographs be taken prior to transport ensures that arresting officers will be properly identified to their arrestees and will be able to participate appropriately in any prosecution function that may follow from the arrest, even if the automated booking processing is interrupted for any reason.

h.  Mobile data storage devices, along with hard copies of all arrest(s) paperwork, are to be retained.

i   A CBIF Intake form will be completed for each arrest location and forwarded to the site/processing center with the transport vehicle.

j.  The arrest team supervisor shall direct arrested persons to the designated sites/processing centers.

k.  When all arrestees have boarded the transport vehicle, are safely seated and restrained by a seatbelt, and the transport vehicle has commenced its travel from the arrest location to the prisoner processing center.

l.  Once at the site/processing center, each arrestee is provided a copy of the Advice of Rights form to read. In addition, the text of the form is to be reflected on signs that are to be placed conspicuously throughout the processing area.

m. In cases of mass seizures of property or evidence, every attempt is made to document the seizure and preparation of the items via videotape or photographs. This documentation will strengthen the Department's position as to the treatment of these items to reduce the likelihood of claims of damage and litigation.

II. PROCESSING OF PRISONERS

   CITY00007615

a.  Initiate an arrestee package for each arrestee.

e.  Forward each package to the Master Control Station.

3.  Station Two: Property Station

a.  Whenever possible, at least two (2) members shall be assigned to the Property Station. One (1) member will be responsible for logging prisoner property and one member will be responsible for releasing property.

b.  Logging Prisoner Property

(1) Members assigned to the Property Station shall:

(a) Take possession of all confiscated prisoner property along with a copy of the CBIF Intake form.

(b) Inspect property for accuracy.

f.  Releasing Prisoner Property

(1) Members assigned to the Property Station shall:

(a) Collect the prisoner's citizen contact receipt.

(b) Members assigned to the Property Station shall ensure a copy of the citizens contact receipt is forwarded to the Master Control Station.

6.  Master Control Station

a.  Members assigned to the Master Control Station shall:

(1) Receive arrestee data packages from the Intake Section for each arrestee.

(2) Forward the entire arrestee when the prisoner is taken to CBIF.

(3) Control and monitor the flow of the arrest paperwork between the processing stations.

G.  Detention of Prisoners

1.  In processing sites containing cells, prisoners shall be detained in the cells separated by gender and age (i.e., juvenile versus adult).

2.  The use of unsecured processing sites shall be avoided unless exigent circumstances exist. All available holding cells at high volume processing sites shall be filled to capacity prior to moving prisoners to an unsecured facility.

3.  If unsecured processing sites (not containing cells) must be used:

          CITY00007616

2. All processing personnel shall have their issued MFF protective gear and chemical protective gear available.

T. Communications

Processing centers, all transportation supervisors and vehicles shall monitor the radio channel designated for exclusive operations for the event.

U. Injured Prisoners

1. Prisoner control transportation personnel shall take custody of injured prisoners and arrange for transportation and security during treatment.

2. Prisoners with serious injuries noted on the scene of the arrest shall be taken directly to the nearest hospital.

3. On-site medical personnel shall initially evaluate injuries noted at the processing centers.

Mark P. Mason
Captain
Professional Development & Training Academy

CONFIDENTIAL - Produced Pursuant to Protective Order



Protest 4-25
Command Structure

UNIFIED COMMAND

FIELD OPERATIONS

RESERVE

WESTERN DISTRICT

CENTRAL DISTRICT



# Protest 4-25
## Operations Structure

FIELD OPERATIONS

RESERVE

WESTERN DISTRICT

CENTRAL DISTRICT

Stationary Platoons

Mobile Platoons

Stationary Platoons

Mobile Platoons

PLATOON =
LT x 1
SGT x 3
P/O x 21

CONFIDENTIAL - Produced Pursuant to Protective Order



Protest 4-25

Central District Operations Structure

CENTRAL DISTRICT

Mobile Platoons X 9
- PLT A-1, PLT A-2, PLT A-3
- PLT B-1, PLT B-2, PLT B-3
- PLT C-1, PLT C-2, PLT C-3

Stationary Platoons X 8
- CITY HALL X 2 PLT
- POLICE HQ X 3PLT
- INNER HARBOR X 1 PLT (MO CO)
- ORIOLE PARK X 1
- HARBOR EAST x 1

CONFIDENTIAL - Produced Pursuant to Protective Order



# Protest 4-25

## CENTRAL DISTRICT SCHEMATIC

KEY

MOBILE

STATIONARY

ZONE B

PLT B1

PLT B2

PLT B3

HQ 3 PLT

CITY HALL 2 PLT

COURT HOUSE 1 PLT BCSD

HARBOR EAST 1 PLT

INNER HARBOR PAVILLIONS 1PLT MO CO PD

PRATT ST

LIGHT ST

ST PAUL

ZONE A

PLT A1

PLT A2

PLT A3

BALTIMORE ST

ZONE C

PLT C1

PLT C2

PLT C3

ORIOLE PARK 1 PLT

SOS
CENTRAL DISTRICT
SWAT= 1 LT 2 SGT 10 P/O
(ARREST TEAMS)

K9= 1 SGT 5 P/O

MOUNTED= 2 SGT 10 P/O

AIU= 1 SGT 2 P/O

CONFIDENTIAL - Produced Pursuant to Protective Order

# Protest 4-25

## Western District Operations Structure



CITY00007622



Protest 4-25
WESTERN DISTRICT SCHEMATIC

FREMONT AVE

MOBILE PLATOONS
BLUE=NORTH OF RIGGS
GREEN= SOUTH OF RIGGS
EAST TO FREMONT AVE

BLUE 1

BLUE 2

MOUNT ST

W/D STATION
4 PLATOONS
1000 MOUNT
1700 RIGGS
CLOSED

GREEN 1

GREEN 2

RIGGS AVE

SOS
WESTERN DISTRICT
SWAT= 2 SGT 10 P/O
(ARREST TEAMS)

K9= 1LT 1 SGT 5 P/O

MOUNTED= ON CALL

AIU= 1 SGT 2 P/O

CONFIDENTIAL - Produced Pursuant to Protective Order

# Protest 4-25
## SOS UNITS

**SOS**
**WESTERN DISTRICT**
SWAT= 2 SGT  10 P/O
(ARREST TEAMS)

K9= 1LT  1 SGT  5 P/O

MOUNTED= ON CALL

AIU= 1 SGT  2 P/O

**SOS**
**CENTRAL DISTRICT**
SWAT= 1 LT  2 SGT  10 P/O
(ARREST TEAMS)

K9= 1 SGT  5 P/O

MOUNTED= 2 SGT  10 P/O

AIU= 1 SGT  2 P/O

CONFIDENTIAL - Produced Pursuant to Protective Order

# Protest 4-25
## PERSONNEL STRENGTH

**WESTERN DISTRICT**

|  | LT | SGT | P/O |
|---|---|---|---|
| 4 STATIONARY PLTS | 1 | 12 | 84 |
| AACO PLT | 2 | 4 | 20 |
| 4 MOBILE PLTS | 2 | 12 | 84 |
| SOS | 1 | 4 | 17 |
| RESERVE | 0 | 3 | 26 |
| TOTALS | 6 | 35 | 231 |

**CENTRAL DISTRICT**

|  | LT | SGT | P/O |
|---|---|---|---|
| 7 STATIONARY PLTS | 7 | 21 | 145 |
| MO CO PLTS | 1 | 2 | 29 |
| 9 MOBILE PLTS | 8 | 23 | 156 |
| SOS | 1 | 6 | 27 |
| HO CO | 1 | 1 | 13 |
| MASS ARREST | 1 | 3 | 21 |
| TOTALS | 19 | 56 | 391 |

**RESERVES**

|  | LT | SGT | P/O |
|---|---|---|---|
| PG CO MFF PLT |  | 1 | 25 |
| MSF/MTAP |  |  | 58 |
| AA CO MOTORS |  |  | 2 |
| TOTALS | 0 | 1 | 85 |

**PERSONNEL TOTALS**

|  | LT | SGT | P/O |
|---|---|---|---|
| WESTERN | 6 | 35 | 231 |
| CENTRAL | 19 | 56 | 391 |
| RESERVES |  | 1 | 85 |
| TOTALS | 25 | 92 | 707 |

CONFIDENTIAL - Produced Pursuant to Protective Order

# Protest 4-25

| WESTERN DISTRICT | | | | |
|---|---|---|---|---|
| | LT | SGT | P/O | |
| 4 STATIONARY PLTS | | 1 | 12 | 84 |
| AACO PLT | | 2 | 4 | 20 |
| 4 MOBILE PLTS | | 2 | 12 | 84 |
| SOS | | 1 | 4 | 17 |
| RESERVE | | 0 | 3 | 26 |
| TOTALS | | 6 | 35 | 231 |

CONFIDENTIAL - Produced Pursuant to Protective Order

# Protest 4-25

| CENTRAL DISTRICT | LT | SGT | P/O |
|---|---|---|---|
| 7 STATIONARY PLTS | 7 | 21 | 145 |
| MO CO PLTS | 1 | 2 | 29 |
| 9 MOBILE PLTS | 8 | 23 | 156 |
| SOS | 1 | 6 | 27 |
| HO CO | 1 | 1 | 13 |
| MASS ARREST | 1 | 3 | 21 |
| TOTALS | 19 | 56 | 391 |

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00007627

# Protest 4-25

|  | RESERVES | | |
|---|---|---|---|
|  | LT | SGT | P/O |
| PG CO MFF PLT |  | 1 | 25 |
| MSP/MTAP |  |  | 58 |
| AA CO MOTORS |  |  | 2 |
| TOTALS | 0 | 1 | 85 |

CONFIDENTIAL - Produced Pursuant to Protective Order

# Protest 4-25

| PERSONNEL TOTALS | LT | SGT | P/O |
| --- | --- | --- | --- |
| WESTERN | | 6 | 35 | 231 |
| CENTRAL | | 19 | 56 | 391 |
| RESERVES | | | 1 | 85 |
| TOTALS | | 25 | 92 | 707 |

CONFIDENTIAL - Produced Pursuant to Protective Order



CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00007630

# Protest 4-25

## Operations Structure



CITY00007631



# Protest 4-25

## Central District Operations Structure

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00007632

# Protest 4-25
## CENTRAL DISTRICT SCHEMATIC



CITY00007633

# Protest 4-25

## Western District Operations Structure



**CONFIDENTIAL - Produced Pursuant to Protective Order**

CITY00007634



# Protest 4-25
## WESTERN DISTRICT SCHEMATIC

Channel 11 A
Alt Ch 7C

**MOBILE PLATOONS**
BLUE=NORTH OF RIGGS
GREEN= SOUTH OF RIGGS
EAST TO FREMONT AVE

FREMONT AVE

MOUNT ST

RIGGS AVE

BLUE 1

BLUE 2

GREEN 1

GREEN 2

**WD STATION**
4 PLATOONS
1000 MOUNT
1700 RIGGS
CLOSED

**SOS**
**WESTERN DISTRICT**
SWAT= 2 SGT 10 P/O
(ARREST TEAMS)

K9= 1LT 1 SGT 5 P/O

MOUNTED= ON CALL

AIU= 1 SGT 2 P/O

# Protest 4-25
## SOS UNITS

**SOS**
**CENTRAL DISTRICT**
SWAT= 1 LT  2 SGT  10 P/O
(ARREST TEAMS)

K9= 1 SGT  5 P/O

MOUNTED= 2 SGT  10 P/O

AIU= 1 SGT  2 P/O

**SOS**
**WESTERN DISTRICT**
SWAT= 2 SGT  10 P/O
(ARREST TEAMS)

K9= 1LT  1 SGT  5 P/O

MOUNTED= ON CALL

AIU= 1 SGT  2 P/O

CONFIDENTIAL - Produced Pursuant to Protective Order

# Protest 4-25
## PERSONNEL STRENGTH

### WESTERN DISTRICT

| | LT | SGT | P/O |
|---|---|---|---|
| 4 STATIONARY PLTS | 1 | 12 | 84 |
| AACO PLT | 2 | 6 | 20 |
| 4 MOBILE PLTS | 2 | 12 | 84 |
| SOS | 1 | 4 | 17 |
| RESERVE | 0 | 3 | 26 |
| TOTALS | 6 | 35 | 231 |

### CENTRAL DISTRICT

| | LT | SGT | P/O |
|---|---|---|---|
| 7 STATIONARY PLTS | 7 | 21 | 145 |
| MO CO PLTS | 1 | 2 | 29 |
| 9 MOBILE PLTS | 8 | 23 | 156 |
| SOS | 1 | 6 | 27 |
| HO CO | | 1 | 13 |
| MASS ARREST | 1 | 3 | 21 |
| TOTALS | 19 | 56 | 391 |

### RESERVES

| | LT | SGT | P/O |
|---|---|---|---|
| PG CO MFF PLT | | 1 | 25 |
| MSP/MTAP | | | 58 |
| AA CO MOTORS | | | 2 |
| TOTALS | 0 | 1 | 85 |

### PERSONNEL TOTALS

| | LT | SGT | P/O |
|---|---|---|---|
| WESTERN | 6 | 35 | 231 |
| CENTRAL | 19 | 56 | 391 |
| RESERVES | | 1 | 85 |
| TOTALS | 25 | 92 | 707 |

   CITY00007637

# Protest 4-25

| WESTERN DISTRICT | LT | SGT | P/O | |
|---|---|---|---|---|
| 4 STATIONARY PLTS | 1 | | 12 | 84 |
| AACO PLT | 2 | | 4 | 20 |
| 4 MOBILE PLTS | 2 | | 12 | 84 |
| SOS | 1 | | 4 | 17 |
| RESERVE | 0 | | 3 | 26 |
| TOTALS | 6 | | 35 | 231 |

CONFIDENTIAL - Produced Pursuant to Protective Order

# Protest 4-25

| CENTRAL DISTRICT | LT | SGT | P/O |
|---|---|---|---|
| 7 STATIONARY PLTS | 7 | 21 | 145 |
| MO CO PLTS | 1 | 2 | 29 |
| 9 MOBILE PLTS | 8 | 23 | 156 |
| SOS | 1 | 6 | 27 |
| HO CO | 1 | 1 | 13 |
| MASS ARREST | 1 | 3 | 21 |
| TOTALS | 19 | 56 | 391 |

# Protest 4-25

|  | RESERVES | | |  |
| --- | --- | --- | --- | --- |
|  | LT | SGT | P/O |  |
| PG CO MFF PLT |  |  | 1 | 25 |
| MSP/MTAP |  |  |  | 58 |
| AA CO MOTORS |  |  |  | 2 |
| TOTALS | | 0 | 1 | 85 |

CONFIDENTIAL - Produced Pursuant to Protective Order

# Protest 4-25

| PERSONNEL TOTALS | LT | SGT | P/O | |
|---|---|---|---|---|
| WESTERN | | 6 | 35 | 231 |
| CENTRAL | | 19 | 56 | 391 |
| RESERVES | | | 1 | 85 |
| TOTALS | | 25 | 92 | 707 |

CONFIDENTIAL - Produced Pursuant to Protective Order



# Protest 4-25
## Command Structure



Protest 4-25
Operations Structure

FIELD OPERATIONS

RESERVE

WESTERN DISTRICT
- Stationary Platoons
- Mobile Platoons

CENTRAL DISTRICT
- Stationary Platoons
- Mobile Platoons

PLATOON = LT x 1 / SGT x 3 / P/O x 21

CONFIDENTIAL - Produced Pursuant to Protective Order

# Protest 4-25

## Central District Operations Structure



CONFIDENTIAL - Produced Pursuant to Protective Order



# Protest 4-25

## CENTRAL DISTRICT SCHEMATIC

KEY
MOBILE
STATIONARY

PLT B1
PLT B2
PLT B3

ZONE B

HQ
3 PLT

HARBOR EAST
1 PLT

CITY HALL
2 PLT

COURT HOUSE
1 PLT BCSD

INNER HARBOR PAVILIONS
1PLT MO CO PD

PRATT ST

LIGHT ST

Channel 10 A
Alt Ch 1C

ST PAUL

ZONE A

PLT A1
PLT A2
PLT A3

MLK BLVD

BALTIMORE ST

ZONE C

PLT C1
PLT C2
PLT C3

ORIOLE PARK
1 PLT

SOS
CENTRAL DISTRICT
SWAT= 1 LT 2 SGT 10 P/O
(ARREST TEAMS)
K9= 1 SGT 5 P/O
MOUNTED= 2 SGT 10 P/O
ATU= 1 SGT 2 P/O

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00007645



# Protest 4-25

## Western District Operations Structure

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00007646



# Protest 4-25
## WESTERN DISTRICT SCHEMATIC

Channel 11 A
Alt Ch 7C

**MOBILE PLATOONS**
BLUE=NORTH OF RIGGS
GREEN= SOUTH OF RIGGS
EAST TO FREMONT AVE

FREMONT AVE

MOUNT ST

RIGGS AVE

BLUE 1

BLUE 2

GREEN 1

GREEN 2

WD STATION
4 PLATOONS
1000 MOUNT
1700 RIGGS
CLOSED

SOS
WESTERN DISTRICT
SWAT= 2 SGT 10 P/O
(ARREST TEAMS)

K9= 1LT 1 SGT 5 P/O

MOUNTED= ON CALL

AIU= 1 SGT 2 P/O

CONFIDENTIAL - Produced Pursuant to Protective Order

# Protest 4-25
## SOS UNITS

**SOS**
**WESTERN DISTRICT**
SWAT= 2 SGT  10 P/O
(ARREST TEAMS)

K9= 1LT  1 SGT  5 P/O

MOUNTED= ON CALL

AIU= 1 SGT  2 P/O

**SOS**
**CENTRAL DISTRICT**
SWAT= 1 LT  2 SGT  10 P/O
(ARREST TEAMS)

K9= 1 SGT  5 P/O

MOUNTED= 2 SGT  10 P/O

AIU= 1 SGT  2 P/O

CONFIDENTIAL - Produced Pursuant to Protective Order

| City Hall 1 | Rank | | Name | Seq# | Unit | Cell Phone | District |
|---|---|---|---|---|---|---|---|
| Lieutenant | Lt. | Scott | Dressler | F070 | | | PSAB |
| **Squad A** | | | | | | | |
| Supervisor | Sgt | Raymond | Santucci | F188 | | | PSAB |
| Ofc 1 | P/O | Andrew | Davis | | | | PSAB |
| Ofc 2 | P/O | Dennis | Smith | E-976 | | | PSAB |
| Ofc 3 | P/O | Bobby | Marvel | G-694 | | | PSAB |
| Ofc 4 | P/O | Shawn | Schwartz | I-242 | | | PSAB |
| Ofc 5 | P/O | Adam | Long | F-648 | | | PSAB |
| Ofc 6 | P/O | Khamla | Soukaseum | G-292 | | | PSAB |
| Ofc 7 | P/O | Antonio | Cabezas | G-817 | | | PSAB |
| **Squad B** | | | | | | | |
| Supervisor | Sgt | Jessica | Mignini | I-240 | | | PSAB |
| Ofc 1 | P/O | Joseph | Rosado | H-979 | | | PSAB |
| Ofc 2 | P/O | Frankie | Wilson | G-266 | | | PSAB |
| Ofc 3 | P/O | Robert | Himes | G-662 | | | PSAB |
| Ofc 4 | P/O | Bexley | Collins | H-092 | | | PSAB |
| Ofc 5 | P/O | Damon | Blacklock | I-845 | | | PSAB |
| Ofc 6 | P/O | Edward | Gillespie | H-686 | | | PSAB |
| Ofc 7 | P/O | Joann | Miller | G-795 | | | PSAB |
| **Squad C** | | | | | | | |
| Supervisor | Sgt | Ricky | Livesay | G-278 | | | PSAB |
| Ofc 1 | P/O | Lloyd | Lewis | | | | PSAB |
| Ofc 2 | P/O | Kevin | Clements | | | | PSAB |
| Ofc 3 | P/O | Geofrey | Meager | | | | PSAB |
| Ofc 4 | P/O | Adrian | Maralusha | | | | PSAB |
| Ofc 5 | P/O | William | Healey | | | | PSAB |
| Ofc 6 | P/O | Shaun | Garrity | | | | PSAB |
| Ofc 7 | P/O | Ian | Cameron | | | | PSAB |

**CONFIDENTIAL - Produced Pursuant to Protective Order**

| City Hall 2 | Rank | | | Name | Seq# | Unit | Cell Phone | District |
|---|---|---|---|---|---|---|---|---|
| Lieutenant | LT | William | Simmons | | G211 | | | IIB |
| **Squad A** | | | | | | | | |
| Supervisor | Sgt | Francis | Sedlak | | | | | PSAB |
| Ofc 1 | P/O | Kristopher | Oliver | | | | | PSAB |
| Ofc 2 | P/O | D | DeVincentz | | | | | PSAB |
| Ofc 3 | P/O | Robert | Tarter | | | | | PSAB |
| Ofc 4 | P/O | Gary | Bennett | | | | | PSAB |
| Ofc 5 | P/O | David | Munyan | | | | | PSAB |
| Ofc 6 | P/O | Edward | Slacum | | | | | PSAB |
| Ofc 7 | P/O | Louis | Nanna | | | | | PSAB |
| **Squad B** | | | | | | | | |
| Supervisor | Sgt | Brian | Dayton | | F-324 | | | PSAB |
| Ofc 1 | P/O | | | Delaney | J016 | | | SED |
| Ofc 2 | P/O | | | Olivo | G648 | | | SED |
| Ofc 3 | P/O | | | Taylor | H839 | | | SED |
| Ofc 4 | P/O | | | Davis | I788 | | | SED |
| Ofc 5 | P/O | | | Wroten | G411 | | | SED |
| Ofc 6 | P/O | | | Jurado | H237 | | | SED |
| Ofc 7 | Det | Gregg | | Boyd | F907 | | | IIB |
| **Squad C** | | | | | | | | |
| Supervisor | Sgt | Kathy | | Jackson | F758 | | | |
| Ofc 1 | Det | Abraham | | Velez | I077 | | | |
| Ofc 2 | Det | Steve | | McDonnell | H250 | | | |
| Ofc 3 | Det | R. | | O'Connor | I702 | | | |
| Ofc 4 | Det | Morgan | | Jones | F373 | | | |
| Ofc 5 | Det | | | Green-Dargan | H609 | | | |
| Ofc 6 | Det | Frank | | Mundy | G381 | | | |
| Ofc 7 | Det | Robert | | Jordan | H600 | | | |

**CONFIDENTIAL - Produced Pursuant to Protective Order**

| Mass Arrest Processing | Rank | | Name | Seq# | Unit | Cell Phone | District |
|---|---|---|---|---|---|---|---|
| Lieutenant | LT | Mark | Walrath | E808 | | | IIB |
| Squad A | | | | | | | |
| Supervisor | Sgt | | Swinton | E634 | | | IIB |
| Ofc 1 | Det | Keith | Tate | I533 | | | IIB |
| Ofc 2 | Det | Phillip | Davis | J040 | | | IIB |
| Ofc 3 | Det | Manny | Rivera | H073 | | | IIB |
| Ofc 4 | Det | Vernon | Davis | I598 | | | IIB |
| Ofc 5 | Det | Lee | Bradndt | I659 | | | IIB |
| Ofc 6 | Det | Joe | Dobry | H411 | | | IIB |
| Ofc 7 | Det | Julius | Dockett | G320 | | | IIB |
| Squad B | | | | | | | |
| Supervisor | Sgt | Jeffrey | Becherer | G325 | | | IIB |
| Ofc 1 | Det | William | Taylor | G036 | | | IIB |
| Ofc 2 | Det | John | Voorhees | G440 | | | IIB |
| Ofc 3 | Det | Chris | Schaefer | G806 | | | IIB |
| Ofc 4 | Det | Chris | Heister | F124 | | | IIB |
| Ofc 5 | Det | John | Wobbelton | F741 | | | IIB |
| Ofc 6 | Det | Ted | Anderson | G093 | | | IIB |
| Ofc 7 | Det | Dwayne | Green | G716 | | | IIB |
| Squad C | | | | | | | |
| Supervisor | Sgt | Kelly | Johnson | G547 | | | IIB |
| Ofc 1 | Det | Peter | Johncox | I697 | | | IIB |
| Ofc 2 | Det | Denise | Gore | E121 | | | IIB |
| Ofc 3 | Det | Patricia | Bradds | F894 | | | IIB |
| Ofc 4 | Det | Michael | Voderick | H764 | | | IIB |
| Ofc 5 | Det | Robert | Crane | I367 | | | IIB |
| Ofc 6 | Det | Alan | Dorsey | | | | IIB |
| Ofc 7 | Det | Vernon | Fuller | H059 | | | IIB |

CONFIDENTIAL - Produced Pursuant to Protective Order

| HQ1 | Rank | | Name | Seq# | Unit | Cell Phone | District |
|---|---|---|---|---|---|---|---|
| Lieutenant | Lt. | Timothy | Devine | D-764 | 4902 | 443-845-7687 | SES |
| **Squad A** | | | | | | | |
| Supervisor | Sgt. | Chip | Schmidt | F-068 | 4860 | 410-303-5838 | SES |
| Ofc 1 | Det. | David | Greene | G-318 | 4863 | 443-277-3963 | SES |
| Ofc 2 | Det. | Donald | Hayes | H-139 | 4864 | 410-804-8144 | SES |
| Ofc 3 | Det. | Gregory | Fischer | H-560 | 4865 | 443-226-2492 | SES |
| Ofc 4 | Det. | James | Mc Shane | H-710 | 4866 | 781-630-1070 | SES |
| Ofc 5 | Det. | Gerald | Hensley | D-432 | 4861 | 443-938-2168 | SES |
| Ofc 6 | Det. | Danny | Fyffe | F-475 | 4862 | 443-938-2490 | SES |
| Ofc 7 | Det. | Eric | Jefferson | G-516 | 4882 | 443-510-5385 | SES |
| **Squad B** | | | | | | | |
| Supervisor | Sgt. | Tony | Ellison | H-874 | 4970 | 443-756-5521 | SES |
| Ofc 1 | Det. | Vincent | Lash | G-545 | 4975 | 443-844-1322 | SES |
| Ofc 2 | Det. | Warren | Benn | G-325 | 4973 | 443-386-0712 | SES |
| Ofc 3 | Det. | Rodney | Howard | H-603 | 4972 | 410-241-0534 | SES |
| Ofc 4 | Det. | David | Mc Cauley | I-675 | 4974 | 443-797-2895 | SES |
| Ofc 5 | Det. | Triston | Ferguson | G-873 | 4967 | 443-564-1898 | SES |
| Ofc 6 | Det. | Abraham | Tasher | I-481 | 4961 | 443-255-2337 | SES |
| Ofc 7 | Det. | Stephon | White | I-621 | 4965 | 201-682-6508 | SES |
| **Squad C** | | | | | | | |
| Supervisor | Sgt. | Michael | Smith | F-797 | 4870 | 443-682-0593 | SES |
| Ofc 1 | Det. | Joseph | Friztges | G-926 | 4877 | 443-681-0101 | SES |
| Ofc 2 | Det. | David | Pietryak | I-159 | 4875 | 443-340-7849 | SES |
| Ofc 3 | Det. | David | Colburn | I-661 | 4873 | 443-938-2817 | SES |
| Ofc 4 | Det. | Robert | Pulliam | I-717 | 4876 | 443-934-7316 | SES |
| Ofc 5 | Det. | Evodio | Hendrix | I-695 | 4966 | 443-845-8116 | SES |
| Ofc 6 | Det. | Fabien | Larande | H-072 | 4921 | 443-677-8903 | SES |
| Ofc 7 | Det. | Valenti | Nagovich | H-392 | 4922 | 443-572-6744 | SES |

| HQ 2 | Rank | | Name | Seq# | Unit | District | Cell Phone |
|------|------|---|------|------|------|----------|-----------|
| Lieutenant | Lt. | | Clayton | F849 | | CD | |
| **Squad A** | | | | | | | |
| Supervisor | Sgt | | Brown | I301 | | CD | |
| Ofc 1 | P/O | | Barnes | I126 | | CD | |
| Ofc 2 | P/O | | Creer | J074 | | CD | |
| Ofc 3 | P/O | | Witter | G888 | | CD | |
| Ofc 4 | P/O | | Ford | I175 | | CD | |
| Ofc 5 | P/O | | Carpenter | I041 | | CD | |
| Ofc 6 | P/O | | Torres | F504 | | CD | |
| Ofc 7 | P/O | | Conde | I 073 | | CD | |
| **Squad B** | | | | | | | |
| Supervisor | Sgt | B. | Kratz | G015 | | CD | |
| Ofc 1 | P/O | | Parris | G774 | | CD | |
| Ofc 2 | P/O | | Martin | F300 | | CD | |
| Ofc 3 | P/O | | Allen | G877 | | CD | |
| Ofc 4 | P/O | | J Sabb | I001 | | CD | |
| Ofc 5 | P/O | | Mesidor | I321 | | CD | |
| Ofc 6 | P/O | | Arutyunov | J341 | | CD | |
| Ofc 7 | P/O | | Sinchi | J448 | | CD | |
| **Squad C** | | | | | | | |
| Supervisor | Sgt | | Robar | G278 | | CD | |
| Ofc 1 | P/O | | DeJesus | J346 | | CD | |
| Ofc 2 | P/O | | Jones | G920 | | CD | |
| Ofc 3 | P/O | | Brathwaite | J591 | | CD | |
| Ofc 4 | P/O | | Evans | G022 | | CD | |
| Ofc 5 | P/O | | Garcia | H640 | | CD | |
| Ofc 6 | P/O | | Featherstone | J416 | | CD | |
| Ofc 7 | P/O | | J. Hall | J530 | | CD | |

**CONFIDENTIAL - Produced Pursuant to Protective Order**

| HQ 3 | Rank | | Name | Seq# | Unit | District | Cell Phone |
|---|---|---|---|---|---|---|---|
| Lieutenant | Lt. | J. | Weaver | E530 | | IIB | |
| **Squad A** | | | | | | | |
| Supervisor | Sgt | | Toliver | G458 | | CD | |
| Ofc 1 | P/O | | Brandt | E949 | | CD | |
| Ofc 2 | P/O | | Huffman | I707 | | CD | |
| Ofc 3 | P/O | | S.Anderson | J276 | | CD | |
| Ofc 4 | P/O | | M Miller | H253 | | CD | |
| Ofc 5 | P/O | | McGrath | I796 | | CD | |
| Ofc 6 | P/O | | D.Allen | J328 | | CD | |
| Ofc 7 | P/O | | Ames | J083 | | CD | |
| **Squad B** | | | | | | | |
| Supervisor | Sgt | | Donato | F533 | | CD | |
| Ofc 1 | P/O | | Baur | J316 | | CD | |
| Ofc 2 | P/O | | Rocks | J087 | | CD | |
| Ofc 3 | P/O | | Sircusano | J325 | | CD | |
| Ofc 4 | P/O | | Wojiechowski | J326 | | CD | |
| Ofc 5 | P/O | | D Jones | D586 | | CD | |
| Ofc 6 | P/O | | Beauregard | I984 | | CD | |
| Ofc 7 | P/O | | McElveen | F206 | | CD | |
| **Squad C** | | | | | | | |
| Supervisor | Sgt | | Klein | I380 | | CD | |
| Ofc 1 | P/O | | Nolan | E898 | | CD | |
| Ofc 2 | P/O | | Baze | C160 | | CD | |
| Ofc 3 | P/O | | Horne | F 467 | | CD | |
| Ofc 4 | P/O | | Lee | F232 | | CD | |
| Ofc 5 | P/O | | Calcatrai | G312 | | CD | |
| Ofc 6 | | | | | | OIS | |
| Ofc 7 | | | | | | OIS | |

**CONFIDENTIAL - Produced Pursuant to Protective Order**

| Oriole Park Platoon | Rank | | Name | Seq# | Unit | District | Cell Phone |
|---|---|---|---|---|---|---|---|
| Lieutenant | Lt | | Butler | | | SD | |
| **Squad A** | | | | | | | |
| Oriole Park A Supervisor | Sgt. | Robert | Amador | G562 | | SD | |
| Ofc 1 | P/O | R. | Watts | | | SD | |
| Ofc 2 | P/O | T. | Washington | | | SD | |
| Ofc 3 | P/O | S. | Lawrence | | | SD | |
| Ofc 4 | P/O | K. | Yourkovik | | | SD | |
| Ofc 5 | P/O | A. | Tondeur | | | SD | |
| Ofc 6 | P/O | S. | Watson | | | SD | |
| Ofc 7 | P/O | R. | Cruz | | | SD | |
| **Squad B** | | | | | | | |
| Oriole Park B Supervisor | Sgt. | G. | Fell | F041 | | SD | |
| Ofc 1 | P/O | J. | Green | | | SD | |
| Ofc 2 | P/O | J. | Gregorio | | | SD | |
| Ofc 3 | P/O | B. | O'Leary | | | SD | |
| Ofc 4 | P/O | I. | Zakrjewski | | | SD | |
| Ofc 5 | P/O | J. | Parker | | | SD | |
| Ofc 6 | P/O | D. | Curtis | | | SD | |
| Ofc 7 | P/O | J. | Gray | | | SD | |
| **Squad C** | | | | | | | |
| Oriole Park C Supervisor | Sgt. | M. | Moore | E014 | | SD | |
| Ofc 1 | P/O | M. | Weilert | | | SD | |
| Ofc 2 | P/O | T. | Purcell | | | SD | |
| Ofc 3 | P/O | C. | Watson | | | SD | |
| Ofc 4 | P/O | S. | Harding | G915 | | SD | |
| Ofc 5 | P/O | M. | Gold | H617 | | SD | |
| Ofc 6 | P/O | E. | Silwick | I965 | | SD | |
| Ofc 7 | P/O | A | Murphy | | | SD | |

**CONFIDENTIAL - Produced Pursuant to Protective Order**

| Harbor East | Rank | | Name | Seq# | Unit | District | Cell Phone |
|---|---|---|---|---|---|---|---|
| Lieutenant | Lt. | James | Barnes | G732 | | IIB | |
| Squad A | | | | | | | |
| Supervisor | Sgt | | Jackson | E706 | | SED | |
| Ofc 1 | P/O | | Cardiz | J683 | | SED | |
| Ofc 2 | P/O | | Nolan Anderson | J584 | | SED | |
| Ofc 3 | P/O | | Carmichael | I973 | | SED | |
| Ofc 4 | P/O | | Giovine | J663 | | SED | |
| Ofc 5 | P/O | | Ennis | H517 | | SED | |
| Ofc 6 | P/O | | Coker | H491 | | SED | |
| Ofc 7 | P/O | | Valencia | J650 | | SED | |
| Squad B | | | | | | | |
| Supervisor | Sgt | | Lattanzi | H657 | | SED | |
| Ofc 1 | P/O | | Yates | H081 | | SED | |
| Ofc 2 | P/O | | Williams, D | G881 | | SED | |
| Ofc 3 | P/O | | Mira | J509 | | SED | |
| Ofc 4 | P/O | | Garcia, O | J629 | | SED | |
| Ofc 5 | P/O | | Simmons | G394 | | SED | |
| Ofc 6 | P/O | | Ancrum | F991 | | SED | |
| Ofc 7 | P/O | | Worell | H069 | | SED | |
| Squad C | | | | | | | |
| Supervisor | Sgt. | Steven | Bowman | G-449 | 6720 | SES | 443-992-6206 |
| Ofc 1 | P/O | | Zamrana | H436 | | SED | |
| Ofc 2 | P/O | | Wassum | G497 | | SED | |
| Ofc 3 | P/O | | Ducharme | J133 | | SED | |
| Ofc 4 | P/O | | Farah | J165 | | SED | |
| Ofc 5 | P/O | | C.Hall | G406 | | SED | |
| Ofc 6 | P/O | | Williams | H885 | | SED | |
| Ofc 7 | P/O | | Quaranto | I236 | | SED | |

CONFIDENTIAL - Produced Pursuant to Protective Order

| Reserve 1 | Rank | | Name | Seq# | Unit | District | Cell Phone |
|-----------|------|---|------|------|------|----------|-----------|
| Lieutenant | Lt. | | | | | OIS | |
| Squad A | | | | | | | |
| Supervisor | | | | | | OIS | |
| Ofc 1 | | | | | | OIS | |
| Ofc 2 | | | | | | OIS | |
| Ofc 3 | | | | | | OIS | |
| Ofc 4 | | | | | | OIS | |
| Ofc 5 | | | | | | OIS | |
| Ofc 6 | | | | | | OIS | |
| Ofc 7 | | | | | | OIS | |
| Squad B | | | | | | | |
| Supervisor | | | | | | OIS | |
| Ofc 1 | | | | | | OIS | |
| Ofc 2 | | | | | | OIS | |
| Ofc 3 | | | | | | OIS | |
| Ofc 4 | | | | | | OIS | |
| Ofc 5 | | | | | | OIS | |
| Ofc 6 | | | | | | OIS | |
| Ofc 7 | | | | | | OIS | |
| Squad C | | | | | | | |
| Supervisor | | | | | | OIS | |
| Ofc 1 | | | | | | OIS | |
| Ofc 2 | | | | | | OIS | |
| Ofc 3 | | | | | | OIS | |
| Ofc 4 | | | | | | OIS | |
| Ofc 5 | | | | | | OIS | |
| Ofc 6 | | | | | | OIS | |
| Ofc 7 | | | | | | OIS | |

**CONFIDENTIAL - Produced Pursuant to Protective Order**

| Reserve 2 | Rank | | Name | Seq# | Unit | District | Cell Phone |
|---|---|---|---|---|---|---|---|
| Lieutenant | Lt. | | | | | OIS | |
| Squad A | | | | | | | |
| Supervisor | | | | | | OIS | |
| Ofc 1 | | | | | | OIS | |
| Ofc 2 | | | | | | OIS | |
| Ofc 3 | | | | | | OIS | |
| Ofc 4 | | | | | | OIS | |
| Ofc 5 | | | | | | OIS | |
| Ofc 6 | | | | | | OIS | |
| Ofc 7 | | | | | | OIS | |
| Squad B | | | | | | | |
| Supervisor | | | | | | OIS | |
| Ofc 1 | | | | | | OIS | |
| Ofc 2 | | | | | | OIS | |
| Ofc 3 | | | | | | OIS | |
| Ofc 4 | | | | | | OIS | |
| Ofc 5 | | | | | | OIS | |
| Ofc 6 | | | | | | OIS | |
| Ofc 7 | | | | | | OIS | |
| Squad C | | | | | | | |
| Supervisor | | | | | | OIS | |
| Ofc 1 | | | | | | OIS | |
| Ofc 2 | | | | | | OIS | |
| Ofc 3 | | | | | | OIS | |
| Ofc 4 | | | | | | OIS | |
| Ofc 5 | | | | | | OIS | |
| Ofc 6 | | | | | | OIS | |
| Ofc 7 | | | | | | OIS | |

CONFIDENTIAL - Produced Pursuant to Protective Order

| Reserve 3 | Rank | | Name | Seq# | Unit | District | Cell Phone |
|---|---|---|---|---|---|---|---|
| Lieutenant | Lt. | | | | | OIS | |
| Squad A | | | | | | | |
| Supervisor | | | | | | OIS | |
| Ofc 1 | | | | | | OIS | |
| Ofc 2 | | | | | | OIS | |
| Ofc 3 | | | | | | OIS | |
| Ofc 4 | | | | | | OIS | |
| Ofc 5 | | | | | | OIS | |
| Ofc 6 | | | | | | OIS | |
| Ofc 7 | | | | | | OIS | |
| Squad B | | | | | | | |
| Supervisor | | | | | | OIS | |
| Ofc 1 | | | | | | OIS | |
| Ofc 2 | | | | | | OIS | |
| Ofc 3 | | | | | | OIS | |
| Ofc 4 | | | | | | OIS | |
| Ofc 5 | | | | | | OIS | |
| Ofc 6 | | | | | | OIS | |
| Ofc 7 | | | | | | OIS | |
| Squad C | | | | | | | |
| Supervisor | | | | | | OIS | |
| Ofc 1 | | | | | | OIS | |
| Ofc 2 | | | | | | OIS | |
| Ofc 3 | | | | | | OIS | |
| Ofc 4 | | | | | | OIS | |
| Ofc 5 | | | | | | OIS | |
| Ofc 6 | | | | | | OIS | |
| Ofc 7 | | | | | | OIS | |

**CONFIDENTIAL - Produced Pursuant to Protective Order**

| Mobile A1 | Rank | | Name | Seq# | Unit | District | Cell Phone |
|---|---|---|---|---|---|---|---|
| Lieutenant | Lt. | Dameon | Carter | F519 | | IIB | |
| Squad A | | | | | | | |
| Supervisor | Sgt | Ethan | Newberg | H589 | | IIB | |
| Ofc 1 | Det | Robert | Corso | H966 | | IIB | |
| Ofc 2 | Det | Akshay | Banker | I569 | | IIB | |
| Ofc 3 | Det | Danny | Grubb | F254 | | IIB | |
| Ofc 4 | Det | Joel | Hawk | G367 | | IIB | |
| Ofc 5 | Det | Eric | Hinson | I132 | | IIB | |
| Ofc 6 | Det | Michael | Reynolds | H037 | | IIB | |
| Ofc 7 | Det | Jake | Nickles | G407 | | IIB | |
| Squad B | | | | | | | |
| Supervisor | Sgt | Lamont | Davis | | | IIB | |
| Ofc 1 | Det | Wayne | Sponsky | D767 | | IIB | |
| Ofc 2 | Det | Charles | Davis | E916 | | IIB | |
| Ofc 3 | Det | Adam | Yates | H434 | | IIB | |
| Ofc 4 | Det | Denise | Johnson | E849 | | IIB | |
| Ofc 5 | Det | Kevin | Robinson | E852 | | IIB | |
| Ofc 6 | Det | Arthur | Page | F458 | | IIB | |
| Ofc 7 | Det | R. | Richardson | G112 | | IIB | |
| Squad C | | | | | | | |
| Supervisor | Sgt | Scott | Mileto | F507 | | IIB | |
| Ofc 1 | Det | E. | Navarro | H274 | | IIB | |
| Ofc 2 | Det | Darren | Moore | H618 | | IIB | |
| Ofc 3 | Det | Richard | Fleurimond | G515 | | IIB | |
| Ofc 4 | Det | Joe | Brown | G573 | | IIB | |
| Ofc 5 | Det | Damon | Nelson | G252 | | IIB | |
| Ofc 6 | Det | William | Keitz | H921 | | IIB | |
| Ofc 7 | Det | Melissa | Warczynski | I845 | | IIB | |

CONFIDENTIAL - Produced Pursuant to Protective Order

| Mobile A2 | Rank | | Name | Seq# | Unit | District | Cell Phone |
|---|---|---|---|---|---|---|---|
| Lieutenant | Lt. | Robert | Brown | G732 | | IIB | |
| Squad A | | | | | | | |
| Supervisor | Sgt | James | Fallon | D354 | | IIB | |
| Ofc 1 | | Wanda | Moore | I662 | | IIB | |
| Ofc 2 | Det | Alvin | Ortiz | I345 | | IIB | |
| Ofc 3 | Det | Sean | Suiter | G484 | | IIB | |
| Ofc 4 | Det | | Sebekos | | | IIB | |
| Ofc 5 | Det | Michael | Lind | G076 | | IIB | |
| Ofc 6 | Det | Durel | Hairston | G510 | | IIB | |
| Ofc 7 | Det | Marvin | Gross | H931 | | IIB | |
| Squad B | | | | | | | |
| Supervisor | Sgt | Robert | Scarborough | | | PSAB | |
| Ofc 1 | Det | Jeffrey | Converse | H218 | | IIB | |
| Ofc 2 | Det | Kevin | Carvell | E913 | | IIB | |
| Ofc 3 | Det | Eric | Johnson | F892 | | IIB | |
| Ofc 4 | Det | Michael | Witmer | I239 | | IIB | |
| Ofc 5 | Det | Matt | Dzambo | F176 | | IIB | |
| Ofc 6 | Det | V. | Reynolds | H357 | | IIB | |
| Ofc 7 | Det | William | Epperson | F707 | | IIB | |
| Squad C | | | | | | | |
| Supervisor | Sgt | Lawrence | Hoovermill | | | PSAB | |
| Ofc 1 | Det | Vanessa | Simpson | F007 | | IIB | |
| Ofc 2 | Det | Justin | Howard | G645 | | IIB | |
| Ofc 3 | Det | J. | Stauder | F838 | | IIB | |
| Ofc 4 | Det | Brooke | Nice | F950 | | IIB | |
| Ofc 5 | Det | Michelle | McClosky | F374 | | IIB | |
| Ofc 6 | | | | | | OIS | |
| Ofc 7 | | | | | | OIS | |

CONFIDENTIAL - Produced Pursuant to Protective Order

| Mobile A3 | Rank | | Name | Seq# | Unit | District | Cell Phone |
|---|---|---|---|---|---|---|---|
| Lieutenant | | | | | | MSD | |
| Squad A | | | | | | | |
| Supervisor | | | | | | MSD | |
| Ofc 1 | | | | | | MSD | |
| Ofc 2 | | | | | | MSD | |
| Ofc 3 | | | | | | MSD | |
| Ofc 4 | | | | | | MSD | |
| Ofc 5 | | | | | | MSD | |
| Ofc 6 | | | | | | MSD | |
| Ofc 7 | | | | | | MSD | |
| Squad B | | | | | | | |
| Supervisor | | | | | | MSD | |
| Ofc 1 | | | | | | MSD | |
| Ofc 2 | | | | | | MSD | |
| Ofc 3 | | | | | | MSD | |
| Ofc 4 | | | | | | MSD | |
| Ofc 5 | | | | | | MSD | |
| Ofc 6 | | | | | | MSD | |
| Ofc 7 | | | | | | MSD | |
| Squad C | | | | | | | |
| Supervisor | | | | | | MSD | |
| Ofc 1 | | | | | | MSD | |
| Ofc 2 | | | | | | MSD | |
| Ofc 3 | | | | | | MSD | |
| Ofc 4 | | | | | | MSD | |
| Ofc 5 | | | | | | MSD | |
| Ofc 6 | | | | | | MSD | |
| Ofc 7 | | | | | | MSD | |

**CONFIDENTIAL - Produced Pursuant to Protective Order**

| Mobile B1 | Rank | | | Name | Seq# | Unit | District | Cell Phone |
|---|---|---|---|---|---|---|---|---|
| Lieutenant | Lt. | William | | Manager | | | SIS | |
| Squad A | | | | | | | | |
| Supervisor | Sgt | Marvin | | Credell | | | SIS | |
| Ofc 1 | DET | Scott | | Jones | | | SIS | |
| Ofc 2 | DET | Dale | | Weese | | | SIS | |
| Ofc 3 | DET | William | | Wagner | | | SIS | |
| Ofc 4 | DET | Danna | | Bell | | | SIS | |
| Ofc 5 | DET | Ronald | | Ogle | | | SIS | |
| Ofc 6 | DET | Tim | | Gardner | | | SIS | |
| Ofc 7 | DET | Mike | | Larkins | | | SIS | |
| Squad B | | | | | | | | |
| Supervisor | Sgt | Bryan | | Bowen | | | SIS | |
| Ofc 1 | DET | Scott | | Suriano | | | SIS | |
| Ofc 2 | DET | Ronald | | Bryant | | | SIS | |
| Ofc 3 | DET | Derek | | Herndon | | | SIS | |
| Ofc 4 | DET | Micale | | Benton | | | SIS | |
| Ofc 5 | DET | Milton | | Scott | | | SIS | |
| Ofc 6 | DET | Jeffrey | | Mellott | | | SIS | |
| Ofc 7 | DET | Mike | | Reno | | | SIS | |
| Squad C | | | | | | | | |
| Supervisor | Sgt | Gloria | | Davis | | | SIS | |
| Ofc 1 | DET | Claude | | Torres | | | SIS | |
| Ofc 2 | DET | Edward | | Vogt | | | SIS | |
| Ofc 3 | DET | Thomas | | Jackson | | | SIS | |
| Ofc 4 | DET | Robert | | Elkner | | | SIS | |
| Ofc 5 | DET | Mike | | Lash | | | SIS | |
| Ofc 6 | DET | Edward | | Hernandez | | | SIS | |
| Ofc 7 | DET | Brian | | Allman | | | SIS | |

CITY00007663

| Mobile B2 | Rank | | Name | Seq# | Unit | District | Cell Phone |
|---|---|---|---|---|---|---|---|
| Lieutenant | Lt. | Regis | Flynn | | | SIS | |
| Squad A | | | | | | | |
| Supervisor | Sgt | Dennis | Raftery | | | SIS | |
| Ofc 1 | DET | Justin | Stinnett | | | SIS | |
| Ofc 2 | DET | Angel | Baley | | | SIS | |
| Ofc 3 | DET | Derek | Carver | | | SIS | |
| Ofc 4 | DET | James | Scott | | | SIS | |
| Ofc 5 | DET | Lakeia | Jones | | | SIS | |
| Ofc 6 | DET | Megan | Antonin | | | SIS | |
| Ofc 7 | DET | Vera | Cromer | | | SIS | |
| Squad B | | | | | | | |
| Supervisor | Sgt | Adam | Kirhagis | | | SIS | |
| Ofc 1 | DET | Mohammed | Ali | | | SIS | |
| Ofc 2 | DET | Mike | Hansen | | | SIS | |
| Ofc 3 | DET | Fank | Hunsicker | | | SIS | |
| Ofc 4 | DET | Amy | Strand | | | SIS | |
| Ofc 5 | DET | Chris | Rivera | | | SIS | |
| Ofc 6 | | | | | | OIS | |
| Ofc 7 | | | | | | OIS | |
| Squad C | | | | | | | |
| Supervisor | | | | | | OIS | |
| Ofc 1 | | | | | | OIS | |
| Ofc 2 | | | | | | OIS | |
| Ofc 3 | | | | | | OIS | |
| Ofc 4 | | | | | | OIS | |
| Ofc 5 | | | | | | OIS | |
| Ofc 6 | | | | | | OIS | |
| Ofc 7 | | | | | | OIS | |

CONFIDENTIAL - Produced Pursuant to Protective Order

| Mobile 83 | Rank | | Name | Seq# | Unit | District | Cell Phone |
|---|---|---|---|---|---|---|---|
| Lieutenant | Lt. | Michael | Newton | C645 | | IIB | |
| Squad A | | | | | | | |
| Supervisor | Sgt | Micheal | Mancuso | E311 | | IIB | |
| Ofc 1 | Det | Seth | Roussey | G311 | | IIB | |
| Ofc 2 | Det | John | Goods | H599 | | IIB | |
| Ofc 3 | Det | Troy | Taylor | F724 | | IIB | |
| Ofc 4 | Det | Ryan | Reass | H176 | | IIB | |
| Ofc 5 | Det | Cassidy | Kapfhammer | G217 | | IIB | |
| Ofc 6 | Det | Valencia | Vaughn | E538 | | IIB | |
| Ofc 7 | Det | John | Riker | H558 | | IIB | |
| Squad B | | | | | | | |
| Supervisor | Sgt | Krystal | Vallair | H394 | | IIB | |
| Ofc 1 | Det | Robert | Burns | F380 | | IIB | |
| Ofc 2 | Det | Joseph | Chin | H576 | | IIB | |
| Ofc 3 | Det | Damon | Talley | G474 | | IIB | |
| Ofc 4 | Det | Richard | Moore | H612 | | IIB | |
| Ofc 5 | Det | David | Moynihan | F292 | | IIB | |
| Ofc 6 | Det | Sandra | Forsythe | F032 | | IIB | |
| Ofc 7 | Det | Thomas | Jackson | G219 | | IIB | |
| Squad C | | | | | | | |
| Supervisor | Sgt | Ryan | Guinn | G-752 | | PSAB | |
| Ofc 1 | Det | Sean | Dallesandro | H280 | | IIB | |
| Ofc 2 | Det | Curtis | McMillon | H977 | | IIB | |
| Ofc 3 | Det | Martin | Young | D657 | | IIB | |
| Ofc 4 | Det | Michael | Moran | E906 | | IIB | |
| Ofc 5 | Det | Hassan | Rasheed | H113 | | IIB | |
| Ofc 6 | Det | Eric | Ragland | F965 | | IIB | |
| Ofc 7 | | | | | | OIS | |

CONFIDENTIAL - Produced Pursuant to Protective Order

| Mobile C1 | Rank | | Name | Seq# | Unit | District | Cell Phone |
|-----------|------|--------|------|------|------|----------|------------|
| Lieutenant | Lt. | Margorie | German | F-974 | 4901 | SES | 443-682-0696 |
| Squad A | | | | | | | |
| Supervisor | Sgt. | M. | Camarote | | | SD | |
| Ofc 1 | P/O | S. | Stinchcomb | | | SD | |
| Ofc 2 | P/O | J. | Walker | D385 | | SD | |
| Ofc 3 | P/O | Y. | Familia | J278 | | SD | |
| Ofc 4 | P/O | J. | Degele | I927 | | SD | |
| Ofc 5 | P/O | E. | Creed | F151 | | SD | |
| Ofc 6 | P/O | T. | Stach | G039 | | SD | |
| Ofc 7 | P/O | C. | Goodwin | G730 | | SD | |
| Squad B | | | | | | | |
| Supervisor | Sgt. | K. | Henry | | | SD | |
| Ofc 1 | P/O | V. | Fox | F778 | | SD | |
| Ofc 2 | P/O | C. | Upham | J256 | | SD | |
| Ofc 3 | P/O | B. | Zero | J021 | | SD | |
| Ofc 4 | P/O | W. | Bernath | J031 | | SD | |
| Ofc 5 | P/O | M. | Runk | F524 | | SD | |
| Ofc 6 | P/O | I | Perez | I027 | | SD | |
| Ofc 7 | P/O | D. | Crawford | J047 | | SD | |
| Squad C | | | | | | | |
| Supervisor | Sgt. | R. | Ford | | | SD | |
| Ofc 1 | P/O | B. | Richards | J053 | | SD | |
| Ofc 2 | P/O | A | Wollein | J132 | | SD | |
| Ofc 3 | P/O | C. | Dyson | | | SD | |
| Ofc 4 | P/O | M. | Santiago | | | SD | |
| Ofc 5 | P/O | J. | Wortham | | | SD | |
| Ofc 6 | P/O | R. | Brown | | | SD | |
| Ofc 7 | P/O | D. | Williams | | | SD | |

CONFIDENTIAL - Produced Pursuant to Protective Order

| Mobile C2 | Rank | | Name | Seq# | Unit | District | Cell Phone |
|---|---|---|---|---|---|---|---|
| Lieutenant | Lt. | Joel | Fried | G-849 | 4803 | SES | 443-681-0062 |
| Squad A | | | | | | | |
| Supervisor | Sgt. | E. | Leitch | | | SD | |
| Ofc 1 | P/O | J. | Toomire | | | SD | |
| Ofc 2 | P/O | J. | Brooks | | | SD | |
| Ofc 3 | P/O | T. | Moody | | | SD | |
| Ofc 4 | P/O | J. | Stefanelli | | | SD | |
| Ofc 5 | P/O | D. | Millburn | | | SD | |
| Ofc 6 | P/O | D. | Roney | | | SD | |
| Ofc 7 | P/O | K. | Vaught | | | SD | |
| Squad B | | | | | | | |
| Supervisor | Sgt. | Kenneth | Ivery | G-485 | 4980 | SES | 443-742-4717 |
| Ofc 1 | P/O | | Gonzalez | | | SD | |
| Ofc 2 | P/O | C. | Wright | | | SD | |
| Ofc 3 | P/O | M. | Larbi | | | SD | |
| Ofc 4 | P/O | R. | Bonomo | | | SD | |
| Ofc 5 | P/O | J. | Roney | | | SD | |
| Ofc 6 | P/O | J. | Joos | | | SD | |
| Ofc 7 | P/O | M. | Karn | | | SD | |
| Squad C | | | | | | | |
| Supervisor | Sgt. | Anthony | Maggio | G-496 | 4940 | SES | 443-250-8210 |
| Ofc 1 | Det. | Michael | Gause | I-315 | 4943 | SES | 443-562-6039 |
| Ofc 2 | Det. | Robert | Clarke | I-653 | 4941 | SES | 493-740-0825 |
| Ofc 3 | P/O | J. | Ford | | | SD | |
| Ofc 4 | P/O | P. | Thompson | | | SD | |
| Ofc 5 | P/O | T. | Copeland | | | SD | |
| Ofc 6 | Det. | Mark | Spilla | H-729 | 6722 | SES | 443-528-0041 |
| Ofc 7 | Det. | Brent | Kluttz | I-480 | 6721 | SES | 433-681-0003 |

| Mobile C3 | Rank | | Name | Seq# | Unit | Cell Phone | District |
|---|---|---|---|---|---|---|---|
| Lieutenant | Lt. | Chris | Oree | F-969 | 4802 | 443-677-5357 | SES |
| **Squad A** | | | | | | | |
| Supervisor | Sgt. | Keith | Gladstone | E-987 | 4880 | 443-682-2293 | SES |
| Ofc 1 | Det. | Derrick | Brown | G-059 | 4881 | 443-742-1737 | SES |
| Ofc 2 | Det. | Jeffery | Lilly | H-642 | 4889 | 717-858-8504 | SES |
| Ofc 3 | Det. | Brandon | Avery | I-176 | 4888 | 443-813-4701 | SES |
| Ofc 4 | Det. | Carmine | Vignola | I-296 | 4884 | 301-693-4343 | SES |
| Ofc 5 | Det. | Robert | Hankard | I-370 | 4883 | 410-504-2539 | SES |
| Ofc 6 | Det. | Mark | Neptune | I-562 | 4891 | 410-562-7594 | SES |
| Ofc 7 | Det. | Marcus | Taylor | I-725 | 4984 | 240-264-4629 | SES |
| **Squad B** | | | | | | | |
| Supervisor | Sgt. | Joe | Landsman | G-692 | 4990 | 443-681-0442 | SES |
| Ofc 1 | Det. | Anthony | Cirillo | G-461 | 4986 | 443-681-0440 | SES |
| Ofc 2 | Det. | Carnest | McDuffie | H-700 | 4985 | 443-769-6812 | SES |
| Ofc 3 | Det. | Ryan | Hill | I-432 | 4998 | 443-250-9458 | SES |
| Ofc 4 | Det. | Tariq | Toro-Munford | I-726 | 4992 | 856-625-9173 | SES |
| Ofc 5 | Det. | Brian | Salmon | J-072 | 4994 | 410-608-2013 | SES |
| Ofc 6 | Det. | James | Padgett | J-319 | 4996 | 571-233-0061 | SES |
| Ofc 7 | Det. | John | Ondek | F-261 | 4881 | 717-887-4986 | SES |
| **Squad C** | | | | | | | |
| Supervisor | Sgt. | John | Burns | G-940 | 4930 | 443-829-9067 | SES |
| Ofc 1 | Det. | Daniel | Hersl | G-491 | 4934 | 410-299-3080 | SES |
| Ofc 2 | Det. | Howard | Ilgenfritz | H-066 | 4935 | 443-463-5455 | SES |
| Ofc 3 | Det. | Timothy | Romeo | I-678 | 4937 | 443-324-8842 | SES |
| Ofc 4 | Det. | Peter | Iacovo | J-036 | 4932 | 203-979-0610 | SES |
| Ofc 5 | Det. | Frank | Golimowski | G-366 | 4933 | 443-938-3066 | SES |
| Ofc 6 | Det. | Jason | Blanchard | I-671 | 4945 | 410-209-9931 | SES |
| Ofc 7 | Det. | John | Mangano | I-192 | 4942 | 443-630-9900 | SES |

| No Current Assignment | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Col | Community | Russell | | | | Community |
| | Capt | Community | Douglas | | | | Community |
| | LT | MSD | Anticipated | | | | MSD |
| | Lt. | OIS | Anticipated | | | | OIS |
| | Lt. | OIS | Anticipated | | | | OIS |
| | Sgt. | Shannon | Cavey | G-135 | 4880 | 443-829-9146 | SES |
| | Sgt. | Lavern | Ellis | E-924 | 6730 | 443-934-5893 | SES |
| | Sgt | Douglas | Gardner | | | | PSAB |
| | Sgt | Dean | Kolackovski | | | | PSAB |
| | Sgt | Antwon | Foster | | | | SIS |
| | Sgt | Allen | Adkins | | | | SIS |
| | Sgt | Lisa | Robinson | | | | SIS |
| | Sgt | Charles | McCauley | | | | SIS |
| | Sgt | Kerry | Snead | | | | SIS |
| | Sgt | OIS | Anticipated | | | | OIS |
| | Sgt | OIS | Anticipated | | | | OIS |
| | Sgt | OIS | Anticipated | | | | OIS |
| | Sgt | OIS | Anticipated | | | | OIS |
| | Sgt | OIS | Anticipated | | | | OIS |
| | Det. | Kevin | Baskette | E-041 | 6712 | 443-829-8987 | SES |

| WD Red Platoon One | Rank | First | Last | Seq# | Unit | District | Cell Phone |
|---|---|---|---|---|---|---|---|
| Lieutenant | | | | | | | |
| | | | | | | | |
| Supervisor | Sgt | | Klado | E776 | | ED | |
| Ofc 1 | P/O | | Kolb | I388 | | ED | |
| Ofc 2 | P/O | | Mumford | J673 | | ED | |
| Ofc 3 | P/O | | Jukam | J397 | | ED | |
| Ofc 4 | P/O | | Conley | J703 | | ED | |
| Ofc 5 | P/O | | Tonsch | J282 | | ED | |
| Ofc 6 | P/O | | Makanjuola | G111 | | ED | |
| Ofc 7 | P/O | | Byron | I286 | | ED | |
| | | | | | | | |
| Supervisor | Sgt | | Lufadeju | G434 | | ED | |
| Ofc 1 | P/O | | Harvey | F408 | | ED | |
| Ofc 2 | P/O | | Hess | H444 | | ED | |
| Ofc 3 | P/O | | McAlexander | F766 | | ED | |
| Ofc 4 | P/O | | Walker | F853 | | ED | |
| Ofc 5 | P/O | | Coppage | J684 | | ED | |
| Ofc 6 | P/O | | Rivera | F447 | | ED | |
| Ofc 7 | P/O | | Hines | I387 | | ED | |
| | | | | | | | |
| Supervisor | Sgt | | Bennett | F444 | | ED | |
| Ofc 1 | P/O | | Guthrie | I954 | | ED | |
| Ofc 2 | P/O | | Sowers | I577 | | ED | |
| Ofc 3 | P/O | | Mohamed | J079 | | ED | |
| Ofc 4 | P/O | | Bonner | J222 | | ED | |
| Ofc 5 | P/O | | Grimes | I528 | | ED | |
| Ofc 6 | P/O | | Segar | H471 | | ED | |
| Ofc 7 | P/O | | McKendry | H370 | | ED | |

| WD Red Platoon Two | Rank | First | Last | Seq# | Unit | District | Cell Phone |
|---|---|---|---|---|---|---|---|
| Lieutenant | Lt. | | Comegna | G404 | | | |
| Squad Red A | | | | | | | |
| Supervisor | Sgt | | Jackson | D982 | | NED | |
| Ofc 1 | P/O | | Hare | H452 | | ED | |
| Ofc 2 | P/O | | Strominger | I151 | | ED | |
| Ofc 3 | P/O | | Phillips | I352 | | ED | |
| Ofc 4 | P/O | | Dandy | J687 | | ED | |
| Ofc 5 | P/O | | Frazier | I139 | | ED | |
| Ofc 6 | P/O | | Hicks | I012 | | ED | |
| Ofc 7 | P/O | | Randolph | G262 | | ED | |
| Squad Red B | | | | | | | |
| Supervisor | Sgt | | Manners | G551 | | NED | |
| Ofc 1 | P/O | | Ayala | J720 | | ED | |
| Ofc 2 | P/O | | George | E815 | | NED | |
| Ofc 3 | P/O | | Brown | G738 | | NED | |
| Ofc 4 | P/O | | Bechtel | H002 | | NED | |
| Ofc 5 | P/O | | Williams | H319 | | NED | |
| Ofc 6 | P/O | | White | H351 | | NED | |
| Ofc 7 | P/O | | Bagdon | H422 | | NED | |
| Squad Red C | | | | | | | |
| Supervisor | Sgt | | Dixon | G468 | | ND | |
| Ofc 1 | P/O | | McWilliams | H852 | | NED | |
| Ofc 2 | P/O | | Waters | I054 | | NED | |
| Ofc 3 | P/O | | London | I488 | | NED | |
| Ofc 4 | P/O | | Lee | I493 | | NED | |
| Ofc 5 | P/O | | Eiseman | I688 | | NED | |
| Ofc 6 | P/O | | Lebrun | I770 | | NED | |
| Ofc 7 | P/O | | Gephardt | I776 | | NED | |

CONFIDENTIAL - Produced Pursuant to Protective Order

| WD Red Platoon Three | Rank | First | Last | Seq# | Unit | District | Cell Phone |
|---|---|---|---|---|---|---|---|
| Lieutenant | | | | | | | |
| Squad Red A | | | | | | | |
| Supervisor | Sgt | | Bailey | F556 | | ND | |
| Ofc 1 | P/O | | Hobe | I880 | | NED | |
| Ofc 2 | P/O | | Gonzalez | I913 | | NED | |
| Ofc 3 | P/O | | Hashagen | I956 | | NED | |
| Ofc 4 | P/O | | Kincaid | I995 | | NED | |
| Ofc 5 | P/O | | Gillespie | J166 | | NED | |
| Ofc 6 | P/O | | Julio | J414 | | NED | |
| Ofc 7 | P/O | | Klingenstein | J425 | | NED | |
| Squad Red B | | | | | | | |
| Supervisor | Sgt | | Messner | C923 | | | |
| Ofc 1 | P/O | | Tondeur | J540 | | NED | |
| Ofc 2 | P/O | | Hussain | J544 | | NED | |
| Ofc 3 | P/O | | Quintin | J564 | | NED | |
| Ofc 4 | P/O | | Pashkevich | J635 | | NED | |
| Ofc 5 | P/O | | Kim | J664 | | NED | |
| Ofc 6 | P/O | | Rodriquez | J675 | | NED | |
| Ofc 7 | P/O | | Jeffrey | J685 | | NED | |
| Squad Red C | | | | | | | |
| Supervisor | Sgt | | Cephas | F303 | | | |
| Ofc 1 | P/O | | Dhaiti | J707 | | NED | |
| Ofc 2 | P/O | | Adams | H182 | | NED | |
| Ofc 3 | P/O | | Dolcine | H145 | | NED | |
| Ofc 4 | P/O | | Frederick | I811 | | NED | |
| Ofc 5 | P/O | | Grant | H802 | | NED | |
| Ofc 6 | P/O | | Hodas | J431 | | NED | |
| Ofc 7 | P/O | | Horton | I981 | | NED | |

CONFIDENTIAL - Produced Pursuant to Protective Order

| WD Red Platoon Four | Rank | First | Last | Seq# | Unit | District | Cell Phone |
|---|---|---|---|---|---|---|---|
| Lieutenant | | | | | | | |
| Squad No 1 A | | | | | | | |
| Supervisor | Sgt | | Abdi | 1233 | | ND | |
| Ofc 1 | P/O | | Johnson | G874 | | NED | |
| Ofc 2 | P/O | | Jones | H236 | | NED | |
| Ofc 3 | P/O | | Klado | J285 | | NED | |
| Ofc 4 | P/O | | Larson | J482 | | NED | |
| Ofc 5 | P/O | | Smothers | I855 | | NED | |
| Ofc 6 | P/O | | Stalter | F015 | | NED | |
| Ofc 7 | P/O | | Strong | I229 | | NED | |
| Squad No 1 B | | | | | | | |
| Supervisor | Sgt | | Rollhauser | G963 | | ND | |
| Ofc 1 | P/O | | Marriott | F076 | | NED | |
| Ofc 2 | P/O | | Robinson | F115 | | NED | |
| Ofc 3 | P/O | | Weese | I510 | | NED | |
| Ofc 4 | P/O | | Edge | I625 | | NED | |
| Ofc 5 | P/O | | Queen | H781 | | NED | |
| Ofc 6 | P/O | | Gasque | I789 | | NED | |
| Ofc 7 | P/O | | Battipaglia | J275 | | NED | |
| Squad No 1 C | | | | | | | |
| Supervisor | Sgt | | Morales | E599 | | ND | |
| Ofc 1 | P/O | | Kostoplis | J102 | | NED | |
| Ofc 2 | P/O | | Dacucuy | I926 | | NED | |
| Ofc 3 | P/O | | Perelta | J299 | | NED | |
| Ofc 4 | P/O | | McCann | J288 | | ND | |
| Ofc 5 | P/O | | Gipson | H816 | | ND | |
| Ofc 6 | P/O | | Eley | J250 | | ND | |
| Ofc 7 | P/O | | Latiolas | J179 | | ND | |

| Red Platoon 5 | Name | Unit | Seq# | Cell Phone | Location |
|---|---|---|---|---|---|
| Plt. Commander | A / Cpt. Goodwin | 1133 | | | |
| Asst. Commander | A / Lt. Crosse | 1340 | | | |
| Motors | Cpl. Stein | | | | |
| Motors | Cpl. Dalton | | | | |
| | | | | | |
| Squad Red 1 | | | | | |
| Red 1 Supervisor | Sgt. Pleasant | 1547 | | | |
| Red 1 Ofc 1 | Sgt. Gardiner | 1160 | | | |
| Red 1 Ofc 2 | P/O Tanchak | 1930 | | | |
| Red 1 Ofc 3 | P/O Bumford | 1999 | | | |
| Red 1 Ofc 4 | P/O Love | 2009 | | | |
| Red 1 Ofc 5 | P/O Falk | 1938 | | | |
| Red 1 Ofc 6 | P/O Koehler | 1958 | | | |
| Red 1 Ofc 7 | P/O Hall | 1757 | | | |
| | | | | | |
| Squad Red 2 | | | | | |
| Red 2 Supervisor | Sgt. Shawkey | | | | |
| Red 2 Ofc 1 | P/O Ellis | 1889 | | | |
| Red 2 Ofc 2 | P/O Foxwell | 1797 | | | |
| Red 2 Ofc 3 | P/O Devers | 1906 | | | |
| Red 2 Ofc 4 | P/O Shapelow | 1947 | | | |
| Red 2 Ofc 5 | P/O Bethea | 1285 | | | |
| Red 2 Ofc 6 | P/O Baldwin | 1527 | | | |
| Red 2 Ofc 7 | P/O Balonis | 1750 | | | |
| | | | | | |
| Squad Red 3 | | | | | |
| Red 3 Supervisor | Sgt Genest | 1417 | | | |
| Red 3 Ofc 1 | P/O Bethel | 2003 | | | |
| Red 3 Ofc 2 | P/O Rodriguez | 1962 | | | |
| Red 3 Ofc 3 | P/O Lemaster | 1085 | | | |
| Red 3 Ofc 4 | P/O Moorhouse | 1880 | | | |
| Red 3 Ofc 5 | P/O Brennan | 1969 | | | |
| Red 3 Ofc 6 | P/O Skube | 1554 | | | |
| Red 3 Ofc 7 | P/O Edwards | 1954 | | | |
| | | | | | |
| Squad Red 4 | | | | | |
| Red 4 Supervisor | | | | | |
| Red 4 Ofc 1 | | | | | |
| Red 4 Ofc 2 | | | | | |
| Red 4 Ofc 3 | | | | | |
| Red 4 Ofc 4 | | | | | |
| Red 4 Ofc 5 | | | | | |

| 1 Cpt | 1Lt. | 4 Sgt. | 20 P/O | 2 Motors |
|---|---|---|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

| WD Blue Platoon One | Rank | First | Last | Seq# | Unit | District | Cell Phone |
|---|---|---|---|---|---|---|---|
| Lieutenant | | | | | | | |
| Squad Blue A | | | | | | | |
| Supervisor | Sgt | | Cooper | E208 | | ND | |
| Ofc 1 | P/O | | Jenkins | J025 | | ND | |
| Ofc 2 | P/O | | Thomas | F451 | | ND | |
| Ofc 3 | P/O | | Williams | F061 | | ND | |
| Ofc 4 | P/O | | Alvarez | G902 | | ND | |
| Ofc 5 | P/O | | Class | I087 | | ND | |
| Ofc 6 | P/O | | France | I748 | | ND | |
| Ofc 7 | P/O | | Stephanelli | F599 | | ND | |
| Squad Blue B | | | | | | | |
| Supervisor | Sgt | | Santiago | I052 | | ND | |
| Ofc 1 | P/O | | Steinhorn | F614 | | ND | |
| Ofc 2 | P/O | | Lester | H788 | | ND | |
| Ofc 3 | P/O | | Carter | E471 | | ND | |
| Ofc 4 | P/O | | Starr | G079 | | ND | |
| Ofc 5 | P/O | | Glenn | H054 | | ND | |
| Ofc 6 | P/O | | Ciotti | H894 | | ND | |
| Ofc 7 | P/O | | Larcuente | I284 | | ND | |
| Squad Blue C | | | | | | | |
| Supervisor | Sgt | | Roeser | H911 | | WD | |
| Ofc 1 | P/O | | Gutierrez | I118 | | ND | |
| Ofc 2 | P/O | | Johncox | I405 | | ND | |
| Ofc 3 | P/O | | Armstrong | H676 | | ND | |
| Ofc 4 | P/O | | Hanyok | H727 | | ND | |
| Ofc 5 | P/O | | Faulkner | I302 | | ND | |
| Ofc 6 | P/O | | Perfetto | F737 | | ND | |
| Ofc 7 | P/O | | Mason | G746 | | ND | |

| WD Blue Platoon Two | Rank | First | Last | Seq# | Unit | District | Cell Phone |
|---|---|---|---|---|---|---|---|
| Lieutenant | Lt. | | Jenkins | F187 | | NW | |
| Squad Blue A | | | | | | | |
| Supervisor | Sgt | | DEGRAFFINRIED | F193 | | NW | |
| Ofc 1 | P/O | | Fuksa | H306 | | ND | |
| Ofc 2 | P/O | | Parker | F911 | | ND | |
| Ofc 3 | P/O | | McMahon | G347 | | ND | |
| Ofc 4 | P/O | | Hemmerly | I760 | | ND | |
| Ofc 5 | P/O | | McCarty | G377 | | ND | |
| Ofc 6 | P/O | | Harker | I449 | | ND | |
| Ofc 7 | P/O | | Plater | D706 | | ND | |
| Squad Blue B | | | | | | | |
| Supervisor | Sgt | | SAUNDERS | H026 | | NW | |
| Ofc 1 | P/O | | Coufal | F064 | | ND | |
| Ofc 2 | P/O | | McFadden | J445 | | NW | |
| Ofc 3 | P/O | | Johnson | J588 | | NW | |
| Ofc 4 | P/O | | Lopez | J404 | | NW | |
| Ofc 5 | P/O | | Marsh | J587 | | NW | |
| Ofc 6 | P/O | | Montgomery | J578 | | NW | |
| Ofc 7 | P/O | | Ryckman | I620 | | NW | |
| Squad Blue C | | | | | | | |
| Supervisor | Sgt | | Lee | F993 | | WD | |
| Ofc 1 | P/O | | Eskins | H074 | | NW | |
| Ofc 2 | P/O | | Mulla | J579 | | NW | |
| Ofc 3 | P/O | | Browne | H532 | | NW | |
| Ofc 4 | P/O | | Tonks | J089 | | NW | |
| Ofc 5 | P/O | | Meertens | H552 | | NW | |
| Ofc 6 | P/O | | Tandy | J375 | | NW | |
| Ofc 7 | P/O | | Chin | I873 | | NW | |

CONFIDENTIAL - Produced Pursuant to Protective Order

| WD Green Platoon One | Rank | First | Last | Seq# | Unit | District | Cell Phone |
|---|---|---|---|---|---|---|---|
| Lieutenant | Lt. | | Bergeron | E693 | | WD | |
| | | | | | | | |
| Supervisor | Sgt | | Stevens | F442 | | WD | |
| Ofc 1 | P/O | | Paul | J691 | | NW | |
| Ofc 2 | P/O | | Edlow | F368 | | NW | |
| Ofc 3 | P/O | | Paul | J648 | | NW | |
| Ofc 4 | P/O | | Mihm | E575 | | NW | |
| Ofc 5 | P/O | | Thomas | G408 | | NW | |
| Ofc 6 | P/O | | Williams | I860 | | NW | |
| Ofc 7 | P/O | | Medeiros | I941 | | NW | |
| | | | | | | | |
| Supervisor | Sgt | | Cutchin | G504 | | WD | |
| Ofc 1 | P/O | | Bennett | H515 | | NW | |
| Ofc 2 | P/O | | Randolph | F669 | | NW | |
| Ofc 3 | P/O | | Johnson | G465 | | NW | |
| Ofc 4 | P/O | | Hartlove | F293 | | NW | |
| Ofc 5 | P/O | | Pfeiler | F847 | | NW | |
| Ofc 6 | P/O | | Popham | J307 | | WD | |
| Ofc 7 | P/O | Michael | Riser | G688 | | SW | |
| | | | | | | | |
| Supervisor | Sgt | | Murphy | I691 | | WD | |
| Ofc 1 | P/O | | Bucksbaum | I839 | | WD | |
| Ofc 2 | P/O | | Luke | J713 | | WD | |
| Ofc 3 | P/O | | Romeo | J657 | | WD | |
| Ofc 4 | P/O | | Raheem | H798 | | WD | |
| Ofc 5 | P/O | | Miskovic | J289 | | WD | |
| Ofc 6 | P/O | | McCoy | J366 | | WD | |
| Ofc 7 | P/O | | Koo | J354 | | WD | |

CONFIDENTIAL - Produced Pursuant to Protective Order

| WD Green Platoon Two | Rank | First | Last | Seq# | Unit | District | Cell Phone |
|---|---|---|---|---|---|---|---|
| Lieutenant | | | | | | | |
| Green A | | | | | | | |
| Supervisor | Sgt | | Blackmon | E336 | | WD | |
| Ofc 1 | P/O | | Provow | J118 | | WD | |
| Ofc 2 | P/O | | Magnuson | J242 | | WD | |
| Ofc 3 | P/O | | Jimenez | I361 | | WD | |
| Ofc 4 | P/O | | Blackburn | G527 | | WD | |
| Ofc 5 | P/O | | Lane | J006 | | WD | |
| Ofc 6 | P/O | | Krauss | H913 | | WD | |
| Ofc 7 | P/O | | Rimolo | J111 | | WD | |
| Green B | | | | | | | |
| Supervisor | Sgt | | Murphy | I691 | | WD | |
| Ofc 1 | P/O | | Crown | G489 | | WD | |
| Ofc 2 | P/O | | Rodriguez | H898 | | WD | |
| Ofc 3 | P/O | | Fedd | I476 | | WD | |
| Ofc 4 | P/O | | McLarty | H845 | | WD | |
| Ofc 5 | P/O | | Persico | J105 | | WD | |
| Ofc 6 | P/O | | Lam | I523 | | WD | |
| Ofc 7 | P/O | | Robles | J003 | | WD | |
| Green C | | | | | | | |
| Supervisor | Sgt | Rebecca | Duncan | G305 | | SW | |
| Ofc 1 | P/O | | Sanchez | J144 | | WD | |
| Ofc 2 | P/O | | Quigley | J131 | | WD | |
| Ofc 3 | P/O | | Chan | J178 | | WD | |
| Ofc 4 | P/O | | Beamer | J430 | | WD | |
| Ofc 5 | P/O | | Sentz | I559 | | WD | |
| Ofc 6 | P/O | | Richards | J119 | | WD | |
| Ofc 7 | P/O | | Beads | G503 | | WD | |

CONFIDENTIAL - Produced Pursuant to Protective Order

| Reserves | Rank | First | Last | Seq# | Unit | District |
|---|---|---|---|---|---|---|
| Lieutenant | | | | | | |
| Reserve Squad A | | | | | | |
| Supervisor | Sgt. | Renard | Owens | G562 | | SW |
| Ofc 1 | P/O | Brenden | Reed | I669 | | SW |
| Ofc 2 | P/O | Doug | Johnson | E422 | | SW |
| Ofc 3 | P/O | Kebin | McLean | F342 | | SW |
| Ofc 4 | P/O | George | Davis | F460 | | SW |
| Ofc 5 | P/O | Owen | Ray | F977 | | SW |
| Ofc 6 | P/O | Mark | Kahler | G893 | | SW |
| Ofc 7 | P/O | Mark | Verkest | I591 | | SW |
| Reserve Squad B | | | | | | |
| Supervisor | Sgt. | Georgios | Giannakoulias | E977 | | SW |
| Ofc 1 | P/O | Kariana | Rose | I542 | | SW |
| Ofc 2 | P/O | Ernest | McMillion | H667 | | SW |
| Ofc 3 | P/O | Jamil | Shakir | J390 | | SW |
| Ofc 4 | P/O | Ronald | Singleton | F592 | | SW |
| Ofc 5 | P/O | Christopher | Wesolowski | J400 | | SW |
| Ofc 6 | P/O | Nicholas | DeJesus | I177 | | SW |
| Ofc 7 | P/O | David | Connor | J211 | | SW |
| Reserve Squad C | | | | | | |
| Supervisor | Sgt. | Carolyn | White | G226 | | SW |
| Ofc 1 | P/O | Markeddar | McCall | I304 | | SW |
| Ofc 2 | P/O | Alexandra | Neumann | J355 | | SW |
| Ofc 3 | P/O | Tyrell | Thomas | J399 | | SW |
| Ofc 4 | P/O | Leon | Dockins | F890 | | SW |
| Ofc 5 | P/O | Chantal | Russell | J124 | | SW |
| Ofc 6 | P/O | Jorge | | J220 | | SW |
| Ofc 7 | P/O | Ludgens | Pierre | J437 | | SW |
| Reserve Squad D | | | | | | |
| Supervisor | | | | | | |
| Ofc 1 | P/O | Angel | Vazquez | J449 | | SW |
| Ofc 2 | P/O | Rene | Aguilera | J486 | | SW |
| Ofc 3 | P/O | Matthew | Reynolds | J420 | | SW |
| Ofc 4 | P/O | Jonathan | Pineda | J492 | | SW |
| Ofc 5 | P/O | Kevin | Roseborough | F344 | | SW |
| Ofc 6 | | | | | | |
| Ofc 7 | | | | | | |

CONFIDENTIAL - Produced Pursuant to Protective Order

| SWAT Downtown | Name | Seq# | Unit | Cell Phone |
|---|---|---|---|---|
| Lieutenant | Lt. DeVita | F382 | 7504 | 443-392-2622 |
| | | | | |
| Arrest Team 1 | Name | Seq# | Unit | Cell Phone |
| Supervisor | Sgt. Harris | E450 | 7580 | 443-452-7753 |
| Ofc 1 | Ofc. O'Toole | G034 | 7581 | |
| Ofc 2 | Ofc. Dejesus | F340 | 7582 | |
| Ofc 3 | Ofc. Holmes | G977 | 7584 | |
| Ofc 4 | Ofc. Steven | H690 | 7586 | |
| Ofc 5 | Ofc. Villodas | I065 | 7587 | |
| Ofc 6 | Ofc. Atkins | H177 | 7588 | |
| Ofc 7 | | | | |
| | | | | |
| Arrest Team 2 | Name | Seq# | Unit | Cell Phone |
| Supervisor | Sgt. Thacker | E958 | 7560 | 443-286-6218 |
| Ofc 1 | Ofc. Etting | I465 | 7562 | |
| Ofc 2 | Ofc. Russell | F738 | 7563 | |
| Ofc 3 | Ofc. Stackewicz | I298 | 7564 | |
| Ofc 4 | Ofc. Adams | H469 | 7565 | |
| Ofc 5 | Ofc. Wojcik | E919 | 7566 | |
| Ofc 6 | Ofc. Robinson | H748 | 7568 | |
| Ofc 7 | | | | |
| | | | | |
| | Name | Seq# | Unit | Cell Phone |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | Name | Seq# | Unit | Cell Phone |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

CONFIDENTIAL - Produced Pursuant to Protective Order

| K9 Downtown | Name | Seq# | Unit | Cell Phone |
|---|---|---|---|---|
| Lieutenant | | | | |
| | | | | |
| K9 Downtown | Name | Seq# | Unit | Cell Phone |
| Supervisor | Sgt. Ferenc | D287 | | 410-375-6714 |
| Ofc 1 | Ofc. Reid | I258 | K9 22 | |
| Ofc 2 | Ofc. Sinchak | I563 | | |
| Ofc 3 | Ofc. Farley | F253 | | |
| Ofc 4 | Ofc. Sturm | D844 | | |
| Ofc 5 | Ofc. Ensor | F335 | | |
| Ofc 6 | | | | |
| Ofc 7 | | | | |
| | | | | |
| | Name | Seq# | Unit | Cell Phone |
| Supervisor | | | | |
| Ofc 1 | | | | |
| Ofc 2 | | | | |
| Ofc 3 | | | | |
| Ofc 4 | | | | |
| Ofc 5 | | | | |
| Ofc 6 | | | | |
| Ofc 7 | | | | |
| | | | | |
| | Name | Seq# | Unit | Cell Phone |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | Name | Seq# | Unit | Cell Phone |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

CONFIDENTIAL - Produced Pursuant to Protective Order

| LPR Downtown | Name | Seq# | Unit | Cell Phone |
|---|---|---|---|---|
| Lieutenant | | | | |
| | | | | |
| AIU Downtown | Name | Seq# | Unit | Cell Phone |
| Supervisor | Sgt. Warren | G241 | 7570 | 443-681-0782 |
| Ofc 1 | Ofc. Hicks | J049 | 7571 | |
| Ofc 2 | Ofc. Hinnant | I849 | 7572 | |
| Ofc 3 | Ofc. More | I102 | 7573 | |
| Ofc 4 | | | | |
| Ofc 5 | | | | |
| Ofc 6 | | | | |
| Ofc 7 | | | | |
| | | | | |
| | Name | Seq# | Unit | Cell Phone |
| Supervisor | | | | |
| Ofc 1 | | | | |
| Ofc 2 | | | | |
| Ofc 3 | | | | |
| Ofc 4 | | | | |
| Ofc 5 | | | | |
| Ofc 6 | | | | |
| Ofc 7 | | | | |
| | | | | |
| | Name | Seq# | Unit | Cell Phone |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | Name | Seq# | Unit | Cell Phone |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

CITY00007682

| Mounted Downtown | Name | Seq# | Unit | Cell Phone |
|---|---|---|---|---|
| Lieutenant | | | | |
| | | | | |
| Mounted Downtown | Name | Seq# | Unit | Cell Phone |
| Supervisor | OIC Gilley | F258 | 8360 | 410-925-0905 |
| Ofc 1 | Ofc. Folk | I134 | | |
| Ofc 2 | Ofc. Garvin | I513 | | |
| Ofc 3 | Ofc. Potter | I085 | | |
| Ofc 4 | Ofc. Tran | I437 | | |
| Ofc 5 | Ofc. Valis | I608 | | |
| Ofc 6 | | | | |
| Ofc 7 | | | | |
| | | | | |
| | Name | Seq# | Unit | Cell Phone |
| Supervisor | PG Co.1 | | | |
| Ofc 1 | PG Co.2 | | | |
| Ofc 2 | PG. Co. 3 | | | |
| Ofc 3 | PG. Co. 4 | | | |
| Ofc 4 | Mo. Co. 1 | | | |
| Ofc 5 | Mo. Co. 2 | | | |
| Ofc 6 | | | | |
| Ofc 7 | | | | |
| | | | | |
| | Name | Seq# | Unit | Cell Phone |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | Name | Seq# | Unit | Cell Phone |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**CONFIDENTIAL - Produced Pursuant to Protective Order**

| SWAT Gear (ND) | Name | Seq# | Unit | Cell Phone |
|---|---|---|---|---|
| Lieutenant | | | | |
| | | | | |
| | Name | Seq# | Unit | Cell Phone |
| Supervisor | OIC Taylor | E957 | 7522 | |
| Ofc 1 | Ofc. Coughlan | E778 | 7521 | |
| Ofc 2 | Ofc. Walker | I401 | 7585 | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | Name | Seq# | Unit | Cell Phone |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | Name | Seq# | Unit | Cell Phone |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

CONFIDENTIAL - Produced Pursuant to Protective Order

| K 9Western | Name | Seq | Unit | Cell Phone |
|---|---|---|---|---|
| Lieutenant | Lt. Kelley | D240 | | |
| | | | | |
| K9 Western | Name | Seq | Unit | Cell Phone |
| Supervisor | OIC Patzman | E850 | K9 34 | |
| Ofc1 | Ofc. Herman | H430 | | |
| Ofc.2 | Ofc. Stenger | F329 | | |
| Ofc.3 | Ofc. Ray | G487 | K9 21 | |
| Ofc.4 | Ofc. Murphy | G421 | K9 6 | |
| Ofc.5 | Ofc. McWiliams | C541 | K9 25 | |
| | | | | |
| | | | | |
| | | | | |
| | Name | Seq | Unit | Cell Phone |
| Supervisor | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | Name | Seq | Unit | Cell Phone |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

CITY00007685

| SWAT WESTERN | Name | Seq | Unit | Cell Phone |
|---|---|---|---|---|
| Lieutenant | | | | |
| | | | | |
| Arrest Team 1(Station) | Name | Seq | Unit | Cell Phone |
| Supervisor | Sgt. Gilbart | E076 | 7509 | 443-463-9794 |
| Ofc 1 | Ofc. Loiero | I850 | 7511 | |
| Ofc 2 | Ofc. Ulmer | I899 | 7512 | |
| Ofc 3 | Ofc. Timms | E650 | 7515 | |
| Ofc 4 | Ofc. Archambault | G055 | 7517 | |
| Ofc 5 | Ofc. Anderson | E055 | 7519 | |
| Ofc 6 | Ofc. Schmitt | G133 | 7516 | |
| | | | | |
| | | | | |
| Arrest Team 2 (Mobile) | Name | Seq | Unit | Cell Phone |
| Supervisor | Sgt. Palmer | F536 | 7540 | 443-438-0491 |
| Ofc 1 | Ofc. Wein | H388 | 7543 | |
| Ofc 2 | Ofc. Merson | H817 | 7545 | |
| Ofc 3 | Ofc. Black | G540 | 7547 | |
| Ofc 4 | Ofc. West | F677 | 7548 | |
| Ofc 5 | Ofc. Schappell | G127 | 7549 | |
| Ofc. 6 | Ofc. Swamm | H158 | 7542 | |
| | | | | |
| | | | | |
| | Name | Seq | Unit | Cell Phone |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

                    CITY00007686

| K9 Western | Name | Seq | Unit | Cell Phone |
|---|---|---|---|---|
| Lieutenant | Lt. Kelley | D240 | | |
| | | | | |
| K9 Western | Name | Seq | Unit | Cell Phone |
| Supervisor | OiC Patzman | E850 | K9 34 | |
| Ofc.1 | Ofc. Herman | H430 | | |
| Ofc. 2 | Ofc. Stenger | F329 | | |
| Ofc. 3 | Ofc. Ray | G487 | K9 21 | |
| Ofc. 4 | Ofc. Murphy | G421 | K9 6 | |
| Ofc. 5 | Ofc. McWiliams | C541 | K9 25 | |
| | | | | |
| | | | | |
| | | | | |
| | Name | Seq | Unit | Cell Phone |
| Supervisor | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | Name | Seq | Unit | Cell Phone |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

CONFIDENTIAL - Produced Pursuant to Protective Order

DownTown

| AIL WESTERN | Name | Seq | Unit | Cell Phone |
|---|---|---|---|---|
| Lieutenant | | | | |
| | | | | |
| | Name | Seq | Unit | Cell Phone |
| Supervisor | Sgt. McMillian | G791 | 8470 | 410-375-6357 |
| Ofc. 1 | Ofc. Peer | E746 | | |
| Ofc. 2 | Ofc. Mercado | H991 | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | Name | Seq | Unit | Cell Phone |
| Supervisor | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | Name | Seq | Unit | Cell Phone |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

CONFIDENTIAL - Produced Pursuant to Protective Order

| AIU Downtown | Name | Seq# | Unit | Cell Phone |
|---|---|---|---|---|
| Lieutenant | | | | |
| | | | | |
| AIU Downtown | Name | Seq# | Unit | Cell Phone |
| Supervisor | Sgt. Deluca | F783 | | |
| Ofc 1 | Ofc. Bender | H364 | | |
| Ofc 2 | Ofc. Izquerdo | F819 | | |
| Ofc 3 | | | | |
| Ofc 4 | | | | |
| Ofc 5 | | | | |
| Ofc 6 | | | | |
| Ofc 7 | | | | |
| | | | | |
| | Name | Seq# | Unit | Cell Phone |
| Supervisor | | | | |
| Ofc 1 | | | | |
| Ofc 2 | | | | |
| Ofc 3 | | | | |
| Ofc 4 | | | | |
| Ofc 5 | | | | |
| Ofc 6 | | | | |
| Ofc 7 | | | | |
| | | | | |
| | Name | Seq# | Unit | Cell Phone |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | Name | Seq# | Unit | Cell Phone |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

CONFIDENTIAL - Produced Pursuant to Protective Order

# EXHIBIT 43

**From:** Maloney, Robert
**Sent:** Wednesday, April 22, 2015 8:56 PM EDT
**To:** Scott, Connor D. <Connor.Scott@baltimorecity.gov>
**Subject:** Re: Sounds like Saturday will be 3pm

Ok

----- Original Message -----
From: Scott, Connor D.
Sent: Wednesday, April 22, 2015 08:21 PM
To: Maloney, Robert
Cc: McMillan, David
Subject: Sounds like Saturday will be 3pm

**CONFIDENTIAL - Produced Pursuant to Protective Order**

# EXHIBIT 44

**From:** Vetter, Drew <Drew.Vetter@baltimorepolice.org> on behalf of Vetter, Drew <drew.vetter@baltimorepolice.org>
**Sent:** Thursday, April 23, 2015 5:56 PM EDT
**BCC:** City Council Members <CityCouncilMembers@baltimorecity.gov>; City Council Staff <ccstaff@baltimorecity.gov>; Fannon, Mary Pat <Mary-Pat.Fannon@baltimorecity.gov>; Smullian, Andrew <Andrew.Smullian@baltimorecity.gov>; Martin, Ganesha <Ganesha.Martin@BaltimorePolice.org>; Blendy, Nicholas T. <Nicholas.Blendy@baltimorecity.gov>; Kowalczyk, John <John.Kowalczyk@BaltimorePolice.org>; Harris, Kevin <Kevin.Harris@baltimorecity.gov>; Hyatt, Melissa R. <Melissa.Hyatt@BaltimorePolice.org>; Antonio Hayes <cfah40@gmail.com>; Antonio Hayes II <antonio.hayes@house.state.md.us>; BaltCity@house.state.md.us <BaltCity@house.state.md.us>; barbara.robinson@house.state.md.us <Barbara.Robinson@house.state.md.us>; BArmwood@senate.state.md.us <BArmwood@senate.state.md.us>; BCYoung@baltimorecity.gov <BCYoung@baltimorecity.gov>; biferguson05@gmail.com <Biferguson05@gmail.com>; bill.ferguson@senate.state.md.us <Bill.Ferguson@senate.state.md.us>; Brooke Lierman <brookefordelegate@gmail.com>; Carleton Atkinson <Carleton_Atkinson@cardin.senate.gov>; catherine.pugh@senate.state.md.us <catherine.pugh@senate.state.md.us>; cdglenndemocrat@aol.com <cdglenndemocrat@aol.com>; cheryl.glenn@house.state.md.us <Cheryl.Glenn@house.state.md.us>; City Council Members; Cory McCray <corymccray@gmail.com>; cory.mccray@house.state.md.us <cory.mccray@house.state.md.us>; curt.anderson@house.state.md.us <curt.anderson@house.state.md.us>; curtanderson@aol.com <curtanderson@aol.com>; Danice Lewis <Danice.Lewis@baltimorecity.gov>; del.branch@gmail.com <del.branch@gmail.com>; delegatemarywashington@gmail.com <delegatemarywashington@gmail.com>; delmaggie@msn.com <delmaggie@msn.com>; delsandy@aol.com <delsandy@aol.com>; drmarywashington@gmail.com <drmarywashington@gmail.com>; Fran.Allen@mail.house.gov <Fran.Allen@mail.house.gov>; frank.conaway@house.state.md.us <frank.conaway@house.state.md.us>; jill.carter@house.state.md.us <jill.carter@house.state.md.us>; joan.carter.conway@senate.state.md.us <joan.carter.conway@senate.state.md.us>; jpclawyer@aol.com <jpclawyer@aol.com>; keith.haynes@house.state.md.us <Keith.Haynes@house.state.md.us>; khaynes44@gmail.com <khaynes44@gmail.com>; Kristen Harbeson <kharbeson@house.state.md.us>; lgladden@aol.com <lgladden@aol.com>; Lisa Smith <LSmith@stattorney.org>; lisa.gladden@senate.state.md.us <lisa.gladden@senate.state.md.us>; luke.clippinger@house.state.md.us <luke.clippinger@house.state.md.us>; lukeclip@gmail.com <lukeclip@gmail.com>; maggie.mcintosh@house.state.md.us <maggie.mcintosh@house.state.md.us>; mary.washington@house.state.md.us <Mary.Washington@house.state.md.us>; Matt Stegman <matthew.stegman@mlis.state.md.us>; Michal, Zoe <Zoe.Michal@baltimorecity.gov>; Michele_Brown@Mikulski.senate.gov <Michele_Brown@Mikulski.senate.gov>; molly@billforbaltimore.com <molly@billforbaltimore.com>; nathaniel.mcfadden@senate.state.md.us <nathaniel.mcfadden@senate.state.md.us>; nathaniel.oaks@house.state.md.us <Nathaniel.Oaks@house.state.md.us>; peter.hammen@house.state.md.us <peter.hammen@house.state.md.us>; Riggs Driban, Jennifer <Jennifer.Driban@mail.house.gov>; samuel.rosenberg@house.state.md.us <samuel.rosenberg@house.state.md.us>; Shirley Nathan-Pulliam <Shirley.Nathan.Pulliam@senate.state.md.us>; Smith, Brigid <Brigid.Smith@mail.house.gov>; Stephens, Jerome (Cardin) <jerome_stephens@cardin.senate.gov>; talmadge.branch@house.state.md.us <Talmadge.Branch@house.state.md.us>; Terrell Boston Smith <tbostonsmith@oag.state.md.us>
**Subject:** On behalf of Commissioner Batts: Update Regarding Demonstrations

Dear Elected Officials and Staff:

We wanted to provide an update on planned demonstrations that are taking place across the City over the next several days in response to the events surrounding the death of Mr. Freddie Gray. Today, April 23, we expect demonstrators to gather at City Hall and around the Western District Police Station in the afternoon and into the evening hours. Similar gatherings are expected Friday afternoon, and a large demonstration is expected on Saturday at City Hall. The demonstration on Saturday is expected to be the largest to date. While we are encouraged that the demonstrations have so far been largely peaceful, BPD has intelligence that individuals from outside the City have been traveling to Baltimore to participate in, and in some cases, help organize the demonstrations. There is reason to believe that some of these individuals are encouraging others to use aggressive tactics and even violence against our officers or others.

BPD is highly supportive of the rights of our citizens to express their frustration, anger, and concern by peaceably assembling in public places. Ensuring that these demonstrations proceed safely is our top priority. However, the BPD expressly condemns any use of violence against our officers or others during the course of what should be peaceful free expression. We will not tolerate the violent actions of a few interfering with the rights of our citizens to be heard. We have deployed resources both Downtown and in the Western District with the goal of promoting safety and preventing escalation of potential violence.

Given that the demonstrations will be occurring across multiple locations, that they are expected to grow in size, and our intelligence regarding potentially violent agitators, the Maryland State Police and other partner agencies will be on hand to assist the BPD with managing the crowds of demonstrators. The BPD routinely collaborates with other agencies on a broad range of activities, and we are appreciative of the support they are providing to ensure the safety of our citizens. BPD will continue to provide the primary support for the demonstrations, with officers from partner agencies on hand to lend secondary support and back-up if needed.

We are encouraging elected officials and community and faith-based leaders to spread a positive message to their constituencies regarding participation in the demonstrations. It is beneficial to the City of Baltimore as a whole that individuals make their voices heard through peaceful demonstration. Commissioner Batts and the rest of the BPD understand it is the right of our citizens to do so. Any participation in violent conflict will only serve to reinforce negative stereotypes of the City we share and love. We are resolved to quickly and transparently uncover the facts of this case. When necessary and appropriate, we will hold people accountable and enact change. Peaceful demonstrations over the next several days will show the strength of our people and begin the healing

process in our communities. Thank you.

Drew Vetter
Director of Government Affairs
Baltimore City Police Department
(410) 456-7539 (cell)

CONFIDENTIAL - Produced Pursuant to Protective Order

# EXHIBIT 45

**From:** Cheatham, Tony <Tony.Cheatham@baltimorepolice.org>
**Sent:** Friday, April 24, 2015 1:27 PM EDT
**To:** Higgins, James <James.Higgins@baltimorepolice.org>
**CC:** Hood, Samuel <Samuel.Hood@BaltimorePolice.org>; DeMotto, Nicole <Nicole.DeMotto@BaltimorePolice.org>;
McClaskey, George <George.McClaskey@BaltimorePolice.org>; Orenstein, Joseph
<Joseph.Orenstein@BaltimorePolice.org>
**Subject:** Event Intelligence for Saturday April 25, 2015

Please see intelligence for event on April 25, 2015.

Tony M. Cheatham
Baltimore Police Department
Criminal Intelligence Analyst (AIS/IAU)
Analytical Intelligence Section
Intelligence Analysis Unit
Office : (410) 396-2640
Cell: (443)452-9148
Email : Tony.Cheatham@baltimorepolice.org

***"Intelligence is quickness in seeing things as they are"***
*-George Santayana*

AIS Logo



# Event Intelligence for Saturday April 25, 2015



Event is scheduled to be begin at 3:00 pm at the Gilmor Homes and commencing at City Hall at 5:00 pm.  Event schedule is attached.

Western District
* Event at the Western District- Everyday until they stop. March to Western District will be 3:30 pm. (Source: Twitter)

City Hall:

CONFIRMED ATTENDANCE

* Malik Zulu Shabazz BLFJ (Black Lawyers For Justice) (See profile handout) vows to bring 10,000 members with him to rally on City Hall. (Google Search)

There is a possibility for multiple groups from the last five days to be present during the event on Saturday. NOT CONFIRMED THAT THEY WILL ATTEND.

* BaltimoreBLOC who participated in this week's events. (Source: Twitter)
* Peoples Power Assembly who held a news conference and rally at North Mount and Presbury Streets. (Source: Twitter)
* Rev. Cortley Witherspoon and organizer with the People's Power Assembly. (Source: Twitter)
* Westley West of Faith Empowered Ministries who led protests through the streets of Baltimore throughout the week. (Sources: Twitter & Facebook)
* Pastor Jamal Bryant -The Empowerment Temple- Led a rally at City Hall on Wednesday, April 23, 2015. (Sources: Twitter)

   11:00am 47° West 3 mph Partly Cloudy   19%

   2:00pm   54° West 5 mph Partly Cloudy   19%

CONFIDENTIAL - Produced Pursuant to Protective Order   CITY00040255

 5:00pm   56° SW 3 mph   Chance of Rain 19%

- Hourly weather for Saturday is rain and cold which may affect crowd turnout, but based on the past week, good support for the event most likely will be present.



---

CONFIDENTIAL - Produced Pursuant to Protective Order

# SHUT EM DOWN!

## MASSIVE MARCH & NATIONAL RALLY AGAINST THE BRUTALITY OF THE BALTIMORE POLICE DEPARTMENT

## FREDDIE GRAY

  

## SATURDAY APRIL 25TH - 3PM

### 3PM: Gathering at Gilmor Homes (Scene of Arrest)
(1640 Balmor Court Baltimore, MD 21217)

### 3:30PM: March to Western District Police Station
1044 N. Mount Street in Baltimore, MD

### 4PM: Mass March to City Hall

### 5PM: National Rally At City Hall  (100 Holiday St. Baltimore, MD)

### www.blfjustice.org

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00040257



# Subject information for Malik Zulu Shabazz



 

*AKA Paris Lewis*

DOB: 9/7/1966

Last Known Address: 4043 Clay Place N.E. Washington D.C. 20019

Arrest record: Assault (2010, 2005) Washington D.C., Assault and felony threats on Police officer (2001) Washington D.C, Unlawful Entry on property (1997) Washington D.C., Car Stop (2012) 1500 Block, Bloomingdale Road, Baltimore MD.

Former New Black Panthers Chairman

Believes and practices Black Nationalism, Black power, Slavery reparations, anti – semantic.

Shabazz gave a speech in Washington D.C in 2002 that highlighted killing Zionists in Israel, little babies, and bombing Zionist supermarkets.

Social Media: (Facebook) Malik Shabazz, (Twitter) Malik Zulu Shabazz@ ZuluMalik, (Twitter) BLFJUSTICE@blfjustice)

Malik Zulu Shabazz has extensive profile information and history that can be further researched on the internet, including an article on Cop Killing.

## Radical black activist issues cop-kill prediction

http://www.wnd.com/2015/01/radical-black-activist-issues-cop-kill-prediction/

CONFIDENTIAL - Produced Pursuant to Protective Order

# EXHIBIT 46

**From:** Vetter, Drew [drew.vetter@baltimorepolice.org]
**Sent:** Friday, April 24, 2015 1:46 PM
**Subject:** Letter from Commissioner Batts
**Attachment(s):** "Commissioner Batts to Community Leaders 4-23-2015.pdf"

Dear Elected Officials and Staff:

Please see the attached letter from Commissioner Batts regarding demonstrations planned for today and tomorrow. Feel free to share with your constituents. Thank you.

Drew Vetter
Director of Government Affairs
Baltimore City Police Department
(410) 456-7539 (cell)

CONFIDENTIAL - Produced Pursuant to Protective Order



# BALTIMORE POLICE DEPARTMENT



STEPHANIE RAWLINGS-BLAKE
Mayor

April 24, 2015

ANTHONY W. BATTS
Police Commissioner

Dear Community Leader:

I am writing to request your assistance to ensure continued peaceful demonstrations in the City of Baltimore. The citizens of Baltimore have come together every day this week to express their frustration and concern regarding the death of Mr. Freddie Gray. We understand this frustration and we stand by our residents' constitutional right to voice demands for justice and accountability. To date, the protests have been largely peaceful, with minimal violence and very few arrests. These peaceful protests build upon a long and proud tradition in our City of citizens peacefully speaking out for justice.

The protests in the Western District and Downtown are expected to continue today, Friday, April 25 and tomorrow, Saturday, April 26. Tomorrow's protest is expected to start in the Western District and it could impact Downtown and other areas of the City as well. It has been reported, and BPD can confirm, that groups from outside the State of Maryland are descending on Baltimore to participate in Saturday's protests. Therefore, it is imperative that we remind our citizens of the importance of keeping the protests peaceful. While peaceful demonstration is to be encouraged, we must avoid any attempts to create a riot. This is the city where we live, work, and send our kids to school. We are the ones that call this City home. The citizens of Baltimore and the BPD must not tolerate any foreign attempts to perpetuate violence in our City.

We are calling on elected officials, community leaders, faith-based leaders, and the citizens of Baltimore to resist any efforts by outsiders to escalate peaceful demonstration into violent conflict. We are asking that you call on other leaders of your communities and implore them to continue Baltimore's proud tradition of peaceful demonstration. In the words of Dr. Martin Luther King Jr., "Darkness cannot drive out darkness: only light can do that. Hate cannot drive out hate: only love can do that." Please spread this message through every mean available to you: email list-serves, social media, text message, and word of mouth.

I acknowledge the challenges we face in improving the community's trust in our Department, and I am working tirelessly to not only uncover the facts of Mr. Gray's case, but also to change our culture. We have made progress. This is evidenced by steady and consistent declines in complaints for excessive use of force and discourtesy over the last five years. However, fewer complaints are still too many and we will not be satisfied until the community's trust in our Department is fully restored. We cannot afford a setback in these efforts in the form of rioting in our streets. With your help, peace will prevail over violence over the next several

c/o 242 W. 29th Street • Baltimore, Maryland 21211

CONFIDENTIAL - Produced Pursuant to Protective Order

Community Leader                    2                    April 24, 2015

days, and we will show the nation Baltimore's resolve for a brighter future. Please help us to seize this opportunity to build Baltimore back up as we continue to try and strengthen our relations with our citizens.

Sincerely,

Anthony W. Batts, Police Commissioner

**CONFIDENTIAL - Produced Pursuant to Protective Order**

# EXHIBIT 47

**From:** Maloney, Robert
**Sent:** Friday, April 24, 2015 9:22 AM EDT
**To:** McMillan, David <David.McMillan@baltimorecity.gov>
**Subject:** Re: I really need you to engage today and tomorrow with the protests. it may require you working Saturday. Can you do it?

perfect

Sent from my iPad

On Apr 24, 2015, at 9:20 AM, McMillan, David <David.McMillan@baltimorecity.gov> wrote:

I'm headed to BPD shortly to attend a 10am meeting.

Then a meeting at 1pm at BPD, and I'll be around watch center in between

Sent from my Verizon 4G LTE Smartphone

------ Original message------
**From:** Maloney, Robert
**Date:** Fri, Apr 24, 2015 8:29 AM
**To:** McMillan, David;
**Subject:**I really need you to engage today and tomorrow with the protests. it may require you working Saturday. Can you do it?

**CONFIDENTIAL - Produced Pursuant to Protective Order**

**CITY00054378**

# EXHIBIT 48

**From:** Curley, Andrea <Andrea.Curley@baltimorecity.gov>
**Sent:** Monday, April 27, 2015 2:51 PM EDT
**Subject:** FW: Rights of Protestors Statement

Please see attachment of Madame Mayor's issued Statement Regarding Mayor's Comments on the Rights of Protestors

Please feel free to share with community members, leaders and residents.

Thank you,

**Andrea C. Curley M.S.**
*Mayor's Office of Neighborhood &*
*Constituent Services*
*Northeastern Neighborhood Liaison*
100 N. Holliday Street, Room 250
Baltimore, MD 21202
andrea.curley@baltimorecity.gov
443-984-3965 (Office)
443-826-2260 (Mobile)
410-396-5136 (Fax)

*Office of*
*Mayor Stephanie*
*Rawlings-Blake*

*Connect with Mayor Rawlings-Blake*

@MayorSRB                          MayorSRB
/Stephanie.Rawlingsblake



OFFICE OF MAYOR STEPHANIE RAWLINGS-BLAKE

MAYOR'S OFFICE OF NEIGHBORHOODS

# Rawlings-Blake Administration Issues Statement Regarding Mayor's Comments on the Rights of Protestors

Saturday evening, in the midst of the protests in the City, Mayor Rawlings-Blake held a press conference calling for peace in the city. The mayor's original quote follows (emphasis and clarification added):

> "I've made it very clear that I work with the police and instructed them to do everything that they could to make sure that the protesters were able to exercise their right to free speech. It's a very delicate balancing act, because, *while* we tried to make sure that they were protected from the cars and the other things that were going on, *we also [as a result]* gave those who wished to destroy space to do that as well. And we worked very hard to keep that balance and to put ourselves in the best position to deescalate, and that's what you saw."

Since this weekend, this quote has been taken out of context and mischaracterized. In an effort to clarify what the Mayor said in her statement this weekend the office made this statement today:

> "What she is saying within this statement was that there was an effort to give the peaceful demonstrators room to conduct their peaceful protests on Saturday. Unfortunately, as a result of providing the peaceful demonstrators with the space to share their message, that also meant that those seeking to incite violence also had the space to operate. The police sought to balance the rights of the peaceful demonstrators against the need to step in against those who were seeking to create violence.
>
> **The mayor is not saying that she asked police to give space to people who sought to create violence. Any suggestion otherwise would be a misinterpretation of her statement."**

CONFIDENTIAL - Produced Pursuant to Protective Order

# EXHIBIT 49

## POLICE DEPARTMENT

## BALTIMORE, MARYLAND

April 24, 2015

**TO:**      Police Commissioner Anthony Batts

**VIA:**     Official Channels

**FROM:**    Lieutenant Colonel Melissa Hyatt
             Chief of Staff

**SUBJECT:** Protests April 25, 2015

Sir:

I respectfully report the following operational plan. This plan is in reference to the possible protests in the WD and CD on today's date.

### I. Command and Control:

Incident Commander: Deputy Commissioner Palmere

Operations Commander: LTC Hyatt

Deputy Operations Commander: Captain Schluderberg

Planning: Colonel DeSousa

Logistics: Major Dennis Smith/Captain Martin Bartness

Finance: Chief Moore


CD Field Operations Commander: Major Marcus

CD Assistant Field Operations Commander: Captain Howe

WD Field Operations Commander: Major Robinson

WD Assistant Field Operations Commander: Captain Bauer

Staging Area: Central Distract Deployment 601 E. Fayette Street (Atrium)

             Western District Deployment 1034 N. Mount Street (Roll Call Room)

Command Post/Base of Operations: 601 E. Fayette Street, 9th Floor, Watch Center

Dedicated Channels: 10A/1C for CD and 11A/7C for WD

CONFIDENTIAL - Produced Pursuant to Protective Order

Individual call numbers will be assigned to officers by their individual commands. However, it will be essential to utilize position locations to relay information via radio.

**II. Overall Objective:** Support a peaceful demonstration of lawfully assembled protesters, while protecting life and property. This operation will utilize the least amount of force possible.

Priorities in Order:

1. Life (Citizen, Safety, Officer Safety)
2. Property and Business
3. Safe Traffic Flow (Ingress and Egress)
4. Restoration of Normal City Services

**III. Individual Assignments (If required):**

**All teams will travel in a minimum of maintained squads for ease of tracking and accountability.**

CITY HALL: Officers assigned to City Hall will be posted on the perimeter of City Hall during full activation with officers posted on the steps/front door of City Hall and inside of the bike racks (on the Lexington side of City Hall, on the Fayette side of City Hall, and parallel to Gay directly to the east of the steps).

MCKELDIN SQUARE and INNER HARBOR (BRICKS) Officers assigned to McKeldin Square will be posted on the perimeter of the Square, including on the footbridges. Due to the presence of the ice rink, in the event that the location becomes relevant, officers will surround and protect the rink. This will leave a small area for demonstrators which will not impact foot traffic or the operation of the rink. The rink will be bike racked in order to protect the integrity of the area.

A deployment will be assigned to the Inner Harbor bricks area with a concentration on stairwells, high ground, and business protection. Communication has been established with Pavilion management in order to lockdown the Pavilions if necessary.

GALLERY: Inner Harbor Units will be posted outside of the Gallery, specifically at Calvert and Pratt Streets. They will stand on the northeast corner. Communication has been established with management in order to lockdown the Gallery if necessary.

POLICE HEADQUARTERS: Officers assigned to Police Headquarters will be Those on the north side of the building will not permit individuals to get between themselves and the glass or doors of the building. Those officers will maintain the flat concrete area outside of the main entrance to the Annex building. Only a small number of officers will be visible to the group on any side, as they will be spread around the building but within eyesight of each other.

COURTHOUSE: The courthouse will be maintained by the Baltimore City Sherriff's Department, who will be in communication with BPD.

CONFIDENTIAL - Produced Pursuant to Protective Order

WESTERN POLICE DISTRICT: Officers assigned to Western District stationhouse will be staged to protect the building and ensure safe ingress and egress.

SPECIAL OPERATIONS SECTION:

The Special Operations Section will provide the following support:

SWAT will be utilized in teams of 1/5 and will function as arrest teams. Individual arrests will be extracted quickly and immediately transported away from the area.

Grenadiers: 2 two-person SWAT grenadier teams will be assigned. Utilizing grenadiers is a last resort option, as this operation prioritizes utilizing the least amount of force needed. Grenadiers will be paired together and each team will have one officer equipped with a 37 mm smooth bore gas launcher, while the other officer will be equipped with a 37 mm Sageco launcher.

Bearcat: A 2 officer team will stage the Bearcat as an evacuation tool in the event that an officer is seriously injured in a hostile environment during the operation. The primary evacuation route from both McKeldin Square and City Hall to University of Maryland Shock Trauma is west on Lombard, south on Penn into the ER. The evacuation route from the Western District will be north on Mount, right on Riggs, right on Gilmor, left on Mulberry, right on Greene into ER.

Mounted: 4 Mounted units will be initially utilized for Army-Navy and then will move to the downtown area.

K9: K9 units will provide mobile patrol in the downtown area unless requested to post on a particular location. In the event of a hostile incident, K9 may be utilized to provide security at the command post. Dogs will remain in kennels unless otherwise advised by the Operations Commander with approval from the Incident Commander.

Foxtrot: One helicopter will be committed to the operation. The ship will monitor crowd movement and identify potential threats. The ship will remain in flight until the event concludes or it is relieved.

Equipment Trailer: This will be staged on Light Street near Redwood and manned by SOS.

OIS/SES: Plain clothes SES detectives will be placed within the demonstrators in order to gather intelligence and alert the Incident Commander of any intelligence. OIS observation point officers will be deployed to each of the following locations. They will provide oversight and communicate intelligence to units on the ground.

CITIWATCH: Monitors will proactively monitor cameras specific to the event and will relay information to ground units.

FISCAL: Fiscal will have a representative present in the Watch Center.

**IV. Supervisory Premise:**

CONFIDENTIAL - Produced Pursuant to Protective Order

First Tier: Sergeants—Utilize line of sight principles to maintain departmental objectives and ensure officer safety. Squads will be broken down into manageable numbers with supervisors in secondary positions keeping subordinates in front of or at their periphery.

Second Tier: Manage personnel based on the objective and actionable intelligence provided by line sergeants, observation point personnel, Foxtrot, City Watch operators, and plain clothes officers.

## V. Arrest Procedures:

Arrest is not a preferred function during this operation. However, in the event that arrests become necessary, the following procedures will be followed.

A line will progress forward of the arrest team and the arrest team (1/5 SWAT) will extract the arrestees. Multiple arrest teams may be utilized if deemed necessary. The team will extract the arrestees and will be met by a wagon at pre-designated locations. Mass arrests will be immediately placed in the Department of Corrections buses. These buses will respond to Central Booking and stage in the sally port until the facility is prepared to accept the prisoners. Detectives will stage at Central Booking to standby and process prisoners.

In the event that any juveniles are arrested, they will be transported directly to Juvenile Booking.

Wagon officers will ensure that arrestees have masking tape on their backs with the arresting officer's last name and sequence number written on same. Also, a photo will be taken when practical of the arresting officer and the prisoner together.

## VI. Video Recording:

A minimum of 4 video recorders will be deployed during this incident. Court attire detectives and undercover officers will maintain video cameras. The Field Operations Commander will have a video camera assigned to a detective who will be with him/her during the duration of the event. All camera operators will film both the crowd and the actions of the officers. Any conversations between the Field Operations Commander and demonstrators will be filmed in entirety. Other contact by officers and demonstrators will be minimized by the positioning of officers. However, in the event that a demonstrator or other citizen approaches an officer, he or she shall remain polite. The incident will be video recorded whenever possible.

**VII. Travel Routes:** Motorized units and foot platoons will be utilized to manage routes from each location to the other in the event that the demonstration becomes mobile. These officers will be focused on pedestrian and vehicular safety. No routes have been verified at this time. In the event that a group attempts to linger in an intersection to gather the attention of motorists, officers will divert traffic for a minimum of 1 block in each direction in order to remove the attention that they are seeking.

The Community Partnership Division will attempt to make contact with the organizer to predetermine the route and locations.

## VIII. External Resources:

**Mayor's Office of Emergency Management:** OEM will coordinate collecting trashcans and newspaper boxes in the protest area. They are also coordinating with MTA to divert bus lines that are impacted by the protests. Street sweepers will be on call and they will prepare plywood in the event that it is required.

**Fire Department:** Fire department medics and suppression will be staged for this event.

**DPW:** DPW will provide bike racks and other barriers at the direction of the police department.

**State's Attorney's Office:** Pat Motsay is working closely with us, along with our Legal Affairs to manage any arrests and charging during demonstrations.

**Businesses:** Businesses will be advised of protests in the area in order to prepare and to secure their establishments if desired.

**Department of Public Safety & Correctional Services:** Two (2) vans at 2201 W. Cold Spring Lane stage at the location unless needed and are responsible for transportation during the event for mass arrests.

**Law enforcement support from other jurisdictions** will be utilized in a reserve status initially.



*Maryland State Police and Maryland Transportation Authority Police* will be maintained in a reserve status. They will only be utilized in the event that officers require assistance. They will be staged in the Headquarters Auditorium initially. Upon the Incident/Operations Commander's determination of the need to transfer them to a secondary reserve position, they will be posted within a three minute response to the protest site.

*Baltimore City Sheriff's Office* will be utilized in the vicinity of the courthouse unless the Incident/Operations Commander determines the need to adjust deployment. They will maintain security on courthouse property. In the event that resources are needed to assist in another location, the BCS will adjust to a minimum configuration in the vicinity of the courthouse and will await instructions for redeployment.

*Baltimore County Police and Montgomery County Police* will be utilized primarily in stationary positions to protect private and city property. Examples of such assignments are Police Headquarters, City Hall, Light Street Pavilion, Pratt Street Pavilion, and Gallery. They may also be utilized in a stationary manner to post across expressway entrances.

*Anne Arundel Police, Howard County Police, and Prince Georges County Police and* will be utilized to supplement and provide relief for Baltimore Police in the Western District and during mobile march routes. Their roles will range from supplementing security inside of the barricades on the property of the Western District stationhouse to shadowing the protest route with

Baltimore Police. They will fall under the direction of the Baltimore Police command during these assignments. They may also be utilized in a stationary manner to post across expressway entrances. When not being utilized, these assets will be staged inside of the Western District stationhouse or in alternative locations.

*MD Transit Administration Police* will initially be utilized in transit hub areas in the downtown and Western District. However, upon the Incident/Operations Commander's determination of the need to utilize them in an active role, they may be reassigned.

*Baltimore City School Police* will be deployed to supplement Baltimore City Police in assignments. They will be utilized primarily for stationary posts such as City Hall, the pavilions, etc. However, upon the Incident/Operations Commander's determination of the need to utilize them in an active role, they may be reassigned.

 **\*The personnel roster and assignments will be submitted separately to this document.**


IX. Events:

The below events are the most notable scheduled in Baltimore City on April 25, 2015.

0900 hours Brigance Brigade Foundation 2nd Annual 5.7K Championship Run, Canton Waterfront Park (3001 Boston St, Baltimore, MD 21224)

1905 hours Orioles vs Red Sox at Camden Yards (333 West Camden Street, Baltimore, MD 21201)

1800-2400 hours Shock Trauma Gala, Baltimore Convention Center (1 West Pratt Street, Baltimore, MD 21201)


Respectfully,

Lieutenant Colonel Melissa Hyatt

CONFIDENTIAL - Produced Pursuant to Protective Order

# EXHIBIT 50

**From:** Maloney, Robert
**Sent:** Saturday, April 25, 2015 11:22 AM EDT
**To:** McMillan, David <David.McMillan@baltimorecity.gov>; Scott, Connor D. <Connor.Scott@baltimorecity.gov>
**Subject:** I want updates every 30 minutes even if it's uneventful.

**CONFIDENTIAL - Produced Pursuant to Protective Order**

**CITY00054190**

# EXHIBIT 51

**From:** McMillan, David <David.McMillan@baltimorecity.gov>
**Sent:** Saturday, April 25, 2015 5:09 PM EDT
**To:** Maloney, Robert <Robert.Maloney@baltimorecity.gov>; Scott, Connor D. <Connor.Scott@baltimorecity.gov>
**Subject:** RE: I want updates every 30 minutes even if it's uneventful.

Mayor just walked in.

**From:** Maloney, Robert
**Sent:** Saturday, April 25, 2015 4:50 PM
**To:** McMillan, David
**Subject:** Re: I want updates every 30 minutes even if it's uneventful.

Ok

**From:** McMillan, David
**Sent:** Saturday, April 25, 2015 04:48 PM
**To:** Maloney, Robert
**Cc:** Scott, Connor D.
**Subject:** RE: I want updates every 30 minutes even if it's uneventful.

There is also now a secondary group on Pratt of ~200+. Not yet clear if they just split off of the first group, or are another group that is growing. Everything is peaceful though.

**From:** McMillan, David
**Sent:** Saturday, April 25, 2015 4:46 PM
**To:** Maloney, Robert
**Cc:** Scott, Connor D.
**Subject:** RE: I want updates every 30 minutes even if it's uneventful.

They are approaching City Hall. BPD is holding up well.

COS is here right now at Watch Center.

**From:** McMillan, David
**Sent:** Saturday, April 25, 2015 4:17 PM
**To:** Maloney, Robert
**Cc:** Scott, Connor D.
**Subject:** RE: I want updates every 30 minutes even if it's uneventful.

new update. About ~650, with another 100 at Western District. And a sprinkling of people outside City Hall.

**From:** Maloney, Robert
**Sent:** Saturday, April 25, 2015 4:12 PM
**To:** McMillan, David
**Cc:** Scott, Connor D.
**Subject:** Re: I want updates every 30 minutes even if it's uneventful.

Ok. Still 500.

**From:** McMillan, David
**Sent:** Saturday, April 25, 2015 03:57 PM
**To:** Maloney, Robert
**Cc:** Scott, Connor D.
**Subject:** RE: I want updates every 30 minutes even if it's uneventful.

They are thinking of marching by Shock Trauma before going to City Hall and then towards the Ball Park. They are still peaceful though, just disrupting traffic, etc.

**From:** Maloney, Robert
**Sent:** Saturday, April 25, 2015 3:14 PM
**To:** McMillan, David
**Cc:** Scott, Connor D.
**Subject:** Re: I want updates every 30 minutes even if it's uneventful.

Yes. That's not a lot at all.

**From:** McMillan, David
**Sent:** Saturday, April 25, 2015 03:13 PM
**To:** Maloney, Robert
**Cc:** Scott, Connor D.
**Subject:** Re: I want updates every 30 minutes even if it's uneventful.

How many what? Protestors? Approximately 500

CONFIDENTIAL - Produced Pursuant to Protective Order

Sent from my Verizon 4G LTE Smartphone

------ Original message------
**From:** Maloney, Robert
**Date:** Sat, Apr 25, 2015 3:11 PM
**To:** McMillan, David;
**Cc:** Scott, Connor D.;
**Subject:** Re: I want updates every 30 minutes even if it's uneventful.

How many?

**From**: McMillan, David
**Sent**: Saturday, April 25, 2015 03:02 PM
**To**: Maloney, Robert
**Cc**: Scott, Connor D.
**Subject**: RE: I want updates every 30 minutes even if it's uneventful.

Group is moving from Western District towards MLK, and then towards City Hall (intel via Mel Russell).  Peaceful so far.

Some thought that they will take 83, and is so, we will let them.  If they actually go too far up, it kind of contains them.

Everythign still under controll.  About to call Tom Yeager, and give an update to him and fish for any information.

**From:** McMillan, David
**Sent:** Saturday, April 25, 2015 2:25 PM
**To:** Maloney, Robert
**Cc:** Scott, Connor D.
**Subject:** RE: I want updates every 30 minutes even if it's uneventful.

Mel Russel actually on point with some intel.  The group is rounding the block by Western District to gather any stragglers, then is headed to pick up Mr. Gray's mother, then are headed somewhere, likely downtown, at ~3pm

BPD is trying to get people to get their helmets on, if needed, inside the district as to not incite the crowd.

Crowd peaceful so far.

Shabazz, the out of town organizer, actually gave him bull-horn to Mr. Gray's brother, so things are going well and the out of towners aren't inciting anything crazy yet.

**From:** McMillan, David
**Sent:** Saturday, April 25, 2015 2:17 PM
**To:** Maloney, Robert
**Cc:** Scott, Connor D.
**Subject:** RE: I want updates every 30 minutes even if it's uneventful.

There were 2 middle-eastern looking persons piloting a drone that might be of interest, but no more information.  They stopped flying it.

By Pennsylvania Ave we had some activity where gang members identifying themselves by colors (Bloods and Crypts) were together engaging police and trying to instigare.  Police were not provoked, but might have engaged more than necessary (particular Coppin State Police).  We are trying to reach out to their commander to make sure they understand the mission is not to engage like that.

Crowd of ~300+ moved from Gilmore Homes to Western District.  Well organized and peaceful.  Nothing of note yet.

CNN coverage just started.  Nothing crazy or interesting.

I didn't see it, but talking with Kowalcyzk, last night Al Sharpton was on TV saying that there was NO reason to protest and that all indications were that Baltimore was handling this much better and much differently than Ferguson.

So far we aren't close to approaching 10k or anything of note.  But there could be a surprise.

**From:** McMillan, David
**Sent:** Saturday, April 25, 2015 1:36 PM
**To:** Maloney, Robert
**Cc:** Scott, Connor D.
**Subject:** RE: I want updates every 30 minutes even if it's uneventful.

Just heard Hyatt speaking of one person taken into custody with a knife on their person.  They are checking the specs of the knife to see if it walls within a legal or illegal range.

No intel on any charter buses that have come into town that were totally dedicated to attending protests.  I'll let you know if we hear anything.

So far, still relatively peaceful.  In here, there were some tensions running high, but I think they are settling in well.

**From:** McMillan, David
**Sent:** Saturday, April 25, 2015 1:26 PM
**To:** Maloney, Robert
**Cc:** Scott, Connor D.
**Subject:** RE: I want updates every 30 minutes even if it's uneventful.

**CONFIDENTIAL - Produced Pursuant to Protective Order**

A group of maybe 150 to 200 peaceful protesters are at Gilmore homes, and a sparse crowd in front of Western District

Nothing at City Hall

I was just outside helping direct the bike rack teams alongside Major Eric Russel, the front of the new annex is bike racked in, and the back of HQ is secure.  We are waiting for more to be delivered for the old front entrance.

John Dulina was hearing that the Shock Trauma Gala tonight might be cancelled.  Waiting for confirmation, so don't pass that along to anyone yet.

No new intel that I'm aware of.

---

**From:** McMillan, David
**Sent:** Saturday, April 25, 2015 12:16 PM
**To:** Maloney, Robert
**Cc:** Scott, Connor D.
**Subject:** RE: I want updates every 30 minutes even if it's uneventful.

So far, its been quiet.

A group of 21 well organized and peaceful protestors marching around for the last 1/2 hour in western district, wearing purple coordinated shirts, perhaps Omega Psi Phi fraternity.

There was a Mercedes that was handing out large stacks of fliers or literature to other people, who are presumably handing that out.  We're assuming its information / advertisement about what the plans are for today.

I've got DOT working with Captain Bartniss on additional bike rack placements around HQ / Central district

There are some vacant houses that aren't boarded up that BPD requested help out.  I called the control 1 for DPW to put in the request, but there may not be personnel / resources to do this today.  Should have been requested yesterday, if possible.

Media and just a few people have gathered so far at Western District.

Lots of officers from various Jurisdictions around HQ and in general.

John Dulina from MEMA is here.


-David

---

**From:** McMillan, David
**Sent:** Saturday, April 25, 2015 11:40 AM
**To:** Maloney, Robert
**Subject:** Re: I want updates every 30 minutes even if it's uneventful.

Understood

Sent from my Verizon 4G LTE Smartphone

------ Original message------
**From:** Maloney, Robert
**Date:** Sat, Apr 25, 2015 11:22 AM
**To:** McMillan, David;Scott, Connor D.;
**Subject:** I want updates every 30 minutes even if it's uneventful.

**CONFIDENTIAL - Produced Pursuant to Protective Order**

CITY00008249

# EXHIBIT 52

**From:** Maloney, Robert <Robert.Maloney@baltimorecity.gov>
**Sent:** Saturday, April 25, 2015 6:42 PM EDT
**To:** McMillan, David <David.McMillan@baltimorecity.gov>
**Subject:** Re: Substantial Update

Ok

---

**From**: McMillan, David
**Sent**: Saturday, April 25, 2015 06:16 PM
**To**: Maloney, Robert; Scott, Connor D.
**Subject**: Substantial Update

So the group has split, with the local / more peaceful protesters between City Hall and Western District protest locations.

The out of towners, led by Shabazz, are at Camden Yards attempting to disrupt gameday operations. Along their way down there, some windows have been broken on cars / store fronts. BPD is monitoring but not engaging substantially in any way that would agitate.

After being stopped at Camden Yards by the Warehouse parking lot, some of the group that is less confrontation is leaving. not sure if they are dispersing or moving.

The real agitators are still by the Warehouse arguing with each other, etc.

---

**From:** Maloney, Robert
**Sent:** Saturday, April 25, 2015 5:26 PM
**To:** McMillan, David; Scott, Connor D.
**Subject:** Re: I want updates every 30 minutes even if it's uneventful.

The rules on drones is the operator must be within walking distance of the drone.

---

**From**: McMillan, David
**Sent**: Saturday, April 25, 2015 05:13 PM
**To**: Maloney, Robert; Scott, Connor D.
**Subject**: RE: I want updates every 30 minutes even if it's uneventful.

On and off again there have been 2 drones in the air, 1 seems to possibly be from the Media, maybe CNN. I believe Palmere is working on confirming. Suzanne Sangree is looking into the legality of the drone usage. That M&T bank table top exercise was on point.

---

**From:** Maloney, Robert
**Sent:** Saturday, April 25, 2015 4:50 PM
**To:** McMillan, David
**Subject:** Re: I want updates every 30 minutes even if it's uneventful.

Ok

---

**From**: McMillan, David
**Sent**: Saturday, April 25, 2015 04:48 PM
**To**: Maloney, Robert
**Cc**: Scott, Connor D.
**Subject**: RE: I want updates every 30 minutes even if it's uneventful.

There is also now a secondary group on Pratt of ~200+. Not yet clear if they just split off of the first group, or are another group that is growing. Everything is peaceful though.

---

**From:** McMillan, David
**Sent:** Saturday, April 25, 2015 4:46 PM
**To:** Maloney, Robert
**Cc:** Scott, Connor D.
**Subject:** RE: I want updates every 30 minutes even if it's uneventful.

They are approaching City Hall. BPD is holding up well.

COS is here right now at Watch Center.

---

**From:** McMillan, David
**Sent:** Saturday, April 25, 2015 4:17 PM
**To:** Maloney, Robert
**Cc:** Scott, Connor D.
**Subject:** RE: I want updates every 30 minutes even if it's uneventful.

new update. About ~650, with another 100 at Western District. And a sprinkling of people outside City Hall.

---

**From:** Maloney, Robert

**CONFIDENTIAL - Produced Pursuant to Protective Order**

**Sent**: Saturday, April 25, 2015 4:12 PM
**To**: McMillan, David
**Cc**: Scott, Connor D.
**Subject**: Re: I want updates every 30 minutes even if it's uneventful.

Ok. Still 500.

---

**From**: McMillan, David
**Sent**: Saturday, April 25, 2015 03:57 PM
**To**: Maloney, Robert
**Cc**: Scott, Connor D.
**Subject**: RE: I want updates every 30 minutes even if it's uneventful.

They are thinking of marching by Shock Trauma before going to City Hall and then towards the Ball Park.  They are still peaceful though, just disrupting traffic, etc.

---

**From**: Maloney, Robert
**Sent**: Saturday, April 25, 2015 3:14 PM
**To**: McMillan, David
**Cc**: Scott, Connor D.
**Subject**: Re: I want updates every 30 minutes even if it's uneventful.

Yes. That's not a lot at all.

---

**From**: McMillan, David
**Sent**: Saturday, April 25, 2015 03:13 PM
**To**: Maloney, Robert
**Cc**: Scott, Connor D.
**Subject**: Re: I want updates every 30 minutes even if it's uneventful.

How many what?  Protestors?  Approximately 500

Sent from my Verizon 4G LTE Smartphone

------ Original message------
**From**: Maloney, Robert
**Date**: Sat, Apr 25, 2015 3:11 PM
**To**: McMillan, David;
**Cc**: Scott, Connor D.;
**Subject**:Re: I want updates every 30 minutes even if it's uneventful.

How many?

---

**From**: McMillan, David
**Sent**: Saturday, April 25, 2015 03:02 PM
**To**: Maloney, Robert
**Cc**: Scott, Connor D.
**Subject**: RE: I want updates every 30 minutes even if it's uneventful.

Group is moving from Western District towards MLK, and then towards City Hall (intel via Mel Russell).  Peaceful so far.

Some thought that they will take 83, and is so, we will let them.  If they actually too go far up, it kind of contains them.

Everythigh still under controll.  About to call Tom Yeager, and give an update to him and fish for any information.

---

**From**: McMillan, David
**Sent**: Saturday, April 25, 2015 2:25 PM
**To**: Maloney, Robert
**Cc**: Scott, Connor D.
**Subject**: RE: I want updates every 30 minutes even if it's uneventful.

Mel Russel actually on point with some intel.  The group is rounding the block by Western District to gather any stragglers, then is headed to pick up Mr. Gray's mother, then are headed somewhere, likely downtown, at ~3pm

BPD is trying to get people to get their helmets on, if needed, inside the district as to not incite the crowd.

Crowd peaceful so far.

Shabazz, the out of town organizer, actually gave him bull-horn to Mr. Gray's brother, so things are going well and the out of towners aren't inciting anything crazy yet.

---

**From**: McMillan, David
**Sent**: Saturday, April 25, 2015 2:17 PM
**To**: Maloney, Robert
**Cc**: Scott, Connor D.
**Subject**: RE: I want updates every 30 minutes even if it's uneventful.

---

**CONFIDENTIAL - Produced Pursuant to Protective Order**

There were 2 middle-eastern looking persons piloting a drone that might be of interest, but no more information.  They stopped flying it.

By Pennsylvania Ave we had some activity where gang members identifying themselves by colors (Bloods and Crypts) were together engaging police and trying to instigate.  Police were not provoked, but might have engaged more than necessary (particular Coppin State Police).  We are trying to reach out to their commander to make sure they understand the mission is not to engage like that.

Crowd of ~300+ moved from Gilmore Homes to Western District.  Well organized and peaceful.  Nothing of note yet.

CNN coverage just started.  Nothing crazy or interesting.

I didn't see it, but talking with Kowalcyzk, last night Al Sharpton was on TV saying that there was NO reason to protest and that all indications were that Baltimore was handling this much better and much differently than Ferguson.

So far we aren't close to approaching 10k or anything of note.  But there could be a surprise.

---

**From:** McMillan, David
**Sent:** Saturday, April 25, 2015 1:36 PM
**To:** Maloney, Robert
**Cc:** Scott, Connor D.
**Subject:** RE: I want updates every 30 minutes even if it's uneventful.

Just heard Hyatt speaking of one person taken into custody with a knife on their person.  They are checking the specs of the knife to see if it walls within a legal or illegal range.

No intel on any charter buses that have come into town that were totally dedicated to attending protests.   I'll let you know if we hear anything.

So far, still relatively peaceful.  In here, there were some tensions running high, but I think they are settling in well.

---

**From:** McMillan, David
**Sent:** Saturday, April 25, 2015 1:26 PM
**To:** Maloney, Robert
**Cc:** Scott, Connor D.
**Subject:** RE: I want updates every 30 minutes even if it's uneventful.

A group of maybe 150 to 200 peaceful protesters are at Gilmore homes, and a sparse crowd in front of Western District

Nothing at City Hall

I was just outside helping direct the bike rack teams alonside Major Eric Russel, the front of the new annex is bike racked in, and the back of HQ is secure.  We are waiting for more to be delivered for the old front entrance.

John Dulina was hearing that the Shock Trauma Gala tonight might be cancelled.  Waiting for confirmation, so don't pass that along to anyone yet.

No new intel that I'm aware of.

---

**From:** McMillan, David
**Sent:** Saturday, April 25, 2015 12:16 PM
**To:** Maloney, Robert
**Cc:** Scott, Connor D.
**Subject:** RE: I want updates every 30 minutes even if it's uneventful.

So far, its been quiet.

A group of 21 well organized and peaceful protestors marching around for the last 1/2 hour in western district, wearing purple coordinated shirts, perhaps Omega Psi Phi fraternity.

There was a Mercedes that was handing out large stacks of fliers or literature to other people, who are presumably handing that out.  We're assuming its information / advertisement about what the plans are for today.

I've got DOT working with Captain Bartniss on additional bike rack placements around HQ / Central district

There are some vacant houses that aren't boarded up that BPD requested help out.  I called the control 1 for DPW to put in the request, but there may not be personnel / resources to do this today.  Should have been requested yesterday, if possible.

Media and just a few people have gathered so far at Western District.

Lots of officers from various Jurisdictions around HQ and in general.

John Dulina from MEMA is here.


-David

---

**From:** McMillan, David
**Sent:** Saturday, April 25, 2015 11:40 AM
**To:** Maloney, Robert
**Subject:** Re: I want updates every 30 minutes even if it's uneventful.

Understood

Sent from my Verizon 4G LTE Smartphone

---

**CONFIDENTIAL - Produced Pursuant to Protective Order**

------ Original message------
**From:** Maloney, Robert
**Date:** Sat, Apr 25, 2015 11:22 AM
**To:** McMillan, David;Scott, Connor D.;
**Subject:**I want updates every 30 minutes even if it's uneventful.

**CONFIDENTIAL - Produced Pursuant to Protective Order**

CITY00008821

# EXHIBIT 53

**From:** Vetter, Drew <Drew.Vetter@baltimorepolice.org> on behalf of Vetter, Drew <drew.vetter@baltimorepolice.org>
**Sent:** Saturday, April 25, 2015 6:53 PM EDT
**Subject:** Update from BPD on Saturday Protests

Dear Elected Officials and Staff:

Protestors assembled in the Western District this afternoon and marched to City Hall. The march and rally at City Hall were peaceful. Protestors are now gathered around Camden Yards before the Orioles game scheduled for 7:05pm. Some protestors are attempting to initiate conflict with the police stationed around Camden Yards. There have been incidents of property destruction and protestors throwing objects at police. BPD and partner agencies are doing everything possible to deescalate conflict and ensure the situation remains calm. Please use social media to encourage protestors to remain civil while exercising their constitutional rights to be heard.

BPD is using Twitter to keep the public updated on the movements of the protestors. Please follow @BaltimorePolice for additional updates throughout the evening. Thank you.

Sincerely,

Drew Vetter
Director of Government Affairs
Baltimore City Police Department
410-456-7539

CONFIDENTIAL - Produced Pursuant to Protective Order

# EXHIBIT 54

**From:** Gordon, Renee <Renee.Gordon@baltimorecity.gov>
**Sent:** Saturday, April 25, 2015 6:54 PM EDT
**To:** Mullen, Jerome <Jerome.Mullen@baltimorecity.gov>
**CC:** MOIT - ECC- One Call Center (Lisa.Allen@baltimorecity.gov) <Lisa.Allen@baltimorecity.gov>; Anderson, Shiria <Shiria.Anderson@baltimorecity.gov>; Cherry, Mark E. <Mark.Cherry@baltimorecity.gov>
**Subject:** Protest turning violent

Protesters have broken out business windows.  They tried to set a police car on fire.  Vehicle windows were busted out and they tried to turn police vehicle over.  I have employees holding in place here until we can determine it is safe for them to leave.

Thank you,

## Renee M. Gordon, RPL, ENP

PSAP Director ,
911 and Emergency Communications
City of Baltimore
Mayor's Office of Information Technology
601 E. Fayette St    Suite 422
Baltimore, Maryland 21202
443-984-4085

# EXHIBIT 55

John Parker - GM Marriott Courtyard <john.parker@crestlinehotels.com>; Jon Koscher - Sheraton <jon.koscher@sheraton.com>; Ken Conklin - GM Harbor Magic Hotels (kconklin@harbormagic.com) <kconklin@harbormagic.com>; Kevin Kennedy - Hyatt Regency Baltimore (kevin.kennedy@hyatt.com) <kevin.kennedy@hyatt.com>; Kristen Mayfield - Hampton Inn <Kristen.mayfield@hilton.com>; Landy Castillo - Spring Hill Suites / Marriott (landy.castillo@marriott.com) <landy.castillo@marriott.com>; Lauren Prendergast - Baltimore Harbor Hotel (lauren.prendergast@interstatehotels.com) <lauren.prendergast@interstatehotels.com>; Mark A. Wright - Holiday Inn Express <gm.balgy@wm.hiexpress.com>; Melissa N. Brocato - Hampton Inn Baltimore Downtown/Convention Center (melissa.brocato@hilton.com) <melissa.brocato@hilton.com>; Nelle Somerville - Manaco (nelle.somerville@hotelmonaco.com) <nelle.somerville@hotelmonaco.com>; Onahlea Shimunek <onahlea.shimunek@marriott.com>; Pat Palmere - Baltimore Harbor Hotel (pat.palmere@interstatehotels.com) <pat.palmere@interstatehotels.com>; Patrick Miner - GM Marriott <Patrick.Miner@Marriott.com>; Peter Bray - Courtyard by Marriott <Peter.Bray@marriott.com>; Rick Kolinsky - GM Hilton Garden Inn / Homewood Suites <Rick.Kolinsky@crestlinehotels.com>; Shahram Khan - Hotel Monaco (Shahram.Khan@monaco-baltimore.com) <Shahram.Khan@monaco-baltimore.com>; (gkhjbritton@aol.com) <gkhjbritton@aol.com>; choltzman@pennparking.com <choltzman@pennparking.com>; Erin Webb - The Promenade Harbor East <Promenade@bozzuto.com>; laurie.schwartz@comcast.net <laurie.schwartz@comcast.net>; Robert Highlander - Harbor Group BECON (rhighlander@harborgbaltimore.com) <rhighlander@harborgbaltimore.com>; Stephen Brookes <SBrookes@Block-by-Block.com>
**Subject:** Message from BCPD

Out of concern for public safety the Police Department is asking that Downtown businesses close for the evening.

**Tom Yeager**
Executive Vice President, Safety Programs
Chairman, Public Safety Coalition
Downtown Partnership of Baltimore, Inc.
20 South Charles Street, 6th Floor
Baltimore, MD 21201
GoDowntownBaltimore.com

The content of this e-mail (including any attachments) is strictly confidential and may be commercially sensitive. If you are not, or believe you may not be, the intended recipient, please advise the sender immediately by return e-mail, delete this e-mail and destroy any copies.

# EXHIBIT 56

**From:** SRB@BaltimoreCity.gov <SRB@BaltimoreCity.gov>
**Sent:** Saturday, April 25, 2015 12:02 PM EDT
**To:** Parthemos, Kaliope <Kaliope.Parthemos@baltimorecity.gov>
**CC:** Batts, Anthony <Anthony.Batts@baltimorepolice.org>; Robinson, StephanieJ <StephanieJ.Robinson@baltimorecity.gov>
**Subject:** Re: Shock trauma gala

Thanks Kali

**Stephanie Rawlings-Blake**
Mayor, City of Baltimore
@MayorSRB


On Apr 25, 2015, at 12:01 PM, Parthemos, Kaliope <Kaliope.Parthemos@baltimorecity.gov> wrote:

> I called. And texted.
>
> ------------------------------------------------------------------------------------------------------------------
> **From**: Rawlings, Stephanie
> **Sent**: Saturday, April 25, 2015 10:59 AM
> **To**: Batts, Anthony
> **Cc**: Parthemos, Kaliope; Robinson, StephanieJ
> **Subject**: Fwd: Shock trauma gala
>
> I asked Kali to reach out. Please teach out to Sen Kelly as well please.
>
> **Stephanie Rawlings-Blake**
> Mayor, City of Baltimore
> @MayorSRB
>
>
> Begin forwarded message:
>
>> **From:** "Kelly, Senator" <senfxkelly@kaig.com>
>> **Date:** April 25, 2015 at 10:28:08 AM EDT
>> **To:** "srb@baltimorecity.gov" <srb@baltimorecity.gov>
>> **Subject: Shock trauma gala**
>>
>> Madam mayor this is Frank Kelly I need your advice regarding the shock trauma gala tonight could you call me on my cell 410-458-0252 I know you're snowed but we could use your advice thanks
>>
>> The Honorable Francis X. Kelly, Jr.
>> Co-Founder and Chairman
>> Kelly & Associates Insurance Group, Inc.
>> 301 International Circle<x-apple-data-detectors://0/0>
>> Hunt Valley, MD 21030<x-apple-data-detectors://0/0>
>> 410-527-3440<tel:410-527-3440>
>> senfxkelly@kaig.com<mailto:senfxkelly@kaig.com>
>>
>>
>> "This email, its electronic document attachments, and the contents of its website linkages may contain confidential information. This information is intended solely for use by the individual or entity to whom it is addressed. If you have received this information in error, please notify the sender immediately and arrange for the prompt destruction of the material and any accompanying attachments.  This message does not and is not intended to contain legal advice, and its contents do not constitute the practice of law or provision of legal counsel. The sender cannot be held legally accountable for actions related to its receipt."

**CONFIDENTIAL - Produced Pursuant to Protective Order**

# EXHIBIT 57
# (CD Submitted to the Court)

# EXHIBIT 58

# A1 CD

# (4/25 1200-1159)

- 1201 B34 requested to be advised if the "wagon" had any flex cuffs to help seal the barricades at President and Fayette Streets
- 1212 Unit 32 and 31 were dispatched to 2000 blk of Linden Ave on the playground of John Howard Elementary school for the report of hundreds of people involved in drug activity
- 1213 Dispatched asked unit 32 if Brookfield Ave and Ducatel Street were on the other side of the school.  Dispatch received reports of loitering as well. Unit 32 advised; checking it out.
- 1215 Units 32 and 31 advised no one is at the park or playground
- 1337 Unit 4401 requested units at Baltimore and Charles Streets for two individuals jumping on cars also receiving reports for Baltimore and South Streets for an individual stopping and blocking cars; Dispatcher advises callers stated person appears to be "High"
- 1403 Dispatch comes across communications with Signal 13 at "North and Carey in the Western"
- 1407 Dispatch advises 10-32 at North and Carey
- 1418 City Watch advised all units to be mindful of "unusual gathering of individuals displaying gang colors"
- 1428 City Watch advised for units to not drive south bound on Mount Street
- 1430 Unit 3599 advised that he was stopped and informed that a couple hundred people were forming in the street on North Ave, approximately three blocks up from Mount Royal Ave
- 1459 City Watch advised crowds are moving towards North Ave; all marked vehicles are to avoid that area
- 1510 Unit 104 advised that protesters are coming to Pennsylvania Ave and any units on Pennsylvania Ave need to get off Pennsylvania Ave now
- 1511 KGA advised per Unified Command that demonstrators are moving south bound on North Ave, all units are advised to "Don't engage, follow, stay on post, don't show any police presence and stay away from North Ave"
- 1557 Unit advised protest on Fremont around Picture street

CONFIDENTIAL - Produced Pursuant to Protective Order

- 1558 Unknown unit advised units to stay off Pennsylvania Ave and Fremont Ave, Charles 30 stated that he was about to do roll call and send units into "hot zone". KGA advises group of teenagers on bikes are stopping and waving down people on Pennsylvania Ave.
- 1604 KGA Advises units per Unified Command that demonstrators are approaching Camden yards.   Units in the area are not to approach, engage, and do not make your presence known.
- 1610 KGA advises units 33 and 32 to respond to 1101 West North Ave (BP Gas station) for customers being harassed (again)
- 1611 1 Charlie advises (Central) protesters are south bound on Pennsylvania Ave around Dolphin street.  Approximately 100-200 individuals in the street, group is not being escorted by police; requested that all units stay out of the area off MLK.
- 1623 City watch advises second group of protesters are going "east bound on Saratoga approaching Eutaw"
- 1624 Charlie 09 advised all units to stay out of the area of south bound Eutaw and Saratoga
- 1644 City Watch advised all units per command staff;  not to respond to headquarters for any calls or to pick up warrants until further notice
- 1645 City Watch advised no units are to come to the area of Fallsway
- 1710 Units 13 and 14 dispatched to Park and Mulberry for juveniles throwing rocks at a woman on bus stop
- 1746 Unit 5701 advised; crowed coming down to harbor and for units to not engage crowds.  All harbor units were also advised to get up on high grounds or shelter in place
- 1803 Units dispatched to Light and Pratt protestors are lying in the street and are reported to have kids with them, not allowing any one to get by
- 1811 KGA inquires if there are any units in the area of Pratt and Light for person sitting in burgundy BMW assaulted by a rock thrown in her car window that ended up hitting her in the nose
- 1812 KGA advises units 30 and 09 caller stated protestors are jumping on her car, she is in a black GMT truck
- 1813 KGA dispatched a call C14 picked it up KGA advised call is for a man lying in street with a pair of glasses lying next to him.  Unit 30 told C14 not to go anywhere near downtown until "they" get orders from 101 or 109. Unit advises KGA to 10-6 the call
- 1828 Signal 13 Howard and Camden.  KGA also advises large street fight at Pratt and Light
- 1906 Reports of 100 people with sticks at Pratt and Howard hitting vehicles and people
- 1917 Reports of several people going into restaurant with a guns at 12 North Eutaw

CONFIDENTIAL - Produced Pursuant to Protective Order

- 1919 KGA advises two armed robberies 308 Saratoga Street and 320 West Lexington Street report of Armed robbery
- 1921 Unit 101 requested units to respond to 3 North Eutaw and 7-11 on Baltimore Street, the glass/windows have been kicked out of the door people are walking in and out of the store taking things
- 1942 KGA advised all patrol units in the downtown areas of (Eutaw, Howard and Saratoga) to leave area immediately the crowds are moving northbound on Eutaw in their direction, Per one Charlie 09
- 1946 Signal 13 Pratt and Howard
- 1956 KGA advised windows have been busted out of 7-11 located on Paca and Franklin
- 2021 City watch advises window broken at Lexington Market and B and E at Lexington Market East; Unit 09 advised that units are not to respond to Hot Zone.
- 2101 City Watch advises two # 1 males cut the bolts locks off 3 stores on Lexington Street and attempted burglary
- 2111 KGA advises report of armed person at 700 West Saratoga and looting the Rite Aid
- 2122 KGA dispatched call for 6 North Howard for the silent alarm "people are hiding in the store". Unit 09 advises no one is going to respond to that call at this time
- 2122 KGA advises unit 09 that  at 22 Light Street "7-11" large group of people inside armed with a knife
- 2131 KGA requests someone check for alarms that are sounding at the pharmacies;  6 north Howard street (Walgreens), 220 West Baltimore Street (Lexington), 200 West Lombard Street (PAC)
- 2138 KGA reports Carjacking at 322 North Charles
- 2157 Sharp and Pratt unarmed robbery reported
- 2158 Unit reports B and E at a pharmacy 6 N. Howard Street
- 2201 Unarmed robbery at Sharp and Pratt
- 2238 Unit 09 reports 15 juveniles are at Pennsylvania and Laurens throwing rocks
- 2303 Silent alarm 229 N. Howard Street
- 2304 Report of people stealing items at the location of 1800 Pennsylvania
- 2307 KGA request units to respond to Howard and Saratoga Streets for reports of Burglary and destruction of property. Reports of juveniles stealing items after breaking a window of store (Metro PCS).
- 2309 City watch advises tactical alert can be lifted in all district except Western district
- 2310 City watch reports #1 male waling with a large box, possible items taking from Metro PCS
- 2318 City watch reports guy at Saratoga and Howard came out of the store with a back pack and camera

- 2325 KGA reports 100 N. Howard fire reported
- 2333 Signal 13 reported 2503 Woodland Ave apt. c

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00021805

CONFIDENTIAL - Produced Pursuant to Protective Order

# EXHIBIT 59

# A10 TAC1

# (4/25 1200-1159)

- 1300 Unit 100 reports 15 protestors at city hall and several media vehicles
- 1326 Unit reports #1 male observed counting police officers in front of City Hall
- 1336 Unit 100 reports a male a is at Baltimore and Charles Street jumping on cars
- 1501 Operations reports the crowd (approximately 400 people) is moving currently at North and Fulton Ave. Unit 100 advises all units to ensure all intersections in the area are locked down.
- 1533 Mobile 2 reports one or two people entering the War Memorial Plaza wearing black mask and yelling things
- 1559 Unit 100 advises approximately 100 people/protestors traveling southbound on Fremont/Riggs Ave.  Foxtrot advises another group is traveling eastbound on Pratt Street
- 1612 Unit reports protestors are on the move Camden Street towards Howard
- 1617 Foxtrot reports a car is driving the wrong way down Howards Street
- 1618 Foxtrot reports group of protestors blocking traffic with a car at Conway and 395
- 1619 Foxtrot reports group of protestors blocking traffic at Howard and Pratt
- 1630 Unit 15 advises another group is coming down Eutaw Street
- 1650 Unit 7906 reports that across from the credit union on Fayette Street five to six "Dudes" are putting on mask
- 1658 Unit reports Drones are flying around War Memorial building and one has landed
- 1722 Foxtrot reports that a car is parked sideways on Gay and Fayette streets blocking street
- 1730 Unit requested medic unit for citizen that was sitting on the ground
- 1737 Unit 22 advised units to approach a man that was trying to take down the American flag
- 1738 Unit advised crowd is moving south on Commerce
- 1739 Foxtrot advised the protestors are lighting the American flag on fire in front of City Hall.
- 1740 Unit 22 advised that the protestors are marching to Camden yards
- 1742 Unit reports that he and his partner are stuck at Lombard and Commerce Street, the protestors has them blocked in.  Unit 7660 reports that citizens approach him and stated that his wife is at Commerce and Lombard; the protestors are trying to yack her out of her car.

CITY00021807

- 1744 Units were advised that the protestors are marching to the Inner Harbor and all officers were advised to take "High Ground"
- 1749 Unit reports that male took a statue from in front of City Hall
- 1751 Unit reports that a medic unit is needed for a 56y/o female that has fallen and can't get up
- 1800 Unit reports that protestors are started to throw things at Camden yards; water bottles, soda bottles, etc.
- 1802 Unit 201 advised that officers at Camden yards are to make the call to Don Helmets.  Foxtrot reported that the protestors are throwing trash cans from the Camden side parking lot.  The protestors are trying to breach the barricades and are running towards the ticket booth at the railroad tracks.
- 1803 Unit reports protestors are throwing rocks down at Camden yards and Foxtrot reports the crowd is coming up Conway Street.
- 1805 Unit 201 reports that the protestors are no longer throwing things and are just shouting
- 1805 Unit reports that protestors are busting out windows by the candy store at Camden yards
- 1808 Unit reports that the protestors are now coming around to Camden and Eutaw Streets
- 1808 Unit 600 reports that approximately 250-300  protestors are blocking traffic at Pratt and Light Streets, directing vehicles to travel the wrong way up Pratt Street.
- 1811 Unit reports that there is a fight within the crowd; command advises that officers are not to go into the crowd.
- 1814 Unit 101 reports that the owner of a Black GMC truck that is at Pratt and Light Street has been struck with a rock that was thrown through the window of her truck. The owner also states that she is alone and the protestors are jumping on her truck.
- 1820 Unit 5701 reported that the medic unit 5 is waiting for police escort to Pratt and Light Street to administer aid to the injured person in the Black GMC.  Command advises that medic will not go into the crowd without police escort and police can't escort them because they are too busy keeping people from getting into harm's way.
- 1820 Foxtrot reports that three city officers are surrounded by the protestors at Russell Street (in front of Pickles restaurant)
- 1823 Command advised officers to back out of Howard and Camden.
- 1826 Units calling for more help at Howard and Camden.
- 1827 Protestors are attacking police vehicles with rocks and bottles at Howard and Camden.
- 1828 Units requesting immediate help at Howard and Camden (Signal 13).

CONFIDENTIAL - Produced Pursuant to Protective Order

- 1829 Second request for Signal 13 at Howard and Camden.
- 1831 Unit reports that protestors are looting, throwing things and people are getting hurt.
- 1832 Unit 5701 reports that he needs units to come on Pratt and Howard Street because the protestors are throwing things at them.  Per Camden yards unit two fights are reported at Sliders and Pickles Pub.
- 1835 Unit request medic at Camden and Paca Street.  Foxtrot reports a group of young people are attacking people that are walking to the game; they are randomly hitting people on Pratt Street.
- 1837 Foxtrot reports that the "Most Violent" crowd is at Pratt Street in front of the Convention Center headed east bound.  They are running abound hitting car, throwing stuff at traffic and hitting people as they are passing by.
- 1839 Unit reports that US Navy personal is being attacked in the subway (Pratt and Howard).
- 1841 Unit requested more "People" at Pratt and Howard Streets
- 1841 Unit mobile B2 advised that he was coming down to Pratt and Howard "now". Command advised unit mobile B2 not to drive into the crowd.
- 1842 Unit 100 advised operations that units are not to come down Howard Street because they will run right into the crowd.
- 1843 Unit 600 advised protestors busted windows to the Gallery with furniture from in front of one the restaurants.
- 1845 Unit advises protestors are "trashing cars"; some of the cars have weapons in them. Foxtrox also advises that some of the protestors are trying to set the cars on fire. One of the patrol cars has a small fire in it.
- 1846 Unit advises fire is out in the patrol car.
- 1901 Units were advised by operations to go in and "Affect Arrest"; grab the biggest agitator and pull them out.
- 1906 Unit report protestors are trying to pull people out of cars at Light and Lombard Streets.
- 1944 Unit 100 reported that the crowd is destroying all businesses as they are coming North on Eutaw Street.
- 1945 Unit reported that protestors are throwing rocks and just busted his patrol car window at Eutaw and Howard Street.
- 1946 Signal 13 Pratt and Howard.
- 2004 Operations dispatched a priority call to a platoon for an injured clerk at the 7-11 at Franklin and Paca Streets; hostiles are reported to still be in the store.

- 2010 Units report that it is getting violent at Pratt and Light Street, protestors are chasing motorist down Light Street.
- 2022 Unit reported windows have been broken out of Lexington market.
- 2049 Looting at Lexington market; Looters used bolt cutters to cut chains off door on Howard street side.
- 2050 Two security officers reported to be hiding in Lexington market as the looting is going on.
- 2104 Foxtrot advises protestors are traveling northbound on Lexington Street continuing "rowdy" behavior, grabbing trash can lids and trash cans.
- 2106 Foxtrot reports that protestors are at Calvert Place (Franklin and St. Paul Streets) breaking windows, throwing garbage cans and benches in the street.
- 2108 Foxtrot reports protestors are trying to set a pickup truck on fire on Pleasant Street.
- 2114 Unit reports crowd is looting in the 100, 200, and 300 unit blocks of North Howard Street.
- 2145 Unit reported "pharmacy" was hit for narcotics
- 2145 Reports of calls for alarms sounding at the following stores and pharmacies; 6 North Howard Street, 620 West Baltimore Street and 200 West Lombard Street.  Unit reports condoms and prescription drugs were stolen from the pharmacies and units should be on the lookout for those items.
- 2149 Unit requests a wagon at Fayette and Park for a suspect with a backpack full of prescription drugs.
- 2204 Foxtrot reports "kids" are throwing rocks and breaking stuff or Parrish and Riggs Ave.
- 2238 Foxtrot reports approximately "Twenty" of the rock throwers have moved to the Central district.
- 2339 Unit reports group of juveniles (approximately 4 or 5) is at the inner harbor trying to break windows at the pavilions where the "Hooters" restaurant is located.
- 2349 Unit request medic unit at the Inner Harbor "Light Street side" for an officer that was hit in the face with a rock and for a suspect.
- 2357 Unit transported injured officer to Mercy hospital by patrol car after being knock unconscious by suspect.

CONFIDENTIAL - Produced Pursuant to Protective Order                                                                    CITY00021810

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00021811

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00021812

# EXHIBIT 60

**From:** Batts, Anthony <Anthony.Batts@baltimorepolice.org>
**Sent:** Sunday, April 26, 2015 12:20 PM EDT
**To:** Drum Guy <drumguy99@gmail.com>
**Subject:** RE: Last Nights Demonstrators/Protesters

Thank you for reaching out and your kind comments. In short, because this was a protest against the Baltimore Police Department. We couldn't be seen as the aggressors or instigators, as such we needed to give them space. Going forward we will tighten up the reins on the marches to ensure everyone's safety. Thanks for supporting my guys.


Sent with Good (www.good.com)


-----Original Message-----
**From:** Drum Guy [drumguy99@gmail.com]
**Sent:** Sunday, April 26, 2015 08:15 AM Eastern Standard Time
**To:** Batts, Anthony
**Subject:** Last Nights Demonstrators/Protesters


Mr. Batts,

Good morning. First, I'd like to thank you for standing up for your police and the law-abiding community at large, as opposed to the majority of leaders who seem to be professional butt-kissers and want to condone the actions of criminals and thugs while demonizing police who take them off the streets. You're a rare person, and I mean that as a compliment. Please don't ever change or back down, and certainly ignore the morons who are calling for your resignation. All they see on TV are the poor criminals and thugs being arrested; they seem to forget, or simply don't care, about the people that the criminal has robbed or hurt. Those idiots are the minority but, as I'm sure you know, they're the ones that seem to get all the media coverage. The majority of the citizens of Baltimore are behind you. But the media doesn't seem to care about that.

That being said, I have to ask you the same question I always wondered to myself whenever I saw protests in other areas around the country - Why are these protesters being allowed to stop traffic and block roads and intersections for hours at a time, without any repercussions? I'm not questioning their right to a peaceful assembly and demonstration; they can march along the sidewalks until their feet bleed, as far as I'm concerned. But why am I the only one that finds it unacceptable that they block traffic, and nobody does anything about it? If I went and stood in the middle of Light Street for more than a few minutes, eventually a cop would tell me to get out of the street, and arrest me if I didn't comply. And rightfully so. So why are these people special, and allowed to bring traffic to a halt by blocking roads for hours at a time? Has anyone considered that there are more people on the roads than just random people going for a joyride around town? What about doctors and other medical personnel that are trying to get to the hospital to respond to an emergency call? What about the single mother trying to get home to her children? What about the son trying to get medication to his geriatric parent(s)? What about the parent trying to get their kid to the ER after an allergic reaction to something, or a broken bone? The list goes on and on. These people being allowed to block traffic for no reason, other than "someone died and we wanna know why", are literally endangering lives every second. So my question to you is, why is this allowed to happen? Again, I'm not saying that they can't or shouldn't protest. They have a Constitutional right to do just that and, as a veteran, I support their right to do so. But blocking roads and traffic is nowhere in the Constitution. So, again, why does nobody have a problem with this?

**CONFIDENTIAL - Produced Pursuant to Protective Order**

# EXHIBIT 61

**From:** Scott, Connor D.
**Sent:** Saturday, April 25, 2015 5:18 PM EDT
**To:** McMillan, David (david.mcmillan@baltimorecity.gov) <David.McMillan@baltimorecity.gov>
**Subject:** Docs
**Attachment(s):** "2013 EOP (Full for printing).pdf","H-04_Civil Disorder_012115_DRAFT.doc","2013_04_CONTINUITY OF GOVERNMENT.doc"

Full EOP
Draft Civil Disorder Annex
COG



**Connor Scott**
*Deputy Director of Emergency Management*
1201 E. Cold Spring Lane
Baltimore, MD_21239
connor.scott@baltimorecity.gov
410-396-6183 (Office)
443-271-7316 (Mobile)

*Mayor's Office of Emergency Management*

**Connect with the Mayor's Office of Emergency Management**

 @BaltimoreOEM

/BaltimoreOEM

*Visit our website:* http://emergency.baltimorecity.gov and www.fema.gov

This message contains information which may be confidential and privileged. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply email, and delete or destroy the message.

CONFIDENTIAL - Produced Pursuant to Protective Order



# CITY OF BALTIMORE

# EMERGENCY OPERATIONS PLAN

# December 2013

**CONFIDENTIAL - Produced Pursuant to Protective Order**

BALTIMORE CITY EMERGENCY OPERATIONS PLAN

# PROMULGATION

This letter serves to promulgate the Emergency Operations Plan (EOP) of the City of Baltimore, its annexes, and other documents which are incorporated by reference.

The Mayor's Office of Emergency Management and the Homeland Security and Emergency Preparedness Coordinating Committee, in collaboration with the Mayor's Office and all relevant entities, establishes this document as part of a program to enable City agencies and the community to respond effectively to any hazard.

As we learned on September 11, 2001, a large-scale disaster can strike without warning. The attacks on the World Trade Center, the Pentagon, and several incidents of anthrax in the mail placed our colleagues on the front lines in New York, Virginia, and other venues. Other disasters that have struck our country in recent years, such as Hurricanes Irene and Sandy, the Blizzards of February 2010, and the 2012 Derecho, emphasize the need for comprehensive planning at the local and regional levels. This plan will enable all involved to address hazards and issue warnings about the possibility of future disasters. As officials and first responders, we play a vital role as sources of accurate information for the injured, the medical community, and the public.

This document is intended to be a comprehensive guide and dynamic framework, which will serve as a quick reference for a complete unified approach in preparing for and responding to all hazards in regards to emergencies and disasters. It serves to facilitate prevention, protection, response, and short-term recovery for the City of Baltimore.

The City of Baltimore Emergency Operations Plan has been hereby reviewed and approved. This plan is effective immediately and supersedes all previous versions.


Stephanie Rawlings-Blake
Mayor
City of Baltimore

BP-ii

CONFIDENTIAL - Produced Pursuant to Protective Order

# APPROVAL & IMPLEMENTATION

## The City of Baltimore

## Emergency Operations Plan (EOP)

The EOP establishes the policies and strategies which the City of Baltimore and its partner organizations will employ to respond to and recover from major incidents and disasters. The plan describes our incident management structure, assigns responsibilities, and is designed to ensure effective emergency response to protect life, property, and the environment within the City of Baltimore. It follows the guidance of the National Response Framework (NRF) to establish a comprehensive, all-hazards approach to incident response and utilizes the National Incident Management System (NIMS) standardized structures and tools for a unified approach to incident management, both on-scene and at the Emergency Operations Center (EOC).

The EOP incorporates best practices and proven approaches to mitigate our most frequent, as well as our most devastating, potential threats and hazards. It utilizes Emergency Support Functions (ESFs) that can be adapted and applied to any scenario.

This document is intended to be a comprehensive guide and a dynamic framework which will serve as a reference for an integrated approach to all hazards. The City of Baltimore and its partners will utilize this document to ensure the most effective and economical allocation of resources for the protection of people, property, and the environment prior to the onset of an emergency or disaster.

Agencies identified in this document shall plan to carry out the necessary responsibilities with which they are tasked. They shall make the necessary revisions and enhancements to internal policies, procedures, and capabilities in order to maintain the integrity of the plan and will notify the Mayor's Office of Emergency Management and any other partner agencies involved when significant changes are made to any operating procedure or policy referenced in this EOP or its annexes.

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00003823

# RECORD OF CHANGES

## Basic Plan

| Change Number | Date of Change | Change Entered By | Date Entered |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

CONFIDENTIAL - Produced Pursuant to Protective Order                    CITY00003824

BALTIMORE CITY EMERGENCY OPERATIONS PLAN                    DEC 2013

# RECORD OF DISTRIBUTION

## Basic Plan

| Department | Receiving Official | Name and title | Date of Delivery |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

Ver 1.6
12/13

BP-v

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00003825

# TABLE OF CONTENTS

PROMULGATION.................................................................................................. BP-II
APPROVAL AND IMPLEMENTATION................................................................. BP-III
RECORD OF CHANGES...................................................................................... BP-IV
RECORD OF DISTRIBUTION.............................................................................. BP-V
TABLE OF CONTENTS......................................................................................... BP-VI

**BASIC PLAN**

I.   Overview.......................................................................................... BP-1
     A.  Purpose....................................................................................... BP-1
     B.  Scope........................................................................................... BP-1
     C.  Situation....................................................................................... BP-1
     D.  Planning Assumptions.................................................................. BP-2

II.  Concept of Operations.................................................................... BP-4
     A.  Strategies..................................................................................... BP-4
     B.  National Incident Management System........................................ BP-4
     C.  Phases of Emergency Management.............................................. BP-5
     D.  Activation Authority...................................................................... BP-7
     E.  Line of Succession....................................................................... BP-7
     F.  Continuity of Government............................................................. BP-8
     G.  Citywide Security Awareness and Emergency Mobilization.......... BP-9
     H.  Mayor's Security Cabinet.............................................................. BP-10
     I.   Emergency Declarations............................................................... BP-10
     J.   Functional Needs Considerations................................................ BP-11

III. Organization and Assignment of Responsibilities........................... BP-12
     A.  Organization................................................................................. BP-12
     B.  Assignment of Responsibilities..................................................... BP-12

IV.  Direction, Control, and Coordination.............................................. BP-19
     A.  General......................................................................................... BP-19
     B.  Emergency Operations Center...................................................... BP-19

V.   Communications.............................................................................. BP-23
     A.  Voice............................................................................................ BP-23
     B.  E-mail.......................................................................................... BP-23
     C.  Blackberry.................................................................................... BP-23
     D.  800 MHz Radio............................................................................ BP-23
     E.  911 Dispatch................................................................................ BP-23
     F.  Communications Failures.............................................................. BP-23

VI.  Administration, Finance, and Logistics........................................... BP-24
     A.  Finance......................................................................................... BP-24
     B.  Records and Reporting................................................................. BP-24
     C.  Use of City Employees During Emergencies................................ BP-25
     D.  Logistics....................................................................................... BP-25

CONFIDENTIAL - Produced Pursuant to Protective Order                        CITY00003826

BALTIMORE CITY EMERGENCY OPERATIONS PLAN                    DEC 2013

|  | E. | Corporate Emergency Access System……………………………………… | BP-25 |
|  | F. | Mutual Aid Agreements………………………………………………… | BP-26 |

| VII. | Plan Development and Maintenance………………………………………… | BP-28 |
|  | A. Plan Development………………………………………………………… | BP-28 |
|  | B. Maintenance……………………………………………………………… | BP-28 |
|  | C. Training………………………………………………………………… | BP-28 |

| VIII. | Authorities and References………………………………………………… | BP-30 |
|  | A. Authorities……………………………………………………………… | BP-30 |
|  | B. References……………………………………………………………… | BP-30 |
|  | C. Supporting Documents…………………………………………………… | BP-31 |
|  | D. Annexes………………………………………………………………… | BP-32 |
|  | E. Acronyms……………………………………………………………… | BP-32 |

CONFIDENTIAL - Produced Pursuant to Protective Order                    CITY00003827

# BASIC PLAN

## I.   OVERVIEW

### A.  Purpose

The Emergency Operations Plan establishes the policies and procedures under which the City of Baltimore will operate in the event of an emergency or major disaster.  It defines the roles, responsibilities, and inter/intra-organizational relationships of government and private entities in an emergency.  It provides assurance of appropriate response to protect the population, property, infrastructure, and environment of Baltimore and to ensure a unified command system for the management of mitigation, preparedness, response, and recovery activities.

### B.  Scope

This plan will be activated when an emergency exceeds the capacity of a single agency or is beyond the scope of their normal operations.  It may be activated prior to an event when warning is available, such as with inclement weather, or as the result of an unforeseen emergency such as a terrorist attack, hazardous materials release, or infrastructure failure.  It may also be activated under a mutual aid agreement to assist neighboring jurisdictions in the state or region.

### C.  Situation

Baltimore City has a population of over 621,000 and a land area of 87 square miles which is predominately urban.  The City accommodates a multitude of different industries, businesses, and communities and is host to over 206,000 daily commuters.  Its seven square miles of deep water harbor is bound by 52 miles of shoreline and is located approximately seven nautical miles from the main stem of the Chesapeake Bay, the nation's largest estuary.  Baltimore lies within two major drainage basins: the Patapsco River and the Back River Basins.  The Patapsco's two main tributaries are the Gwynns Falls, which drains the northwest and western portions of the City, and the Jones Falls, which drains the upper northwest and central portions of the City.  The Herring Run drains the eastern part of the City, emptying into Back River in Baltimore County.

While the port of Baltimore continues to maintain an important role in international trade, it also promotes recreational marina development and boating.  Throughout the City there are several interstates, railways, commuter rail lines, and approximately 14 major marine terminals, making it an important transportation corridor for the East coast.  A number of chemicals and hazardous materials are manufactured in and transported through the City.  The City is also home to a number of sporting arenas, world-class hospitals, colleges and universities, businesses, and tourist destinations.

As with any major urban area, Baltimore City has a large vulnerable population.  There are more than 340 nursing homes and assisted living facilities, as well as a number of housing developments for the elderly, residents with disabilities or other special needs, and senior subsidized apartment buildings.  There is also a large population of citizens requiring regular dialysis treatment.  An estimated 91,268 citizens in Baltimore have some type of disability, and

Ver 1.6                                          BP-1
12/13

CONFIDENTIAL - Produced Pursuant to Protective Order                                          CITY00003828

approximately 20,253 over the age of 5 have limited English proficiency.  .  Other vulnerable populations include those clients at residential treatment centers, methadone clinics, and correctional facilities.  The Emergency Support Function-11: Public Warning and Information annex provides a more detailed breakdown of the vulnerable populations estimates.

For a more detailed hazard and vulnerability analysis, see the Disaster Preparedness and Planning Project and the Baltimore Region Threat and Hazards Identification and Risk Assessment (THIRA).  The Baltimore Police Department also maintains current information relating to potential man-made or intentional threats.  The major hazards Baltimore City faces are generally categorized as follows:

1. Natural hazards such as riverine and tidal flooding, hurricanes, winter storms, and droughts.

2. Infrastructure hazards such as transportation and hazardous materials accidents, water and sewer main breaks and contaminations, and power outages.

3. Acts of terrorism, both foreign and domestic.  In the past decade, the United States has become more aware and vigilant in combating and preventing terrorism, but the threat still exists.  Baltimore City has a number of potential terrorist targets due to its industrial and economic centers, as well as the large populations that gather for a wide range of sporting, cultural, entertainment, business, and political events.

## D.  Planning Assumptions

1. An emergency or disaster may occur at any time and with no warning.

2. The City's Hazard Mitigation Plan will be updated every five years and include the likelihood of occurrence and the severity of the identified natural hazards.

3. The Baltimore Region will update the THIRA annually, which includes manmade threats as well as natural hazards.

4. The current alert and warning systems are properly implemented and are tested frequently to ensure proper functioning.

5. The City of Baltimore, in collaboration with other public and private agencies within the State, may enter into mutual aid agreements for reciprocal emergency aid and other assistance in the event of an occurrence or threat of an emergency that requires resources beyond the capability of the City of Baltimore or our private partners.

6. Critical facilities have been identified and have taken the necessary precautions to ensure continuity of operations.

7. Additional technical and financial assistance will be sought from the State and Federal governments if necessary by MOEM through MEMA.

8. The City of Baltimore may be called upon to respond to either a threat or actual attack by a foreign government or terrorists. The calculated initiation of nuclear war by any present nuclear power remains unlikely.  Nevertheless, this should not be confused

CONFIDENTIAL - Produced Pursuant to Protective Order                                CITY00003829

BALTIMORE CITY EMERGENCY OPERATIONS PLAN                          DEC 2013

with the release of radiological, chemical, or biological materials that could occur through human error or irrational act, as well as by deliberate terrorist act.

9.  Interagency/interdepartmental planning and training of emergency personnel and responders, in collaboration with drills, tabletops, and exercises will improve the City's overall preparedness.

10. Personnel responsible for planning and response have read, exercised, and updated components of the Basic Plan, Annexes, and Standard Operating Procedures (SOPs) and are familiar with their responsibilities.

11. Essential personnel have been identified and have a basic understanding and working knowledge of NIMS and ICS.

12. Agencies will incorporate NIMS into their preparedness and planning, and the Lead Agency for any incident will utilize the ICS for its response.

13. Additional resources can be requested by MOEM through MEMA. See annex ESF 7 for details.

CONFIDENTIAL - Produced Pursuant to Protective Order                      CITY00003830

## II.   CONCEPT OF OPERATIONS

### A.  Strategies

The Mayor's Office of Emergency Management (MOEM) works to maintain the highest level of preparedness to protect the life, health, and safety of Baltimore's citizens, employees, and visitors, as well as to preserve public and private property and the environment.  This plan is based on all-hazard emergency planning and comprehensive emergency management.  This type of planning will assist agencies in mitigation, planning, response, and recovery from all types of emergencies and disasters.  The following objectives illustrate the City's ongoing efforts to ensure the maximum readiness of planning and programming:

1. Employ NIMS as mandated by Homeland Security Presidential Directive 5 (HSPD-5). The implementation of NIMS and ICS provides a single, comprehensive approach to incident management.

2. Utilize ICS for incident management of all field operations.

3. Support field operations with representatives from essential agencies at the EOC organized by ESF.

4. Ensure that first responders are trained and ready to respond to all-hazards incidents through training, drills, and exercises.

### B.  National Incident Management System (NIMS)

1. The City of Baltimore will adhere to all core concepts of NIMS:

    i.    Preparedness
    ii.   Communications and Information Management
    iii.  Resource Management
    iv.   Command and Management
    v.    Ongoing Management and Maintenance

2. Incident Command System (ICS)

    A large part of the Command and Management component of NIMS is the use of ICS to manage all incidents.  ICS enables integrated communication and planning by establishing a manageable span of control.  ICS divides an emergency response into five manageable functions essential for emergency response operations: Command, Operations, Planning, Logistics, and Finance and Administration.  For some types of emergency situations, a specific incident scene may not exist in the initial response phase and the EOC may accomplish initial response actions, such as mobilizing personnel and equipment and issuing precautionary warnings to the public.  As the potential threat becomes clearer and a specific impact site or sites are identified, an Incident Command Post may be established and direction and control of the response transitioned to the Incident Commander.

CONFIDENTIAL - Produced Pursuant to Protective Order                              CITY00003831

3. Resources

   a. Resource management for all incidents will meet the necessary requirements for NIMS compliance. If additional resources are needed from outside of the City of Baltimore, the following measures will be taken:

      i. Activate mutual aid agreements;
      ii. Utilize pre-existing contracts;
      iii. Request assistance from private sector and non-governmental partners;
      iv. Make a formal request through the State Emergency Operations Center (SEOC).

   b. The City of Baltimore will organize resource management in three primary tasks:

      i. Activate system to inventory, request, and track resources prior to an incident;
      ii. Dispatch resources prior to and during an incident;
      iii. Deactivate or recall resources during or after an incident.

## C. Phases of Emergency Management

1. This plan addresses emergency actions that are conducted during all four phases of emergency management.

   a. Mitigation

Mitigation is the effort to reduce loss of life and property by lessening the impact of disasters. Mitigation planning is a continual process and will be revised and implemented by core local, State, and Federal agencies that are proficient in those activities.

   b. Preparedness

The City of Baltimore has a wide range of preparedness activities that range from training to full scale exercises, as well as citizen preparedness through outreach and education. Preparedness activities that are in place include, but are not limited to:

      i. EOC training for primary, secondary, and tertiary department representatives who will staff the EOC during an activation;
      ii. Maintenance of alert and notification lists;
      iii. Homeland Security Exercise and Evaluation Program (HSEEP) compliant exercises;
      iv. Emergency planning;
      v. Applying for and utilizing state and federal grant funding to procure resources to enhance the overall response efforts of first responders;
      vi. Community Emergency Response Teams (CERTs) that educate citizens about disaster preparedness for hazards that may impact their area and train them in basic disaster response skills;
      vii. Outreach and education for citizens and businesses about local hazards, personal preparedness, and business continuity.

CONFIDENTIAL - Produced Pursuant to Protective Order                    CITY00003832

c.   Response

This EOP is to be implemented when an emergency or natural disaster exceeds normal operating procedures.  Policy outlined in this document will serve as the coordination between Baltimore City agencies, state and federal governments, and supporting organizations.

   i.   This plan is intended to apply to a wide range of emergencies.  Under different scenarios, different elements of the plan will be employed at various levels.  Each functional annex can be activated to the appropriate degree, depending on the resource requirements, number of citizens impacted, and level of regional, state, and federal involvement.

   ii.   This plan is not intended to contain the specific procedures used by each department or organization.  Information that may change on a regular basis will be maintained separately and updated on a regular basis.  Emergency functions of the various groups involved in emergency management will generally parallel their normal daily activities.

   iii.   Each department head or his/her designated representative activates their departmental Standing Operating Procedure (SOP).  Key personnel are advised to report to their assigned work site.  Response of the various City departments will generally parallel their normal daily functions.  City personnel, equipment, and materials will be employed to combat the emergency.

   iv.   If necessary, the EOC can be activated to coordinate resources and other response needs.  Coordination of public and private organizations may become necessary (example:  Red Cross, BG&E, Verizon, etc.)  However, every attempt will be made to have the Lead Agency command incident response activities at a location other than the EOC.

   v.   If the emergency exceeds the capability of the City to respond adequately, mutual aid agreements with surrounding counties will be reviewed and, if required, implemented.  Assistance from State or Federal agencies may also be required.

   vi.   If it becomes necessary to suspend the normal functions of the City agencies during the emergency, the Mayor may take whatever steps necessary to protect the public and prevent property damage.

d.   Recovery

Recovery begins with pre-disaster preparedness and planning and is a continuum that can span several years, ultimately rebuilding and revitalizing an impacted system to meet future needs. Short-term recovery operations seek to restore critical services to the community and provide for the basic needs of its citizens.  Long-term recovery focuses on restoring the City to an improved state of affairs.  Examples of recovery actions would be temporary housing, restoration of government services, and reconstruction of damaged areas with a focus on mitigating future events.

CONFIDENTIAL - Produced Pursuant to Protective Order                                    CITY00003833

The City government has the primary responsibility for determining the extent of the damage and the impact of the damage.  Initial damage assessment will be conducted by the City's Damage Assessment Teams (DATs) as outlined in ESF 14A.

Local resources will be initially employed to return the affected areas to normal.  When necessary, requests for further assistance will be forwarded to higher levels of government only when these local resources are depleted or become inadequate.

## D.  Activation Authority

The Mayor and the Emergency Manager, or their designees, have the authority to activate the EOP.  The agency head may activate the ESF or Hazard-Specific annex for which they are the lead agency.  More than one ESF or agency involved in a major response requires the notification of MOEM.

## E.  Line of Succession

1. The Mayor:

   a.  Vacancy in the Office of the Mayor

   In the case of a vacancy in the Office of the Mayor, the City Council President "shall be Mayor" for the remainder of the term for which the Mayor was elected.  (Baltimore City Charter, Art. IV, § 2)

   b.  Temporary Absence of the Mayor

   During the Mayor's sickness, temporary disqualification, or necessary absence, the City Council President "shall be ex officio Mayor of the City."  (Art. IV, § 2)

   c.  Temporary Absence of Both the Mayor and the City Council President

   During the necessary absence, sickness, or temporary disqualification of both the Mayor and the City Council President, "the Vice-President shall be acting Mayor."  (Art. III, §10(c))

2. City Council President:

   a.  Vacancy in the Office of the City Council President

   If the President fills the unexpired term of the Mayor, or in the case of the death, resignation, removal or other disqualification of the President, "the City Council, by a majority vote of its members, shall elect a new president for the unexpired term."  The person that the members elect "may, but need not, be" a member of the City Council, but must "possess the qualifications required for the Mayor of the City."  (Art. III, §3, § 4)

   b.  Temporary Absence of the City Council President

CONFIDENTIAL - Produced Pursuant to Protective Order                              CITY00003834

In the case of the President's temporary absence, sickness, or disqualification, the Vice-President "shall preside" at all City Council meetings and "shall be an acting member" of the Board of Estimates.  (Art. III, § 10(b))

3. City Council Members:

   a. "The City Council, by a majority vote of its remaining members, shall elect a person possessing the qualifications prescribed in Section 1 of this article to serve the remainder of the unexpired term of the former incumbent."  (Art. III, § 6)

   b. If the majority of the City council members are killed, sick, incapacitated, missing or otherwise unavailable, the Mayor, or Governor if the Mayor is unavailable, is authorized to appoint persons to fill the vacancies. (Art. III § 5)

4. Director of Emergency Management:

   a. Designee of the Mayor or Director of Emergency Management

5. The lines of succession for each department and agency head shall be in accordance with the SOPs established by those departments and agencies.

6. The Governor has the authority to exercise powers of the local government "If a majority of the members of the local governing body of a county are killed or are sick, incapacitated, missing, or otherwise unavailable for a temporary or indefinite period because of a military or warlike catastrophe, the Governor may exercise the administrative and executive powers of that local governing body until the number of members of the local governing body sufficient to operate the county government are appointed and qualify." (MD Public Safety Cod Ann. § 14-402)

## F.  Continuity of Government

Continuity of Government (COG) is achieved when each branch of government is able to continue performing its essential functions during an emergency.  Continuity of Operations (COOP) is achieved when each individual agency has a plan to ensure that its essential functions continue during an incident.  MOEM maintains an overall COG plan for City Government.

All City agencies are required to develop a Continuity of Operations Plan (COOP) in coordination with MOEM. Agencies are also required to appoint a COOP Coordinator who acts as a point of contact in developing the COOP. A COOP should include, at a minimum:

1. Privacy Statement
2. Record of Changes
3. Record of Distribution
4. Basic Plan (including an executive summary, promulgation statement, COOP coordinator, and reference documents)
5. Concept of Operations (including organization and assignemeent of responsibilities, standard operating procedures, essential functions, disaster intelligence needs, and major scenarios)
6. Direction, Control, and Coordination

CONFIDENTIAL - Produced Pursuant to Protective Order                    CITY00003835

7. Communications
8. Budget and Acquisition of Resources
9. Plan Development and Maintenance

Agencies should coordinate with MOEM to develop a comprehensive COOP. Agencies should also revise the plan as necessary to keep the plan current. All questions concerning emergency preparedness should be addressed to MOEM, which prepares the City and the public for emergencies, coordinates interagency response and recovery, and implements a comprehensive program of disaster mitigation, preparedness, response, and recovery.

## G. Citywide Security Awareness and Emergency Mobilization

1. Purpose: The Citywide Security Awareness and Emergency Mobilization Plan is a guide to responding to potentially large-scale threats to life and property or to actual occurrences.  It is in response primarily to terrorist or security threats, not necessarily natural disasters.

2. If time permits, the Alert Status Level shall be determined by the Emergency Security Assessment Committee consistent with the prevailing threat.  The Committee consists of the Police Commissioner, Deputy Police Commissioner for Operations, Chief of Patrol and Commander of the Criminal Intelligence Section, Fire Chief, and Director of Emergency Management.  In the event that actions are required immediately, the Police Commissioner may raise the Alert Status Level independently.

3. Agencies are responsible for developing internal security posturing measures corresponding to each Alert Status Level.  A change in the City's Alert Status Level should trigger a corresponding change in each agency's security posture.

4. Alert Status Levels (while the City and federal levels may be equivalent, the levels are technically independent, i.e., a rise in one may or may not cause a rise in the other.)

   ALPHA – Condition Normal: No known threat to the public. (Corresponds to Federal Alert Levels - Low and Guarded)

   BRAVO – Condition of Awareness: A possibility of a threat to the safety of the public exists because of local, regional, national or world conditions.  All personnel are directed to remain aware and observant. (Corresponds to Federal Alert Level - Elevated).

   CHARLIE – Condition of Heightened Alert: An actual threat has been detected or an event or situation has occurred which has the potential for threatening public safety, or the high potential for a threat is perceived by a competent authority.  Agencies are directed to take specific steps to safeguard lives and property pursuant to predetermined citywide plans. (Corresponds to Federal Alert Level - High)

   DELTA – Condition of Highest Alert: An event has occurred within the City that has threatened or currently threatens lives and property, or an extraordinary local, regional, national or world event has occurred that requires the City to initiate its highest level of security.  All agencies are directed to take specific, extraordinary stops to safeguard lives and property pursuant to predetermined citywide plans.  (Corresponds to Federal Alert Level - Severe)

CONFIDENTIAL - Produced Pursuant to Protective Order                              CITY00003836

### H.  Mayor's Security Cabinet

1. The Mayor's Security Cabinet serves to advise the Mayor on homeland security and related issues.  It may be convened at any time at the direction of the Mayor.

2. Members consist of Agency heads, as directed by the Mayor, and is chaired by the Deputy Chief of Emergency Management and Public Safety.


### I.  Emergency Declarations

1. Declarations authorized by the Maryland Public Safety Code Ann. §14-107, §14-111, and §14- 303 (2013).

   a. <u>Local State of Emergency</u>: The Mayor may issue an order or proclamation declaring a Local State of Emergency for any type of event that he/she deems necessary to activate the response and recovery aspects of the EOP and authorize the provision of aid and assistance under the EOP.  A Local State of Emergency may not continue or be renewed for longer than 30 days.

   b. <u>State of Emergency</u>: When an event overwhelms local resources, the Mayor may request that the Governor declare a State of Emergency.  The Governor can also proclaim a state of emergency and designate the emergency area if public safety is endangered or a reasonable apprehension of immediate danger exists. This request can be submitted through MEMA and is usually supplemented by direct communication between the Mayor and the Governor.  The Governor may declare a State of Emergency in the event that an emergency has developed or is impending due to any cause.  A State of Emergency may not continue for longer than 30 days unless the Governor renews it and can be terminated by a joint resolution in the General Assembly.

2. Declarations at the Federal level provided for in the Stafford Act authorize the President to provide Federal disaster assistance.

3. In the event of a major disaster, the President can declare a Major Disaster Declaration for any natural catastrophe that has caused damage of such severity that it is beyond the combined capabilities of State and local governments to respond.  A major disaster declaration provides a wide range of Federal assistance programs for individuals and public infrastructure, including funds for both emergency and permanent work. A major disaster can be declared at the request of the Governor unless the emergency falls within the primary responsibility of the United States as governed by the United States Constitution or laws.

CONFIDENTIAL - Produced Pursuant to Protective Order

BALTIMORE CITY EMERGENCY OPERATIONS PLAN                    DEC 2013

J.  **Functional Needs Considerations**

1.  Health Care, Hospitals, and Human Service Facilities

    The Baltimore City Health Department (BCHD) and the Mayor's Office of Emergency Management (MOEM) meet regularly with the emergency managers from the city hospitals as part of the Hospital Consortium to maintain open communications and work on preparedness issues.  In addition to hospitals, there are numerous institutions in the City of Baltimore that provide services to residents with a spectrum of functional needs. This includes, but is not limited to: nursing homes, assisted living facilities, homeless shelters, adult day care centers, and mental health facilities.  The City will proactively monitor conditions at these facilities before and during an emergency to provide information and identify needs for City assistance.

2.  Functional Needs Populations

    Many citizens with functional needs do not reside in any type of health care or human services facility.  These citizens live in the community, with family or alone.  The City will proactively reach out to these citizens before and during an emergency to provide information and identify needs for City assistance.  This will be done through direct communication and through service agencies and organizations that regularly interact with functional needs populations.

3.  Prisons

    The State Prison System within the City of Baltimore will respond according to their facility EOPs and SOPs.  Dependant on the incident, a liaison from the prison system or from MOEM will ensure that information is distributed to the appropriate agency.

CONFIDENTIAL - Produced Pursuant to Protective Order                    CITY00003838

BALTIMORE CITY EMERGENCY OPERATIONS PLAN                    DEC 2013

## III.   ORGANIZATION AND ASSIGNMENT OF RESPONSIBILITIES

### A.  Organization

1.  General

Many departments within the City of Baltimore government have emergency functions in addition to their normal duties.  Each department is responsible for developing and maintaining its own emergency SOP to ensure that employees are educated and trained on functions and services that will be become priorities during an incident.  The SOP should assign responsible parties to maintain applicable Annexes to this Plan, SOPs, and notification plans, as well as assign employees to staff the EOC as appropriate.

2.  Homeland Security & Emergency Preparedness Coordinating Committee (HSPC)

The HSPC coordinates preparedness policy, programs, plans, and grants as they pertain to Emergency Management programs within the City of Baltimore.  Its various components ensure that programs and initiatives encompass all hazards planning and response and provide a venue for interagency collaboration and coordination.

### B.  Assignment of Responsibilities

1.  General

The individual agency having primary responsibility for an emergency function is normally responsible for coordinating preparation of and maintaining that portion of the EOP that addresses that function.

2.  Emergency Support Functions (ESF)

The City of Baltimore has defined 16 ESFs to plan and carry out the various activities that may be needed during an emergency event.  Each ESF covers a span of activities that focus on specific emergency functions and has a primary agency responsible for carrying out those functions.  The roles and responsibilities for each ESF are outlined in the ESF Annexes to this EOP, and lead agencies are listed in the table below:

CONFIDENTIAL - Produced Pursuant to Protective Order                    CITY00003839

Table 1: Lead Agencies for Emergency Support Functions

| Emergency Support Function | Lead Agency |
|---|---|
| ESF 1:   Transportation | Department of Transportation |
| ESF 2:   Communication | Mayor's Office of Information Technology |
| ESF 3:   Public Works andEngineering | Department of Public Works |
| ESF 4:   Firefighting | Baltimore City Fire Department |
| ESF 5:   Information and Planning | Mayor's Office of Emergency Mgmt. |
| ESF 6:   Sheltering and Mass Care | Department of Housing & Community Development |
| ESF 7:   Resource Support | Mayor's Office of Emergency Mgmt. |
| ESF 8:   Health and Medical | Baltimore City Health Dept |
| ESF 9:   Search and Rescue | Baltimore City Fire Department |
| ESF 10:  Hazardous Materials Response | Baltimore City Fire Department |
| ESF 11:  Public Information and Warning | Mayor's Office of Emergency Mgmt. |
| ESF 12:  Energy | Department of General Services |
| ESF 13:  Law Enforcement | Baltimore Police Department |
| ESF 14:  Recovery | Mayor's Office of Emergency Mgmt. |
| ESF 15:  Donations and Volunteer Management | Mayor's Office of Human Services |
| ESF 16:  Animal Protection | Baltimore City Health Dept |

3. Hazard-Specific Incidents

The City of Baltimore has also identified the types of hazards that are most likely to occur within the jurisdiction or would have the most significant impact.  Some of these hazards correspond with an ESF.  Others rely on a combination of ESFs for the response.  The Incident Commander for these types of events will usually be a designee of the lead agency.  Lead agencies are listed in the table below:

Table 2: Lead Agencies for Hazard-Specific Incidents

| Hazard | Lead Agency |
|---|---|
| H-05 Extreme Heat | Baltimore City Health Department |
| H-06 Extreme Cold | Baltimore City Health Department |
| H-07 Tropical Cyclone | Mayor's Office of Emergency Mgmt./BCFD |
| H-10 Earthquake | Baltimore City Fire Department |

4. While the agencies listed in the tables above are ordinarily the lead agency for those functions/incidents and designate the Incident Commander, the Mayor may designate a different agency or Incident Commander if she deems it necessary.  For instance, when an incident escalates to the point where life safety is the primary concern, the Fire Department may assume command until the situation is more stable.  The same holds true for the Police Department when an incident escalates to the point where containing criminal acts or maintaining civil order becomes the priority.

5. The Mayor will:

a. Exercise overall responsibility for plans and operations for major emergencies and disasters within the City;

CONFIDENTIAL - Produced Pursuant to Protective Order                                        CITY00003840

b. Monitor the emergency response and operations during disaster situations and provide strategic direction;
c. With the assistance of subject matter experts, keep the public informed during emergency situations;
d. Declare a local state of disaster, mandate evacuation of an area, request the Governor declare a state of emergency, or invoke the emergency powers of government when necessary;
e. Directly activate the EOC, if necessary.

6. The Director of Emergency Management will:

a. Serve as the Emergency Manager for the City;
b. Serve as cabinet member and lead subject matter expert to the Mayor on Emergency Management issues;
c. Provide strategy and objectives for Emergency Management programs and initiatives;
d. Ensure that local mitigation, preparedness, response, and recovery planning and operations are efficient;
e. Activate and manage the EOC, develop procedures for its operation, and conduct training for those who staff it.

7. All planning and response agencies will:

a. Provide personnel, equipment, and supplies to support emergency operations upon request;
b. Develop and maintain SOPs and contribute to citywide planning initiatives for emergency tasks;
c. Provide personnel who are trained and who have decision making authority to the EOC;
d. Conduct emergency operations;
e. Report information regarding emergency situations and damage to facilities and equipment to the Incident Commander or the EOC;
f. Comply with NIMS and utilize ICS when responding to an incident;
g. Develop and maintain Continuity of Operations (COOP) plans.

8. The Mayor's Office of Emergency Management (MOEM) will:

a. Exercise overall responsibility for maintaining the EOP and Annexes;
b. Serve as the lead agency for ESFs 5, 7, 11, and 14 planning and response;
c. Serve as the lead agency for Tropical Cyclone hazard-specific incidents during the preparedness phase;
d. Manage, maintain, and provide training for the EOC or other locale as designated if required;
e. Coordinate resource requests not available from City agencies with MEMA;
f. Conduct HSEEP compliant drills and exercises on emergency plans and simulated disasters, to include after action reviews and corrective action plans;
g. Provide situational updates and share information to surrounding jurisdictions, MEMA, and stakeholders as appropriate;
h. Ensure coordination and cooperation amongst stakeholders;

CONFIDENTIAL - Produced Pursuant to Protective Order                    CITY00003841

    i.    Assist in Mass Care efforts to include the selection, maintenance, and operations of pre-designated shelters;
    j.    Monitor the weather and other hazard conditions and take appropriate action;
    k.    Develop and disseminate emergency preparedness materials pre-incident;
    l.    Educate community members on local hazards and emergency preparedness;
    m.    Pre-script public information and warning messages;
    n.    Assign the role of Local Coordinating Officer (LCO) to coordinate with MEMA and FEMA for large scale responses and serve as liaison and subject matter expert on issues relating to emergency management;
    o.    Provide guidance and oversight of all State and Federal homeland security, emergency preparedness, and emergency management grant programs;
    p.    Identify resource deficiencies and recommend corrective actions as appropriate;
    q.    Assist City agencies in meeting NIMS compliance and implementing ICS.
    r.    Assist agencies with resource requests to MEMA

9. The Baltimore Police Department (BPD) will:

    a.    Serve as the lead agency for ESF 13 planning and response;
    b.    Assist in the dissemination of warnings and provide backup communications in cooperation with the Mayor's Office, BCFD, and BCHD;
    c.    Perform traffic control and security measures in the affected area, to include establishment of entrance and exit routes in or out of the area for evacuation;
    d.    Assist in conducting Search and Rescue missions;
    e.    Secure vital facilities and provide security and perimeter control as designated by Incident Commander;
    f.    Liaise with local, State and Federal law enforcement agencies;
    g.    Coordinate security plans and procedures with critical infrastructure and key resources.

10. The Baltimore City Fire Department (BCFD) will:

    a.    Serve as the lead agency for ESFs 4, 9, and 10 planning and response;
    b.    Serve as the lead agency for Earthquake hazard-specific incidents;
    c.    Assist in radiological monitoring of personnel and equipment;
    d.    BCFD will also be responsible for the following emergency functions:

        i.    Fire prevention activities
        ii.    Fire suppression
        iii.    Hazardous materials and response
        iv.    Emergency Medical Services
        v.    Evacuation support
        vi.    Fire inspection and code
        vii.    Respiratory protection

11. Baltimore City Health Department (BCHD) will:

    a.    Serve as the lead agency for ESFs 8 and 16 planning and response;
    b.    Serve as the lead agency for Extreme Cold and Extreme Heat hazard-specific incidents;

CONFIDENTIAL - Produced Pursuant to Protective Order                    CITY00003842

    c.  Liaise with the National Centers for Disease Control and Prevention (CDC), Maryland Department of Health and Mental Hygiene (DHMH), and other sources on issues related to chemical, biological, or radiological exposure;

    d.  Conduct public health surveillance and disseminate relevant information;

    e.  Review the procedures and limitations associated with the possible quarantine of civilians and coordinate with the EOC;

    f.  Provide for the supply and use of medical and health supplies for victims in coordination with the American Red Cross;

    g.  Use assessment data provided by environmental health specialists to ascertain impact on citizens;

    h.  Coordinate with the State Medical Examiner concerning disposition of corpses, carcasses, etc.

12. Baltimore City Department of Finance (DOF) will:

    a.  Serve as the core agency for ESF 7 relating to emergency purchases and financial tracking;

    b.  Implement a purchasing and tracking system related to disbursing City funding prior to, during, and after disaster operations;

    c.  Provide technical advice to the LCO in preparation of Damage Assessment Reports;

    d.  Assure that all appropriate City departments and agencies maintain records of costs and commitment of personnel, equipment, and materials to the emergency or disaster situation, by project.

13. Department of Public Works (DPW) will:

    a.  Serve as the lead agency for ESF 3 planning and response;

    b.  Implement the Debris Management Plan and serve as the lead agency in a debris generating event;

    c.  Provide water main repairs, service, and flood pumping equipment;

    d.  Provide water supply and, in emergency, provide sufficient water, within capabilities, to sustain life, suppress fires, and fight contamination;

    e.  Maintain and repair sanitary sewer and storm water systems.

14. Department General Services (DGS) will:

    a.  Serve as the lead agency for ESF 12 planning and response;

    b.  Recommend priorities and conduct or coordinate the emergency repair or permanent rehabilitation of damaged or destroyed public facilities of the City of Baltimore;

    c.  Provide general engineering and construction support to other departments on an emergency case basis;

    d.  Be responsible for the structural soundness, maintenance, and repair of City buildings except when such responsibility is assigned to another department;

    e.  Maintain motor vehicles, fueling capabilities, and mechanical shops;

    f.  Maintain an inventory of 4-wheel drive vehicles.

15. Department of Transportation (DOT) will:

    a.  Serve as the lead agency for ESF 1 planning and response;

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00003843

  b. Identify transportation resources and coordinates their use during an emergency or incident;

  c. Maintain and repair City roads and bridges;

  d. Provide technical advice to damage assessment teams and supporting agencies;

  e. Coordinate with the Police Department on the safe and efficient movement of the traffic through and /or around the City;

  f. Perform engineering evaluations of bridges and roadway structures as necessary after an emergency or incident.

16. Department of Housing and Community Development (DHCD) will

  a. Serve as lead agency for ESF 6  planning and response;

  b. Determine temporary housing requirements from appropriate agencies and coordinate the provisions of such housing with City, State, or Federal authorities;

  c. Inspect structures damaged by disaster to determine appropriate action to be taken;

  d. Initiate demolition of structures determined to be unsafe;

  e. Deliver emergency commodities in coordination with the American Red Cross;

  f. Enforce requirements of the building codes;

  g. Coordinate provision of social services to disaster victims.

17. Mayor's Office of Human Services (MOHS) will:

  a. Serve as the lead agency for ESF 15 planning and response;

  b. Conduct outreach and coordination with organizations that serve the homeless population.

18. Mayor's Office of Information Technology (MOIT) will:

  a. Serve as the lead agency for ESF 2 planning and response;

  b. Maintain the integrity of computer systems and City websites;

  c. Ensure connectivity between agencies;

  d. Provide subject matter expertise to COOP-related issues;

  e. Maintain the City's outdoor warning system.

19. Department of Planning will:

  a. Maintain Flood Plain Maps for the City of Baltimore;

  b. Maintain the All-Hazards Mitigation Plan for the City of Baltimore.

20. Law Department (DOL) will:

  a. Assist in the preparation of emergency legislation and executive declarations;

  b. Provide legal assistance to City departments and agencies;

  c. Arrange for or coordinate legal assistance to victims of emergencies or major disasters who are unable to provide their own.

21. Department of Recreation and Parks (DRP) will:

  a. Provide support in debris management and clearance;

  b. Coordinate any forestry issues;

CONFIDENTIAL - Produced Pursuant to Protective Order

    c. Provide facilities for emergency shelters and points of dispensing;
    d. Provide operational personnel to open and maintain emergency shelters.

22. Baltimore City Public Schools (BCPS) will:

    a. Provide operational personnel to open and maintain emergency mass care shelters;
    b. Provide facilities for emergency shelters and points of dispensing;
    c. Plan for and implement emergency operations plans for the school system;
    d. Assist in the dissemination of emergency information.

23. Baltimore Office of Cable and Communications will:

    a. Work in conjunction with the lead Public Information Officer (PIO) and the Joint Information Center (JIC) to disseminate alert and warning through the City's television networks;
    b. Provide video equipment for visual documentation as required.

24. Mayor's Office of Policy and Communications (MOPC) will:

    a. Develop public education messages and information to be disseminated through the JIC pre- and post-incident;
    b. Assist with rumor control during incidents;
    c. Brief local media on local warning systems and coordinate procedures for transmitting emergency information to media;
    d. Conduct media surveillance during an event or incident.

25. Other Organizations:

    a. Human Service Agencies/Volunteer Organizations:

    Human Service agencies and organizations will operate under the leadership of DHCD.

    b. Non-Governmental Organizations (NGOs):

    NGOs will collaborate with their respective points of contact within the City of Baltimore infrastructure. They will serve as an affiliated agency and will be integrated into the Incident Command System if necessary. They have the responsibility for the direction of technical operations of elements of their organization. (Example: electric power, natural gas, and telecommunication service problems will be referred to the appropriate utility).

    c. Radio Amateur Civil Emergency Service (RACES)

    RACES is a public service provided by a reserve (volunteer) group of Amateur Radio Operators that is administered by MOEM. RACES will provide emergency backup communication to various city agencies and locations throughout the City of Baltimore.

CONFIDENTIAL - Produced Pursuant to Protective Order                     CITY00003845

## IV.    DIRECTION, CONTROL, AND COORDINATION

### A.  General

1. In accordance with HSPD-5, all departments and organizations having responsibilities delineated in this EOP will utilize NIMS.

2. The Mayor is responsible for establishing strategies and policies for emergency management and providing general guidance for disaster response and recovery operations, in compliance with NIMS.  He or she may delegate those responsibilities to the Director of Emergency Management at his/her discretion.

3. The Director of Emergency Management will manage the EOC.  During an emergency, he/she will coordinate the City's response to an incident or emergency.

4. The Incident Commander will manage the emergency response at an incident site or designated location.

5. Specific departments/agencies are responsible for fulfilling their obligations as presented in the EOP Base Plan and Annexes.

### B.  Emergency Operations Center (EOC)

1. For major emergencies and disasters, the EOC will be activated.  The EOC provides a central location where interagency coordination and executive decision making for managing response and recovery occurs.  It is separate from and supports the on-scene Incident Commander and ICS response.  See the *City of Baltimore Emergency Operations Center Standard Operating Procedures for City Agencies* for more details.

2. When activated, trained EOC representatives from core departments and agencies will support field and incident operations by performing the following functions relevant to their essential support functions:

   a. Policymaking;
   b. Information analysis;
   c. Operational support;
   d. Resource acquisition and allocation.

3. The EOC is responsible for:

   a. Citywide direction and control;
   b. Situational awareness and common operating picture;
   c. Coordination;
   d. Priority establishment;
   e. Resource management.

4. EOC Facilities:

CONFIDENTIAL - Produced Pursuant to Protective Order                              CITY00003846

    a.  The EOC locations are addressed in the *City of Baltimore Emergency Operations Center Standard Operating Procedures for City Agencies.*

    b.  The alternate EOC will be used if the primary EOC becomes unusable or depending on the location and scale of the emergency.

5.  The following individuals are authorized to activate the EOC:

    a.  Mayor;

    b.  Designee of the Mayor;

    c.  Director of Emergency Management;

    d.  Designee of the Director of Emergency Management.

6.  Operational Levels: The City of Baltimore utilizes four operational levels that will be determined by the Mayor, Director of Emergency Management, or the appropriate designee.

    a.  Level IV: Normal Conditions

        i.  Criteria:  Normal operations include coordination and dissemination of intelligence information to appropriate agencies as needed.

        ii.  Staffing:  EOC activation is not necessary during this level.

    b.  Level III: Watch Level

        i.  Criteria:  Watch level is a situation that may escalate and require monitoring, could possibly be handled at the field level, or may require proactive notification of multiple agencies.

        ii.  Staffing:  The EOC is not activated; however, MOEM staff and relevant agencies will coordinate remotely or on scene.

    c.  Level II:  Partial Activation

        i.  Criteria:   At this level, the incident requires the coordination of select agencies, private sector partners, or other jurisdictions in order to achieve an optimal response as well as the resolution of the incident.

        ii.  Staffing:  When activated at Level II, the EOC may be staffed with the appropriate Level I and Level II agencies. Level II activation may include JIC activation

    d.  Level I: Full Activation

        i.  Criteria:  Level I refers to an incident that poses an imminent threat to life and/or property that requires core and support agencies to respond expeditiously.  Level I incidents require the coordination of numerous agencies, private sector partners, or other jurisdictions in order to achieve an optimal response and resolution of a complex or severe incident.

CONFIDENTIAL - Produced Pursuant to Protective Order                              CITY00003847

      ii.    Staffing:  When activated at Level I, the EOC will be staffed by all Level I agencies, as well as select Level II and Level III agencies as determined by the Director or designee, 24 hours per day.  Level I activations will also include JIC activation, as determined by the Director or designee.

7. Participating Agencies:

    a. Level I Agencies. Primary agencies involved in most emergency responses:

> Baltimore City Fire Department (BCFD)
> Baltimore City Health Department (BCHD)
> Baltimore Police Department (BPD)
> Mayor's Office (MO)
> Mayor's Office of Emergency Management (MOEM)
> Mayor's Office of Information Technology (MOIT)
> Department of General Services (DGS)
> Department of Housing and Community Development (DHCD)
> Department of Public Works (DPW)
> Department of Transportation (DOT)
> Mayor's Office of Human Services (MOHS)
> Mayor's Office of Neighborhoods and Constituent Services (MONCS)
> Municipal Telephone Exchange (MTE)

    b. Level II Agencies/Organizations. Secondary and support agencies as well as key State, non-profit, and private sector partners :

> American Red Cross (ARC)
> Baltimore City Law Department (BCLD)
> Baltimore City Public Schools (BCPS)
> Baltimore City Sheriff's Office (BCSO)
> Baltimore Gas & Electric (BGE)
> Baltimore Office of Cable and Communications (BOCC)
> Department of Finance (DOF)
> Department of Human Resources (DHR)
> Department of Planning (DOP)
> Department of Recreation and Parks (DRP)
> Downtown Partnership of Baltimore (DPOB)
> Maryland Emergency Management Agency (MEMA)
> Maryland Transit Administration (MTA)
> Mayor's Commission on Disabilities (MCD)
> Mayor's Office on Criminal Justice (MOCJ)
> Office of the Labor Commissioner (OLC)
> Visit Baltimore

    c. Level III Agencies/Organizations. All other City agencies, as well as State, Federal, non-profit and private sector partners, including, but not limited to:

> Amtrak
> Baltimore Area Convention and Visitors Association (BACVA)
> Baltimore Convention Center

CONFIDENTIAL - Produced Pursuant to Protective Order

BALTIMORE CITY EMERGENCY OPERATIONS PLAN                    DEC 2013

Baltimore Development Corporation
Baltimore Rising Inc.
Baltimore City Circuit Court
Baltimore City District Court
Baltimore Office of Promotion and the Arts (BOPA)
Business Volunteers Unlimited Maryland (BVU)
Comcast
Enoch Pratt Free Library
Maryland Department of Public Safety and Correctional Services (DPSCS)
Maryland Department of Juvenile Services (DJS)
Maryland Department of the Environment (MDE)
Maryland Department of Natural Resources Police (DNRP)
Maryland Transit Administration (MTA)
Maryland Institute for Emergency Medical Services Systems (MIEMSS)
Maryland Military Department/Maryland National Guard
Maryland Port Administration (MPA)
Maryland Stadium Authority (MSA)
Maryland State's Attorney's Office
Maryland State Highway Administration (SHA)
Office of Chief Medical Examiner (OCME)
Parking Authority of Baltimore City (PABC)
Radio Amateur Civil Emergency Services (RACES)
Salvation Army
State Highway Administration
Veolia Energy Company
United States Coast Guard (USCG)
Verizon
Verizon Wireless

CONFIDENTIAL - Produced Pursuant to Protective Order

## V.    COMMUNICATIONS

### A.  Voice
The City provides voice communications through three modes: land lines, cellular network, and Voice over Internet Protocol (VoIP) computer telephony.

### B.  E-mail
The City provides direct and indirect E-mail services to greater than 20,000 mailboxes. A direct E-mail user would have an account on a City E-mail server, while an indirect user may have an entry in the Global Address Book representing a link to the user's specific E-mail environment (e.g., BCPS).

### C.  Blackberry
The City provides Blackberry wireless E-mail/paging devices to approximately 855 key employees in municipal government.  Most of these devices can also be used for Direct Connect and instant messaging.

### D.  800 MHz Radio
Most city agencies have at least some 800MHz radios on hand for daily use.  Although several agencies maintain individual sets of talk groups, all agencies can communicate with each other on Channel B10.

### E.  911 Dispatch

1. When a call is made to 911, Verizon directs that call to a Police 911 Operator.  The call takers are able to diagnose the call and send them help from any agency through the computer-aided dispatch (CAD) system.  If a call is made that is for a fire or medical emergency, that call is transferred to the Fire Department.  Calls may also be transferred to and from 311.  Each of the 52 call taker positions can be configured to take 911 or 311 calls by use of the various logins.  In an emergency, 911 Operators can take over 311 phones to accept additional 911 calls.  The 311 phone line may also be used for 911 calls should it become necessary to abandon the 911 area of the center.

2. BPD and BCFD Dispatches are in two separate locations, which are addressed in the *City of Baltimore Continuity of Government Plan*.  BPD and BCFD currently have protocols to be prepared for both anticipated and unanticipated power outages.

### F.  Communications Failures
See *City of Baltimore Continuity of Government Plan* for more detail on communications and backup communications procedures.

CONFIDENTIAL - Produced Pursuant to Protective Order                           CITY00003850

BALTIMORE CITY EMERGENCY OPERATIONS PLAN                               DEC 2013

## VI.   ADMINISTRATION AND SUPPORT

### A.  Finance

1.  For major emergencies or disasters, all departments and agencies participating in the emergency response will maintain detailed costs, employing their own bookkeeping procedures for emergency operations to include:

    a.  Personnel costs, especially overtime costs;
    b.  Equipment operations costs;
    c.  Costs for leased or rented equipment;
    d.  Costs for contract services to support emergency operations;
    e.  Costs of specialized supplies expended for emergency operations.

2.  Protocols established for reimbursement will be implemented prior to EOC activation and distributed to core and support agencies to be utilized.

3.  Except in life threatening situations, all departments are to use the City's normal supply channels, i.e., Bureau of Purchases, City Warehouses, etc., before making emergency purchases on the commercial market.  Emergency procurements or any exceptions to the normal purchasing process must be approved by the Director of Finance or his/her designee.

4.  Generally, financial records and reports shall be retained for a minimum of three years following audit.  Retention times for certain other records and reports, if different, will be identified and retained as directed.

### B.  Records and Reports

1.  Incident Documentation

    All incidents and emergencies will be documented by Incident Command and the EOC. Incident documentation is essential for after action reports, lessons learned, reimbursement, and auditing purposes.

2.  Situational Report (SITREP)

    SITREPs detailing complete emergency operations should be prepared and distributed by the EOC to represented agencies, City leadership, and the State EOC.  These reports should be prepared and distributed by the schedule set by the EOC Manager and planning section.

3.  After Action Report (AAR)

    The After Action Report is the written report of a structured review that summarizes and analyzes performance, by the participants and those responsible for an incident or event.  In order to improve planning and response, responders and EOC representatives will conduct an After Action Conference and compose an AAR complete with an

CONFIDENTIAL - Produced Pursuant to Protective Order                                      CITY00003851

improvement plan.  AARs for all major incidents and exercises will follow FEMA's HSEEP format.

## C.  Use of City Employees During Emergencies

1.  An appointing authority may assign any employee to perform related work even though the assigned duties are not precisely within the scope of the normal employment.

2.  During a declared emergency, the appointing authority may assign any employee to perform emergency work at any place in the City, and for periods of time other than the usual employment time, in accordance with existing agreements and regulations.

3.  Employees assigned to emergency duties shall be reimbursed for reasonable and necessary expenses and shall receive appropriate overtime /compensatory time in accordance with existing regulations and procedures.

4.  DHR and the OLC will provide additional guidance as to the use of City employees during emergencies.  Refer to the *City of Baltimore Emergency Response Manual For Human Resources Issues Regarding Pandemic Influenza And Other Catastrophic Events*.

## D.  Logistics

1.  MOEM shall develop and maintain resource information on supplies, equipment, facilities, and skilled personnel available for emergency response and recovery.

2.  The resource information will indicate the procedure and contact information necessary to quickly obtain the resources needed to meet an emergency.  See ESF 7 Resource Management Annex for more details.

3.  If necessary, emergency resources will be allocated by priority need.

## E.  Corporate Emergency Access System (CEAS)

1.  The Corporate Emergency Access System (CEAS) is a credentialing program whereby, upon order of the Mayor of the City of Baltimore or other designated official (after consultation with public safety officials), the pre-credentialed employees of participating private businesses with offices located within a specified emergency zone may have access to that zone.  CEAS has been developed by the Business Network of Emergency Resources, Inc. (BNET), following consultation with various City, State and private entities, including the City of Baltimore.

2.  The purpose of this program is to help mitigate the losses experienced by organizations as a result of an emergency in the City of Baltimore.  To this end, it is intended to help participants in CEAS sustain essential business functions and take mitigation measures that will help maintain their organizations' viability during and after an emergency and thereby help protect the City and its economy, which depend on the employment, commerce, and tax revenue generated by the private sector.

CONFIDENTIAL - Produced Pursuant to Protective Order                    CITY00003852

BALTIMORE CITY EMERGENCY OPERATIONS PLAN                    DEC 2013

3. See the *Corporate Emergency Assess System Plan of Administration* and the *Baltimore Police Department General Order T-8, Corporate Emergency Access System*, for details as to the application of CEAS.

**F. Mutual Aid Agreements**

1. Should City government resources prove to be inadequate during an emergency operation, requests for assistance from other local jurisdictions, higher levels of government, private sector volunteer organizations, and other organizations will be in accordance with existing or emergency negotiated mutual aid agreements and understandings.

2. Such assistance may take the form of equipment, supplies, personnel, or other available capabilities.  Agreements and understandings will be entered into by duly authorized officials and will be formalized in writing whenever possible.

3. Baltimore City has adopted the Maryland Emergency Management Assistance Compact (MEMAC), which provides for mutual assistance between jurisdictions in the State of Maryland.

4. Baltimore City has also adopted the Baltimore Regional Protective Action Coordination Agreement, which provides aid in the event of a regional emergency.  Participating members are Baltimore City, Baltimore County, City of Annapolis, Anne Arundel County, Carroll County, Harford County, and Howard County.

5. Baltimore City Mutual Aid Agreements are as follows:

CONFIDENTIAL - Produced Pursuant to Protective Order                    CITY00003853

BALTIMORE CITY EMERGENCY OPERATIONS PLAN                    DEC 2013

Table 3: Baltimore City Mutual Aid Agreements

| Agreement Type/Name | Parties | Date Signed |
|---|---|---|
| Maryland Emergency Management Assistance Compact (MEMAC) | Maryland counties | December 2013 |
| Baltimore Region Emergency Assistance Compact (BREAC) | Central Maryland counties | October 2002 |
| CMARC addendum to BREAC | Central Maryland counties | |
| Protective Action Compact addendum to BREAC | Central Maryland counties | Feb 2007 |
| Fire suppression and EMS mutual aid | Central Maryland counties | July 2004 |
| Law enforcement mutual aid & jurisdiction | BPD and University of Maryland, Baltimore County PD | June 2005 |
| Law enforcement mutual aid & jurisdiction | BPD and Baltimore Sheriff's Office | July 2002 |
| Law enforcement mutual aid & jurisdiction | BPD and Maryland Transportation Authority PD | November 2000 |
| Law enforcement mutual aid & jurisdiction | BPD and Baltimore County PD | 1991 |
| Law enforcement mutual aid & jurisdiction | BPD and US Dept of the Interior Fort McHenry National Monument | July 2005 |
| Mutual aid communications | Baltimore City and Baltimore County | October 1999 |
| Fire suppression mutual aid - BWI Airport | Baltimore City and MD Aviation Administration | October 1999 |
| Baltimore City Health Care Facilities Mutual Aid System | Health care facilities in the City | April 2006 |

CONFIDENTIAL - Produced Pursuant to Protective Order                    CITY00003854

## VII.   PLAN DEVELOPMENT AND MAINTENANCE

### A.  Plan Development

1. The Mayor is responsible for approving and promulgating this plan.

2. The primary responsibility for the development, coordination, implementation, and revision of the City of Baltimore Emergency Operations Plan is MOEM in conjunction with the HSPC.

### B.  Maintenance

1. The Basic Plan and its annexes will undergo a review annually and a complete revision with the transition to a new Mayor or as needed based upon lessons learned from actual incidents and emergencies as well as from exercises.

2. Revision and/or changes to the EOP will be made as necessary by MOEM and the HSPC.  It is expected that responsible officials in local agencies or organizations affected by this Plan will suggest or recommend changes at any time and provide information periodically as to changes of personnel and available resources.

3. The Director of the MOEM will ensure that an annual review of this plan is conducted by officials involved. The Director or his/her designee will assist in all review and revision efforts.

### C.  Training

1. All EOC representatives will go through EOC training to learn the structure of operations and assigned duties.

2. The City of Baltimore utilizes WebEOC as its web based incident management system. It is the responsibility of each agency director to ensure that their EOC representatives are properly trained.

3. It is the overall responsibility of each agency director to ensure that agency personnel, in accordance with the NIMS, possess the level of training, experience, credentialing, currency, physical and medical fitness, or capability for any positions they are tasked to fill.  Each agency director will determine the level of training required for their operational personnel.  All EOC representatives will be trained through the Tactical Management Level. The levels of NIMS training are as follows:

   a.  Awareness Level: IS-100.b and IS-700.a classes

   b.  Operations Level: IS-200.b

   c.  Tactical Management: ICS-300 and IS-800 classes

   d.  Leadership Level: ICS-400

CONFIDENTIAL - Produced Pursuant to Protective Order                                          CITY00003855

4.  At the request of the Director of MOEM, in conjunction with the HSPC, this plan may be tested through HSEEP-compliant exercises to ensure readiness of all agencies covered by this Plan. Updates will be made based on any deficiencies identified by the exercise.

CONFIDENTIAL - Produced Pursuant to Protective Order                                    CITY00003856

BALTIMORE CITY EMERGENCY OPERATIONS PLAN                    DEC 2013

## VIII.   AUTHORITIES AND REFERENCES

### A.  Authorities

1.  Federal:

    a.  Robert T. Stafford Disaster Relief & Emergency Assistance Act, (as amended), 42 U.S.C. § 5121 et seq.
    b.  Emergency Planning and Community Right-to-Know Act, 42 USC § 11001 et seq, Title III of the Superfund Amendments & Reauthorization Act (SARA).
    c.  Federal Emergency Management Agency (FEMA), 44 CFR § 1.1 et seq.

2.  State

    a.  Code of Maryland (COMAR), Public Safety, Title 14
    b.  Maryland Emergency Management Agency (MEMA), Md. Code, Public Safety § 14-101 et seq.
    c.  Executive Order 01.01.1991.02, State of Maryland Emergency Management Policy, COMAR.
    d.  Governor's Emergency Powers, Md. Code, Public Safety § 14-301 et seq.
    e.  Governor's Emergency Health Powers Md. Code, Public Safety § 14-3A-01 et seq.
    f.  Executive Order 01.012005.09, State of Maryland Adoption of National Incident Management System.

3.  Local

    a.  The Baltimore City Charter
        i.    Health and Nuisance Provision, Baltimore City Charter, Art. II § 11.
        ii.   Police Power, Baltimore City Charter, Art. II § 27.
        iii.  General Welfare Provision, Baltimore City Charter, Art. II § 47.
        iv.   Procurement Provision, Baltimore City Charter, Art. VI § 11

    b.  Disaster Control and Civil Defense, Baltimore City Code, Art. I § 18-1 et seq.

### B.  References

1.  Federal

    a.  Comprehensive Preparedness Guide (CGP) 101, Developing and Maintaining Emergency Operations Plans, Version 2.0, FEMA, March 2012.
    b.  Homeland Security Exercise and Evaluation Program (HSEEP), DHS, April 2013
    c.  Homeland Security Presidential Directive. *HSPD-5,* Management of Domestic Incidents
        i.   National Incident Management System
        ii.  National Response Framework.

CONFIDENTIAL - Produced Pursuant to Protective Order                    CITY00003857

BALTIMORE CITY EMERGENCY OPERATIONS PLAN                    DEC 2013

    2.  State

        a.  Maryland Emergency Preparedness Program (2013)

    3.  Local

        a.  The Baltimore Regional Protective Coordination Agreement and Guidelines (2007)

## C.  Supporting Documents

Disaster Preparedness and Planning Project: Hazard Mitigation and Climate Adaptation Plan, (2013)

City of Baltimore Emergency Operations Center Standard Operating Procedures for City Agencies, (Draft 2013)

Maryland Emergency Management Assistance Compact (2013)

Baltimore Regional Protective Action Coordination Agreement (2007)

City of Baltimore Emergency Response Manual For Human Resources Issues Regarding Pandemic Influenza And Other Catastrophic Events (Draft 2009)

City of Baltimore Continuity of Operations Plan, (Draft 2013)

Corporate Emergency Assess System Plan of Administration (2009)

Continuity of Government (COG) Plan (Draft 2013)

Baltimore Regional Threat and Hazard Identification and Risk Assessment (2012)

CONFIDENTIAL - Produced Pursuant to Protective Order                    CITY00003858

### D. Annexes

ESF 1 Transportation
ESF 2 Communications
ESF 3 Public Works and Engineering
ESF 4 Firefighting
ESF 5 Information and Planning
ESF 6 Sheltering and Mass Care
ESF 7 Resource Support
ESF 8 Health and Medical
ESF 9 Search and Rescue
ESF 10 Hazardous Materials
ESF 11 Public Information and warning
ESF 12 Energy
ESF 13 Law Enforcement
ESF 14 Recovery
ESF 15 Donations and Volunteer Management
ESF 16 Animal Protection

H-05 Extreme Heat
H-06 Winter Weather
H-07 Tropical Cyclone
H-10 Earthquake

### E. Acronyms

| | | |
|---|---|---|
| AAR | – | After Action Report |
| ACC | – | Alternate Communications Center |
| ARC | – | American Red Cross |
| | | |
| BACVA | – | Baltimore Area Convention and Visitors Association |
| BCFD | – | Baltimore City Fire Department |
| BCHD | – | Baltimore City Health Department |
| BCLD | – | Baltimore City Law Department |
| BCPS | – | Baltimore City Public Schools |
| BGE | – | Baltimore Gas & Electric |
| BOPA | – | Baltimore Office of Promotion and the Arts |
| BPD | – | Baltimore Police Department |
| BNET | – | Business Network of Emergency Resources, Inc. |
| BREAC | – | Baltimore Region Emergency Assistance Compact |
| BVU | – | Business Volunteers Unlimited Maryland |
| BWI | – | Baltimore-Washington International Airport |
| | | |
| CAD | – | Computer Aided Dispatch |
| CDC | – | Centers for Disease Control |
| CEAS | – | Corporate Emergency Access System |
| CERT | – | Community Emergency Response Team |
| CMARC | – | Central Maryland Area Radio Communications |
| COG | – | Continuity of Government |
| COMAR | – | Code of Maryland Regulations |

CONFIDENTIAL - Produced Pursuant to Protective Order                                    CITY00003859

| | | |
|---|---|---|
| COOP | – | Continuity of Operations |
| | | |
| DAT | – | Damage Assessment Team |
| DGS | – | Department of General Services |
| DHCD | – | Department of Housing and Community Development |
| DHMH | – | Department of Health and Mental Hygiene |
| DHR | – | Department of Human Resources |
| DJS | – | Maryland Department of Juvenile Services |
| DOF | – | Department of Finance |
| DOT | – | Department of Transportation |
| DPOB | – | Downtown Partnership of Baltimore, Inc. |
| DPSCS | – | Maryland Department of Public Safety and Correctional Services |
| DPW | – | Department of Public Works |
| DRP | – | Department of Recreation and Parks |
| | | |
| ECC | – | Emergency Communications Center |
| EMS | – | Emergency Medical Services |
| EOC | – | Emergency Operations Center |
| EOP | – | Emergency Operations Plan |
| ESF | – | Emergency Support Function |
| | | |
| HAZMAT | – | Hazardous Materials |
| HSEEP | – | Homeland Security Exercise and Evaluation Program |
| HSPC | – | Homeland Security & Emergency Preparedness Coordinating Committee |
| HSPD | – | Homeland Security Presidential Directive |
| | | |
| ICS | – | Incident Command System |
| | | |
| JIC | – | Joint Information Center |
| JIS | – | Joint Information System |
| | | |
| LCO | – | Local Coordinating Officer |
| | | |
| MCD | – | Mayor's Commission on Disabilities |
| MDE | – | Maryland Department of the Environment |
| MEMA | – | Maryland Emergency Management Agency |
| MEMAC | – | Maryland Emergency Management Assistance Compact |
| MdTA | – | Maryland Transportation Authority |
| MIEMSS | – | Maryland Institute for Emergency Medical Services Systems |
| MO | – | Mayor's Office |
| MOCC | – | Mayor's Office of Cable Communications |
| MOCJ | – | Mayor's Office of Criminal Justice |
| MOEM | – | Mayor's Office of Emergency Management |
| MOHS | – | Mayor's Office of Human Services |
| MOIIA | – | Mayor's Office of International and Immigrant Affairs |
| MOIT | – | Mayor's Office of Information Technology |
| MONCS | – | Mayor's Office of Neighborhoods and Constituent Services |
| MOU | – | Memorandum of Understanding |
| MPA | – | Maryland Port Authority |

CONFIDENTIAL - Produced Pursuant to Protective Order                                    CITY00003860

BALTIMORE CITY EMERGENCY OPERATIONS PLAN                         DEC 2013

| | | |
|---|---|---|
| MSA | – | Maryland Stadium Authority |
| MTA | – | Maryland Transit Administration |
| MTE | – | Municipal Telephone Exchange |
| | | |
| NIMS | – | National Incident Management System |
| NRF | – | National Response Framework |
| | | |
| OCME | – | Office of Chief Medical Examiner |
| OLC | – | Office of the Labor Commissioner |
| | | |
| PABC | – | Parking Authority of Baltimore City |
| PIO | – | Public Information Officer |
| | | |
| RACES | – | Radio Amateur Civil Emergency Service |
| | | |
| SARA | – | Superfund Amendments & Reauthorization Act |
| SHA | – | Maryland State Highway Administration |
| SITREP | – | Situation Report |
| SOP | – | Standard Operating Procedure |
| | | |
| UC | – | Unified Command |
| USCG | – | United States Coast Guard |
| | | |
| VoIP | – | Voice over Internet Protocol |

CONFIDENTIAL - Produced Pursuant to Protective Order                         CITY00003861

| SECTION: ESF 1 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Transportation | EMERGENCY OPERATIONS PLAN |

# Emergency Support Function 1

## *Transportation*

**Lead Agency:**            Department of Transportation (DOT)

**Core Agencies:**          Baltimore City Police Department (BPD)
                            Mayor's Office of Emergency Management (MOEM)

**Support Organizations:**  Baltimore City Department of Public Works (DPW)
                            Baltimore City Fire Department (BCFD)
                            Baltimore City Public Schools (BCPS)
                            Department of Recreation and Parks (DRP)

## 1. ESF OVERVIEW

### 1.1 Purpose
The purpose of this ESF is to provide for the transportation of people and resources during emergency or disaster events. Resources will need to be provided for services and activities including roadway repairs; debris removal; maintenance of traffic; and mobilization, identification, and coordination. Proper evacuation planning by transportation agencies (public and private) and technical experts will ensure that these services are promptly provided before, during and after emergencies and disasters.

### 1.2 Situation
The City of Baltimore will experience emergency and disaster incidents periodically. These incidents will require the restoration of essential services, infrastructure recovery, and return to normal day-to-day quality of life. Roadways, bridges, transportation facilities, and other transportation structures may be damaged or destroyed. The City will need to repair, reinforce, or demolish these structures to ensure the safety of the environment. However, resources such as personnel and equipment may be limited or insufficient to aide in operations. Equipment may also be inaccessible or damaged.

### 1.3 Assumptions
A. Local, state, and regional transportation infrastructure may also sustain damage. Infrastructure's ability to support response and recovery activities, as well as the nature of the disaster itself, will affect the overall effectiveness and efficiency of the City's response and recovery.
B. The demand for transportation systems by responders carrying out emergency operational activities may exceed the City's capabilities. The City of Baltimore will require assistance from other local jurisdictions, the state, and the private sector.
C. Damage assessments of the impacted areas will assist the City in determining how to prioritize response and transportation demands.

| REVISION DATE: September 2013 | PAGE: | 1-1 |
|---|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order                    CITY00003862

| SECTION:  ESF 1 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Transportation | EMERGENCY OPERATIONS PLAN |

D. Operations will require traffic control to divert vehicular traffic around the damaged, isolated, or evacuated areas.

E. The reestablishment of passable roadways will assist in sustaining the flow of emergency relief and repair efforts.

F. The Baltimore City Department of Transportation will be responsible for the inspection and repair of operational facilities.

G. Operations and dispatch centers should have sufficient supplies for at least a 72 hour period.

H. The use of outside private contractors may be necessary.  This will depend on the incident and its impact on the City.

### 1.4   Scope

ESF 1 is designed to provide transportation support to assist in incident management. Activities within the scope of ESF 1 include:

A. Assist other city agencies in the evacuation of the city.  This assistance will include point control, traffic signal operation, designating evacuation routes, and barricading roadways that are inaccessible or dangerous.

B. Process and coordinate requests for transportation under the EOP.

C. Coordinate the transportation of the general population, with accommodations for citizens with functional needs, including during evacuation.

D. Report damage to the transportation infrastructure resulting from the incident.

E. Coordinate the restoration and recovery of the transportation infrastructure.

F. Coordinate and support prevention, preparedness, and mitigation among transportation stakeholders at the city, regional, and state levels.

## 2.   CONCEPT OF OPERATIONS

### 2.1   General

**Response Operations**

A. Identify the number of people to be evacuated and the best means of transporting them.

B. Establish control points and initiate traffic controls.

C. Designate centrally located pickup points for persons without private automobiles or other means of transportation.

D. Designate rest areas along movement routes where evacuees can obtain fuel, water, medical aid, vehicle maintenance, information, and comfort facilities.

E. Redirect fuel supplies to service stations along evacuation routes and known traffic congestion areas.

F. Pre-position personnel, equipment, and supplies along evacuation routes and known traffic congestion areas to remove disabled vehicles.

G. Establish policies that will govern the use of vehicles during the evacuation period.

H. Provide transportation for essential workers to commute to risk areas as necessary.

I. Provide evacuees with instructional materials showing evacuation routes, reception areas, parking facilities, lodging, food services, medical treatment facilities, and campgrounds for families evacuating in recreational vehicles.

| REVISION DATE: September 2013 | PAGE:      1-2 |
|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00003863

| SECTION: ESF 1 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Transportation | EMERGENCY OPERATIONS PLAN |

J. Provide for the evacuation of the funcational and access needs community, elderly, and other vulnerable groups.

**Recovery Operations**
A. Begin debris clearance on major roads and highways, continuing on to residential streets.
B. Assess the extent of damage to City-maintained roads, bridges and toll facilities, and begin repairs as soon as possible.
C. Ensure that transportation is available for those evacuees with no access to transportation and other functional needs populations requiring support.

**2.2   Roadway Assessment and Repairs**
A. DOT, Traffic Engineering and Construction (TEC) Division, will conduct roadway assessments.  Private contractors will also assist depending on the size and scope of the incident.
B. The TEC Division will be responsible for managing roadway repairs.  Minor repairs will be made by the DOT Maintenance Division, and major repairs will be made by private contractors.

**Evacuation**

Refer to BPD General Order T-6: Emergency Traffic Evacuation Procedure.

**3.   ROLES AND RESPONSIBILITIES**

**3.1  Level I Agencies**

**DOT (Lead Agency)**
A. Provide advice on road conditions and recommend routes to be used for evacuation.
B. Mark evacuation routes, position barricades and other traffic control devices along routes, and provide personnel to assist in manning the control routes.
C. Provide vehicles to transport evacuees, if necessary.
D. Provide equipment and personnel to relocate essential resources to shelter and reception areas.
E. Implementation of access and traffic control.
F. Coordinate all volunteered transportation resources used or planned to be used in the evacuation.
G. Coordinate with other agencies with transportation capabilities to develop and maintain plans and procedures for emergency transportation.
H. Enter into agreements with the Baltimore City Board of Education and other organizations to use their vehicles to support evacuation.
I. Provide emergency repair and towing service, emergency fuel service, and information regarding transportation.
J. Prepare public information releases to advise residents of areas to be evacuated, evacuation routes to be used, and assembly points for persons without private transportation.

| REVISION DATE: September 2013 | PAGE:        1-3 |
|---|---|

| SECTION: ESF 1 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Transportation | EMERGENCY OPERATIONS PLAN |

**MOEM (Core Agency)**
A. Activate and manage the EOC to coordinate the City's response and support the lead agency.
B. Provide administrative and logistical support, as necessary.
C. Assist with public information to advise residents of areas to be evacuated, evacuation routes to be used, and assembly points for persons without private transportation.

**BPD (Core Agency)**
A. Assist with the selection of evacuation routes and access and traffic control points.
B. Assist with access and traffic control.
C. Assist with notification and enforcement of evacuation as necessary.
D. Provide land transportation for critical workers and equipment.
E. Provide emergency repair, towing, and fuel service.

**BCFD**
A. Provide ambulances and personnel to assist with the evacuation of hospitals and nursing homes, as necessary.
B. Assist with notification of evacuations as necessary.

**DPW**
A. Provide equipment and personnel to relocate essential resources to shelter and reception areas.
B. Provide debris removal and disposal for locally maintained roads and bridges and repair damage as necessary.

### 3.2 Level II Agencies

**BCPS**
A. Provide buses and drivers to transport evacuees to shelter and provide specially equipped vehicles to transport the handicapped and elderly.
B. Evacuate students from schools.

**DRP**
A. Provide debris removal and disposal for locally maintained roads and bridges

## 4. PREPAREDNESS AND PLAN MAINTENANCE

### 4.1 Awareness, Training, and Exercises
A. Participating agencies shall ensure that personnel responsible for implementing portions of this plan are familiar with the plan and with their duties.
B. DOT and responsible agencies shall conduct regular training and drills to maintain and improve capabilities that support the execution of this plan.
C. MOEM shall coordinate annual interagency exercises to test the City's ability to implement this plan.

### 4.2 Document Review and Revision
A. MOEM and DOT shall maintain this plan and coordinate an annual review by a committee composed of agencies assigned responsibilities under this plan.

| REVISION DATE: September 2013 | PAGE: 1-4 |
|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION:  ESF 1 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Transportation | EMERGENCY OPERATIONS PLAN |

B. Agencies' procedures to execute their responsibilities under this plan shall be reviewed annually by the respective agencies.

C. Documents that support this plan as listed below shall be maintained by their respective owners and reviewed as needed.  When these documents are substantively modified, the owners are responsible for notifying MOEM.

D. Based on the findings of annual reviews, MOEM shall coordinate plan revisions as necessary.

### 4.3   Authority

A. Baltimore City Charter, Art. VII § 114 and § 116 (2013)

B. Baltimore City Code, Art. 19 § 72 (2013)

C. Baltimore City Code, Art. 31 § 22-11 (2013)

### 4.4   Supporting Documents

**A.  DOT Emergency Operations Plan**

Owner:          Department of Transportation

Objective:      Emergency Operations Plans for the Department of Transportation.

Status:         Complete (April 2013)

**B.  BPD General Order T-6: Emergency Traffic Evacuation Procedure**

Owner:          Baltimore Police Department

Objective:      Codify procedures for orderly emergency traffic evacuations in a coordinated manner with various government agencies.

Status:         Complete (July 2002)

**C.  Baltimore Region Evacuation Traffic Management Support Functions**

Owner:          Baltimore Metropolitan Council

Objective:      Management of vehicular traffic from, through, or ending in Baltimore Region due to emergency evacuation.

Status:         Complete (June 2013)

CONFIDENTIAL - Produced Pursuant to Protective Order                                          CITY00003866

| SECTION:  ESF 2 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Communications | EMERGENCY OPERATIONS PLAN |

# Emergency Support Function 2

## *Communications*

**Lead Agency:**          Mayor's Office of Information Technology (MOIT)

**Core Agencies:**         Baltimore City Fire Department (BCFD)
                          Baltimore Police Department (BPD)

**Support Organizations:**  Baltimore City Health Department (BCHD)
                          Department of Housing and Community Development (DHCD)
                          Department of General Services (DGS)
                          Department of Public Works (DPW)
                          Department of Transportation (DOT)
                          Department of Recreation and Parks (DRP)
                          Mayor's Office (MO)
                          Mayor's Office of Emergency Management (MOEM)
                          Municipal Telephone Exchange (MTE)
                          Radio Amateur Civil Emergency Services (RACES)
                          Verizon
                          All City Agencies with Communications Capabilities

## 1.  ESF OVERVIEW

### 1.1   Purpose
The purpose of this ESF is to provide internal communications capability during emergency or disaster events.  This ESF Annex is designed to provide a flexible organizational structure capable of meeting the varied requirements of many emergency scenarios with the potential to require activation of the Emergency Operations Center (EOC) and implementation of the Emergency Operations Plan (EOP).

### 1.2   Situation
The City of Baltimore is vulnerable to a range of natural and man-made hazards that may affect the ability for responding agencies to communicate internally and externally before, during, and after an emergency, making it important to have redundant means of communication.

### 1.3   Assumptions
A.  All or part of any communications system may be disrupted during a major disaster.
B.  Text messaging and mobile data may allow for communication in situations where voice communication via telephones or cell phones is not operational.

| REVISION DATE: July 2013 | PAGE: | 2- 1 |
|---|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION:  ESF 2 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Communications | EMERGENCY OPERATIONS PLAN |

### 1.4    Scope
This ESF identifies the key tasks to be performed in order to effectively provide and maintain communication channels. It describes strategies and planning considerations for these tasks and assigns responsibility for their performance to different agencies. This plan does not establish operational tactics or standard operating procedures; it supplements and ties together several supporting documents, hazard-specific plans, and agency-specific procedures.

## 2.  COMMUNICATION STRATEGIES

### 2.1    General
The EOC must provide a rapid and reliable means of communications in support of emergency operations during natural and man-made disasters.  Within this general concept, there are two functions.  One is to support the emergency response and associated activities.  The second is to provide necessary survival information to the public at risk, normally through the Emergency Alert System (EAS) and other media. The latter is addressed in ESF 11: Public Information and Warning.

In low-complexity incidents, the Alternative Communications Center (ACC) or the Emergency Communications Center (ECC) will facilitate communication between Incident Command and outside agencies, organizations, or jurisdictions.

In a complex incident, the EOC is the hub for communications between Incident, Unified, or Area Command and outside entities.  This includes the citizens, the private sector, state and federal agencies, and mutual aid partners.  The Joint Information System (JIS) is an important component of this process.

The City network provides an alternate means of communication and information sharing. Email can be used to communicate if the City email system is functioning. Blackberries can be used to communicate directly if the City email system ceases to function as well as the WebEOC software system. The WebEOC software system can be used as a communications tool between City agencies or jurisdictions and can be accessed via the web from any location. The Reverse 911 system can be used as a means to notify citizens and possibly internal staff.

### 2.2    800 MHz Radio
The City operates a digital, trunked 800 MHz public safety voice system.  System keys are shared with all police, fire and emergency medical services agencies with contiguous boundary lines: Anne Arundel, Baltimore, and Howard Counties.  Primary incident talkgroups and mutual aid talkgroups are used for interoperability in accordance with existing agreements.  These talkgroups are used on a daily basis for interoperable communications.  Talkgroup assignments for catastrophic incidents would be the responsibility of the Communications Unit Leader in coordination with the Logistics Branch Chief and the Incident Commander.

The City also maintains a cache of radios that can be distributed as necessary to partners. Although several agencies maintain individual sets of talk groups, all agencies can communicate with each other on Channel B10.  City departments and

| REVISION DATE: July 2013 | PAGE: | 2- 2 |
|---|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00003868

| SECTION:  ESF 2 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Communications | EMERGENCY OPERATIONS PLAN |

agencies that have their own operational radio network manage their nets from the ECC and ACC.  Police, Public Works, and Transportation use the ECC, and Fire uses the ACC.  Each serves as a backup to the other.

The following agencies have 800 MHz radios:

| | |
|---|---|
| BCFD | DPW |
| BCHD | DRP |
| BPD | Inspector General |
| DGS | MO |
| DHCD | MOEM |
| DOT | |

Radio communications between jurisdictions in the region can be accomplished using the Central Maryland Area Radio Communications System (CMARC).  Radio interoperability for mutual aid situations that are limited in scope and geography can generally be handled via use of talkgroups on shared systems and/or shared radios. The 800 MHz interoperability channels are known as 8CALL and 8TAC.  Users of 800 MHz radios can access the National Public Safety Planning Advisory Committee (NPSPAC) channels.  See the *Baltimore Urban Area Tactical Interoperable Communications Plan* (TICP) for more information on mutual aid and interoperable channels.

**2.3   VHF/UHF**
Very high frequency (VHF) is the radio frequency range from 30 MHz to 300 MHz. Fire stations have VHF radios to serve as a backup to the 800 MHz radio system.  The Fire Mutual Aid Radio (FMAR) is a VHF radio used to communicate for mutual aid between jurisdictions.

Ultra high frequency (UHF) is the radio frequency range between 300 MHz and 3 GHz. BPD uses Mutual Aid Coordination (MA COORD), in the 700MHz band, a talkgroup that connects area dispatch centers.

**2.4   Voice**
The City provides voice communications through three modes: land lines, cellular network, and limited Voice over Internet Protocol (VoIP) computer telephony.  The City has access to a limited number of satellite-based telephones.  Assuming a power source (e.g., vehicle battery), these devices are theoretically independent of any existing telephony infrastructure.  In practice within an urban environment, setup and mobility can be problematic.

MOIT maintains the Cassidian Reverse 911 system by defining call out areas, recording messages, and initiating the calls to the public or City employees. Depending on the length of the recorded message a full city-wide call out takes close to 32 hours. The server is located on site in the Municipal Building with a backup instance hosted by the vendor. The vendor-hosted backup system is accessible via the telephone or web to launch a predefined scenario or by web to define and launch a new scenario. A call out area is defined by geographic polygons that can be pre-defined before an emergency or as necessary by EGIS.

| REVISION DATE: July 2013 | PAGE: | 2- 3 |
|---|---|---|

| SECTION:  ESF 2 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Communications | EMERGENCY OPERATIONS PLAN |

Key personnel within the city have Government Emergency Telecommunications Service (GETS) cards, which prioritizes calls over the wired network. These cards can be used to place calls when the phone network is overwhelmed. For priority access over cellular communications networks, key personnel are enrolled in Wireless Priority Service (WPS) on their City-issued wireless devices.

### 2.5  E-mail
The City provides direct and indirect E-mail services to greater than 20,000 mailboxes. A direct E-mail user would have an account on an MOIT or City E-mail server, while an indirect user may have an entry in the Global Address Book representing a link to the user's specific E-mail environment (e.g., BCPS).  BPD, DHCD, and BCPS have their own networks.  All other agencies are serviced by MOIT.

### 2.6  Blackberry
The City provides Blackberry wireless E-mail/paging devices to approximately 855 key employees in municipal government.  Many of these devices can also be used for Direct Connect and instant messaging.  If a large-scale event destroys the Blackberry and E-mail server environment, the E-mail portion of the Blackberry service would cease.  However, assuming the carrier remained in an operational state, the Blackberries could continue to serve in a PIN-to-PIN mode, which is a viable electronic messaging capability.  MTE maintains a "near-time" database of all current Blackberry users and their PIN's, and would distribute such a listing to all City agencies so the appropriate PIN's could be programmed into the hand-held devices.

### 2.7  HAM Radio
RACES is a public service provided by a volunteer group of Amateur Radio Operators that is administered by MOEM. As a part of the Amateur Radio Service, it provides radio communications for civil-preparedness purposes only during emergencies. RACES can be used to communicate between the EOC and designated shelters and can provide communication support wherever needed within capabilities upon request.

Amateur radio capabilities have been installed in several city agencies as well as key partners such as broadcast media and healthcare facilities.

### 2.8  WebEOC
WebEOC is the City of Baltimore's emergency management software system.  It is a web-based system that allows multiple users to record, organize, and share information in real-time.  City WebEOC also shares information with MEMA's WebEOC through WebFusion.

MOEM and MOIT will maintain the WebEOC software system.  All agencies and key partners maintain user IDs and can logon to record and view incident information.  The application is accessible via the web and the data is stored at EOC1 and mirrored in real-time at EOC2.  Backup application servers are also located at both facilities to allow for the system to function independent of the City network or internet availability. NOTE: When WebEOC goes to the backup application server, it will operate independent of the City network; however, it would only be accessible from within the EOC.  Hospitals or any representatives at remote locations would not be able access the application.

| REVISION DATE: July 2013 | PAGE: | 2- 4 |
|---|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION: ESF 2 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Communications | EMERGENCY OPERATIONS PLAN |

## 3. ROLES AND RESPONSIBILITIES

### 3.1 Level I Agencies

**MOIT (Lead Agency)**
A. Assess the extent of damage to the communications network and discuss alternate communication options;
B. Engage necessary vendors (Verizon, cabling companies, etc.) as required to restore physical connectivity;
C. Maintain the City's 800 MHz radio system;
D. Determine immediate network changes required, if any, to activate the required operations;
E. Participate in training and exercises to practice and test this plan;
F. Manage server for WebEOC;
G. Maintain the City network and email systems.

**BCFD (Core Agency)**
A. Provide the appropriate level emergency response to address the needs of the City of Baltimore;
B. Dispatch and maintain communications with emergency responders from the ACC;
C. Relay information between Incident Commander and other agencies, organizations, and jurisdictions until the EOC is activated;
D. Develop, coordinate, and implement communications messages as needed;
E. Provide and distribute 800 MHz radios as necessary;
F. Maintain internal capabilities, policies, and procedures sufficient to execute the tasks assigned in this plan;
G. Design and participate in training and exercises to practice and test this plan.

**BPD (Core Agency)**
A. Dispatch and maintain communications with emergency responders from the ECC;
B. Relay information between Incident Commander and other agencies, organizations, and jurisdictions until the EOC is activated;
C. Provide and distribute 800 MHz radios as necessary;
D. Develop, coordinate, and implement communications messages as needed;
E. Maintain internal capabilities, policies, and General Orders sufficient to execute the tasks assigned in this plan;
F. Ensure ECC supervisors are trained in Reverse 911 procedures;
G. Participate in training and exercises to practice and test this plan.

**BCHD**
A. Develop, coordinate, and implement communications messages as needed.
B. Provide and distribute 800 MHz radios as necessary;
C. Assist hospitals with WebEOC use and other emergency coordination with the City;
D. Participate in training and exercises to practice and test this plan.

**DHCD**
A. Provide and distribute 800 MHz radios as necessary;
B. Participate in training and exercises to practice and test this plan.
C.

| REVISION DATE: July 2013 | PAGE: | 2- 5 |
|---|---|---|

CITY00003871

| SECTION:  ESF 2 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Communications | EMERGENCY OPERATIONS PLAN |

**DGS**
A.  Provide and distribute 800 MHz radios as necessary;
B.  Participate in training and exercises to practice and test this plan.

**DPW**
A.  Provide and distribute 800 MHz radios as necessary;
B.  Participate in training and exercises to practice and test this plan.

**DOT**
A.  Provide and distribute 800 MHz radios as necessary;
B.  Participate in training and exercises to practice and test this plan.

**MO**
A.  Provide and distribute 800 MHz radios as necessary;
B.  Participate in training and exercises to practice and test this plan.

**MOEM**
A.  Activate and manage the EOC to coordinate and support the City's response;
B.  Activate and support a JIS/JIC to coordinate the City's information to the public;
C.  Secure outside resources to support the tasks identified in this plan;
D.  Provide communications support to emergency response services upon request;
E.  Provide communications capability between the EOC and the Incident Commander, Maryland Emergency Management Agency (MEMA), adjacent counties, and all operating entities represented in the EOC;
F.  Provide and distribute 800 MHz radios as necessary;
G.  Activate RACES to engage certified HAM Radio operators when necessary;
H.  Coordinate and maintain RACES volunteers and training;
H.  Maintain and administer the WebEOC system;
I.   Design and participate in training and exercises to practice and test this plan.

**MTE**
A.  Work with MOIT to bring telephone operations back on line;
B.  Activate the call forwarding function on critical phones to re-route calls to identified buildings or temporary headquarters;
C.  Participate in training and exercises to practice and test this plan.

3.2  **Level II Agencies**

**DRP**
A.  Provide and distribute 800 MHz radios as necessary;
B.  Participate in training and exercises to practice and test this plan.

3.3  **Level III Agencies**

**RACES**
A.  Provide personnel to operate the RACES net control in the EOC;
B.  Provide communication between the EOC and designated sites;
C.  Provide emergency communications support wherever needed with capabilities, upon request;

| REVISION DATE: July 2013 | PAGE:      2- 6 |
|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION: ESF 2 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Communications | EMERGENCY OPERATIONS PLAN |

D. Participate in training and exercises to practice and test this plan.

**All City Agencies with Communications Capabilities**
A. Ensure operation of base stations in the event of power outage;
B. Provide fixed or mobile back-up to the emergency communications systems in the EOC, upon request;
C. Participate in training and exercises to practice and test this plan.

## 4. PREPAREDNESS AND PLAN MAINTENANCE

### 4.1 Awareness, Training, and Exercises
A. Participating agencies shall ensure that personnel responsible for implementing portions of this plan are familiar with the plan and with their duties.
B. MOEM and responsible agencies shall conduct regular training and drills to maintain and improve capabilities that support execution of this plan.
C. MOEM shall coordinate annual interagency exercises to test the City's ability to implement this plan.

### 4.2 Document Review and Revision
A. MOEM shall maintain this plan and coordinate an annual review by a committee composed of MOIT and agencies that are assigned responsibilities under this plan.
B. Agencies' procedures to execute their responsibilities under this plan shall be reviewed annually by the respective agencies.
C. Documents that support this plan as listed below shall be maintained by their respective owners and reviewed as needed. When these documents are substantively modified, the owners are responsible for notifying MOEM.
D. Based on the findings of annual reviews, MOEM and MOIT shall coordinate plan revisions as necessary.

### 4.3 Authority
A. Title III of the Communications Act of 1934, as amended (43 FR 54791, Nov. 22, 1978).
B. Department of Commerce Organization Order (DOO) 10-10 of October 5, 1992.
C. NTIA Organization Act, Pub. L. No. 102-538, 106 Stat. 3533 (1992) (codified at 47 U.S.C. 901 et seq.).

### 4.4 Supporting Documents

**A. MOIT Continuity of Operations Plan**
Owner:        Mayors Office of Information Technology
Objective:    Establishes policies and procedures to maintain agency functions during an emergency.
Status:       Complete (February 2010)

**B. BCFD Manual of Procedure (MOP) 515 Series**
Owner:        Baltimore City Fire Department
Objective:    Outlines communications procedures for the Fire Department.
Status:       Individual MOPs updated as needed.

| REVISION DATE: July 2013 | PAGE: 2- 7 |
|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION: ESF 2 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Communications | EMERGENCY OPERATIONS PLAN |

**C. Evacuation Plan and Emergency Procedures Manual**

| Owner: | Baltimore City Police Department, Emergency Communications Center |
|---|---|
| Objective: | Outlines procedures for evacuation and other failures within the ECC. |
| Status: | Complete (May 2006) |

**D. Baltimore Police Department General Order G-1**

| Owner: | Baltimore Police Department |
|---|---|
| Objective: | Outlines the emergency response for the departmental radio communications system. |
| Status: | Published July 1996, amended July 1999 |

**E. City of Baltimore Automated Notification System SOP**

| Owner: | Mayor's Office of Information Technology |
|---|---|
| Objective: | Establish policies and procedures for use of Reverse 911 system. |
| Status: | Draft (August 2013) |

**F. WebEOC City of Baltimore System Administrator Manual**

| Owner: | Mayor's Office of Emergency Management |
|---|---|
| Objective: | Establish policies and procedures for use of the City's WebEOC software system. |
| Status: | Draft (2013) |

**G. Baltimore City Continuity of Government Plan**

| Owner: | Mayor's Office of Emergency Management |
|---|---|
| Objective: | Includes information on backup communications plans. |
| Status: | Draft (June 2011) |

**H. Baltimore Urban Area Tactical Interoperable Communications Plan**

| Owner: | Baltimore Urban Area Working Group |
|---|---|
| Objective: | Documents what interoperable communications resources are available within the urban area, which controls each resource, and the rules of use or operational procedures for each resource, as well as the Central Maryland Area Radio Communications (CMARC) System SOP. |
| Status: | Complete (October 2007) |

**I. Code of Federal Regulation, Title 47, Vol 5, Part 90**

| Owner: | United States Federal Communications Commission |
|---|---|
| Objective: | Sets the conditions under which radio communications systems may be licensed and used in the Public Safety, Industrial/Business Radio Pool, and Radiolocation Radio Services. |
| Status: | Complete (October 2009) |

| REVISION DATE: July 2013 | PAGE: 2- 8 |
|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION: ESF 2 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Communications | EMERGENCY OPERATIONS PLAN |

J. **Manual of Regulations and Procedures for Federal Radio Frequency Management (Redbook)**

| | |
|---|---|
| Owner: | National Telecommunications and Information Administration |
| Objective: | Covers frequency management responsibilities of the Assistant Secretary of commerce for Communications and Information. |
| Status: | Complete (May 2013) |

K. **RACES Operation Manual**

| | |
|---|---|
| Owner: | RACES |
| Objective: | Provide protocols for RACES operators for use when activated. |
| Status: | Draft (September 2013) |

| REVISION DATE: July 2013 | PAGE:   2- 9 |
|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order   CITY00003875

| SECTION: ESF 3 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Public Works and Engineering | EMERGENCY OPERATIONS PLAN |

# Emergency Support Function 3

## *Public Works and Engineering*

**Lead Agencies:** Department of Public Works (DPW)
Department of General Services (DGS)

**Core Agencies:** Mayor's Office of Emergency Management (MOEM)
Department of Transportation (DOT)
Baltimore City Police (BPD)
Baltimore City Fire Department (BCFD)
Baltimore City Law Department (BCLD)
Department of Housing and Community Development (DHCD)
Department of Parks and Recreation (DRP)
Department of Finance (DOF)

**Support Organizations:**
Mayor's Office of Neighborhoods (MON)
Mayor's Office of Information and Technology (MOIT)
Baltimore City Parking Authority (PABC)
Baltimore Gas and Electric (BGE)

## 1. ESF OVERVIEW

### 1.1 Purpose

Emergency Support Function (ESF) 3, Public Works and Engineering, provides an overview and guidance for the assessment and restoration of water systems, debris removal, and ensures the operation of critical facilities. In addition, this ESF will serve to coordinate private and public sector response efforts to ensure timely restoration of water systems and critical facilities following a large-scale disaster or event.

### 1.2 Situation

Much of the infrastructure in the City of Baltimore, particularly the water systems, are aging and in need of replacement. As a result, the City experiences frequent water main breaks, which often disrupt other utilities that run beneath the roadways. During a storm, large amounts of snow, ice, or other debris need to be removed and properly disposed of for the purposes of restoring critical facilities. In the event of a large-scale disaster or disruption, more coordination will be needed to prioritize the recovery efforts and share information.

ESF 3 addresses the assessment and restoration of damage to utilities infrastructure. The utilities covered in this ESF annex is the water system: potable water, waste water, and storm water. This annex may need to be activated in conjunction with ESF 14 – Recovery, which includes damage assessment and debris management.

| REVISION DATE: September 2013 | PAGE: 3 - 1 |
|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00003876

| SECTION: ESF 3 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Public Works and Engineering | EMERGENCY OPERATIONS PLAN |

### 1.3 Assumptions

A. The public expects fundamental resources such as water, sewer, communication, electricity, and natural gas to be restored in a timely manner during an emergency. These resources can also be necessary to maintain response operations.

B. Widespread and prolonged damages to critical infrastructure may exist within the event area, contributing to delays in the process of repairs.

C. Rapid assessments will need to be made to determine the extent of the city's infrastructure involved; resources needed, and estimated repair times.

D. In the event of a major disaster, there will be increasing and conflicting demands for water for firefighting, potable water, and sanitation which may exceed available resources.

E. Water pressure systems may be low or zero, affecting health and safety facilities as well as fire suppression capabilities.

F. If there is a need for severe water use restrictions, the public will need to be informed on ways to conserve water. These restrictions may require vigilant enforcement to ensure compliance.

G. Damage to water systems operated by Baltimore City may have an impact on surrounding jurisdictions.

H. If the wastewater treatment infrastructure is temporarily or permanently inoperable, it may result in raw sewage leaking into the waterways.

I. Development task forces and/or coordination among various city departments for debris removal.

J. Outside contractors may be required for emergency operations.

### 1.4 Scope

ESF 3 addresses the assessment and restoration of damage water and utilities infrastructure. The utilities covered in this ESF annex include roadways and water systems (potable water, waste water, and storm water), and critical infrastructure such as water treatment plants, fire and police stations, and other critical facilities. This annex may need to be activated in conjunction with ESF 14 – Recovery, which includes damage assessment and debris management

## 2. PUBLIC WORKS AND INFRASTRUCTURE STRATEGIES

### 2.1 Concept of Operations

**A. General**

DPW will coordinate the repair and restoration of water systems in a disaster. DGS is responsible for repair and restoration of City-owned critical infrastructure.

**B. Organization**

1) DPW is organized into two bureaus. The Bureau of Water & Wastewater is responsible for all the water distribution and water holding facilities. The Bureau of Solid Waste is responsible for city landfills and debris removal.

2) DGS is organized into five divisions. The Facilities division is responsible for construction, repair, and maintenance of City facilities. The Design and Construction/Major Projects division is responsible for large projects and contract management.

| REVISION DATE: September 2013 | PAGE: 3 - 2 |
|---|---|

**DRAFT**

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION: ESF 3 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Public Works and Engineering | EMERGENCY OPERATIONS PLAN |

### 2.2 Water Systems (pipes)

**A. Drinking Water**

1) **Overview:** The Department of Public Works maintains 3,800 miles of water mainlines. Additionally, DPW maintains 700 miles of water connections, 9,100 city fire hydrants and 13,750 Baltimore County fire hydrants. This infrastructure supplies drinking water to an estimated 1.8 million people within the Baltimore Metropolitan Area. Some of the pipelines within the city are over 100 years old.

2) **Assessment:** Water mains and other water infrastructure are actively monitored by DPW from 7am to 7pm on workdays. Some critical functions are monitored by outside agencies every hour on a 24 x 7 basis. Any anomalies are reported back to DPW for restitution.

3) **Restoration:** City-owned water pipelines and hydrants are maintained/configured/repaired/replaced by DPW staff or city contracts. Physical damage is handled via a requirements contract or state assistance.

**B. Waste Water**

1) **Overview:** On average the waste systems collects and treats 210 million gallons of wastewater daily. To handle that amount of wastewater, there are more than 3,100 miles of sanitary mains in the whole system, of which approximate 1,400 miles are maintained by the city. In addition to the mains, the city also operates and maintains eight (8) major wastewater pumping stations and ten (10) minor installations.

2) **Assessment:** Water mains and other water infrastructure are actively monitored by DPW from 7am to 7pm on workdays. Some critical functions are monitored by outside agencies every hour on a 24 x 7 basis. Any anomalies are reported back to DPW for restitution.

3) **Restoration:** City-owned water pipelines and hydrants are maintained/configured/repaired/replaced by DPW staff or city contracts. Physical damage is handled via a requirements contract or state assistance.

**C. Storm Water**

1) **Overview:** The Surface Water Management Division (SWMD) provides a comprehensive approach to managing surface water. Its goal is to respect and preserve the City's streams, harbor and the Chesapeake Bay. It works to protect water quality; control, accommodate and discharge storm runoff; provide for groundwater recharge; control sediment; stabilize erosion; establish monitoring capability; and rehabilitate stream and drainage corridors. Baltimore City maintains a separate storm drain system. The system includes 1,146 miles of storm drain pipes with 27,561 storm drain manholes. There are approximate 52,438 storm drain inlets and 1,709 outfalls.

2) **Assessment:** Water mains and other water infrastructure are actively monitored by DPW from 7am to 7pm on workdays. Some critical functions are monitored by outside agencies every hour on a 24 x 7 basis. Any anomalies are reported back to DPW for restitution.

| REVISION DATE: September 2013 | PAGE: | 3 - 3 |
|---|---|---|

**DRAFT**

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION:  ESF 3 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Public Works and Engineering | EMERGENCY OPERATIONS PLAN |

    3) **Restoration:** City-owned water pipelines and hydrants are maintained/configured/repaired/replaced by DPW staff or city contracts.  Physical damage is handled via a requirements contract or state assistance.

## 2.3  Infrastructure

### A. Water Treatment Facilities
1) **Overview:**  The City of Baltimore collects and treats up to 250 million gallons of wastewater daily at the Back River and Patapsco wastewater treatment plans. The DPW operates and maintains these facilities and three water filtration plants (Montebello I, Montebello II, and Ashburton).
2) **Assessment:** Water mains and other water infrastructure are actively monitored by DPW 24 hours per day.  Some critical functions are monitored by outside agencies every hour on a 24 x 7 basis.  Any anomalies are reported back to DPW for restitution.
3) **Restoration:** City-owned water treatment facilities are primarily maintained and repaired by DPW staff or city contracts.  Physical damage is handled via a requirements contract or state assistance.

### B. Water Holding Facilities
1) **Overview:**  The city has three raw water reservoirs: Loch Raven, Liberty, and Prettyboy.  Additionally, the City operates eighteen (18) water towers and six (6) tanks.  These facilities are maintained in coordination with the Baltimore City Health Department, Department of Recreation and Parks, MDE, and Baltimore County.
2) **Assessment:** Water holding sites and facilities are actively monitored by DPW 24 hours a day.  Some critical functions are monitored by outside agencies every hour on a 24 x 7 basis.  Any anomalies are reported back to DPW for restitution.
3) **Restoration:** City-owned water treatments are primarily maintained and repaired by DPW staff in conjunction with other city and state entities.  Physical damage is handled via a requirements contract or state assistance.

### C. Critical Facilities
1) **Overview:**  These facilities are critical to the continued operations of the City government.  These facilities have been labeled as critical and receive priority for the restoration of services, clearing of debris, etc. BPD and MOEM maintain a list of designated critical facilities.
2) **Assessment:** Baltimore Environmental Police maintains plans for critical water supply facilities. BPD maintains plans for other critical facilities.
3) **Restoration:** City-owned critical facilities are maintained by DGS in conjunction with other City and State entities.  Physical damage is handled via a requirements contract or state assistance.

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00003879

| SECTION:  ESF 3 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Public Works and Engineering | EMERGENCY OPERATIONS PLAN |

## 3. ROLES AND RESPONSIBILITIES

### 3.1  Level I Agencies

**DPW (Lead)**
A.  Clear, clean, and maintain the water delivery system for public use;
B.  Remove debris from sewage systems, drainage systems, reservoirs, rough water systems, water treatment sites and final water delivery system for public use;
C.  Comply with regulations and laws in regards to water treatment.

**DGS (Lead)**
A.  Responsible for maintenance and repair of critical facilities;
B.  Coordinate repair and restoration of critical facilities with other agencies and contractors;
C.  Maintain fleet and equipment to be used in coordination with DPW;
D.  Maintain on-call fuel truck to support continuity of long-term operations where heavy machinery is needed or other fuel dependent equipment is being used.

**MOEM**
A.  Manage the EOC;
B.  Coordinate recovery efforts, including management of Damage Assessment Teams and relay information and requests to the Debris Management Center (DMC).

**BPD**
A.  Support the debris management process through aerial photos and the use of aerial support to determine the highest concentration of debris in the City of Baltimore.

**BCFD**
A.  Responsible for fire protection, rescue, and HAZMAT incidents involving debris;
B.  Assist with the debris removal process and operations as needed or indicated by the Incident Command or Director of Emergency Management;
C.  Assist the DAT with mapping needed, utilizing GIS to track debris areas as well as progress of removal.

**DRP**
A.  Clear, clean and remove any woody, vegetative debris that may hinder travel or public routine from public areas.
B.  Clear, clean, and remove any debris that may have landed in a City park or other jurisdiction of the Department of Recreation and Parks.  DRP must remove any item deemed unsafe especially playground equipment.
C.  Manage forestry issues and downed tree requests.

**MOIT**
A.  Operate Baltimore City's 311 call center and field requests that may arise from public calls for assistance;
B.  MOIT will assist with IT needs in the EOC, DMC, or any other established command center for debris removal.

| REVISION DATE: September 2013 | PAGE: | 3 - 5 |
|---|---|---|

**DRAFT**

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION:  ESF 3 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Public Works and Engineering | EMERGENCY OPERATIONS PLAN |

### 3.2  Level II Agencies

**DOF**
A.    Maintain a record of contracts, monitor contract work, track expenses, and track salvage inventory, payouts and manage any other costs.  This agency should be prepared for audit by the State or FEMA when requesting reimbursement.

**BCLD**
A.    Review contracts, review insurance policies, ensure environmental and historical preservation compliance, ensure site restoration and closure requirements are fulfilled, review building condemnation process, establish private property demolition, and review right of entry and hold harmless agreements.

## 4.  PREPAREDNESS AND PLAN MAINTENANCE

### 4.1    Awareness, Training, and Exercises
A.  Participating agencies shall ensure that personnel responsible for implementing portions of this plan are familiar with the plan and with their duties.
B.  MOEM and responsible agencies shall conduct regular training and drills to maintain and improve capabilities that support execution of this plan.
C.  MOEM shall coordinate annual interagency exercises to test the City's ability to implement this plan.

### 4.2    Document Review and Revision
A.  MOEM shall maintain this plan and coordinate an annual review by a committee composed of DPW and agencies that are assigned responsibilities under this plan.
B.  Agencies' procedures to execute their responsibilities under this plan shall be reviewed annually by the respective agencies.
C.  Documents that support this plan as listed below shall be maintained by their respective owners and reviewed as needed.  When these documents are substantively modified, the owners are responsible for notifying MOEM.
D.  Based on the findings of annual reviews, MOEM and DPW shall coordinate plan revisions as necessary.

### 4.3    Authority
A.  Baltimore City Code, Art. 24 § 1-1 (2013)
B.  Baltimore City Code, Art. 23 § 1-4 through § 1-7 (2010).
C.  Baltimore City Code, Art. 25 § 1-2 (2013)
D.  Baltimore City Charter, Art. VII § 130, § 132, and § 134 (2013)

### 4.4    Supporting Documents

**A.    Mutual Aid Agreements**
Owner:            Department of Public Works
Objective:        Provide and receive mutual aid for the complete restoration of utilities through established agreements with private companies and/or surrounding jurisdictions.
Status:            See EOP Basic Plan for list of current MAAs

| REVISION DATE: September 2013 | PAGE: | 3 - 6 |
|---|---|---|

**DRAFT**

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION:  ESF 3 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Public Works and Engineering | EMERGENCY OPERATIONS PLAN |

**B.    Baltimore City Critical Infrastructure**

Owner:              MOEM
Objective:        List of critical infrastructure
Status:            Complete (2013)

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00003882

| SECTION: ESF 4 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Firefighting | EMERGENCY OPERATIONS PLAN |

# Emergency Support Function 4

## *Firefighting*

**Lead Agency:**      Baltimore City Fire Department (BCFD)

**Support Agency:**   Department of Public Works (DPW)

## 1. ESF OVERVIEW

### 1.1  Purpose
The purpose of this ESF is to denote responsibility in the field of fire suppression in order to safeguard lives and property in Baltimore City.

### 1.2  Situation
The complexity of the city provides many possibilities for uncontrolled fires that could pose a threat to life, property, and the environment.  In addition to various types and configurations of building construction, a very robust transportation network that includes rail, marine, and Interstate Highways compound the potential for the threat of fires.  These challenges are dealt with on a daily basis.  The ability to effectively respond with adequate resources to control fires under extraordinary conditions caused by natural and man-made events requires evaluation and planning.

### 1.3  Assumptions
Resources dispatched under normal conditions to fires and other emergencies are based on an assessment of data of performance and outcomes relative to the personnel and equipment deployed.  Building on that assessment and the Department's experience during periods where the on-duty resources were overwhelmed, options have been developed to increase capacity to respond safely and effectively when required.

A. Response capacity can be increased by 20% with BCFD equipment and personnel.
B. Mutual Aid Agreements can increase the response capacity of BCFD depending upon resources available from mutual aide partners at the time of the request considering impact of an emergency to the region.
C. Water supply from gravity-fed domestic supply for firefighting can be augmented by large capacity water tender vehicles or by accessing streams and the bay.
D. Radio Communications can be supplemented with additional talk groups from MEMA in the 800 MHz band.  The Fire Department also maintains a VHF radio system as additional backup.
E. Resources for firefighting can be requested through MOEM to MEMA.

| REVISION DATE: September 2013 | PAGE:      4-1 |
|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00003883

| SECTION:  ESF 4 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Firefighting | EMERGENCY OPERATIONS PLAN |

### 1.4  Scope

This Firefighting annex includes firefighting activities, including the detection and suppression of fires on public and private lands, and providing personnel, equipment, and supplies for emergency response or assistance operations.  Other functions of BCFD are addressed in different ESF annexes.

## 2.  CONCEPT OF OPERATIONS

### 2.1   General
As part of an all hazards response strategy, firefighting operations are conducted in accordance with recognized fire service standards and best practices to ensure safety and efficiency.  The basic concepts found in the National Incident Management System (NIMS) are used to manage the operational resources of the Department under normal and extreme conditions.  The Incident Command System (ICS) is used to provide a structure for command and control at the scene of fires and other emergencies.  Three ICS structures and their use by BCFD are:

A. Incident Command – Normal operations can be handled by an Incident Commander with the use of a Liaison Officer to coordinate with stakeholders.
B. Unified Command – During firefighting activities it is expected that BCFD would be lead agency but complex situations may require stakeholder groups to assign decision makers to assist with managing the Incident.
C. Area Command - This organization would be used to manage multiple incidents in a designated area.

| REVISION DATE: September 2013 | PAGE: | 4- 2 |
|---|---|---|

| SECTION:  ESF 4 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Firefighting | EMERGENCY OPERATIONS PLAN |

### 2.2   Organization

The Operations division of the Fire Department is organized as follows:



CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00003885

| SECTION:  ESF 4 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Firefighting | EMERGENCY OPERATIONS PLAN |

### 2.3  Logistics
#### A.  Communications
1) Baltimore City's 800 MHz radio system is used for dispatch, tactical communication, and administrative operations at all times. There are additional back up capabilities by utilizing an existing VHF radio system.
2) Tactical units and Command Staff have paging, email, and radio capabilities.

#### B.  Resources
1) There are 1256 personnel assigned to Fire Department Operations.
2) The City owns Fire Suppression vehicles and equipment for responding to land, marine, and hazardous material fires.  See Apparatus Locations document for the current listing of types of equipment and locations.

## 3.  ROLES AND RESPONSIBILITIES

### 3.1 Level I Agencies

**BCFD (Lead Agency)**
A. Provide leadership in directing, coordinating, and integrating overall City efforts to provide fire suppression and rescue assistance to affected areas and populations;
B. Coordinate the provision of fire prevention services and inspections to include code enforcement;
C. Manage fire fighting and other emergency incidents in accordance with the MOP;
D. Staff can operate a National Incident Management system compliant command and control structure (i.e., Incident Command System) to assure that services and staff are provided to areas of need;
E. Assist with emergency evacuations and re-entry of threatened areas of the City.

**DPW**
A. Work to ensure adequate water supply for fire suppression activities.

## 4.  PLAN DEVELOPMENT AND MAINTENANCE

### 4.1  Awareness, Training, and Exercises
A. Participating agencies shall ensure that personnel responsible for implementing portions of this plan are familiar with the plan and with their duties.

B. BCFD and responsible agencies shall conduct regular training and drills to maintain and improve capabilities that support execution of this plan.

### 4.2  Document Review and Revision
Maintenance of this ESF is the responsibility of the Assistant Chief of Fire Department - Operations.  BCFD will develop and maintain procedures for performance in accordance with the responsibilities assigned.  This ESF should be reviewed at least annually.

| REVISION DATE: September 2013 | PAGE: | 4-4 |
|---|---|---|

| SECTION:  ESF 4 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Firefighting | EMERGENCY OPERATIONS PLAN |

**4.3   Authority**

A.  Baltimore City Charter Art. II § 7

**4.4   Supporting Documents**

**A.  BCFD Manual Of Procedure (MOP)**

Owner:         Baltimore City Fire Department
Objective:     Outlines the operating procedures for all Fire Department
               operations and administrative activities.
Status:        Various sections of the MOP updated as needed

**B.  Mutual Aid Agreements**

Owner:         Baltimore City Fire Department
Objective:     Provide and receive mutual aid for firefighting from neighboring
               jurisdictions.
Status:        See EOP Basic Plan for list of current MAAs

**C.  Apparatus Locations**

Owner:         Baltimore City Fire Department
Objective:     Lists the current locations and assignments of Fire Department
               vehicles and apparatus.
Status:        Last updated Oct. 2013

CONFIDENTIAL - Produced Pursuant to Protective Order                                    CITY00003887

| SECTION: ESF 5 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Information and Planning | EMERGENCY OPERATIONS PLAN |

# Emergency Support Function 5

## *Information and Planning*

**Lead Agency:**      Mayor's Office of Emergency Management (MOEM)

**Core Agencies:**    Baltimore City Fire Department (BCFD)
                      Baltimore Police Department (BPD)
                      Mayor's Office of Information Technology (MOIT)

**Support Agencies:** All Level II and III Agencies

## 1. ESF OVERVIEW

### 1.1   Purpose
To coordinate the effort to collect, analyze, and disseminate information about a potential or actual emergency, as well as to use information to support and coordinate response efforts and use available resources efficiently and effectively. This ESF Annex is designed to provide a flexible organizational structure capable of meeting the varied requirements of many emergency scenarios with the potential to require activation of the Emergency Operations Center (EOC) and implementation of the Emergency Operations Plan (EOP).

### 1.2   Situation
During any emergency, there are needs for accurate, reliable, and credible information to be received in a timely manner and on a continuous basis. The City of Baltimore is vulnerable to a range of natural and man-made hazards that will require the coordination of two or more City agencies to manage an emergency or disaster. The EOC allows agencies to provide a single, recognizable focal point for emergency or disaster management. This setting centralizes direction and control, facilitates long-term operations, increases continuity, allows for quick and effective information sharing and resource management, and provides the ability to build collaborative strategies in support of the City's unified effort to mitigate the effects of an emergency.

### 1.3   Assumptions
A.  During the early stages of the event, little information will be available and the information received may be vague and inaccurate. Verification of this information and caution can delay response to inquiries.
B.  Information may differ from source to source and even from the same source at different times in the disaster or emergency.
C.  In large emergencies, multiple agencies may be involved in responses that require coordination.
D.  Reporting from the agencies to the EOC will improve as the event matures.
E.  Information collection and sharing may be hampered by the disaster itself, and reporting of information may be delayed due to damaged telecommunications infrastructure.

| REVISION DATE: August 2013 | PAGE: | 5 - 1 |
|---|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order                               CITY00003888

| SECTION: ESF 5 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Information and Planning | EMERGENCY OPERATIONS PLAN |

   F. Sharing information before, during, and after an emergency will add value to the response and recovery efforts.
   G. Redundant capabilities are needed to ensure ESF 5 functional capability.
   H. Some information may be classified or law enforcement-sensitive and will be treated as such.

### 1.4 Scope

ESF 5 includes information and planning relating to large scale incidents and events that require activation of the EOP.  This may or may not involve EOC activation.  ESF 5 activities include those functions that are critical to support and facilitate multiagency planning and coordination for operations for large scale incidents. This includes alert and notification, staffing of the EOC, incident action planning, providing support to operations, logistics and material direction and control, information management, facilitation of requests for State assistance, resource acquisition and management, worker safety and health management, facilities management, financial management, and other support as required.

## 2. CONCEPT OF OPERATIONS

### 2.1 General

   A. The National Incident Management System (NIMS) and Incident Command System (ICS) will be the organizational structure used during a response.
   B. Information will be coordinated from the Planning Section of the Incident Command and the EOC, if activated.  Incidents involving multiple agencies in the response and lasting over 24 hours likely require the activation of a Planning Section.
   C. Incident Action Plans (IAPs) will be generated to direct actions and communicate objectives for operational and support activities for each operational period.
   D. Gathered information will be used for planning purposes and to maintain a common operating picture.
   E. Information shall be distributed only to those agencies that are involved. Information shall not be given out to non-involved agencies without the permission of the Incident Commander and/or Public Information Officer (PIO).
   F. Situation Reports (SitReps) will be generated to track overall progress of incident.
   G. The Incident Commander (IC) or Unified Command (UC) will create a list of incident-dependent Leading Indicators that must be tracked by the corresponding ESF leads and reported to the Planning Section regularly.

### 2.2 EOC Activations:

   A. The EOC and JIC shall review and coordinate received information, verify for accuracy, and use it to avoid potential rumor situations.
   B. Information should be communicated in reproducible form whenever possible, such as email, fax, or written reports. All involved response agencies should provide updates to the EOC or designated location during briefings or upon request from the EOC.
   C. The information will be shared by posting in WebEOC. Other methods of sharing information may include, but are not limited to: posting on boards, making announcements, routing messages to other members of the staff, and via SitReps.

| REVISION DATE: August 2013 | PAGE: | 5 - 2 |
|---|---|---|

| SECTION: ESF 5 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Information and Planning | EMERGENCY OPERATIONS PLAN |

D. The agencies represented in the EOC will develop their own reporting procedures with their field representatives. The information requested will be necessary to the needs of the agency and the EOC staff.

E. The Planning Section within the EOC shall provide SitReps to the State EOC as appropriate. This includes transmission of local proclamation of emergencies.

F. The Planning Section will also be responsible for monitoring and posting to the State WebEOC board, if in use.

## 2.3 Notification

The Lead Agency for an incident (see page 13 of the Base Plan) is responsible for notifying City agencies, the Mayor's Office (MO), and other stakeholders about the incident or emergency.  Notification to the MO should go through the Mayor's Office Duty Officer (MODO).  The City Hall Operator can provide the name and contact information for the on call MODO at any time.  MOEM sends out Incident Alert notices via email for incidents they respond to, but this should not be the primary means of notification.

## 2.4 Organization

For most incidents, the IC on scene will either coordinate and collect information, or designate a Planning Section Chief to do so.  For larger incidents that require the activation of the EOC, MOEM is the primary agency for the coordination and collection of incident information for planning and analysis. The Base Plan outlines the EOC activation and staffing levels, as well as Level I, II, and III agencies.  Representatives from any agency may be required to staff the EOC for any activation level, depending on the incident and circumstances.

## 3. ROLES AND RESPONSIBILITIES

### 3.1 Level I Agencies

**MOEM (Lead Agency)**

A. Activate and manage the EOC to coordinate the City's response and support the lead agency for the incident response;

B. Activate the appropriate support agencies to staff the EOC;

C. Designate staff with specific coordination responsibilities to ensure information and coordination support to the IC;

D. Ensure timely collection of information from responding agencies;

E. Vet collected information for accuracy;

F. Disseminate information as appropriate to create common operating picture;

G. Maintain and administer WebEOC;

H. Ensure that support agencies, MEMA, and other key stakeholders are informed and involved in preparedness, response, and recovery activities as necessary.

**MOIT**

A. Provide technical support to the EOC;

B. Provide Geographic Information System (GIS) and mapping services to support operations;

C. Provide support for WebEOC;

| REVISION DATE: August 2013 | PAGE: | 5 - 3 |
|---|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION:  ESF 5 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Information and Planning | EMERGENCY OPERATIONS PLAN |

**BCFD**
A.  Staff EOC as needed;
B.  Staff planning section within EOC as needed;
C.  Ensure that timely and accurate information flows between the field and the EOC.

**BPD**
A.  Staff EOC as needed;
B.  Maintain Watch Center operations during incidents;
C.  Provide law enforcement sensitive information for wider dissemination as necessary;
D.  Vet collected information for accuracy;
E.  Provide EOC, IC, or UC with situational awareness gained from CitiWatch or Watch Center operations;
F.  Ensure that timely and accurate information flows between the field and the EOC.

**All Level I Agencies**
A.  When acting as the lead agency for an incident, notify all necessary stakeholders about the situation;
B.  Utilize ICS for incident responses, to include a Planning Section and IAPs as needed;
C.  Provide representatives to staff the EOC when activated;
D.  Ensure that timely and accurate information flows between the field and the EOC.

**3.2   Level II and III Agencies**
A.  Provide representatives to staff the EOC when activated;
B.  Ensure that timely and accurate information flows between the field and the EOC.

**4   PREPAREDNESS AND PLAN MAINTENANCE**

**4.1   Awareness, Training, and Exercises**
A.  Participating agencies shall ensure that personnel responsible for implementing portions of this plan are familiar with the plan and with their duties.

B.  MOEM and responsible agencies shall conduct regular training and drills to maintain and improve capabilities that support execution of this plan.

C.  MOEM shall coordinate annual interagency exercises to test the City's ability to implement this plan.

**4.2   Document Review and Revision**
A.  MOEM shall maintain this plan and coordinate an annual review by a committee composed of agencies that are assigned responsibilities under this plan.
B.  Agencies' procedures to execute their responsibilities under this plan shall be reviewed annually by the respective agencies.
C.  Documents that support this plan as listed below shall be maintained by their respective owners and reviewed as needed.  When these documents are substantively modified, the owners are responsible for notifying MOEM.
D.  Based on the findings of annual reviews, MOEM shall coordinate plan revisions as necessary.

| REVISION DATE: August 2013 | PAGE: | 5 - 4 |
|---|---|---|

| SECTION: ESF 5 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Information and Planning | EMERGENCY OPERATIONS PLAN |

**4.3 Authority**

See EOP Basic Plan for general authorities.

**4.4 Supporting Documents**

**A. City of Baltimore Emergency Operations Center Standard Operating Procedures for City Agencies**

| | |
|---|---|
| Owner: | MOEM |
| Objective: | Outline the purpose and activation procedures for participating agencies in the City's EOC. |
| Status: | Draft (August 2013) |

**B. EOC Standard Operating Procedure**

| | |
|---|---|
| Owner: | MOEM |
| Objective: | Internal SOP for activating and managing the EOC. |
| Status: | Draft (December 2008) |

**C. JIC SOP**

| | |
|---|---|
| Owner: | MOEM |
| Objective: | Outline the procedures for opening and operating a JIC in Baltimore City. |
| Status: | Draft September 2013 |

**D. Baltimore City WebEOC Administrative Manual**

| | |
|---|---|
| Owner: | MOEM |
| Objective: | Outline administration and usage protocols for WebEOC |
| Status: | Draft, August 2013 |

CONFIDENTIAL - Produced Pursuant to Protective Order                                                          CITY00003892

| SECTION: ESF 6 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: SHELTERING AND MASS CARE | EMERGENCY OPERATIONS PLAN |

# Emergency Support Function 6

## *Sheltering and Mass Care*

**Lead Agency:**          Department of Housing and Community Development (DHCD)

**Core Agencies:**        Mayor's Office of Emergency Management (MOEM)
Baltimore City Health Department (BCHD)
American Red Cross (ARC)

**Support Organizations:**   Mayor's Office of Policy and Communications (MOPC)
Mayor's Office of Information Technology (MOIT)
Mayor's Commission on Disabilities (MCD)
Baltimore City Police Department (BPD)
Baltimore City Fire Department (BCFD)
Baltimore City Public Schools (BCPS)
Baltimore City Schools Police (BCSP)
Department of Recreation and Parks (DRP)
Maryland Department of Human Resources (DHR)
Mayor's Office of Human Services (MOHS)

**Appendices:**           Appendix 6 A: Infection Control Measures for Shelters

## 1. ESF OVERVIEW

### 1.1   Purpose
The purpose of this annex is to describe organizations, procedures and responsibilities for providing reception centers and mass care shelters for those affected by an emergency or disaster.

### 1.2   Situation
An emergency such as a hurricane, flood, hazardous materials accident, or act of terrorism may require residents to immediately evacuate the affected area. An evacuation may be confined to a City block or neighborhood, or it may potentially affect the entire City, depending on the scope of the hazard.

A portion of these evacuees will require assistance with sheltering and basic human service needs. A prolonged emergency may leave residents without access to basic human needs such as emergency first aid, water, food, and sanitary conditions.

There are two basic situations in which a mass evacuation requiring sheltering may occur:
A. <u>Events with Notice</u> – An event where citizens may need to evacuate or shelter in place and later proceed to a shelter or safe location. In these situations, citizens may not be able to return to their home locations in a reasonable period of time. The sequence of events can be placed on a timeline. Examples include

| REVISION DATE: September 2013 | PAGE: | 6-1 |
|---|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION: ESF 6 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: SHELTERING AND MASS CARE | EMERGENCY OPERATIONS PLAN |

forecastable weather events, such as storms and hurricanes, and hazardous materials events.

B. <u>No Notice Events</u> – An event where citizens need to take immediate action to protect themselves. The event may or may not involve evacuation.  Examples include weather events such as a tornado or other severe weather, transportation accidents, earthquakes, terrorism events, and hazardous materials contamination.

Both 'with notice' and 'no notice' events may occur on a large or small scale. The scale of the emergency event will dictate the scope and length of sheltering resources necessary. In addition, it is possible that both types of events could occur simultaneously, or within succession of one another so that a sheltering response would need to be extended.

### 1.3  Assumptions
A. The emergency/disaster will involve evacuating residents from throughout the City from those areas affected and impacted by the event.
B. Under emergency conditions requiring evacuation, most evacuees will seek shelter with friends or relatives.
C. Buildings/locations to be used in this annex have been pre-identified and surveyed for adequacy and accessibility by lead and support agencies.
D. Evacuees may arrive at the shelter sites with insufficient personal supplies, medications, clothing, etc.
E. Shelter operations will be conducted using the National Incident Management System's (NIMS) Incident Command System (ICS) structure, American Red Cross (ARC) shelter standards, and this annex, and related SOPs as guidance.
F. Spontaneous evacuation will occur when there is sufficient warning of the hazard. Between 5 and 20 percent of the people at risk will evacuate before being directed to do so.  These individuals may seek shelter before the City is ready to open shelters.

### 1.4  Objectives
A. **Emergency Shelter**
   Provide emergency shelter during a disaster event.
B. **Emergency First Aid and Medical Triage**
   Provide emergency first aid and medical triage to evacuees upon arrival at City shelters.
C. **Feeding**
   Establish and implement feeding programs as needed for evacuees and others affected by the emergency event or disaster within the City.
D. **Human Services**
   Conduct assessments and referrals for services such as basic medical assistance, food, and transitional and temporary housing.
E. **Victim information and Reunification**
   Collect and assist in the dissemination of victim and evacuee information for the purpose of City recordkeeping and reunification with family and relatives.

### 1.5  Scope
The ESF 6 Appendix identifies the key tasks to be performed in order to effectively provide shelter and mass care in the City of Baltimore.  It lists procedures and planning

| REVISION DATE: September 2013 | PAGE: | 6-2 |
|---|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00003894

| SECTION:  ESF 6 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: SHELTERING AND MASS CARE | EMERGENCY OPERATIONS PLAN |

considerations for these tasks and assigns responsibility for their performance to both City and other agencies as appropriate.

## 2.  SHELTERING and MASS CARE STRATEGIES

### 2.1  Determining Sheltering Needs
A.  Determine population and demographics of areas that will be ordered to evacuate.
B.  Determine population and demographics of areas in which residents may evacuate due to perceived threat.
C.  Estimate the total number of citizens who will seek shelter from the government based on total populations and demographic factors.
D.  Identify primary and secondary sets of shelters, to be opened in that order based on demand.

### 2.2  Pre-Determination/Selection of Shelter Sites
A.  Selected sites will be designated as either primary or secondary shelter sites.
B.  Sites will be listed in WebEOC Shelter board as well as ARC national shelter site.
C.  Shelter sites will have the capability and capacity to shelter evacuees having certain special medical or functional needs (as defined below under Shelter Population), and accompanying service animals per ADA regulations and FEMA Functional Needs Support Serves (FNSS) guidance.
D.  Sites selected during an incident will be chosen based upon:
   1)  Estimated number of affected citizens and size of the affected area.
   2)  Current incident scope and forecasts (if applicable), determination of optimal locations for reception centers and shelters
   3)  Availability of electricity at pre-designated sites
E.  Shelters are facilities intended for overnight accommodations and must be stocked and staffed accordingly.
F.  Shelters will make every effort to be inclusive of individuals with functional needs.
G.  Pets will be allowed in shelters according to ESF-16 and associated plans/guidelines.

### 2.3  Temporary Reception Centers
A.  Reception centers are places where evacuees can receive information, food, water, first aid, and transportation to a shelter.
B.  A reception center may also serve as a shelter.  In a limited event, all reception centers may serve as shelters if there is no need to open additional facilities.
C.  The necessary number of reception centers will be determined based on the estimated number of affected citizens and the size of the affected area.
D.  Optimal locations for reception centers and shelters will be determined from pre-identified location lists based on current incident scope and forecasts (if applicable).
E.  Reception centers can also be identified ad hoc per incident requirements.

### 2.4  Shelter Populations
City shelters are designed to provide immediate temporary housing for persons displaced by an emergency. Displaced persons who can be accommodated in general population shelters include:

| REVISION DATE: September 2013 | PAGE: | 6-3 |
|---|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order                                    CITY00003895

| SECTION:  ESF 6 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: SHELTERING AND MASS CARE | EMERGENCY OPERATIONS PLAN |

A. General Population:
    1)   Persons who are self-sufficient and able to perform routine daily living activities (feeding, bathing, dressing, etc.) and/or persons who are accompanied by a family member or caregiver able to assist with performance of such activities.
    2)   All persons able to complete personal care and activities of daily living, irrespective of disability or chronic health condition, and such disability or chronic health condition does not require ongoing acute medical support that must be delivered within an acute medical care setting or other specialized medical care setting.

B. Children:
    1)   Unaccompanied minors in City shelters will be placed in a separate area away from the general population in accordance with Department of Human Resources (DHR) Department of Social Services (DSS) regulations.
    2)   Baltimore City Department of Social Services (BC DSS) and DHR Central DSS will provide staff to act as caretakers for unaccompanied minors within the shelter facility in accordance with state law.
    3)   Every available resource, including law enforcement, will be used and made available to find parents or guardians of unaccompanied minors.

**2.5   Shelter Safety**
A. Reasonable measures will be taken to ensure the safety of persons in the City shelters.
B. Evacuees and pets will be registered at intake to the reception center or shelter site.
C. All persons may be subject to sign a disclosure form of relevant criminal history as part of the standard intake process.  This form will be used for shelter safety purposes only and will not be released to the public.
D. Any person who violates shelter protocol or provides false information during the registration process is subject to immediate eviction from the shelter.
E. BPD maintains an emergency assistance plan that is implemented when sheltering activities occur within the City.  As per BPD the emergency assistance plan, a police presence will be maintained at City shelters during operational periods.
F. Registered Sex Offenders:
    1)   To the extent possible, shelter staff responsible for the registration of persons entering a City shelter will access the Maryland Sex Offender Registry and the National Registry for Sex Offenders to determine if an evacuee's name is a match in either registry.
    2)   Any individual listed in the Maryland Sex Offender Registry (Md. Code Ann., Crim. Proc. § 11-722 (2014)), as defined by the Maryland Code, Chapter 9, who enters a City managed shelter shall, upon registration at the shelter, notify the shelter management of his/her registry status.  Identification of registered sex offenders will be conducted as per the BPD plan: BPD officers assigned to shelter site will research names of possible or self-identified offenders.
    3)   Maryland Code Ann., Crim. Pro § 11-722 (2014) further prohibits registered sex offenders from entering the property of schools and certain child-care facilities at any time, and for any reason. Therefore, once status has been verified, the person will be asked to shelter in a location separate from the

| REVISION DATE: September 2013 | PAGE: | 6-4 |
|---|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00003896

| SECTION:  ESF 6 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: SHELTERING AND MASS CARE | EMERGENCY OPERATIONS PLAN |

general population in order to avoid contact with minor children at the shelter site and to comply with City laws, State laws, and LDSS regulations governing the movement and interaction of sex offenders with the general population.

    4)  The shelter manager will work with BPD to locate appropriate shelter options for identified sex offenders.

G.  No weapons of any kind are permitted or otherwise allowed in the shelter except if the bearer is registered, active law enforcement and able to provide evidence of such legitimate status.

H.  No alcoholic beverages or illegal drugs are allowed in the shelter or on the shelter grounds.

I.  Refer to ESF-16 for guidance on handling aggressive animals. Animals that are aggressive will not be allowed into the shelter and will be referred to Animal Control for assistance.

**2.6   Public Information**

A.  Citizens should be informed of public shelter openings in accordance with ESF-11.

B.  The following information should be disseminated:

    1)  Encouragement to seek shelter with relatives or friends;

    2)  Locations of reception centers and shelters;

    3)  Instructions regarding caging of pets;

    4)  How citizens can get to shelters;

    5)  What citizens should and should not bring with them - citizens will be encouraged to take all prescribed medications, personal hygiene, bedroll, and photo identification;

    6)  Overview of hazard that caused the evacuation;

    7)  Any hazard-specific instructions.

C.  All communications for the shelter operation will be coordinated through the EOC and JIC.

D.  All agencies supporting shelter operations will maintain current contact information for the alert and notification of personnel necessary for shelter operations and will be responsible for periodically testing alert and notification equipment and practices.

E.  Periodic alert and communications drills will be conducted and a schedule will be developed and disseminated to all response partner agencies.

F.  Equipment and communication requirements beyond the capability of the hosting facility will be identified pre-event and provided per ESF-2.

**2.7   Shelter Supplies**

A.  DHCD, BCHD, MOEM, and ARC will maintain an inventory of shelter supplies.

B.  Just-in-time purchasing will be coordinated at the EOC and use existing City contracts, pre-identified suppliers, and additional sources as necessary to provide additional supplies.

C.  DHCD, BCFD, DPW, and DOT will supply vehicles and drivers to transport shelter supplies as needed.

D.  Per ADA regulation and FEMA FNSS guidance, if functional needs support items are not on hand as part of the regular shelter supplies, they will be acquired on an as-needed basis for those having such need, in coordination with BCHD, State DHR, MCD, and ARC. If necessary, assistance in administering medications or

| REVISION DATE: September 2013 | PAGE: | 6-5 |
|---|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION:  ESF 6 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: SHELTERING AND MASS CARE | EMERGENCY OPERATIONS PLAN |

operating medical equipment may be requested through on-site health representatives provided by BCHD if no personal caregiver is available.

E.  Evacuees are encouraged to bring and keep with them any prescribed pharmaceuticals, supplies and devices necessary for health and continued independence.

**2.8   Shelter Staffing**

A.  Staff must be identified and deployed to shelters to perform the following functions:

| FUNCTION | SOURCES |
|---|---|
| Shelter management | DHCD (Primary) |
| | MOHS, MOEM |
| Registration and tracking | DHCD, ARC, MOHS |
| | CERT, other volunteers |
| Facility maintenance | BCPS, DRP |
| | DPW |
| Support services | ARC, DHR/DSS, CERT, MOHS |
| | City employees, other volunteers |
| Medical care | BCFD-EMS |
| | BCHD |
| | MRC, ARC, other volunteers |
| Functional needs support | MCD, BCHD, ARC |
| Animal Control | BCHD Animal Control |
| | Other volunteers |
| Security | BPD, BCPSP |
| Feeding | ARC, DHCD |

B.  DHCD and other City agencies as necessary will conduct a call-down of personnel to fill shelter staffing positions.

C.  ARC Shelter Staffing Guidelines will determine shelter staffing targets.

**2.9   Opening Reception Centers and Shelters**

A.  For no notice events, reception centers should be opened as soon as practical, even if full staffing and stocking is not accomplished until after they are opened. Shelters should be opened immediately as a second priority.

B.  Shelters should be opened using the procedures described in Shelter SOP.

C.  Shelter operations will be scalable and incident-driven.

D.  Segregated areas for animals, animal intake, and animal tracking will occur in accordance with ESF-16.

E.  Animals that need to be sheltered in the same location as their owner will be placed in facilities with separate HVAC systems or in heated tents on the same premises whenever possible.

**2.10  Coordinate Shelter Operations**

A.  DHCD will track the status of all shelters citywide.

B.  Shelter status will be updated in WebEOC.

C.  Each shelter manager will provide a situation report, including shelter population, at least twice daily to the DHCD representative at the EOC. Resource needs will be processed through the EOC.

| REVISION DATE: September 2013 | PAGE:    6-6 |
|---|---|

| SECTION:  ESF 6 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: SHELTERING AND MASS CARE | EMERGENCY OPERATIONS PLAN |

**2.11 Demobilize Shelters**
A. Shelters will stay operating as long as necessary and continue any other mass care activities, such as the provision of food, water, communications and medical assistance to the affected population and to emergency workers. Upon demobilization, arrangements for the return of evacuees to their homes, or for transportation to long-term shelters, will be facilitated as necessary.
B. Shelters will be cleaned and returned to their original condition and damages documented.
C. Shelter and mass care costs will be tracked and reported to the EOC or MOEM.

## 3.  MASS CARE SERVICES

Mass care services provided under this annex include but are not limited to: emergency sheltering, emergency first aid, feeding operations, human services, evacuee information, and reunification.

Within the City of Baltimore, mass care services will be requested by and coordinated through collaboration between DHCD, MOEM, BCHD, and ARC.

**3.1  Emergency First Aid**
A. Emergency first-aid may be required during a sheltering operation for evacuees within the shelter; such need may not necessarily have arisen as a result of the disaster incident.
B. Emergency first-aid will be provided by medical staff assigned to the shelter under the direction and supervision of the BCHD and/or BCFD EMS.
C. In the absence of licensed professional medical staff, basic First Aid may also be provided by staff or volunteers trained and certified in First Aid.
D. By determination of BCHD medical staff, BCFD EMS or the shelter manager, a referral to an emergency facility may be made if deemed appropriate.
E. Emergency transport of patients to a hospital will be coordinated through the EOC or by calling 911.

**3.2  Feeding**
F. ARC, in agreement with DHCD, will coordinate feeding during sheltering operations.
G. ARC will assess needs and make determinations based on the number of evacuees provided by the shelter manager.
H. Both ARC and DHCD have access to contracted food providers.
I. For larger scaled incidents, acquisition of food from other sources such as members of the Maryland Voluntary Organizations Active in Disasters (VOAD) and/or other business entities capable of assisting with food response will be performed by the EOC.

**3.3  Human Services**
A. Human services during a disaster or other emergency event include, but are not limited to assessment of needs, (temporary housing, food stamps, temporary cash assistance).
B. Human services assessments will be made by DHCD and ARC.

| REVISION DATE: September 2013 | PAGE: | 6-7 |
|---|---|---|

CITY00003899

| SECTION: ESF 6 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: SHELTERING AND MASS CARE | EMERGENCY OPERATIONS PLAN |

### 3.4 Survivor Information and Reunification
A. Collection of survivor/evacuee information will be conducted by staff under supervision of the DHCD, BHCD, or ARC.
B. Information will be shared with DHR for statewide reunification serves.
C. Information will be shared with ARC for nationwide reunification services.
D. Information will not be disseminated to other outside parties or directly to other evacuees without the written consent of the person whose information is being requested.
E. No information regarding minor children will be disseminated to the public or other parties without the express written consent of their parents or legal guardians.

## 4 AGENCY ROLES AND RESPONSIBILITIES

### 4.1 Level I Agencies

**DHCD (Lead Agency)**
A. Management of shelters;
B. Assemble and manage staff for shelters and reception centers;
C. Track shelter status and report information to the EOC;
D. Arrange for shelters to be stocked with sufficient supplies before shelters open;
E. Project shelter needs for the next operational period and report information to the EOC;
F. Identify shelter locations and initiate MOUs for use of non-City facilities in conjunction with MOEM;
G. Train City employees to perform shelter management and support roles in conjunction with MOEM and BCHD;
H. Maintain inventory of City-owned shelter supplies.

**MOEM (Core Agency)**
A. Activate and manage the EOC to coordinate the City's response;
B. Obtain mutual aid resources to support shelter operations at the request of DHCD;
C. Issue recommendations to open shelters and place others on standby in conjunction with DHCD;
D. Identify shelter locations and initiate MOUs for use of non-City facilities in conjunction with DHCD;
E. Advise on use of ICS to manage shelter operations;
F. Train City employees to perform shelter management and support roles in conjunction with DHCD and BCHD.

**BCHD (Core Agency)**
A. Assign public health staff to shelters;
B. Provide basic medical assessment and services with the support of BCFD EMS, Red Cross and MPVC or other agencies;
C. Provide for the housing and feeding of animals in accordance with ESF-16;
D. Arrange for acquisition and delivery of additional essential medical supplies and personnel as necessary;
E. Assess any public health hazards in shelters;
F. Maintain resource list of health-related equipment to be used for sheltering.

| REVISION DATE: September 2013 | PAGE: | 6-8 |
|---|---|---|

| SECTION:  ESF 6 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: SHELTERING AND MASS CARE | EMERGENCY OPERATIONS PLAN |

**MOPC**
A.  Through a Joint Information System, disseminate shelter locations and instructions to the public;
B.  Develop and maintain pre-positioned press releases on shelter information.

**MCD**
A.  Coordinate assessment of shelter facilities for accessibility;
B.  Assist with procurement of functional needs supplies on an as-needed basis.

**BPD**
A.  Provide security at shelters;
B.  Assist with sex offender screenings as needed;
C.  Assist with child reunification process as needed.

**BCFD**
A.  Assign a medic unit to each shelter if resources permit;
B.  Provide additional resource support.

**4.2  Level II Agencies**

**BCPS**
A.  Provide security or other personnel to open schools upon request;
B.  Provide maintenance personnel to assist with shelter operations;
C.  Maintain resource list of equipment for use in an evacuation;
D.  Train key staff on their roles and responsibilities;
E.  Participate in public education initiatives to increase citizen preparedness;
F.  Participate in exercises to practice and test this plan.

**DRP**
A.  Provide personnel to open recreation centers upon request;
B.  Provide personnel to assist with shelter operations;
C.  Train key staff on their roles and responsibilities;
D.  Participate in public education initiatives to increase citizen preparedness;
E.  Participate in exercises to practice and test this plan.

**4.3  Level III Agencies**

**ARC (Core Agency)**
A.  Provide shelter management staffing, in coordination with DHCD and MOEM;
B.  Support BCHD and BCFD EMS in conducting patient assessment and provision of medical services, as needed;
C.  Provide funding assistance, as available, for procurement of essential medications by individuals at shelters;
D.  Provide disaster relief, social services, and meals to evacuees in coordination with DHCD, MOEM and other city agencies;
E.  Request and manage Americorps volunteers.

**BCSP**
A.  Provide Security at shelters.

| REVISION DATE: September 2013 | PAGE:  6-9 |
|---|---|

| SECTION: ESF 6 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: SHELTERING AND MASS CARE | EMERGENCY OPERATIONS PLAN |

**MOHS**
A. At the request of DHCD, provide personnel to staff shelters.

## 5 PREPAREDNESS & PLAN MAINTENANCE

### 5.1 Awareness, Training, and Exercises
A. Participating agencies shall ensure that personnel responsible for implementing portions of this plan are familiar with the plan and with their duties.
B. DHCD and responsible agencies shall conduct regular training and drills to maintain and improve capabilities that support execution of this plan.
C. MOEM shall coordinate annual interagency exercises to test the City's ability to implement this plan.

### 5.2 Document Review and Revision
A. MOEM shall maintain this plan and coordinate an annual review by a committee composed of DHCD and agencies that are assigned responsibilities under this plan.
B. Agencies' procedures to execute their responsibilities under this plan shall be reviewed annually by the respective agencies.
C. Documents that support this plan as listed below shall be maintained by their respective owners and reviewed as needed. When these documents are substantively modified, the owners are responsible for notifying MOEM.
D. Based on the findings of annual reviews, MOEM and DHCD shall coordinate plan revisions as necessary.

### 5.3 Authority
See EOP Basic Plan for General Authorities

### 5.4 Supporting Documents

A. **Federal Emergency Management Agency Functional Needs Integration of Support Services in General Population Shelters Guidance**
Owner:     FEMA
Objective: To provide for more thorough ADA compliance and the elimination of segregated special needs shelters
Status:    Complete (November 2010)

B. **Shelter Operations Management Toolkit**
Owner:     ARC
Objective: To operational tops, checklists, and best practices for shelter managers
Status:    Complete (May 2008)

C. **ESF-6 Mass Care and Sheltering Response Notification Procedure**
Owner:     BCHD
Objective: To ensure necessary staff and agencies are notified of shelter opening and demobilization
Status:    Draft (February 2013)

| REVISION DATE: September 2013 | PAGE:     6-10 |
|---|---|

| SECTION:  ESF 6 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: SHELTERING AND MASS CARE | EMERGENCY OPERATIONS PLAN |

**D. Baltimore City Shelter SOP**
Owner:     MOEM
Objective: Define process to open, operate, and demobilize shelters.
Status:     Draft (April 2013)

**E. ESF 16 Animal Protection**
Owner:     MOEM
Objective: This plan defines objectives, establishes strategies, and assigns
responsibilities for providing animal services; particularly pet sheltering,
to citizens in the City of Baltimore before, during, and after an
emergency.
Status:     Complete (October 2013)

| REVISION DATE: September 2013 | PAGE:     6-11 |
|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order                                       CITY00003903

| SECTION:  ESF 6 Appendix A | CITY OF BALTIMORE |
|---|---|
| **SUBJECT: INFECTION CONTROL MEASURES FOR SHELTERS** | **EMERGENCY OPERATIONS PLAN** |

*EXECUTIVE SUMMARY*

During a major emergency, large numbers of individuals may be displaced and require shelter within the community. While shelters are not expected to administer healthcare services in the traditional sense, triage and surveillance are vital for identifying potentially contagious individuals and others requiring health support. Some shelters may provide limited health care services, which can introduce the risk of infection transmission. In addition, the close proximity of displaced individuals and staff in conjunction with a decrease or lack of routine sanitary services can increase the risk of disease transmission. Overcrowded living conditions can also contribute to the spread of communicable diseases as was seen following Hurricane Katrina.

Although infection prevention and control principles are fundamental, this document is not intended for existing shelters to use for identified populations (homeless, abused individuals, etc.). It should only be used for declared disaster situations during which there are large numbers of displaced individuals who require shelter.

Shelters that are set up during disasters are considered temporary and are not expected to administer healthcare services in the traditional sense. However, triage and infection prevention and control strategies are critical to identify potentially infectious or acutely ill individuals and prevent the spread of disease within a shelter. Ill individuals or those that require specialty care should be transferred to a medical facility.

## APPENDIX OVERVIEW

### 1.1  Purpose

The purpose of this Appendix is to outline infection control measures for shelters and considerations during a communicable illness outbreak at a shelter. Effective infection control measures require cooperation from the agencies or organizations involved in mass care and sheltering, including City, State, and voluntary organizations and the private sector.

### 1.2  Situation and Assumptions

#### A.  Situations

From an infection prevention and control perspective, there are two distinct types of disasters: infectious disease and non-infectious disease disasters. An infectious disease disaster is one in which the event is caused by an infectious agent, such as a bioterrorism attack or a pandemic. A non-infectious disease disaster includes all other types of disasters, such as natural and man-made disasters that do not involve an infectious agent. Examples of non-infectious disease disasters include earthquakes, floods, and terrorism events.

| REVISION DATE: November 2013 | PAGE: | 6-1 |
|---|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION:  ESF 6 Appendix A | CITY OF BALTIMORE |
|---|---|
| SUBJECT: INFECTION CONTROL MEASURES FOR SHELTERS | EMERGENCY OPERATIONS PLAN |

During an infectious disease disaster, all possible steps must be taken to prevent the sheltering of individuals. Crowded conditions in a shelter would likely contribute to infection spread in a shelter during an infectious disease disaster.

In the very rare event that individuals must be sheltered during an infectious disease disaster (such as a hurricane or flood occurring in a community at the same time as pandemic), potentially contagious or ill displaced individuals should be housed in hospitals or isolated. This is most important if the causative agent is believed to be spread via the airborne route, such as avian influenza, smallpox, and viral hemorrhagic fever agents.

**B. Assumptions**

Assumptions are as stated in ESF 6, Sheltering and Mass Care Annex.

Additional assumptions include:

1) Individuals arriving at the shelter have been decontaminated, if necessary by the event, prior to arrival.

2) Environmental conditions can contribute to communicable disease spread within a shelter.

3) Shelters will implement routing/standard infection prevention and control strategies used in healthcare settings to control the spread of disease.

4) Some diseases or conditions such as smallpox or viral hemorrhagic fever require more intensive interventions than the standard procedures described in the document. Furthermore, infection control recommendations can change during a disaster as more is more known about the causative agent and/or situation.

**1.3   Authority**

Authority is provided within the Baltimore City ESF 6, Sheltering and Mass Care Annex and the City EOP.

**1.4   Scope**

The scope of this appendix includes infection control measures for sheltering and mass care functions and the unique planning considerations that a large-scale outbreak or pandemic poses. The presence of a pandemic will alter the regular sheltering and mass care functions offered to disaster survivors in the City of Baltimore as outlined in the Baltimore City ESF 6 annex. This document assumes that sheltering and mass care functions or activities are provided to the public for all hazards and therefore, focuses on the unique planning requirements necessary to safeguard the health and well-being of the public during a pandemic.

| REVISION DATE: November 2013 | PAGE: | 6-2 |
|---|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00003905

| | |
|---|---|
| **SECTION:  ESF 6 Appendix A** | **CITY OF BALTIMORE** |
| **SUBJECT: INFECTION CONTROL MEASURES FOR SHELTERS** | **EMERGENCY OPERATIONS PLAN** |

2.  *Concept of Operations*

### 2.1   General Shelter Infection Control Guidelines

<u>Screening</u>
Disaster shelter residents and staff should be screened at registration upon arrival to assess for symptoms of illness.  Once residents complete registration, they should be triaged to the Health and Medical Station if further screening is necessary.  This will be useful to ensure ill and healthy shelter residents do not occupy that same space. Disaster shelters will have available registered nurses or nurse practitioners on site to identify if a shelter resident needs additional medical care outside of the shelter. If an infectious disease is identified at screening, shelter staff should follow CDC guidelines for disaster shelters[1]

<u>Social Distancing/Isolation</u>
a.  Shelter Layout - FEMA guidelines state that 20 square feet per person should be available for short-term or evacuation shelters and up to 40 square feet per person for sheltering longer than 72 hours[2].
b.  Standard precautions for infection control include arranging all sleeping areas (including cots) so that individuals are separated.
    1.  Put 3 feet between individual sleeping areas (or cots) to prevent the spread of infections[3].
    2.  Use head to toe sleeping configurations for individuals.
c.  Privacy screens can be used during screening and capturing medical information.
d.  Individuals who are ill should be placed in separate rooms until they can receive a higher level of care. A designated isolation area within the shelter for potentially infectious individuals should be pre-identified.
e.  Isolation signs or posters should be placed near the entrance to the isolation area to indicate that individuals should not enter the area without appropriate personal protective equipment.

<u>Recommended Disease Control Measures for Shelters</u>
a.  <u>Assessments:</u>  Assess all patients for dehydration, discomfort, and general well-being. Note the specific symptoms indicating the infection.

b.  <u>Recording information:</u>  Maintain a log noting the name, chief complaint, and date of reported illness for all ill residents and staff.

---

[1] Infection Control Guidance for Community Evacuation Centers Following Disasters.(Sept 2005). "Management of Persons with Infectious Diseases in Evacuation Centers".
http://emergency.cdc.gov/disasters/commshelters.asp
[2] FEMA Guidance on Planning for Integration of FNSS in General Population Shelters.
[3] Centers for Disease Control and Prevention. (2005). Infection control guidance for community evacuation centers following disasters. Retrieved November 11, 2007 from: http://www.bt.cdc.gov/disasters/pdf/commshelters.pdf

| | | |
|---|---|---|
| **REVISION DATE: November 2013** | **PAGE:** | **6-3** |

**CONFIDENTIAL - Produced Pursuant to Protective Order**                               CITY00003906

| SECTION:  ESF 6 Appendix A | CITY OF BALTIMORE |
|---|---|
| SUBJECT: INFECTION CONTROL MEASURES FOR SHELTERS | EMERGENCY OPERATIONS PLAN |

c. <u>Reporting:</u>  In the event of 2 or more cases with similar symptoms, the Shelter Nurse should inform the Shelter Manager and the BCHD physician on call immediately.

d. <u>Placement of Ill Shelter Residents:</u>
  o   Ill shelter residents should be placed with other individuals with the same symptoms.  Syndrome complexes that should be kept together include:
    ⇨   Diarrhea/acute diarrhea, fever, nausea and vomiting
    ⇨   Respiratory - fever and cough
  o   If there is only one symptomatic individual, that person should be kept away from healthy individuals.
  o   Limit ill individuals' mobility as much as possible to prevent contact with others and spread of infection by contact with surfaces.
  o   If the shelter has rooms, designate one room as a clinic area and keep healthy individuals out.
  o   If separate rooms are not available, it may be helpful to designate a specific area for ill persons.

e. <u>Cleaning of contaminated areas/equipment to prevent transmission of microorganisms/ germs:</u>
  o   Do not share patient care equipment (e.g. cots, blankets, etc).
  o   Devise a schedule to ensure cleaning of shelter common areas (e.g. handrails and doorknobs), shelter bathrooms and dining facilities, if they exist.
  o   Shelters should prepare for the presence of regulated medical waste. Feces, vomit, and body fluids should be cleaned with disposable cleaning equipment.
  o   After complete cleaning, a 10% bleach solution (or equivalent commercial product) should be used for terminal (environmental) disinfection.
  o   Use of disposable utensils to prevent the spread of germs in eating areas.

f. <u>Personal Protective Equipment (PPE):</u>
  Different diseases require different types of PPE based on how the agent is transmitted. This can range from using gloves only to wearing full PPE. When the potential for splashing of blood or body fluids is not present, routine use of gloves and hand hygiene will be sufficient to protect you from infection.

  o   Shelter staff should wear gloves, eye protection, and/or gowns when in direct contact with the ill shelter clients or in contact with items in the ill person's environment
  o   Gloves should be changed between contacts.
  o   Attention to proper removal of PPE is important.  Used, soiled PPE must be carefully discarded as close to the point of use as possible.
  o   If possible, shelter staff should wear a mask when cleaning areas grossly contaminated by feces or vomit.
  o   Masks should be worn whenever there is a possibility of aerosolization of contaminated materials. First priority should be given to shelter or healthcare workers performing aerosol-generating procedures.

| REVISION DATE: November 2013 | PAGE: | 6-4 |
|---|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION:  ESF 6 Appendix A | CITY OF BALTIMORE |
|---|---|
| SUBJECT: INFECTION CONTROL MEASURES FOR SHELTERS | EMERGENCY OPERATIONS PLAN |

- o Standard precautions will be used for the care of all evacuees.  Evacuees with known or suspected conditions requiring contact or droplet precautions may be cared for in the shelter setting, provided that the appropriate PPE is available.
- o Clients requiring airborne precautions should not be cared for in the shelter setting because specialized ventilation requirements cannot be met.

g. Hand washing:
  - o Enforce proper hand washing for all shelter staff and shelter residents. Use running water and soap for hand washing whenever possible. Alcohol Based Hand Rubs, which include a variety of waterless alcohol-based hand hygiene products such as gels, foams, and liquids are the preferred method for hand hygiene when hands are not visibly soiled.
  - o Post signs in visible areas reminding individuals to wash hands thoroughly.

h. Work restrictions:
  - o Ill shelter staff should report to the shelter manager and be sent home.
  - o Ill shelter staff should be excluded from the shelter environment until 24-48 hours after the cessation of symptoms, or for the time period recommended by the CDC, National Institutes for Health (NIH), DHMH, or other medical authority guidance.
  - o General maintenance of environmental cleanliness within shelters, per CDC guidelines, will further help minimize the spread of disease[4].

### 2.2   Pandemic Influenza or Large Scale Communicable Outbreak Considerations

A pandemic or large scale outbreak by its very nature creates additional health burdens for shelters and programs of mass care. Thus, it will be necessary for all sheltering facilities to adhere to and implement just-in-time health guidelines published by the CDC, HHS, and/or DHMH at the time of the pandemic/outbreak[5].

Non-congregate sheltering should be implemented to the greatest extent possible during a pandemic or large scale communicable outbreak through the use of publicly or privately owned facilities that by design provide a short-term lodging function and an increased degree of privacy over congregate sheltering. Examples of non-congregate sheltering include hotels and motels.

In the event of a pandemic or large scale outbreak, it may be necessary to provide non-congregate sheltering within hotels, dormitories, motels, or other converted building spaces. At the local level, the ARC provides non-congregate sheltering and some funding for up to three days in the event sheltering facilities are not

---

[4] http://emergency.cdc.gov/disasters/commshelters.asp
[5] Shelters are to follow and implement CDC emergency pandemic shelter guidelines in effect at the time of the pandemic.  Guidelines in effect at the writing of this plan, (Dec. 2009), may change dependent upon transmission patterns, mortality and/morbidity rates and strain of influenza or other contagious disease resulting in a pandemic.

| REVISION DATE: November 2013 | PAGE: | 6-5 |
|---|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION:  ESF 6 Appendix A | CITY OF BALTIMORE |
|---|---|
| SUBJECT: INFECTION CONTROL MEASURES FOR SHELTERS | EMERGENCY OPERATIONS PLAN |

available, or it would be in the best interest of the evacuee to be placed in a non-congregant shelter environment.

During a pandemic local voluntary organizations may be unavailable to support sheltering and mass care functions because volunteers may be affected by the pandemic illness.

**Feeding**
Feeding will be conducted per the City of Baltimore ESF 6 Sheltering and Mass Care Annex.

**Household Pets and Service Animal Support**
Sheltering of household pets and service animals will be conducted in accordance with ESF 16.

### 2.3 Syndromic Surveillance
The shelter should develop a communicable disease assessment plan to monitor individuals and staff at the site. A trained and designated shelter worker should conduct triage and assessment at the following times:

    a. Upon arrival/admission to the shelter
    b. Daily or depending on the risk assessment
    c. When transferring individuals to a healthcare facility

Shelter staff should be assessed every 24 hours. In addition, staff should be encouraged to self-report symptoms between assessments. The results of all surveillance will be reported to the Shelter Manager and BCHD as necessary.

**Recovery**
During the recovery phase of disasters, the focus of shelters throughout the City of Baltimore will be a return to the normal course of duty; it will be important for shelter staff to continue the practices outlined by CDC and DHMH to maintain infection control in order to prevent disease spread.

## 3.  AGENCY ROLES AND RESPONSIBILITIES

Roles and responsibilities are as stated in ESF 6, Sheltering and Mass Care Annex.

## 4.  PREPAREDNESS & PLAN MAINTENANCE

### 4.1 Awareness, Training, and Exercises

    A. Participating agencies shall ensure that personnel responsible for implementing portions of this plan are familiar with the plan and with their duties.
    B. DHCD and responsible agencies shall conduct regular training and drills to maintain and improve capabilities that support execution of this plan.

| REVISION DATE: November 2013 | PAGE: | 6-6 |
|---|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION:  ESF 6 Appendix A | CITY OF BALTIMORE |
|---|---|
| SUBJECT: INFECTION CONTROL MEASURES FOR SHELTERS | EMERGENCY OPERATIONS PLAN |

    C.  DHCD shall coordinate annual interagency exercises to test the City's ability to implement this plan.

### 4.2 Document Review and Revision

    A.  MOEM shall maintain this plan and coordinate an annual review by a committee composed of DCHD and agencies that are assigned responsibilities under this plan.

    B.  Agencies' procedures to execute their responsibilities under this plan shall be reviewed annually by the respective agencies.

    C.  Documents that support this plan shall be maintained by their respective owners and reviewed as needed.  When these documents are substantively modified, the owners are responsible for notifying MOEM.

    D.  Based on the findings of annual reviews, MOEM and DCHD shall coordinate plan revisions as necessary.

**References:**

Rebmann, T., et al., (2008) Infection Prevention and Control for Shelters During Disasters,  APIC (Association of Practitioners of Infection Control) Emergency Preparedness Committee. Retrieved October 2013 from:
http://www.apic.org/Resource_/TinyMceFileManager/Practice_Guidance/Emergency_Preparedness/Shelters_Disasters.pdf

**Infection control signage packet contents:**

CDC, 'Clean Hands Save Lives.' Available at: http://www.cdc.gov/h1n1flu/pdf/handwashing.pdf
CDC, 'Stop Germs! Stay Healthy! Wash Your Hands.' Available at:
http://www.cdc.gov/handwashing/pdf/wash-your-hands-poster.pdf
CDC, 'Cover Your Cough.' Available at: http://www.cdc.gov/flu/pdf/protect/cdc_cough.pdf
APIC document. Available at:
http://www.apic.org/Resource_/TinyMceFileManager/Practice_Guidance/Emergency_Preparedness/Shelters_Disasters.pdf (see pdfs on pages 35 and 51)

CONFIDENTIAL - Produced Pursuant to Protective Order    CITY00003910

| SECTION: ESF 7 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Resource Support | EMERGENCY OPERATIONS PLAN |

# Emergency Support Function 7

## *Resource Support*

**Lead Agency:**      Mayor's Office of Emergency Management (MOEM)

**Core Agency:**      Department of Finance (DOF)

**Support Agencies:**   Baltimore Police Department (BPD)
Department of General Services (DGS)
Department of Transportation (DOT)
Baltimore City Fire Department (BCFD)
Maryland Emergency Management Agency (MEMA)

## 1. ESF OVERVIEW

### 1.1 Purpose
This annex is intended to provide guidance in the event of an emergency or large scale disaster, This Emergency Support Function 7 (ESF 7) will provide a system for managing essential supplies and equipment and provide effective methods and guidelines for requesting additional resources. This annex also lists capabilities provided by Maryland State agencies that are frequently requested during emergency operations.

### 1.2 Situation
The response to any number of hazards involves the mobilization of significant resources. In addition to City-owned resources, these may include resources owned by the private sector, non-profit organizations (NPOs), mutual aid partners, the State of Maryland, or the Federal Government, including the military. The coordination of resources from disparate sources is critical to an effective response and recovery.

### 1.3 Assumptions
A. Baltimore City owns the resources required to respond to most emergencies. City agencies manage these resources according to established Standard Operating Procedures (SOPs).
B. Merchants in the Baltimore region, some of which have contracts with the City, can provide an array of goods and services which may be needed in an emergency.
C. The private sector owns an array of resources that can be obtained for emergency use.
D. NPOs own substantial resources for disaster recovery.
E. Baltimore City's neighboring jurisdictions own resources that can be accessed via direct mutual aid request.
F. Resources from outside the Baltimore region from all levels of government: local, state, and federal, can be requested from MEMA.
G. Including a purpose for the requested resource can help MEMA find alternative resources that can serve the same function.

| REVISION DATE: September 2013 | PAGE: | 7-1 |
|---|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION: ESF 7 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Resource Support | EMERGENCY OPERATIONS PLAN |

### 1.4 Scope

This annex covers resource management that involves the provision of services, personnel, commodities, and facilities to assist other organizations during the response phase of a disaster. This includes equipment, supplies, services, personnel, and other supplies and services required to support emergency response activities. Volunteers and donations fall under the responsibilities of ESF 15. This document does not override any other legal document or authority.

## 2. CONCEPT OF OPERATIONS

### 2.1 General

Agencies will use their own resources first before requesting aid. Equipment, personnel, and supplies will be used from local sources first before requesting aid.

### 2.2 Preparedness

A. Each agency will track resources and maintain an up to date inventory list of available resources as well as their FEMA resource types, and make this list available to MOEM in support of ESF 7. The list will be updated annually.
B. Each agency will have on hand enough resources to be able to initially respond effectively to an emergency without aid.
C. Agencies will identify resource requirements and shortfalls using information from recognized hazards and past incidents and identify resources that are able to overcome resource shortfalls.
D. Agencies will create and maintain lists of available specialized equipment, facilities, personnel, suppliers of foods, materials, and equipment, and provide lists of vendors and suppliers with available resources. Contracts for emergencies should be in place ahead of time, to include food, lodging, and additional equipment and services that are frequently required.
E. Agencies will participate in training and exercises to discover flaws in response plans and correct flaws.

### 2.3 Response

A. Each agency will manage its own resources pursuant to its internal policies and procedures.
B. Coordination of City resources between agencies will be conducted at the Emergency Operations Center (EOC). Each agency representative will maintain awareness of resource deployments and availability, and provide regular updates to the EOC.
C. The City's WebEOC system can be used to track committed and available resources.
D. In a major emergency, resource requests should be coordinated through the EOC. The EOC will:
   1) Receive resource requests from the Incident Commander (IC);
   2) Evaluate the resource requirements of the emergency;
   3) Determine which City agencies own the required resource and coordinate deployment;

| REVISION DATE: September 2013 | PAGE: | 7-2 |
|---|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00003912

| SECTION:  ESF 7 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Resource Support | EMERGENCY OPERATIONS PLAN |

    4)  If the resource requirements are anticipated to exceed what the City has on hand, initiate planning for emergency procurements and/or mutual aid assistance.

E.  If the situation is such that internal resources are insufficient and there are large numbers of external resources procured, the EOC will designate a logistical staging area.

F.  For incidents where large numbers of military vehicles have been requested, the staging area will be at the Oldtown Fire Station.

G.  To initiate emergency procurements:
    1)  Holders of emergency purchasing cards (P-cards) can obtain resources using the card up to the amount that it is set for the particular emergency, as determined by the Department of Finance.
    2)  For significant or citywide resource needs, the Department of Finance representative in the EOC will collect resource requests, identify vendors, and execute procurements.
    3)  For additional information on City contracts, identified suppliers, and purchasing procedures, reference Bureau of Purchases Emergency Response Plan.
    4)  Normal procurement procedures for fair and open competition will be in effect until it is declared no longer practical.

H.  Each agency must track costs incurred throughout the event according to DOF guidelines in order to capture the information as accurately and efficiently as possible.

I.  In certain situations, security must be provided for resource deliveries and staging areas.

J.  Resource allocation will be prioritized according to the ability of the resource to save lives, mitigate the threat, and protect property upon delivery to the requested location or individual. The EOC is responsible for prioritizing resource requests.

K.  To request mutual aid in the Baltimore Region, the EOC will make requests to neighboring jurisdictions for resources as the situation dictates.

L.  To request assistance from the State, resource requests shall go from the City EOC to the State EOC via the State WebEOC.

M.  To request assistance from the Federal Government, the City EOC will make the request through the State EOC.

## 2.4  Recovery

A.  Resources will continue to be managed and requested in the same manner as the response phase although the EOC may not be activated or manned at all times.

B.  Resources will be demobilized when they are no longer needed and returned to the owning agency.

C.  Each agency should contribute to an After Action Report (AAR) that includes lessons learned and corrective actions in order to update plans and improve future responses.

D.  Each agency is responsible for restocking resources that have been depleted.

E.  When applicable, MOEM and the DOF will submit cost expenses through the State for reimbursement in accordance with FEMA guidelines.

| REVISION DATE: September 2013 | PAGE: | 7-3 |
|---|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00003913

| SECTION:  ESF 7 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Resource Support | EMERGENCY OPERATIONS PLAN |

## 3.  ROLES AND RESPONSIBILITIES

### 3.1   General

A. All agencies, organizations or private individuals providing emergency resources shall submit a statement of costs incurred to the MOEM and DOF
B. DOF will maintain a master list of costs incurred in an emergency.
C. As appropriate, agencies and organizations with assigned responsibilities will enter into agreements with private sector organizations and/or individuals for the use of resources to support emergency response and recovery, following proper procurement guidelines for fair and open competition.
D. MOEM will be responsible for developing and maintaining ESF 7. All organizations with emergency management functions will develop and maintain procedures for performing in accordance with the responsibilities assigned.

### 3.2   Level I Agencies

**MOEM (Lead Agency)**
A. Develop Memorandum of Agreements (MOAs) with private and NPOs to access resources in an emergency;
B. Maintain WebEOC system for resource management;
C. Manage coordination of resources in the EOC;
D. When an emergency may escalate, contact potential sources of relevant resources;
E. Review resource needs from Incident Command, identify sources, and initiate requests;
F. Maintain a list of citywide resources categorized by FEMA type;
G. Plan for resource needs for the next operational period;
H. Coordinate and request resources through the State EOC.

**BPD**
A. Ensure security of resource shipments and staging points;
B. Liaison with other law enforcement agencies and organizations to access outside resources.

**DGS**
A. Manage the City's fleet resources;
B. Liaison with contractors to provide additional resources;
C. Coordinate deployment of various non-City resources that perform public works functions.

**DOT**
A. Manage various resources for traffic evacuation;
B. Coordinate deployment of transportation resources.

**BCFD**
A. For minor emergencies, coordinate mutual aid resources with surrounding jurisdictions;
B. Liaison with Maryland Institute for Emergency Medical Services Systems (MIEMSS) to coordinate private EMS resources.

| REVISION DATE: September 2013 | PAGE: | 7-4 |
|---|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00003914

| SECTION: ESF 7 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Resource Support | EMERGENCY OPERATIONS PLAN |

### 3.3   Level II Agencies

**DOF (Core Agency)**
A.  Manage purchasing card (P-card) program;
B.  Enter into contracts with merchants for goods and services likely to be needed in an emergency;
C.  Identify additional suppliers of emergency goods and services, both within and outside the region, and determine inventories which could be obtained from different sources;
D.  Identify alternate merchants for goods and services required to support essential functions of City Government;
E.  Track costs incurrent in an emergency;
F.  In an emergency, obtain resources from merchants at the request of the EOC, the Incident Commander, or a City agency;
G.  Provide guidance to other agencies for cost tracking.

**MEMA**
A.  Access additional resources from the state and federal governments, including military resources, at the request of MOEM;
B.  Serve as point of contact to the City for all requests for federal resources;
C.  Monitor, and coordinate as necessary, resource deployments between jurisdictions in a regional or statewide incident;
D.  Support, assist and provide resources to the City of Baltimore to ensure proper debris management.  MEMA holds contracts with debris management specialists to assist when a State of Disaster or Emergency is granted by the Governor;
E.  Provide support to local jurisdiction sheltering options;
F.  Help to coordinate host sheltering for regional emergencies;
G.  Provide statewide situational awareness;
H.  Maintains contracts with private entities that can be leveraged by local jurisdictions;
I.  Participate in training and exercises to practice and test plans;
J.  Support, assist, and provide resources to the City of Baltimore to ensure proper animal protection and disease outbreak is managed appropriately;
K.  Coordinate with various local, State, and Federal agencies to contain and/or mitigate any disease outbreak.

### 3.4   Level III Agencies – State Agency Capabilities List

**Maryland State Police (MSP)**
A.  Provide air transportation for critical workers and equipment, if required;
B.  Provide helicopters for medical evacuation and for visible cloud tracking;
C.  The Maryland State Police do not typically exercise law enforcement responsibilities within the City of Baltimore.  However, they do have statewide authority and participate in joint task forces with the BPD.

**State Highway Administration (SHA)**
A.  Provide trucks for evacuation transportation, as necessary;
B.  Support MSP in traffic and access control by providing road barricades, traffic cones, and flashing signs;

| REVISION DATE: September 2013 | PAGE: | 7-5 |
|---|---|---|

**CONFIDENTIAL - Produced Pursuant to Protective Order**

| SECTION: ESF 7 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Resource Support | EMERGENCY OPERATIONS PLAN |

C. Provide personnel to assist in manning control points;
D. Furnish petroleum products to selected supply points or other designated areas for emergency operations.
E. Provide debris removal and disposal for State maintained roads, highways, and bridges;
F. Assist in the maintenance and restoration of highways, roads, and bridges upon appropriate requests and authorization;
G. Manage debris generated on state highways, bridges, or other state-funded and maintained entities.

**Maryland Transit Authority (MTA)**
A. Provide buses and drivers to assist in transporting residents and special facility residents (e.g. nursing homes etc.) out of the affected area, and provide transportation for their return home;
B. Assist with notification to and transportation of MTA Mobility customers.

**Maryland Natural Resource Police (MD NRP)**
A. Support evacuation efforts by providing water transportation for evacuees from coastal or harbor areas;
B. Establish access control points on waterways, when necessary.

**Maryland Military Department/Maryland National Guard**
A. Provide evacuation transportation and other transportation needs;
B. Provide personnel to staff access and traffic control points;
C. Provide communications support;
D. Provide technical support in the event of CBRNE involvement;
E. Provide fire suppression (foam delivery) equipment for incidents.

**Maryland Department of the Environment (MDE)**
A. Approve temporary debris management sites (TDMS). All permits and regulations must pass MDE assessment/regulations in order to set up and maintain a TDMS in the event of a debris generating disaster;
B. Assist with removal of hazardous materials. MDE has a list of contractors for specific situations;
C. Provide technical advice and assistance in the form of personnel and equipment;
D. MDE can assist with both land and wate- borne equipment such as sorbent material, containment boom, boats, pumps, and hazardous materials monitoring equipment.

**Maryland Department of Human Resources (MD DHR)**
A. Provide personnel to staff shelters;
B. Provide training in emergency preparedness and shelter management;
C. Open State shelters;
D. Provide social services and case management;
E. Assist in the provision of shelter equipment and supplies;
F. Provide statewide reunification services.

| REVISION DATE: September 2013 | PAGE: | 7-6 |
|---|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION: ESF 7 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Resource Support | EMERGENCY OPERATIONS PLAN |

**Maryland Institute of Emergency Medical Services Systems (MIEMSS)**
A. Provide notification to area Emergency Departments and maintain continuous communications;
B. Assist BCHD in monitoring facilities' resources through the HC Standard;
C. Determine commercial ambulance resources and availability and coordinate deployment;
D. Assist in patient tracking;
E. Provide leadership and medical direction, conduct and support EMS educational programs;
F. Operate and maintain a statewide communications system, designate trauma and specialty centers, license and regulate commercial ambulance services;
G. Participate in EMS-related public education and prevention programs;
H. Participate in training and exercises to practice and test plans;
I. Notify area hospitals of incident situation and assist with patient dispositions from the incident scene;
J. Coordinate information exchange between the Maryland Poison Center, field units, and area hospitals;
K. Provide notification to the State EMS Director who will supply EMS resources to the scene to act as liaisons with State and local jurisdictions.

**Office of the Chief Medical Examiner (OCME)**
A. Assume custody of bodies that result from a man-made mass casualty incident;
B. Assist with scene documentation and investigation;
C. Package and transport bodies from the scene;
D. Establish temporary morgue sites as necessary;
E. Investigate and determine the cause of death;
F. Issue death certificates declaring the cause and manner of death;
G. Release bodies to funeral homes following completion of the tests;
H. Develop and maintain resources to process mass fatalities, including a mass fatality trailer;
I. Participate in training and exercises to practice and test plans.

**Department of Health and Mental Hygiene (DHMH)**
A. Coordinate requests, allocation, and delivery of SNS assets;
B. Assist BCHD;
C. Manage CDC bioterrorism/preparedness grants;
D. Develop and maintain state plans for public health preparedness (e.g. pandemic flu, SNS, CRI);
E. Conduct biosurveillance activities;
F. Conduct exercises and training;
G. Conduct evaluations of CDC bioterrorism/preparedness grant programs at the local level.

**Maryland Port Authority (MPA)**
A. Provide assistance during incidents involving maritime and/or marine terminals.

**Maryland Transportation Authority Police (MDTAP)**
A. Provide police assistance within Port Authority property and other areas within its jurisdiction;

| REVISION DATE: September 2013 | PAGE: | 7-7 |
|---|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00003917

| SECTION:  ESF 7 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Resource Support | EMERGENCY OPERATIONS PLAN |

B. Patrol sections of highway that run through the City of Baltimore.

**Maryland Transportation Authority Police (MTA Police)**
A. Patrol the Metro and Light Rail Station located within the City;
B. Provide security on MTA conveyances.

**Federal Bureau of Investigation (FBI)**
A. Lead law enforcement agency for cases of actual or possible terrorism;
B. Coordinate a local Joint Terrorism Task Forces (JTTF), to which members of the BPD are assigned.

**United States Coast Guard (USCG)**
A. Lead law enforcement agency in matters of maritime security.

**Maryland Department of Agriculture (MDA)**
A. Assists veterinarians and health department officials in providing diagnostic and testing services;
B. Assist in the identification, isolation, and treatment of diseases, including those impacting the human population;
C. Provide inspections for the enforcement of regulations related to animal health;
D. Provide guidance and assist in the execution of State-Federal disease eradication and other programs;
E. Assist in the determining if quarantine(s) are necessary and assist in any quarantine operations;
F. Assist in the epidemiological investigation;
G. Provide animal control and care during a disaster or long-term emergency operations.

**Department of Natural Resources (DNR)**
A. Assist in the identification of disease outbreaks and the contamination of wetland or water ways;
B. Assist in the capture and care of any wildlife within the city limits;
C. Coordinate the National Zoo in Baltimore for any disease outbreaks or other emergencies.

4   **PREPAREDNESS AND PLAN MAINTENANCE**

4.1   **Awareness, Training, and Exercises**
A. Participating agencies shall ensure that personnel responsible for implementing portions of this plan are familiar with the plan and with their duties.
B. MOEM and responsible agencies shall conduct regular training and drills to maintain and improve capabilities that support execution of this plan.
C. Agency Finance Representatives shall participate in any training and education mandated by the Department of Finance.
D. MOEM shall coordinate annual interagency exercises to test the City's ability to implement this plan.

| REVISION DATE: September 2013 | PAGE: | 7-8 |
|---|---|---|

CITY00003918

| SECTION: ESF 7 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Resource Support | EMERGENCY OPERATIONS PLAN |

**4.2  Document Review and Revision**
   A.  MOEM shall maintain this plan and coordinate an annual review by a committee composed of agencies that are assigned responsibilities under this plan.
   B.  Agencies' procedures to execute their responsibilities under this plan shall be reviewed annually by the respective agencies.
   C.  Documents that support this plan as listed below shall be maintained by their respective owners and reviewed as needed.  When these documents are substantively modified, the owners are responsible for notifying MOEM.
   D.  Based on the findings of annual reviews, MOEM shall coordinate plan revisions as necessary.

**4.3  Authority**
   See EOP Basic Plan for general authorities.

**4.4  Supporting Documents**

   **A.  Bureau of Purchases, Emergency Response Plan**
   Owner:            Department of Finance
   Objective:        Emergency procedures for the Bureau of Purchases, to include emergency use of procurement cards.
   Status:           September 2005

   **B.  Emergency Expense Tracking Spreadsheet**
   Owner:            Department of Finance
   Objective:        Accurately track all spending during an emergency.
   Status:           February 2010

   **C.  FEMA Resource Typing**
   Owner:            Federal Emergency Management Agency (FEMA)
   Objective:        Creates a national, measureable standard for identifying resource capabilities and performance levels.
   Status:           Different publications for each category

| REVISION DATE: September 2013 | PAGE: | 7-9 |
|---|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order                                    CITY00003919

| SECTION:  ESF 8 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: HEALTH AND MEDICAL | EMERGENCY OPERATIONS PLAN |

# Emergency Support Function 8

## *Health and Medical*

**Lead Agency:**          Baltimore City Health Department (BCHD)

**Core Agencies:**        Baltimore City Fire Department (BCFD)
                          Baltimore City Police Department (BPD)

**Support Organizations:** Mayor's Office (MO)
                          Mayor's Office of Emergency Management (MOEM)
                          Department of Transportation (DOT)
                          Department of Public Works (DPW)
                          Department of Housing and Community Development (DHCD)
                          Mayor's Office of Information Technology (MOIT)
                          Commission on Aging and Retirement Education (CARE)
                          Mayor's Commission on Disabilities (MCD)
                          Department of Finance (DOF)
                          Baltimore City Law Department (BCLD)
                          Baltimore City Public School System (BSPSS)
                          Office of the Labor Commissioner (OLC)
                          Department of Recreation and Parks (DRP)
                          Maryland Institute for Emergency Medical Services (MIEMS)
                          Maryland Office of the Chief Medical Examiner (OCME)
                          Maryland Department of Health and Mental Hygiene (DHMH)

## 1. ESF OVERVIEW

### 1.1   Purpose
This plan defines objectives, establishes strategies, and assigns responsibilities for providing health and medical services to citizens in the City of Baltimore during and after an emergency.

### 1.2   Situation
The City of Baltimore is vulnerable to a range of natural and man-made hazards that may require the City to provide emergency medical and public health services, including victim triage, transport, and treatment; management of mass fatalities; prophylaxis of the City workforce and the public; provisions for isolation and quarantine; coordination and augmentation of health care resources; and syndromic surveillance and investigation.

In some types of incidents, emergency medical, public health, and/or health care services will be the focus of the response.  In other incidents, they will support the overarching response.

### 1.3   Assumptions

| REVISION DATE: November 2013 | PAGE: | 8-1 |
|---|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order          CITY00003920

| SECTION: ESF 8 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: HEALTH AND MEDICAL | EMERGENCY OPERATIONS PLAN |

An incident that affects Baltimore City or the region may impact the residents and visitors of Baltimore City. Baltimore City governmental agencies that share a role and responsibility as identified in this plan will respond and perform their duties.

It is further understood that a number of the response duties as outlined in this plan can only be carried out under circumstances that require one or more of the following: a local Declaration of Emergency and/or Declaration of a Public Health Emergency; a State Declaration of Emergency by the Governor; a State Declaration of a Public Health Emergency by the State Secretary of Health; an Emergency Use Authorization by the Food & Drug Administration; and/or a Federal Declaration of an Emergency, Disaster, and/or Incident of National Significance by the President of the United States.

## 1.4 Objectives

A. **Emergency Medical Services (EMS)**
Respond to emergency calls involving injury or illness, assess patient status, provide pre-hospital medical care and transport patients to hospitals. Assist with decontamination at hazardous materials incident scenes.

B. **Syndromic surveillance and infectious disease investigation**
Identify clusters of illnesses early, and mobilize a rapid response, thereby reducing morbidity and mortality, through DHMH's syndromic surveillance system and BCHD's Acute Communicable Diseases Program.

C. **Mass casualty field response – triage, treatment, and transport**
Through the proper management of on-scene triage, treatment, and transport processes provide for the following: Prevent the greatest possible number of casualties from death or serious, lasting disability. Minimize the reduction of emergency medical services to the rest of the city. Avoid exceeding the ability of area medical facilities to treat casualties without significantly reducing routine patient care.

D. **Medical surge, health care resource coordination, and alternate care**
Assist the City's health care facilities and resources in handling a significant increase in patient volume in anticipation of, during, or after an emergency; facilitate the coordination of health care resources through the Baltimore City Healthcare Facilities Mutual Aid System Memorandum of Understanding; and assist the City's health care resources in addressing alternate care issues.

E. **Non-pharmaceutical interventions**
Contain the spread of contagious illnesses by controlling exposure to infected or potentially infected persons. Isolation is the separation of persons who have a specific infectious illness from those who are healthy and the restriction of their movement to stop the spread of that illness. Quarantine is the separation and restriction of movement of persons who, while not yet ill, have been exposed to an infectious agent and therefore may become infectious. Other non-pharmaceutical interventions such as social distancing can help prevent the spread of communicable diseases.

F. **Mass prophylaxis and vaccination**
Provide prophylaxis and/or vaccine to the population quickly and efficiently when supplies are made available to local jurisdictions through federal assets such as the Strategic National Stockpile (SNS).

| REVISION DATE: November 2013 | PAGE: | 8-2 |
|---|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00003921

| SECTION: ESF 8 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: HEALTH AND MEDICAL | EMERGENCY OPERATIONS PLAN |

G.  **Mass fatality management**
Secure, decontaminate (if needed), and remove the deceased from the scene of a mass casualty incident in a manner that preserves evidence, ensures safety of responders and the public, and facilitates identification of bodies and determination of cause of death.  In the event that a disaster overwhelms the resources of the mortuary affairs system, establish a supplementary system for processing and storing large numbers of fatalities in a manner that is safe and practical, that minimizes confusion and anguish of family members, and that complies with applicable laws and regulations.

H.  **Emergency Public Information and Warning**
Establish the public health Joint Information Center (JIC). Deliver key messages using principles of crisis and emergency risk communication.  Establish mechanisms for public and media inquiries that are scalable.  Disseminate critical health and safety information to the media, public and other stakeholders regarding potential health risks and reducing exposure to ongoing and potential health risks.

1.5  **Scope**
This plan identifies the key tasks to be performed in order to effectively provide emergency medical and public health services in the City of Baltimore.  It describes strategies and planning considerations for these tasks and assigns responsibility for their performance to different agencies.  This plan does not establish operational tactics or standard operating procedures; it supplements and ties together several supporting documents, hazard-specific plans, and agency-specific procedures.

2.  **HEALTH AND MEDICAL STRATEGIES**

2.1  **Emergency Medical Services**
**Background**
BCFD serves as the primary agency for pre-hospital emergency medical services within the boundaries of the City of Baltimore. The Division of Emergency Medical Services (EMS) provides 24/7 assessment, treatment, and hospital transport of trauma and medical patients with 24 first line medic units that provide Advanced Life Support (ALS), 12 surge units that can provide Basic Life Support (BLS) or ALS, and two Special Event units.

**Operations**
A.  In the event of a declared emergency, BCFD EMS will provide emergency response to the scene of the incident and provide patient triage, treatment, and transport within the incident management framework.
B.  BCFD EMS will provide the initial link for mass patient tracking that will assist Incident Commanders (IC) in tracking patients at different stages throughout the emergency.
C.  BCFD EMS through the IC will establish communication with MIEMSS to identify alternative EMS assets and alternative patient delivery sites.
D.  BCFD EMS will assist BCHD in establishing off-site triage, treatment, and transport centers.

| REVISION DATE: November 2013 | PAGE: | 8-3 |
|---|---|---|

| SECTION:  ESF 8 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: HEALTH AND MEDICAL | EMERGENCY OPERATIONS PLAN |

**2.2   Syndromic Surveillance and Infectious Disease Investigation**
Biosurveillance is a critical component to health security and has been identified in HSPD-21 as a priority area for public health and medical preparedness.

Biosurveillance is the process of active data-gathering with appropriate analysis and interpretation of biosphere data that might relate to disease activity and threats to human or animal health – whether infectious, toxic, metabolic, or otherwise, and regardless of intentional or natural origin – in order to achieve early warning of health threats, early detection of health events, and overall situational awareness of disease activity.

**Operations Ongoing**
A.  BCHD monitors several key indicators in Baltimore City generally on a daily basis. Data is compared to historical data and trends and compiled into a report that is sent to the Health Commissioner and key stakeholders for review.
B.  The following data sets are reviewed and included in the BCHD biosurveillance report:
   1)  Dead animal pick-up calls.
   2)  ED Hospital admissions by syndrome
   3)  OTC sales of flu, stomach, and pain medications
   4)  Extreme Heat/Cold Weather (seasonal)
      a)  Temperature, heat index/wind chill, and precipitation
      b)  BGE power outages
      c)  ED visits related to hyperthermia/hypothermia
      d)  EMS calls related to hyperthermia/hypothermia
   5)  Near real-time syndromic Twitter data geo-tagged in Baltimore
C.  BCHD reviews the weekly DHMH biosurveillance report, the *Weekly Public Health and Emergency Preparedness Bulletin*.
D.  BCHD conducts infectious disease investigations through its Acute Communicable Diseases (ACD) program.  The ACD Program monitors the incidence of reportable infectious diseases in Baltimore.  The program receives mandatory case reports of over sixty acute communicable diseases from health care providers, clinical laboratories, and hospital infection control preventionists in Baltimore City. ACD works with the BCHD Office of Field Health Services (which provides medical care in the field through outbreak investigation, medical transport, and community-based nurse offices) in the field.

**Operations during Response**
In the event of a health emergency, BCHD will increase its biosurveillance efforts and coordination with other relevant entities that are involved in surveillance or need access to surveillance data.  The Biosurveillance Coordinator has a designated station in the Health Department Operations Center (HDOC) to ensure timely access to and coordination and sharing of biosurveillance information during a response.

**2.3   Mass Casualty Field Response – Triage, Treatment, and Transport**
Incidents with a large number of sick or injured people can require extensive resources and pose challenging tactical and command situations. BCFD has established a framework to use as a guideline for a mass casualty incident response. BCFD EMS

| REVISION DATE: November 2013 | PAGE: | 8-4 |
|---|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00003923

| SECTION: ESF 8 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: HEALTH AND MEDICAL | EMERGENCY OPERATIONS PLAN |

will provide triage, treatment, and transport of patients at such incidents that occur within the City of Baltimore.

**Operations**

A. BCFD will provide the appropriate level emergency response to address the needs of the City of Baltimore in the event of a mass casualty incident (MCI) based on their MOP 807.

**Mass Casualty Incident—Initial Report**
- **More than 10 patients**
- 1 Medic Unit
- 1 EMS District Officer
- 1 Suppression Company

**Mass Casualty Incident—Level 1 Response**
- **11 to 25 patients**
- Initial Response (see above)
- Box Alarm (including 1 Medic Unit)
- One Additional EMS District Officer (for a total of 2)
- Four Additional Medic Units (for a total of 6)
- Rescue 1
- EMS-1
- Medical Director

**Mass Casualty Incident—Level 2 Response**
- **26 to 50 patients**
- Level 1 Response (see above)
- Four ALS Companies
- One Additional Battalion Chief (for a total of 2)
- Five Additional Medic Units (for a total of 11)
- One additional EMS District Officer (for a total of 3)
- One EMS MULE with Mass Casualty Trailer
- EMS Command Unit
- EMS Supply Coordinator
- PIO

**Mass Casualty Incident—Level 3 Response**
- **51 or more patients**
- Level 2 Response (see above)
- Division Chief
- Four additional ALS Companies (for a total of 8)
- Five Additional Medic Units (for a total of 16)
- Apparatus Coordinator

B. BCFD will provide emergency triage, treatment, and transport of the sick or injured.

C. BCFD will establish off-site triage, treatment and transport centers (OST3Cs) with the assistance of BCHD and other agencies per the OST3C plan.

| REVISION DATE: November 2013 | PAGE: 8-5 |
|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION: ESF 8 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: HEALTH AND MEDICAL | EMERGENCY OPERATIONS PLAN |

**2.4   Medical Surge, Health Care Resource Coordination, and Alternate Care**
BCHD serves as the liaison between Baltimore City and the City's health care resources. Eleven acute care hospitals in the City have signed the Baltimore City Healthcare Facilities Mutual Aid System MOU.  The purpose of this voluntary agreement is to ensure cooperation and sharing of medical resources among the City's hospitals in the event that a disaster exceeds the capacity of any single hospital. The agreement addresses issues regarding the sharing of medical personnel, supplies, equipment, and pharmaceuticals, as well as the transfer of patients, among hospitals in the event of a disaster.

MOU signatories include:

| | |
|---|---|
| Bon Secours Hospital | Mercy Medical Center |
| Good Samaritan Hospital | Sinai Hospital |
| Harbor Hospital | St. Agnes Hospital |
| Johns Hopkins Health System | Union Memorial Hospital |
| Johns Hopkins Bayview | University of Maryland Medical Center |
| Maryland General Hospital | |

City hospital emergency planners meet on a monthly basis to plan and discuss emergency preparedness and response issues.  The group also collaborates on exercises, emergency response, and communications.

BCHD works with the city's health care facilities and City agency partners to maintain the Medical Surge Plan. This plan describes how hospitals will handle a significant increase, or surge, in patient volume in anticipation of, during, or after an emergency.

BCHD also works closely with DHMH as the local lead coordinating entity for the City's health care facilities to request SNS assets.  During an SNS event, facilities may request SNS assets through BCHD.  DHMH then determines whether to approve the request.  BCHD regularly communicates with health care facilities to keep them apprised of SNS planning.

**Operations**
A. In an incident involving large numbers of patients, BCHD will maintain contact with hospitals from the HDOC or unified command.
B. BCHD and hospitals will use HC Standard to track bed availability and status of other resources.
C. BCHD and hospitals will use available primary and secondary communications devices as well as information sharing platforms (WebFusion and WebEOC) to communicate and coordinate in a response.

**2.5   Non-Pharmaceutical Interventions**
Non-pharmaceutical interventions are strategies for disease, injury and exposure control.  They include isolation and quarantine, restrictions on movement, social distancing, and precautionary protective behaviors.

Isolation refers to the separation of persons who have a specific infectious illness from those who are healthy and the restriction of their movement to stop the spread of that

| REVISION DATE: November 2013 | PAGE: | 8-6 |
|---|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00003925

| SECTION:  ESF 8 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: HEALTH AND MEDICAL | EMERGENCY OPERATIONS PLAN |

illness.  Isolation allows for the focused delivery of specialized health care to people who are ill, and it protects healthy people from getting sick.  People in isolation may be cared for in their homes, in hospitals, or in designated health care facilities.  Isolation is a standard procedure used in hospitals today for patients with tuberculosis (TB) and certain other infectious diseases.  In most cases, isolation is voluntary; however, many levels of government (federal, state, and local) have basic authority to compel isolation of sick people to protect the public.

Quarantine refers to the separation and restriction of movement of persons who, while not yet ill, have been exposed to an infectious agent and therefore may become infectious.  Quarantine of exposed persons is a public health strategy, like isolation, that is intended to stop the spread of infectious disease.  Quarantine is medically very effective in protecting the public from disease.

States generally have authority to declare and enforce quarantine within their borders. This authority varies widely from state to state, depending on state laws.  The Centers for Disease Control and Prevention (CDC), through its Division of Global Migration and Quarantine, also is empowered to detain, medically examine, or conditionally release persons suspected of carrying certain communicable diseases.

In general, the U.S. Department of Health and Human Services (HHS) defers to state, tribal and local health authorities in the primary use of their separate quarantine powers.  CDC anticipates that the need to use this federal authority to quarantine a person will occur only in rare situations, such as in events at ports of entry or other time-sensitive settings.  This authority would be used only if a person posed a threat to public health and refused to cooperate with a voluntary request.
Social distancing includes any measure taken to decrease the distance between individuals.  It differs from isolation because it does not require the complete separation of individuals, but only that individuals maintain a distance of six feet between themselves and others.  Restrictions on movement and closure of large events can also help prevent the spread of disease.

**Operations**
A.  The Health Commissioner has the express authority to order quarantine and isolation and can go to court to enforce the isolation order.

B.  BCHD would likely recommend only voluntary isolation or quarantine during a pandemic influenza situation; widespread mandatory isolation and quarantine during a citywide emergency would only be recommended under highly unusual and serious circumstances.

C.  For more isolated issues, such as certain strains of tuberculosis, BCHD may choose to exercise its authority for isolation and quarantine depending on the particular scenario and severity of the health threat.

**2.6    Mass Prophylaxis and Vaccination**
BCHD is the lead City agency for CRI planning and response.  CRI is a federal program under CDC's Division of SNS and coordinated through state and large

| REVISION DATE: November 2013 | PAGE: | 8-7 |
|---|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00003926

| SECTION:  ESF 8 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: HEALTH AND MEDICAL | EMERGENCY OPERATIONS PLAN |

metropolitan health departments to prophylax 100% of an affected population within 24 hours after an aerosolized anthrax exposure.  While the current focus is on anthrax, the plan has applications for other types of mass distribution efforts, such as mass vaccination during a pandemic influenza scenario, and the CDC is transitioning to a more all-hazards approach.

The First Responder Prophylaxis Plan is an annex to the SNS/CRI plan and defines "first responders" as a "diverse set of individuals who will be critical to mitigating the potential catastrophic effects of a widespread anthrax attack. This includes traditional first responders, such as firefighters and non-traditional responders, such as public health professionals and clinical care employees." The medication for first responders will come from the SNS.

The U.S. Postal Service (USPS) Biohazard Detection System (BDS) program acts as an early warning system for the detection of biohazards within postal processing plants.  It detects trace amounts of biological agents in mail and automatically notifies key individuals of an alert.  BDS reduces the risk to employees and the public from the threat of biohazard materials sent through the mail.  The Baltimore City BDS plan will be activated if the BDS alarms detect anthrax on BDS filters at the USPS mail processing center.  BCHD stores the medication (for approximately 850 USPS staff).

**Operations**
A.  During a CRI event, BCHD will coordinate with DHMH to request resources from the SNS. BCHD will establish points of dispensing (PODs) or mass vaccination sites citywide, or as needed depending on the scope of the incident.
B.  At the direction of USPS, BCHD will provide prophylactic medication to the U.S. Post Office at 900 E. Fayette St.

**2.7   Mass Fatality Management**
Mass fatalities may result from a brief, geographically isolated incident or from a widespread, prolonged public health emergency.  They may result from a man-made disaster (with or without criminal intent) or from a natural disaster.  Responsibility for managing mass fatalities lies with several local, state, and private organizations, which must operate in a coordinated fashion.

In Maryland, some cases of death fall under the responsibility of the Office of the Chief Medical Examiner (OCME) while others do not.  When an individual dies of natural causes, a death certificate is issued by an attending physician.  It is then the responsibility of the deceased's family to arrange for mortuary services to be performed by a funeral home.  When an individual dies in a sudden, unexpected, violent, or non-natural manner, OCME will investigate, assist with body identification, secure the body and personal effects, determine cause of death, and issue a death certificate.

A disaster can overwhelm local fatality management resources in one or both of the following ways:
A.  In a natural disaster such as a pandemic, fatalities may exceed the capacity of the local mortuary affairs system (i.e. physicians, funeral homes), resulting in an inability to process, transport, store, and bury the deceased in a prompt manner.

| REVISION DATE: November 2013 | PAGE: | 8-8 |
|---|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION: ESF 8 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: HEALTH AND MEDICAL | EMERGENCY OPERATIONS PLAN |

B. In a man-made event such as a terrorist attack (multiple homicides) or accidents, fatalities may exceed the capacity of OCME to process, transport, store, and examine the deceased in a prompt manner. A man-made event may simultaneously cause the same problem as a natural event described in (A) above.

**Operation**
A. In a mass fatality incident, the lead agency or BPD will notify OCME. The Maryland Joint Operations Center (MJOC) may also notify OCME.
B. OCME will respond and assist with morgue operations provided that a law enforcement agency is represented in the command, irrespective of lead agency or phase of operations.
C. OCME will respond to the incident scene or other identified location and designate an individual to assume the role of Morgue Team Leader within the Incident/Unified/Area command.
D. OCME will evaluate fatality load and activate mutual aid resources as needed.
E. BPD and/or the lead investigating agency will establish scene security and ensure documentation of bodies, evidence, and property. This includes photography, fixing markers, numbering and tagging bodies and body parts, and inventorying property. OCME will assist with these tasks as needed.
F. In coordination with OCME, BCFD will provide a means for decontamination, if necessary, and removal of the deceased.
G. OCME will package bodies for removal and coordinate transport to morgue site(s).
H. MOEM will assist with identification of temporary morgue sites.
I. OCME will create an infrastructure to process a large number of remains to include setting up a temporary morgue.
J. OCME will assign staff to family assistance center(s) to assist with identifying bodies.

**2.8 Emergency Public Information and Warning**
BCHD works closely with MOEM and other City agencies during emergencies to coordinate public information and warning. Additionally, BCHD has relationships with community, business, non-profit, and faith-based organization leaders who can be leveraged to disseminate information before, during and after a disaster.

**Operations**
A. BCHD and BCFD will develop key public health messages to be disseminated via the JIC during emergencies.
B. BCHD will share key public health messages with leaders of communities, businesses, non-profit organizations, faith-based organizations, hospitals, 311, 211, and other City government agencies.
C. BCHD will work with MOEM and MONCS to share information with and leverage support from CERT volunteers and other volunteers groups to deliver messages door-to-door when necessary.
D. BCHD will work with MONCS to translate public health messages as needed.
E. BCHD will provide information to the 311 call center as needed to provide additional information to the public.

| REVISION DATE: November 2013 | PAGE: | 8-9 |
|---|---|---|

CITY00003928

| SECTION:  ESF 8 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: HEALTH AND MEDICAL | EMERGENCY OPERATIONS PLAN |

## 3. ROLES AND RESPONSIBILITIES

### 3.1   Level I Agencies

**BCHD (Lead Agency)**
A.  Activate and manage the HDOC to coordinate the Health Department's response and support other city agencies;
B.  If the lead agency, establish Incident/Unified/Area command at the scene(s) and or at the HDOC;
C.  If a support agency, participate in Incident/Unified/Area command;
D.  Coordinate response with the EOC, other city agencies, DHMH, and other local health departments or impacted health sector entities;
E.  Activate the specific emergency plan(s) if necessary and depending on the scenario;
F.  Coordinate with city hospitals (if necessary and depending on the scenario);
G.  Develop, coordinate, and implement public health risk messages;
H.  In conjunction with MOEM and MONCS, conduct outreach to city residents and visitors to reduce their health risk and to inform them of the current health emergency and resources available to them (vaccination, prophylaxis, etc.) and conduct targeted outreach to vulnerable populations;
I.  Issue orders pursuant to the Commissioner's powers to protect the public health;
J.  Determine emergency staffing needs and activate appropriate Response Tier staff depending on the emergency and their roles and responsibilities.

**BCFD (Core Agency)**
A.  Provide the appropriate level emergency response to address the needs of the City of Baltimore;
B.  Establish or participate in Incident/Unified/Area command;
C.  Provide emergency triage, treatment, and transport of the sick or injured;
D.  Establish triage, treatment, and transport centers with the assistance of BCHD and other agencies.

**BPD (Core Agency)**
A.  Provide security at points of dispensing;
B.  Provide security at OST3C sites;
C.  Provide security, evidence preservation, and investigation at incident scenes;
D.  Enforce orders issued by the Health Commissioner;
E.  Manage any acts of civil disturbance, which may result from a widespread public health emergency;
F.  Assist with decisions concerning fatality management for suspected criminal incidents.

**Mayor's Office**
A.  Issue orders pursuant to the Mayor's authority to maintain public safety and welfare;
B.  Assign a member of the Mayor's Office of Policy and Communication to the JIC as a lead or supporting PIO;
C.  Develop and coordinate dissemination of public messages.

| REVISION DATE: November 2013 | PAGE:      8-10 |
|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00003929

| SECTION: ESF 8 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: HEALTH AND MEDICAL | EMERGENCY OPERATIONS PLAN |

**MOEM**
A. Activate and manage the EOC to coordinate the City's response and support the lead agency;
B. Activate and support a Joint Information System/Center to coordinate the City's communications to the public;
C. Secure outside resources to support the tasks identified in this plan;
D. Activate public warning systems;
E. Assist with outreach efforts to city residents and visitors and targeted outreach to vulnerable populations;
F. Maintain the WebEOC system, including Health Department and Hospital boards;
G. Maintain systems for alerting the public, including EAS and outdoor sirens.

**DOT**
A. Provide personnel, equipment, and logistical support as needed to support the operation of points of dispensing and an OST3C;
B. Transport medication, equipment, and supplies as needed.

**DPW**
A. Provide personnel, equipment, and logistical support as needed to support the operation of points of dispensing and an OST3C;
B. Transport medication, equipment, and supplies as needed.

**DHCD**
A. Provide human service workers and supplies as needed to support the operation of points of dispensing and an OST3C;
B. Provide and coordinate delivery of human and social services to citizens who are subject to isolation or quarantine;
C. Assist with delivery of prophylactic medication to homebound citizens.

**MOIT**
A. Provide technical support services to support the operation of points of dispensing and an OST3C;
B. Relay emergency information and instructions to citizens who call 311.

**3.2 Level II Agencies**

**MCD**
A. Coordinate with disability providers to ensure service delivery to citizens who are subject to isolation or quarantine;
B. Assist with delivery of prophylactic medication to homebound citizens.

**DOF**
A. Assist with identification of vendors and execution of emergency purchases to support operations at PODs and OST3Cs.

**DOL**
A. Advise the Mayor and the Commissioner of Health with respect to emergency powers and orders to protect public health;

| REVISION DATE: November 2013 | PAGE: | 8-11 |
|---|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order   CITY00003930

| SECTION:  ESF 8 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: HEALTH AND MEDICAL | EMERGENCY OPERATIONS PLAN |

B. Develop contracts and agreements needed to support operation of PODs, OST3Cs, or other components of the response to a public health emergency;

C. Develop and maintain guidelines concerning the City's use of its powers to protect public health.

**BCPSS**

A. Provide facilities in which to operate PODs or OST3Cs as needed;

B. Participate in developing school-specific protocol relating to public health emergencies, such as pandemic flu vaccinations.

**OLC**

A. Provide advice and implement policies concerning City employees during a public health emergency;

B. Communicate instructions and information to City employees;

C. Develop and maintain guidelines concerning instructions for, and policies that relate to, City employees in a public health emergency.

**DRP**

A. Provide access to BCRP facilities for use of PODs;

B. Provide staffing at BCRP facilities used as PODs.

### 3.3  Level III Agencies

**MIEMSS**

A. Provide notification to area Emergency Departments and maintain continuous communications;

B. Assist BCHD in monitoring facilities resources through HC Standard;

C. Determine commercial ambulance resources and availability and coordinate deployment;

D. Assist in patient tracking.

**OCME**

A. Assume custody of bodies that result from a man-made mass casualty incident;

B. Assist with scene documentation and investigation;

C. Package and transport bodies from the scene;

D. Establish temporary morgue sites as necessary;

E. Investigate and determine the cause of death;

F. Issue death certificates declaring the cause and manner of death;

G. Release bodies to funeral homes following completion of the tests.

**DHMH**

A. Coordinate requests, allocation and delivery of SNS assets;

B. Coordinate with the Governor's Office, other state agencies, and the federal government to assist BCHD;

C. Conduct biosurveillance activities.

## 4.  PREPAREDNESS AND PLAN MAINTENANCE

### 4.1  Awareness, Training, and Exercises

| REVISION DATE: November 2013 | PAGE: | 8-12 |
|---|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION: ESF 8 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: HEALTH AND MEDICAL | EMERGENCY OPERATIONS PLAN |

    A. Participating agencies shall ensure that personnel responsible for implementing portions of this plan are familiar with ESF 8 plans and with their duties.
    B. BCHD, MOEM, and responsible agencies shall conduct regular training and drills to maintain and improve capabilities that support execution of ESF 8 plans.
    C. BCHD and MOEM shall coordinate annual interagency exercises to test the City's ability to implement ESF 8 plans.

**4.2 Document Review and Revision**
    A. MOEM shall maintain this plan and coordinate an annual review by a committee composed of agencies that are assigned responsibilities under ESF 8.
    B. Agencies' procedures to execute their responsibilities under ESF 8 shall be reviewed annually by the respective agencies.
    C. Documents that support ESF 8 plans as below shall be maintained by their respective owners and reviewed as needed. When these documents are substantively modified, the owners are responsible for notifying MOEM.
    D. Based on the findings of annual reviews, MOEM shall coordinate ESF 8 plan revisions as necessary.

**4.3 Authority**
    A. Baltimore City Charter, Art. II (2012). Health Code of Baltimore City § 4-406 through § 4-407 (2013).
    B. The Catastrophic Health Emergencies Act (CHEA) MD. Annotated Code, § 14-3A-01 (2013). MD Annotated Code, § 14-602 and 14-702 (2013).

For additional information on legal powers in a health and medical emergency, information from the BCLD is on file.

**4.4 Supporting Documents**

**A. SNS/Cities Readiness Initiative (CRI) Plan (Annex H-01-1)**
    Owner:    BCHD (in coordination with DHMH)
    Objective: To coordinate the requesting, resource allocation, and distribution of SNS medical assets (e.g., medicine, medical supplies, and medical equipment) for BCHD and other City health care resources in the event of a national emergency for which the federal government activates the SNS. Under CRI, to distribute oral antibiotics (ciprofloxacin and doxycycline) to 100% of the City's affected population within a 48-hour timeframe in response to a widespread aerosolized anthrax exposure.
    Status:    Under Revision October 2013).

**B. First Responder Mass Prophylaxis Plan**
    Owner:    BCHD
    Objective: To acquire, store, rotate, and distribute prophylaxis for the city's first responders during a CRI event.
    Status:    Draft Complete (August 2013).

**C. USPS Post-Exposure Prophylaxis Plan**
    Owner:    BCHD (in coordination with BCFD)

| REVISION DATE: November 2013 | PAGE: | 8-13 |
|---|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION: ESF 8 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: HEALTH AND MEDICAL | EMERGENCY OPERATIONS PLAN |

> Objective: To develop and execute a plan to prophylax U.S. Postal Service (USPS) employees at the USPS mail processing center at 900 E. Fayette Street.
> Status: Under Revision October 2013.

### D. Pandemic Influenza Plan
> Owner: BCHD
> Objective: To minimize mortality and preserve essential municipal functions during an influenza pandemic.
> Status: Updated (September 2011).

### E. Baltimore City Healthcare Facilities Mutual Aid System Memorandum of Understanding (MOU)
> Owner: BCHD and signatories (acute care hospitals in City)
> Objective: To ensure and facilitate cooperation and sharing of medical resources among Baltimore City's hospitals in the event of a disaster that exceeds the capacity of any one hospital.
> Status: Ratified (March 2006).

### F. Mass Casualty and Fatality Plans

#### 1. Baltimore City Fire Department MOP 807 (MCI protocols)
> Owner: BCFD
> Objective: Establish guidelines for BCFD to triage, treat, and transport patients in incidents that involve more than 10 patients
> Status: Complete

#### 2. Off-Site Triage, Treatment, and Transport Plan (OST3C)
> Owner: BCFD and BCHD
> Objective: Provide interagency procedures for providing patient triage, treatment, and transport in a mass casualty incident
> Status: Under Revision 2013

#### 3. Mass Fatality Plan – State Level
> Owner: DHMH
> Objective: Effectively manage mass fatalities
> Status: Complete (February 2013)

#### 4. Mass Fatality Plan – Local Level
> Owner: BCHD
> Objective: Effectively manage mass fatalities
> Status: Draft Complete (2012)

### F. Public Health Emergency Operations Handbook
> Owner: BCHD
> Objective: Provide an overview of and guide for health department emergency operations and procedures for BCHD staff
> Status: Complete

| REVISION DATE: November 2013 | PAGE: | 8-14 |
|---|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order
CITY00003933

| SECTION: ESF 8 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: HEALTH AND MEDICAL | EMERGENCY OPERATIONS PLAN |

**G.   Baltimore City Medical Surge Plan**
   Owner:      BCHD
   Objective:  To be prepared for emergencies that generate patients requiring
                  medical treatment that surpasses the normal resource capacity and/or
                  capabilities of Baltimore City
   Status:     Complete (January 2011)

**H.  Baltimore City Health Department Continuity of Operations Plan**
   Owner:      BCHD
   Objective:  Maintain essential public health services
   Status:     Complete (July 2013)

**I.    Mental Health Disaster Plan**
   Owner:      Baltimore Mental Health Systems
   Objective:  Ensure an efficient, coordinated and effective response to mental health
                  needs of the affected population in time of disaster
   Status:     Draft Complete (May 2011).

**J.   Baltimore City Health Department Response Tier Memo**
   Owner:      BCHD
   Objectives: Inform Health Department employees of their role and responsibilities
                  during a disaster. Employees are categorized into four Tiers based on
                  response role. Outlines mode of contact for activation of each Tier
                  (automated call-down, phone tree, etc.) Outlines NIMS, ICS and
                  WebEOC training requirements for each Response Tier.
   Status:     Updated April 2013

**K.  EMS Decontamination Procedures (MOP 625-2)**
   Owner:      BCFD
   Objective:  Establish guidelines for BCFD to decontaminate multiple victims at a
                  hazardous materials incident scene.
   Status:     Complete

**L.   Other EMS MOPs (807)**
   Owner:      BCFD
   Objective:  Establish guidelines for BCFD to respond to and treat multiple victims at
                  mass casualty incidents scene.
   Status:     Complete

**M.  Maryland Region III Alternate Care Site and Training Center at Greater
      Baltimore Medical Center Plan**
   Owner:      Maryland Region III Health and Medical Task Force
   Objective:  Provide framework for the activation and management of Maryland
                  Region III Alternate Care Site.
   Status:     Complete, June 2013

| REVISION DATE: November 2013 | PAGE:     8-15 |
|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00003934

| SECTION: ESF 9 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Search and Rescue | EMERGENCY OPERATIONS PLAN |

# Emergency Support Function 9

## *Search and Rescue*

**Lead Agency:**          Baltimore City Fire Department (BCFD)

**Support Organizations:**   Baltimore City Police Department (BPD)

Department of Public Works (DPW)
Mayor's Office of Emergency Management (MOEM)
Baltimore City Health Department (BCHD)
Department of Housing and Community Development (DHCD)
Maryland Task Force 2 US&R (MD-TF2)

## 1. ESF OVERVIEW

### 1.1 Purpose
The purpose of this ESF is to establish responsibilities and operating procedures whereby the BCFD, BPD, and other City Agencies can fully and effectively mobilize to provide Search and Rescue (SAR) assistance in order to protect life and alleviate suffering in the event of an emergency or major disaster.

### 1.2 Situation
A. City of Baltimore agencies and/or departments may be tasked to initiate a SAR mission that may require the utilization of air, ground, and water rescue operations to preserve life at any time.
B. Agencies that conduct preplanning for SAR mission(s) must consider hazards such as fire, confined space rescue, high-rise structures, building collapse, cave-in/trench collapse, high angle, forested areas, recreational areas/facilities, waterways, and chemical/nuclear/biological locations.
C. Responders may face added difficulties or hindrances after a disaster due to extensive damage to the local infrastructure. Such damage then may create environmental safety and health hazards such as: downed power lines; unstable foundations or structures; and exposure to biohazards, toxins, and blood-borne pathogens.
D. Responders must also take into consideration when their safety and the safety of the victims are being impacted by severe weather conditions such as extreme temperature, snow, rain, and high winds.

### 1.3 Assumptions
A. No guarantee of a perfect response system is expressed or implied by this ESF. The City of Baltimore will make every reasonable effort to respond based on the situation, information, and resources available at the time of the incident.

| REVISION DATE: September 2013 | PAGE: | 9-1 |
|---|---|---|

**CONFIDENTIAL - Produced Pursuant to Protective Order**

| SECTION: ESF 9 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Search and Rescue | EMERGENCY OPERATIONS PLAN |

    B. Available resources may become limited due to high demand in a large-scale incident.
    C. All agencies are required to support this ESF as necessary.
    D. Roads providing access to SAR points may be obstructed or impassable.
    E. SAR teams are trained to handle multiple rescue types and scenarios.

**1.4 Scope**

The City of Baltimore is susceptible to many different natural and technical hazards that   may result in significant damage to isolated or vast areas. Search and Rescue resources must be prepared to respond to emergency events and provide special life saving assistance for the variety of potential threats. Their operational activities include: locating, extricating, and providing on site medical treatment to victims trapped in collapsed structures; locating and stabilizing missing, disoriented, traumatized, or injured persons in wilderness, urban, or flood/Swiftwater incidents. The responsible search and rescue agencies must be prepared to respond to these incidents and implement search and rescue tactics to assist those who are, or believed to be, in distress or imminent danger.

The National Response Plan identifies ESF 9 as Urban Search and Rescue; but for the purpose of function within the City of Baltimore, ESF 9 will include all search and rescue operations to include wilderness, downed aircraft, lost persons, and criminal searches.

**2. CONCEPT OF OPERATIONS**

BCFD will be responsible for rescue and search operations during a disaster with assistance from the BPD and volunteer assets (if applicable).  BPD has authority and serves as lead agency for missing persons searches as they are all potential criminal acts.

**Organization:**

BCFD's Special Rescue Operations Team falls under the command of the Special Operations Command (SOC) and consists of 14 members, all trained to the technician level in rope rescue, trench rescue, confined space rescue, structural collapse rescue, swiftwater rescue, and vehicle/machinery rescue in accordance with NFPA 1670 and 1006.  The Dive-Rescue Team also falls under this ESF.

MD-TF2 Urban Search and Rescue Team is a regional and state asset made up of personnel from 7 local jurisdictions.  Requests for deployment are processed through the Baltimore City Fire Communications Bureau in conjunction with the Senior Task Force Leader and SOC. MD-TF2 is under the command of BCFD, but the deployment of assets is governed by the Urban Area Working Group (UAWG).

For local responses, BPD has the primary responsibility of providing incident management with Search and Rescue (SAR) operations involving criminal incidents. If a criminal incident does not exist, the Fire Department will be the primary agency including urban search and rescue operations.  DPW and the DHCD may assist when required for structural evaluation and safety of buildings and structures. BCHD will

| REVISION DATE: September 2013 | PAGE: | 9-2 |
|---|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION: ESF 9 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Search and Rescue | EMERGENCY OPERATIONS PLAN |

advise search and rescue medical teams on industrial hygiene issues as they become apparent. DPW will assist with any equipment, maps, staff, and vehicles. In a secondary role, BPD will assist with perimeter security, communications, and assistance as required.  BCFD will provide emergency medical resources, equipment, and expertise.

All on-scene resources will be organized using the Incident Command System (ICS).

## 3.  ROLES AND RESPONSIBILITIES

### 3.1  Level I Agencies

**BCFD (Lead Agency)**
A. Serve as primary department in any urban search and rescue (disaster) operation;
B. Manages search and rescue deployment to, employment in, and redeployment from the affected area;
C. Responsible for coordinating non-disaster search and rescue operations;
D. Develop and maintain alerting and communication procedures that will ensure timely notification;
E. Maintain minimum training and roster of personnel;
F. Coordinates logistical support for search and rescue during field operations;
G. Develops policies and procedures for effective use and coordination of search and rescue;
H. Provide medical resources, equipment and expertise;
I. Provide status reports on search and rescue operations throughout the affected area;
J. Request further assistance from the Maryland Emergency Management Agency for additional resources;
K. Process requests for MD-TF2 deployment;
L. Develop and maintain standard operating procedures.

**MOEM**
A. Coordinate resource requests through State EOC;
B. Collect and disseminate situation status reports;
C. Serve as technical specialist as needed;
D. Provide administrative and logistical support.

**BPD**
A. Coordinate all investigations for missing persons;
B. Coordinate initiation of AMBER Alert System.

**DPW**
A. Assist with any equipment, maps, staff, and vehicles;
B. Assist with structural evaluation and safety of buildings and structures;
C. Provide heavy equipment support for SAR operations.

**BCHD**
A. Advise search and rescue teams on industrial hygiene issues as needed.

| REVISION DATE: September 2013 | PAGE: | 9-3 |
|---|---|---|

| SECTION: ESF 9 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Search and Rescue | EMERGENCY OPERATIONS PLAN |

**DHCD**
A. Assist with structural evaluation and safety of buildings and structures.

## 4. PLAN DEVELOPMENT AND MAINTENANCE

### 4.1 Awareness, Training, and Exercises
A. Participating agencies shall ensure that personnel responsible for implementing portions of this plan are familiar with the plan and with their duties.
B. BCFD and responsible agencies shall conduct regular training and drills to maintain and improve capabilities that support execution of this plan.

### 4.2 Document Review and Revision
A. Maintenance for this ESF is the responsibility of the Mayor's Office of Emergency Management (MOEM).
B. All agencies with emergency management functions will develop and maintain procedures for performance in accordance with the responsibilities assigned.
C. Documents that support ESF 9 plans as listed below shall be maintained by their respective owners and reviewed as needed. When these documents are substantively modified, the owners are responsible for notifying MOEM.
D. This ESF should be reviewed at least annually.

### 4.3 Authority
Baltimore City Charter Art. II § 7

### 4.4 Supporting Documents

**A. BCFD Manual of Procedure (MOP) 616**
Owner:        Baltimore City Fire Department
Objective:    Outlines the operating procedures for the Special Rescue Operations Team.
Status:       Published May 2003

**B. BCFD Manual of Procedure (MOP) 620-06**
Owner:        Baltimore City Fire Department
Objective:    Outlines the operating procedures for the Dive-Rescue Team.
Status:       Published April 2002

**C. BCFD Manual Of Procedure (MOP) 695 Series**
Owner:        Baltimore City Fire Department
Objective:    Outlines the operating procedures for situations, such as structural collapse, flooding, excavation rescue, etc., requiring Search and Rescue operations.
Status:       Draft April 2009

**D. Maryland Task Force 2 Notification Procedures**
Owner:        Maryland Task Force 2
Objective:    Outlines how to request and activate MD-TF2 Urban Search and Rescue team.
Status:       Published

| REVISION DATE: September 2013 | PAGE:      9-4 |
|---|---|

| SECTION:  ESF 9 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Search and Rescue | EMERGENCY OPERATIONS PLAN |

E. **Maryland Task Force 2 Mobilization Manual (MOB)**
   Owner:        Maryland Task Force 2
   Objective:
   Status:       Published

F. **NFPA 1670: Standard on Operations and Training for Technical Search and Rescue Incidents**
   Owner:        National Fire Protection Association
   Objective:    Identifies and establishes levels of functional capability for conducting operations safely and effectively.
   Status:       Current edition, 2009

G. **NFPA 1006: Standard for Technical Rescuer Professional Qualifications**
   Owner:        National Fire Protection Association
   Objective:    This standard establishes the minimum job performance requirements necessary for fire service and other emergency response personnel who perform technical rescue operations.
   Status:       Current edition, 2008

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00003939

| SECTION: ESF 10 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Hazardous Materials | EMERGENCY OPERATIONS PLAN |

## Emergency Support Function 10

### *Hazardous Materials*

**Lead Agency:**    Baltimore City Fire Department (BCFD)

**Support Agencies**    Mayor's Office of Emergency Management (MOEM)
Baltimore City Police Department (BPD)
Baltimore City Health Department (BCHD)
Baltimore City Department of Transportation (DOT)
Baltimore City Department of Public Works (DPW)
Maryland Department of the Environment (MDE)
Maryland Institute For Emergency Medical Services System (MIEMSS)
Maryland State Police (MSP)
Maryland National Guard

## 1. ESF OVERVIEW

### 1.1   Purpose
The purpose of ESF 10 is to provide assurance of appropriate response to protect the population and environment of Baltimore City in the event of a hazardous materials (HAZMAT) incident involving the transport, use, storage, and processing of hazardous materials.

### 1.2   Situation
The City of Baltimore encompasses approximately 87 square miles of land and seven square miles of deep water harbor that is bound by 52 miles of shoreline. It is located 7 nautical miles from the main stem of the nation's largest estuary known as the Chesapeake Bay.  In addition to  a very robust transportation network that includes rail, marine and Interstate Highways, approximately 352 Tier II facilities exist; of which 153 contain extremely hazardous substances (EHS), compounding the potential for HAZMAT incidents. These factors continue to be considerations during preplanning. Effective preplanning also involves the potential for significant weather events that would result in influence upon a hazardous materials release, in addition to damage to the vital infrastructure, potentially delaying adequate response.

### 1.3   Assumptions
A. A hazardous materials release or spill may develop slowly or occur suddenly without warning.
B. Actual or threatened releases of hazardous materials, oil spills, or other releases often require immediate response from a number of agencies.
C. The severity of the incident and a combination of factors must be evaluated to determine the appropriate action.

| REVISION DATE: September 2013 | PAGE:      104 |
|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order                                          CITY00003940

| SECTION: ESF 10 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Hazardous Materials | EMERGENCY OPERATIONS PLAN |

D. Mutual Aid Agreements can increase the response capacity of BCFD depending upon resources available from mutual aid partners at the time of the request and considering impact of an emergency to the region.

E. Coordination of responding agencies is critical to the successful recapture of spilled materials and subsequent cleanup.

F. Facilities with known HAZMAT have plans and procedures for incidents.

### 1.4 Scope

This annex includes HAZMAT activities, including the detection and mitigation of HAZMAT incidents on public and private lands, and providing personnel, equipment, and supplies for emergency response or assistance operations.

## 2. CONCEPT OF OPERATIONS

### 2.1 General

A. Procedures, protocols, and plans for hazardous materials incidents have been developed to govern responder and manager operations. These are contained in afore-mentioned *Supporting Documents*. Periodic training and exercises are conducted to evaluate and enhance effectiveness.

B. In the event of a large scale incident requiring local mutual aid, State, or Federal assistance, ESF 10 will work with support agency counterparts to seek and procure, plan, coordinate, and direct the use of any needed assets.

C. ESF 10 will continue to evaluate and analyze information. ESF 10 will further develop and update assessments of the hazardous materials situation and status within the impact area. It will also assist with the planning process to further meet anticipated demands or needs.

### 2.2 Organization

The Hazardous Materials Operations Branch of BCFD is comprised of:

- 4 Engine Companies
- 1 Truck Company
- 1 HAZMAT Unit
- 1 Technical Decontamination Unit
- Battalion Chief 6
- Battalion Chief EMS (Toxicology Medic)
- 1 EMS District Officer (EMS 2)
- Hazardous Materials Coordinators

These units are collectively known as the Hazardous Materials Task Force. Personnel assigned to these units are currently certified Hazardous Materials Technicians, compliant with the current NFPA 472 standard.

On-scene incident management will use the Incident Command System (ICS).

| REVISION DATE: September 2013 | PAGE: 102 |
|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION:  ESF 10 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Hazardous Materials | EMERGENCY OPERATIONS PLAN |

## 3.  ROLES AND RESPONSIBILITIES

### 3.1  Level I Agencies

**BCFD (Lead Agency)**
A.  Maintain overall command of the emergency scene until the hazard is mitigated or until command is passed to the appropriate agency;
B.  Define the hot, warm, and cold zones;
C.  Determine the appropriate incident level;
D.  Determine which public impact procedures will prevail;
E.  Initiate public notification, if applicable;
F.  Develop and implement public evacuations if applicable;
G.  Institute ICS to assure that services and staff are provided to areas of need;
H.  Assist with emergency evacuations and re-entry of threatened areas of the City.

**MOEM**
A.  In the event of a major incident involving the potential or actual release of hazardous materials, MOEM will respond to the scene to facilitate interagency coordination and obtain additional resources at the request of the incident commander;
B.  MOEM may activate the Emergency Operations Center to manage resources and information at the request of the Incident Commander (IC);
C.  MOEM will work with the IC's designated public information officer and the Mayor's Office to ensure the release of timely information and alerts to the public.

**BPD**
A.  Participate in on-scene unified command as necessary;
B.  Assist with police resources as needed to establish perimeter, crowd control, and traffic control;
C.  Assist with the implementation of evacuations or sheltering in place;
D.  Provide scene security for the affected area.

**BCHD**
A.  Participate in on-scene unified command as necessary;
B.  Assist with mass casualty field response – triage, treatment, and transport;
C.  Coordinate isolation and quarantine as needed;
D.  Assist environmental personnel in assessment of health effects of the hazardous material.

**DOT**
A.  Provide assistance with traffic control equipment and personnel;
B.  Assist with coordinating evacuation routes and vehicles.

**DPW**
A.  Provide special equipment, such as dump trucks, front end loaders, and excavating equipment;
B.  Provide assistance with containment;
C.  Provide assistance with clean-up and transportation of bulk materials;

| REVISION DATE: September 2013 | PAGE:      103 |
|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order          CITY00003942

| SECTION:  ESF 10 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Hazardous Materials | EMERGENCY OPERATIONS PLAN |

    D.  If the emergency should occur at a water and/or wastewater treatment plant, existing emergency plans will be put into effect.

### 3.2  Level IIII Agencies

**MDE**
A.  MDE is the lead State Agency for response to environmental incidents;
B.  Upon request, MDE can provide technical advice and assistance in the form of personnel and equipment;
C.  MDE can assist with both land and water borne equipment such as sorbent material, containment boom, boats, pumps, and hazardous materials monitoring equipment.

**MIEMSS**
A.  Coordinate statewide Emergency Medical Services;
B.  Notify area hospitals of incident situation and assist with patient dispositions from the incident scene;
C.  Coordinate information exchange between the Maryland Poison Center, field units, and area hospitals;
D.  Provide notification to the State EMS Director who will supply EMS resources to the scene to act as liaisons with state and local jurisdictions.

**MSP**
A. Provide helicopters for medical evacuation and for visible cloud tracking.

**Maryland National Guard Civil Support Team**
A.  Provide technical support in the event of CBRNE involvement.

## 4.  PLAN DEVELOPMENT AND MAINTENANCE

### 4.1  Awareness, Training, and Exercises
A.  Participating agencies shall ensure that personnel responsible for implementing portions of this plan are familiar with the plan and with their duties.
B.  BCFD and responsible agencies shall conduct regular training and drills to maintain and improve capabilities that support execution of this plan.
C.  Continuing education consistent with NFPA 472 standards, in addition, facility tours will continue to occur to maintain the capabilities of personnel.

### 4.2  Document Review and Revision
A.  Maintenance for this ESF is the responsibility of MOEM.  BCFD will develop and maintain procedures for performance in accordance with the responsibilities assigned.  This ESF should be reviewed at least annually.
B.  Documents that support this plan as listed below shall be maintained by their respective owners and reviewed as needed.  When these documents are substantively modified, the owners are responsible for notifying MOEM.

### 4.1. Authority
Baltimore City Charter Art. II § 7 (2013)

| REVISION DATE: September 2013 | PAGE: | 104 |
|---|---|---|

**CONFIDENTIAL - Produced Pursuant to Protective Order**

CITY00003943

| SECTION:  ESF 10 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Hazardous Materials | EMERGENCY OPERATIONS PLAN |

### 4.2. Supporting Documents

**A.  BCFD Manual Of Procedure (MOP)**

| | |
|---|---|
| Owner: | Baltimore City Fire Department |
| Objective: | Outlines the operating procedures for all Fire Department operations and administrative activities. |
| Status: | Various sections of the MOP updated as needed |

**B.  Mutual Aid Agreements**

| | |
|---|---|
| Owner: | Baltimore City Fire Department |
| Objective: | Provide and receive mutual aid for hazardous materials assets from neighboring jurisdictions. |
| Status: | See EOP Basic Plan for list of current MAAs |

**C.  NFPA 472**

| | |
|---|---|
| Owner: | National Fire Protection Association |
| Objective: | Lists competencies for hazardous materials responders. |
| Status: | Complete (May 2013) |

**D.  Hazardous Materials Action Plan**

| | |
|---|---|
| Owner: | City of Baltimore |
| Objective: | Outlines policies and procedures specific to hazardous materials incidents. |
| Status: | Complete (2011) |

CONFIDENTIAL - Produced Pursuant to Protective Order                                    CITY00003944

| SECTION:  ESF 11 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: PUBLIC INFORMATION AND WARNING | EMERGENCY OPERATIONS PLAN |

## Emergency Support Function 11

### *Public Information and Warning*

**Lead Agency:**       Mayor's Office of Emergency Management (MOEM)

**Core Agencies:**      Baltimore City Fire Department (BCFD)
Baltimore Police Department (BPD)
Mayor's Office (MO)
Mayor's Office of Information Technology (MOIT)
Mayor's Office of Neighborhoods and Constituent Services (MONCS)
Municipal Telephone Exchange (MTE)

**Support Agencies:**    Baltimore Area Convention and Visitors Association
Baltimore City Health Department (BCHD)
Baltimore City Office of Cable and Communications
Baltimore City Public Schools (BCPS)
Department of Housing and Community Development (BHCD)
Department of General Services (DGS)
Department of Public Works (DPW)
Department of Transportation (DOT)
Department of Planning (DOP)
Department of Law (DOL)
Downtown Partnership of Baltimore (DPOB)
Department of Recreation and Parks (DRP)
Mayor's Commission on Disabilities (MCD)
Visit Baltimore

## 1.  ESF OVERVIEW

### 1.1   Purpose
This plan defines objectives, establishes strategies, and assigns responsibilities for providing public information and warning to citizens in the City of Baltimore before, during, and after an emergency.  The City will disseminate warning with minimum delay to the general public in the event of any highly probable and immediate danger, as well as timely, accurate and easily understood information to the public.

### 1.2   Situation
The City of Baltimore is vulnerable to a range of natural and man-made hazards that may require the City to provide initial alert/warning, message development, and dissemination.

There is a need to warn the general public in the event of: a natural disaster, man-made disaster or emergency, hazardous materials emergency, fixed nuclear facility emergency, enemy attack, accidental missile launch, and terrorist event.

| REVISION DATE: July 2013 | PAGE:        11-1 |
|---|---|

          CITY00003945

| SECTION:  ESF 11 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: PUBLIC INFORMATION AND WARNING | EMERGENCY OPERATIONS PLAN |

Timely, accurate and easily understood warning in a major emergency or disaster is an important key to save lives, prevent injury, reduce property losses, and mitigate the suffering of the general public.

An estimated 91,268 citizens in Baltimore have some type of disability, and approximately 20,253 over the age of 5 have limited English proficiency.

**1.3   Assumptions**
   A.  No one method of communication will ever reach all members of the public.
   B.  Major disasters or emergencies may disrupt some methods of communications, such as telephone lines, cell phone towers, or radio systems.
   C.  Incidents involving radiological or chemical hazards may require the evacuation or sheltering in place of portions of the City.  Any such notifications or instructions must be immediate.
   D.  In the event of an emergency, the public will look to the government for guidance and information.  Messages need to be clear, concise, and consistent.
   E.  Monitoring of traditional and new media coverage must take place to ensure emergency messaging is received or appropriate.

**1.4   Scope**
This plan identifies the key tasks to be performed in order to effectively provide adequate warning and information to the City of Baltimore.  It describes strategies and planning considerations for these tasks and assigns responsibility for their performance to different agencies.  This plan does not establish operational tactics or standard operating procedures; it supplements and ties together several supporting documents, hazard-specific plans, and agency-specific procedures.

**2.   CONCEPT OF OPERATIONS**

**2.1   Initial Alert and Warning**
There are a number of different methods for notifying the public of an emergency.  The unique circumstances of each incident will dictate the manner in which the public is notified.   If activated, the JIC will coordinate all messaging and activate the appropriate tools.  Considerations include the incident's severity, geographical scope, time until onset, and projected duration.  The table below provides an overview of available notification tools:

| Notification Tool | Description | Owner | Audience | Activation Authority |
|---|---|---|---|---|
| Emergency Alert System (EAS) | Information contained in crawler across the bottom of television screen, radio announcements. | BCFD Communications (ACC) | Broadcast footprint of TV and radio stations | MOEM |

| REVISION DATE: July 2013 | PAGE:   11-2 |
|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION:  ESF 11 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: PUBLIC INFORMATION AND WARNING | EMERGENCY OPERATIONS PLAN |

| Notification Tool | Description | Owner | Audience | Activation Authority |
|---|---|---|---|---|
| Wireless Emergency Alert (WEA) | WEA is part of the Integrated Public Alert and Warning System (IPAWS) that targets cell phones by geographic area and issues an emergency notification. | MOEM | People with newer cell phones and mobile devices | MOEM |
| Broadcast Media | Public Information Officers (PIOs) conduct interviews, press conferences to provide broadcast media with instructions for citizen protective action. | Mayor, MOEM, Lead Agency | Broadcast media audience | Mayor, MOEM, Lead Agency |
| Outdoor Warning | BCFD Apparatus will sound their horns for one minute from outside of each firehouse to alert citizens that something is wrong and they should seek additional information. | BCFD | City-wide population | Incident Commander |
| Reverse 911 | Computerized system dials phone numbers in affected area with pre-recorded instructions. | MOIT (after hours, BPD ECC) | Listed telephone numbers or registered cell phone/email | Incident Commander, MOEM |
| 311 Call Center | Live operators can relay a scripted message with information or instructions to callers. | MOIT | Public who call in | Lead Agency, MOEM |
| City Hall Operator | Live operator can relay a scripted message with information or instructions to callers. | MTE | Public who call in | Lead Agency, MOEM |
| Emergency Message Line | Recorded message provides instructions to citizens who call an advertised number. | BCFD PIO | Public who call in | MOEM, BCFD |
| NOAA Weather Radio | At City's request, NWS broadcasts evacuation instructions to Weather Alert Radios in Baltimore region. | National Weather Service regional office: Sterling, VA | Schools, public who own Weather Alert Radios | MOEM |
| Emergency Vehicle Loudspeaker Systems | Police and fire vehicles drive through affected areas and announce evacuation instructions via loudspeaker. | BPD, BCFD | Affected area | BPD, BCFD |
| Door-to-Door Evacuations | Police and fire personnel walk door-to-door to encourage or order residents to evacuate the premises. | BPD, BCFD | Affected area | BPD, BCFD |
| BECON Notification System | Sends customized alert messages to designated list of phones, email, pagers. | MOEM | Downtown businesses, hospitals, disability providers | MOEM |

| REVISION DATE: July 2013 | PAGE:      113 |
|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION: ESF 11 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: PUBLIC INFORMATION AND WARNING | EMERGENCY OPERATIONS PLAN |

| Notification Tool | Description | Owner | Audience | Activation Authority |
|---|---|---|---|---|
| City Website | Provides current information, alerts, and press releases via the Internet. | MOIT | Public with internet access | Lead Agency |
| Social Media | City agencies maintain a direct relationship with the public through various social media accounts such as Facebook and Twitter. | MOEM, MO, Other agencies | Public with internet access | Lead Agency |

## A. EAS

**Purpose**
The EAS is used to broadcast a warning message to the public over television, cable, radio, and other broadcast services. EAS is now integrated as part of the Integrated Public Alert and Warning System (IPAWS).

**Background**
The Emergency Management Network (EMNET) console is housed at the Alternate Communications Center (ACC) under the control of Fire Communications. A written and/or verbal message can be sent to Baltimore area broadcast stations as a Civil Emergency message or Civil Danger message. Each station can than broadcast the emergency message to the affected area.

**Operations**
1) Activation of the Emergency Alert System (EAS) will be in conjunction with the City of Baltimore PIOs, ACC, and the Director of Emergency Management.
2) EAS can be activated by the EMNET system which is located at the ACC or via phone from a PIO.
3) WBAL 1090 AM is the Local Primary (LP1) station. WPOC is the backup (LP2) station.
4) WBAL is responsible for relaying the message to other broadcast systems. However, most broadcasters now have their own EAS encoders so they do not rely on WBAL to forward messages. Accordingly, citizens are now simply encouraged to "tune to your local news station for emergency information."
5) If an evacuation is necessary, the public will be directed to monitor local news stations for instructions. Areas affected by an emergency will be identified by zip code or street boundaries.

## B. WEA

**Purpose**
WEA is a component of IPAWS that targets cellular phones with text alerts based on location.

**Background**
WEA should be activated in conjunction with the EAS by the ACC or MOEM.

| REVISION DATE: July 2013 | PAGE: | 114 |
|---|---|---|

CITY00003948

| SECTION: ESF 11 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: PUBLIC INFORMATION AND WARNING | EMERGENCY OPERATIONS PLAN |

**Operations**
1) Activation will be in conjunction with the City of Baltimore PIOs, ACC, and the Director of Emergency Management.

EAS can be activated by the EMNET system which is located at the ACC or via WebEOC by an authorized PIO.

**C. Broadcast Media**

**Purpose**
Press conferences and interviews with local broadcast media can be used to convey emergency instructions to the public over television and radio.

**Background**
The Joint Information Center, Mayor's Office, or lead agency head or Public Information Officer may hold a press conference or issue a press release to provide information about a situation or guidance to the public in the event of an emergency.

**Operations**
Before any statement is released for dissemination to the public, the Mayor's Office and appropriate City agency heads or designees must be notified.

**D. Reverse 911**

**Purpose**
Reverse 911 is a system that can be used to rapidly place automated phone calls to large numbers of citizens.

**Background**
The Reverse 911 vendor is Cassidian, and the system is maintained by Mayor's Office of Information Technology (MOIT). For activation after business hours, BPD Communications (ECC) shift supervisor is trained to activate the system. The server that makes the calls is located at MOIT.

**Operations**
1) Reverse 911 can be used to call land lines and cell phones.

It sends a recorded voice message, and the system capacity depends on length of message and percentage of calls that are answered. A ballpark estimate for capacity is several hundred calls per minute.

2) Web-based software is used to select notification recipients and activate the system to place calls. Thus, the system can be utilized from any computer by an operator who has a password.
3) If the system server fails, the system can still be used through a backup via the vendor.
4) This system can be used to notify two types of groups:
   a. Geographical areas: The operator uses Geographic Information Systems (GIS) software to draw a polygon on a City street map around the area that

| REVISION DATE: July 2013 | PAGE: | 11-5 |
|---|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION: ESF 11 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: PUBLIC INFORMATION AND WARNING | EMERGENCY OPERATIONS PLAN |

is to be notified.  The software generates a list of households *with listed numbers* in the selected area (the database is purchased from Verizon).

   b. <u>Pre-assembled databases</u>: The operator selects a group of phone numbers that have been pre-assembled in a database.  For example, CARE has a database of elderly citizens, which is used to send warnings and advice during periods of extreme heat.

## E.  311 Call Center

**Purpose**
The 311 Call Center can relay a scripted message with information or instructions to callers in an emergency.

**Background**
The 311 Call Center is run by MOIT and is a system for taking calls about non-emergency issues and complaints related to city services.  In the event of an emergency, many residents may call 311 in an attempt to find out information.

**Operations**
1) MOEM, the lead agency, or the JIC can provide a scripted message or instructions to the 311 Call Center for them to relay to individuals calling in about an emergency.
2) Current information needs to be provided to the Call Center as the situation progresses.

   NOTE: The City Hall Operator also fields calls from the public. Any scripted messages or information provided to the 311 Call Center should also go to the City Hall Operator.

## F.  City Hall Operator

**Purpose**
The City Hall Operator can relay a scripted message with information or instructions to callers in an emergency.

**Background**
The City Hall Operator is run by MTE and serves as the switchboard system for City agencies.  In the event of an emergency, many residents may call 410-396-3100 in an attempt to find out information.

**Operations**
1) MOEM, the lead agency, or the JIC can provide a scripted message or instructions to the City Hall Operator for them to relay to individuals calling in about an emergency.
2) Current information needs to be provided to the City Hall Operator as the situation progresses.

| REVISION DATE: July 2013 | PAGE: | 11-6 |
|---|---|---|

| SECTION: ESF 11 | CITY OF BALTIMORE |
| --- | --- |
| SUBJECT: PUBLIC INFORMATION AND WARNING | EMERGENCY OPERATIONS PLAN |

**G. Hazmat/Emergency Message Line:**

**Purpose**
The Hazmat/Emergency Message Line is a telephone number that the public can call to hear a pre-recorded message providing information about a current emergency.

**Background**
This phone line (410-396-3098) is maintained and updated by the BCFD Public Information Officer.

**Operations**
1) In the presence of a major event affecting a large number of citizens, the BCFD Public Information Officer in cooperation with Fire Communications will record a message with information and/or instructions via the HAZMAT/EMERGENCY MESSAGE LINE.
2) The information is for public notification; therefore, it is essential that the information is accurate, specific, and concise.

**H. NOAA Weather Radio:**

**Purpose**
NOAA Weather Radio (NWR) broadcasts National Weather Service (NWS) warnings, watches, forecasts and other non-weather related hazard information 24 hours a day to special Weather Alert Radios.

**Background**
NWR broadcasts warnings and post-event information for all types of hazards: weather (e.g., tornadoes, floods), natural (e.g., earthquakes, forest fires and volcanic activity), technological (e.g., chemical releases, oil spills, nuclear power plant emergencies, etc.), and national emergencies (e.g., terrorist attacks). Working with other Federal agencies and the Federal Communications Commission's (FCC) Emergency Alert System (EAS), NWR is an all-hazards radio network, making it the most comprehensive weather and emergency information available to the public.

**Operations**
1) During an emergency, NWS forecasters interrupt routine broadcasts and send a special tone activating local weather radios.
2) Weather radios equipped with a special alarm tone feature sound an alert to give you immediate information about a life-threatening situation.
3) Life-threatening weather emergency messages are alerted on NWR.  Many of those same weather-related emergency messages are also broadcast via the EAS.
4) For non-weather emergencies, NWS activates the system at the request of local and/or state officials. NWS does not initiate the contact or the message.
5) Local or state officials provide text information about the non-weather hazard directly to the local NWS offices.
6) The Baltimore/Washington office is located in Sterling, VA, (703) 966-2200.

| REVISION DATE: July 2013 | PAGE: 117 |
| --- | --- |

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00003951

| SECTION: ESF 11 | CITY OF BALTIMORE |
| --- | --- |
| SUBJECT: PUBLIC INFORMATION AND WARNING | EMERGENCY OPERATIONS PLAN |

I. **Emergency Vehicle Loudspeaker System and Door to Door Evacuations**

**Purpose**
These methods are used to notify and evacuate an isolated area or large number of citizens during an emergency incident.

**Background**
Residents may be directly warned by emergency responders to evacuate an area when there is advanced warning of a hazard, the possibility of explosion, or the danger of long-term exposure.

**Operations**
1) BPD in conjunction with BCFD shall be responsible for implementing the evacuation procedure, whether all or in part.
2) BPD and BCFD responders using sirens, loudspeakers, and door-to-door alerts will advise the residence of the evacuation.
3) Evacuation areas will be identified by zip code or major streets.
4) In most cases, an evacuation may not be necessary. Citizens are encouraged not to evacuate unless specifically told to do so.

J. **Baltimore Emergency Communication Network (BECON) Notification System**

**Purpose**
BECON can be used to send a customized alert message or instructions to a pre-designated list of city employees, downtown businesses, and hospitals via various communication devices (phone, email, pager, etc).

**Background**
BECON was initially developed by the City of Baltimore, the Downtown Partnership Safety Coalition, and Baltimore businesses. It is now administered by the Baltimore City Mayor's Office of Emergency Management (MOEM) in conjunction with the Downtown Partnership. Participants will include businesses from numerous sectors across the City. The notification system is hosted by vendor, Dell.

**Operations**
1) An emergency communication may be initiated via the internet or via phone. The system is fully secure and the device order is based upon the time of day the alert is sent.

2) BECON consists of two core components: an automated messaging system and a conference bridge.

   <u>Messaging System</u>: BECON participants provide contact information, which is stored in AlertFind, an automated messaging system. AlertFind is provided by Dell to support BECON. In an emergency, AlertFind can be activated to rapidly notify participants via multiple devices.

| REVISION DATE: July 2013 | PAGE: | 118 |
| --- | --- | --- |

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION: ESF 11 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: PUBLIC INFORMATION AND WARNING | EMERGENCY OPERATIONS PLAN |

Conference Bridge: The most common type of emergency notification will instruct participants to dial into a conference bridge in order to receive information and coordinate activities.  This conference bridge is provided free of charge by the Baltimore Metropolitan Telephone Exchange (MTE).

### K. City Website

**Purpose**
The City's website provides current information about the City of Baltimore to the public via the Internet at http://www.baltimorecity.gov.

**Background**
The website can be used during emergencies to post alerts, updates, press releases, or other relevant information and guidance to the public.  The website is maintained by the City's Webmaster in MOIT.

**Operations**
Currently, all updates and postings must go through the Webmaster.  As of April 27, 2010, plans are being made to allow distributed access for posting emergency information, such as alerts or press releases, by agency PIOs or representatives.

### L. Social Media

**Purpose**
Social media are media designed to be disseminated through social interaction, using highly accessible and scalable publishing techniques.  Social media use web-based technologies to transform and broadcast media monologues into social media dialogues.

**Background**
The scope and use of social media has been evolving over the past few years and continues to grow in popularity.  A number of City agencies now use social media to connect with and engage constituents. Forms of social media currently in use by various City agencies are Facebook, Twitter, Pinterest, YouTube, and Instagram.

**Operations**
There are currently no City-wide policies on how and when to use various forms of social media.  Each individual agency establishes and manages its own accounts and policies.  Information is usually cleared through the agency's PIO.  Various agency accounts can echo messages for increased reach.

## 2.2   Message Development and Dissemination

A Joint Information System (JIS) will be used to organize, integrate, and coordinate information to ensure timely, accurate, accessible, and consistent messaging across multiple jurisdictions and/or disciplines with nongovernmental organizations and the private sector.  A JIS includes the plans, protocols, procedures, and structures used to provide public information. The Joint Information Center (JIC) is a central location that facilitates operation of the JIS and serves as the primary point of contact for the media

| REVISION DATE: July 2013 | PAGE: | 11-0 |
|---|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION: ESF 11 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: PUBLIC INFORMATION AND WARNING | EMERGENCY OPERATIONS PLAN |

for information about the crisis or public health emergency. It can be expanded or contracted to meet the needs of the incident.

The PIOs assigned to the JIC are responsible for all message development, dissemination, and monitoring across all platforms.

## 3. ROLES AND RESPONSIBILITIES

### 3.1 Level I Agencies

**MOEM (Lead Agency)**
A. Activate and manage the EOC to coordinate the City's response and support the lead agency;
B. Activate and support a JIS/JIC to coordinate the City's information to the public;
C. Secure outside resources to support the tasks identified in this plan;
D. Activate public warning systems;
E. Maintain and administer WebEOC;
F. Maintain systems for alerting the public, including EAS and outdoor sirens;
G. Disseminate emergency preparedness messages throughout the disaster cycle;
H. Design and participate in training and exercises to practice and test this plan.

**MO (Core Agency)**
A. Provide overall direction and management of public information;
B. Develop and coordinate dissemination of public messages;
C. Designate lead PIO upon activation of the JIC/JIS;
D. Assign a member of the Mayor's Office of Policy and Communication to the JIC as a lead or supporting PIO;
E. Facilitate training and education by holding regularly scheduled PIO meetings;
F. Design and participate in training and exercises to practice and test this plan.

**BCFD (Core Agency)**
A. If necessary, activate Outdoor Warning System, EAS, Evacuation Procedures, and/or Hazmat Emergency Information line;
C. Develop, coordinate, and implement communications messages as needed;
D. Maintain internal capabilities, policies, and procedures sufficient to execute the tasks assigned in this plan;
E. Design and participate in training and exercises to practice and test this plan;
F. Participate in training and education at regularly scheduled Media Relations PIO meetings.

**BPD (Core Agency)**
A. Upon request from Incident Commander or MOEM, activate the Reverse 911 and evacuation procedures;
B. Designate a PIO and/or representatives to staff the JIC or act as lead PIO if required;
C. Develop, coordinate, and implement communications messages as needed;
D. Maintain internal capabilities, policies, and General Orders sufficient to execute the tasks assigned in this plan;

| REVISION DATE: July 2013 | PAGE: | 11-10 |
|---|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00003954

| SECTION: ESF 11 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: PUBLIC INFORMATION AND WARNING | EMERGENCY OPERATIONS PLAN |

E. Ensure Emergency Communications Center (ECC) supervisors are trained in Reverse 911 procedures;
F. Participate in training and education at regularly scheduled Media Relations PIO meetings;
G. Participate in training and exercises to practice and test this plan.

**MOIT (Core Agency)**
A. Relay emergency information and instructions to individuals who call 311;
B. If necessary, activate Reverse 911;
C. Provide technical support to JIC as needed;
D. Participate in training and exercises to practice and test this plan;
E. Maintain 311 Call Center and Reverse 911 system;
F. Manage server for WebEOC.

**BCHD**
A. Develop, coordinate, and implement communications messages as needed;
B. Designate a PIO and/or representatives to staff the JIC or act as lead PIO if required;
C. Serve as the point of contact for hospitals within the City and assist with their emergency coordination;
D. Participate in training and education at regularly scheduled Media Relations PIO meetings;
E. Participate in training and exercises to practice and test this plan.

**DHCD**
A. Designate a PIO and/or representatives to staff the JIC or act as lead PIO if required;
B. Participate in training and education at regularly scheduled Media Relations PIO meetings;
C. Participate in training and exercises to practice and test this plan.

**DPW**
A. Designate a PIO and/or representatives to staff the JIC or act as lead PIO if required;
B. Participate in training and education at regularly scheduled Media Relations PIO meetings;
C. In conjunction with MOEM, maintain and test Outdoor Warning System;
D. Participate in training and exercises to practice and test this plan.

**DOT**
A. Designate a PIO and/or representatives to staff the JIC or act as lead PIO if required;
B. Provide current information on road status, routes, and closures for dissemination to the public;
C. Participate in training and education at regularly scheduled Media Relations PIO meetings;
D. Participate in training and exercises to practice and test this plan.

| REVISION DATE: July 2013 | PAGE: | 11-11 |
|---|---|---|

CITY00003955

| SECTION: ESF 11 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: PUBLIC INFORMATION AND WARNING | EMERGENCY OPERATIONS PLAN |

**MONCS**
A.  Assist in disseminating emergency information to neighborhood contacts;
B.  Maintain contact/distribution list for neighborhood contacts;
C.  Assist in translation services;
D.  Participate in training and exercises to practice and test this plan.

**MTE**
A.  Instruct City Hall Operator to relay emergency information to callers as required;
B.  Participate in training and exercises to practice and test this plan.

**3.2   Level II Agencies**

**BCPS**
A.  Designate a PIO and/or representatives to staff the JIC or act as lead PIO if required;
B.  Participate in training and education at regularly scheduled Media Relations PIO meetings.

**DOP**
A.  Assist in disseminating emergency Flood Plain information to relevant agencies;
B.  Ensure that Flood Plain Maps are available in advance to identify areas known to flood.

**DOL**
A.  Designate representative to staff or assist the JIC if required;
B.  Review press releases and public guidance if required;
C.  Participate in training and exercises to practice and test this plan.

**DPOB**
A.  Disseminate emergency information to business contacts as required;
B.  Maintain updated contact/distribution list for downtown businesses;
C.  Serve as downtown sector leader for BECON;
D.  Participate in training and exercises to practice and test this plan.

**DRP**
A.  Designate a PIO and/or representatives to staff the JIC if required;
B.  Participate in training and education at regularly scheduled Media Relations PIO meetings;
C.  Participate in training and exercises to practice and test this plan.

**MCD**
A.  Designate a representative to staff the JIC if required;
B.  Ensure messages are accessible;
C.  Assist with developing accessible emergency messaging throughout disaster cycle;
D.  Participate in training and education at regularly scheduled Media Relations PIO meetings;
E.  Participate in training and exercises to practice and test this plan.

| REVISION DATE: July 2013 | PAGE: | 11-12 |
|---|---|---|

| SECTION: ESF 11 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: PUBLIC INFORMATION AND WARNING | EMERGENCY OPERATIONS PLAN |

### 3.3 Level III Agencies

**Baltimore Area Convention and Visitors Association**
A. Assist in disseminating emergency information to visitors and tourists at area hotels and convention center;
B. Participate in training and exercises to practice and test this plan.

**Baltimore City Office of Cable and Communications**
A. At the request of the Emergency Manager, broadcast emergency information on TV25;
B. Participate in training and exercises to practice and test this plan.

**Visit Baltimore**
A. Disseminate emergency information to visitors and tourism industry as required;
B. Designate a PIO and/or representatives to staff the JIC if required.

## 4. PREPAREDNESS AND PLAN MAINTENANCE

### 4.1 Awareness, Training, and Exercises
A. Participating agencies shall ensure that personnel responsible for implementing portions of this plan are familiar with the plan and with their duties.
B. MOEM and responsible agencies shall conduct regular training and drills to maintain and improve capabilities that support execution of this plan.
C. Agency PIOs shall participate in training and education by attending Mayor's Media Relations regularly scheduled PIO meetings.
D. MOEM shall coordinate annual interagency exercises to test the City's ability to implement this plan.

### 4.2 Document Review and Revision
A. MOEM shall maintain this plan and coordinate an annual review by a committee composed of agencies that are assigned responsibilities under this plan.
B. Agencies' procedures to execute their responsibilities under this plan shall be reviewed annually by the respective agencies.
C. Documents that support this plan as listed in (1.5) above shall be maintained by their respective owners and reviewed as needed. When these documents are substantially modified, the owners are responsible for notifying MOEM.
D. Based on the findings of annual reviews, MOEM shall coordinate plan revisions as necessary.

### 4.3 Authority
A. Electronic Code of Federal Regulations (e-CFR) Title 47, Part 11 (1994).
B. Electronic Code of Federal Regulations (e-CFR) Title 47, Part 10 (2008).

### 4.3 Supporting Documents

**A. Maryland State Emergency Alert System (EAS) Plan**
Owner: Maryland State Emergency Communications Committee
Objective: FCC-mandated plan outlining the organization and implementation of MD EAS.

| REVISION DATE: July 2013 | PAGE: | 11-13 |
|---|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00003957

| SECTION: ESF 11 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: PUBLIC INFORMATION AND WARNING | EMERGENCY OPERATIONS PLAN |

Status:          Draft release January 2006

**B. BECON: Baltimore Emergency Communication Network Administrator Manual**
   Owner:        MOEM
   Objective:    Administrative Manual for operating BECON
   Status:       Draft Version 1.1, February 23, 2007

**C. BCFD MOP 625-2: Emergency Services: Hazardous Materials Incidents**
   Owner:        BCFD
   Objective:    Includes BCFD public information procedures.
   Status:       Published May 1, 2003

**D. City of Baltimore Reverse 911 Policy**
   Owner:        MOEM
   Objective:    Establish policies and procedures for use of Reverse 911 system.
   Status:       Draft July, 2013

**E. WebEOC City of Baltimore System Administrator Manual**
   Owner:        MOEM
   Objective:    Establish policies and procedures for use of the City's WebEOC software system.
   Status:       Draft, September, 2013

**F. BPD General Order T-6: Emergency Traffic Evacuation Procedure**
   Owner:        BPD
   Objective:    Codify procedures for orderly emergency traffic evacuations in a coordinated manner with various government agencies.
   Status:       Published July 2002

**G. MOIT EOC Procedures Manual**
   Owner:        MOIT
   Objective:    Outline the procedures for MOIT and the 311 Call Center during an emergency.
   Status:       Updated February 2010

**H. JIC SOP**
   Owner:        MOEM
   Objective:    Outline the procedures for opening and operating a JIC in Baltimore City.
   Status:       Draft September 2013

| REVISION DATE: July 2013 | PAGE: | 11-14 |
|---|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00003958

| SECTION: ESF 12 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Energy | EMERGENCY OPERATIONS PLAN |

# Emergency Support Function 12

## *Energy*

**Lead Agencies:**  Department of General Services (DGS)
Mayor's Office of Emergency Management (MOEM)

**Core Agencies:**  Department of Transportation (DOT)
Department of Public Works (DPW)

**Support Organizations:**  Baltimore Gas & Electric (BGE)
Baltimore Refuse Energy Systems Company (BRESCO)
COMCAST
Mayor's Office of Information Technology (MOIT)
Mayor's Office Neighborhoods and Constituent Services (MONCS)
Mayor's Office of Cable and Communications (MOCC)
Municipal Telephone Exchange (MTE)
Veolia Energy
Verizon

## 1. ESF OVERVIEW

### 1.1. Purpose

The purpose of Emergency Support Function (ESF) 12 is to promulgate the policies and procedures to be used by City, support agencies, and organizations in responding to and recovering from damage to energy systems such as shortages and disruptions in the supply and delivery of electricity, natural gas, and other forms of energy and fuels that impact or threaten significant numbers of citizens, visitors and city functions.

### 1.2. Situation

A. Shortages and disruptions in the supply of electricity may be caused by such events as unusually cold or hot weather, storms, power generation, fuel supply disruptions, and electric transmission and distribution disruptions. Other energy and fuel shortages affecting the private sector may be caused by such events as severe weather, flooding, and labor strikes.
ESF 12 involves close coordination with private sector partners to ensure that the integrity of energy systems are maintained during emergency situations and that damaged utility infrastructure is repaired and services restored in an expediential manner. DGS and MOEM will have primary responsibility to monitor and coordinate the availability and supply of fuel and the supply and transportation of generation fuels and emergency power. ESF 12 will have primary responsibility to monitor and coordinate with private sector petroleum fuel suppliers to ensure that adequate supplies of transportation fuels (diesel and gasoline) are available and deliverable.
B. **Electrical Energy:** Baltimore City is part of a regional power grid comprised of 40 large generating facilities and 13 companies that provide transmission and

| REVISION DATE: November 2013 | PAGE: 12 - 1 |
|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION: ESF 12 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Energy | EMERGENCY OPERATIONS PLAN |

distribution services. Local transmission and distribution is handled by Baltimore Gas and Electric (BGE) on the PJM Interconnection grid. 30-35% of power consumed in Maryland is supplied by out-of-state plants. BGE's distribution system consists of a combination of overhead and underground lines.

C. **Natural Gas:** Much of Baltimore City depends on natural gas for heating and cooking; BGE is the sole provider of natural gas inside the City and has one liquefied natural gas (LNG) storage facility within city limits. BGE's facilities are served by three regional transmission pipelines.

D. **Petroleum Fuel:** Baltimore City has no petroleum production or refineries. Petroleum fuel is imported to Baltimore City either by tanker ship, over land, or through the Colonial Pipeline. Only small amounts of gasoline and diesel are stored by the City, and no crude oil or motor oil are stored.

### 1.3. Assumptions

A. Emergencies or disasters could occur in or near the City of Baltimore at any time causing significant human suffering, injury and death; public and private property damage, environmental degradation, loss of essential services, economic hardship to businesses, families and individuals, and disruption to local and other governmental entities.

B. The City of Baltimore is vulnerable to many natural, technological or man-made hazards such as the damaging effects of hazardous materials and chemical incidents, power failures, transit incidents, energy failures, civil disorders, dam failures and acts of terrorism.

C. Primary and secondary effects of hazards must be considered.

D. The occurrence of an emergency or disaster incident can destroy or damage portions of the energy supply, production and distribution systems.

E. Baltimore is vulnerable to fuel disruptions because it depends on imports.

F. Widespread and prolonged electric power failures can occur in a major disaster.

G. The transportation, media, telecommunications and utility infrastructure will be disrupted.

H. Communications and traffic signals may be hindered by power failures, which may affect safety services, the deployment of resources, and/or the overall response to the disaster area.

I. Damage or disruption to one underground utility infrastructure may affect other utilities infrastructure.

J. In a major disaster, there may be response delays for restoring utilities due to damage to facilities and equipment, as well as shortages of personnel.

K. Delays in the production, refining, and delivery of petroleum-based products can occur as a result of transportation infrastructure problems and loss of commercial electric power.

L. Baltimore City's EOP and Continuity of Operations Plans rely on having fuel for vehicles and energy for communications.

### 1.4. Scope

ESF 12 addresses the assessment and restoration of damage to utilities infrastructure, including information sharing concerning restoration.  The utilities covered in this ESF annex include underground and aboveground utilities such as oil/fuel pipelines, natural gas, electric, and steam. This annex may need to be activated in conjunction with ESF 14 – Recovery, which includes damage assessment and debris management.

| REVISION DATE: November 2013 | PAGE: 12 - 2 |
|---|---|

CITY00003960

| SECTION:  ESF 12 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Energy | EMERGENCY OPERATIONS PLAN |

2.  **Concept of Operations**

  2.1.  **General**

  A.  When electric utility operating reserves are nearly exhausted and there is an imminent possibility of curtailment or loss of firm load, threat of distribution service disruptions due to an emergency or disaster incident, or when other energy supplies such as natural gas or automotive transportation fuels are disrupted, an appraisal of the situation is made by designated authorities and personnel, and action is taken is accordance with ESF 12. ESF 12 personnel are notified and mobilized to direct and coordinate relief efforts, communicate with the public and appropriate governmental agencies, and restore normal service as soon as possible. These response actions are carried out to maintain energy system integrity and to minimize the impact on the City, citizens and visitors**.**

  B.  **Activities during an emergency or disaster incident include but is not limited to:**

  1)  Coordinating closely with BGE and other private utilities to establish restoration priorities for essential public services.
  2)  Assessing energy system damage.
  3)  Assessing energy supply and demand.
  4)  Assessing the requirements for restoration.
  5)  Coordinating temporary, alternative, or interim sources of emergency fuel and power.

  2.2.  **Organization**

  A.  DGS and MOEM are the lead agencies for ESF 12.  During an emergency or disaster, the primary and support agencies of ESF 12 will assign personnel to the City's Emergency Operations Center (EOC). A single lead agency will be appointed based on the incident.

  2.3.  **Notification**

  A.  MOEM shall notify DGS when an area of the City is threatened or has been impacted by an emergency or disaster incident that involves the energy system and assign a lead agency.

  B.  The lead agency for ESF 12 will identify respective support agencies and private sector personnel to assist in coordinating response activities associated with utility infrastructure damage and restoration needs. Per the request of ESF 12, support agency personnel will report to the EOC.

  2.4.  **Actions**

  A.  **Preparedness**

  1)  All Department personnel designated to serve as EOC representatives shall be trained on all related Standard Operating Procedures (SOPs) associated with ESF 12.
  2)  Maintain communication with utility representatives to determine response and recovery needs.
  3)  Maintain communication with major fuel providers to determine response and recovery needs.

| REVISION DATE: November 2013 | PAGE:   12 - 3 |
|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION: ESF 12 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Energy | EMERGENCY OPERATIONS PLAN |

    4) Maintain coordination for back-up power generation needs for key City facilities.

**B. Response**

    1) ESF 12 procedures shall be implemented when notified by MOEM. Support agencies and organizations will cooperate with City, state, and federal agencies and public or private entities in achieving the purposes or activities of ESF 12.

    2) The assets available to ESF 12 will be used to assist other ESFs with their emergency response and recovery efforts to provide power and fuel and other resources as necessary.

    3) ESF 12 shall coordinate with support agencies and organizations to ensure sufficient power and fuel supplies to City agencies, emergency response organizations, and areas along evacuation routes.

    4) Maintain communication with utility representatives to determine response and recovery needs.

    5) Maintain communication with major fuel providers to determine response and recovery needs.

    6) Assist the American Red Cross (ARC) and other relief organizations to identify emergency shelter power generation needs for emergency shelters.

    7) Complete an initial assessment that identifies necessary recovery actions. Develop strategies for meeting local energy needs, monitor utility repair actions, and communicate with and monitor state and utility response actions.

    8) Receive and assess requests for aid from City, state and federal agencies, energy offices, energy suppliers, and distributors.

    9) Establish priorities to repair damaged utility systems.

    10) Provide ESF 11 with assessments of energy supply, demand, and requirements to repair or restore energy systems for public information.

**C. Recovery**

    1) Upon request, coordinate the provision of resources to assist City agencies and private partners in restoring emergency power and fuel needs.

    2) Review recovery actions, develop strategies for meeting City energy needs, continue to monitor utility actions, and communicate with and monitor utility response actions.

    3) Establish priorities to repair damaged energy systems.

    4) Update ESF 11 with assessments of energy supply, demand, and requirements to repair or restore energy systems.

    5) Keep accurate logs and other records of emergency response activities and costs.

**D. Mitigation**

    1) ESF 12 will work collaboratively with other ESFs, private energy suppliers, and fuel companies to ensure adequate supplies and resources are available to meet demand created by potential emergencies or disasters.

**E. Command and Control**

    1) In the wake of a disaster, many local resources will be unavailable due to damage, inaccessibility, or insufficient supply. ESF 12 will coordinate a response to electric and natural gas energy related requests with assistance from support agencies and organizations.

| REVISION DATE: November 2013 | PAGE: 12 - 4 |
|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION: ESF 12 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Energy | EMERGENCY OPERATIONS PLAN |

2) When ESF 12 is activated in the EOC, the lead will identify which support agencies for are needed and take the necessary steps to ensure that these agencies are activated, or at least placed on alert status, as appropriate.

3) ESF 12 will coordinate a response to non-utility sector energy and transportation fuel related requests with assistance from other ESF 12 support agencies and organizations as well as assistance from other ESFs.

## 2.5 Conduit Management

### A. Electrical lines

1) **Overview:  The electrical power grid supplies power to the approximate** 621,000 citizens that live and work within the City of Baltimore.  None of the electrical infrastructure is owned or maintained by the city.  Although critical city functions have backup electrical generation capability, the electrical demands of the city can be damaged by storms, terrorism, or accidents.  The City of Baltimore coordinates with privately owned and operated companies to provide and maintain electrical continuity.

2) **Assessment:** BGE depends on outage reports to initiate restoration. Critical facilities have a 24-hour point of contact for BGE.  New smart meters are currently being installed throughout Baltimore City and will report outages every two hours to BGE and can be polled more frequently when conditions warrant; other anomalies are reported to BGE for restitution, who notifies MOEM.

3) **Restoration:** All electronic infrastructure is maintained by BGE or designated subcontractor.  Physical damage is repaired and coordinated though BGE.

4) **Coordinating Companies/Agencies/Jurisdictions:**  BGE controls all power infrastructure within the City and coordinates repair with DOT.

### B. Natural Gas Pipelines

1) **Overview:**  Natural gas provides energy for hot water heaters, heating/air condition units, and home appliances and is distributed in underground pipes, both low and high pressure.  The City of Baltimore coordinates with BGE to provide and maintain natural gas continuity.

2) **Assessment:** Critical pipelines are constantly monitored by BGE.  All repair work is coordinated with DOT.

3) **Restoration:** All natural gas infrastructure is maintained by BGE or designated subcontractor.  Physical damage is repaired and coordinated through DOT.

4) **Coordinating Companies/Agencies/Jurisdictions:**  BGE controls all natural gas lines within the City and coordinates repair with DOT.

### C. Steam

1) **Overview:**  Some buildings and critical facilities are dependent on steam for heating and other purposes.  The City of Baltimore coordinates with Veolia Energy for heat and electrical generation from their facilities.

2) **Assessment:** Critical pipelines are actively monitored by Veolia Energy. Any disruptions are reported to DGS for coordination of restoration.

3) **Restoration:**  All steam infrastructure is maintained by Veolia Energy or designated subcontractor.  Physical damage is repaired and coordinated through Veolia Energy.

| REVISION DATE: November 2013 | PAGE: 12 - 5 |
|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION: ESF 12 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Energy | EMERGENCY OPERATIONS PLAN |

4) **Coordinating Companies/Agencies/Jurisdictions:** Veolia Energy coordinates all steam infrastructure work with DPW.

## 3. ROLES AND RESPONSIBILITIES

### 3.1 Level I Agencies

**DGS (Lead Agency)**
A. Coordinate with all city agencies and private sector entities in maintaining situational awareness and status of energy supplies for the city;
B. Coordinate with various private sector entities in restoring energy services in a timely manner;
C. Provide customer service support and provide information regarding the status of energy systems within the city;
D. Provide information on energy supply, demand, and impacts;
E. Identify resources required to restore energy systems.

**MOEM (Lead Agency)**
A. Manage the EOC;
B. Coordinate with various private sector entities in restoring energy services in a timely manner;
C. Coordinate with private sector entities in prioritizing restoration;
D. Secure outside resources to support the tasks identified within the city's EOP plan and annexes;
E. Provide communications support to emergency response services upon request.

**DPW (Core Agency)**
A. Remove debris that impedes energy production or transfer within the city;
B. Coordinate with city agencies and private sector to maintain continuity of energy production and distribution entities;
C. Assess energy system damage and monitor repair work;
D. Establish a Debris Management Center (DMC) when necessary to coordinate debris removal;
E. Coordinate with city agencies and private sector to maintain continuity of energy production and distribution entities.

**DOT (Core Agency)**
A. Remove debris that impedes energy production or transfer within the city;
B. Coordinate with city agencies and private sector to maintain continuity of energy production and distribution entities;
C. Coordinate debris removal though the DMC when necessary;
D. Coordinate with various private sector entities regarding the restoration of conduit infrastructure within the city.

**MOIT**
A. Operate Baltimore City's 311 call center and field requests that may arise from public calls for assistance;
B. Maintain the City's 800 MHz radio system;

| REVISION DATE: November 2013 | PAGE: 12 - 6 |
|---|---|

| SECTION: ESF 12 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Energy | EMERGENCY OPERATIONS PLAN |

    C.   Determine immediate network changes required, if any, to activate the required operations;
    D.   Maintain the City network and email systems.

### 3.2 Level II Agencies

**BGE**
A.   Assist General Services, DPW and MOEM in clearing debris associated with the electrical power grid and steam services to the city;
B.   Coordinates with the Baltimore City Fire Department and Department of Transportation in repairing and maintain electrical and natural gas services to the City of Baltimore.

### 3.3 Level III Agencies

**BRESCO**
A.   Maintain solid waste disposal service to the City of Baltimore;
B.   Assist BGE, General Services, DPW, and MOEM in ensuring continuity of the electrical power grid and steam services to the city.

**Verizon**
A.   Assist MTE and MOIT as required to restore physical connectivity of communication lines;
B.   Provide maintenance and support for Citizen Alert Telephone lines;
C.   Provide maintenance and support for City communications systems in accordance with service contracts;
D.   Assist DGS, DPW, and MOEM in clearing debris associated with the restoration and maintenance of telecommunication services to the city.

**Veolia Energy**
A.   Assist DGS, DPW, and MOEM in clearing debris associated with the electrical power grid and steam services to the city.

## 4.  PREPAREDNESS, SUPPORT AND PLAN MAINTENANCE

### 4.1.  Awareness, Training, and Exercises
A.   Participating agencies shall ensure that personnel responsible for implementing portions of this plan are familiar with the plan and with their duties.
B.   MOEM and responsible agencies shall conduct regular training and drills to maintain and improve capabilities that support execution of this plan.
C.   MOEM shall coordinate annual interagency exercises to test the City's ability to implement this plan.

### 4.2.  Document Review and Revision
A.   MOEM shall maintain this plan and coordinate an annual review by a committee composed of DGS and agencies that are assigned responsibilities under this plan.
B.   Agencies' procedures to execute their responsibilities under this plan shall be reviewed annually by the respective agencies.

| REVISION DATE: November 2013 | PAGE: | 12 - 7 |
|---|---|---|

CITY00003965

| SECTION: ESF 12 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Energy | EMERGENCY OPERATIONS PLAN |

C. Documents that support this plan as listed below shall be maintained by their respective owners and reviewed as needed.  When these documents are substantively modified, the owners are responsible for notifying MOEM.
D. Based on the findings of annual reviews, MOEM and DGS shall coordinate plan revisions as necessary.

### 4.3 Authority
See EOP Base Plan.

### 4.4 Supporting Documents
**A. DOT Emergency Operations Plan**
Owner:        DOT
Objective:    Emergency Operations Plans for the Department of Transportation.
Status:       Complete

**B. Baltimore City Energy Assurance Plan**
Owner:        DGS
Objective:    Identify and address backup energy assets for operations of City facilities.
Status:       Complete, 2013

| REVISION DATE: November 2013 | PAGE:    12 - 8 |
|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION:  ESF 13 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Law Enforcement | EMERGENCY OPERATIONS PLAN |

# Emergency Support Function 13

## *Law Enforcement*

**Lead Agency:**     Baltimore Police Department (BPD)

**Core Agencies:**   Baltimore City Sheriff's Office (BCSO)
                     Baltimore City School Police (BCSP)

## 1. ESF OVERVIEW

### 1.1  Purpose
Emergency Support Function (ESF) 13, Law Enforcement, integrates Baltimore City's public safety and security capabilities and resources to support the full range of incident management activities associated with potential or actual major incidents. The primary purpose of this ESF is to establish procedures for the command, control, and coordination of Baltimore law enforcement personnel and equipment in the context of the City's Emergency Operations Plan.

### 1.2  Situation
The Baltimore Police Department has primary responsibility for public safety and security within the City limits of Baltimore.  The Police Commissioner may request the assistance of the Baltimore City Sheriff's Office and/or the Baltimore City School Police, as well as other law enforcement agencies which might be needed in carrying out this responsibility.

### 1.3  Assumptions
A. Activities of the BPD will increase significantly during emergency operations while still maintaining basic services.
B. BPD will fully utilize local resources before requesting assistance from other county or regional resources, at the discretion of the Police Commissioner.
C. Assistance between law enforcement agencies is facilitated by memoranda of understanding/agreement in effect for law enforcement agencies which operate in the region.

### 1.4  Scope
ESF 13 capabilities support incident management requirements including force and critical infrastructure protection, security, evacuation assistance, planning and technical assistance, technology support, and public safety in both pre-incident and post-incident situations.  BPD provides law enforcement services on a routine basis within Baltimore City.  Some of the more specialized aspects of ESF 13 are activated only when required due to extraordinary events, such as natural disasters, significant hazardous materials incidents, national special security events, or threatened/actual terrorist attacks.

| REVISION DATE: December 2013 | PAGE: | 13 - 1 |
|---|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION:  ESF 13 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Law Enforcement | EMERGENCY OPERATIONS PLAN |

## 2.  CONCEPT OF OPERATIONS

### 2.1   General
A.  ESF 13 is activated when public safety and security capabilities and resources are needed to support incident operations. This includes threats, pre-incident situations, and post-incident situations.
B.  When activated, BPD will assess public safety and security needs and respond to requests for external resources and planning/technical assistance from other agencies or other ESFs.
C.  ESF 13 manages support by coordinating the implementation of all authorities related to public safety, security, and protection of property, including critical infrastructure, and mobilizing supplemental security resources and technologies and other assistance to support incident management operations.
D.  The Police Commissioner will ensure that close coordination is maintained with Federal, State, and City officials to determine public safety and security support requirements and to jointly determine resource priorities.

### 2.2   Organization
The Baltimore Police Department is divided into three Bureaus, each headed by a Deputy Commissioner. The Neighborhood Patrol Bureau includes patrol operations and community partnerships divisions. The Investigations and Intelligence Bureau consists of criminal investigations and criminal intelligence sections. The Professional Standards and Accountability Bureau contains internal affairs and management services units. Media relations and government affairs entities report directly to the Police Commissioner.

### 2.3   Incident Management
A.  Pre-Incident Coordination: Supporting incident management planning activities and pre-incident actions required to assist in the prevention or mitigation of threats and hazards. This includes the development of operational and tactical public safety and security plans to address potential or actual incidents of critical significance, and the deployment of public safety and security resources to specific threats or potential incidents.
B.  Technical Assistance: Providing expertise and coordination for security planning efforts and conducting technical assessments (e.g. security assessments, risk analyses, surveillance/sensor deployment and use, etc.).
C.  Access Control and Site Security (Inner Perimeter): Providing security forces to support City efforts to control access and provide security to the incident site and critical facilities at the Inner Perimeter.
D.  Traffic and Crowd Control (Outer Perimeter): Providing control of pedestrian and vehicular traffic on the Outer Perimeter of an incident site or critical facility, in order to effect maximum dispersal of traffic and ensure lines of access for first responders. The BPD may also be called upon to carry out curfew restrictions ordered by the Mayor.
E.  Force Protection: Providing for the protection of emergency responders and other workers operating in a high-threat environment.
F.  Security Surveillance: Conducting surveillance to assist in public safety and security efforts.

| REVISION DATE: December 2013 | PAGE:  13 - 2 |
|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00003968

| SECTION: ESF 13 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Law Enforcement | EMERGENCY OPERATIONS PLAN |

### 2.4 Logistics

**A. Communications**
1) Baltimore City's 800 MHz radio system is used for dispatch, tactical and administrative operations at all times. There are additional back up capabilities by utilizing an existing VHF radio system.
2) All officers have radio and email capabilities. Units have cell and text messaging capabilities as well.
3) The Baltimore Police Intelligence Watch Center also has VHF/UHF and RACES capability.

**B. Resources**
1) There 2900 sworn personnel and 300 civilian assigned to the Police Department.  All sworn personnel may be deployed to tactical operations if needed.
2) The Police Department possesses a wide array of equipment to carry out its mission, to include: aviation, marine, SWAT, and surveillance assets.

## 3. ROLES AND RESPONSIBILITIES

### 3.1 Level I Agencies

**BPD (Lead Agency)**
A. Plan for, prepare, and coordinate law enforcement activities conducted in Baltimore City in anticipation of and during incidents of critical significance.
B. Provide leadership in directing, coordinating and integrating overall City efforts to provide law enforcement, public safety and security.
C. The emergency operations necessary for the performance of these functions include but are not limited to:

**Preparedness**
1) Identify agencies, organizations, and individuals capable of providing law enforcement support services and associated resource inventories.
2) Analyze hazards and critical facilities to  determine  law enforcement requirements, and develop plans to pre-position assets.
3) Train personnel in emergency duties.
4) Establish and maintain liaison with Federal, State, and local agencies.
5) Develop and maintain standard operating procedures and plans, to include alerting procedures of personnel and agencies.
6) Participate in exercises and training to validate this annex and supporting SOPs.
7) Ensure all ESF 13 personnel have integrated NIMS principles in all planning. At a minimum, all officers will complete ICS level 100, 200, 700, and 800 courses. Command Personnel will also complete level 300 and 400 courses.

**Response**
1) Provide support in accordance with City EOP.
2) Staff the City EOC as directed.
3) Provide security to the EOC as needed.

| REVISION DATE: December 2013 | PAGE: 13 - 3 |
|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION: ESF 13 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Law Enforcement | EMERGENCY OPERATIONS PLAN |

    4)    Implement and oversee evacuation measures when necessary.
    5)    Secure evacuated areas, including safeguarding critical facilities, and controlling entry and exit points to the disaster area as requested.
    6)    Implement CEAS procedures when program is activated.
    7)    Provide EOC and JIC with situational awareness from the Watch Center.

**Recovery**
    1)    Phase down operations as directed by the EOC.
    2)    Continue those operations necessary to protect people and property.
    3)    Assist in return of evacuees.
    4)    Require ESF 13 personnel to maintain appropriate records of costs incurred during a qualifying event.

**Mitigation**
    1)    Support and plan for mitigation measures.
    2)    Document matters that may be needed for inclusion in agency, City, state and/or Federal briefings, situation reports and action plans.

**BCSO (Core Agency)**
A.  Provide security for the Circuit Court for Baltimore City and for the service of process.  The Office is headed by the Sheriff, who is elected.  Sheriff's Office deputies also have limited authority beyond these roles, but are not generally involved in day to day crime fighting or emergency response.
B.  The Sheriff may be called upon by the Police Commissioner to assist with some crime fighting responsibilities and with significant incidents.

**BCSP (Core Agency)**
A.  Have police powers in or near Baltimore City Public Schools.  Officers answer to the Chief of the School Police, who works for the School Superintendent.
B.  School Police officers may be called upon by the Police Commissioner to assist with securing school facilities that might be used by the City of Baltimore during emergencies.  Such uses might include sheltering, dispensing of medications during public health events or occupation for command or continuity of government purposes.

3.2  **Non-City Agencies**
Non-City law enforcement agencies also operate in the City in the roles listed.  Each agency coordinates activities with the BPD.  Cooperation and information flow are increased during heightened alerts/significant events:

**Maryland Transportation Authority Police**
A.  Patrols sections of State and Federal highway that run through the City of Baltimore.
B.  The MDTA has been designated by the Governor as the coordinating agency in the State of Maryland for transportation security.

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION: ESF 13 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Law Enforcement | EMERGENCY OPERATIONS PLAN |

**Mass Transit Administration Police**
A. Patrol the Metro and Light Rail stations located within the City, and are generally responsible for security on MTA conveyances.

**Maryland State Police**
A. The Maryland State Police do not typically exercise law enforcement responsibilities within the City of Baltimore. However, they do have statewide authority and participate in joint task forces with the BPD.

**Federal Bureau of Investigation**
A. Primary law enforcement jurisdiction for cases of actual or possible terrorism. Not, however, considered a first-responder entity.
B. Each FBI office coordinates a local Joint Terrorism Task Forces (JTTF), to which members of the BPD are assigned.
C. The Police Commissioner and other police chiefs in Maryland coordinate with the Special Agent in charge of the Baltimore FBI office on terrorism issues.

**United States Coast Guard**
A. Has primary law enforcement jurisdiction in matters of maritime security.
B. The Captain of the Port of Baltimore coordinates with local law enforcement officials on security matters.

**4. PLAN DEVELOPMENT AND MAINTENANCE**

**4.1 Awareness, Training, and Exercises**

A. Participating agencies shall ensure that personnel responsible for implementing portions of this plan are familiar with the plan and with their duties.
B. BPD and responsible agencies shall conduct regular training and drills to maintain and improve capabilities that support execution of this plan.

**4.2 Document Review and Revision**
A. Maintenance for this ESF is the responsibility of the BPD Analytical Intelligence Section, in conjunction MOEM.
B. BPD will develop and maintain procedures for performance in accordance with the responsibilities assigned.
C. This ESF should be reviewed at least annually.

**4.3 Authority**
A. Baltimore City Charter, Art. II § 27 (2013)
B. Baltimore City Code, Art. 19 (2013)

**4.4 Supporting Documents**

**A. BPD General Order Manual**
Owner:        BPD/Written Directives Section
Objective:   Provides basic operational rules and regulations; also includes the BPD's Continuity of Operations Plan and Corporate Emergency Access Plan, as well as other emergency operations procedures.

| REVISION DATE: December 2013 | PAGE: 13 - 5 |
|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION: ESF 13 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Law Enforcement | EMERGENCY OPERATIONS PLAN |

      Status:       Issued and updated regularly

**B. BPD Police Commissioner's Memoranda**
     Owner:         BPD/Written Directives Section
     Objective:    Provides additional guidance to BPD members on specific topics.
     Status:       Issued when necessary

**C. Memoranda of Understanding/Agreements**
     Owner:         BPD Legal Affairs Section
     Objective:    Define operating agreements with other law enforcement agencies
                        within the City.
     Status:       On-going

CONFIDENTIAL - Produced Pursuant to Protective Order                                                           CITY00003972

| | |
|---|---|
| **SECTION: ESF 14** | **CITY OF BALTIMORE** |
| **SUBJECT: RECOVERY** | **EMERGENCY OPERATIONS PLAN** |

## Emergency Support Function 14

### *Recovery*

**Lead Agencies:**  Department of Finance (DOF)
Department of Public Works (DPW)
Mayor's Office of Emergency Management (MOEM)

**Supporting Agencies:**  All level I and II agencies

**Appendices:**  Appendix 14A - Damage Assessment
Appendix 14B - Debris Management
Appendix 14C - Public Assistance
Appendix 14D - Individual Assistance

## 1. ESF OVERVIEW

### 1.1 Purpose
In the event of a disaster, it will be responsibility of multiple agencies to assist in the recovery of publicly and privately-owned property.  Specific processes such as damage assessment, debris management, public assistance, and individual assistance will be the initial steps in helping Baltimore City recover from a disaster.

### 1.2 Situation
A debris generating event, from minor to catastrophic can and will occur in the Baltimore City area.  It is imperative that an understanding of recovery is established to assist both the public and private sector.   Baltimore city will utilize specific plans outlined in this Emergency Support Function to prepare for the recovery processes.

### 1.3 Assumptions
A. It will be necessary that an understanding of recovery is priority to allow for a smooth transition into long term community reconstruction.
B. Any hazard may present potential damage to publicly and privately owned property.
C. The EOC will be activated for any event that requires the use of ESF 14.
D. Any large scale disaster will require a multi-agency recovery effort.

### 1.4 Scope
This plan will be used solely in the recovery stages of a disaster.  However this plan should be utilized in training events to allow for a quick and effective transition into community recovery for the public and private sector.  MOEM, as well as other lead and supporting agencies, will need to prepare and plan for recovery while response is ongoing.  Information compiled during damage assessment can be used to influence debris removal or aid in further response and long term recovery.

| | |
|---|---|
| **REVISION DATE: October 2010** | **PAGE: 1** |

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION:  ESF 14 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: RECOVERY | EMERGENCY OPERATIONS PLAN |

## 2.  CONCEPT OF OPERATIONS

### 2.1   Pre-Disaster

A.  MOEM will coordinate with lead agencies to execute annual trainings, drills, and exercises to measure preparedness for damage assessment, debris management, public assistance and individual assistance.  An all hazards approach should be taken during training.

B.  Annual assessments of team availability, roster and training will be conducted to ensure readiness.

C.  Lead agencies should advise MOEM of any shortcomings related to recovery preparedness as early as possible.

### 2.2   Disaster Event

A.  The Damage Assessment Team will be notified and briefed of the potential coming event.  This will also act as the final team roster for the specified event.

B.  The Mayor will or may have already activated the EOC and all necessary agency representatives will be present. The Damage Assessment Coordinator will be identified by the MOEM Director.  The Public Assistance Officer will be identified as well.  At this time agencies should review the critical documents associated with recording and tracking expenses, equipment, personnel and other resources that may be necessary for the recovery process to ensure federal or state reimbursement.

C.  911 and 311 calls will assist the Damage Assessment Team with the windshield evaluation, a prescreening of potential life threatening or immediate danger locations.

D.  See ESF14A Damage Assessment for further information and direction.

### 2.3   Post-Disaster

A.  When it is deemed safe, the Damage Assessment Team will follow given procedures and directions.  A situation report will be given from the MOEM Director to MEMA indicating what resources     are needed.  The State will then send a Preliminary Damage Assessment (PDA) Team representative accompanied by a FEMA PDA representative to conduct a Local/State/Federal Preliminary Damage Assessment of Baltimore City owned property.  This unified assessment will then be forwarded to the Governor to request a federal declaration of disaster.  See ESF14C Public Assistance for further direction.

B.  During this process, debris management of City owned property can begin in areas that have been assessed by the PDA team.  Agencies will utilize Debris Management Plan, ESF14B to clear their responsible areas.

C.  Individual Assistance is outlined in ESF14D and must begin the applicant process within 60 days after the event.  Baltimore City has no obligation or responsibility to assist in the recovery of privately owned land.  Public services will assist in debris removal from privately owned lands.  Only when a Presidential Declaration is made will individual assistance be available.  Further instructions are to be found in ESF14D.

D.  It should be recognized that recovery can and possibly will take week if not months to fully recover from a significant disaster event.

| REVISION DATE: December 2013 | PAGE: 2 |
|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION:  ESF 14 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: RECOVERY | EMERGENCY OPERATIONS PLAN |

## 3.  ROLES AND RESPONSIBILITIES

Lead and supporting agencies should refer to the appendices for specific roles and responsibilities during the recovery process.

Lead agencies for the Recovery Appendices:

    A.  ESF 14 A - Mayor's Office of Emergency Management
    B.  ESF 14 B - Department of Public Works
    C.  ESF 14 C - Department of Finance
    D.  ESF 14 D - Department of Finance

## 4.  PLAN DEVELOPMENT AND MAINTENANCE

### 4.1  Awareness, Training, and Exercises
    A.  Participating agencies shall ensure that personnel responsible for   implementing portions of this plan are familiar with the plan and with their duties.
    B.  MOEM and responsible agencies shall conduct regular training and drills to maintain and improve capabilities that support execution of this plan.

### 4.2  Document Review and Revision
    A.  Maintenance for this ESF is the responsibility of the Director of MOEM.  MOEM will develop and maintain procedures for performance in accordance with the responsibilities assigned.  This ESF should be reviewed at least annually.

### 4.3  Authority
    A.  City Charter Article 7, Number 37 and City Code Article 23.
    B.  City Charter Article 23, Baltimore City Code Subtitles 1 through 21
    C.  Health Code of Baltimore City – Title 7, Subtitle 2, 4, and 7. Environmental Control Board Article 1, subtitle 40
    D.  Environmental Article of the Annotated Code of Maryland 9-101 through 9-229, 9-501 through 9-512 and 9-1703
    E.  Maryland Solid Waste Management Regulations (COMAR 26.04.07)
    F.  Development of County Comprehensive Solid Waste Management Plans (COMAR 26.03.03)
    G.  Storage, Collection, Transferring, Hauling, Recycling, and Processing of Scrap Tires (COMAR 26.04.08)
    H.  Federal Resource Conservation and Recovery Act (RCRC), 42 U.S.C. 6901 Federal Municipal Waste Management Regulations (40 CFR Part 258) Federal Comprehensive Environmental Response, Compensation and        Liability Act (CERCLA) 42 U.S,C. 9601
    I.  FEMA Regulation, 44 CFR Part 206, Federal Disaster Assistance, Subparts A, B, C, G, H, & I
    J.  Public Law 93-288, as amended, the Robert T. Stafford Disaster Relief and Emergency Assistance Act of 1988
    K.  Maryland Code Public Safety Title 14

| REVISION DATE: December 2013 | PAGE: 3 |
|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION:  ESF 14 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: RECOVERY | EMERGENCY OPERATIONS PLAN |

### 4.3   Supporting Documents

**A.  Disaster Debris Management Planning Document**
Owner:          Baltimore Metropolitan Council
Objective:      Regional plan for the Baltimore area for debris management.
Status:         Complete (Feb 3, 2003)

**B.  FEMA Debris Management Guide 325**
Owner:          Federal Emergency Management Agency
Objective:      Outlines the federal regulations, roles and responsibilities for
                debris management.
Status:         Complete (June 2007)

**C.  FEMA Debris Monitoring Guide 327**
Owner:          FEMA
Objective:      Provide guidance on monitoring debris removal operations to
                comply with FEMA public assistance eligibility guidelines.
Status:         Complete (Oct. 2010)

**D.  FEMA Debris Estimating Field Guide 329**
Owner:          FEMA
Objective:      Provide guidance on estimating debris to obtain accuracy for
                FEMA reimbursement.
Status:         Complete (Sept. 2010)

**E.  Department of Public Works, Standard Operating Procedures**
Owner:          City of Baltimore Department of Public Works
Objective:      Dictates specific operating procedures for debris management
Status:         Complete (2010)

**F.  Department of Transportation, Standard Operating Procedures**
Owner:          City of Baltimore, Department of Transportation
Objective:      Dictates specific operating procedures for debris management
Status:         Complete (2010)

**G.  Department of Recreation and Parks, Standard Operating Procedures.**
Owner:          City of Baltimore
Objective:      Dictates specific operating procedures for debris management
Status:         Complete (2010)

**H.  Maryland State Public Assistance Administrative Plan**
Owner:          Maryland Emergency Management Agency
Objective:      States plan for public assistance
Status:         Complete (Feb. 2009)

| REVISION DATE: December 2013 | PAGE: 4 |
|---|---|

| SECTION: ESF 14 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: RECOVERY | EMERGENCY OPERATIONS PLAN |

**I. Baltimore City Expense Tracking Form**
Owner:          DOF
Objective:      Track, record, and document recovery expenses.
Status:         Complete (Oct 2010)

**J. FEMA 323 Applicant Handbook**
Owner:          FEMA
Objective:      Guide for applying for public assistance grants
Status:         Complete (Mar. 2010)

**K. FEMA Equipment Rates**
Owner:          Federal Emergency Management Agency
Objective:      Dictate what the going rate for specific equipment is          and
                how much the City will be reimbursed.
Status:         Complete (Sept. 2010)

**L. Disaster Debris Management Planning Document**
Owner:          Baltimore Metropolitan Council
Objective:      Regional plan for the Baltimore area for debris management.
Status:         Complete (Feb 3, 2003)

**M. FEMA Debris Management Guide 325**
Owner:          FEMA
Objective:      Outlines the federal regulations, roles and responsibilities for
                debris management.
Status:         Complete (June 2007)

**N. Department of Public Works, Standard Operating Procedures**
Owner:          DPW
Objective:      Dictates specific operating procedures for debris management
Status:         Complete (2010)

**O. Department of Recreation and Parks, Standard Operating Procedures**
Owner:          DRP
Objective:      Dictates specific operating procedures for debris management
Status:         Complete (2010)

| REVISION DATE: December 2013 | PAGE: 5 |
|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00003977

| SECTION:  ESF 14A | CITY OF BALTIMORE |
|---|---|
| SUBJECT: DAMAGE ASSESSMENT | EMERGENCY OPERATIONS PLAN |

## Emergency Support Function 14 – Recovery

### *Appendix 14A - Damage Assessment*

**Lead Agency:**  Mayor's Office of Emergency Management (MOEM)

**Supporting Agencies:**  Department of Public Works (DPW)
Department of Recreation and Parks (DRP)
Department of Transportation (DOT)
Department of Housing and Community Development
(DHCD)

American Red Cross (ARC)
Community Emergency Response Teams (CERT)
Baltimore City Fire Department (BCFD)
Baltimore Police Department (BPD)

## 1. ESF OVERVIEW

### 1.1  Purpose
The purpose of this appendix is to describe the operations of damage assessment performed to determine the extent of damage to publicly and privately owned land, property, and assets in the City of Baltimore.  See ESF 14C and 14D for further information regarding Public and Individual Assistance.

### 1.2  Situation
Damage assessment includes the collection of information on the status of critical infrastructure such as electric power generation and distribution, telecommunications, transportation, medical services, water supply and distribution and sanitary services in addition to information on the number and types of residential, commercial, and/or industrial structures damaged or destroyed. The collection of this information requires the support of multiple City departments and agencies as well as partner organizations such as utility service providers.

### 1.3  Assumptions
In the event of a debris generating disaster it is likely that Baltimore City will have to conduct a damage assessment to gather physical information about the damage caused, identify the most affected areas, and to identify specific information needed for Federal aid.  This process is critical to maintain eligibility for reimbursement of costs through Federal/State public and individual assistance programs.

### 1.4  Scope
Damage assessment will be the joint effort of all participating agencies to assess the damage of publicly owned land, with the goal of receiving Federal reimbursement. It is required that all forms and procedures are to be completed to FEMA and MEMA specifications.

| REVISION DATE: December 2013 | PAGE: 14A- 1 |
|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION:  ESF 14A | CITY OF BALTIMORE |
|---|---|
| SUBJECT: DAMAGE ASSESSMENT | EMERGENCY OPERATIONS PLAN |

## 2.  DAMAGE ASSESSMENT STRATEGIES

### 2.1   Concept of Operations

**A.  Pre-Disaster, Team Maintenance, Training and Exercising**

1) In effort to maximize efficiency, it is imperative that the Damage Assessment Team (DAT) be fully aware of their roles and responsibilities.
2) A Damage Assessment Coordinator (DAC) will be in place before a disaster event occurs and will be present at the EOC during activation. The Director of Emergency Management will assign this position as this person is in charge of all damage assessment operations.
3) Participating agencies will engage in State led damage assessment trainings, understand the Infrastructure Public Preparedness Plan (MEMA), and be subject to MEMA PDA inspections.
4) Periodic calls-downs will test and ensure that information remains current and that the team is ready to respond.  MOEM will seek to involve the DAT in simulated and functional drills.

**B.  Response and Team Activation**

1) Baltimore City must be prepared to respond quickly and effectively on a 24-hour basis to any emergency or disaster event.  The Damage Assessment Coordinator will contact DAT members as soon as an event anticipated to generate debris is detected, or occurs unexpectedly.
2) Based on 911 emergency responses, responding agency personnel will begin identifying the areas most affected and by what mechanism.  First responders will perform an initial or "windshield" damage assessment. This provides a high-level overview of the extent of damage to residential and commercial properties, status on infrastructure condition, a rough estimate of damages to public facilities, and determines immediate life-threatening situations and imminent hazards to be addressed by DAT members.  Reports from the 311 call system and field personnel will contribute to the assessment as well.
3) The DAC will conduct a briefing to ensure any last minute issues are settled, explain the rules of engagement, provide geographical assignments and review the Site Collection Form (A-2) to ensure that all DAT members are clear on the task at hand.  Also, printed copies of the MEMA Damage Assessment PowerPoint will be handed out as a guideline and manual for DAT members.
4) When it is deemed safe and the risk of a damage generating event continuation is determined to be minimal, DAT members will proceed to pre-assigned geographical areas and conduct the Public Assistance Damage Assessment Site Collection Form (A-2). These forms will be completed given back to the MOEM Director to be submitted with the situation report to the State Public Assistance Officer at MEMA.
5) At this point, normal recovery operations will continue as described in the other annexes to ESF 14, specifically debris collections and management.

| REVISION DATE: December 2013 | PAGE: 14A- 2 |
|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION:  ESF 14A | CITY OF BALTIMORE |
|---|---|
| SUBJECT: DAMAGE ASSESSMENT | EMERGENCY OPERATIONS PLAN |

C. **Post Disaster Damage Assessment**
Baltimore City will continue to use the correct documentation and record keeping techniques of all expenditures to maintain eligibility for State/Federal reimbursement.  This will also ensure that all measures taken to mitigate hazards have been taken to reduce the risk of health and safety to the public.  See ESF 14C for further information and documentation.

D. **Typical Sequence of Events**
   1) Event occurs which potentially activates the EOC and response is initiated.
   2) Baltimore City will then progress with the Initial Damage Assessments (IDA) or windshield assessment.
   3) If damage is determined to be severe enough to warrant Federal aid, initial assessments will be submitted to MEMA by MOEM.  If MEMA concludes the damage is severe enough, then MEMA will request a joint PDA.
   4) A Local/State/Federal preliminary damage assessment or PDA will occur        for the State to then request a Federal declaration.
   5) Information from the PDA will be evaluated by the State and the Governor may use this to request Federal assistance.
   6) FEMA will review the request and make a recommendation to the President.
   7) If event is determined to be qualified, the President will make a disaster determination.

**2.2   Team Composition**
MOEM will maintain a current list of all trained and active personnel on the DAT.  Prior to a debris-generating event, MOEM will ensure that all personnel from participating agencies are ready and able to be activated for the team.  The list will include representatives from agencies that maintain offices/facilities, MOEM, building inspectors, engineers from DOT, DPW, and fire inspectors and marshals.

**3.  ROLES AND RESPONSIBILITIES**

**3.1   Level I Agencies**

**MOEM (Lead Agency)**
A. Implementation ESF 14A including training, agency coordination, and activation of the DAT;
B. Assign personnel to DATs as needed;
C. Track DAT activity and document damage;
D. Report damage assessment progress to MEMA;
E. Activate and manage the EOC to coordinate the City's response.

**DPW**
A. Allocate personnel and equipment to evaluate the damage created after an event;

| REVISION DATE: December 2013 | PAGE: 14A- 3 |
|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order    CITY00003980

| SECTION: ESF 14A | CITY OF BALTIMORE |
|---|---|
| SUBJECT: DAMAGE ASSESSMENT | EMERGENCY OPERATIONS PLAN |

    B.  Send representatives to the EOC to be DAT members and liaisons for the damage assessment process;

    C.  Evaluate water systems, sewage, reservoirs, solid waste disposal sites, equipment issues, and other infrastructure;

    D.  Document and report health and safety hazards to the EOC.

**DRP**

    A.  Allocate personnel and equipment to evaluate the damage created after an event;

    B.  Send representatives to the EOC to be DAT members and liaisons for the damage assessment process;

    C.  Evaluate damage in parks and recreation centers. Correct documentation is needed to condemn and replace these items that may be deemed a health and safety concern to the public, including, but not limited to: playground equipment, pools, and recreation centers.

**DOT**

    A.  Allocate personnel and equipment to evaluate the damage created after an event;

    B.  Send representatives to the EOC to be DAT members and liaisons for the damage assessment process;

    C.  Evaluate City roadways, bridges, tunnels, and other transportation infrastructure. Any item that may be deemed as a health and safety hazard to the public must be documented and reported to the EOC.

**DHCD**

    A.  Allocate personnel and equipment to evaluate the damage created after an event;

    B.  Send representatives to the EOC to be DAT members and liaisons for the damage assessment process;

    C.  Evaluate damage to houses and buildings;

    D.  Assign building inspectors to evaluate the condition of residential, commercial, and government-owned buildings in the City of Baltimore;

    E.  Condemn private property deemed a health and safety risk to the public and make notification.

**BCHD**

    A.  Allocate personnel and equipment to evaluate the damage created after an event;

    B.  Send representatives to the EOC to be DAT members and liaisons for the damage assessment process;

    C.  Provide environmental health inspectors to assess specific location in which their services are needed.

**3.2  Level II Agencies**

**American Red Cross**

    A.  Provide personnel for DATs.

| REVISION DATE: December 2013 | PAGE: 14A- 4 |
|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION:  ESF 14A | CITY OF BALTIMORE |
|---|---|
| SUBJECT: DAMAGE ASSESSMENT | EMERGENCY OPERATIONS PLAN |

## 4.  PLAN DEVELOPMENT AND MAINTENANCE

### 4.1  Awareness, Training, and Exercise
A.  Participating agencies shall ensure that personnel responsible for implementing portions of this plan are familiar with the plan and with their duties.
B.  MOEM and responsible agencies shall conduct regular training and drills to maintain and improve capabilities that support execution of this plan.

### 4.2  Document Review and Revision
A.  Maintenance for this ESF is the responsibility of MOEM.
B.  Agencies will develop and maintain procedures for performance in accordance with the responsibilities assigned.
C.  Agencies' procedures to execute their responsibilities under this plan shall be reviewed annually by the respective agencies.
D.  Documents that support this plan as listed below shall be maintained by their respective owners and reviewed as needed.  When these documents are substantively modified, the owners are responsible for notifying MOEM.
E.  Based on the findings of annual reviews, MOEM shall coordinate plan revisions as necessary.

### 4.3  Authority

A.  FEMA Regulation, 44 CFR Part 206, Federal Disaster Assistance, Subparts A, B, C, G, H, & I
B.  Public Law 93-288, as amended, the Robert T. Stafford Disaster Relief  and Emergency Assistance Act of 1988
C.  Maryland Code Public Safety Title 14
D.  Building, Fire, and Related Codes of Baltimore City, § 113 and 117, 2013

### 4.4   Supporting Documents

**A.  MEMA Local Damage Assessment Checklist**
Owner:          MEMA
Objective:      Provide guidance for damage assessment.
Status:         Complete

**B.  Public Assistance Damage Assessment Site Collection Form**
Owner:          MEMA
Objective:      Aggregate public assistance information.
Status:         Complete

| REVISION DATE: December 2013 | PAGE: 14A- 5 |
|---|---|

CITY00003982

| SECTION: ESF 14B | CITY OF BALTIMORE |
|---|---|
| SUBJECT: DEBRIS MANAGEMENT | EMERGENCY OPERATIONS PLAN |

# Emergency Support Function 14 - Recovery

## *Appendix 14B - Debris Management*

**Lead Agency:**          Department of Public Works (DPW)

**Core Agencies:**        Department of Transportation (DOT)
                          Mayor's Office of Emergency Management (MOEM)
                          Department of Recreation and Parks (DRP)

**Supporting Agencies:**  Baltimore City Parking Authority (BCPA)
                          Baltimore Gas and Electric (BGE)
                          Baltimore Refuse Energy Systems Company (BRESCO)
                          Baltimore Police Department (BPD)
                          Baltimore City Fire Department (BCFD)
                          Baltimore City Law Department (BCLD)
                          Department of Finance (DOF)
                          Department of General Services (DGS)
                          Department of Housing and Community Development (DHCD)
                          Maryland Department of the Environment (MDE)
                          Mayor's Office of Neighborhoods and Constituent Services
                          (MONCS)
                          Mayor's Office of Information and Technology (MOIT)
                          State Highway Administration (SHA)

## 1. ESF OVERVIEW

### 1.1 Purpose
This Debris Management Plan outlines and provides direction to coordinate the collection and disposal of debris after a disaster event.

### 1.2 Situation
The City of Baltimore is vulnerable to a range of natural and human-made hazards that may generate large quantities of debris.  Debris may include but are not limited to: personal property, trees, brush, soil, construction materials, furniture, vegetation, hazardous household products and waste, hazardous chemicals, dead animals, and other manufactured materials. These types of debris have the ability to block roadways, compromise infrastructure, pose health and safety hazards, and otherwise inhibit response and recovery activities until it is removed.

### 1.3 Assumptions
A.  Citizens are responsible for removing debris from the immediate area of their private property.  Assistance from the City of Baltimore will be necessary to dispose of it properly.

| REVISION DATE: December 2013 | PAGE:14B- 1 |
|---|---|

| SECTION:  ESF 14B | CITY OF BALTIMORE |
|---|---|
| SUBJECT: DEBRIS MANAGEMENT | EMERGENCY OPERATIONS PLAN |

    B.  The City of Baltimore is responsible for response and recovery operations and for removing and clearing disaster debris from City property and rights-of-way. Initially the City will use its own equipment and personnel to perform this function and may obtain additional resources from mutual aid, private debris removal and disposal contractors as well as state and federal assistance as needed.

    C.  As a result of a significant debris generating incident, pre-existing waste disposal sites may not be adequate for effective management due to the capacity limitations and regular soil waste operations.

    D.  Depending on the size and scope of the disaster, it is predicted that the City of Baltimore will need to augment collection services in order to meet the high demand of debris management.

**1.3  Scope**

This plan identifies the key tasks to be performed in order to effectively collect, manage, and dispose of disaster debris in the City of Baltimore.  It describes strategies and planning considerations for these tasks and assigns responsibility for their execution to specific agencies.  The plan identifies resources and establishes policies, operational structures, and procedures to be followed by all participating agencies. The policies and standard operating procedures of individual agencies pertaining to the performance of debris management will be integrated into the objectives of this plan.

**2.  CONCEPT OF OPERATIONS**

**2.1  Control and Coordination**

    A.  The Department of Public Works will be the lead agency for debris management in the City of Baltimore. The Bureau Head of Solid Waste, or appointee, will be the Debris Project Manager (DPM), and all operations conducted under the Debris Management Team will be under his/her direction. The DPM will coordinate the overall debris management mission via a unified Debris Management Team.

    B.  DOT, DRP, and DOF will be core supporting agencies for debris management.

    C.  The DPW representative in the EOC will serve as the primary EOC representative for ESF 14B and will provide briefings on the status of the debris management mission.

**2.2  Organization**

    A.  Debris Management Center

        1.  The Debris Management Center (DMC) is a centralized location where debris management operations are conducted. The DMC can be located at the EOC or at an alternative location designated by DPW.

        2.  Activity that will occur within the DMC includes, but is not limited to, the following:

            a.  Supervision of debris removal operations;

            b.  Provision of administrative oversight of financial, personnel, and public information activities as it relates to operations;

            c.  Oversight of contract development and requirements as well as managing the scope of work;

            d.  Review legal matters and advising management planning staff;

            e.  Provision of technical and information technology expertise;

| REVISION DATE: December 2013 | PAGE:14B- 2 |
|---|---|

CITY00003984

| SECTION:  ESF 14B | CITY OF BALTIMORE |
|---|---|
| SUBJECT: DEBRIS MANAGEMENT | EMERGENCY OPERATIONS PLAN |

     f.   Coordination of City debris removal and disposal operations with mutual aid solid waste managers and other agencies, as necessary.

## 2.3   Planning
  A.  Debris Classification
    1.  Below are general descriptions of the types of debris that can be generated in the aftermath of a debris-generating event. The event's size, intensity, and track will determine the extent to which some or all of the below debris impact the City.
    2.  Types of Debris
      a.  *Vegetative Debris* - consists of whole trees, tree stumps, tree branches, tree trunks, and other leafy/woody materials;
      b.  *Construction and Demolition Debris* - Damaged components of buildings and    structures such as lumber and wood, gypsum wallboard, glass, metal, roofing  material, tile, carpeting and floor coverings, window coverings, concrete, fully  cured asphalt, and furnishings;
      c.  *Mixed Debris* - A combination of vegetative debris and construction and demolition debris that cannot be efficiently separated at the time of collection;
      d.  *Solid Waste* - Waste that consists of garbage, combustible and noncombustible material, street dirt and debris, commercial waste from offices and from industries that are not hazardous wastes;
      e.  *Hazardous Waste* - Any waste that exhibits ignitability, corrosiveness, reactivity, or toxicity;
      f.  *Hazardous Household Waste* - hazardous waste typically found in the household, consisting of paints, stains, varnishes, solvents, and pesticides;
      g.  *Infectious Waste* - Includes contaminated animals, human blood and blood waste, pathological waste and discarded sharps;
      h.  *Special Waste or White Goods* - Waste that requires special handling not limited to, appliances containing CFC refrigerants, appliances/metals.
  B.  Debris Management Site Selection and Preparation
    1.  Debris management sites are established in order to provide flexibility of operations, facilitation of recycling and reduction of debris.  All reasonable efforts will be made to expedite approval for sites.
    2.  If at the time of collection, debris is not able to be directly taken from the collection point to the final disposition location, debris management sites will be utilized to temporarily store, reduce and segregate debris before is taken to the final disposition location.
    3.  In effort to effectively determine potential sites, it is the responsibility of DPW Bureau of Solid Waste to determine where sites should be, how the site should be constructed and what is intended for the site.  The appropriate permits should be acquired for specific sites.  Furthermore, a specific methodological agreement in the form of contracts should exist between DPW and contractors to allow for a continuous flow of information between the two parties.  The contracts should describe setup, operations and closing procedures, environmental needs and concerns, as well as monitoring procedures.  See TDMS Attachment for further information.
    4.  DPW will need to consider the following when selecting a DMS:
      a.  Access

| REVISION DATE: December 2013 | PAGE:14B- 3 |
|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION:  ESF 14B | CITY OF BALTIMORE |
|---|---|
| SUBJECT: DEBRIS MANAGEMENT | EMERGENCY OPERATIONS PLAN |

    b. Environmental use
    c. Cost
    d. Proximity to debris
    e. Size
    f. Neighboring communities
5. Contractors
    a. Contracts should be present prior to any event to allow for a smooth transition to recovery and an effective debris removal process
    b. DPW will develop a method for monitoring contracted projects and operations.  Furthermore, a representative from DPW will ensure compliance with the contract regulations and fee agreements
    c. Contracting expenses submitted for reimbursement through state or federal programs are subject to audit for eligibility and accuracy of costs.
6. Donations and Volunteers
    a. Debris management officials will cooperate with the Donations Coordinator to seek or obtain equipment or tools available as a result of public offerings, as necessary.  See ESF 15 for further information
    b. Volunteers will be considered based on necessary recovery tasks. See ESF 15 for further information.

C. Disaster Response
1. Damage Assessment
    a. Practical, efficient, and appropriate measures will be taken to assess and determine the damage to public facilities prior to debris collection. Members of the Damage Assessment Team (DAT) will coordinate with other government officials to conduct this task.
    b. Documentation will be provided through the Damage Assessment Site Collection Form which will provide an estimate of debris and cost. Assumptions should be made about supplemental debris, dead animals, vegetative, construction and demolition, boats as well as industry materials. See ESF 14A for further information and operations.
2. Information and Documentation Management
    a. All departments and agencies involved in emergency debris management operations will maintain accurate and thorough records or labor, equipment, and materials expenses allowed by each agency SOPs.

**2.4   Removal**
A. The Debris Clearance priorities will be based on providing access to the following types of locations:
1. Trapped or injured disaster victims
2. Flood drainage arteries or other areas in which debris is preventing disaster conditions from receding
3. Emergency routes
4. Critical infrastructure and key resources
5. Hospitals
6. Emergency shelters
7. Worksites for disaster recovery and other essential municipal services
8. Primary traffic routes
9. Commodity Points of Distribution (CPOD) and disaster recovery centers
10. Private property adversely affecting public safety or health

| REVISION DATE: December 2013 | PAGE:14B- 4 |
|---|---|

| SECTION: ESF 14B | CITY OF BALTIMORE |
|---|---|
| SUBJECT: DEBRIS MANAGEMENT | EMERGENCY OPERATIONS PLAN |

B. The DMT will facilitate disaster debris collection and waste that fall into one or all of the following categories:
   1. On roadways or public right-of-way
   2. On public property
   3. On private property, only if it poses a threat to public safety or health
   4. From private property, if placed at the curbside for collection
   5. From private property, if placed in City-owned roll-off containers

C. Collection Method
   1. Salvage and Segregation
      Whenever possible, debris will be sorted during removal or at the temporary storage site to ensure efficient and cost effective disposal. A salvage program will be implemented to collect and hold certain damaged private property that has been relocated as result of the incident.  Items such as vehicles and boats will be held so that the rightful owner can reclaim such items.  Appropriate documentation and proof of ownership will be required to reclaim items. \
   2. Curbside Collection
      Within two to five days post incident, citizens will be encouraged through public information methods such as the media and the 311 call center to place all debris types along the public right-of-way in front of their residences. Also residents will be required to sort the debris by material type and place in front of their residences in appropriate roll-off receptacles.
   3. Collection Centers
      a. Citizens will be instructed to transport their debris to a large roll off bin that may be placed on public rights-of-way or public  property for residents to bring debris for collection
      b. Hazardous Household Waste (HHW) mixed with other debris has the potential to contaminate the entire load. The City of Baltimore will schedule its biannual Hazardous Household Waste collection to deplete the total amount of HHW in resident's possession
      c. Residents who have HHW and other hazards goods will be required to drop off these items at the appropriate collection center after the disaster has occurred unless special circumstances exist. If this is the case, the resident should contact City Officials to report such hazardous debris to allow for proper disposal through the 311 service
      d. Quarantine Rd landfill can and will be used as a site for residents who may collect and transport manageable debris to this location.
   4. Baltimore City Owned Facilities
      a. After hazardous conditions have passed, all City agencies will report to the DMC, quantities and types of debris that are on their properties, as well as waste that has been or is expected to be generated as a result of the disaster.  The DMT will coordinate debris clearance and collection operations and will delegate functions as appropriate to supporting agencies
      b. DOT will have primary responsibility for collecting debris from roadways and public rights-of-way
      c. Designated City agencies with proper debris clearing equipment will participate and assist DOT in the collection of debris from roadways and public rights-of-way
      d. DPW will be responsible for removing debris from facilities that they own.

| REVISION DATE: December 2013 | PAGE:14B- 5 |
|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION:  ESF 14B | CITY OF BALTIMORE |
|---|---|
| SUBJECT: DEBRIS MANAGEMENT | EMERGENCY OPERATIONS PLAN |

**2.5   Solid Waste Facilities**

   **A.   Overview:**  DPW is responsible for ensuring that public and private sector waste is disposed or reused safely and efficiently in accordance with government regulations and mandates. This includes a landfill as well as contracts and agreements with recycling service providers and long-term maintenance of six closed landfills.

   **B.   Assessment:** DPW coordinates the monitoring of these facilities with outside agencies on a 24 x 7 basis.  Any anomalies are reported back to DPW for restitution.

   **C.   Restoration:** Critical facilities are primarily maintained and repaired by DPW staff in conjunction with other city and state entities.  Physical damage is handled via a requirements contract or state assistance.

   **D.   Solid Waste Management:** Normal waste pick-up will be continued when safe to do so.  DPW will have sole responsibility for this task.

**2.6   Debris Disposal**

   **A.   Disposal Sites**

     1.   Debris disposal will take place at designated City owned properties such as parks, landfills, or transfer stations. Sites will be determined by DPW.

     2.   In the event that total capacity is exceeded at disposal sites, the DPW will obtain approval from the MDE to exceed the threshold or seek alternative sites from mutual aide partnerships.

   **B.   Temporary Debris Management Site (TDMS)**

     1.   TDMS will be set up when or if it is anticipated that the primary sites will not be able to accommodate the amount of debris based on the analysis of DATs.  It will be the responsibility of DPW to setup, maintain, monitor, and close temporary sites or contract out to do so. All permits and regulations must pass MDE assessment/regulations in order to set up and maintain a TDMS in the event of a debris generating disaster.

     2.   A TDMS Overview has been drafted with preselected sites and TDMS SOPs.
**Recycling**

     1.   Recycling disaster-related debris has financial and environmental advantages. These operations can decrease the overall cost of a debris removal operation by reducing the amount of material that is taken to a landfill.

     2.   DPW will seek agreements with businesses to take ownership of segregated materials and process them into reusable substances.

     3.   Every reasonable proposal for efficiently disposing of recycled woody debris, concrete, soil, tires, metal and bricks will be considered.

   **C.   Reduction**
Operations will occur to reduce segregated debris into conditions that make storage and disposal easier and more efficient.  Chipping, mulching, grinding, and crushing are all feasible activities of reduction.

   **D.   Reclamation**
Any debris deemed to have salvage value will be held for return to its rightful owner within a reasonable time.  Beyond that time, these items may be placed for auction, in accordance with local, state and federal laws.

   **E.   Resource Recovery**
Every effort will be taken to segregate hazardous materials from the debris for reclamation or appropriate disposal.

| REVISION DATE: December 2013 | PAGE:14B- 6 |
|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION: ESF 14B | CITY OF BALTIMORE |
|---|---|
| SUBJECT: DEBRIS MANAGEMENT | EMERGENCY OPERATIONS PLAN |

**F. Incineration**
1. Burning of debris by private parties is unlawful in the state of Maryland and is prohibited.
2. Managed burning of debris by the City or contracted personnel will be conducted in air curtain pits in accordance will Local, State, and Federal laws.
3. BRESCO will lead incineration operations.

**2.7   Private Property Demolition and Debris Removal**
A. Building code enforcement officers as well as building inspectors will inspect and condemn buildings that are deemed a threat to health and safety of the community. Appropriate environmental and historical concerns will be considered when demolition is warranted.
B. Private property owners will be responsible for the removal of debris once demolition has occurred.
C. The Department of Law representative at the EOC will be responsible for holding receipts of Right of Entry Agreements and coordinating proper disposal of hazardous waste from private property.
D. Individual Assistance may be available to those who qualify. See ESF 14D.

**2.8   Public Information**
A. Accurate and timely information disseminated to the public is an essential component of debris management operations and recovery. A collaborative effort between the Chief of Media Communications DPW and Pubic Information Officers of core and supporting agencies will develop a communications plan to disseminate to the public regarding debris management operations and recovery based on the Joint Information Center (JIC) SOP.
B. All policies for public information will be developed in the DMC and disseminated through the established JIC. The Debris Project Manager will authorize public information strategy and all messages that will be publicized.
C. The JIC will generate incident-specific messages utilizing information provided by the DMT to encourage public cooperation and to assure citizens of the City's commitment to restore normalcy. These messages will be publicized immediately and repeatedly and will include but will not be limited to information on:
   1. Changes to collections;
   2. Special cleaning operations;
   3. Emergency dumpsters;
   4. Extended drop-off hours;
   5. Road closures necessary to manage cleanup;
   6. Separating burnable and non-burnable debris;
   7. Segregating Household Hazardous Waste;
   8. Placing disaster debris at the curbside;
   9. Keeping debris piles away from fire hydrants and valves;
   10. Reporting locations of illegal dump sites or incidents of illegal dumpsters;
   11. Segregating recyclable materials;
   12. Disseminating debris route clearing and pickup schedules through the local news media.
D. Distribution Strategy
   See ESF 11

| REVISION DATE: December 2013 | PAGE:14B- 7 |
|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION:  ESF 14B | CITY OF BALTIMORE |
|---|---|
| SUBJECT: DEBRIS MANAGEMENT | EMERGENCY OPERATIONS PLAN |

## 3.  ROLES AND RESPONSIBILITIES

### 3.1   Level I Agencies

**DPW (Lead Agency)**
A.  Coordinate and oversee all debris removal operations for the City of Baltimore;
B.  Clear, clean, and remove any type of debris that may hinder travel or public routine on City roads, walkways, and public areas;
C.  Remove solid waste from public areas that may be displaced by a disaster event.
D.  Hold items of value, e.g. vehicles, boats, trucks, in a salvage yard for a period of time to allow the rightful owner to reclaim them;
E.  Maintain routine solid waste removal when deemed safe to do so;
F.  Report and document the location of any items that may be a hazardous waste product to be collected by the appropriate agency;
G.  Clear, clean, and maintain the water delivery system for public use;
H.  Remove debris from sewage systems, drainage systems, reservoirs, rough water systems, water treatment sites, and final water delivery system;
I.  Comply with MEA and Federal EPA regulations and laws in regards to water treatment;
J.  Coordinate equipment and personnel to be used for debris removal.

**DOT (Core Agency)**
A.  Clear, clean, and maintain the roadways in Baltimore City from any type of debris that may hinder normal public routines.  Importantly, DOT will remove any debris that is considered a health and safety risk to the public deemed necessary by the Initial Damage Assessment;
B.  Clear debris such that it does not impede the right-of-way (ROW), emergency routes, as well as access to essential City buildings or property. City of Baltimore roadways are classified as primary, secondary or side roads. This will assist the DMT in setting priorities and objectives for debris clearance;
C.  Assist in transfer of parked cars from more vulnerable disaster areas to less vulnerable areas in the pre-disaster stages;
D.  Coordinate public information campaigns (through PIO), including the relay of messages to the public about where to park, where cars are being relocated and when to retrieve vehicles.

**DRP (Core Agency)**
A.  Clear, clean, and remove any vegetative debris that may hinder travel or public routine from public areas;
B.  Clear, clean, and remove any debris from City parks or recreation centers;
C.  Manage forestry issues and downed tree requests.

**MOEM (Core Agency)**
A.  Manage the EOC;
B.  Coordinate recovery effort, including management of DATs and relay information and requests to the DMC;
C.  Handle requests for additional resources as necessary;
D.  Assist with public messaging.

| REVISION DATE: December 2013 | PAGE:14B- 8 |
|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00003990

| SECTION:  ESF 14B | CITY OF BALTIMORE |
|---|---|
| SUBJECT: DEBRIS MANAGEMENT | EMERGENCY OPERATIONS PLAN |

**BPD**
A.  Support the debris management process through aerial photos and the use of aerial support to determine the highest concentration of debris in the City of Baltimore;
B.  Provide personnel to confirm reports of debris.

**BCFD**
A.  Responsible for fire protection, rescue, and HAZMAT incidents involving debris;
B.  Assist with the debris removal process and operations as needed;
C.  Assist the DAT with mapping needed, utilizing GIS to track debris areas as well as progress of removal;
D.  Dispose of hazardous debris;
E.  Provide personnel to confirm reports of debris.

**DGS**
A.  Maintain fleet and equipment to be used in coordination with DPW/SW;
B.  Maintain on-call fuel truck to support continuity of long-term operations where heavy machinery is needed or other fuel dependent equipment is being used.

### 3.2   Level II Agencies

**DOF**
A.  Maintain a record of contracts, monitor contract work, and track expenses related to debris management;
B.  Track salvage inventory, payouts, and manage any other costs related to debris management;
C.  Document, store, and prepare financial records for audit if reimbursement is requested.

**BCLD**
A.  Review contracts, establish land acquisitions for TDMS, review insurance policies, ensure environmental and historical preservation compliance, ensure site restoration and closure requirements are fulfilled, review building condemnation process, establish private property demolition, and review right of entry and hold harmless agreements.

**DGS**
A.  Maintain fleet and equipment to be used in coordination with DPW.
B.  Maintain on-call fuel truck to support continuity of long-term operations where heavy machinery is needed or other fuel dependent equipment is being used.

### 3.3   Level III Agencies

**BRESCO**
A.  Provide incineration capabilities to process debris as appropriate.

**MDE**
A.  Approve TDMS;

| REVISION DATE: December 2013 | PAGE:14B- 9 |
|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00003991

| SECTION: ESF 14B | CITY OF BALTIMORE |
|---|---|
| SUBJECT: DEBRIS MANAGEMENT | EMERGENCY OPERATIONS PLAN |

B. Assist with removal of hazardous waste.

**Baltimore Gas and Electric**
A. Maintain utility service to the City of Baltimore;
B. Assist BCFD in managing gas leaks, electrical emergencies, and other duties that may result because of debris.

**State Highway Administration**
A. Manage debris generated on state highways, bridges, or other State funded and maintained entities.

**MOIT**
A. Operate Baltimore City's 311 call center and field requests that may arise from public calls for assistance;
B. Assist with IT needs in the EOC, DMC, or any other established command center for debris removal.

**BCPA**
A. Coordinate public messaging regarding car removal in debris management zones;
B. Assist with parking allowances to help debris removal.

4. **PLAN DEVELOPMENT AND MAINTENANCE**

4.1 **Awareness, Training, and Exercises**
A. Participating agencies shall ensure that personnel responsible for implementing portions of this plan are familiar with the plan and with their duties.
B. DPW, in conjunction with MOEM and responsible agencies, shall conduct regular training and drills to maintain and improve capabilities that support execution of this plan.

4.2 **Document Review and Revision**
A. MOEM shall maintain this plan and coordinate an annual review by a committee composed of DPW and agencies that are assigned responsibilities under this plan.
B. Agencies' procedures to execute their responsibilities under this plan shall be reviewed annually by the respective agencies.
C. Documents that support this plan as listed below shall be maintained by their respective owners and reviewed as needed. When these documents are substantively modified, the owners are responsible for notifying MOEM.
D. Based on the findings of annual reviews, MOEM and DPW shall coordinate plan revisions as necessary.

4.3 **Authority**
A. City Charter Article 7, Number 37 and City Code Article 23
B. City Charter Article 23, Baltimore City Code Subtitles 1 through 21
C. Health Code of Baltimore City – Title 7, Subtitle 2, 4, and 7. Environmental Control   Board Article 1, subtitle 40
D. Environmental Article of the Annotated Code of Maryland 9-101 through 9-229, 9-501 through 9-512 and 9-1703
E. Maryland Solid Waste Management Regulations (COMAR 26.04.07)

| REVISION DATE: December 2013 | PAGE:14B- 10 |
|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION: ESF 14B | CITY OF BALTIMORE |
|---|---|
| SUBJECT: DEBRIS MANAGEMENT | EMERGENCY OPERATIONS PLAN |

    F. Development of County Comprehensive Solid Waste Management Plans (COMAR 26.03.03)
    G. Storage, Collection, Transferring, Hauling, Recycling, and Processing of Scrap Tires (COMAR 26.04.08)
    H. Federal Resource Conservation and Recovery Act (RCRC), 42 U.S.C. 6901
    I. Federal Municipal Waste Management Regulations (40 CFR Part 258)
    J. Federal Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) 42 U.S,C. 9601

**4.4   Supporting Documents**

**A. Temporary Debris Management Sites Overview**

| Owner: | MOEM |
|---|---|
| Objective: | Provide pre-designated TDMS and SOPs . |
| Status: | Draft (December 2013) |

**B. Load Ticket and Monitoring System**

| Owner: | MOEM |
|---|---|
| Objective: | Document and track movement and disposal of debris. |
| Status: | Draft (December 2013) |

| REVISION DATE: December 2013 | PAGE:14B- 11 |
|---|---|

**CONFIDENTIAL - Produced Pursuant to Protective Order**

CITY00003993

| SECTION:  ESF 14C | CITY OF BALTIMORE |
|---|---|
| SUBJECT: PUBLIC ASSISTANCE | EMERGENCY OPERATIONS PLAN |

# Emergency Support Function 14 – Recovery

## *Appendix 14C - Public Assistance*

**Lead Agency**:           Department of Finance (DOF)

**Supporting Agencies**:    Mayor's Office of Emergency Management (MOEM)
                                  Baltimore City Law Department (BCLD)

## 1. ESF OVERVEIW

### 1.1 Purpose

The purpose of this annex is to outline the procedure for and operations of public assistance through damage assessment in order to determine the extent of damage to publicly owned property and infrastructure as well as private non-profit (PNP) organizations in the City of Baltimore.

### 1.2 Situation

A debris generating event will cause the destruction of publicly owned land.  In order to be federally reimbursed through the public assistance program an assessment is needed and all regulations from FEMA must be followed.

### 1.3 Assumptions

In the event of a disaster, it is likely that publically owned land and property will be subject to damage. Federal reimbursement may be provided, and it is the responsibility of the City of Baltimore to estimate damage and seek assistance.

### 1.4 Scope

The function of public assistance is to financially assist city agencies with eligible work and costs in order to maintain the pre-disaster status quo. Baltimore City, as a local government within the State of Maryland, is an eligible applicant for public assistance from FEMA when a disaster is declared.  Furthermore, certain private non-profit organizations that operate within the City limits are eligible for public assistance as well.

## 2. PUBLIC ASSISTANCE STRATEGIES

### 2.1 Eligibility

A. Baltimore City is an eligible applicant for public assistance, under the local government category outlined by FEMA.

B. Certain Private Non-Profits are eligible, if the institution falls under one of the following categories:

- Educational institutions
- Utilities
- Emergency Facilities

| REVISION DATE: December 2013 | PAGE: 14C- 1 |
|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00003994

| SECTION:  ESF 14C | CITY OF BALTIMORE |
|---|---|
| SUBJECT: PUBLIC ASSISTANCE | EMERGENCY OPERATIONS PLAN |

- Medical Facilities
- Custodial Care Facilities

All must have an IRS or State Certification and be open to the public
PNP recreational facilities are not eligible

**2.2   Costs**

A.  The costs incurred by the City of Baltimore during the recovery phase will be eligible for public assistance if it falls under one of the following categories:

1.  Force Account

a.  The money used to operate Baltimore City's own labor, equipment, and materials at FEMA rates or applicant rates (whichever is lower or more reasonable) is considered a force account. Materials at Baltimore City's cost and labor at cost, including fringe benefits is included. Cost of regular time labor of permanent employees performing emergency protective measures is not eligible.

2.  Contract

a.  Reasonable and necessary net cost to perform required and FEMA approved work. All contracting and procurement laws must be followed. Contracting is the responsibility of Baltimore City.

b.  This is a supplementary reimbursement program. Accurate, complete records of the cost of all eligible work must be maintained to be reimbursed. Records will be audited.

*Application for the program must be submitted at the Applicant's Briefing or within 30 days if a Baltimore City "applicant agent" did not attend the Applicant's Briefing, which will be held following the President's Declaration. MEMA will announce the date, time, and location of the briefing.*

**2.3   Labor**

A.  To be eligible, work must be required as a result of the Presidentially declared disaster, be located within the designated disaster area, be the legal responsibility of an eligible applicant, and no other federal agency may have statutory authority to provide funding.

B.  The following types of labor are considered eligible for public assistance:

1.  Emergency – Measures taken to save lives, protect public health and safety, and to protect improved property. Emergency measures must eliminate or lessen an immediate threat.

a.  **Emergency Proactive Measures**

i.   Traffic control points, specific to evacuation and temporary control measures post disaster, if needed.

ii.  Search and rescue

iii. Sandbagging

iv.  Bracing damaged structures

v.   Provision of food, water, ice

b.  **Debris Removal**

i.   Public property only

ii.  Eliminate immediate threats

iii. Clear passage of right of way to emergency vehicles

iv.  Curbside pickup (specific items)

| REVISION DATE: December 2013 | PAGE: 14C- 2 |
|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00003995

| SECTION:  ESF 14C | CITY OF BALTIMORE |
|---|---|
| SUBJECT: PUBLIC ASSISTANCE | EMERGENCY OPERATIONS PLAN |

2. Permanent - Restore the disaster damaged parts of the facility to pre-disaster designed function and capacity, as well as upgrade restored parts to meet current codes and standards. Road systems, water control facilities, buildings and equipment, public utility systems, and parks/recreation facilities are the general categories of eligible property. Facilities may be replaced if cost of repair is more than 50% of replacement cost.

    **a. Roads and Bridges**

    Any labor performed on repairs to road surfaces, embankments, bridges, culverts, traffic signs/lights, DOT or DPW structures in right of way are all eligible for public assistance.  DOT, the primary agency for the roads and bridges, will maintain the appropriate documentation, participate in the preliminary damage assessment and comply with State and Federal regulations in regards to the public assistance process.

    **b. Water Control Facilities and Public Utilities**

    Any labor performed on repairs to levees, distribution lines, treatment plants, and improvement to drainage channels, dams, and watershed structures are all eligible for public assistance.  DPW, Department of Water Works will be responsible for maintaining the appropriate documentation, participating in the preliminary damage assessment and complying with State and Federal regulations in regards to the public assistance process.

    **c. Buildings and Equipment**

    Any labor performed on repairs to buildings owned by the City of Baltimore is eligible for public assistance.  Supplies, inventory, vehicles, and equipment are all eligible for public assistance.  Any City agency claiming damages will maintain the appropriate documentation, participate in the preliminary damage assessment and comply with State and Federal regulations in regards to the public assistance process.

    **d. Parks, Recreation, and Other**

    Any labor in a Baltimore City park or place of recreation will be eligible for public assistance. Department of Recreation and Parks will maintain the appropriate documentation, participate in the preliminary damage assessment and comply with State and Federal regulations in regards to the public assistance process. However, assistance is limited and subject to the restoration of recreational use. For example, hiking trails are not subject to assistance but removal and replacement of playground equipment is, as it may pose a threat to health and safety to the community.

C. Insurance

1. Baltimore City will be required to obtain and maintain insurance coverage on all insurable facilities as a condition of public assistance funding.  Actual or anticipated insurance proceeds will be deducted from eligible costs for insured facilities.

**2.4 Post-Disaster**

A. After a damage-generating event occurs, the Damage Assessment Team will be assembled and assigned to specific duties outlined in ESF-14A.  Here the team will estimate cost and type of work needed to be done on publicly owned land in the City of Baltimore.  The public assistance site collection form should be used to determine what, where, and the extent of damage caused to public buildings and

| REVISION DATE: December 2013 | PAGE: 14C- 3 |
|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00003996

| SECTION: ESF 14C | CITY OF BALTIMORE |
|---|---|
| SUBJECT: PUBLIC ASSISTANCE | EMERGENCY OPERATIONS PLAN |

property. This form will allow the Director of Emergency Management to determine if mutual aid and State aid will be needed to assist recovery efforts.

B. Only when a Presidential Declaration is implemented will FEMA and State public assistance plans are activated.  Thus, it is imperative that the damage assessment be an expedited, yet thorough, process to ensure proper public assistance funding.

C. See the appendixes to this annex for Forms and Documentation required in the public assistance process.

## 3. ROLES AND RESPONSIBILITIES

### 3.1 Level I Agencies

**MOEM**
A. Coordinate damage assessments (windshield, IDA, PDA) to ensure that all structures applying for reimbursement from federal grants are assessed by a team member.

### 3.2 Level II Agencies

**DOF (Lead)**
A. Work in conjunction with MEMA and FEMA Public Assistance Coordinator (PAC) to ensure proper monetary reimbursement is received by the applicant.

**BCLD**
A. Work in conjunction with MEMA and FEMA Public Assistance Coordinator (PAC) to ensure proper monetary reimbursement is received by the applicant.

## 4. PLAN DEVELOPMENT AND MAINTENANCE

### 4.1 Awareness, Training, and Exercises
A. Participating agencies shall ensure that personnel responsible for implementing portions of this plan are familiar with the plan and with their duties.
B. MOEM and responsible agencies shall conduct regular training and drills to maintain and improve capabilities that support execution of this plan.

### 4.2 Document Review and Revision
A. Maintenance for this ESF is the responsibility of MOEM. MOEM will develop and maintain procedures for performance in accordance with the responsibilities assigned.  This ESF should be reviewed at least annually.

### 4.3 Authority
A. FEMA Regulation, 44 CFR Part 206, Federal Disaster Assistance, Subparts A – L
B. Public Law 93-288, as amended, the Robert T. Stafford Disaster Relief and Emergency Assistance Act of 1988

| REVISION DATE: December 2013 | PAGE: 14C- 4 |
|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION:  ESF 14C | CITY OF BALTIMORE |
|---|---|
| SUBJECT: PUBLIC ASSISTANCE | EMERGENCY OPERATIONS PLAN |

**4.4   Supporting Documents**

A.  Public Assistance Declaration Thresholds FY2014

Owner:       MEMA

Objective:  Lists the amount of damage necessary to trigger public assistance from FEMA

Status:      Complete (Oct. 2013)

| REVISION DATE: December 2013 | PAGE: 14C- 5 |
|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order                    CITY00003998

| SECTION:  ESF 14D | CITY OF BALTIMORE |
|---|---|
| SUBJECT: INDIVIDUAL ASSISTANCE | EMERGENCY OPERATIONS PLAN |

# Emergency Support Function 14 – Recovery

## *Appendix 14D - Individual Assistance*

**Lead Agency:**          Department of Finance (DOF)

**Core Agencies:**        Mayor's Office of Emergency Management (MOEM)
                          Department of Law (DOL)

**Supporting Agency**:    Department of Housing and Community Development (DHCD)


## 1. ESF OVERVIEW

### 1.1   Purpose
The purpose of this annex is to outline the procedures for providing individual assistance during disaster recovery efforts. A determination of the extent of damage to privately owned homes and businesses in the City of Baltimore will be made through the damage assessment process.

### 1.2   Situation
Individual assistance will only be available when a Presidential Disaster is declared. Private property owners expressing assistance needs will be required to contact FEMA as directed by the Federal Coordinating Officer for the incident.

### 1.3   Assumptions
In the event of a disaster event, it is likely that privately owned land and property will be subject to damage.  It is the responsibility of the individual to use these guidelines to apply for assistance and get on the path to recovery.

### 1.4   Scope
This appendix to the recovery annex is a crucial aspect of assisting Baltimore City residents with recovery from the financial burden of a disaster.  However, monetary assistance will only be granted after a series of standardized procedures outlined by FEMA are completed by the individual.  Furthermore, financial reimbursement will only be available when a Presidential Declaration of disaster is enacted.  Baltimore City has no direct role in providing financial reimbursement to individuals.

## 2. INDIVIDUAL ASSISTANCE STRATEGIES

### 2.1   Concept of Operations
A.  All individuals seeking assistance must contact FEMA within sixty (60) days of the disaster declaration. Individuals can call  1-800 621-3362, go online at www.disasterassistance.gov or report to a FEMA Shelter/Recovery Center to register for assistance.  The individual must be able to provide the following information:

| REVISION DATE: December 2013 | PAGE: 14D- 1 |
|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order                                      CITY00003999

| SECTION: ESF 14D | CITY OF BALTIMORE |
|---|---|
| SUBJECT: INDIVIDUAL ASSISTANCE | EMERGENCY OPERATIONS PLAN |

- Name and Social Security number
- Current and pre-disaster address
- Proof of Residency
- Current contact information
- Insurance coverage, policy numbers and agent's name
- Total household annual income
- A bank routing and account number for direct deposit

B. Individuals should contact their insurance company prior to FEMA to file necessary claims. Baltimore City residents must understand that government assistance does not cover damage or losses already covered by private insurance. Federal aid does not guarantee total recovery from all damage losses.

C. Once the registration is complete, a copy of the registration/application will be sent to the applicant and if a need is identified, an inspector will be assigned to view the damaged property. It is the responsibility of the Preliminary Damage Assessment Team to assess the damage to private property endured by City of Baltimore residents. The team will work through the worksheets provided by MOEM to determine the extent of damage to privately owned homes and businesses. A determination must be made if the property is insured or not. The worksheets will outline the damage category in which the property belongs to. For multi-family dwellings, each unit impacted must be put into a category separately. These categories are:

1. **Destroyed**
   - The building is a total loss or is damaged to the extent that it is not economically viable to repair it.
   - Greater than four (4) feet of water is on the first floor of a single family dwelling or apartment.
   - Greater than six (6) inches of water is in a mobile home.
   - The structure has a cracked foundation

2. **Major Damage**
   - The building is damaged to the extent that it is no longer habitable and may be returned to service only with extensive repair.
   - Two (2) to four (4) feet of water is on the first floor in a single family dwelling or apartment.
   - Water has been in the dwelling for longer than twenty-four (24) hours.
   - Less than six (6) inches of water is in a mobile home

3. **Minor Damage**
   - The building is damaged and can only be used under limited conditions and may be restored with minor repairs.
   - Less than twenty-four (24) inches of water on the first floor in a single family dwelling or apartment.
   - Water is above or just below the bottom floor of a mobile home
   - Sewer back-up into the dwelling

4. **Affected**
   - The building is useable without repairs as landscaping maybe the only affected entity of the property. Ingress and egress to the property may be hampered.
   - Water entered the basement.

| REVISION DATE: December 2013 | PAGE: 14D- 2 |
|---|---|

CITY00004000

| SECTION: ESF 14D | CITY OF BALTIMORE |
|---|---|
| SUBJECT: INDIVIDUAL ASSISTANCE | EMERGENCY OPERATIONS PLAN |

- Minor damage to the buildings utilities.
- Shingles missing.

D. Residents of Baltimore City must wait until their property has been assessed by the Preliminary Damage Assessment Team. Once the assessment is completed and the individual has all the proper documentation provided by FEMA, the individual may send their application for reimbursement to FEMA. Baltimore City has no obligation to reimburse private property in any disaster circumstance. Only when a Presidential declaration is made will eligibility for reimbursement be available.

## 2.2 Available Assistance

A. There are two different types of Presidential Declarations that may occur in the face of an emergency or disaster, and this determines the kind of individual assistance that is available. The two types of declaration are:

1. **Emergency Declaration, $5 million cap – assistance available to individuals includes:**
   - Disaster Housing
   - Unemployment Assistance
   - Voluntary Assistance Coordination

2. **Major Disaster Declaration, no cap – assistance available to individuals includes:**
   - Individual and Household Grant Program
   - Small Business Administration loans
     a. Physical Disaster Loan Declaration
     b. Economic Injury Disaster Loan
   - Voluntary assistance disaster housing
   - Unemployment Assistance
   - Crisis Counseling
   - Legal aid
   - Other needs assistance

B. Businesses will be assisted through the Small Business Administration (SBA). All businesses needing assistance should fill out and return an SBA loan application to be considered as well as other forms for Federal and State grant assistance if available.

Individuals should reference Attachment C for the Individual and Households Program to see eligibility/qualifications.

## 3. ROLES AND RESPONSIBILITIES

### 3.1 Level I Agencies

**MOEM**

A. Coordinate damage assessments (windshield, IDA, PDA) to ensure that all individuals applying for monetary reimbursement from FEMA are assessed by a team member;

B. Provide information to the public as to how to apply for individual assistance;

| REVISION DATE: December 2013 | PAGE: 14D- 3 |
|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00004001

| SECTION: ESF 14D | CITY OF BALTIMORE |
|---|---|
| SUBJECT: INDIVIDUAL ASSISTANCE | EMERGENCY OPERATIONS PLAN |

C. Ensure that 311 and City Hall operators have the correct knowledge about individual assistance to provide residents with the most accurate and up-to-date information.

**DHCD**
A. Assist MOEM in the provision of information to the public on how to apply for individual assistance;
B. Assist MOEM to ensure that 311 and City Hall operators have the correct knowledge about individual assistance to provide residents with the most accurate and up-to-date information.

### 3.2 Level II Agencies

**DOF**
A. Work in conjunction with MEMA and FEMA Public Assistance Coordinator (PAC) to ensure proper monetary reimbursement is received by the applicant.

**BCLD**
A. Hold right of entry agreements, indicate unlawful action, and ensure that proper reimbursement is appropriately made to the applicant.  Right of Entry agreements are liability that allows the DAT, MEMA and FEMA representatives to enter private homes with permission and any further damage to private property cannot be held against FEMA, MEMA or the City of Baltimore.

## 4. PLAN DEVELOPMENT AND MAINTENANCE

### 4.1 Awareness, Training, and Exercises
A. Participating agencies shall ensure that personnel responsible for implementing portions of this plan are familiar with the plan and with their duties.
B. MOEM and responsible agencies shall conduct regular training and drills to maintain and improve capabilities that support execution of this plan.

### 4.2 Document Review and Revision
A. Maintenance for this ESF is the responsibility of MOEM. MOEM will develop and maintain procedures for performance in accordance with the responsibilities assigned.  This ESF should be reviewed at least annually.

### 4.3 Authority
A. FEMA Regulation, 44 CFR Part 206, Federal Disaster Assistance, Subparts A, B, C, G, H, & I
B. Public Law 93-288, as amended, the Robert T. Stafford Disaster Relief and Emergency Assistance Act of 1988

### 4.4 Supporting Documents
A. **City of Baltimore Individual Assistance Property Report**
   Owner:        MOEM
   Objective:    Worksheet to estimate economic loss for households.
   Status:       Draft (December 2013)

| REVISION DATE: December 2013 | PAGE: 14D- 4 |
|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00004002

| SECTION: ESF 14D | CITY OF BALTIMORE |
|---|---|
| SUBJECT: INDIVIDUAL ASSISTANCE | EMERGENCY OPERATIONS PLAN |

B. **Estimated Disaster Economic Injury Worksheet for Businesses**
   Owner:      SBA
   Objective:  Worksheet to estimate economic loss for businesses.
   Status:     Complete (May 2010)

C. **FEMA Assistance to Individuals and Households Factsheet**
   Owner:      FEMA
   Objective:  Provide guidance to individuals seeking assistance following a
               disaster.
   Status:     Complete (May 2011)

| REVISION DATE: December 2013 | PAGE: 14D- 5 |
|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order                    CITY00004003

| SECTION: ESF 15 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Donations and Volunteer Management | EMERGENCY OPERATIONS PLAN |

# Emergency Support Function 15

## *ESF 15 – Volunteer and Donations Management*

**Lead Agency:**          Mayor's Office of Human Services (MOHS)

**Core Agencies:**        Mayor's Office of Emergency Management (MOEM)
                          Business Volunteers Maryland (BVM)

**Support Agencies:**     Mayor's Office of Policy and Communications (MOPC)
                          Department of Finance (DOF)
                          Mayor's Office of Information Technology (MOIT)
                          Baltimore City Police Department (BPD)

## 1. ESF OVERVIEW

### 1.1 Purpose
The purpose of this ESF is to provide a plan to effectively coordinate the registration and referral of spontaneous, unaffiliated volunteers so these volunteers can be used to efficiently mobilize, receive just-in-time training, respond to, and recover from, disasters in Baltimore City. Additionally, this ESF will determine where donations should be directed in the event that organizations or individuals wish to donate items or money following a large scale emergency.

ESF 15 will enhance emergency operations by supplementing the personnel resources of City agencies with spontaneous volunteers as requested by the City of Baltimore, as well as providing the means for spontaneous volunteers to serve based on the priorities identified by the agencies represented at the Emergency Operations Center (EOC).

### 1.2 Situations
Following a disaster, people are eager to respond and assist with a community's recovery, but generally lack specific disaster response and recovery training. Often these spontaneous volunteers arrive in numbers greater than what established disaster responders can assimilate. Spontaneous volunteers may overwhelm, hamper or complicate the efforts of first responders by putting them or others at risk.

During the response and recovery phase of a disaster, individuals and organizations may choose to donate money or goods of their own volition or as directed by the news media. Although well intended, these donations may overwhelm receiving agencies and may not serve the needs of the impacted jurisdictions.

### 1.3 Assumptions
A. Under normal circumstances, required services will be available within the city to meet emergency operation needs for small-scale emergencies. A larger scale

| REVISION DATE: July 2013 | PAGE:   15 - 1 |
|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order                                    CITY00004004

| SECTION: ESF 15 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Donations and Volunteer Management | EMERGENCY OPERATIONS PLAN |

emergency may result in the loss of certain services, or quickly exhaust local disaster resources, requiring assistance from volunteers.

B. Under severe disaster circumstances, there is a potential for a large influx of spontaneous volunteers into the disaster area, who may significantly hamper the ability of City government and established volunteer agencies to respond effectively.

C. Spontaneous volunteers from within the City of Baltimore or nearby jurisdictions could begin congregating within 24 hours of a disaster. Spontaneous volunteers from other parts of the country, or the world could begin arriving within 48 hours.

D. Volunteers who are pre-affiliated with an agency or non-governmental organizations (NGO) will report directly to that organization; volunteers without a prior affiliation will report to the Volunteer Mobilization Centers (VMC).

E. BVM staff and volunteers will be available to manage VMCs at the request of MOHS or MOEM as established in the current, signed Memorandum of Understanding (MOU).

F. For any emergency large enough to warrant opening a VMC, the EOC will be activated prior to the opening of the VMC.

G. The VMC will be activated only when it is determined safe for volunteer activities, which will most likely be at the end of response or during recovery.

H. The City has no capacity to accept donations in the event of an emergency. Donations will need to be redirected to any entity with the capability and responsibility to accept, manage, allocate, and distribute donations. Several Voluntary Organizations Active in Disaster (VOADs) are active in Baltimore City and are able to accept donations.

I. In the event of a State declaration of disaster, the City will redirect donations to the Maryland Emergency Management Agency (MEMA) EOC.

### 1.4   Scope

This support function will manage the reception, recruitment, registration, and referral of spontaneous, unaffiliated volunteers to support response and recovery operations associated with a natural or man-made disaster. This effort will be carried out through the activation of VMC.

This support function excludes management or oversight of affiliated volunteers. Disasters in which social distancing is desired, such as a pandemic, may be excluded from this ESF.

This support function recognizes the inability of the City of Baltimore to accept monetary or other donations in the event of a large scale, State declared emergency and will redirect this responsibility to MEMA or VOAD-affiliated private, non-profit organizations during localized events.

## 2   CONCEPT OF OPERATIONS

### 2.1   Terms

**Volunteer:** Any individual providing services without receiving financial compensation.

| REVISION DATE: July 2013 | PAGE: | 15 - 2 |
|---|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order   CITY00004005

| SECTION: ESF 15 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Donations and Volunteer Management | EMERGENCY OPERATIONS PLAN |

**Affiliated Volunteers:** Individuals or groups attached to an established agency or NGO and trained during the preparedness phase to provide specific disaster response skills. Their relationship precedes the onset of disaster, and their services are typically used first in the event of a disaster. Some well-known examples of affiliated volunteer programs include the American Red Cross (ARC) or the local Community Emergency Response Teams (CERT).

**Spontaneous Volunteers:** Individuals or groups that come forward (at times without being asked) following a disaster to assist agencies and NGOs with disaster related activities during the response and recovery phase. Generally, there is no pre-existing relationship with an established volunteer agency or NGO and no formal disaster training. They may come from inside or outside the City or affected area. These individuals may also be called "emergent", "convergent", or "unaffiliated" volunteers.

**Volunteer Mobilization Center (VMC):** A facility where spontaneous volunteers can be registered and referred to requesting agencies and NGOs. Following a disaster, registered agencies and NGOs will request volunteer support through the VMC.

**Donation:** A contribution of money, goods, resources, or supplies given without compensation.

### 2.2 General:

Disaster responders, agencies, and NGOs are expected to use affiliated volunteers before requesting spontaneous volunteers.

Volunteers will be referred from the VMC only to registered agencies
Screening, reference checks, and risk management/liability of referred spontaneous volunteers will be the responsibility of the accepting agency. VMC *personnel shall not manage, supervise, or be liable or responsible for spontaneous volunteers referred to agencies or NGOs from the VMC.*

Volunteers, agencies and NGOs are not obligated to accept any volunteer referral.

BVM volunteers or personnel staffing the VMC reserve the right to decline requests for volunteers should there be a question of supervision, safety, or other concerns.

MEMA will manage the acceptance, management, allocation, and distribution of donations for disasters in which the Governor declares a State of Emergency. In localized disasters, the City will redirect donations to VOAD-affiliated private, non-profit organizations.

### 2.3 Organization:
**VMCs**
BVM has a MOU with the City to activate and manage VMCs after a disaster, providing a buffer between spontaneous volunteers and first responders.
Based upon the MOU, BVM will, upon request, open VMCs to serve as a point of reception for spontaneous volunteers and oversee their registration and referral to requesting agencies.

| REVISION DATE: July 2013 | PAGE: | 15 - 3 |
|---|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00004006

| SECTION: ESF 15 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Donations and Volunteer Management | EMERGENCY OPERATIONS PLAN |

Spontaneous volunteer management will adhere to the guidelines set forth in the National Incident Management System (NIMS).

**2.4   Coordination, Direction and Control**
The decision to activate a VMC will be made jointly by MOHS, MOEM, and BVM. As BVM needs up to 48 hours to fully staff a VMC, advance notification is preferred. Under the established MOU, MOEM will engage BVM support to activate one VMC to serve as the referral mechanism for spontaneous volunteers following a disaster. MOEM, MOHS, and BVM will determine the appropriate site(s) for the VMC based on the specific circumstances surrounding the incident. Potential sites for VMCs will be pre-identified by MOHS, BVM, and MOEM. One community action center (CAC) in each quadrant of the City has been designated as a potential center, with additional sites pre-identified as appropriate. MOUs or other formal agreements will be made in advance when appropriate.

BVM personnel and volunteers will be trained in volunteer management. They will operate the VMC in accordance with the current Volunteer Mobilization Standard Operating Procedure (SOP).

VMC staff will communicate with the EOC through the MOHS EOC representative.

All agencies with volunteer needs will register with the MOHS EOC representative. Agencies receiving volunteers will be responsible for screening, training, and supervising the volunteers as well as ensuring their safety.  Records of expenditures, volunteer tasks and service hours must be maintained for possible future reimbursement.  Volunteers cannot be used to displace City employees.

**3   ROLES AND RESPONSIBILITIES**

**3.1   Level I Agencies**

**MOHS (Lead Agency)**
A. Recommend potential VMC sites and set up formalized agreements or MOU when appropriate;
B. Establish a policy outlining VMC activation, deployment strategies and call down procedures;
C. Establish registration system to organize volunteer needs from all City agencies. Coordinate with other agencies to verify needs/offers for additional volunteer support and communicate needs to the BVM. All agencies will register their volunteer needs with MOHS;
D. Train agencies and NGOs in appropriate procedures to request spontaneous volunteers, and to process, track, and submit volunteer tasks for use as in-kind matching funds for Federal reimbursement;
E. Coordinate with ESF 1 to develop strategies to safely transport spontaneous volunteers as needed to affected and /or service areas;
F. Encourage agencies and NGOs anticipating a need for spontaneous volunteers in the event of a disaster to be aware of/trained in the process of requesting volunteers;

| REVISION DATE: July 2013 | PAGE: | 15 - 4 |
|---|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00004007

| SECTION: ESF 15 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Donations and Volunteer Management | EMERGENCY OPERATIONS PLAN |

G. Determine the number and site(s) for the VMC based on the specific circumstances surrounding the incident;
H. Communicate the decision to activate a VMC to BVM;
I. Establish and support communication channels with VMC either through the use of WebEOC, telephone, fax, email, HAM radio, or 800 Mhz radio;
J. Request security, in cooperation with BP), if necessary for VMCs and/or spontaneous volunteer staging areas;
K. Distribute food and water to VMC(s) if necessary;
L. Develop strategies to safely transport spontaneous volunteers as needed to affected/services areas;
M. Annually participate in training and exercise programs that validate the ESF and supporting SOPs with MOEM and BVM.

**MOEM (Core Agency)**
A. Identify a central repository for MOUs, press release templates, and VMC Manual;
B. Annually participate in training and exercise programs that evaluate the ESF and supporting SOPs with MOEM and BVM;
C. Provide administrative and logistical support;
D. MOEM EOC representative will direct all individuals or organizations offering donations to the City of Baltimore to appropriate NGOs or MEMA;
E. Ensure proper messaging by JIC upon VMC activation

**BPD**
A. Provide security and background checks at VMCs upon request by MOHS.

**MOPC**
A. Assist in development and maintenance of pre-positioned press releases;
B. Utilize pre-positioned press releases to notify the public about VMC activation and community volunteer needs through the Joint Information Center (JIC)

**MOIT**
A. Provide necessary technical expertise, support personnel, and equipment as needed.

**3.2   Level II Agencies**

**DOF**
A. Assist in development of procedures needed to account for expenditures and activities for possible reimbursement as oftentimes volunteer time can be used in cost-sharing federal avenues for reimbursement.

**3.3   Level III Agencies**

**BVM (Core Agency)**
A. Pre-identify potential VMC sites and setup formalized agreements or MOUs when appropriate;
B. Develop and maintain a current Volunteer Mobilization SOP, updated to reflect current national best practices in spontaneous volunteer management;

| REVISION DATE: July 2013 | PAGE:   15 - 5 |
|---|---|

| SECTION: ESF 15 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Donations and Volunteer Management | EMERGENCY OPERATIONS PLAN |

C. Maintain agreements and working relationships with supporting agencies and NGOs, forwarding all copies of MOUs, contracts and agreements to the Baltimore City Law Department for review prior to final approval;

D. Ensure all designated VMC staff associated with ESF 15 have completed prescribed NIMS/ICS and Volunteer Management training;

E. Develop and conduct just-in-time training in the event of a VMC activation;

F. Coordinate with MOHS and MOEM to determine security, communication and mental health needs at the VMC;

G. Develop, maintain, and train on a Standard Operating Procedure (SOP) for VMCs;

H. Recruit, train, and maintain a pool of staff and volunteers familiar with VMC policies and procedures;

I. Maintain a database of registered volunteers who have expressed an interest in serving during and following a disaster/working in a VMC. Names and contact information, with the volunteers' permission, will be shared with MOHS and MOEM when and if the need arises;

J. Maintain limited supplies identified in the Volunteer Mobilization Center SOP needed to activate a VMC;

K. Manage VMCs under MOU with MOHS in accordance with established policies and procedures, and supervise VMC personnel;

L. Work in concert with MOHS and MOPC to release consistent information to the public and the media and promote common messaging;

M. Maintain continuous communications with the EOC until relieved of responsibility for VMC operations;

N. Collect general information from spontaneous volunteers arriving at the VMC to determine time availability, general interests and location preferences;

O. Collect requests for volunteers, submitted by registered agencies and NGOs, from MOHS EOC representative. VMC personnel may reserve the right to decline request for volunteers should there be a question of supervision, safety, or other concerns;

P. Make volunteer referrals to requesting registered agencies;

Q. Keep accurate records of VMC activity. Ensure documentation of spontaneous volunteer tasks and the hours volunteered are collected and compiled for potential use as in-kind match for Federal and State reimbursements. Ensure that all documentation (copies of receipts) for loaned or rented property is submitted to the DOF;

R. Close and deactivate VMC facilities in cooperation with the MOEM and MOHS, in accordance with established SOP;

S. Educate the public about potential need for volunteers after a disaster, and encourage individuals to pre-affiliate with agencies and NGOs.

## 4   PLAN DEVELOPMENT AND MAINTENANCE

### 4.1  Awareness, Training, and Exercises

A. MOEM and BVM shall ensure that personnel responsible for implementing portions of this plan are familiar with the plan and with their duties.

B. BVM in cooperation with MOHS and MOEM shall conduct regular training and drills to maintain and improve capabilities that support execution of this plan.

| REVISION DATE: July 2013 | PAGE: | 15 - 6 |
|---|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order    CITY00004009

| SECTION:  ESF 15 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Donations and Volunteer Management | EMERGENCY OPERATIONS PLAN |

### 4.2   Document Review and Revision

Maintenance of this ESF is the responsibility of MOEM.  All agencies with emergency management functions will develop and maintain procedures for performance in accordance with the responsibilities assigned in regard to SOP, MOUs and mutual aid agreements, as appropriate.  This ESF should be reviewed at least annually.

### 4.3   Authority

See EOP Basic Plan for general authorities.

### 4.4   Supporting Documents

**A.  Volunteer Mobilization Center SOP**
| | |
|---|---|
| Owner: | BVM |
| Objective: | Outlines the operating procedures for the VMC and staff members. |
| Status: | Complete (June 2011) |

**B.  State Liability Laws for Maryland**
| | |
|---|---|
| Owner: | Nonprofit Risk Management Center |
| Objective: | Outlines the Liability Laws in Maryland associated with volunteers. |
| Status: | Complete (January 2009) |

**C.  BVM MOU**
| | |
|---|---|
| Owner: | Mayor and City Council of Baltimore and BVM |
| Objective: | Memorandum of Understanding between BCFD and BVM regarding the effective management of spontaneous volunteers. |
| Status: | Complete (November 2012) |

**D.  MOU with Staging Locations**
| | |
|---|---|
| Owner: | BVM |
| Objective: | Memorandum of Understanding between BVM and locations used for VMCs |
| Status: | Pending |

**E.  VOAD Directory**
| | |
|---|---|
| Owner: | MD VOAD |
| Objective: | List of Maryland VOADs with contact information and capabilities. |
| Status: | Complete (May 2013) |

**F.  VMC Locations**
| | |
|---|---|
| Owner: | BVM |
| Objective: | Location of preferred VMCs. |
| Status: | Complete (Oct 2013) |

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00004010

| SECTION: ESF 16 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Animal Protection | EMERGENCY OPERATIONS PLAN |

# Emergency Support Function 16

## *Animal Protection*

**Lead Agency:**          Baltimore City Health Department (BCHD)

**Core Agency:**          Mayor's Office of Emergency Management (MOEM)

**Support Organizations:**   Baltimore City Fire Department (BCFD)
Baltimore City Police (BPD)
Department of General Services (DGS)
Maryland Department of Natural Resources (DNR)
Maryland Department of Agriculture (MDA)
American Humane Association
Baltimore Animal Rescue and Care Shelter, Inc. (BARCS)

## 1. ESF OVERVIEW

### 1.1 Purpose
The purpose of the Animal Emergency and Protection Plan Annex is to supplement the City of Baltimore Emergency Operations Plan (EOP) by outlining objectives and planning efforts to protect animal welfare before, during, and after an emergency. Special emphasis is placed on the use of phased community planning for evacuation, transportation and sheltering in order to increase the safety of citizens and their pets. This annex also assigns roles and responsibilities for supporting animal protection services in the City of Baltimore.

### 1.2 Situation
The City of Baltimore is vulnerable to a range of natural and man-made hazards that may require the City to provide emergency animal protection services, including evacuation, transportation, and sheltering.

In some types of incidents, animal protection services will be the focus of the response. In other incidents, they will be a supporting part of the overarching response.

In Baltimore City there are an estimated 171,000 dogs and 184,000 cats in 257,996 households. In order to ensure the safety of the community that first responders protect, the City must consider the animal population. To further help first responders in doing their job, shelter locations should allow both animals and humans within the same facility so that continued surveillance and care is provided by the owner for the pet during the time of disaster. In addition, maintaining this care and connection between pet and owner creates a less stressful environment for all involved.

### 1.3 Assumptions

| REVISION DATE: November 2013 | PAGE: | 16 - 1 |
|---|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION:  ESF 16 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Animal Protection | EMERGENCY OPERATIONS PLAN |

A. An incident that affects Baltimore City or its neighboring counties in the region may impact the residents and visitors of Baltimore City.  Baltimore City governmental and volunteer agencies that share a role and responsibility as identified in this plan will respond and perform their duties.

B. Maintaining the health and care of animals in disaster situations may require significant resources and cooperation from local, state, and federal agencies.  Therefore, response efforts may need to extend across city boundaries.

C. The owners of pets or livestock, when notified of an upcoming emergency will take reasonable steps to shelter and provide for animals under their care and/or control.

D. During disaster evacuation many people will not evacuate without their animals or will delay their own evacuation in an attempt to make preparation for their animals left behind to their own detriment.

E. A major disaster or emergency in the City of Baltimore may warrant immediate response from state and local personnel, agencies, and organizations. Outside animal care and rescue assistance would likely be available in most major situations affecting the city. However, situations may become compounded due to the nature of the emergency.

## 1.4   Scope
This plan identifies key tasks to be performed in order to effectively provide animal emergency care and protection services in the City of Baltimore.  It describes strategies and planning considerations for these tasks and assigns responsibility for their performance to different agencies.  This plan does not establish operational tactics or standard operating procedures.

## 1.5   Objectives
A. **Protection of Public and Animal Health**
Coordinate animal control, health care, and veterinary resources to prevent and contain diseases during all aspects of an emergency.  During an emergency, loose and displaced animals are potential carriers of diseases such as rabies and plague.  Prevention of these and other zoonotic diseases is supported by proper control of animals at large.

B. **Evacuation**
Manage and direct evacuation of animals from risk areas and provide technical assistance to prevent injury and the spread of disease.

C. **Transportation**
Identify transportation needs and coordinate with ESF-1 and BPD to facilitate transportation of animals during emergencies.  Public and/or private transportation methods will be coordinated depending on event and location.

D. **Sheltering**
Procure use of facilities, equipment, and supplies necessary for sheltering animals.  Coordinate with identified agencies to inform displaced citizens of the protocol for the delivery, acceptance, and retrieval of pets from designated shelters.

E. **Recovery**
Provide and maintain records for assistance with returning or releasing animals back to their owners.  Establish guidelines for abandoned animals.

F. *Animal fatality management*
Secure, decontaminate (if needed), and remove animal carcasses in a manner that ensures safety of response personnel and the public.

| REVISION DATE: November 2013 | PAGE: | 16 - 2 |
|---|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00004012

| SECTION: ESF 16 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Animal Protection | EMERGENCY OPERATIONS PLAN |

### G. Public Information and Outreach
Provide emergency preparedness information to citizens to encourage preplanning for their animals during an emergency event.  Outreach efforts will include all aspects of an emergency in order to facilitate safe and effective tools that are applicable to a variety of emergency situations.

## 1.6  Animal Control Services
The Baltimore City Health Department is the primary agency responsible for animal health and protection issues.  Specifically the health department has an Animal Control Program which is part of the Bureau of Environmental Health.  Additionally, the Baltimore Animal Rescue and Care Shelter, Inc. (BARCS) provides oversight for the City animal shelter and assists in emergency sheltering and care for animals during large-scale emergencies or disasters.

The Bureau of Animal Control's mission is to enforce Baltimore City and State codes.  Animal Control operates a 24 hours, 7 days per week program that handles all animal issues outside of the shelter.  During emergencies, Animal Enforcement Officer(s) aid in the patrol of disaster areas to rescue domestic animals displaced by catastrophic events and provides support to fire and law enforcement agencies responding to a specific crisis.

## 1.7  Notification
A.  This plan and implementing procedures will be activated in the event of a major emergency causing a significant need for animal protection.
B.  The Head of the Bureau of Environmental Health will recommend to the Directors of MOEM and the Commissioner of Health for Baltimore City when the procedures in this ESF should be implemented and notify the appropriate primary, support, and mutual aid agencies upon the activation of this ESF.
C.  The Animal Control Director or designee will develop and maintain an appropriate emergency notification system of animal control support personnel and agencies.

## 2. Response

### 2.1  BCHD Office of Animal Control Operations During a Response
A.  All operational components of an animal protection related disaster will be coordinated by the Animal Control Director or designee.
B.  In the event of a declared emergency, Animal Control will deploy an Animal Enforcement Office for the purpose of providing animal assessment and transport.
C.  Animal Control will assist with the evacuation, transport, and sheltering of animals within Baltimore City.
D.  Animal Control will assist in the return or reunification of sheltered animals following an incident.
E.  Animal Control response efforts will focus on endangered animals, and as resources allow, will assist with dead animal (cats, dogs, birds, etc) pick up calls.
F.  In coordination with MDA, Animal Control will assist with animal fatality management as needed during an incident.

### 2.2  Stray/Lost Domestic Pets

| REVISION DATE: November 2013 | PAGE: | 16 - 3 |
|---|---|---|

CITY00004013

| SECTION: ESF 16 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Animal Protection | EMERGENCY OPERATIONS PLAN |

    A. All stray/lost domestic pets recovered during a major disaster or emergency by the Animal Control Program will be sheltered as necessary at the BARCS Animal Shelter.

    B. Any pets whose owners cannot care for their pets or domestic pets found by citizens will also be sheltered at these locations.

    C. Unclaimed animals will be disposed of according to City of Baltimore procedures.

**2.3   Wild Animals**

    A. DNR will normally transport wild animals that are endangering themselves or the general public back to their natural habitat. If the animal cannot be transported back to its natural habitat due to the nature of the emergency or to injuries it may have sustained, and if feasible, it will be transported to BARCS or appropriate boarding/medical facility.

    B. Animal Control will pick up wild animals and transfer them to BARCS. BARCS will then work in consultation with wildlife experts to relocate the animal.

    C. If the animal continues to be a danger to the public or it appears that it is inflicted with an incurable disease; it will be disposed of in accordance with established animal control procedures.

**2.4   Vaccination Requirements and Veterinary Services**

Baltimore City has a number of small animal Veterinary practices that BARCS may call upon to assist in large scale emergencies affecting animals.  For example, practices with unique animal related equipment and other emergency related resources, such as food supplies, may be used to supplement BARCS or City resources.

**2.5   Evacuation and Transportation of Displaced Animal Strategies**

BCHD will coordinate efforts with BCFD, BPD, and other City agencies able to provide evacuation assistance to animals, in order to protect life and alleviate suffering in the event of an emergency or major disaster. Evacuation priority will be given to people. Personnel and equipment resources may be provided to animals, as available, only after human health and safety issues have been fully addressed.

BCHD will coordinate with DOT and other ESF 1 partners regarding evacuation routes and transportation needs to manage and direct evacuation of animals from risk areas. The extent of the event will determine the type of transportation vehicles to be used.

**Operations during a response**

    A. BCHD, BCFD, and BPD will coordinate animal evacuation response efforts, whether in animal-only events and events affecting persons and their pets/service animals.

    B. Individual citizens will be encouraged to take their animals with them when they evacuate.  Pet owners will be encouraged to evacuate with their animals in a crate with supplies and documentation, such as vaccination records.

    C. Transportation of displaced animals will be coordinated by BCHD, DOT, and DPW with assistance from MTA as needed/available.

| REVISION DATE: November 2013 | PAGE: | 16 - 4 |
|---|---|---|

CITY00004014

| SECTION: ESF 16 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Animal Protection | EMERGENCY OPERATIONS PLAN |

### 2.6 Shelter Strategies

It may be necessary to shelter animals during a number of different types of emergencies/incidents.  Some emergencies may require only the sheltering of animals while some may require the sheltering of humans and their pets or service animals. DHCD is the lead agency for ESF-6 (Sheltering and Mass Care).  BCHD will support DHCD in sheltering of domestic household pets and service animals.  Service animals shall be sheltered with those whom they assist in accordance with the Americans with Disabilities Act.

Provisions for animal sheltering may be accomplished by establishing separate quarters for pets and service animals within a congregate shelter, having animal only facilities (ex: abandoned building, warehouse, parking garages), or the provision of stand-alone sheltering.  The selection of the shelter site(s) will depend on the area(s) in the City impacted by the incident and the number and types of animals affected by the incident.

BCHD has go-bags that can be used during an animal emergency, which contain basic animal supplies.

**Operations during a response**
A.  During an event that affects both people and their pets/service animals, BCHD will support DHCD in sheltering efforts by taking the lead on animal sheltering issues.
B.  BCHD Animal Control will assist with the feeding/care of animals in shelters.
C.  BCHD Animal Control will keep an inventory of and procure animal supplies as needed with the assistance of MOEM.
D.  BCHD will mobilize volunteer staff through the Maryland State Animal Response Team (SART), organized through the Maryland State Department of Agriculture; BARCS and/or the Humane Society, to assist with animal sheltering efforts as needed and with the assistance of MOEM.
E.  BCHD will activate the American Humane Association MOU and coordinate with the ASPCA.

### 2.7 Recovery Strategies

When sheltering operations are deemed no longer necessary and depending on available resources, BCHD will assist the return of animals to facilities or their owners following the emergency.

**Operations during a response**
A.  Following an event where pets/service animals were sheltered, BCHD will oversee the return of animals to their owners.  Volunteers may be called upon to assist with this effort.
B.  BARCS and local animal shelters will arrange foster pet care for those animals that are abandoned or whose owners cannot be located.

| REVISION DATE: November 2013 | PAGE: | 16 - 5 |
|---|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION: ESF 16 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Animal Protection | EMERGENCY OPERATIONS PLAN |

### 2.8 Donations Management Services

BCHD will coordinate with MOHS and MOEM regarding Donations and Volunteer Management. For large scale and/or extended sheltering operations donations of supplies, such as food and medicines will be anticipated, and volunteers will be needed to assist with animal operations.

**Operations during an emergency**
A. BCHD will call down animal volunteer organizations as needed during a response, and activate the American Humane Association MOU. BARCS and the Maryland Society of Prevention of Cruelty to Animals are volunteer-based programs that may be able to provide volunteers in addition to Maryland SART.
B. Additional volunteers may be requested through the resources outlined in ESF 15.

### 2.9 Search and Rescue of Animals
A. Stray/Domestic Pets
The coordination of stray domestic pets or those in need of assistance due to the emergency or to the death or evacuation of their owners will be the responsibility of municipal or City of Baltimore Animal Control officials.
B. Additional Aid
In the event that City of Baltimore resources cannot meet the requirements for animal search and rescue, the City of Baltimore Chief of Animal Control Programs will request outside assistance through the EOC.

### 2.10 Animal Bites and Disease Control
A. BCHD will make vaccinations available to rescue and shelter personnel and will insure that treatment of bites and injuries is available to affected persons.
B. An outbreak of rabies is a serious threat during an emergency situation. Appropriate steps to control that threat will be implemented by BCHD.
C. MDA will be called for any suspicion of Foreign Animal Disease (FAD) in livestock or poultry. Appropriate protocols will be followed in these circumstances

### 2.11 Recovery
**A. Release/Destruction**
**1) Domestic Pets/Livestock**
a. City of Baltimore Animal Control will support efforts to identify owners of stray/lost animals. If owners cannot be found, the Animal Control Program will transfer animals to BARCS, and BARCS will attempt to put the animal up for adoption.
b. Animals for which no owners can be found and which cannot be placed in adoptive care or sold will be disposed of in accordance with established animal control procedures.
**2) Wild Animals**
a. City of Baltimore Animal Control in cooperation with the Maryland Department of Natural Resources and other organizations will support efforts to reintroduce wild animals back to their natural habitats.

| REVISION DATE: November 2013 | PAGE: 16 - 6 |
|---|---|

| SECTION: ESF 16 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Animal Protection | EMERGENCY OPERATIONS PLAN |

B. **Disposal of Animal Carcasses**
   Disposal of deceased animals will be the responsibility of the Baltimore City Health Department, and will arrange for the disposal of euthanized animals or animals killed during a major disaster or emergency.

## 3. ROLES AND RESPONSIBILITIES

### 3.1 Level I Agencies

**BCHD (Lead Agency)**
A. Activate and manage Health Department Operations Center (HDOC) to coordinate the Health Department's response and support other city agencies during the response;
B. If the lead agency, establish Incident/Unified/Area command at the scene(s) and/or at the HDOC;
C. If a support agency, participate in Incident/Unified/Area command;
D. Coordinate response with the EOC, other City agencies, DHMH, and other local health departments or impacted health sector entities;
E. Activate ESF 16 when necessary;
F. Coordinate with city veterinarian hospitals, clinics and individual offices when necessary;
G. Develop, coordinate, and implement public health risk messages;
H. Conduct outreach to City residents and visitors to reduce their health risk and to inform them of the current health emergency and resources available to them;
I. Issue orders pursuant to the Commissioner's powers to protect the public health;
J. Determine emergency staffing needs and activate appropriate Response Tier staff depending on the emergency and their roles and responsibilities.

**BPD**
A. Lead agency for evacuation;
B. Assist Animal Control officers in the rescuing of animals and investigation of animal cruelty within the city limits.

**BCFD**
A. Assist with evacuation and transportation

**MOEM**
A. Activate and manage the EOC to coordinate the City's response and support the lead agency;
B. Activate and support a Joint Information System/Center to coordinate the City's communications to the public;
C. Secure outside resources to support the tasks identified in this plan;
D. Activate public warning systems.

### 3.2 Level II Agencies

**DGS**
A. Maintain fleet and equipment to be used in coordination with Animal Control operations.

| REVISION DATE: November 2013 | PAGE: 16 - 7 |
|---|---|

 CITY00004017

| SECTION: ESF 16 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Animal Protection | EMERGENCY OPERATIONS PLAN |

### 3.3 Level III Agencies

**MDA**
A. Assists veterinarians and health department officials in providing diagnostic and testing services;
B. Assist in the identification, isolation, and treatment of diseases, including those impacting the human population;
C. Provide inspections for the enforcement of regulations related to animal health;
D. Provide guidance and assist in the execution of State-Federal disease eradication and other programs;
E. Assist in the determining if quarantine(s) are necessary and assist in any quarantine operations;
F. In the case of an outbreak, assist in the epidemiological investigation;
G. Coordinate with the Maryland Volunteer Veterinarian Corp (MVVC) in providing animal care during a disaster or long-term emergency operations.

**DNR**
A. Assist in the identification of disease outbreaks and the contamination of wetland or water ways;
B. Assist in the capture and care of any wildlife within the City limits;
C. Coordinate the National Zoo in Baltimore for any disease outbreaks or other emergencies.

**American Humane Association**
A. Conduct internal contingency planning;
B. Provide volunteers to assist as needed.

**BARCS**
A. Conduct internal contingency planning;
B. Shelter animals picked up by animal control;
C. Assist with relocation of wildlife;
D. Maintain relationship with veterinary practices for emergency medical care and vaccinations;
E. Provide volunteers to assist in animal sheltering;
F. Match animals with appropriate foster care as needed;
G. Assist with reunification services for found animals;
H. Dispose of animals as appropriate in accordance to standing procedures

## 4. PREPAREDNESS AND PLAN MAINTENANCE

### 4.1 Awareness, Training, and Exercises
A. Participating agencies shall ensure that personnel responsible for implementing portions of this plan are familiar with the plan and with their duties.
B. MOEM will conduct annual exercises according to the EOP and this ESF will be tested as appropriate.
C. MOEM shall coordinate annual interagency exercises to test the City's ability to implement this plan.

| REVISION DATE: November 2013 | PAGE: | 16 - 8 |
|---|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION: ESF 16 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Animal Protection | EMERGENCY OPERATIONS PLAN |

### 4.2 Document Review and Revision

A. MOEM shall maintain this plan and coordinate an annual review by a committee composed of BCHD and agencies that are assigned responsibilities under this plan.

B. Agencies' procedures to execute their responsibilities under this plan shall be reviewed annually by the respective agencies.

C. Documents that support this plan as listed below shall be maintained by their respective owners and reviewed as needed. When these documents are substantively modified, the owners are responsible for notifying MOEM.

D. Based on the findings of annual reviews, MOEM and BCHD shall coordinate plan revisions as necessary.

### 4.3 Authority

A. The Baltimore City Health Code establishes a Bureau of Animal Control under the Baltimore City Health Department. BALTIMORE CITY HEALTH CODE § 10-102 (2010). The Health Commissioner may adopt and enforce rules and regulations pertaining to the issuance of permits and licenses, the humane care of all animals, and the general care and control of animals. BALTIMORE CITY HEALTH CODE § 10-104 (2010).

B. The Pets Evacuation and Transportation Standards (PETS) Act of 2006 amends the Robert T. Stafford Disaster Relief and Emergency Assistance Act (the Stafford Act). The PETS Act ensures that state and local emergency preparedness operational plans address the needs of individuals with household pets and service animals prior to, during, and following a major disaster or emergency. Specifically, the PETS Act ensures that State and local plans address the rescue, care, shelter and essential needs of individuals and their pets and animals. The Act also provides financial support to states and local authorities for animal emergency preparedness purposes.

C. FEMA Disaster Assistance Policy (DAP) 9523.19 identifies expenses related to emergency pet evacuation and sheltering activities that are eligible for reimbursement following a major disaster declaration under Category B, Emergency Protective Measures, and provisions of the Public Assistance Program.

D. The Americans with Disabilities Act of 1990 provides enforceable standards to eliminate discrimination towards people with disabilities. This law requires all businesses and organizations that serve the public to allow people with disabilities to bring their service animals into all areas of the facility where customers normally go. Service animals are animals that are individually trained to perform tasks for people with disabilities. A person with a disability cannot be asked to remove their service animal from the premises unless: 1) The animal is out of control and the animal's owner does not take effective action to control it or 2) the animal poses a direct threat to the health or safety of others.

### 4.4 Supporting Documents

The Baltimore City Animal Emergency and Protection Plan is not meant to stand alone. It is intended to be used in support of and in conjunction with and to tie together other plans, policies and protocols.

| REVISION DATE: November 2013 | PAGE: 16 - 9 |
|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION: ESF 16 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Animal Protection | EMERGENCY OPERATIONS PLAN |

A. **Maryland's Animals-in-Emergencies Plan**
   Owner:    MDA
   Objective:  Identify how the resources of the Maryland's governmental agencies in coordination with other agencies and governments, the private sector, and volunteer organizations will provide for the safety and welfare of animals placed at risk by meteorological, geological, technological, and terrorist disasters.
   Status:    Complete

B. **Baltimore City Animal Sheltering Plan**
   Owner:    BCHD
   Objective:  To develop and execute a plan for the sheltering of animals co-located with their owners during a disaster shelter.
   Status:    Under Development

C. **BARCS Disaster Evacuation Plan**
   Owner:    BARCS
   Objective:  To develop and execute a plan for the evacuation of the BARCS animal shelter.
   Status:    Under Development

D. **American Humane Association MOU**
   Owner:    AHA and BCHD
   Objective:  Defines the roles that AHA could undertake in animal disaster preparedness, mitigation, and/or response and/or recovery operations in Baltimore City.
   Status:    Complete

E. **BCHD COOP**
   Owner:    BCHD
   Objective:  Maintain essential public health services during catastrophic emergency events.
   Status:    Complete

F. **BARCS COOP**
   Owner:    BARCS
   Objective:  Maintain essential services of the BARCS animal shelter during a catastrophic emergency event.
   Status:    Complete

G. **Animal Control Training Manual and Operational Guide for Animal Health and Handling**
   Owner:    BCHD
   Objective:  Provides training and operational guidelines for Animal Enforcement Officers.
   Status:    Complete

| REVISION DATE: November 2013 | PAGE: | 16 - 10 |
|---|---|---|

    

| SECTION:  ESF 16 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Animal Protection | EMERGENCY OPERATIONS PLAN |

H. **BCHD Emergency Ops Handbook**
   Owner:     BCHD
   Objective: Provide an overview of and guide for health department emergency
   operations and procedures for BCHD staff.
   Status:     Complete

| REVISION DATE: November 2013 | PAGE:      16 -  11 |
|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order                                    CITY00004021



# CITY OF BALTIMORE

# CONTINUITY OF GOVERNMENT PLAN

# MAY 2013

**CONFIDENTIAL - Produced Pursuant to Protective Order**

# PRIVACY STATEMENT

This document is For Official Use Only.  Portions of this plan contain information that raises personal privacy or other concerns, and those portions may be exempt from mandatory disclosure under the Freedom of Information act (see 5 United States Code §552, 41 Code of Federal Regulations Part 105-60).  Some parts of this plan, if made public, could endanger the lives and privacy of Baltimore City employees and elected officials.

In addition, public disclosure of this plan would have a reasonable likelihood of threatening public safety by exposing potential vulnerabilities within the City of Baltimore; by compromising the security of essential equipment, services, and systems within the City of Baltimore; and by exposing the City of Baltimore's plans to deal with such vulnerabilities through various techniques and efforts in mitigation, preparedness, response and recovery.

For the reasons stated above, the Mayor's Office of Emergency Management (MOEM) and other Baltimore City Agencies are withholding this plan from full public disclosure.  MOEM will distribute copies of this plan on a need to know basis.  Refer any request for a copy of this plan to MOEM and the Baltimore City Law Department.

CONFIDENTIAL - Produced Pursuant to Protective Order                                   CITY00004023

BALTIMORE CITY CONTINUITY OF GOVERNMENT PLAN                    MAY 2013

# PROMULGATION

The Mayor's Office of Emergency Management's mission is to ensure the continued operations of the City of Baltimore and its government in the face of a wide variety of potential natural and man-made hazards as described in the National Response Framework's (NRF) all-hazards approach.

To accomplish this mission, the Mayor's Office of Emergency Management must ensure the City of Baltimore's operations are performed efficiently with minimal disruption, especially during emergencies and disasters.

In addition, it is the job of the Mayor's Office of Emergency Management to ensure that a legitimate constitutional form of government as mandated by the Baltimore City Charter continues, even in the face of an emergency that may necessitate the relocation of the seat of government and/or various parts or functions of any of the city's branches of government and related agencies.

The following document provides necessary planning and guidance to the Mayor's Office of Emergency Management, other critical city agencies, and elected officials in maintaining the execution of essential functions by a constitutionally legitimate government.

Upon activation of this plan, members of the Mayor's Office of Emergency Management COG Team will contact relevant/affected city agencies and officials and ensure a smooth and efficient reestablishment of operational capabilities.  This may require the relocation of officials and personnel to pre-designated alternate facilities.  The capability to perform essential functions for any agency or governing body should be reestablished within 12 hours from activation of this plan, and continue for up to 30 days, ending whenever normal operations can be resumed.

This plan was developed in accordance with guidance from the National Continuity Policy Implementation Plan, Continuity Guidance Circular (CGC 1), Continuity Guidance for on-Federal Entities (State, Territories, Tribal, and Local Government Jurisdictions and Private Sector Organizations); Continuity Guidance Circular 2 (CGC 2), Continuity guidance for Non-Federal Entities; and in accordance with the City of Baltimore Administrative Manual..

---

Robert Maloney
Deputy Chief of Emergency Management and
Public Safety
City of Baltimore

III

CONFIDENTIAL - Produced Pursuant to Protective Order                                    CITY00004024

# RECORD OF CHANGES

## Continuity of Government Plan

| Change Number | Description of Change | Change Entered By | Date Entered |
|---|---|---|---|
| 1 | LINE OF SUCCESSION ADDED | CONNOR SCOTT | 5/31/2013 |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

IV

BALTIMORE CITY CONTINUITY OF GOVERNMENT PLAN                    MAY 2013

# RECORD OF DISTRIBUTION

## Continuity of Government Plan

| Department | Receiving Official | Name and title | Date of Delivery |
|---|---|---|---|
| Mayor's Office | Robert Maloney | Deputy Chief of Emergency Management & Public Safety | 5/28/2013 |
| Mayor's Office of Emergency Management | Connor Scott | Deputy Director of Emergency Management | 5/28/2013 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

v

CONFIDENTIAL - Produced Pursuant to Protective Order

# TABLE OF CONTENTS

PRIVACY STATEMENT ...................................................................................................II
PROMULGATION .........................................................................................................III
RECORD OF CHANGES ................................................................................................IV
RECORD OF DISTRIBUTION ...........................................................................................V
TABLE OF CONTENTS ...................................................................................................VI
I.  OVERVIEW ............................................................................................................ 1
II. CONCEPT OF OPERATIONS ................................................................................. 4
   ORGANIZATION AND ASSIGNMENT OF RESPONSIBILITIES ............................................ 4
   ESSENTIAL FUNCTIONS ............................................................................................ 4
   LINE OF SUCCESSION .............................................................................................. 6
   CITY AGENCY RESPONSIBILITIES .............................................................................. 7
   DISASTER INTELLIGENCE NEEDS ............................................................................... 7
III. CRITICAL PROCEDURES AND RESPONSIBILITIES .............................................10
   DELEGATION AND AUTHORITY OF LIMITS ...................................................................10
   RELOCATION OF PERSONNEL AND FUNCTIONS ..........................................................10
   GO-KITS AND EMERGENCY EQUIPMENT ....................................................................10
   COMMUNICATIONS..................................................................................................11
   PAYROLL, BUDGETING, AND ACQUISITION OF RESOURCES..........................................19
IV. RELOCATION OF CITY GOVERNMENT .................................................................24
   RELOCATION OF CITY COUNCIL.................................................................................24
   RELOCATION OF THE MAYOR'S OFFICE.......................................................................24
V.  PLAN DEVELOPMENT AND MAINTENANCE.........................................................26
   PLAN DEVELOPMENT ...............................................................................................26
   MAINTENANCE ........................................................................................................26
   TRAINING................................................................................................................26

CONFIDENTIAL - Produced Pursuant to Protective Order                    CITY00004027

# CONTINUITY OF GOVERNMENT PLAN

## I.  OVERVIEW

### A.  Purpose

The purpose of the City of Baltimore's Continuity of Government Plan (COG) is to provide a framework for various elected officials and agencies – with assistance and coordination from the Mayor's Office of Emergency Management (MOEM) – to maintain essential functions and a constitutional government in the face of any hazard or incident which threatens the leadership or the essential functions of the city in any significant way.

This document establishes the Baltimore City COG plan with procedures to address four disruption scenarios:

- Relocation in *anticipation* of major event/hazard (e.g., in advance of a hurricane) that threatens the continuation of constitutionally legitimate government and its essential functions;

- Loss of Access to a Facility (e.g. in a fire);

- Loss of Services Due to a Reduction in Workforce (e.g. during a pandemic influenza outbreak); and

- Loss of Services Due to Equipment or System Failure (e.g. during an information technology (IT) systems failure or attack)

Given any one of these four scenarios, this plan details procedures to continue essential functions and constitutional government within recovery time objectives (RTO's) established by the COG Team.  Actions specific to various agencies and government bodies are also detailed in agency-specific Continuity of Operations (COOP) Plans contained in the annexes of this document. The City of Baltimore is committed to the safety and protection of its employees, operations, and facilities.  The operation of the City of Baltimore must be able to continue in the face of all threats and conditions.  While the severity and consequences of an emergency cannot be fully predicted, this plan provides the City and its leadership a framework that is designed to minimize potential impacts during an event.

### B.  Scope

This document applies to all personnel in the Mayor's Office of Emergency Management and all personnel and elected officials in the City of Baltimore who play a role in the execution of essential functions and services.  It applies to all individuals critically involved in efforts to restore essential functions and maintain constitutional government in the face of emergencies.

This plan follows the all hazards approach recommended by the US Federal Emergency Management Agency (FEMA) and thus applies to a wide array of hazards and events that could threaten the City, the execution of its essential functions, and constitutional government.

This plan does NOT apply to minor disruptions of City services including temporary disruptions in information technology or communications systems, or power outages and any other scenarios where essential functions can be readily restored in the primary facility.

1

This plan has been distributed to senior leadership in all applicable agencies and offices in the City of Baltimore.  The plan has been distributed to local emergency response and management agencies including the Mayor's Office of Emergency Management (MOEM); the Maryland Emergency Management Agency (MEMA) and its leadership; and any other emergency management planners and interested parties at the federal, state, and local level, as appropriate.

## C.  Situation

Baltimore City has a population of over 636,000 and a land area of 87 square miles which is predominately urban.  The City accommodates a multitude of different industries, businesses and communities.  Its seven square miles of deep water harbor is bound by 52 miles of shoreline and is located approximately seven nautical miles from the main stem of the Chesapeake Bay, nation's largest estuary.  Baltimore lies within two major drainage basins:  the Patapsco River and the Back River Basins.  The Patapsco's two main tributaries are the Gwynns Falls, which drains the northwest and western portions of the City, and the Jones Falls, which drains the upper northwest and central portions of the City.  The Herring Run drains the eastern part of the City, emptying into Back River in Baltimore County.

While the port City of Baltimore continues to maintain an important role in international trade, it also promotes recreational marina development and boating.  Throughout the City there are several interstates, railways, metro lines and approximately 14 major marine terminals, making it an important transportation corridor for the East coast.  A number of chemicals and hazardous materials are manufactured in and transported through the City.  The City is also home to a number of sporting arenas, world-class hospitals, colleges and universities, businesses and tourist destinations.

As with any major urban area, Baltimore City has a large vulnerable population.  There are more than 340 nursing homes and assisted living facilities, as well as a number of housing developments for the elderly, residents with disabilities or other special needs, and senior subsidized apartment buildings.  There is also a large population of citizens requiring regular dialysis treatment.  Over 110,000 citizens in Baltimore report having some type of disability.  Consideration also needs to be made for the thousands of people with low English proficiency and the large portion of the population that does not have access to their own vehicle.  Other vulnerable populations include those clients at the residential treatment centers, methadone clinics, and correctional facilities.  The Emergency Support Function-11: Evacuation Annex gives a more detailed breakdown of the vulnerable populations estimates.

For a more detailed hazard and vulnerability analysis, see the *All-Hazards Plan for Baltimore City: A Master Plan to Mitigate Natural Hazards*.  The Baltimore Police Department also maintains current information relating to hazards involved with critical infrastructure and terrorist threats.  The major hazards Baltimore City faces are generally categorized as follows:

1.   Natural hazards such as riverine and tidal flooding, hurricanes, winter storms and droughts.

2.   Infrastructure hazards such as transportation and hazardous materials accidents, water and sewer main breaks and contaminations, and power outages.

2

CONFIDENTIAL - Produced Pursuant to Protective Order

3. Acts of terrorism, both foreign and domestic.  In the past decade, the United States has become more aware and vigilant in combating and preventing terrorism, but the threat still exists.  Baltimore City has a number of potential terrorist targets due to its industrial and economic centers, as well as the large populations that gather for a wide range of sporting, cultural, entertainment, business and political events.

PLANNING ASSUMPTIONS

Given Baltimore's situation, there are a number of assumptions the Mayor's Office of Emergency Management and the City of Baltimore should make when planning for the continuation of constitutional government and essential functions in the face of any hazard or potential incident:

1. An emergency or disaster may occur at any time and with no warning, and may threaten government buildings and/or the essential functions of the city.

2. The severity of the incident and a combination of factors must be evaluated to determine the appropriate action.

3. The City's Hazard has an up to date Hazard Mitigation Plan (last updated in 2013) in accordance with the Mitigation Act of 2000

4. The City of Baltimore, in collaboration with other public and private agencies within the State, may enter into mutual aid agreements for reciprocal emergency aid and other assistance in the event of an occurrence or threat of an emergency that requires resources beyond the capability of the City of Baltimore and our private partners.

5. Assistance may be sought from the state and federal government if necessary.  It may come in the form of technical expertise, equipment, monetary aid, additional personnel, or any other resource the city may be lacking.

6. The City of Baltimore could be affected by either a threat or actual attack by a foreign government or terrorist group.  Considering the City of Baltimore's close proximity to our nation's capital, Washington, D.C., Baltimore is in unique position that requires even more planning and vigilance.

7. While the calculated initiation of nuclear war by any present nuclear power is considered unlikely, the release of radiological, chemical or biological materials could occur through human error, irrational act, or even by deliberate terrorist act.

8. A nuclear war would most likely be preceded by days or weeks of international crisis.  In such a period, the City of Baltimore would take action to preserve of life and property, maintain essential functions, and continue a constitutional government.

3

# II. CONCEPT OF OPERATIONS

## A. Strategies

Refer to the City of Baltimore Emergency Operations plan for full information.

The following sections will give a concept of the City of Baltimore's operations by explaining:
- How the City (and to a lesser extent, the Office of Emergency Management) is organized;
- The functions and capabilities of the city, and which are most essential and critical;
- The threats that may activate the City COG plan and in what scenario(s); and
- Given the concept of operations explained, how the City will approach continuity of government and continuity of operations in the face of an event, hazard, or disaster.

### ORGANIZATION AND ASSIGNMENT OF RESPONSIBILITIES

This COG plan is a plan for the City of Baltimore and its officials and personnel, but it also a plan that is specifically coordinated by the Mayor's Office of Emergency Management.  Thus, the key personnel for this plan is diverse and includes individuals such as continuity team members, officials within the line of succession, officials charged with the delegation of authority, the Director of the Mayor's Office of Emergency Management, the COG/COOP Coordinator, individuals in charge of the safety and security of those in the line of succession, etc.

The responsibilities of these individuals are explained in the sections which follow – Organization Flowchart / Hierarchy, Key Operations Staff, and Line of Succession – and their associated SOP's.

### ESSENTIAL FUNCTIONS

This COG plan and the COOP Plans annexed to it must ensure that the City can continue to provide effective leadership as well as key services to its citizens in the event of an emergency.

It order to do this, the COG plan's responsibilities are manifold.  In terms of leadership, the plan must ensure the Mayor, City Council, and Comptroller can continue in their essential leadership functions and roles during an incident or event that impacts City government.  This includes:

Mayor
- Conservator of the peace
- Provide financial oversight as Mayor, and as member of the Board of Estimates (BOE)
- Report on the state of the City as its leader
- Promote and protect economic development
- Approve or veto legislation from City Council
- Appointment of Mayoral staff necessary to discharge Mayor's duties
- Appoint of other municipal officers subject to City Council confirmation

Comptroller

4

BALTIMORE CITY CONTINUITY OF GOVERNMENT PLAN                     MAY 2013

- As member of the Board of Estimates (BOE), assist with financial management
- Member of the Board of Finance
- Supervision of Department of Audits and the City Auditors per city charter
- Oversee proper conduct, management, and operation of Department of Real Estate
- Obtain, with BOE approval, insurance as necessary for the city's proper operation

City Council President and City Council
- Pass all ordinance, not inconsistent with the City Charter, to give effect to all powers vested in the city
- Council President, as member of the Board of Estimates (BOE), helps manage finances
- Use standing and special committees to administer oaths and summon witnesses relevant to any city investigation

To maintain these essential leadership functions, the COG plan provides a framework, along with SOPs, on how to maintain, protect, and move (if necessary) the seat of government in the event of an incident or event that threatens constitutional government.

In addition to leadership functions, there are several important Emergency Support Functions (ESFs) that the City requires to maintain in the event of COG activation. How to provide for and execute these is explained in the City's Emergency Operations Plans (EOPs). How individual agencies continue operations and the provision of their applicable ESF's in the face of an event that threatens normal operations is described in individual agency COOP plans.

See the City's Emergency Operations Plan (EOP) for more details.

In general, in order for the city to maintain its essential functions, a number of resources are required.

The following table estimates these resource requirements. The table states:
- The number of essential personnel that would operate in an administrative and operational capacity;
- The total number of employees that would have to be relocated if there were damage to their primary worksites;
- The total number of vehicles the City would require to maintain essential functions; and
- The number of phones and computers needed to maintain the essential functions

5

BALTIMORE CITY CONTINUITY OF GOVERNMENT PLAN                    MAY 2013

Table #1

| City Agencies | Administrative Personnel | Operational Personnel | Cars | Vans and Pickups | Specialized vehicles | Phones | Computers |
|---|---|---|---|---|---|---|---|
| Mayor's Office | 10 | 0 | 0 | 0 | 0 | 5 | 5 |
| OEM | 0 | 4 | 4 | 0 | 0 | 21 | 20 |
| Fire Department | 18 | 1,600 | 85 | 5 | 95 | 80 | 15 |
| Police Department | 128 | 2,742 | 888 | 0 | 5 | 80 | 30 |
| Health Department | 58 | 1,062 | 0 | 0 | 0 | 15 | 20 |
| Department of Public Works | 44 | 812 | 34 | 25 | 100 | 20 | 20 |
| Department of Transportation | 15 | 236 | 42 | 15 | 54 | 6 | 11 |
| Housing | 20 | 600 | 15 | 10 | 0 | 35 | 10 |
| Recreation & Parks | 14 | 140 | 3 | 38 | 5 | 8 | 15 |
| MOIT | 75 | 5 | 1 | 0 | 0 | 5 | 25 |
| Law | 15 | 0 | 0 | 0 | 0 | 10 | 10 |
| Finance | 17 | 0 | 0 | 0 | 0 | 7 | 10 |
| Human Resource | 3 | 4 | 1 | 0 | 0 | 7 | 1 |
| Labor commissioner | 4 | 0 | 0 | 0 | 0 | 4 | 5 |
| CARE | 6 | 40 | 0 | 0 | 0 | 40 | 46 |
| Total | 427 | 7,245 | 1,073 | 93 | 259 | 343 | 243 |

LINE OF SUCCESSION

**Mayor/Mayor's Office**

Under the Baltimore City Charter, the line of succession for the chief executive officer of Baltimore City is as follows:

- **Mayor:** Article IV, § 2 of the Baltimore City Charter provides:  "In case of vacancy in the office of the Mayor by death, resignation, or permanent disqualification, the President of the City Council shall be Mayor for the remainder of the term from which the Mayor was elected."  The Charter also provides that "In case of, and during, sickness, temporary disqualification or necessary absence of the Mayor, the President of the City Council shall be ex officio Mayor of the City."

- **City Council President:**  Article III, § 4 of the Charter provides:  "If it becomes necessary for the President of the City Council to fill the unexpired term of the Mayor, or in case of the death, resignation, removal or other disqualification of the President, the City Council, by a majority vote of its members, shall elect a new president for the unexpired term.  The person

6

CONFIDENTIAL - Produced Pursuant to Protective Order                                    CITY00004033

so elected as President may, but need not, be, at the time of the election, a member of the City Council."

- **City Council members:**  Article III, § 5 of the Charter provides:  "If, by reason of any catastrophe, a majority of the members elected to the City Council are killed, or are sick, or incapacitated, missing, or otherwise unavailable, so that for a temporary or indefinite period there is not a quorum of the City Council available to permit that body to function, the Mayor, if the Mayor is available, or the Governor of Maryland or the other person acting in that capacity, if the Mayor is unavailable, is authorized to appoint for a temporary or indefinite period persons to fill the vacancies thus existing.  If possible, each of the appointees shall have the qualifications required of members of the City Council.  During their tenure, all such appointive members of the City Council shall possess and may exercise the powers and prerogatives of regularly elected members.  Each appointee shall continue to hold office during the incapacity or unavailability of the member whose position the appointee was appointed to fill, or until the position is filled pursuant to the regular election and qualification of a successor."

For day-to-day operations, a senior member of the Mayor's staff shall serve as Duty Officer and first emergency contact.  The Duty Officer shall rotate between the First Deputy Mayor, Deputy Mayor for Intergovernmental Affairs, and Chief of Staff.

## CITY AGENCY RESPONSIBILITIES

City Agencies are responsible for the following actions to ensure effective continuity of government.
- Develop, maintain, train personnel on, and exercise a Continuity of Operations Plan.
- Identify critical functions that support or affect the ability of the City government to remain functional.
- Identify critical functions that support or affect the ability of the agency to remain functional.
- Establish orders of succession and delegation of authority for the agency as a while and for each essential function.
- Identify continuity personnel for each essential function.
- Identify the vital records and equipment associated with each essential function.
- Identify and enter into Memoranda of Understanding (MOU) with alternate facilities if necessary.
- Establish a testing, training, exercise, and revision schedule for the continuity of operations plan.
- Provide a copy of the plan to the Mayor's Office of Emergency Management.


## DISASTER INTELLIGENCE NEEDS

During an incident or event that warrants the consideration of a COG plan activation, the Mayor's Office of Emergency Management (MOEM) will require the collection and dissemination of critical information.  While specific incidents may create additional or specialized reporting need/requirements, the following chart lists examples of the information that would be collected and reported regardless of incident type.

7

BALTIMORE CITY CONTINUITY OF GOVERNMENT PLAN                    MAY 2013

| Information Element | Specific Requirement | Responsible Element | Deliverables | When Needed |
|---|---|---|---|---|
| Personnel Accountability | Account for key elected officials<br><br>Account for continuity personnel;<br><br>Account for all contracted personnel | Human resources;<br><br>Continuity Coordinator, MOEM<br><br>Continuity Points of Contact (POCs), all agencies | Reports<br><br>Briefings<br><br>Status updates on officials' location and status | Hourly under first day of activation |
| Operational Status | Percentage of continuity personnel arrived and checked in at site<br><br>Ability of city / applicable agency to conduct essential functions | Continuity Manager<br><br>Division, Agency, or Office Representatives | Situation Briefings<br><br>Situation reports | No later than 6 hours after plan activation, then at regular intervals as needed |
| Hazard Information | Threat specific details<br><br>Threat's potential effect on City buildings and resources, continuity facilities, etc | Emergency Operations Center (EOC)<br><br>Incident Command Post / Response Coordination Center | Situation briefings<br><br>Situation reports | Two times a day at shift change |
| Communications Status | Communications Plan according to Incident Action Plan (IAP)<br><br>Current operational status of land-lines, cell phones, internet, | Director of Logistics, MOEM<br><br>MOIT<br><br>BCFD IT | Incident Action Plan (IAP)<br><br>Communications status report<br><br>Situation briefings | Initial report as soon as possible; future information given along with operational status |

8

CONFIDENTIAL - Produced Pursuant to Protective Order

| | 800 MHz radios, etc. | | | |
|---|---|---|---|---|
| Resource Availability | Account for resources in the field<br><br>Account for resources immediately available but not yet used or deployed | Director of Logistics, MOEM<br><br>Division, Agency, or Office Representatives | | No later than 6 hours after plan activation; then regular intervals as needed |
| Information on Applicable MOU / MAA's | Needs not met by City resources<br><br>Available / Applicable MAAs and MOUS | Director of Logistics, MOEM<br><br>Division, Agency, or Office Representatives<br><br>Applicable Planners, etc. | | First report within 24 hours of incident / plan activation; regular intervals as applicable after that |

9

CONFIDENTIAL - Produced Pursuant to Protective Order                                              CITY00004036

# III. CRITICAL PROCEDURES AND RESPONSIBILITIES

1. The Mayor's Security Cabinet serves to advise the Mayor on homeland security and related issues.  It may be convened at any time at the direction of the Mayor.

2. Members consist of Agency heads, as directed by the Mayor, and is chaired by the Deputy Mayor of Public Safety and Operations.


DELEGATION AND AUTHORITY OF LIMITS

During activation of the Continuity of Government Plan, the Mayor, the Mayor's Office, and the City Council all retain their standard levels of responsibility for the control and direction of Baltimore City.  This should not change during and incident or event.

Should the Mayor, City Council president or any other elected official become unavailable or incapacitated and unable to perform their duty in governing the City, the City will follow the directions laid out in Orders of Succession in the Emergency Operations Plan.  Otherwise, the primary responsibilities of the Mayor, Mayor's Office, and City Council should not be delegated to any other body or individual.

If there is an event that incapacitates the Mayor, the Mayor's Office and the City Council and prevents/preempts execution of the Orders of Succession, the power and responsibility to direct and govern the City of Baltimore would devolve back to the State of Maryland and the Governor.

The Director of the Mayor's Office of Emergency Management will maintain responsibility for coordinating operations during an incident or event.

RELOCATION OF PERSONNEL AND FUNCTIONS

In the event of COG activation, it may be necessary to relocate elected officials, certain groups of personnel, certain agencies, and/or certain functions of government.

If relocation of any of these is necessary, agencies should follow the relocation and alternate facility plans set forth in their individual COOP plans and alternate facility plans.  However, the Mayor and Director of MOEM may advise a change in such plans based on real-time disaster intelligence.  Such suggestions should be followed by agencies in the interest of maintaining continuity of operations, continuity of government, and the least damage possible given the circumstances around the event.  Disagreement with any suggestion should be constructively voiced so that an effective and efficient resolution can be come to.

The Mayor and the City Council will follow the relocation SOPs and alternate facilities plans contained within the COG unless otherwise advised by the Director of Emergency Management or his/her confirmed designee.

GO-KITS AND EMERGENCY EQUIPMENT

10

BALTIMORE CITY CONTINUITY OF GOVERNMENT PLAN                    MAY 2013

In the face of an incident or event that forces elected officials and other personnel to relocate to alternate facilities, it is important for these individuals to be prepared to survive and maintain themselves even given the worst circumstances.

The Mayor's Office of Emergency management has created "Go-Kits" for emergency management personnel as well as other critical continuity personnel and officials.

The Go-Kit backpacks come with various supplies that would help personnel sustain themselves in a variety of circumstances.  Personnel can also add other personnel effects to the kits, and MOEM suggests other items such as laptops, blackberries, agency identification, critical files/records, etc. be brought in or along with the standard Go-Kit in the event of an emergency.

The standard Go-Kits as provided by MOEM should include:

- Black Backpack or Wings of Life Backpack
- All Weather Poncho
- Thermal Blanket
- Hygiene Kit (Toothbrush, Comb, Soap, Shampoo)
- Signaling Mirror
- First Aid Kit (Aspirin, Ibuprofen, Antibiotic, Band Aids, Gauze, Antiseptic Wipes)
- Writing Pad and Pen
- Signaling Whistle
- Directional Compass
- Magnifying Glass
- Leather/Cloth Gloves
- Respirator Mask
- Red Emergency Flashing Light (mounted in Wings of Life Back Pack)
- Multifunction Tool (Knife, pliers, screwdriver, ruler, file, can opener, etc)
- Waterproof Document/Cash Bag
- 6 in 1 crank Flash light / radio (Life Gear Item# PSD6N1WX)
- Uvex Safety Eyewear
- Energizer LED Flashlight / Red Glowstick (large)
- Hand Sanitizer

### COMMUNICATIONS

MOEM, with assistance and expertise from the Mayor's Office of Information Technology (MOIT), has performed an analysis on communications systems the City uses in its primary buildings and alternate facilities.

MOEM and MOIT seek to maintain fully capable continuity communications that support the City of Baltimore's needs during any hazard or threat.  This includes basic communication functions as well as more advanced strategies pursued in the face of pandemic and other related emergencies, including social distancing operations such as telework/telecommuting and other virtual offices.

11

CONFIDENTIAL - Produced Pursuant to Protective Order                    CITY00004038

As with most essential functions, all necessary and required communications and IT capabilities are expected to be operational within 12 hours of COG/COOP plan activation.

The following sub-sections examine in detail the City of Baltimore's communication systems and technology.  In particular, the City uses voice, e-mail, Blackberry smart phones, and general internet access to communicate.  All of these communication types are supported by the City of Baltimore's Computer Network, as well as various private and public sector critical infrastructure.

## A.  Voice Communications

The City of Baltimore provides voice communications for its officials and personnel primarily through three modes: land lines, cellular network and limited Voice Over Internet Protocol (Voice Over IP, or VOIP) computer telephony.

These modes of communication have a number of needs, and lend themselves to a number of ways city government can maintain continued and effective communication.

In the event of email failure, refer to the Municipal Telephone Exchange (MTE) COOP plan for details on restoration of service.

## B.  E-Mail Communications

The City provides direct and indirect E-mail services to greater than 15,000 mailboxes.  A direct E-mail user would have an account on an MOIT or City E-mail server, while an indirect user may have an entry in the Global Address Book representing a link to the user's specific E-mail environment (e.g., BCPSS).  There are several significant components comprising the E-mail system including the E-mail host (e.g., Microsoft Exchange Server), the Internet, and the City network.

In the event of email failure, refer to the MOIT COOP plan for details on restoration of service.

## C.  Cell Phone Communications

The City of Baltimore provides Blackberry wireless E-mail/paging devices to approximately 250 key officials and personnel in municipal government.  While many of these units are cellular phones (smart phones) with the associated email, internet, and telephone capabilities, the following discussion will focus on the E-mail/paging capability.

Current Blackberries are provided primarily by Verizon.  A Baltimore City Blackberry's capabilities rely on the functionality of City's Blackberry Enterprise Server, Microsoft Exchange E-mail system, and the carrier's wireless network.

On the City side, there are numerous single points of failure within the Blackberry infrastructure, but under less than catastrophic conditions, the computers could be repaired or replaced in an effort to restore service.

If a large-scale event destroys the Blackberry and E-mail server environment, the E-mail portion of the Blackberry service would cease.  However, assuming the carrier remained in an operational state, the Blackberries could continue to serve in a PIN-to-PIN mode, which still

CONFIDENTIAL - Produced Pursuant to Protective Order

offers a viable electronic messaging capability.  MOIT maintains a "near-time" database of all current Blackberry users and their PIN's, and would distribute such a listing to all City agencies so the appropriate PIN's could be programmed into the hand-held devices.

For all other Blackberry services, the carrier must sustain its proprietary network and infrastructure including continuous power.  If there is a failure in the provider's service, Blackberry functionality outside of direct connect will cease.

There are several alternatives to Blackberry communications:  PC to PC E-mail or Instant Messaging, wireless voice communications or wireless text messaging.

In the event of email failure, refer to the MOIT COOP plan for details on restoration of service.

## D.  Internet Access

The City of Baltimore generally relies on internet access for several critical purposes:

- Bi-directional transmission of E-mail
- Other messaging and data transfer with non-City recipients
- Creation of direct sessions to City computing resources through the establishment of virtual private networks and other remote connections
- Information exchange through access to specific web sites and pages
- General support and connectivity for numerous other applications

Generally, the City relies a third party vendor to provide the Internet conduit between the City network infrastructure and the Internet at large.  Verizon currently serves as the primary Internet Service Provider (ISP) for the City of Baltimore.

However, recognizing that no one service provider is infallible, the City has established multiple options for backup ISP service which can be quickly accessed based on a logical or physical configuration change.  **Alternate ISP options include:**

- The Enoch Pratt Library
- The Baltimore City Housing Authority
- The Baltimore City Police Department
- The Baltimore City Public School System

In each of these cases, pre-existing live network connections are already established, ensuring cutover should be achievable within this and other plans' recovery time objective (RTO).

In a disaster, any working Internet connection (cable broadband, DSL, modem dial-up, etc.) could provide limited opportunities for internet access as well.  However, this would only offer spot solutions to a loss of internet access and not a comprehensive alternate ISP solution for the enterprise.

## E.  Computer Network

The City of Baltimore has constructed a robust, high-speed, significantly redundant computer network - largely on a fiber optic platform - which offers high availability computer data transport throughout the City.  While ease of access is generally assumed in the central business district

13

area, the City's sonnet ring architecture has facilitated high-bandwidth network connectivity to a large geographic portion of the City.

In addition to its own network, in some cases the City has purchased network capacity from third parties who typically sell/lease the service to the municipality based on bandwidth and a service level agreement.

Wireless access to the city network is becoming more available.  There is an increasing penetration of wireless networking technology in the City; however, the wireless portion of the network as implemented is typically integrated with wired resources as opposed to purely standalone.  Hence, most wireless access connectivity to the City network would not be a functional alternate if wireline connectivity to the network is interrupted.

In addition, the InterCounty Broadband Network (ICBN) is a current project that will eventually expand the network.  With a grant from the NTIA that was awarded to the central Maryland region, the City will run fiber optic cable to some facilities that previously didn't have a fiber connection.  The effort will expand the network and grant a redundant fiber connection to both Emergency Operations Centers.  Both locations currently have a single fiber connection.

F.  **800 MHz Radio System**

**Distribution of 800 MHz Radios**

Many city agencies utilize 800MHz radios for daily use.  The table below details current 800MHz radio distribution.

| CITY AGENCIES | 800 MHZ RADIOS |
|---|---|
| MAYOR'S OFFICE | 2 |
| OEM | 4 |
| FIRE DEPARTMENT | 960 |
| POLICE DEPARTMENT | 3,500 |
| HEALTH DEPARTMENT | 20 |
| DEPARTMENT OF PUBLIC WORKS | 453 |
| DEPARTMENT OF TRANSPORTATION | 311 |
| HOUSING | 49 |
| REC & PARK | 10 |
| TOTAL | 5,309 |

Although several agencies maintain individual sets of talk groups, all agencies can communicate with each other on Channel B10. Fire and Police (on the XTS3000 model radios only) can also communicate on Channel B11.  In an emergency in which voice, cell, and blackberry communications were lost, agency to agency communication, including communication amongst Cabinet heads, could be accommodated on the 800MHz system.

**800 MHz Radio System Failure and Redundancy**

14

There are essentially three different points of failure for the City's 800 MHz radio system, tower failure, system failure (Smartzone Controllers), and failure of the actual radio unit itself.

**Tower Failure**
The City's 800 MHz system normally operates on 9 individual tower sites located throughout the City.  Each of the nine tower sites, as well as the Emergency Communications Center and the Alternate Communications Center, normally operate off BGE's power supply.  Should that fail, the affected site's generator will start.  Each generator is on a refueling plan, and will be refueled as needed. If one or all should fail, then there are battery back-ups at each site that will operate the system for several hours until the generators or the BGE power supply is repaired.

Each tower site is rated to withstand sustained winds of 60 miles per hour.  It should be noted that the Harbor Court and Good Samaritan sites are attached directly to the buildings.  Therefore, the durability of the antennas is only as good as the durability of the structure itself.

**System Failure**
The "brain" of the 800 MHz system is located in the Abel Wolman municipal building at 200 N. Holliday Street.  This brain, known as the SmartZone controller, is important as it allows the 800 MHz system to share frequencies (which is more effective and efficient) rather than uniquely assigning frequencies to individuals or agencies.  It does this by distributing and managing frequencies as-needed according to an algorithm. This is known as trunking.

Normally, Baltimore's 800 MHz radio system operates under wide-area trunking.  Wide-area trunking is when each site broadcasts simultaneously, and the dispatchers are able to use their Centracom Gold Elite consoles.  These consoles allow for broadcasting over multiple channels (simulcasting) or for patching multiple talk groups together.

Electricity at this site is backed up by a generator, although the SmartZone controller itself is not backed up.  If the SmartZone controller were to go down, 800 MHz radios could still operate using the two most preferable options described in the next subsections.

**Smartzone Control Failure:**

**Site Trunking Solution**
If the SmartZone controller were to fail, talk channels could still be controlled, at somewhat lesser quality, at the tower sites themselves.  The radios could then still operate over limited range through the towers.  The user in the field would probably not be able to notice the failure.

**Fail-Soft Solution**
If site-trunking should fail at one, or all of the tower sites, radios could still operate using fail-soft, where each radio will default to a pair of send and receive frequencies, but still repeat off of the nearest tower site.

The user in the field will likely only hear those that are utilizing the same tower site as they are, and may not be able to communicate with the dispatcher.

15

If the system goes into fail-soft, the radio will transmit a low tone on an interval basis as an indicator. If a sudden incident destroys the Abel Wolman Building, the Prime Site for the radio system will be destroyed, and the radio system will not go into fail-soft.

**Complete System Failure**
The following are alternate methods of radio communication given a complete controller failure at the Abel Wolman site:

**Point to Point**
If the system is completely destroyed or other incapacitated, 800 MHz radios can still operate using point to point.  The radios used by the City, Motorola XTS 3000's and XTS 5000's, and the Spectra mobile radios installed in some vehicles have channel B16 set as a talk-around group.  This allows the radios to simply talk to each other over a limited range and bypass the tower sites for the 800 MHz radio system.  However, when considering point to point, it is important to keep in mind that the City does not provide the best environment for this type of communication.  The large number of structures in any urban area causes signal disruption, making point to point radio communication unreliable.

**Repeaters**
If the Abel Wolman controller went down, the Fire Department has the ability to use a standby repeater located on top of the Bank of America building at 10 Light Street.  Fire Dispatchers are able to utilize the repeater to broadcast emergencies to fire and medical units throughout the City.  However, it should be noted that those units may not be able to communicate back.

**Operation SWIFT Plan**
The Police Department has a system of locations/telephones that can be used to communicate with dispatchers in case of a complete 800 MHz failure.  They are as follows;

- Supervisor/Shift Commander:  410-396-2284, 2285
- City Wide:  410-396-2393
- Central District:  410-396-2306
- Southeastern District:  410-396-2387
- Eastern District:  410-396-2388
- Northeastern District:  410-637-8838
- Northern District:  410-637-8839
- Northwestern District:  410-396-2355
- Western District:  410-396-2354
- Southwestern District:  410-396-2307
- Southern District:  410-637-8840

The Police Department can also be reached through 410-396-2525, or 1-800-223-2525

**VHF Equipment**
The Fire Department maintains VHF equipment on both Air Cascade trucks for use in underground environments.  As this equipment operates on a lower spectrum, and

16

CONFIDENTIAL - Produced Pursuant to Protective Order

without a repeater, it is well suited for this type of operation.  Should the need for this equipment arise, it will provided by the Fire Department.

## Radio Failure

A primary point of failure for public safety agencies is the loss of battery power for individual portable radio units.  The City of Baltimore has the following methods in which to recharge the batteries on 800 MHz radios, and prevent radio failure, at least from a power standpoint:

## Standard Battery Chargers

Buildings that have electricity or are operating off of generator power would be able to recharge batteries using the City's desktop 800MHz recharging units.  This is generally how radio batteries are recharged on an everyday basis.

## Portable Battery Chargers

To maintain the ability to recharge batteries, in-vehicle chargers were installed in BPD post cars, supervisors' cars, and shift commanders' cars in each district, as well as many cars in the Public Housing Section and tactical.  If fuel becomes critical and the agency is no longer able to fuel generators at district station houses, or unable to refuel cars, then the conventional chargers that operate off of AC or DC power will not be able to recharge the radio batteries.  The Fire Department does not currently have chargers for 800 MHz radios in its apparatus but is in the process of exploring this option.

## Disposable Batteries

In an effort to keep a supply of batteries for the radios, the City has acquired 2,000 one-time use disposable primary Lithium batteries for the radios.  Batteries are distributed as follows:

- 600 will be kept by the Fire Department,
- 200 by the Department of Public Works, and
- 1200 will be stored by the Police Department.

The Police Department's 1200 batteries will be distributed and stored as follows:

- 100 in each district (900 total);
- 100 in Communications (will be used for dispatcher radios and Headquarters personnel not deployed to the districts); and
- 200 with the Homeland Security Division to be stored on the TARU Command Vehicle and the ESU trucks, and with QRT.

Each battery is sealed inside a plastic bag.  The batteries should be stored in a cool, dry location.  Each supervisor in the command should know the location where they are stored.  Each district should store the batteries in a standardized location, so that other members not assigned to the district may quickly locate them should the personnel assigned to the district be unable to retrieve them.  One such location would be the district's armory.

Each battery has a shelf life of 10 years.  When deployed, the manufacturer reports that they will last up to 30 hours under normal operating conditions.  As the battery cannot be

17

recharged, it should be used until exhausted, and not changed with each new radio user or shift.

It is the plan of the Communications Section to acquire more of these batteries each year, as funding permits, to keep a fresh supply on hand so that this supply does not expire at the same time.

**Radio Interoperability:**

**NPSPAC Channels**

Interoperability of radio equipment between different agencies or locales can be extremely important in emergency situations and in maintaining continuity of government.  The Central Maryland Area Radio Communications (CMARC) Oversight committee has put a regional interoperability radio system into place that allows effective communication between different agencies and between different municipalities and levels of government.

Fire and Police primarily use the five National Interoperability channels in this NPSPAC system.  Currently, most members of Fire, Police, and MOEM should be able to access these channels using XTS5000 radios or older radios that have been reprogrammed/re-flashed.  The talk groups are as follows:

| Talk Group | Police Channel | Fire Channel |
|------------|----------------|--------------|
| 8CALL | B11 | B11 |
| 8TAC1 | B12 | B12 |
| 8TAC2 | B13 | B13 |
| 8TAC3 | B14 | B14 |
| 8TAC4 | B15 | B15 |

The NPSPAC system is activated by using the 8CALL channel to reach the Maryland Emergency Management Agency (MEMA).  MEMA will then assign different agencies or incidents the TAC channels.  Additionally, the dispatchers through the Centracom Gold Elite consoles may also activate the TAC channel repeaters.

Once fully on line, any agency that utilizes the NPSPAC channels may communicate with each other.  These channels are also utilized by the agencies in the WASHCOG area around Washington, DC, and MESN on the Eastern Shore.  The current CMARC area is Baltimore City, Baltimore County, Harford County, Carroll County, Howard County and Anne Arundel County.

**Metro System**

The Police Department also uses the Metro system that allows radios to interoperate via a console patch.  Most of the new radios also have talk groups for Baltimore County, Howard County and Anne Arundel County.  This will allow for direct communication, or the ability to use their system should the Baltimore City system fail.  This system may also be extended to other jurisdictions in the event their system fails.

18

PAYROLL, BUDGETING, AND ACQUISITION OF RESOURCES

In any scenario where a disaster forces relocation of City officials, personnel, agencies, or essential functions and may close part or all of the City of Baltimore for a period of time, the government must continue key services.

Particularly, the city government would need to continue to procure and provide for its employees the supplies necessary for the City to maintain its essential functions.  This section of the COG plan explains the plan for the City to maintain continuity in the execution of its payroll and procurement of needed supplies including food, water, and lodging.

## A.  Payroll

**Normal Payroll Processing**
The Bureau of Accounting and Payroll Services (BAPS) is responsible for the processing of payments to approximately 15,000 employees and another 15,000 retirees on designated dates according to the predetermined payroll processing schedule.

During normal day-to-day operations, BAPS is dependent upon each individual agency for paper timesheets. To complete the payroll process, the results must be transmitted to the bank at least 2 days prior to each pay day. In addition, any changes to employee master record data, such as pay rates, deductions, etc., must be coordinated and scheduled prior to processing the payroll for each pay group.

**Disaster Payroll Processing**
In the wake of certain hazards or events, the ability of the BAPS to effectively pay employees and retirees will be dependent upon the status of a particular pay group's file maintenance and timesheet processing at the time of the disaster.

In the event that typical payroll operations are not possible, the next step would be to delay running the payroll until the next day.  In the wake of a incident that prevents normal payroll processing, BAPS would be to use a 'Vanilla' payroll based on the prior payroll period.  Direct deposit and positive pay to bank can take place once the Vanilla payroll is completed. Adjustments to pay can be made later once we've returned to normal operations.

For detailed information refer to the Bureau of Accounting and Payroll Service Continuity of Operations Plan annexed to this document.

## B.  Budgeting and Acquisitions Responsibility

The City of Baltimore budgets for and acquires those resources and capabilities essential to continuity operations.  A copy of the continuity budget can be obtained from MOEM.  Within its budget, the City of Baltimore budgets for continuity resources and capabilities and provides for the acquisition of those resources necessary for up to 30 days or until normal operations can be resumed.

As part of the budget process, MOEM, the City of Baltimore, and it agencies use risk management methodology to indentify, prioritize, and justify the allocation of budgetary resources.

CONFIDENTIAL - Produced Pursuant to Protective Order                                                    CITY00004046

MOEM and the City work together to integrate budgets with a long-term strategic vision and plan for the city, with goals and metrics being set on a continuing basis in this and other plans.

Please examine the specific agency COOP plans annexed here for a more detailed description of budgeting for each office.

**Procurement:**
It is the responsibility of the Bureau of Purchases to purchase, store, secure, inventory and distribute necessary emergency supplies as requested by City agencies and/or as otherwise specified by the Mayor or Director of Finance. The supplies will consist of various emergency supplies, foodstuffs, materials and equipment that are necessary during an incident or event that is a possible or declared emergency.

### Procurement of Emergency Supplies
Warehouse personnel or the person(s) designated by the City Purchasing Agent (or any person serving in that capacity) shall maintain distribution and inventory procedures for the receiving and distributing of emergency supplies.

The Bureau of Purchases maintains a primary and secondary list of vendors and suppliers that can be contacted for emergency services.

The Bureau of Purchases has contracts with vendors for essential goods and services.

### Procurement of Supplies for City-Wide Essential Functions
If required, the Bureau of Purchases shall provide emergency response personnel on a twenty-four (24) hour basis to the Emergency Operations Center.

The Bureau of Purchases has an undisclosed amount of procurement cards that can be used to purchase supplies needed for essential city functions.

For detailed information refer to the Bureau of Purchases Emergency Response Plan.

### Lodging for Essential Personnel
In the event of a major disaster, the City of Baltimore will provide shelter for essential personnel if needed in order to provide a safe place of rest for those who will be involved in maintaining City Government.

The Department of Finance will keep a current list of hotels in all four quadrants of the City which the City might use during a disaster. Shelters are a second means of providing a place of rest for Baltimore City essential employees. In the event that shelters or hotels cannot be provided, than the third option will be to house the employees in their worksites or the alternative work sites as noted in this, Baltimore City's Plan, or any of the individual agencies' Continuity of Operations Plans annexed to this plan.

### Food and Water for Essential Personnel
The Bureau of Purchases will make arrangements for the purchase of additional food supplies by the City for distribution on an as needed basis. The Bureau of Purchases will make advance arrangements with large food chains to obtain various types of food stuffs and supplies from stores or the warehouses of stores.

20

The Bureau of Purchase will provide food and water for all shelters and for essential employees.

**Fuel and Electricity:**
To maintain continuity of government and continuity of operations, fuel and electricity are two important resources that must be located, procured, and efficiently distributed.  They are also related in as much as generators which rely on fuel are a source of backup power for critical buildings.

**Electricity**
Electricity is an important part of the City of Baltimore's ability to continue to operate effectively in the face of any hazard or event.  Electricity powers lighting, air conditioning and heat, among other things that make offices workable regardless of circumstance such as temperature, weather, time of day, etc.  Most importantly, electricity powers computers and various communication systems which have become critical to government operations.

Baltimore City relies on Baltimore Gas and Electric (BGE) for its electricity.  BGE is a subsidiary of Constellation Energy, a Baltimore-based Fortune 500 energy company that is a major generator of electricity throughout the U.S. and Canada and a leading supplier of energy products and services to wholesale and retail electric and natural gas customers.

In the event power is lost during an incident or event, numerous city, state, federal, and private facilities in Baltimore have emergency generators.  For a list and analysis of those facilities that have generators, see the Baltimore City backup Power Survey.

Generators require fuel to run, and for information regarding Baltimore's fuel supply, capacity, and needs see the following sections on Emergency Fuel Supply.

While generators are anticipated to be able to power essential facilities for days at time given proper fuel supplies, the City of Baltimore will still rely heavily on the restoration of normal power supplies.

BGE, when restoring power, has set procedures in place that restore critical infrastructure and give them a priority above less critical infrastructure and private customers.  The order for restoration of service is:
1) Public Safety
2) Critical Infrastructure (911 Call Centers, Hospitals, Pumping Stations, etc.)
3) Jobs/tasks that will return the largest number of customers back online
4) Customers who have been out the longest period of time

The City of Baltimore has a strong partnership with BGE and expects to work smoothly with BGE to restore services to the city government and its citizens in a way that supports continuity of government and continuity of operations.

**Primary Fueling and Capacity:**
**Primary**
The Department of General Services will provide fuel at all of the City of Baltimore fueling stations during an emergency incident.  Each station is equipped with back-up

CONFIDENTIAL - Produced Pursuant to Protective Order                    CITY00004048

generation to maintain a continuous fuel source for the City of Baltimore's equipment and vehicles.

### Capacity and City Fuel Sites
The following table displays the City's fuel capacity at its main fueling locations.  The following figures list the maximum capacities for each tank.

| FUEL SITE TANK CAPACITIES | | |
|---|---|---|
| | Unleaded | Diesel |
| Midtown (incl 2K Prem Unl) | 19,800 | 9,000 |
| Central | 9,000 | 9,000 |
| Northwest | 9,000 | 9,000 |
| Northeast | 5,400 | 5,400 |
| Patapsco | 7,200 | 7,200 |
| Back River | 7,200 | 7,200 |
| Solid Waste-Northwest | | 3,600 |
| Solid Waste-Western | | 3,600 |
| Druid Hill Pk | 3,600 | |
| Education | 6,750 | 6,750 |
| All Mobiles | 250 | 16,300 |
| TOTAL CAPACITY | 68,200 | 77,050 |

### Emergency Fuel Supply
Maintaining fuel supply during and incident, event, or disaster is critical for the City of Baltimore.  Fuel plays a critical part in maintaining Continuity of Operation and Continuity of Government.

The City's fleet of vehicles contains many emergency response vehicles (Fire Trucks and Engines, Ambulances, Police Cars, SWAT Vehicles, USAR vehicles, etc.) that rely on fuel.  These vehicles are critical to effective response to emergencies and maintaining the provision of several Emergency Support Functions (ESF's).  Maintaining continuity requires maintaining the fueling of these critical vehicles.

Many of the plans to provide backup electricity/power to critical city buildings rely on the use of generators that run on diesel fuel.  Maintaining fuel levels is also a matter of maintaining the largest source of backup-power for the city.

The following section outlines current fuel stockpiles, fuel needs, and the means which the City has to continue the provision of fuel during an emergency.

### Wright Express Card
Several City agencies have Wright Express cards.  Wright Express cards are credit cards that work at most gas stations in the United States.  When fuel is allocated in times of crisis, there is a hierarchy of which facilities are able to receive fuel.  Branded stations such as Amoco, BP and Shell receive their fuel allotments fuel first, followed by unnamed fuel stations.

Baltimore City and other municipal vendors are low priorities on the list.  General Services' Fleet Management division has a plan to station General Services employees at fuel stations with fuel cards in an emergency if needed.   Baltimore City employees

22

will be able to refuel their vehicles and fleet employees will dispense the gas and pay for it with the Wright Express Cards.

**Contract Options**
The City currently has a contract for fuel with one vendor, ISObunkers, but and has negotiated a second call contract with Carroll Independent Fuel in the event ISObunkers cannot deliver.

**Other Legal Options for Backup Fuel Acquisition and Distribution**
Depending on the magnitude of an emergency, the Mayor may apply the City's general police powers to requisition fuel from area gas stations.

The State of Maryland provides the Governor with powers to enact a "State Standby Petroleum Fuel Set-Aside Program."  Under this program, the State requires fuel vendors to set aside an allotment of fuel for the State and Local Governments.

Municipalities have the ability to ask the State Government for an allotment of fuel to conduct emergency services, including law enforcement, firefighting, emergency medical services, emergency road services, sanitation services and bus transportation for pupils to and from school.

**CONFIDENTIAL - Produced Pursuant to Protective Order**                    **CITY00004050**

BALTIMORE CITY CONTINUITY OF GOVERNMENT PLAN                    MAY 2013

# IV. RELOCATION OF CITY GOVERNMENT

Relocation of the Mayor and/or City Council will generally occur under one of two scenarios:
- Receipt of a confirmed threat that gives the Executive Protection Unit reason to believe relocation is necessary for the safety of the Mayor and/or City Council members.
- An event or incident has occurred or is expected to occur that will render typical workspace, equipment, facilities, etc. inoperable or unsafe.

Continuity operations will be fully functional within 12 hours of notification of an incident or event necessitating relocation.

Refer to the COG Standard Operating Procedures for full details.

RELOCATION OF CITY COUNCIL

| TASK | RECOVERY TIME OBJECTIVEs |
|---|---|
| Confirm City Council must relocate. | .5 hours |
| Confirm safety of City Council members. | .5 hours |
| Notify appropriate parties that relocation will take place. | 1 hour |
| Prepare alternate site. | 2 hours |
| Relocate City Council members to alternate facility. | 4 hours |
| Begin continuity operations. | 5 hours |
| Issue press release (if deemed necessary, pertinent) | 5 Hours |
| Demobilize alternate site. | N/A |

**City Council Relocation site:**
Back Water Waste Water Treatment
8201 EAstern Avenue
Baltimore, Maryland 21224

RELOCATION OF THE MAYOR'S OFFICE

| TASK | RECOVERY TIME OBJECTIVEs |
|---|---|
| Confirm Mayor's Office must relocate. | .5 hours |
| Confirm safety of Mayor's Office staff. | .5 hours |
| Notify appropriate parties that relocation will take place. | 2 hours |
| Prepare alternate site. | 2 hours |
| Relocate Mayor's Office members to alternate facility. | 4 hours |
| Begin continuity operations. | 5 hours |
| Issue press release (if deemed necessary, pertinent) | 5 Hours |
| Demobilize alternate site. | N/A |

24

BALTIMORE CITY CONTINUITY OF GOVERNMENT PLAN                              MAY 2013

**Mayor's Office Relocation site:**
Department of Recreation and Parks
3001 East Drive
Baltimore, Maryland 21217

CONFIDENTIAL - Produced Pursuant to Protective Order                              CITY00004052

# V.   PLAN DEVELOPMENT AND MAINTENANCE

PLAN DEVELOPMENT

1. The Mayor is responsible for approving and promulgating this plan.

2. The primary responsibility for the development, coordination, implementation, and revision of the City of Baltimore Continuity of Government Plan is MOEM in conjunction with the HSPC.

MAINTENANCE

1. The COG Plan and its annexes will undergo a review annually and a complete revision with the transition to a new Mayor or as needed based upon lessons learned from actual incidents and emergencies as well as from exercises.

2. Revision and/or changes to the COG Plan will be made as necessary by MOEM and the HSPC.  It is expected that responsible officials in local agencies or organizations affected by this Plan will suggest or recommend changes at any time and provide information periodically as to changes of personnel and available resources.

3. The Director of the MOEM will ensure that an annual review of this plan is conducted by officials involved. The Director or his/her designee will assist in all review and revision efforts.

TRAINING

1. At the request of the Director of MOEM, in conjunction with the HSPC, this plan may be tested through exercise to ensure readiness of all agencies covered by this Plan. Updates will be made based on any deficiencies identified by the exercise.

CONFIDENTIAL - Produced Pursuant to Protective Order                                        CITY00004053

| SECTION: H-04 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Civil Disorder | EMERGENCY OPERATIONS PLAN |

## Hazard Annex

### *Civil Disorder*

**Lead Agency:**         Baltimore City Police Department (BPD)

**Core Agency:**         Baltimore City Fire Department (BCFD)
Baltimore City Public Schools (BCPS)
Department of Law (DOL)
Department of Public Works (DPW)
Department of Transportation (DOT)
Mayor's Office (MO)
Mayor's Office of Emergency Management (MOEM)

**Support Organizations:**   Baltimore City Health Department (BCHD)
Baltimore Gas & Electric (BGE)
Department of Finance (DOF)
Maryland National Guard
Maryland Emergency Management Agency (MEMA)
Mayor's Office of Information Technology (MOIT)
Mayor's Office of Neighborhoods (MON)



| REVISION DATE: DECEMBER, 2014 | PAGE:   H-04-1 |
|---|---|

DRAFT

CONFIDENTIAL - Produced Pursuant to Protective Order                                                    CITY00004054

| SECTION: H-04 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Civil Disorder | EMERGENCY OPERATIONS PLAN |

## 1. HAZARD OVERVIEW

### 1.1. Purpose

This plan defines objectives, establishes strategies, and assigns resources and responsibilities for a coordinated response and recovery for a civil disturbance event. It is designed to establish a framework for a coordinated response between agencies, neighboring jurisdictions, and State and Federal organizations.

### 1.2. Situation

The City of Baltimore has experienced protests throughout its history, with activities peaking during the Civil Rights Era of the 1960s. Historically, these protests were led by student groups from Morgan State University and Coppin State University. These protests were largely peaceful and included sit-ins at segregated businesses. However, violent riots did erupt following the assassination of Dr. Martin Luther King, Jr. in April or 1968. The 1968 riots caused six deaths and 700 injuries. Over 1,000 small businesses were damaged or destroyed by looting or fire. Property damage was assessed at $12 million. Law enforcement made 5,800 arrests in the five days of rioting and required assistance from the Maryland State Police, Maryland National Guard, and the U.S. Army. More recent protests in Baltimore include the Occupy movement in the fall and winter of 2011. Occupy Baltimore focused on the downtown area and included demonstrations that blocked traffic, occupation of foreclosed homes, and camping by the Inner Harbor in downtown Baltimore. Currently a small group of protesters gathers weekly to demonstrate against police brutality at City Hall and police headquarters.

### 1.3. Assumptions

The First Amendment to the Constitution guarantees citizens the right to free speech. Civil disorder can be peaceful, such as protests. However, these protests can escalate, leading to rioting, looting, and violence. This plan is based on a scenario where a large, non-violent protest becomes unruly. Protest organizers can apply for permits and notify BPD of scheduled activities. When notice is available, planning for civil disorder should take place and resources should be staged ahead of any scheduled activity.

### 1.4. Scope

This plan identifies key tasks to be performed in order to prepare for, respond to, and recover from civil disorder incidents including riots, large-scale protests, and looting. It describes strategies and planning considerations for these tasks and assigns responsibility for their performance to different agencies. This plan does not establish operational tactics or standard operating procedures; it supplements and ties together several supporting documents, plan, and agency-specific procedures. This plan is a Hazard Annex to the Emergency Operations Plan (EOP) and is to be used in conjunction with the EOP, particularly Emergency Support Functions (ESF) 11 (Public Information and Warning) and 13 (Law Enforcement).

## 2. CONCEPT OF OPERATIONS

### 2.1. General

| REVISION DATE: DECEMBER, 2014 | PAGE: | H-04-2 |
|---|---|---|

DRAFT

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00004055

| SECTION: H-04 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Civil Disorder | EMERGENCY OPERATIONS PLAN |

BPD will be the lead agency when civil disorder activity warrants a multi-agency, coordinated response. However, Unified Command (UC) may be implemented by BCFD if life safety becomes a concern. A multi-agency coordination center (MACC) such as the EOC may be staffed and activated based on the scope of the event. Non-tasked agencies may be called upon to provide assistance where needed. When emergency operations are in effect, they will be assigned the highest priority and take precedence over all other daily operations. Emergency operations will be established at a level that is determined by available intelligence. A Joint Information Center may be established if conditions warrant.

## 2.2. Incident Goals and Priorities

The overall goals for the City during any civil disorder activity are limiting injuries, minimizing disruption, and dispersing the crowd.
Priorities for incidents include the following:
A. Protection and preservation of life
B. Protection of citizens' First Amendment rights to peacefully assemble and exercise the freedom of speech
C. Neutralize immediate threats to the safety of the general public and responding officers
D. Incident stabilization and isolation
E. Recording of actions taken
F. Dispersal of the crowd when necessary and the restoration of order
G. Crime scene preservation and collection of evidence
H. Restoration of unrestricted access to public services, roadways, and businesses

## 2.3. Incident Management

A. Every crowd control incident will require the identification of an Incident Commander (IC) who will have absolute authority at the scene of the incident. The first officer on the scene will become the initial IC, and he/she will continue in that role until officially relieved. All tenets of the Incident Command System (ICS) will be followed throughout the incident.
B. An Incident Action Plan (IAP) will be established based on the Incident Priorities listed above and containing general objectives that reflect the IC's strategy for controlling/dispersing the crowd. It may be basic in nature, can be passed down to subordinates by way of direct verbal instructions, and includes the establishment of a Staging Area. The IC can and should revise their IAP based on the evolving situation. Any element of an existing IAP that proves ineffective in serving the IC's strategic goals should be altered or discarded as necessary.
C. Staging area(s) should be utilized under the direct control of a permanent rank supervisor to serve as an assembly area for additional personnel and resources. It must have adequate space for police, fire, and utility vehicles, as well as areas in which specialized units such as SWAT may prepare for deployment.

## 3. ROLES AND RESPONSIBILITIES

### 3.1 Level I Agencies

**BPD (Lead Agency)**

| REVISION DATE: DECEMBER, 2014 | PAGE: | H-04-3 |
|---|---|---|

DRAFT

CONFIDENTIAL - Produced Pursuant to Protective Order
CITY00004056

| SECTION: H-04 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Civil Disorder | EMERGENCY OPERATIONS PLAN |

A.  Plan for, prepare, and coordinate law enforcement activities conducted in Baltimore City in anticipation of and during incidents of civil disorder;
B.  Establish incident command on scene for civil disorder incidents;
C.  Establish unified command as needed for complex, evolving scenes;
D.  Obtain and share intelligence on planned civil disorder events and the evolution of ongoing activities;
E.  Activate the Watch Center in support of City activities;
F.  Establish and maintain communications for responding personnel;
G.  Deploy mobile command unit to incident command post (ICP) as needed;
H.  Track personnel and resources throughout incident;
I.  Maintain agency plans, equipment, and training to perform necessary tasks during civil disorder events.

**BCFD (Core Agency)**
A.  Provide fire suppression, decontamination, and EMS as needed in support of responders and participants in civil disorder incidents;
B.  Implement OST3 plan as needed for mass casualty incidents;
C.  Assist with situational awareness on BCFD activity that may impact or may be impacted by civil disorder.

**BCHD**
A.  Implement OST3 plan as needed for mass casualty incidents;

**BCPS (Core Agency)**
A.  Provide law enforcement personnel to assist BPD as needed;
B.  Assist with situational awareness on BCPS activity that may impact or may be impacted by civil disorder.

**DOL (Core Agency)**
A.  Provide BPD with policy guidance to ensure adherence with Federal, State, and Local laws and regulations.

**DPW (Core Agency)**
A.  Provide barrier devices to control crowds and traffic;
B.  Ensure water supply for decontamination operations and fire suppression activity;
C.  Provide logistic support with fuel, light towers, generators, and other resources as needed;
D.  Facilitate street cleaning and debris removal as needed during recovery.

**DOT (Core Agency)**
A.  Provide barrier devices to protect and control crowds and traffic;
B.  Establish and distribute traffic management plans for incoming responders and resources;
C.  Assist with traffic management around and through areas where civil disorder activities are taking place;
D.  Assist with public messaging using variable message boards.

**MO (Core Agency)**

| REVISION DATE: DECEMBER, 2014 | PAGE: H-04-4 |
|---|---|

DRAFT

CONFIDENTIAL - Produced Pursuant to Protective Order
CITY00004057

| SECTION:  H-04 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Civil Disorder | EMERGENCY OPERATIONS PLAN |

    A.  Set policy for Citywide preparedness, response, and recovery related to civil disorder;
    B.  Provide strategic direction to BPD during civil disorder events;
    C.  Declare local emergency as needed with consultation from the emergency manager and police commissioner;
    D.  Request state declaration of emergency as needed with consultation from the emergency manager and police commissioner;;
    E.  Assist with public messaging as needed.

**MOEM (Core Agency)**
    A.  Activate and operate EOC as necessary to support incident;
    B.  Support IC as liaison officer on-scene;
    C.  Facilitate local emergency declaration as needed;
    D.  Request state emergency declaration as needed;
    E.  Procure additional resources as needed in accordance with ESF-7, including State and Federal resources;
    F.  Assist BPD and other agencies with planning, training, and exercises as needed to build capabilities needed to address civil disorder.

**MOIT**
    A.  Maintain communications, GIS, and network capabilities to support incident;
    B.  Assist with public information and warning in accordance with ESF-11.

**MON**
    A.  Assist with public information and warning in accordance with ESF-11.

**3.2  Level II Agencies**

**BGE**
    A.  Maintain integrity of electrical and gas infrastructure;
    B.  Shut-off electrical power as needed to areas directed by BPD.

**DOF**
    A.  Assist agencies with cost tracking throughout duration of incident;
    B.  Assist with emergency contracts as needed.

**3.3  Level III Agencies**

**MEMA**
    A.  Assist with access to regional, State, and Federal resources as requested;
    B.  Facilitate state emergency declaration when requested;
    C.  Assign liaison officer to Baltimore City as needed to coordinate;
    D.  Assist with statewide situational awareness.

**Maryland National Guard**
    A.  Provide support to BPD and other law enforcement partners during a declared State of Emergency;
    B.  Provide 50-person Initial Reaction Force within 8 hours of request;
    C.  Provide 250 National Guard Reaction Force within 24 hours of request;

| REVISION DATE: DECEMBER, 2014 | PAGE: | H-04-5 |
|---|---|---|

**DRAFT**

| SECTION: H-04 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Civil Disorder | EMERGENCY OPERATIONS PLAN |

D. Provide advisor at EOC or at ICP before emergency declaration or full deployment;
E. Provide supplemental communications capability with the Joint Incident Site Communications Capability (JISCC) and the Civil Support Team (CST);
F. Support decontamination activities with the CST;
G. Provide armed support personnel if requested;
H. Provide nourishment at staging locations.

All law enforcement agencies in the Baltimore region are capable of providing personnel support to BPD.

4. **PLAN DEVELOPMENT AND MAINTENANCE**

   4.1 **Awareness, Training, and Exercises**

   A. Participating agencies shall ensure that personnel responsible for implementing portions of this plan are familiar with the plan and with their duties.
   B. BPD and responsible agencies shall conduct regular training and drills to maintain and improve capabilities that support execution of this plan.

   4.2 **Document Review and Revision**
   A. Maintenance for this ESF is the responsibility of the BPD Analytical Intelligence Section, in conjunction MOEM.
   B. BPD will develop and maintain procedures for performance in accordance with the responsibilities assigned.
   C. This ESF should be reviewed at least annually.

   4.3 **Authority**
   A. Baltimore City Charter, Art. II § 27 (2013)
   B. Baltimore City Charter, Art. IV § 4 (2013)
   C. Baltimore City Code, Art. 19 (2013)

   4.4 **Supporting Documents**

   A. **BPD General Order 37-77**
      Owner:      BPD
      Objective:  Set policy concerning free speech and the interruption thereof in accordance with Federal, State, and Local laws.
      Status:     Complete (June 1977)

   B. **BPD General Order J-16**
      Owner:      BPD
      Objective:  Set policy concerning video recording of police activity.
      Status:     Complete (April 2014)

   C. **BPD SOP for Response to Crowd Control Incidents**
      Owner:      BPD
      Objective:  Provide framework around which an incident commander during a crowd control incident can create and implement an incident action plan.

| REVISION DATE: DECEMBER, 2014 | PAGE: | H-04-6 |
|---|---|---|

DRAFT

CONFIDENTIAL - Produced Pursuant to Protective Order

| SECTION: H-04 | CITY OF BALTIMORE |
|---|---|
| SUBJECT: Civil Disorder | EMERGENCY OPERATIONS PLAN |

Status:          Complete (March 2012)

**D. Response Guide for Critical Incidents**
Owner:          BPD
Objective:      Standardize tactics, techniques, and procedures used by BPD in
                response to critical incidents.
Status:          Complete (August, 2013)

**E. Mobile Field Force Lesson Plan**
Owner:          BPD
Objective:      In-service training for police officer mobile field unit.
Status:          Complete (March, 2012)

**F. Off-Site Triage, Treatment, and Transport Plan (OST3C)**
Owner:          BCFD and BCHD
                Objective:      Provide interagency procedures for providing
                patient triage, treatment, and transport in a mass casualty incident
Status:          Complete (November 2013)



| REVISION DATE: DECEMBER, 2014 | PAGE:   H-04-7 |
|---|---|

CONFIDENTIAL - Produced Pursuant to Protective Order                                        CITY00004060

# EXHIBIT 62

## BALTIMORE REGION EMERGENCY ASSISTANCE COMPACT

### ARTICLE 1.
### PURPOSE

(A)  (1)   The purpose of this compact is to provide for mutual assistance between the jurisdictions entering into this compact in managing a state of emergency as defined in Maryland Annotated Code Article 16A, Section3(d).  The emergency support function shall include, but not be limited to fire, law enforcement, emergency medical services, transportation, communications, public works, and engineering, building inspection, planning and information assistance, mass care, resource support, health and medical services, and search and rescue or other local agency equipment and personnel as requested and provided.

(2)   This compact recognizes and does not intend to supersede present and future mutual aid agreements among party jurisdictions.

(3)   This compact does not limit a party jurisdiction's ability to enter into mutual aid agreements in the future.

(4)   This compact also shall provide for mutual cooperation in emergency-related exercises, testing, or other training activities using equipment or personnel simulating performance of any aspect of the giving and receiving of aid by party jurisdictions during emergencies.

### ARTICLE 2.
### REQUESTS FOR ASSISTANCE

(B)  (1)   The senior elected official of each jurisdiction shall designate an authorized representative.  The authorized representative of a party jurisdiction may request assistance of another party jurisdiction by contacting the authorized representative of that jurisdiction.

(2)   The provisions of this compact shall apply only to requests for assistance made by and to authorized representatives.

(3)   Requests may be verbal or in writing.

(4)   If verbal, the request shall be confirmed in writing at the earliest possible date, but no later than 10 calendar days following the verbal request.

(5)   Written requests shall provide the following information:

(I)   A description of the emergency support function for which assistance is needed;

1

*D. ur*

(II)   The amount and type of personnel, equipment, materials, and supplies needed and a reasonable estimate of the length of time they will be needed; and

(III)   The specific place and time for staging of the assisting party's response and a point of contact at that location.

(6)   There shall be frequent consultations between the Maryland Emergency Management Agency and appropriate representatives of the party jurisdictions with free exchange of information and plans generally relating to emergency capabilities.

(7)   A senior elected official or an authorized representative will advise the Maryland Emergency Management Agency of verbal requests and provide copies of written requests.

## ARTICLE 3.
## LIMITATIONS

(C)   (1)   Any jurisdiction which is a party to this compact and that receives a request for assistance shall take such actions as are necessary to provide requested resources.

(2)   Any jurisdiction may withhold resources to the extent necessary to provide reasonable protection to its own jurisdiction.

(3)   Each party jurisdiction shall afford to the emergency responders of any party jurisdiction operating within the requesting jurisdiction under the terms and conditions of this compact, the same powers, duties, rights, and privileges as are afforded those of the jurisdiction in which they are performing emergency services.

(4)   Emergency responders will continue under the command and control of their regular leaders, but the organizational units will come under the operational control of the emergency services authorities of the requesting jurisdiction.

(5)   Emergency responders shall have the same powers, duties, rights, and privileges as personnel of the requesting jurisdiction correspondent to performing the same function.

(6)   (I)   The provisions of this article shall only take effect:

1.   Subsequent to a local declaration of a state of emergency by the requesting jurisdiction; or

2.   Upon commencement of exercises, testing, or training for mutual aid.

(II)   The provisions of this article shall continue as long as:

2

D 49

1. The exercises, testing, or training for the mutual aid are in progress;

2. The state of emergency or the disaster remains in effect; or

3. Loaned resources remain in the requesting jurisdiction during the required time period.

### ARTICLE 4.
### LIABILITY

(D) (1)   Each of the parties hereto agrees to waive any and all claims against the other party which may arise out of its activities, including travel, outside its respective jurisdiction under this Agreement.  Also. each of the parties hereto requesting the service of another party hereto shall defend, indemnify and save harmless such other responding party from all claims by third parties for property damage or personal injury which may arise out of the activities, including travel, of the parties during such service outside of their respective jurisdictions; provided, however, that a requesting party need not indemnify the party providing assistance if:

    (I)   The party providing assistance does not cooperate in defending against claims made by third parties, or

    (II)   The third-party claims arise out of malicious acts of the party providing assistance.

(2)   The agreement to indemnify shall in no way be construed to constitute a waiver of any common law or statutory immunity or limited liability which may be claimed by the requesting party or the responding party or which either might enjoy, and the requesting party shall be able to raise all defenses available to or which might be raised by the responding party.

### ARTICLE 5.
### SUPPLEMENTARY AGREEMENTS

(E) (1)   Nothing in this compact shall:

    (I)   Preclude any jurisdiction from entering into supplementary agreements with another jurisdiction; or

    (II)   Affect any other agreements between jurisdictions.

(2)   Supplementary agreements may include, but are not limited to:

    (I)   Provisions for evacuation and reception of injured and other persons; and

3

CONFIDENTIAL - Produced Pursuant to Protective Order

(II)    The exchange of medical, fire, police, public utility, reconnaissance, welfare, transportation, and communications personnel, equipment, and supplies.

## ARTICLE 6.
## REIMBURSEMENT

(F)    (1)    Each party jurisdiction shall provide for the payment of workers' compensation and death benefits to injured members of the emergency responders of its own jurisdiction.

(2)    The requesting jurisdiction will reimburse the responding jurisdiction for all reasonable and necessary expenses incurred by the responding jurisdiction except that any responding jurisdiction may:

(I)    Elect to assume in whole or in part such loss, damage, expense, or other cost;

(II)    Loan equipment or donate services to the requesting jurisdiction without charge or cost; or

(III)    Agree to any other allocation of expenses between the responding and requesting jurisdiction they may deem as appropriate.

(3)    Records of expenses are required in sufficient detail to satisfy auditing requirements of the requesting jurisdiction as soon as possible following the termination of the assistance provided.

## ARTICLE 7.
## IMPLEMENTATION

(G)    (1)    Party jurisdictions are encouraged to consult frequently with each other and with the Maryland Emergency Management Agency and to exchange information and plans relating to emergency management.

(2)    This regional compact shall become effective with its signing by the chief elected executives and the president of the Carroll County Commissioners and subsequent approval by appropriate local legislative bodies, as may be necessary.

(3)    Any party jurisdiction may withdraw from this compact by enacting a repeal of the same but no such withdrawal shall take effect until 30 days after the senior elected official of the withdrawing jurisdiction has given notice in writing of such withdrawal to the senior elected officials of all party jurisdictions.

(4)    Withdrawal from the compact shall not relieve the withdrawing jurisdiction from obligations assumed under Article 4 or Article 6 of this compact prior to the effective date of withdrawal.

4

P.49

CONFIDENTIAL - Produced Pursuant to Protective Order                    CITY00025842

(5)    Authenticated copies of this compact and of such supplementary agreements as may be entered into shall at the time of their approval be retained by each party jurisdiction and with the Maryland Emergency Management Agency.

## ARTICLE 8.
## VALIDITY

(H)    (1)    This compact shall be construed to effectuate the purposes stated in Article I hereof.

(2)    If any part or provision of this compact or the application thereof to any person or circumstance is held invalid for any reason in a court of competent jurisdiction, the invalidity does not affect other provisions or any other application of this compact which can be given effect without the invalid provision or application, and for this purpose the provisions of this compact are declared severable.

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00025843

This Compact was approved and executed by the Baltimore Metropolitan Council's Board of Directors on October 15, 2002.

The Honorable James N. Robey
Howard County Executive
Chair, Baltimore Metropolitan Council

The Honorable Janet S. Owens
Anne Arundel County Executive
Vice Chair, Baltimore Metropolitan Council

The Honorable Martin J. O'Malley
Mayor, City of Baltimore

The Honorable C. A. Dutch Ruppersberger
Baltimore County Executive

The Honorable Julia W. Gouge
President, Board of Carroll County Commissioners

The Honorable James W. Harkins
Harford County Executive

6

P. 51

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00025844

CARROLL COUNTY

_____
Attest

_____
The Honorable Julia W. Gouge
President, Board of Carroll County Commissioners

Approved as to form and legal sufficiency:

Name _____
Title _____

HARFORD COUNTY

_____
Attest

_____
The Honorable James M. Harkins
Harford County Executive

Approved as to form and legal sufficiency:

Name _RobERT S. MACARD_
Title _COUNTY ATTORNEY_

HOWARD COUNTY

_____
Attest

_____
The Honorable James N. Robey
Howard County Executive

Approved as to form and legal sufficiency:

Name _____
Title _____

H:\WPDATA\Agreements\PkG\addendumtoCompact.wpd

-4-

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00025845

# EXHIBIT 63

Emergency Management Assistance Compact (EMAC)
Interstate Mutual Aid Request For Assistance
Form REQ-A, 2011



865-REQA-3773-1-3

### SECTION III TO BE COMPLETED BY THE REQUESTING STATE

| | | | |
|---|---|---|---|
| Date | 04/29/2015 | | |
| Event | BaCi Demonstrations 25 Apr 15 | | |
| Mission Description: | 500 Mobile Field Force Personnel with helmets, shields, batons & gas masks. Responding personnel expected to operate on 12 hour shifts. Duty length is for 72 hours with option for renewal at end of period. | | |
| Req. State Tracking #: | 427-205526751 | Assisting State Tracking #: | 865-RR-3770 |

The EMAC Authorized Signature below certifies that information contained herein accurately
represents to the best of their knowledge, the resource request at this time

| | | | |
|---|---|---|---|
| Name of EMAC Authorized Representative | *Connor Scott* | | |
| Signature of EMAC Authorized Representative | *[signature]* | Date | 4/29/15 |

CONFIDENTIAL - Produced Pursuant to Protective Order

Emergency Management Assistance Compact (EMAC)
Interstate Mutual Aid Request For Assistance
Form REQ-A, 2011



665-REQA-3773-1-2

## SECTION II TO BE COMPLETED BY THE ASSISTING STATE

| Assisting State: | PA | State TN #: | 665-RR 3773 |
|---|---|---|---|
| Assisting Agency: | Pennsylvania State Police | State EM TN #: | |

### Offer Description

| Mission Start Date: | 5/1/2015 | Arrival Date: | 4/29/2015 |
|---|---|---|---|
| Departure Date: | 5/3/2015 | Mission End Date: | 5/4/2015 |
| # Mission Days | 4 | | |
| Mission Type | State | Type / Status | Law Enforcement -State PoliceSelect Status: |
| Mission Description | 240 Enlisted personnel from the Pennsylvania State Police to support law enforcement operations in Baltimore City, Maryland.  Approximately 120 members will deploy each 12 hour shift, totaling approximately 240 members per 24-hour period.  First shift start on 05/01/2015 at 0700 hours; 2nd shift start on 05/01/2015 at 1900 hours. The anticipated period of deployment is 3 days until 05/04/2015.  NOTE: PSP MEMBERS MUST BE DEPLOYED AS AN ENTIRE UNIT, NOT SUBDIVIDED INTO SMALLER UNITS.  PSP will operate with Command and Support personnel  Field support members will be in a modified BDU uniform with riot gear/PPE/shields/long guns and portable radios. | | |
| Resource Description | Complement Totals = 2 Majors; 8 Captains; 6 Lieutenants; 16 Sergeants; 43 Corporals, 197 Troopers.  Additionally 1 Sergeant; 2 Corporals; 2 Troopers and 4 Civilians as support staff.  Numbers provided are a general estimate of overall PSP complement for each 24-hour period.  2 members per marked vehicle. | | |
| NIMS Type: | | | |
| # Requested: | 500 | # Type: | Personnel |

### In-State Resource Point of Contact

| First Name | John | Last Name | Yunk |
|---|---|---|---|
| Phone 1: | 717-585-2187 | Phone 2: | |
| Email 1: | jyunk@pa.gov | Email 2: | |

### Assisting State REQ-A Contact

| First Name: | Jonathan | Last Name | Anschutz |
|---|---|---|---|
| Phone 1: | 717-651-2138 | Phone 2: | |
| Email 1: | jonschutz@pa.gov | Email 2: | slogistics@pa.gov |

### Total Mission Estimated Costs

| Travel: | $98,750.00 | | |
|---|---|---|---|
| Personnel: | $441,420.48 | | |
| Equipment: | $0.00 | | |

CONFIDENTIAL - Produced Pursuant to Protective Order

| Commodities: | $0.00 | | |
|---|---|---|---|
| Other: | $53,000.00 | | |
| EST. TOTAL COST: | $593,170.48 | | |

## Travel

| Personal Vehicle Costs: | $0.00 | Rental Vehicle Costs: | $0.00 | Gvt. Vehicle Costs: | $0.00 |
|---|---|---|---|---|---|
| Air Travel Costs: | $0.00 | Meals & Tips (Receipt): | $0.00 | Meals & Tips (Per Diem): | $39,090.00 |
| Lodging: | $60,780.00 | Parking Fees: | $0.00 | Shipment & Transportation: | $0.00 |
| Identify any transportation requirements: | | 2 members per hotel room | | | |

## Personnel Assigned to Mission

| Total: | 363 | |
|---|---|---|

The EMAC Authorized Signature below certifies that information contained herein accurately represents to the best of their knowledge, the resource request at this time

| Name of EMAC Authorized Representative | Richard Flinn, Jr. |
|---|---|
| Signature of EMAC Authorized Representative | _(signature)_  Date 7/29/15 |

## Personnel Costs

| ID | Name / Phone / Email | Reg. Salary Hourly Rate | Range Benefit Hourly Rate | Reg. Hours Worked Per Day | OT Salary Hourly Rate | OT Range Benefit Hourly Rate | OT Hours Worked Per Day | # Days | Total Daily Cost | Total Mission Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| 7130 7 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7130 8 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7130 5 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7130 4 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7130 3 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7130 2 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7130 1 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7130 0 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7129 9 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |

9

CONFIDENTIAL - Produced Pursuant to Protective Order

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 7129 8 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7129 7 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7129 6 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7129 5 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7129 4 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7129 3 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7129 2 | PSP Trooper 717-346 5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7129 1 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7128 0 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7128 9 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7128 8 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7128 7 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7128 6 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7128 5 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7128 4 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7128 3 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7128 2 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7128 1 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7128 0 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7127 9 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7127 8 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7127 7 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |

CONFIDENTIAL - Produced Pursuant to Protective Order

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 7127 6 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7127 5 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7127 4 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7127 3 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7127 2 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7127 1 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7127 0 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7126 9 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7126 8 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7126 7 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7126 6 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7126 5 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7126 4 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7126 3 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7126 2 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7126 1 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7126 0 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7125 9 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7125 8 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7125 7 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7125 6 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7125 5 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |

CONFIDENTIAL - Produced Pursuant to Protective Order

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 7125 4 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7125 3 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7125 2 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7125 1 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7125 0 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7124 9 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7124 8 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7124 7 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7124 6 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7124 5 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7124 4 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7124 3 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7124 2 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7124 1 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7124 0 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7123 9 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7123 8 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7123 7 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7123 6 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7123 5 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7123 4 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7123 3 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |

CITY00005002

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 7123 2 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7123 1 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7123 0 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7122 9 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7122 8 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7122 7 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7122 6 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7122 5 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7122 4 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7122 3 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7122 2 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7122 1 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7122 0 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7121 9 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7121 8 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7121 7 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7121 6 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7121 5 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7121 4 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7121 3 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7121 2 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7121 1 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |

CITY00005003

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 7121 0 0 | PSP Trooper 717-346-5512 | $0.00 | $0.00 | 0 | $58.67 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7120 9 0 | PSP Trooper 717-346-5512 | $0.00 | $0.00 | 0 | $58.67 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7120 8 0 | PSP Trooper 717-346-5512 | $0.00 | $0.00 | 0 | $58.67 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7120 7 0 | PSP Trooper 717-346-5512 | $0.00 | $0.00 | 0 | $58.67 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7120 6 0 | PSP Trooper 717-346-5512 | $0.00 | $0.00 | 0 | $58.67 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7120 5 0 | PSP Trooper 717-346-5512 | $0.00 | $0.00 | 0 | $58.67 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7120 4 0 | PSP Trooper 717-346-5512 | $0.00 | $0.00 | 0 | $58.67 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7120 3 0 | PSP Trooper 717-346-5512 | $0.00 | $0.00 | 0 | $58.67 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7120 2 0 | PSP Trooper 717-346-5512 | $0.00 | $0.00 | 0 | $58.67 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7120 1 0 | PSP Trooper 717-346-5512 | $0.00 | $0.00 | 0 | $58.67 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7120 0 0 | PSP Trooper 717-346-5512 | $0.00 | $0.00 | 0 | $58.67 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7119 9 0 | PSP Trooper 717-346-5512 | $0.00 | $0.00 | 0 | $58.67 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7119 8 0 | PSP Trooper 717-346-5512 | $0.00 | $0.00 | 0 | $58.67 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7119 7 0 | PSP Trooper 717-346-5512 | $0.00 | $0.00 | 3 | $58.67 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7119 6 0 | PSP Trooper 717-346-5512 | $0.00 | $0.00 | 0 | $58.67 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7119 5 0 | PSP Trooper 717-346-5512 | $0.00 | $0.00 | 0 | $58.67 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7119 4 0 | PSP Trooper 717-346-5512 | $0.00 | $0.00 | 0 | $58.67 | $22.33 | 6 | | $482.40 | $1,447.20 |
| 7119 3 0 | PSP Trooper 717-346-5512 | $0.00 | $0.00 | 0 | $58.67 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7119 2 0 | PSP Trooper 717-346-5512 | $0.00 | $0.00 | 0 | $58.67 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7119 1 0 | PSP Trooper 717-346-5512 | $0.00 | $0.00 | 0 | $58.67 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7119 0 0 | PSP Trooper 717-346-5512 | $0.00 | $0.00 | 0 | $58.67 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7118 9 0 | PSP Trooper 717-346-5512 | $0.00 | $0.00 | 0 | $58.67 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 7118 8 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7118 7 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7118 6 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7118 5 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7118 4 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7118 3 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7118 2 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7118 1 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7118 0 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7117 9 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7117 8 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7117 7 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7117 6 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7117 5 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7117 4 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7117 3 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7117 2 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7117 1 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7117 0 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 5 | 3 | $482.40 | $1,447.20 |
| 7116 9 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7116 8 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7116 7 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |

CITY00005005

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 7116 0 | PSP Trooper 717-346-5512 0 | | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7116 5 | PSP Trooper 717-346-5512 0 | | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7116 4 | PSP Trooper 717-346-5512 0 | | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7116 3 | PSP Trooper 717-346-5512 0 | | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7116 2 | PSP Trooper 717-346-5512 0 | | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7116 1 | PSP Trooper 717-346-5512 0 | | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7116 0 | PSP Trooper 717-346-5512 0 | | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7115 9 | PSP Trooper 717-346-5512 0 | | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7115 8 | PSP Trooper 717-346-5512 0 | | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7115 7 | PSP Trooper 717-346-5512 0 | | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7115 6 | PSP Trooper 717-346-5512 0 | | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7115 5 | PSP Trooper 717-346-5512 0 | | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7115 4 | PSP Trooper 717-346-5512 0 | | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7115 3 | PSP Trooper 717-346-5512 0 | | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7115 2 | PSP Trooper 717-346-5512 0 | | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7115 1 | PSP Trooper 717-346-5512 0 | | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7115 0 | PSP Trooper 717-346-5512 0 | | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7114 9 | PSP Trooper 717-346-5512 0 | | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7114 8 | PSP Trooper 717-346-5512 0 | | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7114 7 | PSP Trooper 717-346-5512 0 | | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7114 6 | PSP Trooper 717-346-5512 0 | | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7114 5 | PSP Trooper 717-346-5512 0 | | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |

CONFIDENTIAL - Produced Pursuant to Protective Order

| 7112 4 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7114 3 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7130 8 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7130 9 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7131 0 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7131 1 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7131 2 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7131 3 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7131 4 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7131 5 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7131 6 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7131 7 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7131 8 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7131 9 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7132 0 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7132 1 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7132 2 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7132 3 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7132 4 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7132 5 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7132 6 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7132 7 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |

CITY00005007

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 7132 8 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7132 9 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7133 0 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7133 1 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7133 2 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7133 3 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7133 4 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7133 5 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7133 6 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7133 7 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7133 8 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7133 9 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7134 0 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7134 1 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7134 2 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7134 3 | PSP Trooper 717-346-5512 0 | $0.00 | $0.00 | 0 | $58.07 | $22.33 | 6 | 3 | $482.40 | $1,447.20 |
| 7134 4 | PSP Corporal 717-346-5512 0 | $0.00 | $0.00 | 0 | $68.46 | $26.33 | 6 | 3 | $568.74 | $1,706.22 |
| 7134 5 | PSP Corporal 717-346-5512 0 | $0.00 | $0.00 | 0 | $68.46 | $26.33 | 6 | 3 | $568.74 | $1,706.22 |
| 7134 6 | PSP Corporal 717-346-5512 0 | $0.00 | $0.00 | 0 | $68.46 | $26.33 | 6 | 3 | $568.74 | $1,706.22 |
| 7134 7 | PSP Corporal 717-346-5512 0 | $0.00 | $0.00 | 0 | $68.46 | $26.33 | 6 | 3 | $568.74 | $1,706.22 |
| 7134 8 | PSP Corporal 717-346-5512 0 | $0.00 | $0.00 | 0 | $68.46 | $26.33 | 6 | 3 | $568.74 | $1,706.22 |
| 7134 9 | PSP Corporal 717-346-5512 0 | $0.00 | $0.00 | 0 | $68.46 | $26.33 | 6 | 3 | $568.74 | $1,706.22 |

CITY00005008

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 7135 0 | PSP Corporal 717-346-5512 | $0.00 | $0.00 | 0 | $68.46 | $26.33 | 6 | 3 | $568.74 | $1,706.22 |
| 7135 1 | PSP Corporal 717-346-5512 | $0.00 | $0.00 | 0 | $68.46 | $26.33 | 6 | 3 | $568.74 | $1,706.22 |
| 7135 2 | PSP Corporal 717-346-5512 | $0.00 | $0.00 | 0 | $68.46 | $26.33 | 6 | 3 | $568.74 | $1,706.22 |
| 7135 3 | PSP Corporal 717-346-5512 | $0.00 | $0.00 | 0 | $68.46 | $26.33 | 6 | 3 | $568.74 | $1,706.22 |
| 7135 4 | PSP Corporal 717-346-5512 | $0.00 | $0.00 | 0 | $68.46 | $26.33 | 6 | 3 | $568.74 | $1,706.22 |
| 7135 5 | PSP Corporal 717-346-5512 | $0.00 | $0.00 | 0 | $68.46 | $26.33 | 6 | 3 | $568.74 | $1,706.22 |
| 7135 6 | PSP Corporal 717-346-5512 | $0.00 | $0.00 | 0 | $68.46 | $26.33 | 6 | 3 | $568.74 | $1,706.22 |
| 7135 7 | PSP Corporal 717-346-5512 | $0.00 | $0.00 | 0 | $68.46 | $26.33 | 6 | 3 | $568.74 | $1,706.22 |
| 7135 8 | PSP Corporal 717-346-5512 | $0.00 | $0.00 | 0 | $68.46 | $26.33 | 6 | 3 | $568.74 | $1,706.22 |
| 7135 9 | PSP Corporal 717-346-5512 | $0.00 | $0.00 | 0 | $68.46 | $26.33 | 6 | 3 | $568.74 | $1,706.22 |
| 7136 0 | PSP Corporal 717-346-5512 | $0.00 | $0.00 | 0 | $68.46 | $26.33 | 6 | 3 | $568.74 | $1,706.22 |
| 7136 1 | PSP Corporal 717-346-5512 | $0.00 | $0.00 | 0 | $68.46 | $26.33 | 6 | 3 | $568.74 | $1,706.22 |
| 7136 2 | PSP Corporal 717-346-5512 | $0.00 | $0.00 | 0 | $68.46 | $26.33 | 6 | 3 | $568.74 | $1,706.22 |
| 7136 3 | PSP Corporal 717-346-5512 | $0.00 | $0.00 | 0 | $68.46 | $26.33 | 6 | 3 | $568.74 | $1,706.22 |
| 7136 4 | PSP Corporal 717-346-5512 | $0.00 | $0.00 | 0 | $68.46 | $26.33 | 6 | 3 | $568.74 | $1,706.22 |
| 7136 5 | PSP Corporal 717-346-5512 | $0.00 | $0.00 | 0 | $68.46 | $26.33 | 6 | 3 | $568.74 | $1,706.22 |
| 7136 6 | PSP Corporal 717-346-5512 | $0.00 | $0.00 | 0 | $68.46 | $26.33 | 6 | 3 | $568.74 | $1,706.22 |
| 7136 7 | PSP Corporal 717-346-5512 | $0.00 | $0.00 | 0 | $68.46 | $26.33 | 6 | 3 | $568.74 | $1,706.22 |
| 7136 8 | PSP Corporal 717-346-5512 | $0.00 | $0.00 | 0 | $68.46 | $26.33 | 6 | 3 | $568.74 | $1,706.22 |
| 7136 9 | PSP Corporal 717-346-5512 | $0.00 | $0.00 | 0 | $68.46 | $26.33 | 6 | 3 | $568.74 | $1,706.22 |
| 7137 0 | PSP Corporal 717-346-5512 | $0.00 | $0.00 | 0 | $68.46 | $26.33 | 6 | 3 | $568.74 | $1,706.22 |
| 7137 1 | PSP Corporal 717-346-5512 | $0.00 | $0.00 | 0 | $68.46 | $26.33 | 6 | 3 | $568.74 | $1,706.22 |

CONFIDENTIAL - Produced Pursuant to Protective Order

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 7159 4 | PSP Sergeant 717-346-5512 G | | $0.00 | $0.00 | 0 | $75.74 | $29.12 | 6 | 3 | $629.16 | $1,887.48 |
| 7139 5 | PSP Sergeant 717-346-5512 G | | $0.00 | $0.00 | 0 | $75.74 | $29.12 | 6 | 3 | $629.16 | $1,887.48 |
| 7139 6 | PSP Sergeant 717-346-5512 G | | $0.00 | $0.00 | 0 | $75.74 | $29.12 | 6 | 3 | $629.16 | $1,887.48 |
| 7139 7 | PSP Sergeant 717-346-5512 G | | $0.00 | $0.00 | 0 | $75.74 | $29.12 | 6 | 3 | $629.16 | $1,887.48 |
| 7139 8 | PSP Sergeant 717-346-5512 G | | $0.00 | $0.00 | 0 | $75.74 | $29.12 | 6 | 3 | $629.16 | $1,887.48 |
| 7135 9 | PSP Sergeant 717-346-5512 G | | $0.00 | $0.00 | 0 | $75.74 | $29.12 | 6 | 3 | $629.16 | $1,887.48 |
| 7140 0 | PSP Sergeant 717-346-5512 G | | $0.00 | $0.00 | 0 | $75.74 | $29.12 | 6 | 3 | $629.16 | $1,887.48 |
| 7140 1 | PSP Sergeant 717-346-5512 G | | $0.00 | $0.00 | 0 | $75.74 | $29.12 | 6 | 3 | $629.16 | $1,887.48 |
| 7140 2 | PSP Sergeant 717-346-5512 G | | $0.00 | $0.00 | 0 | $75.74 | $29.12 | 6 | 3 | $629.16 | $1,887.48 |
| 7140 3 | PSP Sergeant 717-346-5512 G | | $0.00 | $0.00 | 0 | $75.74 | $29.12 | 6 | 3 | $629.16 | $1,887.48 |
| 7140 4 | PSP Sergeant 717-346-5512 G | | $0.00 | $0.00 | 0 | $75.74 | $29.12 | 6 | 3 | $629.16 | $1,887.48 |
| 7140 5 | PSP Sergeant 717-346-5512 G | | $0.00 | $0.00 | 0 | $75.74 | $29.12 | 6 | 3 | $629.16 | $1,887.48 |
| 7140 6 | PSP Sergeant 717-346-5512 G | | $0.00 | $0.00 | 0 | $75.74 | $29.12 | 6 | 3 | $629.16 | $1,887.48 |
| 7140 7 | PSP Sergeant 717-346-5512 G | | $0.00 | $0.00 | 0 | $75.74 | $29.12 | 6 | 3 | $629.16 | $1,887.48 |
| 7140 8 | PSP Sergeant 717-346-5512 G | | $0.00 | $0.00 | 0 | $75.74 | $29.12 | 6 | 3 | $629.16 | $1,887.48 |
| 7140 9 | PSP Sergeant 717-346-5512 G | | $0.00 | $0.00 | 0 | $75.74 | $29.12 | 6 | 3 | $629.16 | $1,887.48 |
| 7141 0 | PSP Sergeant 717-346-5512 G | | $0.00 | $0.00 | 0 | $75.74 | $29.12 | 6 | 3 | $629.16 | $1,887.48 |
| 7141 1 | PSP Sergeant 717-346-5512 G | | $0.00 | $0.00 | 0 | $75.74 | $29.12 | 6 | 3 | $629.16 | $1,887.48 |
| 7141 2 | PSP Sergeant 717-346-5512 G | | $0.00 | $0.00 | 0 | $75.74 | $29.12 | 6 | 3 | $629.16 | $1,887.48 |
| 7141 3 | PSP Lieutenant 717-346-5512 G | | $0.00 | $0.00 | 0 | $83.66 | $32.17 | 6 | 3 | $694.98 | $2,084.94 |
| 7141 4 | PSP Lieutenant 717-346-5512 G | | $0.00 | $0.00 | 0 | $83.66 | $32.17 | 6 | 3 | $694.98 | $2,084.94 |
| 7141 5 | PSP Lieutenant 717-346-5512 G | | $0.00 | $0.00 | 0 | $83.66 | $32.17 | 6 | 3 | $694.98 | $2,084.94 |

CITY00005010

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 71372 | PSP Corporal 717-346-5512 0 | | $0.00 | $0.00 | 0 | $68.46 | $26.33 | 6 | 3 | $568.74 | $1,706.22 |
| 71373 | PSP Corporal 717-346-5512 0 | | $0.00 | $0.00 | 0 | $68.46 | $26.33 | 6 | 3 | $568.74 | $1,706.22 |
| 71374 | PSP Corporal 717-346-5512 0 | | $0.00 | $0.00 | 0 | $68.46 | $26.33 | 6 | 3 | $568.74 | $1,706.22 |
| 71375 | PSP Corporal 717-346-5512 0 | | $0.00 | $0.00 | 0 | $68.46 | $26.33 | 6 | 3 | $568.74 | $1,706.22 |
| 71376 | PSP Corporal 717-346-5512 0 | | $0.00 | $0.00 | 0 | $68.46 | $26.33 | 6 | 3 | $568.74 | $1,706.22 |
| 71377 | PSP Corporal 717-346-5512 0 | | $0.00 | $0.00 | 0 | $68.46 | $26.33 | 6 | 3 | $568.74 | $1,706.22 |
| 71378 | PSP Corporal 717-346-5512 0 | | $0.00 | $0.00 | 0 | $68.46 | $26.33 | 6 | 3 | $568.74 | $1,706.22 |
| 71379 | PSP Corporal 717-346-5512 0 | | $0.00 | $0.00 | 0 | $68.46 | $26.33 | 6 | 3 | $568.74 | $1,706.22 |
| 71380 | PSP Corporal 717-346-5512 0 | | $0.00 | $0.00 | 0 | $68.46 | $26.33 | 6 | 3 | $568.74 | $1,706.22 |
| 71381 | PSP Corporal 717-346-5512 0 | | $0.00 | $0.00 | 0 | $68.46 | $26.33 | 6 | 3 | $568.74 | $1,706.22 |
| 71382 | PSP Corporal 717-346-5512 0 | | $0.00 | $0.00 | 0 | $68.46 | $26.33 | 6 | 3 | $568.74 | $1,706.22 |
| 71383 | PSP Corporal 717-346-5512 0 | | $0.00 | $0.00 | 0 | $68.46 | $26.33 | 6 | 3 | $568.74 | $1,706.22 |
| 71384 | PSP Corporal 717-346-5512 0 | | $0.00 | $0.00 | 0 | $68.46 | $26.33 | 6 | 3 | $568.74 | $1,706.22 |
| 71385 | PSP Corporal 717-346-5512 0 | | $0.00 | $0.00 | 0 | $68.46 | $26.33 | 6 | 3 | $568.74 | $1,706.22 |
| 71386 | PSP Corporal 717-346-5512 0 | | $0.00 | $0.00 | 0 | $68.46 | $26.33 | 6 | 3 | $568.74 | $1,706.22 |
| 71387 | PSP Corporal 717-346-5512 0 | | $0.00 | $0.00 | 0 | $68.46 | $26.33 | 6 | 3 | $568.74 | $1,706.22 |
| 71388 | PSP Corporal 717-346-5512 0 | | $0.00 | $0.00 | 0 | $68.46 | $26.33 | 6 | 3 | $568.74 | $1,706.22 |
| 71389 | PSP Corporal 717-346-5512 0 | | $0.00 | $0.00 | 0 | $68.46 | $26.33 | 6 | 3 | $568.74 | $1,706.22 |
| 71390 | PSP Corporal 717-346-5512 0 | | $0.00 | $0.00 | 0 | $68.46 | $26.33 | 6 | 3 | $568.74 | $1,706.22 |
| 71391 | PSP Corporal 717-346-5512 0 | | $0.00 | $0.00 | 0 | $68.46 | $26.33 | 6 | 3 | $568.74 | $1,706.22 |
| 71392 | PSP Corporal 717-346-5512 0 | | $0.00 | $0.00 | 0 | $68.46 | $26.33 | 6 | 3 | $568.74 | $1,706.22 |
| 71393 | PSP Corporal 717-346-5512 0 | | $0.00 | $0.00 | 0 | $68.46 | $26.33 | 6 | 3 | $568.74 | $1,706.22 |

CONFIDENTIAL - Produced Pursuant to Protective Order

| 7141 6 | PSP Lieutenant 717-346-5512 8 | $0.00 | $0.00 | 0 | $93.60 | $32.17 | 8 | 3 | $694.95 | $2,084.84 |
| 7141 7 | PSP Lieutenant 717-346-5512 8 | $0.00 | $0.00 | 0 | $83.60 | $32.17 | 8 | 3 | $694.98 | $2,084.84 |
| 7141 8 | PSP Lieutenant 717-346-5512 8 | $0.00 | $0.00 | 0 | $83.60 | $32.17 | 8 | 3 | $694.98 | $2,084.84 |
| 7141 9 | PSP Captain 717-346-5512 8 | $0.00 | $0.00 | 0 | $93.63 | $36.01 | 8 | 3 | $777.84 | $2,333.52 |
| 7142 0 | PSP Captain 717-346-5512 8 | $0.00 | $0.00 | 0 | $93.63 | $36.01 | 8 | 3 | $777.84 | $2,333.52 |
| 7142 1 | PSP Captain 717-346-5512 8 | $0.00 | $0.00 | 0 | $93.63 | $36.01 | 8 | 3 | $777.84 | $2,333.52 |
| 7142 2 | PSP Captain 717-346-5512 8 | $0.00 | $0.00 | 0 | $93.63 | $36.01 | 8 | 3 | $777.84 | $2,333.52 |
| 7142 3 | PSP Captain 717-346-5512 8 | $0.00 | $0.00 | 0 | $93.63 | $36.01 | 8 | 3 | $777.84 | $2,333.52 |
| 7142 4 | PSP Major 717-346-5512 0 | $0.00 | $0.00 | 0 | $103.98 | $39.99 | 8 | 3 | $863.82 | $2,591.46 |
| 7142 5 | PSP Major 717-346-5512 0 | $0.00 | $0.00 | 0 | $103.98 | $39.99 | 8 | 3 | $863.82 | $2,591.46 |

## Commodity Costs

| ID | Commodity Description | | Cost Per Item | Quantity | Total Costs |
|---|---|---|---|---|---|

## Equipment Costs

| ID | Equipment Description | | Cost Per Item | Qty | Rate Per Day | Qty | # Days Used | Total Cost |
|---|---|---|---|---|---|---|---|---|

## Other Costs

| ID | Other Description | | Cost Per Item | Qty | Rate Per Day | Qty | # Days Used | Total Cost |
|---|---|---|---|---|---|---|---|---|
| 3574 | Miscellaneous | | $0.00 | | $0.00 | | | $83,000.00 |

CONFIDENTIAL - Produced Pursuant to Protective Order

# EXHIBIT 64

**From:** Augustus, Gussener <Gussener.Augustus@baltimorecity.gov>
**Sent:** Sunday, April 26, 2015 10:19 AM EDT
**To:** Robinson, StephanieJ <StephanieJ.Robinson@baltimorecity.gov>
**CC:** Parthemos, Kaliope <Kaliope.Parthemos@baltimorecity.gov>; Libit, Howard <Howard.Libit@baltimorecity.gov>; Hyatt, Melissa R. <Melissa.Hyatt@BaltimorePolice.org>
**Subject:** Funeral

FYI-

New Shiloh's Pastor, Rev. Dr. Harold A. Carter, Jr. has requested special attention for the funeral.

The details:

**11 a.m. Monday at New Shiloh Baptist Church, 2100 N. Monroe St.** in West Baltimore.

I am notifying Joe Jones of The Center For Urban Families to be advised of the high concentration of traffic; both foot and vehicle.

Best,

Gus
443-310-3374 personal mobile

My LG phone is on the charger

CONFIDENTIAL - Produced Pursuant to Protective Order                                    CITY00045625

# EXHIBIT 65

**Subject:** Mayor to ATTEND Family Hour (possibly Funeral Service )for Freddie Gray
**Location:** New Shiloh Baptist Church, 2100 N. Monroe Street, Baltimore, MD

**Start:** Monday, April 27, 2015 10:40 AM EDT
**End:** Monday, April 27, 2015 1:30 PM EDT
**Show Time As:** Busy

**Recurrence:** None

**Meeting Status:** Not yet responded

**Organizer:** Rawlings, Stephanie
**Optional Attendees:** New Shiloh Baptist Church, 2100 N. Monroe Street, Baltimore, MD

Requestor: Kali                                    Staff/Briefing: Gus
Note: SRB will arrive during family hour and will stay for a portion of the funeral service.
10am-11am:Family Hour
11am-2pm: Funeral Service

# EXHIBIT 66

**From:** Davis, Kevin <Kevin.Davis@baltimorepolice.org>
**Sent:** Sunday, April 26, 2015 6:09 PM EDT
**To:** YERG, JASON <Jason.Yerg@BaltimorePolice.org>; Turner, KevinB <KevinB.Turner@BaltimorePolice.org>; Smith, Dennis L. <Dennis.Smith@BaltimorePolice.org>; Weaver, JoeAnn <JoeAnn.Weaver@BaltimorePolice.org>; Howard, Justin <Justin.Howard@BaltimorePolice.org>; Stauder, Jeffrey <Jeffrey.Stauder@BaltimorePolice.org>; Conaway, Byron J. <Byron.Conaway@BaltimorePolice.org>; Fries, Michael <Michael.Fries@BaltimorePolice.org>; Adamsjr, Wayne <Wayne.Adamsjr@BaltimorePolice.org>
**CC:** Reitz, David <David.Reitz@BaltimorePolice.org>; Howard, Lamar D. <Lamar.Howard@BaltimorePolice.org>; Armstrong-Reichenberg , Jessica <Jessica.Armstrong-Reichenberg@baltimorepolice.org>; Fennoy, Chakia <Chakia.Fennoy@BaltimorePolice.org>; Furlong, William <william.furlong@baltimorepolice.org>; Palmere, Dean <Dean.Palmere@BaltimorePolice.org>; Hyatt, Melissa R. <Melissa.Hyatt@BaltimorePolice.org>
**Subject:** RE: Deployment needed ASAP for tomorrow (Monday April 27, 2015)

Thank you all. Very important.


-----Original Message-----
**From:** Yerg, Jason
**Sent:** Sunday, April 26, 2015 05:52 PM Eastern Standard Time
**To:** Turner, KevinB; Smith, Dennis L.; Weaver, JoeAnn; Howard, Justin; Stauder, Jeffrey; Conaway, Byron J.; Fries, Michael; Adamsjr, Wayne
**Cc:** Davis, Kevin; Reitz, David; Howard, Lamar D.; Armstrong-Reichenberg , Jessica; Fennoy, Chakia; Furlong, William
**Subject:** Deployment needed ASAP for tomorrow (Monday April 27, 2015)


Good Afternoon,
From the Operations Center, tomorrow has been deemed an "all-hands on deck" day with shifts to begin at 0900, 1200 and 1800 hrs.
Please use the enclosed Platoon Organizational sheet to organize as best you can and those that remain unassigned please add to the email.
If each command could complete **ASAP** and **CC**- ALL this will allow Lt. William Furlong to complete the plan.


Jason A. Yerg
Lieutenant
**Office of Deputy Commissioner Kevin Davis**
Office-(443) 984-7366
Cellular-(443) 462-2639
jason.yerg@baltimorepolice.org
242 W. 29th Street
Baltimore, Maryland 21211

**CONFIDENTIAL - Produced Pursuant to Protective Order**

# EXHIBIT 67

**From**: Palmere, Dean <Dean.Palmere@baltimorepolice.org> on behalf of Palmere, Dean <Dean.Palmere@BaltimorePolice.org>
**Sent**: Friday, April 24, 2015 7:14 PM EDT
**To**: DeSousa, Darryl <Darryl.DeSousa@BaltimorePolice.org>; Hyatt, Melissa R. <Melissa.Hyatt@BaltimorePolice.org>; Miller, Sean <Sean.Miller@BaltimorePolice.org>; Robinson, Osborne <Osborne.Robinson@baltimorepolice.org>; Marcus, William <William.Marcus@BaltimorePolice.org>
**CC**: Batts, Anthony <Anthony.Batts@baltimorepolice.org>; Martin, Ganesha <Ganesha.Martin@BaltimorePolice.org>; Green, Garnell W. <Garnell.Green@BaltimorePolice.org>; Davis, Kevin <Kevin.Davis@baltimorepolice.org>; Higgins, James <James.Higgins@baltimorepolice.org>
**Subject**: Leave Cancellation

Darryl,

Due to the Funeral arrangements for Freddie Gray on Monday, leave will be cancelled.  Please ensure this is put out.

*Dean M. Palmere*
*Deputy Commissioner*
*Baltimore Police Department*

CONFIDENTIAL - Produced Pursuant to Protective Order                          CITY00041194

# EXHIBIT 68

**From:** Kirstaetter, Dawn <Dawn.Kirstaetter@baltimorecity.gov>
**Sent:** Sunday, April 26, 2015 1:25 PM EDT
**To:** Harris, Kevin <Kevin.Harris@baltimorecity.gov>; Libit, Howard <Howard.Libit@baltimorecity.gov>; Robinson, StephanieJ <StephanieJ.Robinson@baltimorecity.gov>; Parthemos, Kaliope <Kaliope.Parthemos@baltimorecity.gov>
**CC:** Sutton, Sabrina <sabrina.sutton@baltimorecity.gov>; Pardini, Jill <Jill.Pardini@baltimorecity.gov>
**Subject:** City Schools Update

Schools planning to open tomorrow with normal hours. They are viewing the death of Mr Gray and protests as teachable moment and encouraging students to have "Courageous Conversations."  I have offered additional support through agencies in my portfolio.

If mayor planning to visit schools, need time and locations asap song can share with Thornton's team.

Dr Thornton has informed me that there is a mass high school purge expected tomorrow at 3 pm. Students are expected to converge on city hall. Wondering if there will be logistical adjustments that need to be made to the mayor's 4:30 meeting with teens at city hall . Sabrina, Thornton wanted to know if you need permission slips for tomorrow?

Sent from my iPhone

**CONFIDENTIAL - Produced Pursuant to Protective Order**

# EXHIBIT 69

**From:** Winterling, Earl <Earl.Winterling@7-11.com> on behalf of Winterling, Earl <earl.winterling@7-11.com>
**Sent:** Monday, April 27, 2015 1:01 PM EDT
**To:** McMillan, David <David.McMillan@baltimorecity.gov>; Jugan, Thomas <Thomas.Jugan@BaltimorePolice.org>
**CC:** Kropkowski, Michael <Michael.Kropkowski@7-11.com>; Macaluso, William <William.Macaluso@7-11.com>; Todd Rogers (toddr@VytalSec.com) <toddr@VytalSec.com>; Toddr@vitalsecurity.com <Toddr@vitalsecurity.com>
**Subject:** RE: Security Guard Service Baltimore City Stores

David & Tom,

After we conversed and i spoke with Tom Jugen, the more immediate threat would be at the Mondomin Area, 7-Eleven is deploying 2 Armed Special Police Officers from Vytal Security at our 7-Eleven store 24164 which is located at 2500 Liberty Heights Avenue, Baltimore, MD 21215.

In addition, as a precaution and a sense of security for the stores recently vandalized in the Down Town Area of the City, 7-Eleven is deploying Armed SPO's from Vytal Security to the below listed stores:

| Store# | Address |
|--------|---------|
| 33685 | 22 Light St., Baltimore, Maryland 21202 |
| 33514 | 300 West Baltimore St., Baltimore, Maryland 21201 |
| 36457 | 301 North Howard St., Baltimore, Maryland 21201 |
| 36457 | 415 West Franklin St., Baltimore, Maryland 21201 |

These SPO's will be posted at the store by around 2 pm and will be there until 7-Eleven through coordination with the Baltimore City Police feel the potential threat is no longer an issue.

The Officers will be there to control entry to our businesses as well as the safety of our guest and employees. The stores as well as the Officers have been advised if they see any indication of large crowds forming, they will immediately call Baltimore Police Department.

Please make sure as you monitor City Watch Cameras, that you call me on any suspicious movement of groups so a can take the proper steps to lock down our stores.

Thank you for all of your assistance and cooperation.

Please be safe and help bring our City back in order.

*Earl E. Winterling| 7-Eleven, Inc.*
*Zone Asset Protection  Specialist*
*Zone 10 - MD, DC, N.VA, & W.VA*
*One Arts Plaza 1722 Routh St. Suite 1000  Dallas  TX 78201-2502*
*C.410 274-4972  |  Earl.winterling@7-11.com*

*Law Enforcement Request For Video, Email : LawEnforcement@7-11.com*

*Leadership is not a position or a title, it is action and example.*

-------------------------------------------------------------------------------------

**From:** McMillan, David [mailto:David.McMillan@baltimorecity.gov]
**Sent:** Monday, April 27, 2015 11:28 AM
**To:** Winterling, Earl
**Cc:** Kropkowski, Michael; Macaluso, William
**Subject:** RE: Security Guard Service Baltimore City Stores

I just got confirmation that intel is credible.  There have been calls on social media for such action.  BPD is monitoring and coordinating their response.   What do you think 7-11's posture will / should be in response to this?

David McMillan
Director of Planning and Preparedness
Mayor's Office of Emergency Management
City of Baltimore
Office: (410) 396-6182
Cell: (443) 690-6814
David.McMillan@baltimorecity.gov

-------------------------------------------------------------------------------------

**From:** Winterling, Earl [mailto:Earl.Winterling@7-11.com]
**Sent:** Monday, April 27, 2015 9:53 AM
**To:** McMillan, David
**Cc:** Kropkowski, Michael; Macaluso, William
**Subject:** Re: Security Guard Service Baltimore City Stores

David,

Our last store opened this morning at 5 am at Baltimore and Howard. We still have window replacements to be done when the glass comes in.

**CONFIDENTIAL - Produced Pursuant to Protective Order**

I spoke with Tom Jugen this morning and he advised me of possible issues near Mondomin Mall in which we have a store adjacent on Liberty Rd. Tom stated he would give me advance warning if there is any indication we need to take further steps.

Note:

I received the below from a couple Field Reps:
Possible flash mobs/kids downtown....credible?

Another Rep sent me this:
There is another call for civil disorder today via social networking. Just heard on the radio. Calling all high school students at 3 to March downtown don't know if there is any force behind it.

Please advise so we can continue to stay prepared as well as take appropriate action.

Earl Winterling
7-Eleven Inc.
Liberty Zone
Asset Protection Specialist
410 274-4972
Earl.winterling@7-11.com

For Law Enforcement Video Request: email: LawEnforcement@7-11.com

Leadership is not a position or a title, it is action and example.

On Apr 27, 2015, at 9:31 AM, McMillan, David <David.McMillan@baltimorecity.gov> wrote:

How is everything going?   Just checking in.  I also will keep you abreast with any intel on any future protest or safety issues.

Best,

David McMillan
Director of Planning and Preparedness
Mayor's Office of Emergency Management
City of Baltimore
Office: (410) 396-6182
Cell: (443) 690-6814
David.McMillan@baltimorecity.gov

CONFIDENTIAL - Produced Pursuant to Protective Order

# EXHIBIT 70

**From:** Rzeczkowski, Deanne <Deanne.Rzeczkowski@BaltimorePolice.org>
**Sent:** Monday, April 27, 2015 11:20 AM EDT
**To:** Palmere, Dean <Dean.Palmere@BaltimorePolice.org>; DeSousa, Darryl <Darryl.DeSousa@BaltimorePolice.org>; Davis, Kevin <Kevin.Davis@baltimorepolice.org>; Hyatt, Melissa R. <Melissa.Hyatt@BaltimorePolice.org>; Batts, Anthony <Anthony.Batts@baltimorepolice.org>
**BCC:** Hildebrandt, Donald <Donald.Hildebrandt@BaltimorePolice.org>; Loeffler, Derek <Derek.Loeffler@BaltimorePolice.org>
**Subject:** FW: Potential High School Purge

FYI – from School Police Chief.

---

**From:** Goodwin, Marshall T. [mailto:mtgoodwin@bcps.k12.md.us]
**Sent:** Monday, April 27, 2015 11:13 AM
**To:** Cooper, Damion; 'nburrell@coppin.edu'; Rzeczkowski, Deanne; Hyatt, Melissa R.; Russell, Melvin
**Cc:** Batts, Anthony; Thornton, Gregory L.
**Subject:** RE: Potential High School Purge

Damion

We are all working together on this information.

Chief

Marshall "Toby" Goodwin
Chief of Police
Baltimore City Schools Police Force
200 E. North Ave
Baltimore, Maryland 21202
Office: 410-396-8591
Fax:     410-396-5266

---

**From:** Cooper, Damion - (Baltimore City)
**Sent:** Monday, April 27, 2015 11:10 AM
**To:** Goodwin, Marshall T.; 'nburrell@coppin.edu'; Rzeczkowski, Deanne (BCPD); Hyatt, Melissa R.; Russell, Melvin (BCPD)
**Cc:** Batts, Anthony (Police Commissioner); Thornton, Gregory L. - (Baltimore City)
**Subject:** Potential High School Purge

Good Morning Everyone,

I am not sure if you're aware or not, but the image that is attached has been floating all through social media. I just wanted to bring it to your attention.

At Your Service,

*Damion*

<table>
<tr><td>
Protecting Communities
Creating Jobs
Strengthening
Accountability
Investing in Youth
</td><td>
**DAMION J. COOPER**
*Director, Office of Neighborhood Relations*
Office of City Council President Bernard C. "Jack" Young
100 Holliday Street, Room 400, Baltimore, MD 21202
Office: 410-396-3595   Cellular: 410-948-8393   Fax: 410-539-0647
Email:   damion.cooper@baltimorecity.gov
Website: www.baltimorecitycouncil.com
Twitter:   Facebook     Subscribe to Jack's Journal
</td></tr>
</table>

NOTICE: The information contained in this e-mail may be confidential and is intended solely for the use of the named addressee. Access, copying or re-use of the e-mail or any information contained herein by any other person is not authorized. If you are not the intended recipient please notify us immediately by returning the e-mail to the originator.

**CONFIDENTIAL - Produced Pursuant to Protective Order**                                            **CITY00011631**

# EXHIBIT 71



# BALTIMORE POLICE DEPARTMENT

OFFICE OF THE POLICE COMMISSIONER
MEDIA RELATIONS SECTION



Anthony W. Batts
Police Commissioner

Captain J. Eric Kowalczyk
Director

## CREDIBLE THREAT TO LAW ENFORCEMENT

Baltimore, Md., April 27, 2015 – The Baltimore Police Department / Criminal Intelligence Unit has received credible information that members of various gangs including the Black Guerilla Family, Bloods, and Crips have entered into a partnership to "take-out" law enforcement officers.

This is a **credible threat**. Law enforcement agencies should take appropriate precautions to ensure the safety of their officers. Notification will be sent via NLETS. Further information will be sent through appropriate channels.

Media is requested to distribute this information to the public and law enforcement nationwide.

-END-

For more information please contact the Media Relations Section at 410-396-2012

1

CONFIDENTIAL - Produced Pursuant to Protective Order

# EXHIBIT 72

**From:** DeMotto, Nicole <Nicole.DeMotto@BaltimorePolice.org>
**Sent:** Friday, April 24, 2015 11:06 AM EDT
**To:** Hyatt, Melissa R. <Melissa.Hyatt@BaltimorePolice.org>; Davis, Kevin <Kevin.Davis@baltimorepolice.org>; Reitz, David <David.Reitz@BaltimorePolice.org>; Schluderberg, Gordon <Gordon.Schluderberg@BaltimorePolice.org>; Palmere, Dean <Dean.Palmere@BaltimorePolice.org>; DeSousa, Darryl <Darryl.DeSousa@BaltimorePolice.org>
**Subject:** Fw: Funeral Information


------ Original message------
**From:** Cheatham, Tony
**Date:** Fri, Apr 24, 2015 11:04
**To:** DeMotto, Nicole;McClaskey, George;
**Cc:** Orenstein, Joseph;
**Subject:** Funeral Information for Freddie Gray

Funeral information is as follows:


Monday, April 27th 2015
New Shiloh Baptist Church
2100 N. Monroe Street
Baltimore, MD 21217

Family time: 10:00 am
Funeral for public: 11:00am

Found information via Twitter
Verified information with the church via the undercover phone.


Tony M. Cheatham
Baltimore Police Department
Criminal Intelligence Analyst (AIS/IAU)
Analytical Intelligence Section
Intelligence Analysis Unit
Office : (410) 396-2640
Cell: (443)452-9146
Email : Tony.Cheatham@baltimorepolice.org

***"Intelligence is quickness in seeing things as they are"***
*-George Santayana*

AIS Logo

# EXHIBIT 73

**From:** Bartness, Martin <Martin.Bartness@baltimorepolice.org> on behalf of Bartness, Martin
<Martin.Bartness@BaltimorePolice.org>
**Sent:** Sunday, April 26, 2015 6:22 PM EDT
**To:** Schluderberg, Gordon <Gordon.Schluderberg@BaltimorePolice.org>; Hyatt, Melissa
<Melissa.Hyatt@BaltimorePolice.org>; Palmere, Dean <Dean.Palmere@BaltimorePolice.org>; Thompson, Charles
<Charles.Thompson@BaltimorePolice.org>; Smith, DennisR <DennisR.Smith@BaltimorePolice.org>; Pool, Michael
<Michael.Pool@BaltimorePolice.org>; Furlong, William <william.furlong@baltimorepolice.org>; Cohen, Elliot
<Elliot.Cohen@BaltimorePolice.org>; Quick, Robert <Robert.Quick@BaltimorePolice.org>; Lansey, Stephanie
<Stephanie.Lansey@BaltimorePolice.org>; Barillaro, Margaret <Margaret.Barillaro@BaltimorePolice.org>; Green, Garnell
W. <Garnell.Green@BaltimorePolice.org>
**Subject:** Monday Protest: OJ Commitments

Sir/Ma'am,

Here's what we have for tomorrow:

MSP - 40
MTAP - 15
Montgomery Co - 32 (plus support personnel including a deputy chief, captain, lieutenant, 3 U/C's, analyst, and tactical EMS)
Howard Co Sheriff - 1, 1 + 13
PG Co - 25

They are reporting to the atrium at 1200 hours.

**CONFIDENTIAL - Produced Pursuant to Protective Order**

# EXHIBIT 74

**From:** Tarbert, Colin
**Sent:** Thursday, April 23, 2015 1:56 PM EDT
**To:** Bivens, Christine <Christine.Bivens@baltimorecity.gov>; Pinkett, Leon <leon2.pinkett@baltimorecity.gov>
**Subject:** RE: Outreach Call

Sounds like there is interest in the call.



**Colin Tarbert**
*Mayor's Office of Economic & Neighborhood Development*
*Deputy Mayor*
100 N. Holliday Street, Room 250
Baltimore, MD 21202
colin.tarbert@baltimorecity.gov
410-545-6208 (Office)
443-683-0218 (Mobile)
410-576-9425 (Fax)

*Office of Mayor Stephanie Rawlings-Blake*

***Connect with Mayor Rawlings-Blake***

@MayorSRB                                  MayorSRB
/Stephanie.Rawlingsblake

---

**From:** Bivens, Christine
**Sent:** Thursday, April 23, 2015 1:23 PM
**To:** Tarbert, Colin; Pinkett, Leon
**Subject:** RE: Outreach Call

Yes, we will include the Coalition Committee Chairs also – Stanley Tucker, Shelonda Stokes, Jeanette Glose Partlow, Anthony Robinson, and Cidalia Luis-Akbar (Holton is Co-Chair and Mayor already reaching out to her via call to elected officials).

I'll check with Bob Wallace first.  Thanks.



**Christine Bivens, MCA**
*Mayor's Office of Minority and Women-Owned Business Development*
*Acting Director*
250 City Hall, 100 N. Holliday Street
Baltimore, MD 21202
christine.bivens@baltimorecity.gov
410-396-3818 (Office)
410-528-1671 (Fax)

*Office of Mayor Stephanie Rawlings-Blake*

***Connect with Mayor Rawlings-Blake***

@MayorSRB                                  MayorSRB
/Stephanie.Rawlingsblake

---

**From:** Tarbert, Colin
**Sent:** Thursday, April 23, 2015 1:19 PM
**To:** Bivens, Christine; Pinkett, Leon
**Subject:** RE: Outreach Call

I would only do #1 through 5. Do you have coalition committee chairs that might also make sense to include.  In addition, I will add Kirby Fowler, Tom Sadowski, Bill Cole, and Brian Rodgers.

Can you ask Bob Wallace if he thinks this would be benefit to the business community?  I don't want to take up people's time if they are not interested. Thanks!



**Colin Tarbert**
*Mayor's Office of Economic & Neighborhood Development*
*Deputy Mayor*
100 N. Holliday Street, Room 250
Baltimore, MD 21202
colin.tarbert@baltimorecity.gov
410-545-6208 (Office)
443-683-0218 (Mobile)
410-576-9425 (Fax)

*Office of Mayor Stephanie Rawlings-Blake*

***Connect with Mayor Rawlings-Blake***

@MayorSRB                                  MayorSRB
/Stephanie.Rawlingsblake

**CONFIDENTIAL - Produced Pursuant to Protective Order**                                  **CITY00039305**

**From:** Bivens, Christine
**Sent:** Thursday, April 23, 2015 11:49 AM
**To:** Tarbert, Colin; Pinkett, Leon
**Subject:** RE: Outreach Call
**Importance:** High

Colin / Leon:

Here's a listing of business organizations with relevant memberships that we thought should be included in the conference call for maximum effect:

1. Mayor's Coalition on Supplier Diversity and Inclusion – Robert Wallace, Chair
2. Presidents' RoundTable – Kevin Johnson, President
3. Greater Baltimore Committee – Don Fry, President
4. Baltimore City Chamber of Commerce – Charles Owens, President
5. Baltimore City Black Chamber of Commerce – Lance Lucas, President
6. Maryland Minority Contractors Association – Pless Jones, President
7. Md. Washington Minority Companies Association – Wayne Frazier, President
8. Associated Builders and Contractors – Baltimore Metro Chapter – Jeffrey Hargrave, Chair
9. Capital Region Minority Supplier Development Council – Sharon Pinder, President & CEO

I also wanted your thoughts on including some other business organizations so as to be more inclusive in the communications; the following and any that you know of that aren't listed:

Ø Baltimore Hispanic Chamber of Commerce
Ø Maryland Hispanic Chamber of Commerce
Ø National Association of Women Business Owners – Baltimore Region
Ø Women Entrepreneurs of Baltimore

Thanks!!



**Christine Bivens, MCA**
*Mayor's Office of Minority and Women-Owned Business Development*
*Acting Director*
250 City Hall, 100 N. Holliday Street
Baltimore, MD 21202
christine.bivens@baltimorecity.gov
410-396-3818 (Office)
410-528-1671 (Fax)

*Office of Mayor Stephanie Rawlings-Blake*

**Connect with Mayor Rawlings-Blake**

@MayorSRB                          MayorSRB
/Stephanie.Rawlingsblake

---

**From:** Tarbert, Colin
**Sent:** Thursday, April 23, 2015 11:23 AM
**To:** Day, Ashley; Uhl, Christopher
**Cc:** Pinkett, Leon; Bivens, Christine; Lanier, Beverly
**Subject:** RE: Outreach Call

No. It was per Kaliope. I can ask the Mayor during my 1130 mtg.



**Colin Tarbert**
*Mayor's Office of Economic & Neighborhood Development*
*Deputy Mayor*
100 N. Holliday Street, Room 250
Baltimore, MD 21202
colin.tarbert@baltimorecity.gov
410-545-6208 (Office)

*Office of Mayor Stephanie*

CONFIDENTIAL - Produced Pursuant to Protective Order

*Rawlings-Blake*        443-683-0218 (Mobile)
                        410-576-9425 (Fax)

**Connect with Mayor Rawlings-Blake**

@MayorSRB                                    MayorSRB
/Stephanie.Rawlingsblake

---

**From:** Day, Ashley
**Sent:** Thursday, April 23, 2015 11:22 AM
**To:** Tarbert, Colin; Uhl, Christopher
**Cc:** Pinkett, Leon; Bivens, Christine; Lanier, Beverly
**Subject:** RE: Outreach Call

Has this been approved by the Mayor?

-----Original Message-----
**From:** Tarbert, Colin
**Sent:** Thursday, April 23, 2015 11:18 AM Eastern Standard Time
**To:** Uhl, Christopher; Day, Ashley
**Cc:** Pinkett, Leon; Bivens, Christine; Lanier, Beverly
**Subject:** Outreach Call

Chris and Ashley,

Kaliope would like to schedule a business outreach call with the Mayor to update leaders on the Freddie Gray situation.  She suggested 3pm tomorrow (Friday 4/24).  Leon, Christine and I will help prepare a memo and talking points today.

If you can also provide a call in number and instructions, we will contact business leaders today. I think 30 minutes will suffice.

Thanks,
Colin



*Office of
Mayor Stephanie
Rawlings-Blake*

**Colin Tarbert**
*Mayor's Office of Economic & Neighborhood Development*
*Deputy Mayor*
100 N. Holliday Street, Room 250
Baltimore, MD  21202
colin.tarbert@baltimorecity.gov
410-545-6208 (Office)
443-683-0218 (Mobile)
410-576-9425 (Fax)

**Connect with Mayor Rawlings-Blake**

@MayorSRB                                    MayorSRB
/Stephanie.Rawlingsblake

CONFIDENTIAL - Produced Pursuant to Protective Order

# EXHIBIT 75

**Subject:** Mayor to PARTICIPATE in Business Outreach Conference Call
**Location:** Mayor's ECR - Call: 443-984-1696

**Start:** Friday, April 24, 2015 3:00 PM EDT
**End:** Friday, April 24, 2015 3:30 PM EDT
**Show Time As:** Tentative

**Recurrence:** None

**Meeting Status:** Not yet responded

**Organizer:** Rawlings, Stephanie
**Required Attendees:** Mayor's ECR - Call: 443-984-1696
**Optional Attendees:** Mayor's ECR - Call: 443-984-1696

Staff/Briefing: Leon/Howard. Requester: Kaliope.
ONLY 20 Lines Available

**CONFIDENTIAL - Produced Pursuant to Protective Order**

# EXHIBIT 76

**To:** Donald Fry <donaldf@gbc.org>
**Subject:** RE: Voicemail

Sounds good.  Below are individuals we are going to include.

Kirby Fowler
Tom Sadowski
Bill Cole
Brian Rodgers
Stanley Tucker
Shelonda Stokes
Jeanette Glose Partlow
Anthony Robinson
Cidalia Luis-Akbar
Mayor's Coalition on Supplier Diversity and Inclusion – Robert Wallace, Chair
Presidents' RoundTable – Kevin Johnson, President
Greater Baltimore Committee – Don Fry, President
Baltimore City Chamber of Commerce – Charles Owens, President
Baltimore City Black Chamber of Commerce – Lance Lucas, President



*Office of
Mayor Stephanie
Rawlings-Blake*

**Colin Tarbert**
*Mayor's Office of Economic & Neighborhood
Development
Deputy Mayor*
100 N. Holliday Street, Room 250
Baltimore, MD  21202
colin.tarbert@baltimorecity.gov
410-545-6208 (Office)
443-683-0218 (Mobile)
410-576-9425 (Fax)

*Connect with Mayor Rawlings-Blake*
@MayorSRB                                    MayorSRB
/Stephanie.Rawlingsblake

**From:** Donald Fry [mailto:donaldf@gbc.org]
**Sent:** Thursday, April 23, 2015 1:50 PM
**To:** Tarbert, Colin
**Subject:** RE: Voicemail

Colin:
I'm sure many would be interested – particularly in light of City DOT advising people to leave work early today because of protests. Business interruption is always a concern plus the image/perception of the city is being significantly impacted. Heard some pretty bad numbers of a recent survey that was done by a local business about the perception of being safe in Baltimore as a result of the media attention. Don't know if you are looking to set up a large conference call or what but I would participate – I am sure others would as well.

Donald C. Fry
President & CEO
Greater Baltimore Committee
111 S. Calvert Street
Suite 1700
Baltimore, Maryland 21202
Phone : (410) 727-2820
Fax   : (410) 539-5705
E-Mail : donaldf@gbc.org
www.gbc.org
Follow the GBC on Twitter: http://twitter.com/GBCorg
Become a GBC fan on Facebook: http://www.facebook.com/GBCorg

Upcoming GBC Events:

May 11, 2015     GBC 60th Anniversary Annual Meeting

GREATER BALTIMORE COMMITTEE: Regional business leaders creating a better tomorrow...today!

**CONFIDENTIAL - Produced Pursuant to Protective Order**

This message contains confidential information and is intended only for the recipient or the recipient's authorized agent. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately if you have received this e-mail by mistake and delete this e-mail from your system. Please note, this e-mail is being sent to you as part of your membership or business relationship with the Greater Baltimore Committee or one of its affiliate organizations. Finally, the recipient should check this e-mail and any attachment for the presence of viruses. Although outbound e-mails are screened for viruses, the Greater Baltimore Committee accepts no liability for any damage caused by any virus transmitted through this e-mail.

**From:** Tarbert, Colin [mailto:Colin.Tarbert@baltimorecity.gov]
**Sent:** Thursday, April 23, 2015 12:58 PM
**To:** Donald Fry
**Subject:** Voicemail
**Importance:** High

Hi Don,

I left you a voicemail asking if you think you and key business leaders would like to hear from the Mayor on the current event around the Freddie Gray case and what steps are being taken by the Mayor to address public concerns.  We are looking at holding a 3pm conference call tomorrow, 30 minutes max.  Let me know your thoughts as soon as possible so I can coordinate the call.

Best,
Colin

---



*Office of
Mayor Stephanie
Rawlings-Blake*

**Colin Tarbert**
*Mayor's Office of Economic & Neighborhood Development*
*Deputy Mayor*
100 N. Holliday Street, Room 250
Baltimore, MD  21202
colin.tarbert@baltimorecity.gov
410-545-6208 (Office)
443-683-0218 (Mobile)
410-576-9425 (Fax)

**Connect with Mayor Rawlings-Blake**

@MayorSRB                                   MayorSRB
/Stephanie.Rawlingsblake

CONFIDENTIAL - Produced Pursuant to Protective Order

# EXHIBIT 77

**From:** Tarbert, Colin
**Sent:** Sunday, April 26, 2015 4:05 PM EDT
**To:** Tarbert, Colin <Colin.Tarbert@baltimorecity.gov>
**BCC:** FLee@tydingslaw.com <FLee@tydingslaw.com>; robinsonanthonyw@aol.com <robinsonanthonyw@aol.com>; robertwallace@bithgroup.com <robertwallace@bithgroup.com>; llucas@digitallsystems.org <llucas@digitallsystems.org>; kjohnson@commercial-interiors.com <kjohnson@commercial-interiors.com>; stanley.tucker@mmggroup.com <stanley.tucker@mmggroup.com>; Bivens, Christine <Christine.Bivens@baltimorecity.gov>; JeanettePartlow@mdchem.com <JeanettePartlow@mdchem.com>; shelonda@greibo.com <shelonda@greibo.com>; cidalia@mluisconstruction.com <cidalia@mluisconstruction.com>; Charlieo@baltimorecitychamber.org <Charlieo@baltimorecitychamber.org>; Donald Fry <donaldf@gbc.org>; Kirby Fowler (kfowler@dpob.org) <kfowler@dpob.org>; J. Thomas Sadowski (JTSadowski@GreaterBaltimore.org) <JTSadowski@GreaterBaltimore.org>; Cole, William H. <wcole@baltimoredevelopment.com>; Kennedy, Jim <Jim_Kennedy@troweprice.com>; Arnold Williams - Abrams, Foster, Nole & Williams (awilliams@afnw.com) <awilliams@afnw.com>; 'Laurie Schwartz' (laurie@waterfrontpartnership.org) <laurie@waterfrontpartnership.org>; Robert Thomas <rethomas@lexingtonmarket.com>; Smith, Janet M (janet.m.smith@citi.com) <janet.m.smith@citi.com>; Josh Dean (Josh.Dean@generalgrowth.com) <Josh.Dean@generalgrowth.com>; Parthemos, Kaliope <Kaliope.Parthemos@baltimorecity.gov>; Libit, Howard (Howard.Libit@baltimorecity.gov) <howard.libit@baltimorecity.gov>; Day, Ashley <Ashley.Day@baltimorecity.gov>; Tom Noonan <tnoonan@baltimore.org>; Daidakis, Peggy <pdaidakis@bccenter.org>
**Subject:** Call with Mayor Rawlings-Blake at 5:30 PM TONIGHT

Dear Business Leader,

The Mayor has asked that you join her on a <u>conference call this evening at 5:30 pm</u> so that she may update you and other business leaders on the Freddie Gray protests held yesterday and what steps are being taken to ensure public safety and the least amount of disruption to downtown businesses.

The call will be at 5:30pm and should last about 30 minutes.

The call in number is **443-984-1696**
The Conference ID is **265460**

Please let me know if you have any concerns or questions in advance.

Best,
Colin



*Office of
Mayor Stephanie
Rawlings-Blake*

**Colin Tarbert**
*Mayor's Office of Economic & Neighborhood Development*
*Deputy Mayor*
100 N. Holliday Street, Room 250
Baltimore, MD 21202
colin.tarbert@baltimorecity.gov
410-545-6208 (Office)
443-683-0218 (Mobile)
410-576-9425 (Fax)

**Connect with Mayor Rawlings-Blake**

@MayorSRB                    MayorSRB
/Stephanie.Rawlingsblake

**CONFIDENTIAL - Produced Pursuant to Protective Order**                    CITY00037614

# EXHIBIT 78

**From:** Tarbert, Colin
**Sent:** Sunday, April 26, 2015 4:16 PM EDT
**To:** Naron, Sean <Sean.Naron@baltimorecity.gov>
**CC:** Parthemos, Kaliope <Kaliope.Parthemos@baltimorecity.gov>
**Subject:** Business Outreach Call Invitees:

Business Outreach Call Invitees:

1. Anthony Robinson, Esq., Mayor's Coalition Subcommittee Chair
2. Arnold Williams, Baltimore Development Corporation
3. Bill Cole, Baltimore Development Corporation
4. Charles Owens, Baltimore City Chamber of Commerce
5. Christine Bivens, Mayor's Office Minority Women-Owned Business Dev.
6. Cidalia Luis-Akbar, Mayor's Coalition Subcommittee Chair
7. Don Fry, Greater Baltimore Committee
8. Franklin Lee, Esq., Mayor's Coalition Subcommittee Chair
9. Jeanette Glose Partlow, Mayor's Coalition Subcommittee Chair
10. Jim Kennedy, T. Rowe Price
11. Brian Rogers, T. Rowe Price
12. Kevin Johnson, Presidents' RoundTable
13. Kirby Fowler, Downtown Partnership
14. Lance Lucas, Baltimore City Black Chamber of Commerce
15. Laurie Schwartz, Waterfront Partnership
16. Peggy Daidakis, Convention Center
17. Robert Thomas, Public Market Corporation
18. Shelonda Stokes, Mayor's Coalition Subcommittee Chair
19. Stanley Tucker, Mayor's Coalition Subcommittee Chair
20. Tom Noonan, Visit Baltimore
21. Tom Sadowski, Economic Alliance of Greater Baltimore
22. Janet Smith, One Main Financial*
23. Josh Dean, General Growth Properties*
    *experienced property damage last night



*Office of
Mayor Stephanie
Rawlings-Blake*

**Colin Tarbert**
*Mayor's Office of Economic & Neighborhood Development*
*Deputy Mayor*
100 N. Holliday Street, Room 250
Baltimore, MD  21202
colin.tarbert@baltimorecity.gov
410-545-6208 (Office)
443-683-0218 (Mobile)
410-576-9425 (Fax)

*Connect with Mayor Rawlings-Blake*

 @MayorSRB
 /Stephanie.Rawlingsblake

          MayorSRB

# EXHIBIT 79

**Subject:** Mayor to call Business Community Leaders to discuss protests and moving froward
**Location:** call in number 443-984-1696 Conference ID is 265460

**Start:** Sunday, April 26, 2015 5:30 PM EDT
**End:** Sunday, April 26, 2015 6:00 PM EDT
**Show Time As:** Busy

**Recurrence:** None

**Meeting Status:** Not yet responded

**Organizer:** Rawlings, Stephanie

call in number 443-984-1696
Conference ID is 265460

Conference call members:

1. Anthony Robinson, Esq., Mayor's Coalition Subcommittee Chair
2. Arnold Williams, Baltimore Development Corporation
3. Bill Cole, Baltimore Development Corporation
4. Charles Owens, Baltimore City Chamber of Commerce
5. Christine Bivens, Mayor's Office Minority Women-Owned Business Dev.
6. Cidalia Luis-Akbar, Mayor's Coalition Subcommittee Chair
7. Don Fry, Greater Baltimore Committee
8. Franklin Lee, Esq., Mayor's Coalition Subcommittee Chair
9. Jeanette Glose Partlow, Mayor's Coalition Subcommittee Chair
10. Jim Kennedy, T. Rowe Price
11. Brian Rogers, T. Rowe Price
12. Kevin Johnson, Presidents' RoundTable
13. Kirby Fowler, Downtown Partnership
14. Lance Lucas, Baltimore City Black Chamber of Commerce
15. Laurie Schwartz, Waterfront Partnership
16. Peggy Daidakis, Convention Center
17. Robert Thomas, Public Market Corporation
18. Shelonda Stokes, Mayor's Coalition Subcommittee Chair
19. Stanley Tucker, Mayor's Coalition Subcommittee Chair
20. Tom Noonan, Visit Baltimore
21. Tom Sadowski, Economic Alliance of Greater Baltimore
22. Janet Smith, One Main Financial*
23. Josh Dean, General Growth Properties*

*experienced property damage last night

# EXHIBIT 80

**From:** Tarbert, Colin <Colin.Tarbert@baltimorecity.gov>
**Sent:** Monday, April 27, 2015 1:49 PM EDT
**To:** Brian_Rogers@troweprice.com <Brian_Rogers@troweprice.com>; Parthemos, Kaliope
<Kaliope.Parthemos@baltimorecity.gov>
**Subject:** Re: T. Rowe Price's Plans

Thanks for the heads up. We will communicate any details as they are provided.

Sent from my Verizon 4G LTE Smartphone

------ Original message------
**From:** Rogers, Brian
**Date:** Mon, Apr 27, 2015 1:19 PM
**To:** Parthemos, Kaliope;Tarbert, Colin;
**Subject:**T. Rowe Price's Plans


Kali and Colin, please convey to the Mayor that we are going to shut down our Pratt Street location early.  We're moving essential folks out to our backup facility in Linthicum and others will work from home.  Given  the speculation and rumors and the fact that our location is often ground zero, we're going to err on the side of caution.  Call with questions, Brian Rogers

Brian Rogers
Chairman and CIO
T. Rowe Price
100 E. Pratt St, BA-0960
Baltimore, MD 21202
* Office: (410) 345-5758
* E-mail brian_rogers@troweprice.com<mailto:brian_rogers@troweprice.com>


T. Rowe Price (including T. Rowe Price Group, Inc. and its affiliates) and its associates do not provide legal or tax advice.  Any tax-related discussion contained in this e-mail, including any attachments, is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding any tax penalties or (ii) promoting, marketing, or recommending to any other party any transaction or matter addressed herein.  Please consult your independent legal counsel and/or professional tax advisor regarding any legal or tax issues raised in this e-mail.

The contents of this e-mail and any attachments are intended solely for the use of the named addressee(s) and may contain confidential and/or privileged information. Any unauthorized use, copying, disclosure, or distribution of the contents of this e-mail is strictly prohibited by the sender and may be unlawful. If you are not the intended recipient, please notify the sender immediately and delete this e-mail.

**CONFIDENTIAL - Produced Pursuant to Protective Order**

# EXHIBIT 81

**From:** Tarbert, Colin <Colin.Tarbert@baltimorecity.gov>
**Sent:** Monday, April 27, 2015 1:53 PM EDT
**To:** laurie@waterfrontpartnership.org <laurie@waterfrontpartnership.org>
**Subject:** Re: From Marcus Garvin

That is the rumor. Nothing confirmed. I'm worried about the image, but if restaurants can be prepared to secure the furniture that would be helpful. I think downtown partnership is simply going to lock it up as they do after hours.

Sent from my Verizon 4G LTE Smartphone

------ Original message------
**From:** Laurie Schwartz
**Date:** Mon, Apr 27, 2015 1:31 PM
**To:** Tarbert, Colin;
**Subject:** RE: From Marcus Garvin

Just spoke to Lt Col Marcus – he said he highly recommends patio furniture be taken in. Sounds like they're going pretty much on same info we all have – kids meeting at Mondawmin and saying they are going to tear up Mondawmin and then head downtown to wreak havoc.

Laurie Schwartz, President
Waterfront Partnership of Baltimore Inc.
650 S. Exeter Street # 200
Baltimore, Maryland 21202
laurie@waterfrontpartnership.org
www.waterfrontpartnership.org
443-743-3307
healthyharborbaltimore.org

------
**From:** Tarbert, Colin [mailto:Colin.Tarbert@baltimorecity.gov]
**Sent:** Monday, April 27, 2015 1:23 PM
**To:** laurie@waterfrontpartnership.org
**Subject:** Re: From Lt Olson
**Importance:** High

I am getting the same questions. Will advise shortly.

Sent from my Verizon 4G LTE Smartphone

------ Original message------
**From:** Laurie Schwartz
**Date:** Mon, Apr 27, 2015 1:18 PM
**To:** Tarbert, Colin;
**Subject:** RE: From Lt Olson

We got a call from Mike Evitts – are you asking folks now take in their patio furniture? We're starting to get some calls from panicky IH businesses - whether they should close or what. Please advise. Thanks

Laurie Schwartz, President
Waterfront Partnership of Baltimore Inc.
650 S. Exeter Street # 200
Baltimore, Maryland 21202
laurie@waterfrontpartnership.org
www.waterfrontpartnership.org
443-743-3307
healthyharborbaltimore.org

------
**From:** Tarbert, Colin [mailto:Colin.Tarbert@baltimorecity.gov]
**Sent:** Sunday, April 26, 2015 4:16 PM
**To:** Laurie Schwartz
**Subject:** RE: From Lt Olson

Maybe they should take in or lock furniture if there's a protest – otherwise it will look like a ghost town. Not good either…

**Colin Tarbert**
*Mayor's Office of Economic & Neighborhood Development*
*Deputy Mayor*
100 N. Holliday Street, Room 250
Baltimore, MD  21202

**CONFIDENTIAL - Produced Pursuant to Protective Order**

*Office of*
*Mayor Stephanie*
*Rawlings-Blake*

colin.tarbert@baltimorecity.gov

410-545-6208 (Office)
443-683-0218 (Mobile)
410-576-9425 (Fax)

**Connect with Mayor Rawlings-Blake**

@MayorSRB                              MayorSRB
/Stephanie.Rawlingsblake

---

**From:** Laurie Schwartz [mailto:laurie@waterfrontpartnership.org]
**Sent:** Sunday, April 26, 2015 4:10 PM
**To:** Tarbert, Colin
**Subject:** FW: From Lt Olson

Just FYI below. Our window at Columbus Center got smashed too.
Conf call is a good idea.


Laurie Schwartz, President
Waterfront Partnership of Baltimore Inc.
650 S. Exeter Street # 200
Baltimore, Maryland 21202
laurie@waterfrontpartnership.org
www.waterfrontpartnership.org
443-743-3307
healthyharborbaltimore.org

**From:** Sarah St.Clair [mailto:sarah@waterfrontpartnership.org]
**Sent:** Sunday, April 26, 2015 3:45 PM
**To:** Laurie Schwartz
**Subject:** Re: From Lt Olson

I just spoke with Lt. Olson & he would like us to encourage restaurants to close their outdoor seating for at least the next week. People are using the furniture to break windows - plus it's not safe. I can email the restaurants later tonight or tomorrow morning. Right now I know Michael Kors and H&M both ended up with broken windows this weekend.

443-743-3308
waterfrontpartnership.org
healthyharborbaltimore.org

CONFIDENTIAL - Produced Pursuant to Protective Order

# EXHIBIT 82

**Baltimore City**
**Mayor's Office of Emergency Management**



**Timeline of Events**
**Baltimore City Protest & Riots**

**Sunday, 12 April 2015**

- **8:39 am**: Baltimore Police Department (BPD) officers attempt to stop two (2) suspicious persons, Freddie Gray and an unknown individual, after seeing them at West North Avenue and North Mount Street.

- **8:40 am**: BPD officers catch and arrest Freddie Gray after a pursuit in the 1700 Block of Presbury Street.

- **8:42 am**: BPD officers request a Prisoner Transport Van (PTV) to transport Freddie Gray to the Western District Police Station.

- **8:42 am**: Freddie Gray requests an inhaler from the police.

- **8:46 am**: BPD PTV driver reports that Gray begins acting irate in the rear compartment. BPD stops the PTV and places Gray in leg iron restraints and loads him back into the PTV.

- **8:54 am**: The PTV clears Mount Street and is en route to BPD Central Booking.

- **8:59 am**: At Druid Hill Avenue and Dolphin Street, the PTV driver requests an additional BPD unit to respond to the PTV's location to check on Gray in the rear compartment.

- **9:00 am** (estimated): BPD PTV is requested to respond to 1600 West North Avenue to pick up a second prisoner. The PTV leaves W. North Ave. and drives to the Western District Police Station.

- **9:26 am**: Baltimore City Fire Department (BCFD) Emergency Medical Services (EMS) receives a call to respond to the Western District Police Station for an "unconscious male".

- **9:33 am**: BCFD Medic Unit arrived at the Western District Police Station (WDPS). The medic unit and Paramedics provide on-scene patient care for twenty-one (21) minutes. The medic unit departs WDPS for University of Maryland Shock Trauma Center (Shock Trauma).

- **10:00 am**: BCFD Medic Unit arrives at Shock Trauma.


**Monday, 13 April 2015**

- **4:30 pm**: BPD holds a news conference to brief the media on the Gray incident.

2

**Tuesday, 14 April 2015**

- All Day: Gray undergoes a double surgery on his spine for three broken vertebrae and an injured voice box, at Shock Trauma.

**Wednesday, 15 April 2015**

- Gray remains in a coma at Shock Trauma.

**Thursday, 16 April 2015**

- Gray remains in a coma at Shock Trauma.

**Friday, 17 April 2015**

- Gray remains in a coma at Shock Trauma.

**Saturday, 18 April 2015**

- Gray remains in a coma at Shock Trauma.

- Unplanned/spontaneous protest erupts outside the BPD WDPS.

**Sunday, 19 April 2015**

- **7:00 am**: Gray passes away at Shock Trauma after being in a coma for several days.

- Gray Family Attorney releases statement that Gray's spine was eighty (80) percent severed.

- Protests resumes at the WDPS and throughout the Western District area.

**Monday, 20 April 2015**

- **9:00 am**: Protest unfolds at Baltimore Police Headquarters and City Hall. Leadership from the Baltimore Chapter of the NAACP and Baltimore City Chapter of the Southern Christian Leadership Conference (SCLC) were in attendance.

- **9:15 am**: The Baltimore Sun reports on Charging Documents from the Gray incident. They report that Gray was in possession of a knife at the time of arrest and that he was arrested without force or incident.

- **3:30 pm**: Baltimore City Mayor and BCPD conduct a joint news conference.  At the news conference BPD reports that Gray repeatedly asked for medical care and did not receive it during the arrest that preceded his death.

**Tuesday, 21 April 2015**

- **11:20 am**: BPD identifies six (6) BCPD officers that have been suspended with pay in connection with the Freddie Gray investigation. They range in age from twenty-five (25)

3

to forty-five (45) and in department experience from three (3) years to eighteen (18) years and include a lieutenant.

- **4:10 pm**: U.S. Department of Justice (DOJ) opens a criminal and civil rights investigation into Freddie's Gray death. The DOJ opened the investigation following the request of several members of Maryland's congressional delegation. DOJ spokeswoman announces that it "has officially opened this matter and is gathering information to determine whether any prosecutable civil rights violations occurred."

- **5:30 pm**: Protestors turn out for a fourth consecutive day of demonstrations following Gray's death, this time gathering at the intersection where Gray was arrested and marching to the WDPS.

### Wednesday, 22 April 2105

- **3:21 pm**: BPD announces that investigators have statements from five (5) of the six (6) officers.

- **4:30 pm**: Baltimore Police Union (BPU) holds a press conference. Gene Ryan, president of BPU draws outrage for comparing Freddie Gray protests to a "lynch mob" for the calling of the immediate jailing of officers.

- **5:30 pm**: Protestors turn out for a fifth consecutive of protests, this time at both the WDPS and City Hall downtown.

### Thursday, 23 April 2015

- Baltimore City Police Commissioner Anthony W. Batts meets with representatives of the protesters and Gray's family, expressing his sympathy and updating them on the investigation.

- **12:00 pm**: Maryland Governor Larry Hogan sends Maryland State Police (MSP) Troopers to Baltimore City as protests intensify over Freddie Gray's Death.

- **3:00 pm**: Hundreds of protestors pour onto streets. In another afternoon and evening of demonstrations, two protestors are arrested, but non-violence prevails, with protestors pulling peers away from a confrontation with a taxi driver. Police and city leaders took new steps to maintain order, canceling leave for officers "to ensure adequate coverage of the city" and allowing city employees to leave early to reduce traffic congestion.


### Friday, 24 April 2015

- Civil Rights groups (ACLU & NAACP) call on Governor Hogan to help resolve a fractured relationship between Baltimore residents and BPD.

4

- Governor Hogan announces to he plans to sign legislation that would double how much people injured by police can collect in civil lawsuits.

- BCPD acknowledge mistakes in Freddie Gray's death.

**Saturday, 25 April 2015**

- Freddie Gray arrest witness accuses police of intimidation. Witness is Kevin Moore, who captured part of the arrest on a cellphone video.

- 12:00 pm – 6:30 pm: More than 1,000 people gather for a protest and march toward City Hall. Police say they arrested 12 people — "pockets of individuals causing disturbances" — after rocks are thrown at cops and windows are smashed near Camden Yards.

- Several violent groups assault individuals around Camden Yards and at the bar establishments on the 500 blk. of Washington Blvd.

- Five officers suffer minor injuries. A group of juveniles also looted a 7-Eleven.  Some demonstrators damaged police vehicles and area business.

-

**Sunday, 26 April 2015**

- Wake for Freddie Gray

**Monday, 27 April 2015**:

- **8:25 am:** Baltimore Police release information advising that members of various gangs have entered into a partnership to "take-out" law enforcement officers.  Media is requested to distribute the information to the public and law enforcement nationwide.

- **9:00 am:** At some point during the morning a message on social media circulates widely amongst high school students that states "All high schools Monday @ 3 we going to purge.  From Mondawmin, to the Ave, back to downtown #Fdl"

- **9:30 am**: Final open casket viewing prior to the funeral.

- **9:45 am**: Mourners fill into the New Shiloh Baptist Church for the funeral of Freddie Gray

- **10:30 am**: Members of Freddie Gray's family arrive and enter the New Shiloh Baptist Church

- **11:00 am**: Funeral Services held for Freddie Gray at New Shiloh Baptist Church. There is a heavy media presence outside of the funeral.  All local and national outlets are

5

represented with reports that the funeral is attended by over 2,500 people. Notable attendees include:

- o Mayor Stephanie Rawlings-Blake
- o Rep. Elijah Cummings
- o Rep. John Sarbanes
- o Rev. Jesse Jackson
- o Kweisi Mfume

- o Broderick Johnson, White House
- o Sheila Dixon
- o Dick Gregory, activist
- o Rev. Jamal Bryant
- o Family of Trayvon Martin
- o Daughter of Eric Gardner

- **1:00 pm:** BPD has pre-staged resources at several locations throughout the city to include: City Hall, Western District Police Station, Mondawmin Mall, Camden Yards, Downtown, Inner Harbor, and Digital Harbor High School.

- **1:18 pm:** Additional resources are sent to Mondawmin Mall to include 4 arrest teams, 1 platoon from Montgomery County and 1 platoon from PG County.

  - o These units join a BPD platoon led by Unit 600.

- **1:42 pm**: The casket holding Freddie Gray's body is loaded into the hearse. There are crowds, but no protests at the funeral.

- **1:45 pm**: The Freddie Gray funeral services conclude after nearly two (2) hours.

- **1:45 pm**: The NAACP has stated that they are opening a satellite office in Freddie Gray's Baltimore neighborhood of Sandtown. The office will include legal support from the national office.

- **1:53 pm:** Unit 600 takes command of the Mondawmin Deployment.

- **1:59 pm:** 2 Vans are dispatched to the Northern District to pick up 30 shields and deliver them to Mondawmin Mall.

- **2:00 pm**: The University of Maryland campus in downtown Baltimore shuts down its campus effective at 2:00pm, stating that is has been warned by the BPD that activities in the area may turn violent. University of MD could not identify who at BPD provided them with that information, which was not the official recommendation of BPD.

- **2:04 pm:** The mall is reported to be open.

  - o Additional personnel from other areas are moved to Mondawmin Mall

CONFIDENTIAL - Produced Pursuant to Protective Order

- o Foxtrot reports no groups gatherings in problem spots, no problems at Mondawmin.

- **2:16 pm:** A Signal 13 (officer in need of assistance) is dispatched in the 300 block of S. Monroe St. in the Southwestern District
- **2:27 pm:** CitiWatch reports a crowd gathering around the area of the Signal 13.

- **2:33 pm:** Students begin to walk out of Douglas High School roughly an hour and a half prior to the end of the school day at 4:00pm.

- **2:35 pm:** All districts go into Tactical Alert, only responding to Priority 1 and Priority 2 calls.

- **2:43 pm:** Western District call for service: 2 black males walking in the 2000 block of Ridgehill Ave armed with guns. WD units respond.

- **2:44 pm:** 11 minutes after the walkout begins, Unit 600 announces "Mondawmin Mall, helmets on now!"

- **2:45 pm:** A school police officer notifies his communications center that "they're throwing rocks and bricks" at Mondawmin by the Dunkin Donuts.

- **2:46 pm:** A platoon of 1 Lieutenant, 6 Sergeants, and 23 Officers at Camden Yards is redirected to Mondawmin Mall.

- **2:46 pm:** School police at Mondawmin report the crowd is students and adults, 90% Douglas High students.

- **2:46 pm:** Northwest District call for service: Silent alarm at the payless shoe store in the rear of the mall. NWD units respond.

- **2:48 pm:** School Police officer requests dispatch to notify the NWD that a large crowd is headed towards the 7-11 on Liberty Heights Ave.

- **2:49 pm:** A BPD officer reports that a crowd is rushing the 7-11. Another officer reports it should already be closed.

  - o Foxtrot switches to the NWD channel and advises the group is headed towards 7-11. 3 NWD officers respond.

  - o Another BPD officer reports the 7-11 is not closed, and is being rushed.

7

- **2:50 pm:** Foxtrot reports people running in and out of the 7-11.

- **2:52 pm:** NWD call for service: Holdup alarm at the 7-11. The NWD Lieutenant states he is responding.

  o Operations on 10 A orders "Let's start corralling these kids and making arrests."

- **2:53 pm:** School Police officer in the area reports the crowd has been pushed away from the 7-11, asks the School Police representative in the Watch Center if buses in the area have been shut down or re-routed yet.

  o Baker 11 from the NWD arrives at the 7-11 and 10-32's (sufficient units on the scene) the call; reports the crowd has left, destruction of property, and looting.

- **2:55 pm:** The School Police rep in the Watch Center reports that MTA is closing the bus loop at Mondawmin; will keep the subway open**.**

- **2:59 pm:** Three units from the WD (B22, B31, and B32) request that KGA hold them out at Mondawmin Mall.

- **3:00 pm:** Western District  KGA advises B22 that they are receiving 911 calls for teenagers threatening to shoot people. B22 advises there are numerous police on location who will handle.

  o The School Police rep in the Watch Center reports that MTA is now also closing the subway.

- **3:01 pm:** A medic unit is requested for a civilian at the bus stop hit by concrete. 36 year old male with a head injury, breathing and conscious.

- **3:02 pm:** WD two calls for service dispatched:
  o 1623 W. North Ave – Breaking and entering
  o 1611 W. North Ave – Larceny in progress
  o WD units respond

- **3:04 pm:** Foxtrot requests units from the NWD to block traffic on Liberty Heights and Reisterstown to keep people away from the mall.

  o B29 takes Reisterstown Southbound

**CONFIDENTIAL - Produced Pursuant to Protective Order**                                                      CITY00021682

- o   B47 takes Liberty Heights Eastbound

- **3:07 pm:** Medic 8 is dispatched to stand by at E52 to await a police escort to pick up an injured subject.

  - o   Request from School Police officer at Mondawmin to Watch Center to have MTA shut down all bus traffic at Mondawmin. Rep in the Watch Center advises this should have been done already.

  - o   Foxtrot reports to Unit 600 that he is in a good spot. All aggressors are south of his location.

  - o   Operations in the Watch Center requests a Bearcat to respond to the top of the bus loop for an officer being assaulted.

- **3:09 pm:** A Lieutenant from the NWD reports that the 7-11 is closed and secure.

- **3:10pm:** Foxtrot requests a unit from the WD to block traffic northbound on Reisterstown prior to Gwynns Falls.  B22 responds to Fulton and Reisterstown.

- **3:12 pm:** A large crowd at Reisterstown and Liberty Heights is reported to be throwing rocks.

- **3:12 pm:** Foxtrot requests someone from the NWD block traffic at Swann Dr. and Gwynns Falls. The NWD reports that is the Northern.

  - o   ND Dispatch requests a unit to block traffic at Swann Dr. and Gwynns Falls. B33 takes it.

- **3:13 pm:** Prisoner transport requested at Reisterstown Rd and Liberty Heights. Unclear if anyone is actually in custody.

  - o   A unit from the ND reports that juveniles are being pushed from the mall towards the park (ND area). The ND Lieutenant requests 33 and 41 to respond and advise.

- **3:14 pm:** Foxtrot reports a large group breaking up cinder blocks in the alley behind the Midas, getting ready to throw bricks.

  - o   School Police officer at Mondawmin requests a medic for a male BPD sergeant with an ankle injury, located inside the hub.

- **3:34 pm:** Protestors become violent and begin confronting law enforcement units deployed for riot control.

9

- **3:41 pm**: Protestors, at Mondawmin Mall, turn into rioters and begin to throw bottles, rocks, whole and/or pieces of bricks and concrete at police officers and journalists.

- **3:41 pm:** First report from CNN.

- **3:43 pm:** Report of an officer down in front of Mondawmin.

- **3:48 pm:** Signal 13 at Westbury and Woodbrook. Officer down, others injured.

- **3:48 pm:** WD units B11, B22, B21 respond to the Signal 13.

- **3:49 pm**: BPD officer severely injured and needs to be carried off to a safe location, loaded into the BPD Tactical Response/Rescue Vehicle.

- **3:50 pm:** BPD Officer reported with broken leg and broken arm. Location unclear.

  - CityWide dispatch: All reserve units from the districts respond to the atrium at headquarters.

- **3:51 pm**: Law Enforcement units continue to take control of the area around Mondawmin Mall. Following the injury of several officers, BPD deploys several less than lethal and diversionary devices (such as flash bangs, smoke grenades, pepper balls, etc.).

- **3:52 pm:** Unit B11 advises his window has been busted out while responding to the Signal 13 and he could not get through. Now on 3200 block of Auchentoroly Terrace.

  - All injured officers are being evacuated to the MTA lot.  Currently three injured officers near the bus station.

- **4:00 pm:** Mayor Rawlings-Blake activates the Baltimore City EOC effective at 5:00pm.

- **4:14 pm:** Foxtrot reports the largest crowd is currently at Gwynns Falls and Woodbrook.

- **4:15 pm**: Reports of hundreds of youth congregated around the Mondawmin Mall area clashing violently with rioters throwing rocks, bricks, and bottles at police officers.

- **4:17 pm:** BPD unit B31 is at Gwynns Falls and Swan after the Signal 13, staying to direct traffic.  His sergeant (B10) tells him no, come back to take calls.

  - BPD Unit 2 begins to build a U shape to defend Reisterstown and Gwynns Falls.

  - Foxtrot reports a large group now at Monroe and Gwynns Falls, another east at Woodbrook.

10

 CITY00021684

- **4:19 pm:** Unit 800 brings a group of 1-12 from the SW and asks where to deploy.

  - Operations asks if all injured officers have been evacuated. No response.

- **4:20 pm:** Foxtrot reports majority of crowd appears to be moving south.

- **4:24 pm:** BPD unit B31 is at Fulton and Retreat. Reports his car windows have just been broken out.  He is advised by WD Sergeant and Lieutenant to get out of the area.

- **4:27 pm**: Rioters surround and destroy several law enforcement vehicles (1 – BPD cruiser; 1 – MTAP cruiser; and 1 – MTAP van).

- **4:25 pm:** WD Lieutenant advises he has 15 officers with him, asks where to deploy.

  - BPD unit B32 requests a Signal 13 for 1620 W. North Ave. Crowd attacking his vehicle.

- **4:26 pm:** Report that traffic still needs to be shut down.

  - BPD unit B10 requests all units leave North Ave. "They have taken North Ave."

- **4:27 pm:** Watch Center reports to Mondawmin Command patrol car, shop number 057 being assaulted on North Ave.

  - Watch Center reports to Mondawmin Command patrol car, shop number 057 being assaulted on North Ave.

  - BPD unit B32 reports he is hiding in the Fresh Buy grocery store. The door does not lock. B10 requests an extraction team.

- **4:29 pm:** Unit 7504 reports an assault team in the Bearcat is responding to North Ave.

  - BPD sends out a Tweet reporting that bottles and bricks are being thrown at officers. The Tweet also reported that a group of juveniles are congregated in the area of Mondawmin Mall.

- **4:30 pm:** WD Lieutenant reports he has 3 units with him available for the extraction, but there are too many people on North Ave.

- **4:40 pm:** CityWide order goes out for all districts other than the Western have all but 2 officers respond to headquarters per Unit 1.

- **4:41 pm:** Unit 3 in foxtrot advises Unit 2 there is one last group 2 at Reisterstown and Whittier. Other crowds are further south.

11

CITY00021685

- **4:42 pm:** The Bearcat advises it has the last MTA officer, needs another vehicle to help with extraction.

- **4:44 pm:** Rioters break into the CVS Pharmacy, which closed at 15:00, located at the intersection of Pennsylvania Avenue and North Avenue, and begin looting the store.

- **4:45 pm:** BPD reports that at least seven (7) officers have been injured. According to BPD PIO one (1) officer is unresponsive and others have broken bones.

- **4:47 pm:** CityWide dispatch, all units avoid Pennsylvania Ave.

- **4:51 pm:** Unit 3 advises from Foxtrot that the Mondawmin area is just about clear; units need to start moving south.

- **4:52 pm:** CityWide dispatch: All units do not request Crime Lab for breaking and entering. Only request them for Priority 1 calls.

- **4:53 pm:** Unit 2 reports he is focused on holding the line, not getting flanked. Waiting for more platoons.

- **4:54 pm:** Unit 400 reports 1- 2-16 available at Northern Pkwy and Reisterstown with 8 shields.

- **4:55 pm:** Unit 1C30 requests that CitiWatch keep an eye on Penn/MLK to watch for any protestors. Last known location of protestors was Penn/Dolphin. CitiWatch reports yes, several hundred protestors crossing MLK at Penn coming southbound. Unit 100 switches to 10A and advises Unit 2.

- **4:58 pm:** Baltimore City issued a Maryland Emergency Management Assistance Compact (MEMAC) request for 300 Mark 9 (Mk 9) handheld units. To be delivered to Baltimore City Public Safety Training Center.

- **4:59 pm:** Unit 8 reports BCFD putting out a fire at Pennsylvania and North and are being attacked. Assistance needed.

  o Assistance requested for a crowd of approximately 200 at Franklin and Paca.

- **5:00 pm:** Baltimore City activates the Emergency Operations Center (EOC). The EOC submits a request to MEMA via a phone call to the Maryland Joint Operations Center (MJOC).

  o The Maryland Emergency Management Agency (MEMA) activates the State Emergency Operations Center (SEOC).

12

- **5:01 pm:** Unit 100 reports they are taking bricks at Paca and Franklin. Help needed, requests a Signal 13. Crowd reported now eastbound on Franklin headed towards Eutaw.

- **5:02 pm:** WD dispatch advises 29 calls pending, including larceny, stores being broken into, a cameraman being beaten. 10 asks where the assault is. 2100 Bryant Ave number 2 male beaten by several kids. 10 advises it can wait.

- **5:05 pm:** Unit 7C20 requests a medic in front of the shoppers. #1 male with a head injury.

- **5:06 pm:** Douglas High School reported to be secured.

- **5:07 pm:** Report of an issue with a small crowd at Liberty Heights and Reisterstown.

- **5:09 pm:** Units from Mondawmin begin to deploy downtown.

- **5:10 pm:** Foxtrot reports a group at Paca and Center.

    o   Unit 600 is at Monroe and Bryant has a group at the intersection. Needs an arrest team or chemical agents.

- **5:11 pm:** Units responding to Fayette and Cathedral to form a line. Unit 100 advises Unit 2 that a group is walking down Eutaw. Wants squads sent to Eutaw and Baltimore to form a line.

- **5:12 pm:** Foxtrot reports large crowd at Howard and Centre, moving eastbound.

- **5:13 pm:** WD dispatch advises 31 calls pending. Most at Penn/North. Unit 10 states they are not responding unless life-threatening.

    o   Unit 6810 requests additional units at North and Pennsylvania. Being surrounded.

- **5:15 pm:** WD call for service: Silent alarm at the Ace Check Cashing. Unit 10 says to hold it.

    o   Report of a large group looting in the 2500 block of W. North Ave.

    o   Groups of youth are looting convenience stores in the downtown area.

- **5:16 pm:** Unit 2 begins to demobilize at Liberty Heights and Reisterstown to start deploying south.

- **5:17 pm:** Foxtrot advising 25 at Monroe and Whittier. 15-20 at Reisterstown and Liberty. Hundreds at Pennsylvania and North. More moving downtown.

13

- **5:18 pm:** CitiWatch reports a group southbound on St. Paul. Unit 100 sends two squads to Inner Harbor.

  o   Unit 103 requests a Signal 13 for 2500 Pennsylvania. More officers needed ASAP.

- **5:24 pm:** Report of multiple cars burning 2300 block of Anoka Ave behind the 7-11.

- **5:26 pm:** Signal 13 requested at 100 Hopkins Place.

- **5:29 pm:** Unit 3 reports way too many troops at Mondawmin. Need to move to North and Pennsylvania.

- **5:31 pm:** Unit 103 reports help needed, looting, fires, street barricaded on Pennsylvania.

- **5:33 pm:** Unit 2 reports problems sending people to Pennsylvania/North because platoons were dropped off; they have no ride.

- **5:35 pm**: BPD, via Twitter, urges parents to locate their children and bring them home after youths clashed violently with police.

- **5:58 pm:** Shields requested to 1600 retreat for a couple hundred people throwing rocks.

- **6:00 pm:** Looters reported still coming out of CVS.

- **6:01 pm:** Pepper spray requested to North and Retreat for a large crowd throwing rocks.

  o   Fox advises people from North and Retreat have moved to North and Fulton and are looting the liquor store.

- **6:02 pm:** Report of 10 juveniles moving southbound on Howard at Howard and Fayette.

- **6:04 pm:** Units are being deployed to 1133 Pennsylvania Ave for a shooting.  Operations gets on the air and advises that fire is reporting that it is only and elderly male with chest pains.

  o   Unit 7660 reporting small fires set in front of CVS.

  o   Fox advising the crowd from Retreat St. has moved to North and Fulton and is looting all of the stores.  Specifically reports that North and Pennsylvania is all clear except for a small trash can fire in front of the metro station.

- **6:05 pm:** Units from Mondawmin begin to relocate to North and Pennsylvania.

- **6:06 pm:** Large crowd reported at Pennsylvania and Dolphin St.

14

**CONFIDENTIAL - Produced Pursuant to Protective Order**

CITY00021688

- o   2 People reported on the roof in the 200 block of N. Paca St.  Fox requested by Unit 100 to make announcement to get off roof.  At same time Lexington and Eutaw parking garage is reported to have 6 people on the top level.

- **6:07 pm:** Wagon requested for Fayette and Eutaw.

  - o   7 Baker 10 requests a medic to North and McCullough for an unresponsive male.

  - o   Unit 7660 asks fox to see what is going on behind CVS, advises it looks like they are trying to set a car on fire.

- **6:08 pm:** Unit 2 orders operations to begin staging platoons from the south at MLK and Pennsylvania.

- **6:09:** Unit 2 advises the deployment of an LRAD at North and Pennsylvania

- **6:11 pm:** Foxtrot reports crowd destroying cars and setting them on fire at North and Fulton.

- **6:12 pm:** Foxtrot advises more than 2 platoons will be needed at North and Fulton.

- **6:13 pm:** Foxtrot reporting 300 people in the crowd at North and Fulton looting stores on both sides of the street.

  - o   Units 9981 or 9983 are requested by KGA to switch to the school police channel.

- **6:14 pm:** Unit 4814 advises UC's in crowd identified an individual in the crowd at Calvert and Pratt armed with a knife requesting units.

  - o   "Gallery 1" advises a contingency of 1 2 and 15 walking Westbound on Pratt from Gay St.

- **6:15:** Unit 2 and Operations continue to try and figure out where all of their assets are deployed.

- **6:16 pm:** KGA advises Unit 300 of anonymous report of an armed person at 1701 Cliftview.  People hanging out on porch of vacant with tazers, guns, and drugs.

- **6:17 pm:** MTA busses being sent to Mondawmin to retrieve large amounts of officers to redeploy to North and Pennsylvania

- **6:18 pm:** Wagon requested at Calvert and Pratt.

  - o   Unit 5701 requesting all of his units to redeploy to Pennsylvania and Cumberland and switching to talk group 10A.

15

- o Baltimore City requested MEMA Regional Liaison Officer to provide the status of area hospitals.

- o Wagon requested at Calvert and Pratt

- **6:19 pm:** Units beginning to stage at Calhoun and Cumberland.

  - o Camden Yards closes the gates to the stadium.

- **6:20 pm:** Foxtrot reporting Mondawmin is clear and North and Fulton is major area of activity.

- **6:21 pm:** Operations advises no busses available to transport officers from Mondawmin mall and they must start marching towards North and Pennsylvania.  Unit 800 advises that all his officers were redeployed with other vehicles that showed up.

  - o Ops reports group of 8 juveniles with masks causing trouble on the Pratt St. corridor.  CitiWatch advises Pratt and Eutaw.

- **6:22**: Decision to cancel Orioles game is made by the Baltimore Orioles and the Commissioner of Major League Baseball.

- **6:23 pm:**  Operations advises that Central District is to use talkgroup 11A and Western District to use 10A.

- **6:24 pm:** Foxtrot advises that it is an extremely long walk from Mondawmin to North Ave and Pennsylvainia.  Unit 8 advises to get them started until they can get the busses.

- **6:25 pm:** Unit advises that CVS is on fire inside and they are going to start to push the intersection and requests BCFD.

  - o Additional units reports that the CVS is on fire at North and Pennsylvania.

- **6:26 pm:** Many units are having confusion about which talkgroup to be on (10A or 11A).

- **6:29 pm:** BPD personnel begin to take smoke from the CVS fire and are forced to reposition.

  - o Unit 3 advises that its clear for fire units to proceed in to extinguish the fire at CVS.

- **6:30 pm**: Baltimore City Mayor, Stephanie Rawlings-Blake signs and issues an Executive Order declaring a State of Emergency in Baltimore City.

16

- o Governor Larry Hogan has stated that the Maryland National Guard has been placed on alert and to begin planning for a possible rapid mobilization and deployment of MDNG units in support of law enforcement operations in the City.

- **6:31 pm:** Foxtrot still advising the need for several platoons to control crowd at North and Fulton.

  - o Unit 57 reporting "20 guys stuck in the store on Pennsylvania and Robert" requesting a medic.

- **6:32 pm: Commissioner Batts requests that the Mayor bring in the National Guard.**

  - o BCFD arrives on location at CVS.

  - o ED Unit charlie09 advises North Avenue westbound traffic is shut down at Howard St.

  - o Unidentified unit advises of 2 arrests and requests a "wagon" to unknown location.

- **6:33 pm:** Foxtrot reports a crowd of 60 people looting a store at North and Smallwood with 200-300 still at North and Fulton.

- **6:34 pm:** Arrest made at 1800 Pennsylvania.  Units standing by for a wagon

  - o Unit advises that they have a county contingent with them and need instructions on their deployment.

- **6:35 pm:** Operations advises of a lot of units staged at Calhoun and Cumberland available for deployment.

  - o President Barack Obama is pledging the support of the federal government's help to respond to the riots that have broken out in Baltimore.

- **6:36 pm:** Unit 2 advises of a senior building right next to the CVS that needs to be evacuated and that they might need a transport bus.

- **6:37 pm:** Foxtrot advises crowd at North and Fulton is running full speed southbound on Fulton.

- **6:38 pm:** Foxtrot advises crowd switches direction and begins running north on Fulton.

  - o Foxtrot advises that a white female is being attacked by 80 people in the 1800 block of N. Fulton.

- **6:39 pm:** Operations requests a Bearcat to respond to North and Fulton.

17

CITY00021691

- Foxtrot advises assaulted female is at Westwood and Bruce with two civilians trying to help with the crowd chasing after her.

- **6:40 pm:** Unit 2 requests a bearcat to extract female.

  - Foxtrot advises female is walking north on Westwood and the crowd has stopped following her. Female walked to police for assistance.

- **6:41 pm:** City Watch advising a business owner at North and Smallwood has been attacked by a mob and is laying in the gutter.

  - Group of 20 juveniles walking eastbound on Lombard at Calvert St.

  - Commercial building fire reported in the City EOC.

- **6:42 pm:** MOEM requests a Baltimore Gas & Electric (BG&E) representative to report to the City EOC.

- **6:43 pm:** City Watch advises crowd of 100 at North and Smallwood.

- **6:44 pm:** Unit 2 advises that large crowds outnumber available police resources and the tactic is going to be bearcats extracting injured subjects instead of deploying what platoons they do have available.

- **6:45 pm:** Unit reporting that the windows of the Central wagon have been busted out.

- **6:46 pm:** Unit 100 requesting for Operations to contact the water taxi and stop their operations.

  - Unit 2 requesting status of Baltimore County units. Was not aware that they had any, but a Baltimore County Officer walked up to him and asked the whereabouts of his team.

- **6:48 pm:** Foxtrot directs bearcat to the injured store owner that was laying in gutter. Patient moved himself into a vehicle at that location.

  - Operations advises water taxi should be advised by marine unit to only run outbound passengers from harbor to accommodate for fans leaving the baseball game, but not bringing anyone into the harbor.

- **6:49 pm:** Patient extracted from North and Smallwood.

  - Unit 6641 advises an assault at Calvert and Pleasant and requests a medic.
- **6:50 pm:** Wagon requested to Freemont and Pennsylvania for 2 arrests.

18

- o   Unit 4901 advises they are cutting the fire hose at North and Pennsylvania on the CVS fire.

- o   Report of crowd at Arlington and Pratt throwing objects.

- **6:51 pm:** Bearcat with injured store owner from North and Smallwood is directed to quarters of E52 for EMS standing by.

- **6:51 pm:** Unidentified unit advises that FD stating possibility of collapse related to CVS fire.

- **6:53 pm:** Walgreens Corporate Emergency Management advises Baltimore City EOC that seven (7) Walgreens stores/pharmacies are closed for the evening.

- **6:58 pm:** KGA advises every wagon in the city to switch to 10A.

- **7:00 pm:** Unit 2 requesting water for dehydrated personnel.

- **7:01 pm:** Operations advises Unit 8 now has Operations on channel 11A.

- **7:01 pm**: Governor Larry Hogan signs and issues an Executive Order declaring a State of Emergency and authorizes the mobilization and deployment of the Maryland National Guard (MDNG) to support BPD and MSP in suppressing the unrest in Baltimore.

- **7:02 pm:** Radio batteries being requested from Unit 7500 who advises they are loading up a vehicle at HQ.

- **7:03 pm:** Unit 2 advises BCFD requesting assistance to access a hydrant at Woodbrook and North.

- **7:04 pm:** Wagon requested at Pennsylvania and Robert to transport 15 arrests.

- o   Unit 6820 advising fire hose cut at the location of 2400 Woodbrook.

- **7:06 pm:** Foxtrot advises crowd of 200-300 looting stores at North and Smallwood.

- o   Unit 2 requesting counter surveillance team to vacant dwellings along North Ave to prevent any type of sniper activity.

- o   Unit 7904 reporting liquor store owner at North and Fulton was assaulted and is in "real bad shape" inside the store

- **7:07 pm:** KGA reports burglary in progress at S Carey and McHenry with people trying to break into the T Mobile Store, units advised windows broken out.

19

- o   Unit 30 requesting a squad with mace to Retreat and Pennsylvania for a crowd forming.

- **7:08 pm:** Unit 18 reports 30 black males with masks running down the 700 block of Cumberland St with 300 written on the back of their shirts.

- **7:15 pm**: MEMA increases the SEOC activation to a Level 2.

- **7:17 pm**: The State of Maryland requests the following agencies to deploy a representative to the Baltimore City EOC on North Calvert Street:

  - o   Maryland Institute of Emergency Medical Services Systems (MIEMSS)

  - o   Maryland Transit Authority

  - o   Maryland Department of Justice

- **7:19 pm:** Foxtrot advises bearcats have extracted the store owners and Unit 2 clears the air.

- **7:20 pm:** Unit 2 advises activity has calmed down at North and Pennsylvania and prepares to redeploy towards the west where all the activity is.

  - o   Unit 2 begins to request relief for officers on the line to use the bathroom and get water.  Fresh batteries are also requested by an unidentified individual.

  - o   The Baltimore Orioles & Major League Baseball (MLB) announce they have postponed the evening game.

- **7:22 pm:** Counter surveillance on scene at North Avenue to monitor vacants between Pennsylvania and Carey.

- **7:23 pm:** Foxtrot advises a group of 70 people approaching Mondawmin Mall from the south at the high school.

  - o   Unit 6Baker20 advises that the only units that are left at Mondawmin are himself and 3 other officers.

  - o   Call for a shooting at Northern and Walther (person shot at the Family Dollar) with employee running out saying someone was shot inside.

- **7:24 pm:** Officer advises that the group is about to assault Mondawmin Mall.
- **7:25 pm:**  Unit 8 advises Unit 100 of issues at Mondawmin Mall and requests resources from downtown.

20

- **7:26 pm:** Operations requests assistance from foxtrot to direct units in to Mondawmin where they are getting reports of people running into the mall.

- **7:27 pm:** Unit 3 from fox confirms that crowd had entered the mall.

  - o   Operations requests any units not committed to answer up to be redeployed.

- **7:28 pm:** Operations shifts 100 Officers from Downtown to Mondawmin.

- **7:29 pm:** Minimal presence needed at Inner Harbor and all resources requested to be transported to Mondawmin.

- **7:30 pm:** Looting at Mondawmin mall is reported by Foxtrot.

- **7:31 pm:**  KGA updated as an armed robbery in progress.

- **7:32 pm:** KGA advises a mob of people at the Dollar Store in the NE District attacking a female.

  - o   KGA requesting units in the SD for destruction of property in progress at 1000 Cherry Hill Rd for juveniles breaking out car windows.

- **7:33 pm:** Unit 900 advising all SD units not to respond by themselves.

  - o   Unit 3 requests fire apparatus staged near Mondawmin mall and advises that once they are done looting they are going to set the mall on fire and it is going to be a big one.

  - o   Unit 8 makes announcement on 11A that Mondawmin Mall operations are moving to this channel and takes priority over Central District Ops.

- **7:36 pm:** Operations advises all units responding to Mondawmin to stage at Gwynns Falls and Druid Hill Parkway and not to enter the mall.  Operations will be on 11A with Unit 8 in command

- **7:36 pm**: NE District Unit Adam 12 clears the call put out for the Dollar Store at 7:32 pm, no injuries and no weapons.

- **7:37 pm:** Multiple Downtown platoons continue to call out availability, but no transportation available.

- **7:39 pm:** Unit 400 reports 4 sgts, 40 officers, and 2 Howard County units at staging for Mondawmin Mall.

21

**CONFIDENTIAL - Produced Pursuant to Protective Order**

CITY00021695

- **7:41 pm:** Foxtrot reports vehicles are pulling up to the south side of the mall being loaded with stolen merchandise. The east side doors are also being used for looting. At least 30 cars are being loaded.

- **7:42 pm:** Operations deploys bearcats to the south side parking lot at Mondawmin Mall.

- **7:45 pm**: MOEM deploys fifty (50) cots from Pimlico to the War Memorial.

- **7:46 pm:** Foxtrot advises that looters have breached the bottom level of the east side of the mall.

- **7:47 pm:** Unit advises that Sheriff is advising the 7-11 at Front and Gay is being looted. Unit calls on air and advises no such activity.

- **7:48 pm:** Unit advises that LE personnel have made entry into Mondawmin Mall by the Dunkin Donuts.

    o   Operations orders units not enter both sides of the mall to prevent cross fire.

- **7:49 pm:** Baker09 advises people coming out of the mall on the target side and "somebody just threw gas."

    o   Unit 501 advises "they're all over the place in this mall."

    o   Operations (on 10 A) reporting a group of ministers at North Ave and Pulaski.

- **7:50 pm:** CD unit requests a 10-16 (backup requested) at 300 W. Lexington. Citiwatch advises that a group of 20 are breaking into a store and are 3 doors down from the Citiwatch building.

- **7:51 pm**: Unit 400 confirms that gas has been deployed at Mondawmin Mall.

- **7:52 pm:** NE District KGA reporting two priority 1 silent alarms, 1506 Medford (residential) 1610 Abbotston (reports of people breaking in the rear).

- **7:53 pm:** NE District KGA trying to clear units for a B&E in progress at 1610 Abbotston. Unit 440 advising all units not to exit vehicles until he arrives and they have enough resources on scene.

    o   Unit reports on 11A that individuals are still proceeding towards the mall and entering from Gwynns Falls.

- **7:55 pm:** Flex cuffs and wagons are requested to Mondawmin for multiple arrests.

22

- o Confirmation of Law Enforcement deployment of less than lethal munitions (beanbags rounds and rubber bullets) against looters at the Mondawmin Mall and other areas.

- **7:57 pm:** Eastern District KGA sends unit to 2325 E. Monument for a hold up alarm. Upgraded to a burglary at 7:57 pm.

- **7:57 pm:** 4 wagons requested to Mondawmin Mall for prisoners.

- **7:58 pm:** Baltimore Mayor Stephanie Rawlings-Blake announces that a citywide, nightly curfew will be imposed starting Tuesday (4/28/2015) 10:00 pm until 05:00 am. It will be in effect for one (1) week with the possibility of extending the curfew if necessary.

- **7:59 pm:** Baltimore City EOC requests a cache of 800 MHz portable radios and batteries from MEMA.

  - o Operations orders Unit 100 to Lombard and Eutaw on 10A for people trying to break into the Steadman Fire Station.

  - o 1610 Abbotston marked as a David No (no police services needed) in the NE District.

- **8:00 pm:** ED Unit 3070 advises that more units will be needed at 2325 E. Monument and requests KGA to raise Unit 300.

- **8:02 pm:** Unit at 2325 E. Monument advises he cannot get out of his car and there are about 100 people forming at location.

  - o Foxtrot advises that the south side and east side entrances at Mondawmin Mall have been secured.

- **8:04 pm:** Foxtrot advises a contingency of 50 people with vehicles looting the Ross at Mondawmin.

  - o Unit 302 advises Unit 300 that a large group is gathering at Patterson Park and Monument, unable to give good estimate of crowd because their vehicle got damaged when they tried to approach.

- **8:05 pm:** CitiWatch advises approximately 100 people at Patterson Park and Monument looting a store.

  - o ED Unit 300 advises the Watch Center.

  - o **CitiWatch advises they busted the windows out of the check cashing place in the ED.**

23

- o **Operations advises a DOC bus and boxes of flex cuffs on the way to the Mondawmin Mall.**

- **8:06 pm:** ED Unit 302 requests a command post to be established at Wolf and Monument St.  Unit 300 advises that is too close to the activity and Unit 302 requests an adequate location.

  - o Unit 300 advises he is on phone with Watch Center requesting resources.

  - o Orleans and Chester is established as the Command Post

- **8:07 pm:** Unit 2 requesting LRAD and any available bullhorns for the pastors to use at Monroe and North Avenue.

- **8:09 pm: ED** Units are advised by Unit 302 that units cannot use Monument St due to things being thrown at them.

  - o ED Unit 09 requests relief from stopping traffic on North Ave at Howard St.

  - o Unit 6500 advises operations that he is finding shotgun shells and a blood trail inside Mondawmin Mall.

- **8:10 pm:** Multiple units confirm with Operations that the only discharge inside the mall was less lethal bean bag rounds, but there was lots of broken glass, which was the cause of the blood trails.

  - o Operations begins to transfer units to Eastern District talkgroup A3 to support the Eastern District

- **8:11 pm:** Unit 2 requests medic to North and Monroe for an unconscious female.

  - o CitiWatch advises crowd is at Monument and Bradford trying to break open an ATM machine.

  - o  ED Charlie 09 advises Unit 300 that he received info that they are looting the Rite Aid at Greenmount and North.

  - o ED Unit 302 advises 300 that the ED does not have any shields.

  - o KGA requests a signal 13 at the Westside shopping center in the SD.

- **8:12 pm:** KGA repeats requests for a signal 13 at Westside shopping center.

- **8:14 pm:** Operations releases Foxtrot from 11A and orders them to support SD at Westside Shopping Center for officers surrounded.

24

CITY00021698

- **8:15 pm:** CitiWatch advises people breaking into the DTLR store at Monument and Patterson.

- **8:16 pm:** BPD reporting that fifteen (15) law enforcement officers have been injured in the City during the riots. Two are still hospitalized. BPD also reported that two dozen (24) people have been arrested after looting multiple stores, set cars/other property on fire, and threw bricks and other debris at police.

- **8:17 pm:** KGA 10-32 (sufficient units on scene) at the Signal 13 for Westside Shopping Center.

- **8:20 pm:** Unit 15 advises any units around Lexington Market that people are trying to break into the market.

  o SD Units reporting vehicles streaming into 1200 W Pratt St (Mt Clair Shopping Center) reports from Mondawmin were that they were coming that way.

- **8:22 pm:** ED Unit 300 has officers organized in a line and begins to proceed down Monument St.

- **8:24 pm:** SD Unit 904 requests citywide broadcast that line of 100 cars left Mt Claire Shopping Center, but are going from shopping center to shopping center.

  o SD Unit 900 orders cars to Fort Ave Shopping center to block the entrance to the lot and advise any shop owners still open to close their businesses.  Same tactic is advised to other shopping districts in the Southern.

- **8:26 pm:** Arrest team requested to North and Pennsylvania with Foxtrot reporting a group of 20 moving north on Monroe towards North Ave.

- **8:27 pm:** ED Officers engage crowd at DTLR on Monument St.

- **8:28 pm:** District wagon 9Baker92 ordered to the 2300 block of Monument Code 1.

  o SD Unit Baker 22 advises they are ordering the Cross St. market to close.

- **8:29 pm:** Watch Center requests unit to check the area of Arlington and Pratt (Mt Clair Shopping Center) per report of UB Police advising large crowd gathering.  Advises not to engage.

  o ED Officers engage looters at Rite Aid with school police.

- **8:30 pm:** Tow truck requested to North and Pennsylvania to remove an abandoned BMW.
  o Group of 50-100 reported at Pratt and Carey.

**CONFIDENTIAL - Produced Pursuant to Protective Order**

- o About 200 people, mostly men, are marching arm-in-arm through the neighborhoods of the WD that is littered with broken glass, flattened aluminum cans and other debris following the rioting in that area.

- **8:32 pm: Unit 400 coordinating resources to close all vehicular access to Mondawmin Mall requesting additional units to secure unmanned LE vehicles.**

- **8:33 pm:** Operations requests units from Mondawmin to Mt Claire shopping center for a crowd of 100 if Mondawmin is stable.

  - o Unit 104 requests 2 wagons to Monument and Patterson Park.

- **8:34 pm:** Unit 5701 advises they are at 2400 Monument and taking projectiles, requesting assistance.

  - o Foxtrot advises they are headed to SW shopping center for a report of 125 juveniles headed that way.

  - o Units requested to North and Mount for officers getting bottles and rocks thrown at them.

- **8:35 pm:** Unit reporting that people are trying to break into 407 N. Paca. Unit 401 requests who was advising of this activity 22 advises US Marshalls received a call advising of the situation. Unit 401 advises he just left that area and reports 9 police in the 300 blk with an arrest and on Eutaw and Lexington there is about 65 State Police.

  - o KGA reporting a break in the SD at the pharmacy on 1111 Washington Blvd.

- **8:36 pm:** Arrest team requested to North and Mount.

  - o Unit 5701 advises crowd is starting a fire in the street on Monument.

- **8:37 pm:** Report of a shooting 2738 Pennsylvania Ave put out by KGA.

- **8:38 pm:** Unit 4140 reports a foot chase and requests a signal 13 at Grant and Lombard.

  - o ED Unit 5701 requesting additional platoons.

  - o KGA requests a Signal 13 at Grant and Lombard.

  - o ED Unit 5701 requesting shields ASAP.

- **8:39 pm:** Unit 6500 calls in a 10-33 (emergency) "I need someone to answer up" Advising he is at 2738 Pennsylvania for the shooting call and there is no shooting that he

CONFIDENTIAL - Produced Pursuant to Protective Order

can see. He is in an undercover car and there are a lot of people in the Pizza place, but nobody shot.

- **8:40** Foxtrot asks Unit 300 if he is aware of the fire at Gay and Federal.

- **8:41 pm:** Foxtrot advises that the entire building is engulfed.

  o Unit 4140 reports 10-32 (sufficient units on scene) for the Signal 13 at Grant and Lombard.

- **8:42 pm:** Foxtrot advises KGA to send fire department to Gay and Federal for a new construction building fully engulfed.

- **8:44 pm:** Unit 300 to all units on Monument advises 10-18 (go to district station).

  o Unit 2 asks command where resources are needed and is advised the east side.

- **8:45 pm:** KGA advises a vehicle fire at Smallwood and North with an individual trapped inside.

  o Motor 1 advises they are on their way to the ED from Camden yards with 2 busses.

  o Reports of 5 gunshots West of the Mt Clair Shopping Center in the SD.

- **8:46 pm:** Unit 300 advises to hold the line at 2200 Monument until they can get reinforcement and shields.

  o CitiWatch advises the vehicle fire put out by KGA at 8:45 pm is a house on fire not a vehicle. Fire in the rear of a corner store with 100 people outside of the building.

- **8:47 pm:** Unit 5 Charlie 09 advises of some fires in Druid Hill Park on 10A.

  o Looting reported at the liquor store on the corner of Pratt and Carey.

- **8:48 pm:** ED Unit 302 to KGA reporting intel of a huge crowd approaching North and Greenmount and requests CitiWatch assistance.

- **8:49 pm:** ED Adam 35 requests KGA to contact MTA to divert traffic off of Monument onto Wolf or Washington.

  o Unknown ED Unit advising total of 16 arrests from DTLR.

  o Foxtrot advises Unit 800 that they do not see anybody trapped in the house on fire at Smallwood and North and Unit 800 stands down the requested bearcat .

**CONFIDENTIAL - Produced Pursuant to Protective Order**

- **8:50 pm:** State of Maryland conducts press conference with Governor Hogan, MSP Superintendent Colonel Pallozzi, Homeland Security Advisor Hutchins, Adjutant General of Maryland – Major General Linda Singh, and MEMA Executive Director Clay Stamp. During the press conference the State announced the declaration of a State of Emergency, the deployment of law enforcement resources, the mobilization and deployment of the Maryland National Guard, the request of additional resources from within and outside of the State.

- **8:51 pm:** MSP Superintendent Colonel Pallozzi announced the following Maryland Emergency Assistance Compact (MEMAC) and Emergency Management Assistance Compact (EMAC) request:

  o EMAC:
    - 5,000 Law Enforcement Officers from Mid-Atlantic Region/East Coast
  o MEMAC:
    - 600 Law Enforcement Officers with Riot Control Gear
      - 25-30 Person Platoons with transportation
    - Command Staff Personnel
    - 500 Prisoner Transport Vehicles
    - 10 Tactical Response/Rescue Vehicles (armored vehicles)

- **8:52 pm:** The decision to close Baltimore City Public Schools is made.

  o Unit 8 redeploys units from downtown (Pratt & Calvert) to North and Smallwood to assist BCFD on fire, But they don't have transportation.

  o Unit 8 redeploys units from Mondawmin (AA Police Bus) for an urgent call from BCFD for units at Smallwood and North to assist FD resources.

- **8:53 pm:** Backlog of wagons reported at central booking waiting to process prisoners.

  o Citywide advises the academy isn't taking prisoners any more.

  o ED Unit 3c09 requesting permission to leave the traffic detail at North and Howard St. to assist ED units on Monument St.

  o ED Unit 5701 advises MTA needs to suspend all bus service anywhere they are having issues, they are going to attack the busses.

- **8:54 pm:** Unknown ED unit advises school police reporting juveniles near school with malotov cocktails(school not identified).
  o Operations advises Unit 2 that assets are needed at the house fire on North and Smallwood for people trapped.

28

- o Foxtrot advises BCFD is arriving on scene at Smallwood and North with no law enforcement protection.  Looting is occurring across the street, but not attacking the fire hose or threatening fire personnel.

- **8:56 pm:** ED 3charlie09 requests permission again to release traffic at North Avenue and Howard St to respond to the East Side which is under siege now.

- **8:57 pm:** SD Unit 908 reporting looters at Patapsco Village Shopping Center.

  - o Unit 2 approves request from ED unit and traffic is allowed to flow west on North Ave towards North and Pennsylvania.

- **8:58 pm:** Unit 300 advises city tow trucks are assisting with blocking traffic.

  - o KGA requests anyone in area of 3919 Erdman avenue for reports of large group of juveniles looting in the area.  Erdman Shopping center armed security guard on scene in rear on phone with 911.

- **8:59 pm:** CitiWatch advises Unit 200  on 3A that a crowd of 300-400 people trying to get into a check cashing place in the ED.  Unit 200 advises they don't have the resources to confront that group.

- **9:01 pm:** Unit 800 ordered by Unit 2 on 10A to move assets from North and Fulton to head back to North and Carey.

- **9:03 pm:** ED Charlie 09 reports that they are free from traffic detail and able to assist on Monument St.

  - o ED unit 4adam42 advising large group of juveniles broke into shoe city at Erdman Shopping center.  5 or 6 still inside of store.

  - o Baltimore City EOC requests twenty (20) Suppression Engines and ten (10) trucks through MEMA.

- **9:04 pm:**  Signal 13 requested by KGA for 3919 Erdman Ave.

  - o Unit 300 requesting officers to assist at scene of fire on Gay and Federal.  Only 1 LT on scene.

  - o Unit 2 transfers command of the North Avenue corridor to Unit 7 (LTC Reitz) and establishes  North Ave between Carey and Pennsylvania as the Incident Command Post and advises he is headed back to HQ.

- **9:05pm:** BPD requests that the Lexington Street garage be opened for law enforcement use.

29

- **9:07 pm:** Baltimore City Department of General Services (DGS) is developing a strategic plan for refueling city and mutual aid vehicles.

- **9:10 pm:** City DGS reports that the War Memorial Building will be opened as a rest and rehabilitation area for law enforcement. Access will be on Lexington Street or Fayette Street.

  o Units at multiple locations throughout the city begin to request food.

  o Unit 8 advises Foxtrot that they have a report of a shooting inside of a store at 1801 W. Lexington requesting a downlink to evaluate before sending units.

  o KGA reporting looting at 5000 Sinclair Ln. (Parkside shopping center).

- **9:11 pm:** Unit 99 advising "special police" at location has 1 at gunpoint inside the DTLR at 5126 Sinclair Ln.

  o Unit 4520 advises that a bus driver gave them a report of looting inside of H&H camping supplies on Eutaw St. Also advises that store has ballistic vests and a lot of weapons. Unit 8 notes as a priority and advises Unit 100 and 400 requesting report of what units they can break off. Requests at least 2 platoons headed to that location.

- **9:12 pm:** CD unit advises 1 in custody that jumped out of window in H&H.

  o Unit 99 upgrades to two suspects in the ED at gunpoint advising other people approaching 5126 Sinclair Ln.

  o County air has visual of police with suspects at gun point.

- **9:13 pm:** Unit 4520 advises they are making entry into H&H.

  o ED Unit 5701 requesting MFF platoons to Madison and Patterson Park with gas to be prepared if they need it.

- **9:14 pm:** Unit 8 advises to slow down and wait till tactical assets are in place to make entry at H&H.

- **9:15 pm:** Unit 8 advises all units to back away from the front of the store and set perimeter. If anyone comes out they can apprehend them.

  o Unit 4802 advises of reports of looting at the gas station at North and Madison.
- **9:16 pm:** Unit 100 on scene advising all personnel to move away from the front of the building and to standby until tactical arrives.

- **9:17:** KGA 10-32 the Signal 13 at 3919 Erdman Ave that was put out at 9:04 pm.

30

**CONFIDENTIAL - Produced Pursuant to Protective Order**                                    CITY00021704

- **9:20 pm:** Signal 13 requested for 4600 block of Reisterstown for shots fired.

  o Unit 658 requests Foxtrot to Reisterstown and Virginia for officers taking gunshots. Not acknowledged and requests again at 2121, KGA attempts to get Foxtrot to answer up.

- **9:21 pm:** Unit 7580 advises clearing H&H and responding to Reisterstown and Virginia.

- **9:22 pm:** KGA requests Signal 13 at Poplar Grove and North Ave.

- **9:23 pm:** City DGS fueling station will be available for remainder of the evening at 405 Fallsway (Midtown); 4325 York Road; & 4410 Lewin Avenue. City Department of Public Works (DPW) will provided fuel at the Patapsco Station for the southern area on 4/28/2015.

  o Baltimore City Public Schools (BCPS) announced that all BCPS schools will be closed on Tuesday, 28 April 2015.

- **9:24 pm:** ED unit 300 prepares to advance on large crowd. Bearcat to lead with less lethal munitions followed by platoon lines.

- **9:25 pm:** CitiWatch advises 10 cars at Montford and Monument breaking into a check cashing store.

- **9:26 pm:** Operations requesting at least 2 units to respond to Poplar Grove and North Ave for officers being surrounded requesting a signal 13 (dropped at 9:22 pm on A8 SW).

  o Command advises 10-32 (Sufficient units on scene) at Poplar Grove and North and the officer has been extracted.

- **9:29 pm:** Bearcat and line begin moving towards crowd at Montford and Monument.

  o KGA makes announcement not to bring any prisoners to E&T.

- **9:30 pm:** Unit 100 requesting update on tactical assets to H&H so that he can clear it.

  o Unit 801 calls command and advises that the SW district is experiencing looting at 3 locations and he doesn't have enough manpower to secure.
    - North/Poppleton (6 arrests)
    - Westside Shopping Center
    - Frederick and Warwick.

31

- **9:31 pm:** Platoon sent to North and Smallwood unable to make it due to taking on bottles and rocks.

  - Unidentified ED unit advises they are deploying munitions on talkgroup A3.

- **9:32 pm:** County air support advises the crowd on Monument St. is largely dispersed.

- **9:34 pm:** KGA puts out request for units for possibly armed individuals at the city yard (6700 Pulaski Highway trying to steal dirt bikes).

- **9:36 pm:** Command requests county air support to 5600 Alameda to check on reports of the Alameda shopping center being looted in the NE.

- **9:37 pm:** County Air advising roughly 5 people running around the city yard at 6700 Pulaski Highway.

- **9:39 pm:** Multiple pursuits initiated when units arrive to 6700 Pulaski Highway.  Per Unit 440 no vehicle pursuits advised and ordered officers to stop vehicle pursuits.

  - SD Unit 903 at St Margaret and 10th St involved in foot pursuit.  Signal 13 requested by KGA.  1015 E Patapsaco is exact location and was 10-32 at 9:41 pm

- **9:40 pm:** Report of alarm going off at Orleans and Gay with 15 cars behind building and widespread looting.

  - BPD request to open Lexington Street garage is completed and the garage is open.

- **9:43 pm:** Unit 6474 reports looting at Broadway and Fleet.  Command advises they have no assets to send to that location and to notify the SE to send some marked cars to that location.  Unit 200 advises they have no units available to respond.

- **9:44 pm:** Operations advises everyone on channel 11A about North and Woodyear, man with gun and shots fired in the Northwest.  Reminds everyone to use caution.

  - City DGS maintenance staff are available at BPD Police Headquarters for the remainder for the evening.

- **9:45 pm:** Operations asks Unit 100 if he has anything to free up to send to the NE District without exposing downtown.

  - NE District unit 4 Adam 09 announces she has info from the Watch Center that "they are supposed to hit the Belair Rd. corridor next and burn something down in the NE, but no exact info"
- **9:47 pm:** Unit 800 advises they are taking projectiles at North Ave and Woodyear, requesting air support.

32

CITY00021706

- **9:49 pm:** Unit 9652 requests units to the Sports Mart at Gay and Orleans St for people breaking in the back.

- **9:50 pm:** NE District unit Adam 11 responding to 1111 E. 25th St with a citizen advising a tire shop is on fire.

- **9:51 pm:** Unit 104 reports possible fire at 2430 Monument St (smoke coming from the top of the building).

  - ED unit 300 requesting BCFD to 2430 Monument for house fire.

  - Unit 4940 at Colvin and Orleans with looters in custody requesting additional units.

- **9:58 pm:** Unit 24 advises the Dollar General at 700 Washington Blvd is being looted.

- **9:59 pm:** 3 Uniforms enter the store to clear it….cleared at 10:02 pm.

- **10:06 pm:** Watch Center requests units to respond to 6700 Pulaski Highway to assist School Police.

  - Unit 5701 advises rumor going around of a killed officer on the West Side is false.

  - BCFD is conducting exterior defensive suppression operations on the neighboring commercial and residential buildings around the Mary Harvin Transformation Center, which at this point continues to smolder after being engulfed by flames earlier in the evening.

- **10:07 pm:** Additional units requested to Foot Locker on Monument (no address given) for looters in the store and only 3 officers on the scene.

- **10:08 pm:** KGA requests a Signal 13 for Foot Locker on Monument. (10-32 one minute later).

- **10:09 pm:** KGA updates location of Foot Locker to 900 Caroline.

  - ED Unit 5701 requesting 4 more units for an interior sweep at 900 Caroline.

- **10:10 pm:** Unit 100 requests units to 300 lexington for looters back in shoe city.

- **10:13 pm:** Unit reporting 1301 Laurens being looted with owner trapped upstairs.

- **10:14 pm:** Wagon requested for arrest at 300 Lexington.

CONFIDENTIAL - Produced Pursuant to Protective Order                    CITY00021707

- **10:15 pm:** Unit 801 requesting resources at Westside shopping center for looting. Operations advises a few other priorities and resources will be cleared up as soon as possible.

- **10:16 pm:** CitiWatch requests ED units to the liquor store at Curly and Monument for looting (no address given).

- **10:21 pm**: Maryland's Attorney General Brian E. Frosh calls for an end to the violence.

- **10:23 pm:** NE District unit 4 Adam 44 reports group of 20 males walking down the Moravia ramp to try and get into the City yard.

  - o Command reports a large fire set in the intersection of North Ave and Fulton with people walking up and throwing things in the fire to make it bigger.

- **10:24 pm:** Food for officers being requested at Pennsylvania and North.

  - o CitiWatch advises ED units again of looting at liquor store at Monument and Curly St.

- **10:26 pm:** Unidentified NE District unit advises a beauty supply store and Foreman Mills has been broken into on Belair Rd.

- **10:27 pm:** KGA advises firearm discharged at Erdman Ave and Lake Montebello, 4 shots discharged in area.

- **10:28 pm:** Unit 7560 advises 10-32 it was tac units shooting bean bag rounds.

- **10:37 pm**: BPD requests 3,000 rounds of Live or Live X Pepper Ball Rounds. The request was submitted to SEOC.

- **10:47 pm: report of food being available at North and Pennsylvania.**

- **10:48 pm:** Unit reporting Mondawmin is secure and company is coordinating to begin boarding up.

- **10:49 pm:** Unit 4940 advises group at Commerce and Pratt going into construction site and grabbing bricks.  Requests additional units.

  - o Unit at North and Pennsylvania reporting that the food provided "doesn't even scratch the surface of what is needed"

- **10:50 pm:** Additional food requested to North and Pennsylvania.

34

- Unit 4940 requesting a wagon at Commerce and Pratt for 8 or 9 arrests.

- **10:54 pm:** Foxtrot reports individuals trying to climb the fence at the city yard to steal dirt bikes.

- **10:59:** 5701 advises they should be good for the night and will not need MFF teams anymore.

- **11:01 pm:** CSX police notifies KGA of possible shots fired at Erdman and Federal St.

  - BPD requests food and water for all law enforcement personnel in the field.

    - 100 Officers located at Pennsylvania Avenue and North Avenue.

    - 100 Officers located at Pennsylvania Avenue and Retreat.

- **11:02 pm:** CSX police advise 25 to 30 protestors with masks in the area of Erdman and Federal.

- **11:05 pm:** Fox checking on large crowd at 4500 blk of Erdman towards Sinclair, reported walking Westbound.

- **11:14 pm:** Unit 99 reports to KGA he received calls for looting at Milton and Lanvale and Collington and Biddle.

- **11:16 pm:** CitiWatch advises units on North Ave that the bar on the SW corner of Fulton and North Ave is on fire.

- **11:17 pm:** KGA advises a silent alarm at 1644 Milton at Apache Liquors.  Owner is watching security cameras from a remote location.

- **11:18 pm:** Unit 7660 advises that BCFD says they are not going to extinguish the car or liquor store that is on fire.  Command then consults with Chief in command and advises that if they push and clear the intersection, fire will proceed in and extinguish the fire.

- **11:19 pm:** WD unit 1c30 advises that they are breaking into the liquor store at Laurens and Division St.  Foxtrot confirms 20 people looting the store.

- **11:21 pm:** CitiWatch advising a break in at a store in the 700 blk of Lakewood.

  - Medic requested to the ED station for multiple injured officers.

- **11:22 pm:** Foxtrot is heard in the background of a citywide announcement advising of a house fire at 1829 Pennsylvania.

35

CITY00021709

- **11:22 pm:** KGA advises city yard is closed and all medallion tows should be taken to the operator's lots.

- **11:23 pm:** Unit 9800 reporting to KGA looting at the Family Dollar Store at Harford and Broadway (2000 blk Harford Rd).

- **11:25 pm:** Unit 7650 reports 2 buildings on fire at Fulton and North.

- **11:26 pm:** CitiWatch advising 1800 Pennsy for a building fire in the middle of the block. Unit 100 requests operations to advise BCFD.

- **11:28 pm:** Unit 20 reporting a building on fire at Pennsylvania and Laurens.

  o KGA requesting unit on ED channel A3 to 1600 blk N. Durham for a report of an armed person.

- **11:32 pm:** Signal 13 requested for 5516 Bowleys Ln. for an off duty officer with his gun drawn.

- **11:33 pm:** Unit requests BCFD for a dwelling fire at 2400 Monument (updated to the 2500 blk).

- **11:36 pm:** Signal 13 at 5516 Bowley's Ln. 10-32.

- **11:39 pm:** Unit 1510 requests several units to the Rite Aid at MLK and Park Avenue for individuals entering the store.

- **11:40 pm:** Baltimore Police Commissioner Anthony Batts disclosed during a late-night news conference that MDNG troops have begun taking up positions on the ground in the City.

- **11:45 pm:** Unit 3901 advises the Governor is in front of City Hall.

- **11:47 pm:** Unit 42 requests a wagon to the Rite Aid at MLK and Park for at least 3 under arrest at the Rite Aid.

- **11:48 pm:** Additional units requested to Monument and Potomac, Signal 13 requested for officers in pursuit and engaged with looters. (10-32 one minute later).

- **11:51 pm:** Platoon requested to the 2200 blk of Monument St to retake the block (where DTLR was looted).
- **11:53 pm:** Unit 42 advising 20 people in the Rite Aid at MLK and Saratoga.

36

CONFIDENTIAL - Produced Pursuant to Protective Order                    CITY00021710

- **11:54 pm:** Unit 6770 advising one prisoner advises that an individual in the Rite Aid at Saratoga and MLK has a gun.

- **11:55 pm:** Unidentified ED unit reports that DTLR and 2200 blk of Monument St. are clear.

- **11:56 pm:** KGA requesting unit for 2921 E. Monument for a silent alarm from Curly liquors.  Citiwatch reports people still coming out the back door.

- **11:57 pm:** Unit 7580 advises they are responding and for officers on scene at the Rite Aid on Saratoga and MLK to not make entry.

- **11:58 pm:** Mayor of Baltimore conducts a press conference with members of the City Council, leaders of the faith community, and Freddie Gray's twin sister Fredericka Gray. She makes a statement asking citizens to not riot and to stop the violence.

**Tuesday, 28 April 2015**:

- **12:01 am:** Fire units are dispatched to 2100 Hollings Ferry Rd for several vehicles on fire in the junk yard.

- **12:16 am:** Fire units are dispatched to 1701 Baker St. for fire in a two-story storefront.

- 12:57 am: Fire units are dispatched to 2401 Biddle St. for heavy fire through the roof of a two-story vacant dwelling.

- 1:04 am: Fire units are dispatched to W. North Ave. and Smallwood St. for a fire in the first floor of a two-story storefront with apartments above.  A civilian is rescued and transported to Shock Trauma.

- 1:34 am: Fire units are dispatched to 2109 W. Pratt St. for fire on the first and second floors of a three-story storefront.

- 1:38 am: Fire units are dispatched to the Rite Aid store at W. Saratoga St. and MLK. Units report heavy fire upon arrival.

- 1:41 am: Fire units are dispatched to N. Hilton St. and Piedmont Ave. for a three-story store front fully involved.

- 1:49 am: Fire units are dispatched to 1710 Harman Ave for a fully involved two-story frame dwelling.

- 2:13 am: Fire units are dispatched to 2413 Frederick Ave for a fire in the Gamestop store in the Westside Shopping Center.

37

- 2:33 am: Fire units are dispatched to 24th St. and N. Charles St. for fire in the doorway of a four-story brick building.

- **2:53 am**: Two (2) officers at the War Memorial Building for rehabilitation. The number is expected to increase significantly by morning. War Memorial has fifty (50) cots and an additional 250 cots are ready for deployment from ENT.

- **3:23 am:** Fire units are dispatched to the intersection of N. Mount St. and Baker St. for fire on the second floor of a two-story dwelling.

- **3:57 am:** Fire units are dispatched to the intersection of 2111 W. Pratt St. for a reported fire in several three-story brick storefronts. Progress is hampered by a wall collapse. Working fire called at 4:15 am. Second alarm called at 4:18 am. Third alarm is called at 4:30 am.

- **5:43 am**: Baltimore City Circuit Court will be closed all day on 4/28/2015.

- **6:59 am:** Fire units are dispatched to return to the CVS Pharmacy at the corner of W. North Ave and Pennsylvania Ave. to extinguish a small trash fire.

- **8:15 am**: Baltimore Urban Area Security Initiative (UASI) mutual aid Emergency Management planning support personnel arrive at the Baltimore City EOC.

  o Emergency Management personnel from Harford and Howard County's.

- **9:17 am**: Report for Baltimore City Health Department (effective from 09:00):

  o All Baltimore City Health Department (BCHD) building will be closed,
    - Closure exceptions include:
      - BCHD Headquarters – 1001 East Fayette Street
      - Eastern Health Clinic
      - Field Health Services
      - Animal Control
      - Office on Aging and Care Services (CARE)
  o All Senior Centers will be closed.
  o Druid Health Center is closed.
  o Eastern Health Center closing at noon (12:00 hours) on 4/28/2015.
  o Field Health Services will be providing only life-sustaining medical transports such as chemotherapy and dialysis.

- **10:26 am**: City DGS has completed building inspections at the following locations:

  o Eastern Health Center – 620 Caroline Street

38

- o   Oliver Multi-Purpose – 1400 East Federal Street
- o   Govan - 5225 York Road
- o   Hatton Center
- o   Zeta – 4501 Reisterstown Road
- o   Lower Park Height – 3939 Reisterstown Road
- o   Druid Hill Health Center – 1515 West North Avenue
- o   Health Department – 1001 East Caroline Street
- o   John Booth Senior Center – 2600 Baltimore Street
- o   Hooper Health Department (ADC) – 2600 Baltimore Street
- o   Forest Park Senior Center – 4801 Liberty Heights

- **3:22 pm:** Fire units are dispatched to return to the CVS Pharmacy at the corner of W. North Ave. and Pennsylvania Ave. to extinguish a small fire on the roof.

- **5:10 pm**: All requests for MDNG tactical deployments within the City will come from Incident Command, at the BPD Watch Center, to the MSP liaison at the Watch Center. The MSP liaison will notify the MJOC for tracking purposes. All parties are in agreement.

- **5:41 pm**: Baltimore City MOEM finalized the EMAC request for Pennsylvania State Police resources.

- **10:00 pm:** City Curfew in in effect and is being enforced by BPD.

- **11:00 pm:** State EOC requests an update on police and firefighter injuries over the entire incident thus far.

    - o   20 Police injuries

    - o   2 Firefighter Injuries (related to Firefighting duties)

**Wednesday, 29 April 2015**

- **12:01 am:** Briefing held in the EOC with Agency report out.

- One Baltimore campaign enacted for donations and volunteerism from individuals and agencies

**Thursday, 30 April 2015**

- **8:00 am:** As of 0800, a total of 98 Law Enforcement personnel have been injured. 43 were seen at Mercy Hospital, 13 were put on medical leave, 15 were assigned to light duty, and 15 were released back to full duty.

39

- **11:00 am:** Police Commissioner Anthony Batts announces to the press that the Department has handed over all evidence to the states attorney's office.  Police reveal that they discovered the van transporting Freddy Grey made one previously unknown stop.

- **2:00 pm:** Pennsylvania SEOC activated to level 2 at 1400 in support of Philadelphia protesting.

- **3:00 pm:** Report of Anonymous group posting a YouTube video "Operation Baltimore" Threat sent to Watch Center.

- **4:00 pm:** EOC Briefing
    - Heavy traffic congestion is expected in the downtown area, specifically at the Inner Harbor, downtown, and in the Mount Vernon areas along: North Ave, St. Paul Street, Lexington Street, and Holiday Street.
    - Concern for Exelon natural gas location at 395 overpass; no credible threat, but concern of security breach possibility
    - Threat made towards Baltimore Harbor Hotel
    - 201 People have been arrested in relation to the protests; 106 released 4/30 with charges to be determined at a later time.
    - Cyber threat reported by FBI: route of attack was reported as via email
    - 2 health clinics open with security presence
    - Health Department command center has been opened
    - Resources in support of mental health and medical needs includes the Red Cross and Maryland Responds
    - Fire Department mutual aid resources include Anne Arundel County, Baltimore County, Howard County, and BWI Airport Fire Department.

- **5:00 pm:**  National Guard Posted at key facilities to protect fuel sites and infrastructure.

- **7:30 pm:** Cyber Attack on One Baltimore City website.

- **10:00 pm:** Curfew begins for third night with relatively little violence. Several arrests made without incident.

**Friday, 1 May 2015**:

- **3:00 am:** Baltimore City website still down.

- **6:00 pm:** Corrections has activated their EOC.

- **10:00 pm:** Curfew begins with many protestors still on the street. Arrests being made. No violence experienced.

40

## Information Sources

1. Baltimore City Mayor's Office of Emergency Management's WebEOC – Incident Management and Situational Awareness Software Tool

2. The Baltimore Sun – "Timeline: Freddie Gray's Arrest, Death, and the Aftermath"
   Website: http://data.baltimoresun.com/news/freddie-gray/

3. CNN – "Baltimore Riots: A Timeline"
   Website: http://www.cnn.com/2015/04/27/us/baltimore-riots-timeline/index.html

4. Associated Press – "Timeline of Violent Baltimore Protest"
   Website: http://wwlp.com/2015/04/27/timeline-of-violent-baltimore-protests/

41

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00021715

# EXHIBIT 83



# AFTER ACTION REVIEW

## Civil Unrest

## April 27th, 2015

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00025873

8:00 a.m.

Baltimore Police have requested law
enforcement support from several other
agencies to state in the city.

Mutual Aid includes:

* Baltimore County

* Anne Arundel County

* Prince George's County

* Montgomery County

* Maryland State Police

* Maryland Transportation Authority Police



CONFIDENTIAL - Produced Pursuant to Protective Order

08:25 a.m.

Baltimore Police release the following
threat information:



## BALTIMORE POLICE DEPARTMENT

OFFICE OF THE POLICE COMMISSIONER
MEDIA RELATIONS SECTION



Anthony W. Batts
Police Commissioner

Captain J. Eric Kowalczyk
Director

## CREDIBLE THREAT TO LAW ENFORCEMENT

Baltimore, Md., April 27, 2015 – The Baltimore Police Department / Criminal
Intelligence Unit has received credible information that members of various
gangs including the Black Guerilla Family, Bloods, and Crips have entered into
a partnership to "take-out" law enforcement officers.

This is a **credible threat**. Law enforcement agencies should take appropriate
precautions to ensure the safety of their officers. Notification will be sent via
NLETS. Further information will be sent through appropriate channels.

Media is requested to distribute this information to the public and law
enforcement nationwide.

-END-



**CONFIDENTIAL - Produced Pursuant to Protective Order**

# During the school day

## The flyer below is reported to have been circulated widely among city school students via social media





CONFIDENTIAL - Produced Pursuant to Protective Order

09:00 a.m.

As reported by WBAL, MTA Police receive a briefing from Colonel DeSousa on possible unrest.



**CONFIDENTIAL - Produced Pursuant to Protective Order**

# 11:00 a.m.

## The funeral service for Freddie Gray begins at New Shiloh Baptist Church





**CONFIDENTIAL - Produced Pursuant to Protective Order**





CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00025879

# 11:00 a.m.



## In attendance:

Mayor Stephanie Rawlings-Blake
Rep. Elijah Cummings
Rep. John Sarbanes
Rev. Jesse Jackson
Kweisi Mfume
Broderick Johnson, White House
Sheila Dixon
Dick Gregory, activist
Rev. Jamal Bryant
Family of Trayvon Martin
Daughter of Eric Gardner
Over 3,000 others



CONFIDENTIAL - Produced Pursuant to Protective Order   CITY00025880

There is a heavy media presence
outside of the funeral. All local and
several national outlets represented.







**CONFIDENTIAL - Produced Pursuant to Protective Order**

# 8:18 a.m.

According to their Tweets, Miguel Marquez
and Brian Todd are both at the funeral. They
are later seen in CNN coverage.







CONFIDENTIAL - Produced Pursuant to Protective Order

12:09 p.m.

According to their Tweets, Miguel Marquez
and Brian Todd are both at the funeral.  They
are later seen in CNN coverage.



**Miguel Marquez** @miguelmarquez · Apr 27
#FreddieGray funeral.  Full choir





**Miguel Marquez**
NATIONAL CORRESPONDENT

RETWEETS     FAVORITES
7            21

12:09 PM - 27 Apr 2015 · Details

 



**CONFIDENTIAL - Produced Pursuant to Protective Order**

There is a heavy media presence outside of the funeral. All local and several national outlets represented.





CONFIDENTIAL - Produced Pursuant to Protective Order

1:42 p.m.

The casket holding Freddie Gray is loaded into the hearse. There are crowds, but no protests at the funeral.



CONFIDENTIAL - Produced Pursuant to Protective Order

# 1:00 p.m.

## Baltimore Police have pre-staged resources at several locations throughout the city, including:

- City Hall

- Western District Police Station

- Mondawmin Mall

- Camden Yards

- Downtown

- Inner Harbor



**CONFIDENTIAL - Produced Pursuant to Protective Order**

CITY00025886

# 1:18 p.m.

## Additional resources are sent to Mondawmin Mall

- 4 arrest teams

- 1 platoon from Montgomery County

- 1 Platoon from Prince George's County

They join a platoon from BPD led by Unit 600, Major Partee.



CONFIDENTIAL - Produced Pursuant to Protective Order

- **1:53pm** Major Partee takes command of the Mondawmin deployment.

- **1:59pm** 2 vans are dispatched to the Northern District to pick up 30 shields and deliver them to Mondawmin Mall.

- **2:04pm** The mall is reported to be open.

- **2:04pm** Additional personnel from other areas are moved to Mondawmin Mall.

- **2:04pm** Foxtrot reports no groups gathering in problem spots, no problems at Mondawmin.

- **2:16pm** A Signal 13 (officer in need of assistance) is dispatched in the 300 block of South Monroe Street in the Southwest District.

- **2:27pm** CitiWatch reports a crowd gathering around the area of the Signal 13.



**CONFIDENTIAL - Produced Pursuant to Protective Order**

CITY00025888





CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00025889

- **2:33pm** Students begin to walk out of Douglas High School.

- **2:35pm** All districts go into Tactical Alert, only responding to Priority 1 and Priority 2 calls.

- **2:43pm** Western District call for service: 2 black males walking in the 2000 block of Ridgehill Ave armed with guns. WD units respond.

- **2:44pm** 11 minutes after the walkout begins, Major Partee announces "Mondawmin Mall, helmets on now!"

- **2:45pm** A school police officer notifies his communications center that "they're throwing rocks and bricks" at Mondawmin by the Dunkin Donuts.

- **2:46pm** A platoon of 1-6-23 led by Lt. Morris at Camden Yards is redirected to Monawmin Mall.

- **2:46pm** School police at Mondawmin reports the crowd is students and adults, 90% Douglas High students.

- **2:46pm** Northwest District call for service: Silent alarm at the payless shoe store in the rear of the mall. NWD units respond.



**CONFIDENTIAL - Produced Pursuant to Protective Order**





CONFIDENTIAL - Produced Pursuant to Protective Order



2:44pm
Report of rocks
thrown at officers

2:33pm
Students begin to
walk out of Douglas

2:43pm
2000 block of Ridgehill Ave
CFS report of 2 armed men



CONFIDENTIAL - Produced Pursuant to Protective Order

- 2:48pm School Police officer requests dispatch to notify the NWD that a large crowd is headed towards the 7-11 on Liberty Heights Ave.

- 2:49pm A BPD officer reports on TAC1 that a crowd is rushing the 7-11. Another officer reports it should already be closed.

- 2:49pm Foxtrot switches to the NWD channel and advises the group is headed towards 7-11. 3 NWD officers respond.

- 2:49pm Another BPD officer reports the 7-11 is not closed, and is being rushed.

- 2:50pm Foxtrot reports people running in and out of the 7-11.

- 2:52pm NWD call for service: Holdup alarm at the 7-11. The NWD Lieutenant states he is responding.

- 2:52pm Lt. Col. Hyatt – Operations in the Watch Center – is heard on TAC1 "Let's start corralling these kids and making arrests."



**CONFIDENTIAL - Produced Pursuant to Protective Order**

* 2:53pm School Police officer in the area reports the crowd has been pushed away from the 7-11, asks the School Police representative in the Watch Center if buses in the area have been shut down or re-routed yet.

* 2:53pm Baker 11 from the NWD arrives at the 7-11 and 10-32's the call. Reports the crowd has left, destruction of property and looting.

* 2:55pm The School Police rep in the Watch Center reports that MTA is closing the bus loop at Mondawmin; will keep the subway open.

* 2:59pm Three units from the WD (B22, B31, and B32) request that KGA hold them out at Mondawmin Mall.

* 3:00pm WD KGA advises B22 that they are receiving 911 calls for teenagers threatening to shoot people. B22 advises there are numerous police on location who will handle.

* 3:00pm The School Police rep in the Watch Center reports that MTA is now also closing the subway.

* 3:01pm A medic unit is requested for a civilian at the bus stop hit by concrete. 36 year old male with a head injury, breathing and conscious.



**CONFIDENTIAL - Produced Pursuant to Protective Order**





CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00025895

- 3:02pm WD two calls for service dispatched:

  - 1623 W. North Ave – Breaking and entering

  - 1611 W. North Ave – Larceny in progress

  - WD units respond

- 3:04pm Foxtrot requests units from the NWD to block traffic on Liberty Heights and Reisterstown to keep people away from the mall

  - B29 takes Reisterstown Southhbound

  - B47 takes Liberty Heights Eastbound

- 3:07pm Medic 8 is dispatched to stand by at E52 to await a police escort to pick up an injured subject.

- 3:07pm Request from School Police officer at Mondawmin to Watch Center to have MTA shut down all bus traffic at Mondawmin. Rep in the Watch Center advises this should have been done already.

- 3:07pm Foxtrot reports to Major Partee that he is in a good spot. All aggressors are south of his location.

- 3:07pm Operations in the Watch Center requests the Bearcat respond to the top of the bus loop for an officer being assaulted.

- 3:09pm the Lieutenant from the NWD reports that the 7-11 is closed and secure.



CONFIDENTIAL - Produced Pursuant to Protective Order

* 3:10pm Foxtrot requests a unit from the WD to block traffic northbound on Reisterstown prior to Gwynns Falls. B22 responds to Fulton and Reisterstown.

* 3:12pm A large crowd at Reisterstown and Liberty Heights is reported to be throwing rocks.

* 3:12pm Foxtrot requests someone from the NWD block traffic at at Swan Dr and Gwynns Falls. The NWD reports that is the Northern.

* 3:12pm ND Dispatch requests a unit to block traffic at Swan Dr and Gwynns Falls. B33 takes it.

* 3:13pm Prisoner transport requested at Reisterstown Rd and Liberty Heights. Unclear if anyone is actually in custody.

* 3:13pm A unit from the ND reports that juveniles are being pushed from the mall towards the park (ND area). The ND Lieutenant requests 33 and 41 to respond and advise.

* 3:14pm Foxtrot reports a large group breaking up cinder blocks in the alley behind the Midas, getting ready to throw bricks.

* 3:14pm School Police officer at Mondawmin requests a medic for a male BPD sergeant with and ankle injury, located inside the hub.

* 3:15pm Situational awareness update from Sgt. Chris Oree.



CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00025897







CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00025899

* **3:15pm** School Police officer at Mondawmin advises they are being bombarded with bricks and bottles.

* **3:18pm** The platoon led by Lt. Morris arrives at Mondawmin.

* **3:19pm** WD call for service: 1520 W. North Ave, kids inside the North Penn subway stealing items.

* **3:23pm** WD B22 (block[ ] bottles at his vehicle. B[ ] leave.



**Baltimore Police** ✓
@BaltimorePolice

🐦 Follow

A group of juveniles are still in the area of Mondawmin Mall. We are hearing reports of bottles and bricks being thrown at officers.

3:29 PM · 27 Apr 2015

↩ ♻ 231  ⭐ 61

t that kids are throwing B22 advises he is going to

* **3:28pm** Unit 7580 reque[ ] still reported to be arrivi[ ]

o Mondawmin. Buses are

* **3:29pm** Signal 13 at Reisterstown and Liberty Heights.

* **3:31pm** The WD Lieutenant is requested to go to the WD and obtain half of the foggers and bring them Code 1 to Mondawmin

* **3:34pm** A group of 75-100 juveniles are reported to be heading southeast on Liberty Heights at Tioga Pkwy

* **3:41pm** WD Call for service: 2718 Pennsylvania Ave, break-in. B31 and B41 from the WD respond



**CONFIDENTIAL - Produced Pursuant to Protective Order**

- 3:41-3:53pm First report from CNN.

- http://www.cnn.com/2015/04/27/us/baltimore-riots-timeline/

- 3:43pm Report of an officer down in front of Mondawmin.

- 3:48pm Signal 13 at Westbury and Woodbrook. Officer down, others injured.

- 3:48pm WD units B11, B22, B21 respond to the Signal 13.

- 3:50pm Officer reported with broken leg and broken arm. Location undeterminable.

- 3:50pm CityWide dispatch: All reserve units from the districts respond to the atrium at headquarters.

- 3:51pm Western District dispatch advises 3 calls pending.

- 3:52pm WD units B11 advises his window has been busted out while responding to the Signal 13 and he could not get through. Now on 3200 block of Auchentoroly Terrace.

- 3:51pm All injured officers are being evacuated to the MTA lot. Currently three injured officers near the bus station



**CONFIDENTIAL - Produced Pursuant to Protective Order**

- 3:54pm The Bearcat reports it has 2 priority injured officers.

- 3:56pm WD Unit 1520 requests a medic for an injured officer at the Shoppers Warehouse on the south side of Mondawmin Mall.  Female officer with an ankle injury.

- 3:59pm Officer down reported at Liberty Heights and Reisterstown.

- 4:00pm Female officer with a head injury reported at the Midas.

- 4:05pm Report of a crowd forming near Douglas High School.

- 4:05pm Unit 2 (Palmere) arrives on scene. Unit 3 (Davis) is being picked up by Foxtrot for overhead observation.

- 4:08pm WD call for service: Asthma attack, Gwynns Falls and Reisterstown.

- 4:10pm Signal 13 at Gwynns Falls and Swan Dr.

- 4:11pm Second Signal 13 for Gwynns Falls and Swan Dr.



CONFIDENTIAL - Produced Pursuant to Protective Order



CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00025903

- 4:12pm WD unit B22 responds to the Signal 13.

- 4:14pm Foxtrot reports the largest crowd is currently at Gwynns Falls and Woodbrook.

- 4:17pm WD unit B31 is at Gwynns Falls and Swan after the Signal 13, staying to direct traffic. His sergeant (B10) tells him no, come back to take calls.

- 4:17pm Palmere begins to build a U shape to defend Reisterstown and Gwynns Falls.

- 4:17pm Foxtrot reports a large group now at Monroe and Gwynns Falls, another east at Woodbrook.

- 4:19pm Unit 800 brings a group of 1-12 from the SW and asks where to deploy.

- 4:19pm Lt. Col. Hyatt asks if all injured officers have been evacuated. No response.

- 4:20pm Foxtrot reports majority of crowd appears to be moving south.

- 4:24pm WD unit B31 is at Fulton and Retreat. Reports his car windows have just been broken out. He is advised by WD Sergeant and Lieutenant to get out of the area.



CONFIDENTIAL - Produced Pursuant to Protective Order

- 4:25pm WD Lieutenant advises he has 15 officers with him, asks where to deploy.

- 4:25pm WD unit B32 drops a Signal 13 for 1620 W. North Ave. Crowd attacking his vehicle.

- 4:26pm Report that traffic still needs to be shut down.

- 4:26pm WD unit Sergeant B10 requests all units leave North Ave. "They have taken North Ave."

- 4:27pm Watch Center reports to Mondawmin Command patrol car, shop number 057 being assaulted on North Ave.

- 4:27pm WD unit B32 reports he is hiding in the Fresh Buy grocery store. The door does not lock. B10 requests an extraction team.

- 4:29pm Unit 7504 reports an assault team in the Bearcat is responding to North Ave.

- 4:30pm WD Lieutenant reports he has 3 units with him available for the extraction, but there are too many people on North Ave.



CONFIDENTIAL - Produced Pursuant to Protective Order

- 4:30pm Arrest teams requested at Douglas football field.  Officers taking fire from group of 15.

- 4:31pm The Bearcat moves in on North Ave to make the rescue.
- https://www.youtube.com/watch?v=5Kh4pUqY3Dg
- https://www.youtube.com/watch?v=FN0k4eGFwPk

- 4:31pm A WD unit reports a large crowd moving south on Pennsylvania approaching Baker.

- 4:33pm The Bearcat extricates the officer from North Ave.

- 4:36pm Lt. Col. Hyatt requests a contingent to Penn North Metro station for a crowd trying to break in to assault MTA officers.

- 4:36pm Foxtrot reports a crowd of about 50 at Gwynns Falls and Monroe throwing bricks.

- 4:37pm Foxtrot asks if the MTA officers from the two burning vehicles are OK.

- 4:38pm Operations states the officers are inside the Metro station, requests the Bearcat to extricate them.



CONFIDENTIAL - Produced Pursuant to Protective Order

* 4:40pm CityWide order goes out for all districts other than the Western have all but 2 officers respond to headquarters per Unit 1.

* 4:41pm Unit 3 in foxtrot advises Unit 2 there is one last group 2 at Reisterstown and Whittier. Other crowds are further south.

* 4:42pm The Bearcat advises it has the last MTA officer, needs another vehicle to help with extraction.

* 4:47pm CityWide dispatch, all units avoid Pennsylvania Ave.

* 4:51pm Davis advises from Foxtrot that the Mondawmin area is just about clear; units need to start moving south.

* 4:51pm WD Lieutenant gives a rundown of the district, 1 sergeant and 8 officers.

* 4:52pm CityWide dispatch; All units do not request Crime Lab for breaking and entering.  Only request them for Priority 1 calls.

* 4:53pm Palmere reports he is focused on holding the line, not getting flanked. Waiting for more platoons.

* 4:54pm Unit 400 reports 1- 2-16 available at Northern Pkwy and Reisterstown with 8 shields.



**CONFIDENTIAL - Produced Pursuant to Protective Order**



CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00025908

* 4:55pm CD 1C30 requests that CitiWatch keep an eye on Penn/MLK to watch for any protestors.  Last known location of protestors was Penn/Dolphin.  CitiWatch reports yes, several hundred protestors crossing MLK at Penn coming southbound.  Unit 100 (Howe) switches to 10A and advises Palmere.

* 4:59pm Lt. Col. Hyatt reports BCFD putting out a fire at Pennsylvania and North and are being attacked. Assistance needed.

* 4:59pm CD reports assistance needed with a crowd of approximately 200 at Franklin and Paca.

* 5:00pm WD dispatch advises currently 24 calls pending.

* 5:01pm Unit 100 (Howe) reports they are taking bricks at Paca and Franklin. Help needed, drops Signal 13. Crowd reported now eastbound on Franklin headed towards Eutaw.

* 5:02pm WD dispatch advises 29 calls pending  including larceny, stores being broken into, a cameraman being beaten.  10 asks where the assault is.  2100 Bryant Ave number 2 male beaten by several kids. 10 advises it can wait.

* 5:05pm WD 7C20 requests a medic in front of the shoppers. #1 male with a head injury  dispatch advises already requested by the NW

* 5:06pm Douglas High School reported to be secured.



**CONFIDENTIAL - Produced Pursuant to Protective Order**

* 5:07pm Report of an issue with a small crowd at Liberty Heights and Reisterstown.

* 5:09pm Units from Mondawmin begin to deploy downtown.

* 5:10pm Foxtrot reports a group at Paca and Center.

* 5:10pm Unit 600 is at Monroe and Bryant has a group at the intersection. Needs an arrest team or chemical agents.

* 5:11pm Units responding to Fayette and Cathedral to form a line. Howe advises Palmere a group is walking down Eutaw. Wants squads sent to Eutaw and Baltimore to form a line.

* 5:12pm Foxtrot reports large crowd at Howard and Centre, moving eastbound.

* 5:13pm WD dispatch advises 31 calls pending.  Most at Penn/North.  10 states they are not responding unless life-threatening.

* 5:13pm 6810 requests additional units at North and Pennsylvania. Being surrounded.

* 5:15pm WD call for service. Silent alarm at the Ace Check Cashing.  10 says to hold it.

* 5:15pm Report of a large group looting in the 2500 block of W North Ave.



**CONFIDENTIAL - Produced Pursuant to Protective Order**

* 5:16pm  Palmere begins to demobilize at Liberty Heights and Reisterstown to start deploying south.

* 5:17pm  Foxtrot assessment: Foxtrot assessment: 25 at Monroe and Whittier, 15-20 at Reisterstown and Liberty. Hundreds at Pennsylvania and North. More moving downtown.

* 5:18pm  CitiWatch reports a group southbound on St. Paul. Howe sends two squads to Inner Harbor.

* 5:18pm  103 drops a Signal 13 for 2500 Pennsylvania. More officers needed ASAP.

* 5:24pm  Report of multiple cars burning 2300 block of Anoka Ave behind the 7-11.

* 5:26pm  Signal 13 at 100 Hopkins Place.

* 5:29pm  Davis reports way too many troops at Mondawmin. Need to move to North and Pennsylvania.

* 5:31pm  103 reports help needed, looting, fires, street barricaded on Pennsylvania

* 5:33pm  Palmere reports problems sending people to Pennsylvania/North because platoons were dropped off; they have no ride



**CONFIDENTIAL - Produced Pursuant to Protective Order**

* 5:35pm Hyatt reports Central District has stabilized. Units can shore up Penn/North.

* 5:26pm 103 requests BCFD at Penn/North to extinguish fires. Davis and Hyatt say no, staging until safe.

* 5:41pm Shooting dispatched. 1133 Pennsylvania. Fox 4 to investigate. Fox reports store being looted. No shooting found on camera.

* 5:42pm Palmere reports large group of officers heading SB on Pennsylvania.

* 5:47pm Hyatt reports there is a pawn shop at 1600 Pennsylvania that needs to be guarded.

* 5:50pm WD dispatch reports 50 calls pending.

* 5:53pm Report that a group of 50 have looted the Keystone pharmacy on North Ave.

* 5:57pm Explosions reported at Penn/North. Taking rocks on Retreat St. Molotov cocktails being thrown.







CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00025913

# EXHIBIT 84

**From:** Parthemos, Kaliope <Kaliope.Parthemos@baltimorecity.gov>
**Sent:** Monday, April 27, 2015 3:55 PM EDT
**To:** Williams, Daphney <Daphney.Williams@baltimorecity.gov>
**CC:** Morton, Kimberly <Kimberly.Morton@baltimorecity.gov>
**Subject:** Re: Constituent Request

State troopers have been assisting. National guard is only when there is state of emergency.

---

**From**: Williams, Daphney
**Sent**: Monday, April 27, 2015 03:52 PM
**To**: Parthemos, Kaliope
**Cc**: Morton, Kimberly
**Subject**: Constituent Request

Kali – We are getting request for the mayor to call in the national guard or state troopers.

**Daphney D. Williams**
*Mayor's Office of Constituent Services Director*

100 N. Holliday Street, Room 250
Baltimore, MD  21202
daphney.williams@baltimorecity.gov
443-984-4004 (Office)
443-827-6836 (Mobile)
410-396-5136 (Fax)

*Office of Mayor Stephanie Rawlings-Blake*

*Connect with Mayor Rawlings-Blake*

@MayorSRB                          MayorSRB
/Stephanie.Rawlingsblake

**CONFIDENTIAL - Produced Pursuant to Protective Order**

# EXHIBIT 85

**From:** Parthemos, Kaliope
**Sent:** Monday, April 27, 2015 4:40 PM EDT
**To:** Sparaco, Daniel J. <Daniel.Sparaco@baltimorecity.gov>
**CC:** Harris, Kevin <Kevin.Harris@baltimorecity.gov>; Robinson, StephanieJ <StephanieJ.Robinson@baltimorecity.gov>
**Subject:** Re: Bob wants approval to open EOC now

Yes.

---

**From:** Sparaco, Daniel J.
**Sent:** Monday, April 27, 2015 04:38 PM
**To:** Parthemos, Kaliope
**Cc:** Harris, Kevin
**Subject:** Bob wants approval to open EOC now


I tried to reach you by cell.

CONFIDENTIAL - Produced Pursuant to Protective Order

# EXHIBIT 86

**From:** Parthemos, Kaliope
**Sent:** Tuesday, April 28, 2015 8:43 AM EDT
**To:** Sangree, Suzanne <Suzanne.Sangree@baltimorepolice.org>; Nilson, George <George.Nilson@baltimorecity.gov>; Morton, Kimberly <Kimberly.Morton@baltimorecity.gov>; Smullian, Andrew <Andrew.Smullian@baltimorecity.gov>; Robinson, StephanieJ <StephanieJ.Robinson@baltimorecity.gov>
**CC:** Whitney-McNeely, Lorraine <Lorraine.Whitney-McNeely@baltimorecity.gov>
**Subject:** Signed curfew and state of emergency docs
**Attachment(s):** "Scanned from a Xerox Multifunction Device.pdf","ATT00001.txt"

**CONFIDENTIAL - Produced Pursuant to Protective Order**

CURFEW --EMERGENCY.

1.      FINDINGS. The Mayor finds that a public emergency has been created as a result of rioting within the City of Baltimore, creating a serious and substantial menace to the public peace, safety, health and welfare of the Citizens of Baltimore.  The Mayor orders this General Curfew in accordance with Article IV of the Baltimore City Charter pursuant to the Mayor's power and authority as conservator of the peace and the general police powers bestowed on the Mayor during times of emergencies.  Beginning at 5 a.m. on April 28, 2015 the Additional Curfew for Minors found at paragraph 3(b)(iii)  takes effect.  Beginning at 10 p.m. on April 28, 2015, this General Curfew takes effect.  These Curfews remain in effect until May 4, 2015 unless rescinded or extended by Order of the Mayor.

2.      DEFINITIONS.

(a) In General. The following terms have the meanings indicated.

(b) Establishment. "Establishment" means: (i) any privately-owned place of business carried on for a profit; or (ii) any place of amusement or entertainment to which the public is invited.

(c) Minor. "Minor" means any person under the age of 17 years.

(d) Operator. "Operator" means any individual, firm, association, partnership or corporation operating, managing or conducting any establishment. Whenever used in any clause prescribing a penalty, the term "operator," as applied to associations or partnerships, shall include the members or partners thereof; and as applied to corporations, shall include the officers thereof.

(e) Parent. "Parent" means: (i) any natural parent of a minor; (ii) a guardian; or (iii) any person 18 years old or older who is legally responsible for the care and custody of a minor.

(f) Public Place. "Public place" means any public street, highway, road, alley, park, playground, public sidewalk, wharf, dock, public building or vacant lot.

(g) Health Care Facility.  "Health Care Facility" means hospitals, nursing homes and other similar health care facilities.

(h) Curfew Period.  "Curfew Period" shall mean from that period of time extending from 10 p.m. in the evening until 5 a.m. the next morning.

(i) Other Hours.  "Other Hours" shall mean that period of time extending from 5:01 a.m. in the morning until 9:59 p.m.

1

3.    PROHIBITED CONDUCT.

(a) Scope of Section. This section applies to all persons within the City of Baltimore, including those traveling through the City of Baltimore, excluding only: (i) public safety officers; (ii) persons working for the federal, state and local law enforcement; (iii) legislative offices and their aides; (iv) persons employed by a Health Care Facility who are traveling to or from the Health Care Facility; (v) persons going to and from work; (vi) persons suffering a health emergency who are traveling to a Health Care Facility; and (vii) individuals traveling through Baltimore City via Interstate 95 and who are not driving into the City.

(b) Prohibited Conduct.   Except as specifically provided by subparagraphs (i) - (vii) above:

    (i) no person located within the City of Baltimore may be in a public place during the Curfew Period, whether in a vehicle or on foot;

    (ii) no person within the City of Baltimore may engage in a march, parade, assembly or demonstration on a public place, whether during the Curfew Period or during Other Hours unless the event has a previously issued permit;

    (iii) Additional Curfew for Minors. In addition to the restrictions imposed in subsections (b)(i) and (ii), during Other Hours, minors may not be in a public place except: when accompanied by the minor's parent; when strictly necessary to travel to and from school when required to be at school; and when going to or returning from an official school, religious, or other recreational activity supervised by adults and sponsored by the City of Baltimore, a civic organization, or another similar entity that takes responsibility for the minor.

    (iv) no operator of an establishment or his agents or employees may knowingly permit any minor to remain on the premises of that establishment if that minor's presence would violate subsection (iii) above.

[the remainder of this page is intentionally blank]

2

CONFIDENTIAL - Produced Pursuant to Protective Order                    CITY00052729

4.    ENFORCEMENT.   Violation of the foregoing provisions constitutes a misdemeanor and violators are subject to arrest.

IN WITNESS WHEREOF I HAVE
HEREUNTO PLACED MY HAND AND
THE GREAT SEAL OF THE CITY OF
BALTIMORE

THIS 27th DAY OF APRIL 2015.

ATTEST:

_____
STEPHANIE RAWLINGS-BLAKE,
MAYOR
CITY OF BALTIMORE

APPROVED AS TO FORM AND LEGAL
SUFFICIENCY BY THE BALTIMORE CITY LAW DEPARTMENT

_____
SUZANNE SANGREE
CHIEF SOLICITOR
BPD LEGAL AFFAIRS

3

CONFIDENTIAL - Produced Pursuant to Protective Order

CITY00052730

EXECUTIVE ORDER
STATE OF EMERGENCY

WHEREAS, pursuant to Section 14-111 of the Public Safety Article of the Annotated Code of Maryland the Mayor is authorized to declare a local state of emergency;

WHEREAS, among the protestors and others who are assembled in the City, three or more individuals have at the same time and in the same place engaged in tumultuous conduct that lead to the commission of unlawful acts that disturb the public peace or caused the unlawful destruction or damage of public or private property;

WHEREAS there is reason to believe that unlawful acts and violence will spread and that this violence and these unlawful acts will not be readily contained;

WHEREAS this violence and unlawful acts have the potential to adversely affect the health, safety, and welfare of the citizens of Baltimore City; and

WHEREAS, measures must be taken in order to protect the persons and property affected by these circumstances, including implementation of Baltimore City's emergency operations plan;

NOW THEREFORE, I, Mayor Stephanie Rawlings-Blake, Mayor of the City of Baltimore, by virtue of the authority vested in me, do hereby declare a State of Emergency in Baltimore City, and I do hereby issue the following Executive Order:

BE IT ORDERED that the City's Emergency Operations Plan be implemented in Baltimore City.

[the remainder of this page is intentionally blank]

1

This declaration of a state of emergency shall take effect immediately and remain in effect for thirty days, subject to renewal or cancellation as conditions warrant.

IN WITNESS WHEREOF I HAVE
HEREUNTO PLACED MY HAND
AND THE GREAT SEAL OF THE
CITY OF BALTIMORE
THIS 27th DAY OF APRIL 2015.

ATTEST:

_____
STEPHANIE RAWLINGS-BLAKE,
MAYOR, CITY OF BALTIMORE

APPROVED AS TO FORM AND LEGAL
SUFFICIENCY BY THE BALTIMORE CITY LAW DEPARTMENT

_____
SUZANNE SANGREE
CHIEF SOLICITOR
BPD LEGAL AFFAIRS

2

# EXHIBIT 87

**From:** Parthemos, Kaliope
**Sent:** Tuesday, April 28, 2015 5:34 PM EDT
**To:** Sangree, Suzanne <Suzanne.Sangree@baltimorepolice.org>; Nilson, George <George.Nilson@baltimorecity.gov>; Morton, Kimberly <Kimberly.Morton@baltimorecity.gov>; Smullian, Andrew <Andrew.Smullian@baltimorecity.gov>; Robinson, StephanieJ <StephanieJ.Robinson@baltimorecity.gov>
**CC:** Whitney-McNeely, Lorraine <Lorraine.Whitney-McNeely@baltimorecity.gov>
**Subject:** Re: Signed curfew and state of emergency docs

That's her signature. She signed it. I was there

----- Original Message -----
From: Sangree, Suzanne
Sent: Tuesday, April 28, 2015 05:33 PM
To: Parthemos, Kaliope; Nilson, George; Morton, Kimberly; Smullian, Andrew; Robinson, StephanieJ
Cc: Whitney-McNeely, Lorraine
Subject: RE: Signed curfew and state of emergency docs

When you have a second please someone send me a more legible copy of the Mayor's signature.  It is barely perceptible on this copy.  Thanks

Suzanne Sangree
Chief of Police Legal Affairs
Baltimore City Law Department
100 N. Holliday Street, Rm 109
Baltimore, MD 21202
443-984-7303
443-388-2190 (cell)
443- 539-0536 (fax)


-----Original Message-----
From: Parthemos, Kaliope
Sent: Tuesday, April 28, 2015 8:44 AM
To: Sangree, Suzanne; Nilson, George; Morton, Kimberly; Smullian, Andrew; Robinson, StephanieJ
Cc: Whitney-McNeely, Lorraine
Subject: Signed curfew and state of emergency docs

**CONFIDENTIAL - Produced Pursuant to Protective Order**

CITY00052541

# EXHIBIT 88

**From:** Rzeczkowski, Deanne <Deanne.Rzeczkowski@BaltimorePolice.org>
**Sent:** Tuesday, April 28, 2015 7:44 AM EDT
**To:** Turner, Leeann (MPD) <Leeann.Turner@dc.gov>
**CC:** Batts, Anthony <Anthony.Batts@baltimorepolice.org>; Hyatt, Melissa R. <Melissa.Hyatt@BaltimorePolice.org>; Martin, Ganesha <Ganesha.Martin@baltimorepolice.org>; Palmere, Dean <Dean.Palmere@BaltimorePolice.org>; Davis, Kevin <Kevin.Davis@baltimorepolice.org>; DeSousa, Darryl <Darryl.DeSousa@BaltimorePolice.org>; Green, Garnell W. <Garnell.Green@BaltimorePolice.org>
**BCC:** Rzeczkowski, Deanne <Deanne.Rzeczkowski@BaltimorePolice.org>
**Subject:** RE: BPD-METROPDMOU

Thank you. I'll pass the information on.

---

**From:** Turner, Leeann (MPD) [mailto:Leeann.Turner@dc.gov]
**Sent:** Monday, April 27, 2015 8:00 PM
**To:** Rzeczkowski, Deanne
**Subject:** Fwd: BPD-METROPDMOU

Deanne,

Looks like we are back on. I assume your EMA will get you guys squared away? I understand chief Lanier has committed to sending a platoon tomorrow so I will follow up on paperwork tomorrow.

Sent from my iPhone

Begin forwarded message:

> **From:** "Geldart, Chris (HSEMA)" <chris.geldart@dc.gov>
> **Date:** April 27, 2015 at 7:32:03 PM EDT
> **To:** "Young, Rashad (EOM)" <rashad.young@dc.gov>
> **Cc:** "O'Meara, Kelly (MPD)" <Kelly.O'Meara@dc.gov>, "Harris, Ronald (MPD)" <Ronald.Harris@dc.gov>, "Turner, Leeann (MPD)" <Leeann.Turner@dc.gov>, "Tuohey, Mark (EOM)" <mark.tuohey@dc.gov>, "Ryan, Terry (MPD)" <terry.ryan@dc.gov>, "Lanier, Cathy (MPD)" <cathy.lanier@dc.gov>
> **Subject: Re: BPD-METROPDMOU**
>
> Baltimore and MD have declared a state of emergency. Now they can request resources through the Emergency Management Assistance Compact. Once we reply to their request in that system and receive an accepted mission we can deploy DC employees. They will then be covered for an agreed to amount of reimbursement and our workers comp insurance will cover fully.
>
> Chris
>
> Chris T Geldart
> Director
> District of Columbia Homeland Security and Emergency Management Agency
> (O) 202-481-3180
> (C) 202-297-7679

**CONFIDENTIAL - Produced Pursuant to Protective Order**

# EXHIBIT 89

 **Baltimore Civil Unrest April 2015** 

Name:  Connor Scott

Rank:  Deputy Director of OEM

Position/Location during "Unrest": Emergency Operations Center, BPD Watch Center, Camden Yards Staging Area

Date worked: April 25th and April 27th - May 3rd

Narrative:

The majority of my time was spent in the Emergency Operations Center (EOC) on Calvert Street as the EOC manager.  In the EOC, I coordinated the actions of the numerous city and state agencies responding to the civil unrest and supporting the Baltimore Police Department (BPD) .  I also maintained contact with private businesses, non-profit organizations, and community members involved with response or impacted by the incidents taking place.  Some of the work performed in the EOC including tracking incident data and information, maintaining situational awareness, enacting numerous mutual aid requests, providing logistical support and obtaining equipment for first responders, and providing the Mayor with regular briefings.  The EOC was also the source of the overall Incident Action Plan and citywide Goals and Objectives for the response.  One of our bigger challenges in the EOC was space.  The EOC is too small to accommodate the number of people and functions needed for an event of such magnitude.  The amount of support needed to manage the EOC, staging area, and to support planning and logistics for BPD quickly overwhelmed our capacity, and two Incident Management Teams (IMT) and an Incident Management Assistance Team were called in to support response and recovery efforts.  Future training efforts should include IMT training for select BPD officers to ensure enough personnel are ready to act in a supporting role for a major incident.

# EXHIBIT 90

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

|  |  |
|---|---|
| **CHAE BROTHERS, LIMITED LIABILITY COMPANY, et al.** | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | )   Civil Action No.  1:17-cv-01657-SAG ) |
| **MAYOR & CITY COUNCIL OF BALTIMORE, et al.** | ) ) ) |
| Defendants. | ) ) |

## DECLARATION OF JOHN HAN CHAE

I, John Han Chae, being duly sworn, do hereby certify and state that I am over 18 years of age. I am competent to testify, and I have personal knowledge of the matters asserted herein and state as follows:

1.      I am an authorized member of Chae Brothers, LLC d/b/a Fireside North Liquors.

2.      At approximately 6:00PM on April 27, 2015, Han Chae and I were operating the business known as Fireside North Liquors and witnessed neighboring businesses being looted by rioters.  Within a few minutes, a group of approximately 50 rioters attempted to force their way into the business. I was able to push the rioters out of the store and locked the front entryway of the business from the inside. Han Chae and I observed from inside the business as the number of rioters outside the business began to grow.  Soon, additional rioters carrying what appeared to be crowbars and pipes joined the group.  The rioters then began using these crowbars and pipes to force open the front entryway of the business and forced their way into the business.  Han Chae retreated to the second floor of the business, which was used as an office, and hid in a closet.

Meanwhile, I called the police but was forwarded to an answering machine. Before I could leave a message, the rioters began to destroy the business and throw bottles and other objects at me. I retreated from the rioters and ran out of the side entryway of the business. Immediately upon exiting the business, I was accosted by a group of rioters who patted me down, searched through my pockets, and stole my wallet, keys and cell phone. The rioters then viciously punched, kicked and beat me with blunt objects. As I lay outside the business seriously injured, law enforcement appeared, and I was taken to Bon Secours Hospital.

      3.     I suffered fractures in my orbital and cheek bones, as well as lacerations, abrasions and contusions. In the meantime, the rioters set multiple fires to the business premises. All told, the rioters stole and damaged all of the inventory and business personal property, stole cash, and completely destroyed and set fire to the business premises. In the aftermath of this incident, the building in which the business operated was condemned and we have been unable to salvage the business. Han Chae and I are also owners of the building located at 2201 West North Avenue, Baltimore, Maryland 21216, the building in which Fireside North Liquors was located. The rioters caused significant damage to the building and the business premises. Indeed, as a result of the fires started by the rioters, the building was condemned. Thus, in addition to their physical injuries, I and Han Chae also suffered losses to our real property as a result of the preventable rioting.

I DELARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED ON:  5|17|2021

John Han Chae

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## NORTHERN DIVISION

)
**CHAE BROTHERS, LIMITED**                )
**LIABILITY COMPANY, et al.**             )
)
     Plaintiffs,                        )
)     Civil Action No. 1:17-cv-01657-SAG
     v.                                 )
)
**MAYOR & CITY COUNCIL OF**               )
**BALTIMORE, et al.**                     )
)
     Defendants.                        )
_____)

## DECLARATION OF HAN BOK CHAE

I, Han Bok Chae, being duly sworn, do hereby certify and state that I am over 18 years of age. I am competent to testify, and I have personal knowledge of the matters asserted herein and state as follows:

1.      At approximately 6:00PM on April 27, 2015, John Chae and I were operating the business known as Fireside North Liquors and witnessed neighboring businesses being looted by rioters. Within a few minutes, a group of approximately 50 rioters attempted to force their way into the business. John Chae was able to push the rioters out of the store and locked the front entryway of the business from the inside. John Chae and I observed from inside the business as the number of rioters outside the business began to grow. Soon, additional rioters carrying what appeared to be crowbars and pipes joined the group. The rioters then began using these crowbars and pipes to force open the front entryway of the business and forced their way into the business. I retreated to the second floor of the business, which was used as an office, and hid in a closet. In the meantime, the rioters set multiple fires to the business premises. I was hiding in a closet

on the second floor, noticed the smoke buildup and attempted to exit the building. Immediately upon exiting the closet, I noted at least one rioter rummaging through the office located on the second floor. I managed to jump from a window and drove to safety in his car.

2.      In the aftermath of this incident, the building in which the business operated was condemned. John Chae and I are the owners of the building located at 2201 West North Avenue, Baltimore, Maryland 21216, the building in which Fireside North Liquors was located. The rioters caused significant damage to the building and the business premises. Indeed, as a result of the fires started by the rioters, the building was condemned. John Chae and I suffered losses to our real property as a result of the preventable rioting.

I DELARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED ON:   05/13/21

Han Bok Chae

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

**CHAE BROTHERS, LIMITED**
**LIABILITY COMPANY, et al.**

      Plaintiffs,

      v.

**MAYOR & CITY COUNCIL OF**
**BALTIMORE, et al.**

      Defendants.

Civil Action No. 1:17-cv-01657-SAG

## DECLARATION OF CHONG IL CHOE

I, Chong Il Choe, being duly sworn, do hereby certify and state that I am over 18 years of age. I am competent to testify, and I have personal knowledge of the matters asserted herein and state as follows:

1.  I am an authorized officer of Shon's Market, Inc. d/b/a Shon's Food Market.

2.  Shon's Market, Inc. was forced to close its retail grocery business, Shon's Food Market located at 4709 Garrison Boulevard, Baltimore, Maryland 21215, early on April 27, 2015 for safety reasons. At approximately 3:30AM on April 28, 2015, rioters broke the front entryway of the business and forced their way into the business. The rioters stole and damaged much of the inventory, stole cash, caused damage to the business premises, stole and damaged business equipment and furnishings, and stole and damaged business personal property. As a result of the damage to the business and for safety reasons, Shon's Market, Inc. was forced to close the business until April 29, 2015.

I DELARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED ON: ___5/11/21___

Chong Il Choe

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

|  |  |  |
|---|---|---|
| **CHAE BROTHERS, LIMITED LIABILITY COMPANY, et al.** | ) ) ) |  |
| Plaintiffs, | ) ) | Civil Action No.  1:17-cv-01657-SAG |
| v. | ) ) |  |
| **MAYOR & CITY COUNCIL OF BALTIMORE, et al.** | ) ) ) |  |
| Defendants. | ) ) |  |

## DECLARATION OF CHONG IL CHOE

I, Chong Il Choe, being duly sworn, do hereby certify and state that I am over 18 years of age. I am competent to testify, and I have personal knowledge of the matters asserted herein and state as follows:

1.      On or about 3:30AM on April 28, 2015, rioters broke into the retail grocery business operating within the building that I own located at 4709 Garrison Boulevard, Baltimore, Maryland 21215, and caused significant damage to the building.

I DELARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED ON:   5/11/21

Chong Il Choe

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

**CHAE BROTHERS, LIMITED
LIABILITY COMPANY, et al.**

        Plaintiffs,

    v.

**MAYOR & CITY COUNCIL OF
BALTIMORE, et al.**

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No.  1:17-cv-01657-SAG

## DECLARATION OF CHONG RAN KIM

    I, Chong Ran Kim, being duly sworn, do hereby certify and state that I am over 18 years of age. I am competent to testify, and I have personal knowledge of the matters asserted herein and state as follows:

    1.    I am the owner of the grocery/deli/carryout business known as One Plus One Grocery & Deli located at 2708 Orleans Street, Baltimore, Maryland 21224.

    2.    I was forced to close my business at approximately 4:00PM on April 27, 2015 for safety reasons. At approximately 9:00PM that evening, rioters broke through the roof of the building in which the business is located and forced their way into the business. From within the business, the rioters broke through the rear entryway of the business to carry out the stolen goods. The rioters stole and damaged much of the inventory, stole cash, caused damage to the business premises, stole and damaged business equipment and furnishings, and stole and damaged business personal property. As a result of the damage to the business and for safety reasons, I was forced to close the business from the time of the rioting through April 29, 2015.

I DELARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND

CORRECT.

EXECUTED ON: _____5|11|21_____

Chong Ran Kim

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

|  |  |  |
|---|---|---|
| **CHAE BROTHERS, LIMITED LIABILITY COMPANY, et al.** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No.  1:17-cv-01657-SAG |
| v. | ) | |
| | ) | |
| **MAYOR & CITY COUNCIL OF BALTIMORE, et al.** | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF DOMINGO KIM

I, Domingo Kim, being duly sworn, do hereby certify and state that I am over 18 years of age.  I am competent to testify, and I have personal knowledge of the matters asserted herein and state as follows:

1.  I am an authorized officer of DSK Enterprise, Inc. d/b/a Cl0ever Mart.

2.  I am also an authorized officer of SRN Communications 101, Inc. d/b/a Boost Mobile.

3.  DSK Enterprise, Inc. was forced to close its beauty supply/general merchandise/cell phone business, Clever Mart located at 200-214 Highland Avenue, Baltimore, Maryland 21224, at approximately 5:30PM on April 27, 2015 for safety reasons.  That evening, rioters broke the front window of the business and forced their way into the business.  The rioters stole and damaged much of the inventory, stole cash, caused damage to the business premises, stole and damaged business equipment and furnishings, and stole and damaged business personal property.  I arrived at the business at approximately 11:00PM on April 27, 2015 and discovered

the aftermath of the rioting. I personally guarded the business and fended off looters throughout that night and the morning of April 28, 2105.

    4.    SRN Communications 101, Inc. was forced to close its cell phone business, Boost Mobile located at 5412 York Road, Baltimore, Maryland 21212, early on April 27, 2015 for safety reasons. That evening, rioters broke the front entryway of the business and forced their way into the business. The rioters stole and damaged much of the inventory, stole cash, caused damage to the business premises, stole and damaged business equipment and furnishings, and stole and damaged business personal property. As a result of the damage to the business and for safety reasons, SRN Communications 101, Inc. was forced to close the business from the time of the rioting through April 29, 2015

I DELARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED ON: May 10, 2021

Domingo Kim

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

|  |  |  |
|---|---|---|
| CHAE BROTHERS, LIMITED LIABILITY COMPANY, et al. | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No.  1:17-cv-01657-SAG |
| v. | ) ) | |
| MAYOR & CITY COUNCIL OF BALTIMORE. et al. | ) ) ) | |
| Defendants. | ) ) | |

## DECLARATION OF GINA HWANG

I, Gina Hwang, being duly sworn, do hereby certify and state that I am over 18 years of age. I am competent to testify, and I have personal knowledge of the matters asserted herein and state as follows:

1.      I was the owner of the grocery/deli/beauty supply business known as Novak Market located at 2054 East Federal Street, Baltimore, Maryland 21213.

2.      I was forced to close my business at approximately 1:00PM on April 27, 2015 for safety reasons.  At approximately 8:55PM on April 27, 2015, rioters set fire to the business and the building in which the business was located.  In the aftermath of the riots, the building in which the business was located was demolished. and the business no longer exists.

I DELARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND

CORRECT.

EXECUTED ON: 5/14/2021

Gina Hwang

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

|  |  |  |
|---|---|---|
| **CHAE BROTHERS, LIMITED LIABILITY COMPANY, et al.** | ) ) ) |  |
| Plaintiffs, | ) ) | Civil Action No. 1:17-cv-01657-SAG |
| v. | ) ) |  |
| **MAYOR & CITY COUNCIL OF BALTIMORE, et al.** | ) ) ) |  |
| Defendants. | ) ) |  |

## DECLARATION OF GRACE LYO

I, Grace Lyo, being duly sworn, do hereby certify and state that I am over 18 years of age. I am competent to testify, and I have personal knowledge of the matters asserted herein and state as follows:

1.　I am the owner of the retail grocery business known as Hae-Ttenen Market located at 1701 Baker Street, Baltimore, Maryland 21217.

2.　I am also the owner of the building located at 1701 Baker Street, Baltimore, Maryland 21217.

3.　On night of April 27, 2015 and into the early morning of April 28, 2015, rioters broke into Hae-ttenen Market located at 1701 Baker Street, Baltimore, Maryland 21217. The rioters stole and damaged all of the inventory, stole cash, stole and damaged business equipment and furnishings, stole and damaged business personal property, and set fire to the business premises and the building in which the business was located. The fire caused significant damage to the building and the business.

I DELARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND

CORRECT.

EXECUTED ON:  5 — 10 — 21

Grace Lyo

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

|  |  |  |
|---|---|---|
| **CHAE BROTHERS, LIMITED LIABILITY COMPANY, et al.** | ) ) ) |  |
| Plaintiffs, | ) ) | Civil Action No. 1:17-cv-01657-SAG |
| v. | ) ) ) |  |
| **MAYOR & CITY COUNCIL OF BALTIMORE, et al.** | ) ) ) |  |
| Defendants. | ) ) |  |

## DECLARATION OF HAK JUN LEE

I, Hak Jun Lee, being duly sworn, do hereby certify and state that I am over 18 years of age. I am competent to testify, and I have personal knowledge of the matters asserted herein and state as follows:

1.      I am an authorized officer of Lee L&M, Inc. d/b/a L&M Liquors.

2.      Lee L&M, Inc. was forced to close its retail liquor business, L&M Liquors, located at 1148 East North Avenue, Baltimore, Maryland 21202, at approximately 6:00PM on April 27, 2015 for safety reasons. Shortly thereafter, at approximately 6:40PM, the alarm company for the business notified me that an alarm for the business had been triggered. I, therefore, went back to the business and watched as rioters attempted to break down the front entryway of the business. I called the police, and the police instructed me to just wait at the scene. The rioters, being unsuccessful in breaking down the front entryway of the business, climbed the roof of the business with a ladder to attempt to gain entry. The rioters then broke down the rear entryway of the business and forced their way into the business premises. The

rioters stole and damaged much of the inventory, stole cash, caused damage to the business premises, stole and damaged business equipment and furnishings, and stole and damaged business personal property.

I DELARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED ON: 5/12/21

Hak Jun Lee

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

)
**CHAE BROTHERS, LIMITED** )
**LIABILITY COMPANY, et al.** )
)
     Plaintiffs, )
) Civil Action No.  1:17-cv-01657-SAG
v. )
)
**MAYOR & CITY COUNCIL OF** )
**BALTIMORE, et al.** )
)
     Defendants. )
_____)

## DECLARATION OF HAN UP LEE

I, Han Up Lee, being duly sworn, do hereby certify and state that I am over 18 years of

age.  I am competent to testify, and I have personal knowledge of the matters asserted herein and

state as follows:

1.      I am an authorized officer of Luckychoi, Inc. d/b/a Kim's Liquor.

2.      Luckychoi Inc. was forced to close its retail liquor business, Kim's Liquor located

at 2863 West North Avenue, Baltimore, Maryland 21216, early on April 27, 2015 for safety

reasons.  At approximately 7:30PM, rioters broke the front entryway of the business and forced

their way into the business.  Shortly thereafter, rioters broke through the side wall of the business

premises and forced their way into the rear portion of the business.  The rioters stole and damaged

much of the inventory, stole cash, caused damage to the business premises, stole and damaged

business equipment and furnishings, and stole and damaged business personal property.  As a

result of the damage to the business and for safety reasons, Luckychoi Inc. was forced to close the

business from the time of the rioting through May 17, 2015.

I DELARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND
CORRECT.

EXECUTED ON: 5 / 20 / 20 #21

Han Up Lee

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| | |
|---|---|
| **CHAE BROTHERS, LIMITED**<br>**LIABILITY COMPANY, et al.** | )<br>)<br>) |
| Plaintiffs, | )<br>) |
| | ) Civil Action No.  1:17-cv-01657-SAG |
| v. | )<br>) |
| **MAYOR & CITY COUNCIL OF**<br>**BALTIMORE, et al.** | )<br>)<br>) |
| Defendants. | )<br>) |

## DECLARATION OF HYO H. KIM

I, Hyo H. Kim, being duly sworn, do hereby certify and state that I am over 18 years of age. I am competent to testify, and I have personal knowledge of the matters asserted herein and state as follows:

1.     Tony Kim and I are the owners of the grocery/beauty supply business known as Carrollton Food Market located at 640 North Carrollton Avenue, Baltimore, Maryland 21217.

2.     Tony Kim and I closed Carrollton Food Market at approximately 4:30PM on April 27, 2015 for safety reasons.  At approximately 3:30AM on April 28, 2015 and again several times thereafter, rioters broke the front entryway of the business and forced their way into the business.  The rioters stole and damaged much of the inventory, stole cash, caused damage to the business premises, stole and damaged business equipment and furnishings, and stole and damaged business personal property.  As a result of the damage to the business and for safety reasons, Tony Kim and I were forced to close the business from the time of the rioting through May 7, 2015.

I DELARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND

CORRECT.

EXECUTED ON: _____

_____

Hyo H. Kim

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| | |
|---|---|
| **CHAE BROTHERS, LIMITED LIABILITY COMPANY, et al.** | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Civil Action No.  1:17-cv-01657-SAG ) |
| **MAYOR & CITY COUNCIL OF BALTIMORE, et al.** | ) ) ) |
| Defendants. | ) ) |

## DECLARATION OF HYO YOL CHOI

I, Hyo Yol Choi, being duly sworn, do hereby certify and state that I am over 18 years of age.  I am competent to testify, and I have personal knowledge of the matters asserted herein and state as follows:

1.     I am an authorized officer of Beauty Fair, Inc. d/b/a Beauty Fair.

2.     The business known as Beauty Fair located at 1825 North Smallwood Street, Baltimore, Maryland 21216, was forced to close at approximately 3:30PM on April 27, 2015 for safety reasons.  At approximately 7:00PM that evening, rioters broke the front window as well as the side entryway of the business and forced their way into the business.  The rioters stole and/or damaged much of the inventory, stole cash, caused damage to the business premises, stole and damaged business equipment and furnishings, and stole and damaged business personal property. As a result of the damage to the business and for safety reasons, the business was closed from the time of the rioting through May 31, 2015.

I DELARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND

CORRECT.

EXECUTED ON: _5/11 /2-1_

Hyo Yol Choi

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

CHAE BROTHERS, LIMITED
LIABILITY COMPANY, et al.

      Plaintiffs,

v.

MAYOR & CITY COUNCIL OF
BALTIMORE, et al.

      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 1:17-cv-01657-SAG

## DECLARATION OF HYUN YOUNG OH

    I, Hyun Young Oh, being duly sworn, do hereby certify and state that I am over 18 years

of age. I am competent to testify, and I have personal knowledge of the matters asserted herein

and state as follows:

    1.     Sometime in the evening of April 27, 2015 or early morning of April 28, 2015,

rioters set fire to buildings adjacent to my buildings which are located at 2109, 2111, and 2113-

2115 West Pratt Street, Baltimore, Maryland 21223. Consequently, my buildings incurred

significant fire, smoke and water damage.

I DELARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND

CORRECT.

EXECUTED ON: 5/21/2021

Hyun Young Oh

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

**CHAE BROTHERS, LIMITED**
**LIABILITY COMPANY, et al.**

     Plaintiffs,

     v.

**MAYOR & CITY COUNCIL OF**
**BALTIMORE, et al.**

     Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 1:17-cv-01657-SAG

## DECLARATION OF JAE H. LEE

I, , being duly sworn, do hereby certify and state that I am over 18 years of age. I am competent to testify, and I have personal knowledge of the matters asserted herein and state as follows:

1.    I am an authorized officer of Hoon's Beer & Wine, Inc. d/b/a Grace Young Beer & Wine.

2.    Hoon's Beer & Wine, Inc. was forced to close its retail liquor/grocery business, Grace Young Beer & Wine located at 3600 West Garrison Avenue, Baltimore, Maryland 21215, at approximately 5:30PM on April 27, 2015 for safety reasons. That evening or in the early morning of April 28, 2015, rioters broke the front window of the business and forced their way into the business. The rioters stole and damaged much of the inventory, stole cash, caused damage to the business premises, stole and damaged business equipment and furnishings, and stole and damaged business personal property. As a result of the damage to the business and for

safety reasons, Hoon's Beer & Wine, Inc. was forced to close the business from the time of the rioting through May 3, 2015.

I DELARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED ON: _6 - 11 - 21_

Jae H. Lee

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| | |
|---|---|
| **CHAE BROTHERS, LIMITED**<br>**LIABILITY COMPANY, et al.** | )<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) Civil Action No.  1:17-cv-01657-SAG<br>)<br>) |
| **MAYOR & CITY COUNCIL OF**<br>**BALTIMORE, et al.** | )<br>)<br>) |
| Defendants. | )<br>) |

## DECLARATION OF JENNIFER YOUN

I, Jennifer Youn, being duly sworn, do hereby certify and state that I am over 18 years of age. I am competent to testify, and I have personal knowledge of the matters asserted herein and state as follows:

1.     I am an authorized officer of JJYC, Inc. d/b/a Uptown Liquors located at 215 W. North Avenue, Baltimore, Maryland 21217.

2.     I am also the owner of the building located at 215 W. North Avenue, Baltimore, Maryland 21217

3.     At approximately 6:00PM on April 27, 2015, rioters forced their way into the business known as Uptown Liquors located at 215 W. North Avenue, Baltimore, Maryland 21217 caused significant damage to the business and the building premises.

4.     My husband, Jong Youn, and my daughter, Julie Youn, who were working at the business at the time of the riot, were assaulted and badly injured. As a result, they were not able to lock up and secure the business until the afternoon of April 28, 2015.  Thus, the looting

continued throughout the evening of April 27 through the afternoon of April 28, 2015. All told, the rioters stole and/or damaged all of the inventory and business personal property, stole cash, and damaged the business premises.

     5.    As a result of the damage to the business and for safety reasons, Uptown Liquors was forced to remain closed from the time of the looting through July 31, 2015.


I DELARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED ON: 5/11/2021

Jennifer Youn

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

CHAE BROTHERS, LIMITED )
LIABILITY COMPANY, et al. )
                                   )
      Plaintiffs, )
                                     )     Civil Action No. 1:17-cv-01657-SAG
    v. )
                                       )
MAYOR & CITY COUNCIL OF )
BALTIMORE, et al. )
                                     )
      Defendants. )

## DECLARATION OF JIN SOO KIM

      I, Jin Soo Kim, being duly sworn, do hereby certify and state that I am over 18 years of

age. I am competent to testify, and I have personal knowledge of the matters asserted herein and

state as follows:

      1.     I am an authorized officer of Dasarang Wholesale, Inc. d/b/a Mountain Grocery &

Deli.

      2.     Dasarang Wholesale, Inc. was forced to close its grocery/deli business, Mountain

Grocery & Deli located at 1700 Presstman Street, Baltimore, Maryland 21217, at approximately

4:00PM on April 27, 2015 for safety reasons. At approximately 8:00PM on April 27, 2015,

rioters broke the front entryway of the business and forced their way into the business. The

rioters stole and damaged much of the inventory, stole cash, caused damage to the business

premises, stole and damaged business equipment and furnishings, and stole and damaged business

personal property. As a result of the damage to the business and for safety reasons, Dasarang

Wholesale, Inc. was forced to close the business from the time of the rioting through May 6, 2015.

I DELARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND

CORRECT.

EXECUTED ON: _5|14|2021_ .

Jin Soo Kim

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| | | |
|---|---|---|
| **CHAE BROTHERS, LIMITED** | ) | |
| **LIABILITY COMPANY, et al.** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No.  1:17-cv-01657-SAG |
| v. | ) | |
| | ) | |
| **MAYOR & CITY COUNCIL OF** | ) | |
| **BALTIMORE, et al.** | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DECLARATION OF JIN SUK KIM

I, Jin Suk Kim, being duly sworn, do hereby certify and state that I am over 18 years of age.  I am competent to testify, and I have personal knowledge of the matters asserted herein and state as follows:

1.    I am an authorized officer of Jin Suk Kim, Inc. d/b/a Ebony Towne Store.

2.    At approximately 3:30PM on April 27, 2015, my wife, Kil Ja Kim, and I, who were working at a retail liquor store known as Ebony Towne Store located at 1801 W. North Avenue, Baltimore, Maryland 21217, attempted to close the business for safety reasons.  When I attempted to close the outer steel barricade door to the front entryway of the business from the inside, rioters prevented me from closing the steel door and forced it open.  When I then attempted to close the glass front entryway of the business to keep the rioters out, the rioters forced the glass door open, forced their way into the business, and immediately began assaulting me and my wife.  Among other things, I was struck in the head and face with bottles and suffered a laceration on my head (that later required eight stitches) as well as a broken orbital bone.

3.      My wife and I watched helplessly and in fear for our lives as the rioters stole the business inventory and cash from the cash register.  Within a few minutes, the rioters exited the business and I immediately locked the outer steel barricade door as well as the front glass door of the business.  My wife and I remained inside the business, and I called the police to request help as I observed the same rioters crossing the street and begin looting another retail liquor business across the street.

4.      Within a few minutes, another group of rioters arrived at the business and began ripping open the steel barricade door that I had just locked.  In desperation, I again called the police to request help.  As the rioters broke through the steel barricade door and the glass front entryway, I dropped the telephone, and my wife and I immediately retreated to the rear stairway area of the business.  We huddled together as the rioters began to rampage the store.  During the chaos, some of the rioters approached me and my wife and began to pat us down and search through our pockets.  My wife and I were frozen with fear and did not attempt to resist as these rioters took our wallets, cell phones and other personal belongings from our pockets.  Then the rioters grabbed me and my wife and attempted to drag us out of the rear stairway area of the business.  Fearing for their lives, my wife and I huddled together and resisted being dragged out into the crowd of rioters.  The looting continued for approximately 30 to 40 minutes, then the rioters set fire to the business and left.

5.      Soon thereafter, the police arrived and took me and my wife by squad car a few blocks away where we were told an ambulance would pick us up to take us to the hospital.  We waited there for approximately an hour when an ambulance arrived.  The EMTs provided dressing on the laceration on my head and released me and my wife.  My son arrived to the scene soon thereafter and drove me and my wife to GMC hospital for further treatment.

6.     In the aftermath of this incident, I suffered from bouts of dizziness, fainting, and limited use of the right side of his body.  It was later discovered that the assault had caused bleeding in my brain.  Consequently, I underwent neuro surgery and as well as therapy and rehabilitation to attempt to walk without impairment and regain full range of motion to the right side of his body.

7.     My wife and I are also owners of the building located at 1801 W. North Avenue, Baltimore, Maryland 21217, the building in which Ebony Towne Store was located.  The rioters caused tremendous damage to the building and the business premises.  Thus, in addition to our physical injuries, my wife and I also suffered losses to our real property as a result of the preventable rioting.  All told, the rioters stole and damaged all of the inventory and business personal property, stole cash, and completely destroyed and set fire to the business premises.  In the aftermath of this incident, my wife and I have been unable to salvage the business, and the business has been permanently closed.

I DELARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED ON: _5/11/'21_

Jin Suk Kim

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

|  |  |  |
|---|---|---|
| **CHAE BROTHERS, LIMITED LIABILITY COMPANY, et al.** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No.  1:17-cv-01657-SAG |
| v. | ) | |
| | ) | |
| **MAYOR & CITY COUNCIL OF BALTIMORE, et al.** | ) | |
| | ) | |
| Defendants. | ) | |

**DECLARATION OF JONG HWA LEE**

I, Jong Hwa Lee, being duly sworn, do hereby certify and state that I am over 18 years of age. I am competent to testify, and I have personal knowledge of the matters asserted herein and state as follows:

1. I am an authorized officer of J & K Food, Inc. d/b/a Metro Sundries located at the Mondawmin Mall.

2. Mondawmin Mall, where Metro Sundries is located, was completely closed for safety reasons from approximately 2:30PM on April 27, 2015 through May 2, 2015, and was open with shortened hours (closed three hours early) from May 3, 2015 through May 10, 2015. Consequently, J & K Food, Inc. d/b/a Metro Sundries suffered loss of business damages.

I DELARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND
CORRECT.

EXECUTED ON: _5/12/21_

Jong Hwa Lee

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

**CHAE BROTHERS, LIMITED**
**LIABILITY COMPANY, et al.**

   Plaintiffs,

  v.

**MAYOR & CITY COUNCIL OF**
**BALTIMORE, et al.**

   Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No.  1:17-cv-01657-SAG

## DECLARATION OF JONG YOUN

  I, Jong Youn, being duly sworn, do hereby certify and state that I am over 18 years of age. I am competent to testify, and I have personal knowledge of the matters asserted herein and state as follows:

  1. At approximately 6:00PM on April 27, 2015, my daughter, Julie Youn, and I, who were working at the retail liquor store known as Uptown Liquor located 215 W. North Avenue, Baltimore, Maryland 21217, witnessed a neighboring business being looted by a large mob of rioters. Fearing that Uptown Liquor would be targeted next by the rioters, I called the police. The police informed me that they were not able to provide any assistance, and suggested that I lock up the business and attempt to hide inside. My daughter and I immediately locked the front entryway, locked the bulletproof-glass door separating the customer area from the rest of the business, and turned off the lights. My daughter hid in a rear storage room while I hid behind the customer counter.

2.      Within a few minutes, the rioters broke through the front entryway of the business and forced their way into the customer area of the business. They then broke through the bullet-proof glass-door and broke into the area where my daughter and I were hiding. Immediately upon encountering me, some of the rioters restrained me while some of the others patted me down and searched through my pockets. The rioters stole my wallet and cell phone as well as the keys for the business, my car and my home. The mob then forcefully dragged me out of the business and into the street. There, they viciously punched, kicked and beat me with blunt objects. This assault was filmed from a helicopter by a news crew and was broadcast for the world to see. I lost consciousness during the assault, and my body was dragged to a nearby alley, where I was later approached by police officers and taken to Bon Secours Hospital. I suffered a concussion, a laceration to the back of my head that required six stitches, and contusions and abrasions to my body and face, among other injuries. I was hospitalized and was discharged on April 28, 2015.

3.      Upon information and belief, after the looting, at least one of the rioters who had stolen my wallet and keys stole my car from the parking lot of the business and, referring to my driver's license, went to my residence located at Joppa, Maryland late in the evening of April 27, 2015. Upon information and belief, at least one of the rioters entered my residence using the stolen keys but was apparently chased away by my dog.

I DELARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED ON: 5/12/2021

Jong Youn

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

| | |
|---|---|
| **CHAE BROTHERS, LIMITED LIABILITY COMPANY, et al.** ) ) ) ) | |
| Plaintiffs, ) ) | |
| v. ) ) | Civil Action No.  1:17-cv-01657-SAG |
| **MAYOR & CITY COUNCIL OF BALTIMORE, et al.** ) ) ) ) | |
| Defendants. ) ) | |

<u>**DECLARATION OF JULIE YOUN**</u>

I, Julie Youn, being duly sworn, do hereby certify and state that I am over 18 years of age.  I am competent to testify, and I have personal knowledge of the matters asserted herein and state as follows:

1.      At approximately 6:00PM on April 27, 2015, my father, Jong Youn, and I, who were working at the retail liquor business known as Uptown Liquor located 215 W. North Avenue, Baltimore, Maryland 21217, witnessed a neighboring business being looted by a large mob of rioters.  Fearing that Uptown Liquor would be targeted next by the rioters, my father and I immediately locked the front entryway, locked the bulletproof-glass door separating the customer area from the rest of the business, and turned off the lights.  I hid in a rear storage room while my father hid behind the customer counter.  Within a few minutes, the rioters broke through the front entryway of the business and forced their way into the customer area of the business.  They then broke through the bullet-proof glass-door and broke into the area where my father and I were hiding.

2.      The mob discovered me hiding in the rear storage room.  The mob viciously punched, kicked and beat me with cans and bottles.  I lost consciousness during the assault. When I regained consciousness, I was helped by a good Samaritan and was taken by ambulance to Bon Secours Hospital.  I suffered two cracked teeth, four loosened teeth, a lip laceration, a concussion, and contusions and abrasions to my body and face, among other injuries.  I was discharged from the hospital late in the evening of April 27, 2015.

 I DELARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED ON: _June 3, 2021_

Julie Youn

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

**CHAE BROTHERS, LIMITED**                )
**LIABILITY COMPANY, et al.**              )
                                           )
       Plaintiffs,                    )
                                           )
       v.                             )    Civil Action No.  1:17-cv-01657-SAG
                                           )
**MAYOR & CITY COUNCIL OF**                )
**BALTIMORE, et al.**                      )
                                           )
       Defendants.                    )
_____)

## DECLARATION OF JUN BIN BAIK

      I, Jun Bin Baik, being duly sworn, do hereby certify and state that I am over 18 years of age. I am competent to testify, and I have personal knowledge of the matters asserted herein and state as follows:

      1.     On or about 7:00PM on April 27, 2015, rioters set on fire the building owned by me, Seong Ok Baik, Kyong Joo Baik, and Kyong Yol Baik and located at 2054 East Federal Street, Baltimore, Maryland 21213. The fire destroyed the entire building, including, but not limited to, all of the improvements, furnishings, fixtures, and the retail business that had operated within the building. The building has since been demolished.

I DELARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND
CORRECT.

EXECUTED ON: 5/10, 21

Jun Bin Baik

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

|  |  |
|---|---|
| **CHAE BROTHERS, LIMITED LIABILITY COMPANY, et al.** | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Civil Action No.  1:17-cv-01657-SAG ) ) |
| **MAYOR & CITY COUNCIL OF BALTIMORE, et al.** | ) ) ) |
| Defendants. | ) ) ) |

## DECLARATION OF JUNG CHUNG

I, Jung Chung, being duly sworn, do hereby certify and state that I am over 18 years of age. I am competent to testify, and I have personal knowledge of the matters asserted herein and state as follows:

1.      Sung Chung and I are the owners of the business known as J Mart Wig, located at 2100 W. Pratt Street, Baltimore, Maryland 21223. We were forced to close the business at approximately 6:00PM on April 27, 2015 for safety reasons. That evening or in the early morning of April 28, 2015, rioters broke the steel pull-down security gate covering the front of the business and forced their way into the business by breaking the front display windows and front entryway of the business. The rioters stole and damaged much of the inventory, stole cash, caused damage to the business premises, stole and damaged business equipment and furnishings, and stole and damaged business personal property. In the aftermath of this incident, Sung Chung and I were unable to salvage the business, and the business has been permanently closed.

2.      Sung Chung and I are also the owners of the building located at 2100 W. Pratt Street, Baltimore, Maryland 21223, the building in which J Mart Wig was located. The rioters caused significant damage to the building and the business premises. Thus, in addition to the losses to our business, Sung Chung and I also suffered losses to our real property as a result of the preventable rioting.


I DELARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED ON: ___5/12/21___

Jung Chung

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

|  |  |
|---|---|
| **CHAE BROTHERS, LIMITED LIABILITY COMPANY, et al.** | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) ) |
| **MAYOR & CITY COUNCIL OF BALTIMORE, et al.** | ) ) ) |
| Defendants. | ) ) ) |

Civil Action No. 1:17-cv-01657-SAG

## DECLARATION OF JUNG HYUN KIM

I, Jung Hyun Kim, being duly sworn, do hereby certify and state that I am over 18 years of age. I am competent to testify, and I have personal knowledge of the matters asserted herein and state as follows:

1.      During the evening of April 27, 2015 through the morning of April 28, 2015, rioters broke into my building located at 1301 North Fulton Avenue, Baltimore, Maryland 21217 and caused significant damage to the building.

I DELARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED ON: ___5/12/21___

_Jung Hyun Kim_
Jung Hyun Kim

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

CHAE BROTHERS, LIMITED )
LIABILITY COMPANY, et al. )
)
Plaintiffs, )
)           Civil Action No.  1:17-cv-01657-SAG
v. )
)
MAYOR & CITY COUNCIL OF )
BALTIMORE, et al. )
)
Defendants. )

## DECLARATION OF JUNG KIM

I, Jung Kim, being duly sworn, do hereby certify and state that I am over 18 years of age. I am competent to testify, and I have personal knowledge of the matters asserted herein and state as follows:

1.      I am an authorized officer of MGC Market, Inc. d/b/a Fox Liquors.

2.      MGC Market, Inc. was forced to close its retail liquor business, Fox Liquors located at 1301 North Fulton Avenue, Baltimore, Maryland 21217, at approximately 5:00PM on April 27, 2015 for safety reasons.  At approximately 9:00PM, I was notified by the business alarm company that there had been a break-in at the business.  My husband and I drove to the business and found that rioters had broken the rear entryway of the business and had forced their way into the business.  My husband and I watched helplessly from our car as the looting of the business continued and waves of rioters entered the store, destroyed the business and fled with merchandise and business personal property.  My husband and I went to the nearest police station to request help, but were informed, without elaboration, that help was not available.

Consequently, my husband and I were left with no alternative but to park our vehicle outside of the business all night, honking the car horn occasionally to deter further looting.

    3.    All told, the rioters stole and damaged much of the inventory, stole cash, caused damage to the business premises, stole and damaged business equipment and furnishings, and stole and damaged business personal property. As a result of the damage to the business and for safety reasons, MGC Market, Inc. was forced to close the business from the time of the rioting through May 6, 2015.

I DELARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED ON: 5/12/21

Jung Kim

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| | |
|---|---|
| **CHAE BROTHERS, LIMITED LIABILITY COMPANY, et al.** | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Civil Action No.  1:17-cv-01657-SAG ) |
| **MAYOR & CITY COUNCIL OF BALTIMORE, et al.** | ) ) ) |
| Defendants. | ) ) |

## DECLARATION OF JUNG RAN KIM

I, Jung Ran Kim, being duly sworn, do hereby certify and state that I am over 18 years of age. I am competent to testify, and I have personal knowledge of the matters asserted herein and state as follows:

1.     During the evening of April 27, 2015 through the morning of April 28, 2015, rioters broke into my building located at 1301 North Fulton Avenue, Baltimore, Maryland 21217 and caused significant damage to the building.

I DELARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED ON:  5/12/21

Jung Ran Kim

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| | |
|---|---|
| **CHAE BROTHERS, LIMITED LIABILITY COMPANY, et al.** | ) ) ) |
| Plaintiffs, | ) ) |
| v. | Civil Action No.  1:17-cv-01657-SAG |
| | ) ) |
| **MAYOR & CITY COUNCIL OF BALTIMORE, et al.** | ) ) ) |
| Defendants. | ) ) |

## DECLARATION OF KEVIN KIM

I, Kevin Kim, being duly sworn, do hereby certify and state that I am over 18 years of age. I am competent to testify, and I have personal knowledge of the matters asserted herein and state as follows:

1.    I am an authorized officer of The One Liquor, Inc. d/b/a Perry Liquor.

2.    The One Liquor, Inc. was forced to close its retail liquor business, Perry Liquor located at 2550 Edmondson Avenue, Baltimore, Maryland 21223, early on April 27, 2015 for safety reasons. At approximately 10:30PM that day, rioters broke into and forced their way into the business. The rioters stole and damaged much of the inventory, stole cash, caused damage to the business premises, stole and damaged business equipment and furnishings, and stole and damaged business personal property. As a result of the damage to the business and for safety reasons, The One Liquor, Inc. was forced to close the business from the time of the rioting through May 3, 2015.

I DELARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND

CORRECT.

EXECUTED ON: __05__/__14__/__2021__

Kevin Kim

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

|  |  |  |
|---|---|---|
| **CHAE BROTHERS, LIMITED LIABILITY COMPANY, et al.** | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No.  1:17-cv-01657-SAG |
| v. | ) ) ) | |
| **MAYOR & CITY COUNCIL OF BALTIMORE, et al.** | ) ) ) | |
| Defendants. | ) ) ) | |

### DECLARATION OF KIL JA KIM

I, Kil Ja Kim, being duly sworn, do hereby certify and state that I am over 18 years of age. I am competent to testify, and I have personal knowledge of the matters asserted herein and state as follows:

1.  At approximately 3:30PM on April 27, 2015, my husband, Jin Suk Kim, and I, who were working at a retail liquor store known as Ebony Towne Store located at 1801 W. North Avenue, Baltimore, Maryland 21217, attempted to close the business for safety reasons.  When my husband attempted to close the outer steel barricade door to the front entryway of the business from the inside, rioters prevented him from closing the steel door and forced it open. When my husband then attempted to close the glass front entryway of the business to keep the rioters out, the rioters forced the glass door open, forced their way into the business, and immediately began assaulting me and my husband.  I was beaten with a fire extinguisher and suffered a laceration on my head (that later required four stitches).

2.    My husband and I watched helplessly and in fear for their lives as the rioters stole the business inventory and cash from the cash register. Within a few minutes, the rioters exited the business and my husband immediately locked the outer steel barricade door as well as the front glass door of the business. My husband and I remained inside the business, and my husband called the police to request help as he observed the same rioters crossing the street and begin looting another retail liquor business across the street.

3.    Within a few minutes, another group of rioters arrived at the business and began ripping open the steel barricade door that my husband had just locked. In desperation, my husband again called the police to request help. As the rioters broke through the steel barricade door and the glass front entryway, my husband and I immediately retreated to the rear stairway area of the business. We huddled together as the rioters began to rampage the store. During the chaos, some of the rioters approached me and my husband and began to pat us down and search through our pockets. My husband and I were frozen with fear and did not attempt to resist as these rioters took our wallets, cell phones and other personal belongings from our pockets. Then the rioters grabbed me and my husband and attempted to drag us out of the rear stairway area of the business. Fearing for our lives, my husband and I huddled together and resisted being dragged out into the crowd of rioters. The looting continued for approximately 30 to 40 minutes, then the rioters set fire to the business and left.

4.    Soon thereafter, the police arrived and took me and my husband by squad car a few blocks away where we were told an ambulance would pick us up to take us to the hospital. We waited there for approximately an hour when an ambulance arrived. The EMTs eventually released me and my husband. My son arrived to the scene soon thereafter and drove us to GMC hospital for further treatment.

5.      My husband and I are also owners of the building located at 1801 W. North Avenue, Baltimore, Maryland 21217, the building in which Ebony Towne Store was located. The rioters caused tremendous damage to the building and the business premises. Thus, in addition to our physical injuries, my husband and I also suffered losses to our real property as a result of the preventable rioting. All told, the rioters stole and damaged all of the inventory and business personal property, stole cash, and completely destroyed and set fire to the business premises. In the aftermath of this incident, my husband and I have been unable to salvage the business, and the business has been permanently closed.

6.      .

I DELARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED ON: 5/11/21

Kil Ja Kim

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

|  |  |  |
|---|---|---|
| **CHAE BROTHERS, LIMITED LIABILITY COMPANY, et al.** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No.  1:17-cv-01657-SAG |
| v. | ) | |
| | ) | |
| **MAYOR & CITY COUNCIL OF BALTIMORE, et al.** | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF KYONG HO KIM

I, Kyong Ho Kim, being duly sworn, do hereby certify and state that I am over 18 years

of age. I am competent to testify, and I have personal knowledge of the matters asserted herein

and state as follows:

1.      I am an authorized officer of KHY Company, Inc. d/b/a Yom's Food Market

located at 1610 Abbotson Street, Baltimore, Maryland 21218.

2.      KHY Company, Inc. was forced to close its grocery business, Yom's Food

Market located at 1610 Abbotson Street, Baltimore, Maryland 21218, at approximately 5:30PM

on April 27, 2015 for safety reasons.  At approximately 7:30PM and again several times

thereafter, rioters broke the front veneer of the business and forced their way into the business.

The rioters stole and damaged much of the inventory, stole cash, caused damage to the business

premises, stole and damaged business equipment and furnishings, and stole and damaged business

personal property.  As a result of the damage to the business and for safety reasons, KHY

Company, Inc. was forced to close the business from the time of the rioting through April 28, 2015.

I DELARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED ON: ___5|13|2021___

Kyong Ho Kim

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

|  |  |  |
|---|---|---|
| **CHAE BROTHERS, LIMITED LIABILITY COMPANY, et al.** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No.  1:17-cv-01657-SAG |
| v. | ) | |
| | ) | |
| **MAYOR & CITY COUNCIL OF BALTIMORE, et al.** | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF KYONG JOO BAIK

I, Kyong Joo Baik, being duly sworn, do hereby certify and state that I am over 18 years of age.  I am competent to testify, and I have personal knowledge of the matters asserted herein and state as follows:

1.    On or about 7:00PM on April 27, 2015, rioters set on fire the building owned by me, Seong Ok Baik, Jun Bin Baik, and Kyong Yol Baik and located at 2054 East Federal Street, Baltimore, Maryland 21213.  The fire destroyed the entire building, including, but not limited to, all of the improvements, furnishings, fixtures, and the retail business that had operated within the building.  The building has since been demolished.

I DELARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND
CORRECT.

EXECUTED ON: 5/10/20

Kyong Joo Baik

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

|  |  |  |
|---|---|---|
| **CHAE BROTHERS, LIMITED LIABILITY COMPANY, et al.** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No.  1:17-cv-01657-SAG |
| v. | ) | |
| | ) | |
| **MAYOR & CITY COUNCIL OF BALTIMORE, et al.** | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF KYONG YOL BAIK

I, Kyong Yol Baik, being duly sworn, do hereby certify and state that I am over 18 years of age.  I am competent to testify, and I have personal knowledge of the matters asserted herein and state as follows:

1.      On or about 7:00PM on April 27, 2015, rioters set on fire the building owned by me, Jun Bin Baik, Kyong Joo Baik, and Seong Ok Baik and located at 2054 East Federal Street, Baltimore, Maryland 21213.  The fire destroyed the entire building, including, but not limited to, all of the improvements, furnishings, fixtures, and the retail business that had operated within the building.  The building has since been demolished.

I DELARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND

CORRECT.

EXECUTED ON: 5/11/21

Kyong Yol Baik

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

**CHAE BROTHERS, LIMITED**                )
**LIABILITY COMPANY, et al.**              )
                                           )
          Plaintiffs,                      )
                                           )    Civil Action No.  1:17-cv-01657-SAG
     v.                                    )
                                           )
**MAYOR & CITY COUNCIL OF**                )
**BALTIMORE, et al.**                      )
                                           )
          Defendants.                      )
                                           )

## DECLARATION OF KYUNG HAE OH

I, Kyung Hae Oh, being duly sworn, do hereby certify and state that I am over 18 years of

age.  I am competent to testify, and I have personal knowledge of the matters asserted herein and

state as follows:

1.       Sometime in the evening of April 27, 2015 or early morning of April 28, 2015,

rioters set fire to buildings adjacent to my buildings which are located at 2109, 2111, and 2113-

2115 West Pratt Street, Baltimore, Maryland 21223.  Consequently, my buildings incurred

significant fire, smoke and water damage.

I DELARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND

CORRECT.

EXECUTED ON: _May 21 - 2021_

Kyung Hae Oh

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

|  |  |
|---|---|
| **CHAE BROTHERS, LIMITED LIABILITY COMPANY, et al.** | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Civil Action No. 1:17-cv-01657-SAG ) |
| **MAYOR & CITY COUNCIL OF BALTIMORE, et al.** | ) ) ) |
| Defendants. | ) ) |

## DECLARATION OF KYUNG SUB KIM

I, Kyung Sub Kim, being duly sworn, do hereby certify and state that I am over 18 years of age. I am competent to testify, and I have personal knowledge of the matters asserted herein and state as follows:

1.      I am an authorized officer of 3ded Mobile, Inc. d/b/a We Fix It All.

2.      The business known as We Fix It All was forced to close its cell phone repair business located at 3234 Greenmount Avenue, Baltimore, Maryland 21218, early on April 27, 2015 for safety reasons. During the evening of April 27, 2105 or early morning of April 28, 2105, rioters broke the front entryway of the adjacent business and forced their way through the building's rear shared corridor into We Fix It All's business premises. The rioters stole and damaged much of the inventory, stole cash, caused damage to the business premises, stole and damaged business equipment and furnishings, and stole and damaged business personal property. As a result of the damage to the business and for safety reasons, the business was forced to close through April 29, 2015.

I DELARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND

CORRECT.

EXECUTED ON: 5/25/2021

Kyung Sub Kim

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

|  |  |  |
|---|---|---|
| **CHAE BROTHERS, LIMITED**<br>**LIABILITY COMPANY, et al.** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No.  1:17-cv-01657-SAG |
| v. | ) | |
| | ) | |
| **MAYOR & CITY COUNCIL OF**<br>**BALTIMORE, et al.** | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF MI JA JANG

I, Mi Ja Jang, being duly sworn, do hereby certify and state that I am over 18 years of age. I am competent to testify, and I have personal knowledge of the matters asserted herein and state as follows:

1.      Se Hoon Jang and I are the owners of the grocery business known as Doughty's Food Market located at 2798½ West North Avenue, Baltimore, Maryland 21216. We were forced to close the business early on April 27, 2015 for safety reasons. At approximately midnight, Se Hoon Jang and I were notified by the business alarm company that there had been a break-in at the business. Se Hoon Jang and I drove to the business and found that rioters had broken the rear entryway of the business and had forced their way into the business. At approximately 1:30AM on April 28, 2015, Se Hoon Jang and I called the police, but no help arrived. At approximately 2:30AM and again at approximately 4:00AM, we again called the police, but again no help arrived. The rioters stole and damaged much of the inventory, stole cash, caused damage to the business premises, stole and damaged business equipment and furnishings, and stole and damaged

business personal property.  As a result of the damage to the business and for safety reasons, Se
Hoon Jang and I were forced to close the business from the time of the rioting through April 28,
2015.

I DELARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND
CORRECT.

EXECUTED ON:

Mi Ja Jang

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

**CHAE BROTHERS, LIMITED**                    )
**LIABILITY COMPANY, et al.**                 )
                                              )
            Plaintiffs,                        )
                                              )    Civil Action No.  1:17-cv-01657-SAG
    v.                                        )
                                              )
**MAYOR & CITY COUNCIL OF**                   )
**BALTIMORE, et al.**                         )
                                              )
            Defendants.                        )
                                              )

## DECLARATION OF MI SUN KIM

  I, Mi Sun Kim, being duly sworn, do hereby certify and state that I am over 18 years of

age.  I am competent to testify, and I have personal knowledge of the matters asserted herein and

state as follows:

  1. I am an authorized officer of K and Mike Corporation d/b/a Carey Liquors located

at 245 North Carey Street, Baltimore, Maryland 21223.

  2. K and Mike Corporation was forced to close its retail liquor business, Carey

Liquors located at 245 North Carey Street, Baltimore, Maryland 21223, at approximately 8:00PM

on April 27, 2015 for safety reasons.  Shortly thereafter, at approximately 10:00PM, rioters broke

the front entryway of the business and forced their way into the business.  The rioters stole and

damaged much of the inventory, stole cash, caused damage to the business premises, stole and

damaged business equipment and furnishings, and stole and damaged business personal property.

As a result of the damage to the business and for safety reasons, K and Mike Corporation was

forced to close the business from the time of the rioting through May 24, 2015.

I DELARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND

CORRECT.

EXECUTED ON: _May. 12_

Mi Sun Kim

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

|  |  |  |
|---|---|---|
| **CHAE BROTHERS, LIMITED**<br>**LIABILITY COMPANY, et al.** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No.  1:17-cv-01657-SAG |
| v. | ) | |
| | ) | |
| **MAYOR & CITY COUNCIL OF**<br>**BALTIMORE, et al.** | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF MOON H. PARK

I, Moon H. Park, being duly sworn, do hereby certify and state that I am over 18 years of age. I am competent to testify, and I have personal knowledge of the matters asserted herein and state as follows:

1.      I am an authorized officer of Cathedral Rock, Inc. d/b/a Jerry's Bar.

2.      The business known as Jerry's Bar, located at 604 Poplar Grove Street, Baltimore, Maryland 21216, was forced to close at approximately 4:30PM on April 27, 2015 for safety reasons. At approximately 11:30PM on April 27, 2015, rioters broke the front entryway of the business and forced their way into the business. The rioters stole and damaged much of the inventory, stole cash, caused damage to the business premises, stole and damaged business equipment and furnishings, and stole and damaged business personal property.

I DELARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED ON: _5 - 1$ - 21_

Moon H. Park

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

|  |  |  |
|---|---|---|
| **CHAE BROTHERS, LIMITED LIABILITY COMPANY, et al.** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 1:17-cv-01657-SAG |
| v. | ) | |
| | ) | |
| **MAYOR & CITY COUNCIL OF BALTIMORE, et al.** | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF SE HOON JANG

I, Se Hoon Jang, being duly sworn, do hereby certify and state that I am over 18 years of age. I am competent to testify, and I have personal knowledge of the matters asserted herein and state as follows:

1.    Mi Ja Jang and I are the owners of the grocery business known as Doughty's Food Market located at 2798½ West North Avenue, Baltimore, Maryland 21216. We were forced to close the business early on April 27, 2015 for safety reasons. At approximately midnight, Mi Ja Jang and I were notified by the business alarm company that there had been a break-in at the business. Mi Ja Jang and I drove to the business and found that rioters had broken the rear entryway of the business and had forced their way into the business. At approximately 1:30AM on April 28, 2015, Mi Ja Jang and I called the police, but no help arrived. At approximately 2:30AM and again at approximately 4:00AM, we again called the police, but again no help arrived. The rioters stole and damaged much of the inventory, stole cash, caused damage to the business premises, stole and damaged business equipment and furnishings, and stole and damaged

business personal property.  As a result of the damage to the business and for safety reasons, Se Hoon Jang and I were forced to close the business from the time of the rioting through April 28, 2015.

I DELARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED ON: 3/16/2021

Mi Ja Jang

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

|  |  |  |
|---|---|---|
| **CHAE BROTHERS, LIMITED LIABILITY COMPANY, et al.** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No.  1:17-cv-01657-SAG |
| v. | ) | |
| | ) | |
| **MAYOR & CITY COUNCIL OF BALTIMORE, et al.** | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF SEONG OK BAIK

I, Seong Ok Baik, being duly sworn, do hereby certify and state that I am over 18 years of age.  I am competent to testify, and I have personal knowledge of the matters asserted herein and state as follows:

1.    On or about 7:00PM on April 27, 2015, rioters set on fire the building owned by me, Jun Bin Baik, Kyong Joo Baik, and Kyong Yol Baik and located at 2054 East Federal Street, Baltimore, Maryland 21213.  The fire destroyed the entire building, including, but not limited to, all of the improvements, furnishings, fixtures, and the retail business that had operated within the building.  The building has since been demolished.

I DELARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND

CORRECT.

EXECUTED ON: _____ 5/10/2021

Seong Ok Baik

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| | |
|---|---|
| **CHAE BROTHERS, LIMITED**<br>**LIABILITY COMPANY, et al.** | )<br>) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )     Civil Action No.  1:17-cv-01657-SAG |
| | ) |
| **MAYOR & CITY COUNCIL OF**<br>**BALTIMORE, et al.** | )<br>) |
| | ) |
| Defendants. | ) |
| | ) |

## DECLARATION OF SEUNG YONG LEE

I, Seung Yong Lee, being duly sworn, do hereby certify and state that I am over 18 years of age.  I am competent to testify, and I have personal knowledge of the matters asserted herein and state as follows:

1.  On or about midnight on April 27, 2015, rioters broke into the retail liquor business operating within my building located at 2601 North Hilton Street, Baltimore, Maryland 21216, and, shortly thereafter, set the building on fire.  The fire destroyed the entire building, including, but not limited to, all of the improvements, furnishings, fixtures, and the business that had operated within the building.

I DELARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND

CORRECT.

EXECUTED ON: _____5 / 14 / '21_____

Seung Yong Lee

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

|  |  |
|---|---|
| **CHAE BROTHERS, LIMITED**<br>**LIABILITY COMPANY, et al.** | ) |
| Plaintiffs, | ) |
| | ) Civil Action No. 1:17-cv-01657-SAG |
| v. | ) |
| **MAYOR & CITY COUNCIL OF**<br>**BALTIMORE, et al.** | ) |
| Defendants. | ) |

## DECLARATION OF SONG JA LEE

I, Song Ja Lee, being duly sworn, do hereby certify and state that I am over 18 years of age. I am competent to testify, and I have personal knowledge of the matters asserted herein and state as follows:

1. I am an authorized officer of Pat Liquors, Inc. d/b/a J&J Liquor.

2. Pat Liquors, Inc. d/b/a J&J Liquor was forced to close its retail liquor business, J&J Liquor located at 2601 North Hilton Street, Baltimore, Maryland 21216, at approximately 4:30PM on April 27, 2015 for safety reasons. At approximately midnight on April 27, 2015, rioters set fire to the building in which the building is located. The fire destroyed the entire building, including, but not limited to, all of the improvements, furnishings, fixtures, and Plaintiff Pat Liquors, Inc. d/b/a J&J Liquor's business. The building is scheduled to demolished or has been demolished.

I DELARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND

CORRECT.

EXECUTED ON: _5-14 -2021_

Song Ja Lee

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

**CHAE BROTHERS, LIMITED
LIABILITY COMPANY, et al.**

       Plaintiffs,

     v.

**MAYOR & CITY COUNCIL OF
BALTIMORE, et al.**

       Defendants.

Civil Action No.  1:17-cv-01657-SAG

## DECLARATION OF SONG JA LEE

     I, Song Ja Lee, being duly sworn, do hereby certify and state that I am over 18 years of age. I am competent to testify, and I have personal knowledge of the matters asserted herein and state as follows:

     1.    On or about midnight on April 27, 2015, rioters broke into the retail liquor business operating within my building located at 2601 North Hilton Street, Baltimore, Maryland 21216, and, shortly thereafter, set the building on fire. The fire destroyed the entire building, including, but not limited to, all of the improvements, furnishings, fixtures, and the business that had operated within the building.

I DELARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND

CORRECT.

EXECUTED ON: 5-14-2021

Song Ja Lee

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

**CHAE BROTHERS, LIMITED**
**LIABILITY COMPANY, et al.**

   Plaintiffs,

  v.

**MAYOR & CITY COUNCIL OF**
**BALTIMORE, et al.**

   Defendants.

Civil Action No. 1:17-cv-01657-SAG

## DECLARATION OF SOOK YEO

I, Sook Yeo, being duly sworn, do hereby certify and state that I am over 18 years of age. I am competent to testify, and I have personal knowledge of the matters asserted herein and state as follows:

1. I was forced to close my grocery/beauty supply business, A&D Food Mart located at 2424 Presbury Street, Baltimore, Maryland 21216, at approximately 4:00PM on April 27, 2015 for safety reasons. At approximately 6:30PM on April 27, 2015 and again several times thereafter, rioters broke the front entryway of the business as well as the rear window of the business and forced their way into the business. The rioters stole and damaged much of the inventory, stole cash, caused damage to the business premises, stole and damaged business equipment and furnishings, and stole and damaged business personal property. As a result of the damage to the business and for safety reasons, I was forced to close the business from the time of the rioting through May 3, 2015.

I DELARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND

CORRECT.

EXECUTED ON: 5/10/21

Sook Yeo

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

|  |  |  |
|---|---|---|
| **CHAE BROTHERS, LIMITED LIABILITY COMPANY, et al.** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No.  1:17-cv-01657-SAG |
| v. | ) | |
| | ) | |
| **MAYOR & CITY COUNCIL OF BALTIMORE, et al.** | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF SOON JUNG HONG

I, Soon Jung Hong, being duly sworn, do hereby certify and state that I am over 18 years of age.  I am competent to testify, and I have personal knowledge of the matters asserted herein and state as follows:

1.     I am the owner of the wig business known as Metro Plaza Wig located at the Mondawmin Mall.

2.     Mondawmin Mall, where Metro Plaza Wig is located, was completely closed for safety reasons from approximately 2:30PM on April 27, 2015 through May 2, 2015, and was open with shortened hours (closed three hours early) from May 3, 2015 through May 10, 2015. Consequently, I suffered loss of business damages.

I DELARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED ON: _____ ꜰ−12−21

_____

Soon Jung Hong

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

|  |  |  |
|---|---|---|
| **CHAE BROTHERS, LIMITED LIABILITY COMPANY, et al.** | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No.  1:17-cv-01657-SAG |
| v. | ) ) ) | |
| **MAYOR & CITY COUNCIL OF BALTIMORE, et al.** | ) ) ) | |
| Defendants. | ) ) | |

## DECLARATION OF SOONSUE KIM

I, Soonsue Kim, being duly sworn, do hereby certify and state that I am over 18 years of age. I am competent to testify, and I have personal knowledge of the matters asserted herein and state as follows:

1.    I incurred damage to my vehicle. On April 27, 2015, I was working at a business known as Stadium Lounge located at 3351 Greenmount Avenue, Baltimore, Maryland 21218. My vehicle was parked in the vicinity of the business. At approximately 11:00PM, I observed mobs of rioters breaking into nearby businesses. Consequently, I asked my brother-in-law, Mr. Moon, who was with me at the business, to move my vehicle to a safer location to prevent the rioters from vandalizing or otherwise damaging my vehicle. Soon after Mr. Moon exited the business to move my vehicle, he was attacked by a mob, and members of the mob stole the keys to my vehicle. I later discovered that my vehicle had been stolen. My vehicle was recovered on May 17, 2015 and had been damaged.

I DELARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED ON: _5 | 10 | 2021_

Soonsue Kim

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

|  |  |  |
|---|---|---|
| **CHAE BROTHERS, LIMITED LIABILITY COMPANY, et al.** | ) ) ) ) | |
| Plaintiffs, | ) ) ) | Civil Action No. 1:17-cv-01657-SAG |
| v. | ) ) | |
| **MAYOR & CITY COUNCIL OF BALTIMORE, et al.** | ) ) ) | |
| Defendants. | ) ) | |

## DECLARATION OF STEPHEN PARK

I, Stephen Park, being duly sworn, do hereby certify and state that I am over 18 years of age. I am competent to testify, and I have personal knowledge of the matters asserted herein and state as follows:

1.  I was forced to close my grocery/deli business, Park's Food Market located at 538 North Arlington Avenue, Baltimore, Maryland 21223, at approximately 5:00PM on April 27, 2015 for safety reasons. Shortly thereafter, at approximately 6:00PM, rioters broke the front entryway of the business and forced their way into the business. In the early morning of April 28, 2015, a second wave of rioters forced their way into the business through the broken entryway. The rioters stole and damaged much of the inventory, stole cash, caused damage to the business premises, stole and damaged business equipment and furnishings, and stole and damaged business personal property. As a result of the damage to the business and for safety reasons, I was forced to close the business from the time of the rioting through May 4, 2015.

I DELARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND

CORRECT.

EXECUTED ON: May . 10 . 2021

Stephen Park

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

|  |  |  |
|---|---|---|
| **CHAE BROTHERS, LIMITED LIABILITY COMPANY, et al.** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No.  1:17-cv-01657-SAG |
| v. | ) | |
| | ) | |
| **MAYOR & CITY COUNCIL OF BALTIMORE, et al.** | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF SUNG HEE KOO

I, Sung Hee Koo, being duly sworn, do hereby certify and state that I am over 18 years of age. I am competent to testify, and I have personal knowledge of the matters asserted herein and state as follows:

1.    I am the owner of the beauty supply business known as Beauty Mart located at 5118 Sinclair Lane, Baltimore, Maryland 21206.

2.    I was forced to close my beauty supply business, Beauty Mart located at 5118 Sinclair Lane, Baltimore, Maryland 21206, at approximately 7:00PM on April 27, 2015 for safety reasons. At approximately 12:45AM on April 28, 2015, rioters broke through the front entryway and the front display window of the business and forced their way into the business. The rioters stole and damaged much of the inventory, stole cash, caused damage to the business premises, stole and damaged business equipment and furnishings, and stole and damaged business personal property. As a result of the damage to the business and for safety reasons, I was forced to close the business from the time of the rioting through April 29, 2015.

I DELARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND
CORRECT.

EXECUTED ON: _5/12/2021_

Sung Hee Koo

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| | |
|---|---|
| **CHAE BROTHERS, LIMITED**<br>**LIABILITY COMPANY, et al.** | ) <br> ) <br> ) <br> ) |
| Plaintiffs, | ) <br> ) |
| v. | ) <br> ) |
| **MAYOR & CITY COUNCIL OF**<br>**BALTIMORE, et al.** | ) <br> ) <br> ) |
| Defendants. | ) <br> ) |

Civil Action No.  1:17-cv-01657-SAG

## DECLARATION OF SUNG CHUNG

I, Sung Chung, being duly sworn, do hereby certify and state that I am over 18 years of

age. I am competent to testify, and I have personal knowledge of the matters asserted herein and

state as follows:

1.      Jung Chung and I are the owners of the business known as J Mart Wig, located at

2100 W. Pratt Street, Baltimore, Maryland 21223. We were forced to close the business at

approximately 6:00PM on April 27, 2015 for safety reasons. That evening or in the early

morning of April 28, 2015, rioters broke the steel pull-down security gate covering the front of

the business and forced their way into the business by breaking the front display windows and

front entryway of the business. The rioters stole and damaged much of the inventory, stole cash,

caused damage to the business premises, stole and damaged business equipment and furnishings,

and stole and damaged business personal property. In the aftermath of this incident, Jung Chung

and I were unable to salvage the business, and the business has been permanently closed.

2.     Jung Chung and I are also the owners of the building located at 2100 W. Pratt Street, Baltimore, Maryland 21223, the building in which J Mart Wig was located. The rioters caused significant damage to the building and the business premises. Thus, in addition to the losses to our business, Jung Chung and I also suffered losses to our real property as a result of the preventable rioting.

I DELARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED ON: 5/12/2021

Sung S. Chung

Sung Chung

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

|  |  |  |
|---|---|---|
| **CHAE BROTHERS, LIMITED LIABILITY COMPANY, et al.** | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Civil Action No. 1:17-cv-01657-SAG |
| **MAYOR & CITY COUNCIL OF BALTIMORE, et al.** | ) ) ) | |
| Defendants. | ) ) | |

**DECLARATION OF SUNG HEE CHOO**

I, Sung Hee Choo, being duly sworn, do hereby certify and state that I am over 18 years of age. I am competent to testify, and I have personal knowledge of the matters asserted herein and state as follows:

1. I am an authorized officer of KCJJ, Inc. d/b/a Hillen Grocery located at 1900 East 31st Street, Baltimore, Maryland 21218.

2. KCJJ, Inc. was forced to close its grocery/deli/beauty supply business, Hillen Grocery located at 1900 East 31st Street, Baltimore, Maryland 21218, at approximately 12:00PM on April 27, 2015 for safety reasons. Between 11:00PM on April 27, 2015 and 5:00AM on April 28, 2015, rioters broke the rear entryway of the business and forced their way into the business. The rioters stole and damaged much of the inventory, stole cash, caused damage to the business premises, stole and damaged business equipment and furnishings, and stole and damaged business personal property. As a result of the damage to the business and for safety reasons, KCJJ, Inc. was forced to close the business from the time of the rioting through May 11, 2015.

I DELARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND

CORRECT.

EXECUTED ON: _5 - 13 - 21_

Sung Hee Choo

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

|  |  |  |
|---|---|---|
| **CHAE BROTHERS, LIMITED LIABILITY COMPANY, et al.** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 1:17-cv-01657-SAG |
| v. | ) | |
| | ) | |
| **MAYOR & CITY COUNCIL OF BALTIMORE, et al.** | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF SUNG PARK

I, Sung Park, being duly sworn, do hereby certify and state that I am over 18 years of age. I am competent to testify, and I have personal knowledge of the matters asserted herein and state as follows:

1.    I incurred losses to my building located at 604 Poplar Grove Street, Baltimore, Maryland 21216.  At approximately 11:30PM on April 27, 2015, rioters broke into the retail liquor business known as Jerry's Bar, which is located within my building.  The rioters not only damaged the retail liquor business, but they caused significant damage to my building.

I DELARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED ON: 5-11-21

Sung Park

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

|  |  |  |
|---|---|---|
| **CHAE BROTHERS, LIMITED LIABILITY COMPANY, et al.** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 1:17-cv-01657-SAG |
| v. | ) | |
| | ) | |
| **MAYOR & CITY COUNCIL OF BALTIMORE, et al.** | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF TONY KIM

I, Tony Kim, being duly sworn, do hereby certify and state that I am over 18 years of age. I am competent to testify, and I have personal knowledge of the matters asserted herein and state as follows:

1.     Hyo H. Kim and I are the owners of the grocery/beauty supply business known as Carrollton Food Market located at 640 North Carrollton Avenue, Baltimore, Maryland 21217.

2.     Hyo H. Kim and I closed Carrollton Food Market at approximately 4:30PM on April 27, 2015 for safety reasons. At approximately 3:30AM on April 28, 2015 and again several times thereafter, rioters broke the front entryway of the business and forced their way into the business. The rioters stole and damaged much of the inventory, stole cash, caused damage to the business premises, stole and damaged business equipment and furnishings, and stole and damaged business personal property. As a result of the damage to the business and for safety reasons, Hyo H. Kim and I were forced to close the business from the time of the rioting through May 7, 2015.

I DELARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND
CORRECT.

EXECUTED ON: 05/12/2021

Tony Kim

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## NORTHERN DIVISION

|  |  |
|---|---|
| **CHAE BROTHERS, LIMITED LIABILITY COMPANY, et al.** | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Civil Action No.  1:17-cv-01657-SAG ) |
| **MAYOR & CITY COUNCIL OF BALTIMORE, et al.** | ) ) ) |
| Defendants. | ) ) |

## DECLARATION OF YOUNG KIM

I, Young Kim, being duly sworn, do hereby certify and state that I am over 18 years of age.  I am competent to testify, and I have personal knowledge of the matters asserted herein and state as follows:

1.  I am an authorized officer of Royal K & K, Inc. d/b/a Royal Liquors.

2.  Royal K & K, Inc. was forced to close its retail liquor business, Royal Liquors located at 1800 Division Street, Baltimore, Maryland 21217, early on April 27, 2015 for safety reasons.  That evening or in the early morning of April 28, 2015, rioters broke through the second floor roof of the building in which the business is located and forced their way into the business, which is on the first floor of the building.  The rioters stole and damaged much of the inventory, stole cash, caused damage to the business premises, stole and damaged business equipment and furnishings, and stole and damaged business personal property.  As a result of the damage to the business and for safety reasons, Royal K & K, Inc. was forced to close the business from the time of the rioting through May 1, 2015.

I DELARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND
CORRECT.

EXECUTED ON: _____5|20|2021_____

_____

Young Kim

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

**CHAE BROTHERS, LIMITED**
**LIABILITY COMPANY, et al.**

      Plaintiffs,

      v.

**MAYOR & CITY COUNCIL OF**
**BALTIMORE, et al.**

      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No.  1:17-cv-01657-SAG

## DECLARATION OF YOUNG PARK

    I, Young Park, being duly sworn, do hereby certify and state that I am over 18 years of age. I am competent to testify, and I have personal knowledge of the matters asserted herein and state as follows:

    1.    I am an authorized officer of Geun, Inc. d/b/a Freddie's Liquor.

    2.    Geun, Inc. was forced to close its retail liquor business, Freddie's Liquor located at 2000-2002 West Lanvale Street, Baltimore, Maryland 21217, at approximately 7:45PM on April 27, 2015 for safety reasons. At approximately 8:15PM, I was notified by the business alarm company that there had been a break-in at the business. My wife and I drove to the business and found that rioters had broken the front entryway of the business and had forced their way into the business. My wife and I watched helplessly from our car as the looting of the business continued and waves of rioters entered the store, destroyed the business and fled with merchandise and business personal property. Shortly thereafter, I located a Baltimore City Police squad car approximately one block from the business and asked for help. The officers, without elaborating,

simply responded that they were not able to help. For safety reasons, my wife and I departed the scene as the rioting continued.

3. At approximately 10:00AM on April 28, 2015, I returned to the business to attempt to repair the front entryway of the business and salvage what I could. When I walked into the business, two rioters entered the business, assaulted me, and fled with merchandise. As a result, I suffered contusions to my face, among other injuries.

4. All told, the rioters stole and damaged much of the inventory, stole cash, caused damage to the business premises, stole and damaged business equipment and furnishings, and stole and damaged business personal property. As a result of the damage to the business and for safety reasons, Geun, Inc. was forced to close the business from the time of the rioting through July 4, 2015.


I DELARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED ON: 05 – 12 – 2021

Young Park

# EXHIBIT 91



### STEPHANIE RAWLINGS-BLAKE
MAYOR

*100 Holliday Street, Room 250*
*Baltimore, Maryland 21202*

May 22, 2015

The Honorable Larry J. Hogan, Governor
c/o Clay Stamp
Executive Director
Maryland Emergency Management Agency
5401 Rue Saint Lo Drive
Reisterstown, MD 21136

Dear Governor Hogan:

In accordance with Title 14 Public Safety Article of the Annotated Code of Maryland and Executive Order 01.01.2013.06, I request that you take all necessary actions to secure federal disaster relief for the City of Baltimore as a result of the civil unrest that started April 25, 2015, and required increased use of city resources and the use of mutual aid through May 3, 2015.

I declared a local state of emergency on Monday, April 27, 2015, and took the steps necessary to activate the City of Baltimore's emergency operations plan. The emergency protective measures taken after activating our plans were critical in containing the event and helping return calm to the City of Baltimore.

However, the civil unrest that occurred in the wake of the death of Freddie Gray had, and will continue to have, a large impact on our local communities and businesses. Additionally, the event may have lasting fiscal implications for the City of Baltimore given the amount expended during the incident and the resulting effects it may have on City revenues.

The unrest in the City disrupted the lives and activities of residents, workers, and visitors for eight days between April 25, 2015, and May 3, 2015. There were over 200 incidents of looting, as well as many suspected arson incidents spread across the City. Furthermore, over 370 businesses were damaged.

As a part of the effort to contain the unrest, I enacted a 10:00 pm to 5:00 am curfew from April 28, 2015, to May 4, 2015. While this helped the Baltimore Police Department, the National Guard, and other public safety personnel prevent further physical damage and keep the peace, many leisure and hospitality businesses across the City lost income during the curfew. Fears of violence and further unrest also caused the cancellation and relocation of Orioles baseball games and multiple conventions. Some of the revenue losses stemming from the disturbances maybe be offset as we return to normal, but other losses may not be made up.

*phone: 410.396.3835   fax: 410.576.9425   email: mayor@baltimorecity.gov*

**CONFIDENTIAL - Produced Pursuant to Protective Order**

Page 2
5/22/15
Disaster Relief Letter

As the situation evolved and called for more resources, significant numbers of additional Baltimore City Public Safety personnel including, but not limited to, the Baltimore Police Department and the Baltimore City Fire Department, were called in and deployed. In anticipation of the events that led to damage and disruption largely contained to the downtown area on Saturday, April 25, 2015, Baltimore Police Department leadership met with numerous local outside agencies to request assistance, including:

- Maryland State Police
- Maryland Transit Administration Police
- Maryland Transportation Authority Police
- Baltimore City Sheriff's Office
- Baltimore City School Police
- Baltimore County Police
- Anne Arundel County Police
- Howard County Police
- Prince George's County Police
- Montgomery County Police

Moreover, on Saturday, April 25, 2015, Baltimore Police cancelled one H-Day and forfeited another in order to increase the available number of officers to handle public safety concerns related to the unrest while continuing to take regular calls for service city-wide. Starting Thursday, April 30, 2015, a 12-hour shift configuration was implemented, and the department implemented another H-Day Cancellation and H-Day Forfeit on May 2, 2015. All of these measures were necessary to keep enough officers in the City to contain and mitigate the effects of the unrest, but all have significant costs and potential budgetary implications moving forward.

By the end of the event, the Baltimore Police Department's personnel were supplemented with hundreds of mutual aid officers in addition to the support of hundreds of National Guardsmen activated by the state. These mutual aid officers included personnel from our neighboring jurisdictions, as well as assistance from other states, including D.C. Metropolitan Police, New Jersey State Police, officers from Butler County, Ohio, and elsewhere. This help was critical in stopping the event from further escalating and in preventing the loss of life and property.

The Baltimore City Fire Department, which dealt with over 15 major structure fires and more than 140 vehicle fires, had additional units in service throughout the event, and also called in mutual aid totaling over dozens of suppression and medic units coming from several jurisdictions as needed, including Anne Arundel, Prince George's, Baltimore, Howard, Queen Anne's, Dorchester, Talbot, Charles, and Washington counties, as well as units from Washington D.C. Fire Department and the BWI Airport.

CONFIDENTIAL - Produced Pursuant to Protective Order

Page 3
5/22/15
Disaster Relief Letter

Beyond emergency protective measures taken by the Baltimore Police Department, Baltimore City Fire Department and other public safety personnel, City agencies responded quickly and effectively in responding to the disaster and promoting recovery.

- Our Department of Public Works efficiently moved to clean and remove debris so we could reopen city streets, while also responding quickly to boarding requests — vital to protecting affected businesses.
- Recreation and Parks assisted Public Works with debris removal while actively managing sites that were used for protests. Recreation and Parks also kept Recreation Centers open to give our children a safe place to gather during the event.
- The Department of Transportation kept city streets open and traffic flowing to allow peaceful protests to continue while minimizing the effect on other citizens. As the event escalated, Transportation towed damaged and destroyed vehicles away to restore traffic flow in affected areas. Transportation also provided and moved bike racks in a timely and efficient manner to assist public safety personnel with crowd control.
- The Department of Housing and Community Development relocated families that were displaced by fires.
- The Department of General Services stepped up to the task of refueling, maintaining, and repairing fleet vehicles, while managing the permitting process for registered protests and demonstrations.
- The Health Department provided prescription medication alternatives - vital to maintaining the health of vulnerable citizens whose normal sources were interrupted and in some cases destroyed during the unrest. The Health Department also stayed in contact with hospitals to ensure their continuity of operations.
- The Office of Information Technology expanded 3-1-1 call center operations to 24 hours to maintain the ability of citizens to connect to their government through the creation of service requests. In addition, the office maintained a ready position to deal with cyber-threats and restored the city website following a cyber-attack.
- The Department of Human Services established a system for accepting donations and volunteers, which was critical to managing the spontaneous outpouring of help.

All of these efforts were vital to response and recovery, but required additional resources, personnel, and hours worked.

Because of all of our efforts, we were able to prevent this event from escalating to the level of loss of life and property seen in some historical riots, as well as some more recent disturbances elsewhere in our country. However, we still had over 100 public safety personnel injured, two seriously, and one citizen seriously injured in a fire.

Our efforts to recover continue. The Baltimore Development Corporation (BDC), in partnership with the Mayor's Office of Economic and Neighborhood development, has continued to reach out the business community to assess the damage and find ways to offer assistance in recovery. The BDC launched the Baltimore Business Recovery Fund. Our "OneBaltimore" recovery effort is taking shape as we find ways to reach out to the community and citizens in the wake of this event. Human Services continues to organize those who wish to volunteer and fundraise to help those affected. Organizations in support of Baltimore's recovery include the Baltimore Community Foundation, Baltimore City Foundation, Salvation Army, Maryland Food Bank, The Associated —

CONFIDENTIAL - Produced Pursuant to Protective Order

Page 4
5/22/15
Disaster Relief Letter

Jewish Community Federation of Baltimore, United Way, and many more. Over $700,000 has already been pledged, and donations of time, money, and other resources continue to come in.

The Baltimore City Department of Finance, tracking costs in preparation for FEMA's Preliminary Damage Assessment, has found more than $13 million so far in federally reimbursable costs related to this event if we qualify for assistance. Over $2 million of that is attributable to mutual aid called in to supplement the City's own resources.

Given the facts stated above, I have determined that this disaster is of such severity and magnitude that the required effective response and recovery was beyond the normal capabilities of the City of Baltimore and supplementary Federal assistance is necessary. Specifically, I am requesting public assistance under the Stafford Act.

If you have any questions, please contact Andrew Smullian, Deputy Mayor of Government Relations and Labor, Office of the Mayor.

Sincerely,

Stephanie Rawlings-Blake
*Mayor*
*City of Baltimore*

Cc:  Kaliope Parthemos, Chief of Staff, Office of the Mayor
     Craig Williams, Chief of Staff, Office of the Governor
     Andrew Smullian, Deputy Mayor of Government Relations and Labor, Office of the Mayor
     Stephanie Robinson, Director of Public Safety, Office of the Mayor
     Robert Maloney, Director, Mayor's Office of Emergency Management
     Jeannie Haddaway-Riccio, Director of Intergovernmental Affairs, Office of the Governor
     Keiffer J. Mitchell, Jr., Special Advisor, Governor's Legislative Office

CONFIDENTIAL - Produced Pursuant to Protective Order

# EXHIBIT 92

**From:** Barbour, Torrence D Capt USAF ANG 175 SFS/OPS <Torrence.Barbour@ang.af.mil>
**Sent:** Sunday, April 26, 2015 12:52 PM EDT
**To:** Schluderberg, Gordon <Gordon.Schluderberg@BaltimorePolice.org>
**CC:** Hyatt, Melissa R. <Melissa.Hyatt@BaltimorePolice.org>
**Subject:** FW: Potential Triggers for NG Support to BPD

---

From: Bennett, Amy E LTC USARMY NG MDARNG (US) [amy.e.bennett3.mil@mail.mil]
Sent: Sunday, April 26, 2015 11:12 AM
To: Barbour, Torrence D Capt USAF ANG 175 SFS/OPS
Subject: RE: Potential Triggers for NG Support to BPD

Sure.  Please share that these are observations and assumptions on our part.  We'd like their input and validation, additions to, take-aways for our future planning.

Amy E. Bennett
LTC, MP, MDARNG
Deputy J3
Office: 410-702-9027
BB: 443-520-1092

-----Original Message-----
From: Barbour, Torrence D Capt USAF ANG 175 SFS/OPS [mailto:Torrence.Barbour@ang.af.mil]
Sent: Sunday, April 26, 2015 11:47 AM
To: Bennett, Amy E LTC USARMY NG MDARNG (US)
Subject: RE: Potential Triggers for NG Support to BPD

Ma'am

Can I forward this to LTC Hyatt for her review prior to the 1300 dial-in?

CPT Barbour

---

From: Bennett, Amy E LTC USARMY NG MDARNG (US) [amy.e.bennett3.mil@mail.mil]
Sent: Sunday, April 26, 2015 10:24 AM
To: Casey, Sean M COL USARMY (US); Blair, Andrew T COL USARMY (US); Zimmerman, Charles D COL USARMY NG MDARNG (US); Cisar, Paul J CIV USARMY ATEC (US)
Cc: Brown, Eric C LTC USARMY (US); Barbour, Torrence D Capt USAF ANG 175 SFS/OPS; Bennett, Michael R LTC USARMY NG MDARNG (US); Kohler, Charles S COL USARMY NG MDARNG (US)
Subject: Potential Triggers for NG Support to BPD

Sir,

Per your directive, we assembled a small staff group to assess potential triggers for NG support to BPD.  As briefed to you, we have a 1300 dial-in with LtCol Hyatt of BPD for her input.  This will be an opportune time to validate or dispel our triggers.

Not in any particular order:

- Significant and/or multiple simultaneous events in the city that will draw large crowds and national attention (ie, O's game, conventions, races, etc). Crowd size is a factor but the driving factor here is how do these events affect BPD overtime (how much of their force will be engaged or exhausted)
    * Antagonist TTP from this weekend is that they CAN shut down parts of the city with even a small crowd with bad intentions
        - shut down I-83 south of the beltway into the city even though protests didn't reach that part of the city
        - shut down the light rail
        - delayed (real or perceived) release of crowd in Camden Yards

- National events that may have secondary events affecting Baltimore (ie, another Ferguson-like event somewhere else triggering solidarity protests in Baltimore)

- Known events or information release dates that may trigger public response (press conferences, investigation results announcements, indictment decision announcements, etc)

- Presence of/participation in city events by known activist and/or antagonist groups or people that draw/mobilize large crowds (New Black Panther Party, International Black Lawyers for Justice - Malik Shabazz, Rev Al Sharpton, Jesse Jackson, etc)

- BPD logistics shortfall support that either cannot or will not be provided by other state agencies or contracted.  Top priorities are transportation (to move police) and jersey barriers.
    * NG support for transportation - bus or LMTV, drivers, fuel, sustainment for drivers
    * NG support for jersey barriers - Air Guard has this capacity/barriers on the base (not sure how many) and have forklifts. Army may need to provide the drivers and haul/flatbed capability to move the barriers.  Considerations - forklifts on both ends (airbase and destination), fuel, sustainment for drivers

- BPD has a finite amount of civil disturbance/riot gear (how much serviceable and on hand?).  May need NG in riot gear to reinforce the BPD front line.
    * NG will NOT sign our gear over to BPD in case we need it for our own force protection
    * What other state or LEAs have the capability to provide support for CD/riot with gear?

- At what point does BPD exhaust their own capability to sustain extended operations/OPTEMPO?  72-96 hours
    * What is the capacity of the supporting counties/LEAs and MSP to provide support?

Amy E. Bennett
LTC, MP, MDARNG
Deputy J3
Office: 410-702-9027

**CONFIDENTIAL - Produced Pursuant to Protective Order**

BB: 443-520-1092

**CONFIDENTIAL - Produced Pursuant to Protective Order**

**CITY00011635**