**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| | * | |
| **CHAE BROTHERS LIMITED** | * | |
| **LIABILITY COMPANY**, *et al.*, | * | |
| | * | |
| **Plaintiffs,** | * | |
| **v.** | * | **Civil Case No. 1:17-cv-01657-SAG** |
| | * | |
| **MAYOR & CITY COUNCIL OF** | * | |
| **BALTIMORE**, *et al.*, | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## <u>MEMORANDUM OPINION</u>

Plaintiff Chae Brothers Limited Liability Company, along with a group of 67 other plaintiffs (collectively "Plaintiffs"), filed an Amended Complaint alleging, *inter alia*, that Defendant Mayor and City Council of Baltimore (the "City"[1] or "Defendant") is liable to the Plaintiffs under Maryland's Riot Act (the "Riot Act"). Plaintiffs, consisting primarily of small businesses, small business owners, and property owners in Baltimore City, seek to recover for damages suffered during the civil unrest that occurred after the arrest and subsequent death of Freddie Gray in April, 2015.[2] Discovery is now concluded, and the Defendant has filed a Motion

---

[1] References to "the City" are meant to include City government officials working for the Mayor and City Council of Baltimore.

[2] A group of 65 plaintiffs filed a 264-count initial complaint in the Circuit Court for Baltimore City against the Mayor and City Council of Baltimore, the City of Baltimore, the Baltimore City Police Department, former Baltimore City Mayor Stephanie Rawlings-Blake, former Baltimore City Police Commissioner Anthony Batts, and the State of Maryland. ECF 2. On June 19, 2017, the case was removed to this Court. ECF 1. Each of the defendants moved to dismiss. ECF 27, 33, 34. On March 30, 2018, the Court dismissed all defendants except for the Mayor and City Council of Baltimore, and it dismissed all counts other than the Riot Act claims. ECF 55. On April 27, 2018, the Plaintiffs filed an Amended Complaint, ECF 65, to add three plaintiffs, but the parties agreed, ECF 63, and the Court ordered, ECF 64, that all Plaintiffs would be bound by the Court's

for Summary Judgment (the "Motion").  ECF 123.  The Motion argues that the Court should grant summary judgment in the Defendant's favor and that, if the Court denies the Motion, it should hold that the Local Government Tort Claims Act ("LGTCA") caps the damages available to the Plaintiffs.  ECF 123.  The Court has reviewed the Motion, the Plaintiffs' opposition, ECF 126, and the Defendant's reply, ECF 127, along with the accompanying exhibits.  No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2021).  For the reasons that follow, the Defendant's Motion will be denied.

## I.      FACTUAL BACKGROUND

The facts described herein are viewed in the light most favorable to the Plaintiffs as the non-moving parties.

### A.  April 12-19, 2015: Freddie Gray Is Arrested, Dies from His Injuries, and Protests Begin

On April 12, 2015, Freddie Gray was arrested by the Baltimore City Police Department ("BPD") and sustained serious injuries while in BPD custody.  ECF 123-1 at 3; ECF 126 at 6.  In the days after Mr. Gray's arrest, both the BPD and the City were concerned that the arrest and Mr. Gray's corresponding injuries could trigger civil unrest.  ECF 126-2 at 401:7-25 (Anthony Batts Dep., Mar. 12, 2021); *id.* at 219:3-17 (Robert Maloney Dep., Dec. 18, 2020); *id.* at 307:1-9 (David McMillan Dep., Jan. 15, 2021).  The BPD and the City worked together to plan for potential protests, *id.* at 308:1-18 (McMillan Dep.), which in fact began on April 18, 2015 in front of the BPD's Western District police station.  ECF 123-1 at 3.  Mr. Gray died the following day.  *Id.*; ECF 126 at 7.

---

March 30, 2018 Memorandum Opinion and that only the Plaintiffs' Riot Act claims against the Mayor and City Council of Baltimore would remain.

Both the City and the BPD knew that Mr. Gray's death could cause the protests to escalate. ECF 126-2 at 28:4-7 (Stephanie Rawlings-Blake Dep., Jan. 29, 2021); *id.* at 758 (Apr. 19, 2021 email from Gussener Augustus to Commissioner Batts copying Kevin Harris, the Mayor's Chief of Public Affairs).  In the hours after Mr. Gray's death, the BPD informed the City that there was "talk of a riot in East Baltimore maybe taking place by noon."  *Id.* at 758 (Apr. 19, 2021 email from Gussener Augustus to Commissioner Batts copying Kevin Harris).  Faced with the possibility of escalating protests, the BPD informed the City that it might need additional resources to respond adequately.  *Id.* at 29:20-30:4 (Rawlings-Blake Dep.).  In particular, the City was aware that the BPD would need to make mutual aid requests to call in additional officers from jurisdictions outside Baltimore City to assist the BPD in responding to the protests, *id.*, and the BPD began making such requests shortly after Mr. Gray's death.  *See, e.g.*, *id.* at 760 (Apr. 20, 2015 Mem. from Commissioner Batts to the State Law Enforcement Coordinating Council requesting additional officers from the Maryland Transportation Authority Police Department).

As the protests escalated, the City coordinated with the BPD with respect to its engagement with protesters.  *Id.* at 54:24-55:18 (Rawlings-Blake Dep.).  The City instructed the BPD that it did not want the BPD's response to appear "overly aggressive[,]" *id.*, and that the BPD should prioritize protecting the protesters and their First Amendment rights.  *Id.*  Consistent with those priorities, officers were ordered not to wear certain protective gear.  *Id.* at 486:2-17 (Melissa Hyatt Dep., Dec. 2, 2020).

### B.  April 22-24, 2015: Protests Escalate

Protests escalated further between April 22, 2015 and April 24, 2015.  *See, e.g.*, *id.* at 775 (Apr. 22, 2015 email from Connor Scott, Deputy Director of the Mayor's Office of Emergency Management ("MOEM") to Robert Maloney, the City's Emergency Manager in the MOEM, and

David McMillan, Deputy Director of Planning and Preparedness in the MOEM); *id.* at 779 (Apr. 23, 2015 email chain between Connor Scott and Robert Maloney); *id.* at 781 (Apr. 23, 2015 email chain between Robert Maloney, Niles Ford, Jeffrey Segal, and Mark Wagner). The City continued to monitor the escalating protests and the BPD's response to them. *Id.*

Between April 22nd and April 24th, the City also monitored the BPD's need for additional resources. *See, e.g.*, *id.* at 777 (Apr. 22, 2015 email chain regarding a BPD request for possible access to plywood). The City knew, for example, that that the BPD had cancelled officers' leave for April 25th, *id.* at 36:16-21 (Rawlings-Blake Dep.), and it monitored the BPD's efforts to recruit additional officers from law enforcement agencies throughout the State. *See id.* at 798 (Apr. 25, 2015 email chain between City and BPD leadership regarding BPD's mutual aid requests). The City was also aware the BPD was having trouble securing the mutual aid that it was requesting, *id.* at 111:4-12 (Kaliope Parthemos Dep., Jan. 12, 2021), and that the BPD's mutual aid requests were not guaranteed to work, because the requested jurisdictions could decline to provide any mutual aid. *Id.* at 40:12-19 (Rawlings-Blake Dep.).

As protests continued to escalate, the BPD shared intelligence with the City indicating that the protests on April 25th would be large and that the BPD was expecting "agitators"—individuals who intended to be "disruptive," "violent," and "destructive"—to participate. *Id.* at 33:5-34:17. In the lead-up to the April 25th protests, the City remained focused on ensuring that the BPD not "silenc[e]" protesters or "interfere[e] with their First Amendment rights." *Id.* at 58:2-12. The City was also aware of the BPD's plans for how it would engage with the protesters on April 25th. *Id.* at 35:21-36:25. Those plans included an instruction to BPD officers that "[a]rrest is not a preferred function during this operation." *Id.* at 919 (Apr. 24, 2015 Mem. from Lieutenant Colonel Melissa Hyatt to Commissioner Batts Regarding "Protests Apr. 25, 2015").

### C.  April 25, 2015: Protests Turn Violent and Destructive

As both the City and the BPD anticipated, the protests on April 25th turned destructive. *See, e.g.*, *id.* at 929 (Apr. 25, 2015 email from David McMillan to Robert Maloney and Connor Scott explaining that: "some windows have been broken on cars/store fronts.  BPD is monitoring but not engaging substantially in any way that would agitate."); *id.* at 936 (Apr. 25, 2015 email from Renee Gordon to Jerome Mullen: "Protesters have broken out business windows. They tried to set a police car on fire.  Vehicle windows were busted out and they tried to turn police vehicle over.  I have employees holding in place here until we can determine it is safe for them to leave."). Protesters also initiated violent confrontations with the BPD.  *Id.* at 934 (Apr. 25, 2015 email from Drew Vetter discussing objects thrown at police).  Nonetheless, BPD officers were instructed not to engage with the protesters.  *See id.* at 941 (recordings of dispatcher calls).  Throughout the protests, City leadership coordinated with the BPD to monitor its officers' engagement with protesters.  *Id.* at 911 (Apr. 24, 2015 email from Robert Maloney to David McMillan regarding efforts to coordinate with BPD on its response to the protests); *id.* at 931 (Apr. 25, 2015 email from David McMillan to Robert Maloney referring to the City's "mission" that officers were not to engage with protesters).

The following day, the BPD and the City acknowledged that their coordinated approach to the protests focused on avoiding confrontation and engagement with the protesters.  Commissioner Batts wrote that: "[B]ecause this was a protest against the Baltimore Police Department.  We couldn't be seen as the aggressors or instigators, as such we needed to give them space."  *Id.* at 956 (Apr. 26, 2015 email from Commissioner Batts).  And although the City would eventually try to walk back the statement, the Mayor said:

> I've made it very clear that I work with the police and instructed them to do everything that they could to make sure that the protesters were able to exercise

their right to free speech.  It's a very delicate balancing act, because, while we tried
to make sure that they were protected from the cars and the other things that were
going on, we also gave those who wished to destroy space to do that as well.

*Id.* at 914 (City's Statement Regarding Mayor's Comments on the Rights of Protesters).

### D.  April 25-27, 2015: The City and the BPD Prepare for Another Escalation

Between April 25, 2015 and April 27, 2015, the BPD continued to make mutual aid

requests in an effort to call in additional officers.  *Id.* at 109:19-25 (Parthemos Dep.).  Despite the

unrest on April 25th, the City had not yet declared a state of emergency, which would have allowed

it to exercise its authority under various inter- and intra-state agreements to request additional

officers from jurisdictions outside Baltimore City.  *See, e.g.*, *id.* at 1200 (Baltimore Region

Emergency Assistance Compact, requiring a state of emergency before making a request under the

compact).  Unlike the mutual aid requests that the BPD was making to other police departments,

which left the decision whether to provide any aid entirely up to the discretion of the requested

department, *id.* at 40:12-19 (Rawlings-Blake Dep.), the agreements under which the City could

have requested additional officers in a state of emergency *require* participating jurisdictions to

provide the requested resources (with some limitations to preserve the safety of the requested

jurisdiction).  Md. Code, Pub. Safety § 14-702(4) ("[a]ny party state requested to render mutual

aid or conduct exercises and training for mutual aid *shall* take such action as is necessary to provide

and make available the resources covered by this compact[.]") (emphasis added); ECF 126-2 at

1200-01 (Baltimore Region Emergency Assistance Compact, which states: "Any jurisdiction

which is a party to this compact and that receives a request for assistance *shall* take such actions

as are necessary to provide requested resources.") (emphasis added).  The City also had not yet

activated its Emergency Operations Center ("EOC") which directs, coordinates, and manages City

resources during emergencies.  ECF 126-2 at 1352 (Apr. 27, 2015 email showing that the Mayor did not approve activation of the EOC until 4:40 PM on April 27th).

Both the BPD and the City were aware that the protests could continue on Monday, April 27th, especially since Mr. Gray's funeral was scheduled for that day.  As the former Mayor testified, "Saturday was so fresh in everyone's mind . . . everyone was feeling like . . . something could happen anywhere at any time and that this very emotional event of the funeral was coming up."  *Id.* at 64:13-21 (Rawlings-Blake Dep.).  In anticipation of additional protests on April 27th, the BPD cancelled leave for its officers.  *Id.* at 1231 (Apr. 24, 2015 email among BPD leadership cancelling leave on April 27th "Due to the funeral arrangements for Freddie Gray on Monday[.]").  The BPD and the City were also aware of reports of a "purge" scheduled to take place that day near Mondawmin Mall.  *Id.* at 1238 (Apr. 27, 2015 email with City and BPD officials discussing the potential "purge"); *id.* at 172:6-16 (Robinson Dep.).  Moreover, the BPD had received reports that several gangs had entered into partnerships to "take-out" law enforcement officers.  *Id.* at 1240 (Apr. 27, 2015 "Credible Threat to Law Enforcement").

### E.  April 27, 2015: Protests Lead to Widespread Violence and Property Damage

Protests began on April 27th in the early afternoon near Mondawmin Mall and quickly turned violent.  *Id.* at 1272 (MOEM Timeline of Events).  By 2:45 PM, a school police officer reported that protesters were "throwing rocks and bricks."  *Id.*  Throughout the afternoon, evening, and into the early morning of April 28th, protesters spread throughout the City, resulting in violent confrontations with police, some injuries to civilians, and widespread damage to property, including the Plaintiffs' businesses and properties.  *See generally id.*; *id.* at 1367-1466 (Declarations of Plaintiffs).  At 4:00 PM, the Mayor activated the EOC, effective at 5:00 PM.  *Id.* at 1275 (MOEM Timeline of Events).  At 6:30 PM, the Mayor signed and issued an executive

order declaring a state of emergency. *Id.* at 1281. Just after 7:00 PM, Governor Larry Hogan signed and issued an executive order declaring a state of emergency and authorizing the deployment of the Maryland National Guard to assist the BPD. *Id.* at 1284. Shortly before 8:00 PM, the Mayor announced a citywide curfew between 10:00 PM and 5:00 AM that would begin the following day and would last one week. *Id.* at 1288. And just before midnight, Commissioner Batts announced that National Guard troops had begun to arrive in the City, and the Mayor held a press conference asking the public not to riot and to "stop the violence." *Id.* at 1302. The Mayor would later acknowledge that the local and state declarations of emergency, the assistance of the National Guard and law enforcement officers from other jurisdictions, and the citywide curfew were critical in helping to suppress unrest, prevent loss of life, and limit further property damage. *Id.* at 1468-71 (May 22, 2015 letter from Mayor Rawlings-Blake to Governor Hogan).

## II.     LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of showing that there is no genuine dispute of material facts. *See Casey v. Geek Squad*, 823 F. Supp. 2d 334, 348 (D. Md. 2011) (citing *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987)). If the moving party establishes that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to proffer specific facts to show a genuine issue exists for trial. *Id.* The non-moving party must provide enough admissible evidence to "carry the burden of proof in [its] claim at trial." *Id.* at 349 (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315-16 (4th Cir. 1993)). The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which

8

the jury could reasonably find in its favor. *Id.* at 348 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)). Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another." *Id.* at 349 (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)).

Additionally, summary judgment shall be warranted if the non-moving party fails to provide evidence that establishes an essential element of the case. *Id.* at 352. The non-moving party "must produce competent evidence on each element of [its] claim." *Id.* at 348-49 (quoting *Miskin*, 107 F. Supp. 2d at 671). If the non-moving party fails to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial." *Id.* at 352 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Coleman v. United States*, 369 Fed. App'x 459, 461 (4th Cir. 2010) (unpublished)). In ruling on a motion for summary judgment, a court must view all of the facts, including reasonable inferences to be drawn from them, "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

## III.   ANALYSIS

Defendant seeks summary judgment on the Plaintiffs' Riot Act claims but argues that, if the Court denies the Motion, it should hold that the LGTCA caps the Plaintiffs' damages. Because the Court will deny the Motion, each issue will be addressed in turn.

### A.  Riot Act

Maryland's Riot Act provides that "if a structure or personal property is stolen, damaged, or destroyed in a riot, the injured party may recover actual damages sustained in a civil action against the county or municipal corporation of the State in which the riot occurred." Md. Code

Ann., Pub. Safety § 14-1001(b).  However, the county or municipal corporation is not liable unless it:

> (1) had good reason to believe that the riot was about to take place or, having taken place, had notice of the riot in time to prevent the theft, damage, or destruction; and

> (2) had the ability, either by use of the county's or municipal corporation's police or with the aid of the residents of the county or municipal corporation, to prevent the theft, damage, or destruction.

*Id.* at § 14-1002(a).  Moreover, a plaintiff may not prevail under the Riot Act if the county or municipal corporation, "used reasonable diligence and all the powers entrusted to them to prevent or suppress the riot."  *Id.* at § 14-1002(b).  Because the City has moved for summary judgment, it bears the burden to show that the Plaintiffs have not produced sufficient evidence to raise a genuine dispute of material fact about whether the City may be held liable under the Riot Act.  Viewing the facts, as this Court must, in the light most favorable to the Plaintiffs, the City has not met its burden.[3]

### i. Notice

The City argues that Plaintiffs have not raised a factual dispute as to whether the City "had good reason to believe" that the rioting on April 27, 2015 "was about to take place or, having taken place, had notice of the riot in time to prevent the theft, damage, or destruction."  Md. Code Ann.,

---

[3] The City argues in its reply brief that some of the evidence on which the Plaintiffs rely is inadmissible.  ECF 127 at 2-6.  The City is correct that "on a motion for summary judgment, the court may only consider evidence that is admissible." *Major v. CSX Transp.*, 278 F. Supp. 2d 597, 604 (D. Md. 2003).  But the City only contests a small fraction of the evidence on which the Plaintiffs rely: (1) portions of the deposition testimony offered by Lieutenant Gene Ryan, Lieutenant Kenneth Butler, Detective Sergeant Michael Mancuso, and Sheriff Michael Lewis, and (2) excerpts of Governor Larry Hogan's book and the Governor's affidavit swearing to the truth of those excerpts.  ECF 127 at 2-6.  While the Court declines to make any specific evidentiary rulings at this stage, even assuming the City is correct that the evidence it contests is inadmissible, Plaintiffs' remaining evidence is sufficient to create a genuine issue of material fact as to their claims.  This Court did not rely upon the disputed evidence in this Memorandum Opinion.

Pub. Safety § 14-1002(a).  First, the City argues that the Plaintiffs' damages were not caused in a riot at all, but rather by "individuals opportunistically taking advantage of unrest in order to commit crimes and property destruction."  ECF 123-1 at 19.  As Plaintiffs point out, however, the City's attempt to distinguish between individuals who were rioting and individuals who were "opportunistically taking advantage of unrest" is a distinction without a difference.  The Riot Act only requires plaintiffs to show that their damages occurred "in a riot[,]" and the Plaintiffs here have offered evidence to support their contention that they were.  Md. Code Ann., Pub. Safety § 14-1001(b).  The declarations signed by the Plaintiffs state that their businesses and properties were damaged on either the evening of April 27, 2015 or the early morning of April 28, 2015 during the unrest that stemmed from protests in response to Freddie Gray's arrest and subsequent death.  ECF 126-2 at 1367-1466 (Declarations of Plaintiffs).  Aside from characterizing the individuals who caused the Plaintiffs' damages as "opportunistic," the City does not meaningfully contest those declarations or the Plaintiffs' contention that rioting occurred in Baltimore City from April 27-28, 2015.  Moreover, Plaintiffs rely on statements from City leadership, and documents created by the City itself, characterizing the civil unrest on April 27, 2015 as a "riot."  *See, e.g.*, *id.* at 242:12 (Maloney Dep. referring generally to "the riots"); *id.* at 1266 (document entitled "Timeline of Events Baltimore City Protest & Riots").  The Plaintiffs, therefore, have raised a factual dispute, best left to the jury, as to whether their damages were caused "in a riot."

Second, the City argues it was not on notice that any rioting would occur on April 27, 2015. ECF 123-1 at 19.  But the Plaintiffs have provided evidence that: between April 18th and April 25th, protests in response to Freddie Gray's death had, at times, turned violent and destructive, *see supra* Factual Background § I(A)-(C); that the City was preparing for, and expecting, larger and more volatile protests throughout the City on April 27th, the day of Freddie Gray's funeral, *see*

*supra* Factual Background § I(D); and that the City and the BPD had received credible intelligence suggesting that those protests could turn violent, *id.*  On those facts, a jury could reasonably decide that the City "had good reason to believe" that rioting would occur on April 27th.[4]

### ii. Ability to Prevent the Plaintiffs' Damages

Neither party's brief explicitly addresses the second element of a Riot Act claim, which requires the plaintiff to prove that the county or municipal corporation, "had the ability, either by use of the county's or municipal corporation's police or with the aid of the residents of the county or municipal corporation, to prevent the theft, damage, or destruction."  Md. Code Ann., Pub. Safety § 14-1002(a)(2).  Instead, the parties conflate this element with the question of whether the City acted with reasonable diligence.  The City implicitly suggests that because it acted reasonably it, therefore, did not have the ability to prevent the Plaintiffs' damages.  While the question whether the City had the ability to prevent the Plaintiffs' damages is different from the question whether it acted with "reasonable diligence and all the powers entrusted to them to prevent or suppress the riot[,]" the same evidence compels the Court's conclusion that the Plaintiffs have raised a genuine dispute of material fact on both questions.  That evidence is described below.

_____

[4] The City argues that there was not one large riot on April 27th but, instead, many small riots and that, therefore, the City could not have been on notice of each individual riot.  ECF 123-1 at 20. In their Amended Complaint, the Plaintiffs also characterize their damages as the result of "multiple" riots.  ECF 65 ¶ 78.  With respect to the City's notice, however, the distinction is immaterial.  Plaintiffs have offered evidence to support its theory that the City anticipated that protests on April 27, 2015, in response to Freddie Gray's death, might turn violent and destructive. Whether those protests spawned one large riot or several smaller riots has no bearing on whether the City "had good reason to believe" that a riot (or several) might ensue.  The City also suggests that, even if it was aware of the possibility of a riot near Mondawmin Mall since it had seen a flyer advertising a "purge" in that location, it could not have been on notice of rioting in other parts of the City.  ECF 123-1 at 21-23.  As explained above, though, the Plaintiffs' evidence is not limited to that flyer, and their evidence, viewed as a whole, is sufficient to raise a genuine dispute of material fact about whether the City "had good reason to believe" that there would be rioting throughout the City on April 27, 2015.

### iii.   Reasonable Diligence

The Riot Act precludes a finding of liability against a defendant county or municipal corporation if the defendant "used reasonable diligence and all the powers entrusted to them to prevent or suppress the riot." Md. Code Ann., Pub. Safety § 14-1002(b). This limitation, therefore, raises two questions: first, whether the defendant used "reasonable diligence," and, second, whether the defendant used "all the powers entrusted to them to prevent or suppress the riot." *Id.* Here, there are genuine disputes of material fact on both questions.

Plaintiffs have adduced the following relevant evidence. Once Freddie Gray died, the City anticipated that rioting might occur. ECF 126-2 at 28:4-7 (Rawlings-Blake Dep., Jan. 29, 2021); *id.* at 758 (Apr. 19, 2021 email from Gussener Augustus to Commissioner Batts copying Kevin Harris, the Mayor's Chief of Public Affairs). Despite that concern, the City closely monitored the BPD's response to the protesters to ensure that the officers did not appear overly aggressive. *Id.* at 54:24-55:18 (Rawlings-Blake Dep.). The City knew that the BPD was understaffed, and that it was making, with little success, mutual aid requests to attempt to call in additional officers and resources. *Id.* at 798 (Apr. 25, 2015 email chain between City and BPD leadership regarding BPD's mutual aid requests); *id.* at 111:4-12 (Parthemos Dep., Jan. 12, 2021). The City knew that the protests on April 25th turned from peaceful to violent and destructive. *See, e.g.*, *id.* at 929 (Apr. 25, 2015 email from David McMillan to Robert Maloney and Connor Scott describing some of the damage). Nonetheless, the City coordinated with the BPD to ensure that, to the greatest extent possible, the BPD did not engage with protesters. *Id.* at 911 (Apr. 24, 2015 email from Robert Maloney to David McMillan regarding efforts to coordinate with BPD on its response to the protests); *id.* at 931 (Apr. 25, 2015 email from David McMillan to Robert Maloney referring to the City's "mission" that officers were not to engage with protesters). After the April 25th

13

protests, the Mayor initially admitted that the City "gave those who wished to destroy space to do that[.]"  *Id.* at 914 (City's Statement Regarding Mayor's Comments on the Rights of Protesters). The City anticipated that protesting on April 27th—the day of Freddie Gray's funeral—might again turn violent and destructive.  *Id.* at 1238 (Apr. 27, 2015 email with City and BPD officials discussing the potential "purge"); *id.* at 172:6-16 (Robinson Dep.).  As predicted, the protests on April 27th did, in fact, lead to violence and property damage.  *Id.* at 1272 (MOEM Timeline of Events).  The City did not declare a state of emergency, which would have allowed it to assist the BPD in obtaining additional police resources, until several hours after rioting had begun on April 27th.  *Id.* at 1281.  Finally, the City did not announce a curfew until several hours after rioting began, and that curfew did not go into effect until 10:00 PM the following day.  *Id.* at 1302.

To be sure, the City argues that it did everything it could to quell the unrest and to assist the BPD in limiting the violence and property damage that resulted.  The City argues that Plaintiffs' suggested responses either would have made no difference in preventing or suppressing the riot, or, in some cases, would have made matters worse.  ECF 123-1 at 23-31.  The City relies on *City of Baltimore v. Silver*, which it cites for the proposition that the Riot Act only requires the City to use "reasonable means" to quell unrest.  263 Md. 439, 453 (1971).  But the *Silver* case undermines, rather than strengthens, the City's position that summary judgment is warranted.  In *Silver*, the Maryland Court of Appeals affirmed the denial of the City's motion for summary judgment and held that, "it is for the trier or triers of facts to determine just what action the City could or should have taken, if any, in the exercise of 'reasonable diligence' to prevent or contain the situation." *Silver*, 263 Md. at 459.  That holding comports with the general rule that "reasonableness is a question of fact for the trier to determine based on all of the circumstances." *Toll Bros. v. Dryvit*

14

*Sys.*, 432 F.3d 564, 571 (4th Cir. 2005) (quoting *Williams Ford, Inc. v. Hartford Courant Co.*, 232 Conn. 559, 580 (1995)).

The City accuses the Plaintiffs, with the benefit of hindsight, of "Monday morning quarterbacking" the City's and the BPD's response to the unrest.  ECF 127 at 9-10.  It focuses on the overall reasonableness of its strategy, noting that, in comparison with other jurisdictions facing unrest following police-involved civilian deaths, Baltimore's unrest spanned a shorter duration and resulted in no loss of life.  ECF 123-1 at 3.  This Court is not charged with second-guessing the actions of the BPD or the City during an unprecedented time in the City's recent history.  The question the Riot Act poses, however, is not one of overall reasonableness or of good policy, but one of actions taken to prevent "theft, damage, or destruction."  Md. Code Ann., Pub. Safety § 14-1002(a).  The City may ultimately be right that it acted reasonably as a matter of overall policy and prioritization, and a reasonable juror could certainly agree.  However, a reasonable juror could also (and perhaps simultaneously) conclude that the City remains liable for the ensuing property damage arguably attributable to the "trade-off" between more traditional anti-riot measures and the City's policy decisions in April of 2015.  Regardless, at this stage, the Plaintiffs have produced enough evidence to allow a reasonable jury to find that the City's response fell short of its obligation to act with "reasonable diligence and all the powers entrusted to [it]."  *Id.* at § 14-1002(b).

The City also argues that the Plaintiffs are attempting to hold it liable for the actions of the BPD, which, according to the City, is improper because the BPD is not a City agency.  ECF 132-1 at 26-27; ECF 127 at 8-9.  The City is correct that the BPD is not a City agency, but it mischaracterizes the Plaintiffs' arguments.  Plaintiffs do not attempt to hold the City liable for the

BPD's actions, they attempt to hold the City liable for *the City's* actions or inactions. The *Silver* court expressly rejected the City's attempt to make this same argument:

> [A]lthough the City of Baltimore had no authority over the police department we think that among the various courses of action that the Mayor might have taken, and perhaps did take, was to have conferred with the police commissioner and made requests for specific kinds of police action. . . . [T]he question as to whether such action was taken, or whether other action was taken by the Mayor in his capacity as a conservator of the peace, as well as the practical effect of such action, may well be questions which should be determined by the trier of facts at a hearing on the merits of the case. . . . [F]ailure to have control over a municipal police force does not excuse a municipality from endeavoring to suppress or contain riots or tumultuous actions by using other reasonable means available.

*Silver*, 263 Md. at 452-53. Accordingly, the City's Motion must be denied.

## B. Local Government Tort Claims Act

In the alternative, the City asks this Court, for the third time, to apply the LGTCA to cap the damages available to the Plaintiffs. More than three years ago, the City moved for a declaratory judgment asking for the same relief. ECF 58. When that motion was denied, ECF 88, the City moved for reconsideration, ECF 91, which was also denied. ECF 96. The City now asks this Court to consider the issue pursuant to its authority under Federal Rule of Civil Procedure 60(b)(6).[5] ECF 127 at 15.

Rule 60(b)(6) allows the Court to provide relief "from a final judgment, order, or proceeding" for "any . . . reason that justifies relief." Fed. R. Civ. P. 60(b)(6). However, "[t]he remedy afforded by Rule 60(b) is an 'extraordinary one' that is 'only to be invoked upon a showing of exceptional circumstances.'" *K.C. v. Shipman*, 716 F.3d 107, 117 n.3 (4th Cir. 2013) (quoting *Compton v. Alton S.S. Co.*, 608 F.2d 96, 102 (4th Cir. 1979)). "The exceptional circumstances

---

[5] Alternatively, the City asks the Court to consider the question "as an issue on summary judgment." ECF 127 at 16. The Court is not inclined to reconsider an issue that has already been litigated and decided (twice) under the Declaratory Judgment Act as part of the City's Motion for Summary Judgment. Regardless, for the reasons explained in the Court's previous two opinions on this issue, ECF 87, 96, this Court would deny the City's motion.

requirement helps balance the 'sanctity of final judgments' with the court's responsibility to ensure justice is done." *SEC v. Tsao*, 317 F.R.D. 31, 36 (D. Md. 2016) (quoting *Compton*, 608 F.2d at 102). Additionally, "[a] motion under Rule 60(b) must be made within a reasonable time[.]" Fed. R. Civ. P. 60(c).

The City has not met either the procedural or the substantive requirements of Rule 60(b). First, the City waited nearly two and a half years from the Court's denial of its motion for reconsideration to move for relief under Rule 60(b)(6). The City offers no justification for that delay, and, accordingly, the Court finds it to be unreasonable. *See Al-Sabah v. Agbodjogbe*, No. SAG-17-730, 2020 WL 7351603, at *1 n.4 (D. Md. Dec. 14, 2020) (denying a Rule 60(b) motion on substantive grounds but finding the movant's nine-month delay to be "much more than necessary" where "all relevant facts were known at or shortly after" the time the judgment was issued). Second, the City has offered no "exceptional circumstances" that justify relief and instead merely attempts to relitigate this issue by way of a Rule 60(b) motion. The Court has reviewed the parties' briefing on this issue, ECF 58, 73, 78, 91, 92, 95, and the Court's prior decisions on it, ECF 87, 96, and finds no "exceptional circumstances" to upset those decisions.

## IV.    CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment, ECF 123, will be DENIED. A separate order follows.


Dated: August 26, 2021                                    _____/s/_____
                                                          Stephanie A. Gallagher
                                                          United States District Judge